UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 FEB -8  P 3: 23

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-11614-WGY |
| VESTMONT LIMITED PARTNERSHIP, VESTMONT LIMITED PARTNERSHIP II, VESTMONT LIMITED PARTNERSHIP III, and VESTERRA CORPORATION d/b/a MONTGOMERY SQUARE PARTNERSHIP, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## AFFIDAVIT OF BRIAN A. DAVIS
## IN SUPPORT OF PLAINTIFF
## JOHN HANCOCK LIFE INSURANCE COMPANY'S
## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
## PROHIBITING DEFENDANTS FROM DISPOSING OF CERTAIN ASSETS

I, Brian A. Davis, hereby state under oath:

1.      I am a partner, through my professional corporation, in the law firm of Choate,

Hall & Stewart LLP in Boston, Massachusetts. I serve as counsel for plaintiff John Hancock Life

Insurance Company ("John Hancock" or "Hancock") in this action.  I submit this affidavit in

support of John Hancock's Motion for Preliminary Injunctive Relief Prohibiting Defendants from

Disposing of Certain Assets, which is filed herewith (the "Motion").

2.     On January 18, 2006, I deposed James R. Koller in this action.  Mr. Koller is an attorney and one of the three principals in defendant Montgomery Square Partnership and its general partner, Vesterra Corporation (collectively, "Montgomery Partners").  Attached to this Affidavit at Tab 1 are various true and correct excerpts from the official written transcript of Mr. Koller's deposition.

3.     Attached to this Affidavit at Tab 2 is a true and correct copy of a brief description of Montgomery Partners' principals, which was marked as Exhibit 1 at Mr. Koller's deposition.

4.     Attached to this Affidavit at Tab 3 is a true and correct copy of a document describing various Representative Projects of the Defendants, which was marked as Exhibit 2 at Mr. Koller's deposition.

5.     Attached to this Affidavit at Tab 4 is a true and correct copy of the Loan Commitment between John Hancock and Montgomery Partners, which was marked as Exhibit 8 at Mr. Koller's deposition.

6.     Attached to this Affidavit at Tab 5 is a true and correct copy of an e-mail message sent by Mr. John Ferrie of John Hancock to Messrs. Joseph Kelly and James Koller of Montgomery Partners, dated June 6, 2005, which was marked as Exhibit 11 at Mr. Koller's deposition.

7.     Attached to this Affidavit at Tab 6 is a true and correct copy of a letter sent from Mr. James Koller to Thomas C. Rogers, Esq., John Hancock's outside real estate counsel, dated June 20, 2005, which was marked as Exhibit 14 at Mr. Koller's deposition.

8.     Attached to this Affidavit at Tab 7 is a true and correct copy of the Defendants'
Answer and Counterclaim, which was marked as Exhibit 21 at Mr. Koller's deposition.

9.     Attached to this Affidavit at Tab 8 is a true and correct copy of John Hancock's
sworn Response to Defendants' First Set of Interrogatories in this action, dated January 4,
2006.

10.    Since late 2005, I have attempted, on behalf of John Hancock, to negotiate a
voluntary agreement with Montgomery Partners that will ensure that Montgomery Partners
retains sufficient assets after the planned sale of the Avenel Apartments to pay any judgment
entered in this action.  Montgomery Partners, through its counsel, has refused to enter into
such an agreement.

Signed under the pains and penalties of perjury this 8th day of February, 2006.

Brian A. Davis

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served by hand, or by electronic and
regular mail, upon counsel for each other party on February 8, 2006.

Brian A. Davis

4041282.1

-3-

1       IN THE UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2
3   JOHN HANCOCK LIFE            :    CIVIL ACTION
    INSURANCE COMPANY,          :
4      Plaintiff/Counterclaim:
       Defendant               :
5                               :           ORIGINAL
           vs.                  :
6                               :
    VESTMONT LIMITED            :
7   PARTNERSHIP, VESTMONT       :
    LIMITED PARTNERSHIP II,     :
8   VESTMONT LIMITED            :
    PARTNERSHIP III, and        :
9   VESTERRA CORPORATION        :
    d/b/a MONTGOMERY SQUARE     :
10  PARTNERSHIP,                :
       Defendants/Counter-      :   NO. 05-11614-
11     claim Plaintiffs         :      WGY
12
                 - - - - - -
13           January 18, 2006
                 - - - - - -
14
                Oral Deposition of JAMES R.
15  KOLLER, ESQ., held in the law offices of
    Morgan, Lewis & Bockius, LLP, 1701
16  Market Street, 9th Floor, Philadelphia,
    Pennsylvania 19103, beginning at
17  approximately 10:39 a.m., before Ann V.
    Kaufmann, a Registered Professional
18  Reporter, Certified Realtime Reporter,
    Approved Reporter of the U.S. District
19  Court, and a Notary Public of the
    Commonwealth of Pennsylvania.
20                   - - - - - -
21
22        ESQUIRE DEPOSITION SERVICES
         1600 John F. Kennedy Boulevard
23        Four Penn Center, 12th Floor
        Philadelphia, Pennsylvania   19103
24             (215) 988-9191

```
 1   APPEARANCES:
 2      CHOATE, HALL & STEWART, LLP
        BRIAN A. DAVIS, ESQUIRE
 3      bad@choate.com
        Two International Place
 4      Boston, MA   02110
        (617) 248-500
 5      Counsel for John Hancock Life
        Insurance Company
 6
 7      BUCHANAN INGERSOLL
        HOWARD D. SCHER, ESQUIRE
 8      scherhd@bipc.com
        Eleven Penn Center, 14th Floor
 9      1835 Market Street
        Philadelphia, PA   19103
10      (215) 665-3829
        Counsel for Vestmont Limited
11      Partnerships and Vesterra
        Corporation d/b/a Montgomery Square
12      Partnership
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                  EXAMINATION INDEX
 2
    JAMES R. KOLLER, ESQ.
 3
         BY MR. DAVIS . . . . . .        7
 4
 5                   EXHIBIT INDEX
 6                                              MAR
    Koller
 7
    1        Document entitled "Vesterra      21
 8           Corporation's Principals"
 9  2        Document entitled               26
             "Representative Projects,"
10           JH 00803
11  3        Letter, 6/18/04, to Avenel      48
             from Ferrie, with
12           handwriting, V1181 through
             V1188
13
    4        Letter, 6/15/04, to Kelly       70
14           from Campbell/Maguire,
             V1158 and V1159
15
    5        Letter, 7/2/04, to Kelly        72
16           from Maguire, V1160
17  6        Letter, 7/21/04, to Avenel      73
             from Ferrie, JH 00733
18           through JH 00737
19  7        Document entitled "Exhibit      75
             D, Rate Lock Confirmation"
20           8/2/04, JH 00925 and JH
             00926
21
    8        Document entitled               80
22           "Application to John
             Hancock Life Insurance
23           Company For A First
             Mortgage Loan," 7/30/04,
24           JH 00958 through JH 01028
```

```
 1              EXHIBIT  INDEX  (continued)
 2                                               MAR
        Koller
 3
        9      Letter, 9/2/04, to Russell       93
 4             from Rogers, JH 00517
               through JH 00521
 5
        10     E-mail, 5/31/05, to Roseen       103
 6             from Malik, JH 01211
               and JH 01212
 7
        11     E-mail, 6/7/05, to Ferrie        120
 8             from Koller, JH 00149
 9      12     E-mail, 6/9/05, to Malik         126
               from Ferrie, JH 01196
10
        13     Letter, 6/9/04, to Koller        131
11             from Rogers, JH 00486 and
               JH 00487
12
        14     Letter, 6/20/05, to Rogers       133
13             from Koller, JH 00482
14      15     Letter, 7/8/04, to Koller        140
               from Rogers, JH 00475
15             through JH 00481
16      16     Letter, 7/15/05, to Rogers       145
               from Koller, V0120
17
        17     Handwritten notes, V1175         149
18             through V1178
19      18     Letter, 7/29/05, to Rogers       164
               from Greenspan, JH 00470
20             and JH 00471
21      19     Third Amendment to Purchase      171
               and Sale Contract, JH 00524
22             through JH 00637
23      20     Fourth Amendment to             173
               Purchase and Sale Contract,
24             V1084 through V1086
```

```
 1            EXHIBIT  INDEX  (continued)

 2                                                MAR
      Koller

 3

        21    Defendants'  Answer  and         191

 4            Counterclaim

 5      22    Defendants'  Response  To  The    198
              First  Request  For  The

 6            Production  Of  Documents  Of
              Plaintiff  John  Hancock

 7            Insurance  Company

 8      23    Defendants'  Responses  and       210
              Objections  to  Plaintiff's

 9            First  Set  Of
              Interrogatories

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

ESQUIRE  DEPOSITION  SERVICES

James R. Koller, Esq.

1            MR. SCHER:  Federal court
2   stipulations.
3            ...JAMES R. KOLLER, ESQ.,
4   892 Andorra Road, Lafayette Hill, PA
5   19444, having been duly sworn was
6   examined and testified as follows:
7            EXAMINATION
8   BY MR. DAVIS:
9       Q.    Good morning, Mr. Koller.
10      A.    Good morning, Mr. Davis.
11      Q.    Would you state your name
12  for the record, please.
13      A.    James R. Koller.
14      Q.    I believe you already gave
15  to the reporter, but would you put on
16  the record your current address.
17      A.    892 Andorra Road, Lafayette
18  Hill, PA, 19444.
19      Q.    As you know, I represent
20  John Hancock in this matter and I'm
21  going to be asking you a series of
22  questions here today.
23            If at any point in time you
24  don't understand my question, I'm going

James R. Koller, Esq.

1    to ask you to speak up and let me know

2    that.  Is that fair?

3        A.    Yes.

4        Q.    It is not intended to be a

5    torture test.  If at any point in time

6    you wish to take a break, please let me

7    know and we will try to accommodate you

8    as soon as possible thereafter. Do you

9    understand that?

10       A.    Yes.

11       Q.    Mr. Koller, would you give

12   me a brief description of your

13   educational background, please.

14       A.    I graduated from Temple

15   University in 1973 and the Dickinson

16   School of Law in 1976.

17       Q.    Did you pass the Bar?

18       A.    Yes.

19       Q.    In Pennsylvania?

20       A.    Yes.

21       Q.    Are you still a member of

22   the Bar?

23       A.    Yes.

24       Q.    And do you on occasion

James R. Koller, Esq.

1    still act as an attorney?

2         A.    Not for outside clients.

3         Q.    For which clients do you

4    still act as attorney on occasion?

5         A.    I still do the work that

6    our company does.

7         Q.    And by "our company," you

8    mean Vesterra?

9         A.    Yes.

10        Q.    If I discuss the term and

11   use the term "Vesterra," does that mean

12   all of the parties who are defendants to

13   this action, including the Vestmont

14   Limited Partnerships?

15        A.    Yes, Vesterra.

16        Q.    For a period of time you

17   practiced law as your primary means of

18   occupation?

19        A.    Yes.

20        Q.    And from the time that you

21   graduated from Dickinson in '76, what

22   law positions did you hold?

23        A.    I was first an associate at

24   Dilworth Paxon and then a partner, and I

James R. Koller, Esq.

1  left there in 1984 and I became a

2  partner at Dechert, Price & Rhoads.

3      Q.    And how long did you

4  practice at Dechert?

5      A.    For about a year and a half

6  to two years.

7      Q.    And you were partner at

8  Dechert?

9      A.    Yes.

10      Q.    And what is your area of

11  specialty?

12      A.    Real estate.

13      Q.    And when you say "real

14  estate," what kinds of work did that

15  encompass?

16      A.    I represented developers,

17  building owners, lenders.

18      Q.    What lenders did you

19  represent?

20      A.    We represented Fidelity

21  Bank for a while, we did some work for

22  Mid-Atlantic Bank, and those are the two

23  that come to mind.

24      Q.    Did the work that you did

James R. Koller, Esq.

1    Q.    And does Mr. Palopoli

2 remain a partner in Vesterra Corp.?

3    A.    Yes.

4    Q.    Is it true to say that

5 Vesterra has acted as sort of the

6 general partner in a series of real

7 estate development projects that you

8 have been involved in since 1986?

9    A.    Yes.

10    Q.    At any point in time have

11 you ever done business in the real

12 estate development field under any

13 entity other than Vesterra Corp.?

14        MR. SCHER:  Object to the

15 form.

16        You can answer, if you are

17 able to.

18        THE WITNESS:  Well, each

19 project was conducted under a different

20 partnership, and so to that extent, yes,

21 we did business under those partnership

22 names as well as Vesterra.

23 BY MR. DAVIS:

24    Q.    For any of those

James R. Koller, Esq.

1    employee of Vesterra Corporation?

2         A.    He was an employee of

3    Vesterra Corporation.

4         Q.    Is he no longer an employee

5    of Vesterra?

6         A.    No.

7         Q.    What is his position with

8    respect to Vesterra now?

9         A.    He is still an officer of

10   Vesterra, an assistant secretary, I

11   think, and assistant vice-president, but

12   he is not employed by Vesterra.

13        Q.    Is it true that Mr. Kelly

14   is a CPA?

15        A.    I don't know if he has

16   continued to keep his CPA designation,

17   what's involved in that; but he was a

18   CPA.

19        Q.    Among yourself,

20   Mr. Palopoli, and Mr. Kelly, do you

21   divide up responsibilities in the

22   operations of Vesterra?

23        A.    Yes.

24        Q.    What's the division of

James R. Koller, Esq.

1    of the pieces we sold from Normandy

2    Farm.  And Fawn Creek is complete.

3         Q.    Montgomery Square, that's

4    the shopping plaza that's associated

5    with the apartment complex that's the

6    subject of this litigation; correct?

7         A.    Montgomery Square is a

8    partnership that owned 180 acres, of

9    which this retail shopping center was a

10   part in addition to the apartment

11   complex.  But the Montgomery Square

12   listed here, the 400,000 square foot

13   shopping center, is part of that

14   Montgomery Square project.

15        Q.    Was the Montgomery Square

16   Shopping Center developed by Vesterra?

17        A.    Yes.

18        Q.    When was that?

19        A.    '99 to 2000.

20        Q.    And Vesterra currently owns

21   the shopping center?

22        A.    No.  The shopping center

23   has been sold.

24        Q.    When was that sold?

James R. Koller, Esq.

1        A.        In 2002.

2        Q.        Then there's the 256-unit

3  apartment project that's associated with

4  Montgomery Square; correct?

5        A.        Correct.

6        Q.        And that's the Avenel At

7  Montgomery Square project that's the

8  subject of this litigation?

9        A.        Correct.

10        Q.        That has been developed by

11  Vesterra?

12        A.        Correct.

13        Q.        When did Vesterra start

14  developing that project?

15        A.        The Montgomery Square

16  project, the development began in 1994.

17        Q.        A moment ago we talked

18  about the development dates for the

19  shopping center.  You said '99 to 2000.

20        A.        '99 to 2000 is when we

21  built them.  I might have misspoke.  The

22  overall development of Montgomery Square

23  began in 1994 and the approvals weren't

24  obtained until 1999 and we started

James R. Koller, Esq.

1    construction on the shopping center in

2    '99.

3          Q.      Did the construction on the

4    apartment complex follow construction of

5    the shopping center?

6          A.      No.   That didn't begin

7    until 2003, construction of the

8    apartments.

9          Q.      So I said it correctly, in

10   that the apartment complex followed the

11   construction of the commercial shopping

12   center?

13         A.      That's correct.

14         Q.      You said it was 2003 that

15   you began construction of the apartment

16   complex?

17         A.      Correct.

18         Q.      And the apartment complex

19   is still owned by Vesterra at this point

20   in time?

21         A.      It's owned by --

22         Q.      The Montgomery Square

23   Partnership of which Vesterra is general

24   partner?

James R. Koller, Esq.

1   receive them within the next three to

2   four weeks.

3           Q.      Who is the buyer of the

4   property, the Avenel property?

5               THE WITNESS:  Should I

6   answer that question?

7               MR. SCHER:  Is it

8   confidential?

9               THE WITNESS:  No.

10              MR. SCHER:  Sure.

11              THE WITNESS:  It's a group

12  that was formed by J.P. Morgan, and the

13  name of the buyer -- it's a new entity

14  they formed; I don't know what the exact

15  name is, but it's Avenel-something.

16  BY MR. DAVIS:

17          Q.      Does Montgomery Square

18  Partnership anticipate a gain, a

19  financial gain, as a result of the sale

20  of the Avenel property?

21          A.      Yes.

22          Q.      Approximately what gain do

23  you expect?

24          A.      Approximately $28 million.

James R. Koller, Esq.

1    A.    Yes.    I mean, subject to
2    all the conditions that are part of that
3    agreement.
4    Q.    Why was it that Vesterra
5    was looking for a forward commitment as
6    opposed to an immediate loan in 2004?
7    A.    Because the project was
8    still under construction and it was not
9    yet leased.
10   Q.    Was it your belief that you
11   couldn't obtain permanent financing in
12   2004?
13   A.    We were not in a position
14   to obtain permanent financing until the
15   buildings were completely constructed
16   and there was at least some of the units
17   occupied.
18   Q.    Why didn't you just wait
19   until the building was completely
20   constructed and the majority of the
21   units were occupied to go out and obtain
22   permanent financing?
23   A.    Because at that time the
24   interest rates looked like they would

James R. Koller, Esq.

1    start to increase.

2            Q.     So is it fair to say that

3    you went looking for a forward

4    commitment in mid-2004 in the hopes of

5    locking in a more favorable interest

6    rate for the ultimate financing that

7    would take place sometime in the future?

8            A.     Yes.

9            Q.     Did you achieve that?

10           A.     We locked in a commitment

11   for an interest rate in the future.  As

12   it turned out, whether that was

13   favorable or not is really in question.

14           Q.     You would be considerably

15   richer today if you could predict that

16   with accuracy, would you not?

17           A.     Yes.

18           Q.     Good.  All right.

19                  But is it fair to say also

20   that what Vesterra was looking for in

21   mid-2004 was a binding commitment by a

22   lender to give them a loan at some point

23   in time in the future at a certain

24   interest rate?

James R. Koller, Esq.

1    BY MR. DAVIS:

2           Q.      Mr. Koller, would you

3    please look at Exhibit 7 and identify

4    that document for me, if you can.

5           A.      This is the Rate Lock

6    Confirmation dated August 2, 2004.

7           Q.      Did Vesterra in fact lock

8    in a rate with Hancock?

9           A.      We signed this Rate Lock

10   Confirmation.

11          Q.      And at the time that you

12   signed this Rate Lock Confirmation, did

13   you understand this to be locking in the

14   rate that was listed here?

15          A.      Yes.

16          Q.      Is it correct, Mr. Koller,

17   that Vesterra had the ability, within a

18   certain range, to identify when it

19   wanted to lock in the rate?

20          A.      Yes.

21          Q.      And I take it Vesterra did

22   that based on when it thought the rate

23   was most favorable to Vesterra; is that

24   right?

James R. Koller, Esq.

1    A.    As I said before, we were

2  concerned that interest rates would

3  increase and so we wanted to lock the

4  rate as soon as we could.

5    Q.    And I note that under

6  Subsection (a) of this it says "the

7  Interest Rate will be locked on August

8  2, 2004." Do you see that?

9    A.    Yes.

10    Q.    And it is 6.1% -- 1.8% per

11  annum for a period of 365 days from the

12  rate lock date. Why was it that

13  Vesterra wanted to lock in for 365 days?

14    A.    The property was still

15  under construction and so we needed to

16  build it and enter into leases with

17  tenants.

18    Q.    At the time that you

19  entered into this rate lock agreement

20  with Hancock in August of 2004, what was

21  the anticipated completion date for

22  construction of the Avenel property?

23    A.    I think it was June of

24  2005.

James R. Koller, Esq.

1        A.    I've never seen them.

2        Q.    So you don't know one way

3    or the other whether the draft documents

4    that Hancock proposed back in September

5    of 2004 had terms that were acceptable

6    to Vesterra?

7        A.    I do not.

8        Q.    And you've never yourself

9    reviewed any of those documents?

10        A.    I've never seen them.

11        Q.    Did Vesterra ever pay

12    Mr. Russell for any time that he spent

13    on this particular matter?

14        A.    I had Mr. Russell review

15    the commitment when I started to receive

16    letters from John Hancock.  I think Tom

17    Rogers sent a letter, and so I asked

18    Mitch to review the commitment and tell

19    me what he thought.

20        Q.    Without disclosing what he

21    told you, did he in fact give you some

22    advice or feedback?

23        A.    Yes.

24        Q.    Approximately when was

James R. Koller, Esq.

1    that?

2           A.     In the summer of 2005.

3           Q.     And he was paid for that

4    work?

5           A.     Yes.

6           Q.     And do you know whether he

7    was ever paid for negotiating any

8    documents?

9           A.     He never negotiated any

10   documents.

11          Q.     And was he ever paid for

12   reviewing any documents on behalf of

13   Vesterra?

14          A.     No.

15                 MR. SCHER:   Other than what

16   he has testified to?

17                 MR. DAVIS:   Yes.

18                 THE WITNESS:   Just the

19   commitment letter -- the application.

20   BY MR. DAVIS:

21          Q.     Was Mr. Russell or his firm

22   ever paid by Vesterra for reviewing any

23   of the documents that accompanied

24   Mr. Rogers' September 21, 2004, letter

James R. Koller, Esq.

1        Q.      At some point in time in
2   the spring of 2005 did you begin to
3   explore a potential sale of the Avenel
4   property?
5        A.      Yes.
6        Q.      When was the first time
7   that you took any action to explore a
8   potential sale?
9        A.      I think in May of 2005.
10       Q.      Why was it that you decided
11   you might sell at that time?
12       A.      Because we recognized that
13   we probably would not meet the
14   requirements under the loan and we were
15   told of a transaction in the local
16   marketplace here in which a similar
17   project under construction and under
18   leasing was sold without any requirement
19   that it be occupied.
20              And so we contacted the
21   broker involved in that transaction to
22   try to understand it and we engaged them
23   to market our property.
24       Q.      Is that Rockland?

James R. Koller, Esq.

1        A.      Yes, Rockland Realty.

2        Q.      Rockland.   When did you

3    engage Rockland?

4        A.      I think it was in May of

5    2005, May, June, in that period of time.

6        Q.      Was your decision to

7    explore a potential sale of the Avenel

8    property at that time based in any way

9    or motivated in any way by your belief

10   that you could get a good price for the

11   property?

12       A.      Yes.

13       Q.      And you saw there was a

14   potential significant gain to be made

15   from the sale of the property at that

16   time; is that right?

17       A.      Yes.

18       Q.      Do you recall a series of

19   meetings or discussions with Hancock

20   representatives beginning in roughly May

21   of 2005 regarding the loan commitment?

22       A.      We had -- I only had one

23   meeting that I recall.  We went to lunch

24   with Tim Malik and John Ferrie.

James R. Koller, Esq.

1              And if you would read --
2    you can read the whole document, but I
3    direct your attention specifically to
4    the original message that begins about a
5    third of the way or halfway down the
6    first page of Exhibit 10.  It is
7    Mr. Ferrie's message to Mr. Malik.  And
8    then tell me when you're done, please.
9         A.     Okay.
10        Q.     Have you read it?
11        A.     Uh-huh.  Yes.
12        Q.     Did Mr. Ferrie fairly
13   characterize the discussions that you
14   and he and Mr. Kelly had on May 31 in
15   this e-mail?
16        A.     I don't think so.
17        Q.     Let's go through it for a
18   moment.  First, you did meet him for
19   lunch; correct?
20        A.     Yes.
21        Q.     And in the course of your
22   discussion at that lunch meeting did you
23   inquire about unwinding the Hancock
24   commitment?

James R. Koller, Esq.

1          A.      Yes, we did.

2          Q.      And when you said you were

3    unwinding the Hancock commitment, does

4    that mean to somehow obtain release from

5    any obligations that Vesterra had under

6    that commitment?

7          A.      Yes.

8          Q.      And at the time that you

9    had that discussion with Mr. Ferrie in

10   May of 2005, did you believe that

11   Vesterra had obligations to Hancock

12   under the commitment that needed to be

13   unwound?

14         A.      Well, we had signed the

15   application letter and we decided it

16   would make sense to meet with John to

17   talk about the options.

18         Q.      You understood that your

19   application had been accepted by

20   Hancock; correct?

21         A.      Yes.

22         Q.      And did you believe at that

23   point in time that you had a binding

24   agreement with Hancock?

James R. Koller, Esq.

1          A.      You read the provisions

2    that said we were obligated to borrow

3    the loan and, you know, so to the extent

4    that the commitment itself says we were

5    obligated to borrow the loan -- borrow

6    the money, you know, we were obligated

7    to do that.

8              But as I said to you

9    before, I think that, you know, there

10   were so many conditions on John

11   Hancock's part that they didn't have a

12   similar obligation.

13          Q.      In the course of this May

14   31 lunch with Mr. Ferrie, did you tell

15   him at any point in time that you

16   regarded the commitment to be illusory?

17          A.      No.

18          Q.      Did you tell him at any

19   point in time that you regarded it as

20   being non-binding on Vesterra?

21          A.      No.

22          Q.      Did you tell him at any

23   point in time that you regarded it as

24   being non-binding on Hancock?

James R. Koller, Esq.

1    then negotiated an agreement of sale

2    with one of those bidders. So it was a

3    process that went June and July into

4    August.

5         Q.    And how many bids did you

6    receive?

7         A.    I don't recall.

8         Q.    More than ten?

9         A.    I'm not sure.

10        Q.    Were there bids submitted

11   in writing?

12        A.    Yes. Excuse me. The final

13   bids were submitted in writing. The

14   broker did have other discussions with

15   prospective buyers and some of those

16   discussions were probably not in

17   writing.

18        Q.    When you refer to the

19   broker, you are referring to Rockland?

20        A.    Yes.

21        Q.    Did Vesterra pick the

22   highest bidder?

23        A.    Yes.

24        Q.    Who was that? J.P. Morgan?

James R. Koller, Esq.

```
 1          A.     Yes.

 2          Q.     What bid did they make at

 3    that point in time?

 4          A.     At what point in time?

 5          Q.     Back in the June or July

 6    time frame, 2005.  In order to make them

 7    the high bidder.

 8          A.     Well, their final bid was

 9    $59,250,000.  That was not their

10    original bid.  Their original bid was a

11    little lower than that and then they

12    increased their bid.

13          Q.     Had you had any appraisals

14    done on the property prior to the

15    bidding process?

16          A.     No.

17          Q.     Had you asked Rockland to

18    give you an appraisal or an estimate as

19    to the likely selling price of the

20    property?

21          A.     We didn't ask them for an

22    appraisal.  We asked them to tell us

23    what they thought the property was

24    likely to sell for.
```

James R. Koller, Esq.

1    front with John Hancock and John Ferrie,

2    with whom we've had a relationship over

3    the years.  We've known him and we

4    wanted him to know what was going on.

5              So we called him and told

6    him we weren't sure what was going to

7    happen, whether we were going to sell it

8    or not.  We were concerned that we were

9    not going to achieve the -- meet the

10   rental occupancy requirements to be able

11   to close the loan and this was another

12   option for us and we were going to

13   explore that option.

14        Q.    Is it fair to say,

15   Mr. Koller, at the time that you had

16   this meeting with Mr. Ferrie in May of

17   2005, that you believed you had

18   obligations to Hancock under the loan

19   commitment and what you were trying to

20   do is see if you could negotiate some

21   deal that would -- whereby Hancock would

22   release you from those obligations?

23              MR. SCHER:  Object to the

24   form.

James R. Koller, Esq.

1              THE WITNESS:  Yes.  The

2    purpose of the meeting was to tell

3    John -- it was more to tell him what we

4    were proceeding with and then to open up

5    the discussions on how we could settle

6    the arrangement with John Hancock.

7              MR. DAVIS:  Mark this,

8    please, as the next exhibit.

9              Actually, before we put that

10   one away, I just want to follow up.

11   BY MR. DAVIS:

12       Q.      You said that you thought

13   that Mr. Ferrie had not necessarily

14   accurately characterized at least some

15   aspects of the discussion at the May 31,

16   2005, meeting in this e-mail. What

17   aspects of the e-mail, what portions of

18   Mr. Ferrie's e-mail, do you believe are

19   inaccurate?

20       A.      I'm not sure that we said a

21   key component of our decision to sell

22   would be how much we owe Hancock.  And I

23   do not believe -- when we asked John how

24   we might be able to settle this, I don't

James R. Koller, Esq.

1          Q.      Well, Hancock's counsel had

2     sent along draft closing documents;

3     correct?

4          A.      Correct.

5          Q.      Pursuant to your

6     instructions, Vesterra's counsel had

7     never reviewed or taken any steps to

8     respond to those draft documents?

9          A.      That's correct.

10         Q.      So Hancock at least had

11    taken the step of proposing closing

12    documents?

13         A.      That's correct.

14         Q.      So coming back to the

15    second part of my question, you are not

16    aware of anything that Hancock did that

17    prevented the closing from occurring; is

18    that right?

19         A.      Yes.    They did do

20    something.    I mean they -- if they

21    wanted the loan to close, they could

22    have said, "Don't worry about the rental

23    achievement, don't worry about the

24    occupancy, we will lend you the money

James R. Koller, Esq.

```
 1                I'm sorry.  Picking up
 2    where I left off, it says:
 3    "Concurrently with the execution and
 4    delivery of this Amendment, Avenel Loan
 5    Company LLC, has made a mortgage loan to
 6    Seller in the original principal amount
 7    of up to" -- blank.
 8                What is the amount that has
 9    been redacted?
10         A.    44 million -- and I'm not
11    sure of the exact amount, but I think
12    it's $44,370,000.
13         Q.    So who is Avenel Loan
14    Company?
15         A.    It's -- I don't know who
16    they are, but they are a company somehow
17    related to J.P. Morgan.
18         Q.    Is it correct that Avenel
19    Loan Company already has made a mortgage
20    loan to Montgomery Square Partnership in
21    the amount of approximately $44 million?
22         A.    Yes.
23         Q.    When did that occur?
24         A.    December 23, 2005, is the
```

James R. Koller, Esq.

1  amount.

2          Q.    Your best estimate?

3          A.    I think it was somewhere

4  between 29 and 30 million.

5          Q.    What happened to the rest

6  of the funds from the mortgage loan in

7  December?

8          A.    We set aside some funds in

9  the partnership to cover payments to the

10 contractor and other people who were

11 still doing work and are entitled to

12 payment.

13         Q.    How much did you set aside?

14         A.    Approximately 500,000.

15         Q.    Do you think that's

16 sufficient to complete the work on the

17 property?

18         A.    Yes.

19         Q.    What happened to the rest

20 of the money?

21         A.    That was distributed to the

22 partners.

23         Q.    That's the individual

24 partners?

James R. Koller, Esq.

1          A.      Yes.

2          Q.      Is that just you and

3   Mr. Kelly and Mr. Palopoli?

4          A.      Correct.

5          Q.      Are there any additional

6   obligations associated with the Avenel

7   property that will have to be paid when

8   you close the sale?

9          A.      There's a broker's

10  commission.

11         Q.      How much is that?

12         A.      It was on a sliding scale.

13  I don't know the exact amount, but I'd

14  say it's probably around $400,000.

15         Q.      Anything else?

16         A.      There will be transfer

17  taxes.

18         Q.      An approximate amount?

19         A.      Approximately $600,000.  It

20  is actually 1% of the purchase price, so

21  5925.

22         Q.      Who imposes that?

23         A.      The state imposes 1% and

24  the township imposes 1%, so --

James R. Koller, Esq.

| | |
|---|---|
| 1 | by Hancock that Vesterra is seeking in |
| 2 | this matter? |
| 3 | A.   Could you just ask your |
| 4 | question again. |
| 5 | (Discussion off the |
| 6 | record.) |
| 7 | BY MR. DAVIS: |
| 8 | Q.    Strike that.  Start again. |
| 9 | I will reread the |
| 10 | paragraph.  Paragraph 29 says: |
| 11 | "Accordingly, John Hancock should return |
| 12 | to Vesterra, with interest, the $960,000 |
| 13 | wrongfully obtained by John Hancock, and |
| 14 | Counterclaim Plaintiffs are entitled to |
| 15 | additional damages in an amount to be |
| 16 | determined at trial." |
| 17 | My question is:  Are you |
| 18 | aware of any additional damages that |
| 19 | Vesterra has incurred, above and beyond |
| 20 | the 960,000 identified here, for which |
| 21 | it seeks recovery in this case? |
| 22 | A.    I would leave that to my |
| 23 | lawyers.  I know we have paid legal |
| 24 | fees. |

James R. Koller, Esq.

1       Q.      Are you currently aware of
2   any damages above and beyond legal fees?
3       A.      I'd have to give that some
4   more thought.  I can't answer that.
5       Q.      Can you think of any as you
6   sit here today?
7       A.      Well, there's been the loss
8   of our time and effort in trying to
9   resolve this thing, and that has some
10  value.
11      Q.      Anything else?
12      A.      Not that I can think of.
13              MR. DAVIS:  Will you mark
14  this, please, as the next exhibit.  We
15  are up to 22.
16              (Below-described document
17  marked as Koller Exhibit 22.)
18  BY MR. DAVIS:
19      Q.      Mr. Koller, you have what's
20  been marked as Exhibit 22 at your
21  deposition.  I will ask you -- actually,
22  I will represent to you that this is a
23  response to John Hancock's First Request
24  for Production of Documents in this

## VESTERRA CORPORATION'S PRINCIPALS

James R. Koller is an attorney who specialized in real estate law for ten years until co-founding Vesterra in 1986. As a partner in the law firms of Dilworth Paxson Kalish & Kauffman and later with Dechert Price & Rhoads, Mr. Koller represented and advised developers, investors, landlords, tenants, buyers, sellers, lenders and contractors, which provided the broad based understanding of the technical and practical elements critical to success in the business of real estate.

Frank C. Palopoli has over twenty-five years of experience in real estate consulting and development. Prior to co-founding Vesterra, Mr. Palopoli was a principal in the firms of Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc., providing work-out, development and real estate investment services to corporate, institutional and private investment clients. Mr. Palopoli has been responsible for the planning, approval, development or disposition of a variety of projects, including life care and assisted living, conventional garden and high-rise apartments, single family and townhome communities and commercial office projects.

Joseph P. Kelly joined Vesterra Corporation in 1987. Before joining Vesterra, Mr. Kelly was a Financial Manager for mergers and acquisitions with Foster Medical, a $250 million home healthcare division of Avon Products, Inc., where he was responsible for company valuations, acquisition structure and due diligence. Mr. Kelly began his career with Price Waterhouse as a member of the firm's audit division after he received his bachelor's degree in accounting from Villanova University. He is a member of the American Institute of Certified Public Accountants and holds a current real estate sales license.

Koller

EXHIBIT NO. 1

AMK 1/18/06

JH 00779

## REPRESENTATIVE PROJECTS

- *East Gate Square*: 850,000 square foot shopping center located at the ramp from Interstate 295 and Nixon Drive, Mt. Laurel and Moorestown Townships, New Jersey. Anchored by Home Depot, Shop Rite Supermarket, Barnes & Noble Bookstore, Best Buy, Dick's Sporting Goods, Old Navy, CompUSA, Michael's Arts & Crafts and many other national retailers.

- *Montgomery Square*: 400,000 square foot shopping center located at Route 309 and Knapp Road, Montgomeryville, PA, and 256-unit apartment project currently under construction.

- *Normandy Farm*: 75 acres located at Route 202 and Morris Road, Whitpain Township, PA. Created new zoning district to facilitate the development of 76 single-family homes selling in the $700,000 range and the preservation of the largest barn in Montgomery County, an historic mansion and several other historic homes, which will be used for offices and a conference and banquet center.

- *Fawn Creek*: 109 acres located in a bucolic setting with a stream flowing through it on Hollow Road, Worcester Township, Montgomery County, PA. Developed for large lot (1.5 to 4 acres) single-family homes whose prices range from $800,000 to $1,700,000.

- *Mercer Square*: 91,400 square foot shopping center located at Route 611 and Old Dublin Pike, Doylestown, Pennsylvania, anchored by 44,000 square foot Genuardi Supermarket.

- *New Britain Village Square*: 140,000 square foot shopping center located at the intersection of Route 202 and County Line Road, Chalfont, Pennsylvania, anchored by Genuardi Supermarket, CVS Drugstore, McDonalds and First Union Bank.

- *Towamencin Shopping Village*: 140,000 square foot shopping center located at Forty Foot Road and Allentown Road, Towamencin Township, Pennsylvania, anchored by Genuardi Supermarket, Thrift Drug, Blockbuster and Wendy's.

- *Warwick Square*: 92,000 square foot shopping center located on Old York Road, Warwick Township, PA, anchored by Genuardi Supermarket, Blockbuster and McDonald's.

- *Dresher Plaza*: 96,500 square foot shopping center located at Limekiln Pike and Dreshertown Road, Dresher, Pennsylvania.

Kollee

EXHIBIT NO. 2

AML 1/18/06

JH 00803

Application No. 6518467

## APPLICATION TO
## JOHN HANCOCK LIFE INSURANCE COMPANY
## FOR A FIRST MORTGAGE LOAN

### July 30, 2004

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, MA 02116
Attn: Real Estate Investment Group

RE:    APPLICATION NO.  6518467
      APPLICANT:    **Montgomery Square Partnership**
      PROPERTY:  **Avenel at Montgomery Square, 1100 Avenel Boulevard, North Wales, Montgomery County, PA 19454**

    THE FOLLOWING EXHIBITS ARE ATTACHED:  A,B,C,D,E,F,G & H

    SUPPLEMENT OF 18 PAGES ATTACHED

Ladies and Gentlemen:

    The undersigned (the "Applicant") hereby applies to John Hancock Life Insurance Company ("John Hancock") for a first mortgage loan (the "Loan") to Borrower in the principal amount and upon the terms and conditions set forth below and in the Exhibits and in any Supplement referred to above (the "Terms and Conditions"):

1.  BORROWER

    Name:    **Montgomery Square Partnership** (the "Borrower")
    Type of Entity:    **General Partnership**
    State of Organization: **PA**
    Address:    **490 Norristown Road, Suite 151, Blue Bell, PA 19422**

    TAXPAYER IDENTIFICATION NO. OF BORROWER: 23-2865711
    BORROWER'S FISCAL YEAR ENDING DATE: December 31, 2004

    Applicant represents that the description of the Borrower and all constituent entities and the list of names, types of interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are truly, accurately, and completely described on Exhibits F and G attached to this Application.

2.  NOMINATION OF BORROWER

    If Borrower is not definitely named in Condition 1 hereof, Borrower shall be subject to approval by John Hancock in its sole discretion and shall be nominated in writing by Applicant to John Hancock; and said nomination shall be accompanied by information as to the identity, financial condition, background and experience (including Exhibits F and G) of Borrower and the proposed guarantors and indemnitors; and, if Borrower is an entity, of the principals (as determined as set forth in Condition 41) of Borrower; and Borrower so nominated shall furnish John Hancock with an agreement under which Borrower shall become jointly and severally liable with Applicant for performance of the

Kollee

EXHIBIT NO. B
AMC 1/19/06

Application No. 6518467

obligations of Applicant and Borrower hereunder, and the proposed guarantors and indemnitors execute the acknowledgment sections thereof, such nomination and agreement to be consummated on the form attached hereto and made a part hereof marked Exhibit A and to be submitted to John Hancock within seven (7) days from the date of acceptance by John Hancock of this Application.

Applicant agrees to provide John Hancock and its agents in a timely fashion all of the information as requested in this Application or otherwise that John Hancock may reasonably request to appraise the Security and underwrite this Loan.

3. **LOAN TERMS**

   (a) PRINCIPAL AMOUNT:       **$32,000,000.00**

   (b) INTEREST RATE:       **The interest rate shall be equal to the sum of the 10 year treasury at the time of rate lock, plus a spread of 175 basis points. This interest rate is subject to change based on market conditions such as movements in the treasuries and the swap curve (affecting both the treasuries and spread) until the rate is actually locked**

   (c) INTEREST RATE AND RATE LOCK:    The interest rate set forth in Condition 3(b) may be changed or confirmed if John Hancock, in its sole discretion, prior to acceptance of the Application issues a Rate Lock Confirmation to Applicant in the form attached hereto as Exhibit D (the "Rate Lock Confirmation"). If so issued, the Rate Lock Confirmation will amend the date of the Application to be the date of issuance of the Rate Lock Confirmation, will confirm or change the interest rate (the "Interest Rate"), the amount of the monthly payment of principal and interest (the "Monthly Payment"), the Amortization Period and establish the outside date for Closing (as hereinafter defined). If the terms of the Rate Lock Confirmation are satisfactory to the Applicant and the Applicant wishes to accept the proposed Rate Lock (hereinafter defined), the Applicant must execute the Rate Lock Confirmation and return such to John Hancock by telecopy to Timothy J. Malik at (617) 572-9699 within the time required on the Rate Lock Confirmation. The execution and delivery of said Rate Lock Confirmation by Applicant as described above will be deemed to amend this Application to incorporate herein the amended Application date, the Interest Rate, the Monthly Payment, the Amortization Period, the date of Closing and any other terms contained in said Rate Lock Confirmation. In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

It is understood and agreed that John Hancock is under no obligation to issue any Rate Lock Confirmation.

Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committees and John Hancock has accepted this Application in the place provided below, and then said obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

   (d) REPAYMENT TERMS:

      (i) Monthly installments of principal and interest will be based on an amortization period of 360 months, provided that all unpaid principal and all accrued and unpaid interest shall be due and payable at the end of the Term of the Loan specified in subparagraph (e) of this Condition 3. The amount of the monthly payment will be established at Rate Lock as set forth in Condition 3(c). Interest shall be computed on a monthly basis using a twelve (12) thirty- (30) day month formula, except that interest due and payable for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such partial month by a daily rate based on a three hundred sixty-five (365) day year.

   (e) TERM OF LOAN: 120 months.

                2                 JH 00959

Application No. 6518467

(f)  REPAYMENT DATES: All payments are due on the first day of the month. Unless Closing occurs on the first day of a month, interest shall, at John Hancock's option, be payable at Closing to the first day of the following month; and in such event other time computations to be stipulated in the Loan Documents (as hereinafter defined) shall run from the latter date, except where otherwise required by John Hancock.

(g)  PREPAYMENT PRIVILEGE: Except as provided below, Borrower may not prepay the Loan in whole or in part.

On or after the end of the **4th** Loan Year (as hereinafter defined), on any scheduled payment date and subject to giving John Hancock not less than thirty (30) nor more than ninety (90) days' prior written notice specifying the scheduled payment date on which prepayment is to be made ("Prepayment Date"), Borrower may prepay the entire principal amount together with any and all accrued interest and other sums due under the Loan Documents and subject to payment of a prepayment premium equal to the greater of:

(i)    the positive amount, if any, equal to (aa) the sum of the present values of all scheduled payments due under the Note from the Prepayment Date to and including the maturity date of the Note, minus (bb) the principal balance of the Note immediately prior to such prepayment; or

(ii)    **0.00%** of the principal balance of the Note immediately prior to such prepayment.

All present values shall be calculated as of the Prepayment Date, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in The Wall Street Journal or other business publication of general circulation five (5) business days before the Prepayment Date.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

The Loan will be open to prepayment without premium during the last 90 days of the term of the Loan.

If any notice of prepayment is given, the principal balance of the Loan and the other sums required pursuant to this Condition shall be due and payable on the Prepayment Date unless Borrower provides written notice that it is revoking said prepayment notice no later than five (5) business days prior to the Prepayment Date.

Provided no default exists under the Loan Documents, the above premium shall not be applicable to a prepayment resulting from John Hancock's election to require insurance loss proceeds or condemnation awards to be applied to a payment of principal.

No partial prepayment shall be allowed.

The Loan Year is defined as any twelve-month period commencing with the date on which the first monthly installment is due or any anniversary thereof.

(h)  METHOD OF PAYMENT: Any amounts due John Hancock shall be paid via ACH debits against Borrower's account. The attached Exhibit H, Authorization Agreement for Direct Deposits (ACH), has been completed and executed and a voided check or deposit slip is attached thereto.

4.  CLOSING AND CLOSING DATE

(a)  All References to closing in this Application shall mean the funding of the Loan by John Hancock (the "Closing").

(b)  The Closing shall occur on or before the date established by the Rate Lock Confirmation as set forth in Condition 3(c) (the "Closing Date").

JH 00960

Ed. 1/28/2004

Application No. 6518467

(c) It is understood and agreed that John Hancock shall have no obligation to extend the Closing Date. If Borrower has not complied with all the Terms and Conditions hereof by that time, and John Hancock in its sole discretion does not extend said date pursuant to Condition 32 hereof, John Hancock's obligation to Close and fund the Loan shall terminate pursuant to Condition 29 hereof; and any Rate Lock shall expire automatically.

5. THE SECURITY FOR THE LOAN

The Loan shall be secured by the Real Estate Security and Personal Property Security described below (collectively, the "Security"):

(a) REAL ESTATE SECURITY: The Loan will be secured by a first mortgage, first deed of trust, first security deed, first loan deed, or similar instrument, as determined by John Hancock (the "Mortgage"), upon the following described real estate, including without limitation, the buildings and improvements located thereon and all appurtenances thereto, including without limitation, all easements, licenses and permits in connection with the ownership and operation of the land and improvements (the "Real Estate Security"):

**A newly constructed three & four-story 256 unit garden apartment complex situated on approximately 8.35 acres and located in nine separate buildings at 1100 Avenel Boulevard, North Wales, PA 19454**

(b) PERSONAL PROPERTY SECURITY: In addition to the Real Estate Security, the Loan will be secured by the following security (the "Personal Property Security"):

(i) ASSIGNMENT OF LEASES AND RENTS: A first priority present, absolute and unconditional assignment to John Hancock of all present and future rents, issues and profits (including without limitation all accounts receivable) from the Security and of all present and future leases of personal property and leased property, including ground leases and master-leases (all of the foregoing hereinafter referred to as "Other Leases"), and leases of space to occupancy tenants on the Security, more particularly referred to in Condition 15 hereof (the "Space Leases") and all rents and other sums payable thereunder by instruments satisfactory in form and substance to John Hancock and its counsel, which will be recorded and which will provide, among other things, that certain Space Leases and Other Leases will not be modified or amended, surrendered, canceled or terminated and new Space Leases and Other Leases may not be entered into without the prior written consent of John Hancock, and that no prepayment of rent will be accepted from any such tenant Leases.

(ii) SECURITY INTEREST IN PERSONAL PROPERTY: A first priority security interest in personal property under the Uniform Commercial Code combined with the Mortgage or by way of a chattel mortgage or other instrument satisfactory in form and substance to John Hancock and its counsel shall be granted to John Hancock and shall constitute a first and prior lien upon all articles of personal property now or hereafter attached to or used in any way in connection with the Real Estate Security or the operation thereof, including without limitation, fixtures, furniture, equipment, insurance proceeds, condemnation awards, tenant deposits, escrow deposits, transferable warranties, licenses, permits, plans and specifications, contracts and other items of tangible or intangible personal property, and the following property (the "Personal Property Security"):

**Anything owned by the borrowing entity used solely in the operation and management of the real estate, not including personal property owned or leased by tenants at the security, but including personal property owned by the Borrower if leased to the tenants.**

Such security interest shall be perfected by filing or recording as John Hancock shall require.

(iii) ASSIGNMENT OF AGREEMENTS, LICENSES AND PERMITS: A first priority present, absolute and unconditional assignment to John Hancock of all management agreements, franchise agreements,

Application No. 6518467

warranties, licenses, permits, plans and specifications, construction contracts and all other contracts and agreements with respect to the construction, use or operation of the Real Estate Security.

(c) The Security for the Loan is more particularly described on Exhibit B attached hereto and made a part hereof.

(d) Applicant hereby represents and warrants to John Hancock that the Security has not been subjected to a condominium or cooperative form of ownership, and Applicant and Borrower hereby represent and warrant that the Security shall not be so subjected prior to the Closing Date nor prior to the date on which the Loan is paid in full.

6. <u>THE LOAN DOCUMENTS</u>

The Note (the "Note"), the Mortgage and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the "Loan Documents") shall be satisfactory in all respects in form and substance to John Hancock and its counsel, and, without in any way limiting the generality of the foregoing, the Loan Documents shall contain provisions satisfactory in form and substance to John Hancock and its counsel, including, without limitation, the following:

(a) LATE CHARGES: A covenant to the effect that the Borrower will pay a late charge of 5% of any installment of any principal and interest not paid within five (5) days of the due date, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated.

(b) DEFAULT INTEREST RATE: A covenant requiring the Borrower to pay an increased interest rate ("Default Interest Rate") on the entire principal balance during default or after maturity at a rate equal to 7% above the interest rate on the Loan stipulated in Condition 3(c) hereof as amended by the Rate Lock Confirmation, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated.

(c) RESERVE FUND FOR TAXES AND OTHER CHARGES: A covenant to the effect that Borrower, at the option of John Hancock, will pay to John Hancock monthly such amounts as John Hancock estimates to be necessary to create and maintain a reserve fund or funds from which to pay before they become due, all taxes, assessments, liens, charges and hazard insurance premiums on or against or pertaining to the Security, together with ground rents under ground leases, if any, and any other sums required pursuant to Condition 18, which reserve fund(s) will be held by John Hancock without interest.

(d) PAYMENT OF LOAN AFTER DEFAULT AND ACCELERATION: A covenant to the effect that Borrower acknowledges that the Loan was made on the basis and assumption that John Hancock would receive the payments of principal and interest set forth herein for the full term of this Loan. Therefore, whenever the maturity of the Loan has been accelerated by reason of a default under the Loan Documents, which default occurs prior to the time period, if any, in which prepayment is allowed and prior to the date on which the full amount of the balance of principal and interest then remaining unpaid shall be due, including an acceleration by reason of sale, conveyance, further encumbrance or other default (which acceleration shall be at John Hancock's sole option), there shall be due, in addition to the outstanding principal balance, accrued interest and other sums due under the Loan Documents, a premium equal to the greater of:

(i) The sum obtained by adding:

(aa) the positive amount, if any, equal to (x) the sum of the present values of all scheduled payments due under the Note from the date of said payment to and including the maturity date of the Note, minus (y) the then outstanding principal balance of the Note, and

(bb) **0.00%** of the then outstanding principal balance of the Note; or

(ii) An amount equal to **7.00%** of the then outstanding principal balance of the Note.

All present values shall be calculated as of the date of said payment, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in the Wall Street Journal or other business publication of general circulation five (5) business days before the date of said payment.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

In the event default occurs on or after the date on which prepayment is permitted, then in lieu of the above premium, payment of a premium calculated in the manner set forth in Condition 3(g) hereof shall be required.

A tender of the amount necessary to satisfy the entire indebtedness, paid at any time following such default or acceleration, including at a foreclosure sale, shall be deemed a voluntary prepayment, and, at John Hancock's option, such payment shall include a premium as described above.

(e)  FINANCIAL STATEMENTS: A covenant to the effect that the Borrower will furnish to John Hancock within ninety (90) days after the end of each fiscal year a statement of Borrower's financial condition, including a balance sheet and profit and loss statement and a statement of annual income and expenses satisfactory in form and substance to John Hancock in connection with the operation of the Security, in detail satisfactory to John Hancock, prepared, audited and certified by a certified public accountant who is a member of the American Institute of Certified Public Accountants; and in addition, within forty-five (45) days after the end of each fiscal quarter of Borrower, Borrower shall provide the above information except that it may be prepared and certified by the financial officer of Borrower who is responsible for the preparation of such annual financial statements.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is office, retail or multi-tenant industrial property, shall be a certified current rent roll, which shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase options and/or co-tenancy requirements, and any and all other fees paid by tenants and security deposits currently held.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is multifamily property, mobile home park, congregate care property or self-storage facility, shall be a certified current rent roll, which shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, and any and all other fees paid by tenants, including but not limited to utility reimbursements, and security deposits currently held.

For all other property types, accompanying the submission of the certified statements of annual and quarterly income and expenses shall be such additional financial information as John Hancock shall require.

(f)  DUE ON SALE: A covenant to the effect that if the Borrower, whether voluntarily or by operation of law, sells, assigns or otherwise transfers the Security or any portion thereof or enters into an installment sale contract or similar agreement, without the prior written consent of John Hancock, or if a change shall occur in the ownership or control of the Borrower or Borrower permits or suffers any merger, consolidation or dissolution or syndication affecting Borrower, or permits or suffers the transfer, sale, assignment or pledge of any interest in Borrower or any entity or person, directly or indirectly, controlling Borrower or any general partner or member of Borrower (if applicable), whether at one time or in a series of related or unrelated transfers without the prior written consent of John Hancock, such event shall constitute a default under the Loan Documents; and John Hancock shall have the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

Notwithstanding the foregoing, John Hancock will permit a one-time transfer of the Real Estate Security together with assumption of the Loan during the term of the Loan, subject to John Hancock's prior written approval, provided that:

6

JH 00963

Application No. 6518467

(i)   no default or event which with the giving of notice or the passage of time would constitute a default under the Loan Documents shall have occurred and remain uncured;

(ii)   the proposed transferee (the "Transferee"), the proposed guarantors of non-recourse carveouts, and the proposed indemnitors of environmental liabilities shall be reputable entities or persons of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by John Hancock;

(iii)   the Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Security, and John Hancock shall be provided with reasonable evidence thereof (and John Hancock reserves the right to approve the Transferee without approving the substitution of the property manager);

(iv)   John Hancock receives a written request for approval from the Borrower at least sixty (60) days prior to the proposed transfer (including a description of the proposed terms of the transfer), together with a diagram as described in Exhibit F showing the structure of the Transferee, the proposed guarantor of non-recourse carveouts and the proposed indemnitor of environmental liabilities, and all of the constituent entities of each, after the contemplated transfer, and a list of the names, types of interests and ownership percentages of all persons to have ownership interests in any of the foregoing or any constituent entity thereof, financial statements, including a completed Exhibit G, for all such entities and an administrative fee of $5,000.00, which shall be deemed fully earned on the date of receipt and shall be retained by John Hancock regardless of whether or not the transfer occurs and whether or not approval is given;

(v)   The Transferee executes and delivers to John Hancock a Loan assumption agreement and delivers a guaranty of non-recourse carveouts from an approved guarantor and a separate environmental indemnity agreement from an approved indemnitor, and such other documentation as John Hancock may require, in form and substance satisfactory to John Hancock;

(vi)   John Hancock and its counsel receive (aa) certification from Borrower and the Transferee that the proposed terms of the transfer described in subparagraph (iv) of this Condition 6(f) are the actual terms of the transfer, (bb) evidence of casualty insurance and other applicable insurance, (cc) all corporate, partnership or other entity documents, and (dd) all other certificates, legal opinions, title materials and other documents which John Hancock may require, all in form and substance satisfactory to John Hancock, at least 30 days prior to the proposed transfer;

(vii)   John Hancock be provided satisfactory evidence concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change on the ability of the Security to generate a cash flow sufficient to pay the debt service on the Loan and to maintain a debt service coverage ratio satisfactory to John Hancock;

(viii)   John Hancock shall have received in writing evidence from the Rating Agencies to the effect that such transfer will not result in a re-qualification, reduction or withdrawal of any rating initially assigned or to be assigned in a secondary market transaction together with such legal opinions as may be requested by the Rating Agencies. The term "Rating Agencies" as used herein shall mean each of Standard & Poor's Ratings Group, Moody's Investors Service, Inc., Duff & Phelps Credit Rating Co., Fitch Investors Service, Inc. or any other nationally-recognized statistical rating agency who shall then be rating the certificates or securities issued in connection with the secondary market transaction;

(ix)   the Transferee and its constituent entities shall comply with all requirements pertaining to the Borrower's being a Special Purpose/Bankruptcy Remote Entity (as hereinafter defined) contained in this Application and in the Loan Documents;

(x)   the Transferee shall have delivered to John Hancock such legal opinions and title insurance endorsements as may be reasonably requested by John Hancock; and

7

JH 00964

Application No. 6518467

(xi)  John Hancock shall have received an assumption fee equal to one percent (1%) of the then unpaid principal balance of the Note (against which the administrative fee shall be credited) in addition to the payment of all costs and expenses incurred by John Hancock in connection with such assumption (including reasonable attorney's fees and costs).

(g)  OTHER INDEBTEDNESS AND LIENS:  A covenant to the effect that no indebtedness (whether secured or unsecured) other than the Loan, no encumbrances other than those approved by John Hancock in its sole discretion in connection with the Closing, and no liens other than that of the Loan, shall be permitted to be secured by the Security, or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and any violation thereof shall be a default under the Loan Documents and shall give John Hancock the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

(h)  USE OF SECURITY:  A representation, warranty and covenant to the effect that the Security will at all times be operated as a **Class A Apartment** and for no other purpose.

(i)  CONDOMINIUM OR COOPERATIVE:  A covenant to the effect that Borrower has not filed and will not file a declaration of condominium, map or any other document having the effect of subjecting the Security to the condominium or cooperative form of ownership.

(j)  FEES:  A covenant to the effect that John Hancock may charge administrative fees and be reimbursed for all costs and expenses, including reasonable attorneys' fees and disbursements, associated with reviewing and processing post-closing requests of Borrower.

(k)  DISCLOSURE:  A representation and warranty  to the effect that Borrower has fully disclosed to John Hancock all facts material to the Security, the Borrower, the Borrower's business operations and each guarantor listed in Condition 44 of this Application and each guarantor, if any, of the Loan required pursuant to this Application (collectively "Guarantors"), and each indemnitor of environmental liabilities listed in Condition 11(d)(ii)(cc) of this Application (collectively "Indemnitors"); and a misrepresentation or breach of any representation, warranty or covenant made in this Application shall be a default under the Loan Documents.

7.  <u>TITLE, TITLE EVIDENCE AND TITLE INSURANCE</u>

(a)  The title to the Real Estate Security and Personal Property Security and all documentation pertaining thereto shall be satisfactory in all respects to John Hancock and its counsel.

(b)  Borrower shall furnish to John Hancock a policy of title insurance satisfactory in form and substance to John Hancock and its counsel issued by a title insurance company acceptable to John Hancock, in an amount not less than the amount of the Loan, insuring John Hancock and its successors and assigns that the Mortgage is a valid, first and prior lien on the Real Estate Security, subject only to such exceptions to and conditions of title as John Hancock may approve, and containing such endorsements as John Hancock may require.  The seven (7) title companies (the "Title Companies") which are named below are acceptable to John Hancock.  To facilitate the Closing, Borrower may wish to consider choosing one of them.  Notwithstanding the foregoing, John Hancock's providing this information is merely to expedite the Closing of the Loan, and John Hancock is not responsible for the performance of any of said Title Companies.  Borrower further acknowledges and agrees that whichever title company is selected, will provide their services directly to Borrower; and John Hancock is not responsible for any fees, costs or expenses of said company.  Subject to the approval of John Hancock, Applicant hereby designates the following title insurance company as the title insurer for the loan:

Name of Title Insurance Company:

1. ☐ First American Title Insurance Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

2. ☐ Chicago Title Insurance Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

3. ☐ Commonwealth Land Title Insurance Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

4. ☐ Lawyers Title Insurance Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

5. ☐ Transnation Title Insurance Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

6. ☐ Stewart Title Guaranty Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

7. ☐ Old Republic National Title Company
   Contact Person:
   Address:

   Telephone Number:
   Telecopy Number:

9

JH 00966

Application No. 6518467

In the event Applicant wishes to select a title company other than one of those listed above, Applicant must submit a written request to John Hancock. If title company is acceptable to John Hancock in its sole discretion, it will be approved in writing by John Hancock and will be included in the definition of Title Company.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the title insurance company, or the issuing agent, if a title company other than one of the Title Companies has been selected. John Hancock hereby reserves the right to impose reinsurance requirements and to approve the Closing medium, all in its sole discretion.

(c) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the Title Company John Hancock's title requirements. Applicant further agrees to provide the Title Company said written notification to proceed immediately after Rate Lock. It is understood that the Title Company will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Title Company whether or not the Loan Closes and for ensuring that the Title Company and title policy satisfy all the conditions of this Application.

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the preliminary evidence of title insurance satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock.

(e) Borrower shall furnish to John Hancock a chattel search certificate or other similar evidence satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock showing that such security interest is a first lien on the Personal Property Security, which evidence shall be updated through the date of Closing.

8. THE SURVEY

(a) Borrower shall furnish John Hancock a current instrument survey of the Real Estate Security, satisfactory in form and substance to John Hancock and its counsel, prepared by a licensed surveyor acceptable to John Hancock and its counsel and certified by such surveyor to John Hancock and its successors and assigns and to the title insurance company insuring the Loan, pursuant to a certification in form and substance satisfactory to John Hancock and its counsel, showing all final improvements, physical conditions and all other matters affecting the title to, use of and zoning of the Real Estate Security as required by John Hancock.

(b) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the surveyor designated below John Hancock's survey requirements. Applicant further agrees to provide the surveyor written notification to proceed immediately after Rate Lock. It is understood that the Surveyor will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Surveyor whether or not the Loan Closes and for ensuring that the Surveyor and the survey satisfy all the conditions of this Application.

(c) The name and address of Applicant's surveyor are set forth below:

Name of Surveyor:     **Stout & Traconelli Associates**
Address:              **2499 Knights Road, Pennsburg, PA 18073**
Phone No.             **215-679-0200**

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the survey described in subparagraph (a) of this Condition 8 no later than twenty-one (21) days from the date of Rate Lock.

9. BORROWER REQUIREMENTS

(a) If the Borrower is a limited partnership, a limited liability company, or a corporation, or any other form of entity, then no later than fourteen (14) days from the date of acceptance by John Hancock of this Application,

10

JH 00967

Application No. 6518467

Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, full and complete copies of the Borrower's partnership certificates and filings and partnership agreement, operating agreement, corporate articles, by-laws and resolutions or other organizational documents, as the case may be, which shall be satisfactory in form and substance to John Hancock and its counsel. In the event any of the foregoing need to be amended to comply with Condition 9(c) or any condition of this Application, said amended documents shall be furnished to John Hancock, or to John Hancock's Special Counsel designated herein, if any, no later than thirty (30) days from the date of acceptance by John Hancock of this Application.

(b) Borrower shall furnish evidence satisfactory to John Hancock and its counsel that the Borrower has, and the persons signing on behalf of the Borrower have, the legal capacity and authority to enter into this transaction and to execute the Loan Documents.

(c) Special Purpose/Bankruptcy Remote Entity. The Borrower must be one of the following types of entities: (aa) a corporation which meets the requirements of SPE (as defined below), (such corporation hereinafter referred to as an "SPE Corporation"), (bb) a limited partnership, in which at least one of its general partners is an SPE Corporation, (cc) a limited liability company, having a minimum of two members, one of which is an SPE Corporation, or (dd) a general partnership, in which at least two of its general partners are SPE Corporations. The following additional requirements shall apply. The Borrower must be now, or prior to Closing must become, a special purpose and bankruptcy remote entity ("SPE"). In general, this includes but is not limited to the following requirements:

(i)  The activities of Borrower must be limited by its organizational documents to the ownership and operation of the Security.

(ii)  The activities of the SPE Corporations must be limited by their organizational documents to the ownership of interests in the Borrower.

(iii)  Borrower and its SPE Corporations must be limited by their organizational documents from owning any property unrelated to the Security.

(iv)  Borrower and its SPE Corporations must be prohibited by their organizational documents from incurring any indebtedness, secured or unsecured, other than, with respect to the Borrower, the Loan, and (aa) incurred in the ordinary course of business to vendors and suppliers of services to the Real Estate Security, (bb) not secured by the Security or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and (cc) not accompanied by any rights to control or to obtain control of the Borrower or any constituent entity thereof.

(v)  Each of Borrower and its SPE Corporations must maintain separate assets, bank accounts, operations, books and records and tax returns so that it is not costly or difficult to segregate its assets and operations from those of any affiliate or any other person.

(vi)  Each of Borrower and its SPE Corporations must do all other things necessary, in the opinion of John Hancock's legal counsel, to establish and maintain its existence as an SPE.

(vii)  Borrower and its SPE Corporations must be prohibited by their organizational documents from dissolving, liquidating, consolidating or merging, or selling all or substantially all of the assets of the Borrower or its SPE Corporations or transferring all or substantially all of the assets of the Borrower or its SPE Corporations, or engaging in any other business activity.

(viii)  For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the organizational documents of Borrower and its SPE Corporations must require a unanimous vote or consent of the Borrower's directors, partners or members, as applicable, and the unanimous consent of the directors of the SPE Corporations, if applicable, to file a petition for bankruptcy protection or obtain any other relief from its creditors.

Ed. 1/28/2004

JH 00968

(ix)    For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the board of directors of Borrower or its SPE Corporations, if applicable, must include at least one Independent Director whose consent shall be required before such Borrower or its SPE Corporations shall be permitted to file for bankruptcy protection, or obtain any other relief from its creditors, on behalf of such Borrower or its SPE Corporations. Independent Director shall mean a director of the special-purpose, bankruptcy remote corporation serving as the Borrower or the SPE Corporations of the Borrower, who is not at the time of initial appointment and has not been at any time during the preceding five (5) years: (a) a stockholder, director, officer, employee or partner of such corporation, the Borrower or any affiliate of either of them; (b) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the corporation, the Borrower or any affiliate of either of them; (c) a person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other person; (d) an attorney or counsel to such corporation, the Borrower or any affiliate of either of them or (e) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other person. (As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.)

(x)    Non-Consolidation Opinion. For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the Borrower's legal counsel (who must be satisfactory to John Hancock's legal counsel) shall provide an opinion, in form and substance satisfactory to John Hancock's legal counsel to the effect that a bankruptcy proceeding involving,

(aa)    the parent or an affiliate (including without limitation any affiliated property manager) of the Borrower,

(bb)    a member, partner or shareholder of the Borrower, or

(cc)    a partner of a partnership, a member of a limited liability company or shareholders of a corporation, which partnership, limited liability company or corporation serves as a special purpose, bankruptcy remote general partner or managing member of the Borrower,

shall not cause (1) the assets of the Borrower (including without limitation the Security) to be substantively consolidated with the assets of its bankrupt parent, affiliate, member, partner or shareholder and, (2) if applicable, the assets of the SPE Corporations of the Borrower to be substantively consolidated with the assets of its bankrupt partner, member or shareholder.

(xi)    Fraudulent Conveyance and Other Required Opinions. If the Security was transferred to the Borrower by an affiliated entity, John Hancock may require an additional opinion to establish that the transfer of the Security to the Borrower cannot be avoided as a fraudulent conveyance or pursuant to similar laws which would cause the Security to be included among the assets or estate of the transferor.

10.    COMPLIANCE WITH ZONING, BUILDING LAWS, SUBDIVISION AND OTHER LAWS, REGULATIONS, ETC. AND SEPARATE TAX PARCEL

John Hancock shall be furnished within twenty-one (21) days of Rate Lock with evidence satisfactory in form and substance to John Hancock and its counsel, including, without limitation, affirmative title insurance in the form of an ALTA 3.1 (or CLTA 123.2) title endorsement (modified to cover parking) if issued in the jurisdiction where the Real Estate Security is located and a letter from the municipality evidencing that the Real Estate Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto. If said title endorsement is not issued in the jurisdiction, both an opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required. John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Real Estate Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel. John Hancock shall be provided with evidence that the Security and the use thereof

JH 00969

Application No. 6518467

comply with all building laws, ordinances, rules and regulations, including without limitation, permanent and unconditional certificates of occupancy and all other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, and evidence of rebuildability, all of which shall be satisfactory in form and substance to John Hancock and its counsel.

## 11. COMPLIANCE WITH ENVIRONMENTAL LAWS; LOAN DOCUMENTS

(a) Applicant furnishes to John Hancock herewith an environmental certificate and questionnaire (the "Environmental Certificate") completed and executed by Applicant, attached hereto and made a part hereof marked Exhibit C, which Applicant acknowledges is subject to the approval of John Hancock. Applicant agrees that the Closing of the Loan is conditioned upon the continued accuracy of the representations, warranties and certifications contained in Exhibit C.

(b) John Hancock shall also be furnished with such additional evidence as it may require, and satisfactory in form and substance to John Hancock and its counsel, that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, together with all certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, including without limitation, an engineering report in form and substance satisfactory to John Hancock and a certification by an engineer satisfactory to John Hancock and its successors and assigns, whose fees and expenses shall be paid by Applicant and/or Borrower, as to the structural and mechanical sufficiency of the improvements and equipment to meet municipal, state and federal environmental requirements.

(c) The Applicant shall provide to John Hancock an assessment, in form and substance satisfactory to John Hancock and its counsel, by one or more qualified registered professional engineers, hydrologists, or other scientists approved by John Hancock, whose report or reports shall be certified to John Hancock and its successors and assigns and the Applicant and whose fees and expenses shall be paid by the Applicant, and which shall be dated no earlier than one hundred eighty (180) days prior to the Closing, that based on a visual inspection and a thorough review of historical uses of the Real Estate Security and neighboring lands, review of all lists of actual or suspected sites of releases which are published by federal or state agencies, consultation with local officials and a records check of local agencies and authorities who might be knowledgeable with respect to the Real Estate Security:

(i) there exists no evidence of the past or ongoing release or threatened release at, upon, under, or within, or of the past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials, which term shall in this Application include hazardous waste, as that term is defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5), hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14), pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C. §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM") and volatile organic compounds, including oil and petroleum products; and

(ii) there exists no evidence that ACM, polychlorinated biphenyls (PCBs), Mold (defined as the presence of any form of (i) multicellular fungi that live on plant or animal matter and an indoor environment (including without limitation Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor and Stchybotrys chartarum (SC) often found in water damaged building materials), (ii) spores, scents or byproducts produced or released by fungi, including mycotoxins and (iii) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living (collectively "Mold")) or radon gas is present at the Real Estate Security.

If, in John Hancock's sole discretion, the report or reports provided pursuant to subparagraphs (b) and/or (c) above; the answers to any questions on the Environmental Certificate attached hereto as Exhibit C; the provisions of any federal, state, or local laws; and/or any other information which John Hancock has obtained

13

JH 00970

Application No. 6518467

so warrants, John Hancock may require, as a further condition to Closing the Loan, a further report at the Borrower's expense that there exists no evidence of the discharge, migration, or presence of Hazardous Materials, ACM, PCBs, Mold and/or radon gas at the Real Estate Security, said further report to be based on, in John Hancock's sole discretion, soil and groundwater sampling and monitoring, and/or sampling and analysis of building materials.

(d) The Loan Documents will contain, without limitation:

    (i)     warranties and representations by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

        (aa)   to the best of Borrower's knowledge, there have been no releases or threatened release at, upon, under, or within, nor past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials; and

        (bb)   Borrower has not received any notice from any governmental authority or from any tenant or other occupant or from any other person with respect to any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security; and

        (cc)   to the best of Borrower's knowledge, there is no ACM, PCBs, Mold or radon gas at or within the Real Estate Security; and

    (ii)     covenants by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

        (aa)   Borrower has not been, is not, and will not become involved in operations at the Real Estate Security which could lead to the imposition on Borrower of liability under RCRA, CERCLA, or any similar applicable federal or state laws or regulations;

        (bb)   Borrower will strictly comply with the requirements of RCRA, CERCLA, and all similar applicable federal and state laws and regulations, and of all federal and state laws and regulations relating to ACM, PCBs, Mold and radon gas, and will notify John Hancock of any release of Hazardous Materials at, upon, under, or within the Real Estate Security involving Borrower, or of the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, or of the receipt by Borrower of any notice from any governmental agency or authority or from any tenant or other occupant or from any other person with respect to any alleged such release or presence, promptly upon discovery of such release or presence or receipt of such notice, and will send John Hancock copies of all results of tests of underground storage tanks at the Real Estate Security; and

        (cc)   Notwithstanding any provisions in the Loan Documents limiting or negating Borrower's personal liability, Applicant, Borrower and James R. Koller, Frank C. Palopoli & Joseph P. Kelly, individually, will jointly and severally indemnify and hold John Hancock harmless from and against any and all loss, cost, damage, liability, and expense, including attorneys' fees, suffered or incurred by John Hancock in connection with this Loan, at any time, whether before, during, or after enforcement of its rights and remedies upon default, on account of any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security, or resulting from the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, including with respect to (i) the imposition by any governmental authority of any lien or so-called "super priority lien" upon the Real Estate Security, (ii) clean-up costs, (iii) liability for personal injury or property damage or damage to the environment, and (iv) fines, penalties, and punitive damages; provided, however, that the obligation of Applicant and the Indemnitors to indemnify John Hancock shall not apply to any release or presence of Hazardous Materials which (1) first occurs after (A) a repayment of the Loan in full in accordance with the Loan Documents, or (B) acquisition of title by John Hancock upon a foreclosure and surrender of possession and occupancy of the Security by Applicant and the Indemnitors, their agents, affiliates, employees and independent contractors, and (2) with respect to both (1) (A) and (1) (B) above, is not due to any action occurring prior to such repayment or acquisition.

JH 00971

The Applicant, Borrower, Guarantors and Indemnitors shall have the burden of proving that the conditions in the foregoing clauses (1) and (2) were satisfied by clear and convincing evidence and shall continue to defend with counsel reasonably satisfactory to John Hancock and shall indemnify and hold harmless John Hancock for all matters set forth in Section 11(d)(ii)(cc), unless a court of competent jurisdiction finds that Indemnitors have met such burden.

(e) The Loan Documents will contain, without limitation, in form and content satisfactory to John Hancock and its counsel, (i) provisions to the effect that at any time while the Loan is outstanding, John Hancock may (but will not be obliged to) enter the Real Estate Security to make reasonable inspections of its condition, including but not limited to soil and groundwater sampling and monitoring, and including but not limited to inspections for Hazardous Materials, ACM, PCBs, Mold and/or radon gas, (ii) warranties and representations by Borrower that all of the answers on the Environmental Certificate attached hereto as Exhibit C are true and complete, (iii) covenants by Borrower that Borrower will notify John Hancock in writing immediately upon learning that any of the answers on the Environmental Certificate either was not true when made or is no longer true, and (iv) provisions to the effect that any event which causes any of the answers on the Environmental Certificate to be no longer true, or John Hancock's learning that any of the answers on the Environmental Certificate were not true when made, shall, if the change is in John Hancock's sole determination adverse, constitute a default under the Loan Documents, giving John Hancock all the rights and remedies available to it upon a default by Borrower.

(f) The title insurance required by Condition No. 7 shall include, if available in the jurisdiction where the Real Estate Security is located, affirmative assurances (i) that no liens or notices affecting the Real Estate Security or any part thereof under RCRA, CERCLA, or any similar applicable federal and state laws have been placed of record in any place of public record and (ii) that the records of the state environmental agency have been examined, and that no expenditures for clean-up of hazardous materials at the Real Estate Security have been incurred by any government agency or authority.

## 12. COMPLETION

Prior to Closing, all construction of buildings and other improvements shall be completed to the satisfaction of John Hancock.

## 13. THIRD PARTY INSPECTIONS

Borrower is obligated to deliver to John Hancock within thirty (30) days of the date of Rate Lock the reports and materials described below in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock:

(a) a structural report prepared by an engineer acceptable to John Hancock who will (i) conduct an engineering study of the Real Estate Security satisfactory to John Hancock including, without limitation, an inspection of the structural, mechanical, electrical, plumbing and roof systems and, if required, a termite inspection, and (ii) make an Americans with Disabilities Act review; and where applicable, a seismic study satisfactory to John Hancock, prepared by an engineer acceptable to John Hancock (collectively, "Property Condition Assessment");

(b) an environmental assessment or assessments (collectively, "Environmental Assessment") prepared by an environmental consultant acceptable to John Hancock who will perform a Phase I environmental assessment of the Real Estate Security as further described in Condition 11; and a Phase II environmental assessment, if recommended in the Phase I report and John Hancock determines that such additional assessment is advisable; and

(c) an appraisal (the "Appraisal") by a state licensed appraiser acceptable to John Hancock who will provide an appraisal acceptable to John Hancock as more fully described in Condition 14.

Reports from other third party contractors may be required to evaluate any issues raised in the underwriting process.

Ed. 1/28/2004

JH 00972

Application No. 6518467

Applicant hereby designates, subject to approval by John Hancock, the following third party professionals:

Engineer:      **Con-Tech Services Inc., 388 Reed Road, Bldg.#1, 2nd Floor, Broomall, PA 19008**

Environmental
Consultant:    **RT Environmental**

Appraiser:     **Cushman & Wakefield, Att; Jerry McNamara, Bell Atlantic Tower, 1717 Arch Street, 30th Floor, Philadelphia, PA 19103**

John Hancock is not responsible for the performance of said third party professionals. Applicant further acknowledges and agrees that said professionals will provide their services directly to Applicant.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the third party professionals. John Hancock hereby reserves the right to approve the third party professionals.

The costs of and in connection with reports from all third party professionals required pursuant to Condition 13 are defined as "Third Party Report Fees".

In order to facilitate the Closing process, Applicant hereby authorizes John Hancock to contact the third party professionals designated above, and to instruct them on behalf of Applicant to commence work as soon as possible after Rate Lock. It is understood that the third party professionals will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the third party professionals whether or not the Loan closes, and for making sure that the third party professionals and said reports satisfy all the conditions of this Application

14. UNDERLINE APPRAISAL

John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser acceptable to John Hancock with no interest, direct or indirect, in the Security or in any loan made on the Security, and whose compensation is not affected by the approval or disapproval of the Loan. The appraisal shall be addressed to John Hancock and its successors and assigns. The appraisal must support a loan-to-value ratio of not more than **75.00%**, calculated as determined by John Hancock in its sole discretion.

15. LEASE REQUIREMENTS

(a) If the Security is occupied by any tenants under Space Leases, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on the rent roll attached hereto as Exhibit B and made a part thereof, and fully executed copies of the Space Leases so listed have already been delivered or are forwarded to John Hancock with this Application. The rent roll shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase option and/or co-tenancy requirements, any and all other fees paid by tenants, and security deposits currently held.

    (i)   All additional Space Leases which are entered into prior to Closing, shall be furnished to John Hancock immediately upon execution thereof;

    (ii)  All Space Leases and Other Leases shall be satisfactory in form and substance to John Hancock;

    (iii) Prior to Closing, John Hancock shall be furnished with a Tenant's Estoppel Certificate in the form attached hereto and made a part hereof marked Exhibit E, executed by each tenant under each Space

Application No. 6518467

Lease and each other Lease, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities;

(b) If the Security consists of a multifamily property, a mobile home park, a congregate care property or a self-storage facility, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on a rent roll attached hereto as Exhibit B and made a part hereof. The rent roll shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, any and all other fees paid by tenants including but not limited to utility reimbursements, and security deposits currently held.

16. RENTAL AND DEBT SERVICE COVERAGE REQUIREMENTS.

(a) On the Closing Date rents at the rate of not less than **$4,221,126.00** per annum in the aggregate shall be currently collectible from actual occupants of the Security under Space Leases that are in form, for periods and at rentals satisfactory to John Hancock, under which Space Leases there shall be no concessions, free rent or rebates.

(b) On the Closing Date, there shall be a minimum debt service coverage ratio of **1.25:1**, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues and expenses as John Hancock determines are appropriate.

17. SUBORDINATION OF LEASES AND MANAGEMENT AGREEMENTS

John Hancock may, at its sole option, require (a) that any or all Space Leases and Other Leases and management agreements and other agreements affecting the Real Estate Security or Personal Property Security be made absolutely subject and subordinate to the lien of the Mortgage, (b) that any or all such Space Leases and Other Leases and agreements be made superior and prior to the Mortgage, or (c) that, except for Loans on multifamily properties, mobile home parks, congregate care properties or self-storage facilities, prior to Closing, John Hancock shall be furnished with a Subordination Non-Disturbance and Attornment Agreement in form and substance satisfactory to John Hancock, in its sole discretion, executed by each tenant required by John Hancock.

18. ESTABLISHMENT ON CLOSING DATE OF RESERVE FUNDS

(a) TAXES AND OTHER CHARGES: On the Closing Date Borrower will establish with John Hancock, a reserve fund in an amount satisfactory to John Hancock from which to pay taxes, assessments, liens, charges, hazard insurance premiums and ground rents, if any.

(b) REPLACEMENT RESERVE: Borrower will be required to make monthly deposits pursuant to an approved capital expenditure budget equal to one twelfth (1/12) of the amount estimated by John Hancock to be necessary for capital repairs or replacements to the Real Estate Security during each calendar year. John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

(c) TENANT IMPROVEMENT AND LEASING COMMISSION RESERVE: Borrower may be required to make monthly deposits for tenant improvements and leasing commissions in amounts determined by John Hancock.

(d) IMPROVEMENTS/REPAIR AND REMEDIATION RESERVE: In the event John Hancock's Property Condition Assessment, Environmental Assessment or any other report detects any deferred maintenance or other repair items, or the possibility that any Hazardous Materials described in Condition 11 are located in, on or under the Real Estate Security, and if John Hancock in its sole discretion approves the Loan for Closing, then a reserve with John Hancock equal to one hundred twenty-five percent (125%) of John Hancock's estimated cost to repair or remediate such items (as determined by a qualified engineer or environmental consultant, as the case may be, retained by John Hancock on behalf of Applicant, at Applicant's expense) will be established by Borrower at the Closing of the Loan and will be maintained until completion of the repairs or remediation, as

JH 00974

determined by John Hancock. John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

19. INSURANCE

Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may require, satisfactory in form and substance to John Hancock, which insurance shall comply with the provisions of the Loan Documents pertaining to such insurance, and be issued by companies satisfactory to John Hancock and licensed to do business in the state where the Real Estate Security is located.

The policies for the insurance required above shall be delivered to John Hancock at least seven (7) days prior to the Closing of the Loan. All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance and provide full extended coverage, naming John Hancock and its successors and assigns as first mortgagee and otherwise covering John Hancock's interest in the Real Estate Security in a manner satisfactory to John Hancock.

20. FINANCIAL STATEMENTS

Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion. In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock.

21. CLOSING AND OTHER COSTS

Unless specifically stated to the contrary herein, whether or not the Loan closes, Applicant and Borrower shall be jointly and severally liable to pay on the earlier of the Closing date or termination of this Application all costs pertaining to the Loan and the Closing, including, without limitation, all Third Party Report Fees, all charges for title examination and title insurance and escrow, all survey costs, all recording and filing fees, all mortgage or similar taxes, and all attorneys' fees and costs of John Hancock (collectively "Costs").

22. BORROWER'S COUNSEL

The name, address and telephone number of counsel for the Borrower to be contacted by John Hancock's counsel are as follows:

Name:           Mitchell E. Russell
Address:        510 Township Line road, Suite 150, Blue Bell, Pa 19422
Telephone No.:  215-653-0110
Fax No.:        215-653-0383

23. OPINION OF COUNSEL

Applicant and/or Borrower shall provide John Hancock on or prior to the Closing Date with an opinion satisfactory in form and substance to John Hancock and its counsel dated as of the Closing Date from an attorney approved by John Hancock and its counsel and, in addition, at John Hancock's option, from its counsel, that, among other things:

(a) the Borrower, if an entity, the Guarantors and Indemnitors, if entities, and all constituent entities thereof, are duly formed, validly existing and in good standing,

(b) the Borrower and any entity executing Loan Documents on behalf of Borrower or in addition to Borrower (e.g. owners of subordinated fees, Guarantors and Indemnitors) and all other constituent entities, if any, are duly authorized to execute, deliver and perform the obligations under the Loan Documents,

Application No. 6518467

(c) the Loan Documents are legal, valid, binding and enforceable in accordance with their terms,

(d) the Loan Documents do not violate any law, regulation or ordinance, and

(e) the Loan Documents do not conflict with the Borrower's or any Guarantor's or Indemnitor's by-laws or any other documents creating or giving the Borrower or any Guarantor or Indemnitor authority, and are not in violation of or in conflict with any other agreement of Borrower or any Guarantor or Indemnitor.

If the Loan is in the principal amount of $15 million or more or if the box is checked, the opinions set forth in Conditions 9(c)(ix) and (x) shall be delivered.

Borrower will provide John Hancock and its counsel with the proposed form of said opinion no later than fourteen (14) days from the date of acceptance of this Application by John Hancock.

24. COOPERATION AND DISCLOSURE

Applicant, Borrower, each Guarantor and each Indemnitor acknowledge: (a) that John Hancock has advised them that it may sell, assign, pledge, securitize, participate or otherwise transfer the Loan or any interest therein, in whole or in part, (such transaction being called a "Transaction"), (b) that John Hancock may use and disclose in connection with such Transaction any information it receives in connection with the Loan and that such information will be reviewed and relied upon by John Hancock, its advisers, attorneys, underwriters, placement agents, rating agencies, investors and potential investors in connection with such Transaction, and (c) that they agree to cooperate in the Transaction and to provide required information at their own cost and expense.

25. REPRESENTATIONS, WARRANTIES AND COVENANTS

Applicant, Borrower and, as applicable, each Guarantor, and each Indemnitor, represent and warrant as follows in connection with this Application: (a) all material information submitted or to be submitted in connection with this Application and the Loan is or will be, respectively, true, correct and complete, including, but not limited to, the information on Exhibits B and G and the rent roll attached to this Application; (b) the financial and operating statements and other accounting information submitted in connection with the Application are true, correct, complete, and fairly present the financial condition of the Applicant, Borrower, Guarantors and Indemnitors and their respective Principals and have been prepared consistent with proper accounting standards; (c) there is no litigation, action, claim, or other proceeding, pending or threatened which might, in any way, materially and/or adversely affect the Applicant, Borrower, any Guarantor, any Indemnitor or the Principals of any of them, or the Security, John Hancock's proposed first lien thereon, or the financial condition of the Security or any of the aforementioned persons; (d) that their respective Principals are truly, accurately, and completely described on Exhibit F; (e) neither the Applicant, the Borrower, any Guarantor and Indemnitor, nor their respective Principals has received notice of, or is otherwise aware of, any condemnation or other action against the Security; (f) Applicant and/or Borrower and/or the Security possess adequate assets, leases, licenses, franchises, rights, governmental and other permits, certificates, consents and approvals to conduct and/or operate the business of the Security and none of the foregoing contains any term or condition that is materially burdensome or different from those possessed or held by other parties conducting or operating a similar business; and (g) each has fully disclosed to John Hancock all facts material to the Security and the operation and tenants thereof, and all facts material to the Applicant, the Borrower, each Guarantor and each Indemnitor and their respective Principals and the background, creditworthiness, financial condition and the business operations of each.

Applicant, Borrower and, as applicable, each Guarantor and each Indemnitor hereby (a) covenants that the foregoing representations and warranties are true, accurate and complete in all respects and will continue to be so from the date hereof through the Closing Date with the same effect as if made on the Closing Date and (b) agrees that the foregoing is a condition to Closing the Loan.

It is understood that other representations, warranties and covenants customary for loans of this nature, will be required by and set forth in the Loan Documents.

19

Ed. 1/28/2004

JH 00976

26. COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and Borrower agree that prior to Closing they will satisfy and otherwise comply with all Terms and Conditions hereof at the earliest possible date, and in any event within any time limits specifically stipulated in the Terms and Conditions hereof, and so as to permit the Closing of the Loan to occur on or prior to the Closing Date, and, pursuant to the foregoing, Applicant and Borrower further agree that they will submit to John Hancock or to John Hancock's counsel, as the case may be, all instruments, documents, evidence, papers, information and other materials pertinent to the Loan, as soon as possible and in any event no later than (a) the date or dates, if any, specifically stipulated in the Terms and Conditions hereof, and (b) where such dates are not so specifically stipulated, twenty-one (21) days prior to the Closing Date.

27. ACCEPTANCE BY JOHN HANCOCK OF THIS APPLICATION

   (a) Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committee and John Hancock has accepted this Application in the place provided below, and then said obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

   (b) In the event that John Hancock accepts this Application in the place provided below and forwards an executed copy thereof to the Applicant, Applicant will borrow the Principal Amount; and provided that, after such acceptance by John Hancock, Applicant pays John Hancock the Commitment Fee within the time and as otherwise stipulated in condition 30(c) hereof, then John Hancock agrees to make the Loan upon and subject to the provisions contained in the Terms and Conditions hereof, and this Application will thereupon become a Commitment between Applicant and John Hancock.

   (c) The acceptance of this Application by John Hancock shall not constitute approval by John Hancock of any leases or other materials heretofore submitted to John Hancock. Such leases and other materials will be the subject of separate communications from John Hancock.

28. ASSIGNABILITY

This instrument and the rights of Applicant and Borrower hereunder shall not be assignable by operation of law or otherwise, and any purported assignment thereof shall be null and void. John Hancock may assign its rights and obligations hereunder to any affiliate.

29. TERMINATION OF THIS INSTRUMENT

   (a) In the event that a Rate Lock has occurred or John Hancock accepts this Application, (whether or not Applicant has timely paid the Commitment Fee) John Hancock may terminate its obligation to Close and fund the Loan (and the Rate Lock shall automatically expire) at John Hancock's option and in such manner as John Hancock may determine in the event that:

      (i) Applicant or Borrower shall fail to fully and timely satisfy or otherwise comply with any of the Terms and Conditions contained in this instrument,

      (ii) there is filed by or against any Applicant, any Borrower any Guarantor or any Indemnitor or Principal of any of them, or any constituent entity of any of them or against any tenant under any Space Lease or Other Lease referred to in Condition 15(a) hereof a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee or liquidator, or if any Applicant, Borrower, Guarantor or Indemnitor, or Principal of any of them or any constituent entity of any of them or any tenant makes an assignment for the benefit of creditors or files a petition for arrangement which is not withdrawn or dismissed, canceled and/or terminated, or which may exist, at the time herein or hereafter established for Closing of the Loan,

Ed. 1/28/2004

JH 00977

Application No. 6518467

    (iii)    there shall occur prior to the Closing Date a material and adverse change in the financial condition of any Applicant, Borrower, or any Guarantor or Indemnitor, or Principal of any of them, or any constituent entity of any of them, or of any tenant referred to in Condition 15(a) hereof,

    (iv)    the Security shall suffer any material damage or destruction and the same is not restored to the satisfaction of John Hancock prior to the Closing Date,

    (v)    any material information furnished to John Hancock by or on behalf of the Applicant, the Borrower, any Guarantor, any Indemnitor, any Principal of any of them or any constituent entity of any of them is or becomes untrue, incomplete, inaccurate or misleading, or

    (vi)    any representation, warranty or covenant contained in Condition 25 or elsewhere in this Application shall cease to be materially true, accurate and complete.

provided, however, that in the event of such termination of John Hancock's obligation to Close and fund the Loan by John Hancock (and the expiration of the Rate Lock), Applicant and Borrower shall continue to remain liable for all Costs.

(b) Delay in the exercise of John Hancock's right to terminate said obligations as aforesaid shall not be construed as a waiver of such right by John Hancock to terminate with respect to any of the events specified in subparagraph (a) above, and John Hancock's failure to act as to any such event shall not be construed as a waiver by John Hancock of its rights as to any subsequent event of a similar or dissimilar nature.

## 30. APPLICATION, PROCESSING AND COMMITMENT FEES

Applicant and Borrower covenant that they shall pay the following fees in connection with this Application and the Closing of the Loan:

(a) Processing Fee: A processing fee, payable to John Hancock by cashier's check, in the amount of $5,000.00 is enclosed herewith/has been paid prior hereto (the "Processing Fee"). This Processing Fee is deemed fully earned upon receipt, is non-refundable and will be retained by John Hancock whether John Hancock accepts this Application and whether or not the Loan Closes.

(b) Application Fee: An application fee in the amount of $640,000.00 (the "Application Fee"), payable to John Hancock by cashier's check is enclosed herewith. The Application Fee will be applied as follows:

    (i)    In the event the Loan Closes, John Hancock will return to the Applicant the Application Fee, less all Costs.

    (ii)    Unless the Applicant withdraws or revokes this Application, in the event John Hancock does not accept this Loan Application within sixty (60) days from the date of this Application, and John Hancock and Applicant are unable to agree on a modified Application within that time, John Hancock will return the entire Application Fee to the Applicant.

    (iii)    In the event that, before Rate Lock, Applicant withdraws or revokes this Application, John Hancock will return the Application Fee, less all Costs.

    (iv)    In the event that, after Rate Lock, but prior to John Hancock's acceptance of this Application, Applicant withdraws or revokes this Application, John Hancock will retain the Application Fee and Applicant shall be liable for all Costs.

    (v)    In the event John Hancock accepts this Loan Application and the Loan does not Close, John Hancock will retain the entire Application Fee in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

Ed. 1/28/2004

JH 00978

(c) Commitment Fee: If John Hancock shall accept this Application, then in consideration of such acceptance by John Hancock and in recognition of the significant commercial value thereof, Applicant shall pay to John Hancock within five (5) days of such acceptance by John Hancock $320,000.00, the Commitment Fee. The Commitment Fee will be applied as follows:

    (i)    In the event the Loan Closes, $320,000.00 of the Commitment Fee will be returned to the Applicant.

    (ii)    In the event the Loan does not Close, the Commitment Fee will be retained by John Hancock in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

Payment of the entire amount of the Commitment Fee within the time period herein provided is a condition to Applicant's and Borrower's rights under this instrument.

(d) If John Hancock accepts this Application, and in the event that thereafter:

    (i)    Applicant or Borrower shall fail to satisfy or otherwise comply with any of the Terms and Conditions hereof in timely fashion, or

    (ii)    John Hancock shall terminate this instrument pursuant to Condition 29 hereof, or

    (iii)    in any event, if the Loan shall not have been Closed by the Closing Date or as the same may be extended by John Hancock as provided below, on which date John Hancock's obligation to Close and fund shall expire,

then all obligations of John Hancock hereunder shall thereupon immediately terminate and be of no further force or effect, and John Hancock shall be entitled to recover from Applicant and/or Borrower all damages, losses, costs and expenses suffered or incurred by John Hancock as a result of any of the events described in part (i), (ii) or (iii) of this subparagraph (d), including, without limitation, all such damages, losses, costs or expenses arising from the fact that, in reliance on the agreements of Applicant and Borrower contained herein, John Hancock allocated and set aside assets for the purpose of funding the Loan and made commitments to third parties based thereon, in addition to retention of the Processing Fee, the Application Fee and the Commitment Fee, provided, however, that Applicant and/or Borrower shall also continue to remain liable for all Costs.

## 31. LIMITATION OF OUT-OF-POCKET COSTS FOR APPLICANT

Notwithstanding any other conditions of this Application and provided that the Applicant shall use its best efforts to satisfy all of the conditions of this Application, if the Applicant is not at fault in any way and John Hancock in its sole discretion, elects not to Close the Loan because the Security violates any zoning, building or environmental law, ordinance, code, rule, or regulation or the Property Condition Assessment, Environmental Assessment, Appraisal or title evidence are not satisfactory to John Hancock or its Special Counsel, and any of the foregoing problems cannot be cured to the satisfaction of John Hancock and its Special Counsel by monetary payment of a sum certain by the Applicant or Borrower, then John Hancock will return to Applicant any Application Fee or Commitment Fee paid hereunder, less Costs.

## 32. EXTENSIONS OF TIME AND WAIVERS OF CONDITIONS

John Hancock reserves the right in its sole and absolute discretion to:

(a) extend the Closing Date specified in Condition 4(b) hereof, as amended by the Rate Lock Confirmation, if Borrower is not ready to close and, if Borrower has not complied with any of the Terms and Conditions hereof by the date herein provided, to extend any such date for the satisfaction of or compliance with such Terms and Conditions hereof, and

(b) waive any of the Terms and Conditions hereof.

22

Application No. 6518467

Any such extension or waiver, and any amendment or modification of this instrument, shall be in writing and be signed by John Hancock. In no event shall there be any obligation on the part of John Hancock to grant any extensions or waivers, or if any should in John Hancock's sole discretion be granted, there shall be no obligation to grant additional ones.

33. NOTICES

Any notices given hereunder by Applicant or Borrower to John Hancock shall be addressed as follows:

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, Massachusetts 02116
Attn: Real Estate Investment Group

34. PUBLICITY

In the event the Loan contemplated herein is made, John Hancock shall have the right to issue press releases, advertisements and other promotional materials describing John Hancock's participation in the origination of the Loan or the Loan's inclusion in any securitization.

35. GOVERNING LAWS

This Application shall be deemed to be executed and performable in and governed by the substantive laws of Massachusetts.

36. LIMITATION ON LIABILITY

The Loan Documents shall contain language satisfactory to John Hancock which will serve to negate the personal liability of the Borrower, with exceptions for loss, costs or damage arising from the following (collectively "Non-recourse Carveout Obligations"):

(a) Fraud, misrepresentation and waste.

(b) Any rents, issues or profits collected more than one (1) month in advance of their due dates.

(c) Any misapplication of rents, issues or profits, security deposits, and any other payments from tenants or occupants (including, without limitation, lease termination fees) insurance proceeds, condemnation awards, or other sums of a similar nature.

(d) Liability under environmental covenants, conditions and indemnity contained in the Mortgage and separate environmental indemnity agreement.

(e) Personalty or fixtures removed or allowed to be removed by or on behalf of Borrower and not replaced by items of equal or greater value or functionality than the personalty or fixtures so removed.

(f) Failure to pay taxes or assessments prior to delinquency, or to pay charges for labor, materials or other charges which can create liens on any portion of the Security and any sums expended by John Hancock in the performance of or compliance with the obligations of Borrower under the Loan Documents, including, without limitation, sums expended to pay taxes or assessments or hazard insurance premiums or bills for utilities or other services or products for the benefit of the Security.

(g) The unauthorized sale, conveyance or transfer of title to the Security or encumbrance of the Security.

(h) The failure of Borrower to maintain its status as a single purpose, bankruptcy-remote entity pursuant to its organizational documents and the Loan Documents.

23

JH 00980

Application No. 6518467

(i)  Attorney's fees, court costs and other expenses incurred by John Hancock in connection with enforcement of Borrower's or Guarantors' personal liability as set forth herein.

37.  CORRESPONDENT

Applicant and Borrower agree that **Carey, Kramer, Pettit, Panichelli & Associates, Inc.** is acting solely as an independent contractor in connection with this Application and the Loan and not as an agent for John Hancock, and has no authority to bind or make any agreements, warranties or representations on behalf of John Hancock, and any agreement by said independent contractor in connection with this Application or the Loan or otherwise shall not be binding upon John Hancock.

38.  DISCLOSURE NOTICE

The Applicant is entitled to a statement of the action taken on this Application. If such action is adverse and the Applicant so requests, the Applicant is entitled to receive the reasons for such action. The statement of adverse action shall be provided by John Hancock. The Applicant may, within sixty (60) days of the Applicant's receipt of the statement of adverse action, request that John Hancock provide a statement of specific reasons for that adverse action by contacting John Hancock at John Hancock Tower, T-56, 200 Clarendon Street, Boston, Massachusetts 02116, Attention: **Timothy J. Malik,** telephone (617) 572-3891, and in such event, John Hancock will provide the Applicant the specific reasons for the adverse action within thirty (30) days. Should John Hancock choose to provide the Applicant with oral notice of the adverse action taken on the Application and the reasons for that action, the Applicant may request written confirmation of those reasons, which will be provided to the Applicant within thirty (30) days of John Hancock's receipt of a written request for confirmation from Applicant.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

39.  ACCESS TO REPORTS AND TO SECURITY

(a)  John Hancock is to be provided a complete credit history for the Applicant, Borrower, the Guarantors, the Indemnitors and the Principals of each (including but not limited to physical record searches for bankruptcy, pending suits, judgments, UCCs and tax liens) in all jurisdictions deemed necessary by John Hancock. John Hancock is hereby authorized (i) to obtain credit reports on the Applicant, Borrower, each Guarantor and Indemnitor, and their respective Principals, as well as verification of statements made in this Application and any attachments hereto, and (ii) to obtain an environmental records search and a seismic screening with respect to the Security.

(b)  Applicant will give John Hancock and its consultants access to the Security and to Applicant's, the Borrower's, the Guarantors', the Indemnitors' (and those of the Principals of each) books and records to conduct the investigations required by Condition 13, this Condition 39 and any other required investigations during normal business hours.

Ed. 1/28/2004

24

JH 00981

Application No. 6518467

40. JOHN HANCOCK'S SPECIAL COUNSEL

The name, address and telephone number of John Hancock's Special Counsel are as follows:

| | |
|---|---|
| Name: | **Robert Schwartz, Esquire** |
| Firm: | **White & Williams** |
| Address: | **One Liberty Place, Suite 1800, 1650 Market Street** |
| City and State: | **Philadelphia, PA 19103-7301** |
| Telephone No. | **215-864-7000 and FAX 215-864-7123** |

41. APPLICANT REPRESENTATION

Applicant hereby warrants and represents that none of the Applicant, the Borrower, any Guarantor or any Indemnitor listed herein, nor any of the Principals (determined as described below) of any of them nor any entity in which any of the foregoing holds or has held an ownership interest has been in default under any loan or been given relief by any lender under the terms of any loan or been subject to a foreclosure or deed-in-lieu of foreclosure or been the subject of any bankruptcy, reorganization or insolvency proceeding, unless this box ☐ is checked.

Principal is determined as follows:

(a) Any individual or entity possessing management or operational control of Applicant, Borrower, any Guarantor or any Indemnitor;

(b) Any person or entity possessing at least 25% of the ownership interests in the Applicant, Borrower, any Guarantor or any Indemnitor;

(c) In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner;

(d) In addition, for a corporation, the Principal(s), will be the majority shareholder(s);

(e) In addition, for a limited liability company, the Principal(s) will be all the member(s) thereof and the majority shareholder(s) of any corporate member and the general partners of any partnership member.

42. AUTHORIZATION FOR DIRECT DEBITS

Borrower hereby agrees to authorize John Hancock to make direct debit entries as described on Exhibit H attached hereto and to execute said written authorization by completing and executing an agreement in the form of said Exhibit H.

43. COMPLIANCE WITH REGULATION U.

No part of the proceeds of the Loan will be used for the purpose (whether immediate, incidental or ultimate) of buying or carrying any margin stock within the meaning of Regulation U (12 CFR part 221) of the Board of Governors of the Federal Reserve System of the United States or for the purpose of reducing or retiring any indebtedness which was originally incurred for any such purpose, or for any other purpose which might constitute this Loan a "purpose credit" within the meaning of such Regulation U.

44. GUARANTORS OF NON-RECOURSE CARVEOUT OBLIGATIONS

**Borrower and James R. Koller, Frank C. Palopoli & Joseph P. Kelly** will guaranty the Non-Recourse Carveout Obligations.

45. Time is of the essence of this Application.

25

JH 00982

Application No. 6518467

Applicant (1) agrees to be fully bound by the Terms and Conditions hereof and (2) covenants that all facts and circumstances pertaining to this Application, the Loan and the Security are and shall continue to be as represented to John Hancock.

The undersigned hereby represents that the Applicant has, and all persons signing this Application on behalf of the Applicant have, the legal capacity and authority to enter into this transaction and to execute this Application.

MONTGOMERY SQUARE PARTNERSHIP
(Applicant) By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____

Its: PRESIDENT

26

JH 00983

Application No. 6518467

INDEMNITORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Indemnitors hereby agrees to execute the indemnification agreement required by Condition 11(d)(ii)(cc) and joins in the representations, warranties and covenants pertaining to the Indemnitors in Condition 25 of this Application.

INDEMNITOR(S): James R. Koller

By: _____
Date:        7 - 30 - 04

INDEMNITOR(S): Frank C. Palopoli

By: _____
Date:

INDEMNITOR(S): Joseph P. Kelly

By: _____
Date:        7- 30 -04

Ed. 1/28/2004

28

JH 00984

Application No. 6518467

ACCEPTANCE BY JOHN HANCOCK

John Hancock hereby accepts the foregoing Application and agrees with the Terms and Conditions therein contained, as modified by the Rate Lock Confirmation, a copy of which is attached hereto.

JOHN HANCOCK LIFE INSURANCE COMPANY.

By: _____

Date: _8/17/04_

**Timothy J. Malik**
Senior Investment Officer

GUARANTORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Guarantors hereby agrees, jointly and severally, to guaranty the Non-recourse Carveout Obligations of the Borrower under the Loan Documents and joins in the representations, warranties and covenants with respect to the Guarantors contained in Condition 25 of this Application.

GUARANTOR(S): James R. Koller

By: _____

Date: _7-30-04_

GUARANTOR(S): Frank C. Palopoli

By: _____

Date:

GUARANTOR(S): Joseph P. Kelly

By: _____

Date: _7-30-04_

Application No. 6518467

### INDEMNITORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Indemnitors hereby agrees to execute the indemnification agreement required by Condition 11(d)(ii)(cc) and joins in the representations, warranties and covenants pertaining to the Indemnitors in Condition 25 of this Application.

INDEMNITOR(S): James R. Koller

By:

Date:  7- 30 -04

INDEMNITOR(S): Frank C. Palopoli

By:

Date:

INDEMNITOR(S): Joseph P. Kelly

By:

Date:  7- 30-04

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 1 of 18

*CONDITION 46- INSURANCE PREMIUM RESERVE - SUSPENSION*

Condition Nos. 6(c) and No. 18(a) are amended as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for hazard insurance premiums as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding insurance, including without limitation providing John Hancock with timely evidence (1) that the required insurance is in place for the Real Estate Security and is never delinquent or suspended, and (2) that all insurance premiums are paid in full.

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Conditions 6 or 18 of the Application.

> **PLEASE NOTE: ALL RISK INSURANCE WITHOUT AN EXCLUSION FOR TERRORISM INSURANCE IS REQUIRED AT ALL TIMES.**

*CONDITION 47- TENANT IMPROVEMENT AND LEASING COMMISSIONS - SUSPENSION*

Condition 18(c) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for tenant improvements and leasing commissions for the Real Estate Security as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding leases at the Real Estate Security.

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 2 of 18

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of
Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the
Application.

## *CONDITION 48- REPLACEMENT RESERVE - SUSPENSION*

Condition 18(b) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and
maintain a reserve fund for capital repairs and replacements to the Real Estate Security as long as
all of the following conditions are satisfied:

(1)     No default has occurred and is continuing under the Loan Documents beyond any applicable
notice or cure period;

(2)     **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)     Borrower complies with all obligations in the Loan Documents regarding maintaining the
Security, including without limitation maintaining the Security in good order and repair;

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of
Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the
Application.

## *CONDITION 49 - RENTAL ACHIEVEMENT*

The Closing shall be no later than 365 days (12 months) from the Rate Lock Date and the outside date for
Closing shall be set forth in the Rate Lock Confirmation.

The maximum permitted principal amount of the Loan shall be $32,000,000, which shall be funded in full
at Closing subject to the Terms and Conditions of this Application, but a portion of the Loan may be
deposited into a rental achievement reserve ("Rental Achievement Reserve") pursuant to the Rental
Achievement Reserve Agreement (as defined below) if all of the following terms and conditions are
satisfied:

(1) *Borrower Portion.*

If the Funding Conditions (as defined below) are satisfied, a portion of the Loan shall be funded and
disbursed to the Borrower. The amount to be disbursed to the Borrower on the Closing Date (the
"Borrower Portion") shall be an amount which does not cause the loan-to-value ratio as set forth in
Condition 14 to exceed 75% (the "Loan to Value" or "LTV"), and at which amount there is minimum
rental income (as described in Condition 16(a)) as modified by this Condition 49 to provide a
component of Value (as defined below) and a Debt Service Coverage ("DSCR") of 1.25:1 (as
described in Condition 16(b)).

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 3 of 18

The amount of the Borrower Portion shall be determined by multiplying 75% by the "Value". The Value is computed by dividing the net operating income of the Security ("NOI") by a capitalization rate of 7.25%.

The NOI is determined by subtracting (a) the operating expenses of (1) $758,433, (2) stabilized taxes (estimated at $480,000) and (3) a management fee of 3.75% of Effective Gross Income (as defined below) from (b) the annualized monthly income from tenants that on the date of Closing occupy apartments and garages under leases reasonably acceptable to John Hancock ("Effective Gross Income")

(See Exhibit 1 for a sample calculation of the Borrower Portion and the amount of the reserves described below.

The DSCR will be determined by reducing the NOI by $64,000 (Replacement Reserve of $250/unit) and then dividing the remainder by the annual debt service payments due and payable upon the Loan, which debt service payments will be determined in connection with the Rate Lock and the applicable Principal Amount of the Loan and shall be deemed to include an amortization schedule of no greater than thirty (30) years.

The amount of the Borrower Portion calculated pursuant to this Section (1) shall be rounded downward to the nearest $1,000.

The amount the Effective Gross Income and the NOI will be determined by John Hancock prior to Closing based upon a review of the Certified Rent Roll (as defined below) and current operating statements submitted by Borrower to John Hancock.

(2) *Conditions to Funding and Provisions for Funding with Rental Achievement Reserve*

In the event that the Security has not achieved an NOI of $3,097,860 as calculated pursuant to Section (1) above within 10 business days prior to the Closing, then John Hancock shall still fund the Loan as long as:

(a) Borrower satisfies timely the other Terms and Conditions of this Application;

(b) Occupancy at the Security under Space Leases satisfying the terms of this Application is not less than 80% (which shall not include Space Leases the tenant or guarantor of which is subject to a bankruptcy or insolvency action);

(c) Borrower establishes the required Rental Achievement Reserve (as defined below) pursuant to a Rental Achievement Reserve Agreement (as defined below) and otherwise satisfies the obligations of this Condition; and

(d) The amount of the Rental Achievement Reserve is not greater than $5,380,000.

The foregoing conditions are referred to collectively as the "Funding Conditions." If all of the Funding Conditions are not satisfied, John Hancock shall have no obligation to fund any portion of the Loan.

The amount of the Rental Achievement Reserve shall be equal to the difference between the entire principal balance of the Loan as specified in Section 3(a) of this Application and the Borrower Portion (the "Rental Achievement Reserve Amount") and will be required to be held by John Hancock in reserve at Closing pursuant to a reserve agreement in form and substance acceptable to John Hancock ("Rental Achievement Reserve Agreement"). (See Exhibit 1 for sample

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 4 of 18

calculation.). The Rental Achievement Reserve may be funded with a Letter of Credit (as defined below) acceptable to John Hancock.

(3) *Achieving Required NOI After Closing*

After the Closing, upon the Security's reaching an NOI of $3,097,860, the Rental Achievement Reserve will be released to Borrower within ten (10) business days of receipt by John Hancock all of the requirements necessary to satisfy the Release Conditions (as defined below).

Notwithstanding the foregoing, if on or after six (6) months from the Closing the NOI is less than $3,097,860, the Rental Achievement Reserve Amount will be recomputed using the method set forth in Section (1) above. If the recalculated Rental Achievement Reserve Amount is less than the then existing Rental Achievement Reserve Amount, the excess reserve will be released to the Borrower (assuming the Release Conditions are satisfied), and at John Hancock's option, the remaining Reduced Principal Amount Rental Achievement Reserve (including without limitation, any accrued interest) (a) may be applied to reduce the principal balance of the Loan, without prepayment premium (in which case the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised); (b) may be applied as is otherwise provided in the Loan Documents; or (c) may continue to be held by John Hancock from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860.

If the recalculated Rental Achievement Reserve Amount is equal to or greater than the then existing Rental Achievement Reserve Amount, then (a) Borrower shall pay to John Hancock within ten (10) days of demand, the amount of such deficiency and (b) John Hancock, at its sole option, (a) may apply the entire Rental Achievement Reserve Amount (including without limitation any accrued interest) to reduce the principal balance of the Loan, without prepayment premium, (in which case, the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised) or as is otherwise provided in the Loan Documents or (b) may continue to hold the Rental Achievement Reserve Amount from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860. Failure to pay such deficiency shall be a default under the Loan.

John Hancock shall have the option in its sole and absolute discretion to extend the six (6) month period described in the foregoing paragraphs in accordance with the provisions of Condition 32 of this Application. Borrower shall be responsible for all costs and expenses, including without limitation, all reasonable attorneys fees of John Hancock, pertaining to the amendment of the Loan Documents or otherwise incurred in connection with effecting the provisions contemplated hereby.

(4) *Full Amount of Loan Disbursed.*

The Loan Documents shall provide that, notwithstanding the fact that the amount of the Borrower Portion may not be equivalent to the entire Principal Amount of the Loan, or that John Hancock has required the funding of one or more reserves at Closing, Borrower shall be required to pay interest on the entire Principal Amount of the Loan.

(5) *Expanding Definition of Costs.*

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the application of all or any

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 5 of 18

portion of the Rental Achievement Reserve, and the revision of the amortization schedule and the monthly payment as described in Condition 49 of this Application."

*Definitions*

*Release Conditions* shall mean that all of the following are satisfied:

(a)   The Loan is not in default;

(b)   Borrower delivers to John Hancock a Certified Rent Roll dated not more than thirty (30) days prior to submission;

(c)   The result of the recalculation of the Rental Achievement Reserve Amount, when conducted at the time of the release, yields a figure that is less than or equal to the amount then held as the Rental Achievement Reserve Amount;

(d)   The LTV is not then more than 75% and the DSCR is not less than 1.25:1 in each case as calculated by John Hancock as provided above;

(e)   All tenants listed on the Certified Rent Roll submitted to John Hancock for the applicable request occupy apartments and garages under leases reasonably acceptable to John Hancock and occupancy at the Security under Leases satisfying the terms of this Application is not less than 80%; and

(f)   Borrower satisfies such other reasonable requirements as are contained in the Rental Achievement Reserve Agreement.

*Certified Rent Roll* shall mean the rent roll certified by the Borrower and submitted to John Hancock dated within thirty (30) days prior to submission, listing each building(s) designation, tenant names, lease commencement and expiration dates, monthly rent due and monthly rent collected, any rental or other tenant concessions, any and all other fees and reimbursements paid by tenants and security deposits currently held. For purposes of computing the gross annual rent, all tenant concessions shall reduce the gross annual rent of all tenants.

*Letter of Credit* shall mean an irrevocable, unconditional, transferable evergreen letter of credit in the applicable amount in form and substance satisfactory to John Hancock and issued by a bank acceptable to John Hancock. The Letter of Credit shall permit partial draws. The Borrower shall execute an agreement satisfactory to John Hancock in connection with said Letter of Credit, providing, among other things, that in the event that Borrower fails to meet its obligations under said agreement, John Hancock shall have the right to require that the expiration date of the Letter of Credit be extended or, at its option, to draw upon the Letter of Credit and to apply the proceeds thereof to the reduction of the principal amount of the Loan, or otherwise in accordance with the Loan Documents or the Rental Achievement Reserve Agreement. It is further required that the bank issuing the Letter of Credit (or any substituted Letter of Credit) be acceptable to John Hancock in its sole discretion not only at the time of the issuance of said Letter of Credit but shall also continue to be so acceptable to John Hancock during the entire term of said Letter of Credit, including all extension and/or renewal periods. If John Hancock, in its sole discretion, shall determine that an issuing bank is or has become unacceptable, Borrower shall be obligated to provide a substitute Letter of Credit. If Borrower does not provide such substitute letter of credit within fourteen (14) days of written notice of the unacceptability of such bank, such failure shall entitle John Hancock to draw upon the existing Letter of Credit and hold and apply the proceeds in accordance with the Rental Achievement Reserve Agreement. Additionally, if Borrower uses a Letter of Credit for the Rental Achievement Reserve and fails to provide a replacement Letter of Credit at least thirty (30) days prior to its expiration, then John Hancock shall have the right, in its sole discretion, to draw on the Letter of Credit and to apply the proceeds as set forth above and to exercise its other remedies under the Loan Documents. All fees and expenses in connection with the Letter of Credit shall be paid by Borrower.



Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 6 of 18

### *CONDITION 50 – CLOSING DATE AND EXTENSION OF CLOSING DATE*

Condition 4(b) of the Application hereby is deleted and the following hereby is substituted in its stead:

The Closing shall occur on or before the date established by the Rate Lock Confirmation executed by Borrower and John Hancock.

John Hancock shall allow the Borrower to extend the Closing Date for up to six (6) periods of up to thirty (30) days each for an aggregate period of one hundred eighty (180) days, provided that no later than ten (10) business days prior to the Closing Date (as the same may have been extended as described herein), John Hancock shall receive written notice that Borrower has elected to extend the Closing Date pursuant to this Condition 50. If Borrower elects to extend the Closing Date, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall increase by five (5) basis points for each 30-day period or portion of a 30-day period for which the Closing Date shall be extended (each, an "Interest Rate Adjustment"). For example if the Closing Date is extended by one hundred fifty one (151) days, the Interest Rate would increase by thirty (30) basis points; provided, however, that in the event that the Borrower extends the outside date for Closing for the aggregate one hundred eighty (180) day period, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall not be increased by more than thirty (30) basis points in the aggregate.

Each Interest Rate Adjustment shall be evidenced by an Extension Agreement which John Hancock shall provide and Borrower shall execute. The Extension Agreement shall set forth the period for which the Interest Rate (or if applicable, each Interest Rate) is locked, the Interest Rate (or, if applicable, each Interest Rate) as adjusted by the applicable Interest Rate Adjustment, the monthly loan payment, the revised outside date for Closing, and if applicable, the revised lock out period. Each Extension Agreement shall result in an Interest Rate Adjustment, which shall be cumulative. Borrower acknowledges that the Interest Rate Adjustments may affect the calculations under Condition 49 which may affect (a) the Borrower Portion; (b) the Rental Achievement Reserve Amount and/or (c) John Hancock's obligation to close the Loan.

### *CONDITION 51 – ADDITIONAL APPLICATION FEE (Regarding Condition 30(b))*

After the Interest Rate for the Loan is locked, if the yield for the "on the run" 10-year U.S. Treasury Security ("10-Year Treasury Rate") is for a period of five (5) consecutive business days at least 45 basis points below the 10-Year Treasury Rate that was used to determine the locked Interest Rate for the Loan ("Initial Treasuries Trigger Point"), Borrower is required to deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (3) business days after written notice of such fact from John Hancock. Such additional amount shall be added to, and be deemed a part of, the Application Fee. Further, Borrower shall deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (10) business days after written notice from John Hancock for any additional 15-basis point drop below the Initial Treasuries Trigger Point which lasts for a period of five (5) consecutive business days. Any such additional amounts shall be added to, and be deemed a part of, the Application Fee. Regardless of how low the 10-Year Treasury Rate declines after Rate Lock, the amount of additional Application Fee which Borrower shall be obligated to add to the existing Application Fee shall be limited to 2% of the Loan amount ($640,000).

In the event that any additional deposit(s) for the Application Fee are made as outlined above, and subsequently, the 10-Year Treasury Rate rises above the threshold(s) for the additional deposit(s) for a period of five (5) consecutive business days, John Hancock will return the applicable portion of such

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 7 of 18

additional deposit for the Commitment Fee to the Borrower. In no event shall John Hancock be obligated to return an amount to Borrower which leaves less than $640,000 as the Application Fee being held by John Hancock.

Any additional deposit(s) for the ADDITIONAL APPLICATION FEE made pursuant to this Condition 51 shall be held, retained and disbursed by John Hancock pursuant to and in accordance with the terms and conditions applicable to the Commitment Fee described in this Application.

### CONDITION 52 - PAYMENT OF THE APPLICATION, COMMITMENT FEE OR ADDITIONAL APPLICATION FEE (LETTER OF CREDIT)

Condition Nos. 30(b) and (c) and Supplemental Condition No. 77 are expanded as follows: All of the Commitment Fee and all of the Application Fee required to be deposited under this Application may consist of one or more unconditional, irrevocable and transferable Letters of Credit, both in form and substance, and drawn on a commercial bank satisfactory, to John Hancock. Any and all Letters of Credit delivered to John Hancock in connection with this provision shall be in a form and subject to the conditions described in the last grammatical paragraph of Condition 49 of this Application.

### CONDITION 53 - FORWARD COMMITMENT COMPONENT: COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and John Hancock acknowledge and agree that, in the ordinary course, (a) the Interest Rate is locked for a period of (60) days in accordance with, and subject to, the terms and conditions of this Application; and (b) the Closing is obligated to occur within such time period.

Borrower and Applicant desire that the Interest Rate be locked for more than a period of sixty (60) days. Accordingly, Applicant and John Hancock agree to amend the Application as follows to accommodate such longer period to close the Loan:

**A.** *Extension of Rate Lock.* The following language is deleted from the first paragraph of Condition 3(c) of the Application:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

and is replaced with the following:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of three hundred sixty five (365) days (the "Rate Lock") subject to receipt of the fee required pursuant to the terms and conditions of this Application (the "Commitment Fee") within the applicable time periods provided herein.

**B.** *Additional Modifications to Application to Adjust Time Frames of Deliveries to Extended Rate Lock Period*

    1.  Section 7(c) is amended as follows:



JH 00993

# MONTGOMERY SQUARE PARTNERSHIP
# (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 8 of 18

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior the expiration of Rate Lock."

2.  Section 7(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

3.  Section 7(e) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

4.  Section 8(b) is amended as follows:

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior to the expiration of Rate Lock."

5.  Section 8(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

6.  Section 9(a) is amended as follows:

    (i)- delete the words "no later than fourteen (14) days from the date of acceptance by John Hancock of this Application" and insert "in no event fewer than forty-five (45) days prior to the expiration of Rate Lock".

    (ii)  delete the words "no later than thirty (30) days from the date of acceptance by John Hancock of this Application" and insert "no fewer than forty-five (45) days prior to the expiration of Rate Lock".

7.  Section 10 is amended by deleting the words "within twenty-one (21) days of Rate Lock" in the first sentence and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

8.  Section 13 is amended by deleting the words "within thirty (30) days of the date of Rate Lock" in the first line and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

9.  Section 19 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

JH 00994

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 9 of 18

10. Section 20 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

11. Section 23 is amended by deleting the words "no later than fourteen (14) days from the date of acceptance of this Application by John Hancock" and replacing it with: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

## CONDITION 54 – FLOATING RATE OPTION IN THE 11TH YEAR

Borrower shall have the option to extend the term of the Loan for one (1) period of twelve (12) months from the maturity date of the Loan upon delivering to John Hancock written notice of the desire to so extend not less than one hundred eighty (180) days prior to the maturity date. The Loan shall accrue interest during such extended period at a variable rate. Notwithstanding the foregoing, the Loan shall only be extended if all of the following conditions are satisfied:

(a) There is no default then continuing under the Loan Documents;

(b) John Hancock and Borrower agree to terms for the extension period (including without limitation an interest rate index and spread and acceptable LTV and DSCR ratio given the then amount of the Loan and any subordinate financing which may be in place on the Security) no less than one hundred twenty (120) days prior to the then maturity date of the Loan;

(c) Borrower satisfies all of the conditions of John Hancock then imposed in its sole but reasonable discretion to extend the Loan;

(d) The Loan remains prior to any other lien, mortgage or encumbrance on the Security;

(e) Borrower satisfies all conditions of, and executes and delivers documents for, such extension on or before the then maturity date of the Loan;

(f) Borrower pays all of John Hancock's costs associated with such extension (including without limitation all attorneys' fees); and

(g) John Hancock is still making variable rate commercial mortgage loans on properties of similar size, credit quality, character, type and location at the time of such extension.

## CONDITION 55 – LOAN TERMS

Condition 3(g)- The 4th paragraph is deleted and replaced with, "The Loan will be open to prepayment without premium during the last 120 days of the term of the Loan".

Condition 3(h) is deleted in its entirety.

## CONDITION 56 – ASSIGNMENT OF LEASES

In Condition 5(b)(ii) insert in the last line "for more than two months" between "rent" and "will.

## CONDITION 57 – LOAN DOCUMENTS

Condition 6(a) delete 5% and insert 4%.

JRK

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
## Page 10 of 18

Condition 6(b) delete 7% and insert 5%.

Condition 6(c) delete "without interest" at the end of the paragraph and insert "with interest at the prevailing rate with Borrower responsible for any set-up and annual maintenance fees.

## CONDITION 58 – ANNUAL FINANCIAL STATEMENTS PROVIDED BY THE BORROWER

Condition No. 6(e):   ANNUAL FINANCIAL STATEMENTS is amended by adding the following:  The Loan Documents will provide that John Hancock will accept a statement of annual income and expense prepared and certified by the Borrower, the Borrower's accountant or a financial officer of the Borrowing entity within 120 days after the end of each fiscal year, provided that the statement certified by a certified public accountant is not available and there has not been a default by the Borrower in the performance of any of its obligations under the Loan Documents.

## CONDITION 59 – DUE ON SALE: CHANGE IN OWNERSHIP OR CONTROL

### TRANSFER OF OWNERSHIP WITHIN THE PARTNERSHIP

Borrower represents that the description of the Borrower and all constituent entities and the list of names, types of interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are accurately described on Exhibit F attached to this Commitment. It is understood that the following amendment to Condition 6(f) is conditioned upon the accuracy and completeness of the information provided on said Exhibit F.

Condition No. 6(f):  DUE ON SALE is amended to add the following:  The transfer of partnership interests shall be permitted between partners and their families as long as any of the existing partners as of Closing controls at least 51% of the combined general and limited partnership interests of the Borrower; provided:

1.   There shall be no default under the Loan Documents,

2.   John Hancock shall be provided with prior written notice of such transfer, together with a diagram showing the structure of the Borrower and all constituent entities after the contemplated transfer and a list of the names, types of interests and percentages of ownership of all owners of interests in the Borrower and any constituent entities after the contemplated transfer, and an administrative fee of $5,000, which shall be deemed fully earned upon receipt, and

3.   All fees and costs in connection with the transaction, including without limitation, John Hancock's attorneys' fees, shall be paid by the Borrower.

## CONDITION 60 – DUE ON SALE

Condition 6(f)- In the last sentence delete "one-time" and replace with "two-time".          JRL

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
#### Page 11 of 18

Condition 6(f)(vii)- In the 2nd and 3rd lines delete "concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change"

Condition 6(f)(vii)- Delete the 4th line and insert at the end of the 3rd line after "ratio", the words "of not less than 1.25:1 as determined by John Hancock".

Condition 6(f)(viii) is amended by inserting the following at the beginning of such section: "If the Loan is made part of a secondary market transaction,".

## *CONDITION 6I* – SUBORDINATE FINANCING

Condition No. 6(f) . SECONDARY FINANCING is· amended to add the following: Notwithstanding the foregoing, John Hancock ("Lender") will permit secondary financing one time, provided that:

1. No default exists under the Loan Documents,

2. The Loan Documents contain a covenant whereby Borrower agrees not to make payments to the holder of any secondary financing during any period in which a monetary default exists under the Loan Documents,

3. The secondary financing will consist of a single mortgage which will be the only loan secured by the Security other than the Loan,

4. The secondary financing, by its terms, shall be and remain completely subject and subordinate to the Loan Documents and any additional fundings, extensions, modifications and amendments thereof, and to any subsequent advances made by the first mortgagee, whether obligatory or optional and Borrower and the secondary financing lender shall enter into such Subordination and Intercreditor Agreements as requested by Lender,

5. The secondary financing shall not violate the terms of any leases, and by its terms, shall be and remain subordinate to all present and future leases, and shall, by its terms, prohibit the second mortgagee from joining any tenants in any foreclosure action it may institute,

6. A default under the secondary financing will be a default under the Loan,

7. The secondary financing shall have a maturity date coterminous with or longer than the maturity date of the Loan,

8. The secondary financing shall be held by a regulated financial institution acceptable to Lender,

9. The secondary financing may be at a fixed or floating rate, but in either case shall have a constant amortization and require that all payments be on a current basis with no accruals for

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 12 of 18

interest or additional principal or advances. Furthermore, if the secondary financing has a floating rate of interest, the Borrower must purchase an interest rate cap and the debt service coverage ratio condition set forth below shall be calculated using the maximum interest rate achievable considering such cap and amortizing such secondary financing using the lesser of the (a) the actual amortization schedule and (b) a thirty (30) year amortization schedule.

10.  The secondary financing must not be given in satisfaction of or to evidence any judgments or claims against the Borrower,

11.  The secondary financing shall not be cross-defaulted or cross-collateralized with any loans encumbering any security other than the Security,

12.  The holder of the secondary financing shall not be in any way affiliated with the Borrower,

13.  The debt service coverage ratio for the combined loan payments of the secondary financing and the Loan (including without limitation any additional funding) shall not result in a debt service coverage ratio of less than 1.25:1, calculated to the satisfaction of Lender, and the loan-to-value ratio for the combined proposed mortgage and the Lender's mortgage (including without limitation any additional funding) shall not exceed 75%, calculated to the satisfaction of Lender.

14.  Such secondary financing shall provide that all insurance proceeds and condemnation awards shall be applied solely as described in the Loan Documents,

15.  The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan,

16.  The mortgagee under such secondary financing shall have agreed in writing (a) to give simultaneous copies to Lender of any notices given by such mortgagee under said secondary financing, including without limitation, notices of default, (b) to collect no income, rents, issues, profits or proceeds from the Security, whether directly or through a receiver, unless the prior written consent of Lender is obtained, and (c) to be bound by any extensions, modifications or amendments to the Loan Documents,

17.  All information necessary to determine whether or not the conditions provided herein have been satisfied shall be provided to Lender at the time of the request, together with an administrative fee of $5,000 which shall be deemed fully earned on the date of receipt and shall be retained by Lender regardless of whether or not the junior financing is obtained and whether or not consent is given,

18.  The Non-Recourse Carve-Out Obligations shall be expanded to include liability for an amount equal to the sum of all payments made by Borrower to junior lienholders during any period in which a default exists under the Loan.

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
# (AVENEL AT MONTGOMERY SQUARE)
# SUPPLEMENT TO APPLICATION
# Page 13 of 18

19. All costs and expenses in connection with the request for approval shall be paid by the Borrower, including, without limitation, Lender's attorneys' fees.

## *CONDITION 62 – FEES*

Condition 6(j)- Insert in the first line after "administrative fees", the words "not to exceed $5,000".

## *CONDITION 63 – SPE WAIVER/TOTAL*

Condition 9(c): BORROWER REQUIREMENTS is amended by deleting Condition 9(c).

## *CONDITION 64 – COMPLIANCE WITH ZONING*

Condition 10- In the 4th line from the bottom after "certificates of occupancy" the words "or such temporary certificates of occupancy necessary to operate the security until final certificates are available".

## *CONDITION 65 – COMPLIANCE WITH ENVIRONMENTAL LAWS*

Condition 11(b)- In the first sentence insert "reasonably" before the word "satisfactory".

Condition 11(d)(ii)(cc)- Insert at the end of the paragraph, "This indemnification shall not apply to situations where the liability is as a result of or caused by conditions that exist or occur on real estate adjoining the Real Estate Security owned by the Borrower".

## *CONDITION 66 – COMPLETION*

Condition 12- Insert between "completed" and "to" the words "other than normal punch list items and final landscaping",

## *CONDITION 67 – REPRESENTATIONS AND WARRANTIES*

Condition 25- In the 3rd line after "complete" insert "in all material respects".

Condition 25- In the 7th line delete the words "and have been prepared consistent with proper accounting standards";

Condition 25- Insert in the 2nd line, 2nd paragraph after "all" the word "material".

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 14 of 18

## *CONDITION 68* – TERMINATION OF THIS INSTRUMENT

Condition 29(a)(ii)- In the 2nd and 3rd lines delete "or against any tenant under any Space lease or Other Lease referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- At the end of the sentence delete "or of any tenant referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- Define "material adverse change in the financial condition" as an event or occurrence which causes the combined net worth of the Guarantors to decline below $10,000,000.

## *CONDITION 69* – APPLICATION, PROCESSING AND COMMITMENT FEES

Condition 30(b)(ii)- Delete "sixty (60) and insert twenty one (21).

## *CONDITION 70* – LIMITATION ON LIABILITY

Condition 36(f) - In the first line after "taxes" insert "excluding taxes escrowed by John Hancock".

Condition 36(h) - Delete in its entirety.

## *CONDITION 71* – ADDITIONAL FUNDING

1.  Additional Funding.  Borrower shall have the right to request additional loan proceeds in the minimum amount of $1,000,000 ("Additional Funding") once between the 2nd and the end of the 5th Loan Years, provided the following conditions are satisfied:

    a.  The rental and debt service coverage requirements of Condition 16 and the loan-to-value ratio requirement of Condition 14 are satisfied as of the date of the request for and the funding of the Additional Funding, as determined by John Hancock, taking into consideration the Loan and the Additional Funding;

    b.  No default has occurred and is continuing under the Loan Documents;

    c.  There shall be no partial funding of the Additional Funding;

    d.  There shall be no subordinate financing requested for, or then in place on, the Security;

    e.  The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan

    f.  A request for Additional Funding shall be made in accordance with Section 2 below;

    g.  John Hancock is continuing to finance loans of the same size, property type, location, character and credit quality as the Loan and the Additional Funding, and the interest rate on the Additional Funding shall be as set forth in Section 2 below and shall be established

JH 01000

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 15 of 18

as a fixed rate equal to the then interest rate being offered by John Hancock for loans of the same size, property type, location, character and credit quality;

h.  Except as set forth herein or in the Rate Lock Confirmation described below, the Additional Funding shall be on the same terms and conditions as the Loan and shall be evidenced by an amendment to the existing Loan Documents or by a second note and mortgage on the Security as determined by John Hancock. The Loan Documents shall be satisfactory to John Hancock;

i.  The Additional Funding shall be amortized over the remaining term of Loan (e.g. if drawn at the end of the 2nd year, with 28 years remaining on the Loan term, then Additional Funding will be amortized over 28 years); and

j.  The Additional Funding shall have the same loan maturity date as initial Loan maturity date.

2.  Rate Lock Process.

Upon receipt of sufficient and satisfactory information from Borrower, including, but not limited to, (i) a rent roll for the Security certified by the Borrower which is no more than thirty (30) days old, (ii) current operating statements for the Security in form and for periods as John Hancock may reasonably request; (iii) financial statements from the Borrower, its Principals, Guarantors and Indemnitors, as set forth in Condition 20 of the Application, and (iv) current color photographs of the Security which are not more than thirty (30) days old showing the Security in a manner reasonably satisfactory to John Hancock ("Quote Package"), John Hancock may, in John Hancock's sole discretion, issue a Rate Lock Confirmation to Borrower in a form substantially shown on Exhibit D to the Application and the process described in Section 3(c) of the Application shall be followed. The Rate Lock Confirmation shall also set forth any Application Fee or Commitment Fee that must be paid in connection with the Additional Funding. John Hancock shall be under no obligation to issue a Rate Lock Confirmation for the Additional Funding, and any Additional Funding shall be subject to approval by John Hancock's internal committees.

3.  Due Diligence Matters.

The following shall be conditions precedent to the Additional Funding:

a.  *Title, Title Evidence and Title Insurance.* Borrower shall provide an endorsement to the loan title insurance policy issued to John Hancock in connection with the initial closing of the Loan ("Title Endorsement"), reflecting the Additional Funding and satisfactory in form and content to John Hancock.

b.  *Survey.* Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security since the date of the Survey. A recertification and update of the Survey will be required in form and substance satisfactory to John Hancock, dated within sixty (60) days of the Closing for the Additional Funding if (i) the Title Endorsement reveals any new title matters that are plottable; or (ii) there are any exterior additions, alterations or other changes to the Security,.

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 16 of 18

c. *Borrower Requirements.* Borrower shall provide a certificate from the Borrower, certifying that Borrower and its constituent entities continue to comply with the requirements of Condition 9 of the Application. Borrower will also provide a certified copy of all organizational documents pertaining to the Borrower and, if requested by John Hancock, its constituent entities.

d. *Compliance with Environmental Laws; Loan Documents.* Borrower shall provide a certificate from the Borrower and the Guarantors in form and substance satisfactory to John Hancock, certifying that there have been no changes to any matters contained in the Environmental Certificate, to any of the representations and warranties regarding environmental matters contained in the Loan Documents or to any other environmental matter related to the Security. In addition, John Hancock shall obtain at Borrower's expense, a report from an environmental database confirming that there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the last verification of the environmental database.

At John Hancock's option, Borrower shall provide an update to the environmental site assessment that Borrower delivered to John Hancock prior to the Loan Closing Date in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the initial assessment have been remediated as required and that otherwise there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the initial assessment.

e. *Compliance with Zoning, Building Laws, Subdivision and Other Laws, Regulations etc. and Separate Tax Parcel.*

Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security and no changes of use or access or the parking have occurred, in each case since the initial funding of the Loan. In addition, Borrower shall provide (i) an updated letter from the municipality dated no earlier than thirty (30) days before the Closing Date for the Additional Funding, evidencing that the Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations, that there are no outstanding violations pending against the Security and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, and (ii) if a title endorsement covering zoning matters in a form satisfactory to John Hancock is not issued in the jurisdiction, both an updated opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required. If not previously furnished, John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel.

f. *Third Party Inspections.* Borrower shall provide a certificate from the Borrower and Guarantors, certifying that since the initial Loan no changes to the buildings or improvements have occurred on the Security and no significant repairs or replacements in any one instance have occurred which were not expressly contemplated in the Property Condition Assessment or pursuant to, and in compliance with, one of the reserve agreements established at the Closing of the Loan. Any matters disclosed by the original Property Condition Assessment which the Borrower agreed to remedy will be re-inspected by John Hancock or an engineer acceptable to John Hancock, at Borrower's

JRK

JH 01002

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 17 of 18

expense. John Hancock shall also have the right to re-inspect the Security to verify the condition of the Security and to assure that no adverse changes have occurred at the Security.

If requested by John Hancock, Borrower shall provide an update to the property condition report that Borrower delivered to John Hancock in connection with the Loan ("Initial PCR") in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the Initial PCR have been remedied and corrected as required and that otherwise there have been no adverse changes to the conditions at the Security since the date of the Initial PCR.

g. *Lease Requirements.* Borrower, not more than fourteen (14) days prior to the Closing Date for the Additional Funding, shall provide an updated rent roll certified by Borrower identifying any changes to the rent roll submitted as part of the Quote Package.

h. *Appraisal.* An update of the Appraisal prepared by the appraiser who prepared the original Appraisal. The update must be acceptable to John Hancock.

i. *Reserve Funds.* The amounts, deposits and payments into the reserve accounts required by Section 18 and Section 49 of the Application will be evaluated and may be adjusted as part of the Rate Lock Process based upon the information obtained or revealed during the Rate Lock Process and subsequent due diligence and evaluation of John Hancock prior to the Additional Funding.

j. *Opinion of Counsel.* Borrower shall provide an update to all opinions issued in connection with the Loan satisfactory in form and substance to John Hancock dated as of the Closing of the Additional Funding from an attorney approved by John Hancock and its counsel opining to the matters set forth in Section 23 of the Application; provided, however, that any opinion issued regarding the Loan Documents shall apply to the loan documents executed in connection with the Additional Funding.

4. Closing and Other Costs.

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the Additional Funding."

5. Except as modified by this Supplement, the Terms and Conditions of the Application shall apply to the Additional Funding, including, but not limited to, Condition 39 of the Application.

## CONDITION 72 – BORROWER COVENANT REGARDING OTHER HOLDINGS

Borrower, Montgomery Square Partnership, a general partnership, also owns two (2) vacant pieces of land in the vicinity of the Security and identified as Exhibit X. Borrower agrees (a) not to acquire any other real estate or other assets during the term of the Loan, other than those necessary to conduct the ordinary business of the Security and (b) not to incur indebtedness on these

Application No.6518467

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 18 of 18

properties during the term of the Loan unless ownership of the two properties is transferred to a third party not owned or controlled by the Borrowing Entity.

### *CONDITION 73* – OPINION OF COUNSEL

Condition 23(e)- Delete the next to last paragraph referencing "Conditions 9(c)(ix) and (x)" in its entirety.

Avenel_Supplement_7-29-04.doc

JH 01004

# EXHIBIT 1

## EXAMPLES OF RESERVE CALCULATIONS

AVENEL @ MONTGOMERY SQUARE

| | | | EXAMPLE 1 | | EXAMPLE 2 | | EXAMPLE 3 |
|---|---|---|---|---|---|---|---|
| Units | 256 | | | | | | |
| **INCOME** | | | | | | | |
| | Base Rent | | $4,638,600 | | $4,638,600 | | $4,638,600 |
| | Parking Income | | $0 | | $0 | | $0 |
| | Other Income | | $312,213 | | $312,213 | | $312,213 |
| Gross Income | | | $4,950,813 | | $4,950,813 | | $4,950,813 |
| | Vacancy @ | 20% | $990,163 | 15% | $742,622 | 9.00% | $445,573 |
| Effective Gross Income | | | $3,960,650 | | $4,208,191 | | $4,505,240 |
| **EXPENSES** | | | | | | | |
| Operating Expenses | | | | | | | |
| | Real Estate Taxes | | $480,000 | | $480,000 | | $480,000 |
| | Property Insurance | | $82,480 | | $82,480 | | $82,480 |
| | Utilities | | $87,749 | | $87,749 | | $87,749 |
| | Repairs & Maintenance | | $182,741 | | $182,741 | | $182,741 |
| | Janitorial | | $0 | | $0 | | $0 |
| | Management Fees @ 3.75% | | $148,524 | 3.75% | $157,807 | 3.75% | $168,946 |
| | Payroll & Benefits | | $294,781 | | $294,781 | | $294,781 |
| | Advertising & Marketing | | $59,713 | | $59,713 | | $59,713 |
| | Professional Fees | | $5,000 | | $5,000 | | $5,000 |
| | General & Administrative | | $45,969 | | $45,969 | | $45,969 |
| | Other Expenses | | $0 | | $0 | | $0 |
| Total Operating Expenses | | | $1,386,957 | | $1,396,240 | | $1,407,379 |
| NET OPERATING INCOME | | | $2,573,693 | | $2,811,951 | | $3,097,860 |
| | Value @ 7.25% Cap | | $35,499,214 | | $38,785,529 | | $42,729,108 |
| Maximum Loan or | 75.00% LTV | | $26,520,000 | | $29,090,000 | | $32,050,000 |
| | Round To | | $26,520,000 | | $29,090,000 | | $32,000,000 |
| | Locked Amount | | $32,000,000 | | $32,000,000 | | $32,000,000 |
| **RESERVE** | | | $5,380,000 | | $2,910,000 | | $0 |
| | Base Rent Required | | $3,710,880 | | $3,942,810 | | $4,221,126 |

JH 01005

Application No.

**EXHIBIT B**
**DESCRIPTION OF PROPERTY**

**SECTION A:**

| LOCATION | | | | | | |
|---|---|---|---|---|---|---|
| **Property Name:** Avenel at Montgomery Square | | | | | | |
| **Address:** 1100 Avenel Boulevard | **City:** North Wales Montgomery Township | | **County:** Montgomery | | **State:** Pennsylvania | |
| **Zoning:** ECPOD | **Streets:** private | | **Water:** public | | **Gas:** Yes | |

| LAND | | | | | |
|---|---|---|---|---|---|
| **Frontage:** 1,220 Ft. | **Depth:** 0 Ft. TREECOLAR | **Area:** 799,116 Sq.ft. | | **Filled:** | |
| **Rights of Way: Describe:** see title report | | | | | |
| **Easements: Describe:** see title report - Gas, electric, sewer, water, phone, cable | | | | | |
| **Special Assessments: Describe:** N/A | | | | | |

| PROPERTY OVERVIEW | | | |
|---|---|---|---|
| **Net Rentable Area:** 276,710 Sq.ft. | **# of Buildings:** 9 | **# of Stories:** 4 | **# Bays:** |
| **Year Built:** 2004 | **Year Last/Renovated:** 0 | | **Current Occupancy Rate:** |
| **Property Manager:** Bozzuto Management | | **Fee:** 3.75% | |

| CURRENT OWNER PURCHASE INFORMATION | | |
|---|---|---|
| **Purchase Price:** | **Amount Financed:** | **Seller:** |
| **Purchase Date:** | | |

| EXISTING FINANCING | | | |
|---|---|---|---|
| **Holder:** | **Original Amount:** | **Rate:** | **Date:** |
| Wilmington Trust of Pennsylvania | $30,732,000.00 | Floating – Libor | May 15, 2003 |
| **Balance:** | | | |

Application No.

SECTION B: (To be completed in all cases)

## BUILDING FRAMEWORK

Wood: ☒          Reinforced Concrete ☐     Steel: ☒          Solid Masonry: ☐

Other: (explain): **Manor Building includes some steel**

## BUILDING CONSTRUCTION

Sidewall Construction:       **2*4 Stud with 1/2" plywood sheathing**

Exterior Sidewall Finish:     **Brick, vinyl, hardy board**

Floor Construction:          **Engineered wood truss with pylwood and gypsum floor**

Roof Construction:           **Engineered wood truss and sheathing sytem**

Roofing Material:            **25 yr asphalt shingle**

Window Type & Material:   **vinyltech window**

Exterior Door Type:         **metal over foam core**

## MECHANICAL

Heating Type:    **Aquatherm**        Fuel:   **Gas**                Unit Location:   **each unit**

Air Conditioning Type:   **Carrier**            Unit Location:   **Each unit**

# of Elevators:   **1**                          Type:   **Hydraulic Schindler**

Fire Protection:   **Wet Sprinkler in accordance with NFPA 13**

Security System: **N/A**

Sewerage System:      ☒ Public      ☐ Private

Water System:          ☒ Public      ☐ Private

SECTION C: ( To be completed for Apartment Buildings Only)

Balcony Construction: (describe framing, flooring, railings):   **ACQ framing and flooring with steel railings**

Exterior Stairway Construction: (describe framing, flooring, railings):   **Steel framing and railings with concrete treads**

Interior Partitions:   **2* 4 stud wit 1/2" drywal**

Sound Proofing:

      Between Apartments:       **insulated wall with sound batting**

      Between Floors:            **Channel system with gypsum floor**

Insulation Method:   **Exterior walls – R15 vapor barrier – Attic – R30**

Application No.

| Finish Schedule | Floor | Walls | Ceiling | Trim |
|---|---|---|---|---|
| Living Room: | Carpet | Paint | Paint | Wood |
| Bedroom: | Carpet | Paint | Paint | Wood |
| Dining Room: | Carpet | Paint | Paint | Wood |
| Kitchen: | Vinyl | Paint | Paint | Wood |
| Baths: | Vinyl | Paint | Paint | Wood |
| Public Areas: | Ceramic / Wood | | | |

## KITCHEN EQUIPMENT

Range:  GE - JGBP28WGH   Oven:   GE - JVM1441WH   Refrigerator:   GE - GFC325F   Dishwasher:   GSDY200J

Disposal:  GE- WX9X18    Hood & Fan:    GE- JN327   Other:

Counter Tops:    Formica    Cabinets:   wood

**SECTION D: ( To be completed for Buildings Other than Apartments )**

Divisional Partitions: (Describe)

Ceiling System: (Describe)

Interior Wall Finish:

Floor Covering:

Sprinkler System:

Electric Lighting Fixture Type:

Toilet Rooms: (Describe fixture standards, room finish, number of locations, ADA compliance)

**SECTION E:**

## PARKING AND ON-SITE IMPROVEMENTS

Covered Parking Spaces:  112                    Location:  32 Attached, 80 detached

Construction:    Concrete and stud

Open Parking Spaces:    404

Swimming Pool:  Yes

Other On-Site Improvements:    Landscaping, fountain, compactor pad

Application No.

**SECTION F: (To be completed for all property types)**

**RENT ROLL**

Correspondent will attach one copy of the rent roll for the Real Estate Security.  Correspondent will sign this Exhibit on the appropriate signature line below.

**CORRESPONDENT CERTIFICATION**

I have examined the property operating statements, rent roll, and any other supporting information given to me by the Applicant and have analyzed the Loan in accordance with such information.  In addition, I have examined the leases listed on the rent roll and have satisfied myself that the space is occupied as indicated, that there are no existing concessions, free rent, or rebates unless shown on the attached rent roll, and the rents are currently collectable under such leases.  I believe that all information heretofore submitted to John Hancock in connection with the Loan is complete, correct and accurately reflects the physical, leasing and financial status and history of the Real Estate Security.

Correspondent: *JHREF / BLUE BELL*
By: *JOHN D. FENRIG, REG. D. P.*
Name: *Jake D. Fenig*
Title *REGIONAL V. P.*

JHLICO
Ed 7/17/01

4

JH 01009

Application No.

## EXHIBIT C
## ENVIRONMENTAL QUESTIONNAIRE AND CERTIFICATE

**DEFINITIONS.** The following two terms have the following meanings when used in this Questionnaire.

A. "Hazardous Materials" includes hazardous waste, as that term is defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5); hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14); pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C. §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM"), and volatile organic compounds, including oil and petroleum products.

B. "The Real Estate Security" means the land, the buildings thereon, and the other improvements thereon which are to be the security for the Loan from John Hancock being applied for by Borrower in the attached Application ("the Loan").

1. Are any Hazardous Materials generated, stored, treated, or disposed of or expected to be generated, stored, treated, or disposed of on the Real Estate Security?

   Yes ☐    No ☒

2. To the best of your knowledge, have any Hazardous Materials been disposed of or released at, on, or under the Real Estate Security, or at, on, or under land abutting the Real Estate Security, in the past, or have any such materials migrated from other land to the Real Estate Security?

   Yes ☐    No ☒

3. a.  Are there any underground or other storage tanks on the Real Estate Security?

   Yes ☐    No ☒

   b.  If the answer to 3.a. is Yes, state the type and quantity of material that is being stored and the location and age of each tank; describe the leak detection system and the inventory control system which are being maintained for each tank; and describe the corrosion protection and spill/overfill protection methods which are being used for each tank.  (Attach additional pages if necessary.)

   c.  If the answer to 3.a. is Yes, state when each tank was last tested for tightness; state whether each tank is registered with any government entity, and attach copies of the most recent test results for each tank and all registration materials.

Application No.

d.  Are there any empty or unused tanks on the Real Estate Security? (If yes, state the location of each.)

Yes ☐    No ☒

Location:

e.  To your knowledge, have any tanks been removed from the Real Estate Security?

Yes ☐    No ☒    To the best of our knowledge there were
NO UNDERGROUND TANKS.

f.  If the answer to 3.e. is Yes, state when each tank was removed; describe the location from which it was removed; and state whether during or after the removal any Hazardous Materials were found in the soil or groundwater.

4.  a.  Has there ever been an operating dry cleaner at the Real Estate Security?

Yes ☐    No ☒

b.  If the answer to 4.a. is Yes, state the name of the dry cleaner and the years in which it has operated.

5.  a.  Have any of the buildings at the Real Estate Security been tested for the presence of ACM?

Yes ☐    No ☒

b.  Do any of the buildings at the Real Estate Security contain ACM?

Yes ☐    No ☒

6.  Are there any transformers or other electrical equipment on the Real Estate Security which contain PCB's?

Yes ☐    No ☒

7.  (To be answered for multi-family residential properties:)

a.  Has the Real Estate Security ever been tested for the presence of radon gas?

Yes ☐    No ☒

b.  Have any of the buildings at the Real Estate Security ever been tested for the presence of lead paint?

Yes ☐    No ☒

JHLICO
Ed 3/2/00

2

JH 01011

Application No.

    c.   Has any of the water at the Real Estate Security ever been tested for the presence of lead?

        Yes  ☐    No  ☒

    d.   If the answer to 7.a., b., or c. is yes, attach copies of test results.

8.   a.   What is the name of the seller from whom you bought the Real Estate Security?

    b.   Describe the use of the Real Estate Security at the time you acquired it.

9.   State the year in which each building at the Real Estate Security was constructed.

        *2004*

10. a.   Was the Real Estate Security transferred out of or described as part of a larger parcel within the past five years?

        Yes  ☐    No  ☒

    b.   If the answer to 10.a. is Yes, describe by boundaries the larger parcel of which the Real Estate Security was a part.

11.  Has an environmental assessment report been prepared for the Real Estate Security, or any part of it, within the last ten years? (If yes, attach copies of each report.)

        Yes  ☒    No  ☐

12.  Has the Real Estate Security ever been the subject of a notice of non-compliance, abatement or clean-up order, or lawsuit, relating to Hazardous Materials?

        Yes  ☐    No  ☒

13.  If the answer to any of questions 1, 2, 5.b., 6, 7, or 12 is Yes, explain in detail the nature of these items in the area below and on additional pages if necessary.

    I/We certify (a) that each of the above answers is true and complete; (b) that to the best of my/our knowledge there is no violation of federal, state, or local environmental laws on the Real Estate Security, except as described herein; and (c) that I/we will immediately notify John Hancock if at any time while the Loan is outstanding I/we learn that any of the above answers either was not true when made or is no longer true.

JHLICO
Ed 3/2/00

3

JH 01012

Application No.

I/We understand that the answers to any of the above questions may cause John Hancock to require, as a condition or conditions to Closing the Loan, (a) satisfactory responses to further inquiries by John Hancock, and/or (b) further investigation of the Real Estate Security, including, in John Hancock's sole discretion, sampling and/or monitoring of soil, groundwater, air, water, or building materials, with results satisfactory to John Hancock, in its sole discretion.

APPLICANT: MONTGOMERY SQUARE PARTNERSHIP
By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____
          James R. Koller
Title: President

Date: _____


GUARANTOR(S):

_____
James R. Koller

Date: _____

_____
Frank E. Palopoli

Date: _____

_____
Joseph P. Kelly

Date: _____



# Memo

**To:**   Jim Koller

**From:**   Joe Kelly

**Date:**   6/11/2003

**Re:**   Montgomery Square Apartments – Land Development Agreement and Declaration of Covenants and Restrictions

Please note that the parcel and unit numbers recited in the Land Development Agreement and the Declaration of Covenants and Restrictions are not correct. The parcel and unit reference should be as follows:

| Address | Parcel | Block | Unit | Parcel # |
|---------|--------|-------|------|----------|
| 512 DeKalb Pike | 46-00-00784-00-7 | 011 | 048 | 00784007 |
| 500 DeKalb Pike | 46-00-00778-00-4 | 011 | 035 | 00778004 |
| 440 DeKalb Pike | 46-00-00772-00-1 | 011 | 028 | 00772001 |
| 440A DeKalb Pike | 46-00-00775-00-7 | 011 | 031 | 00775007 |
| 436 DeKalb Pike | 46-00-00769-00-4 | 011 | 047 | 00769004 |
| 430 DeKalb Pike | 46-00-00766-00-7 | 011 | 055 | 00766007 |
| 426 DeKalb Pike | 46-00-00763-001 | 011 | 027 | 00763001 |
| HDR | 46-00-00316-21-4 | 011c | 014 | 00316214 |
| 502 DeKalb Pike [Included ins HDR] | 46-00-00781-001 | 011 | 051 | 00781001 |

Attached is a copy of the real estate tax bills.

1

JH 01014

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA 19401 • 610-239-9920 • FAX 610-239-9921

August 27, 2003



Mr. Don Elly
Allen A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA  19490

RE: Asbestos Abatement
    Lead Paint Soil Remediation
    Montgomery Square Partnership

Dear Mr. Elly:

Attached is the manifest for the lead paint soil remediation work
at the above project.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

JH 01015

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

ep-19-03 10:46A ALLAN A. MYERS
09/18/2003 13:48  5J P73A9921                    6103518062
                                 PLYMOUTH ENVIRONMENT —      PAGE 02   P.02

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA 19401 • 610-239-9920 • FAX 610-239-9921

September 18, 2003

Mr. Don Elly
Allan A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA 19490

RE: Asbestos Abatement
    Lead Paint Abatement
    Montgomery Square Partnership
    Montgomery Township

Dear Mr. Elly:

This letter will certify that Plymouth Environmental Co.,Inc.
properly abated all asbestos containing materials and lead in soil
as noted in RT Environmental Services, Inc. survey reports. All
work was performed in accordance with all prevailing federal, state
and local regulations. Waste manifests and project air management
report was previously supplied to you.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

JH 01016

FEB/27/2003  13:53    +733000000000000-8    00000000    PAGE  02

Bureau of Land Recycling and Waste Management
P.O. Box 8550
Harrisburg, PA 17105-8550
OFFICIAL PENNSYLVANIA MANIFEST FORM

| UNIFORM HAZARDOUS WASTE MANIFEST | 1. Generator's US EPA ID No. P A D E P 0 0 1 0 5 3 9 | Manifest Document No. 1/677C | 2. Page 1 of | Information within the bold red border is not required by Federal law but may be required by State law. |
|---|---|---|---|---|

A. State Manifest Document Number **PAH   016776**

2. Generator's Name and Mailing Address
MONTGOMERY SQUARE PARTNERSHIP
490 NORRISTOWN ROAD
BLUE BELL PA 19422

B. State Doc. ID  SAME

4. Generator's Phone ( 610 )  238-0400

3. Transporter 1 Company Name
REPUBLIC ENV SYS (TRANS GROUP)     | 6. US EPA ID Number  P A D 9 8 2 6 6 1 3 8 1

C. State Trans. ID  **PA-AH**   0 3 1 7

7. Transporter 2 Company Name     | 8. US EPA ID Number

D. Transporter's Phone (  215 822-2676

9. Designated Facility Name and Site Address
REPUBLIC ENV SYS (PA), INC.
2869 SANDSTONE DRIVE
HATFIELD PA 19440     | 10. US EPA ID Number  P A D 0 8 5 6 9 0 5 9 2

E. State Trans. ID  **PA-AH**

F. Transporter's Phone (     )

G. State Facility's ID

H. Facility's Phone (  215) 822-8995

| 11. US DOT Description (Including Proper Shipping Name, Hazard Class, and ID Number) | | 12. Containers | | 13. Total Quantity | 14. Unit Wt/Vol | L. Waste No. |
|---|---|---|---|---|---|---|
| HM | | No. | Type | | | |
| a. | RQ HAZARDOUS WASTE, SOLID, N.O.S., 9, NA3077, PG III, (LEAD), (D008) | be 1 | D M | n 100 | 1 | D 0 0 8 |
| b. | | | | | | |
| c. | | | | | | |
| d. | | | | | | |

J. Additional Descriptions for Materials Listed Above
S    1D64444

K. Handling Codes for Wastes Listed Above
a. SD1

15. Special Handling Instructions and Additional Information

EMERGENCY PHONE _____

16. GENERATOR'S CERTIFICATION: I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packed, marked and labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations. If I am a large quantity generator, I certify that I have a program in place to reduce the volume and toxicity of waste generated to the degree I have determined to be economically practicable and that I have selected the practicable method of treatment, storage, or disposal currently available to me which minimizes the present and future threat to human health and the environment; OR, if I am a small quantity generator, I have made a good faith effort to minimize my waste generation and select the best waste management method that is available to me and that I can afford.

| Printed/Typed Name Jim Keller | Signature Jim Keller | Month 07 Day 03 Year 03 |
| Printed/Typed Name Robert Lassow | Signature | Month 07 Day 03 Year 03 |
| Printed/Typed Name | Signature | Month  Day  Year |

18. Discrepancy Indication Space

20. Facility Owner or Operator: Certification of receipt of hazardous materials covered by this manifest except as noted in item 18.

| Printed/Typed Name | Signature | Month 07 Day 11 Year 05 |

AE5884 1/1     JH 01017

COPY 1 - TSD: MAIL TO PA DEP

P.02    6103618062    Sep-17-03 03:45P ALLAN A. MYERS

08/27/2003  13:53    +7338000000000000000-8    00000000    PAGE  83

REPUBLIC ENV SYS (PA)
· こどにまさくさんさ; いけ(ぼ)だ)

1865 SANDSTONE DRIVE / NORTHFIELD, PA 19110 / 215-822-8855
PN I.D. 0PAN5500592

C E R T I F I C A T E   O F   W A S T E   D I S P O S A L   N o .   4 6 5 8 8 4

THIS IS TO CERTIFY THAT WASTE MATERIAL RECEIVED FROM:
Generator  : MONTGOMERY SQUARE PARTNERSHIP
E.P.A. ID. : PAD0P0010639
Address    : 490 NORRISTOWN ROAD / BLUE BELL, PA 19422

AS REFERENCED ON MANIFEST NUMBER: PAM016776

HAS BEEN ANALYZED AND ACCEPTED AS SPECIFIED UNDER THE FACILITY'S WASTE ANALYSIS PLAN.
ALL MATERIALS REPRESENTED HEREIN SHALL BE STORED, TREATED, MANAGED AND/OR
DISPOSED OF IN ACCORDANCE WITH ALL APPLICABLE LOCAL
STATE AND FEDERAL REGULATIONS IN THE MANNER DESCRIBED BELOW.

Storage/Treatment/Disposal Method
H11 H132

Lab Code/Clin #    D.O.T./E.P.A. Description
1D64444  RQ HAZARDOUS WASTE, SOLID, N.O.S.,
(D008)

Mary C. Steinhorn
REPUBLIC ENV SYS (PA), INC.
Representative - Title:Document Control)

07/11/2003

JH 01018

Sep-17-03 03:50P ALLAN A. MYERS

6103618062

P.03

## Exhibit D

### Rate Lock Confirmation

Date:    **August 2, 2004**

TO:      JOHN HANCOCK LIFE INSURANCE COMPANY

RE:      JOHN HANCOCK APPLICATION NO. 6518467

      Property Address:  Avenel @ Montgomery Square Apartments
                  1100 Avenel Blvd.,
                  Montgomeryville, PA 19454

John Hancock is willing to lock the interest rate in connection with the above-captioned Application on the terms set forth below:

    (a)    the Interest Rate will be locked on **August 2, 2004** at **6.18%** per annum for a period of **365 days** from the Rate Lock Date (as hereinafter defined), subject to receipt by John Hancock of **$320,000**, the Commitment Fee, no later than five (5) days after the date of acceptance of the Application by John Hancock,

    (b)    the amount of the Monthly Payment is **$195,574.96**,

    (c)    the Amortization Period is **360 months**,

    (d)    the date of the Application is amended to be **August 2, 2004**,

    (e)    the outside date for Closing is **August 1, 2005**,  and

    (f)    the Application is hereby modified to incorporate the terms and conditions hereof, **time still being of the essence**.  In the event of any conflict between the terms hereof and those contained in the Application, the terms of this Rate Lock Confirmation shall prevail;

provided that:

    (g)    Applicant accepts and confirms said Interest Rate, subject to the above terms,

    (h)    makes the representations set forth below,

    (i)    telecopies this Rate Lock Confirmation back to John Hancock so that it is received **no later than 4:30 PM, Boston time, on August 2, 2004** (the "Rate Lock Date"), and

    (j)    time being of the essence hereof.

                            **JOHN HANCOCK LIFE INSURANCE COMPANY**

                            By:

                            Name:  Timothy J. Malik

                            Title:  Senior Investment Officer

                            Date:  August 2, 2004

1

JH 01019

The undersigned hereby:

(i)    requests that John Hancock lock the Interest Rate in connection with the above-captioned Application at the rate set forth above and accepts all of the terms and conditions set forth above, and agrees that the Application remains unchanged and in full force and effect, except as modified by the terms set forth above;

(ii)    acknowledges that, notwithstanding the locking of the Interest Rate, John Hancock is not obligated to make the Loan contemplated by and pursuant to the Application unless and until the Loan has been authorized by the John Hancock loan committees and John Hancock has accepted said Application by signing the Application in the place provided therein;

*EXCEPT AS AMENDED BY THE APPLICATION,*

*JRK* (iii)    certifies that the title company designated by the undersigned in Condition 7(b) of the Application and, if applicable, approved by John Hancock ("Title Company") and the surveyor designated by the undersigned in Condition 8(c) of the Application (the "Surveyor") have received and acknowledged receipt of John Hancock's title requirements and survey requirements, respectively, and have agreed to deliver a title policy and materials and a survey, complying with said requirements, respectively, within twenty-one (21) days of receipt of notification to proceed from the undersigned; and

*EXCEPT AS MODIFIED BY THE APPLICATION*

*JRK* (iv)    agrees to give the Title Company notice to proceed with the title and the Surveyor notice to proceed with the survey, and to provide John Hancock with a copy of said notice, no later than the next business day after the date at the tope of this Rate Lock Confirmation.

**APPLICANT:**

**Montgomery Square Partnership**

By: Vestmont Limited Partnership

By: Vesterra Corporation

By: _____

Name: _James R. Koller_

Title: _PRESIDENT_

2

JH 01020

Application No.

## EXHIBIT F

### BORROWER REPRESENTATION

Date:

Correspondent:

Please provide the following. Attach additional sheets as needed.

1. A diagram of the Borrower/Applicant and all constituent entities
2. A list of the owners and their respective percentage interest in each entity and type of interest.
3. With respect to Partnerships, please designate the General Partner(s), the Limited Partner(s), and the Managing General Partner.
4. With respect to Limited Liability Companies, please designate the members and the managing members.

The Applicant/Borrower certifies that the information provided above is true, accurate and complete.

BORROWER: MONTGOMERY SQUARE PARTNERSHIP
BY VESTMONT LIMITED PARTNERSHIP
BY VESTERRA CORPORATION

By: _____
        James R. Koller
Title: President

JHLICO
Ed 3/2/00

JH 01021

Montgomery Square Partnership
Ownership Structure

Montgomery Square Partnership  (general partnership)

**Ownership**

| | | | | |
|---|---|---|---|---|
| 33.33% | | | 23-2865711 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| 1 | *Vestmont Limited Partnership  (limited partnership)* | | 23-2865712 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | **Ownership** | | | |
| | 1 | 1.0% | Vesterra Corporation - general partner | 23-2388602 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 2 | 44.50% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| | 3 | 44.50% | Frank C. Palopoli - limited partner | 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 | 1017 Lorien Drive, Gwynedd, PA  19437 |
| | 4 | 10.0% | Joseph P. Kelly - limited partner | 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 | 851 Wright Drive, Maple Glen, PA  19002 |

| | | | | |
|---|---|---|---|---|
| 33.33% | 2 | *Vestmont Limited Partnership II (limited partnership)* | 01-0744096 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 1 | 1.0% | Vesterra Corporation - general partner | 23-2388602 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 2 | 38.28% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| | 3 | 38.28% | Frank C. Palopoli - limited partner | 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 | 1017 Lorien Drive, Gwynedd, PA  19437 |
| | 4 | 22.44% | Joseph P. Kelly - limited partner | 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 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |

| | | | | |
|---|---|---|---|---|
| 33.33% | 2 | *Vestmont Limited Partnership III (limited partnership)* | 20-0671819 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 1 | 1.0% | Vesterra Corporation - general partner | 20-0671932 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 2 | 66.17% | Koller Kelly Partnership - limited partnership | 20-0671819 | 490 Norristown Road, Suite 252, Blue Bell, PA  19422 |
| | 3 | 32.83% | FCP GROUP LP | | |

Application No.

## EXHIBIT G
### BORROWER DUE DILIGENCE

Correspondent:

The Borrower, Applicant, the Guarantors, the Indemnitors, and Principal(s) of the Borrower and the Applicant, the Guarantors and the Indemnitors shall be responsible for completing or responding to Part I and Part II of this Exhibit H at the time of submission of the Application to John Hancock Life Insurance Company ("John Hancock").

The Principal(s) of the Borrower, the Applicant, the Guarantor(s) and the Indemnitor(s) are determined as follows:

- Any entity and/or individual who possesses management or operational control of the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- Any person or entity possessing at least 25% of the ownership interest in the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner,
- In addition, for a corporation, the Principal(s) will be the majority shareholder(s) of the Borrower,
- In addition, for a limited liability company, the Principal(s) will be the members and the general partners of any partnership member and the majority shareholder(s) of any corporate member.

## PART I

Provide John Hancock with the following information for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s):

1) Financial statements (certified by a certified public accountant, if available) for the last year with a statement not more than 90 days old that there have been no material adverse changes since the date of the most recent statement. Such statements must include liquid assets (cash, stocks, bonds, marketable securities), non-liquid assets (real estate owned, businesses owned, ownership interests in other enterprises), cash flow (interest income, dividend income, wages, other income), liabilities and obligations (any refinancings during the term of the proposed mortgage, any partnership contributions or loans not yet made, any law suits, any personal guarantees or other contingent liabilities, current and potential tax obligations, any circumstances which may affect the individual or entity.)

2) For a corporate Borrower, Applicant, Guarantor(s), Indemnitor(s), corporate Principal(s) thereof, and major tenants or a REIT:

   a) Annual report for the last two years along with the most recent quarterly report (ex., 10K or 10Q for publicly traded companies and complete certified financial statements for the last two years for privately held companies).

   b) If not in the annual report, a detailed description of the business of the corporation,

3) Provide a social security number or tax identification number for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals.

4) Provide the country of domicile of each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and the home address of each Principal and the Guarantor(s) and the Indemnitor(s). USA

5) List other real estate assets in which the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) have an interest, including:

Application No.

    a)    Property type, location, size and occupancy.
    b)    Estimated market value, cash flow information, including effective gross income, expenses and net operating income.
    c)    Mortgage loan obligations, including each balance, rate (indicate whether fixed or floating), annual debt service, lender and whether recourse or non-recourse.
    d)    Any defaults, historically or currently.
    e)    Any modifications or restructurings, historically or currently.
    f)    Percentage of ownership interest.

6)    Describe the property management experience of the Borrower, the Applicant and their Principal(s), including property type, locations, sizes and conditions and ownership interest in any management companies. (If managed by other than the Borrower, the Applicant and each of their Principal(s), a description of the firm, including the year organized, type and variety of properties it manages, estimated number of units/square feet they manage).

7)    For the subject property, provide a statement of the acquisition or construction budget, including land acquisition cost, and a detailed list of subsequent capital expenditures, including when made. Include copies of internally or externally prepared audits indicating the capital improvements which should be made, if any, and a statement as to the capital improvements which are planned and their anticipated costs.

8)    Describe fully any financing which is secured by the Borrower's or the Applicant's interest in the entity which owns the subject real estate. (For example, debt which has as its collateral a limited partner's partnership interest or a corporate member's shares in the corporation.)

## TO BE COMPLETED BY EACH PRINCIPAL OF THE APPLICANT, BORROWER, GUARANTOR(S) AND INDEMNITOR(S)

### PART II

The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) must each complete the questionnaire which appears below and, for that reason, several copies are attached. By their signature each of them hereby represents and warrants that the responses to the following questions are accurate and complete with regard to each of them and the undersigned acknowledges John Hancock's reliance thereon. The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s), agree to provide John Hancock with prompt written notice of any change in financial condition. Otherwise, John Hancock will be entitled to rely on the continuing accuracy of the information provided.

If a response to a question is "yes," provide a written explanation supplementing the answer.

| YES | NO | | |
|-----|-----|-----|-----|
| ☒ | ☐ | 1.) | Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) have any contingent liabilities (ex., endorser or co-maker on notes or guarantees, current or potential tax liabilities)? See FINANCIAL STATEMENTS |
| ☒ | ☐ | 2.) | Are any of the current assets of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) pledged as collateral (ex., cash, marketable securities, certificates of deposit)? see FINANCIAL STATEMENTS |

JH 01024

Application No.

|  | ☑ | 3.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) or any entity in which they hold or have held an ownership interest, been involved in any lawsuits which might result in financial judgments against them? *not covered by insurance* |
|--|---|-----|------|
|  | ☑ | 4.) | Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, have any unsatisfied judgments against them? |
|  | ☑ | 5.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or are they in bankruptcy/insolvency/reorganization (whether voluntary or involuntary)? |
|  | ☑ | 6.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been foreclosed on or given deeds in lieu of foreclosure? |
|  | ☑ | 7.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been in default or been given relief (workout or restructuring by the lender under the terms of any mortgage loan, deed of trust or other financing agreement)? |
|  | ☑ | 8.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or convicted of a felony or been the subject of a complaint or indictment charging a felony? |
|  | ☑ | 9.) | Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, ever borrowed funds from John Hancock or any affiliate of John Hancock?  What is the status of those borrowings, regardless of whether outstanding or paid off? |
|  | ☑ | 10.) | Do the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, hold an ownership interest in any of the tenants at the Real Estate Security? |

Provide a list of banking and financial relationships of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and provide at least three specific lender references for the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals (individual contacts' names, addresses and telephone numbers) below.  Include contact name and telephone number for the lender(s) holding the current mortgage(s) on the Real Estate Security.

Greg Hurtio
Wilmington Trust of Pennsylvania
116 East Court Street
Doylestown, PA 18901
(267) 880-7002

Glenn Gallagher
Wachovia Bank
PA 1245
123 South Broad Street, 15th Floor
Philadelphia, PA 19109
215-670-6522

The undersigned certifies that all of the information provided is accurate and complete.

Application No.

_____

Signature of Borrower
Montgomery Square Partnership
By: Vestmont Limited Partnership
By: Vesterra Corporation

By: _____
        James R. Koller
Its: President

23-2865711
Taxpayer Identification No.

_____
Signature of Guarantor
Name:    James R. Koller
              900 Andorra Road
              Lafayette Hill, PA  19444

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
Social Security No.

_____
Signature of Guarantor
Name:    Frank C. Palopoli
              1017 Lorien Drive
              Gwynedd, PA  19437

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
Social Security No.

_____
Signature of Guarantor
Name:    Joseph P. Kelly
              851 Wright Drive
              Maple Glen, PA  19002

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
Social Security No.

JH 01026

## Montgomery Square Apartments

### Loan Budget

| | Project Costs | Equity | Budget |
|---|---|---|---|
| Land | $7,680,000 | $4,823,801 | $2,856,199 |
| Site Work | $3,284,000 | | $3,284,000 |
| Building Costs | $17,844,124 | | $17,844,124 |
| Sewer | $1,543,500 | | $1,543,500 |
| Water | $234,640 | | $234,640 |
| Building Permits & Township Fees | $278,104 | | $278,104 |
| Design & Engineering | $530,000 | | $530,000 |
| Construction Loan | $263,660 | | $263,660 |
| Permanent Loan | $300,490 | | $300,490 |
| Taxes and Insurance | $260,000 | | $260,000 |
| Miscellaneous Contingency | $1,279,243 | | $1,279,243 |
| Marketing | $481,600 | | $481,600 |
| Developer's Fee | $550,000 | | $550,000 |
| Debt Funded Operating Costs | $100,000 | | $100,000 |
| Interest | $926,440 | | $926,440 |
| | $35,555,801 | $4,823,801 | $30,732,000 |

JH 01027

## REPRESENTATIVE PROJECTS

- *East Gate Square*: 850,000 square foot shopping center located at the ramp from Interstate 295 and Nixon Drive, Mt. Laurel and Moorestown Townships, New Jersey. Anchored by Home Depot, Shop Rite Supermarket, Barnes & Noble Bookstore, Best Buy, Dick's Sporting Goods, Old Navy, CompUSA, Michael's Arts & Crafts and many other national retailers.

- *Montgomery Square*: 400,000 square foot shopping center located at Route 309 and Knapp Road, Montgomeryville, PA, and 256-unit apartment project currently under construction.

- *Normandy Farm*: 75 acres located at Route 202 and Morris Road, Whitpain Township, PA. Created new zoning district to facilitate the development of 76 single-family homes selling in the $700,000 range and the preservation of the largest barn in Montgomery County, an historic mansion and several other historic homes, which will be used for offices and a conference and banquet center.

- *Fawn Creek*: 109 acres located in a bucolic setting with a stream flowing through it on Hollow Road, Worcester Township, Montgomery County, PA. Developed for large lot (1.5 to 4 acres) single-family homes whose prices range from $800,000 to $1,700,000.

- *Mercer Square*: 91,400 square foot shopping center located at Route 611 and Old Dublin Pike, Doylestown, Pennsylvania, anchored by 44,000 square foot Genuardi Supermarket.

- *New Britain Village Square*: 140,000 square foot shopping center located at the intersection of Route 202 and County Line Road, Chalfont, Pennsylvania, anchored by Genuardi Supermarket, CVS Drugstore, McDonalds and First Union Bank.

- *Towamencin Shopping Village*: 140,000 square foot shopping center located at Forty Foot Road and Allentown Road, Towamencin Township, Pennsylvania, anchored by Genuardi Supermarket, Thrift Drug, Blockbuster and Wendy's.

- *Warwick Square*: 92,000 square foot shopping center located on Old York Road, Warwick Township, PA, anchored by Genuardi Supermarket, Blockbuster and McDonald's.

- *Dresher Plaza*: 96,500 square foot shopping center located at Limekiln Pike and Dreshertown Road, Dresher, Pennsylvania.

**From:**  Jim Koller [jkoller@kollerkelly.com]
**Sent:**  Tuesday, June 07, 2005 8:28 PM
**To:**    Ferrie, John
**Cc:**    Joseph P. Kelly; Frank C. Palopoli
**Subject:** RE: Avenel Unwind Costs

John:

   Please explain exactly what the $86,000 for Hedge Costs was used for and provide us with the calculation of the the Yield Maintenance Penalty.

Jim


   -----Original Message-----
   **From:** Ferrie, John [mailto:jferrie@jhancock.com]
   **Sent:** Monday, June 06, 2005 10:27 AM
   **To:** Joe Kelly
   **Cc:** Jim Koller (jkoller@kollerkelly.com); Malik, Timothy J.
   **Subject:** Avenel Unwind Costs

   Joe & Jim:
   The Application is under Massachusetts law and provides for the collection of the following amounts:
   1. Forfeit of Application & Commitment Fees of $960,000 (Letter's of credit)
   2. Payment of 3rd party costs (undetermined at present)
   3. Hedge Costs of $86,000
   4. Yield Maintenance Penalty of $5,600,000
   The above numbers are an estimate only and are subject to change based on market conditions and movement of interest rates.

   John

   *The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments.*

   *John P. Ferrie*
   John Hancock Real Estate Finance, Inc.
   486 Norristown Road, Suite 130
   Blue Bell, PA 19422
   610-825-9200 x 15 Phone
   610-941-9872 Fax
   e: mail: jferrie@jhancock.com

*Kollee*
EXHIBIT NO. 11
AR 1/19/06




## VESTERRA CORPORATION
## C/o KOLLER KELLY LLC
**1100 Avenel Boulevard**
**North Wales, PA 19454**
**(215) 616-0400**
**Fax (215) 699-9935**

received
6/23/05

June 20, 2005

Thomas C. Rogers, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Re:   John Hancock Life Insurance Company
      Avenel at Montgomery Square

Dear Tom:

This letter is in response to your letter of June 9, 2005.  As you pointed out in your letter, the outside date for Closing is August 1, 2005.  The Application requires that we meet certain conditions in order to close the loan.  Most significant among these conditions are the rental achievement requirements contained in condition 49.  We are not, at this point, able to satisfy these conditions, and we have so informed John Ferrie and Tim Malik of this.   The pace of leasing has been slower than we anticipated.  We have also informed John and Tim that we are exploring all options at this point.

We are fully aware of our obligations under the Loan Application.  We have deposited $960,000 with John Hancock, and we think that amount far exceeds the amount required to compensate them for their Costs and damages.  If you have any questions, please call me at 215-605-7770.

Sincerely,

James R. Koller

Koller
EXHIBIT NO. 14
AL 1/18/06

JH 00482

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | Civil Action No. 05-11614 WGY |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| VESTMONT LIMITED PARTNERSHIP, VESTMONT LIMITED PARTNERSHIP II, VESTMONT LIMITED PARTNERSHIP III, and VESTERRA CORPORATION d/b/a MONTGOMERY SQUARE PARTNERSHIP, | |
| Defendants. | |

### DEFENDANTS' ANSWER AND COUNTERCLAIM

Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively, "Vesterra"), by and through their undersigned counsel, hereby file this Answer and Counterclaim, as follows:

### Introduction

1.    Vesterra denies the allegations contained in paragraph 1 of the Complaint. By way of further answer, the purported "Loan Commitment" (by which Vesterra presumes that Plaintiff refers to the July 20, 2004 "Application to John Hancock Life Insurance Company for a First Mortgage Loan") is a document which speaks for itself, any characterization of which is denied. Further, Plaintiff's conclusory allegations in a so-called "introduction" are unnecessary and improper under the Federal Rules of Civil Procedure. Vesterra denies all characterizations of its conduct as in any way wrongful or improper.



## Parties

2.      Vesterra denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint.

3.      Vesterra denies the allegations contained in paragraph 3 of the Complaint, except admits that Vestmont Limited Partnership ("Vestmont") is a limited partnership existing under the law of the Commonwealth of Pennsylvania, and is a general partner of Montgomery Square Partnership. Vestmont's principal place of business is 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

4.      Vesterra denies the allegations contained in paragraph 4 of the Complaint, except admits that Vestmont Limited Partnership II ("Vestmont II") is a limited partnership existing under the law of the Commonwealth of Pennsylvania and is a general partner of Montgomery Square Partnership. Vestmont II's principal place of business is 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

5.      Vesterra denies the allegations contained in paragraph 5 of the Complaint, except admits that Vestmont Limited Partnership III ("Vestmont III") is a limited partnership existing under the law of the Commonwealth of Pennsylvania and is a general partner of Montgomery Square Partnership. Vestmont III's principal place of business is 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

6.      Vesterra denies the allegations contained in paragraph 6 of the Complaint, except admits that Vesterra Corporation is a Pennsylvania corporation and is the general partner of Vestmont, Vestmont II, and Vestmont III. Vesterra Corporation's principal place of business is 892 Andorra Road, Lafayette Hill, Pennsylvania 19444.

2

## Jurisdiction and Venue

7.     The allegations contained in paragraph 7 of the Complaint are conclusions of law to which no responsive pleading is required.

8.     The allegations contained in paragraph 8 of the Complaint are conclusions of law to which no responsive pleading is required.

## Facts

9.     Vesterra denies the allegations contained in paragraph 9 of the Complaint, except admits that Montgomery Square Partnership is the owner of a 256-unit residential apartment complex located in North Wales, Pennsylvania. By way of further answer, on or about July 30, 2004, Vesterra submitted to Plaintiff a document entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application"). Vesterra specifically denies that the Loan Application was "binding" on Plaintiff or Vesterra, or a "commitment" by Plaintiff.

10.    Vesterra denies the allegations contained in paragraph 10 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

11.    Vesterra denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the Complaint, and therefore denies such allegations.

12.    Vesterra denies the allegations contained in paragraph 12 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

3

13.    Vesterra denies the allegations contained in paragraph 13 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

14.    Vesterra denies the allegations contained in paragraph 14 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

15.    Vesterra denies the allegations contained in paragraph 15 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

16.    Vesterra denies the allegations contained in paragraph 16 of the Complaint, except admits that it did not close on any mortgage loan with Plaintiff relating to a residential apartment complex in North Wales, Pennsylvania, on or before August 1, 2005, and specifically denies any duty or obligation to do so.

17.    Vesterra denies the allegations contained in paragraph 17 of the Complaint, except admits that it has no present intention of closing on any mortgage loan with Plaintiff relating to a residential apartment complex in North Wales, Pennsylvania, and specifically denies any duty or obligation to do so.

**COUNT I**
**(Breach of Contract)**

18.    Vesterra restates its answers to paragraphs 1 through 17 as if set forth fully herein.

19.    Vesterra denies the allegations contained in paragraph 19 of the Complaint.

20.    Vesterra denies the allegations contained in paragraph 20 of the Complaint. By way of further answer, the Loan Application is a document which speaks for itself, any characterization of which is denied.

4

21.    Vesterra denies the allegations contained in paragraph 21 of the Complaint.

22.    Vesterra denies the allegations contained in paragraph 22 of the Complaint.

## AFFIRMATIVE DEFENSES

Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively, "Vesterra") reserve the right to assert any and all defenses to Plaintiff's Complaint. Vesterra has not yet obtained discovery from Plaintiff or any third party in connection with this action, and Vesterra reserves the right to amend or otherwise supplement this pleading.

Without limiting the generality of the foregoing, and without regard to whether the additional defenses set forth below are affirmative defenses within the meaning of Rule 8(c) of the Federal Rules of Civil Procedure, and without conceding that any such defenses must be set forth in its Answer to the Complaint, Vesterra states as follows:

## FIRST AFFIRMATIVE DEFENSE

1.    Plaintiff's Complaint fails to state a claim against Vesterra upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

2.    Plaintiff's claims are barred, either in whole or in part, because to permit Plaintiff to prevail on such claims would unjustly enrich Plaintiff.

## THIRD AFFIRMATIVE DEFENSE

3.    Plaintiff's claims are barred, either in whole or in part, because any alleged contract between Vesterra and John Hancock based on John Hancock's acceptance of the Loan Application is void and unenforceable due to a lack of consideration.

### FOURTH AFFIRMATIVE DEFENSE

4.      Plaintiff's claims are barred, in whole or in part, because the Loan Application was subject to unilateral modification or revocation by Plaintiff and, thus, is illusory and unenforceable.

### FIFTH AFFIRMATIVE DEFENSE

5.      Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to mitigate its alleged damages and/or because of similar doctrines.

### SIXTH AFFIRMATIVE DEFENSE

6.      Plaintiff's claims are barred, either in whole or in part, by the doctrines of laches, waiver, and estoppel, as well as the applicable statute of limitations.

**WHEREFORE,** Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation request that the Court dismiss the Complaint and enter judgment in their favor and against Plaintiff, together with costs and any such other and further relief that the Court deems just and proper under the circumstances.

## COUNTERCLAIM

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively, "Vesterra"), by and through their undersigned attorneys, assert the following counterclaim against Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company, and, in support thereof, aver as follows:

1.    Vesterra repeats and realleges each and every answer and Affirmative Defense from above as if the same were fully set forth herein.

### The Parties

2.    Defendant/Counterclaim Plaintiff Vestmont Limited Partnership is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

3.    Defendant/Counterclaim Plaintiff Vestmont Limited Partnership II is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

4.    Defendant/Counterclaim Plaintiff Vestmont Limited Partnership III is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

5.    Defendant/Counterclaim Plaintiff Vesterra Corporation is a Pennsylvania corporation with a principal place of business at 892 Andorra Road, Lafayette Hill, Pennsylvania 19444.

6.     Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company ("John Hancock") is a company existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts.

### Jurisdiction and Venue

7.     Jurisdiction for this counterclaim is proper pursuant to Rule 13 of the Federal Rules of Civil Procedure. In addition, this is an action for, *inter alia*, a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a case of actual controversy between the parties. Jurisdiction is also proper under 28 U.S.C. § 1332(a) because of diversity of citizenship, and the matter in controversy exceeds $75,000.

8.     Venue is proper under 28 U.S.C. § 1391.

### Underlying Facts

9.     On or about July 30, 2004, Vesterra submitted an "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application"). A copy of the Loan Application is attached hereto as Exhibit A.

10.     Pursuant to paragraph 30 of the Loan Application, Vesterra provided John Hancock with the following fees:

a) $5,000 for a "Processing Fee";

b) $640,000 for an "Application Fee"; and

c) $320,000 for a "Commitment Fee."

11.     Pursuant to "Condition 52" of the Loan Application, Vesterra provided the Application Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $640,000 and provided the Commitment Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $320,000.

8

12.    Although the Loan Application was purportedly "accepted" by John Hancock on August 17, 2004, it contains terms and conditions that make illusory any purported "commitment" by John Hancock, in that it makes John Hancock's performance entirely optional.

13.    The Loan Application contains, *inter alia*, the following conditions that give to John Hancock the unfettered discretion to approve or deny the Loan Application subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

> (a)    Condition 16(b) provides: "On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues as John Hancock determines are appropriate." (Emphasis added.)
>
> (b)    Condition 20 provides: "Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion. In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock." (Emphasis added.)

14.    The Loan Application also contains, *inter alia*, the following conditions that give to John Hancock the sole right to approve or deny the Loan Application, based on the "satisfaction" of John Hancock and its counsel, subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

9

(a)    Condition 6 provides that "The Note, the Mortgage, and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the 'Loan Documents') <u>shall be satisfactory in all respects in form and substance to John Hancock and its counsel,</u> and . . . shall contain provisions satisfactory in form and substance to John Hancock and its counsel . . ." (Emphasis added.)

(b)    Condition 7 provides that the title and all documentation pertaining thereto "<u>shall be satisfactory in all respects to John Hancock and its counsel,</u>" that title insurance shall be "<u>satisfactory in form and substance to John Hancock and its counsel,</u>" (emphasis added), and contains similar provisions respecting other documentation.

(c)    Condition 8(a) provides that "a current instrument survey" shall be furnished that is "<u>satisfactory in form and substance to John Hancock and its counsel.</u>" (Emphasis added.)

(d)    Condition 10 provides that "John Hancock shall be furnished within twenty-one (21) days of Rate Lock with <u>evidence satisfactory in form and substance to John Hancock and its counsel</u> . . . ." (Emphasis added.)

(e)    Condition 11(b) provides: "John Hancock shall also be furnished with such additional evidence as it may require, <u>and satisfactory in form and substance to John Hancock and its counsel,</u> that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, . . ." (Emphasis added.)

(f)     Condition 12 provides: "Prior to Closing, all construction of buildings and other improvements shall be completed to the satisfaction of John Hancock." (Emphasis added.)

(g)     Condition 13 provides that Vesterra is "obligated to deliver to John Hancock . . . the reports and materials described below in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock: . . ." (Emphasis added.)

(h)     Condition 14 provides, in relevant part: "John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser acceptable to John Hancock . . . This appraisal must support a loan-to-value ratio of not more than 75.00%, calculated as determined by John Hancock in its sole discretion." (Emphasis added.)

(i)     Condition 19 provides: "Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may require, satisfactory in form and substance to John Hancock, . . . All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance . . . and otherwise cover[] John Hancock's interest in the Real Estate Security in a manner satisfactory to John Hancock." (Emphasis added.)

(j)     Condition 23 provides that Vesterra "shall provide John Hancock on or prior to the Closing Date with an opinion satisfactory in form and substance to John Hancock and its counsel . . . from an attorney approved by John Hancock and its counsel, . . ." (Emphasis added.)

11

15.    Thus, in a number of conditions, John Hancock expressly retained the right to determine whether it would or would not approve the Loan Application subsequent to its "acceptance" by John Hancock, based on John Hancock's "sole discretion" or "satisfaction," so that John Hancock was free to make or not make any such mortgage loan to Vesterra.

16.    Notwithstanding the illusory and non-binding nature of the purported loan commitment, John Hancock, in early August 2005, drew upon the Letters of Credit and wrongfully took possession of $960,000 that belongs to Vesterra.

## COUNTERCLAIM – COUNT I
### Declaratory Judgment

17.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

18.    Because John Hancock's "commitment" to make a mortgage loan was illusory, there was a lack of consideration, and thus no binding agreement.

19.    Accordingly, Vesterra is entitled to a declaration that any purported contract based on John Hancock's acceptance of the Loan Application is void and unenforceable, and John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT II
### Unjust Enrichment

20.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

21.    John Hancock has received or obtained $965,000 from Vesterra, and in the circumstances here it is inequitable for John Hancock to retain such monies.

12

22.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT III
### Money Had and Received

23.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

24.     John Hancock has obtained $965,000 from Vesterra under such circumstances that in equity and good conscience this money should be returned.

25.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT IV
### Conversion

26.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

27.     Because any loan commitment by John Hancock was illusory, Vesterra had a right to retain the $640,000 Application Fee and the $320,000 Commitment Fee.

28.     Notwithstanding Vesterra's right, John Hancock converted these monies to its own use, exercising dominion over these monies by wrongfully drawing down the Letters of Credit.

29.     Accordingly, John Hancock should return to Vesterra, with interest, the $960,000 wrongfully obtained by John Hancock, and Counterclaim Plaintiffs are entitled to additional damages in an amount to be determined at trial.

13

**WHEREFORE,** Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation request that the Court:

(1)     Enter judgment declaring that any contract, agreement or commitment based on John Hancock's "acceptance" of the Loan Application is void and unenforceable;

(2)     Enter judgment against John Hancock requiring restitution to Counterclaim Plaintiffs of $965,000, plus appropriate interest;

(3)     Enter judgment against John Hancock for compensatory and punitive damages by reason of its conversion of monies rightfully belonging to Counterclaim Plaintiffs, as determined by the jury; and

(4)     Enter an order granting Counterclaim Plaintiffs the costs of this action, and such other and additional relief against John Hancock as may be just and proper in the circumstances.

14

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants/

Counterclaim Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Respectfully submitted,

VESTMONT LIMITED PARTNERSHIP,
VESTMONT LIMITED PARTNERSHIP II,
VESTMONT LIMITED PARTNERSHIP III, and
VESTERRA CORPORATION d/b/a
MONTGOMERY SQUARE PARTNERSHIP,

By their attorneys,

/s/ *Robert D. Hillman*

Steven J. Brooks, BBO # 059140
Robert D. Hillman, BBO # 552637
DEUTSCH WILLIAMS BROOKS DeRENSIS
&  HOLLAND, P.C.
99 Summer Street
Boston, MA  02110-1213
Date: September 6, 2005.                (617) 951-2300

OF COUNSEL:

/s/ *Howard D. Scher*

Howard D. Scher, Esquire
C. Randolph Ross, Esquire
Buchanan Ingersoll PC
1835 Market Street, Floor 14
Philadelphia, PA 191103
(215) 665-8700

### CERTIFICATE OF SERVICE

I understand that an electronic copy of the
foregoing pleading will be served by the court on all
counsel of record for the parties in the above-captioned action.

/s/ *Robert D. Hillman*

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE )
COMPANY, )
)
    Plaintiff/Counterclaim Defendant, )
)
v. )
)   CIVIL ACTION NO. 05-11614-WGY
VESTMONT LIMITED PARTNERSHIP, )
VESTMONT LIMITED PARTNERSHIP II, )
VESTMONT LIMITED PARTNERSHIP III, )
and VESTERRA CORPORATION d/b/a )
MONTGOMERY SQUARE PARTNERSHIP, )
)
    Defendants/Counterclaim Plaintiffs. )

## PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S
## RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

    Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock"), by its

attorneys, hereby responds and objects, pursuant to Fed. R. Civ. P. 33 and Local Rule 33.1, to the

First Set of Interrogatories propounded by defendants Vestmont Limited Partnership, Vestmont

Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation d/b/a/

Montgomery Square Partnership (collectively, "Defendants") as follows.

### General Objections

    1.    John Hancock generally objects to the Defendants' Interrogatories to the extent

that they seek the disclosure of any information that is protected from disclosure by the attorney-

client privilege, the work product doctrine, or any other applicable privilege.  John Hancock

hereby asserts and relies upon any and all such privileges. To the extent that the Defendants'
Interrogatories implicate such privileged or protected information, it is excluded from John
Hancock's responses. The inadvertent disclosure of any information protected by any such
privilege or immunity shall not constitute a waiver of that privilege or immunity.

2.    John Hancock generally objects to Defendants' Interrogatories to the extent that
they seek the disclosure of confidential or proprietary information. To the extent confidential or
proprietary information is produced, it shall be governed by the Stipulated Protective Order filed
jointly by the parties on October 28, 2005.

3.    John Hancock generally objects to Defendants' Interrogatories to the extent that
they seek to impose obligations on John Hancock different from or beyond those imposed by the
Federal Rules of Civil Procedure, the Local Rules of this Court, or other applicable law.

4.    John Hancock generally objects to Instruction No. 10 on the grounds that it is
overly broad and unduly burdensome in that it is not limited to a reasonable time period.

5.    The provision of any specific response is not intended to, and does not, act as a
waiver of any General Objection.

6.    Discovery in this action is ongoing. John Hancock expressly reserves the right to
supplement or otherwise modify its responses to Defendants' Interrogatories as it deems
necessary or appropriate in light of additional information, documents or materials that are
discovered or disclosed in the course of this proceeding.

## Specific Objections and Responses

Subject to and without waiving or compromising the foregoing general objections, each
of which is hereby incorporated by reference into each of the following responses, John Hancock
responds to the specific Interrogatories propounded by the Defendants as follows:

-2-

## INTERROGATORY NO. 1

Identify all persons with knowledge of any relevant facts relating to this lawsuit and for each such person identified, provide the following:

(a)    A brief summary of the facts known;

(b)    Identify the source of each and every such fact; and

(c)    Identify each and every document supporting, contradicting and/or relating to such fact.

## RESPONSE NO. 1

John Hancock objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome. John Hancock further objects to this Interrogatory to the extent that it seeks information that is subject to the attorney-client privilege and/or attorney work product doctrine. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that non-privileged information responsive to Interrogatory No. 1 can be found in its Initial Disclosures, which was served on October 24, 2005, and in its responses to Interrogatory Nos. 2, 3 and 5, *infra*.

## INTERROGATORY NO. 2

With respect to John Hancock's allegation in paragraph 11 of the Complaint that it "allocated and set aside assets for the purpose of funding the Loan and made commitments to third parties based thereon," describe in detail the factual basis for such allegations, including how such funds are "allocated and set aside," the identity of the third parties alluded to, and the return on such funds, and further identify any rules or regulations applicable to the investment of such funds, identify the person or persons with decision-making authority over such funds, and identify the two persons who are most knowledgeable about the factual basis of this allegation.

## RESPONSE NO. 2

John Hancock objects to this Interrogatory on the grounds that is overly broad, unduly burdensome and impermissibly compound. John Hancock further objects to this Interrogatory on the grounds that the request that Hancock identify the two persons who are "most knowledgeable" about "this allegation," as well as the request that Hancock identify persons who

-3-

have "decision-making authority" over the funds allocated to the Loan, are unreasonably ambiguous, vague and indefinite.

Notwithstanding and without waiving the foregoing general and specific objections, John Hancock responds as follows. After the Defendants executed the Loan Application, and prior to its final approval by John Hancock, Hancock's portfolio management team prospectively allocated the investment contemplated in that Loan Application based on the individual needs of various lines of business. The assets to fund the Loan were allocated from the following portfolio accounts in the following amounts:

| | |
|---|---|
| Guaranteed Benefit Reinsurance Account | $3,900,000 |
| Group Insurance | $3,000,000 |
| Retail Long Term Care | $5,000,000 |
| Remainder Block | $4,200,000 |
| Open Block | $2,600,000 |
| Investors Partner Life Insurance Company | $2,100,000 |
| Individual Qualified Annuity | $10,000,000 |
| Reinsured Fixed Annuity | $1,200,000 |

John Hancock further states that the following former Hancock employee is believed to have had significant involvement in decision-making relative to the allocation of assets set aside to fund the Loan to the Defendants and/or to possess knowledge of said assets:

Ms. Diane Crisileo, Senior Investment Officer

John Hancock further states that, pursuant to Fed. R. Civ. P. 33(d) and Local Rule 33.1(B), additional non-privileged information responsive to this Interrogatory can be derived from the following documents, copies of which accompany John Hancock's Response to Defendants' First Request for Production of Documents: JH00405-JH00425 and JH00913.

-4-

**INTERROGATORY NO. 3**

With respect to John Hancock's allegation in paragraph 22 of the Complaint that it "has suffered, and continues to suffer, losses and monetary damages," describe in detail the factual basis for such allegation, and identify the two persons who are most knowledgeable about this factual basis.

**RESPONSE NO. 3**

John Hancock objects to this Interrogatory on the grounds that the request that Hancock identify the two persons who are "most knowledgeable" about "this factual basis" is unreasonably ambiguous, vague and indefinite. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that it has suffered, and continues to suffer, losses and monetary damages as a result of the Defendants' breach of their obligations under the approved Loan Application (the "Loan Commitment") because Hancock has been deprived of its bargained-for rate of the return over the anticipated life of the Loan and been forced to incur additional expenses, including but not limited to attorney's fees, in order to enforce its rights under that Loan Commitment. Based on its preliminary calculations, John Hancock believes that its losses resulting from the Defendants' breach of their obligations under the Loan Commitment currently exceed $4.7 million (not including certain costs and the proceeds of any letters of credit for which the Defendants have counterclaimed in this action).

John Hancock further states that the following Hancock employees or attorneys are believed to possess knowledge with respect to John Hancock's losses:

Mr. John Ferrie, Regional Vice President;

Mr. Timothy Malik, Assistant Vice President;

Nathaniel Margolis, Esq., Vice President and Counsel;

Thomas Rogers, Esq., Partner, White & Williams LLP;

Mr. Morgan Salmon, former Investment Officer; and

Ms. Joan Uzdavinis, Assistant Vice President.

John Hancock further states that, pursuant to Fed. R. Civ. P. 33(d) and Local Rule

33.1(B), additional non-privileged information responsive to this Interrogatory can be derived

from the following documents, copies of which accompany John Hancock's Response to

Defendants' First Request for Production of Documents: JH00405-JH00425; JH00454;

JH00475-JH00476; JH00486-JH00487; and JH01101.

## INTERROGATORY NO. 4

With respect to your claim for damages, state, identify or describe:

(a)    the total amount of money Plaintiffs are seeking;
(b)    the manner in which such amount was calculated;
(c)    each element of damage or component of recovery that you are seeking;
(d)    the amount sought for each element or component;
(e)    the manner in which each element or component of the calculation was determined;
(f)    the source of each number used in the calculation;
(g)    for each element of damage or component of recovery, all facts on which you rely in contending that it was caused by the actions or omissions of Vesterra; and
(h)    all documents that refer or relate to such claim.

## RESPONSE NO. 4

John Hancock objects to this Interrogatory on the grounds that it is overly broad, unduly

burdensome and impermissibly compound. Notwithstanding and without waiving the foregoing

general and specific objections, John Hancock further responds as follows:

(a)    Based on its preliminary calculations, John Hancock believes that its losses

resulting from the Defendants' breach of their obligations under the Loan Commitment currently

exceed \$4.7 million (not including certain costs and the proceeds of any letters of credit for

which the Defendants have counterclaimed in this action). In addition to the foregoing losses,

John Hancock has incurred, and continues to incur, additional attorney's fees and other expenses

-6-

in order to enforce its rights under the Loan Commitment, for which Hancock seeks reimbursement pursuant to the terms of that agreement.

(b)     A summary that illustrates the manner in which John Hancock has preliminarily calculated its losses resulting from the Defendants' breach of their obligations under the Loan Commitment is appended to this Response as Exhibit A. The information set forth in Exhibit A was obtained from various sources within John Hancock, including without limitation Hancock's Real Estate Finance Group.

(c)     Please see John Hancock's response to subsections (a) and (b), *supra*.

(d)     Please see John Hancock's response to subsections (a) and (b), *supra*.

(e)     Please see John Hancock's response to subsections (a) and (b), *supra*.

(f)     Please see John Hancock's response to subsections (a) and (b), *supra*.

(g)     John Hancock has suffered, and continues to suffer, losses and monetary losses as a result of the Defendants' breach of their obligations under the Loan Commitment because Hancock has been deprived of its bargained-for rate of the return over the anticipated life of the Loan and been forced to incur additional expenses, including but not limited to attorney's fees, in order to enforce its rights under that Loan Commitment.

(h)     Pursuant to Fed. R. Civ. P. 33(d) and Local Rule 33.1(B), additional non-privileged information responsive to this Interrogatory can be derived from the following documents, copies of which accompany John Hancock's Response to Defendants' First Request for Production of Documents: JH00405-JH00425; JH00454; JH00475-JH00476; JH00486-JH00487; and JH01101.

**INTERROGATORY NO. 5**

Describe in detail every step that John Hancock has taken or will take to mitigate its alleged damages, including the use to which John Hancock has now put and intends to put the $32 million allegedly allocated and set aside for the loan to Vesterra, including the actual or expected rate of return on such funds, identify the person or persons with decision-making authority over such funds, and identify the two persons who are most knowledgeable about this.

**RESPONSE NO. 5**

John Hancock objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and impermissibly compound. John Hancock further objects to this Interrogatory on the grounds that the request that Hancock identify the two persons who are "most knowledgeable" about "this" is unreasonably ambiguous, vague and indefinite. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that, as of early August 2005, John Hancock already had approximately $1 billion or more in liquid assets awaiting long term investment, and the Defendants' failure to close the Loan as required under the terms of the Loan Commitment only unexpectedly increased (or failed to decrease) the level of liquid assets held by John Hancock. John Hancock has attempted to mitigate its damages by investing those additional liquid assets in available investments, including United States treasury bills and other monetary instruments. The rate of return that John Hancock actually will receive on those additional liquid assets over the anticipated life of the Loan is inherently unknowable, but can be estimated with reasonable certainty. For example, as of early August 2005, United States treasury bills with a maturity of ten years were paying approximately 4.32 percent per year.

John Hancock further states that the following Hancock employees or attorneys are believed to possess knowledge with respect to John Hancock's efforts to mitigate its losses:

Mr. Timothy Malik, Assistant Vice President;

-8-

Mr. Scott Navin, Vice President;

Mr. Barry Nectow, former Debt Investment Manager;

Mr. Tim Roseen, Assistant Vice President; and

Ms. Joan Uzdavinis, Assistant Vice President.

## INTERROGATORY NO. 6

Identify every mortgage loan application that John Hancock has accepted since January 1, 1995, that was subsequently denied, or that otherwise did not close, based in whole or in part on any of the terms and conditions from John Hancock's loan application that are listed in paragraphs 13 and 14 of Vesterra's Counterclaim, identify which of these provisions was the basis for the non-consummation of each such accepted loan application, and identify the two persons who are most knowledgeable about the reason(s) for the non-consummation of these loans.

## RESPONSE NO. 6

John Hancock objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. John Hancock further objects to this Interrogatory on the grounds that the request that Hancock identify the two persons who are "most knowledgeable" about "these loans" is unreasonably ambiguous, vague and indefinite. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that John Hancock is not aware of any commercial real estate loan, reasonably comparable to the Loan contemplated in the Loan Commitment, that ultimately did not close after being approved by John Hancock because of the conditions listed in paragraphs 13 and 14 of the Counterclaim.

## INTERROGATORY NO. 7

For each of the following individuals – Timothy J. Malik, John P. Ferrie, Helene McCole and Brian Depolis – provide a detailed description of their computer(s), including desktop computers, personal digital assistances (such as Palm Pilots or Blackberries), portable, laptop and notebook computers from January 1, 2004 to the present, and identify whether those machines and/or computers were capable of sending or receiving e-mails. If an individual uses a

computer for business purposes that is located at his/her residence, please include information concerning these systems.

## RESPONSE NO. 7

John Hancock objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that, during the time period relevant to this action, each of Mr. Malik, Mr. Ferrie, Mr. Depolis, and Ms. McCole have used desktop computers at their places of employment. Each has used his/her computer to send and receive e-mail. John Hancock further states that it has fulfilled its obligations under Fed. R. Civ. P. 26 and 34 by conducting a reasonably diligent search for electronic documents and e-mail files on the computers of Mr. Malik, Mr. Ferrie, Mr. Depolis and Ms. McCole in response to the Defendants' First Set of Requests for the Production of Documents and Things.

## INTERROGATORY NO. 8

Describe in detail all possible ways in which electronic data is shared between and among Plaintiff's employees and representatives, the method of transmission, type(s) of data transferred and the names of all individuals possessing the capability for such transfer.

## RESPONSE NO. 8

John Hancock objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, calls for speculation, and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the foregoing general and specific objections, John Hancock states that all employees have a shared "S:" drive mapped for sharing documents, although access to the documents stored on such drive can be restricted by means of user-defined file security settings. John Hancock further states that some Hancock offices, such as the office located in Blue Bell, Pennsylvania, have a partial T-1 connection to Hancock's

-10-

home office in Boston, Massachusetts for e-mail and Internet access, as well as access to selected

group data.

## INTERROGATORY NO. 9

List of all Plaintiff's computer systems that are backed up.

(a)    Describe the backup program(s) used (including information about legacy systems);
(b)    Give details of your backup procedures/protocols; and
(c)    Are files ever deleted from the computer system(s) as part of backup/retention procedures?

## RESPONSE NO. 9

John Hancock objects to this Interrogatory on the grounds that it is overly broad and

unduly burdensome. Notwithstanding and without waiving the foregoing general and specific

objections, John Hancock states that it has fulfilled its obligations under Fed. R. Civ. P. 26 and

34 by conducting a reasonably diligent search for electronic documents and e-mail files on the

computers of various Hancock employees in response to the Defendants' First Set of Requests

for the Production of Documents and Things.

## INTERROGATORY NO. 10

Identify each and every person who participated in answering these Interrogatories, and
compiling documents responsive to Defendants' First Request for the Production of Documents
and Things.

## RESPONSE NO. 10

John Hancock objects to this Interrogatory to the extent that it seeks information

protected by the attorney work product doctrine. Notwithstanding and without waiving the

foregoing general and specific objections, John Hancock states that the following Hancock

employees or attorneys assisted the undersigned counsel in answering these Interrogatories and

compiling documents responsive to Defendants' First Set of Requests for the Production of Documents and Things:

Ms. Betsy Daly, Information Security;

Mr. Brian Depolis, Senior Investment Officer;

Mr. John Ferrie, Regional Vice President;

Mr. Timothy Malik, Assistant Vice President;

Nathaniel Margolis, Esq., Vice President and Counsel;

Ms. Helene McCole, Closing Analyst;

Thomas Rogers, Esq., Partner, White & Williams LLP;

Mr. Tim Roseen, Assistant Vice President; and

Ms. Joan Uzdavinis, Assistant Vice President.

As to objections,

JOHN HANCOCK LIFE INSURANCE
COMPANY

By its attorneys,

Brian A. Davis (BBO No. 546462)
Lisa M. Gaulin (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tele:  617-248-5000
Fax: 617-248-4000

Date:  January 4, 2006

4024737.1

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL/HAND ON: 1-4-06
/s/ _____ electronic

-13-

## VERIFICATION

I, Timothy A. Roseen, hereby state that: I am an authorized signatory of John Hancock Life Insurance Company; I have read the foregoing Response to the Defendants' First Set of Interrogatories and know the contents thereof; that the information contained in said Response has been collected and made available to me by others; that the information contained in said Response is true to the best of my knowledge, information and belief based upon the information made available to me; and that, therefore, said Response is verified on behalf of John Hancock Life Insurance Company.

Signed under the pains and penalties of perjury this 4th day of January, 2006.

Timothy A. Roseen
Assistant Vice President

4024737.1

-14-

# EXHIBIT A

**Loan 6518467**

| | |
|---|---|
| Date of Target Closing | 8/1/05 |
| Maturity Date | 8/1/15 |
| Loan Term | 120.00 |
| Loan Amount | 32,000,000.00 |
| Monthly Constant | 195,574.96 |
| Balloon Payment | 26,963,760.00 (include interest due) |
| Today's 10-Yr.Treasury Rate | 0.043 (formatted as percent) |
| Discount Rate | 0.003551648 |
| PV P&I Constant | $19,081,437.97 |
| PV of Balloon Pmt. | $17,620,289.26 |
| Sum of PV's | $36,701,727.22 |
| Loss of Interest/Opportunity | $4,701,727.22 |
| | |
| TOTAL Loss of Interest/Oppor. | **$4,701,727.22** |