UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>VESTMONT LIMITED PARTNERSHIP, )<br>VESTMONT LIMITED PARTNERSHIP II, )<br>VESTMONT LIMITED PARTNERSHIP III, )<br>and VESTERRA CORPORATION d/b/a )<br>MONTGOMERY SQUARE PARTNERSHIP, )<br><br>Defendants. ) | CIVIL ACTION NO. 05-11614-WGY |

**PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
PROHIBITING DEFENDANTS FROM DISPOSING OF CERTAIN ASSETS**

Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock") respectfully submits this Memorandum of Law in support of its Motion for Preliminary Injunctive Relief Prohibiting Defendants from Disposing of Certain Assets (the "Motion"), filed herewith, in which John Hancock seeks an order prohibiting defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation d/b/a Montgomery Square Partnership (collectively, "Montgomery Partners" or the "Defendants") from proceeding with their plan to dispose of their primary marketable asset, a new, 256 unit apartment complex known as "Avenel at Montgomery Square" (the

"Avenel Apartments"), during the pendency of this action.  Alternatively, John Hancock seeks

an order directing Montgomery Partners to place a sufficient amount of funds from that sale in

escrow during the pendency of this action in order to ensure prompt payment of any judgment

entered in favor of John Hancock.  John Hancock is highly likely to succeed on the merits of

its breach of contract claim against Montgomery Partners in this action, and injunctive relief is

necessary and appropriate to preserve Hancock's damages remedy.  *See* Boston Athletic Assoc.

v. Int'l Marathons, Inc., 392 Mass. 356, 362 (1984); Teradyne, Inc. v. Mostek Corp., 797

F.2d 43, 51-52 (1st Cir. 1986).  Moreover, the balance of hardships weighs heavily in favor of

granting the relief sought by John Hancock, and issuing an injunction in this case will not harm

the public interest.  For all of these reasons, which are addressed in greater detail below, John

Hancock's Motion should be granted.

**Relevant Facts**

This is an action in which John Hancock seeks to enforce the unambiguous terms of a

$32 million loan commitment that Hancock and Montgomery Partners entered into in August

2004 (the "Loan Commitment").    Montgomery  Partners  is  a  single  purpose,  general

partnership that was formed under Pennsylvania law to develop certain commercial property

located in North Wales, Montgomery County, Pennsylvania.  Deposition of James R. Koller,

January 18, 2006 ("Koller Dep."), 20:18-22; 33-34.  By their own admission, the three

individuals who ultimately comprise Montgomery Partners -- Messrs. James R. Koller, Joseph

P. Kelly, and Frank C. Palopoli -- all are experienced and sophisticated real estate developers.

Koller Dep. Exh. 1 (describing the backgrounds of Vesterra Corporation's Principals).

Mr. Koller is a licensed attorney and a former partner in the real estate department of the

Philadelphia law firm of Dechert, Price & Rhoads (now "Dechert"). *Id.*; Koller Dep. at 8-10.

Mr. Kelly is a Certified Public Accountant and former corporate executive who previously was

employed by Price Waterhouse. Koller Dep. Exh. 1; Koller Dep. at 24:13-18. Mr. Palopoli

is a real estate consultant with over twenty-five years of experience. Koller Dep. Exh. 1.

Together, Messrs. Koller, Kelly and Palopoli have developed more than 1,500,000 square feet

of commercial properties in the Pennsylvania area since 1986. Koller Dep. Exh. 2 (list of the

Defendants' "Representative Projects").

Montgomery Partners began construction of the Avenel Apartments on the North Wales

site in 2003. Koller Dep. at 35:3-8. Construction of the Avenel Apartments was scheduled to

be completed in June 2005. *Id.* at 76:18-24. The majority of the construction work on the

Avenel Apartments now is complete. Affidavit of John P. Ferrie, dated February 7, 2006

("Ferrie Aff."), ¶ 2.

Prior to the completion of construction, Montgomery Partners became concerned that

interest rates would rise significantly before Montgomery Partners was ready to obtain

permanent financing on the Avenel Apartments project, and that a rise in interest rates would

substantially increase the cost of that project. Koller Dep. at 58-59. Accordingly, in the

summer of 2004, Montgomery Partners negotiated and entered into a 70-page written loan

commitment with John Hancock (the "Loan Commitment"), whereby Hancock agreed, subject

to various standard and negotiated conditions, to provide Montgomery Partners with $32

million in permanent financing on the Avenel Apartments at any time over the ensuing twelve

months at a "locked" interest rate of 6.18% per annum. *Id.* at 75-76. Extending the rate lock

period for twelve months was highly beneficial to Montgomery Partners because it allowed

Montgomery Partners to take advantage of then-existing low interest rates and protect itself from future, potentially unfavorable rate fluctuations. Ferrie Aff., ¶ 3. Montgomery Partners expressly agreed, in return, to actually "borrow the Principal Amount" set forth in the Loan Commitment from John Hancock on or before August 1, 2005, or to pay "all ... damages, losses, costs and expenses suffered or incurred by John Hancock" as a result of any default.[1] *Id.*; Koller Dep. Exh.8, Conditions 27 and 30(d) (Loan Commitment).

Notwithstanding the clear terms of the Loan Commitment, Montgomery Partners admittedly made no effort to "borrow the Principal Amount" from John Hancock on or before the scheduled closing date of August 1, 2005. Koller Dep. at 168:1-13 (acknowledging that Defendants never reviewed or responded to John Hancock's proposed closing documents). Rather, Montgomery Partners elected to take advantage of the strong demand for apartment properties in the Pennsylvania area to enlist a buyer for the Avenel Apartment project. Ferrie Aff., ¶ 4; Koller Dep. at 101:10-23. Beginning in May or June of 2005, Montgomery Partners began soliciting private bids on the Avenel Apartments from interested buyers. Ferrie Aff., ¶ 4; Koller Dep. at 96-97. Montgomery Partners ultimately agreed to sell the project to an entity controlled by JP Morgan Chase Bank ("JP Morgan") for $59,250,000, which the Defendants themselves have characterized as a "good price." Koller Dep. at 102:6-12; 113-14. Montgomery Partners' anticipated gain on the sale of the Avenel Apartments is approximately $28 million. *Id.* at 38:17-24.

---

[1] The Loan Commitment also afforded Montgomery Partners the opportunity to extend the closing date up to six (6) times for periods of up to thirty (30) days each, *i.e.*, for an aggregate period of one hundred eighty (180) days. Koller Dep. at 141:4-13. Montgomery Partners, however, never exercised its right to any such extension.

After deciding to sell the Avenel Apartments for a substantial gain, Montgomery Partners first attempted to "unwind" the Loan Commitment through negotiations with John Hancock, during which Montgomery Partners' principals repeatedly acknowledged both orally and in writing their "obligations" to Hancock under the Loan Commitment. *See, e.g.*, Koller Dep. Exh. 14 (Letter of James R. Koller to Thomas C. Rogers, Esq., dated June 20, 2005); Koller Dep. at 104-06; 116-17; Ferrie Aff., ¶ 5. When John Hancock refused to agree to the Defendants' proposed terms, however, Montgomery Partners changed its tune and claimed, for the first time, that the Loan Commitment is totally "illusory" and unenforceable because it makes a loan closing dependent upon the fulfillment of certain conditions to John Hancock's "satisfaction," including, without limitation, the delivery of satisfactory environmental and financial assurances. Ferrie Aff., ¶ 5. Montgomery Partners makes this argument despite the undisputed facts that: (a) the Defendants never made any effort to close the loan, and (b) John Hancock never actually exercised its discretion to deny or reject anything under any of the discretionary provisions cited by Montgomery Partners. Koller Dep. at 168:1-9.

John Hancock commenced this action for damages after Montgomery Partners failed to close the loan or compensate Hancock for its resulting losses and expenses by the August 1, 2005 deadline set forth in the Loan Commitment. Ferrie Aff., ¶ 6. Due to a significant drop in interest rates between execution of the Loan Commitment and the time of Montgomery Partners' default, John Hancock's current total losses and expenses on this failed transaction (not including attorney's fees) are estimated to be approximately $4.7 million. *Id.*; Plaintiff John Hancock Life Insurance Company's Response to Defendants' First Set of Interrogatories, Response No. 3. Montgomery Partners has asserted counterclaims seeking, *inter alia*, the

return of $965,000 in deposits and fees that were paid at the time the Loan Commitment was executed. Koller Dep. Exh. 21 (Defendant's Answer and Counterclaim); Koller Dep. at 196-97. All of Montgomery Partners' claims and defenses, however, are premised on the legal proposition that the entire Loan Commitment is "illusory." Koller Dep. Exh. 21.

Shortly after commencement of this litigation, John Hancock learned that the planned sale of the Avenel Apartments to JP Morgan had been terminated for undisclosed reasons. Ferrie Aff., ¶ 7. More recently, however, John Hancock was informed that that sale now is expected to go forward within the next 30 to 60 days. *Id.* If it does, Montgomery Partners' ability to pay any future judgment that John Hancock obtains in this action will be severely compromised. *Id.* ¶ 8. The Avenel Apartments represent the only marketable property owned by Montgomery Partners that is of sufficient value to satisfy a judgment in the amount of John Hancock's claimed damages. *Id.* The only other significant assets currently owned by Montgomery Partners are a one-acre parcel near the Avenel Apartments with an alleged value of approximately $700,000, and an adjacent forty-five acre parcel that is encumbered by a notice of possible taking by the Pennsylvania Department of Transportation for use in a state highway project. *Id.* The potential for a government taking of that forty-five acre parcel renders it effectively unmarketable for a fair price and, therefore, insufficient security for the foreseeable future. *Id.* ¶ 10.

John Hancock has attempted, through negotiation, to reach a voluntary agreement with Montgomery Partners that will ensure that Montgomery Partners retains sufficient assets after the planned sale of the Avenel Apartments to pay any judgment entered in this action. Affidavit of Brian A. Davis, dated February 8, 2006, ¶ 10. Ominously, Montgomery Partners

has refused to enter into such an agreement. *Id.* John Hancock's concern regarding Montgomery Partners' ability to satisfy a future judgment only has been heightened by the news that Montgomery Partners recently extracted $44 million in value from the Avenel Apartments through a temporary mortgage loan transaction with JP Morgan in late December 2005. Koller Dep. at 179:1-12; Ferrie Aff., ¶ 11. The net proceeds of that transaction -- which was not disclosed to John Hancock beforehand -- were not retained by Montgomery Partners, but rather were promptly dispersed to Messrs. Koller, Kelly and Palopoli, the individuals who comprise that partnership. Koller Dep. at 182-183; Ferrie Aff., ¶ 11. John Hancock rightfully fears that Montgomery Partners promptly will disperse the proceeds of the impending sale of the Avenel Apartments in the same manner, thereby making it extremely difficult, if not impossible, for John Hancock actually to collect upon any judgment that ultimately is entered in this action. Ferrie Aff., ¶ 11.

## Specific Injunctive Relief Requested

The preliminary injunctive relief that John Hancock seeks is modest. John Hancock asks only that Montgomery Partners be enjoined, during the pendency of this action, from selling the Avenel Apartments *or, alternatively,* that Montgomery Partners be ordered to place an amount reasonably sufficient to pay any judgment entered in this action (which John Hancock respectfully submits is $3.75 million) in an interest-bearing escrow account during the pendency of this action in order to ensure prompt payment of any judgment entered in favor of John Hancock.[2]

---

[2] The amount that John Hancock requests be placed in escrow reflects Hancock's estimated losses to date (approximately $4.7 million, not including attorney's fees) *minus* the amount of the commitment and application fees that Montgomery Partners forfeited when it defaulted on its obligations under the Loan Commitment in August 2005 ($960,000).

## Argument

### I.    THE RELEVANT STANDARD.

Fed. R. Civ. P. 64 grants district courts the power to employ "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action," including preliminary injunctions, "in the manner provided by the law of the state in which the district court is held." Fed. R. Civ. P. 64. "Thus, although federal law determines the standard for issuing ... an injunction," the federal courts look to state law to "determine[] whether the state law cause of action can support an injunction." John Paul Mitchell Sys. v. Quality King Distrib., Inc., 106 F.Supp.2d 462, 477-78 (S.D.N.Y. 2000) (citations omitted). *See also* Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004) (*citing* Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), and Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc., 527 U.S. 308, 318 n.3 (1999) and commenting that plaintiffs waived, by failing to raise, any argument that "the availability of injunctive relief should be determined, in the first instance, by reference to the tenet that the law of the forum state supplies the rules of decision in diversity cases").

The facts and the law in this case strongly support John Hancock's request for a preliminary injunction prohibiting the Defendants from disposing of valuable assets during the pendency of this litigation. Massachusetts law -- which expressly governs the parties' respective rights and obligations pursuant to Condition 35 of the Loan Commitment -- provides that a court may issue such an injunction where necessary or appropriate to ensure that a final judgment will be collectible. *See, e.g.*, GTE Prods. Corp. v. Stewart, 414 Mass. 721, 724 (1993) (affirming injunction and holding that a "plaintiff experiences irreparable injury if there

is no adequate remedy at final judgment."); Boston Athletic Assoc. v. Int'l Marathons, Inc.,

392 Mass. 356, 362 (1984) (affirming grant of preliminary injunction prohibiting dispersal of

funds by defendant until merits of claim could be decided where failure to grant injunction

could force plaintiff to engage in the "time-consuming and sometimes difficult task of trying to

exact its damages").    Federal law, in turn, provides that John Hancock is entitled to a

preliminary injunction if it demonstrates that: (1) it is likely to succeed on the merits of its

claims; (2) it faces a risk of irreparable injury if injunctive relief is denied; (3) the balance of

resulting hardships favors the issuance of an injunction; and (4) the public interest will not be

adversely affected by the issuance of an injunction.    *See* Planned Parenthood League of

Massachusetts v. Belotti, 641 F.2d 1006, 1009 (1st Cir. 1981); Teradyne, Inc. v. Mostek

Corp., 797 F.2d 43, 51-52 (1st Cir. 1986) (*citing* Planned Parenthood and applying the four

factor test in a breach of contract action).    "If a great showing of likely success on the merits is

made by a plaintiff," however, "a reduced showing of irreparable harm may be appropriate."

Cablevision of Boston v. Public Improvement Comm., 38 F.Supp.2d 46, 53 (D. Mass. 1999).

*See also* TEC Eng'g Corp. v. Budget Molders Supply, 927 F. Supp. 528, 535 (D. Mass. 1996)

("where the likelihood of plaintiff's success on the merits is great, 'the less weight is to be

given to the defendant's loss.'") (*quoting* F.D.I.C. v. Elio, 39 F.3d 1239, 1248 (1st Cir.

1994)).

John Hancock can and will demonstrate, as set forth below, that it is entitled to

preliminary injunctive relief in this case because: (1) Hancock is highly likely to prevail on the

merits of its claim that Montgomery Partners has breached the Loan Commitment;

(2) Hancock will suffer irreparable harm if Montgomery Partners is permitted to render itself

effectively judgment-proof during the pendency of this litigation by selling its interest in the Avenel Apartments and dispersing the net proceeds; (3) the balance of resulting hardships cuts decidedly in Hancock's favor; and (4) the public interest will not be harmed by an injunction.

II.   JOHN HANCOCK'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED BECAUSE JOHN HANCOCK IS HIGHLY LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM.

This action presents a straightforward breach of contract claim between sophisticated, experienced business entities. In August 2004, Montgomery Partners and John Hancock entered into a 70-page, extensively-negotiated Loan Commitment whereby Hancock agreed to loan Montgomery Partners $32 million at a fixed interest rate of 6.18% per annum at any time over the next twelve months regardless of any subsequent increase in interest rates generally, and Montgomery Partners, in turn, agreed to *either*: (a) actually borrow the $32 million from John Hancock by August 1, 2005 (or within the permissible extension periods); or (b) pay John Hancock's resulting losses and expenses if Montgomery Partners did not close the loan. Koller Dep. Exh. 8, Conditions 27 and 30(d). Montgomery Partners subsequently elected, for business reasons, not to close the loan with John Hancock, but rather to sell the property to an interested buyer for what Montgomery Partners regards as a "good price." Koller Dep. at 102:6-12; 113-14. It is undisputed that Montgomery Partners expressly understood and acknowledged, before making that decision, that its conduct would expose it to liability for John Hancock's resulting losses and expenses. *Id.* at 104-06; 116-17. Montgomery Partners even knew beforehand the potential amount of those losses and expenses. Koller Dep. Exh. 11 (E-mail from John Ferrie to Joseph Kelly and James Koller, dated June 6, 2005). In the

-10-

circumstances, it is apparent that Montgomery Partners made its decision not to close the loan with Hancock with its eyes wide open.

Only later, when Montgomery Partners was unable to convince John Hancock to forego its contractual rights and accept considerably less than its full damages, did Montgomery Partners first make the claim that the Loan Commitment -- which Montgomery Partners had actively pursued, negotiated and executed less than a year earlier -- is totally "illusory" and unenforceable because it makes a loan closing dependent upon the fulfillment of certain conditions to John Hancock's "satisfaction," including, without limitation, the delivery of satisfactory environmental and financial assurances.    This argument, which constitutes Montgomery Partners one and only defense to John Hancock's breach of contract claim, is itself a fiction.  Massachusetts law is clear that a written agreement that conditions one party's performance on the "satisfactory" performance of the other is not illusory or unenforceable for lack of mutuality.  As the Massachusetts Supreme Judicial Court long ago stated in Eliopoulos v. Makros, 322 Mass. 485, 488 (1948),

> [t]he large class of cases where one party to a contract may reject performance which is not satisfactory to him ... while no corresponding privilege is given to the other party, is itself enough to establish what should need no augment, that the obligations of the parties to a contract need not be substantially equal.

In each such case, the party to be satisfied is bound to judge the performance of his opposite in a manner consistent with the obligation of good faith and fair dealing, which is implied in every contract under Massachusetts law. Kerrigan v. City of Boston, 361 Mass. 24, 33 (1972); Rand-Whitney Packaging Corp. v. Robertson Group, Inc., 651 F. Supp. 520, 535 (D. Mass. 1986).    The First Circuit expressly recognized and endorsed this rule of

Massachusetts law in <u>Stevens v. G.L. Rugo & Sons, Inc.</u>, 209 F.2d 135, 139 (1st Cir. 1953),

in which it said,

> [i]t might be questioned as an abstract proposition whether a
> promise to render a performance satisfactory to the other party to
> a contract was not illusory in character because conditioned on
> the caprice or whim of the party to be satisfied. But such
> promises are not uncommon in contracts, and contracts
> containing them have generally been upheld by the courts by
> construing the promise as at least requiring a performance
> satisfactory to the other party in the exercise of an honest
> judgment.

Here, Montgomery Partners negotiated and entered into the Loan Commitment with

John Hancock with the full knowledge and expectation that, once approved by Hancock, it

created binding obligations on both sides. Indeed, less than forty-five days prior to the

required closing date, Montgomery Partners openly acknowledged in writing that it was "fully

aware of [its] obligations" under that agreement. Koller Dep. Exh. 14. The mere fact that

some of those obligations included submitting loan documentation and materials that were

"satisfactory" to John Hancock does not make the Loan Commitment in any way illusory or

unenforceable. Had Montgomery Partners ever submitted such documentation or materials to

John Hancock for review, Hancock would have been obligated to assess them in good faith and

"in the exercise of an honest judgment." <u>Kerrigan</u>, 361 Mass. at 33; <u>Stevens</u>, 209 F.2d

at 139. John Hancock never got the chance, however. Montgomery Partners simply walked

away from its contractual obligations to Hancock in favor of a more lucrative deal elsewhere.

In doing so, Montgomery Partners undeniably breached the Loan Commitment, and established

that John Hancock has a high likelihood of success of recovering its losses resulting from that

breach.

III.    JOHN HANCOCK'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF
        SHOULD BE GRANTED BECAUSE HANCOCK IS LIKELY TO SUFFER
        IRREPARABLE HARM IF MONTGOMERY PARTNERS SUCCEEDS IN SELLING
        THE AVENEL APARTMENTS PROPERTY AND DISPERSING THE PROCEEDS
        OF THAT SALE.

Massachusetts law, as applied by both state courts and federal courts sitting in this

Commonwealth, expressly recognizes that the destruction or impairment of one party's ability

to recover damages from the other can constitute irreparable harm for purposes of obtaining

injunctive relief.  *See, e.g.,* Boston Athletic Assoc., 392 Mass. at 362 (affirming grant of

preliminary injunction prohibiting dispersal of funds by defendant until merits of claim could

be decided where failure to grant injunction could force plaintiff to engage in the "time-

consuming and sometimes difficult task of trying to exact its damages"); Teradyne, 797 F.2d

at 53 (holding that "a preliminary injunction can be granted when it is necessary to protect the

damages remedy").  The required showing of irreparable harm is reduced where there is a

"great showing of likely success on the merits." Cablevision of Boston, 38 F.Supp.2d at 53.

John Hancock will suffer irreparable harm in this case if Montgomery Partners is

permitted to go forward with the planned sale of the Avenel Apartments and immediately

disperse the proceeds of that sale because doing so will destroy or severely diminish Hancock's

ability to collect on any final judgment.  Hancock's current net losses resulting from

Montgomery Partners' indisputable breach of the Loan Commitment (not including attorney's

fees) total approximately $3.75 million.  *See* footnote 2, *supra.*  The Avenel Apartments

project is the only marketable asset owned by Montgomery Partners that is of sufficient value

to satisfy a final judgment in that amount. Ferrie Aff., ¶ 8.  The only other significant assets

currently owned by Montgomery Partners are a one-acre parcel near the Avenel Apartments

with an alleged value of approximately $700,000, and an adjacent forty-five acre parcel that is encumbered by a notice of possible taking by the Pennsylvania Department of Transportation for use in a state highway project. *Id.* As explained in the accompanying Affidavit of John P. Ferrie, Regional Vice President of John Hancock's Real Estate Investment Group, Hancock's recent experience demonstrates that the potential for a government taking of that forty-five acre parcel renders it effectively unmarketable at a fair price, and, therefore, insufficient security for the foreseeable future. *Id.*, ¶ 10.

If Montgomery Partners is permitted to (a) go forward with its planned sale of the Avenel Apartments, and (b) disperse the proceeds of that sale to the individual partners, John Hancock may be forever precluded from recovering on any judgment rendered in this action or, alternatively, forced to wait years for a recovery. John Hancock's concern in this regard has been heightened by the recent transaction in which Montgomery Partners extracted $44 million in value from the Avenel Apartments through a temporary mortgage loan transaction with the planned buyer in late December 2005. Koller Dep. at 179:1-12; Ferrie Aff., ¶ 11. The net proceeds of that transaction were not retained by Montgomery Partners, but rather were promptly dispersed to Messrs. Koller, Kelly and Palopoli. Koller Dep. at 182-83. John Hancock fears that Montgomery Partners promptly will disperse the proceeds of the impending sale of the Avenel Apartments in the same manner. Ferrie Aff., ¶ 11. The issuance of a preliminary injunction as requested by John Hancock is necessary and appropriate to prevent such an unjust outcome.

IV.    JOHN HANCOCK'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED BECAUSE THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN JOHN HANCOCK'S FAVOR.

John Hancock may face severe hardship if its request for an injunction is denied and its ability to collect on any final judgment subsequently is impaired or destroyed during the pendency of this action.  Montgomery Partners, on the other hand, will suffer *no* meaningful harm if it is required to place less than one-quarter of the proceeds from its planned sale of the Avenel Apartments in an interest-bearing escrow account in order to preserve the status quo pending the final determination of John Hancock's claim on the merits.  *See, e.g.,* St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis, 951 F.Supp. 5, 7 (D. Mass. 1996) (observing, in similar circumstances, that a freeze on an "appropriate amount of assets ... would not impose any great or substantial harm" on the defendants, and "would serve only to preserve the status quo").  In the circumstances, the balance of hardships weighs heavily in John Hancock's favor.

V.    JOHN HANCOCK'S REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED BECAUSE AN INJUNCTION WILL NOT HARM THE PUBLIC INTEREST.

Granting the preliminary injunctive relief requested by John Hancock in this private business dispute will not harm the public interest.  To the contrary, issuing an injunction in this case actually will *serve* the public interest by "tak[ing] reasonable steps to secure the payment of a prospective judgment by the defendants."  St. Paul Fire & Marine, 951 F.Supp. at 7. Montgomery Partners cannot reasonably argue to the contrary.

### Conclusion

John Hancock is highly likely to succeed on the merits of its breach of contract claim against Montgomery Partners in this action, and the injunctive relief requested is necessary and

appropriate to preserve Hancock's damages remedy.   Moreover, the balance of hardships weighs heavily in favor of granting the relief sought by John Hancock, and issuing an injunction in this case will not harm the public interest.   For these reasons, and for the other reasons set forth above, John Hancock respectfully requests that the Court grant its Motion for Preliminary Injunctive Relief in its entirety.

JOHN HANCOCK LIFE INSURANCE COMPANY

By its attorneys,

Brian A. Davis (BBO No. 546462)
Lisa M. Gaulin (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:   February 8, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served by hand, or by electronic and regular mail, upon counsel for each other party on February 8, 2006.

Brian A. Davis