UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————— :
                                                      :
JOHN HANCOCK LIFE INSURANCE                           :
COMPANY,                                              :    Civil Action No. 05-11614 WGY
                                                      :
            Plaintiff/Counterclaim Defendant,         :
                                                      :
            v.                                        :
                                                      :
VESTMONT LIMITED PARTNERSHIP,                         :
et al.,                                               :
                                                      :
            Defendants/Counterclaim Plaintiffs.       :
———————————————————— :


**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

        Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont

Limited Partnership III and Vesterra Corporation ("Defendants" or "Vesterra"), by and through

their undersigned attorneys, hereby submit this Memorandum of Law in Opposition to Plaintiff

John Hancock Life Insurance Company's Rule 64 Motion for a Preliminary Injunction.

**I.      INTRODUCTION**

        With discovery underway, Defendants have learned that this is not a case involving a

conventional breach of a contract to borrow $32,000,000, nor is it merely a case about the

illusory promise of Plaintiff John Hancock Life Insurance Company ("Plaintiff" or "John

Hancock") to loan that amount; it is a case of fraud.  John Hancock never intended to loan

defendants the $32 million.  Instead, it intended to collect fees of $965,000 and avoid losses of

$355,000 by signing a loan application while, at the same time, unbeknownst to Defendants,

conditioning the disbursement of the mortgage loan on a secret requirement which it knew Defendants did not and would not satisfy.

And, with extraordinary arrogance, John Hancock is attempting to avoid the consequence of its fraud by aggressively seeking injunctive relief, both to recover a windfall and to preclude Vesterra from selling the property that was originally going to be the subject of the mortgage loan. John Hancock presumably hopes to use the threat of this remedy, or, worse, its actual grant by this Court, to use the Court to bludgeon Vesterra into surrender and evade the exposure of its scheme.

By its request for Rule 64 injunctive relief, Plaintiff John Hancock ultimately seeks to have this Court rewrite the law to prevent Vesterra from selling an apartment complex in Montgomery County, Pennsylvania -- in effect granting it a mortgage lien where no mortgage loan was ever made -- to provide John Hancock with "prejudgment security." In short, even though John Hancock has known about Vesterra's intention to sell the apartment complex since at least September 2005, and never acted on it, John Hancock now seeks to halt the sale on the basis that it wants prejudgment security for an expected damages award. Such relief is unwarranted under the law of Massachusetts, the facts of this case, and the equitable powers of this Court.

In July 2004, Vesterra applied to John Hancock for a mortgage loan to be secured by Vesterra's Pennsylvania apartment complex (then under construction), and John Hancock approved and "accepted" this loan application the following month. As explained below, Vesterra and John Hancock did not close on the mortgage loan, and John Hancock never

disbursed the loan to Vesterra.[1]  However, John Hancock has retained $965,000 in fees from

Vesterra, and has filed the instant lawsuit seeking additional money damages of $3.7 million,

totaling damages in excess of $4.5 million.  However, the loan application was illusory and

unenforceable because it provided John Hancock the unfettered discretion to approve or deny the

mortgage loan subsequent to its "acceptance" by John Hancock, so that John Hancock was free

to make or not make any such mortgage loan to Vesterra.

But even more outrageous, Defendants recently learned -- through the discovery process

-- that the internal John Hancock loan approval contained a hidden, additional requirement that

had to be met by Vesterra before John Hancock would disburse the Loan.  Vesterra has

confirmed through discovery and deposition testimony that this additional, undisclosed

requirement was never revealed to Vesterra, and also that John Hancock was aware that

Vesterra's own figures showed that Vesterra would not meet this additional requirement.

Thus, it now appears that John Hancock fraudulently induced Vesterra to sign the loan

application, and to pay almost a million dollars in processing, application and commitment fees,

by falsely representing to Vesterra in the loan application that if Vesterra met the terms and

conditions contained therein John Hancock would fund the Loan.  Instead, an additional hidden

condition was also required to be met before the Loan would be disbursed.

As the proposed loan never closed, John Hancock never secured a mortgage or any other

lien on the property in question.  Instead, John Hancock has sued Vesterra in an ordinary breach

of contract action for money damages.  Nonetheless, in the instant preliminary injunction motion

John Hancock requests an Order of the Court *prohibiting* Defendants from selling the Avenel

---

[1] The loan did not close because the loan application required the apartment complex to be 80% occupied by a certain date before closing.  As that date approached, Vesterra realized that it was not going to meet such an objective and informed John Hancock of this issue.  Vesterra did not choose to not close on the loan; it would have been unable to close due to its inability to meet certain conditions of the loan.

apartment complex to a third-party (this sale is pending), or seeking an Order requiring

Defendants to place more than $3.75 million into escrow. John Hancock's request must fail

because it is unable to show either that there is any basis in Massachusetts law for this interim

relief, or (if such relief were available) that it has met its burden of proof for the issuance of a

preliminary injunction.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 2004, Vesterra was in the process of constructing an apartment complex

in Montgomery County, Pennsylvania. In connection with this project, Vesterra, which had

secured a construction loan to finance the development of the project, sought a commitment for a

first and permanent mortgage loan with which to replace the construction loan after completion

of the project, anticipating that this would occur in the summer of 2005. Vesterra explored

funding from several potential lenders, but in the end decided to apply for such a mortgage loan

from John Hancock. Before submitting the actual loan application to John Hancock, Vesterra

negotiated the terms and conditions of the application with John Hancock's representative in

Pennsylvania during the summer of 2004. The negotiated application indicated that it contained

the terms and conditions that Vesterra would have to meet by August 1, 2005, in order for John

Hancock actually to fund the loan.

On July 30, 2004, Vesterra applied for a mortgage loan (the "Loan") from John Hancock

by submitting an "Application to John Hancock Life Insurance Company for a First Mortgage

Loan" to John Hancock for approval and acceptance (the "Loan Application"). John Hancock

thereafter approved the Loan Application by countersigning it and delivering it to Vesterra the

following month. However, internally at John Hancock, there are several documents which

show that a condition for disbursing the loan was deliberately kept secret from Vesterra. One

internal document contains the signatures of several John Hancock employees indicating that the Loan was "recommended" and "approved" with the additional condition. *See* Exhibit A.

Pursuant to paragraph 30 of the Loan Application, Vesterra provided John Hancock with the following fees:

        a) $5,000 for a "Processing Fee";

        b) $640,000 for an "Application Fee"; and

        c) $320,000 for a "Commitment Fee."

Vesterra paid the Processing Fee by delivering a check in the amount of $5,000 to John Hancock's representative in Pennsylvania.

Pursuant to "Condition 52" of the Loan Application, Vesterra provided the Application Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $640,000 and delivering it to John Hancock's representative in Pennsylvania, and provided the Commitment Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $320,000 and delivering it to John Hancock's representative in Pennsylvania.

Vesterra and John Hancock did not close on the Loan. *See supra* fn. 1. However, John Hancock has retained $965,000 in fees from Vesterra, and has filed the instant lawsuit for breach of contract, seeking money damages in excess of $4.5 million, entitling it to retain the $965,000 and recover the balance.

Last month -- January 2006 -- Defendants received the production of internal documents from John Hancock that <u>for the first time</u> disclosed a secret condition on the disbursement of the $32 million loan. This undisclosed, additional requirement that had to be met by Vesterra before John Hancock would disburse the Loan created a condition that Vesterra did not meet and was

unlikely to meet. Vesterra confirmed at its first deposition of a John Hancock employee on January 27, 2006, that this newly-produced evidence did in fact reveal such an additional undisclosed requirement for the disbursement of the Loan, and also that John Hancock was aware that Vesterra's own analysis showed that it would <u>not</u> meet this additional requirement.

Thus, it now appears that John Hancock fraudulently induced Vesterra to sign the loan application, and to pay almost a million dollars in application and commitment fees, by falsely representing to Vesterra in the loan application that if Vesterra met the terms and conditions contained therein John Hancock would fund the Loan. Instead, an additional hidden condition was also required to be met before the Loan would be disbursed.

Now, although this is a breach of contract action for money damages, John Hancock has requested a preliminary injunction attempting to freeze certain of Vesterra's assets. The preliminary injunction hearing is scheduled for Tuesday, February 14, 2006 at 9:00 a.m.

## III.   LEGAL ARGUMENT

### A.   IT IS WELL ESTABLISHED UNDER MASSACHUSETTS LAW THAT JOHN HANCOCK CANNOT OBTAIN AN "EQUITABLE ATTACHMENT" WITHOUT FIRST OBTAINING A JUDGMENT ON ITS BREACH OF CONTRACT CLAIM.

John Hancock requests a preliminary injunction pursuant to Fed. R. Civ. P. 64, based on the remedies available under Massachusetts law for the seizure of assets. Plaintiff's Mem., at 8. The reason for this is clear. The possibility of obtaining such pre-judgment injunctions in breach of contract actions under <u>federal</u> law was dramatically curtailed by the United States Supreme Court in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). John Hancock notes only that this case did not decide the range of injunctive relief under state law (Plaintiff's Mem., at 8), but it is important to clarify why John Hancock must rely entirely for its requested relief on a proper basis in Massachusetts law. As the First Circuit has described

the Supreme Court's "landmark opinion" in *Grupo Mexicano*, "the Supreme Court held that the district court 'had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages' where no preexisting lien or equitable interest had been claimed." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 155, 159 (1st Cir. 2004) (quoting *Grupo Mexicano*, 527 U.S. at 333). As in *Grupo Mexicano,* John Hancock's claim against Vesterra is a "contract claim for money damages." John Hancock does not, and cannot, allege any preexisting lien or equitable interest in Vesterra's property, because it never advanced any money to Vesterra and so never acquired a mortgage lien or any other security interest.

This is why John Hancock asks for a preliminary injunction on the basis of Fed. R. Civ. P. 64, relying on Massachusetts law, instead of seeking one under Fed. R. Civ. P. 65 based on federal law. However, John Hancock does not cite <u>any</u> Massachusetts authority for the relief it seeks here -- a preliminary injunction, in a breach of contract action, to freeze Vesterra's assets, <u>before</u> it has been determined that Vesterra owes any money to John Hancock.[2] Rule 64, "Seizure of Person or Property," provides in pertinent part:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.

Attachment, of course, is not available where, as here, there is no property within the state to

---

[2] The two cases cited by John Hancock, *GTE Prods. Corp. v. Stewart*, 414 Mass. 721 (1993), and *Boston Athletic Ass'n v. International Marathons, Inc.*, 392 Mass. 356 (1984), are inapposite, as both concerned lawsuits in which the plaintiff sought equitable relief, not just money damages. The former lawsuit sought permanent injunctive relief ordering the return and non-disclosure of corporate documents; the latter sought to void a contract and also involved

attach.  What John Hancock requests here is called "equitable attachment" or "a bill to reach and apply."  John Hancock must show authority for such interim relief either in Massachusetts common law or in the Massachusetts statutes.[3]  The First Circuit has held that there is no such authority, and that, to the contrary, Massachusetts <u>prohibits</u> such a remedy until John Hancock establishes in court that Vesterra owes it money.

>    **1.    There Is No Basis In Massachusetts Common Law For An Injunction Freezing Vesterra's Assets Before John Hancock Has Obtained A Judgment.**

In *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896 (1st Cir. 1988), the First Circuit considered whether under Fed. R. Civ. P. 64, a district court could issue an injunction to "reach and apply."  It first considered the "traditional" (common law) remedy, and explained that this remedy was only "available to *judgment* creditors who have been unable to execute on the defendant's assets."  *Id*. at 903 (emphasis in original).  The only exception to this involved an insolvent defendant.  *Id*. at 904.  Thus, the First Circuit found no basis in Massachusetts common law for the interim relief that John Hancock seeks here:  "This remedy is not available in the instant case because the [plaintiff] has not obtained a judgment nor has he made any showing that [the defendant] is insolvent."  *Id.*

This District Court has also more recently considered this precise question at greater length.  In *Hunter v. Youthstream Media Networks, Inc.* 241 F. Supp. 2d 52 (D. Mass. 2002), the plaintiff requested the *identical* relief now sought by John Hancock -- a preliminary injunction requiring the defendant to hold certain assets as security for an anticipated money judgment in a

---

corporate governance issues, as well as recovery of monies earned through the defendant's use of the plaintiff's trademark name and logos.

[3]  Rule 65 of the Massachusetts Rules of Civil Procedure, based on Fed. R. Civ. P. 65, provides the procedural rules for obtaining injunctive relief.  It does not add to the common law and statutory bases for obtaining such interim relief.

breach of contract lawsuit.  The Court discussed the Massachusetts common law remedy, *id.* at 54-57, and found that the requested preliminary injunction sought an "equitable attachment" that fell directly within the rule as explained by *Rare Coin Galleries*.  Accordingly, the court denied the motion for preliminary injunction.  Thus, it is settled that John Hancock may not obtain its freeze order through Fed. R. Civ. P. 64 based on Massachusetts common law.

> **2.    There Is No Basis In The Massachusetts Statutes For An Injunction Freezing Vesterra's Assets Before John Hancock Has Obtained A Judgment.**

The First Circuit also addressed the Massachusetts statutory basis for "reach and apply" in *Rare Coin Galleries*.  The pertinent provision is contained in Mass. Gen. L. ch. 214, § 3(6), which covers "[a]ctions by creditors to reach and apply, in payment of a debt, any property, right, title or interest, legal or equitable, of a debtor, within or without the commonwealth, which cannot be reached to be attached or taken on execution although the property sought to be reached and applied is in the possession or control of the debtor independently of any other person . . . ."[4]  The First Circuit reviewed controlling decisions by the Supreme Judicial Court, and explained that "the term 'debt', although broadly construed, did not include a pending breach of contract suit not reduced to judgment."  *Id.* at 904 (citing *H.G. Kilbourne Co. v. Standard Stamp Affixer Co.*, 216 Mass. 188 (1913)).  The *Kilbourne* court specifically distinguished "debts" from "mere claims for damages."  216 Mass. at 119.

In *Hunter, supra,* this District Court also considered the statutory basis for the request for a preliminary injunction to freeze certain assets of the defendant, and again found *Rare Coin Galleries* directly on point.  *Hunter*, 241 F. Supp. 2d at 58 ("The First Circuit's conclusion would

---

[4]  It is doubtful whether the property here should be considered to be "in the possession or control of [Vesterra] independently of any other person," as required by this statute, since a contract of sale has been entered into and an affiliate of the buyer has a mortgage lien on the property (*see* Plaintiff's Mem., at 7).

appear to foreclose the plaintiff's request for an injunction.").  The court stated that whether or not *every* claim had to first be reduced to a judgment before statutory reach and apply would be available, the statute "certainly requires that contract claims such as [the plaintiff] brings be reduced to judgment before a 'debt' is established, since whether liability exists on the part of the defendants is hotly contested and there are disputed issues of which must be resolved."  *Id.*

As the First Circuit summarized:  "Since the instant action contains contract . . . claims not reduced to judgment, the remedy of a statutory bill to reach and apply is not available at this stage of the proceedings under Massachusetts law.  The traditional common law bill also is not available."  *Rare Coin Galleries*, 862 F.2d at 904.  Accordingly, the relief sought here by John Hancock is not available under Massachusetts law any more than it is available under federal law, and its motion must be denied.

**B.    EVEN IF A PRE-JUDGMENT PRELIMINARY INJUNCTION FREEZING VESTERRA'S ASSETS WERE AVAILABLE TO JOHN HANCOCK, IT HAS FAILED TO MEET ITS BURDEN OF ESTABLISHING ITS RIGHT TO ANY SUCH INJUNCTIVE RELIEF.**

**1.    The Standard Governing the Grant of a Preliminary Injunction**

In order to succeed on a preliminary injunction motion, a plaintiff bears the burden of showing that:

1. it has a likelihood of success on the merits;
2. there exists, absent the injunction, a significant risk of irreparable harm;
3. a balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld); and
4. granting the injunction will not adversely affect the public interest.

*Foxboro Company v. Arabian Amer. Oil Co.*, 805 F.2d 34 (1st Cir. 1986).  *See also In re Websecure, Inc. Securities Litigation*, No. 97-10662-GAO, 1997 WL 770414 (D. Mass. Nov. 26, 1997) (citing *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir. 1996)); *Packaging Indus.*

*Group, Inc. v. Cheney*, 405 N.E.2d 106 (1980). The burden of proof is on John Hancock, the movant here. *See Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston*, 38 F. Supp. 2d 46 (D. Mass. 1999).

This test cannot be satisfied unless the moving party demonstrates, among other things, that it will be irreparably harmed absent the injunction. In this regard, the Supreme Judicial Court has held:

> Where the moving party has failed to demonstrate that denial of the injunction would create any substantial risk that it would suffer irreparable harm, the injunction must be denied, *no* matter how likely it may be that the moving party will prevail on the merits.

*Packaging Indus.*, 405 N.E.2d at 114. Where no showing is made of urgent necessity to avoid immediate and irreparable harm that could not be compensated, the preliminary injunction should be denied. A preliminary injunction is an "extraordinary remedy, which is not issued lightly or as a matter of course." *See Neighborhood Ass'n of The Back Bay, Inc. v. Federal Transit Admin.*, ___ F. Supp. 2d ___, 2005 WL 3588421, *5 (D. Mass. Dec. 28, 2005). An injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests. *See Charlesbank Equity Fund*, 370 F.3d at 163.

## 2. John Hancock Is Not Likely To Prevail On The Merits Of Its Claims

The Court's analysis should begin with the likelihood of success. *See Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). Needless to say, a mere possibility of success, in the absence of any other weighty consideration, should not move this Court to grant such "drastic relief" as a preliminary injunction. *See GA Enterprises, Inc. v. Leisure Living Communities, Inc.*, 355 F. Supp. 947, 948 (D. Mass. 1973). Plaintiff cannot establish this first prerequisite for injunctive relief here.

**(a)      The Loan Application Was Illusory And Unenforceable.**

As set forth below, John Hancock cannot show a clear right to relief because the contract it is trying to enforce is illusory and, thus, unenforceable.  On or about August 17, 2004, John Hancock accepted the Loan Application by countersigning a copy and returning it to Vesterra. Although the Loan Application was purportedly "accepted" by John Hancock on August 17, 2004, it contains terms and conditions that make illusory any purported "commitment" by John Hancock, in that it makes John Hancock's performance entirely optional.  The Loan Application contains, *inter alia*, the following conditions that give John Hancock the unfettered discretion to approve or deny the Loan Application subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

> (a)      Condition 14 provides, in relevant part:  "John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser acceptable to John Hancock . . .  This appraisal must support a loan-to-value ratio of not more than 75.00%, calculated as determined by John Hancock in its sole discretion."  (Emphasis added.)

> (b)      Condition 16(b) provides: "On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues as John Hancock determines are appropriate."  (Emphasis added.)

> (c)      Condition 20 provides:  "Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion.  In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock."  (Emphasis added.)

The Loan Application also contains, *inter alia*, the following conditions that give to John Hancock the sole right to approve or deny the Loan Application, based on the "satisfaction" of John Hancock and its counsel, subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

(a)    Condition 6 provides that "The Note, the Mortgage, and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the 'Loan Documents') <u>shall be satisfactory in all respects in form and substance to John Hancock and its counsel,</u> and . . . shall contain provisions satisfactory in form and substance to John Hancock and its counsel . . ." (Emphasis added.)

(b)    Condition 7 provides that the title and all documentation pertaining thereto "<u>shall be satisfactory in all respects to John Hancock and its counsel,</u>" that title insurance shall be "<u>satisfactory in form and substance to John Hancock and its counsel,</u>" (emphasis added), and contains similar provisions respecting other documentation.

(c)    Condition 8(a) provides that "a current instrument survey" shall be furnished that is "<u>satisfactory in form and substance to John Hancock and its counsel.</u>" (Emphasis added.)

(d)    Condition 10 provides that "John Hancock shall be furnished within twenty-one (21) days of Rate Lock with <u>evidence satisfactory in form and substance to John Hancock and its counsel</u> . . . ." (Emphasis added.)

(e)    Condition 11(b) provides: "John Hancock shall also be furnished with such additional evidence as it may require, <u>and satisfactory in form and substance to John Hancock and its counsel,</u> that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, . . ." (Emphasis added.)

(f)    Condition 12 provides: "Prior to Closing, all construction of buildings and other improvements shall be completed <u>to the satisfaction of John Hancock.</u>" (Emphasis added.)

(g)    Condition 13 provides that Vesterra is "obligated to deliver to John Hancock . . . the reports and materials described below <u>in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock</u>: . . ." (Emphasis added.)

(h)    Condition 19 provides: "Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may  require, <u>satisfactory in form and substance to John Hancock,</u> . . .  All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance . . . and otherwise cover[] John Hancock's interest in the Real Estate Security in a manner <u>satisfactory to John Hancock.</u>" (Emphasis added.)

(i)    Condition 23 provides that Vesterra "shall provide John Hancock on or prior to the Closing Date with an opinion <u>satisfactory in form and substance to John Hancock and its counsel</u> . . . from an attorney approved by John Hancock and its counsel, . . ." (Emphasis added.)

(j)      Condition 49 provides that the "amount of Effective Gross Income and the NOI will be determined by John Hancock prior to Closing . . .."  (Emphasis added.)

Thus, in a number of conditions, John Hancock expressly retained the sole right to determine whether it would approve the Loan Application subsequent to its "acceptance" by John Hancock, based on John Hancock's "sole discretion" or "satisfaction," such that John Hancock was free to make or not make any such mortgage loan to Vesterra.

John Hancock argues that the implied covenant of good faith and fair dealing would have constrained its discretion in such a way that this loan application, once accepted, became binding upon it.  While it is true that this covenant is implied in all contracts in Massachusetts, it is also the case that this covenant does not operate to take away discretion that has been granted to a party.  *See, e.g., Saddlebred L.P. v. Bay State Savings Bank*, 830 N.E.2d 1117, 2005 WL 1652923, *2 (Mass. App.  Div. July 14, 2005) (unpublished) ("the bank was required to make the loans only if all environmental issues were resolved to its satisfaction," so permissible exercise of this discretion was not violation of implied covenant of good faith and fair dealing); *Eaton Financial Corp. v. Dunleavy*, No. 9114, 1991 WL 241863, *4 (Mass. App. Div.  Nov. 7, 1991) (no violation of implied covenant of good faith and fair dealing where contract accorded party "almost unfettered latitude and discretion").  *See also Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004) ("The [implied] covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship . . . .").

In light of the broad discretion retained by John Hancock, described above, it cannot be determined at this stage in the proceedings that John Hancock was bound in any meaningful way to fund the Loan.

**(b)      John Hancock Fraudulently Induced Vesterra Into
Entering Into The Loan Application.**

Even if the unfettered discretion provided by the above-referenced conditions did not render illusory any purported commitment by John Hancock, the Loan Application would still be unenforceable because Vesterra was induced to sign the Loan Application by deceptive and fraudulent acts on the part of John Hancock. *See* Vesterra's February 8, 2006 Motion to Amend Counterclaim, attached hereto as Exhibit B (attached without exhibits, except amended counterclaims).

At the time Vesterra signed the Loan Application (and indeed until Vesterra received documents from John Hancock as a part of the discovery conducted in this action), Vesterra believed John Hancock's representations in the Loan Application that the terms and conditions that Vesterra needed to meet for the disbursement of the Loan were all set forth therein. For example, the Loan Application includes such specific requirements as the loan-to-value ratio (condition 14), minimum annual rent and debt service coverage ratio (condition 16), and specifies rental amounts, ratios, reserves, net operating income, and minimum occupancy, which with other conditions set forth are defined as the "Funding Conditions" (condition 49).

The Loan Application represents that if, after acceptance by John Hancock, the Terms and Conditions therein were met by Vesterra, including the "Funding Conditions" set forth therein, then John Hancock would fund the Loan to Vesterra. No reference is made to any additional terms or conditions, and the comprehensiveness and specificity of the entire Loan Application negate any understanding by Vesterra that there were any additional undisclosed terms or conditions.

Documents produced by John Hancock in discovery (attached hereto as Exhibits A, C and D, and discussed *infra*), and the deposition testimony of one of John Hancock's employees,

Timothy Malik (attached hereto as Exhibit E), demonstrate that John Hancock knowingly misrepresented to Vesterra the conditions that Vesterra would have to meet in order for the Loan to be funded.  John Hancock's internal documents show that Vesterra was required to satisfy a never-disclosed ***additional*** material condition in order for the Loan to be disbursed.

For example, one John Hancock document produced in this action was explained by Mr. Malik to be the internal "commitment approval" or "loan approval" by John Hancock, and contains the conditions under which John Hancock would disburse the Loan to Vesterra.  *See* Exhibits A and E, at 62, 64, 124-17, 212-13.  The second page of this document (the "John Hancock Approval") contains the signatures indicating approval by the appropriate John Hancock employees.  *See* Exhibit A.

The John Hancock Approval, under "Specific Conditions," identifies the following "Disbursement Requirements":  "Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment."  *Id.*  This "10% breakeven" requirement was not included as a term or condition in the Loan Application, and was never communicated to Vesterra as a requirement for obtaining the Loan.  *See* Exhibit E, at 84-85, 93-94, 116-17, 196.

Other John Hancock documents, as well as Mr. Malik's deposition testimony, confirm that meeting this "10% breakeven" or "10% constant" was a requirement for approval of the Loan and for actual disbursement of the Loan to Vesterra.  *See* Exhibits A and C.  In addition, Mr. Malik also knew that John Hancock could conceivably lose $355,000 in hedge funds costs, if the Avenel deal was not approved by John Hancock and accepted by Vesterra.  *See* Exhibits D and E (deposition of T. Malik).

16

Based on the figures and projections submitted by Vesterra to John Hancock, John Hancock knew that Vesterra would not meet this additional requirement for disbursement of the Loan.  In fact, in order to satisfy this requirement, in its internal calculations John Hancock changed the expense numbers that had been submitted to it by Vesterra.  Yet John Hancock never informed Vesterra of this additional requirement, or of the fact that Vesterra would not meet this undisclosed requirement for the disbursement of the Loan.

By not disclosing to Vesterra this additional requirement for disbursement of the Loan, John Hancock intentionally misrepresented the conditions that Vesterra would have to meet in order to obtain the Loan, and thereby induced Vesterra to sign the Loan Application and to pay or fund the Processing, Application, and Commitment Fees.

Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.  Accordingly, but for John Hancock's knowing misrepresentation that all of the terms and conditions for disbursement of the Loan were set forth in the Loan Application, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

These new allegations, contained in Vesterra's Amended Counterclaim, are essential to analyzing this Motion, because a jury could find that John Hancock added a condition to its

approval about which it should have told Vesterra, but did not, in order to collect almost $1 million in fees and to avoid hedge fund losses which it would have sustained.[5]

### 3.    Plaintiffs Cannot Establish Irreparable Injury Because Any Claimed Injury Is Compensable By Money Damages.

Vesterra has sufficient assets to satisfy a judgment, but even it does not, the fact that a defendant may have insufficient assets to satisfy a judgment does not turn monetary damage into irreparable harm.  *See GA Enterprises,* 355 F. Supp. at 948.  Further, John Hancock misrepresents that the "Avenel Apartments project is the only marketable asset owned by Montgomery Partners."  (Plaintiff's Mem., at 13).  This is simply untrue, as John Hancock knows.

Under any formulation of the standard for injunctive relief, the moving party must demonstrate a significant threat of irreparable injury.  *See Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)  ("[M]erely alleg[ing] imminent harm" is insufficient: "a plaintiff must *demonstrate* immediate threatened injury").

One court in this district has held that:

> The possibility that defendants may not have assets at some future date to satisfy a judgment which to date has not been rendered does not amount to a showing of "immediate and irreparable harm."  Although plaintiff desires an injunction, an extraordinary remedy of a preliminary injunction will not issue until this Court is convinced that plaintiff will suffer immediate and irreparable harm by its denial. Such is not the case here.

*GA Enterprises,* 355 F. Supp. at 948.  In *GA Enterprises*, the plaintiff sought a preliminary injunction seeking, *inter alia*, that the individual defendants be enjoined from transferring any of

---

[5] John Hancock recently produced a privilege log to Vesterra.  The privilege log identifies a document entitled "Draft Amendment to Vesterra Loan Application", which was dated August 11, 2004.  Vesterra presumes that this draft amendment relates to the 10% constant; however, this draft amendment was never forwarded to Vesterra because John Hancock knew that Vesterra would reject it, and the deal would terminate.   If the loan application was never executed, John Hancock would have lost its $355,000 hedge loss fund, and would have had to return the $965,000 in fees that Vesterra already provided.

the common stock of the corporate defendant, and that all defendants be enjoined from disposing

of their assets or property other than in the usual and ordinary course of business. *Id.*

   The court denied the motion, and refused to restrain the individual defendants from

disposing of assets or property other than in usual and ordinary course of business, particularly

where it appeared that corporate defendant's solvent financial position could be severely

jeopardized if injunction were granted. *Id.* at 948-50. *See also Charlesbank Equity Fund*, 370

F.3d at 162-63 (affirming district court's denial of plaintiffs' motion for preliminary injunction

which sought to freeze company's funds because plaintiffs could not show they would suffer

irreparable harm in absence of injunction). "A finding of irreparable harm must be grounded on

something more than conjecture, surmise, or a party's unsubstantiated fears of what the future

may have in store." *Id.* at 162 (citations omitted).

   Further, the circumstances of the present case are markedly different from those in

*Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986), which is cited by plaintiff. In

*Teradyne*, the plaintiff Teradyne sued Mostek for breach of contract at a time when Mostek was

apparently capable of responding to damages. However, after the institution of suit, Mostek was

sold for approximately $71 million in cash, subject to certain offsets and debits, and these sales

proceeds were deposited in a Mostek bank account and "dedicated to the payment of the claims

of Mostek's creditors." *Id.* at 45. Thereafter, despite the fact that Teradyne's claim was

apparently "undisputed," Mostek refused to set aside a portion of the $71 million to satisfy

Teradyne's $3-4 million claim; it refused to specify what portions of the remaining assets would

be paid out of the fund to pay off creditors' claims and wind down expenses in what Mostek

described as an "orderly liquidation process"; and it refused to point to any "concrete harm" that

it would suffer as a result of the injunction. *Id.* The defendant, Mostek, was actively in the

process of liquidating and paying off creditors.  *Id.* at 45, 53.   Under these unusual

circumstances, the district court granted the injunction.

*Teledyne* is distinguishable because, in this case, the damages are vigorously disputed,

and Plaintiff has made no showing that Defendants are now in the process of dissipating assets in

an attempt to render Plaintiff's legal remedy meaningless.  Nor has Plaintiff demonstrated, as

Teradyne did, that the funds it seeks to freeze are the only ones available to satisfy Plaintiff's

claims in this litigation.[6]

Plaintiff claims that recent discovery suggests that Defendants are dissipating their assets

at such a rate that unless the injunction is granted, there will be nothing from which to collect

any judgment they might win.  On the present record, Plaintiff's argument is overstated and

made with a false sense of urgency.  *See Charlesbank Equity Fund*, 370 F.3d at 163.  In

*Charlesbank Equity Fund*, the Court stated that the petitioner's

> cries of urgency are sharply undercut by its own rather leisurely approach to
> the question of preliminary injunctive relief.   It waited more than a year after
> the commencement of the action to seek an injunction.   That chronology has
> evidentiary significance:  delay between the institution of an action and the
> filing of a motion for preliminary injunction, not attributable to intervening
> events, detracts from the movant's claim of irreparable harm.

*Id.*  For example, Plaintiff first raised this issue with Vesterra's counsel as early as mid-

September 2005.  *See* Exhibit F (email from B. Davis, Esquire to B. McCormick, Esquire, dated

Sept. 22, 2005).  Vesterra then informed Plaintiff that the Avenel property was under an

Agreement of Sale in early October 2005, and produced the applicable Agreement of Sale and

amendments.  *See* Exhibit G (letter from B. McCormick, Esquire, to B. Davis, Esquire dated

---

[6] In addition, none of the other cases cited by John Hancock stand for the proposition that the court is permitted to take the drastic step of *halting* an ongoing sale of a defendant's primary asset.  *See Boston Athletic Assoc. v. Int'l Marathons, Inc.*, 467 N.E.2d 58 (Mass. 1984) (involved the dispersal of funds already received by the defendant); *St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis*, 951 F. Supp. 5 (D. Mass. 1996) (court froze "an appropriate amount of assets of the defendants").

October 11, 2005).[7]

Finally, John Hancock requested that Vesterra provide John Hancock with forty-five (45) days written notice prior to any anticipated closing date on a sale of the Avenel property. Vesterra refused to agree to this arbitrary and unnecessary condition because John Hancock's lawsuit is a personal action for damages, not an *in rem* or foreclosure action concerning that real property. *See* Exhibit I (letter from B. McCormick, Esquire, to B. Davis, Esquire dated January 10, 2006). Thus, John Hancock made a strategic decision not to act on this knowledge, more than four months after learning about it, until after it was provided a copy of Vesterra's Motion to Amended the Counterclaim to add counts for fraud.

Additionally, Montgomery Square owns a one-acre parcel in North Wales, Pennsylvania. That property was recently under an Agreement of Sale for $750,000, but did not close. Also, the Affidavit of John Ferrie is misleading, at best. First, Mr. Ferrie consistently claims that the 45-acre parcel bordering Avenel, and owned by Vesterra, is "unmarketable at a fair price." Ferrie Affidavit, ¶ 10. This is irrelevant to the issue here: whether it is marketable for a sufficient price to meet any likely recovery by John Hancock. John Hancock has introduced no evidence that the value of this property is not above the $3.75 million John Hancock seeks to have put in escrow (and its motion should be denied on this basis alone). In fact, one of Vesterra's principals, James R. Koller, will be available to testify at the hearing that the property in question is marketable for at least the amount of damages claimed by John Hancock, even with the interest by the Pennsylvania Department of Transportation.[8]

---

[7] Also, on October 31, 2005, Vesterra's counsel informed Plaintiff's counsel of Vesterra' various holdings and their approximate value. *See* Exhibit H (letter from B. McCormick, Esquire, to B. Davis, Esquire dated October 31, 2005).

[8] In fact, as recently as February 2002, Vesterra sold 5 acres of this property for $429,459 per acre.

Moreover, John Hancock's counsel questioned Mr. Koller about the 45-acre parcel during Mr. Koller's deposition.  Mr. Koller testified that Vesterra recently sold several adjacent tracts to the 45-acre parcel that is allegedly "unmarketable"; 12 of those acres were sold for approximately $550,000 an acre (1999), and five acres were sold for approximately $400,000 an acre (2002).  *See* Exhibit J (deposition testimony of James R. Koller), at 188-190.  Finally, these 45 acres is not subject to any liens or mortgages, but is owned free and clear by the defendants.  Even assuming that the Pennsylvania Department of Transportation condemns the entire 45 acres, it will still pay Vesterra a reasonable price per acre based on these recent sales.

Finally, Mr. Ferrie's description of the problems related to totally different property in which John Hancock possessed a security interest are inapposite.  The circumstances involved were extremely different than here:  the property was a shopping center that was losing tenants, and there were on-going lawsuits that tied up the property.  In contrast, Vesterra owns undeveloped land, with no tenants who may cause any problems, and no litigation (other than the present lawsuit by John Hancock, which does not concern this property).  Thus, none of the problems described by Mr. Ferrie exists with regard to the 45-acres of real estate adjacent to Avenel.

If the Court were to grant the injunction in this case, "it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action.   No relief of this character has been thought justified in the long history of equity jurisprudence."  *De Beers Consol. Mines v. United States*, 325 U.S. 212, 222-23 (1945).

22

4.    **The Balance Of Hardships Favors The Defendants**

The third requirement in the First Circuit for injunctive relief is that the injury to the plaintiff "outweighs any harm which granting injunctive relief would inflict on the defendant." *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1009 (citations omitted).  Any possibility of harm to Plaintiff here is greatly outweighed by the harm to the Defendants if they are not permitted to sell this property while it is at its maximum value.

"A preliminary injunction preventing expansion . . . and the growth of [Vesterra's] business would harm the defendants more than the absence of a preliminary injunction will harm" John Hancock.  *Cablevision of Boston*, 38 F. Supp. 2d at 62-63.  "An additional consideration of granting injunctive relief must be its effect upon the parties in the litigation." *GA Enterprises*, 355 F. Supp. at 949.  *See also State Street Bank and Trust Co. v. United States*, 729 F. Supp. 1402 (D. Mass. 1990) (after court analyzed practicalities of circumstances, including defendant's financial condition, court denied preliminary injunction).

First, there is no question that John Hancock is large corporation, with assets under management exceeding $73 billion (according to its 2004 report to the Massachusetts Insurance Department).  Even if John Hancock were to win on the merits and were then unable to collect its damages -- a possibility about which it has offered nothing but speculation -- it strains credulity to assert that this loss of a few million dollars would be a "severe hardship" on John Hancock.  The damages it seeks would amount to less than one one-hundredth of one percent of John Hancock's assets under management ($4.7 million represents .006% of John Hancock's assets under management), a negligible increase or decrease.  On the other hand, there can be little question that enjoining Defendants from selling the Avenel property, or somehow freezing Defendants' cash and cash equivalents would severely hamper, if not entirely eliminate,

Defendants' ability to function. While the apartment complex is not Vesterra's only asset, it constitutes a significant portion of its value, and the amount to be escrowed, while insignificant in comparison to John Hancock's assets, would be a significant portion of Vesterra's operating income.

Plaintiff's request is too drastic a remedy, especially in light of the Plaintiff's inability to show it is likely to suffer irreparable harm. Accordingly, the "balance of hardships" weighs against granting the requested injunction. *Astra USA*, 94 F.3d at 742.

### 5.    Public Interest

John Hancock asserts that granting the requested injunction would serve the public interest by securing the payment of a prospective judgment. However, as explained above, this is contrary to well-established Massachusetts law, so it would be against any such public interest. Furthermore, this would be an unwarranted restraint on the alienation of private property in which John Hancock has never had a mortgage lien or any other legal or equitable lien. Its alternative request to freeze the assets of defendants that have not been found liable to it for <u>any</u> amount of money also goes against the legal principles and traditions of the Commonwealth of Massachusetts, and of the general equity jurisdiction as recently explained in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). Accordingly, this factor also weighs against John Hancock.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation respectfully requests that Plaintiff's Motion for a Preliminary Injunction be denied.

Respectfully submitted,

/s/ *Robert D. Hillman*

_____
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.:  617-951-2300

Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr. (admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

Dated: February 13, 2006

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ***hand*** on this date.

/s/ *Robert D. Hillman*

_____

DWLIB 195300v1
8836/00

TAB A

# John Hancock Life Insurance Company

| | | | | | | |
|---|---|---|---|---|---|---|
| Investment No: | | | | | | |
| File Name: | 6510467 | | | | | |
| Regional Office/Correspondent: | Montgomery Square Partnership | | | | | |
| Property Name: | Avenel @ Montgomery Square Apts | | | | | |
| | John Hancock Real Estate Finance, Inc. - Philadelphia | | | | | 040-03 |
| Location (city / state): | Montgomeryville | | Pennsylvania | | Property Type: Multifamily | |
| | | | | | Garden Style | |
| Jun Han Rating: | | MLI Rating: | BBB | JH Rating: | Total # Units: 256 | |
| | | | | | BAA1 | |

**Key Statistics:**

| | | | | | | Stabilized | |
|---|---|---|---|---|---|---|---|
| Loan Amount: | $32,000,000 | | | Loan per Unit | $125,000 | $/ Unit | |
| Term: (in years) | 10 | Amortization | 30 | Interest Only | 0 | Avg Life: | 9.29 |
| Base Spread: | 134 | Forward BPS: | 45 | Embedded Fees: | 7 | Total Spread: | 186 |
| Matrix Spread at JH Rating Level: | 145 | | | | | Pricing Index | 10 year Treasury |
| Other Basis | | | | | | | |

| | | Current "As-Is" | | | Stabilized | | |
|---|---|---|---|---|---|---|---|
| | Valuation | LTV % | Valuation | $/ Unit | LTV % | Stabilized Cap Rate | |
| As Is Vacancy: | n/a | | | | | | |
| Stabilized Vacancy: | 5.0% | | | | | | |
| | $/ SF | | | | | | |
| NOI Basis | | | $47,302,807 | $184,777 | 67.65% | 7.25% | |
| NCF Basis | | | $46,773,151 | $182,708 | 68.42% | 7.25% | |
| Appraisal Basis | | | $35,555,800 | $138,889.84 | 90.00% | | |
| Cost of Land and Estimate to Build | | | | | | | |

Breakeven Interest Rate: 10.60%

Connections: No

Property is under construction.

**Specific Conditions:**

**Principal Affiliates Requirements:** James R. Koller, Frank C. Palopoli and Joseph P. Kelley

**Guaranty Requirements:** Standard non-recourse carve-outs.

**Funding:** This is a one-year (365 days) forward commitment.

**Disbursement Requirements:** Rents of at least $4,221,126 plus other income of $284,314 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment.

**Estoppel & SNDA Requirements:** N/A

**Escrow Requirements:** Real estate taxes. Replacement reserves and insurance escrow requirements have been suspended

**Rental Achievement Reserve,** as described above, likely at closing, but limited to $5,380,000.

**Transfers Permitted:** Two-time right to transfer with 1% fee.

**Additional Proceeds:** One time right between the 2nd and 5th loan years the Borrower may request additional funds of not less than $1,000,000 at the then prevailing terms and rates. Amortization will be based on the remaining original amortization term.

**Extension Option:** Borrower as one time right to extend loan for 12 months at the then prevailing floating-rate terms and rates upon maturity of the original loan.

**Prepayment Terms:** Closed for 4 years, then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan. The yield maintenance premium shall be discounted to its present value. The loan will be open to prepayment at par during the last 120 days of the loan term.

**Monthly Payment Basis:** Monthly payments will be on a 30/360 day basis.

**Financial Statements:** Borrower certified acceptable if CPA audited not available. Quarterly statements not required unless loan is in default.

**Appraisal:** Required loan to value of 75%

**Borrower:** SPE and S&E status was waived since the Borrower owns a separate piece of land. The land, however, must be transferred if Borrower wishes to use it as security for a loan.

**Additional Application Fee:** Should the 10-year treasury drop more than 45 bps prior to the closing, Borrower shall deposit up to 2% of the Loan principal as an additional application fee, which amounts shall be returned if that treasury shall increase above such threshold prior to closing.

**Credit Group Remarks:**

Great location, demographics and product type.

Funding at 80% occupied versus MLI requirement of 90% mitigated by the full economic holdback.

Credit recommends deal as structured.

IMAGED

JH 00405

John Hancock Life Insurance Company

6518467

Montgomery Square Partnership

Investment No:
File Name:

**Recommended By:**
Investment Officer:    Timothy J. Malik    Date: 8/16/04

Credit Group:    Patricia Coyne    _OUT OF OFFICE_    Date: 8-16-04

Team Leader:    David Henderson    Date:

**Approved By:**

Barry Nectow    Date: 8-16-04

Ivor Thomas    Date: 8-16-04

Paul English    Date:

Warren Thomson    Date: 8-16-04

JH 00406

# John Hancock Life Insurance Company

| File Name: | Avenel @ Montgomery Square Apts | | | Date: | 8/16/2004 |
|---|---|---|---|---|---|
| | | Mortgage Investment No. 6519467 | | | |
| | | Montgomery Square Partnership | | | |
| | | Multifamily | | | |
| | | 1100 Avenel Blvd. | | | |
| | | Montgomeryville | Pennsylvania | | |

| Rating: | MLJ - | BBB | OSFI - | Satisfactory | New Loan |

**LOAN TERMS:** 10-Year Term, 30-Year Amortization, monthly payments on 30/360 basis; Option to extend Loan with a one-year feature.

**ARREARS HISTORY:** None, project under construction

**Ground Lease:** N/A

**PROJECT DESCRIPTION:** The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting. The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be faxed on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

**LOCATION:** The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject. I-476, the Blue Route, is about five mile Turnpike (I-276) about six miles south of the subject. The site is located between the Montgomery Mall and the Montgomery Square southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast

| LOAN STATISTICS: | | Stabilized |
|---|---|---|
| Loan Amount: | | $32,000,000 |
| Final Lending Value: | | $47,000,000 |
| Purchase Price: | $35,555,800 Cost to Build | |
| Income Value: | | $47,302,807 |
| Cap Rate: | | 7.25% |
| Value Adjustment: | | |
| Value / SF: | | $183,593.75 |
| Loan / SF: | | $125,000.00 |
| Loan / Value Ratio: | | 67.6% |
| Loan / SF @ Maturity | | $105,105.60 |
| Balloon Loan / Value: | | 56.9% |
| DSC - NOI: | | 1.46 |
| DSC - NCF: | | 1.44 |
| DSC (25-yr Amort) - NOI: | | 1.36 |
| DSC (25-yr Amort) - NCF: | | 1.35 |
| Average Rental Rate (actual): | | $1,509.96 |
| Average Rental Rate (market): | | $945.00 |
| Breakeven Interest Rate: | | 10.69% |

| Credit Rating: | MLJ - BBB | OFSI - Satisfactory | John Hancock - BAA1 |

JH 00407

# INCOME, EXPENSE & LOAN ANALYSIS

| | | |
|---|---|---|
| Borrower | Montgomery Square Partnership | |
| Loan No. | (03194?) | |
| Property Name | Montgomeryville | |
| Property Type | Multifamily | |
| Date | 20Jul2004 | |

| Financial Statements Reviewed by | | |
|---|---|---|
| Name | Timothy J. Hable | Pennsylvania |
| Date | 20May2004 | |

Total Number of Units: 256
Vacant Units: 0
% Occupancy: 100%
% Vacancy: n/a

Case Key: **INPUT FIELD**
John Hancock Life Insurance Company

| | | 5.0% | 5.0% | 0.0% | |
|---|---|---|---|---|---|
| | | 30Jul2004 | 30Aug2005 | | Appraisal / COARS |
| | | Pro Forma | Stabilized | | |
| | Benchmark Rate | | | 6.160% | |
| | (benchmark Rate prior period) | | | 0.55% | |
| | (benchmark Amortization Period (m)) | | | 25 | |

**INCOME**

| | Actual | | | Current "As-Place" | Pro Forma | Stabilized | |
|---|---|---|---|---|---|---|---|
| | 2000 | 2001 | 2002 | 2004 | $/unit | $/unit | $/unit |
| Base Rent | | | | | | | |
| Occupied | no | no | no | | 4,038,560 | 18,120 | 18,120 |
| Vacant | no | no | no | | 0 | | |
| Total Rental Income | | | | | 4,038,560 | 18,120 | 18,120 |
| Expense Reimbursement | | | | | 0 | | |
| Parking Income | | | | | 0 | | |
| Other Income | | | | | 312,213 | 1,220 | 1,220 |
| Percentage Rent | | | | | 0 | | |
| TOTAL GROSS INCOME | | | | | 4,350,813 | 17,339 | |
| Vacancy | 0.0% | 0.0% | 0.0% | 0.0% | 247,541 | 967 | 967 |
| EFFECTIVE GROSS INCOME | 0.0% | 0.0% | 0.0% | 0.0% | 4,703,272 | 18,372 | 18,372 |

**OPERATING EXPENSES**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Real Estate Taxes | | | | | 456,540 | 1,783 | 1,783 |
| Property Insurance | | | | | 72,720 | 284 | 284 |
| Utilities | | | | | 51,200 | 200 | 200 |
| Repairs & Maintenance | | | | | 157,184 | 614 | 614 |
| Janitorial | | | | | 0 | | |
| Management Fee | | | | | 164,915 | 643 | 643 |
| Payroll & Benefits | | | | | 286,000 | 1,094 | 1,094 |
| Advertising & Marketing | | | | | 51,500 | 201 | 201 |
| Professional Fees | | | | | 5,000 | 20 | 20 |
| General & Administrative | | | | | 35,000 | 137 | 137 |
| Ground Rent | | | | | 0 | | |
| Other Expenses | | | | | 0 | | |
| Sub-Total Operating Expenses | | | | | 1,273,319 | 4,976 | 4,976 |
| Reserves | | | | | 36,400 | 150 | 150 |
| TOTAL OPERATING EXPENSES | | | | | 1,273,319 | 4,976 | 4,976 |
| Cap Expenditures / Reserve | | | | | 36,400 | 150 | 150 |
| NET OPERATING INCOME | | | | | 3,393,553 | 13,246 | 13,246 |

**NET CASH FLOW**

| MANAGEMENT FEE as % EGI | | | | | 3.50% | 3.50% | |
|---|---|---|---|---|---|---|---|
| TOTAL EXPENSES as % EGI | | | | | 27.1% | 27.1% | |

| NET OPERATING INCOME | 0 | 0 | 0 | 0 | 3,426,453 | 3,391,053 | |
|---|---|---|---|---|---|---|---|
| NET CASH FLOW | 0 | 0 | 0 | 0 | 3,426,453 | 3,391,053 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cap. Rate | 0.00% | 0.00% | 0.00% | 0.000% | 7.250% | 7.250% | 0.000% |
| Income Value - NOI (calculated) | 0 | 0 | 0 | 0 | 47,260,593 | 47,262,097 | 0 |
| Income Value - NCF (calculated) | 0 | 0 | 0 | 0 | 46,773,145 | 46,773,151 | 0 |
| Appraiser's Final Value | | | | N/A | N/A | N/A | N/A |
| LCF** Income Value - NOI | | | | N/A | N/A | N/A | N/A |
| LCF** Income Value - NCF | | | | 0.0% | 87.0% | 87.0% | 0.0% |
| Appr. Indicated Cap. Rate - NOI | | | | N/A | 182,726 | 182,726 | N/A |
| Appr. Indicated Cap. Rate - NCF | | | | N/A | | | N/A |
| Purchase Price | | | | | | | |

**Max. Loan Calculation:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - Max Loan to Value @ | 75% | | | 0.00 x | 1.45 x | 1.45 x | 0.00 x |
| - Total Expenses Value @ | 75% | | | 0.00 x | 1.44 x | 1.44 x | 0.00 x |
| - Min. DSC (1st Loan Term) | 1.25 x | | | 0.00 x | 1.32 x | 1.32 x | 0.00 x |
| - Min. DSC (NOI & 25 yr Amort) | 1.25 x | | | 0.00 x | 1.31 x | 1.31 x | 0.00 x |
| Loan Amount | | | | 0.00 | 32,000,000 | 32,000,000 | |
| Interest Rate | 0 | 0 | 0 | 6.190% | 6.190% | 6.190% | |
| Amortization | | | | 360 mths | 360 mths | 360 mths | |
| Interest Only Period | | | | mths | mths | 120 mths | |
| Amortization | | | | mths | 360 mths | 360 mths | |
| Monthly Payment | | | | 0.00 | 195,574.06 | 195,574.06 | 0.00 |
| Annual Debt Service | | | | 0.00 | 2,346,890 | 2,346,890 | 0.00 |

| Superior Debt Service Expense (Annual) | | | | 0.00 | | | |
|---|---|---|---|---|---|---|---|
| Subsequent Debt Service Expense (Annual) | Interest Only Basis | | | 0.00 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DSC - NOI | | | 0.00 x | 0.00 x | 1.46 x | 1.46 x | 0.00 x |
| DSC - NCF | | | 0.00 x | 0.00 x | 1.44 x | 1.44 x | 0.00 x |
| DSC (25 yr Amort) - NOI | | | 0.00 x | 0.00 x | 1.32 x | 1.32 x | 0.00 x |
| DSC (25 yr Amort) - NCF | | | 0.00 x | 0.00 x | 1.31 x | 1.31 x | 0.00 x |
| Combined Total DSC - NOI | | | N/A | N/A | N/A | N/A | N/A |
| Combined Total DSC - NCF | | | N/A | N/A | N/A | N/A | N/A |
| LCF** | | | 0.0% | 0.0% | 87.0% | 87.0% | 0.0% |
| LCF** (Total DSC) | | | $0.00 | $0.00 | $125,000 | $125,000 | $0.00 |
| G. | | | $0.00 | $0.00 | $14,806 | $14,806 | $0.00 |
| Net Breakeven Rent (Before Vacancy) | | | $0.00 | $0.00 | $14,806 | $14,806 | $0.00 |
| Breakeven Rent (Before Vacancy) | | | 0.00% | 0.00% | 10.60% | 10.60% | 0.00% |
| PBO @ End of Term (Balloon) | | | $0 | $0 | $26,907,040 | $26,907,040 | $0 |
| Balloon (+) | | | $0.00 | $0.00 | $105,105.06 | $105,105.06 | $0.00 |
| Balloon Loan / Value | | | 0% | 0% | 57% | 57% | 0% |

JH 00408

John Hancock Life Insurance Company

A meeting of the Mortgage and Real Estate Loan Committee was held on

Voted - To authorize the following investment:



8/16/04

| | | |
|---|---|---|
| Investment: | | Avenel @ Montgomery Square Apts Company |
| Type of Investment: | Mortgage Loan | JHLICO Allocation |
| Lien Position or Priority | First | IPLICO Allocation |

6518467

| | | $ Allocation |
|---|---|---|
| Investment Amount | $32,000,000 | $29,900,000 |
| | $125,000 per Unit | $2,100,000 |

| | |
|---|---|
| Rollover of Existing Loan | No |
| Loan Term | 120 months |
| Amortization Term | 360 months |
| Effective Yield Monthly | 6.109% |

| | |
|---|---|
| Summation Value | $47,000,000 |
| | $184,804 per Unit |

| | |
|---|---|
| Maximum Loan to Value | 68.09% |
| Minimum DSCR | 1.45 times |

| | | |
|---|---|---|
| Interest Rate (Note Rate) | 6.180% per annum | Effective Yield Semi-Annual Rate (30/360 basis) | 6.260% |
| Interest Calculation | 30/360 | Average Life | 9.29 |
| Less: embedded Fee | -0.071% | Duration | 6.76 |
| | | Monthly Spread over Treasury | 179 |
| | | Semi-Annual Spread over Treasury | 187 |
| | | REIG Department Rating | BAA1 |

| Collateral Property | Property Type/Sub-Type | Property Size |
|---|---|---|
| Avenel @ Montgomery Square Apts | Multifamily | 256 Units |
| Montgomeryville | Multifamily - Garden Apartments | |
| Pennsylvania | | |

| | |
|---|---|
| Investment Officer | Timothy J. Malik |
| 2nd Investment Officer | Ryan Hawley |
| Originating Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia |
| Servicing Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Closing Analyst | Robin Costa | 040-03 |
| Internal Counsel | Nathaniel Margolis | |

JH 00409

# VOTED INVESTMENT

Investment:    6510467                                      Investment Amount:    $32,000,000
               Avenel @ Montgomery Square Apts

## Loan Overview:

- The security is a class-A, 256-unit apartment project under construction in Montgomeryville, Pennsylvania (suburban north Philadelphia). The property will be comprised of 256 garden-style apartments (125 one-bedrooms and 131 two-bedrooms) in eight three-story buildings and one four-story building (which will also hold the clubhouse).

- Construction of the security is scheduled to be complete in March 2005, and 17 of the 22 units completed to date have been leased. Funding will occur when the property is fully constructed and is at least 80% occupied (August 2005 at the latest). A Rental Achievement Reserve will be funded if the property does not achieve the underwritten rents. Because of the construction and occupancy requirements, the Loan is priced as a one-year forward commitment.

- The debt service coverage ratio for a 10% Constant is 1.06:1 and the breakeven interest rate is 10.6%.

## Loan Information - Voted Section:

| | | | |
|---|---|---|---|
| Borrower/Applicant | Montgomery Square Partnership | Underwriter's Capped Value | $47,309,708 |
| Loan Amount | $32,000,000 | Underwriter's LTV | 67.64% |
| Loan per SF/Unit/Pad | $125,000 | Underwriter's NOI | $3,420,054 |
| Loan Term - years | 10 | Underwriter's Cap Rate | 7.250% |
| Amortization - years | 30 | Underwriter's Cash Flow | $3,391,554 |
| Interest Only Period - years | 0 | Underwriter's DSCR | 1.45 |
| Interest Rate | 6.180% | Annual Debt Service | $2,346,900 |
| Contract Type | Fixed Rate | Monthly Debt Service | $195,574.96 |
| Payment Method | 30/360 | Service Fee | 0.029% |
| Interest Method | | Secondary Financing in Place | No |
| Payment Constant | 7.334% | Amount | N/A |
| Balloon Balance | $26,863,760 | Secondary Financing Type | |
| Sanctified Loan (Yes/No) | Yes | Secondary Financing Permitted in Future | Yes |
| Ground Lease | No | Amount | |
| Recourse to Borrower | No | Secondary Financing Type | |
| Recourse to Principal/Sponsor | No | Lockbox | Secured by Property |
| Due on Sale | Yes | Lockbox Status | No |
| Partial Release Allowed | No | Lockbox Type | |
| Cross Collateralized | No | Rate Reset/Loan Term Extension Option | Yes |
| Cross Defaulted | No | See Supplemental Page Attached to Vote | |
| Crossed Loans | N/A | | |

## Other Loan Information - Memorandum Section

| | | | |
|---|---|---|---|
| Assumption Provision (if times) | 2 | Payment Due Date | 1st |
| Index Name | 10 year Treasury | Grace Day Period for Late Charge | 5 |
| Interest Rate | 4.43% | Late Charge | 4% |
| Fraud Carve out | | Grace Day Period for Default | 5 |
| Borrower | Yes | Default Interest Rate | 5% |
| Sponsor | Yes | | |
| Environmental Indemnification | | | |
| Borrower | Yes | | |
| Sponsor | Yes | | |

## Loan Terms Description - Voted Section

- The Borrower was given 365 days to close the Loan although the typical commitment is 60 days. The net spread includes 45 basis points for the cost of this extra 305 days of forward commitment. The closing date may be extended for up to 90 days at the cost of an adding five (5) basis point to the interest rate for each 30-day extension period or portion of a 30-day extension period. -- Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan request at or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

- The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1 million between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock. The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.

- The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar-type apartment buildings in the Philadelphia metropolitan area.

JH 00410

# VOTED INVESTMENT

Investment: 6518457    Avanel @ Montgomery Square Apts    Investment Amount: $32,000,000

## LINES OF BUSINESS ALLOCATIONS - VOTED SECTION

| JHLICO Accounts | $ Allocation | | IPLICo Accounts | $ Allocation |
|---|---|---|---|---|
| GBRE | $3,900,000 | | IPLICo | $2,100,000 |
| GRP-INS | $3,000,000 | | | |
| RLTC | $5,000,000 | | | |
| Remain | $4,200,000 | | | |
| Open | $2,600,000 | | | |
| IDA | $10,000,000 | | | |
| REFA | $1,200,000 | | | |

Total JHLICO    $29,900,000    Total IPLICO    $2,100,000

Prepayment Premium

*Prepayment Terms - Voted Section

Lo    48
YMt    69
Open    3

*Prepayment Terms Description - Voted Section

- Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan. The yield maintenance premium shall be discounted to its present value. The loan will be open to prepayment at par during the last 90 days of the loan term.

Partial Payment Allowed    No

## Key Date Information - Voted Section

| Rate Lock Date | 02/2/2004 | Commitment Expiration | 02/2/2005 |
|---|---|---|---|
| Approval Date | 8/16/2004 | Vote Expiration | 8/15/2005 |

Page 3

JH 00411

INVESTMENT MEMORANDUM

Investment: 6518467

Avenel @ Montgomery Square Apts

Investment Amount: $32,000,000

## Strengths of Deal

– The security is a newly constructed, class-A apartment complex located in a strong apartment market that has not had new apartment construction in over 15 years.

– The developers of the security have extensive construction experience and they have contracted with a very experienced management and marketing firm to direct the lease up and property operations.

## Weaknesses of Deal

– The property does not have an operating history since it is under construction and in its lease-up phase.  However, leasing for the first building has been strong.  In addition, a waiting list of 100 prospects has been assembled for certain units in other buildings now under construction.  Operating expenses were also conservatively estimated to be '5,527/unit per year, even though tenants pay for most utilities.

## Exceptions to Guidelines

– Funding will occur when the property is complete and is at least 80% occupied.  If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

– The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1.0 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock.  The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.

– The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar size, type, location and character secured by rental apartment buildings in the 'hiladelphia metropolitan area.  –  Late charges will be 4% instead of 5%, and the interest rate add-on for defaults was reduced from 7% to 5%.  –  SPE and SAE status was waived since the Borrower owns a separate piece of land.  This land, however, must be transferred if Borrower wishes to use it as security for a loan.

# INVESTMENT MEMORANDUM

**Investment:**

6510467
Avenel @ Montgomery Square Apts

**Investment Amount:    $32,000,000**

## Use of Funds

| | | | Borrower Purchase Information | |
|---|---|---|---|---|
| Loan Purpose | | Refinance | Purchase Date | 06/01/95 |
| Loan Amount | | $32,000,000 | Purchase Price | $7,680,000 |
| Less Current Debt/Purchase Price | | $30,742,000 Wilmington Trust & | Capital Expenditures | $27,875,801 |
| Closing Cost/Other Expenses | | $5,063,801 Wachovia | Borrower Investment Basis | $35,555,801 |
| Net Proceeds to Borrower | | -$3,805,801 | | |

| Loan Fees | $ Amount | % of Loan | | |
|---|---|---|---|---|
| Processing Fee | $5,000 | 0.02% | | |
| Application Fee | $320,000 | 1.00% | | |
| Commitment Fee | $640,000 | 2.00% | | |
| Embedded Origination Fee | $160,000 | 0.50% | | JHREF - Philadelphia |
| Broker's Origination Fee | $160,000 | 0.50% | Carey, Kramer, Pettit, Panichelli & Associates |

**Purchase Information / Previous History**

– The Borrower purchased the site in 1995, rezoned it, obtained building permits and started construction in late 2003. At closing, the Borrower will have an estimated $3.0 million of cash equity in the property.

## Borrower Information

| | | | | |
|---|---|---|---|---|
| Borrower/Applicant | Montgomery Square Partnership | | | |
| Entity Type | Partnership | | | |
| State of Incorporation | Pennsylvania | | | |
| Single Asset Entity | No | Independent Director | No | |
| Special Purpose Entity | No | Non-Consolidation Opinion | No | |
| Bankruptcy Remote Entity | No | | | |

**Property Management Company**    Buzzulo Management    Affiliate of Borrower    No

## Borrower Entity Information

– The Borrower is a general partnership composed of three limited partnerships, all formed in Pennsylvania. (1.) Vestmont Limited Partnership's general partner is Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli ) and the LP units are owned 44.5% by James R. Koller, 44.5% by Frank C. Palopoli, and 10% by Joseph P. Kolley. (2.) Vestmont Limited Partnership II's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 38.26% by James R. Koller, 38.28% by Frank C. Palopoli, and 22.44% by Joseph P. Kolley. (3.) Vestmont Limited Partnership III's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 66.17% by Koller Kelly Partnership, LP and 32.83% by FCP Group LP.

## Description of Credit Issues - Borrowing Entity Only

| Database Searched | Issue | Database Searched | Issue |
|---|---|---|---|
| Bankruptcy | No | UCC-1 | No |
| Credit Report | No | | |
| Civil Records | No | | |
| Judgments | No | | |
| Secretary of State | No | | |
| Tax Authority/Liens | No | | |

– None known.

JH 00413

INVESTMENT MEMORANDUM

Investment:    6518467                                              Investment Amount:    $32,000,000
               Avenel @ Montgomery Square Apts

Principal/Sponsor Information

First Principal/Sponsor Name              James P. Koller
Net Worth        $25,100,415        as of    6/30/2004 Source        Financial Statement

Was the Principal/Sponsor ever convicted of a felony?                                              No
Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years?   No
Has the Principal/Sponsor ever failed to repay debt in full?                                       No
Was the Principal/Sponsor ever subject to foreclosure?                                             No
Was the Principal/Sponsor ever in bankruptcy?                                                      No

Second Principal/Sponsor Name             Frank C. Palopoli
Net Worth        $21,634,000        as of    6/30/2004 Source        Personal Balance Sheet

Was the Principal/Sponsor ever convicted of a felony?                                              No
Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years?   No
Has the Principal/Sponsor ever failed to repay debt in full?                                       No
Was the Principal/Sponsor ever subject to foreclosure?                                             No
Was the Principal/Sponsor ever in bankruptcy?                                                      No

Principal/Sponsor Comment

-  James P. Koller is an attorney who specialized in real estate law for 10 years until founding, in 1986, the Vesterra
Corporation, the general partner of the Borrower.  Vesterra develops both commercial properties and single-family
homes.   Mr. Koller was associated with Dilworth Paxson Kalish & Kaufman and later with Dechert Price & Rhoads prior
o his involvement with Vesterra.  Mr. Koller guarantees the non-recourse carve outs and has a net worth of $25.1
million with liquid assets of $14.6 million.

-  Frank C. Palopoli has over 25 years of real estate experience and, prior to co-founding Vesterra, was a principal in
Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc.  Both firms provided work-out, development and real
estate services to corporate, institutional and private individuals.  Mr. Palopoli guarantees the non-recourse carve outs
and has a net worth of $21.6 million with liquid assets of $9 million.

-  Joseph P. Kelley joined Vesterra in 1987.  Before joining Vesterra he was a financial manager for mergers and
acquisitions for Foster Medical.  He began his career as an auditor with Price Waterhouse.  Mr. Kelley also guarantees
the non-recourse carve outs and has a net worth of $3.6 million with liquid assets of $738,000.

Principal/Sponsor related John Hancock Loans

-  None.

## INVESTMENT MEMORANDUM

Investment: 6518467    Investment Amount: $32,000,000
Avenel @ Montgomery Square Apts

Escrows

| Reserve Type | | Amount at Closing | Monthly Amount | Cap |
|---|---|---|---|---|
| Tax | Required | | | |
| Insurance | Yes | | | |
| Capex | No | | | |
| Deferred Maintenance | No | | | |
| TI/LC | No | | | |
| Environmental | No | | | |

Reserve Comments

~ Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

~ Reserves for insurance, replacements and leasing costs will be suspended as long as the Loan does not have an event of default, and subject to other customary conditions.

JH 00415

## INVESTMENT MEMORANDUM

**Investment:**          6518467          **Investment Amount:**  $32,000,000

Avenel @ Montgomery Square Apts

### Location Information

| Property Name | Avenel @ Montgomery Square Apts | | | |
|---|---|---|---|---|
| Address | 1100 Avenel Blvd. | | County | Montgomery |
| | Montgomeryville | Pennsylvania | 19454 | MSA    Philadelphia |

### Location Description

– The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast.

– The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000.

### Property Information

| Property Type | Multifamily | | Property Kind Code | B |
|---|---|---|---|---|
| Property Sub-Type | Multifamily - Garden Apartments | | Property Type Code | 19 |
| Garden Apts. (1980+) | | | Property Sub-Type Code | 101 |
| Total Number of Units | 256 | | Land area | 18.35 |
| Total Net Rentable Sq. Ft. | 274,931 | | Open Parking | 404 |
| Number of Buildings | 9 | | Covered Parking | 112 |
| Number of Floors | 3 | | Total Parking | 516 |
| Year Built | 2004-05 | | Parking Ratio | 2.02 |
| Year Renovated | 0 | | Sewer | Public |
| Elevators | 1 | | Water | Public |
| Building Frame | Steel | | HVAC System | Package Units |
| Exterior | Vinyl | | Fuel | Electric |
| Roof Type | Pitched | | Seismic Zone | 2 |
| Roof Material | Shingle | | Alquist Priolo Zone | No |
| Ground Lease | No | | PML Factor | |
| Ground Lease Expiration | N/A | | Storm/Hurricane Zone | No |
| Ground Lease Subordinate | N/A | | Flood Zone | No |
| | | | Environmental Issues | No |

### Property Description

– The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting.

– The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

JH 00416

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Additional Property Information

| Rent Controlled | No | Electric Paid By | Tenant |
|---|---|---|---|
| Rent Subsidized | No | Heat Paid By | Tenant |
| Section 42 | No | Water Paid By | Tenant |
| Section 8 | No | Sewerage Paid By | Tenant |

### Utilities/Expenses Paid by Tenant

- Tenants pay for all utilities to their units.

### Utilities/Expenses Paid by Landlord

- Landlord pays for common area utilities. Only the four-story building will have fully enclosed hallway and staircases.

### General Comments

- This is a project under construction.

### Amenities

| Air Conditioning | Yes | Fireplace | Yes | Health Club | Yes |
|---|---|---|---|---|---|
| Washer/Dryer | Yes | Laundry | No | Club Room | Yes |
| Dishwasher | Yes | Security | Yes | Pool | Yes |
| Trash Compactor | No | Other Amenities | Yes | Hot Tub | No |
| | | | | Tennis | No |

### Amenities Comments

- These apartments will also offer security system rental, 9-foot ceilings, track lighting, multiple phone lines and high-speed cable outlets, private patios or balconies, full-size washer and dryer, walk-in closets, extra storage space and attached or detached garages for rent.

- The common area will offer a residence lounge, executive business center, exercise room and resort-style pool. Most units will have two parking spaces.

### Tenant Mix

| Family | 40% | Senior | 10% | Military | 5% |
|---|---|---|---|---|---|
| Single | 60% | Student | 10% | Other | 5% |

### Tenant Mix Comment

- This is an upscale residential development that targets mid to upper income individuals and professionals.

### Environmental Issue Comment

- None known.

JH 00417

INVESTMENT MEMORANDUM

6518467
Avenel @ Montgomery Square Apts

| Investment: | | Investment Amount: | $32,000,000 |
|---|---|---|---|

## Valuation Summary

| | | | Loan to Value Ratios | |
|---|---|---|---|---|
| NOI | $3,429,954 | | Underwriter's Capped | 67.64% |
| Underwriter's Cap Rate | 7.256% | | Underwriter's Capped Value | 0.00% |
| Discounted Cash Flow Value | $47,309,708 | | Discounted Cash Flow | 0.00% |
| External Appraisal | | | External Appraisal | 68.09% |
| Summation Value | $47,000,000 | | Summation Value | |

| | | | Physical Valuation | |
|---|---|---|---|---|
| Land Area | 18.35 | | Land | $7,680,007 |
| Land Value per Acre | $418,529 | | Building | $27,875,254 |
| Total Gross Building Area | 274,931 | | Site Improvement | $0 |
| Building Cost per Sq. Ft. (net) | $101.39 | | | |
| Other Site Improvements | | | Total Physical Value | $35,555,261 |

## Valuation Comment

- RENTAL COMPS: Nine comparable properties were identified with one bedroom rents from $1,020 - $1,461/unit and two bedroom rents from $933 - $1,790/unit, while the subject projects rents of $1,197 - $1,790/unit for the one bedrooms and $1,609 - $1,846/unit for the two bedrooms and $1,895 - $2,200/unit for the three bedrooms.  Only one comparable property is nearby but is over 20 years old.  The remaining comparable properties will not compete with the subject since the distance is in excess of five mils, and most of those are much older properties as well.  The rent-per-square-foot of the rental comps indicate that the subject's rents are similar to market rents, even though the subject has the advantage of being brand new.

- Condominium sales comps range from $173,900 to $264,000 while the newer apartment buildings valuation is $184,777/unit.

- Capitalization rates range from 6.25% to 7.5%, with the newer apartment buildings going in the lower cap rates.  The subject's valuation is based on a 7.25% cap rate.

- Comparable sales for garden-style apartment building built since 1990 range from $104,000/unit to $149,000/unit. The Regatta Apartments in Norristown (an inferior location) is currently being marketed at $172,000/unit.

## Market/Sub-Market Performance

| Name of Market | Market | Sub-Market | Competitive Group |
|---|---|---|---|
| | Philadelphia | Lansdale/Gwynedd | Lansdale/Gwynedd |
| Total Units | 194,682 | 5,880 | 5,880 |
| Total Vacancy (current/worst/best) | 3.8%/3.8%/1.5% | 4.9%/4.9%/.09% | |
| New Supply - Coming Year (units) | 1,461 | 100 | 100 |
| New Supply last 12 months | 401 | 0 | 0 |
| Net Absorption last 12 months | 303 | -18 | -18 |
| Projected net absorption next 12 mths | 1,059 | 110 | 110 |
| | | | |
| Effective Rent / Unit | $806 | $945 | $945 |
| Peak Rent / Unit | $878 | $978 | $978 |
| Last Year's Rent / Unit | $878 | $936 | $936 |
| Median Operating Expenses / Unit | | | |
| Concessions | | | |

## Source of Market Information

REIS, Marcus & Millichamp

## Market/Sub-Market Comment

- According to REIS, the Lansdale/Gwynedd apartment market (5,880 units in 29 projects) is 4.9% vacant and with a median vacancy rate of 3.4%.  Rental growth should moderate after growing 2.7% during the previous year.  The average asking rent is $945/mth.  No new units were constructed in the last four years and only 32 units have been built since 1999.  The subject is the only complex under construction or planned in this submarket at this time.  The Greater Philadelphia apartment market (194,270 units in 1,141 projects) is 3.8% vacant and rental growth should also moderate after growing 3.2% over the previous year.  Roughly 1,461 units are under construction and are projected to be absorbed with minor effect on the overall vacancy.

- Marcus & Millichap project slightly increasing vacancy for the Philadelphia market, but also rent increases of 3.0% in 2004.

- Two apartment properties were recently built in different submarkets about eight miles south or west to the subject.  The Glen at Lafayette Hill (139 units) located in Lafayette, PA was developed in 1999 and reached stabilization within 10 months.  Henderson Square (128 units) located in King of Prussia was built in 2001 and was stabilized within 12 months.  The subject's 256 units are projected to be stabilized within 20 months from the start of construction.

- The population in a three mile radius is approximately 63,400 individuals and median household income is about $89,000 while average household income is about $99,000.  Of that population, about 24% rent their homes.

JH 00418

**INVESTMENT MEMORANDUM**

| Investment: | 6518467 | | | | | | | | Investment Amount: | $32,000,000 |
| Property: | Avenel @ Montgomery Square Apts | | | Cash Flow Analysis | | | | | No. of Units | 256 |

Statement Name

| Period Ended | 12/31/00 | 12/31/01 | 12/31/02 | $ / Unit | % of EGI | Underwritten | $ / Unit | % of EGI | Appraisal | $ / Unit | % of EGI | Cash Flow Footnotes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | | | | | |
| Base Rent - Occupied | $0 | $0 | $0 | $0 | 0% | $4,638,600 | $1,510 | 99% | $0 | $0 | 0% | a |
| Base Rent - Vacant | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | a |
| Laundry/Vending Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Parking Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Other Income | $0 | $0 | $0 | $0 | 0% | $312,213 | $102 | 7% | $0 | $0 | 0% | b |
| Gross Income | $0 | $0 | $0 | $0 | 0% | $4,950,813 | $1,612 | 105% | $0 | $0 | 0% | |
| Vacancy Allowance | $0 | $0 | $0 | $0 | 0% | $247,541 | $81 | 5% | $0 | $0 | 0% | c |
| Effective Gross Income | $0 | $0 | $0 | $0 | 0% | $4,703,272 | $1,531 | 100% | $0 | $0 | 0% | |
| | | | | | | | | | | | | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Real Estate Taxes | $0 | $0 | $0 | $0 | 0% | $456,540 | $1,783 | 10% | $0 | $0 | 0% | d |
| Property Insurance | $0 | $0 | $0 | $0 | 0% | $72,780 | $284 | 2% | $0 | $0 | 0% | e |
| Utilities | $0 | $0 | $0 | $0 | 0% | $51,200 | $200 | 1% | $0 | $0 | 0% | f |
| Repairs and Maintenance | $0 | $0 | $0 | $0 | 0% | $156,684 | $612 | 3% | $0 | $0 | 0% | f |
| Management Fees | $0 | $0 | $0 | $0 | 0% | $164,615 | $643 | 4% | $0 | $0 | 0% | g |
| Payroll & Benefits | $0 | $0 | $0 | $0 | 0% | $280,000 | $1,094 | 6% | $0 | $0 | 0% | f |
| Advertising & Marketing | $0 | $0 | $0 | $0 | 0% | $51,500 | $201 | 1% | $0 | $0 | 0% | f |
| Professional Fees | $0 | $0 | $0 | $0 | 0% | $5,000 | $20 | 0% | $0 | $0 | 0% | f |
| General and Administrative | $0 | $0 | $0 | $0 | 0% | $35,000 | $137 | 1% | $0 | $0 | 0% | f |
| Other Expenses | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Ground Rent | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Total Operating Expenses | $0 | $0 | $0 | $0 | 0% | $1,273,319 | $4,974 | 27% | $0 | $0 | 0% | |
| | | | | | | | | | | | | |
| Net Operating Income | $0 | $0 | $0 | $0 | 0% | $3,429,954 | $13,398 | 73% | $0 | $0 | 0% | |
| | | | | | | | | | | | | |
| Reserves | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | h |
| Extraordinary Capital Expenditures | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | i |
| Total LC, TI's and Capital | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | |
| | | | | | | | | | | | | |
| Cash Flow Available for D. S. | $0 | $0 | $0 | $0 | 0% | $3,391,554 | $13,248 | 72% | $0 | $0 | 0% | |
| | | | | | | | | | | | | |
| Annual Debt Service | $2,346,900 | $2,346,900 | $2,346,900 | | | $2,346,900 | | | $2,346,900 | | | |
| | | | | | | | | | | | | |
| Net Cash Flow after Debt Service | | | | | | $1,044,654 | | | | | | |
| | | | | | | | | | | | | |
| DSCR | | | | | | 1.45 | | | | | | |

11

JH 00419

INVESTMENT MEMORANDUM

| Investment: 6518467 | Investment Amount: | $32,000,000 |
| Property:   Avenel @ Montgomery Square Apts | No. of Units | 256 |

**Cash Flow Footnotes**

> **General Comments**
>
> ~ The rents and expenses are based on market studies and projections by the developer.

a.) GPR is based on rental projections, a market study and some preleasing.

b.) Other income is based on rental of security systems, storage spaces, and garages, as well as application fees, and late fees.

c.) Vacancy allowance was taken at 5% which is below the sub-market vacancy rate.

d.) Real estates taxes were underwritten based on an estimate of final assessed value.

e.) Insurance was underwritten based on insurance bids.

f.) General operating expenses were underwritten based on the developer's budget and estimates of operating costs.

g.) Management fee was underwritten at 3.75%, which is a market rate for like-type properties.

h.) Replacement reserves were underwritten at $150 per unit since this new construction.

i.) Extraordinary capital items were not underwritten since this is project will me new construction.

12

JH 00420

INVESTMENT MEMORANDUM

| Investment: | 6518467 | | | | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|---|---|---|
| Property Name: | Avenel @ Montgomery Square Apts | Unit Mix Analysis | | | | | |
| Property Type: | Multifamily | | | | | Total Number of Units | 256 |
| | | | | | | Current Occupancy: | 100.0% |

Rent Roll Date:    1/0/1900

| Type | Unit Description | Number of Units | Total Sq. Ft. | Average Sq. Ft. / Unit | Number of Occupied Units | Physical Occupancy | Total Monthly Rent for Occupied Units | Average Monthly Rent for Occupied Units | Average Monthly Rent per Sq. Ft. | Low | High | Monthly Rent for Vacant Units (market) | Total Monthly Rent for Vacant Units | Total Underwritten Monthly Rent | Underwritten Rent per Unit | Underwritten Rent per Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | OCCUPIED | | | Rental Range | | VACANT | | UNDERWRITTEN | | |
| 1 BR | A | 30 | 23,640 | 788 | 30 | 100% | $36,750 | $1,225 | $1.55 | | | $1,225 | $0 | $36,750 | $1,225 | $1.55 |
| 1 BR | B | 48 | 40,896 | 852 | 48 | 100% | $60,000 | $1,250 | $1.47 | | | $1,250 | $0 | $60,000 | $1,250 | $1.47 |
| 1 BR | C | 15 | 14,655 | 977 | 15 | 100% | $21,000 | $1,400 | $1.43 | | | $1,400 | $0 | $21,000 | $1,400 | $1.43 |
| 1 BR | B-L | 32 | 32,224 | 1,007 | 32 | 100% | $47,200 | $1,475 | $1.46 | | | $1,475 | $0 | $47,200 | $1,475 | $1.46 |
| 2 BR | F | 8 | 9,264 | 1,158 | 8 | 100% | $12,600 | $1,575 | $1.36 | | | $1,575 | $0 | $12,600 | $1,575 | $1.36 |
| 2 BR | E | 69 | 81,006 | 1,174 | 69 | 100% | $112,470 | $1,630 | $1.39 | | | $1,630 | $0 | $112,470 | $1,630 | $1.39 |
| 2 BR | E-L | 34 | 45,934 | 1,351 | 34 | 100% | $60,350 | $1,775 | $1.31 | | | $1,775 | $0 | $60,350 | $1,775 | $1.31 |
| 2 BR | G | 16 | 21,472 | 1,342 | 16 | 100% | $28,800 | $1,800 | $1.34 | | | $1,800 | $0 | $28,800 | $1,800 | $1.34 |
| 2 BR | D | 4 | 5,840 | 1,460 | 4 | 100% | $7,380 | $1,845 | $1.26 | | | $1,845 | $0 | $7,380 | $1,845 | $1.26 |
| **Totals** | | 256 | 274,931 | 1,074 | 256 | 100% | $386,550 | | | | | | $0 | $386,550 | | |

Total Annualized Rent    $4,638,600

**Rent Roll Comments**

~ The project is under construction so the rents are projections of actual final lease up. If these rents are not achieved, the loan will only be funded up to a 75% LTV and 1.25 DSC based on the actual NOI and the appraisal.

13

JH 00421

| | | | | | | |
|---|---|---|---|---|---|---|
| stment Number: | 6518467 | | Loan Term - Mths / Amortization - Mths | 120 | 3( | |
| erty Name: | Avenel (a) Montgomery Square Apts | | Interest Rate / Payment Constant: | 6.180% 7.334% | | |
| ATION : | Montgomeryville Pennsylvania | | Semi-Annual Equivalent: | 6.260% | | |
| | | | Average Life: | 9.29 | | |
| stment Officer: | Timothy J. Malik | | Duration: | 6.76 | | |
| | | | Treasury Spread | 186.77 | | |
| | | | RATING: | BAA1 | | |

inating Correspondent: John Hancock Real Estate Finance, Inc. - Philadelphia    040-03
vicing Correspondent: John Hancock Real Estate Finance, Inc. - Philadelphia    040-03

| URITY | EXCELLENT 3 | VERY GOOD 2 | GOOD 1 | FAIR 0 | POOR -0.5 | VERY POOR -1 | X | TOTAL |
|---|---|---|---|---|---|---|---|---|
| ATION | | | X | | | | 5 | 5 |
| ROVEMTS, | | X | | | | | 4 | 8 |
| KET | | X | | | | | 3 | 6 |
| QUAL. | | | X | | | | 2 | 2 |
| NERSHIP | | | X | | | | 1 | 1 |
| | | | | | | **Total Security Rating Scale** | | 22 |

DERWRITING
N TO FMV

| | <45% | 45%-49% | 50%-54% | 55%-61% | 62%-63% | 64%-65% | 66%-67% | 68%-69% | 70%-71% | 72%-73% | 74%-75% | 76%-77% | 78%-80% | 81%-83% | 84%-88% | 89%-99% | >=100% | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68.09% | 3.00 | 2.75 | 2.50 | 2.25 | 2.00 | 1.75 | 1.50 | 1.25 | 1.00 | 0.75 | 0.50 | 0.25 | 0.00 | -0.25 | -0.50 | -0.75 | -1.00 | 6 | 7.50 |

COVERAGE

| | >=1.946 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.450 | 1.229-1.314 | 1.133-1.228 | 1.053-1.132 | <1.053 | | | | | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.45 | 3.00 | 2.78 | 2.56 | 2.33 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.90 | -1.00 | | | | | | 5 | 6.10 |

L CAPAC.

| | >=1.946 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.450 | 1.229-1.314 | 1.133-1.228 | 1.053-1.132 | <1.053 | | | | | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.302 | 3.00 | 2.78 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | | | | | 4 | 4.00 |
| | | | | | | | | | X | | | | | | | | **Total Underwriting Rating Scale** | | 17.60 |

**nance Scale Calculation**

| | |
|---|---|
| nance Sizing Constant | 9.66% |
| on Balance | $26,963,760 |
| t Service | $2,604,689 |
| erwritten CFADS | $3,391,554 |
| nance Annual DSCR | 1.302 |
| mum DSCR | 1.15 |

**Sizing Constant Information**

| | |
|---|---|
| Loan Amount | $32,000,000 |
| Sizing Constant | 10.00% |
| Annual Debt Service | $3,200,000 |
| Underwritten CFADS | $3,391,554 |
| DSCR | 1.06 |
| Minimum DSCR | 1.05 |

Rating Adjustment Comments

| | |
|---|---|
| Total Points from Security Scale | 22.00 |
| Total Points from Underwriting Scale | 17.60 |
| Sub Total | 39.60 |
| ADJUSTMENTS: | 0 |
| GRAND TOTAL: | 39.60 |
| | Rating BAA1 |

stant at 1.20 DSCR (using
Refinance Sizing Constant    10.48%
e interest rate)

XXXX

| AAA | AA1 | AA2 | AA3 | A1 | A2 | A3 | BAA1 | BAA2 | BAA3 | BA1 | BA2 | BA3 | B1 | B2 | B3 | CAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| >=70 | 58-69 | 55-57 | 52-54 | 49-51 | 45-48 | 40-44 | 30-39 | 22-29 | 15-21 | 12-14 | 9-11 | 7-8 | 5-6 | 3-4 | -14-2 | -15 |

JH 00422

# Manulife Financial - U.S. Mortgage Risk Rating Worksheet

## ALL SHADED AREAS MUST BE FILLED IN

Date: 8/16/2004

Loan #: 6510467

Borrower Name: Montgomery Square Partnership
Property Name: Avenel @ Montgomery Square Apts
Property Address: Montgomeryville    Pennsylvania

Credit Rating:    Final: BBB    Indicated: BBB    Recommended: BBB

Based on:    Quality Classification: **Good**
Loan to Value: **67.60%**
Debt Service Coverage: **1.35**

QUALITY: Award points, on a scale of -5 to +5, representing the project's quality ranging from Unacceptable to Excellent taking into account competitive factors and future trends.

| Project Characteristics | Points | Multiplier | Total |
|---|---|---|---|
| **1. Location** | | | |
| a) State Economics | | 1 | 5 |
| b) City Economics | | 2 | 10 |
| c) Neighbourhood Economics | | 2 | 10 |
| d) Site Logistics | | 2 | 10 |
| **2. Age, Condition** | | | |
| a) Age (Old to New) | | 1 | 5 |
| b) Attractiveness | | 2 | 10 |
| c) Flexibility | | 2 | 6 |
| d) Parking ratios | | 2 | 6 |
| e) Construction Quality | | 2 | 10 |
| f) Landscaping | | 1 | 4 |
| g) Property Management | | 1 | 4 |
| h) Environmental Risk (High to Low) | | 1 | 4 |
| **3. Zoning Conformity** | | 2 | 10 |
| **4. Market/Neighbourhood Suitability** | | 2 | 10 |
| **5. Market Demand, Leasing Risk** | | | |
| a) Comparison to Market Vacancy | | 1 | 4 |
| b) Market Trends (Weak to Strong) | | 1 | 4 |
| c) Lease Terms | | 1 | 4 |
| d) Income Mix | | 1 | 4 |
| e) Tenant Mix | | 1 | 4 |
| f) Tenant Quality | | 1 | 4 |
| g) Rental Rates (above to below mkt) | | 1 | 4 |
| h) Lease Maturity Diversification | | 2 | 2 |

| Sponsor Characteristics | Points | Multiplier | Total |
|---|---|---|---|
| 1. Net Worth | 3 | 1 | 3 |
| 2. Financial Capacity | 3 | 1 | 3 |
| 3. Experience | 5 | 1 | 5 |
| 4. Reputation | 5 | 1 | 5 |
| 5. Monetary Recourse | 0 | 2 | 0 |

ver: JH 5-10-04

Manulife Financial - U.S. Mortgage
Risk Rating Worksheet

**Credit Structure**
| | | |
|---|---|---|
| 1. Term (vs. Market, Longer to Less) | 2 | 2 |
| 2. Additional Security (Sufficiency) | 0 | 0 |
| 3. Covenants (Sufficiency) | 3 | 3 |
| 4. Guarantees (Sufficiency) | 3 | 6 |
| 5. Amortization (vs Market, Longer to Less) | 2 | 4 |
| 6. Interest Rate (vs Historical Trend, Lower to Higher) | 3 | 3 |

**TOTAL QUALITY POINTS**                    163

## SUMMARY

Loan #:                 6518467

Borrower Name:    Montgomery Square Partnership

Quality:    The total points of    **163**    indicates a Quality classification of:    **Good**

Classification Table (Minimum): Excellent    = 180 points
Good    = 140 points
Fair    = 90 points, min. 18 pts. from Sponsor

Debt Service Coverage Ratio

DSC is    ░░░░░░░    using a    ░░░░░░░░░░ vacancy factor and 25 year amortization.

Loan to Value Ratio

LTV is    ░░░░░░░░░    using a Capitalization rate of    ░░░░░░░░

| | Indicated Credit Rating: | MLI | BBB | OSFI | Satisfactory |
| | Recommended Credit Rating: | MLI | ░░░ BBB ░░░ OSFI | ░░░ Satisfactory ░░░ |

Remarks:

(Justify if Indicated and Recommended ratings do not agree).

Borrower/Principal Affiliate(s)/Individuals:
Reviewed against Master Consolidated List of terrorist names/organizations/entities.    ░░ YES ░░

Signed: _____    Date: 8/16/04
Timothy L. Malik



JH 00425

TAB B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY,

        Plaintiff,

    v.

VESTMONT LIMITED PARTNERSHIP,
et al.,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 05-11614 WGY

JURY TRIAL DEMANDED

## MOTION FOR LEAVE TO FILE AMENDED COUNTERCLAIM

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited

Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively,

"Vesterra"), by and through their undersigned attorneys, hereby move, pursuant to Fed. R. Civ.

P. 15(a) and 16(b), for leave to file an Amended Counterclaim in the form attached as Exhibit 1

to the accompanying Memorandum of Law, which sets forth the reasons in support of this

motion. The Amended Counterclaim asserts two new counts that are based on internal John

Hancock documents not produced to Vesterra until January 2006, and on the deposition

testimony of a John Hancock employee on January 27, 2006.

Case 1:05-cv-11614-WGY     Document 9     Filed 02/08/2006     Page 2 of 3

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1

The undersigned conferred with counsel for all parties in a good faith effort to resolve or narrow the issues contained in this motion.

/s/ C. Randolph Ross

Respectfully submitted,

/s/ Robert D. Hillman

Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

/s/ C. Randolph Ross

Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs
Vestmont Limited Partnership, Vestmont Limited
Partnership II, Vestmont Limited Partnership III
and Vesterra Corporation

Dated: February 8, 2006

2

## CERTIFICATE OF SERVICE

I, Robert D. Hillman, certify that I understand that counsel of record will receive electronic notice of the electronic filing of this pleading.

_/s/ Robert D. Hillman_

DWLIB 195122v1
8836/00

3

Case 1:05-cv-11614-WGY    Document 10    Filed 02/08/2006    Page 1 of 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY,

                    Plaintiff,

        v.

VESTMONT LIMITED PARTNERSHIP,
et al.,

                    Defendants.

Civil Action No. 05-11614 WGY

JURY TRIAL DEMANDED

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR LEAVE TO FILE AMENDED COUNTERCLAIM

### INTRODUCTION

On July 30, 2004, Defendants (collectively, "Vesterra") applied for a mortgage loan (the "Loan") from plaintiff John Hancock Life Insurance Company ("John Hancock"), and John Hancock approved and "accepted" this loan application the following month. As explained below, Vesterra and John Hancock did not close on the Loan. However, John Hancock has retained $960,000 in fees from Vesterra, and has filed the instant lawsuit seeking additional money damages in excess of $4.5 million. Last month -- January 2006 -- Defendants received the production of internal documents from John Hancock that for the first time disclosed a hidden, additional requirement that had to be met by Vesterra before John Hancock would disburse the Loan. Vesterra confirmed at its first deposition of a John Hancock employee on January 27, 2006, that this newly-produced evidence did in fact reveal such an additional

Case 1:05-cv-11614-WGY    Document 10    Filed 02/08/2006    Page 2 of 10

undisclosed requirement for the disbursement of the Loan, and also that John Hancock was aware that Vesterra's own figures showed that it would not meet this additional requirement.

Thus, it now appears that John Hancock fraudulently induced Vesterra to sign the loan application, and to pay almost a million dollars in application and commitment fees, by falsely representing to Vesterra in the loan application that if Vesterra met the terms and conditions contained therein John Hancock would fund the Loan. Instead, an additional hidden condition was also required to be met before the Loan would be disbursed.

Accordingly, Vesterra now seeks leave from this Court to file an Amended Counterclaim, in the form of Exhibit 1 hereto, which includes two new counterclaims based on this newly disclosed evidence. For the convenience of the Court, a blackline version showing the changes from the original Counterclaim is attached as Exhibit 2.

## FACTUAL BACKGROUND

In the spring of 2004, Vesterra was in the process of constructing an apartment complex in Montgomery County, Pennsylvania. In connection with this project, Vesterra sought a commitment for a first mortgage loan with which to replace the construction loan after completion of the project, anticipating that this would occur in the summer of 2005. Vesterra explored funding from several potential lenders, but in the end decided to apply for such a mortgage loan from John Hancock. Before submitting the actual loan application to John Hancock, Vesterra negotiated the terms and conditions of the application with John Hancock's representative in Pennsylvania during the summer of 2004. The negotiated application indicated that it contained the terms and conditions that Vesterra would have to meet by August 1, 2005, in order for John Hancock actually to fund the loan.

2

On July 30, 2004, Vesterra signed the "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application") and submitted it to John Hancock for approval and acceptance. (A copy of the Loan Application is attached to the Amended Counterclaim as Exhibit A.) John Hancock thereafter approved this loan application. An internal document, which is attached to the Amended Counterclaim as Exhibit B, contains the signatures of several John Hancock employees indicating that the Loan was "recommended" and "approved" (Bates numbers JH 405-425, at 406) (hereinafter, the "John Hancock Approval"). One of the signers was of the John Hancock Approval was Timothy J. Malik, Senior Investment Officer, who the following day signed the Loan Application on behalf of John Hancock (under "Acceptance by John Hancock"). *See* Exhibit A to the Amended Counterclaim, at JH 354.

The first page of the John Hancock Approval, under "Specific Conditions," identifies the following requirements for actual disbursement of the Loan:

> **Disbursement Requirements:** Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment.

*Id.* at JH 405. These requirements for disbursement include one that was not included as a term or condition in the Loan Application, and was never communicated to Vesterra as a condition for obtaining the Loan: the "10% breakeven" requirement (also called a "10% constant").

In late May, 2005, Vesterra informed John Hancock that it would not be able to meet certain of the terms and conditions in the Loan Application, due to slower than expected rental of the apartments, and also informed John Hancock that it might arrange a sale of the project. Subsequently, Vesterra requested that John Hancock release Vesterra from any purported obligations arising from the Loan Application. John Hancock not only refused this request, but

3

appropriated the $960,000 in application and commitment fees from Vesterra by drawing down two letters of credit, and demanded payment of a "yield maintenance penalty" in the amount of $5,600,000 that is not specified in the Loan Agreement. John Hancock filed the instant lawsuit against Vesterra on August 3, 2005.

Throughout this time period, Vesterra was unaware that John Hancock had in place an additional prerequisite for disbursing the Loan to Vesterra -- a requirement which would have prevented the Loan from closing in any case. Had Vesterra known of this additional requirement, it would not have signed the Loan Application and would not have paid John Hancock the $960,000 in application and commitment fees.

On November 11, 2005, Vesterra served its first set of document requests on John Hancock. At John Hancock's request, Vesterra extended the time for John Hancock to respond from early December until after the holidays. Thus, Vesterra did not even receive documents from John Hancock until January 5, 2006 -- after the December 16, 2005 date set in the Scheduling Order for amendment of pleadings.

Upon receipt of John Hancock's first document production, Vesterra began to review and analyze the documents it had received. In the course of this review, Vesterra had its first opportunity to examine the John Hancock Approval and related documents, and for the first time became aware of the "10% breakeven" included in the "disbursements requirements" for the Loan.

Cognizant of its responsibilities under Rule 11 to ascertain that it had reasonable grounds for the serious allegation of fraud, and also cognizant of the requirement to plead such fraud with particularity pursuant to Rule 9(b), Vesterra continued its investigation of this possible new claim on January 27, 2006, at its very first deposition of a John Hancock witness, Mr. Malik --

the same senior investment officer who had signed the Loan Application on behalf of John Hancock and who was also one of the signatories of the John Hancock Approval. At this January 27 deposition, Vesterra confirmed that this document was indeed the internal approval of the Loan Application by John Hancock, and that the prerequisites for <u>disbursement</u> of the Loan did in fact include satisfying this "10% breakeven" requirement. Exhibit 3 hereto (containing cited pages of the rough deposition transcript of T. Malik, Jan. 27, 2006), pp. 62, 64, 124-27, 212-13. Mr. Malik also testified that this condition was not contained in the Loan Application, that he never informed Vesterra of this requirement and, furthermore, that John Hancock was aware that the figures submitted by Vesterra as part of the Loan Application showed that Vesterra would <u>not</u> meet this additional requirement for disbursement of the Loan. *Id.* at 84-85, 93-94, 116-17, 196.

Although Mr. Malik at times expressed some uncertainty about the application of this 10% breakeven requirement, he testified that the loan "closer" for John Hancock would review "all the criteria set forth" in the John Hancock Approval before disbursing the loan, and that the "disbursement requirements" listed therein included the "10% breakeven." *Id.* at 126-27, 212-13. Having confirmed the nature and the content of the John Hancock Approval, on the third business day after Mr. Malik's deposition counsel for Vesterra faxed the proposed Amended Counterclaim to counsel for John Hancock and requested consent for the filing of this amendment pursuant to Fed. R. Civ. P. 15(a) and in accordance with Local Rule 7.1, and also requested that John Hancock inform Vesterra of its answer by Friday, February 3, "so that, if necessary, [Vesterra] can promptly proceed with filing a motion for leave to amend." In response, John Hancock informed Vesterra that it would not be able to respond to this request until Tuesday, February 7. On that date, by correspondence sent after the close of business, John

Hancock declined to consent, necessitating this motion, which Vesterra is filing on the following day.

## ARGUMENT

I.  **VESTERRA SHOULD BE PERMITTED TO ADD THE TWO NEW COUNTERCLAIMS BECAUSE IT ACTED WITH DILIGENCE AS SOON AS IT LEARNED OF AND CONFIRMED THE FACTUAL BASIS FOR THESE CLAIMS**

The First Circuit recently restated in detail the standard for ruling on a motion to amend a pleading:

> A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. A plaintiff is permitted to amend a complaint once as a matter of right prior to the filing of a responsive pleading by the defendant. Fed. R. Civ. P. 15(a). Thereafter, the permission of the court or the consent of the opposing party is required. The default rule mandates that leave to amend is to be "freely given when justice so requires," *id.*, unless the amendment "would be futile, or reward, *inter alia*, undue or intended delay."
>
> As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting. Scheduling orders, for example, typically establish a cut-off date for amendments . . . . Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b). This standard focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent.

*Steir v. Girl Scouts of the USA*, 383 F.3d 7, 11-12 (1st Cir. 2004) (quoting *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994)) (other citations omitted).

The Scheduling Order in this case established December 16, 2005 as the last day for the amendment of the pleadings. Accordingly, Vesterra has the burden of showing "good cause" for not filing its Amended Counterclaim until February 8, 2006 -- that is, as explained by the First Circuit in *Steir*, of showing that it has exercised "diligence" in filing this motion. The undisputed facts show that Vesterra has indeed acted promptly and with all possible diligence.

6

Vesterra did not even receive the internal John Hancock documents until January, 2006. It first reviewed and analyzed those documents, and then confirmed the nature and the meaning of the John Hancock Approval at the first deposition of a John Hancock witness on January 27, 2006. Where, as here, the amended pleading involves an allegation of fraud, the mandates of Rule 9(b) and Rule 11 require no less. As soon as this had been completed, within three business days Vesterra drafted the Amended Counterclaim and presented it to counsel for John Hancock with a request for its consent pursuant to Rule 15(a).

Although most scheduling orders contain a date by which the pleadings must be amended, courts have routinely found "good cause" and granted leave to add new claims where the facts underlying the claims were not discovered until after that date -- often with a much longer "delay" than here. *See, e.g., Stewart v. Coyne Textile Services*, 212 F.R.D. 494, 497 (S.D. W. Va. 2003) (finding good cause for amending complaint 12 weeks after deadline where additional allegations were based on delay in document production by other side); *Topps Co. v. Cadbury Stani S.A.I.C.*, No. 99 Civ. 9437, 2002 WL 31014833 (S.D.N.Y. Sept. 10, 2002) (finding good cause for amendment of complaint more than ten months after deadline, where party requested leave the month following depositions in which it learned of facts supporting new claim); *Deghand v. Wal-Mart Stores, Inc.*, 904 F. Supp. 1218, 1222 (D. Kan. 1995) (finding good cause for amendment 12 weeks after date in scheduling order, where amended claim was filed less than three weeks after document in question was produced by other party); *Robinson v. Town of Colonie*, No. 91-CV-1355, 1993 WL 191166 (N.D.N.Y. June 3, 1993) (finding good cause for amending complaint one year after deadline, based on information first learned at depositions that occurred after deadline).

Furthermore, courts have particularly found good cause for delay due to the discovery of the underlying facts where, as here, the heightened pleading requirements for alleging fraud are implicated. For example, in *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F. Supp. 2d 484 (D. Del. 2003), the court permitted the defendant in a patent infringement lawsuit to amend its pleadings to add an affirmative defense and counterclaim of "inequitable conduct" more than six months after the deadline, following the depositions of two inventors. Although the plaintiff argued that the underlying facts had long been available in the public prosecution history, the court found that, because the Rule 9(b) requirement for pleading for particularity was implicated, the defendant was "prudent and, possibly even required to confirm the factual allegations through discovery," and "demonstrated 'good cause' . . . as required by Rule 16(b)." *Id.* at 489, 490.

Similarly, in *Rhone-Poulenc Agro S.A. v. Monsanto Company*, 73 F. Supp. 2d 537 (M.D. N.C. 1999), the plaintiff argued that Monsanto's motion to amend was late and should be denied because it had the documents it needed to assert the defense of inequitable conduct six months earlier. The court stated, "The proper question is whether it was reasonable for Monsanto to expect to obtain clarifying information regarding the claim at the deposition, and therefore to wait until after the deposition to file its Motion. . . . [B]y waiting until after the depositions to file its Motion, Monsanto appropriately fulfilled its obligation to investigate its claim thoroughly prior to making it." *Id.* at 538-39. *See also Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.*, 989 F. Supp. 1237, 1247 (N.D. Cal. 1997) ("because the legal theory implicates Federal Rule of Civil Procedure Rule 9(b), requiring pleading of fraud with particularity, [the defendant] was entitled to confirm factual allegations before amending to include the inequitable conduct defense"); *Go Medical Industries Pty. Ltd. v. C.R. Bard, Inc.*, No. 1:93cv-1538-HTW, 1995 WL 605802, *4 (N.D. Ga. July 6, 1995) ("this court will

not penalize defendant for obtaining additional, confirming information . . . to support its claims -- especially given that Rule 9(b) requires that allegations of fraud . . . be stated with particularity'").

Because Vesterra has established that it has been diligent in seeking leave to add these two new counterclaims, it has met the "good cause" requirement of Rule 16(b). Thus, Vesterra's motion must be evaluated under Rule 15(a), which "mandates that leave to amend is to be freely given when justice so requires unless the amendment would be futile, or reward, *inter alia*, undue or intended delay." *Steir*, *supra*, 383 F.3d at 12 (internal quotation marks and citations omitted). It has already been demonstrated that Vesterra did not engage in any delay once it confirmed the underlying factual basis for its allegations.

Additionally, permitting such amendment at this point will not prejudice John Hancock in any way. Trial is not scheduled until September 2006, and, if necessary, fact discovery can be extended beyond the current cut-off date of March 3 without affecting the trial date. (In fact, John Hancock has already proposed a joint motion to extend fact discovery for several weeks specifically to accommodate additional depositions. Vesterra would not oppose general fact discovery during this time period concerning its newly-asserted counterclaims.) Accordingly, Vesterra should be permitted to amend its Counterclaim by adding two new counts based on the very recent discovery of the underlying facts.

Case 1:05-cv-11614-WGY    Document 10    Filed 02/08/2006    Page 10 of 10

## CONCLUSION

For the foregoing reasons, the motion of Vestera for leave to file an Amended Counterclaim should be granted.

Respectfully submitted,

DEFENDANTS VESTMONT LIMITED
PARTNERSHIP, VESTMONT LIMITED
PARTNERSHIP II, VESTMONT LIMITED
PARTNERSHIP III AND VESTERRA
CORPORATION

By their attorneys,

/s/ *Robert D. Hillman*

/s/ *C. Randolph Ross*

Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr. (admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Dated: February 8, 2006

## CERTIFICATE OF SERVICE

I, Robert D. Hillman, certify that I understand that counsel of record will receive electronic notice of the electronic filing of this pleading.

/s/ *Robert D. Hillman*

DWLLIB 195121v1
8836/00

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY,

        Plaintiff,

        v.

VESTMONT LIMITED PARTNERSHIP,
et al.,

        Defendants.

: : : : : : : : : : : :

Civil Action No. 05-11614 WGY

JURY TRIAL DEMANDED

## AMENDED COUNTERCLAIM

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited

Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively,

"Vesterra"), by and through their undersigned attorneys, assert the following counterclaim

against Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company, and in support

thereof aver as follows:

    1.      Vesterra repeats and realleges each and every statement contained in its Answer

and Affirmative Defenses as if the same were fully set forth herein.

### The Parties

    2.      Defendant/Counterclaim Plaintiff Vestmont Limited Partnership is a limited

partnership existing under the laws of the Commonwealth of Pennsylvania with its principal

place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

3.      Defendant/Counterclaim Plaintiff Vestmont Limited Partnership II is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

4.      Defendant/Counterclaim Plaintiff Vestmont Limited Partnership III is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

5.      Defendant/Counterclaim Plaintiff Vesterra Corporation is a Pennsylvania corporation with a principal place of business at 892 Andorra Road, Lafayette Hill, Pennsylvania 19444.

6.      Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company ("John Hancock") is a company existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts.

## Jurisdiction and Venue

7.      Jurisdiction for this counterclaim is proper pursuant to Rule 13 of the Federal Rules of Civil Procedure. In addition, this is an action for, *inter alia*, a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a case of actual controversy between the parties. Jurisdiction is also proper under 28 U.S.C. § 1332(a) because of diversity of citizenship, and the matter in controversy exceeds $75,000.

8.      Venue is proper under 28 U.S.C. § 1391.

## Underlying Facts

9.      In 2004, John Hancock drafted and negotiated with Vesterra the terms of a document that, in its final form, is entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application"). A copy of the final Loan

2

Application is attached hereto as Exhibit A; the loan applied for therein shall hereinafter be referenced as the "Loan."

10.   All of the negotiations over the terms of the Loan Application took place in Pennsylvania between Vesterra and representatives of John Hancock located in Pennsylvania.

11.   On or about July 30, 2004, Vesterra signed a copy of the Loan Application in Pennsylvania and submitted it to John Hancock's representative in Pennsylvania.

12.   On or about August 17, 2004, John Hancock indicated its "acceptance" of the Loan Application by countersigning a copy and returning it to Vesterra.

13.   Paragraph 35 of the Loan Application provides, "This Application shall be deemed to be executed and performable in and governed by the substantive laws of Massachusetts."

14.   Pursuant to paragraph 30 of the Loan Application, Vesterra provided John Hancock with the following fees:

a) $5,000 for a "Processing Fee";

b) $640,000 for an "Application Fee"; and

c) $320,000 for a "Commitment Fee."

15.   Vesterra paid the Processing Fee by delivering a check in the amount of $5,000 to John Hancock's representative in Pennsylvania.

16.   Pursuant to "Condition 52" of the Loan Application, Vesterra provided the Application Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $640,000 and delivering it to John Hancock's representative in Pennsylvania, and provided the Commitment Fee by obtaining an irrevocable transferable Letter

3

of Credit payable to John Hancock in the amount of $320,000 and delivering it to John Hancock's representative in Pennsylvania.

17.    Although the Loan Application was purportedly "accepted" by John Hancock on August 17, 2004, it contains terms and conditions that make illusory any purported "commitment" by John Hancock, in that it makes John Hancock's performance entirely optional.

18.    The Loan Application contains, *inter alia*, the following conditions that give to John Hancock the unfettered discretion to approve or deny the Loan Application subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

(a)    Condition 16(b) provides: "On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues as John Hancock determines are appropriate." (Emphasis added.)

(b)    Condition 20 provides: "Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion. In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock." (Emphasis added.)

19.    The Loan Application also contains, *inter alia*, the following conditions that give to John Hancock the sole right to approve or deny the Loan Application, based on the

4

"satisfaction" of John Hancock and its counsel, subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

(a)    Condition 6 provides that "The Note, the Mortgage, and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the 'Loan Documents') shall be satisfactory in all respects in form and substance to John Hancock and its counsel, and . . . shall contain provisions satisfactory in form and substance to John Hancock and its counsel . . ."

(Emphasis added.)

(b)    Condition 7 provides that the title and all documentation pertaining thereto "shall be satisfactory in all respects to John Hancock and its counsel," that title insurance shall be "satisfactory in form and substance to John Hancock and its counsel," (emphasis added), and contains similar provisions respecting other documentation.

(c)    Condition 8(a) provides that "a current instrument survey" shall be furnished that is "satisfactory in form and substance to John Hancock and its counsel." (Emphasis added.)

(d)    Condition 10 provides that "John Hancock shall be furnished within twenty-one (21) days of Rate Lock with evidence satisfactory in form and substance to John Hancock and its counsel . . ." (Emphasis added.)

(e)    Condition 11(b) provides: "John Hancock shall also be furnished with such additional evidence as it may require, and satisfactory in form and substance to John Hancock and its counsel, that the Security is in compliance with all

5

applicable environmental laws, ordinances, rules and regulations, . . ." (Emphasis added.)

(f)      Condition 12 provides: "Prior to Closing, all construction of buildings and other improvements shall be completed <u>to the satisfaction of John Hancock</u>." (Emphasis added.)

(g)      Condition 13 provides that Vesterra is "obligated to deliver to John Hancock . . . the reports and materials described below <u>in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock</u> . . . ." (Emphasis added.)

(h)      Condition 14 provides, in relevant part: "John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser <u>acceptable to John Hancock</u> . . . . This appraisal must support a loan-to-value ratio of not more than 75.00%, <u>calculated as determined by John Hancock in its sole discretion</u>." (Emphasis added.)

(i)      Condition 19 provides: "Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may require, <u>satisfactory in form and substance to John Hancock</u>, . . . All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance . . . and otherwise cover[] John Hancock's interest in the Real Estate Security in a manner <u>satisfactory to John Hancock</u>." (Emphasis added.)

(j)      Condition 23 provides that Vesterra "shall provide John Hancock on or prior to the Closing Date with an opinion <u>satisfactory in form and substance to</u>

6

additional terms or conditions, and the comprehensiveness and specificity of the entire Loan Application negate any understanding by Vesterra that there were any additional undisclosed terms or conditions.

25.    The documents produced by John Hancock in discovery, and the deposition testimony of one of its employees, Timothy Malik, demonstrate that John Hancock knowingly misrepresented to Vesterra the conditions that Vesterra would have to meet in order for the Loan to be funded.

26.    John Hancock's internal documents show that Vesterra was required to satisfy a never-disclosed *additional* material condition in order for the Loan to be disbursed.

27.    A John Hancock document, produced in this action on January 5, 2006 (Bates Numbers JH 405- JH 425), was explained by Mr. Malik to be the internal "commitment approval" or "loan approval" by John Hancock, and contains the conditions under which John Hancock would disburse the Loan to Vesterra.  (Attached as Exhibit B.)  The second page of this document (the "John Hancock Approval") contains the signatures indicating approval by the appropriate John Hancock employees.

28.    The John Hancock Approval, under "Specific Conditions," identifies the following "Disbursement Requirements": "Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment." *See* Exh. B, at JH 405.  *This* "10% breakeven" requirement was not included as a term or condition in the Loan Application, and was never communicated to Vesterra as a requirement for obtaining the Loan.

8

29.    Other John Hancock documents, as well as Mr. Malik's deposition testimony, confirm that meeting this "10% breakeven" or "10% constant" was a requirement for approval of the Loan and for actual disbursement of the Loan to Vesterra.

30.    Based on the figures and projections submitted by Vesterra to John Hancock, John Hancock knew that Vesterra would not meet this additional requirement for disbursement of the Loan.  In fact, in order to satisfy this requirement, in its internal calculations John Hancock changed the expense numbers that had been submitted to it by Vesterra.  Yet John Hancock never informed Vesterra of this additional requirement, or of the fact that Vesterra would not meet this undisclosed requirement for the disbursement of the Loan.

31.    By not disclosing to Vesterra this additional requirement for disbursement of the Loan, John Hancock intentionally misrepresented the conditions that Vesterra would have to meet in order to obtain the Loan, and thereby induced Vesterra to sign the Loan Application and to pay or fund the Processing, Application, and Commitment Fees.

32.    Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.  Accordingly, but for John Hancock's knowing misrepresentation that all of the terms and conditions for disbursement of the Loan were set forth in the Loan Application, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

33.     In early August, 2005, John Hancock drew upon the Letters of Credit and thus wrongfully took possession of $960,000 that belongs to Vesterra.

## COUNTERCLAIM – COUNT I
### Declaratory Judgment

34.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

35.     Because John Hancock's "commitment" to make a mortgage loan was illusory, there was a lack of consideration, and thus no binding agreement.

36.     Accordingly, Vesterra is entitled to a declaration that any purported contract based on John Hancock's acceptance of the Loan Application is void and unenforceable, and John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT II
### Unjust Enrichment

37.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

38.     John Hancock has received or obtained $965,000 from Vesterra, and in the circumstances here it is inequitable for John Hancock to retain such monies.

39.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT III
### Money Had and Received

40.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

10

41.    John Hancock has obtained $965,000 from Vesterra under such circumstances that in equity and good conscience this money should be returned.

42.    Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM – COUNT IV
### Conversion

43.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

44.    Because any loan commitment by John Hancock was illusory, and because John Hancock fraudulently induced Vesterra to deposit the Letters of Credit totaling $960,000, Vesterra had a right to retain the $640,000 Application Fee and the $320,000 Commitment Fee.

45.    Notwithstanding Vesterra's right, John Hancock converted these monies to its own use, exercising dominion over these monies by wrongfully drawing down the Letters of Credit.

46.    Accordingly, John Hancock should return to Vesterra, with interest, the $960,000 wrongfully obtained by John Hancock, and Counterclaim Plaintiffs are entitled to additional damages in an amount to be determined at trial.

## COUNTERCLAIM – COUNT V
### Common Law Fraud and Deceit

47.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

48.    John Hancock misrepresented a material fact by indicating in the Loan Application that all of the requirements for disbursement of the Loan were contained therein.

11

Whereas, in truth, John Hancock had an additional undisclosed requirement, namely that Vesterra meet the 10% "breakeven" or "constant" requirement.

49.    John Hancock knew that the 10% constant was a requirement for approval of the Loan and also for disbursement of the Loan, as indicated in its internal documents. John Hancock also knew that this requirement was not disclosed in the Loan Application and was never communicated to Vesterra in any form.

50.    The secret 10% constant requirement was material to the transaction because it was a requirement for disbursement of the Loan.

51.    John Hancock made this material misrepresentation concerning the requirements for disbursement of the Loan by indicating that the Loan Application contained all the terms and conditions that needed to be met by Vesterra for disbursement of the Loan, and by not disclosing that the 10% breakeven or constant requirement was an additional condition, in order to induce Vesterra to sign the Loan Application and pay the Processing Fee, Application Fee, and Commitment Fee.

52.    Vesterra reasonably and justifiably relied upon the representations in the Loan Application, and John Hancock's representation that all of the terms and conditions required for approval and disbursement of the Loan were contained therein was a prerequisite to Vesterra's signing of the Loan Application.

53.    Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.

12

54.     Accordingly, but for John Hancock's knowing misrepresentation in the Loan Application that all of the terms and conditions for disbursement of the Loan were set forth therein, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

55.     Thus, as a result of Vesterra's reasonable and justified reliance on the terms and conditions disclosed in the Loan Application, Vesterra was injured because John Hancock collected all of the Fees.

56.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra, and Vesterra should be awarded punitive damages.

## COUNTERCLAIM – COUNT VI
### Unfair and Deceptive Practices under Massachusetts G.L. c. 93A

57.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

58.     John Hancock and Vesterra engaged in "trade or commerce" within the meaning of Massachusetts G.L. c. 93A by negotiating the terms of the Loan Application and countersigning the Loan Application.

59.     John Hancock knowingly used an unfair method of competition and knowingly employed an unfair and deceptive act when it made material misrepresentations in the Loan Application about the requirements for disbursement of the Loan.

60.     John Hancock's misrepresentation was unethical and would cause substantial injury to other businesspersons, and did, in fact, cause substantial injury to Vesterra.

13

61.    Vesterra reasonably and justifiably relied upon the representations in the Loan Application.

62.    Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.

63.    Accordingly, but for John Hancock's knowing misrepresentation in the Loan Application that all of the terms and conditions for disbursement of the Loan were set forth therein, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

64.    Thus, as a result of Vesterra's reasonable and justified reliance on the terms and conditions disclosed in the Loan Application, Vesterra was injured because John Hancock collected all of the Fees.

65.    Accordingly, John Hancock should return to Vesterra, with interest, three times the $965,000 received and/or obtained by John Hancock from Vesterra for a total of $2,895,000, plus attorneys' fees and costs.

**WHEREFORE,** Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation request that the Court:

(1)    Enter judgment declaring that any contract, agreement or

14

commitment based on John Hancock's "acceptance" of the Loan Application is void and unenforceable;

(2)  Enter judgment against John Hancock requiring restitution to Counterclaim Plaintiffs of $965,000, plus appropriate interest;

(3)  Enter judgment against John Hancock for compensatory and punitive damages by reason of its conversion of monies rightfully belonging to Counterclaim Plaintiffs, as determined by the jury;

(4)  Enter judgment against John Hancock for compensatory and punitive damages by reason of its fraud and deceit;

(5)  Enter judgment against John Hancock for treble damages for its violation of G.L. c. 93A, as well as Vesterra's attorneys' fees; and

(6)  Enter an order granting Counterclaim Plaintiffs the costs of this action, and such other and additional relief against John Hancock as may be just and proper in the circumstances.

15

# DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants/

Counterclaim Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Respectfully submitted,

_____
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL, PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs
Vestmont Limited Partnership, Vestmont Limited
Partnership II, Vestmont Limited Partnership III
and Vesterra Corporation

Dated: February ___, 2006

16

TAB C

*John Hancock*
**REAL ESTATE**
**INVESTMENT GROUP**

Patricia C. Coyne
*Investment Officer*

John Hancock Place, T-56
Post Office Box 111
Boston, MA 02117-0111
(617) 572-3867
(617) 572-0699 FAX
Email: pcoyne@jhancock.com
Website: www.jhancockrealestate.com
Express Mail: 200 Clarendon Street, T-56

## MEMORANDUM

**To:**    Timothy Malik – Home Office

**From:**    Patricia Coyne

**Subject:**    Montgomery Square Partnership
          Apartments
          1100 Avenel Boulevard
          Montgomeryville, PA
          New Mortgage Account No. 6518467

**Date:**    August 17, 2004

The above referenced mortgage loan was approved on August 10, 2004, as follows:

1)   Amount    $32,000,000,
2)   Term    120 months
3)   Amortization    360 months
5)   Spread    175 bps spread over the 10 Treasury which includes 45 bps for the 10 month forward component
6)   Interest Rate    Interest rate was locked on August 2, 2004 at 6.180% Three hundred sixty five (365) days from interest rate lock
7)   Funding    Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and a 10% Breakeven interest rate using reserves of
8)   Disbursement Requirements    $150.00 per unit with the possibility of a Rental Achievement Reserve of up to $5,380,000.
9)   Anticipated Closing Date    on or before August 2, 2005, unless option to extend for a period of up to 90 days is exercised
10)   MAI Appraisal    MAI appraisal must have a LTV no greater than 75%
11)   Principal Affiliates    James R. Koller, Frank C. Palopoli and Joseph P. Kelley

If you have any questions or comments in this regard, please do no hesitate to contact me.

Regards,

*Patricia Coyne*
Patricia Coyne

c.c. Arthur Francis – Closing – via e-mail
     Frank Vinkevich – REIG Systems – via e-mail
     Tricia Wilson – REIG Systems – via e-mail
     Kelley Mitnik – REIG – via email

JH 01174

TAB D

' Hedge Loss

Page 1 of 1

From:    Malik, Timothy J. [tjmalik@jhancock.com]
Sent:    Wednesday, August 11, 2004 10:54 AM
To:      Ferrie, John
Subject: Avenel Hedge Loss

FYI

The hedge loss today would be $355,000.

_____

*Timothy J. Malik,* CPM(c), CCIM
Senior Investment Officer
John Hancock Real Estate Investment Group
200 Clarendon Street, 56th Floor
Boston, MA 02116-5021
(617) 572-3891
CELL (617) 791-6840
FAX (617) 572-9699
Email: tjmalik@jhancock.com
Website: www.jhancockrealestate.com

The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments.

JH 00335

TAB E

00001
1                THIS IS A DRAFT TRANSCRIPT!

2        This UNCERTIFIED rough draft transcript

3        has not been proofread or corrected.  This

4        draft may contain computer-generated

5        mistranslations of stenotype code,

6        resulting in inaccurate or nonsensical

7        word combinations or untranslated

8        stenotype symbols which cannot be

9        deciphered by non-stenotypists.

10       Corrections will be made in the

11       preparation of the certified transcript,

12       resulting in differences in page and line

13       numbers, punctuation, and formatting.

14

15               THIS DRAFT TRANSCRIPT IS SUPPLIED
         TO YOU ON THE CONDITION THAT,
16       UPON RECEIPT OF THE CERTIFIED
         TRANSCRIPT, THIS DRAFT AND ANY
17       COPIES THEREOF SHALL BE
         DESTROYED. THE UNCERTIFIED ROUGH
18       DRAFT TRANSCRIPT CANNOT BE QUOTED
         IN ANY PLEADING OR FOR ANY OTHER
19       PURPOSE AND MAY NOT BE FILED WITH
         ANY COURT OR OTHER TRIBUNAL.
20

21

22       Judith Williams, RPR, CRR, CSR

23

24

01-27-2006 Malick Rough ASCII                                    Page 1

00002

1   today is January 27,

2   2006. Today is January 27, 2006. . .

3   Today is January 27, 2006

4   [Reporter's note: Vestmont.

5   [Reporter's note: United States

6   District Court for the district of

7   Massachusetts: John Hancock Life Insurance

8   Company, plaintiff counterclaim defendant

9   versus vest limited partnership, vestmont

10  limited partnership 2, vestmont limited

11  partnership 3, and vesterra corporation D

12  B A Montgomery square partnership, Civil

13  Action No. 05-11614-W G Y.

14  [Reporter's note: Today is

15  January 27, 2006.

16  [Reporter's note: Today is

17  January 27, 2006 at the deposition of John

18  Malik.

19  MR. SCHER: This is a case in

20  Federal Court, so there are no

21  stipulations. We will operate under the

22  rules.

23  [Reporter's note: With sworn.

24  [Reporter's note: Direct

00062

1   Q.   What is this document called?

2   A.   This is called an approval.  It used to be

3   called a vote by John Hancock, but it is

4   called an approval, a commitment approval,

5   loan approval.

6   Q.   And is it accurate to say that this is an

7   example of the signature process.

8   A.   It will begetting an example.  It has

9   changed since then.  It has become more

10  descriptive than this form.

11  [Reporter's note:  Bee getting

12  example.

13  [Reporter's note:  A bee getting

14  example] /TA*EUP [h] H 492.

15  Q.   So my question is how many other approvals

16  had you presented?  You presented this

17  loan?

18  A.   Yes.

19  Q.   How many others had you presented in this

20  process prior to August 16, 2004?

21  A.   I don't recall.

22  Q.   [W] was this form introduced following the

23  Manulife acquisition?

24  A.   Yes.  Some of the form.

00063
1   Q.   All right.

2   A.   Hold on a second.  Let me look.

3   (Pause.)

4   (The witness viewing Exhibit No.

5   1J.

6   A.   The first four pages are new.

7   Q.   And J H 00409 is an old John Hancock form?

8   A.   Yes.

9   Q.   .

10  Q.   At the top of J H 00410 it says voted

11  investment.  Do you see that?

12  A.   Which page are you on?

13  Q.   410.?

14  A.

15  Q.   , at the very top?

16  A.   Yes, yes.

17  Q.   What is a voted investment?

18  A.   A voted investment is the form -- is one

19  that is -- relates to the investment

20  committee.  It is the the original --

21  from 409 on is the form used to present to

22  the original John Hancock investment

23  committee that no longer was in place.

24  The signature process was added to the

00064
1   front of it.

2   Q.   I see.

3   Q.   Now is Malik Exhibit 1 the approval of

4   John Hancock life insurance company for

5   the what we have called the Avenel loan?

6   A.   Yes.

7   Q.

8   MR. SCHER:   So the next exhibit

9   number.

10   [Reporter's note: Marked 2].

11   Q.   I show you what I have had marked as Malik

12   Exhibit 2.

13   (Hand 2]?

14   A.   Yes.

15   Q.   And it is a document that is Bates stamped

16   J H 01174.   It appears to be a memorandum

17   from Patricia C Coyne, investment officer,

18   to you?

19   A.   Yes.

20   Q.   Can you tell me what this is?

21   A.   This is a summary memo indicating that the

22   general terms of the approval.

23   Q.   But the actual approval is Malik one?

24   A.   Correct.

00084

1  first before I answer.

2  Q.   Please.  I didn't mean to --

3  (Pause.)

4  (The witness viewing Exhibit No.

5  4?

6  [Reporter's note:

7  A.   Okay.

8  Q.   Can you tell me --

9  A.   What was the question again?

10  Q.   Yes.  Is it accurate to say that by this

11  memorandum -- this e-mail you were

12  seeking to reduce the reserves to 150 $per

13  unit?

14  A.   Yes.

15  Q.   Why?

16  A.   Well, I believe I recall now that when I

17  first -- we first sent the approval up

18  the chain for Ivor to sign, he noticed

19  that in some -- one instance that it did

20  not meet the 10 constant at the 125 cover

21  for the rental achieve ment.

22  Q.   Okay.  And because it did not meet the 10

23  constant coverage, it -- you --

24  A.   It didn't meet the credit guidelines.

00085

1  Q.   It didn't meet the credit guidelines.  Did

2  you tell that to the borrower?

3  A.   No.

4  A.   It is not relevant to the borrower.

5  Q.   Okay.  Why is it not relevant to the

6  borrower to know that it did not meet the

7  credit guidelines with a $250 per unit

8  reserve?

9  A.   This is internal underwriting that we

10  never discuss with the borrower.  That is

11  how we -- it has only to do with the

12  Hancock credit guidelines.

13  Q.   The --

14  A.   There was a --

15  Q.   Go ahead?

16  A.   Go ahead.

17  Q.   No, I am sorry.

18  A.   No. I am done.

19  Q.   I understand that you never discuss with

20  the borrower this constant -- this -- is

21  that true that you never discuss with the

22  borrower the --

23  A.   We typically don't discuss --

24  MR. DAVIS:  Please let him

00093

1   MR. DAVIS:  Objection.

2   Q.   Why would the lowering of the the reserves

3   to $150 per unit to meet the deficiency

4   Mr. Thomas had identified cause him to

5   laugh?

6   MR. DAVIS:  Objection.

7   MR. SCHER:  What is your basis?

8   MR. DAVIS:  The basis of the

9   objection is that it calls for

10  speculation.

11  MR. SCHER:  Okay.

12  Q.   If you know, tell me.

13  SPEAKER A:  I withdraw that.

14  Q.   Tell me why you thought that it would

15  cause Mr. Thomas to laugh.

16  A.   I believe that was written for John's

17  benefit to let him know that we don't like

18  to lower reserves to $150 a unit.

19  Q.   Is that your best answer?

20  MR. DAVIS:  Objection.

21  A.   Yes.  He rarely laughs.

22  Q.   Honestly, Mr. Malik, I don't understand.

23  I guess I will try one more time the

24  bureaucratic approach."  What is the

00094

1   bureaucratic approach?

2   A.   The bureaucratic approach must be to get

3   Ivor to lower the reserves, to go along

4   with lowering the reserves from 250 to 150

5   so at a full rental achievement reserve

6   and a 125 coverage, it still will equal

7   -- you will still cover the constant, 10,

8   the 10 constant, 10.

9   Q.   What is it about lowering the reserve from

10   250 to 150 that would cause Mr. Thomas or

11   a person in his position to laugh?

12   A.   Because --

13   MR. DAVIS:  Objection.

14   A.    -- it goes outside the guidelines of

15   typically wanting 250 a unit for reserves

16   in our abstract analysis of what the

17   property will cash flow, but because this

18   was a brand new property that didn't need

19   a lot of -- a lot of work on units when

20   people vacated and came back, 150 turned

21   out to be fine.

22   My comment was meant to let John

23   Ferrie know that we don't like lowering

24   reserves if we can avoid it.

00116

1   Q.   -- of the loan?  And --

2   A.   Well, yes, I think so.

3   Q.   Among the approvers of the loan?

4   A.   Yes.

5   Q.   And this e-mail, your second paragraph,

6   you say to make the numbers work we would

7   need to assume that the expense per unit

8   is 4,957 a unit instead of the original

9   5527 dollars a unit?

10  A.   Yes.

11  Q.   Right?

12  A.   That's what -- I think that's what it

13  says.

14  Q.   What do you mean by making the numbers

15  work "?

16  A.   Looking at the memo or the e-mail, it

17  looks like the 10 constant, coming up with

18  another way of making the 10 constant

19  hurdle work, other than lowering the

20  reserve estimate down to 150, ,

21  explaining the risk inherent in the

22  property?

23  Q.   How can you just change the expenses per

24  unit from what was the borrower's

00117

1  estimate?

2  A.   Because the borrowers.

3  MR. DAVIS:  Objection.

4  You can respond.

5  THE WITNESS:  Okay.

6  Q.   The borrowers estimate is this 5,200 --

7  55 hundreded amount?

8  A.   Right.

9  Q.   How can you --

10  A.   Because his estimate is based on his

11  judgment, and our estimate is based on our

12  judgment.

13  Q.   There was an element of not wanting to

14  lose the deal in connection with your

15  making the numbers work?  Am I right about

16  that?

17  A.   Yes.

18  Q.   And so you were asking Mr. Henderson to

19  help you out to figure out a way to make

20  the numbers work so that the criteria,

21  including the 10 percent constant, in this

22  case, so that the criteria, the 10 percent

23  constant --

24  MR. SCHER:  Let me start all

00124

1  A.   Sure.  There is a whole bunch of criteria

2  in the commitment regarding reports,

3  physical report, environmental reports,

4  title work, title assurance, and a certain

5  occupancy and a certified rent roll to

6  verify that occupancy and other criteria

7  that are outlined.

8  Q.   All right?

9  A.   When all of that is provided, then the

10  borrower would estimate what he thinks --

11  when he would like to close it, and we

12  close.

13  Q.   What --

14  A.   As long as it is inside the outside

15  closing date.

16  Q.   All right.

17  A.   As long as the requested closing date is

18  within the outside closing date.

19  Q.   Okay.  Internally within John Hancock,

20  what process is undertaken to fund the

21  loan?

22  Q.   In other words, prior to the time that the

23  32 million dollars is disbursed to the

24  borrower, what does John Hancock have to

00125
1    do internally?

2    A.    We collect all the documents.  We produce

3    a closing statement.  We have the borrower

4    sign the closing statement.  We request

5    the funds and close the loan on the day

6    that it's required.  There is no other

7    approvals required as long as the loan

8    meets the criteria of the commitment.

9    Q.    So the form work that, if you will, to get

10    the cash from the John Hancock, what form

11    is employed for that purpose?

12    A.    I don't know.  That — we have a closer

13    who ace signed to it.

14    Q.    Yes?

15    A.    Who is on the other side of the floor.

16    They gather and coordinate all the

17    information that is needed, and I think

18    they just call to say, we'll need these

19    funds," and they send the loan disbursal

20    statement, called an L D S, to whoever is

21    at treasury, and they produce the funds

22    through the wireing source, wire the funds

23    to the escrow agent, and then our outside

24    counsel makes sure that we have everything

00126

1   we need to close the loan.

2   Q.   Does the securing of the cash, the wire

3   transfer of the funds, require a review of

4   the loan approval?

5   A.   Yes.  The closer reviews that.

6   Q.   And --

7   A.   As the information comes in.

8   Q.   And the credit review that Patricia Coyne

9   prepared in this case?

10  A.   They may look at that.

11  Q.   Okay.

12  A.   Ordinarily just looked at the approval.

13  Q.   Ordinarily, the closer would just take

14  Malik one?

15  A.   Right.

16  Q.   The approval?

17  A.   Right.

18  Q.   The commitment letter -- the commitment

19  -- the loan approval document?

20  A.   Yes.

21  Q.   Malik one?

22  A.   Yes.

23  Q.   And take that, and then call upon the --

24  so long as all the criteria set forth in

00127

1  Malik one had been satisfied?

2  A.  Right.

3  Q.  -- send me the money?

4  A.  Right.

5  Q.  Prior to today, is it accurate to say that

6  you have been in Mr. Koller's company on

7  one occasion?

8  A.  I believe that's the case.

9  Q.  And the same with respect to Joe Kelly?

10  A.  Yes.  I think so.

11  Q.  And that was the same occasion?  That was

12  a lunch?

13  A.  Yes.

14  Q.  A luncheon you had?

15  A.  Yes.

16  Q.  And Mr. Ferrie was in attendance as well?

17  A.  Yes.

18  Q.  Was there anyone else there besides the

19  four of you?

20  A.  No.

21  Q.  Do you have any recollection of what

22  occurred at that luncheon?

23  A.  I believe -- and I knew ahead of time --

24  that they wanted to discuss doing away

00196
1  next exhibit.

2  [Reporter's note:  Marked 17.

3  Q.   This is Malik Exhibit 17.

4  (Hand?

5  Q.   It shows an Avenel Exhibit 1 A, new

6  expenses Excel sheet, and shows a vacancy

7  rate at 9 percent, and a handwritten note?

8  A.   Yes.

9  Q.   Whose handwritten note that is?

10  A.   That is my handwriting.

11  Q.   Could you read that?

12  A.   You wouldn't be the first to ask me.

13  Q.   I can read it.  I just want you to.

14  A.   Lower than application reserve of 5.38

15  because more conservative.  Under

16  application scenario we fund less".

17  Q.   And that is referring to the 10 percent

18  constant?

19  A.   The 10 constant.  Right.  So I know -- I

20  believe it is saying -- a note to myself

21  or to somebody that under the application

22  we're required to fund more than a 10

23  percent constant would allow us to.

24  Q.   And so do you believe that this is the --

002l2

1  the Excel, where the block on 412 is not

2  part of the Excel. It is in the sheet,

3  but it is a word document embedded in

4  there, so you have to go back and manually

5  change it.

6  Q.    I see?

7  A.    It doesn't change automatically with the

8  other numbers.

9  Q.    Right.

10  Q.    On the first page of Malik Exhibit 1, it

11  has the disbursement requirements. Do you

12  see that?

13  A.    Malik Exhibit 1, disbursement

14  requirements?

15  Q.    Specific conditions?

16  A.    Okay.

17  Q.    And the disbursements requirements are to

18  have certain rents, a minimum net cash

19  flow, debt service coverage ratio?

20  A.    Yes.

21  Q.    And the 10 percent break even, according

22  to underwriting, right?

23  A.    Yes.

24  Q.    Now that 10 percent break even according

00213

1  to underwriting is not contained in the

2  loan application, is it?

3  A.  No.

4  MR. DAVIS:  Objection.  You.

5  You can respond.

6  Q.

7  MR. SCHER:  I think I am going

8  to ask you to step outside, just for a

9  couple of minutes.

10  THE WITNESS:  Okay.

11  MR. SCHER:  I think I am close

12  to the end.

13  MR. DAVIS:  Okay.

14  (Recess taken at 346 p.m.)

15  (Recess ended at at 348 p.m.

16  MR. SCHER:  I have no further

17  questions.

18  MR. DAVIS:  Okay.  I have no

19  questions.

20  [Reporter's note:  End 348.

21  [Reporter's note:

22

23

24

01-27-2006 Malick Rough ASCII

Page 213

TAB F

2/13/2006

**Pearce, Cheri**

| | |
|---|---|
| **From:** | Davis, Brian [BDavis@choate.com] |
| **Sent:** | Thursday, September 22, 2005 2:40 PM |
| **To:** | McCormick, Brian |
| **Cc:** | rhillman@dwboston.com; Gaulin, Lisa M. |
| **Subject:** | John Hancock v. Vestmont L.P., et al., USDC (Mass.) Civil Action No. 05-11614-WGY |

Brian,

In an abundance of caution, this message will confirm our telephone discussion this afternoon in which you stated that the defendants have not sold the "Avenel at Montgomery Square" property that forms the subject matter of this litigation, and that the property is not currently under contract to be sold. I asked that your clients voluntarily agree to give John Hancock reasonable notice prior to any sale of the property, and you promised to convey that request to your clients and provide me with their response. You also agreed that the property would not be sold before you provide me with that response.

Please let me know immediately if I have misstated or mischaracterized the relevant portions of our discussion.

Thank you for your cooperation.

Brian Davis

C H O A T E
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tele: 617-248-5056
Fax: 617-248-4000
E-mail: bad@choate.com

C H O A T E

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

TAB G

# Buchanan Ingersoll PC

ATTORNEYS

**Brian J. McCormick, Jr.**
215 665 3957
mccormickbj@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985

T 215 665 8700
F 215 665 8760

www.buchananingersoll.com

October 11, 2005

## VIA UPS OVERNIGHT

Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

Re:     John Hancock Life Ins. Co. v. Vesterra Corp., et al.

Dear Brian:

I enclose a pending Agreement of Sale regarding the Avenel at Montgomery Square property. As you requested, we are providing you with reasonable notice of the sale of the property before it is completed.

I trust that following our earlier discussion regarding defendant Vesterra Corporation, you understand that there is no reason to take any further action that may impede or interfere with the sale of this property. Thus, please be advised that any action taken to interfere with this transaction is at your and your client's peril.

Very truly yours,

Brian J. McCormick, Jr.

BJM/pjc
Enclosure
cc:     Howard D. Scher, Esquire (w/o encl.)
        Robert Hillman, Esquire (w/encl.)

Pennsylvania :: New York :: Washington, DC :: Florida :: New Jersey :: Delaware :: California

TAB H

# Buchanan Ingersoll PC

ATTORNEYS

Brian J. McCormick, Jr.
215 665 3957
mccormickbj@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985

T  215 665 8700
F  215 665 8760

www.buchananingersoll.com

October 31, 2005

VIA FACSIMILE AND REGULAR MAIL

Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

Re:    John Hancock Life Ins. Co. v. Vesterra Corp., et al.

Dear Mr. Davis:

I write in response to John Hancock's request for certain financial information relating to defendant Vesterra Corporation. Without waiving any privileges, rights or objections to the production of this information, Defendants agree to provide the following information.

You specifically requested: (a) a description of all of Vesterra Corporation's current real estate holdings, including the nature and street address of each property; (b) the most recent appraised and/or assessed value of each property; (c) the current outstanding mortgage or other loan balance on the property; (d) the nature and amount of any other known lien or encumbrance on the property; and (e) whether the property currently is under contract to be sold or in negotiations to be sold.

Vesterra holds interests in the following three properties: The Shopping Centers at East Gate, a 741,000 square-foot retail (power) center located in Mt. Laurel and Moorestown, New Jersey; Avenel at Montgomery Square, 256 new apartments located in Montgomery Township, Pennsylvania; and 45 acres of vacant land located in Montgomery Township, Pennsylvania. We cannot provide the most recent assessment and/or value of each property, but will provide the following information responsive to your request:

| PROPERTY | VALUE | MORTGAGE | OTHER LIENS | STATUS |
|---|---|---|---|---|
| The Shopping Centers at East Gate | $210,000,000 | approx. $94,000,000 | None | Not currently on market |
| Avenel | $59,250,000 | $30,750,000 | None | Under Sales Agreement |



Pennsylvania :: New York :: Washington, DC :: Florida :: New Jersey :: Delaware :: California

Brian A. Davis, Esquire
October 31, 2005
Page 2

| 45 acres in Montgomery Township, PA | $8,000,000 | None | None | May be condemned by PENNDOT for use in Route 202 Parkway |
|---|---|---|---|---|

Vesterra provides this information without waiving any of its rights or remedies (i) with respect to the July 20, 2004 Application to John Hancock Life Insurance Company for a First Mortgage Loan, (ii) at law and (iii) in equity; all of which rights and remedies it hereby expressly reserves. Further, Vesterra designates the information provided in this letter as "CONFIDENTIAL" pursuant to the Stipulated Protective Order that has been agreed to by the parties in this case.

Please call me with any questions.

Very truly yours,

Brian J. McCormick, Jr.

BJM/bjc
cc:    Howard D. Scher, Esquire
       Robert Hillman, Esquire

TAB I

# Buchanan Ingersoll PC

ATTORNEYS

1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
T  215 665 8700
F  215 665 8760
www.buchananingersoll.com

Brian J. McCormick, Jr.
215 665 3957
mccormickbj@bipc.com

January 10, 2006

*Via Facsimile and Regular Mail*
Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

Re:   *John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.,*
      Civil Action No. 05-11614-WGY

Dear Mr. Davis:

I write in response to your letter of November 28, 2005, and to follow up on our later conversations about your proposal that my clients provide John Hancock with forty-five (45) days written notice prior to any anticipated closing date on a sale of the Avenel property. John Hancock's lawsuit is a personal action for damages, not an *in rem* or foreclosure action concerning that real property. Contrary to the statement in your letter, the real property is not the "subject matter" of this action. Accordingly, we do not agree nor shall we give any notice to John Hancock before closing on a sale of this property

You should guide yourself accordingly.

Very truly yours,

Brian J. McCormick, Jr.

BJM:clp
cc:   Howard D. Scher, Esquire
      C. Randolph Ross, Esquire
      Robert D. Hillman, Esquire (via facsimile and regular mail)

Pennsylvania :: New York :: Washington, DC :: Florida :: New Jersey :: Delaware :: California

TAB J

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3   JOHN HANCOCK LIFE            :
     INSURANCE COMPANY,           :   CIVIL ACTION
 4        Plaintiff/Counterclaim :
          Defendant               :
 5                                :
              vs.                 :
 6                                :
                                  :
 7   VESTMONT LIMITED             :
     PARTNERSHIP, VESTMONT        :
 8   LIMITED PARTNERSHIP II,      :
     VESTMONT LIMITED             :
 9   PARTNERSHIP III, and         :
     VESTERRA CORPORATION         :
10   d/b/a MONTGOMERY SQUARE      :
     PARTNERSHIP,                 :
11        Defendants/Counter-     :   NO. 05-11614-
12        claim Plaintiffs        :   WGY
13
14                        January 18, 2006
                          - - - - -
15
               Oral Deposition of JAMES R.
16        KOLLER, ESQ., held in the law offices of
          Morgan, Lewis & Bockius, LLP, 1701
17        Market Street, 9th Floor, Philadelphia,
          Pennsylvania 19103, beginning at
18        approximately 10:39 a.m., before Ann V.
          Kaufmann, a Registered Professional
19        Reporter, Certified Realtime Reporter,
          Approved Reporter of the U.S. District
20        Court, and a Notary Public of the
          Commonwealth of Pennsylvania.
21                        - - - - -
22
23             ESQUIRE DEPOSITION SERVICES
                  1600 John F. Kennedy Boulevard
24             Four Penn Center, 12th Floor
               Philadelphia, Pennsylvania 19103
                    (215) 988-9191
```

COPY

```
 1   APPEARANCES:
 2     CHOATE, HALL & STEWART, LLP
       BRIAN A. DAVIS, ESQUIRE
 3     bad@choate.com
       Two International Place
 4     Boston, MA  02110
       (617) 248-500
 5     Counsel for John Hancock Life
       Insurance Company
 6
 7     BUCHANAN INGERSOLL
       HOWARD D. SCHER, ESQUIRE
 8     scherhd@bipc.com
       Eleven Penn Center, 14th Floor
 9     1835 Market Street
       Philadelphia, PA  19103
10     (215) 665-3829
       Counsel for Vestmont Limited
11     Partnerships and Vesterra
       Corporation d/b/a Montgomery Square
12     Partnership
13
14
15
16
17
18
19
20
21
22
23
24
```

2

James R. Koller, Esq.

1       Q.    Let's talk for a moment

2    about East Gate Square, Vesterra -- did

3    Vesterra Corporation develop that

4    project?

5       A.    Yes.

6       Q.    And when was that?

7       A.    That was developed over a

8    period of time from 1989 until probably

9    2000 or 2001.  It was done in stages.

10      Q.    The project?

11      A.    Yes.

12      Q.    Is that all commercial

13   space?

14      A.    Yes.

15      Q.    And does Vesterra currently

16   own that project, have an ownership

17   interest in that project?

18      A.    Yes.

19      Q.    Was that project, the East

20   Gate Square project, one that was

21   developed and was a joint venture of the

22   real estate developers?

23      A.    Yes.

24      Q.    What percentage interest

James R. Koller, Esq.

1    does Vesterra have of the East Gate

2    Square project?

3        A.    It varies by phases.    There

4    are six phases.

5        Q.    What's the range?

6        A.    It ranges from

7    approximately 25% to 40%.

8        Q.    Again, I'm sorry.    You said

9    that Vesterra currently has an interest

10   in that project?

11       A.    Yes.

12       Q.    Has it sold any of its

13   interest in the East Gate Square

14   project?

15       A.    No.

16       Q.    Is the Montgomery Square

17   project the most recent development by

18   Vesterra?

19       A.    Avenel is the most recent

20   development, yes.

21       Q.    For any of the projects

22   that are listed -- let's just talk about

23   the commercial projects that are on

24   Exhibit 2.    On any of those projects has

40

James R. Koller, Esq.

1    Partnership II, and Vestmont Limited

2    Partnership III will have are these 45

3    acres of ground that potentially may be

4    taken for the parkway and the 1-acre

5    parcel in front of the Target store?

6           MR. SCHER:  Objection to the

7    form.

8           THE WITNESS:  Yes.

9    Montgomery Square Partnership owns those

10   assets, and so Vestmont Limited

11   Partnership I, II, and III own -- their

12   ownership interest is as a partner in

13   the Montgomery Square Partnership.

14   BY MR. DAVIS:

15       Q.   With that caveat, those

16   would be the only assets in which the

17   Vestmont Limited Partnerships have any

18   interest?

19       A.   That's correct.

20           MR. DAVIS:  Why don't we

21   take a break for five minutes or so.

22                (Recess.)

23   BY MR. DAVIS:

24       Q.   Mr. Koller, going back for

James R. Koller, Esq.

1   a moment to the other piece of property

2   that are held by Montgomery Square

3   Partnership, the 45 acres of ground, do

4   you have an understanding of the

5   approximate value of that property?

6      A.  It's difficult for us to

7   value it.  Land -- we just had this

8   discussion because the appraiser is

9   appraising it for PENNDOT.

10      MR. SCHER:  PENNDOT.

11      THE WITNESS:  Pennsylvania

12   Department of Transportation.

13      We sold 12 acres to Target

14   in that same vicinity for approximately

15   550 to 600 thousand dollars an acre.

16      We sold 5 acres adjacent to

17   it for approximately 400,000 an acre.

18      If you take the purchase

19   price of the Avenel apartments and

20   attribute a 20 or a 22 percent land

21   value to it, it comes to approximately

22   $750,000 to $800,000 an acre.

23      So that's where we think

24   the value is.  So it's a matter of when

ESQUIRE DEPOSITION SERVICES

189

James R. Koller, Esq.

```
 1   PENNDOT condemns it, where we end up.
 2   BY MR. DAVIS:
 3        Q.    Is that likely to occur, in
 4   your view, that it will be condemned or
 5   taken?
 6        A.    Yes.
 7        Q.    And is the 45 acres of
 8   property encumbered in any way?
 9        A.    No.    It's free and clear.
10        Q.    And the 1-acre parcel,
11   what's the approximate value of that?
12        A.    We had it under agreement
13   for $750,000, but that was a year and a
14   half ago or so and that did not
15   consummate, that transaction was not
16   consummated.
17              We have not pursued a sale
18   because we just think that it will
19   increase in value when the parkway, the
20   202 parkway, comes in.
21        Q.    Okay.
22        MR. DAVIS:    I will mark this
23   as the next exhibit.
24              (Below-described document
```