UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>  Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP,<br>VESTMONT LIMITED PARTNERSHIP II,<br>VESTMONT LIMITED PARTNERSHIP III,<br>and VESTERRA CORPORATION d/b/a<br>MONTGOMERY SQUARE PARTNERSHIP,<br><br>  Defendants. | CIVIL ACTION NO. 05-11614-WGY |

**AFFIDAVIT OF TIMOTHY J. MALIK
IN SUPPORT OF PLAINTIFF
JOHN HANCOCK LIFE INSURANCE COMPANY'S
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
PROHIBITING DEFENDANTS FROM DISPOSING OF CERTAIN ASSETS**

I, Timothy J. Malik, hereby state under oath that:

1.  I am employed as an Assistant Vice President in the Real Estate Investment Group of plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock"). I have been employed by John Hancock in various positions since May 19, 1986. At present, my primary duties and responsibilities consist of processing and approving post closing borrower requests and loan assumptions; assisting personnel in John Hancock's field offices with originating and structuring commercial loans; making an initial assessment as to the strength of a particular loan investment; developing, applying and assessing loan underwriting criteria; and

4044224v1

assisting with the loan approval process. In this capacity, I was involved in the negotiation, underwriting and approval of the $32 million loan (the "Loan") by John Hancock for the Avenel at Montgomery Square apartment complex (the "Avenel Apartments") that forms the subject matter of this litigation.

2.  Avenel Apartments is a new, 256-unit residential apartment complex located in North Wales, Montgomery County, Pennsylvania. Defendants (herein "Montgomery Partners") began construction of the Avenel Apartments in 2003. Construction was scheduled to be finished in June 2005.

3.  In the summer of 2004, John Hancock and Montgomery Partners negotiated the terms and conditions of a 70-page written loan application (the "Loan Application"), whereby John Hancock agreed, subject to the various standard and negotiated conditions provided for in the Loan Application, to provide Montgomery Partners with $32 million in permanent financing on the Avenel Apartments project at any time over the ensuing twelve months at a "locked" interest rate of 6.18% per annum.

4.  During the negotiation of the Loan Application, the borrower recognized the possibility that the Avenel Apartments might not be fully leased at the end of the Loan Commitment period because leasing momentum could be affected by the construction schedule. To provide for this consideration and to give Montgomery Partners sufficient funding flexibility, John Hancock structured within the terms and conditions of the Loan Application a so-called "Rental Achievement Reserve," whereby Hancock agreed to fund the Loan even if the Avenel Apartments complex was not fully leased, but would retain a certain portion of the Loan proceeds in a reserve fund until the rental achievement requirements were met. As the Avenel

Apartments obtained increasing levels of occupancy and rent (and, thus, its Net Operating Income, or "NOI," increased), the retained Loan proceeds would be released.

5. In accordance with John Hancock's loan approval process, once the Loan Application was negotiated and Montgomery Partners locked its interest rate, I circulated a loan approval package containing, among other things, a description of the Loan terms and information regarding the Avenel Apartments to designated John Hancock officers for their review. During this phase of the loan process, various internal underwriting benchmarks are used to assess a borrower's ability to repay and, John Hancock's risk in making, a particular loan. The benchmarks are each a different means to this same ultimate end. Accordingly, it is not imperative for a particular benchmark to be satisfied if John Hancock otherwise believes that the loan under assessment is a good investment, and therefore exceptions can be and often are made in the underwriting process so that a loan that does not meet all of John Hancock's underwriting benchmarks still can be approved.

6. At the time Montgomery Partners' Loan Application was under review by John Hancock, one underwriting benchmark that could be applied to the proposed Loan was the so-called sizing constant or "10% Constant." To meet this particular benchmark, a property's cash flow -- generally equal to its NOI, less any assumed cash reserve amount determined on a per unit basis -- must be equal to 10% or greater than the loan amount funded to the borrower. Because the assessment of the 10% Constant benchmark is a function of a property's cash flow, its projected income, expenses and reserves are examined during the loan approval process.

7. During review of the initial approval documents for the Avenel Apartments Loan, the new head of John Hancock's mortgage operations in the United States, Mr. Ivor Thomas, raised the possibility that, in certain instances using Montgomery Partners' projected operating

expenses, the 10% Constant benchmark might not be met. Specifically, if Montgomery Partners were to exercise the Rental Achievement Reserve provision because the Avenel Apartments were not fully leased (and, thus, its rental income was not fully realized), with vacancy of more than 9%, the 10% Constant benchmark would not be satisfied if Montgomery Partners' projected expenses, as they were outlined in the Loan Application, were used in that calculation.

8. When this possibility was raised by Mr. Thomas, I explained to him that the projected expenses for the Avenel Apartments initially provided by Montgomery Partners, which had been used in conjunction with the projected rental income to assess the 10% Constant benchmark, were overly conservative. More specifically, I judged that the $250 per unit rental reserve contained in Montgomery Partners' projections to be too high, so I lowered it to $150 per unit. I also determined that operating expenses were probably overstated by approximately $140,000 per year. With these changes to John Hancock's underwriting assumptions, the *pro forma* for the Avenel Apartments in the John Hancock confidential loan approval satisfied John Hancock's 10% Constant benchmark.

9. I reviewed my revised expenses and reserve assumptions with Mr. Thomas before John Hancock acted on Montgomery Partners' Loan Application. He agreed that the 10% Constant was satisfied for purposes for the loan approval using the revised assumptions that I proposed, and indicated that he would approve the Loan based upon those assumptions. Because the reserves required by the existing Loan Application, which used the Borrower's higher expenses, exceeded the reserves computed with the lower expenses and the 10% Constant, the 10% Constant did not restrict the funding amount to any less than the amount outlined in the Loan Application.

10. Thereafter, on or about August 17, 2004, the Loan Application, in its entirety and without any changes, was given final and unequivocal approval by John Hancock, and the terms and conditions therein became a binding Loan Commitment between John Hancock and Montgomery Partners.

11. The 10% Constant *never* was a term or condition of the Loan Application but, rather, was one of several internal benchmarks used to determine whether the Loan Application would be approved by John Hancock in the first instance. Further, because the Loan Application ultimately was approved by Hancock based upon my revised rental reserve projections, the 10% Constant did not impose any additional financial restrictions on, or impediments to, funding the Loan.

12. Furthermore, for various business reasons, in late 2004, the internal 10% Constant benchmark was reduced by John Hancock to a 9% Constant benchmark for all loans with interest rates of less than 6.5%. Even with the Borrower's expenses as outlined in the Loan Application plus a $250/unit reserve, the Avenel Apartments Loan easily would have cleared that revised benchmark if Montgomery Partners had endeavored to close the Loan as required in 2005.

Signed under the pains and penalties of perjury this 13th day of February, 2006.

                                                /s/ Timothy J. Malik
                                                Timothy J. Malik

### CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served by hand upon counsel for each other party on February 14, 2006.

                                                /s/ Brian A. Davis
                                                Brian A. Davis