UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP,<br>VESTMONT LIMITED PARTNERSHIP II,<br>VESTMONT LIMITED PARTNERSHIP III,<br>and VESTERRA CORPORATION d/b/a<br>MONTGOMERY SQUARE PARTNERSHIP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 05-11614-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock")

submits this Memorandum of Law in support of its Motion for Summary Judgment, filed

herewith. This is an action in which John Hancock seeks to enforce the unambiguous terms of a

binding $32 million loan commitment that Hancock and defendants Vestmont Limited

Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra

Corporation d/b/a Montgomery Square Partnership (collectively, "Montgomery Partners" or the

"Defendants") negotiated and entered into in the summer of 2004 (the "Loan Commitment").

The undisputed facts establish as a matter of law that: (1) Montgomery Partners has breached the

clear terms of the Loan Commitment by failing to close the loan or make John Hancock whole

-2-

for its resulting losses; (2) contrary to the Defendants' assertions, the Loan Commitment is not "illusory" and, therefore, constitutes a valid and enforceable agreement between John Hancock and Montgomery Partners; and (3) John Hancock did not commit fraud or violate M.G.L. c. 93A with respect to the Loan Commitment. Accordingly, John Hancock is entitled to summary judgment on its breach of contract claim, and on all of Montgomery Partners' counterclaims, for the reasons set forth below.

### Relevant Facts

I.    THE PARTIES.

John Hancock is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America. John Hancock's Statement of Undisputed Material Facts ("SOF"), ¶ 1.[1]   The Real Estate Finance Group at John Hancock, in particular, provides commercial mortgage loans on substantial properties, including, *inter alia*, large residential apartment complexes. *Id.*

Montgomery Partners is a single purpose, general partnership that was formed under Pennsylvania law to develop certain commercial property located in North Wales, Montgomery County, Pennsylvania. SOF, ¶ 2. By their own admission, the three individuals who ultimately comprise Montgomery Partners -- Messrs. Koller, Joseph P. Kelly, and Frank C. Palopoli -- all are experienced and sophisticated real estate developers. *Id.* Mr. Koller is a licensed attorney and a former partner in the real estate department of the Philadelphia law firm of Dechert, Price & Rhoads (now "Dechert"). *Id.*, ¶ 3. Mr. Kelly is a Certified Public Accountant and former corporate executive who previously was employed by Price Waterhouse. *Id.* Mr. Palopoli is a real estate consultant with over twenty-five years of experience. *Id.* Together, Messrs. Koller,

---

[1]    John Hancock also submits herewith its Statement of Undisputed Material Facts ("SOF"), as well as the Supplemental Affidavit of Timothy J. Malik ("Supp. Malik Aff.").

Kelly and Palopoli have developed more than 1,500,000 square feet of commercial properties in the Pennsylvania area since 1986. *Id.*

## II.    THE NEGOTIATION AND TERMS OF THE LOAN COMMITMENT.

Montgomery Partners is the owner of a new, 256 unit apartment complex known as "Avenel at Montgomery Square" in North Wales, Pennsylvania (the "Avenel Apartments"). SOF, ¶ 4.    Construction of the Avenel Apartments commenced in 2003 and originally was scheduled to be completed in June 2005. *Id.*   The majority of the construction work on the Avenel Apartments now is complete. *Id.*

Prior to completing construction of the Avenel Apartments, Montgomery Partners became concerned that interest rates would rise significantly before Montgomery Partners was ready to obtain permanent financing on that project, and that a rise in interest rates would substantially increase the overall cost of the project. SOF, ¶ 5.  Accordingly, in the summer of 2004, Montgomery Partners negotiated and entered into a 70-page written loan commitment with John Hancock (the "Loan Commitment"), whereby Hancock agreed, subject to various standard and negotiated conditions, to provide Montgomery Partners with $32 million in permanent financing on the Avenel Apartments at any time over the ensuing twelve months at a "locked" interest rate of 6.18% per annum ("Loan"). *Id.*  Extending the rate lock period for twelve months was highly beneficial to Montgomery Partners because it allowed Montgomery Partners to take advantage of then-existing low interest rates and protect itself from future, potentially unfavorable rate fluctuations. *Id.*, ¶ 6.  Montgomery Partners expressly agreed, in return, to actually "borrow the Principal Amount" set forth in the Loan Commitment from John Hancock

on or before August 1, 2005, or to pay "all ... damages, losses, costs and expenses suffered or incurred by John Hancock" as a result of any default.[2] *Id.*

All the negotiations leading to the Loan Commitment took place in Pennsylvania, not Massachusetts. SOF, ¶ 7. During those negotiations, Montgomery Partners recognized the possibility that the Avenel Apartments might not be fully leased at the end of the Loan Commitment period because leasing momentum could be affected by the construction schedule. *Id.* To provide for this consideration and to give Montgomery Partners sufficient funding flexibility, John Hancock structured within the terms and conditions of the Loan Commitment a so-called "Rental Achievement Reserve," whereby Hancock agreed to fund the Loan even if the Avenel Apartments complex was not fully leased. *Id.*, ¶ 8 In such circumstances, John Hancock would retain a certain portion of the Loan proceeds in a reserve fund until the rental achievement requirements were met. *Id.* As the Avenel Apartments obtained increasing levels of occupancy and rent (and, thus, its Net Operating Income, or "NOI," increased), the retained Loan proceeds would be released. *Id.*

Montgomery Partners signed the Loan Application in Pennsylvania, and submitted the application and deposit to John Hancock's representative in Pennsylvania. SOF, ¶ 9. In accordance with John Hancock's standard loan approval process, once a Loan Application was negotiated and Montgomery Partners "locked in" an interest rate, a loan approval package containing, among other things, a description of the proposed loan terms and information regarding the Avenel Apartments, was circulated to designated Hancock officers for their review. *Id.* During this phase of the loan application process, various internal underwriting benchmarks typically are used to assess a borrower's ability to repay, and John Hancock's risk in making, a

---

[2] The Loan Commitment also afforded Montgomery Partners the opportunity to extend the closing date up to six (6) times for periods of up to thirty (30) days each, *i.e.*, for an aggregate period of one hundred eighty (180) days. SOF, ¶ 6. Montgomery Partners, however, never exercised its right to any such extension. *Id.*

-5-

particular loan. *Id.*, ¶ 10. The benchmarks are each a different means to the same ultimate end. *Id.* Accordingly, it is not imperative for a particular benchmark to be satisfied if John Hancock otherwise believes that the loan under assessment is a good investment, and exceptions can be, and often are, made in the underwriting process so that a loan that does not meet all of John Hancock's underwriting benchmarks still can be approved. *Id.*

At the time Montgomery Partners' Loan Application was under review by John Hancock, one underwriting benchmark that could be applied to the proposed Loan was the so-called "sizing constant" or "10% Constant." SOF, ¶ 11. To meet this particular benchmark, a property's cash flow (generally equal to its NOI, less any assumed cash reserve amount determined on a per unit basis) must be equal to 10% or more of the loan amount funded to the borrower. *Id.* Because the assessment of the 10% Constant is a function of a property's cash flow, its projected income, expenses and reserves are examined during the loan approval process. *Id.*

During review of the initial approval documents for the Avenel Apartments Loan, the new head of John Hancock's mortgage operations in the United States, Mr. Ivor Thomas, raised the possibility that, in certain instances when the rental achievement reserve was funded using Montgomery Partners' projected operating expenses, the 10% Constant benchmark might not be met. SOF, ¶ 12. More specifically, if Montgomery Partners were to exercise the Rental Achievement Reserve provision because the Avenel Apartments were not fully leased (and, thus, its rental income was not fully realized) with vacancy of more than 9%, the 10% Constant benchmark would not be satisfied if Montgomery Partners' projected expenses, as they were outlined in the Loan Application, were used in that calculation. *Id.*

-6-

When the 10% Constant issue was raised by Mr. Thomas, Mr. Timothy Malik, then the Senior Investment Officer in John Hancock's Real Estate Investment Group who had primary responsibility for underwriting the proposed loan to Montgomery Partners, explained to Mr. Thomas that the projected expenses for the Avenel Apartments initially provided by Montgomery Partners -- which had been used in conjunction with the projected rental income to assess the 10% Constant benchmark -- were overly conservative. SOF, ¶ 13. More specifically, Mr. Malik judged that the $250 per unit rental reserve contained in Montgomery Partners' projections was too high, so he lowered the rental reserve estimate to $150 per unit. *Id.* Mr. Malik also determined that Montgomery Partners' operating expense estimate was probably overstated by approximately $140,000 per year, so he reduced that number as well. *Id.* With these changes to John Hancock's underwriting assumptions, the *pro forma* for the Avenel Apartments in Hancock's internal loan approval form satisfied the 10% Constant benchmark. *Id.*

Mr. Thomas agreed that the 10% Constant was satisfied for purposes for the loan approval using Mr. Malik's revised assumptions, and indicated that he would approve the Loan based upon those assumptions. SOF, ¶ 14. Because the rental achievement reserves required by the existing Loan Application, which used the Borrower's higher expenses, exceeded the rental achievement reserves computed with the lower expenses and the 10% Constant, the 10% Constant did not restrict the amount of funding available to Montgomery Partners to anything less than the amount stated in the Loan Application. *Id.* Thereafter, on or about August 17, 2004, the Loan Application, in its entirety and without any changes, was given final and unequivocal approval by John Hancock, and the terms and conditions therein became a binding Loan Commitment between John Hancock and Montgomery Partners. *Id.*

The 10% Constant *never* was a term or condition of the Loan Commitment but, rather, was one of several internal benchmarks used to determine whether the Loan Application would be approved by John Hancock in the first instance. SOF, ¶ 15. Because the Loan Application ultimately was approved by Hancock based upon Mr. Malik's revised rental reserve projections, the 10% Constant did not impose any additional financial restrictions on, or impediments to, funding the Loan. *Id.* Furthermore, for various business reasons, the internal 10% Constant benchmark was reduced by John Hancock in late 2004 to a 9% Constant benchmark for all mortgage loans company-wide with interest rates of less than 6.5%. *Id.* Even with the expenses as outlined in the Defendants' Loan Application plus a $250 per unit reserve, the Avenel Apartments Loan easily would have cleared that revised benchmark if Montgomery Partners had endeavored to close the Loan as required in 2005. *Id.*

III.   MONTGOMERY PARTNERS DECIDES TO SELL THE AVENEL APARTMENTS FOR A "GOOD PRICE" RATHER THAN CLOSE THE LOAN WITH JOHN HANCOCK.

Notwithstanding the clear terms of the Loan Commitment, Montgomery Partners admittedly made no effort to "borrow the Principal Amount" from John Hancock on or before the scheduled closing date of August 1, 2005. SOF, ¶ 16 (acknowledging that Defendants never reviewed or responded to John Hancock's proposed closing documents). Rather, Montgomery Partners elected to take advantage of the strong demand for apartment properties in the Pennsylvania area to enlist a buyer for the Avenel Apartment project. *Id.* Beginning in May or June of 2005, Montgomery Partners began soliciting private bids on the Avenel Apartments from interested buyers. *Id.,* ¶ 17. Montgomery Partners ultimately agreed to sell the project to an entity controlled by JP Morgan Chase Bank ("JP Morgan") for $59,250,000, which the Defendants themselves have characterized as a "good price." *Id.* Montgomery Partners' anticipated gain on the sale of the Avenel Apartments is approximately $28 million. *Id.*

After deciding to sell the Avenel Apartments for a substantial gain, Montgomery Partners first attempted to "unwind" the Loan Commitment through negotiations with John Hancock, during which the Defendants repeatedly acknowledged both orally and in writing their "obligations" to Hancock under the Loan Commitment. SOF, ¶ 18. When John Hancock refused to agree to their proposed terms, however, the Defendants changed their tune and claimed, for the first time, that the Loan Commitment is totally "illusory" and unenforceable because it makes a loan closing dependent upon the fulfillment of certain conditions to John Hancock's "satisfaction," including, without limitation, the delivery of satisfactory environmental and financial assurances. *Id.* Montgomery Partners makes this argument despite the undisputed facts that: (a) the Defendants never made any effort to close the loan, and (b) John Hancock never actually exercised its discretion to deny or reject anything under any of the discretionary provisions cited by Montgomery Partners. *Id.*

IV.    JOHN HANCOCK'S RESULTING LOSSES.

John Hancock commenced this action for damages after Montgomery Partners failed to close the loan or compensate Hancock for its resulting losses and expenses by the August 1, 2005 deadline set forth in the Loan Commitment. SOF, ¶ 19. Due to a significant drop in interest rates between execution of the Loan Commitment and the time of Montgomery Partners' default, John Hancock's current total economic losses on this failed transaction (not including attorney's fees, which are recoverable pursuant to Conditions 21 and 30(d) of the Loan Commitment) are estimated to be approximately $4,700,000. *Id.* John Hancock's lost opportunity damages, which are summarized in Exhibit A to Mr. Malik's Supplemental Affidavit, reflect the differential between the amount that Hancock would have received from Montgomery Partners over the life of the Loan minus the amount that Hancock would receive on the same funds if they were invested in ten-year United States treasury bills as of August 1, 2005

(*i.e.*, the date by which Montgomery Partners was required to close the Loan), discounted to present value using a compounded-monthly discount rate equal to the ten-year United States treasury converted to its monthly equivalent. *Id.*, ¶ 20. John Hancock also incurred other Loan-related expenses (including hedge costs and document preparation fees) that are not included in this calculation. *Id.* John Hancock believes that this calculation represents a fair and reasonably accurate estimate of Hancock's actual damages because Hancock already had substantial liquidity awaiting investment as of August 2005, and Montgomery Partners' failure to close the Loan did not create any additional real estate investment opportunities for John Hancock. *Id.*

V.    THE DEFENDANTS' VARIOUS COUNTERCLAIMS.

Montgomery Partners has responded to John Hancock's Complaint by asserting a variety of counterclaims seeking, *inter alia*, the return of $965,000 in deposits and fees that were paid at the time the Loan Commitment was executed, as well as other unspecified damages. SOF, ¶ 21. Montgomery Partners' primary claims and defenses, however, are premised on the legal proposition that the entire Loan Commitment is "illusory." *Id.* Two recently-added counterclaims alleging fraud and violations of M.G.L. c. 93A are premised on the mistaken belief that application of the 10% Constant would have prevented John Hancock from fully funding the Loan to Montgomery Partners. *Id.* John Hancock is entitled to, and respectfully requests, entry of judgment in its favor on all claims and counterclaims as a matter of law.

**Argument**

I.    THE RELEVANT STANDARD.

Summary judgment should be granted where "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986). A genuine issue of fact exits only if, on the evidence

presented, a reasonable jury could return a verdict in favor of the non-moving party. *See*

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

II.    JOHN HANCOCK SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS
       BREACH OF CONTRACT CLAIM BECAUSE MONTGOMERY PARTNERS
       INDISPUTABLY VIOLATED THE LOAN COMMITMENT BY REFUSING TO
       CLOSE THE LOAN OR PAY HANCOCK'S RESULTING LOSSES.

This action presents a straightforward breach of contract claim between sophisticated,

experienced business entities. In August 2004, Montgomery Partners and John Hancock entered

into a 70-page, extensively-negotiated Loan Commitment whereby Hancock agreed to loan

Montgomery Partners $32 million at a fixed interest rate of 6.18% per annum at any time over

the next twelve months regardless of any subsequent increase in interest rates generally, and

Montgomery Partners, in turn, agreed to *either*: (a) actually borrow the $32 million from John

Hancock by August 1, 2005 (or within the permissible extension periods); or (b) pay John

Hancock's resulting losses and expenses if Montgomery Partners did not close the loan. SOF, ¶

5-6. Montgomery Partners subsequently elected, for business reasons, not to close the loan with

John Hancock, but rather to sell the property to an interested buyer for what Montgomery

Partners regards as a "good price." *Id.*, ¶ 17. It is undisputed that Montgomery Partners

expressly understood and acknowledged, before making that decision, that its conduct would

expose it to liability for John Hancock's resulting losses and expenses. *Id.* Montgomery

Partners even knew beforehand the potential amount of those losses and expenses. *Id.* In the

circumstances, it is clear that Montgomery Partners made its decision not to close the Loan with

Hancock with its eyes wide open. It is equally clear that Montgomery Partners' failure to

"borrow the Principal Amount" of the Loan on or before August 1, 2005 as required under

Condition 27 of the Loan Commitment, or to pay "all … damages, losses, costs and expenses

suffered or incurred by John Hancock" as a result of their default, constitutes a breach of the

terms of that agreement. Unless the Defendants possess a valid defense (which they do not, for

the reasons discussed below), John Hancock is entitled to be compensated for its losses as a

matter of law.

III.    JOHN HANCOCK SHOULD BE GRANTED SUMMARY JUDGMENT ON ITS
        BREACH OF CONTRACT CLAIM BECAUSE MONTGOMERY PARTNERS'
        DEFENSE THAT THE LOAN COMMITMENT IS "ILLUSORY" AND
        UNENFORCEABLE IS WRONG AS A MATTER OF LAW.

Only after Montgomery Partners was unable to convince John Hancock to forego its

contractual rights and accept considerably less than its full damages, did the Defendants first

make the claim that the Loan Commitment -- which Montgomery Partners had actively pursued,

negotiated and executed less than a year earlier -- is totally "illusory" and unenforceable because

it makes a loan closing dependent upon the fulfillment of certain conditions to John Hancock's

"satisfaction," including, without limitation, the delivery of satisfactory environmental and

financial assurances. This argument, which constitutes Montgomery Partners' primary defense

to John Hancock's breach of contract claim, is itself a fiction. Massachusetts law is clear that a

written agreement that conditions one party's performance on the "satisfactory" performance of

the other is not illusory or unenforceable for lack of mutuality. As the Massachusetts Supreme

Judicial Court long ago stated in Eliopoulos v. Makros, 322 Mass. 485, 488 (1948),

> [t]he large class of cases where one party to a contract may reject
> performance which is not satisfactory to him ... while no
> corresponding privilege is given to the other party, is itself enough
> to establish what should need no augment, that the obligations of
> the parties to a contract need not be substantially equal.

In each such case, the party to be satisfied is bound to judge the performance of his

opposite in a manner consistent with the obligation of good faith and fair dealing, which is

implied in every contract under Massachusetts law. Kerrigan v. City of Boston, 361 Mass. 24,

33 (1972); Rand-Whitney Packaging Corp. v. Robertson Group, Inc., 651 F. Supp. 520, 535 (D.

Mass. 1986). The First Circuit expressly recognized and endorsed this rule of Massachusetts law

in Stevens v. G.L. Rugo & Sons, Inc., 209 F.2d 135, 139 (1st Cir. 1953), in which it said,

> [i]t might be questioned as an abstract proposition whether a
> promise to render a performance satisfactory to the other party to a
> contract was not illusory in character because conditioned on the
> caprice or whim of the party to be satisfied. But such promises are
> not uncommon in contracts, and contracts containing them have
> generally been upheld by the courts by construing the promise as at
> least requiring a performance satisfactory to the other party in the
> exercise of an honest judgment.

Here, Montgomery Partners negotiated and entered into the Loan Commitment with John

Hancock with the full knowledge and expectation that, once approved by Hancock, it created

binding obligations on both sides. Indeed, less than forty-five days prior to the required closing

date, Montgomery Partners openly acknowledged in writing that it was "fully aware of [its]

obligations" under that agreement. SOF, ¶ 18. The mere fact that some of those obligations

included submitting loan documentation and materials that were "satisfactory" to John Hancock

does not make the Loan Commitment in any way illusory or unenforceable. Had Montgomery

Partners ever submitted such documentation or materials to John Hancock for review, Hancock

would have been legally bound to assess them in good faith and "in the exercise of an honest

judgment." Kerrigan, 361 Mass. at 33; Stevens, 209 F.2d at 139. John Hancock never got the

chance, however. Montgomery Partners simply walked away from its binding contractual

obligations to Hancock in favor of a more lucrative deal elsewhere. In doing so, Montgomery

Partners undeniably breached the Loan Commitment. John Hancock is entitled to be

compensated for that breach as a matter of law.

IV.    JOHN HANCOCK SHOULD BE GRANTED SUMMARY JUDGMENT ON
       MONTGOMERY PARTNERS' COUNTERCLAIMS FOR DECLARATORY
       JUDGMENT, UNJUST ENRICHMENT, MONEY HAD AND RECEIVED, AND

CONVERSION BECAUSE EACH OF THOSE COUNTERCLAIMS IS BASED ON THE ERRONEOUS PREMISE THAT THE LOAN COMMITMENT IS "ILLUSORY" AND UNENFORCEABLE.

Montgomery Partners has asserted a range of counterclaims against John Hancock for a declaratory judgment (Count I), unjust enrichment (Count II), money had and received (Count III), and conversion (Count IV), all implicitly or explicitly based on the underlying premise that the Loan Commitment is "illusory" and unenforceable. *See, e.g.,* Amended Counterclaim, Count I, ¶ 35 ("Because John Hancock's 'commitment' to make a mortgage loan was illusory…"), Count III, ¶ 44 ("Because any loan commitment by John Hancock was illusory…"). For the reasons already stated in Section III, above, that premise is wrong. The Loan Commitment constitutes a valid, enforceable agreement between Montgomery Partners and John Hancock. Because the Loan Commitment is indisputably binding, John Hancock is entitled to summary judgment on Counts I through IV of the Defendants' Amended Counterclaim -- each of which relies and depends upon a contrary finding -- as a matter of law. *See* Rauseo v. Commonwealth, 65 Mass. App. Ct. 219, 226 (2005) (defendant's argument necessarily failed because it was based on a false premise).

V.    JOHN HANCOCK SHOULD BE GRANTED SUMMARY JUDGMENT ON MONTGOMERY PARTNERS' COUNTERCLAIMS FOR FRAUD AND VIOLATION OF CHAPTER 93A BECAUSE THOSE CLAIMS ARE BASED ON THE ERRONEOUS PREMISE THAT THE 10% CONSTANT BENCHMARK PREVENTED HANCOCK FROM CLOSING THE LOAN AND THE TRANSACTION AT ISSUE DID NOT OCCUR "PRIMARILY AND SUBSTANTIALLY" IN MASSACHUSETTS.

In a belated effort to bolster its flagging defense in this case, Montgomery Partners recently asserted two new counterclaims against John Hancock alleging that Hancock committed fraud and unfair or deceptive acts or practices back in 2004 by "misrepresent[ing] a material fact by indicating in the Loan Application that all of the requirements for disbursement of the Loan were contained therein … [w]hereas, in truth, John Hancock ha[d] an additional undisclosed

-13-

requirement, namely that [Montgomery Partners] meet the 10% 'breakeven' or 'constant' requirement." SOF, ¶ 22. John Hancock is entitled to summary judgment on these additional counterclaims, in the first instance, because they are based on the demonstrably false premise that the 10% Constant benchmark prevented Hancock from closing the Loan on the Avenel Apartments. When that premise fails, the Defendants' counterclaims necessarily fail as well.

A.    John Hancock Did Not Defraud The Defendants By Imposing An Undisclosed And Unattainable Closing Requirement.

In order to prevail on its counterclaim for fraud, Montgomery Partners must show that John Hancock "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the [Defendants] to act thereon, and that the [Defendants] reasonably relied upon the representation as true and acted upon it to his damage." Russell v. Cooley Dickinson Hospital, Inc., 437 Mass. 443, 458 (2002) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982)) (internal quotations omitted). The "material fact" that the Defendants claim was misrepresented by John Hancock in this case is that Hancock was willing to close the Loan on the Avenel Apartments in accordance with the terms of the Loan Commitment irrespective of the 10% Constant benchmark. SOF, ¶ 22. The problem with this claim is that the undisputed evidence establishes that John Hancock already had determined *before approving the Defendants' Loan Application* that the Avenel Apartments property *met the 10% Constant benchmark* using Hancock's revised, internal underwriting assumptions. As described above, Timothy Malik, John Hancock's primary underwriter on Montgomery Partners' Loan Application, judged that the $250 per unit rental reserve contained in the Defendants' financial projections was too high, so he lowered the rental reserve estimate to $150 per unit. SOF, ¶ 13. Mr. Malik also determined that Montgomery Partners' operating expense estimate was probably overstated by approximately $140,000 per year, so he reduced that number as well. *Id.* With

these changes to John Hancock's underwriting assumptions, the *pro forma* for the Avenel Apartments in Hancock's internal loan approval form satisfied the 10% Constant benchmark. *Id.* Thereafter, on or about August 17, 2004, the Loan Application, in its entirety and without any changes, was given final and unequivocal approval by John Hancock, and the terms and conditions therein became a binding Loan Commitment between Hancock and Montgomery Partners. *Id.*, ¶ 14. Furthermore, it is undisputed that Hancock reduced the 10% Constant benchmark to a readily-obtainable 9% Constant benchmark in late 2004, thereby eliminating *any* possibility that Loan proceeds ultimately would not be disbursed as a result. *Id.*, ¶ 15. Montgomery Partners has offered, and can offer, no evidence to the contrary.

Massachusetts law is clear that there can be no recovery for fraud where no misrepresentation has been made. *See* Howarth v. Hunneman & Co., 53 Mass. App. Ct. 1116, 2002 WL 187216, * 1 (Mass. App. Ct. Feb. 6, 2002); Commerce Bank & Trust Co. v. Hayeck, 46 Mass. App. Ct. 687, 693 (1999); Delorie v. Bolduc, No. 9706461D, 1998 WL 1184174, *3 (Mass. Super. Aug. 28, 1998). No misrepresentation was made by John Hancock in this case. Accordingly, John Hancock is entitled to the entry of judgment in its favor on the Defendants' fraud claim as a matter of law.

B.     John Hancock Did Not Violate Chapter 93A.

Montgomery Partners claims that John Hancock is liable for up to double or treble damages under M.G.L. c. 93A, § 11, because Hancock allegedly "made material misrepresentations in the Loan Application about the requirements for disbursement of the Loan." SOF, ¶ 23. Once again, the purported "material misrepresentation" that the Defendants cite and rely upon in support of this claim is Hancock's stated willingness to close the Loan on the Avenel Apartments in accordance with the terms of the Loan Commitment notwithstanding the 10% Constant benchmark. *Id.* And once again, the Defendants are wrong. There was

nothing unfair or deceptive in John Hancock's use of the 10% Constant benchmark to internally evaluate Montgomery Partners' Loan Application, and there certainly was nothing unfair or deceptive in Hancock's decision to *approve* that application based upon Hancock's own revised projections regarding appropriate rental reserves and operating expenses for the Avenel Apartments project. *See* Atlantic Cement Co., Inc. v. South Shore Bank, 730 F.2d 831, 834 (1st Cir. 1984) (defendant's lawful conduct undertaken in good faith was not a violation of 93A); Westchester Assoc., Inc. v. Boston Edison Co., 47 Mass. App. Ct. 133, 138 (1999) (same); Fourth Street Pub, Inc. v. Nat'l Union Fire Ins. Co., 28 Mass. App. Ct. 157, 164 (1990) (same). Indeed, it hardly rises to a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce" for John Hancock to make revised underwriting assumptions *for the benefit* of the proposed borrower. *See* Levings v. Forbes & Wallace, Inc., 396 N.E. 2d 149, 153 (Mass. App. Ct. 1979).

In the circumstances, Montgomery Partners cannot prove that anything John Hancock did or failed to do was unfair or deceptive. Accordingly, Montgomery Partners' counterclaim under M.G.L. c. 93A necessarily fails as a matter of law. *See* Cheswell, Inc. v. Premier Homes and Land Corp., 319 F. Supp.2d 135, 142 (D. Mass. 2004) (summary judgment granted on 93A claim when bank did not engage in any unfair or deceptive acts or practices).

Montgomery Partners' Chapter 93A counterclaim also fails for the further reason that the loan transaction underlying that claim did not occur "primarily and substantially" within the Commonwealth of Massachusetts as required under Section 11 of that statute. The First Circuit has adopted a three-prong balancing test to determine whether the alleged acts occurred primarily or substantially in Massachusetts: "(1) where the defendant committed the deception; (2) where the plaintiff was deceived; and (3) the situs of plaintiff's losses due to the deception."

Henry v. Nat'l Geographic Soc'y, 147 F. Supp.2d 16, 22 (D. Mass. 2001) (*quoting* Clinton Hosp. Ass'n v. Corson Group, Inc., 907 F.2d 1260 (1st Cir. 1990)) (internal quotations omitted). The Massachusetts Supreme Judicial Court, however, has concluded that "the analysis required under § 11 should not be based on a test identified by any particular factor or factors," but rather "a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459 (2003).

Under either analysis, it is apparent that the unfair and deceptive acts alleged by Montgomery Partners did not occur primarily and substantially within Massachusetts. As Montgomery Partners itself acknowledges in its Amended Counterclaim, *all* of the negotiations leading to the Loan Commitment took place in Pennsylvania, not Massachusetts. SOF, ¶ 7. Further, Montgomery Partners signed the Loan Application in Pennsylvania, and submitted the completed application and deposit to John Hancock's representative in Pennsylvania. *Id.*, ¶ 9. Lastly, the property at issue in this case, the Avenel Apartments complex, also is situated in Pennsylvania. *Id.*, ¶ 4. Thus, the only factual connection that this transaction has to Massachusetts is John Hancock's presence in this Commonwealth. That fact in-and-of-itself is not enough, however, to sustain a claim under M.G.L. c. 93A, § 11. *See* American Mgmt. Serv. v. George S. May Intern Co., 933 F. Supp. 64, 68 (D. Mass. 1996) ("Something more than a Massachusetts plaintiff is required to invoke the provisions of Chapter 93A.").

Accordingly, John Hancock is entitled to the entry of judgment in its favor on the Defendants' Chapter 93A counterclaim as a matter of law.

## Conclusion

For the reasons set forth herein, John Hancock respectfully requests entry of summary judgment in its favor on its breach of contract claim, and on each of the counts asserted by the Defendants in their Amended Counterclaim.

JOHN HANCOCK LIFE INSURANCE
COMPANY

By its attorneys,


/s/ Brian A. Davis
Brian A. Davis (BBO No. 546462)
Paul D. Popeo (BBO No. 567727)
Lisa M. Gaulin (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: 617-248-5000
Fax: 617-248-4000


Date:   March 1, 2006

4046619.4

-19-

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 1, 2006.

*/s/ Brian A. Davis*
Brian A. Davis

4046619.4