UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP,<br>VESTMONT LIMITED PARTNERSHIP II,<br>VESTMONT LIMITED PARTNERSHIP III,<br>and VESTERRA CORPORATION d/b/a<br>MONTGOMERY SQUARE PARTNERSHIP,<br><br>Defendants. | CIVIL ACTION NO. 05-11614-WGY |

### PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock") respectfully submits this Statement of Undisputed Facts in support of its accompanying Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1. All of the material facts stated herein are undisputed for summary judgment purposes.

*The Parties*

1.  John Hancock is one of the nation's leading insurance companies, providing a broad array of insurance and investment products to retail and institutional customers, primarily in North America. Supplemental Affidavit of Timothy J. Malik, dated February 28, 2006 ("Supp. Malik Aff."), ¶ 2. The Real Estate Investment Group at John Hancock, in particular,

-2-

provides commercial mortgage loans on substantial properties, including, *inter alia*, large residential apartment complexes. *Id.*

2.    Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation d/b/a Montgomery Square Partnership (collectively, "Montgomery Partners" or the "Defendants") are a single purpose, general partnership that was formed under Pennsylvania law to develop certain commercial property located in North Wales, Montgomery County, Pennsylvania. Deposition of James R. Koller, January 18, 2006 ("Koller Dep."), 20:18-22; 33-34.[1] By their own admission, the three individuals who ultimately comprise Montgomery Partners -- Messrs. Koller, Joseph P. Kelly, and Frank C. Palopoli -- all are experienced and sophisticated real estate developers. Koller Dep. Exh. 1 (describing the backgrounds of Vesterra Corporation's Principals).

3.    Mr. Koller is a licensed attorney and a former partner in the real estate department of the Philadelphia law firm of Dechert, Price & Rhoads (now "Dechert"). *Id.*; Koller Dep. at 8-10. Mr. Kelly is a Certified Public Accountant and former corporate executive who previously was employed by Price Waterhouse. Koller Dep. Exh. 1; Koller Dep. at 24:13-18. Mr. Palopoli is a real estate consultant with over twenty-five years of experience. Koller Dep. Exh. 1. Together, Messrs. Koller, Kelly and Palopoli have developed more than 1,500,000 square feet of commercial properties in the Pennsylvania area since 1986. Koller Dep. Exh. 2 (list of Defendants' "Representative Projects").

---

[1] A copy of excerpts and exhibits from Mr. Koller's Deposition in this case are attached to the Affidavit of Brian A. Davis, submitted to the Court on February 8, 2006 in support of John Hancock's Motion for Preliminary Injunctive Relief.

*The Negotiation and Terms of the Loan Commitment*

4.   Montgomery Partners is the owner of a new, 256 unit apartment complex known as "Avenel at Montgomery Square" in North Wales, Pennsylvania (the "Avenel Apartments"). Koller Dep. at 34:2-12; Koller Dep. Exh. 2. Construction of the Avenel Apartments commenced in 2003 and originally was scheduled to be completed in June 2005. Koller Dep. at 35:3-8; 76:18-24. The majority of the construction work on the Avenel Apartments now is complete. Affidavit of John P. Ferrie, dated February 7, 2006 ("Ferrie Aff."), ¶ 2.[2]

5.   Prior to completing construction of the Avenel Apartments, Montgomery Partners became concerned that interest rates would rise significantly before Montgomery Partners was ready to obtain permanent financing on that project, and that a rise in interest rates would substantially increase the overall cost of the project. Koller Dep. at 58-59. Accordingly, in the summer of 2004, Montgomery Partners negotiated and entered into a 70-page written loan commitment with John Hancock (the "Loan Commitment"), whereby Hancock agreed, subject to various standard and negotiated conditions, to provide Montgomery Partners with $32 million in permanent financing on the Avenel Apartments at any time over the ensuing twelve months at a "locked" interest rate of 6.18% per annum ("Loan"). *Id.* at 75-76.

6.   Extending the rate lock period for twelve months was highly beneficial to Montgomery Partners because it allowed Montgomery Partners to take advantage of then-existing low interest rates and protect itself from future, potentially unfavorable rate fluctuations. Ferrie Aff., ¶ 3. Montgomery Partners expressly agreed, in return, to actually "borrow the Principal Amount" set forth in the Loan Commitment from John Hancock on or before August 1, 2005, or to pay "all ... damages, losses, costs and expenses suffered or incurred by John

---

[2] The original Affidavit of John P. Ferrie was submitted to the Court by John Hancock in support of its Motion for Preliminary Injunctive Relief on February 8, 2006.

Hancock" as a result of any default.[3] *Id.*; Koller Dep. Exh. 8, Conditions 27 and 30(d) (Loan Commitment).

7. All the negotiations leading to the Loan Commitment took place in Pennsylvania, not Massachusetts. Defendants' Amended Counterclaim, ¶ 10. During those negotiations, Montgomery Partners recognized the possibility that the Avenel Apartments might not be fully leased at the end of the Loan Commitment period because leasing momentum could be affected by the construction schedule. Affidavit of Timothy J. Malik, dated February 13, 2006 ("Malik Aff."), ¶ 4.[4]

8. To provide for this consideration and to give Montgomery Partners sufficient funding flexibility, John Hancock structured within the terms and conditions of the Loan Commitment a so-called "Rental Achievement Reserve," whereby Hancock agreed to fund the Loan even if the Avenel Apartments complex was not fully leased. Malik Aff., ¶ 4. In such circumstances, John Hancock would retain a certain portion of the Loan proceeds in a reserve fund until the rental achievement requirements were met. *Id.* As the Avenel Apartments obtained increasing levels of occupancy and rent (and, thus, its Net Operating Income, or "NOI," increased), the retained Loan proceeds would be released. *Id.*

9. Montgomery Partners signed the Loan Application in Pennsylvania, and submitted the application and deposit to John Hancock's representative in Pennsylvania. Defendants' Amended Counterclaim, ¶¶ 11, 15. In accordance with John Hancock's standard loan approval process, once a Loan Application was negotiated and Montgomery Partners

---

[3] The Loan Commitment also afforded Montgomery Partners the opportunity to extend the closing date up to six (6) times for periods of up to thirty (30) days each, *i.e.*, for an aggregate period of one hundred eighty (180) days. Koller Dep. Exh. 8, Supplement Condition 50. Montgomery Partners, however, never exercised its right to any such extension.

[4] The original Affidavit of Timothy J. Malik was submitted to the Court by John Hancock in support of its Motion for Preliminary Injunctive Relief on February 12, 2006.

"locked in" an interest rate, a loan approval package containing, among other things, a description of the proposed loan terms and information regarding the Avenel Apartments, was circulated to designated Hancock officers for their review. Malik Aff., ¶ 5.

*John Hancock's Underwriting Process and the 10% Constant Benchmark*

10.    During this phase of the loan application process, various internal underwriting benchmarks typically are used to assess a borrower's ability to repay, and John Hancock's risk in making, a particular loan. Malik Aff., ¶ 5. The benchmarks are each a different means to the same ultimate end. *Id.* Accordingly, it is not imperative for a particular benchmark to be satisfied if John Hancock otherwise believes that the loan under assessment is a good investment, and exceptions can be, and often are, made in the underwriting process so that a loan that does not meet all of John Hancock's underwriting benchmarks still can be approved. *Id.*

11.    At the time Montgomery Partners' Loan Application was under review by John Hancock, one underwriting benchmark that could be applied to the proposed Loan was the so-called "sizing constant" or "10% Constant." Malik Aff., ¶ 6. To meet this particular benchmark, a property's cash flow (generally equal to its NOI, less any assumed cash reserve amount determined on a per unit basis) must be equal to 10% or more of the loan amount funded to the borrower. *Id.* Because the assessment of the 10% Constant is a function of a property's cash flow, its projected income, expenses and reserves are examined during the loan approval process. *Id.*

12.    During review of the initial approval documents for the Avenel Apartments Loan, the new head of John Hancock's mortgage operations in the United States, Mr. Ivor Thomas, raised the possibility that, in certain instances using Montgomery Partners' projected operating expenses, the 10% Constant benchmark might not be met. Malik Aff., ¶ 7. More specifically, if Montgomery Partners were to exercise the Rental Achievement Reserve provision because the

Avenel Apartments were not fully leased (and, thus, its rental income was not fully realized) with vacancy of more than 9%, the 10% Constant benchmark would not be satisfied if Montgomery Partners' projected expenses, as they were outlined in the Loan Application, were used in that calculation. *Id.*

13. When the 10% Constant issue was raised by Mr. Thomas, Mr. Timothy Malik, then the Senior Investment Officer in John Hancock's Real Estate Investment Group who had primary responsibility for underwriting the proposed loan to Montgomery Partners, explained to Mr. Thomas that the projected expenses for the Avenel Apartments initially provided by Montgomery Partners -- which had been used in conjunction with the projected rental income to assess the 10% Constant benchmark -- were overly conservative. Malik Aff., ¶ 8; Supp. Malik Aff., ¶ 1. More specifically, Mr. Malik judged that the $250 per unit rental reserve contained in Montgomery Partners' projections was too high, so he lowered the rental reserve estimate to $150 per unit. *Id.* Mr. Malik also determined that Montgomery Partners' operating expense estimate probably was overstated by approximately $140,000 per year, so he reduced that number as well. *Id.* With these changes to John Hancock's underwriting assumptions, the *pro forma* for the Avenel Apartments in Hancock's internal loan approval form satisfied the 10% Constant benchmark. *Id.*

14. Mr. Thomas agreed that the 10% Constant was satisfied for purposes for the loan approval using Mr. Malik's revised assumptions, and indicated that he would approve the Loan based upon those assumptions. Malik Aff., ¶ 9. Because the rental achievement reserves required by the existing Loan Application, which used the Borrower's higher expenses, exceeded the rental achievement reserves computed with the lower expenses and the 10% Constant, the 10% Constant did not restrict the amount of funding available to Montgomery Partners to

anything less than the amount stated in the Loan Application. *Id.* Thereafter, on or about August 17, 2004, the Loan Application, in its entirety and without any changes, was given final and unequivocal approval by John Hancock, and the terms and conditions therein became a binding Loan Commitment between John Hancock and Montgomery Partners. *Id.*, ¶ 10.

15. The 10% Constant *never* was a term or condition of the Loan Commitment but, rather, was one of several internal benchmarks used to determine whether the Loan Application would be approved by John Hancock in the first instance. Malik Aff., ¶ 11. Because the Loan Application ultimately was approved by Hancock based upon Mr. Malik's revised rental reserve projections, the 10% Constant did not impose any additional financial restrictions on, or impediments to, funding the Loan. *Id.* Furthermore, for various business reasons, the internal 10% Constant benchmark was reduced by John Hancock in late 2004 to a 9% Constant benchmark for all mortgage loans company-wide with interest rates of less than 6.5%. *Id.*, ¶ 12. Even with the expenses as outlined in the Defendants' Loan Application plus a $250 per unit reserve, the Avenel Apartments Loan easily would have cleared that revised benchmark if Montgomery Partners had endeavored to close the Loan as required in 2005. *Id.*

*Montgomery Partners Decides to Sell the Avenel Apartments for a "Good Price" Rather Than Close the Loan with John Hancock*

16. Notwithstanding the clear terms of the Loan Commitment, Montgomery Partners admittedly made no effort to "borrow the Principal Amount" from John Hancock on or before the scheduled closing date of August 1, 2005. Koller Dep. at 168:1-13 (acknowledging that Defendants never reviewed or responded to John Hancock's proposed closing documents). Rather, Montgomery Partners elected to take advantage of the strong demand for apartment properties in the Pennsylvania area to enlist a buyer for the Avenel Apartment project. Ferrie Aff., ¶ 4; Koller Dep. at 101:10-23.

17. Beginning in May or June of 2005, Montgomery Partners began soliciting private bids on the Avenel Apartments from interested buyers. Ferrie Aff., ¶ 4; Koller Dep. at 96-97. Montgomery Partners ultimately agreed to sell the project to an entity controlled by JP Morgan Chase Bank ("JP Morgan") for $59,250,000, which the Defendants themselves have characterized as a "good price." Koller Dep. at 102:6-12; 113-14. Montgomery Partners expressly understood and acknowledged, before making that decision, that its conduct would expose it to liability for John Hancock's resulting losses and expenses. *Id.* at 104-06; 116-17. Montgomery Partners even knew beforehand the potential amount of those losses and expenses. Koller Dep. Exh. 11 (E-mail from John Ferrie to Joseph Kelly and James Koller, dated June 6, 2005). Montgomery Partners' anticipated gain on the sale of the Avenel Apartments is approximately $28 million. *Id.* at 38:17-24.

18. After deciding to sell the Avenel Apartments for a substantial gain, Montgomery Partners first attempted to "unwind" the Loan Commitment through negotiations with John Hancock, during which the Defendants repeatedly acknowledged both orally and in writing their "obligations" to Hancock under the Loan Commitment. *See, e.g.*, Koller Dep. Exh. 14 (Letter of James R. Koller to Thomas C. Rogers, Esq., dated June 20, 2005); Koller Dep. at 104-06; 116-17; Ferrie Aff., ¶ 5. When John Hancock refused to agree to their proposed terms, however, the Defendants changed their tune and claimed, for the first time, that the Loan Commitment is totally "illusory" and unenforceable because it makes a loan closing dependent upon the fulfillment of certain conditions to John Hancock's "satisfaction," including, without limitation, the delivery of satisfactory environmental and financial assurances. Ferrie Aff., ¶ 5. Montgomery Partners makes this argument despite the undisputed facts that: (a) the Defendants never made any effort to close the loan, and (b) John Hancock never actually exercised its

discretion to deny or reject anything under any of the discretionary provisions cited by Montgomery Partners. Koller Dep. at 168:1-9.

*John Hancock's Resulting Losses*

19. John Hancock commenced this action for damages after Montgomery Partners failed to close the loan or compensate Hancock for its resulting losses and expenses by the August 1, 2005 deadline set forth in the Loan Commitment. Ferrie Aff., ¶ 6. Due to a significant drop in interest rates between execution of the Loan Commitment and the time of Montgomery Partners' default, John Hancock's current total damages and expenses on this failed transaction (not including attorney's fees, which are recoverable pursuant to Conditions 21 and 30(d) of the Loan Commitment) are estimated to be approximately $4,700,000. *Id.*; Supp. Malik Aff., ¶ 3.

20. John Hancock's lost opportunity damages (which are summarized in Exhibit A to Mr. Malik's Supplemental Affidavit) reflect the differential between the amount that Hancock would have received from Montgomery Partners over the life of the Loan, minus the amount that Hancock would receive on the same funds if they were invested in ten-year United States treasury bills as of August 1, 2005 (*i.e.*, the date by which Montgomery Partners was required to close the Loan), discounted to present value using a compounded-monthly discount rate equal to the ten-year United States treasury converted to its monthly equivalent. Supp. Malik Aff., ¶ 3. John Hancock also incurred other Loan-related expenses (including hedge costs and document preparation fees) that are not included in this calculation. *Id.* John Hancock believes that this calculation represents a fair and reasonably accurate estimate of Hancock's actual damages because Hancock already had substantial liquidity awaiting investment as of August 2005, and

Montgomery Partners' failure to close the Loan did not create any additional real estate investment opportunities for John Hancock. *Id.*

*The Defendants' Various Counterclaims*

21. Montgomery Partners has responded to John Hancock's Complaint by asserting a variety of counterclaims seeking, *inter alia*, the return of $965,000 in deposits and fees that were paid at the time the Loan Commitment was executed, as well as other unspecified damages. Defendants' Amended Counterclaim, ¶¶ 34-65; Koller Dep. at 196-97. Montgomery Partners' primary claims and defenses, however, are premised on the legal proposition that the entire Loan Commitment is "illusory." Defendants' Amended Counterclaim, ¶¶ 34-46. Two recently-added counterclaims alleging fraud and violations of M.G.L. c. 93A are premised on the belief that application of the 10% Constant would have prevented John Hancock from fully funding the Loan to Montgomery Partners. Defendants' Amended Counterclaim, ¶¶ 47-65.

22. Montgomery Partners further alleges that John Hancock committed fraud and unfair or deceptive acts or practices back in 2004 by "misrepresent[ing] a material fact by indicating in the Loan Application that all of the requirements for disbursement of the Loan were contained therein ... [w]hereas, in truth, John Hancock ha[d] an additional undisclosed requirement, namely that [Montgomery Partners] meet the 10% 'breakeven' or 'constant' requirement." Defendants' Amended Counterclaim, ¶ 48. The "material fact" that the Defendants claim was misrepresented by John Hancock in this case is that Hancock was willing to close the Loan on the Avenel Apartments in accordance with the terms of the Loan Commitment irrespective of the 10% Constant benchmark. *Id.*

23. In support of its Chapter 93A claim, Montgomery Partners alleges that Hancock "made material misrepresentations in the Loan Application about the requirements for

disbursement of the Loan." Defendants' Amended Counterclaim, ¶ 59. Again, the purported "material misrepresentation" that the Defendants cite and rely upon in support of this claim is Hancock's stated willingness to close the Loan on the Avenel Apartments in accordance with the terms of the Loan Commitment irrespective of the 10% Constant benchmark. *Id.*, ¶ 51.

JOHN HANCOCK LIFE INSURANCE
COMPANY

By its attorneys,

*/s/ Brian A. Davis*
Brian A. Davis (BBO No. 546462)
Paul D. Popeo (BBO No. 567727)
Lisa M. Gaulin (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: 617-248-5000
Fax: 617-248-4000

Date:   March 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 1, 2006.

/s/ Brian A. Davis
Brian A. Davis