UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

:
JOHN HANCOCK LIFE INSURANCE :
COMPANY, :
        :
      Plaintiff, :
        :   Civil Action No. 05-11614 WGY
     v. :
        :
VESTMONT LIMITED PARTNERSHIP, :
et al., :
        :
      Defendants. :
        :

---

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
OF PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY**

## INTRODUCTION

This lawsuit concerns a mortgage loan application (the "Loan Application") submitted by Defendants/ Counterclaim Plaintiffs (collectively, "Defendants" or "Vesterra") to Plaintiff John Hancock Life Insurance Company ("John Hancock").  After negotiating a Loan Application which contained certain terms and conditions, and included borrower-proposed financial projections, John Hancock, without disclosure to Vesterra, decided to change the terms and conditions and modified the borrower's financial projections.  John Hancock deliberately concluded that if it were to seek the borrower's agreement to these changes, this would be a "deal breaker," and so instead "approved" this Loan Application only after adding a new and undisclosed requirement for the sizing and disbursement of the loan -- the 10% Constant requirement -- and modified the related financial projections.  Thus, there was no "meeting of the minds" on the essential terms of the Loan, a fact that was not discovered by Vesterra until this litigation commenced and discovery was obtained from John Hancock.  There is ample evidence to show the existence of and materiality of the difference in John Hancock's "state of mind" when it appeared to accept Vesterra's offer, including admissions by John Hancock employees and the refusal to produce on attorney client privilege grounds, an amended loan application which was prepared by John Hancock but never submitted to Vesterra (which the Court may presume would have sought Vesterra's agreement to this new condition and the modified financial projections).

Furthermore, certain conditions of the Loan Application were carefully drafted by John Hancock to provide that, **after the loan is closed**, the borrower would be required to pay to the lender the yield expected over the life of the loan, even if the borrower were to seek to repay it prior to its expiration.  *See* section IV of the factual statement, below.  However, no express provision for such a measure of damages is set forth for the eventuality present in this case -- the

non-funding of the loan.  Instead, John Hancock specified that it would be entitled to retain the fees paid, in this case $965,000, and any damages or "Costs" as defined in the Loan Application. These damages do not include "yield maintenance" for a loan which was never made, on a note that was never signed, and thus for which there was no "yield" to "maintain."

John Hancock has now moved for summary judgment in this action based on the assertion that there are no undisputed material facts concerning, *inter alia*, (1) the existence of a binding agreement between the parties, (2) the illusory nature of any such agreement, (3) whether John Hancock fraudulently induced the Defendants to pay almost a million dollars in application and commitment fees; and (4) the measure of damages to which John Hancock would be entitled if the contract were enforceable and if the Defendants were found to have breached it. As explained below, there are important unresolved questions of fact related to every one of these issues except the last (which is the subject of Vesterra's cross-motion for partial summary judgment).

John Hancock's own documents, and the testimony of its witnesses, demonstrate that, without informing Vesterra, John Hancock only approved the Loan Application after adding another <u>requirement</u> for <u>disbursement</u> of the mortgage loan -- a requirement which Vesterra's own figures showed that it was unlikely to meet.  John Hancock did not inform Vesterra of this additional requirement after being told by its local field representative that it was a "deal killer," and after realizing that killing the deal at that point would result in a hedge loss of $355,000 and the return of $960,000 in fees to Vesterra.  Thus, as explained in detail below, the apparent "commitment" manifested by the countersigned Loan Application did not reflect the state of the "mind" of John Hancock, and hence did not "meet" the written offer of Vesterra, limited to other specified disbursement conditions.  Hence there was no meeting of the minds between Vesterra and John Hancock on the conditions for disbursement of the Loan.  Accordingly, John

Hancock's documents, and the testimony of its employees, demonstrate that it is not entitled to summary judgment, and that at the very least there are disputed issues of fact that must be resolved by the jury.

## STATEMENT OF RELEVANT FACTS

**I.    Vesterra's Negotiation of the Loan Application with John Hancock**

Vesterra Corporation has been involved in the development of both commercial and residential commercial real estate sites since 1986.  Affidavit of James R. Koller, dated March 13, 2006 ("Koller Aff."), ¶ 7.  In 1996, Defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III formed a general partnership known as Montgomery Square Partnership to develop a tract of land in the suburban Philadelphia area, including, *inter alia*, the construction of a residential apartment complex, Avenel at Montgomery Square ("Avenel").  Defendants' Statement of Disputed Facts in Opposition to the Motion for Summary Judgment of Plaintiff John Hancock Life Insurance Company (hereinafter, "Defs.' Facts"), at ¶ 2.  *See also* Koller Aff., ¶ 5.  As John Hancock concedes, the three individual principals who ultimately control Vesterra are "experienced and sophisticated real estate developers."  John Hancock Memorandum of Law ("JH Mem."), at 2.  *See also* Koller Aff., ¶ 4.

Construction of the Avenel Apartments began in 2003, funded by a $30.7 million construction loan from Wilmington Trust of Pennsylvania.  Koller Aff., ¶ 11.  In the summer of 2004, approximately one year before Vesterra anticipated that the apartment complex would be completed and largely rented, Vesterra approached several possible sources for a permanent mortgage loan.  Defs.' Facts, ¶ 5; Exhibit D, at 50.[1]  In June 2004, John Hancock's regional manager in Pennsylvania, John Ferrie, notified the home office of this potential loan opportunity.  Defs.' Facts, at ¶ 25.  As described in more detail in Defendants' Facts, Vesterra then negotiated

---

[1]  All exhibits referenced herein are attached to the Declaration of Brian J. McCormick, Jr. in Opposition to Plaintiff's Motion for Summary Judgment, filed herewith.

with John Hancock the terms of a document entitled "Application to John Hancock Life

Insurance Company for a First Mortgage Loan" (the "Loan Application"), *see* Exhibit A, which

it signed on July 30, 2004 and submitted to John Hancock for approval.[2]  Koller Aff., ¶¶ 14-15.

The terms were for a $32 million loan, and contained disbursements requirements concerning the

income and the value of the project (a "Debt Servicing Coverage Ratio" of 1:25 and a "Loan to

Value" ratio of 75%).  Exhibit A, at Condition 49(1) (at JH 00988).  Additionally, if at least 80%

occupancy was achieved, John Hancock could loan a lesser amount, setting aside a reserve of up

to $5.38 million for up to six months to be released as occupancy and income increased.  Exhibit

A, at Condition 49(2) (JH0989).[3]  Shortly thereafter, based on its mistaken understanding that the

conditions for disbursement of the Loan were set in the Loan Application, Vesterra paid related

commitment and application fees by obtaining irrevocable letters of credit in favor of John

Hancock in the amount of $960,000.  Affidavit of Joseph P. Kelly, dated March 13, 2006 ("Kelly

Aff."), ¶¶ 20-22.

     However, the Loan Application also provided that even if the stated conditions were all

met by Vesterra, John Hancock still retained unfettered discretion to decide whether to fund the

Loan, based on numerous other provisions.  These included, for example, John Hancock's

determination of whether the "debt service coverage ratio" had been met, as "calculated by John

Hancock <u>in its sole discretion</u>, including such allowances and adjustments (e.g., reserves) . . . <u>as</u>

<u>John Hancock determines</u> are appropriate."  Exhibit A, at Condition 16(b) (at JH 00974)

---

[2] One key point during the negotiations concerned a limitation of Vesterra's liability for "Costs," a term that is defined in the Loan Application.  After initially agreeing to a cap of 5%, which would have limited Vesterra's liability for "Costs" to approximately $600,000 on top of its letters of credit, John Hancock informed Vesterra that it could not accept that limitation because "[i]f we don't close and interest rates move against us, we could be subject to unlimited losses. . . .  Therefore, you need to deliver the loan or be liable for all Costs."  Exhibit H.  Thus, in its own contemporary explanation of the liability to which Vesterra might be exposed under the Loan Application, John Hancock described "losses" that were a part of the defined "Costs."  Notably, when it had full opportunity and reason to do so, John Hancock did <u>not</u> inform Vesterra that it considered the "yield maintenance" remedy, explicitly included only in Conditions 3 and 6 concerning terms of the mortgage loan and note, to be implicitly included in Condition 30 as well.

[3] However, this reserve was only available for the first six months.  If Vesterra could not reach the occupancy levels required by the Loan Application, it would lose the reserved funds.  *Id.*, at Condition 49(2).

(emphasis added). John Hancock also retained the continuing right to assess "financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals" which were required to "evidenc[e] a financial condition of such parties that is satisfactory to John Hancock in its sole discretion." *Id.,* Condition 20 (emphasis added). *See also id.* at Conditions 6, 7, 8(a), 11(b), 12-14, 19 and 23. Of course, when John Hancock assessed whether such financial requirements were satisfied "in its sole discretion," it could include criteria such as the 10% Constant.

## II.     John Hancock's Approval of the Loan Application with the Additional Undisclosed Requirement for Disbursement -- the "10% Constant" Requirement

Once the Loan Application was submitted by Vesterra, John Hancock's internal approval process began. John Hancock "allocated" the $32 million for the Loan among various lines of business, for use if and when the Loan was funded. The Loan Application itself was submitted by the investment officer (Mr. Malik) for seriatim recommendation and approval by his superiors. However, Mr. Malik ran into an unexpected problem in getting this approval. When the new head of John Hancock's mortgage loan operations in the United States received Vesterra's Loan Application, he insisted that the application meet an additional requirement which had been recently introduced by the company that had acquired John Hancock -- the "10% constant" requirement -- and noted that it did not appear from the financial figures submitted by Vesterra that it would meet this requirement.[4]  *See* Exhibit B, at 45, 61-62. Thus, on August 10, 2004, the John Hancock investment committee conditionally approved the loan to Vesterra, with the handwritten additional disbursement requirement of "10% Breakeven." *See* Exhibit N.

This resulted in (1) a draft amendment to the Loan Application (Defs.' Facts, ¶¶ 32-34),

---

[4] John Hancock was acquired by ManuLife Financial Corporation of Canada on or about April 28, 2004, which caused the introduction of a "new head of John Hancock's mortgage operations in the United States," Ivor Thomas, and new requirements for the approval of mortgage loans. *See* Exhibit B, at 45, 61-62. The 10% Constant requirement was a new requirement introduced during this time period by ManuLife. *See* Exhibits B, at 179-80 and C, at 35.

(2) contacting John Hancock's Pennsylvania field representative, John Ferrie, about adding this new requirement to the Loan Application (Exhibit M), and (3) numerous manipulations by Mr. Malik of Vesterra's financial figures to find a way "to make the numbers work" for this new requirement. *See, e.g.,* Defs.' Facts, at ¶¶ 26-31.  However, the home office was notified by Mr. Ferrie that any amendment of the application along those lines would be a "deal killer", and that the introduction of the new requirement would cost John Hancock the loan.  Exhibit C, at 84-85, 93-94.[5]  As a result of obtaining this information, John Hancock decided to not ask Vesterra to agree to what John Hancock required, and thus the amendment to the Loan Application was not submitted to Vesterra for its acceptance.

Nonetheless, Mr. Malik continued with his various manipulations of the financial projections made part of the Loan Application by Vesterra (including lowering the reserves per unit and increasing the occupancy rate) -- manipulations that he had to perform because, as submitted to John Hancock, Vesterra's figures showed that Vesterra would <u>not</u> meet this new requirement.  Exhibit M; Kelly Aff., ¶ 19; Koller Aff., ¶ 20.  Apparently Mr. Malik had doubts about his proposed methodology, as he forwarded it to Mr. Ferrie with the note "I'll let you know how hard he [Mr. Thomas of ManuLife] laughs."  *Id. See also* Exhibit B, at 97.   The next morning Mr. Malik began his work day with a proposal to increase the assumed occupancy, and by the end of that day, in order "to make the numbers work" he proposed reducing the annual expenses by $550 per unit (or $140,800 total), which he described as "not <u>wholly</u> unreasonable" (emphasis added).  Defs.' Facts, ¶¶ 30-31.

---

[5]  John Hancock has refused to produce this draft amendment based on an assertion of attorney-client privilege.  Exhibits X, at 2 and Y, at 7.  Under Massachusetts law, Vesterra is entitled to an inference that this document does not support John Hancock's position that the 10% Constant was only an internal requirement for initial approval of the Loan. *See Eldridge v. Provident Cos.*, No. Civ.A. 97-1294, 2001 WL 262937, *6 (Mass. Super. Ct. Mar. 13, 2001) (quoting Justice Holmes).

In addition, around this time, Mr. Malik had learned that John Hancock would suffer a hedge loss of $355,000 if the deal was not approved. *See* Exhibit P. (Presumably this hedge was purchased when the interest rate was locked, although no related discovery has been provided by John Hancock.) Thus, it appears that John Hancock was motivated by its desire to avoid a hedge loss and to retain certain fees when it decided not to seek the agreement of Vesterra to Mr. Thomas' new condition (and Mr. Malik's reworked numbers). John Hancock knew it would be a "deal killer" to seek Vesterra's acceptance of this, so it did not do so.

Thus, John Hancock's home office decided to proceed without the borrower's knowledge and consent. John Hancock modified the approval process, and once more sought approval, based on the inclusion of the new 10% Constant condition and Mr. Malik's new figures (again, without Vesterra's knowledge or consent). The second approval document was prepared -- expressly including the "10% breakeven" requirement -- and the required signatures were obtained on August 16, 2004. Defs.' Facts, at ¶¶ 10-15, 27-32. *See also* Exhibit G. The next day (August 17) an internal approval letter was issued to Mr. Malik (cc'd to John Hancock's "closing" department) from Patricia Coyne, John Hancock's credit officer, which again listed the "10% Breakeven" as one of three "Disbursement Requirements." *See* Exhibit Q. That same day, Mr. Malik countersigned the Loan Application, which purportedly converted it into a "commitment." (However, as admitted by John Hancock, the actual final approval of the loan and its amount would not be made until closing, which was not projected to occur until August 2005, and which in fact never did occur. *See* Exhibit F.)

Hence, as far as John Hancock was concerned, the 10% Constant remained as a condition for actual disbursement of the Loan. Thus it cannot have been merely a requirement for initial approval of the Loan Application (as John Hancock tries to argue), nor can it have been a requirement based merely on Mr. Malik's manipulated *pro formas* -- otherwise, once the Loan

had been approved on this basis of these *pro formas*, the 10% Constant would not have continued as an independent requirement for disbursement. Mr. Malik confirmed at his January 27 deposition that the prerequisites for <u>disbursement</u> of the Loan did in fact include satisfying this "10% breakeven" requirement. Exhibit B, at 66, 68, 130-33, 219-20. Mr. Malik also testified that this condition was not contained in the Loan Application, that he never informed Vesterra of this requirement and, furthermore, that John Hancock was aware that the figures submitted by Vesterra as part of the Loan Application showed that Vesterra would <u>not</u> meet this additional requirement for disbursement of the Loan. *Id.* at 89-91, 93, 98-100, 121-23, 203-06.

Although Mr. Malik at times expressed some uncertainty about the application of this 10% breakeven requirement, he testified that the loan "closer" for John Hancock would review "all the criteria set forth" in the John Hancock Approval before disbursing the Loan, and that the "disbursement requirements" listed therein included the "10% breakeven." *Id.* at 130-33, 219-20. Only later, no doubt after consultations with John Hancock's attorneys, did Mr. Malik develop his present certainty that the 10% Constant was <u>not</u> such a disbursement requirement, contradicting both his earlier testimony and the plain import of John Hancock's internal documents.

Thus, John Hancock's own documents, and the testimony of its own witnesses, establish that the 10% Constant was added as a new condition for <u>disbursement</u> of the Loan, without Vesterra's knowledge or consent, and with John Hancock's awareness that Vesterra's submitted financial information would not meet that requirement. Further, this same evidence establishes *at least* a question of fact as to whether this new condition was concealed from Vesterra because John Hancock's representative in Pennsylvania informed John Hancock that this was a "deal killer," and to avoid consequent hedge losses. Accordingly, John Hancock has not established that there was ever a "meeting of the minds" so as to create a contract in the first place, nor has it

8

submitted evidence sufficient to prove the other elements of its breach of contract claim, or to

dismiss Vesterra's counterclaims, beyond a question of fact.[6]

**III.    Despite Its Best Efforts, Vesterra Was Unable to Achieve Occupancy of About One-Half of the Units in the Avenel Apartments Prior to the Closing Date and Accordingly Explored Other Alternatives**

Since February 2005, Koller Kelly, LLC ("Koller Kelly") has provided management and

leasing services to Avenel. Kelly Aff., ¶¶ 5-9. As the management company for Avenel, Koller

Kelly was responsible for leasing the apartments, financial accounting and general property

management. *Id.*, at ¶ 10. Some of the marketing activities undertaken to rent apartments in

Avenel have included (but are not limited to) advertising in print media in the Philadelphia,

suburban Philadelphia and southern New Jersey areas (e.g., *Apartment Guide*, *Apartment*

*Finders* and *Apartment Shoppers Guide*); advertising on the Internet; and maintaining a website

for Avenel (www.avenelapartments.com). Defs.' Facts, at ¶¶ 43-44; Kelly Aff., ¶¶ 11-12;

Exhibits Z, AA and BB. In addition, Koller Kelly established a "Preferred Employer Program"

with local employers which offers rent "specials," and advertised in local newspapers. *Id.*

Despite Koller Kelly's best efforts, Avenel was unable to achieve the minimum

occupancy requirements provided for in the Loan Application. Kelly Aff., ¶¶ 15-16; Koller Aff.,

¶ 23. This inability to reach these requirement occurred for a number of reasons, including the

fact that construction was behind schedule, and interest rates remained unexpectedly low so that

individuals who would otherwise have leased apartments were able to afford townhomes. *Id.*

For example, in April 2005 and July 2005, Avenel was only 32% and 44% occupied,

respectively. Kelly Aff., ¶ 14. Even in December 2005, more than four months after the Loan

---

[6] John Hancock also asserts that it later reduced this 10% constant to a 9% constant for all loans with interest rates below 6.5%. However, John Hancock has produced <u>no</u> evidence that this applied retroactively to already established disbursement requirements. Furthermore, this later unilateral change of an undisclosed term would not obviate the established fact that this was an essential term for disbursement of the Loan, upon which no meeting of the minds was ever reached. Finally, Vesterra would not have met the 9% constant requirement in any case. Koller Aff., ¶ 18.

was supposed to have closed, Avenel was only 53% occupied. *Id.* The anticipated cash flow or income for Avenel is to be derived primarily from its leasing. *Id.*, at ¶ 17. Thus, Vesterra would not have met the 10% Constant if it had endeavored to close the Loan in 2005. *Id.*, ¶ 18.[7]

## IV.    John Hancock Has Failed to Submit Any Evidence of its Actual Damages

For all of the reasons set forth above, the Loan Application never became a binding agreement between Vesterra and John Hancock. However, even if it *were* a binding agreement, and even if Vesterra were found to have breached it, the Loan Application does not provide for the "yield maintenance" remedy sought by John Hancock (as explained in more detail in Vesterra's cross-motion for partial summary judgment). There is no basis for measuring damages with the use of a formula that was specifically limited to a prepayment premium and default acceleration under the loan itself. Such a "prepayment" premium or penalty was specifically described, in great detail, as a provision that would be included in the terms of the loan and the terms of the note, for prepayment of or default on the loan. *See* Exhibit A, at Conditions 3(g) and 6(d). If John Hancock had intended this to be the measure of damages, this same language could have been included in the definition of Costs and damages available for a breach of the Loan Application itself. It was not.

Thus, John Hancock must show its actual damages from Vesterra's alleged breach of the purported contract. This it has failed to do. In fact, John Hancock has failed to submit any evidence of any actual damages or losses related to the Loan Application; rather, it has only submitted to the Court a hypothetical calculation based on the difference between the proposed loan and ten-year treasury bills, that was specifically provided only for prepayment of or default on the Loan itself. (In addition, since the Loan Application provides that John Hancock would

---

[7] John Hancock makes various assertions based on statements made by Vesterra during settlement negotiations in 2005. *See, e.g.*, JH Mem., at 8, 10, 12. This is improper under F.R.E. 408, and all such references should be stricken and ignored.

not have loaned the entire $32 million if occupancy were lower than required for $4.2 million in rental income, there also remains a factual question as to the amount upon which any purported damages should be calculated, even if the Loan Application provided for the recovery of lost interest absent a closing of the Loan -- which it does not.)

## ARGUMENT

### I.    The Standard for Summary Judgment

The standard for summary judgment is well established:

> In adjudicating a motion for summary judgment, a district court construes the facts "in the light most amiable to the nonmovant[ ] and indulge[s] all reasonable inferences favorable to [him]." The Civil Rules empower the court to render summary judgment only when this portrait of the case depicts "no genuine issue as to any material fact" and establishes "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual issue is "genuine" if "it may reasonably be resolved in favor of either party" and, therefore, requires the finder of fact to make "a choice between the parties' differing versions of the truth at trial."

*DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). Thus, Vesterra, as the non-movant, is entitled to all reasonable inferences in its favor. *Paparo v. M/V Eternity*, 433 F.3d 169, 172 (1st Cir. 2006) (reversing grant of summary judgment where reasonable inferences were not drawn in favor of the non-moving party).

### II.   John Hancock Has Not Presented Sufficient Evidence To Support Judgment as a Matter of Law on Its Breach of Contract Claim

#### A.    The Loan Application Never Became a Binding Contract Because There Was No Meeting of the Minds

First and foremost, John Hancock's motion for summary judgment on its breach of contract claim must be denied because John Hancock has not met its burden of demonstrating the existence of a contract. The Loan Application, although signed by both parties, cannot be construed to be a binding contract because there was no meeting of the minds on a crucial

provision -- the requirements that must be met by Vesterra for disbursement of the Loan. As

explained above, John Hancock approved the loan with an added "disbursement requirement"

that was not included in the Loan Application -- the 10% Constant. Vesterra, on the other hand,

had agreed to disbursement requirements that were limited to certain revenue and valuation

benchmarks, and which did <u>not</u> include the 10% Constant. Furthermore, it is undisputed that

Vesterra would not have agreed to this additional disbursement requirement (*see* Koller Aff.,

¶36; Kelly Aff., ¶ 24) which, as demonstrated by Mr. Malik's tortured manipulations, the

financial information supplied by Vesterra to John Hancock showed that Vesterra was unlikely

to meet. Accordingly, John Hancock cannot demonstrate the "meeting of the minds" that was

essential for the Loan Application to become a contract.

It is a fundamental principle of contract law that "the formation of a contract requires a

bargain in which there is a manifestation of mutual assent to the exchange and consideration."

RESTATEMENT (SECOND) OF CONTRACTS § 17(1); *I & R Mech., Inc. v. Hazelton Mfg. Co.*, 62

Mass. App. Ct. 452, 454-55, 817 N.E.2d 799, 802 (Mass. App. Ct. 2004). This mutual assent

occurs when parties have "'a meeting of the minds' on the same proposition on the same terms at

the same time." *I & R Mech., Inc.*, 62 Mass. App. Ct. at 455, 817 N.E.2d at 802; *see also Twin*

*Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 423, 837 N.E.2d 1121,

1134 (Mass. 2005) ("a contract requires a 'meeting of the minds'") (citations omitted). "Failure

of the parties to agree on the essential terms of a contract precludes the existence of an express

contract." *Fraser and Wise v. Primarily Primates, Inc.*, 966 F. Supp. 63, 76 (D. Mass. 1996); *see*

*also Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 229-30

(1st Cir. 2005) (affirming district court's conclusion that there was "insufficient evidence in the

record to find that the parties had reached a meeting of the minds" and, accordingly, that there

was no breach of contract).

The agreement of John Hancock and Vesterra as to some or even most of the material terms does not constitute a meeting of the minds. "It is not enough if parties negotiating have agreed upon certain important terms if there has been no agreement on other essential elements of the undertaking . . . ." *The Community Builders, Inc. v. Indian Motorcycle Assocs., Inc.*, 44 Mass. App. Ct. 537, 556, 692 N.E.2d 964, 976-77 (Mass. App. Ct. 1998) (quotation omitted); *Mass Cash Register, Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404, 417 (D. Mass. 1995) (same). For example, in *Nelson v. Rebello*, 26 Mass. App. Ct. 270, 273, 530 N.E.2d 798, 800 (Mass. App. Ct. 1988), where a signed offer form included most of the significant economic terms but was silent as to one significant economic factor, the Appeals Court of Massachusetts determined that "there was no meeting of the minds" and hence no binding contract.

The undisputed fact that the 10% Constant was added by John Hancock after Vesterra signed the Loan Application means that there was similarly no meeting of the minds here. This additional requirement could have meant -- in fact, would likely have meant -- that John Hancock would not have disbursed the loan even if Vesterra had met the other conditions that were spelled out in the Loan Application. Thus, this added condition, to which Vesterra did not agree and would not have agreed, was not only a material element of the parties' prospective agreement, but was an <u>essential</u> element upon which no agreement was reached.

There is a vigorous factual dispute as to the meaning and character of the added 10% Constant disbursement requirement. But this dispute is not between Vesterra's version of events and John Hancock's version. Rather, the dispute is largely between the plain meaning of John Hancock's internal documents, which was supported by Mr. Malik's sworn deposition testimony on January 27th, and John Hancock's present legal position, supported by Mr. Malik's subsequent sworn affidavit. This is a classic issue of disputed material fact that must be decided by the jury, which must assess the credibility of Mr. Malik's former and present testimony.

13

**B.    The Loan Application is Not Enforceable Because It is Illusory**

As explained above, John Hancock retained the ability to fund the Loan or not -- subject to its satisfaction with the financial condition of the project and the related entities, within John Hancock's "sole discretion."  Vesterra submits that this broad discretion makes any purported contract "illusory."  John Hancock's only response is to quote a First Circuit case noting that contracts with such provisions are "generally upheld," and to assert that the implied covenant of good faith and fair dealing eliminates the illusory nature of John Hancock's obligation.  JH Mem., at 11-12.  However, the question is not whether such contracts are *generally* found to be binding.  The question is whether *this* Loan Application is binding on John Hancock or illusory in the very particular circumstances *here* -- where there was an additional undisclosed requirement for disbursement of the Loan added unilaterally by John Hancock, and where the Loan Application reserves "sole discretion" to John Hancock in the very subject area of that additional undisclosed disbursement requirement.

Further, it is well-settled that the requirement of "good faith" cannot serve to change or contradict the explicit terms of a contract.  The fact that John Hancock must exercise its discretion with good faith does not alter the fact that it was expressly within John Hancock's "sole discretion" whether to fund the proposed loan.  *See, e.g.*, *Piantes v. Pepperidge Farm, Inc.*, 875 F. Supp. 929, 938 (D. Mass. 1995) (lack of good reason for termination of franchisee did not show absence of good faith, where franchisor exercised clear contractual right to terminate long-standing franchisee); *Eaton Financial Corp. v. Automotive Testing Equip., Inc.*, 1991 Mass. App. Div. 178, 1991 WL 241863, *4 (Nov. 7, 1991) (repossession of leased equipment not breach of covenant of good faith where contract accorded plaintiff "almost unfettered latitude and discretion in disposing of the equipment").  *See also McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287, 302 (1st Cir. 2004) ("covenant [of good faith]

14

cannot be used to contradict clear contractual terms"); *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004) (implied covenant of good faith and fair dealing "may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship"); *Sheehan v. FDIC*, 36 F.3d 1089, 1994 WL 524090, *2 (1st Cir. Sept. 26, 1994) (unpublished) (implied covenant did not limit "unrestricted discretion to withhold approval", and plaintiffs made no showing of "bad faith"); *Hackenson Corp. v. Fairhaven Assocs. Inc.*, No. 011616, 2001 WL 1249691, *2 (Mass. Super. Ct. Aug. 17, 2001) (affirming "broad powers of discretion" granted to the defendant in the agreement at issue, even though these "may have placed the plaintiff as a disadvantage").

Thus, under the caselaw, John Hancock's unfettered discretion cannot be abridged by the implied covenant of good faith. Because this discretion may be informed here by an additional undisclosed disbursement requirement, and because the Court must draw all reasonable inferences in favor of the non-movant, disputed issues of material fact preclude summary judgment for John Hancock on its breach of contract claim.

### C.   The Loan Application Is Void and Unenforceable and Should Be Rescinded Because of John Hancock's Fraudulent Inducement

Vesterra has both alleged that, and adduced evidence that, John Hancock misrepresented the terms and conditions under which the Loan would be disbursed. These conditions were not limited to those set forth in the Loan Application, as Vesterra believed. Rather, as demonstrated by John Hancock's own internal documents, the 10% Constant was adopted as an additional "disbursement requirement." This material misrepresentation concerning the conditions for disbursing the Loan renders the Loan Application void and unenforceable, and thus incapable of supporting John Hancock's claim for breach of contract.

John Hancock has asserted that the unfair and deceptive acts occurred primarily in Pennsylvania (JH Mem., at 17). While Vesterra maintains that the undisclosed addition of the

10% Constant took place in Massachusetts, so as to satisfy the requirements for applying Chapter 93A (see below), Vesterra does not object to the application of Pennsylvania law to its common-law claim of fraudulent inducement.[8]  Under Pennsylvania law, "the victim of fraud in the inducement has two options: (1) rescind the contract, or (2) affirm the contract and sue for damages."  *Eigen v. Textron Lycoming Reciprocating Engine Division*, 874 A.2d 1179, 1184 (Pa. Super. Ct. 2005) (citing *Scaife Co. v. Rockwell-Standard Corp.*, 285 A.2d 451, 456 (Pa. 1971) (other citations omitted).  Vesterra was a victim of fraudulent inducement, and any agreement founded on the Loan Application should be rescinded.[9]

> Fraudulent inducement has the following six elements:
>
> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Eigen*, 874 A.2d at 1185 (citations omitted); *see also Porreco v. Porreco*, 811 A.2d 566, 570 (Pa. 2002) (citations omitted) (listing the same elements for fraudulent misrepresentation); *Overall v. University of Pennsylvania*, 412 F.3d 492, 498 (3d Cir. 2005) (same).[10]  Vesterra has provided evidence as to each of these elements.  *See* Statement of Relevant Facts, *supra*, sections I-II.

John Hancock bases its entire argument against Vesterra's fraud counterclaim on the proposition that the 10% Constant was merely a requirement for approval, using John Hancock's underwriting assumptions, and was <u>not</u> added as a separate requirement for disbursement of the Loan. (JH Mem., at 14.)  However, as explained above, this is contradicted by John Hancock's

---

[8]  If the parties in a dispute have agreed as to what law governs, "a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the parties' agreement."  *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991).

[9]  Under this Counterclaim, Vesterra also seeks the return of its fees and punitive damages.

[10]  Under Massachusetts law, fraudulent inducement includes the following elements:  "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying."  *Commerce Bank & Trust Co. v. Hayeck*, 46 Mass. App. Ct. 687, 692, 709 N.E.2d 1122, 1126 (Mass. App. Ct. 1999) (quotation omitted).

own internal documents, which identify the "10% Breakeven" as a <u>disbursement requirement</u>, and by Mr. Malik's own earlier testimony.

It is undisputed that Vesterra would not have signed the Loan Application if it had known of the 10% Constant requirement for disbursement of the Loan. *See* Exhibit C, at 84-85, 93-94 (John Hancock's Mr. Ferrie admits that the 10% Constant was a "deal killer"); Koller Aff., ¶ 36; Kelly Aff., ¶ 24. As the non-movant, Vesterra is entitled to the reasonable inferences that (1) a "disbursement requirement" is in fact a requirement that must be satisfied for disbursement of the proposed loan, and (2) John Hancock concealed this additional requirement from Vesterra to avoid having to cancel the Loan Application, pay hedge losses of $355,000, and give up almost $1 million in loan fees from Vesterra. These are, at the very least, disputed issues of material fact that must be decided by the jury after weighing not only the documentary evidence but also the credibility of the witnesses. Accordingly, Vesterra's counterclaim for fraudulent inducement cannot be dismissed on summary judgment, and for the same reasons John Hancock's motion for summary judgment on its breach of contract claim must be denied.

### D. Vesterra Did Not Breach the Requirements of the Loan Application by Failing to Make a Futile Request to Close the Loan or by Failing to Pay John Hancock the Yield Maintenance Damages that are not Provided for in the Loan Application

Even if the Loan Application were an enforceable agreement, John Hancock knowingly misstates the facts when it asserts that Vesterra simply decided not to close the Loan. It is undisputed that John Hancock would not have disbursed the Loan unless the Avenel Apartments achieved at least 80% occupancy, and that through the end of 2005 occupancy at no time exceeded 53%. Kelly Aff., ¶ 14. Thus, any request by Vesterra to John Hancock to close the

Loan would have been futile, and the law does not require futile or useless acts.[11]  Nor has John

Hancock even alleged that Vesterra failed to use its best efforts to rent out the apartments.

Additionally, Vesterra did not breach the Loan Application by failing to pay John

Hancock the "yield maintenance" damages that it has calculated under the formula provided for

prepayment of the Loan or default on the note in Conditions 3(g) and 6(d).  The Loan was never

closed, the note never signed, and the terms of the Loan and note never took effect.  Koller Aff.,

¶ 34.  Nowhere is this formula included or contemplated for breach of the Loan Application, and

John Hancock has submitted no evidence of any actual damages arising under the Loan

Application.[12]

**III.    John Hancock Has Not Presented Sufficient Evidence to Enter Judgment as to Vesterra's Other Counterclaims as a Matter of Law**

**A.    Declaratory Judgment, Unjust Enrichment, Money Had and Received, Conversion, and Common Law Fraud**

Because John Hancock has not provided facts sufficient to support its motion for

summary judgment as to the breach of contract claim, for the reasons stated above, material

issues of fact remain outstanding as to Vesterra's claims for declaratory judgment, unjust

enrichment, money had and received, conversion, and (as explained in detail above) common

law fraud.  John Hancock's motion for summary judgment must be denied as to those claims.

**B.    Violation of Chapter 93A**

Lastly, John Hancock argues that Vesterra's counterclaim for violation of Chapter 93A

should be dismissed because (1) John Hancock asserts that it did not engage in any "unfair or

deceptive" conduct, and (2) John Hancock asserts that the allegedly unfair and deceptive acts did

---

[11] *Northern Heel Corp. v. Compo Industries, Inc.*, 851 F.2d 456, 461 (1st Cir. 1988) ("The law should not be construed idly to require parties to perform futile acts or to engage in empty rituals"); *Cheschi v. Boston Edison Co.*, 39 Mass. App. Ct. 133, 142, 654 N.E.2d 48, 54 n.10 (Mass. App. Ct. 1995).

[12] As noted above, John Hancock's quotation of Vesterra's statements made during settlement negotiations is improper under F.R.E. 408, and all such references should be stricken and ignored.

not occur "primarily and substantially" with Massachusetts. Because a jury could reasonably draw inferences and make findings adverse to John Hancock on both of these issues, John Hancock's motion for summary judgment on Vesterra's Chapter 93A claim should also be denied.

First, it is well established that "[c]ommon law fraud can be the basis for a claim of unfair or deceptive practices under the statute, and an intentional fraud can constitute a basis for the multiplication of damages." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 714, 563 N.E.2d 188, 194-95 (1990) (citations omitted). *See also Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004) ("unfair" conduct covered by statute includes conduct "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people") (internal quotation omitted).[13] Indeed, causes of action under Chapter 93A have fewer requirements than a common law action for fraud. *See, e.g., Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 800, 840 N.E.2d 526, 534 n.20 (2006) (Chapter 93A does not require proof of actual reliance by the plaintiff on a representation). As explained above, John Hancock's own documents provide evidence supporting Vesterra's claim of common law fraud, which is a sufficient legal basis for its claim under Chapter 93A.

John Hancock also argues that the conduct that gave rise to this claim did not occur primarily and substantially within Massachusetts. Under the statute, John Hancock bears the burden of proving this affirmative defense. *Kansallis Finance Ltd. v. Fern*, 40 F.3d 476, 481 (1st

---

[13] Chapter 93A protects businesses as well as consumers: "The Legislature originally enacted c. 93A to improve the commercial relationship between consumers and businessmen. By requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace. By the addition of [G.L. c. 93A, § 11,] by St. 1972, c. 614, § 2, . . . these protections were extended to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce." *Manning v. Zuckerman*, 388 Mass. 8, 12, 444 N.E.2d 1262, 1264-65 (1983)).

Cir. 1994) (section 11 of the statute "provides an exemption from 93A liability, available as a defense, rather than a jurisdictional prerequisite to suit, and thus defendants bear the burden of proving a lack of primary and substantial involvement in Massachusetts"). John Hancock cannot meet this burden here. It is undisputed that the addition of the new and undisclosed requirement for disbursement of the Loan, the 10% Constant requirement, took place in Massachusetts. In addition, the events surrounding the loan approval support an inference that the decision not to inform Vesterra of this additional requirement -- and thus to misrepresent the conditions for disbursement of the Loan -- also occurred in Massachusetts. (Furthermore, the Loan Application by its own terms "shall be deemed to be executed and performable in . . . Massachusetts." Exhibit A, ¶ 35.) Under these facts, a jury could reasonably find that "the center of gravity of the circumstances that give rise to the claim is primarily and substantially" in Massachusetts. *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 473, 781 N.E.2d 787, 799 (2003). *See also Kansallis Finance, supra,* 40 F.3d at 480-81 (affirming determination that the conduct at issue occurred primarily and substantially within Massachusetts, even though opinion letter containing misrepresentations was drafted, and fraudulent filings occurred, outside of state, where opinion letter was executed and the loan money was disbursed in Massachusetts). Accordingly, John Hancock's motion for summary judgment should be denied as to Vesterra's counterclaim under Chapter 93A.

## CONCLUSION

For the foregoing reasons, John Hancock's motion for summary judgment should be denied.

Respectfully submitted,


  /s/ Robert D. Hillman
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.:  617-951-2300


  /s/ Howard D. Scher
Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700


Attorneys for Defendants/Counterclaim Plaintiffs
Vestmont Limited Partnership, Vestmont Limited
Partnership II, Vestmont Limited Partnership III
and Vesterra Corporation


Dated:  March 14, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____          :
                                             :
JOHN HANCOCK LIFE INSURANCE                  :
COMPANY,                                     :     Civil Action No. 05-11614 WGY
                                             :
            Plaintiff,                       :
                                             :
        v.                                   :
                                             :
VESTMONT LIMITED PARTNERSHIP,                :
et al.,                                      :
                                             :
            Defendants.                      :
_____          :

I, Brian J. McCormick, Jr., hereby certify that on this 14th day of March 2006, the following documents have been filed electronically and are available for viewing and downloading on the Electronic Case Filing System of the United States District Court for the District of Massachusetts:

(1)     Defendants' Statement of Disputed Facts in Opposition to the Motion for Summary Judgment of Plaintiff John Hancock Life Insurance Company;

(2)     Defendants' Memorandum of Law in Opposition to the Motion for Summary Judgment of Plaintiff John Hancock Life Insurance Company;

(3)     Affidavit of James R. Koller;

(4)     Affidavit of Joseph P. Kelly; and

(5)     Declaration of Brian J. McCormick, Jr. in Opposition to the Motion for Summary Judgment of Plaintiff John Hancock Life Insurance Company.

I further certify that I caused a true and correct copy of these documents to be served by first-class, regular mail upon the following:

Brian A. Davis, Esquire
Paul D. Popeo, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

I hereby certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

 /s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr.

2