UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP, et al.,<br><br>Defendants. | :<br>:<br>:  Civil Action No. 05-11614 WGY<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**AFFIDAVIT OF JAMES R. KOLLER IN SUPPORT OF DEFENDANTS'
OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
OF PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY**

COMMONWEALTH OF PENNSYLVANIA   )
                              )   SS:
COUNTY OF MONTGOMERY           )

JAMES R. KOLLER deposes and says:

1. I make this Affidavit based upon my personal knowledge, information and belief. If called upon to do so, I could competently testify at a hearing or trial about the matters stated herein.

2. I graduated from the Dickinson School of Law in 1976 and am a member of the bar of the Commonwealth of Pennsylvania.

3. I am a limited partner of Vestmont Limited Partnership and Vestmont Limited Partnership II, both of which are defendants in this action. I am also the President and a director of Defendant Vesterra Corporation.

4.  I consider myself an experienced and sophisticated real estate attorney and developer.

5.  Montgomery Square Partnership ("Montgomery Square") is a general partnership composed of three limited partnerships: Vestmont Limited Partnership, Vestmont Limited Partnership II and Vestmont Limited Partnership III. Montgomery Square was formed in 1996 to develop a tract of land containing approximately 180 acres located in the suburban Philadelphia area. This development includes a retail shopping center and a residential apartment complex.

6.  Vesterra Corporation is the general partner of Vestmont Limited Partnership, Vestmont Limited Partnership II and Vestmont Limited Partnership III.

7.  Vesterra Corporation is a real estate development company. It is not a single-purpose entity, but holds interests in commercial real estate other then Montgomery Square. Vesterra Corporation has been involved in the development of both commercial and residential commercial real estate sites since 1986.

8.  Montgomery Square is the owner of a 256-unit apartment complex known as "Avenel at Montgomery Square," in North Wales, Pennsylvania ("Avenel").

9.  Construction of the Avenel Apartments began in 2003 and was originally scheduled to be completed in or about March 2005.

10. Construction of Avenel was completed in March 2006.

11. To fund the construction of Avenel, Montgomery Square obtained a loan in the amount of $30,732,000 in May 2003 from Wilmington Trust of Pennsylvania (the "construction loan").

12. In the summer of 2004, Montgomery Square sought to put in place arrangements for repayment of the construction loan by obtaining permanent financing for the Avenel project. The permanent mortgage loan that we sought needed to be $32 million in order to pay down the entire construction loan and related expenses.

13. Montgomery Square sought a forward commitment for a permanent mortgage loan in order to lock in a favorable interest rate.

14. Montgomery Square negotiated the terms of a document that, in its final form, is entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application").

15. I signed the Loan Application, on behalf of Montgomery Square, on July 30, 2004, and submitted it to John Ferrie, John Hancock's regional manager.

16. On August 2, 2004, we requested that John Hancock lock the interest rate on the Loan for one year at 6.18%, as provided in Loan Application.

17. The disbursement of the full loan amount was contingent on certain conditions beyond the control of Montgomery Square, including occupancy and revenue levels. Furthermore, occupancy of at least 80% of the apartment units in Avenel was required even for disbursement of less than the full amount of the loan.

18. Since July 2004, I have believed that the disbursement of the full loan amount was subject to the unfettered discretion of John Hancock.

19. During discovery in this case, I learned that disbursement of the full loan amount was made subject to another condition that had not been negotiated between the parties and was not disclosed to Vesterra prior to this litigation -- the "10% Constant" or "10% Breakeven" disbursement requirement. None of the members of Montgomery Square were ever told about

this additional disbursement requirement. No John Hancock employee ever discussed or approached me about using or including a 10% constant disbursement requirement in the loan documents.

20. Further, during discovery in this case, I learned that Timothy Malik, an Assistant Vice President and one of our primary contacts with John Hancock, made several unilateral modifications to Avenel's suggested figures and calculations in order to ensure that the Avenel figures met John Hancock's requirements. However, Mr. Malik never asked anyone at Montgomery Square to agree to the modification of the calculations and projections which were a part of the Loan Application, and on which we believed disbursement of the loan would be based; nor did Mr. Malik send us an amendment to the Loan Application, which was the process contemplated for any modifications by the Loan Application in paragraph 30(b)(ii).

21. Despite our best efforts, as of May 2005, only about 38% of the apartment units at Avenel had been occupied, and it was apparent to us that we were not going to achieve the 80% occupancy necessary to disburse even a reduced amount of the Loan.

22. Accordingly, in May 2005, I informed John Ferrie of John Hancock that Montgomery Square would not meet several conditions in the Loan Application, including conditions relating to occupancy and revenue.

23. Because we were having unexpected difficulties achieving the occupancy level required to obtain the permanent mortgage loan, Joseph Kelly and I, on behalf of Montgomery Square explored other alternatives, and learned that, unexpectedly, the real estate market was now such that apartment complexes in the same geographic area had sold without a requirement of first attaining any occupancy. Thus, realizing that we were unable to meet the requirements to close the Loan, we began, in May and June 2005, to explore a sale of Avenel instead.

24. During the summer of 2005, I engaged in discussions with several John Hancock employees and attorneys, including Thomas Rogers, an attorney representing John Hancock. Beginning in May, 2005, all of my communications with John Hancock representatives were directed at an attempt to resolve any potential dispute and reach a compromise with John Hancock, and thus were statements covered by Federal Rule of Evidence 408.

25. John Hancock refused to negotiate, and, instead, adopted a hard-line view and demanded more than $6.6 million from Vesterra if the loan did not close on Vesterra's account.

26. I explained to Mr. Rogers that Avenel would not be able to meet the 80% occupancy requirement by the anticipated closing date of August 1, 2005. Mr. Rogers suggested we extend the closing date pursuant to the Loan Application. I explained to Mr. Rogers that such an extension would be useless, since we would not be able to satisfy the 80% occupancy requirement, even if we extended the closing date to the last date possible, which was February 1, 2006.

27. In fact, today, March 13, 2006, we are still only 52% occupied.

28. When Montgomery Square entered into the Loan Application, I understood that the prepayment premium, which is included in Condition 3 of the Loan Application, and the default premium, included in Condition 6, would apply only to a prepayment or default of the Loan if and when the Loan closed. I also understood that no such provision was included as a condition relative to the application process itself.

29. On July 29, 2004, during our negotiation of the terms of the Loan Application, I received an email from John Ferrie. In that email, Mr. Ferrie makes reference to "unlimited losses." I understood that reference to denote John Hancock's possible hedge losses, not as a reference to "yield maintenance" losses.

30. At no point did we ever believe that Vesterra could be liable for a prepayment premium or default premium for a loan that never made it past the application process, a loan that we never received. Montgomery Square would never have agreed to such a condition or to any other form of "yield maintenance" premium or penalty related to performance of the Loan Application itself. In addition, Montgomery Square would never have agreed to such a possible "premium" or "penalty" for failure to meet conditions that were not within its control.

31. Both John Hancock and Montgomery Square recognized that Avenel might not be fully occupied by August 1, 2005. In fact, both parties understood that construction of the Avenel apartments might not even been complete by August 1, 2005 -- which turned out to be the case.

32. There were several reasons for the delay in achieving the anticipated occupancy level, including a delay in the construction, but more importantly, an unexpected, continued decline in mortgage interest rates that led to an increase in home purchases in the geographic area surrounding Avenel and a consequent diminished demand for the rental of high quality apartments such as those Avenel.

33. John Hancock never agreed to disbursement of the full loan amount if Avenel was not fully occupied. Rather, John Hancock agreed to lend a <u>reduced amount</u> to Montgomery Square, but <u>only</u> if the Avenel Apartments were <u>at least</u> 80% occupied.

34. Montgomery Square would <u>not</u> have met <u>either</u> the 9% or the 10% Constant if it had endeavored to close the Loan in 2005. In fact the Loan did not close, and no note or mortgage or any other "loan document" related to the Loan was ever signed by Montgomery Square.

35. John Hancock consistently made it clear to us that its' minimum requirement for closing the Loan was the 80% occupancy specified in the Loan Application (at which level Vesterra would receive a loan of only $26,620,000).

36. Montgomery Square would not have signed the Loan Application if it had known of the 10% Constant requirement for disbursement of the Loan, nor would it have agreed to any amendment of the Loan Application to add such a requirement.

37. I have carefully read the above Affidavit and I certify under penalty of perjury that the foregoing is true and correct.

Executed by me on March 14, 2006

_____
JAMES R. KOLLER

SWORN TO and subscribed before
me this 14 day of March, 2006.

_____
Notary Public

BETTY CHERI PEARCE,
Commissioner Of Deeds
Commonwealth Of Pennsylvania
Commission Expires April 24, 2006

My Commission Expire