UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | : : : | Civil Action No. 05-11614 WGY |
| Plaintiff, | : : | |
| v. | : : | JURY TRIAL DEMANDED |
| VESTMONT LIMITED PARTNERSHIP, et al., | : : : | |
| Defendants. | : : | |

### DECLARATION OF BRIAN J. MCCORMICK, JR. IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY

BRIAN J. McCORMICK, JR., of full age, hereby declares as follows:

1.      I am an attorney-at-law of the Commonwealth of Pennsylvania and an associate with the law firm of Buchanan Ingersoll PC, counsel for Defendants/ Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation in the above-captioned action. I have also been admitted *pro hac vice* to this Court pursuant to an Order entered on February 23, 2006. As such, I have personal knowledge of the facts set forth herein.

2.      This Declaration is submitted in support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment.

3.      Attached hereto as Exhibit "A" is a true and correct copy of a document entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan."

4.      Attached hereto as Exhibit "B" is a true and correct copy of relevant portions of the January 27, 2006 deposition of Timothy Malik.

5.      Attached hereto as Exhibit "C" is a true and correct copy of relevant portions of the February 1, 2006 deposition of John Ferrie.

6.      Attached hereto as Exhibit "D" is a true and correct copy of relevant portions of the January 27, 2006 deposition of James R. Koller.

7.      Attached hereto as Exhibit "E" is a true and correct copy of a document entitled "Vesterra Corporation's Principals."

8.      Attached hereto as Exhibit "F" is a true and correct copy of a May 9, 2005 letter from Jessica Yaffie Leveroni to Leonard Shatz, Esq.

9.      Attached hereto as Exhibit "G" is a true and correct copy of the internal John Hancock loan approval package, containing Bates numbers JH 00405 through JH 00425.

10.     Attached hereto as Exhibit "H" is a true and correct copy of a July 29, 2004 email from John Ferrie to Joseph Kelly, Robert Kelly and Timothy Malik.

11.     Attached hereto as Exhibit "I" is a true and correct copy of a document entitled "Assignment Memorandum to Closing Department."

12.     Attached hereto as Exhibit "J" is a true and correct copy of a document entitled "Interest Rate Circle Notification."

13.     Attached hereto as Exhibit "K" is a true and correct copy of Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company, and accompanying cover letter.

14.    Attached hereto as Exhibit "L" are true and correct copies of a March 3, 2006 letter from Howard D. Scher, Esq., to Brian A. Davis, Esq. and a March 10, 2006 letter from Howard D. Scher, Esq., to Brian A. Davis, Esq. and Paul D. Popeo, Esq.

15.    Attached hereto as Exhibit "M" is a true and correct copy of an August 11, 2004 email from Timothy Malik to John Ferrie, containing Bates number JH 00131 through JH 00132.

16.    Attached hereto as Exhibit "N" is a true and correct copy of the internal John Hancock loan approval package, containing Bates numbers JH 01128 through JH 01148.

17.    Attached hereto as Exhibit "O" is a true and correct copy of an August 12, 2004 email from Timothy Malik to David Henderson and Ivor Thomas.

18.    Attached hereto as Exhibit "P" is a true and correct copy of an August 11, 2004 email from Timothy Malik to John Ferrie, containing Bates number JH 00135.

19.    Attached hereto as Exhibit "Q" is a true and correct copy of an August 17, 2004 memorandum from Patricia Coyne to Timothy Malik.

20.    Attached hereto as Exhibit "R" is a true and correct copy of an August 12, 2004 email from Timothy Malik to John Ferrie.

21.    Attached hereto as Exhibit "S" is a true and correct copy of an August 11, 2004 email from John Ferrie to Robert Kelly, and attachments.

22.    Attached hereto as Exhibit "T" is a true and correct copy of a June 17, 2004 email from John  Ferrie to Timothy Malik, and attachments.

23.    Attached hereto as Exhibit "U" is a true and correct copy of a July 21, 2004 letter from John Ferrie to Robert Kelly.

24.    Attached hereto as Exhibit "V" is a true and correct copy of a July 29, 2004 letter from John Ferrie to Joseph Kelly.

25.    Attached hereto as Exhibit "W" is a true and correct copy of an August 12, 2004 email from John Ferrie to Timothy Malik.

26    Attached hereto as Exhibit "X" is a true and correct copy of the Privilege Log of John Hancock Life Insurance Company.

27.    Attached hereto as Exhibit "Y" is a true and correct copy of Plaintiff John Hancock Life Insurance Company's Response to Defendants' Second Set of Requests for the Production of Documents and Things.

28.    Attached hereto as Exhibit "Z" are true and correct copies of certain portions of rental publications.

29.    Attached hereto as Exhibit "AA" are true and correct copies of certain Internet advertising materials related to Avenel.

30.    Attached hereto as Exhibit "BB" are true and correct copies of certain advertising materials related to Avenel

I hereby declare under the penalty of perjury that the foregoing statements made by me are true and correct.

/s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr.

Dated: March 14, 2006

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11614-WGY

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JOHN HANCOCK LIFE INSURANCE

COMPANY,

        Plaintiff/Counterclaim

        Defendant

   Vs.

VESTMONT LIMITED PARTNERSHIP,

VESTMONT LIMITED PARTNERSHIP II,

VESTMONT LIMITED PARTNERSHIP III,

and VESTERRA CORPORATION d/b/a

MONTGOMERY SQUARE PARTNERSHIP,

        Defendants/Counterclaim

        Plaintiffs

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

VOLUME:  I

PAGES:  1-224

DEPOSITION OF TIMOTHY J. MALIK

JANUARY 27, 2006

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/Facsimile 617.786.7723

Page 2

1    DEPOSITION of TIMOTHY J. MALIK, a witness

2    called on behalf of the Defendants/

3    Counterclaim Plaintiffs, pursuant to the

4    Federal Rules of Civil Procedure, before

5    Judith McGovern Williams, Certified

6    Shorthand Reporter, Registered

7    Professional Reporter, Certified Realtime

8    Reporter, Certified LiveNote Reporter, and

9    Notary Public in and for the Commonwealth

10   of Massachusetts, at the offices of

11   Deutsch, Williams, Brooks, DeRensis &

12   Holland, P.C., 99 Summer Street, Boston,

13   Massachusetts, on Friday, January 27,

14   2006, commencing at 9:30 a.m.

15

16   APPEARANCES:

17   CHOATE, HALL & STEWART, L.L.P.

18     Brian A. Davis, Esquire

19     Two International Place

20     Boston, Massachusetts  02110

21     617-248-5056

22     bad@choate.com

23     on behalf of the Plaintiff/

24     Counterclaim Defendant

1    APPEARANCES (Continued):

2

3    BUCHANAN INGERSOLL, P.C.

4      Howard D. Scher, Esquire

5      1835 Market Street

6      14th Floor

7      Philadelphia, Pennsylvania   19103-2985

8      215-665-3920

9      scherhd@bipc.com

10     on behalf of the Defendants/

11     Counterclaim Plaintiffs

12

13   ALSO PRESENT:

14     James Koller

15

16

17

18

19

20

21

22

23

24

Page 44

1  Q.  And to whom did he report to then at the

2      time of Regatta and now at the time of

3      Avenel?

4  A.  I believe Sam Davis or Barry Nectow.

5  Q.  Okay.  And to whom did Mr. Henderson

6      report after -- with respect to the Avenel

7      decision?

8  A.  It would -- he would have discussed this

9      with either Barry Nectow or I believe

10     possibly Ivor Thomas.

11 Q.  Ivor Thomas, I-V-O-R?

12 A.  Yes.

13 Q.  T-H-O-M-A-S?

14 A.  Yes.

15 Q.  And who is Mr. Thomas?

16 A.  He is a -- his title is senior vice

17     president, North American Mortgage

18     Operations --

19 Q.  Did he succeed --

20 A.  -- for Manulife.

21 Q.  Did he succeed Mr. Davis?

22 A.  In the transition when he -- yes.  He

23     succeeded Mr. Davis.  Correct.

24 Q.  In terms of the role that Mr. Davis was

1      playing at this time --

2  A.   Correct.

3  Q.   -- with respect to the Regatta loan?

4  A.   Yes.

5  Q.   Now during this period of time, that is

6      2004 to 2005, is it accurate to say that

7      there were changes occurring throughout

8      the John Hancock Company?

9  A.   Yes.

10 Q.   And could you just describe to me in

11      general what, you know, what caused that,

12      which is the obvious?

13 A.   Manulife acquired John Hancock in

14      April 28, 2004.

15 Q.   And over the period of time after that

16      acquisition, certain personnel changes

17      occurred?

18 A.   Correct.

19 Q.   One of which was Mr. Davis' change of his

20      position and Mr. Thomas' assumption of his

21      position; is that right?

22 A.   Yes.

23 Q.   As far as you know with respect to the

24      Regatta and Avenel decisions, were there

1          beginning late 1999 --

2     A.   Yes.  Probably.  Or early 1999.

3     Q.   Okay.  Well, at the time you assumed that

4          position --

5     A.   Yes.

6     Q.   -- could you just describe them for me,

7          what your duties and responsibilities

8          were?

9     A.   My duties were to work with either

10         correspondents or personnel like John

11         Ferrie in the field offices to help them

12         originate mortgage loans on commercial

13         real estate of any sort.

14    Q.   And those duties and responsibilities

15         remain unchanged, even to today?

16    A.   Pretty much.

17    Q.   Have your duties --

18    A.   Excuse me.  There is a change.  I am now

19         considered a credit officer.

20    Q.   And how does that change your duties and

21         responsibilities?

22    A.   I still work with John and other field

23         offices, but now I work with fellow

24         investment officers who work with

1    correspondents to help them get their

2    deals approved.  It has gone, under

3    Manulife, it has gone from a committee

4    process with John Hancock to a signature

5    process for approval, and I am one of the

6    signators now on deals that I'm involved

7    with.

8  Q.  Okay.  The committee process, could you

9    just describe what the committee process

10    is?

11  A.  The committee process is a formal

12    presentation of a written mortgage loan to

13    get it approved so we can send our

14    commitment out in a group setting, where

15    anywhere from four to eight officers, and

16    anybody else who wants to sit in and hear

17    it, hears the presentation and your

18    response to questions asked by the

19    committee.

20  Q.  The signature process is all in writing?

21  A.  The signature is more of a written

22    process, with greater written

23    descriptions, and the loan officer -- John

24    is considered a loan officer, and so are

Page 66

1   A.   Yes.

2   Q.   And it continues through Bates stamp

3        JH 00425.

4   A.   Yes.

5   Q.   Is that the document you have in front of

6        you?

7   A.   Yes.

8   Q.   What is this document called?

9   A.   This is called an approval.  It used to be

10       called a vote by John Hancock, but it is

11       called an approval, a commitment approval,

12       loan approval.

13  Q.   And is it accurate to say that this is an

14       example of the signature process?

15  A.   A begetting example.  It has changed since

16       then.  It has become more descriptive than

17       this form.

18  Q.   So my question is:  How many other

19       approvals had you presented?  You

20       presented this loan?

21  A.   Yes.

22  Q.   How many others had you presented in this

23       process prior to August 16, 2004?

24  A.   I don't recall.

Page 68

1          of it.

2     Q.   I see.  Now is Malik Exhibit 1 the

3          approval of John Hancock Life Insurance

4          Company for the what we have called the

5          Avenel loan?

6     A.   Yes.

7                    MR. SCHER:  So the next exhibit

8          number.

9                    (One-page memorandum dated

10                        August 17, 2004, to Mr. Malik

11                        from Ms. Coyne, production

12                        number JH 01174 marked Exhibit

13                        No. 2 for identification.)

14    BY MR. SCHER:

15    Q.   I show you what I have had marked as Malik

16         Exhibit 2.

17                    (Handing Exhibit No. 2 to the

18         witness.)

19    A.   Yes.

20    Q.   And it is a document that is Bates stamped

21         JH 01174.  It appears to be a memorandum

22         from Patricia C. Coyne, investment

23         officer, to you?

24    A.   Yes.

Page 89

1           MR. DAVIS:  Stipulated.

2           MR. SCHER:  Okay.

3           (Laughter.)

4    Q.  Let's take the earlier e-mail first, --

5    A.  Yes.

6    Q.  -- the one that is seven minutes earlier.

7    A.  Yes.

8    Q.  Is it accurate to say that you were

9        seeking approval to lower the reserves to

10       $150 per unit and to fund the loan with a

11       75 percent loan to value ratio and a

12       1.25 percent debt service coverage ratio?

13   A.  I don't remember this, so let me read this

14       first before I answer.

15   Q.  Please.  I didn't mean to --

16           (Pause.)

17           (The witness viewing Exhibit

18       No. 4.)

19   A.  Okay.

20   Q.  Can you tell me --

21   A.  What was the question again?

22   Q.  Yes.  Is it accurate to say that by this

23       memorandum -- this e-mail you were seeking

24       to reduce the reserves to $150 per unit?

Page 90

1   A.   Yes.

2   Q.   Why?

3   A.   Well, I believe I recall now that when I

4        first -- we first sent the approval up the

5        chain for Ivor to sign, he noticed that in

6        some -- one instance that it did not meet

7        the 10 constant at the 1.25 cover for the

8        rental achievement.

9   Q.   Okay.  And because it did not meet the 10

10       constant coverage, it -- you --

11  A.   It didn't meet the credit guidelines.

12  Q.   It didn't meet the credit guidelines.  Did

13       you tell that to the borrower?

14  A.   No.  It is not relevant to the borrower.

15  Q.   Okay.  Why is it not relevant to the

16       borrower to know that it did not meet the

17       credit guidelines with a $250 per unit

18       reserve?

19  A.   This is internal underwriting that we

20       never discuss with the borrower.  That is

21       how we -- it has only to do with the

22       Hancock credit guidelines.

23  Q.   The --

24  A.   There was a --

Page 91

1   Q.   Go ahead.

2   A.   **Go ahead.**

3   Q.   No.  I am sorry.

4   A.   **No.  I am done.**

5   Q.   I understand that you never discuss with

6        the borrower this constant -- this -- is

7        that true that you never discuss with the

8        borrower the --

9   A.   **We typically don't discuss --**

10                  MR. DAVIS:  Please let him

11       finish.

12                  THE WITNESS:  Yes.

13  Q.   -- the 10 percent constant coverage; is

14       that right?

15  A.   **Not --**

16                  MR. DAVIS:  Objection.

17                  You can respond.

18  A.   **Not to my knowledge, I mean.**

19  Q.   You said "typically," and that's what I am

20       asking about.

21  A.   **Right.**

22  Q.   So why is it not relevant to the borrower

23       to know that there is this 10 percent

24       constant coverage requirement?

Page 93

1   A.   Yes.

2   Q.   And the debt service coverage ratio is

3        disclosed to the borrower?

4   A.   Yes.

5   Q.   In fact, the precise numbers that the

6        borrower is required in this case, in the

7        Avenel situation, are set forth in the

8        application and agreed to in the loan

9        application; am I right?

10  A.   Yes.

11  Q.   Why is the debt service coverage -- sorry

12       -- why is the 10 percent constant coverage

13       not?

14  A.   It seems irrelevant.

15  Q.   Why is it irrelevant to the borrower?

16  A.   Because the 10 percent constant relates to

17       our credit policy internally, and the

18       industry standard is ordinarily debt

19       service coverage ratio and LTV.

20  Q.   It is true that the 10 percent constant

21       coverage is a criteria which was required

22       to be satisfied in order for the loan to

23       be approved; am I right?

24            MR. DAVIS:  Objection.

Page 95

1         the borrower?

2    A.   Not at all.

3    Q.   Why not?

4    A.   Because we're not requiring him to hold

5         those reserves.  They are purely

6         theoretical reserves in the underwriting.

7    Q.   So if it is purely theoretical, why do you

8         need approval to do it?

9    A.   We don't need approval to do it.  We need

10        approval to get the commitment.

11   Q.   Well, you are asking for approval to lower

12        the reserves?

13   A.   Within the -- within our underwriting.  In

14        underwriting, it is a proforma estimate of

15        what we think is a relative, reasonable

16        characterization of the cash flow to be

17        expected from the security.

18   Q.   If the request for approval to lower the

19        reserves had been refused -- am I -- is it

20        accurate to say that the loan commitment

21        would not have been made?

22   A.   The signing authority has to -- asked me

23        to write -- to put the memo together so

24        that we could lower the reserves.

Page 96

1    Q.   You didn't know in advance of making the
2         request that it would be granted, did you?
3    A.   I did.
4    Q.   You did?
5    A.   Yes.  Paper the file with this.  Correct.
6    Q.   Say again?
7    A.   Yes.  I papered the file with this.
8    Q.   You papered the file with this?
9    A.   Yes.
10   Q.   But there was a moment in time when you
11        did not know whether or not the request
12        would be granted; am I right?
13   A.   No.  I knew it would always be granted.
14        He caught a technical error with my
15        approval document and just corrected it.
16   Q.   What are you -- so can you explain to me
17        the e-mail that you sent seven minutes
18        later to Mr. Ferrie in which you say, "I
19        guess I will try, one more time, the
20        bureaucratic approach"?
21             I won't criticize your spelling
22        of "bureaucratic."  It is just a typo.
23   A.   It must be.
24   Q.   "I'll let you know how hard he laughs."

Page 97

1          What are you -- isn't it

2      accurate to say that "I'll let you know

3      how hard he laughs" suggests that he was

4      going to refuse the request?

5          MR. DAVIS:  Objection.

6   A.  I'm not quite sure who I am relating --

7      who I am referring to as the "he."

8   Q.  Ivor Thomas?

9   A.  Yes.

10  Q.  So --

11  A.  I don't know if it is Ivor or not.

12  Q.  I want you to explain to me why you say in

13     this August 11th, 7:39 p.m. e-mail, sent

14     seven minutes after you sent your e-mail

15     to Ivor Thomas, why you said to

16     Mr. Ferrie, "I'll let you know how hard he

17     laughs."

18  A.  I can only speculate.

19  Q.  You have no recollection whatsoever; is

20     that right?

21  A.  I recall that Ivor caught the error with

22     the coverage and asked us to lower

23     something to make it work, and I could

24     only assume and I can only speculate that

1    that refers to John's idea to lower the

2    reserves to $150.

3 Q.   Why would that cause laughter on the part

4    of Mr. Thomas?

5           MR. DAVIS:  Objection.

6 Q.   Why would the lowering of the reserves to

7    $150 per unit to meet the deficiency

8    Mr. Thomas had identified cause him to

9    laugh?

10           MR. DAVIS:  Objection.

11           MR. SCHER:  What is your basis?

12           MR. DAVIS:  The basis of the

13    objection is that it calls for

14    speculation.

15           MR. SCHER:  Okay.

16 Q.   If you know, tell me.

17           MR. SCHER:  I withdraw that.

18 Q.   Tell me why you thought that it would

19    cause Mr. Thomas to laugh.

20 A.   I believe that was written for John's

21    benefit to let him know that we don't like

22    to lower reserves to $150 a unit.

23 Q.   Is that your best answer?

24           MR. DAVIS:  Objection.

1   A.   Yes.  He rarely laughs.

2   Q.   Honestly, Mr. Malik, I don't understand.

3        "I guess I will try, one more time, the

4        bureaucratic approach."  What is the

5        bureaucratic approach?

6   A.   The bureaucratic approach must be to get

7        Ivor to lower the reserves, to go along

8        with lowering the reserves from 250 to 150

9        so at a full rental achievement reserve

10       and a 1.25 coverage it still will equal --

11       you will still cover the constant, 10, the

12       10 constant, 10.

13  Q.   What is it about lowering the reserve from

14       250 to 150 that would cause Mr. Thomas or

15       a person in his position to laugh?

16  A.   Because --

17                 MR. DAVIS:  Objection.

18  A.   -- it goes outside the guidelines of

19       typically wanting 250 a unit for reserves

20       in our abstract analysis of what the

21       property will cash flow, but because this

22       was a brand new property that didn't need

23       a lot of -- a lot of work on units when

24       people vacated and came back, 150 turned

Page 100

1       out to be fine.

2               My comment was meant to let John

3       Ferrie know that we don't like lowering

4       reserves if we can avoid it.

5   Q.  So who is the one who wanted the reserves

6       lowered from 250 to 150?

7   A.  Well, I can only speculate, but I think it

8       was John.  Ivor wanted us to make the 150

9       -- wanted us to make the 10 constant, and

10      my memo explains -- my memo explains how

11      to do it.

12  Q.  Your e-mail to Mr. Thomas explains how to

13      do it; right?

14  A.  Right.

15  Q.  Why did Mr. Ferrie want that accomplished?

16  A.  He wanted to fund the loan.  He wanted to

17      commit the loan.

18  Q.  And why is that?

19  A.  Because that's his job.

20  Q.  Is his desire to commit the loan any

21      different than your desire to commit the

22      loan --

23              MR. DAVIS:  Objection.

24  Q.  -- as far as you know?

Page 110

1  A.  Didn't he present it to Rob, he said?  Rob

2      Kelly.

3  Q.  But Rob Kelly doesn't approve the loan,

4      does he?  Of course not.

5           So what are you suggesting?  The

6      fact that Rob Kelly received Malik

7      Exhibit 5, does that change what is in the

8      application or commitment?

9  A.  Because you put "Malik Exhibit 5" doesn't

10     mean it came from me.

11  Q.  I am not suggesting it came from you.  I

12     am asking you whether the introduction of

13     the new criteria, namely the 10 percent

14     constant, --

15  A.  I don't know.

16          MR. DAVIS:  Please, let him

17     finish his question --

18          THE WITNESS:  Okay.

19          MR. DAVIS:  -- because I want to

20     get my objection in.

21          THE WITNESS:  Okay.

22  BY MR. SCHER:

23  Q.  Is it accurate to say that the loan

24     constant hurdle was introduced into the

Page 111

1      loan commitment process after the loan

2      application was submitted?

3                  MR. DAVIS:  Objection.

4   A.  I'm not quite sure what you mean by "loan

5      commitment process."

6   Q.  The application.

7   A.  The application?

8                  MR. DAVIS:  The same objection.

9   A.  I -- the commitment -- I think the

10     commitment speaks for itself.

11  Q.  Okay.

12  A.  I don't see it in there.

13  Q.  Okay.  That is fair enough.

14                 MR. SCHER:  Mark this.

15                 (One-page e-mail dated

16                 August 11, 2004, to Mr. Ferrie

17                 from Mr. Malik, production

18                 number JH 00135 marked Exhibit

19                 No. 6 for identification.)

20     BY MR. SCHER:

21  Q.  I show you what I have had marked as Malik

22     Exhibit 6.

23                 (Handing Exhibit No. 6 to the

24     witness.)

Page 121

1   Q.   Is it accurate to say that after you sent

2         your e-mail to Mr. Thomas on August 11th

3         at 7:32 p.m. --

4   A.   Yes.

5   Q.   -- Mr. Thomas did laugh?

6   A.   No.  He rarely laughs.

7   Q.   Was there -- do you have any recollection

8         -- is it accurate to say that there was

9         push-back or resistance to the proposal

10        that you were making?

11  A.   I can't recall.  I really can't.

12  Q.   Is there -- can you tell me, number one,

13        Mr. Henderson was your team leader?

14  A.   Yes.

15  Q.   Is that right?

16  A.   Yes.

17  Q.   And Mr. Thomas was the approver --

18  A.   Yes.

19  Q.   -- of the loan?  And --

20  A.   Well, yes, I think so.

21  Q.   Among the approvers of the loan?

22  A.   Yes.

23  Q.   In this e-mail, your second paragraph, you

24        say, "To make the numbers work, we would

Page 122

1       need to assume that the expense per unit

2       is 4,957 a unit instead of the original

3       $5,527 a unit"?

4    A.    Yes.

5    Q.    Right?

6    A.    That's what -- I think that's what it

7          says.

8    Q.    What do you mean by "making the numbers

9          work"?

10   A.    Looking at the memo or the e-mail, it

11         looks like the 10 constant, coming up with

12         another way of making the 10 constant

13         hurdle work, other than lowering the

14         reserve estimate down to 150, explaining

15         the risk inherent in the property.

16   Q.    How can you just change the expenses per

17         unit from what was the borrower's

18         estimate?

19   A.    Because the borrower's --

20              MR. DAVIS:  Objection.

21              You can respond.

22              THE WITNESS:  Okay.

23   Q.    The borrower's estimate is this 5,200 --

24         5,500 dollar amount?

1    A.    Right.

2    Q.    How can you --

3    A.    Because his estimate is based on his

4          judgment, and our estimate is based on our

5          judgment.

6    Q.    There was an element of not wanting to

7          lose the deal in connection with your

8          making the numbers work; am I right about

9          that?

10   A.    Yes.

11   Q.    And so you were asking Mr. Henderson to

12         help you out to figure out a way to make

13         the numbers work so that the criteria,

14         including the 10 percent constant, in this

15         case, so that the criteria, the 10 percent

16         constant --

17               MR. SCHER:  Let me start all

18         over.

19   Q.    So you were asking Mr. Henderson to help

20         you out to figure out a way to make the

21         numbers work so that the 10 percent

22         constant criteria could be satisfied; am I

23         right?

24   A.    Partially.

1   Q.   Continuing in the process, after the loan

2        commitment was made, the borrower would,

3        within the period of time provided for in

4        the loan commitment, request that the loan

5        be funded, the $32 million loan be funded?

6        That would be the normal process; am I

7        right?

8             MR. DAVIS:  Objection.

9   A.   I am not quite -- you have to again

10       rephrase that question.

11  Q.   Okay.  I am trying to have you tell me

12       what the closing of the loan process

13       includes.  So could you do that?

14  A.   Sure.  There is a whole bunch of criteria

15       in the commitment regarding reports,

16       physical report, environmental reports,

17       title work, title insurance, and a certain

18       occupancy, and a certified rent roll to

19       verify that occupancy, and other criteria

20       that are outlined.

21  Q.   All right.

22  A.   When all of that is provided, then the

23       borrower would estimate what he thinks --

24       when he would like to close it, and we

1       close --

2   Q.  What --

3   A.  -- as long as it is inside the outside

4       closing date.

5   Q.  All right.

6   A.  As long as the requested closing date is

7       within the outside closing date.

8   Q.  Okay.  Internally within John Hancock,

9       what process is undertaken to fund the

10      loan?  In other words, prior to the time

11      that the $32 million is disbursed to the

12      borrower, what does John Hancock have to

13      do internally?

14  A.  We collect all the documents.  We produce

15      a closing statement.  We have the borrower

16      sign the closing statement.  We request

17      the funds and close the loan on the day

18      that it's required.  There is no other

19      approvals required as long as the loan

20      meets the criteria of the commitment.

21  Q.  So the form work that, if you will, to get

22      the cash from the John Hancock, what form

23      is employed for that purpose?

24  A.  I don't know.  That -- we have a closer

1       who is assigned to it --

2  Q.   Yes.

3  A.   -- who is on the other side of the floor.

4       They gather and coordinate all the

5       information that is needed, and I think

6       they just call to say, "We'll need these

7       funds," and they send the loan disbursal

8       statement, called LDS, to whoever is at

9       treasury, and they produce the funds

10      through the wiring source, wire the funds

11      to the escrow agent, and then our outside

12      counsel makes sure that we have everything

13      we need to close the loan.

14  Q.  Does the securing of the cash, the wire

15      transfer of the funds, require a review of

16      the loan approval?

17  A.  Yes.  The closer reviews that --

18  Q.  And --

19  A.  -- as the information comes in.

20  Q.  And the credit review that Patricia Coyne

21      prepared in this case?

22  A.  They may look at that.

23  Q.  Okay.

24  A.  Ordinarily just looked at the approval.

Page 133

1   Q.   Ordinarily, the closer would just take

2        Malik 1?

3   A.   Right.

4   Q.   The approval?

5   A.   Right.

6   Q.   The commitment letter -- the commitment --

7        the loan approval document?

8   A.   Yes.

9   Q.   Malik 1?

10  A.   Yes.

11  Q.   And take that, and then call upon the --

12       so long as all the criteria set forth in

13       Malik 1 had been satisfied, --

14  A.   Right.

15  Q.   -- send me the money?

16  A.   Right.

17  Q.   Prior to today, is it accurate to say that

18       you have been in Mr. Koller's company on

19       one occasion?

20  A.   I believe that's the case.

21  Q.   And the same with respect to Joe Kelly?

22  A.   Yes.  I think so.

23  Q.   And that was the same occasion?  That was

24       a lunch?

Page 179

1    Q.    So the changes that were made on the eve

2          of the commitment approval contained

3          within them elements of making the deal

4          happen as well as some reality?

5    A.    It was mostly for presentation.  Right.

6    Q.    Mostly for presentation, though;

7          right?

8    A.    Yes.

9    Q.    And not because the expenses really or the

10         reserves really should be adjusted?

11   A.    It is because the reserves weren't that

12         important.  Right.

13   Q.    Right?

14   A.    Yes.

15   Q.    Take a look at JH 00105, the commercial

16         rating sheet, if you would.

17   A.    Okay.

18                    (Witness complying.)

19   Q.    There is a block down there called

20         "Refinance Sizing Constant."

21   A.    Yes.

22   Q.    And then that's the old John Hancock

23         securities industry standard as contrasted

24         with the 10 percent constant that new

Page 180

```
 1        Manulife --
 2   A.   Right.
 3   Q.   -- required?
 4   A.   Right.
 5   Q.   And the refinance annual DSCR, could you
 6        tell me what that is?
 7   A.   That I believe -- I'm not quite sure what
 8        that is.  Hold on.  Let me think about
 9        this for a second.
10   Q.   Okay.
11             (Pause.)
12   A.   The underwriter cash flow available for
13        debt service, which is 3.5 million, and
14        the debt service of the balloon balance at
15        the end of the loan, which is 27.28 --
16        27.2 million, the debt service with the
17        current interest rate would be 2.7, so the
18        coverage is 3.1 million divided by
19        2.79 million.  So, in essence, it is
20        saying if the interest rate was
21        9.66 percent, with the balloon balance at
22        the end of the loan, the refinancing
23        annual debt service coverage ratio would
24        be 1.12 to 1.
```

Page 203

1       at it, the total operating expenses drop,

2       too.

3   Q.  Okay.

4   A.  They go up to $140,000.

5   Q.  Okay.  I see.  By reducing certain

6       expenses by $140,000 --

7   A.  Right.

8   Q.  -- plus the reserve, then you can achieve

9       a loan funding amount of exactly

10      32 million?

11  A.  Right.

12              MR. SCHER:  Let me show you the

13      next exhibit.

14              (One-page Examples of Reserve

15               Calculations, production

16               numbers JH 01119 marked Exhibit

17               No. 17 for identification.)

18  BY MR. SCHER:

19  Q.  This is Malik Exhibit 17.

20              (Handing Exhibit No. 17 to the

21      witness.)

22  Q.  It shows an Avenel Exhibit 1A, new

23      expenses Excel sheet, and shows a vacancy

24      rate at 9 percent, and a handwritten note?

 1  A.   Yes.

 2  Q.   Whose handwritten note is that?

 3  A.   That is my handwriting.

 4  Q.   Could you read that?

 5  A.   You wouldn't be the first to ask me.

 6  Q.   I can read it.  I just want you to.

 7  A.   "Lower than application reserve of 5.38

 8       because more conservative.  (Under

 9       application scenario we fund less)."

10  Q.   And that is referring to the 10 percent

11       constant?

12  A.   The 10 constant.  Right.  So I know -- I

13       believe it is saying -- a note to myself

14       or to somebody that under the application

15       we're required to fund more than a

16       10 percent constant would allow us to.

17  Q.   And so do you believe that this is the --

18       what precipitated -- what caused you to

19       seek a reduction in the reserve so that

20       the 10 percent constant could be achieved?

21  A.   I believe what was -- what I was doing and

22       based on Ivor's comment that we weren't

23       achieving the 10 percent constant at

24       80 percent occupancy in a full funding of

1          the rental achievement reserve was stress

2          testing it from different ways as to so --

3          so to see what that means in terms of

4          reserves or returns of expenses or how

5          important that really was in terms of the

6          margin of error within underwriting.

7    Q.   You are basically trying to see how you

8          can get to the $32 million loan amount?

9    A.   Well, yes.  From an in-house guidelines

10         credit policy guidelines point of view,

11         right.  But it had nothing to do with the

12         commitment.  The commitment was already

13         set.

14   Q.   Well, the commitment hadn't been made yet?

15   A.   The commitment was rate locked on --

16   Q.   Oh, that.

17   A.   -- 8-02.  It was signed and committed --

18         signed but not committed at this time.  It

19         hadn't been changed since then.

20   Q.   Okay.

21   A.   So we didn't go back and change the

22         commitment.  We purely were playing with

23         the numbers in terms of trying to figure

24         out the risks of being over or under the

Page 206

```
 1        10 percent constant and how to paper it

 2        for the internal approval process.

 3   Q.   And to get it papered for your internal

 4        approval process, you had to get the

 5        permission of Mr. Thomas; am I right about

 6        that?

 7   A.   Yes.

 8   Q.   If you would turn back to --

 9             MR. DAVIS:  When you have a

10        minute, why don't we take a break, but we

11        can do this first, if you would like to.

12             MR. SCHER:  Let's take a break,

13        because we're in good shape.

14             (Recess taken at 3:19 p.m.)

15             (Recess ended at 3:28 p.m.)

16   BY MR. SCHER:

17   Q.   Would you take a look at Malik Exhibit 1

18        again, please?  Is that the loan approval?

19   A.   Yes.

20   Q.   The internal loan approval document?

21   A.   Yes.

22   Q.   Now is this document prepared by you?

23   A.   Yes.

24   Q.   And are you kind of like the secretary to
```

Page 219

1   A.   Yes.

2   Q.   JH -- to back up -- JH 408, that shows

3        4,900?  That is where the 4,900 comes

4        from; right?

5   A.   408?

6   Q.   Yes.  4,976?

7   A.   Well, for the obvious reason that this --

8        that page is part of the entire link in

9        the Excel, where the block on 412 is not

10       part of the Excel.  It is in the sheet,

11       but it is a Word document embedded in

12       there, so you have to go back and manually

13       change it.

14  Q.   I see.

15  A.   It doesn't change automatically with the

16       other numbers.

17  Q.   Right.  On the first page of Malik

18       Exhibit 1, it has the disbursement

19       requirements.  Do you see that?

20  A.   Malik Exhibit 1, disbursement

21       requirements?

22  Q.   Specific conditions?

23  A.   Okay.

24  Q.   And the disbursements requirements are to

Page 220

1      have certain rents, a minimum net cash

2      flow, debt service coverage ratio?

3  A.   Yes.

4  Q.   And the 10 percent breakeven, according to

5      underwriting; right?

6  A.   Yes.

7  Q.   Now that 10 percent breakeven according to

8      underwriting is not contained in the loan

9      application, is it?

10 A.   No.

11              MR. DAVIS:  Objection.

12              You can respond.

13              MR. SCHER:  I think I am going

14     to ask you to step outside, just for a

15     couple of minutes.

16              THE WITNESS:  Okay.

17              MR. SCHER:  I think I am close

18     to the end.

19              MR. DAVIS:  Okay.

20              (Recess taken at 3:46 p.m.)

21              (Recess ended at 3:48 p.m.)

22              MR. SCHER:  I have no further

23     questions.

24              MR. DAVIS:  Okay.  I have no

# EXHIBIT C

# ORIGINAL TRANSCRIPT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE      CIVIL ACTION
INSURANCE COMPANY,

     Plaintiff/Counterclaim
     Defendant,

     vs.

VESTMONT LIMITED
PARTNERSHIP, et al.,

     Defendant/Counterclaim
     Plaintiff.      NO. 0511614 WGY

Oral deposition of JOHN PATRICK FERRIE, taken at the law offices of BUCHANAN INGERSOLL, P.C., Eleven Penn Center, 14th Floor, 1835 Market Street, Philadelphia, Pennsylvania, on Wednesday, February 1, 2006, at 9:36 a.m., before Rosemary Locklear, Registered Professional Reporter, Certified Shorthand Reporter (NJ), Certified Realtime Reporter and Notary Public, pursuant to notice.



## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

2

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
1    APPEARANCES:

2    CHOATE HALL & STEWART, L.L.P.
          BY:  BRIAN A. DAVIS, ESQUIRE
3         bad@choate.com
          Two International Place
4         Boston, Massachusetts 02110
          (617) 248-5000
5         Appearing on behalf of Plaintiff

6    BUCHANAN INGERSOLL, P.C.
          BY:  HOWARD D. SCHER, ESQUIRE
7         scherhd@bipc.com
          Eleven Penn Center, 14th Floor
8         1835 Market Street
          Philadelphia, Pennsylvania 19103
9         (215) 665-8700
          Appearing on behalf of Defendant
10
     ALSO PRESENT:
11
          JAMES KOLLER
12
13            EXAMINATION INDEX

14   JOHN PATRICK FERRIE
          BY MR. SCHER                        6
15
16            EXHIBIT INDEX

17                                      MARKED

18   Ferrie
      1    1-page copy of E-mail          89
19         dated 8/11/04 from John
           Ferrie, plus attachment
20         JH 00133-JH 00134

21    2    28-page copy of document       109
           dated 7/30/04 entitled
22         "Application to John
           Hancock Life Insurance
23         Company For A First Mortgage
           Loan," plus attachments, JH
24         00327-JH 01121
```

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd , 6th Floor, Philadelphia. PA 19103
www.JDReporting.com

215.564.3905                    FAX 215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1    existed before I came with them.

2         Q.    Who did you replace?

3         A.    Pat Hollenbach.

4         Q.    So from 1990 to the present

5    you've been manager of the regional

6    office covering Pennsylvania, New

7    Jersey, Delaware, and Puerto Rico?

8         A.    Yes.

9         Q.    In 2004 Manulife acquired

10   John Hancock; is that right?

11        A.    Yes.

12        Q.    What, if any, effect did

13   that have on your duties and

14   responsibilities?

15        A.    None.

16        Q.    What, if any, effect did

17   that have on your person to whom you

18   report?

19        A.    None.

20        Q.    What, if any, effect did it

21   have on you at all?

22        A.    Well, a little

23   disconcerting to have somebody else

24   buy you.  I guess psychologically a

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1    little feeling of uncertainty.

2        Q.    Any policies or procedures

3    or methods of doing business that

4    changed after the acquisition by

5    Manulife?

6        A.    Yes.

7        Q.    Could you tell me what they

8    are?

9        A.    Well, we went from a real

10   estate committee process to a

11   signature process.

12       Q.    And what does that mean?

13       A.    Prior to Manulife, loans

14   were approved at a real estate

15   committee.

16            After Manulife they were

17   approved by -- they were indicated

18   approved by signature authority up to

19   the loan amount that that person was

20   allowed to sign for.

21       Q.    Okay.    What other changes?

22       A.    None that I can think of.

23       Q.    Were there any new or

24   different criteria requirements for

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation              FAX  215.751.0581
                    1880 JFK Blvd , 6th Floor, Philadelphia. PA 19103
                              www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1  loans after Manulife acquired John

2  Hancock?

3       A.   Well -- how do I want to

4  say this?

5            Nothing in -- nothing

6  specifically that I can think of.

7       Q.   All right.  Are you

8  familiar with the 10 percent constant

9  requirement?

10      A.   Yes.

11      Q.   Did that requirement exist

12  in John Hancock when John Hancock --

13      A.   No.

14      Q.   -- prior to acquisition?

15      A.   No.

16      Q.   And that --

17           MR. DAVIS:  Please let him

18  finish his questions before you begin

19  to answer.

20           THE WITNESS:  Oh, okay.

21  All right.  All right.

22           MR. SCHER:  I was mumbling,

23  I apologize.  I'll try not to

24  whisper.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX 215 751.0581
                1880 JFK Blvd , 6th Floor. Philadelphia, PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1    BY MR. SCHER:

2        Q.    Was that 10 percent

3    constant requirement introduced after

4    the acquisition by Manulife?

5        A.    Yes.

6        Q.    And was that criteria

7    reflected in the loan application at

8    the time Avenel completed its loan

9    application?

10            MR. DAVIS:    Objection.

11   BY MR. SCHER:

12       Q.    Was it contained in it?

13            MR. DAVIS:    Objection.

14            MR. SCHER:    Okay.

15   BY MR. SCHER:

16       Q.    You can answer it anyway.

17            THE WITNESS:    Is that -- is

18   that okay?

19            MR. SCHER:    Yes.

20            MR. DAVIS:    Yes.    You can

21   answer.    That's fine.

22            MR. SCHER:    He'll say "I

23   instruct you not to answer" if he

24   doesn't want you to answer.

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
 1              THE  WITNESS:   Okay.   Can

 2    you  repeat  the  question,  please.

 3              MR.  SCHER:   Sure.

 4    BY MR. SCHER:

 5        Q.    Was  the  10  percent  constant

 6    criteria  contained  in  the  Avenel  loan

 7    application?

 8        A.    No.

 9        Q.    When  did  the  10  percent

10    constant  criteria,  when  was  that

11    introduced  into  the  requirements  for

12    a  loan  after  the  Manulife

13    acquisition?

14        A.    Between  the  application  and

15    the  approval.

16        Q.    How  did  you  learn  that  the

17    new  criteria,  the  10  percent  constant

18    criteria,  was  introduced?

19        A.    Tim  told  me,  Tim  Malik.

20        Q.    And  how  did  he  tell  you

21    that?  Do  you  remember?  Was  it  an

22    E-mail  or  a  telephone  conversation?

23        A.    As  far  as  I  can  remember,

24    it  was  a  phone  call.
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd . 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1      Q.      The application is dated

2    July 30, the approval is dated August

3    17, I believe.

4             Can you approximate with

5    any greater precision when that

6    approval -- when you learned the 10

7    percent constant had been introduced?

8      A.      To clarify?

9      Q.      Yes.

10     A.      Can I ask a clarifying

11   question?

12     Q.      Yes.

13             MR. DAVIS:   You can ask.

14             MR. SCHER:   You're entitled

15   to, yes.

16             THE WITNESS:   For this

17   specific deal, you mean?

18             MR. SCHER:   Yes.   Yes.

19             THE WITNESS:   Sometime

20   between July 30th and the approval

21   date.

22             MR. SCHER:   Okay.

23             THE WITNESS:   Yeah.

24   BY MR. SCHER:

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905              InnovatingLitigation              FAX 215.751.0581
                  1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
                          www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
 1        Q.     And what, if anything, did
 2   you do after you learned that this
 3   new criteria, the 10 percent
 4   constant, had been introduced into
 5   the approval process with respect to
 6   the Avenel loan?  What did you do?
 7        A.     Well, I complained to Tim.
 8        Q.     And do you recall the gist
 9   of what you complained?
10        A.     I complained that it
11   shouldn't be inserted now because it
12   wasn't in the original application.
13        Q.     Okay.  And what else did
14   you do?
15        A.     I contacted the broker, Rob
16   Kelly.
17        Q.     And what did you --
18        A.     And I told him, I think I
19   said there may be a potential
20   problem.
21        Q.     Okay.  And what else did
22   you do?
23        A.     I think that's it.
24        Q.     Did you undertake to modify
```

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1           MR. DAVIS:  Objection.

2           THE WITNESS:  No.

3           MR. SCHER:  No.

4           MR. DAVIS:  If we could

5   take a break at some point.

6           MR. SCHER:  Sure.  Now is

7   fine.

8           MR. DAVIS:  Okay.

9           (Recess, 10:50-10:58 a.m.)

10  BY MR. SCHER:

11      Q.   You testified earlier that

12  the 10 percent constant criteria was

13  objected to by you; is that right?

14  You objected to that.

15      A.   I objected to having it.

16  Yes.

17      Q.   And you testified that it

18  was not contained in the loan

19  application; right?

20      A.   The original -- yes.

21  Exactly.

22      Q.   And you testified that you

23  understood that that requirement had

24  been eliminated; am I right about

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd . 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
 1    that?

 2         A.    Yes.

 3         Q.    And could you tell me the

 4    basis for that belief, that it was

 5    eliminated?

 6         A.    That we committed on the

 7    loan without the 10 percent constant.

 8         Q.    And that's because the loan

 9    application doesn't contain the 10

10    percent constant and it was signed by

11    John Hancock?

12              MR. DAVIS:   Sorry.   Would

13    you read back the question.

14    BY MR. SCHER:

15         Q.    Could you tell me the basis

16    for your belief that it was

17    eliminated?

18              MR. DAVIS:   And I thought

19    there was a question subsequent to

20    that, but go ahead.

21              All right.   You can

22    respond.

23              THE WITNESS:   The

24    application was executed without it
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

76

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1    by the borrower and approved by

2    Hancock, so we were prepared to honor

3    our commitment.

4    BY MR. SCHER:

5        Q.    And that's the basis for

6    it; right?

7        A.    Yes.

8        Q.    Did anyone ever tell you

9    from John Hancock internally that

10   that criteria had been eliminated?

11   Did anybody tell you separate and

12   apart from the fact that the loan

13   application was signed by John

14   Hancock?

15       A.    No.

16       Q.    Did Malik say, well, your

17   objection has been sustained; that

18   is, the loan criteria has now -- the

19   loan criteria has now -- the criteria

20   required has now been reduced to only

21   those which are contained in the loan

22   application and this 10 percent

23   constant is no longer in the mix?

24       A.    He signed the --

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1        MR. SCHER:  What's the

2   basis?

3        MR. DAVIS:  I think that

4   mischaracterizes the record.  I think

5   he already said he talked to Rob

6   Kelly about it and that Mr. Kelly, I

7   think, was their representative.

8        MR. SCHER:  Okay.

9        MR. DAVIS:  But you can

10  respond.

11       MR. SCHER:  All right.

12  BY MR. SCHER:

13       Q.    Other than the one

14  communication you had with Rob Kelly,

15  did you have any other communications

16  on the subject of the 10 percent

17  constant?

18       A.    I don't recall.

19       Q.    Can you recall any

20  conversations with Mr. Koller on the

21  subject of the 10 percent constant?

22       A.    I don't recall.

23       Q.    Any conversations with Mr.

24  Joe Kelly on the subject of the 10

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation                    FAX  215.751.0581
              1880 JFK Blvd . 6th Floor, Philadelphia. PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1    percent constant?

2        A.    I don't recall.

3        Q.    And any conversations with

4    Mr. Frank Palopoli on the 10 percent

5    constant?

6        A.    Definitely not Frank.

7        Q.    Okay.  In connection with

8    your communication with Rob Kelly,

9    did that communication take the form

10   of anything other than the E-mail you

11   sent to Rob Kelly?  In other words,

12   did you call him besides E-mail him?

13       A.    Well, I called him.

14       Q.    You called him.

15       A.    Called Rob Kelly, yes.

16       Q.    What did you tell him?

17       A.    Paraphrasing, that there

18   may be a potential problem.  We had

19   a new underwriting criteria and we'd

20   like to insert the 10 percent

21   constant.

22       Q.    And did you tell him

23   anything else at that time?

24       A.    Not that I recall.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

84

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1       Q.    What did he say to you?

2       A.    He said it could be a deal

3    killer.

4       Q.    Did he report that in that

5    same conversation, in the one

6    conversation you had?

7       A.    In the initial

8    conversation?

9       Q.    Yes.

10      A.    No.

11      Q.    So he got back to you?

12      A.    Yes.

13      Q.    And can you approximate how

14   long it took?

15      A.    Short period of time.

16      Q.    Day?  Hour?

17      A.    Within a few days.

18      Q.    Within a few days?

19            And Rob Kelly called you

20   back.

21      A.    Right.

22      Q.    And what did he say to you?

23      A.    He said it was a problem.

24      Q.    Could be a deal killer?

**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd . 6th Floor, Philadelphia. PA 19103
www.JDReporting.com

FAX  215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1       A.      Uh-huh.

2       Q.      Yes?

3       A.      Yes.

4       Q.      Did he amplify?  Did he

5   expand on that?

6       A.      That's pretty explanatory.

7       Q.      That's it.

8               And if it had -- if the

9   deal had been killed at that moment,

10  you would have lost the $965,000 in

11  fees; am I right about that?

12              MR. DAVIS:   Objection.

13  Calls for speculation, calls for a

14  legal conclusion.

15              THE WITNESS:   At that point

16  we didn't have any fees.

17  BY MR. SCHER:

18      Q.      Well, the $5,000 fee had

19  been paid when the --

20      A.      Yes.

21      Q.      -- application fee was

22  made.

23      A.      Right.

24      Q.      Okay.  So your testimony is

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
1    prospective borrower had the deal

2    been killed, am I right about that,

3    as far as you know?

4         A.    Yes.

5              MR. DAVIS:  Objection.

6              Pause before you respond.

7              Objection.

8              MR. SCHER:  What's the

9    basis?

10             MR. DAVIS:  Again, I think

11   it calls for a legal conclusion.

12             MR. SCHER:  Okay.

13   BY MR. SCHER:

14        Q.    And the practice at John

15   Hancock, if the deal is killed prior

16   to the approval of the loan

17   application, the Letter of Credit

18   posting is refunded to the

19   prospective borrower.

20        A.    If the deal is changed and

21   it's not approved by the borrower,

22   the money is refunded.

23        Q.    Okay.  And that's exactly

24   what was being discussed at that
```

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd, 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1  point, the change of the deal to

2  include a new criteria, the 10

3  percent constant; right?

4           MR. DAVIS:  Objection.

5           THE WITNESS:  The

6  application was being looked at to

7  determine whether it would be

8  approved or not.

9           The 10 percent constant was

10  requested by Hancock to be inserted

11  into the application.  It was not.

12           And subsequently it was

13  eliminated from the application,

14  which became a commitment, and

15  therefore, it didn't matter.  There

16  are lots of things that are

17  negotiated.

18  BY MR. SCHER:

19     Q.   Can you recall anything

20  that Mr. Kelly said to you in that

21  conversation other than what you've

22  already -- that is, the second

23  conversation when he reported back to

24  you, other than what he's already --

**JDR**

**James DeCrescenzo Reporting**, LLC
InnovatingLitigation
1880 JFK Blvd , 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1      Q.    From -- except for this
2   E-mail, all your other communications
3   are directly with the borrower.
4           Can you explain to me
5   any -- in any greater detail than you
6   have already why it is you chose to
7   communicate with Rob Kelly on -- in
8   connection with this new criteria?
9           MR. DAVIS:   Objection.
10          THE WITNESS:   I believe I
11  had constant communication with Rob
12  Kelly with regard to how the
13  application was proceeding.
14          MR. SCHER:   Okay.
15  BY MR. SCHER:
16     Q.    Now, you told me that in
17  your second conversation -- telephone
18  conversation with Rob Kelly he said
19  it was a deal killer and it was a
20  problem; right?
21     A.    Yes.
22     Q.    Did you communicate that to
23  anyone?
24     A.    Yes.

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1      Q.    Who did you communicate

2    that to?

3      A.    Tim Malik.

4      Q.    And what did you tell him?

5      A.    I told him it's a -- it's a

6    problem.  It wasn't in the original

7    application, it should be stricken,

8    and it subsequently was.

9      Q.    What did Malik say to you

10    in that conversation?

11      A.    I don't recall.

12      Q.    How did you learn that it

13    was stricken?

14      A.    Because we committed

15    without that constant being in there.

16      Q.    Right.

17          So if I have the sequence

18    correctly, you called Rob Kelly, told

19    him there was a problem and it was a

20    new criteria, you sent him Ferrie-1,

21    the E-mail; is that right?

22          MR. DAVIS:   Objection.

23          You can respond.

24          THE WITNESS:  I can't say

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

```
 1   Leveroni --
 2        A.    Yes.
 3        Q.    -- and Tom Rogers?
 4              And those two are lawyers;
 5   am I right?
 6        A.    Yes.
 7        Q.    Jessica is in house and --
 8        A.    Tom is out house.
 9        Q.    -- Tom Rogers is out house;
10   is that right?
11        A.    Yes.
12              MR. DAVIS:   I'm going to
13   object to that characterization of
14   "out house."
15   BY MR. SCHER:
16        Q.    And that's your E-mail; am
17   I right?  You wrote that?
18        A.    Of June the 9th.  Yes.
19        Q.    Yes.  Okay.
20              Is it accurate to say that
21   you negotiated the terms of the loan
22   commitment -- the loan application
23   with the prospective borrower?
24        A.    No.
```

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

ORAL DEPOSITION OF JOHN PATRICK FERRIE, 2/1/06

1       Q.      Who did?

2       A.      I conveyed the -- other

3    than the boilerplate, I conveyed the

4    requests from the borrower to home

5    office and home office subsequently

6    decided.

7       Q.      Earlier in your testimony

8    you described yourself as a

9    go-between.  Is that what you meant?

10      A.      Yes.  Right.  Yeah.

11      Q.      So you took the information

12   that the borrower conveyed to you,

13   passed it on to Boston home office,

14   John Hancock, and then received their

15   response and passed it back to the

16   borrower; is that right?

17      A.      Right.  For example, when

18   the borrower asked for rather than

19   three one-month extensions, six

20   one-month extensions, I either

21   verbally or written would communicate

22   that with Boston and they would tell

23   me whether they would be able to go

24   for that or not.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905        InnovatingLitigation        FAX  215.751.0581
1880 JFK Blvd , 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

# EXHIBIT D

```
 1        IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
 3   JOHN HANCOCK LIFE          :    CIVIL ACTION
     INSURANCE COMPANY,         :
 4      Plaintiff/Counterclaim: 
        Defendant               :
 5                              :
            vs.                 :
 6                              :
     VESTMONT LIMITED           :
 7   PARTNERSHIP, VESTMONT      :
     LIMITED PARTNERSHIP II,    :
 8   VESTMONT LIMITED           :
     PARTNERSHIP III, and       :
 9   VESTERRA CORPORATION       :
     d/b/a MONTGOMERY SQUARE    :
10   PARTNERSHIP,               :
        Defendants/Counter-     :    NO. 05-11614-
11      claim Plaintiffs        :    WGY
12
                     - - - - - -
13                January 18, 2006
                     - - - - - -
14
                    Oral Deposition of JAMES R.
15   KOLLER, ESQ., held in the law offices of
     Morgan, Lewis & Bockius, LLP, 1701
16   Market Street, 9th Floor, Philadelphia,
     Pennsylvania 19103, beginning at
17   approximately 10:39 a.m., before Ann V.
     Kaufmann, a Registered Professional
18   Reporter, Certified Realtime Reporter,
     Approved Reporter of the U.S. District
19   Court, and a Notary Public of the
     Commonwealth of Pennsylvania.
20                   - - - - - -
21
22        ESQUIRE DEPOSITION SERVICES
          1600 John F. Kennedy Boulevard
23         Four Penn Center, 12th Floor
          Philadelphia, Pennsylvania  19103
24               (215) 988-9191
```

COPY

```
 1   APPEARANCES:
 2       CHOATE, HALL & STEWART, LLP
         BRIAN A. DAVIS, ESQUIRE
 3       bad@choate.com
         Two International Place
 4       Boston, MA  02110
         (617) 248-500
 5       Counsel for John Hancock Life
         Insurance Company
 6
 7       BUCHANAN INGERSOLL
         HOWARD D. SCHER, ESQUIRE
 8       scherhd@bipc.com
         Eleven Penn Center, 14th Floor
 9       1835 Market Street
         Philadelphia, PA  19103
10       (215) 665-3829
         Counsel for Vestmont Limited
11       Partnerships and Vesterra
         Corporation d/b/a Montgomery Square
12       Partnership
13
14
15
16
17
18
19
20
21
22
23
24
```

James R. Koller, Esq.

1   about Vesterra Limited.   When was

2   Vesterra Corporation formed?

3         A.      1986.

4         Q.      Where did you get the name?

5         A.      "Terra" means land and it

6   was just a short for investing in land,

7   so.... It means land in Latin.

8         Q.      I think I took a year of

9   Latin somewhere in my past and I agree

10  with you "terra" means land.

11              MR. SCHER:   Stipulation.

12              MR. DAVIS:   We stipulate to

13  that.   We have a motion practice about

14  that, I hear.

15  BY MR. DAVIS:

16        Q.      You formed it back in '86.

17  That's when you left Dechert to form

18  Vesterra?

19        A.      Yes.

20        Q.      And at the time that you

21  formed Vesterra, did you have partners?

22        A.      One.

23        Q.      One.   Who was that?

24        A.      Frank Palopoli.

James R. Koller, Esq.

1        Q.      And does Mr. Palopoli
2   remain a partner in Vesterra Corp.?
3        A.      Yes.
4        Q.      Is it true to say that
5   Vesterra has acted as sort of the
6   general partner in a series of real
7   estate development projects that you
8   have been involved in since 1986?
9        A.      Yes.
10        Q.      At any point in time have
11   you ever done business in the real
12   estate development field under any
13   entity other than Vesterra Corp.?
14            MR. SCHER:  Object to the
15   form.
16            You can answer, if you are
17   able to.
18            THE WITNESS:  Well, each
19   project was conducted under a different
20   partnership, and so to that extent, yes,
21   we did business under those partnership
22   names as well as Vesterra.
23   BY MR. DAVIS:
24        Q.      For any of those

ESQUIRE DEPOSITION SERVICES

James R. Koller, Esq.

1    partnerships were there general partners

2    other than Vesterra?

3          A.    Yes.

4          Q.    What other entities served

5    as general partners?

6          A.    Not Vesterra entities, but

7    joint venture partners that we had in

8    various entities.

9          Q.    So some of the projects

10   that you have been involved in have been

11   sort of Vesterra-only projects and other

12   projects have been joint ventures with

13   other real estate developers?

14         A.    Yes.

15         Q.    What is Mr. Palopoli's

16   background?

17         A.    Prior to joining me,

18   Mr. Palopoli worked at Berwyn Property

19   Group.

20              MR. DAVIS:   Mark these,

21   please, as Exhibit No. 1.

22              (Below-described document

23   marked as Koller Exhibit 1.)

24   BY MR. DAVIS:

James R. Koller, Esq.

1    of the pieces we sold from Normandy

2    Farm.  And Fawn Creek is complete.

3         Q.    Montgomery Square, that's

4    the shopping plaza that's associated

5    with the apartment complex that's the

6    subject of this litigation; correct?

7         A.    Montgomery Square is a

8    partnership that owned 180 acres, of

9    which this retail shopping center was a

10   part in addition to the apartment

11   complex.  But the Montgomery Square

12   listed here, the 400,000 square foot

13   shopping center, is part of that

14   Montgomery Square project.

15        Q.    Was the Montgomery Square

16   Shopping Center developed by Vesterra?

17        A.    Yes.

18        Q.    When was that?

19        A.    '99 to 2000.

20        Q.    And Vesterra currently owns

21   the shopping center?

22        A.    No.  The shopping center

23   has been sold.

24        Q.    When was that sold?

James R. Koller, Esq.

1          A.      In 2002.

2          Q.      Then there's the 256-unit

3    apartment project that's associated with

4    Montgomery Square; correct?

5          A.      Correct.

6          Q.      And that's the Avenel At

7    Montgomery Square project that's the

8    subject of this litigation?

9          A.      Correct.

10          Q.      That has been developed by

11   Vesterra?

12          A.      Correct.

13          Q.      When did Vesterra start

14   developing that project?

15          A.      The Montgomery Square

16   project, the development began in 1994.

17          Q.      A moment ago we talked

18   about the development dates for the

19   shopping center.  You said '99 to 2000.

20          A.      '99 to 2000 is when we

21   built them.  I might have misspoke.  The

22   overall development of Montgomery Square

23   began in 1994 and the approvals weren't

24   obtained until 1999 and we started

James R. Koller, Esq.

1  construction on the shopping center in

2  '99.

3      Q.    Did the construction on the

4  apartment complex follow construction of

5  the shopping center?

6      A.    No.  That didn't begin

7  until 2003, construction of the

8  apartments.

9      Q.    So I said it correctly, in

10 that the apartment complex followed the

11 construction of the commercial shopping

12 center?

13     A.    That's correct.

14     Q.    You said it was 2003 that

15 you began construction of the apartment

16 complex?

17     A.    Correct.

18     Q.    And the apartment complex

19 is still owned by Vesterra at this point

20 in time?

21     A.    It's owned by --

22     Q.    The Montgomery Square

23 Partnership of which Vesterra is general

24 partner?

James R. Koller, Esq.

```
 1          A.        That's correct.
 2                    That's not technically
 3    correct.    I think you know the
 4    ownership.    The Montgomery Square
 5    Partnership is composed of three
 6    partnerships:    Vestmont Limited
 7    Partnership, Vestmont II Limited
 8    Partnership, and Vestmont III Limited
 9    Partnership.    And Vesterra Corporation
10    is the general partner of each of those
11    partnerships, not the general partner of
12    Montgomery Square.
13          Q.        All right.    I stand
14    corrected.
15                    Currently Montgomery Square
16    Partnership has an agreement with
17    someone to sell them the apartment
18    complex known as Avenel At Montgomery
19    Square?
20          A.        That's correct.
21          Q.        If I refer to that
22    apartment complex as Avenel, will you
23    agree we'll be talking about the
24    apartment complex?
```

James R. Koller, Esq.

1    participated in the transaction.

2         Q.    What was the total amount

3    of construction financing?

4         A.    I believe it was

5    30,750,000.

6         Q.    At the time that you were

7    looking, in mid-2004, how did it come

8    about that you connected with John

9    Hancock as a potential lender?

10        A.    A mortgage broker, Rob

11   Kelly, who is Joe Kelly's brother,

12   contacted John Hancock and several other

13   lenders seeking proposals for permanent

14   financing.

15        Q.    What is the entity for whom

16   Mr. Rob Kelly works?

17             MR. SCHER:  You are looking

18   at Koller 3.

19             THE WITNESS:  Carey, Kramer

20   is the name.  I don't know how you spell

21   it, but it's in the John Hancock loan

22   commitment, their name is in there,

23   Carey, Kramer.

24   BY MR. DAVIS:

James R. Koller, Esq.

1    believed wouldn't necessarily have any

2    binding effect on Hancock?

3          A.      Well, as I said before, we

4    had -- John Hancock is in the business

5    of lending money.  This was a good

6    project to lend money on and it was our

7    hope that John Hancock would ultimately

8    lend us the money, and so it made sense

9    to go through some of these provisions

10   and try to make them acceptable to us.

11         Q.      But at the time that you

12   were negotiating this supplement to the

13   application with the folks at John

14   Hancock -- by the way -- strike that.

15                 Did you negotiate this

16   supplement?

17         A.      Mr. Kelly and I did.

18         Q.      So you were personally

19   involved?

20         A.      Yes.

21         Q.      And at the time that you

22   were engaged in that activity of

23   negotiating the supplement, did you

24   believe that any of the provisions here

James R. Koller, Esq.

1   would bind John Hancock?

2        A.     As I said before, it was

3   our hope that John Hancock would lend

4   the money, but it was subject to so many

5   conditions that if John Hancock did not

6   want to lend the money, they really did

7   not have to lend the money.

8        Q.     So you believe that they --

9   the terms contained in the supplement to

10  the application that you were

11  negotiating wouldn't be binding on

12  Hancock if Hancock didn't want to be

13  bound by them; is that right?

14             MR. SCHER:   Object to the

15  form.

16             THE WITNESS:   I will just

17  state again that there were so many

18  conditions in this application that were

19  subject to John Hancock's approval, and

20  in some cases their sole discretion,

21  that I was concerned that John Hancock,

22  if they wanted to, could decide not to

23  make this loan.

24  BY MR. DAVIS:

James R. Koller, Esq.

1    front with John Hancock and John Ferrie,

2    with whom we've had a relationship over

3    the years.  We've known him and we

4    wanted him to know what was going on.

5              So we called him and told

6    him we weren't sure what was going to

7    happen, whether we were going to sell it

8    or not.  We were concerned that we were

9    not going to achieve the -- meet the

10   rental occupancy requirements to be able

11   to close the loan and this was another

12   option for us and we were going to

13   explore that option.

14        Q.    Is it fair to say,

15   Mr. Koller, at the time that you had

16   this meeting with Mr. Ferrie in May of

17   2005, that you believed you had

18   obligations to Hancock under the loan

19   commitment and what you were trying to

20   do is see if you could negotiate some

21   deal that would -- whereby Hancock would

22   release you from those obligations?

23             MR. SCHER:  Object to the

24   form.

James R. Koller, Esq.

```
 1              THE  WITNESS:   Yes.   The
 2    purpose  of  the  meeting  was  to  tell
 3    John  --  it  was  more  to  tell  him  what  we
 4    were  proceeding  with  and  then  to  open  up
 5    the  discussions  on  how  we  could  settle
 6    the  arrangement  with  John  Hancock.
 7              MR.  DAVIS:   Mark  this,
 8    please,  as  the  next  exhibit.
 9              Actually,  before  we  put  that
10    one  away,  I  just  want  to  follow  up.
11    BY  MR.  DAVIS:
12         Q.     You  said  that  you  thought
13    that  Mr.  Ferrie  had  not  necessarily
14    accurately  characterized  at  least  some
15    aspects  of  the  discussion  at  the  May  31,
16    2005,  meeting  in  this  e-mail.  What
17    aspects  of  the  e-mail,  what  portions  of
18    Mr.  Ferrie's  e-mail,  do  you  believe  are
19    inaccurate?
20         A.     I'm  not  sure  that  we  said  a
21    key  component  of  our  decision  to  sell
22    would  be  how  much  we  owe  Hancock.   And  I
23    do  not  believe  --  when  we  asked  John  how
24    we  might  be  able  to  settle  this,  I  don't
```

James R. Koller, Esq.

1    certain obligations on us and we were

2    aware of the loan application and those

3    purported obligations.

4         Q.    But you didn't use the term

5    "purported obligations" in this letter,

6    did you?

7         A.    No.

8         Q.    Did you mean to say that

9    we're fully aware of our purported

10   obligations under the loan application?

11        A.    I think at the time I just

12   wanted to let them know that they didn't

13   need to tell us; we knew what the loan

14   application said.

15        Q.    At the time that you wrote

16   this letter did you believe that the

17   loan application imposed obligations

18   upon Vesterra?

19        A.    There were loan

20   obligations, but I believed at the time

21   that those obligations would be obviated

22   by the fact that the commitment itself

23   had too many conditions and we would not

24   be bound by that commitment.

James R. Koller, Esq.

1          Q.      The obligations that you

2    were fully aware of, that you refer to

3    in this letter, were obligations that

4    you did not think bound Vesterra?

5          A.      No.    What I said was that

6    the loan obligation contained

7    obligations and I was aware of what the

8    loan application said, and I did not

9    agree, one way or another, you know,

10   whether -- and whether the loan -- I did

11   not make a statement one way or another

12   on whether we were bound by those

13   obligations.

14         Q.      The obligations that you

15   refer to in this letter, did they

16   include the obligation to close the loan

17   on or before August 1, 2005?

18         A.      They included every

19   obligation that was contained in the

20   loan commitment, and that was one of

21   them.

22         Q.      So you had reviewed and you

23   were familiar with all of the

24   obligations that Vesterra had undertaken

# EXHIBIT E

## VESTERRA CORPORATION'S PRINCIPALS

James R. Koller is an attorney who specialized in real estate law for ten years until co-founding Vesterra in 1986. As a partner in the law firms of Dilworth Paxson Kalish & Kauffman and later with Dechert Price & Rhoads, Mr. Koller represented and advised developers, investors, landlords, tenants, buyers, sellers, lenders and contractors, which provided the broad based understanding of the technical and practical elements critical to success in the business of real estate.

Frank C. Palopoli has over twenty-five years of experience in real estate consulting and development. Prior to co-founding Vesterra, Mr. Palopoli was a principal in the firms of Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc., providing work-out, development and real estate investment services to corporate, institutional and private investment clients. Mr. Palopoli has been responsible for the planning, approval, development or disposition of a variety of projects, including life care and assisted living, conventional garden and high-rise apartments, single family and townhome communities and commercial office projects.

Joseph P. Kelly joined Vesterra Corporation in 1987. Before joining Vesterra, Mr. Kelly was a Financial Manager for mergers and acquisitions with Foster Medical, a $250 million home healthcare division of Avon Products, Inc., where he was responsible for company valuations, acquisition structure and due diligence. Mr. Kelly began his career with Price Waterhouse as a member of the firm's audit division after he received his bachelor's degree in accounting from Villanova University. He is a member of the American Institute of Certified Public Accountants and holds a current real estate sales license.

JH 00779

# EXHIBIT F

**John Hancock Financial Services, Inc.**

Real Estate Law Division
Investments Division

John Hancock Place
Post Office Box 111
Boston, Massachusetts 02117
(617) 572-1042
Fax: (617) 572-9268
E-mail: jleveroni@jhancock com

Jessica Yaffie Leveroni
Assistant Vice President and Counsel

*John Hancock.*
FINANCIAL SERVICES

May 9, 2005

VIA UPS
Leonard Shatz, Esq.
First American Title Insurance Company
2 Penn Center Plaza
Suite 1910
Philadelphia, PA 19102

RECEIVED

MAY 1 3 2005

CLOSING

Re:    John Hancock Life Insurance Company ("Lender")
       Commitment No. 6518467
       Matter No. 04-13111
       Avenel at Montgomery Square, 1100 Avenel Boulevard, North Wales, PA 19454
       ("Property")

Dear Mr. Shatz:

Lender proposes to make a loan ("Proposed Loan") in the amount of $32,000,000 to Montgomery Square Partnership ("Applicant"), which will be secured by a mortgage on the Property.

We have been advised by the Applicant that First American Title Insurance Company ("Title Company") has been designated as the title insurer on the Proposed Loan. This designation is acceptable to us No reinsurance of the policy will be necessary.

If Lender approves the Proposed Loan, it is scheduled to close on or before **August 1, 2005.** The Commitment requires the title commitment to be provided to the Lender no later than **June 17, 2005.**

### *Title Company as Closing Medium*

In addition to Title Company being the title insurer, Lender hereby designates Title Company to act as the closing medium for Lender in the closing of the Proposed Loan, as more particularly discussed below. We understand that the closing will be handled through your offices at the above address. Please be advised of the following:

- If you are an agent of the Title Company and not a branch office of the title insurer, we will require an Insured Closing Protection Letter from the title insurer in the form attached as **Exhibit A.**
- We will not permit borrower's counsel to serve as escrow agent for the closing even if borrower's counsel is serving as title agent and issuing the title insurance policy for the Proposed Loan. In such event, please contact Lender's Outside Counsel designated below to discuss alternative arrangements.

The following people will be working on the Proposed Loan:

JH 00950                    12/28/04

- 2 -

| Role | Name | Address | Telephone No. | Telecopier No. |
|------|------|---------|---------------|----------------|
| *Closing Analyst:* | Robin Costa | John Hancock Life Insurance Company Closing and Consulting, T-56 200 Clarendon Street Boston, MA 02117 | (617) 572-9844 | (617) 572-0266 |
| *Lender's Outside Counsel:* | Thomas C. Rogers, Esq. | White and Williams LLP 1800 One Liberty Place Philadelphia, PA 19103 | (215) 864-7190 | (215) 789-7690 |
| *Regional Officer* | John Ferrie | John Hancock Real Estate Finance, Inc. 486 Norristown Road Suite 130 Blue Bell, PA 19422 | (610) 825-9200 | (610) 941-9872 |
| *Applicant's Surveyor:* | Clifford Stout | Stout & Traconelli Associates 2499 Knights Road Pennsburg, PA 18073 | (215) 679-0200 | |

We have been advised that the Applicant's counsel will be Mitchell E. Russell, Esq., 510 Township Line Road, Suite 150, Blue Bell, PA 19422. Mr. Russell's telephone number is (215) 653-0110; his telecopy number is (215) 653-0383.

### Title Insurance Requirements

I have attached as **Exhibit B** a copy of Lender's Title Insurance Policy Requirements ("Title Requirements"). Lender will expect that the title insurance commitments, specimen policies or pro forma policies and the title policies issued for the Proposed Loan will comply with all of these requirements unless Lender consents to deviations.

After receiving the title order, you should contact Staff Counsel to indicate when we can expect to receive the completed title materials. The Title Company will also be expected to inform Lender (i) if the required form of policy is unavailable, and (ii) as to which endorsements required in the Title Requirements are available in the jurisdiction where the Property is located and which are not. Please inform Staff Counsel at the outset of the process if you do not expect to meet Lender's Title Requirements.

### Delivery of Title Report

After ensuring compliance with Lender's Title Requirements, the Title Company should then prepare and send as soon as possible:
- one (1) set of the foregoing to Outside Counsel by overnight courier service;
- one (1) set of the foregoing to the Applicant's surveyor; and
- one (1) set of the foregoing to the loan correspondent.

The title report should take the form of a title insurance binder, commitment to insure, pro forma policy, specimen policy, preliminary report on title or other preliminary title evidence acceptable to

JH 00951

- 3 -

Lender. The title report should reflect the exact nature of the title that will exist after the closing of the Proposed Loan. For example, if the title holding entity to the Property is to be changed prior to the closing of a loan, or if a then existing mortgage is to be discharged, the title report should account for those facts. Any matters necessary to effect the state of affairs shown on the title report should be reflected as conditions in the title report. Any requirements or exceptions that will be released or discharged prior to or at the closing of a loan must be shown on Schedule B, Section I of the title commitment.

The Title Company will be responsible for contacting Applicant's counsel to ensure that the Applicant will provide any necessary materials and indemnities to satisfy Lender's Title Requirements. If the Title Company identifies important issues that should be addressed either before delivery of the title report or during Lender's review of the title materials, please call Lender's Outside Counsel.

If requested by Lender's Outside Counsel or Applicant's counsel, the Title Company will also be responsible for conducting or ordering UCC-11 searches of the public records for parties designated by Lender's Outside Counsel, and sending copies of those searches to Lender's Outside Counsel.

### Coordination of the Loan Closing

Lender typically funds its loans through escrow closings. Lender will require that the Title Company, or an agent of the Title Company who meets the requirements of this letter, serve as the escrow agent for all documents and funds necessary to close the Proposed Loan. Lender's Outside Counsel will prepare escrow instructions that will indicate what conditions must be satisfied to permit the release of escrow, the recording of documents and disbursement of funds ("Escrow Instructions") and will send them to the Title Company. Lender's Outside Counsel will provide a copy of the Escrow Instructions to the Applicant or its representative. The Escrow Instructions will make the Title Company responsible for fulfilling Lender's requirements in connection with the closing of the Proposed Loan. The instructions will direct that at such time as the Title Company can determine that all of the conditions in the Escrow Instructions either have been or will be met at or prior to a certain date, a closing date should be established by consulting with Lender's Outside Counsel and the Applicant's representative prior to the date of closing. Once the date is established, the Closing Analyst will make arrangements to place the closing funds in the Title Company for disbursement on the closing date.

In preparation for the closing, the Closing Analyst will prepare a Loan Disbursement Statement-a settlement statement-the form of which is attached as **Exhibit C**. The Closing Analyst will work directly with the Title Company as the closing of the Proposed Loan nears to complete this form. The Closing Analyst will rely on the Title Company to provide the figures to complete the line item for any payoff of an existing lien. *It will be your responsibility to obtain from the Applicant any payment for the title insurance premium, the escrow fee, recording fees, transfer taxes and property water and sewer taxes.*

*The Lender's closings rely upon gap coverage.* Upon satisfaction of all conditions to closing in the Escrow Instructions, Lender requires the Title Company to agree (a) that the final form of title report to which the Lender agrees prior to closing will serve as the title insurance policy until the actual original title insurance policy is issued, and (b) that the proceeds of the loan may be disbursed prior to recording of the applicable loan documents, and the Title Company and the title insurance policy issued at closing will insure the period between the disbursement of proceeds and the recording of loan documents. The final title insurance policy will be dated the later of the date of the recording of the applicable mortgage or the funding of the loan proceeds and will show no matters of record, exceptions or exclusions other than those to which Lender agreed in the final form of title report. The Title Company will be responsible for obtaining any documentation from the borrower that is required to provide such gap coverage.

JH 00952

- 4 -

Upon satisfaction of all of the conditions of the Escrow Instructions, the Title Company will be responsible for releasing the loan documents from escrow, recording the necessary documents, filing the UCC-1 Financing Statements and disbursing the loan funds in accordance with the Loan Disbursement Statement. The Title Company shall issue Lender's title insurance policy containing all applicable recording information at no cost to Lender within five (5) business days of the closing.

You should not, of course, commence your work on this transaction without instructions to do so from the Applicant or its representative, and it is to be understood that the title evidence is to be obtained and the other closing requirements of Lender are to be met, all at no expense to Lender. You may wish to contact the Applicant to confirm when you may proceed with the title work.

We look forward to working with you. Please feel free to contact me should you have any questions regarding this letter.

Very truly yours,

Jessica Yaffe Leveroni

Enclosures

cc:    Ms Robin Costa (w/out encl.)
       Mitchell E. Russell, Esq. (with encl.)
       Mr. John P. Ferrie (w/out encl.)
       Ms. Patricia C. Coyne (w/out encl.)
       Thomas C. Rogers, Esq. (w/out encl.)

Attached Exhibits
       Exhibit A - Sample Insured Closing Protection Letter
       Exhibit B - Lender's Title Insurance Requirements
       Exhibit C - Lender's Form Loan Disbursement Statement

L:\MORTGAGE\LAWLECA\Avenel title referral 5-9-05 doc

JH 00953

# EXHIBIT G

**John Hancock Life Insurance Company**

| | |
|---|---|
| Investment No: | 6518467 |
| File Name: | Montgomery Square Partnership |

*IMAGED*

| | | |
|---|---|---|
| Regional Office/Correspondent: | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Property Name: | Avenel @ Montgomery Square Apts | Property Type: Multifamily Garden Style |
| Location (city / state): | Montgomeryville          Pennsylvania | Total # Units   256 |
| Jun Han Rating: | MLI Rating:   BBB | JH Rating:   BAA1 |

**Key Statistics:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan Amount: | $32,000,000 | | | Loan per Unit | $125,000 | | |
| Term: (in years) | 10 | Amortization | 30 | Interest Only | 0 | Avg Life: | 9.29 |
| Base Spread: | 134 | Forward BPS: | 45 | Embedded Fees: | 7 | Total Spread: | 186 |
| Matrix Spread at JH Rating Level: | 145 | | | | Pricing Index: | 10 year Treasury | |

| | |
|---|---|
| As Is Vacancy: | n/a |
| Stabilized Vacancy: | 5 0% |

| | Current "As-Is" | | | Stabilized | | | Stabilized |
|---|---|---|---|---|---|---|---|
| | Valuation | $ / SF | LTV % | Valuation | $ / Unit | LTV % | Cap Rate |
| NOI Basis | Property is under construction. | | | $47,302,807 | $184,777 | 67.65% | 7.25% |
| NCF Basis Appraisal Basis | | | | $46,773,151 | $182,708 | 68.42% | 7.25% |
| Cost of Land and Estimate to Build Other Basis | | | | $35,555,800 | $138,889.84 | 90.00% | |
| Breakeven Interest Rate: | | | | 10.60% | | | |
| Connections: | No | | | | | | |

**Specific Conditions:**
Principal Affiliates Requirements: James R. Koller, Frank C. Palopoli and Joseph P. Kelley
Guaranty Requirements: Standard non-recourse carve-outs.
Funding: This is a one-year (365 days) forward commitment.
Disbursement Requirements: Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment.
Estoppel & SNDA Requirements: N/A
Escrow Requirements: Real estate taxes. Replacement reserves and insurance escrow requirements have been suspended. Rental Achievement Reserve, as described above, likely at closing, but limited to $5,380,000.
Transfers Permitted:  Two-time right to transfer with 1% fee.
Additional Proceeds: One time right between the 2nd and 5th loan years the Borrower may request additional funds of not less than $1,000,000 at the then prevailing terms and rates. Amortization will be based on the remaining original amortization term.
Extension Option: Borrower as one time right to extend loan for 12 months at the then prevailing floating-rate terms and rates upon maturity of the original loan.
Prepayment Terms: Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan. The yield maintenance premium shall be discounted to its present value. The loan will be open to prepayment at par during the last 120 days of the loan term.
Monthly Payment Basis: Monthly payments will be on a 30/360 day basis.
Financial Statements: Borrower certified acceptable if CPA audited not available. Quarterly statements not required unless loan is in default.
Appraisal: Required loan to value of 75%
Borrower: SPE and SAE status was waived since the Borrower owns a separate piece of land. The land, however, must be transferred if Borrower wishes to use it as security for a loan.
Additional Application Fee: Should the 10-year treasury drop more than 45 bps prior to the closing, Borrower shall deposit up to 2% of the Loan principal as an additional application fee, which amounts shall be returned if that treasury shall increase above such threshold prior to closing.
Credit Group Remarks:
Great location, demographics and product type.
Funding at 80% occupied versus MLI requirement of 90% mitigated by the full economic holdback.
Credit recommends deal as structured.

JH 00405

John Hancock Life Insurance Company

Investment No:                6518467
File Name:                    Montgomery Square Partnership

**Recommended By:**
**Investment Officer:** _____    Date: 8/16/04
                        Timothy J. Malik

**Credit Group:** _____    Date: 8-16-04
                    Patricia Coyne

**Team Leader:** _____    Date: _____
                    David Henderson    OUT OF OFFICE

**Approved By:**
                    Barry Nectow _____    Date: 8-16-04

                    Ivor Thomas _____    Date: 8-16-04

                    Paul English _____    Date: _____

                    Warren Thomson _____    Date: 8-16-04

JH 00406

John Hancock Life Insurance Company

| File Name: | Avenel @ Montgomery Square Apts | | | Date: | 8/16/2004 |
|---|---|---|---|---|---|
| | Mortgage Investment No.   651B467 | | | | |
| | Montgomery Square Partnership | | | | |
| | Multifamily | | | | |
| | 1100 Avenel Blvd. | | | | |
| | Montgomeryville | Pennsylvania | | | |
| Rating: | MLI - | BBB | OSFI - | Satisfactory | New Loan |

**LOAN TERMS:** 10-Year Term, 30-Year Amortization, monthly payments on 30/360 basis; Option to extend Loan with a one-year floater.

**ARREARS HISTORY:** None, project under construction

**Ground Lease:** N/A

**PROJECT DESCRIPTION:** The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting. The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

**LOCATION:** The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast

| LOAN STATISTICS: | | Stabilized |
|---|---|---|
| Loan Amount: | | $32,000,000 |
| Final Lending Value: | | $47,000,000 |
| Purchase Price: | $35,555,800 Cost to Build | |
| Income Value: | | $47,302,807 |
| Cap Rate: | | 7.25% |
| Value Adjustement: | | |
| Value / SF: | | $183,593.75 |
| Loan / SF: | | $125,000.00 |
| Loan / Value Ratio: | | 67.6% |
| Loan / SF @ Maturity: | | $105,105.66 |
| Balloon Loan / Value: | | 56.9% |
| DSC - NOI: | | 1.46 |
| DSC - NCF: | | 1.44 |
| DSC (25 yr Amort) - NOI: | | 1.36 |
| DSC (25 yr Amort) - NCF: | | 1.35 |
| Average Rental Rate (actual): | | $1,509.96 |
| Average Rental Rate (market): | | $945.00 |
| Breakeven Interest Rate: | | 10.60% |

**Credit Rating:**

| MLI - BBB | OFSI - Satisfactory | John Hancock - BAA1 |
|---|---|---|

JH 00407

# INCOME, EXPENSE & LOAN ANALYSIS

John Hancock Life Insurance Company

| | |
|---|---|
| Borrower | Montgomery Square Partnership |
| Loan No. | 6518467 |
| Property Address | Montgomeryville          Pennsylvania |
| Property Type | Multifamily |
| Date | 30Jul2004 |

| | |
|---|---|
| Total Number of Units | 256 |
| Vacant Units | 0 |
| % Occupancy | 100% |
| % Vacancy | n/a |

Color Key  INPUT FIELD

| | |
|---|---|
| Benchmark Rate | 6.180% |
| Benchmark Rate (per period) | 0.515% |
| Benchmark Amortization Period (yrs) | 25 |

Financial Statements Reviewed by  Timothy J. Malk
Date  20May2004          Vacancy as % Gross Income->          5.0%          5.0%          0.0%

| | Actual | | | Current "In-Place" | | Pro Forma | | Stabilized | | Appraisal / CARS | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Financial Statement Date | 2000 | 2001 | 2002 | 2004 | | 30Jul2004 | | 30Aug2005 | | | |
| Vacancy as % NRA | | | | | | | | | | | |
| | | | | $/Unit | | $/Unit | | $/Unit | | $/Unit | |

| INCOME | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Rent | Property is currently under construction. | | | | | | | | | | |
| Occupied | 0 | 0 | 0 | 0 | 0 | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Vacant | n/a | n/a | n/a | n/a | n/a | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Total Rental Income | 0 | 0 | 0 | 0 | 0 | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Expense Reimbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Percentage Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Parking Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Other Income | 0 | 0 | 0 | 0 | 0 | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| TOTAL GROSS INCOME | 0 | 0 | 0 | 0 | 0 | 4,950,813 | 19,339 | 4,950,813 | 19,339 | 0 | 0.00 |
| Vacancy | 0 | 0 | 0 | 0 | 0 | 247,541 | 967 | 247,541 | 967 | 0 | 0.00 |
| EFFECTIVE GROSS INCOME | 0 | 0 | 0 | 0 | 0 | 4,703,272 | 18,372 | 4,703,272 | 18,372 | 0 | 0.00 |

| OPERATING EXPENSES | | | | <- Inflation factor | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Real Estate Taxes | 0 | 0 | 0 | 0 | 0 | 456,540 | 1,783 | 456,540 | 1,783 | 0 | 0.00 |
| Property Insurance | 0 | 0 | 0 | 0 | 0 | 72,780 | 284 | 72,780 | 284 | 0 | 0.00 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 51,200 | 200 | 51,200 | 200 | 0 | 0.00 |
| Repairs & Maintenance | 0 | 0 | 0 | 0 | 0 | 157,184 | 614 | 157,184 | 614 | 0 | 0.00 |
| Janitorial | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Management Fee | 0 | 0 | 0 | 0 | 0 | 164,615 | 643 | 164,615 | 643 | 0 | 0.00 |
| Payroll & Benefits | 0 | 0 | 0 | 0 | 0 | 280,000 | 1,094 | 280,000 | 1,094 | 0 | 0.00 |
| Advertising & Marketing | 0 | 0 | 0 | 0 | 0 | 51,500 | 201 | 51,500 | 201 | 0 | 0.00 |
| Professional Fees | 0 | 0 | 0 | 0 | 0 | 5,000 | 20 | 5,000 | 20 | 0 | 0.00 |
| General & Administrative | 0 | 0 | 0 | 0 | 0 | 35,000 | 137 | 35,000 | 137 | 0 | 0.00 |
| Other Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Sub Total - Operating Expenses | 0 | 0 | 0 | 0 | 0 | 1,273,819 | 4,976 | 1,273,819 | 4,976 | 0 | 0.00 |
| Ground Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Total Expenses | 0 | 0 | 0 | 0 | 0 | 1,273,819 | 4,976 | 1,273,819 | 4,976 | 0 | 0.00 |
| NET OPERATING INCOME | 0 | 0 | 0 | 0 | 0 | 3,429,453 | 13,396 | 3,429,453 | 13,396 | 0 | 0.00 |
| T.I. Cost / Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| L.C. Cost / Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Cap Expenditures / Reserve | 0 | 0 | 0 | 0 | 0 | 38,400 | 150 | 38,400 | 150 | 0 | 0.00 |
| Reserves | 0 | 0 | 0 | 0 | 0 | 38,400 | 150 | 38,400 | 150 | 0 | 0.00 |
| CASH FLOW | 0 | 0 | 0 | 0 | 0 | 3,391,053 | 13,246 | 3,391,053 | 13,246 | 0 | 0.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MANAGEMENT FEE as % EGI | 0.0% | 0.0% | 0.0% | 0.0% | 3.50% | 3.50% | 0.0% | |
| TOTAL EXPENSES as % EGI | 0.0% | 0.0% | 0.0% | 0.0% | 27.1% | 27.1% | 0.0% | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NET OPERATING INCOME | 0 | 0 | 0 | 0 | 3,429,453 | 3,429,453 | 0 | |
| NET CASH FLOW | 0 | 0 | 0 | 0 | 3,391,053 | 3,391,053 | 0 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cap. Rate | | | | | 7.250% | per unit | 7.250% | per unit | 0.000% |
| Income Value - NOI (calculated) | | 0 | 0.00 | 0 | 0.00 | 47,302,800 | 184,777 | 47,302,807 | 184,777 | 0 | 0.00 |
| Income Value - NCF (calculated) | | 0 | 0.00 | 0 | 0.00 | 46,773,145 | 182,708 | 46,773,151 | 182,708 | 0 | 0.00 |
| Appraiser's Final Value | | | | | | | | | |
| Appr. Indicated Cap. Rate - NOI | | | | | | | | 0.00% | |
| Appr. Indicated Cap. Rate - NCF | | | | | | | | 0.00% | |
| Purchase Price | | 0 | | | | | | | |

| Max. Loan Calculations: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| - Max Loan to Value | 75% | | 0 | 0.00 | 0 | 0.00 | 35,477,100 | 138,582 | 35,477,105 | 138,582 | 0 | 0.00 |
| - Max Loan to Value @ ACLI Average | 75% | | 0 | 0.00 | 0 | 0.00 | 35,477,100 | 138,582 | 35,477,105 | 138,582 | 0 | 0.00 |
| - Min. DSC (NOI & Loan Terms) | 1.25 x | | 0 | 0.00 | 0 | 0.00 | 37,408,502 | 146,127 | 37,408,507 | 146,127 | 0 | 0.00 |
| - Min. DSC (NOI & 25 yr Amort) | 1.25 x | | 0 | 0.00 | 0 | 0.00 | 34,886,781 | 136,276 | 34,886,786 | 136,277 | 0 | 0.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Loan Amount | | 0 | 0.00 | 32,000,000 | 125,000 | 32,000,000 | 125,000 | 0 | 0.00 |
| Interest Rate | | | 0.000% | 6.180% | 6.180% | 6.180% | |
| Loan Term | | | | mths | 120 mths | 120 mths | mths | |
| Interest Only Period | | | | mths | mths | mths | mths | |
| Amortization | | | | mths | 360 mths | 360 mths | 360 mths | |
| Monthly Payment   Interest Only Basis | | | | 0.00 | 195,574.96 | 195,574.96 | 0.00 | |
| Annual Debt Service | | | | 0 | 2,346,900 | 2,346,900 | 0 | |

| | | | | | |
|---|---|---|---|---|---|
| Superior Debt Service Expense (Annual) | | | 0 | 0 | 0 |
| Subsequent Debt Service Expense (Annual) | | | 0 | 0 | 0 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DSC - NOI | 0.00 x | 0.00 x | 1.46 x | 1.46 x | 0.00 x | |
| DSC - NCF | 0.00 x | 0.00 x | 1.44 x | 1.44 x | 0.00 x | |
| DSC (25 yr Amort) - NOI | 0.00 x | 0.00 x | 1.36 x | 1.36 x | 0.00 x | |
| DSC (25 yr Amort) - NCF | 0.00 x | 0.00 x | 1.35 x | 1.35 x | 0.00 x | |
| Combined Total DSC - NOI | N/A | N/A | N/A | N/A | N/A | |
| Combined Total DSC - NCF | N/A | N/A | N/A | N/A | N/A | |
| Loan-to-Value (PBO / Value) | 0.0% | 0.0% | 67.65% | 67.65% | 0.0% | |
| Loan-to-Unit (PBO / #Units) | $0.00 | $0.00 | $125,000 | $125,000 | $0.00 | |
| Breakeven Rent (Before Vacancy) | $0.00 | $0.00 | $14,806 | $14,806 | $0.00 | |
| Net Breakeven Rent (Before Vacancy) | $0.00 | $0.00 | $14,806 | $14,806 | $0.00 | |
| Breakeven Interest Rate (int only) - SNCF | 0.00% | 0.00% | 10.60% | 10.60% | 0.00% | |
| PBO @ End of Term (Balloon) | $0 | $0 | $26,907,048 | $26,907,048 | $0 | |
| Balloon / sf | $0.00 | $0.00 | $105,105.66 | $105,105.66 | $0.00 | |
| Balloon Loan / Value | 0% | 0% | 57% | 57% | 0% | |

JH 00408

**John Hancock Life Insurance Company**



**A meeting of the Mortgage and Real Estate Loan Committee was held on**                    8/16/04

**Voted - To authorize the following investment:**

| | | | | |
|---|---|---|---|---|
| Investment: | 6518467 | Avenel @ Montgomery Square Apts | **Company** | **$ Allocation** |
| | | | JHLICO Allocation | $29,900,000 |
| Type of Investment: | Mortgage Loan | | | |
| | | | IPLICO Allocation | $2,100,000 |
| Lien Position or Priority | First | | | |
| Investment Amount | $32,000,000 | $125,000 per Unit | | |
| Rollover of Existing Loan | No | | | |
| Loan Term | 120 | months | | |
| Amortization Term | 360 | months | | |
| Summation Value | $47,000,000 | $184,804 per Unit | | |
| Maximum Loan to Value | 68.09% | | | |
| Minimum DSCR | 1.45 times | | | |

| | | | |
|---|---|---|---|
| Interest Rate (Note Rate) | 6.180% per annum | Effective Yield Semi-Annual Rate (30/360 basis) | 6.260% |
| Interest Calculation | 30/360 | Average Life | 9.29 |
| | | Duration | 6.76 |
| Less: embedded Fee | -0.071% | Monthly Spread over Treasury | 179 |
| | | Semi-Annual Spread over Treasury | 187 |
| Effective Yield Monthly | 6.109% | REIG Department Rating | BAA1 |

| **Collateral Property** | | **Property Type/Sub-Type** | **Property Size** | |
|---|---|---|---|---|
| Avenel @ Montgomery Square Apts | | Multifamily | 256 | Units |
| Montgomeryville | Pennsylvania | Multifamily - Garden Apartments | | |

| | | |
|---|---|---|
| Investment Officer | Timothy J. Malik | |
| 2nd Investment Officer | Ryan Hawley | |
| Originating Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Servicing Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Closing Analyst | Robin Costa | |
| Internal Counsel | Nathaniel Margolis | |

Page 1

JH 00409

**VOTED INVESTMENT**

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

**Loan Overview:**

-- The security is a class-A, 256-unit apartment project under construction in Montgomeryville, Pennsylvania (suburban north Philadelphia). The property will be comprised of 256 garden-style apartments (125 one-bedrooms and 131 two-bedrooms) in eight three-story buildings and one four-story building (which will also hold the clubhouse).

-- Construction of the security is scheduled to be complete in March 2005, and 17 of the 22 units completed to date have been leased. Funding will occur when the property is fully constructed and is at least 80% occupied (August 2005 at the latest). A Rental Achievement Reserve will be funded if the property does not achieve the underwritten rents. Because of the construction and occupancy requirements, the Loan is priced as a one-year forward commitment.

-- The debt service coverage ratio for a 10% Constant is 1.06:1 and the breakeven interest rate is 10.6%.

**Loan Information - Voted Section:**

| | | | |
|---|---|---|---|
| Borrower/Applicant | Montgomery Square Partnership | | |
| Loan Amount | $32,000,000 | Underwriter's Capped Value | $47,309,708 |
| Loan per SF/Unit/Pad | $125,000 | Underwriter's LTV | 67.64% |
| Loan Term - years | 10 | Underwriter's NOI | $3,429,954 |
| Amortization - years | 30 | Underwriter's Cap Rate | 7.250% |
| Interest Only Period - years | 0 | Underwriter's Cash Flow | $3,391,554 |
| Interest Rate | 6.180% | Underwriter's DSCR | 1.45 |
| Contract Type | Fixed Rate | Annual Debt Service | $2,346,900 |
| Interest Method | 30/360 | Monthly Debt Service | $195,574.96 |
| Payment Constant | 7.334% | Service Fee | 0.029% |
| Balloon Balance | $26,963,760 | Secondary Financing in Place | No |
| Sanctified Loan (Yes/No) | Yes | Amount | |
| Ground Lease | No | Secondary Financing Type | N/A |
| Recourse to Borrower | No | Secondary Financing Permitted in Future | Yes |
| Recourse to Principal/Sponsor | No | Amount | |
| Due on Sale | Yes | Secondary Financing Type | Secured by Property |
| Partial Release Allowed | No | Lockbox | No |
| Cross Collateralized | No | Lockbox Status | |
| Cross Defaulted | N/A | Rate Reset/Loan Term Extension Option | Yes |
| Crossed Loans | | See Supplemental Page Attached to Vote | |

**Other Loan Information - Memorandum Section**

| | | | |
|---|---|---|---|
| Assumption Provision (# times) | 2 | Payment Due Date | 1st |
| Index Name | 10 year Treasury | Grace Day Period for Late Charge | 5 |
| 10 year Treasury | 4.43% | Late Charge | 4% |
| Fraud Carve out | | Grace Day Period for Default | 5 |
| Borrower | Yes | Default Interest Rate | 5% |
| Sponsor | Yes | | |
| Environmental Indemnification | | | |
| Borrower | Yes | | |
| Sponsor | Yes | | |

**Loan Terms Description - Voted Section**

-- The Borrower was given 365 days to close the Loan although the typical commitment is 60 days. The net spread includes 45 basis points for the cost of this extra 305 days of forward commitment. The closing date may be extended for up to 90 days at the cost of an adding five (5) basis point to the interest rate for each 30-day extension period or portion of a 30-day extension period. -- Funding will occur when the property is fully complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion. but with no prepayment premium.
-- The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock. The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.
-- The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar-type apartment buildings in the Philadelphia metropolitan area.

JH 00410

**VOTED INVESTMENT**

| Investment: | 6518467 | | | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | | | |

**LINES OF BUSINESS ALLOCATIONS - VOTED SECTION**

| JHLICO Accounts | | | IPLICO Accounts | | | |
|---|---|---|---|---|---|---|
| | $ Allocation | | | $ Allocation | | |
| GBRE | $3,900,000 | | IPLICo | $2,100,000 | | |
| GRP.INS | $3,000,000 | | | | | |
| RLTC | $5,000,000 | | | | | |
| Remain | $4,200,000 | | | | | |
| Open | $2,600,000 | | | | | |
| IQA | $10,000,000 | | | | | |
| REFA | $1,200,000 | | | | | |

| Total JHLICO | $29,900,000 | | Total IPLICO | $2,100,000 |
|---|---|---|---|---|

**Prepayment Terms - Voted Section**

Prepayment Premium

| | Lo | 48 |
|---|---|---|
| | YM1 | 69 |
| | Open | 3 |

| Partial Payment Allowed | No |
|---|---|

**Prepayment Terms Description - Voted Section**

- Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan.  The yield maintenance premium shall be discounted to its present value.  The loan will be open to prepayment at par during the last 90 days of the loan term.

**Key Date Information - Voted Section**

| Rate Lock Date | 8/2/2004 | Commitment Expiration | 8/2/2005 |
|---|---|---|---|
| Approval Date | 8/16/2004 | Vote Expiration | 8/15/2005 |

Page 3

JH 00411

## INVESTMENT MEMORANDUM

Investment: 6518467
       Avenel @ Montgomery Square Apts

Investment Amount:  $32,000,000

### Strengths of Deal

~ The security is a newly constructed, class-A apartment complex located in a strong apartment market that has not had new apartment construction in over 15 years.

~ The developers of the security have extensive construction experience and they have contracted with a very experienced management and marketing firm to direct the lease up and property operations.

### Weaknesses of Deal

~ The property does not have an operating history since it is under construction and in its lease-up phase.   However, leasing for the first building has been strong.  In addition, a waiting list of 103 prospects has been assembled for certain units in other buildings now under construction.  Operating expenses were also conservatively estimated to be `5,527/unit per year, even though tenants pay for most utilities.

### Exceptions to Guidelines

~ Funding will occur when the property is complete and is at least 80% occupied.  If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment.  The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

~ The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1.0 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock.  The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.

~ The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar size, type, location and character secured by rental apartment buildings in the Philadelphia metropolitan area.   ~ Late charges will be 4% instead of 5%, and the interest rate add-on for defaults was reduced from 7% to 5%.   ~ SPE and SAE status was waived since the Borrower owns a separate piece of land.  This land, however, must be transferred if Borrower wishes to use it as security for a loan.

JH 00412

INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

**Use of Funds**

| | | | **Borrower Purchase Information** | |
|---|---|---|---|---|
| | | | Purchase Date | 06/01/96 |
| Loan Purpose | Refinance | | Purchase Price | $7,680,000 |
| Loan Amount | $32,000,000 | | Capital Expenditures | $27,875,801 |
| Less Current Debt/Purchase Price | $30,742,000 Wilmington Trust & | | Borrower Investment Basis | $35,555,801 |
| Closing Cost/Other Expenses | $5,063,801 Wachovia | | | |
| Net Proceeds to Borrower | -$3,805,801 | | | |

| Loan Fees | $ Amount | % of Loan | | |
|---|---|---|---|---|
| Processing Fee | $5,000 | 0.02% | | |
| Application Fee | $320,000 | 1.00% | | |
| Commitment Fee | $640,000 | 2.00% | | |
| Embedded Origination Fee | $160,000 | 0.50% | JHREF - Philadelphia | |
| Broker's Origination Fee | $160,000 | 0.50% | Carey, Kramer, Pettit, Panichelli & Associates | |

**Purchase Information / Previous History**

~ The Borrower purchased the site in 1996, rezoned it, obtained building permits and started construction in late 2003. At closing, the Borrower will have an estimated $3.8 million of cash equity in the property.

**Borrower Information**

| Borrower/Applicant | Montgomery Square Partnership | | | |
|---|---|---|---|---|
| Entity Type | Partnership | | | |
| State of Incorporation | Pennsylvania | | | |
| Single Asset Entity | No | | Independent Director | No |
| Special Purpose Entity | No | | Non-Consolidation Opinion | No |
| Bankruptcy Remote Entity | No | | | |
| | | | | |
| Property Management Company | Buzzuto Management | | Affiliate of Borrower | No |

**Borrower Entity Information**

~ The Borrower is a general partnership composed of three limited partnerships, all formed in Pennsylvannia. (1.) Vestmont Limited Partnership's general partner is Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli ) and the LP units are owned 44.5% by James R. Koller, 44.5% by Frank C. Palopoli, and 10% by Joseph P. Kelley. (2.) Vestmont Limited Partnership II's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 38.28% by James R. Koller, 38.28% by Frank C. Palopoli, and 22.44% by Joseph P. Kelley. (3.) Vestmont Limited Partnership III's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 66.17% by Koller Kelly Partnership, LP and 32.83% by FCP Group LP.

| Database Searched | Issue | Database Searched | Issue |
|---|---|---|---|
| Bankruptcy | No | UCC-1 | No |
| Credit Report | No | | |
| Civil Records | No | | |
| Judgments | No | | |
| Secretary of State | No | | |
| Tax Authority/Liens | No | | |

**Description of Credit Issues - Borrowing Entity Only**

~ None known.

JH 00413

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
| | Avenel @ Montgomery Square Apts | | | |

### Principal/Sponsor Information

| First Principal/Sponsor Name | | James P. Koller | | | |
| Net Worth | $25,100,415 | as of | 6/30/2004 Source | Financial Statement |

| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

| Second Principal/Sponsor Name | | Frank C. Palopoli | | | |
| Net Worth | $21,634,000 | as of | 6/30/2004 Source | Personal Balance Sheet |

| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

### Principal/Sponsor Comment

~ James P. Koller is an attorney who specialized in real estate law for 10 years until founding, in 1986, the Vesterra Corporation, the general partner of the Borrower. Vesterra develops both commercial properties and single-family homes. Mr. Koller was asociated with Dilworth Paxson Kalish & Kauffman and later with Dechert Price & Rhoads prior o his involvement with Vesterra. Mr. Koller guarantees the non-recourse carve outs and has a net worth of $25.1 million with liquid assets of $14.6 million.

~ Frank C. Palopoli has over 25 years of real estate experience and, prior to co-founding Vesterra, was a principal in Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc. Both firms provided work-out, development and real estate services to corporate, institutional and private individuals. Mr. Palopoli guarantees the non-recourse carve outs and has a net worth of $21.6 million with liquid assets of $9 million.

~ Joseph P. Kelley joined Vesterra in 1987. Before joining Vesterra he was a financial manager for mergers and acquisitions for Foster Medical. He began his career as an auditor with Price Waterhouse. Mr. Kelley also guarantees the non-recourse carve outs and has a net worth of $3.6 million with liquid assets of $738,000.

### Principal/Sponsor related John Hancock Loans

~ None

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

**Escrows**

| Reserve Type | Required | Amount at Closing | Monthly Amount | Cap |
|---|---|---|---|---|
| Tax | Yes | | | |
| Insurance | No | | | |
| Capex | No | | | |
| Deferred Maintenance | No | | | |
| TI/LC | No | | | |
| Environmental | No | | | |

**Reserve Comments**

~ Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

~ Reserves for insurance, replacements and leasing costs will be suspended as long as the Loan does not have an event of default, and subject to other customary conditions.

JH 00415

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Location Information

| Property Name | Avenel @ Montgomery Square Apts | | County | Montgomery |
|---|---|---|---|---|
| Address | 1100 Avenel Blvd. | | MSA | Philadelphia |
| | Montgomeryville | Pennsylvania | 19454 | |

### Location Description

~ The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast.

~ The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000.

### Property Information

| Property Type | Multifamily | Property Kind Code | B |
|---|---|---|---|
| Property Sub-Type | Multifamily - Garden Apartments | Property Type Code | 19 |
| Garden Apts (1980+) | | Property Sub-Type Code | 101 |

| | | | |
|---|---|---|---|
| Total Number of Units | 256 | Land area | 18.35 |
| Total Net Rentable Sq. Ft. | 274,931 | Open Parking | 404 |
| Number of Buildings | 9 | Covered Parking | 112 |
| Number of Floors | 3 | Total Parking | 516 |
| Year Built | 2004-05 | Parking Ratio | 2.02 |
| Year Renovated | 0 | Sewer | Public |
| Elevators | 1 | Water | Public |
| Building Frame | Steel | HVAC System | Package Units |
| Exterior | Vinyl | Fuel | Electric |
| Roof Type | Pitched | Seismic Zone | 2 |
| Roof Material | Shingle | Alquist Priolo Zone | No |
| Ground Lease | No | PML Factor | |
| Ground Lease Expiration | N/A | Storm/Hurricane Zone | No |
| Ground Lease Subordinate | N/A | Flood Zone | |
| | | Environmental Issues | No |

### Property Description

~ The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting

~ The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

JH 00416

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Additional Property Information

| | | | |
|---|---|---|---|
| Rent Controlled | No | Electric Paid By | Tenant |
| Rent Subsidized | No | Heat Paid By | Tenant |
| Section 42 | No | Water Paid By | Tenant |
| Section 8 | No | Sewerage Paid By | Tenant |

### Utilities/Expenses Paid by Tenant

~ Tenants pay for all utilities to their units.

### Utilities/Expenses Paid by Landlord

~ Landlord pays for common area utilities. Only the four-story building will have fully enclosed hallway and staircases.

### General Comments

~ This is a project under construction.

### Amenities

| | | | | | |
|---|---|---|---|---|---|
| Air Conditioning | Yes | Fireplace | Yes | Health Club | Yes |
| Washer/Dryer | Yes | Laundry | No | Club Room | Yes |
| Dishwasher | Yes | Security | Yes | Pool | Yes |
| Trash Compactor | No | Other Amenities | Yes | Hot Tub | No |
| | | | | Tennis | No |

### Amenities Comments

~ These apartments will also offer security system rental, 9-foot ceilings, track lighting, multiple phone lines and high-speed cable outlets, private patios or balconies, full-size washer and dryer, walk-in closets, extra storgae space and attached or detached garages for rent.

~ The common area will offer a residence lounge, executive business center, exercise room and resort-style pool. Most units will have two parking spaces.

### Tenant Mix

| | | | | | |
|---|---|---|---|---|---|
| Family | 40% | Senior | 10% | Military | 5% |
| Single | 60% | Student | 10% | Other | 5% |

### Tenant Mix Comment

~ This is an upscale residential development that targets mid to upper income individuals and professionals.

### Environmental Issue Comment

~ None known.

JH 00417

### INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

**Valuation Summary**

| | | | |
|---|---|---|---|
| NOI | $3,429,954 | | |
| Underwriter's Cap Rate | 7.250% | **Loan to Value Ratios** | |
| Underwriter's Capped Value | $47,309,708 | Underwriter's Capped | 67.64% |
| Discounted Cash Flow Value | | Discounted Cash Flow | 0.00% |
| External Appraisal | | External Appraisal | 0.00% |
| Summation Value | $47,000,000 | Summation Value | 68.09% |
| | | | |
| Land Area | 18.35 | **Physical Valuation** | |
| Land Value per Acre | $418,529 | Land | $7,680,007 |
| Total Gross Building Area | 274,931 | | |
| Building Cost per Sq. Ft. (net) | $101.39 | Building | $27,875,254 |
| Other Site Improvements | | Site Improvement | $0 |
| | | | |
| | | Total Physical Value | $35,555,261 |

**Valuation Comment**

~ RENTAL COMPS: Nine comparable properties were identified with one bedroom rents from $1,020 - $1,461/unit and two bedroom rents from $933 - $1,790/unit, while the subject projects rents of $1,197 - $1,790/unit for the one bedrooms and $1,609 - $1,846/unit for the two bedrooms and $1,895 - $2,200/unit for the three bedrooms. Only one comparable property is nearby but is over 20 years old. The remaining comparable properties will not compete with the subject since the distance is in excess of five mile, and most of those are much older properties as well. The rent-per-square-foot of the rental comps indicate that the subjects rents are similar to market rents, even though the subject has the advantage of being brand new.

~ Condominium sales comps range from $173,900 to $264,000 while the subjects valuation is $184,777/unit.

~ Capitalization rates range from 6.25% to 7.5%, with the newer apartment buildings going in the lower cap rates. The subject's valuation is based on a 7.25% cap rate.

~ Comparable sales for garden-style apartment building built since 1990 range from $104,000/unit to $149,000/unit. The Regatta Apartments in Norristown (an inferior location) is currently being marketed at $172,000/unit.

| Market/Sub-Market Performance | Market | Sub-Market | Competitive Group |
|---|---|---|---|
| Name of Market | Philadelphia | Lansdale/Gwynedd | |
| Total Units | 194,682 | 5,880 | |
| Total Vacancy (current/worst/best) | 3.8%/3.8%/1.6% | 4.9%/4.9%/.09% | |
| New Supply - Coming Year (units) | 1,461 | 100 | |
| New Supply last 12 months | 401 | 0 | |
| Net Absorption last 12 months | 303 | -18 | |
| Projected net absorption next 12 mths | 1,059 | 110 | |
| | | | |
| Effective Rent / Unit | $886 | $945 | |
| Peak Rent / Unit | $878 | $945 | |
| Last Year's Rent / Unit | $878 | $936 | |
| Median Operating Expenses / Unit Concessions | | | |
| | | | |
| Source of Market Information | REIS, Marcus & Millichamp | | |

**Market/Sub-Market Comment**

~ According to REIS, the Lansdale/Gwynedd apartment market (5,880 units in 29 projects) is 4.9% vacant and with a median vacancy rate of 3.4%. Rental growth should moderate after growing 2.7% during the previous year. The average asking rent is $945/month. No new units wave been constructed during the last four years and only 32 units have been built since 1999. The subject is the only complex under construction or planned in this submarket at this time. The Greater Philadelphia apartment market (194,270 units in 1,141 projects) is 3.8% vacant and rental growth should also moderate after growing 3.2% over the previous year. Roughly 1,461 units are under construction and are projected to be absorbed with minor effect on the overall vacancy.

~ Marcus & Millichap project slightly increasing vacancy for the Philadelphia market, but also rent increases of 3.8% in 2004.

~ Two apartment properties were recently built in different submarkets about eight miles south or west to the subject. The Glen at Lafayette Hill (139 units) located in Lafayette, PA was developed in 1999 and reached stabilization within 10 months. Henderson Square (128 units) located in King of Prussia was built in 2001 and was stabilized within 12 months. The subject's 256 units are projected to be stabilized within 20 months from the start of construction.

~ The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000. Of that population, about 24% rent their homes.

JH 00418

## INVESTMENT MEMORANDUM

Cash Flow Analysis

Investment: 6518467  Investment Amount: $32,000,000
Property: Avenel @ Montgomery Square Apts  No. of Units: 256

| Statement Name Period Ended | 12/31/00 | 12/31/01 | 12/31/02 | $/Unit | % of EGI | Underwritten | $/Unit | % of EGI | Appraisal | $/Unit | % of EGI | Cash Flow Footnotes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | | | | | |
| Base Rent - Occupied | $0 | $0 | $0 | $0 | 0% | $4,638,600 | $1,510 | 99% | $0 | $0 | 0% | a |
| Base Rent - Vacant | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | a |
| Laundry/Vending Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Parking Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Other Income | $0 | $0 | $0 | $0 | 0% | $312,213 | $102 | 7% | $0 | $0 | 0% | b |
| Gross Income | $0 | $0 | $0 | $0 | 0% | $4,950,813 | $1,612 | 105% | $0 | $0 | 0% | |
| Vacancy Allowance | $0 | $0 | $0 | $0 | 0% | $247,541 | $81 | 5% | $0 | $0 | 0% | c |
| Effective Gross Income | $0 | $0 | $0 | $0 | 0% | $4,703,272 | $1,531 | 100% | $0 | $0 | 0% | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Real Estate Taxes | $0 | $0 | $0 | $0 | 0% | $458,540 | $1,783 | 10% | $0 | $0 | 0% | d |
| Property Insurance | $0 | $0 | $0 | $0 | 0% | $72,780 | $284 | 2% | $0 | $0 | 0% | e |
| Utilities | $0 | $0 | $0 | $0 | 0% | $51,200 | $200 | 1% | $0 | $0 | 0% | f |
| Repairs and Maintenance | $0 | $0 | $0 | $0 | 0% | $156,684 | $612 | 3% | $0 | $0 | 0% | f |
| Management Fees | $0 | $0 | $0 | $0 | 0% | $164,615 | $643 | 4% | $0 | $0 | 0% | g |
| Payroll & Benefits | $0 | $0 | $0 | $0 | 0% | $280,000 | $1,094 | 6% | $0 | $0 | 0% | f |
| Advertising & Marketing | $0 | $0 | $0 | $0 | 0% | $51,500 | $201 | 1% | $0 | $0 | 0% | f |
| Professional Fees | $0 | $0 | $0 | $0 | 0% | $5,000 | $20 | 0% | $0 | $0 | 0% | f |
| General and Administrative | $0 | $0 | $0 | $0 | 0% | $35,000 | $137 | 1% | $0 | $0 | 0% | f |
| Other Expenses | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Ground Rent | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | |
| Total Operating Expenses | $0 | $0 | $0 | $0 | 0% | $1,273,319 | $4,974 | 27% | $0 | $0 | 0% | |
| Net Operating Income | $0 | $0 | $0 | $0 | 0% | $3,429,954 | $13,398 | 73% | $0 | $0 | 0% | |
| Reserves | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | h |
| Extraordinary Capital Expenditures | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | i |
| Total LC, TI's and Capital | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | |
| Cash Flow Available for D. S. | $0 | $0 | $0 | $0 | 0% | $3,391,554 | $13,248 | 72% | $0 | $0 | 0% | |
| Annual Debt Service | $2,346,900 | $2,346,900 | $2,346,900 | | | $2,346,900 | | | $2,346,900 | | | |
| Net Cash Flow after Debt Service | | | | | | $1,044,654 | | | | | | |
| DSCR | | | | | | 1.45 | | | | | | |

JH 00419

11

INVESTMENT MEMORANDUM

Investment: 6518467                                                    Investment Amount: $32,000,000
Property:    Avenel @ Montgomery Square Apts                          No. of Units                256

Cash Flow Footnotes

General Comments

– The rents and expenses are based on market studies and projections by the developer.

a.) GPR is based on rental projections, a market study and some preleasing.

b.) Other income is based on rental of security systems, storage spaces, and garages, as well as application fees, and late fees.

c.) Vacancy allowance was taken at 5% which is below the sub-market vacancy rate.

d.) Real estate taxes were underwritten based on an estimate of final assessed value.

e.) Insurance was underwritten based on insurance bids.

f.) General operating expenses were underwritten based on the developer's budget and estimates of operating costs.

g.) Management fee was underwritten at 3.75%, which is a market rate for like-type properties.

h.) Replacement reserves were underwritten at $150 per unit since this new construction.

i.) Extraordinary capital items were not underwritten since this is project will me new construction.

12

JH 00420

INVESTMENT MEMORANDUM

| Investment: | 9151987 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| Property Name: | Avenel @ Montgomery Square Apts | Unit Mix Analysis | Total Number of Units: | 256 |
| Property Type: | Multifamily | | Current Occupancy: | 100.0% |
| Rent Roll Date: | 10/01/90 | | | |

| | | | | | | | OCCUPIED | | | Rental Range | | VACANT | | UNDERWRITTEN | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Unit Description | Number of Units | Total Sq. Ft. | Average Sq. Ft. / Unit | Number of Occupied Units | Physical Occupancy | Total Monthly Rent for Occupied Units | Average Monthly Rent for Occupied Units | Average Monthly Rent per Sq. Ft. | Low | High | Monthly Rent for Vacant Units (marked) | Total Monthly Rent for Vacant Units | Total Underwritten Monthly Rent | Underwritten Rent per Unit | Underwritten Rent per Sq. Ft. |
| 1 BR | A | 30 | 23,640 | 788 | 30 | 100% | $36,750 | $1,225 | $1.55 | | | $1,225 | $0 | $36,750 | $1,225 | $1.55 |
| 1 BR | B | 48 | 40,896 | 852 | 48 | 100% | $60,000 | $1,250 | $1.47 | | | $1,250 | $0 | $60,000 | $1,250 | $1.47 |
| 1 BR | C | 15 | 14,655 | 977 | 15 | 100% | $21,000 | $1,400 | $1.43 | | | $1,400 | $0 | $21,000 | $1,400 | $1.43 |
| 1 BR | B-L | 32 | 32,224 | 1,007 | 32 | 100% | $47,200 | $1,475 | $1.46 | | | $1,475 | $0 | $47,200 | $1,475 | $1.46 |
| 2 BR | F | 8 | 9,264 | 1,158 | 8 | 100% | $12,600 | $1,575 | $1.36 | | | $1,575 | $0 | $12,600 | $1,575 | $1.36 |
| 2 BR | E | 69 | 81,006 | 1,174 | 69 | 100% | $112,470 | $1,630 | $1.39 | | | $1,630 | $0 | $112,470 | $1,630 | $1.39 |
| 2 BR | E-L | 34 | 45,934 | 1,351 | 34 | 100% | $60,350 | $1,775 | $1.31 | | | $1,775 | $0 | $60,350 | $1,775 | $1.31 |
| 2 BR | G | 16 | 21,472 | 1,342 | 16 | 100% | $28,800 | $1,800 | $1.34 | | | $1,800 | $0 | $28,800 | $1,800 | $1.34 |
| 2 BR | D | 4 | 5,640 | 1,460 | 4 | 100% | $7,380 | $1,845 | $1.26 | | | $1,845 | $0 | $7,380 | $1,845 | $1.26 |
| Totals | | 256 | 274,931 | 1,074 | 256 | 100% | $386,550 | | | | | | $0 | $386,550 | | |

Total Annualized Rent   $4,638,600

**Rent Roll Comments**

- The project is under construction so the rents are projections of actual final lease up. If these rents are not achieved, the loan will only be funded up to a 75% LTV and 1.25 DSC based on the actual NOI and the appraisal.

JH 00421

13

ment Numbers: 6518407

erly Name: Avenel at Montgomery Square Apts

CATION: Montgomeryville Pennsylvania

tment Officer: Timothy J. Malik

Loan Term - Mths / Amortization - Mths: 120

Interest Rate / Payment Constant: 6.180%  7.334%

Semi-Annual Equivalent: 6.280%

Average Life: 9.29

Duration: 6.76

Treasury Spread: 185.77

RATING: BAA1

inating Correspondent: John Hancock Real Estate Finance, Inc - Philadelphia  04/0-03

vicing Correspondent: John Hancock Real Estate Finance, Inc - Philadelphia  04/0-03

| | EXCELLENT 3 | VERY GOOD 2 | GOOD 1 | FAIR 0 | POOR -0.5 | VERY POOR -1 | | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| UNITY | | | X | | | | | 5 | 5 |
| COVERAGE | X | | | | | | | 4 | 8 |
| RKET | X | | X | | | | | 3 | 6 |
| QUAL | | | X | | | | | 2 | 2 |
| NERSHIP | | | X | | | | | 1 | 1 |

Total Security Rating Scale: 22

| | <45% | 45%-49% | 50%-54% | 55%-61% | 62%-63% | 64%-65% | 66%-67% | 68%-69% | 68%-67% | 70%-71% | 72%-73% | 74%-75% | 76%-77% | 78%-79% | 81%-83% | 84%-86% | 87%-99% | >=100% | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DERWRITING LTV / FMV | 3.00 | 2.75 | 2.50 | 2.25 | 2.00 | 1.75 | 1.50 | 1.25 | | 1.00 | 0.75 | 0.50 | 0.25 | 0.00 | -0.25 | -0.50 | -0.75 | -1.00 | 6 | 7.50 |
| | 68.07% | | | | | | | | X | | | | | | | | | | | |
| COVERAGE | >=1,946 | 1,806-1,945 | 1,735-1,805 | 1,667-1,734 | 1,604-1,666 | 1,536-1,603 | 1,492-1,535 | 1,451-1,491 | | 1,315-1,490 | 1,229-1,314 | 1,133-1,228 | 1,053-1,132 | <1,053 | | | | | 5 | 6.10 |
| | 3.00 | 2.78 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | | | | | | |
| | 1.45 | | | | | | | X | | | | | | | | | | | | |
| LCAPAC | >=1,946 | 1,806-1,945 | 1,735-1,805 | 1,667-1,734 | 1,604-1,666 | 1,536-1,693 | 1,492-1,535 | 1,451-1,491 | | 1,315-1,490 | 1,229-1,314 | 1,133-1,228 | 1,053-1,132 | <1,053 | | | | | 4 | 4.00 |
| | 3.00 | 2.78 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | | | | | | |
| | 1,302 | | | | | | | X | | | | | | | | | | | | |

Total Underwriting Rating Scale: 17.60

nance Scale Calculation
- 9.65%
- $26,963,780
- $2,604,600
- $3,391,554
- 1,302
- 1.15

tard at 1.20 DSCR (using
Refinance Sliding Constant
e Interest rate)   10.48%

**Sliding Constant Information**
| | |
|---|---|
| Loan Amount | $32,000,000 |
| Sliding Constant | 10.00% |
| Annual Debt Service | $3,200,000 |
| Underwritten CFADS | $3,391,554 |
| DSCR | 1.06 |
| Minimum DSCR | 1.05 |

Rating Adjustment Comments

| | |
|---|---|
| Total Points from Security Scale | 22.00 |
| Total Points from Underwriting Scale | 17.60 |
| Sub Total | 39.60 |
| ADJUSTMENTS: | 0 |
| GRAND TOTAL: | 39.60 |
| Rating | BAA1 |

Total Underwriting Rating Scale

| | AAA | AA1 | AA2 | AA3 | A1 | A2 | A3 | BAA1 | BAA2 | BAA3 | BA1 | BA2 | BA3 | B1 | B2 | B3 | CAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | >=70 | 58-69 | 58-57 | 52-54 | 49-51 | 45-48 | 40-44 | 30-39 | 22-29 | 15-21 | 12-14 | 9-11 | 7-8 | 5-6 | 3-4 | 1-2 | -15 |

XCXX

JH 00422

Manulife Financial – U.S. Mortgage
Risk Rating Worksheet

## ALL SHADED AREAS MUST BE FILLED IN

Date:               8/16/2004

Loan #:             6518467

Borrower Name:   Montgomery Square Partnership
Property Name:    Avenel @ Montgomery Square Apls
Property Address: Montgomeryville          Pennsylvania

Credit Rating:   Final:      BBB        Indicated:    BBB      Recommended:    BBB

                 Based on:    Quality Classification:  Good
                              Loan to Value:   67.60%
                              Debt Service Coverage:   1.35

QUALITY:    Award points, on a scale of -5 to +5, representing the project's quality ranging
            from Unacceptable to Excellent taking into account competitive factors and future
            trends.

| Project Characteristics | | Points | Multiplier | Total |
|---|---|---|---|---|
| 1. Location | | | | |
| a) | State Economics | | 1 | 5 |
| b) | City Economics | | 2 | 10 |
| c) | Neighbourhood Economics | | 2 | 10 |
| d) | Site Logistics | | 2 | 10 |
| | | | | |
| 2. Age, Condition | | | | |
| a) | Age (Old to New) | | 1 | 5 |
| b) | Attractiveness | | 2 | 10 |
| c) | Flexibility | | 2 | 6 |
| d) | Parking ratios | | 2 | 6 |
| e) | Construction Quality | | 2 | 10 |
| f) | Landscaping | | 1 | 4 |
| g) | Property Management | | 1 | 4 |
| h) | Environmental Risk (High to Low) | | 1 | 4 |
| | | | | |
| 3. Zoning Conformity | | | 2 | 10 |
| | | | | |
| 4. Market/Neighbourhood Suitability | | | 2 | 10 |
| | | | | |
| 5. Market Demand, Leasing Risk | | | | |
| a) | Comparison to Market Vacancy | | 1 | 1 |
| b) | Market Trends (Weak to Strong) | | 1 | 4 |
| c) | Lease Terms | | 1 | 4 |
| d) | Income Mix | | 1 | 4 |
| e) | Tenant Mix | | 1 | 3 |
| f) | Tenant Quality | | 1 | 3 |
| g) | Rental Rates (above to below mkt) | | 1 | 4 |
| h) | Lease Maturity Diversification | | 1 | 2 |
| | | | | |
| **Sponsor Characteristics** | | | | |
| 1. Net Worth | | 3 | 1 | 3 |
| 2. Financial Capacity | | 3 | 1 | 3 |
| 3. Experience | | 5 | 1 | 5 |
| 4. Reputation | | 5 | 1 | 5 |
| 5. Monetary Recourse | | 0 | 2 | 0 |

JH 00423

Manulife Financial – U.S. Mortgage
Risk Rating Worksheet

**Credit Structure**

| | | | |
|---|---|---|---|
| 1. Term (vs. Market, Longer to Less) | 2 | 1 | 2 |
| 2. Additional Security (Sufficiency) | 0 | 2 | 0 |
| 3. Covenants (Sufficiency) | 3 | 1 | 3 |
| 4. Guarantees (Sufficiency) | 3 | 2 | 6 |
| 5. Amortization (vs Market, Longer to Less) | 2 | 2 | 4 |
| 6. Interest Rate (vs Historical Trend, Lower to Higher) | 3 | 1 | 3 |

TOTAL QUALITY POINTS                           163

# SUMMARY

Loan #:            6518467

Borrower Name:    Montgomery Square Partnership

**Quality:**

The total points of    **163**    indicates a Quality classification of:    **Good**

Classification Table (Minimum): Excellent    = 180 points
Good    = 140 points
Fair    = 90 points, min. 18 pts. from Sponsor

**Debt Service Coverage Ratio**

DSC is    1.35    using a    20%    vacancy factor and 25 year amortization.

**Loan to Value Ratio**

LTV is    67.60%    using a Capitalization rate of    7.25%

| Indicated Credit Rating: | MLI | BBB | OSFI | Satisfactory |
|---|---|---|---|---|
| Recommended Credit Rating: | MLI | BBB | OSFI | Satisfactory |

Remarks:    (justify if Indicated and Recommended ratings do not agree.)

**Borrower/Principal Affiliate(s)/Individuals:**
Reviewed against Master Consolidated List of terrorist names/organizations/entities.        Yes

Signed:    _Timothy J. Malik_        Date:    8/16/04

JH 00424



Regional Map

JH 00425

# EXHIBIT H

**From:**    Ferrie, John [jferrie@jhancock.com]

**Sent:**    Thursday, July 29, 2004 11:25 AM

**To:**    'jkelly@kollerkelly com'

**Cc:**    'kelly@ckpp.com'; Malik, Timothy J.

**Subject:** Avenel

Joe:

Enclosed are the following:

1. Instruction

2. Application

3. Red-line Supplement including legal clarifications to the one I provided yesterday.

4. Clean Supplement

There is one substantial change (concerning paragraph 30 in the App and Condition 69 in the Supplement) to our agreement which Hancock is unable to agree to. When Hancock approves the loan, we want to close it. If we don't close and interest rates have moved against us, we could be subject to unlimited losses. Based on the volume of forwards we are doing this risk is not acceptable. Therefore, you need to deliver the loan or be liable for all Costs. We had originally agreed to limit your exposure to a maximum of 5%. As long as you close the loan there is no liability

Please let me know if you want to proceed.

John

<<Avenel 7-29-04 doc>> <<Avenel-Application 7-28-04 pdf>> <<Avenel_Supplement_Nath Red Line 7-29-04 pdf>> <<Avenel_Supplement_Nath Clean 7-29-04 pdf>>

*The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments.*

John P. Ferrie

John Hancock Real Estate Finance, Inc.

486 Norristown Road, Suite 130

Blue Bell, PA 19422

610-825-9200 x 15 Phone

610-941-9872 Fax

e: mail: jferrie@jhancock com

JH 00219

# EXHIBIT I

ASSIGNMENT MEMORANDUM TO CLOSING DEPARTMENT

July 23, 2004

**(SECTION I – REQUEST – TO BE COMPLETED BY IO/ADMIN)**

| | |
|---|---|
| TO: Arthur Francis<br>Director of Closing | FROM: Marysol Calderon |
| RE: Select:<br>Lender:  John Hancock Life Insurance Company<br>Proposed Loan No.: 6518467<br>Loan Amount:  $32,000,000.00 | Investment Officer: Tim Malik<br>Field Originator: JHREF - Philadelphia |
| Property Name:  Avenel @ Montgomery Square Apts<br>Property Address:  North Wales, PA | Did Liaison Counsel negotiate application:  No<br>If Yes, Liaison Counsel:  Select |
| Borrower Name:<br>Repeat Borrower:  Select<br>If Yes, Loan Nos.<br>of previous deals: | Anticipated Closing Date: |

Request: Assign Closing Analyst/Refer to LAW - Deposit Check - Processing Fee

**(SECTION II – FEES – TO BE COMPLETED BY IO/ADMIN)**

DATE: July 23, 2004
AMOUNT OF FEE: $5,000.00
FEE TYPE (CHECK ONE):

| | | |
|---|---|---|
| ☒ *Processing* | *$2,500.00* | |
| ☐ *Application (2%)* | | |
| ☐ *Commitment (1%)* | | |
| ☒ *JHREF Field Office Processing* | *$2,500.00* | |
| ☐ *Manulife Branch Office*<br>*Processing Fee* | | |
| ☐ *Loan Maturity Date Extension* | Refundable | |
| ☐ *Loan Commitment Extension* | | |

DEPOSIT TYPE (CHECK ONE)
☒ *Check*
☐ *Letter of Credit #*
☐ *Wire (Bank)*

**(SECTION III – CLOSING ASSIGNMENT – TO BE COMPLETED BY CLOSING DIRECTOR)**

Date of Assignment:  7-23-04    Assigned By:  _[signature]_

Closing Analyst Assignment

| East Team | West Team |
|---|---|
| ☐ *Joyce Klar* | ☐ *Eva Chan* |
| ☐ *Kimberly Highfield* | ☐ *Stacey Amodeo* |
| ☐ *Jennifer Milavec* | ☒ *Robin Costa* |
| ☐ *Anna Szlemp* | ☐ *Lisa Palmer* |
| | ☐ *Karim Liousfi* |

*cc upon assignment*: Production Administrative Assistant, Toi Neeley, Janice DiMaina

JH 01183

6518467-Referral&ProcessingFee.doc

Ed. 6/10/2004

MONTGOMERY SQUARE PARTNERSHIP
490 NORRISTOWN ROAD
SUITE 151
BLUE BELL, PA 19422-2350

© 2003 INTUIT INC. # 785 1-800-433-0810

WILMINGTON TRUST OF PA
60-192/319

0297

7/21/2004

PAY TO THE
ORDER OF  John Hancock Real Estate Finance, Inc. _____  $ **5,000.00

Five Thousand and 00/100************************************************  DOLLARS

John Hancock Real Estate Finance, Inc.

MEMO  Processing Fee

⑆000 2 9 7⑈ ⑆0 3 1 9 0 1 9 2 9⑈ ⑆400  288 8  388 9

_Joseph P Kelly_

---

MONTGOMERY SQUARE PARTNERSHIP
John Hancock Real Estate Finance, Inc.

Processing Fee    7/21/2004    0297

Processing Fee    5,000.00

---

Checking - Wilmington    Processing Fee    5,000.00

JH 01184

# EXHIBIT J

# INTEREST RATE CIRCLE NOTIFICATION

### REIG HAS CIRCLED AN INTEREST RATE ON THE FOLLOWING DEBT INVESTMENT:

|  |  |
|---|---|
| **CIRCLE DATE:** | 08/02/04 |
| **TYPE OF TRANSACTION:** | First Mortgage Loan - New Money |
| **TYPE OF PROPERTY:** | Apartment |
| **CITY:** | Montgomeryville |
| **STATE:** | PA |
| **BORROWER NAME:** | Montgomery Square Partnership |
| **COMMITMENT NUMBER:** | 6518467 |

|  |  |
|---|---|
| **TOTAL LOAN AMOUNT:** | $32,000,000 |
| **INTEREST RATE:** | 6.180% |
| **TERM:** | 10.00 |
| **AMORTIZATION:** | 30.00 |
| **AVERAGE LIFE:** | 9.29 |
| **DURATION:** | 6.76 |
| **LTV:** | 70% |
| **DSC:** | 1.37 |
| **PRELIMINARY RATING:** | BAA1 |
| **SEMI-ANNUAL SPREAD:** | 187 |
| **ANTICIPATED CLOSING DATE:** | 08/01/05 |

|  |  |
|---|---|
| **EXISTING LOAN NUMBER:** | N/A |
| **EXISTING LOAN MATURITY DATE:** | N/A |
| **EXISTING LOAN DURATION:** | N/A |
| **EXISTING LOAN ORIGINAL AMOUNT:** | N/A |
| **PAYDOWN/AMORTIZATION:** | N/A |
| **EXISTING ROLLOVER MONEY:** | N/A |
| **ADDITIONAL NEW MONEY PROCEEDS:** | N/A |
| **TOTAL NEW MONEY:** | $32,000,000 |

| **PROPOSED ALLOCATION:** | | |
|---|---|---|
| | GBRE | $3,900,000 |
| | Grp.Ins | $3,000,000 |
| | RLTC | $5,000,000 |
| | Remain | $4,200,000 |
| | Open | $2,600,000 |
| | IPLICo | $2,100,000 |
| | IQA | $10,000,000 |
| | REFA | $1,200,000 |

JH 00913

# EXHIBIT K

# Buchanan Ingersoll PC

ATTORNEYS

Howard D. Scher
215 665 3920
scherhdj@bipc com

1835 Market Street, 14th Floor
Philadelphia. PA  19103-2985

T  215 665 8700
F  215 665 8760
www buchananingersoll com

February 1, 2006

**VIA FACSIMILE AND REGULAR MAIL**

Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

      Re:     <u>John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.</u>

Dear Brian:

    I enclose Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company.

    Please feel free to contact me with any questions or concerns.

              Very truly yours,

              Howard D. Scher

HDS:clp
Enclosure
cc:    Robert D. Hillman, Esquire (w/encl.)

```
** JOB STATUS REPORT              AS OF  FEB 01   06 16:05      PAGE 01
                                         B. I. PHILA.


        JOB #911

      DATE  TIME          TO/FROM        MODE    MIN/SEC    PGS   STATUS
001   2/01  16:03         617  248 4000  G3--S   02′05″     007   OK
```

## Buchanan Ingersoll PC

1835 Market Street
14th Floor
Philadelphia, PA 19103-2985

### Fax Number

(215) 665-8760

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN
INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.

IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE
MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS
COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY
BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

### FAX COVER SHEET

Please deliver the following materials as soon as possible.

No of Pages
(Including cover sheet)

| TO/COMPANY: | FAX/PHONE: |
|---|---|
| Brian Davis | FAX # 617-248-4000 |
| Choate Hall & Stewart, LLP | PHONE # 617-248-5056 |
| | FAX # |
| | PHONE # |
| | FAX # |
| | PHONE # |
| | FAX # |
| | PHONE # |
| | FAX # |
| | PHONE # |

**FROM:** Howard D. Scher     Telephone #: (215) 665-3920     Date 2/1/06

Additional Comments or Instructions:

Return Originals to: Brian McCormick     Floor No. 13th Floor

53499 / 000002

IF YOU DO NOT RECEIVE THE DESIGNATED NUMBER OF PAGES, OR IF YOU EXPERIENCE ANY PROBLEM WITH THE
TRANSMISSION OF THIS DOCUMENT, PLEASE CALL OUR FAX OPERATOR AT (215) 665-3861

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE INSURANCE
COMPANY,

               Plaintiff/Counterclaim Defendant,

                v.

VESTMONT LIMITED PARTNERSHIP,
et al.,

               Defendants/Counterclaim Plaintiffs.

Civil Action No. 05-11614 WGY

## DEFENDANTS' NOTICE OF
## RULE 30(b)(6) VIDEOTAPE DEPOSITION OF
## PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY

TO:    BRIAN A. DAVIS, ESQUIRE
        Choate, Hall & Stewart LLP
        Two International Place
        Boston, MA 02110

PLEASE TAKE NOTICE THAT, pursuant to the Federal Rules of Civil Procedure,

defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited

Partnership III and Vesterra Corporation ("Defendants"), by and through their undersigned

attorneys, will take the deposition via videotape oral examination of Plaintiff John Hancock Life

Insurance Company ("John Hancock") before a person duly authorized to administer oaths, at the

offices of Deutsch Williams Brooks DeRensis & Holland, P.C., 99 Summer Street, Boston, MA

02110, on Wednesday, February 22, 2006, starting at 9:30 a.m. The deposition will be recorded by

sound, sound-and-visual and stenographic means, and shall continue from day to day until

concluded.

PLEASE TAKE NOTICE THAT, pursuant to rule 30(b)(6) of the Federal Rules of Civil

Procedure, John Hancock is required to designate one or more knowledgeable persons to testify on

its behalf with respect to the matters set forth in Exhibit A attached hereto, and the person(s) so

designated shall be required to testify as to those matters known or reasonably available to John

Hancock.

You are invited to attend and participate.

DEFENDANTS VESTMONT LIMITED
PARTNERSHIP, VESTMONT LIMITED
PARTNERSHIP II, VESTMONT LIMITED
PARTNERSHIP III AND VESTERRA
CORPORATION

By their attorneys,

Dated: February 1, 2006

Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr. (admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

2

## EXHIBIT A

**Definitions:** The following definitions apply to the Topics listed below.

    1.    The term "John Hancock" shall mean plaintiff John Hancock Life Insurance Company, its agents, officers, directors, members, employees, subsidiaries, affiliates, employees of subsidiaries, affiliates, successors, and predecessors, and all other persons acting or purporting to act on its behalf, including its attorneys and/or other representatives.

    2.    The term "Loan Application" shall mean the "Application to John Hancock Life Insurance Company for a First Mortgage Loan," application no. 6518467, by applicant Montgomery Square Partnership, dated July 30, 2004.

    3.    The term "Loan" shall mean the mortgage loan applied for in the Loan Application.

    4.    The term "Regatta Apartments" shall mean the Regatta Apartment Homes complex in Plymouth Meeting, Pennsylvania.

## TOPICS

    1.    The decision by John Hancock to accept the Loan Application, referenced in Paragraph 10 of the Complaint, including all of the factors, requirements and guidelines that were involved in John Hancock's internal consideration of the Loan Application.

    2.    The terms and conditions contained in the Loan Application, including but not limited to, any and all conditions that Defendants were required to meet for disbursement of the Loan, and the negotiation of these terms and conditions between Defendants and John Hancock.

    3.    The policies, guidelines, requirements, targets, practices, processes or methods that apply to the making of mortgage loans by John Hancock, and any differences in any of the foregoing before April 28, 2004 and after April 28, 2004.

    4.    The manner, method and/or process by which John Hancock approved mortgage loans during the period from January 1, 2000 through April 28, 2004.

    5.    The manner, method and/or process by which John Hancock approved mortgage loans during the period from April 28, 2004 to the present.

    6.    The requirements and conditions that, following John Hancock's acceptance of the Loan Application, would have to have been met by Defendants in order for John Hancock to fund or disburse the Loan applied for in the Loan Application.

    7.    The draft amendment to the Loan Application prepared by John Hancock after it was signed by Defendants on July 30, 2004.

8.    The decision by John Hancock, after a mortgage loan approved by John Hancock for the Regatta Apartments failed to close, not to attempt to recover from that loan applicant more than the processing and application and commitment fees, as testified to in the deposition of Timothy Malik on January 27, 2006.

9.    The decision by John Hancock to treat differently the failure of the Loan to Defendants to close, as compared to the failure of the loan to the Regatta Apartments to close.

10.    The losses allegedly suffered by John Hancock as a result of the failure of the Loan to close, as referenced in Paragraph 16 of the Complaint, including: the basis, policy and practice relating to decisions whether to invest funds in mortgage loans or other investment vehicles; the projected return on all investments by John Hancock over the ten years beginning on August 1, 2005; and the actual return on all investments by John Hancock for the 10 year period ending August 1, 2005.

11.    The policies, guidelines, requirements, targets, practices, processes or methods pursuant to which John Hancock allocates assets among various types of investments such as, but not limited to, government bonds, commercial bonds, commercial real estate mortgages, other mortgages and other types of investments.

12.    The steps taken by John Hancock to mitigate any losses allegedly suffered by it as a result of the failure of the Loan to close, including but not limited to: the actual use or uses to which the monies "allocated" for this loan have been put; the alternative investment vehicles which have been available to John Hancock since August 1, 2005; and the policies and practices of John Hancock that govern the choice of such alternative investment vehicles.

13.    The manner in which John Hancock accounts for the application and commitment fees that John Hancock retains when a loan fails to close, to what departments or individuals such fees are credited, how such fees are recognized on John Hancock's books, and how they are thereafter invested, including the fees related to the Loan Application

14.    The decision to "allocate[] and set aside assets for the purpose of funding the Loan", as referenced in paragraph 11 of the Complaint, and the nature of such allocation and set aside, as well as any hedge costs or other costs associated therewith.

15.    The "commitments made to third parties", as referenced in paragraph 11 of the Complaint.

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Deposition has this

1st day of February, 2006, been transmitted by facsimile and regular, first-class mail as follows:

Brian A. Davis
Choate, Hall & Stewart, LLP
Two International Place
Boston, MA 02110

_____
Brian J. McCormick, Jr.

.

# EXHIBIT L

# Buchanan Ingersoll PC

ATTORNEYS

**Howard D. Scher**
215 665 3920
scherhd@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985
T  215 665 8700
F  215 665 8760
www.buchananingersoll.com

March 3, 2006

**VIA ELECTRONIC MAIL AND REGULAR MAIL**

Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

   Re: <u>John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.</u>

Dear Brian:

   I write to complain about John Hancock's latest disregard for the Federal Rules of Civil Procedure and my client's time and costs.

   We served a Rule 30(b)(6) Notice of Deposition on John Hancock on February 1, 2006. John Hancock still has not identified a witness for nine of the 15 topics listed in that Notice. Nor has it scheduled a deposition for such witnesses, despite our repeated requests made to you and Paul Popeo of your office.

   Last Friday evening, during a conference call to discuss other discovery issues, you informed me that David Henderson, a former John Hancock employee who was scheduled to testify concerning his factual knowledge of the case on March 1, 2006, would also be the designated corporate witness on three of the topics identified in our Rule 30(b)(6) Notice. You stated that Mr. Henderson would testify regarding topics 1, 3, and 4. As we had already scheduled Mr. Henderson's fact deposition, I also prepared for the deposition assuming that Mr. Henderson would be prepared to testify as the sole corporate representative and be knowledgeable about those issues.

   However, Mr. Henderson was not prepared to testify on these matters. First, Mr. Popeo told me, after the deposition commenced, that Mr. Henderson was not the designee with regard to the entire time period concerning one of the topics but instead you would designate someone else for that portion of the topic at some later date. Second, Mr. Henderson testified that he did "nothing in particular" to prepare for his deposition. He testified that he was prepared last Friday, before our call, for about 90 minutes during which much of the time was spent simply reviewing deposition procedure. Mr. Henderson did not speak with any of John Hancock's current or former employees. Nor did he review any documents that contained facts specifically related to these three particular topics in Vesterra's Rule 30(b)(6) Notice. He had no recollection of many of the subjects in the designation and explained he had processed hundreds of loan and therefore could not remember anything about this particular loan. Mr. Henderson also testified

Brian A. Davis, Esquire
March 3, 2006
Page - 2 -

that he used an underwriting manual during his time at John Hancock. This manual has never been produced in this litigation. Nor was it shown to Mr. Henderson to prepare him for his deposition.

For example, Mr. Henderson was designated to testify regarding Topic No. 1 of the Rule 30(b)(6) Notice --

> The decision by John Hancock to accept the Loan Application, referenced in Paragraph 10 of the Complaint, including all of the factors, requirements and guidelines that were involved in John Hancock's internal consideration of the Loan Application.

In response to questions regarding this topic, Mr. Henderson, John Hancock's designated witness on this issues, testified as follows -- "I have no specific recollection of the processing of the application in this case." Thus, John Hancock was unable to testify through Mr. Henderson concerning its knowledge of the Loan Application at issue in this case or the policies and guidelines that John Hancock employed in making mortgage loans during the relevant time period

Finally, as discussed above, at the beginning of the deposition, Mr. Popeo, for the first time, informed me that Mr. Henderson would be restricted to testifying about the pre-April 28, 2004 period. The deposition topic requests a person knowledgeable about "any differences in any of the foregoing [John Hancock policies and procedures] before April 28, 2004 and after April 28, 2004." I was not told that Mr. Henderson could not testify as to these "differences" until after the deposition began. However, since Mr. Henderson met with you or someone from your office last Friday, you knew that Mr. Henderson would not be able to testify about this period during our telephone conference later that day. You chose not to tell me about this distinction at that time. This is unacceptable and outrageous.

John Hancock had an obligation to ensure that Mr. Henderson was adequately prepared to discuss the topics at issue. *See In re Vitamins Antitrust Litigation*, 216 F.R.D. 168 (D.D.C. 2003); *United Sates v. Massachusetts Indus. Fin. Agency*, 162 F.R.D. 410, 412 (D. Mass. 1995). Monetary sanctions are mandatory under Rule 37(d) for failure to appear by means of failing to educate a Rule 30(b)(6) witnesses. *See Vitamins Antitrust Litig.*, 216 F.R.D. at 174 (citing cases).

John Hancock must provide a Rule 30(b)(6) witness who can testify regarding these topics. It has failed to do so. In addition, you informed me that it would have a corporate designee available on Wednesday, and then, at the last possible moment and without warning, improperly withdrew that designation. Finally, John Hancock did nothing to prepare this witness for his testimony. This was required by the Federal Rules of Civil Procedure.

Brian A. Davis, Esquire
March 3, 2006
Page - 3 -

I demand that John Hancock compensate Vesterra for my additional preparation time and travel time to depose another John Hancock witness. Also, John Hancock should immediately produce the documents that it used to prepare Mr. Henderson for his deposition, including the underwriting manual. Moreover, I demand that John Hancock produce any and all materials that it uses in the future to prepare its other 30(b)(6) witnesses going forward.

Finally, John Hancock must provide us with the names of the individuals and available dates for depositions for the remaining Rule 30(b)(6) Notice topics by the close of business today. If we have not received them by that date, we will request a telephone conference with the judge immediately.

Very truly yours,

Howard D. Scher

HDS:clp
cc:     Brian J. McCormick, Jr., Esquire (via electronic mail)
        Robert D. Hillman, Esquire

# Buchanan Ingersoll PC

ATTORNEYS

Howard D. Scher
215 665 3920
scherhd@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985

T 215 665 8700
F 215 665 8760
www.buchananingersoll.com

March 10, 2006

## VIA ELECTRONIC MAIL AND REGULAR MAIL

Brian A. Davis, Esquire
Paul D. Popeo, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

   Re: John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.

Gentlemen:

   This letter constitutes Defendants' request for a discovery conference pursuant to Local Rule 37.1 and is to advise you that, if that conference fails to resolve John Hancock's ongoing failure to comply with the requirements of Fed.R.Civ.P. 30(b)(6), Defendants intend to seek immediate, emergency relief from the Court.

   The background is familiar to you. As set forth in my letter to Mr. Davis dated March 3, 2006, David Henderson was produced as John Hancock's designee for topics 1, 3 and 4 of Defendants' Rule 30(b)(6) Notice of Deposition. At the outset of the deposition, I was advised that Mr. Henderson's Rule 30(b)(6) testimony would be limited as to timeframe. That limitation ultimately did not matter, as Mr. Henderson was unprepared to testify as a Rule 30(b)(6) witness at all, and freely admitted that he had taken no meaningful steps to prepare as a 30(b)(6) witness or to conduct the required investigation.

   John Hancock's failure to comply, or even attempt to comply, with Rule 30(b)(6) with respect to Mr. Henderson resulted in my March 3, 2006 letter to you pointing out these deficiencies, demanding that John Hancock produce a witness prepared to testify as required by Rule 30(b)(6), and expressing the Defendants' right to sanctions for this failure to comply with the Rule.

   This morning, John Hancock produced Patricia Coyne as a witness. Mr. Popeo's e-mail of March 8, 2006 designated Ms. Coyne as "the Hancock designee on topic #s 2, 5 and 6 and will supplement the testimony already provided on topic #3."

   In the first moments of her deposition, Ms. Coyne testified that she had taken no steps to prepare her Rule 30(b)(6) testimony. She did not speak with any other John Hancock employee regarding the topics for which she was designated. Also, she testified that she did not review any documents in preparation for her deposition. To my considerable surprise, she testified that, during her preparation at your office, she was in the presence of documents relating to the case, but was not shown any of the documents.

Brian A. Davis, Esquire
Paul D. Popeo, Esquire
March 10, 2006
Page 2

Under any circumstances, John Hancock's repeated refusals to comply with Rule 30(b)(6) would be unacceptable and sanctionable violations of the Rules of Civil Procedure. Under the circumstances of this case -- with a motion for summary judgment pending and a trial scheduled on an expedited basis -- these failures defy any explanation or excuse.

Defendants intend to bring this matter to the immediate attention of the Court. In accordance with Local Rule 37.1, we hereby offer to engage in the conference required by that Local Rule not later than the end of business on Monday, March 13, 2006. Unless all of the issues raised by this letter are adequately addressed, Defendants will file a motion to compel and for sanctions seeking an expedited hearing on March 16, 2006.

In order to provide the possibility that the conference we have requested can be productive, we will expect John Hancock to address the following:

- to provide one or more witnesses, fully prepared to testify as to the topics contained in the Defendants' Rule 30(b)(6) Notice of Deposition dated February 1, 2006, on a date convenient to Defendants not later than March 20, 2006;

- to agree to pay all costs, including attorneys' fees, associated with returning to Boston to take these additional depositions; and

- to provide copies of all documents used in the preparation of these witnesses prior to the depositions.

Very truly yours,

Howard D. Scher

HDS:clp
cc:    Brian J. McCormick, Jr., Esquire
       Robert D. Hillman, Esquire (via electronic mail)

# EXHIBIT M

**From:** Malik, Timothy J. [tmalik@jhancock com]

**Sent:** Wednesday, August 11, 2004 7:39 PM

**To:** Ferrie, John

**Subject:** FW: Request for approval to lower the Reserves to $150/unit and t o fund the Loan with 75% LTV - 1 25% DSCR:

I guess I will try, one more time, the beauracratic approach

I'll let you know how hard he laughs

---

*Timothy J. Malik*, CPM(c), CCIM
Senior Investment Officer
John Hancock Real Estate Investment Group
200 Clarendon Street, 56th Floor
Boston, MA 02116-5021
(617) 572-3891
CELL (617) 791-6840
FAX (617) 572-9699
Email: tmalik@jhancock.com
Website: www.jhancockrealestate.com

> *The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient  Any use  dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited.  If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments*

-----Original Message-----
**From:** Malik, Timothy J.
**Sent:** Wednesday, August 11, 2004 7:32 PM
**To:** Thomas, Ivor
**Cc:** Henderson, David B ; Coyne, Patricia C.
**Subject:**    Request for approval to lower the Reserves to $150/unit and to fund the Loan with 75% LTV - 1 25% DSCR:

Subject: Mortgage #6518467
      Avenel @ Montgomery Square Apartments
      Montgomeryville, PA

---

Borrower:        Montgomery Square Partnership
Original Approval Date: August 10, 2004
Original Loan Amount:  $32,000,000
Spread at Approval:    186 over average life
Current PBO:        not funded (one-year forward commitment)
Rate:            Locked on August 2, 2004 at 6 18%
Term/Amortization:    10/30 years
Maturity:        August 2015
Rating:          BAA1/BBB/Satisfactory

JH 00133

Specific Provisions:   $0

Status:        Not Funded

Remarks:          The executed Approval indicates that the reserves are to be calculated with $250/unit,
               the typical reserves for most apartment loans. Since this is new construction, we
               request that reserves in the Approval be reduced to $150/unit, a more reasonable
               estimate.

               The Approval requires a 1.00:1 coverage based on a 10% constant at funding.
               Funding is contemplated by the Loan Application to occur based on a 75% LTV and
               1.25:1 DSCR, which will provide 10% Constant Coverage of 0.96:1 and actual debt
               service coverage of 1.30:1. An increase of only 3% in the property's occupancy will
               alleviate this shortfall and will provide 10% Constant Coverage of 1.00:1. At the
               underwritten market occupancy of 95%, based on net cash flow, the property will
               provide 10% Constant Coverage of 1.02:1 and actual coverage of debt service of
               1.37:1. Actual market occupancy is 99%.

               Our review of the rental market demand factors indicate that the 10% Constant
               Coverage shortfall should be relatively brief. We fully expect that, since the location
               of the subject property is excellent with few nearby properties that effectively compete
               with it, the 10% Constant Coverage of 1.00:1 will occur within less than two (2)
               months from funding and certainly not more than six (6) months from funding.

               In addition, treasuries have dropped 15 bps since rate lock, making the interest rate
               higher for the John Hancock Loan than for a loan the Borrower could garner today
               from a competing lender. GMAC has also offered the Borrower a loan or $33 million,
               $1 million higher than the John Hancock Loan.

               Approval of this request is recommended.


Approved:

        Ivor Thomas          David Henderson          Patricia Coyne
        Senior VP            Senior Investment Officer   Investment Officer

JH 00132

# EXHIBIT N

**John Hancock Life Insurance Company**

ORIGINAL REDONE

| | |
|---|---|
| Investment No: | 6518467 |
| File Name: | Montgomery Square Partnership |
| Regional Office/Correspondent: | John Hancock Real Estate Finance, Inc. - Philadelphia    040-03 |
| Property Name: | Avenel @ Montgomery Square Apts    Property Type: Multifamily Garden Style |
| Location (city / state): | Montgomeryville    Pennsylvania    Total # Units  255 |
| Jun Han Rating: | MLI Rating:  BBB    JH Rating:  BAA1 |

**Key Statistics:**

| | | | | | |
|---|---|---|---|---|---|
| Loan Amount: | $32,000,000 | | Loan per Unit | $125,000 | |
| Term: (in years) | 10 | Amortization  30 | Interest Only  0 | Avg Life:  9.29 | |
| Base Spread: | 134 | Forward BPS:  45 | Embedded Fees:  7 | Total Spread:  186 | |
| Matrix Spread at JH Rating Level: | 145 | | | Pricing Index:  10 year Treasury | |
| As Is Vacancy: | n/a | | | | |
| Stabilized Vacancy: | 5.0% | | | | |

| | Current "As-Is" | | | Stabilized | | | Stabilized |
|---|---|---|---|---|---|---|---|
| | Valuation | $ / SF | LTV % | Valuation | $ / Unit | LTV % | Cap Rate |
| NOI Basis | Property is under construction. | | | $45,358,156 | $177,180 | 70.55% | 7.25% |
| NCF Basis | | | | $44,475,397 | $173,732 | 71.95% | 7.25% |
| Appraisal Basis | | | | | | | |
| Cost of Land and Estimate to Build | | | | $35,555,800 | $138,889.84 | 90.00% | |
| Other Basis | | | | | | | |
| Breakeven Interest Rate: | | | | 10.08% | | | |
| Connections: | No | | | | | | |

**Specific Conditions:**
Principal Affiliates Requirements:  James R. Koller, Frank C. Palopoli and Joseph P. Kelley
Guaranty Requirements: Standard non-recourse carve-outs.
Funding:  This is a one-year (365 days) forward commitment.
Disbursement Requirements: Rents of at least $4,221,126 plus other income of $284,114 and a minimum DSCR of 1.25:1 with NCF and 10% Breakeven — the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR.
Estoppel & SNDA Requirements: N/A
Escrow Requirements:  Real estate taxes.  Replacement reserves and insurance escrow requirements have been suspended.
Rental Achievement Reserve, as described above, likely at closing, but limited to $5,380,000.
Transfers Permitted:  Two-time right to transfer with 1% fee.
Additional Proceeds:  One time right between the 2nd and 5th loan years the Borrower may request additional funds of not less than $1,000,000 at the then prevailing terms and rates.  Amortization will be based on the remaining original amortization term.
Extension Option:  Borrower as one time right to extend loan for 12 months at the then prevailing floating-rate terms and rates upon maturity of the original loan.
Prepayment Terms: Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan.  The yield maintenance premium shall be discounted to its present value.  The loan will be open to prepayment at par during the last 120 days of the loan term.
Monthly Payment Basis:  Monthly payments will be on a 30/360 day basis.
Financial Statements: Borrower certified acceptable if CPA audited not available.  Quarterly statements not required unless loan is in default.
Appraisal: Required loan to value of 75%
Borrower:  SPE and SAE status was waived since the Borrower owns a separate piece of land.  The land, however, must be transferred if Borrower wishes to use it as security for a loan
Additional Application Fee: Should the 10-year treasury drop more than 45 bps prior to the closing, Borrower shall deposit up to 2% of the Loan principal as an additional application fee, which amounts shall be returned if that treasury shall increase above such threshold prior to closing.

**Credit Group Remarks:**
Great location, demographics and product type.
Funding at 80% occupied versus MLI requirement of 90% mitigated by the full economic holdback    JH 01128
Credit recommends deal as structured

**John Hancock Life Insurance Company**

Investment No:                6518467

File Name:                    Montgomery Square Partnership

**Recommended By:**
**Investment Officer:**
       Timothy J. Malik _____  Date: _8/6/04_

**Credit Group:**
       Patricia Coyne _Patricia C. Coyne_____  Date: _8/6/04_

**Team Leader:**
       David Henderson _____  Date: _8/9/04_

**Approved By:**
       Barry Nectow _____  Date: _8-9-2004_

       Ivor Thomas _____  Date: _8-10-04_

       Paul English _____  Date: _8/10/04_

       Warren Thomson _____  Date: _8/10/04_

JH 01129

John Hancock Life Insurance Company

| File Name: | Avenel @ Montgomery Square Apts | | | | Date: | 8/10/2004 |
|---|---|---|---|---|---|---|
| | Mortgage Investment No.   6518467 | | | | | |
| | Montgomery Square Partnership | | | | | |
| | Multifamily | | | | | |
| | 1100 Avenel Blvd. | | | | | |
| | Montgomeryville | | Pennsylvania | | | |
| Rating: | MLI - | BBB | OSFI - | Satisfactory | | New Loan |

**LOAN TERMS:** 10-Year Term, 30-Year Amortization, monthly payments on 30/360 basis; Option to extend Loan with a one-year floater.

**ARREARS HISTORY:** None, project under construction

**Ground Lease:** N/A

**PROJECT DESCRIPTION:** The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting. The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

**LOCATION:** The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast.

**LOAN STATISTICS:** Stabilized

| | | |
|---|---|---|
| Loan Amount: | | $32,000,000 |
| Final Lending Value: | | $45,400,000 |
| Purchase Price: | $35,555,800 Cost to Build | |
| Income Value: | | $45,358,156 |
| Cap Rate: | | 7.25% |
| Value Adjustement: | | |
| Value / SF: | | $177,343.75 |
| Loan / SF: | | $125,000.00 |
| Loan / Value Ratio: | | 70.5% |
| Loan / SF @ Maturity: | | $105,105.66 |
| Balloon Loan / Value: | | 59.3% |
| DSC - NOI: | | 1.40 |
| DSC - NCF: | | 1.37 |
| DSC (25 yr Amort) - NOI: | | 1.31 |
| DSC (25 yr Amort) - NCF: | | 1.28 |
| Average Rental Rate (actual): | | $18,119.53 |
| Average Rental Rate (market): | | |
| Breakeven Interest Rate: | | 10.08% |

**Credit Rating:**

| | | | |
|---|---|---|---|
| | MLI - BBB | OFSI - Satisfactory | John Hancock - BAA1 |

JH 01130

# INCOME, EXPENSE & LOAN ANALYSIS

John Hancock Life Insurance Company

| | | | | |
|---|---|---|---|---|
| Borrower | Montgomery Square Partnership | Total Number of Units | 256 | Color Key INPUT FIELD |
| Loan No. | 6518467 | Vacant Units | 0 | |
| Property Address | Montgomeryville    Pennsylvania | % Occupancy | 100% | Benchmark Rate    6.180% |
| Property Type | Multifamily | % Vacancy n/a | | Benchmark Rate (per period)    0.515% |
| Date | 30Jul2004 | | | Benchmark Amortization Period (yrs)    25 |

Financial Statements Reviewed by    Timothy J. Malik
Date    20May2004        Vacancy as % Gross Income

| | Actual | | | Current "In-Place" | Pro Forma | Stabilized | Appraisal / CARS |
|---|---|---|---|---|---|---|---|
| | 5.0% | | | | 5.0% | 5.0% | 0.0% |
| | 2000 | 2001 | 2002 | 2004 | 30Jun2004 | 30Aug2005 | |
| Financial Statement Date | | | | | | | |
| Vacancy as % NRA | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | $/Unit | | $/Unit | | $/Unit | | $/Unit | | $/Unit |
| Base Rent | | Property is currently under construction | | | | | | | | | | |
| Occupied | 0 | 0 | 0 | 0 | 0 | 0 | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Vacant | n/a | n/a | n/a | n/a | 0 | n/a | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Total Rental Income | 0 | 0 | 0 | 0 | n/a | 0 | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Expense Reimbursement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Percentage Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Parking Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| Total Other Income | 0 | 0 | 0 | 0 | 0 | 0 | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| TOTAL GROSS INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 4,950,813 | 19,339 | 4,950,813 | 19,339 | 0 | 0.00 |
| Vacancy | 0 | 0 | 0 | 0 | 0 | 0 | 247,541 | 967 | 247,541 | 967 | 0 | 0.00 |
| EFFECTIVE GROSS INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 4,703,272 | 18,372 | 4,703,272 | 18,372 | 0 | 0.00 |
| | | | | | | | | | | | | |
| **OPERATING EXPENSES** | | | | | | — Inflation Factor | | | | | | |
| Real Estate Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 480,000 | 1,875 | 480,000 | 1,875 | 0 | 0.00 |
| Property Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 82,480 | 322 | 82,480 | 322 | 0 | 0.00 |
| Utilities | 0 | 0 | 0 | 0 | 0 | 0 | 87,749 | 343 | 87,749 | 343 | 0 | 0.00 |
| Repairs & Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 182,741 | 714 | 182,741 | 714 | 0 | 0.00 |
| Janitorial | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Management Fee | 0 | 0 | 0 | 0 | 0 | 0 | 176,373 | 689 | 176,373 | 689 | 0 | 0.00 |
| Payroll & Benefits | 0 | 0 | 0 | 0 | 0 | 0 | 294,781 | 1,151 | 294,781 | 1,151 | 0 | 0.00 |
| Advertising & Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 59,713 | 233 | 59,713 | 233 | 0 | 0.00 |
| Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 20 | 5,000 | 20 | 0 | 0.00 |
| General & Administrative | 0 | 0 | 0 | 0 | 0 | 0 | 45,969 | 180 | 45,969 | 180 | 0 | 0.00 |
| Other Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Sub Total - Operating Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 1,414,806 | 5,527 | 1,414,806 | 5,527 | 0 | 0.00 |
| Ground Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Total Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 1,414,806 | 5,527 | 1,414,806 | 5,527 | 0 | 0.00 |
| NET OPERATING INCOME | 0 | 0 | 0 | 0 | 0 | 0 | 3,288,466 | 12,846 | 3,288,466 | 12,846 | 0 | 0.00 |
| T.I. Cost / Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| L.C. Cost / Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Cap Expenditures / Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 64,000 | 250 | 64,000 | 250 | 0 | 0.00 |
| Total Reserves | 0 | 0 | 0 | 0 | 0 | 0 | 64,000 | 250 | 64,000 | 250 | 0 | 0.00 |
| NET CASH FLOW | 0 | 0 | 0 | 0 | 0 | 0 | 3,224,466 | 12,596 | 3,224,466 | 12,596 | 0 | 0.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| MANAGEMENT FEE as % EGI | 0.0% | 0.0% | 0.0% | 0.0% | 3.75% | 3.75% | 0.0% |
| TOTAL EXPENSES as % EGI | 0.0% | 0.0% | 0.0% | 0.0% | 30.1% | 30.1% | 0.0% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NET OPERATING INCOME | 0 | 0 | 0 | 0 | 3,288,466 | 3,288,466 | 0 |
| NET CASH FLOW | 0 | 0 | 0 | 0 | 3,224,466 | 3,224,466 | 0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Cap. Rate | | | | | | 7.250% | per unit | 7.250% | per unit |
| Income Value - NOI (calculated) | | | 0 | 0.00 | 0 | 0.00 | 45,358,152 | 177.180 | 45,358,156 | 177.180 |
| Income Value - NCF (calculated) | | | 0 | 0.00 | 0 | 0.00 | 44,475,393 | 173.732 | 44,475,397 | 173.732 |
| Appraiser's Final Value | | | | | | | | | |
| Appr. Indicated Cap. Rate - NOI | | | | | | | | | |
| Appr. Indicated Cap. Rate - NCF | | | | | | | | | |
| Purchase Price | 0 | | | | | | | | |

Max. Loan Calculations:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| - Max Loan to Value | 75% | | 0 | 0.00 | 0 | 0.00 | 34,018,614 | 132,885 | 34,018,617 | 132,885 |
| - Max Loan to Value @ ACLI Average | 75% | | 0 | 0.00 | 0 | 0.00 | 34,018,614 | 132,885 | 34,018,617 | 132,885 |
| - Min. DSC (NOI & Loan Terms) | 1.25 x | | 0 | 0.00 | 0 | 0.00 | 35,870,615 | 140,120 | 35,870,618 | 140,120 |
| - Min. DSC (NOI & 25 yr Amort) | 1.25 x | | 0 | 0.00 | 0 | 0.00 | 33,452,563 | 130,674 | 33,452,566 | 130,674 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Loan Amount | | 0 | 0.00 | 32,000,000 | 125,000 | 32,000,000 | 125,000 | 0 | 0.00 |
| Interest Rate | | | | 0.000% | | 6.180% | | 6.180% | |
| Loan Term | | | | mths | | 120 mths | | 120 mths | |
| Interest Only Period | | | | mths | | mths | | mths | |
| Amortization | | | | mths | | 360 mths | | 360 mths | |
| Monthly Payment    Interest Only Basis | | | | 0.00 | | 195,574.96 | | 195,574.96 | 0.00 |
| Annual Debt Service | | | | 0 | | 2,346,900 | | 2,346,900 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Superior Debt Service Expense (Annual) | | | | 0 | 0 | 0 | 0 |
| Subsequent Debt Service Expense (Annual) | | | | 0 | 0 | 0 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| DSC - NOI | 0.00 x | | 0.00 x | 1.40 x | 1.40 x | 0.00 x |
| DSC - NCF | 0.00 x | | 0.00 x | 1.37 x | 1.37 x | 0.00 x |
| DSC (25 yr Amort) - NOI | 0.00 x | | 0.00 x | 1.31 x | 1.31 x | 0.00 x |
| DSC (25 yr Amort) - NCF | 0.00 x | | 0.00 x | 1.28 x | 1.28 x | 0.00 x |
| Combined Total DSC - NOI | N/A | | N/A | N/A | N/A | N/A |
| Combined Total DSC - NCF | N/A | | N/A | N/A | N/A | N/A |
| Loan / Value (PDD / Value) | 0.0% | | 0.0% | 70.55% | 70.55% | 0.0% |
| Loan /$/Unit (PDD / $/Unit) | $0.00 | | $0.00 | $125,000 | $125,000 | $0.00 |
| Gross Breakeven Rent (Before Vacancy) | $0.00 | | $0.00 | $15,357 | $15,357 | $0.00 |
| Net Breakeven Rent (Before Vacancy) | $0.00 | | $0.00 | $15,357 | $15,357 | $0.00 |
| Breakeven Interest Rate (Int only) - SNCF | 0.00% | | 0.00% | 10.08% | 10.08% | 0.00% |
| PBD @ End of Term (Balloon) | $0 | | $0 | $26,907,848 | $26,907,848 | $0 |
| Balloon / sf | $0.00 | | $0.00 | $105,105.66 | $105,105.66 | $0.00 |
| Balloon Loan / Value | 0% | | 0% | 59% | 59% | 0% |

JH 01131

## John Hancock Life Insurance Company



**A meeting of the Mortgage and Real Estate Loan Committee was held on**          8/10/04

**Voted - To authorize the following Investment:**

| | | | | |
|---|---|---|---|---|
| Investment: | 6518467 | Avenel @ Montgomery Square Apts | **Company** | **$ Allocation** |
| | | | JHLICO Allocation | $29,900,000 |
| Type of Investment: | Mortgage Loan | | | |
| | | | IPLICO Allocation | $2,100,000 |
| Lien Position or Priority | First | | | |
| Investment Amount | $32,000,000 | $125,000 per Unit | | |
| Rollover of Existing Loan | No | | | |
| Loan Term | 120 | months | | |
| Amortization Term | 360 | months | | |
| Summation Value | $45,400,000 | $177,180 per Unit | | |
| Maximum Loan to Value | 70.48% | | | |
| Minimum DSCR | 1.37 times | | | |

| | | | |
|---|---|---|---|
| Interest Rate (Note Rate) | 6.180% per annum | Effective Yield Semi-Annual Rate (30/360 basis) | 6.260% |
| Interest Calculation | 30/360 | Average Life | 9.29 |
| | | Duration | 6.76 |
| Less: embedded Fee | -0.071% | Monthly Spread over Treasury | 179 |
| | | Semi-Annual Spread over Treasury | 187 |
| Effective Yield Monthly | 6.109% | REIG Department Rating | BAA1 |

| **Collateral Property** | | **Property Type/Sub-Type** | **Property Size** | |
|---|---|---|---|---|
| Avenel @ Montgomery Square Apts | | Multifamily | 256 | Units |
| Montgomeryville | Pennsylvania | Multifamily - Garden Apartments | | |

| | | |
|---|---|---|
| Investment Officer | Timothy J. Malik | |
| 2nd Investment Officer | Ryan Hawley | |
| Originating Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Servicing Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia | 040-03 |
| Closing Analyst | Robin Costa | |
| Internal Counsel | Nathaniel Margolis | |

Page 1

JH 01132

VOTED INVESTMENT

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

**Loan Overview:**

~ The security is a class-A, 256-unit apartment project under construction in Montgomeryville, Pennsylvania (suburban north Philadelphia). The property will be comprised of 256 garden-style apartments (125 one-bedrooms and 131 two-bedrooms) in eight three-story buildings and one four-story building (which will also hold the clubhouse).

~ Construction of the security is scheduled to be complete in March 2005, and 17 of the 22 units completed to date have been leased. Funding will occur when the property is fully constructed and is at least 80% occupied (August 2005 at the latest). A Rental Achievement Reserve will be funded if the property does not achieve the underwritten rents. Because of the construction and occupancy requirements, the Loan is priced as a one-year forward commitment.

~ The debt service coverage ratio for a 10% Constant is 1.01:1 and the breakeven interest rate is 10.08%.

**Loan Information - Voted Section:**

| Borrower/Applicant | Montgomery Square Partnership | | |
|---|---|---|---|
| Loan Amount | $32,000,000 | Underwriter's Capped Value | $45,358,161 |
| Loan per SF/Unit/Pad | $125,000 | Underwriter's LTV | 70.55% |
| Loan Term - years | 10 | Underwriter's NOI | $3,288,467 |
| Amortization - years | 30 | Underwriter's Cap Rate | 7.250% |
| Interest Only Period - years | 0 | Underwriter's Cash Flow | $3,224,467 |
| Interest Rate | 6.180% | Underwriter's DSCR | 1.37 |
| Contract Type | Fixed Rate | Annual Debt Service | $2,346,900 |
| Interest Method | 30/360 | Monthly Debt Service | $195,574.96 |
| Payment Constant | 7.334% | Service Fee | 0.029% |
| Balloon Balance | $26,963,760 | Secondary Financing in Place | No |
| Sanctified Loan (Yes/No) | Yes | Amount | |
| Ground Lease | No | Secondary Financing Type | N/A |
| Recourse to Borrower | No | Secondary Financing Permitted in Future | Yes |
| Recourse to Principal/Sponsor | No | Amount | |
| Due on Sale | Yes | Secondary Financing Type | Secured by Property |
| Partial Release Allowed | No | Lockbox | No |
| Cross Collateralized | No | Lockbox Status | |
| Cross Defaulted | N/A | Rate Reset/Loan Term Extension Option | Yes |
| Crossed Loans | | See Supplemental Page Attached to Vote | |

**Other Loan Information - Memorandum Section**

| Assumption Provision (# times) | 2 | Payment Due Date | 1st |
|---|---|---|---|
| Index Name | 10 year Treasury | Grace Day Period for Late Charge | 5 |
| 10 year Treasury | 4.43% | Late Charge | 4% |
| Fraud Carve out | | Grace Day Period for Default | 5 |
| Borrower | Yes | Default Interest Rate | 5% |
| Sponsor | Yes | | |
| Environmental Indemnification | | | |
| Borrower | Yes | | |
| Sponsor | Yes | | |

**Loan Terms Description - Voted Section**

~ The Borrower was given 365 days to close the Loan although the typical commitment is 60 days. The net spread includes 45 basis points for the cost of this extra 305 days of forward commitment. The closing date may be extended for up to 90 days at the cost of an adding five (5) basis point to the interest rate for each 30-day extension period or portion of a 30-day extension period ~ Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.
· The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock. The Borrower shall also have the right to have one second mortgage by a third party lender subject to these same LTV and DSCR conditions and other conditions
~ The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar-type apartment buildings in the Philadelphia metropolitan area.

JH 01133

VOTED INVESTMENT

| Investment: | 6518467 | | | | | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | | | | | |

LINES OF BUSINESS ALLOCATIONS - VOTED SECTION

| JHLICO Accounts | | | | IPLICO Accounts | | | | |
|---|---|---|---|---|---|---|---|---|
| | $ Allocation | | | | $ Allocation | | | |
| GBRE | $3,900,000 | | | IPLICo | $2,100,000 | | | |
| GRP.INS | $3,000,000 | | | | | | | |
| RLTC | $5,000,000 | | | | | | | |
| Remain | $4,200,000 | | | | | | | |
| Open | $2,600,000 | | | | | | | |
| IQA | $10,000,000 | | | | | | | |
| REFA | $1,200,000 | | | | | | | |

| Total JHLICO | $29,900,000 | | | Total IPLICO | $2,100,000 | |
|---|---|---|---|---|---|---|

Prepayment Terms - Voted Section

Prepayment Premium

| | | | Lo | 48 |
|---|---|---|---|---|
| | | | YM1 | 69 |
| | | | Open | 3 |

| Partial Payment Allowed | No | |
|---|---|---|

Prepayment Terms Description - Voted Section

Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan. The yield maintenance premium shall be discounted to its present value. The loan will be open to prepayment at par during the last 90 days of the loan term.

Key Date Information - Voted Section

| Rate Lock Date | 8/2/2004 | Commitment Expiration | 8/2/2005 |
|---|---|---|---|
| Approval Date | 8/10/2004 | Vote Expiration | 8/9/2005 |

Page 3

JH 01134

## INVESTMENT MEMORANDUM

Investment: 6518467                                          Investment Amount:  $32,000,000
     Avenel @ Montgomery Square Apts

**Strengths of Deal**

~  The security is a newly constructed, class-A apartment complex located in a strong apartment market that has not had new apartment construction in over 15 years.

~  The developers of the security have extensive construction experience and they have contracted with a very experienced management and marketing firm to direct the lease up and property operations.

**Weaknesses of Deal**

~  The property does not have an operating history since it is under construction and in its lease-up phase.   However, leasing for the first building has been strong.   In addition, a waiting list of 103 prospects has been assembled for certain units in other buildings now under construction.  Operating expenses were also conservatively estimated to be $5,527/unit per year, even though tenants pay for most utilities.

**Exceptions to Guidelines**

~  Funding will occur when the property is complete and is at least 80% occupied.  If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or 1.25 DSCR.  The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents.  Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium
~  The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1.0 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock.  The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.
~  The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar size, type, location and character secured by rental apartment buildings in the Philadelphia metropolitan area   ~  Late charges will be 4% instead of 5%, and the interest rate add-on for defaults was reduced from 7% to 5%   ~  SPE and SAE status was waived since the Borrower owns a separate piece of land.  This land, however, must be transferred if Borrower wishes to use it as security for a loan.

JH 01135

INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

| Use of Funds | | | Borrower Purchase Information | |
|---|---|---|---|---|
| | | | Purchase Date | 06/01/96 |
| Loan Purpose | Refinance | | Purchase Price | $7,680,000 |
| Loan Amount | $32,000,000 | | Capital Expenditures | $27,875,801 |
| Less Current Debt/Purchase Price | $30,742,000 Wilmington Trust & | | Borrower Investment Basis | $35,555,801 |
| Closing Cost/Other Expenses | $5,063,801 Wachovia | | | |
| Net Proceeds to Borrower | -$3,805,801 | | | |

| Loan Fees | $ Amount | % of Loan | | |
|---|---|---|---|---|
| Processing Fee | $5,000 | 0.02% | | |
| Application Fee | $320,000 | 1.00% | | |
| Commitment Fee | $640,000 | 2.00% | | |
| Embedded Origination Fee | $160,000 | 0.50% | JHREF - Philadelphia | |
| Broker's Origination Fee | $160,000 | 0.50% | Carey, Kramer, Pettit, Panichelli & Associates | |

Purchase Information / Previous History

~ The Borrower purchased the site in 1996, rezoned it, obtained building permits and started construction in late 2003. At closing, the Borrower will have an estimated $3.8 million of cash equity in the property.

**Borrower Information**

| Borrower/Applicant | Montgomery Square Partnership | | | |
|---|---|---|---|---|
| Entity Type | Partnership | | | |
| State of Incorporation | Pennsylvania | | | |
| Single Asset Entity | No | | Independent Director | No |
| Special Purpose Entity | No | | Non-Consolidation Opinion | No |
| Bankruptcy Remote Entity | No | | | |
| Property Management Company | Buzzuto Management | | Affiliate of Borrower | No |

**Borrower Entity Information**

~ The Borrower is a general partnership composed of three limited partnerships, all formed in Pennsylvannia. (1.) Vestmont Limited Partnership's general partner is Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli ) and the LP units are owned 44.5% by James R. Koller, 44.5% by Frank C. Palopoli, and 10% by Joseph P. Kelley. (2.) Vestmont Limited Partnership II's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 38.28% by James R. Koller, 38.28% by Frank C. Palopoli, and 22.44% by Joseph P. Kelley. (3.) Vestmont Limited Partnership III's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 66.17% by Koller Kelly Partnership, LP and 32.83% by FCP Group LP.

| Database Searched | Issue | Database Searched | Issue |
|---|---|---|---|
| Bankruptcy | No | UCC-1 | No |
| Credit Report | No | | |
| Civil Records | No | | |
| Judgments | No | | |
| Secretary of State | No | | |
| Tax Authority/Liens | No | | |

**Description of Credit Issues - Borrowing Entity Only**

~ None known.

JH 01136

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

### Principal/Sponsor Information

**First Principal/Sponsor Name**     James P. Koller

| Net Worth | $25,100,415 | as of | 6/30/2004 Source | Financial Statement |
|---|---|---|---|---|

| | |
|---|---|
| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

**Second Principal/Sponsor Name**     Frank C. Palopoli

| Net Worth | $21.634,000 | as of | 6/30/2004 Source | Personal Balance Sheet |
|---|---|---|---|---|

| | |
|---|---|
| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

### Principal/Sponsor Comment

~ James P. Koller is an attorney who specialized in real estate law for 10 years until founding, in 1986, the Vesterra Corporation, the general partner of the Borrower. Vesterra develops both commercial properties and single-family homes. Mr. Koller was asociated with Dilworth Paxson Kalish & Kauffman and later with Dechert Price & Rhoads prior to his involvement with Vesterra. Mr. Koller guarantees the non-recourse carve outs and has a net worth of $25.1 million with liquid assets of $14.6 million.

~ Frank C. Palopoli has over 25 years of real estate experience and, prior to co-founding Vesterra, was a principal in Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc. Both firms provided work-out, development and real estate services to corporate, institutional and private individuals. Mr. Palopoli guarantees the non-recourse carve outs and has a net worth of $21.6 million with liquid assets of $9 million.

~ Joseph P. Kelley joined Vesterra in 1987. Before joining Vesterra he was a financial manager for mergers and acquisitions for Foster Medical. He began his career as an auditor with Price Waterhouse. Mr. Kelley also guarantees the non-recourse carve outs and has a net worth of $3.6 million with liquid assets of $738,000.

### Principal/Sponsor related John Hancock Loans

~ None.

JH 01137

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
| | Avenel @ Montgomery Square Apts | | | |

**Escrows**

| Reserve Type | Required | Amount at Closing | Monthly Amount | Cap |
|---|---|---|---|---|
| Tax | Yes | | | |
| Insurance | No | | | |
| Capex | No | | | |
| Deferred Maintenance | No | | | |
| TI/LC | No | | | |
| Environmental | No | | | |

**Reserve Comments**

~ Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

~ Reserves for insurance, replacements and leasing costs will be suspended as long as the Loan does not have an event of default, and subject to other customary conditions.

JH 01138

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

**Location Information**

| Property Name | Avenel @ Montgomery Square Apts | | County | Montgomery |
|---|---|---|---|---|
| Address | 1100 Avenel Blvd. | | MSA | Philadelphia |
| | Montgomeryville | Pennsylvania | 19454 | |

**Location Description**

~ The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property  Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road).  Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject.  I-476, the Blue Route, is about five mile soulhwest of the subject.  The site is located between the Montgomery Mall and the Montgomery Square Shopping Center.  Philadelphia is about 17 miles to the southeast.

~ The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000.

**Property Information**

| Property Type | Multifamily | | Property Kind Code | B |
|---|---|---|---|---|
| Property Sub-Type | Multifamily - Garden Apartments | | Property Type Code | 19 |
| Garden Apts  (1980+) | | | Property Sub-Type Code | 101 |

| | | | | |
|---|---|---|---|---|
| Total Number of Units | 256 | Land area | 18 35 | |
| Total Net Rentable Sq. Ft. | 274,931 | Open Parking | 404 | |
| Number of Buildings | 9 | Covered Parking | 112 | |
| Number of Floors | 3 | Total Parking | 516 | |
| Year Built | 2004-05 | Parking Ratio | 2 02 | |
| Year Renovated | 0 | Sewer | Public | |
| Elevators | 1 | Water | Public | |
| Building Frame | Steel | HVAC System | Package Units | |
| Exterior | Vinyl | Fuel | Electric | |
| Roof Type | Pitched | Seismic Zone | 2 | |
| Roof Material | Shingle | Alquist Priolo Zone | No | |
| Ground Lease | No | PML Factor | | |
| Ground Lease Expiration | N/A | Storm/Hurricane Zone | No | |
| Ground Lease Subordinate | N/A | Flood Zone | | |
| | | Environmental Issues | No | |

**Property Description**

~ The subject will be comprised of eight (8) three-story buildings and one four-story building  The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases  The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio  The buildings also offer interior garages and storage space for rent, as well exterior garages  The site will be landscaped and have pole lighting.

~ The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis.  All rooms will have phone lines and cable outlets  About 108 units will also have electric fireplaces.

JH 01139

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

### Additional Property Information

| Rent Controlled | No | Electric Paid By | Tenant |
|---|---|---|---|
| Rent Subsidized | No | Heat Paid By | Tenant |
| Section 42 | No | Water Paid By | Tenant |
| Section 8 | No | Sewerage Paid By | Tenant |

### Utilities/Expenses Paid by Tenant

~ Tenants pay for all utilities to their units.

### Utilities/Expenses Paid by Landlord

~ Landlord pays for common area utilities. Only the four-story building will have fully enclosed hallway and staircases.

### General Comments

~ This is a project under construction.

### Amenities

| Air Conditioning | Yes | Fireplace | Yes | Health Club | Yes |
|---|---|---|---|---|---|
| Washer/Dryer | Yes | Laundry | No | Club Room | Yes |
| Dishwasher | Yes | Security | Yes | Pool | Yes |
| Trash Compactor | No | Other Amenities | Yes | Hot Tub | No |
| | | | | Tennis | No |

### Amenities Comments

-- These apartments will also offer security system rental, 9-foot ceilings, track lighting, multiple phone lines and high-speed cable outlets, private patios or balconies, full-size washer and dryer, walk-in closets, extra storgae space and attached or detached garages for rent.

~ The common area will offer a residence lounge, executive business center, exercise room and resort-style pool. Most units will have two parking spaces.

### Tenant Mix

| Family | 40% | Senior | 10% | Military | 5% |
|---|---|---|---|---|---|
| Single | 60% | Student | 10% | Other | 5% |

### Tenant Mix Comment

~ This is an upscale residential development that targets mid to upper income individuals and professionals.

### Environmental Issue Comment

~ None known.

JH 01140

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32.000.000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Valuation Summary

| | | Loan to Value Ratios | |
|---|---|---|---|
| NOI | $3,288,467 | | |
| Underwriter's Cap Rate | 7.250% | Loan to Value Ratios | |
| Underwriter's Capped Value | $45,358,161 | Underwriter's Capped | 70.55% |
| Discounted Cash Flow Value | | Discounted Cash Flow | 0.00% |
| External Appraisal | | External Appraisal | 0.00% |
| Summation Value | $45,400.000 | Summation Value | 70.48% |
| | | | |
| Land Area | 18.35 | Physical Valuation | |
| Land Value per Acre | $418.529 | Land | $7,680,007 |
| Total Gross Building Area | 274,931 | | |
| Building Cost per Sq. Ft. (net) | $101.39 | Building | $27.875,254 |
| Other Site Improvements | | Site Improvement | $0 |
| | | | |
| | | Total Physical Value | $35,555.261 |

### Valuation Comment

– RENTAL COMPS: Nine comparable properties were identified with one bedroom rents from $1,020 - $1,461/unit and two bedroom rents from $933 - $1,790/unit, while the subject projects rents of $1,197 - $1,790/unit for the one bedrooms and $1,609 - $1.846/unit for the two bedrooms and $1,895 - $2,200/unit for the three bedrooms. Only one comparable property is nearby but is over 20 years old. The remaining comparable properties will not compete with the subject since the distance is in excess of five mile, and most of those are much older properties as well. The rent-per-square-foot of the rental comps indicate that the subjects rents are similar to market rents, even though the subject has the advantage of being brand new.

– Condominium sales comps range from $173.900 to $264,000 while the subjects valuation is $177.180/unit.

– Capitalization rates range from 6.25% to 7.5%, with the newer apartment buildings going in the lower cap rates. The subject's valuation is based on a 7.25% cap rate.

– Comparable sales for garden-style apartment building built since 1990 range from $104,000/unit to $149,000/unit. The Regatta Apartments in Norristown (an inferior location) is currently being marketed at $172,000/unit

| Market/Sub-Market Performance | Market | Sub-Market | Competitive Group |
|---|---|---|---|
| Name of Market | Philadelphia | Lansdale/Gwynedd | |
| Total Units | 194,682 | 5.880 | |
| Total Vacancy (current/worst/best) | 3.8%/3.8%/1.6% | 4.9%/4.9%/0.9% | |
| New Supply - Coming Year (units) | 1,461 | 100 | |
| New Supply last 12 months | 401 | 0 | |
| Net Absorption last 12 months | 303 | -18 | |
| Projected net absorption next 12 mths | 1.059 | 110 | |
| | | | |
| Effective Rent / Unit | $886 | $945 | |
| Peak Rent / Unit | $878 | $945 | |
| Last Year's Rent / Unit | $878 | $936 | |
| Median Operating Expenses / Unit | | | |
| Concessions | | | |

Source of Market Information        REIS. Marcus & Millichamp

### Market/Sub-Market Comment

– According to REIS, the Lansdale/Gwynedd apartment market (5.880 units in 29 projects) is 4.9% vacant and with a median vacancy rate of 3.4%. Rental growth should moderate after growing 2.7% during the previous year. The average asking rent is $945/month. No new units wave been constructed during the last four years and only 32 units have been built since 1999. The subject is the only complex under construction or planned in this submarket at this time. The Greater Philadelphia apartment market (194.270 units in 1.141 projects) is 3.8% vacant and rental growth should also moderate after growing 3.2% over the previous year. Roughly 1.461 units are under construction and are projected to be absorbed with minor effect on the overall vacancy.
– Marcus & Millichap project slightly increasing vacancy for the Philadelphia market, but also rent increases of 3.6% in 2004
– Two apartment properties were recently built in different submarkets about eight miles south or west to the subject. The Glen at Lafayette Hill (139 units) located in Lafayette, PA was developed in 1999 and reached stabilization within 10 months. Henderson Square (128 units) located in King of Prussia was built in 2001 and was stabilized within 12 months. The subject's 255 units are projected to be stabilized within 20 months from the start of construction.
– The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000. Of that population, about 24% rent their homes.

Page 10

JH 01141

# INVESTMENT MEMORANDUM

Investment: 6518467
Property: Avenal @ Montgomery Square Apts

Cash Flow Analysis

Investment Amount: $32,000,000
No. of Units: 256

Statement Name

| Period Ended | 12/31/00 | 12/31/01 | 12/31/02 | $ / Unit | % of EGI | Underwritten | $ / Unit | % of EGI | Appraisal | $ / Unit | % of EGI | Cash Flow Footnotes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | | | | | |
| Base Rent - Occupied | $0 | $0 | $0 | $0 | 0% | $4,638,600 | $1,510 | 99% | $0 | $0 | 0% | a |
| Base Rent - Vacant | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | a |
| Laundry/Vending Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Parking Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Other Income | $0 | $0 | $0 | $0 | 0% | $312,213 | $102 | 7% | $0 | $0 | 0% | b |
| Gross Income | $0 | $0 | $0 | $0 | 0% | $4,950,813 | $1,612 | 105% | $0 | $0 | 0% | |
| Vacancy Allowance | $0 | $0 | $0 | $0 | 0% | $247,541 | $81 | 5% | $0 | $0 | 0% | c |
| Effective Gross Income | $0 | $0 | $0 | $0 | 0% | $4,703,272 | $1,531 | 100% | $0 | $0 | 0% | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Real Estate Taxes | $0 | $0 | $0 | $0 | 0% | $480,000 | $1,875 | 10% | $0 | $0 | 0% | d |
| Property Insurance | $0 | $0 | $0 | $0 | 0% | $82,480 | $322 | 2% | $0 | $0 | 0% | e |
| Utilities | $0 | $0 | $0 | $0 | 0% | $87,749 | $343 | 2% | $0 | $0 | 0% | f |
| Repairs and Maintenance | $0 | $0 | $0 | $0 | 0% | $182,741 | $714 | 4% | $0 | $0 | 0% | f |
| Management Fees | $0 | $0 | $0 | $0 | 0% | $176,373 | $680 | 4% | $0 | $0 | 0% | g |
| Payroll & Benefits | $0 | $0 | $0 | $0 | 0% | $294,761 | $1,151 | 6% | $0 | $0 | 0% | f |
| Advertising & Marketing | $0 | $0 | $0 | $0 | 0% | $59,713 | $233 | 1% | $0 | $0 | 0% | f |
| Professional Fees | $0 | $0 | $0 | $0 | 0% | $5,000 | $20 | 0% | $0 | $0 | 0% | f |
| General and Administrative | $0 | $0 | $0 | $0 | 0% | $45,969 | $180 | 1% | $0 | $0 | 0% | f |
| Other Expenses | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Ground Rent | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | |
| Total Operating Expenses | $0 | $0 | $0 | $0 | 0% | $1,414,806 | $5,527 | 30% | $0 | $0 | 0% | |
| Net Operating Income | $0 | $0 | $0 | $0 | 0% | $3,288,467 | $12,846 | 70% | $0 | $0 | 0% | |
| Reserves | $0 | $0 | $0 | $0 | 0% | $64,000 | $250 | 1% | $0 | $0 | 0% | h |
| Extraordinary Capital Expenditures | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | i |
| Total LC, TI's and Capital | $0 | $0 | $0 | $0 | 0% | $64,000 | $250 | 1% | $0 | $0 | 0% | |
| Cash Flow Available for D. S. | $0 | $0 | $0 | $0 | 0% | $3,224,467 | $12,596 | 69% | $0 | $0 | 0% | |
| Annual Debt Service | $2,346,900 | $2,346,900 | $2,346,900 | | | $2,346,900 | | | $2,346,900 | | | |
| Net Cash Flow after Debt Service | | | | | | $877,567 | | | | | | |
| DSCR | | | | | | 1.37 | | | | | | |

11

JH 01142

INVESTMENT MEMORANDUM

Investment Amount: $32,000,000
No. of Units                256

Investment: 6516467
Property:   Avenel @ Montgomery Square Apts

Cash Flow Footnotes

General Comments

- The rents and expenses are based on market studies and projections by the developer.

a.) GPR is based on rental projections, a market study and some preleasing.

b.) Other income is based on rental of security systems, storage spaces, and garages, as well as application fees, and late fees.

c.) Vacancy allowance was taken at 5% which is below the sub-market vacancy rate.

d.) Real estates taxes were underwritten based on an estimate of final assessed value.

e.) Insurance was underwritten based on insurance bids.

f.) General operating expenses were underwritten based on the developer's budget and estimates of operating costs.

g.) Management fee was underwritten at 3.75%, which is a market rate for like-type properties.

h.) Replacement reserves were underwritten at $250 per unit.

i.) Extraordinary capital items were not underwritten since this is project will me new construction.

12

JH 01143

## INVESTMENT MEMORANDUM

Investment: 6516467
Property Name: Avenal @ Montgomery Square Apts — Unit Mix Analysis
Property Type: Multifamily

Rent Roll Date: 10/19/02

Investment Amount: $32,000,000
Total Number of Units: 256
Current Occupancy: 100.0%

| Type | Unit Description | Number of Units | Total Sq. Ft. | Average Sq. Ft. / Unit | Number of Occupied Units | Physical Occupancy | OCCUPIED Total Monthly Rent for Occupied Units | Average Monthly Rent for Occupied Units | Average Monthly Rent per Sq. Ft. | Rental Range Low | High | VACANT Monthly Rent for Vacant Units (market) | Total Monthly Rent for Vacant Units | UNDERWRITTEN Total Underwritten Monthly Rent | Underwritten Rent per Unit | Underwritten Rent per Sq. F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1BR | A | 30 | 23,640 | 788 | 30 | 100% | $36,750 | $1,225 | $1.55 | | | $1,225 | $0 | $36,750 | $1,225 | $1.55 |
| 1BR | B | 48 | 40,896 | 852 | 48 | 100% | $60,000 | $1,250 | $1.47 | | | $1,250 | $0 | $60,000 | $1,250 | $1.47 |
| 1BR | C | 15 | 14,655 | 977 | 15 | 100% | $21,000 | $1,400 | $1.43 | | | $1,400 | $0 | $21,000 | $1,400 | $1.43 |
| 1BR | B-L | 32 | 32,224 | 1,007 | 32 | 100% | $47,200 | $1,475 | $1.46 | | | $1,475 | $0 | $47,200 | $1,475 | $1.46 |
| 2BR | F | 8 | 9,264 | 1,158 | 8 | 100% | $12,600 | $1,575 | $1.36 | | | $1,575 | $0 | $12,600 | $1,575 | $1.36 |
| 2BR | E | 69 | 81,006 | 1,174 | 69 | 100% | $112,470 | $1,630 | $1.39 | | | $1,630 | $0 | $112,470 | $1,630 | $1.39 |
| 2BR | E-L | 34 | 45,934 | 1,351 | 34 | 100% | $60,350 | $1,775 | $1.31 | | | $1,775 | $0 | $60,350 | $1,775 | $1.31 |
| 2BR | G | 16 | 21,472 | 1,342 | 16 | 100% | $28,800 | $1,800 | $1.34 | | | $1,800 | $0 | $28,800 | $1,800 | $1.34 |
| 2BR | D | 4 | 5,840 | 1,460 | 4 | 100% | $7,380 | $1,845 | $1.26 | | | $1,845 | $0 | $7,380 | $1,845 | $1.26 |
| Totals | | 256 | 274,931 | 1,074 | 256 | 100% | $386,550 | | | | | | $0 | $386,550 | | |

Total Annualized Rent    $4,638,600

### Rent Roll Comments

- The project is under construction so the rents are projections of actual final lease up. If these rents are not achieved, the loan will only be funded up to a 75% LTV and 1.25 DSC based on the actual NOI and the appraisal.

13

JH 01144

**VOTED MEMORANDUM**

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Rate Reset/Loan Term Extension Information - VOTED TERMS

Borrower shall have the option to extend the term of the Loan for one (1) period of twelve (12) months from the maturity date of the Loan upon delivering to JH written notice of the desire to so extend not less than one hundred eighty (180) days prior to the maturity date. The Loan shall accrue interest during such extended period at a variable rate. Notwithstanding the foregoing, the Loan shall only be extended if all of the following conditions are satisfied: (a) There is no default then continuing under the Loan Documents; (b) JH and Borrower agree to terms for the extension period (including without limitation an interest rate index and spread and acceptable LTV and DSCR ratio given the then amount of the Loan and any subordinate financing which may be in place on the Security) no less than one hundred twenty (120) days prior to the then maturity date of the Loan; (c) Borrower satisfies all of the conditions of JH then imposed in its sole but reasonable discretion to extend the Loan; (d) The Loan remains prior to any other lien, mortgage or encumbrance on the Security; (e) Borrower satisfies all conditions of, and executes and delivers documents for, such extension on or before the then maturity date of the Loan; (f) Borrower pays all of JH's costs associated with such extension (including without limitation all attorneys' fees) and an extension fee equal to 0.25% of the then outstanding principal balance of the Loan; and (g) JH is still making variable rate commercial mortgage loans on properties of similar size, credit quality, character, type and location at the time of such extension.

Investment Number: 6318467

Property Name: Avenel @ Montgomery Square Apts

LOCATION: Montgomeryville, Pennsylvania

Investment Officer: Timothy J. Malir

| Loan Term - Mths / Amortization - Mths | 120 | 360 |
|---|---|---|
| Interest Rate / Payment Constant: | 6.180% | 7.334% |
| Semi-Annual Equivalent: | 6.260% | |
| Average Life: | 9.29 | |
| Duration: | 6.76 | |
| Treasury Spread: | 186.77 | |
| RATING: | BAA1 | |

Originating Correspondent: John Hancock Real Estate Finance, Inc. - Philadelphia
Servicing Correspondent: John Hancock Real Estate Finance, Inc. - Philadelphia

| SECURITY | EXCELLENT | VERY GOOD | GOOD | FAIR | POOR | VERY POOR |
|---|---|---|---|---|---|---|
| | -1 | -.5 | 0 | .5 | 1 | .1 |
| LOCATION | | X | | | | |
| IMPROVEMENTS | | X | | | | |
| MARKET | | | X | | | |
| INC. QUAL. | | | X | | | |
| OWNERSHIP | | X | | | | |

Total Security Rating Scale

| | X | 5 | 4 | 3 | 2 | 1 | TOT. |
|---|---|---|---|---|---|---|---|

UNDERWRITING

70.48%

| | <45% | 45%-49% | 50%-54% | 55%-61% | 62%-63% | 64%-65% | 66%-67% | 68%-69% | 70%-71% | 72%-73% | 74%-75% | 76%-77% | 78%-80% | 81%-83% | 84%-88% | 89%-99% | >=100% | TOT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOAN TO PAV | -3 | 2.75 | 2.50 | 2.25 | 2.00 | 1.75 | 1.50 | 1.25 | 1.00 | 0.75 | 0.50 | 0.25 | 0.00 | -0.25 | -0.50 | -0.75 | -1.00 | |
| | | | | | | | | | X | | | | | | | | | 6 |

1.37

| | <1.946 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.450 | 1.229-1.314 | 1.133-1.228 | 1.033-1.132 | <1.033 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DS COVERAGE | 3.00 | 2.76 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | |
| | | | | | | | | | X | | | | | |

1.238

| | >=1.946 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.459 | 1.229-1.314 | 1.133-1.228 | 1.033-1.132 | <1.033 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REFI CAPAC. | 3.00 | 2.76 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | |
| | | | | | | | | | | X | | | | |

Rating Adjustment Comments

Refinance Scale Calculation
| Refinance Sizing Constant | 9.60% |
| Balloon Balance | $26,803,760 |
| Balloon Balance | $2,604,090 |
| Debt Service | $3,224,497 |
| Underwritten CFADS | 1.238 |
| Minimum DSCR | 1.15 |

Constant at 1.20 DSCR (using the Refinance Sizing Constant as the interest rate) 9.97%

Sizing Constant Information
| Loan Amount | $32,000,000 |
| Sizing Constant | 10.00% |
| Annual Debt Service | $3,200,000 |
| Underwritten CFADS | $3,224,497 |
| DSCR | 1.01 |
| Minimum DSCR | 1.05 |

Total Points from Security Scale
Total Points from Underwriting Scale
Sub Total
ADJUSTMENTS:
GRAND TOTAL:

Total Underwriting Rating Scale

| | X | 5 | 4 | 3 | 2 | 1 | TOT |
|---|---|---|---|---|---|---|---|

Rating

XXXX

| AAA | AA1 | AA2 | AA3 | A1 | A2 | A3 | BAA1 | BAA2 | BAA3 | BA1 | BA2 | BA3 | B1 | B2 | B3 | CAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| >=70 | 58-69 | 55-57 | 52-54 | 49-51 | 45-48 | 40-44 | 36-39 | 32-35 | 15-31 | 12-14 | 9-11 | 7-8 | 5-6 | 3-4 | -14.2 | -15 |

JH 01146

Manulife Financial - U.S. Mortgage
Risk Rating Worksheet

| ALL SHADED AREAS MUST BE FILLED IN |
|---|

Date:               8/10/2004

Loan #:            █████65184█5█

Borrower Name:   Montgomery Square Partnership
Property Name:    Avenel @ Montgomery Square Apts
Property Address: Montgomeryville              Pennsylvania

Credit Rating:     Final:        BBB█████      Indicated:    BBB       Recommended:    BBB

                   Based on:            Quality Classification:    Good
                                              Loan to Value:    70.00%
                                      Debt Service Coverage:    1.26

QUALITY:           Award points, on a scale of -5 to +5, representing the project's quality ranging
                   from Unacceptable to Excellent taking into account competitive factors and future
                   trends.

| Project Characteristics | | Points | Multiplier | Total |
|---|---|---|---|---|
| 1. Location | | | | |
| a) | State Economics | | 1 | 5 |
| b) | City Economics | | 2 | 10 |
| c) | Neighbourhood Economics | | 2 | 10 |
| d) | Site Logistics | | 2 | 10 |
| | | | | |
| 2 Age, Condition | | | | |
| a) | Age (Old to New) | | 1 | 5 |
| b) | Attractiveness | | 2 | 10 |
| c) | Flexibility | | 2 | 6 |
| d) | Parking ratios | | 2 | 6 |
| e) | Construction Quality | | 2 | 10 |
| f) | Landscaping | | 1 | 4 |
| g) | Property Management | | 1 | 4 |
| h) | Environmental Risk (High to Low) | | 1 | 4 |
| | | | | |
| 3 Zoning Conformity | | | 2 | 10 |
| | | | | |
| 4. Market/Neighbourhood Suitability | | | 2 | 10 |
| | | | | |
| 5 Market Demand. Leasing Risk | | | | |
| a) | Comparison to Market Vacancy | | 1 | 1 |
| b) | Market Trends (Weak to Strong) | | 1 | 4 |
| c) | Lease Terms | | 1 | 4 |
| d) | Income Mix | | 1 | 4 |
| e) | Tenant Mix | | 1 | 3 |
| f) | Tenant Quality | | 1 | 3 |
| g) | Rental Rates (above to below mkt) | | 1 | 4 |
| h) | Lease Maturity Diversification | | 1 | 2 |
| | | | | |
| Sponsor Characteristics | | | | |
| 1 Net Worth | | | 1 | 3 |
| 2. Financial Capacity | | | 1 | 3 |
| 3. Experience | | | 1 | 5 |
| 4. Reputation | | | 1 | 5 |
| 5. Monetary Recourse | | | 2 | 0 |

JH 01147

Manulife Financial - U.S. Mortgage
Risk Rating Worksheet

**Credit Structure**

| | | 1 | 2 |
|---|---|---|---|
| 1. Term (vs. Market, Longer to Less) | | 1 | 2 |
| 2 Additional Security (Sufficiency) | | 2 | 0 |
| 3 Covenants (Sufficiency) | | 1 | 3 |
| 4. Guarantees (Sufficiency) | | 2 | 6 |
| 5. Amortization (vs Market, Longer to Less) | | 2 | 4 |
| 6. Interest Rate (vs Historical Trend, Lower to Higher) | | 1 | 3 |

TOTAL QUALITY POINTS          163

## SUMMARY

Loan #:          6518467

Borrower Name:    Montgomery Square Partnership

**Quality:**

The total points of      163      indicates a Quality classification of:          **Good**

Classification Table (Minimum): Excellent    = 180 points
                                Good         = 140 points
                                Fair         = 90 points, min. 18 pts from Sponsor

**Debt Service Coverage Ratio**

DSC is ▨▨▨ using a ▨▨▨ vacancy factor and 25 year amortization.

**Loan to Value Ratio**

LTV is ▨▨▨ using a Capitalization rate of      ▨▨▨

**Indicated Credit Rating:**       MLI          BBB    OSFI    Satisfactory

**Recommended Credit Rating:**    MLI          ▨BBB▨ OSFI    ▨Satisfactory▨

Remarks:          (justify if Indicated and Recommended ratings do not agree).

**Borrower/Principal Affiliate(s)/Individuals:**
Reviewed against Master Consolidated List of terrorist names/organizations/entities.    ▨▨▨

Signed:  _____    Date:  8/6/04
         Timothy ▨ Mall ▨▨▨

# EXHIBIT O

**Malik, Timothy J.**

| | |
|---|---|
| From: | Malik, Timothy J. |
| Sent: | Thursday, August 12, 2004 5:32 PM |
| To: | Henderson, David B |
| Cc: | Thomas, Ivor |
| Subject: | Avenel |

Dave,

Operating expenses are high in a number of instances other than the reserves. . taxes - since they are using a 2006 projection instead of 2005, management - since the start-up fee is probably higher than the fee would be with a stabilized property, utilities - since everything is reimbursed (including water usage of tenants), and possibly insurance and repairs & maintenance - by smaller amounts.

To make the numbers work, we would need to assume that the expense/unit is $4,957/unit instead of the original $5,527/unit...something that is not wholly unreasonable given the new condition of the property.

However, I did go back and look at the Regatta Apartments (new construction in Philadelphia) that has done earlier this year. I noticed that at approval it only underwrote a 0.95:1 DSCR on the 10% Constant. (Keep in mind that the CMBS world uses a 9.66% constant hurdle because apartment loans have intrinsically less risk.) The Regatta had expenses of $5,109/unit in my underwriting although it has more interior common areas than Avenel. I think the expenses in Avenel are high, since I tried to be conservative in my underwriting, but my conservatism may lose a deal in this instance.

Today (only 4 months later) Regatta has at least 8 institutional all-cash buyers at a $58.5 million (which is over $10MM more than we valued it). The cap rate with my underwriting would be 5.7%. I guess many of the buyer would feel that my underwriting is too conservative.

I strongly feel that the Avenel property is in a better location than Regatta and appeals to a larger population.

I look forward to your advice on what to do about solving the 10% constant problem without losing the deal.

Tim

---

*Timothy J. Malik*, CPM©, CCIM
Senior Investment Officer
John Hancock Real Estate Investment Group
200 Clarendon Street, 56th Floor
Boston, MA 02116-5021
(617) 572-3891
CELL (617) 791-6840
FAX (617) 572-9699
Email: tmalik@jhancock.com
Website: www.jhancockrealestate.com

*The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments*

JH 01175

# EXHIBIT P

**From:** Malik, Timothy J. [tmalik@jhancock.com]

**Sent:** Wednesday, August 11, 2004 10:54 AM

**To:** Ferrie, John

**Subject:** Avenel Hedge Loss

FYI

The hedge loss today would be $355,000.

_____

*Timothy J. Malik*, CPM(c), CCIM

Senior Investment Officer

John Hancock Real Estate Investment Group

200 Clarendon Street, 56th Floor

Boston, MA 02116-5021

(617) 572-3891

CELL (617) 791-6840

FAX (617) 572-9699

Email: tmalik@jhancock.com

Website: www.jhancockrealestate.com

*The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments*

JH 00135

# EXHIBIT Q



Patricia C. Coyne
*Investment Officer*

John Hancock Place, T-56
Post Office Box 111
Boston, MA 02117-0111
(617) 572-3867
(617) 572-9699 FAX
Email: pcoyne@jhancock.com
Website: www.jhancockrealestate.com
Express Mail: 200 Clarendon Street, T-56

## MEMORANDUM

To:        Timothy Malik  – Home Office

From:    Patricia Coyne

Subject:  Montgomery Square Partnership
             Apartments
             1100 Avenel Boulevard
             Montgomeryville, PA
             New Mortgage Account No  6518467

Date:     August 17, 2004

The above referenced mortgage loan was approved on August 10, 2004, as follows:

| | | |
|---|---|---|
| 1) | Amount | $32,000,000, |
| 2) | Term | 120 months |
| 3) | Amortization | 360 months |
| 5) | Spread | 175 bps spread over the 10 Treasury which includes 45 bps for the 10 month forward component |
| 6) | Interest Rate | Interest rate was locked on August 2, 2004 at 6.180% |
| 7) | Funding | Three hundred sixty five (365) days from interest rate lock |
| 8) | Disbursement Requirements | Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1 25:1 and a 10% Breakeven interest rate using reserves of $150 00 per unit with the possibility of a Rental Achievement Reserve of up to $5,380,000. |
| 9) | Anticipated Closing Date | on or before August 2, 2005, unless option to extend for a period of up to 90 days is exercised |
| 10) | MAI Appraisal | MAI appraisal must have a LTV no greater than 75% |
| 11) | Principal Affiliates | James R. Koller, Frank C. Palopoli and Joseph P. Kelley |

If you have any questions or comments in this regard, please do no hesitate to contact me.

Regards,

Patricia Coyne

c.c.  Arthur Francis – Closing – via e-mail
       Frank Vitukevich – REIG Systems – via e-mail
       Tricia Wilson – REIG Systems -- via e-mail
       Kolby Mitnik – REIG – via email                                              JH 01174

# EXHIBIT R

**From:**    Malik, Timothy J. [tmalik@jhancock.com]

**Sent:**    Thursday, August 12, 2004 8:56 AM

**To:**    Ferrie, John

**Subject:** FW: Revised Request for approval to fund the Loan with 75% LTV - 1.25% DSCR:

Revised

Who is the broker you are working with at Carey Kramer and his phone number

Ivor may want to call him.

_____

***Timothy J. Malik***, CPM(c), CCIM
Senior Investment Officer
John Hancock Real Estate Investment Group
200 Clarendon Street, 56th Floor
Boston, MA 02116-5021
(617) 572-3891
CELL (617) 791-6840
FAX (617) 572-9699
Email:  tmalik@jhancock.com
Website:  www.jhancockrealestate.com

*The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient. Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments.*

-----Original Message-----
**From:** Malik, Timothy J.
**Sent:** Thursday, August 12, 2004 8:52 AM
**To:** Thomas, Ivor
**Cc:** David Henderson (Henderson, David); Coyne, Patricia C.
**Subject:** Request for approval to fund the Loan with 75% LTV - 1.25% DSCR:

**Subject Loan:**    John Hancock Mortgage #6518467
                      Avenel @ Montgomery Square Apartments
                      Montgomeryville, PA

_____

Borrower:         Montgomery Square Partnership
Original Approval Date: August 10, 2004
Original Loan Amount:  $32,000,000
Spread at Approval:    186 over average life
Current PBO:           not funded (one-year forward commitment)
Rate:                  Locked on August 2, 2004 at 6.18%
Term/Amortization:     10/30 years
Maturity:              August 2015

JH 00129

Rating:              BAA1/BBB/Satisfactory
Specific Provisions:    $0

Status:              Not Funded

Remarks:              The Approval requires a 1.00:1 coverage based on a 10% constant at funding.
Funding is contemplated in the Loan Application to be based on a 75% LTV and
1.25:1 DSCR, which will provide 10% Constant Coverage of 0.96:1 and actual debt
service coverage of 1.30:1. An increase of only 3% in the property's occupancy
(8 additional apartment rentals) will alleviate this shortfall and will provide the 10%
Constant Coverage of 1.00:1. At the underwritten market occupancy of 95%, based
on net cash flow, the property will provide 10% Constant Coverage of 1.02:1 and
actual debt service coverage of 1.37:1. Actual market occupancy is 99% in this
submarket of 5,880 apartment units.

Our review of the rental-market demand factors indicates that the 10% Constant
Coverage shortfall should be relatively brief. We fully expect that, since the location
of the subject is excellent with few nearby properties that effectively compete with it,
the 10% Constant Coverage of 1.00:1 will occur within less than two (2) months from
funding and certainly not more than six (6) months from funding.

In addition, treasuries have dropped 15 bps since rate lock, making the interest rate
higher for the John Hancock Loan than for a loan the Borrower could garner today
from a competing lender. GMAC has also offered the Borrower a loan of $33 million,
$1 million higher than the John Hancock Loan.

Approval of this request to allow full funding at 75% LTV and a 1.25:1 DSCR is
recommended.

Approved:

Ivor Thomas              David Henderson              Patricia Coyne
Senior VP              Senior Investment Officer        Investment Officer

JH 00130

# EXHIBIT S

---

**From:**    Ferrie, John [jferrie@jhancock.com]
**Sent:**    Wednesday, August 11, 2004 3:34 PM
**To:**      'kelly@ckpp.com'
**Subject:** Avenel

Rob:
Slight hiccup. Hopefully we can resolve. Give me a call.
John

<<Avenel Exhibit 1A 8-11-04.xls>>

John P. Ferrie
John Hancock Real Estate Finance, Inc
486 Norristown Road, Suite 130
Blue Bell, PA 19422
610-825-9200 x 15 Phone
610-941-9872 Fax
e: mail: jferrie@jhancock.com

JH 00133

# EXHIBIT 1A

## EXAMPLES OF RESERVE CALCULATIONS

AVENEL @ MONTGOMERY SQUARE

| | | | | EXAMPLE 1 | | EXAMPLE 2 | | EXAMPLE 3 |
|---|---|---|---|---|---|---|---|---|
| Units | 256 | | | | | | | |
| **INCOME** | | | | | | | | |
| | Base Rent | | | $4,638,600 | | $4,638,600 | | $4,638,600 |
| | Parking Income | | | $0 | | $0 | | $0 |
| | Other Income | | | $312,213 | | $312,213 | | $312,213 |
| Gross Income | | | | $4,950,813 | | $4,950,813 | | $4,950,813 |
| | Vacancy | @ | 20% | $990,163 | 15% | $742,622 | 6.05% | $299,524 |
| Effective Gross Income | | | | $3,960,650 | | $4,208,191 | | $4,651,289 |
| **EXPENSES** | | | | | | | | |
| Operating Expenses | | | | | | | | |
| | Real Estate Taxes | | | $480,000 | | $480,000 | | $480,000 |
| | Property Insurance | | | $82,480 | | $82,480 | | $82,480 |
| | Utilities | | | $87,749 | | $87,749 | | $87,749 |
| | Repairs & Maintenance | | | $182,741 | | $182,741 | | $182,741 |
| | Janitorial | | | $0 | | $0 | | $0 |
| | Management Fees @ 3.75% | | | $148,524 | 3.75% | $157,807 | 3.75% | $174,423 |
| | Payroll & Benefits | | | $294,781 | | $294,781 | | $294,781 |
| | Advertising & Marketing | | | $59,713 | | $59,713 | | $59,713 |
| | Professional Fees | | | $5,000 | | $5,000 | | $5,000 |
| | General & Administrative | | | $45,969 | | $45,969 | | $45,969 |
| | Other Expenses | | | $0 | | $0 | | $0 |
| Total Operating Expenses | | | | $1,386,957 | | $1,396,240 | | $1,412,856 |
| **NET OPERATING INCOME** | | | | $2,573,693 | | $2,811,951 | | $3,238,432 |
| LESS RESERVES @ $150/UNIT | | | | $38,400 | | $38,400 | | $38,400 |
| | | | | $2,535,293 | | $2,773,551 | | $3,200,032 |
| | Value @  7.25% Cap | | | $35,499,214 | | $38,785,529 | | $44,668,034 |
| Maximum Loan or | 75.00% | LTV | | $26,620,000 | | $29,090,000 | | $33,500,000 |
| | | Round To | | $26,620,000 | | $29,090,000 | | $34,000,000 |
| | Maximum Loan @ | 10% Constant | | $25,352,930 | | $27,735,509 | | $32,000,325 |
| | | Round To | | $25,353,000 | | $27,736,000 | | $32,000,000 |
| | Locked Amount | | | $32,000,000 | | $32,000,000 | | $32,000,000 |
| **RESERVE (Based on LTV)** | | | | $5,380,000 | | $2,910,000 | | $0 |
| **RESERVE (Based on 10% Constant)** | | | | $6,647,000 | | $4,264,000 | | $0 |
| | **DIFFERENCE** | | | $1,267,000 | | $1,354,000 | | $0 |
| **LOAN FUNDING AMOUNT** | | | | $25,353,000 | | $27,736,000 | | $32,000,000 |
| Base Rent Required with 75% LTV | | | | $3,710,880 | | $3,942,810 | | $4,221,126 |
| Base Rent Required with 10% Constant | | | | $3,710,880 | | $3,942,810 | | $4,357,965 |
| Additional Base Rent Required | | | | | | | | $136,839 |

JH 00134

# EXHIBIT T

---

**From:**    Ferrie, John [jferrie@jhancock.com]
**Sent:**    Thursday, June 17, 2004 2:02 PM
**To:**      Malik, Timothy J
**Subject:** FW: Avenel at Montgomery Square/ $34 million

Tim:
New apartment construction seeking 1 year forward on 10/30 basis. Great location and sponsorship. 256 units, the first building to come on line in July and the last in February 2005. Have leased 10 units out of construction trailer. Mucho competition but only FHLMC has ability for additional dollars. Best spread is 150 from NY Life but at $31 million. FHLMC probably full dollars and +160-170 over 10 year all in

John
<<Avenel 6-11-04.xls>> <<Avenel Rating 6-17-04.xls>>

-----Original Message-----
**From:** McIsaac, Scott
**Sent:** Friday, June 11, 2004 11:59 AM
**To:** Ferrie, John
**Subject:** Avenel at Montgomery Square


                    Ian S. McIsaac
                    Regional Manager, Boston Mortgage Branch
                    116 Huntington Ave , Suite 5300
                    Boston, MA 02116
                    Tel: 617-236-0693
                    Fax: 617-236-0585
                    e-mail: scott_mcisaac@manulife.com
                    ----- Forwarded by Scott McIsaac/Investments/Manulife on 06/11/2004 11:58 AM -----


    Kevin Collins <collins@ckpp.com>

                    06/04/2004 03:08 PM


    To:    scott_mcisaac@manulife.com
    cc:
    Subject:    Avenel at Montgomery Square

                    Scott -

                    As you discussed with Rob, attached please find some preliminary information on
                    Avenel at Montgomery Square Apartments, a 256-unit Class "A" complex being
                    constructed in Montgomeryville, PA  The subject property has an excellent location,
                    close to all major arteries and amenities, in a high-income location  The first buildings

JH 00100

will be delivered in July, with the balance completed through February. The sponsor is seeking either a Lender to take over their construction loan and provide permanent financing or a forward. We have attached an excel file, including the proforma, construction costs and unit mix breakdown. We have also provided demographics and maps. Please review the attached and contact us with any questions. We will furnish you with any additional information you need. Thanks.


Kevin T. Collins
Carey, Kramer, Pettit, Panichelli & Assoc.
460 E. Swedesford Road, Suite 1000
Wayne, PA 19087
(610) 341-0250 x20 - Phone
(610) 341-0260 - Fax
collins@ckpp.com <<mailto:collins@ckpp.com>>

  <<Montgomery 5-27-04.xls>> <<Demographics.pdf>> <<Regional Map.jpg>>
<<Neighborhood Map.jpg>>

# JOHN HANCOCK Real Estate Investment Group

PRELIMINARY LOAN INFORMATION WORKSHEET FOR
MULTIFAMILY PROPERTIES

NOTE 1: Blue fonts represent formulas. DO NOT CHANGE ANY FORMULAS!
NOTE 2: Red fonts represent input areas. Please complete as appropriate or put n/a.

## SUBMISSION DATA

| | | | | |
|---|---|---|---|---|
| Correspondent Firm | JHREF, Inc. - Philadelphia | Borrower Name | | Boston Underwriter | Timothy J. Malik |
| Contact | John Ferrel/ Brian Depolo | Type of Entity | | | |
| Contact Telephone # | 610-825-9200 | Borrower Contact | Rob Kelly | Date Prepared | 06/11/04 |
| | | Borrower Telephone # | 610-341-0250 x 24 | Date/Time Printed (updated) | 12/5/05 1:33 PM |

## PROPERTY INFORMATION

| | | | | |
|---|---|---|---|---|
| | | Property Type | Multifamily | | |
| Property Name | Avenel @ Montgomery Square Apts | Property Sub Type | Multifamily - Garden Apartments | Year Built | 0 |
| Address | 1100 Avenel Blvd. | Class | A | Most Recent Year Renovated | 0 |
| City | North Wales | Total No. of Units | 255 | # of Buildings | 0 |
| State | Pennsylvania | No. of Studio Units | 0 | # of Floors | 0 |
| County | Montgomery | No. of 1BR Units | 125 | Land Area (acres) | 0.00 |
| Zip Code | 19454 | No. of 2BR Units | 131 | # of Open Parking Spaces | 0 |
| MSA | | No. of 3BR Units | 0 | # of Covered Parking Spaces | 0 |
| | | No. of 4 or More BRs | 0 | Total Parking Spaces | 0 |
| | | | | Parking Spaces/ Unit | 0.00 |
| | | Occupancy per Rent Roll | 100.0% | | |
| | | Rent Roll Date | 10/10/00 | | |

## LOAN REQUEST

### LOAN TERMS:

| | | | | |
|---|---|---|---|---|
| Requested Loan Amount | $34,400,000 | OTHER LOAN DATA: | | | |
| Underwritten Loan Amount | $32,000,000 | Monthly Payment Type | Fixed Rate | | |
| Loan per Unit | $125,000 | Interest Rate Basis | 30/360 | | |
| Full Loan Term (months) | 120 | Type of Loan | Senior Mortgage | | |
| Interest Only Period (months) | 0 | Loan Position or Priority | First | | |
| Amortization (months) | 360 | Loan Program | JHLICO | | |
| Treasury Benchmark | 4.75% | | | | |
| Monthly Spread | 1.70% | CAP RATE & LTV TEST based on Underwritten CFADS: | | | |
| Interest Rate | 6.45% | S & P Cap Rates | Maximum LTV = 95% | | |
| Payment Constant | 7.55% | S & P Cap Rate used | 9.50% | Source & Use of Proceeds: | |
| LOAN TO VALUE CALCULATIONS: | | S & P Valuation | $32,965,721 | + Loan Amount | $32,000,000 |
| Underwritten NOI | $3,195,686 | Loan to Value | 97.1% | (-) Purchase Price | $0 |
| Capitalization Rate | 7.25% | | | (-) Payoff Loan | $0 |
| Valuation (Cap of NOI) | $44,078,434 | LOAN SIZING CALCULATION: | | (-) Repair Escrows | $0 |
| Loan to Value | 72.60% | Loan Amount | $32,000,000 | (-) TI/LC Escrows | $0 |
| Value per Unit | $172,181 | Refinancing Constant | 9.66% | (-) Other Escrows | $0 |
| DEBT SERVICE COVERAGE CALCULATION: | | Annual P&I - Refinancing | $3,091,200 | (-) Closing Costs | $0 |
| Underwritten CFADS | $3,131,686 | DSCR | 1.01 | (-) Other | $0 |
| Annual P&I | $2,414,528 | | | Cash Out | $32,000,000 |
| DSCR (amortized basis) | 1.30 | | | | |
| BALANCE AT MATURITY: | | COMMENTS OR DISCLOSURE ITEMS: | | | |
| Amount Due at Maturity | $27,149,531 | Spread includes 1 year forward and 1/2 point embedded JHREF fee. | | | |
| Balance per Unit | $106,053 | | | | |
| LTV at Maturity | 61.59% | | | | |

JH 00102

Avenel 6-11-04.xls

Last Updated 1/5/04

JOHN HANCOCK MULTIFAMILY UNIT MIX ANALYSIS

Property Type: Multifamily
Property Name: Avenel @ Montgomery Square Apts
Total Number of Units: 256
Current Occupancy: 100.0%
Date of Rent Roll: 01/00/00

| Bedroom Classification | Unit Description | Number of Units | Total Sq. Ft. | Average Sq. Ft./Unit | Number of Occupied Units | Physical Occupancy | OCCUPIED Total Monthly Rent for Occupied Units | Average Monthly Rent for Occupied Units | Average Monthly Rent per Sq. Ft. | Rental Range Low | High | VACANT Monthly Rent for Vacant Units (market) | Total Monthly Rent for Vacant Units | UNDERWRITTEN Total Underwritten Monthly Rent | Underwritten Rent per Unit | Underwritten Rent per Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 BR | A | 30 | 23,640 | 788 | 30 | 100.0% | $36,750 | $1,225 | 1.55 | | | $0 | $0 | $36,750 | $1,225 | $1.55 |
| 1 BR | B | 48 | 40,896 | 852 | 48 | 100.0% | $60,000 | $1,250 | 1.47 | | | $0 | $0 | $60,000 | $1,250 | $1.47 |
| 1 BR | C | 15 | 14,655 | 977 | 15 | 100.0% | $21,000 | $1,400 | 1.43 | | | $0 | $0 | $21,000 | $1,400 | $1.43 |
| 1 BR | B-L | 32 | 32,224 | 1,007 | 32 | 100.0% | $47,200 | $1,475 | 1.46 | | | $0 | $0 | $47,200 | $1,475 | $1.49 |
| 2 BR | F | 8 | 9,264 | 1,158 | 8 | 100.0% | $12,600 | $1,575 | 1.36 | | | $0 | $0 | $12,600 | $1,575 | $1.36 |
| 2 BR | E | 69 | 81,006 | 1,174 | 69 | 100.0% | $112,470 | $1,630 | 1.39 | | | $0 | $0 | $112,470 | $1,630 | $1.39 |
| 2 BR | E-L | 34 | 45,934 | 1,351 | 34 | 100.0% | $60,350 | $1,775 | 1.31 | | | $0 | $0 | $60,350 | $1,775 | $1.31 |
| 2 BR | G | 16 | 21,472 | 1,342 | 16 | 100.0% | $28,800 | $1,800 | 1.34 | | | $0 | $0 | $28,800 | $1,800 | $1.34 |
| 2 BR | D | 4 | 5,840 | 1,460 | 4 | 100.0% | $7,380 | $1,845 | 1.26 | | | $0 | $0 | $7,380 | $1,845 | $1.29 |
| Total | | 256 | 274,931 | 1,074 | 256 | 100.0% | $386,550 | #VALUE! | #VALUE! | | | | $0 | $386,550 | | |

Total Annualized Rent    $4,638,600

JH 00103

JOHN HANCOCK MULTI-FAMILY WORKSHEET

OPERATING HISTORY AND PRO FORMA

Date Prepared 6/11/2004
Date Printed 12/5/2005
Time Prepared 1:33 PM

Property Type: Multifamily
Property Name: Avenel @ Montgomery Square Apts
Number of Units: 256

Loan Amount: $32,000,000
Underwritten LTV: 72.60%
Underwritten DSCR: 1.30

| Statement Name / Period Ended | 12/31/00 | | | 12/31/01 | | | 12/31/02 | | | Pro Forma | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % | $/Unit | Amount | % | $/Unit | Amount | % | $/Unit | Amount | % | $/Unit |
| **INCOME:** | | | | | | | | | | | | |
| Base Rent | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $4,638,600 | 93.7% | $1,510 |
| Laundry/Vending Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| Parking Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| Other Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $312,213 | 6.3% | $102 |
| Gross Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $4,950,813 | 100.0% | $1,612 |
| Vacancy Allowance | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $247,541 | 5.0% | $81 |
| Effective Gross Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $4,703,272 | 95.0% | $1,531 |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Real Estate Taxes | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $419,485 | 8.9% | $1,639 |
| Property Insurance | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $82,480 | 1.8% | $322 |
| Utilities | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $112,749 | 2.4% | $440 |
| Repairs and Maintenance | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $170,428 | 3.6% | $666 |
| Management Fees | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $188,131 | 4.0% | $735 |
| Payroll & Benefits | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $383,006 | 8.1% | $1,496 |
| Advertising & Marketing | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $92,829 | 2.0% | $363 |
| Professional Fees | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| General and Administrative | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $58,478 | 1.2% | $228 |
| Other Expenses | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| Ground Rent | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| Total Operating Expenses | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $1,507,586 | 32.1% | $5,889 |
| Net Operating Income | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $3,195,686 | 67.9% | $12,483 |
| Replacement Reserves | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $64,000 | 1.4% | $250.00 |
| Extraordinary Capital Expenditures | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 |
| Total Reserves and Capital | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $64,000 | 1.4% | $250 |
| Cash Flow Available for D. S. | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $0 | 0.0% | $0 | $3,131,686 | 66.6% | $12,233 |
| Annual Debt Service | $2,414,528 | | | $2,414,528 | | | $2,414,528 | | | $2,414,528 | | |
| Net Cash Flow after Debt Service | --- | | | --- | | | --- | | | $717,158 | | |
| DSCR | --- | | | --- | | | --- | | | 1.30 | | |
| Average Annual Occupancy | 0.0% | | | 0.0% | | | 0.0% | | | 95.0% | | |

JH 00104



COMMERCIAL RATING SHEET

Property Name: Averal
Location: Bucks County, PA
Investment Officer: Trimguth

Property Type: Garden Apts. (1980+)

| | | Investment Amount: | $32,000,000 |
|---|---|---|---|
| Loan Term in Months | 120 | Loan Term - Mths / Amortization - Mths | 120 / 360 |
| Interest Only Term in Months | 0 | | |
| Amortization in Months | 360 | Interest Rate / Payment Constant: | 6.650% / 7.70% |
| Day Interest Rate Basis | 30/360 | | |
| Treasury Index | 4.75% | 25 Bp's over AL | |
| Spread | 1.90% | Semi-Annual Equivalent: | 6.743% |
| Interest Rate | 6.65% | Average Life: | 9.34 |
| Embedded Origination Fee | $ 160,000 | Duration: | 6.64 |
| Rate Buy Down Fee | $ | Treasury Spread | 202 |
| | | RATING: | BAA2 |

Net Operating Income $ 3,195,696
Capitalization Rate 7.25%
Valuation $44,078,428

CFADS $ 3,131,696
Annual Debt Service $ 2,465,145

| SECURITY | EXCELLENT 3 | VERY GOOD 2 | GOOD 1 | FAIR 0 | POOR -0.5 | VERY POOR -1 | | x | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| LOCATION | | x | | | | | | 5 | 10 |
| IMPROVEMENTS | | x | | | | | | 4 | 8 |
| MARKET | | x | | | | | | 3 | 6 |
| MG. QUAL. | | | x | | | | | 2 | 2 |
| OWNERSHIP | | | x | | | | | 1 | 1 |
| | | | | | | | | | 27 |

Total Security Rating Scale

Result: 73%

| UNDERWRITING | <40% | 40%-44% | 45%-49% | 50%-54% | 55%-61% | 62%-63% | 64%-65% | 66%-67% | 68%-69% | 70%-71% | 72%-73% | 74%-75% | 76%-77% | 78%-80% | 81%-83% | 84%-88% | >=89% | X | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOAN TO FMV | 3.00 | 2.75 | 2.50 | 2.25 | 2.00 | 1.75 | 1.50 | 1.25 | 1.00 | 0.75 | 0.50 | 0.25 | 0.00 | -0.25 | -0.50 | -0.75 | -1.00 | 6 | 3.00 |
| | 73% | | | | | | | | | | x | | | | | | | | |

| DS COVERAGE | >=2.066 | 1.946-2.065 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.450 | 1.229-1.314 | 1.133-1.228 | <1.133 | | | | | X | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3.00 | 2.78 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | | | | | 5 | 2.50 |
| 1.270 | | | | | | | | | | | | | x | | | | | | |

| REFINANCE SCALE | >=2.066 | 1.946-2.065 | 1.806-1.945 | 1.735-1.805 | 1.667-1.734 | 1.604-1.666 | 1.536-1.603 | 1.492-1.535 | 1.451-1.491 | 1.315-1.450 | 1.229-1.314 | 1.133-1.228 | <1.133 | | | | | X | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3.00 | 2.78 | 2.56 | 2.33 | 2.11 | 1.89 | 1.67 | 1.44 | 1.22 | 1.00 | 0.50 | 0.00 | -1.00 | | | | | 4 | -4.00 |
| 1.122 | | | | | | | | | | | | | x | | | | | | |

Total Underwriting Rating Scale 1.50

Refinance Sizing Constant 9.65%
Balloon Balance $27,283,865
Debt Service (30 yrs) $ 2,791,314
Underwritten CFADS $ 3,131,696
Refinance Annual DSCR 1.12

| | AAA | AA1 | AA2 | AA3 | A1 | A2 | A3 | BAA1 | BAA2 | BAA3 | BA1 | BA2 | BA3 | B1 | B2 | B3 | CAA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | >=70 | 58-69 | 55-57 | 52-54 | 49-51 | 45-48 | 40-44 | 30-39 | 22-29 | 15-21 | 12-14 | 9-11 | 7-8 | 5-6 | 3-4 | -14-2 | -15 |

XXX

Total Points from Security Scale 27
Total Points from Underwriting Scale 1.50
Sub Total 28.50
ADJUSTMENTS: 0
GRAND TOTAL 28.50

Rating = BAA2

JH 00105

# EXHIBIT U



**John P. Ferrie**
*Regional Vice President*

Office Court at Walton Point
486 Norristown Road
Suite 130
Blue Bell, Pennsylvania 19422
(610) 825-9200 PHONE
(610) 941-9872 FAX

*E-Mail: jferrie@jhancock.com*

July 21, 2004

**BY E MAIL**

Avenel @ Montgomery Square or Nominee
c/o Robert W. Kelly
Carey, Kramer, Pettit, Panichelli and Assoc., Inc.
460 E. Swedesford Road, Suite 1000, Wayne, Pa 19087

Re: Avenel @ Montgomery Square, 1100 Avenel Blvd, North Wales, Pa 19454
    256 Garden Apartments

Gentlemen:

John Hancock Life Insurance Company ("JHLICO") has reviewed the preliminary information you provided on the above-referenced property and based on your information, proposes the following loan terms:

| | |
|---|---|
| Loan Amount: | $32,000,000 |
| Term: | 10 years |
| Amortization: | 30 years |
| Spread & Interest Rate: | The interest rate shall be equal to the sum of the 10 year treasury at the time of rate lock, plus a spread of 175 basis points. This interest rate is subject to change based on market conditions such as movements in the treasuries and the swap curve (affecting both the treasuries and spread) until the rate is actually locked. This interest rate is based on the loan-to-value and debt-service-coverage ratios outlined below. The interest shall be calculated using the 30/360-day formula.  If the interest rate were locked today, the interest rate would have been 6.24%. |
| Maximum LTV: | 75% (as determined by JHLICO) |
| Minimum DSCR: | 1.25 (as determined by JHLIC) on a stabilized basis. |
| Collateral: | A first mortgage on all land and improvements. |
| Reserves: | The Borrower will escrow for real estate taxes. Tenant improvements, leasing commissions and replacement reserves ($250/unit annually) will be suspended pending results of annual inspection. |
| Processing Fee: | A nonrefundable fee of $5,000 payable with acceptance of this Preliminary Quote. |

JH 00733

| Application Fee: | 2 0% due with the executed application, which may be comprised of either cash or Letter of Credit in a form and from an institution acceptable to John Hancock. At the time of interest rate lock, this fee will be retained by JHLIC and returned when the loan closes, less John Hancock Real Estate Finance, Inc.'s (JHREF) fees and expenses. |
|---|---|
| Commitment Fee: | 1%, which may be comprised of either 1% cash or 1% Letter of Credit in a form and from an institution acceptable to John Hancock, due within five (5) days from receipt of a Commitment signed by JHLIC. This fee will be retained by JHLIC and returned when the loan closes |
| Borrower: | Montgomery Square Partnership, a general partnership, which also owns 2 vacant pieces of land in the vicinity of the subject. Borrower agrees not to incur indebtedness on these two parcels during the life of the loan unless transferred to another entity. |
| Prepayment: | The principal balance of the loan may not be prepaid in whole or in part during the first 4 years of the loan. Beginning in the 5th year, the loan may be prepaid in full subject to JHLICO's yield maintenance provision. The loan can be repaid in full without premium during the last 120 days of the loan term. |
| Recourse: | There shall be no recourse to either the Borrower or the Principal(s), except for carveouts including but not limited to such acts as fraud, misappropriation of funds and environmental matters. |
| Assumption: | The mortgage is assumable on a two-time basis subject to John Hancock's approval of the new Borrower, Principals and other conditions   There is a one-percentage point (1%) assumption fee. |
| Funding: | Initial funding shall be no later than 12 months from the time of rate lock Initial funding to be calculated based on 75% Loan to Value ("LTV") with a minimum of 80% physical occupancy. The value is determined by applying an 7.25% cap rate to the net of the annualizing monthly income from tenants that occupy apartments under acceptable leases less expenses of 1) $1,238,433, and 2) a management fee of 3.75% of effective gross income (Exhibit 1). |

In the event that Borrower has not achieved annualized base apartment rents of $4,221,126 ("Proforma Rents") by the initial funding date, a Holdback Reserve equal to the difference between the Rate Locked Loan Amount and the initial funding will be required. (See Exhibit 1 for sample calculation ) The Holdback Reserve can be funded with a letter of credit acceptable to John Hancock. Upon reaching Proforma Rents, the Holdback Reserve will be released to Borrower.

Within six (6) months after the Closing, if the Proforma Rents are not achieved, the Holdback Reserve will be recomputed using the above outlined method   If the revised Holdback Reserve is less than the initial Holdback Reserve, the excess reserve will be released to the Borrower, the revised Holdback Reserve shall be applied to reduce the principal balance of the Loan, without prepayment penalty, and the amortization schedule and loan payments will be revised.

2

JH 00734

| | |
|---|---|
| Extension of Funding Date: | The initial funding date may be extended for up to one hundred eighty (180) days by increasing the spread by five (5) basis points per each additional 30-day period or portion of additional 30-day period. For example if the initial funding date is extended by sixty-one (61) days, the spread would increase by fifteen (15) basis points. |
| Additional Deposits: | After the rate is locked, if, for 5-business days in a row, the yield for the "on the run" 10-year U.S. Treasury Security ("10-Year Treasury Rate") is 45 basis points or more below the 10-Year Treasury Rate that was used to determine the locked interest rate, Borrower is required to deposit with John Hancock an additional 1% of the Loan amount within three (3) business days. An additional commitment fee equal to 1% of the Loan Amount will be required for each additional subsequent 15-basis-point drop below 45 basis points in the 10-Year Treasury Rate (or if the initial reduction is 60 basis points or more). Any additional commitment fees will be limited to a maximum of 2% regardless of how low the 10-Year Treasury falls. |
| | In the event additional deposit(s) for the Commitment Fee are made, as outlined above, and subsequently, the 10-Year Treasury Rate rises and is above the threshold(s) for the additional deposit(s) for 5-business days in a row, John Hancock will return the applicable portion of the Additional Commitment Fee to the Borrower. |
| Additional Funding: | Borrower shall have the one-time right to request additional loan proceeds starting at the beginning of the 2nd year through the loan term minus 5 years (e.g. if the loan term is 10 years, additional proceeds can be requested from years 2-5). The combined loan proceeds shall have a maximum Loan to Value (LTV) no more than the maximum LTV applicable for the original pricing for the first mortgage and the combined minimum Debt Service Coverage Ratio (DSCR) must be no less than the minimum DSCR that was applicable for the original pricing for the first mortgage. The interest rate on the additional funding shall be equal to the then current interest rate being offered by John Hancock for loans of the same size, property type, location, character and credit quality, with a minimal increment of $1,000,000. |
| Other Costs: | Customary closing costs to include but not limited to legal, appraisal, environmental and engineering reports and title insurance. |
| Other Conditions: | Building construction completed in accordance with plans and specs and all approvals necessary for operation to be obtained. |

3

JH 00735

Credit Reports:    Attached is an executed Credit Report Authorization

Options:    Prior to Rate Lock and in lieu of a ten year term, Borrower may request 1) an 11 year term with the interest fixed for 10 years, as per paragraph 4, and the 11th year floating over Libor. Spread over Libor to be determined at that time and to be equivalent to that spread offered by John Hancock for first mortgages of similar type, quality and location; open to prepayment at par after the 116th month or 2) a 15 year term. The interest rate for this 15 year term shall be equal to the sum of the 13.27 year average life Treasury (using the 10 and 30 year Treasuries) at the time of rate lock, plus a spread of 191 basis points. This interest rate is subject to change based on market conditions such as movements in the treasuries and the swap curve (affecting both the treasuries and spread) until the rate is actually locked. This interest rate is based on the loan-to-value and debt-service-coverage ratios outlined above. The interest shall be calculated using the 30/360-day formula. If the interest rate were locked today, the interest rate would have been 6.52%.

This letter is not a formal commitment to lend, either expressed or implied, but rather a preliminary indication of our interest to lend based on the limited information received to date. The terms quoted herein are subject to change. Applicant acknowledges that JHLIC is not obligated to make the loan contemplated herein unless and until an application is submitted by Applicant with the appropriate fees, the loan has been authorized by JHLIC's Loan Committees, the Commitment is signed by JHLIC and the Borrower pays the Commitment Fee

Please indicate your acceptance of the terms and conditions herein by executing a counterpart of this letter and returning it to John Ferrie with a check, made payable to John Hancock Real Estate Finance, Inc., in the amount of $5,000 by July 25, 2004 along with the completed Credit Report Authorization. If Applicant does not accept this agreement in the space provided below and return by July 25, 2004, then JHREF/JHLIC shall have no further duty or obligation to Applicant concerning the property described above or the proposed loan.

Sincerely yours,


*John P. Ferrie*



The foregoing is agreed and accepted
Montgomery Square Partnership
By: Vestmont Limited Partnership
By: Vesterra Corporation

BY: _____

NAME: James R. Koller

ITS: President

DATE: 7-22-0A _____

Attachments: *Two*

4

JH 00736

# EXHIBIT 1

## EXAMPLES OF RESERVE CALCULATIONS

AVENEL @ MONTGOMERY SQUARE

| | Units | 256 | | EXAMPLE 1 | | EXAMPLE 2 | | EXAMPLE 3 |
|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | |
| | Base Rent | | | $4,638,600 | | $4,638,600 | | $4,638,600 |
| | Parking Income | | | $0 | | $0 | | $0 |
| | Other Income | | | $312,213 | | $312,213 | | $312,213 |
| Gross Income | | | | $4,950,813 | | $4,950,813 | | $4,950,813 |
| | Vacancy | @ | 20% | $990,163 | 15% | $742,622 9.00% | | $445,573 |
| Effective Gross Income | | | | $3,960,650 | | $4,208,191 | | $4,505,240 |
| **EXPENSES** | | | | | | | | |
| Operating Expenses | | | | | | | | |
| | Real Estate Taxes | | | $480,000 | | $480,000 | | $480,000 |
| | Property Insurance | | | $82,480 | | $82,480 | | $82,480 |
| | Utilities | | | $87,749 | | $87,749 | | $87,749 |
| | Repairs & Maintenance | | | $182,741 | | $182,741 | | $182,741 |
| | Janitorial | | | $0 | | $0 | | $0 |
| | Management Fees @ 3.75% | | | $148,524 3.75% | | $157,807 3.75% | | $168,946 |
| | Payroll & Benefits | | | $294,781 | | $294,781 | | $294,781 |
| | Advertising & Marketing | | | $59,713 | | $59,713 | | $59,713 |
| | Professional Fees | | | $5,000 | | $5,000 | | $5,000 |
| | General & Administrative | | | $45,969 | | $45,969 | | $45,969 |
| | Other Expenses | | | $0 | | $0 | | $0 |
| Total Operating Expenses | | | | $1,386,957 | | $1,396,240 | | $1,407,379 |
| NET OPERATING INCOME | | | | $2,573,693 | | $2,811,951 | | $3,097,860 |
| | Value @ | 7.25% | Cap | $35,499,214 | | $38,785,529 | | $42,729,108 |
| Maximum Loan or | 75.00% | LTV | | $26,620,000 | | $29,090,000 | | $32,050,000 |
| | Round To | | | $26,620,000 | | $29,090,000 | | $32,000,000 |
| Locked Amount | | | | $32,000,000 | | $32,000,000 | | $32,000,000 |
| **RESERVE** | | | | $5,380,000 | | $2,910,000 | | $0 |
| | Base Rent Required | | | $3,710,880 | | $3,942,810 | | $4,221,126 |

JH 00737

Avenel Exhibit 1 revised 7-13-04 xls

# EXHIBIT V



**John P. Ferrie**
*Regional Vice President*

Office Court at Walton Point
486 Norristown Road
Suite 130
Blue Bell, Pennsylvania 19422
(610) 825-9200  PHONE
(610) 941-9872  FAX

*E-Mail: jferrie@jhancock.com*

**E-MAIL jkelly@kollerkelly.com**

July 29, 2004

Montgomery Square Partnership
490 Norristown Road, Suite 151
Blue Bell, PA 19422

        Re:    $32,000,000 First Mortgage Loan Application
                Avenel @ Montgomery Square, North Wales, PA

Gentlemen:

Enclosed is the John Hancock Life Insurance Company ("JHLICO") loan Application in the amount of $32,000,000. The "Application" consists of three parts, the body of the Application (28 pages), the Supplement (#'s 46 to 72), and the Exhibits (A through H). All changes to the standard "Application" are made in the Supplement, so make sure you read the Supplement first.

With respect to the body of the Application:

      1.    The borrower(s) needs to execute the pages 26, 27 and 28 where indicated by the words "Applicant", "Guarantor" and "Indemnitor".

      2.    The borrower(s) needs to initial the bottom right-hand side of <u>every</u> page of the Application including the Supplement and Exhibit pages, where indicated.

With respect to the Exhibits:

      3.    Exhibit A:    N/A

      4.    Exhibit B:    Please complete Pages 1, 2 and 3.

      5.    Exhibit C:    Complete Exhibit C by answering the questions and signing on Page 4.

JH 00220

John Hancock
REAL ESTATE
F I N A N C E

*E-Mail: jferrie@jhancock.com*

**John P. Ferrie**
*Regional Vice President*

Avenel
January 29, 2004
Page 2

| | | |
|---|---|---|
| 6. | Exhibit D: | Rate Lock Agreement. Prior to telephone confirmation of a rate lock between Borrower and Lender this Agreement will be faxed to Borrower for its signature. Please initial at the bottom of the page. |
| 7. | Exhibit E: | N/A |
| 8. | Exhibit F: | Kindly complete and provide the information requested with respect to the Borrowing Entity and parties which comprise said entity. |
| 9. | Exhibit G: | Please provide the information requested in Part I and complete the checklists in Part II. |
| 10. | Exhibit H: | N/A |

Regarding the attached Supplement:

12.    Please initial each page in the lower right hand corner.

Return the executed "Application" as noted above along with a letter of credit or wire transfer, payable **to JHLICO in the amount of $640,000 as detailed in Paragraph 30(b).**

When the loan is approved in committee, an officer of John Hancock will execute page 27 of this document thereby transforming the Loan Application into your Loan Commitment.

Sincerely,

*John P. Ferrie*

Enclosures
Cc:   Timothy J. Malik
        Rob Kelly
Enclosures: Four

JH 00221

# EXHIBIT AA



**Rent.com**
an eb Y company

Account | Search Preferer

| My Rent.com | **RENTALS** | ROOMMATES | MOVING CENTER | MANAGERS |

<< Return to search results



**Avenel at Montgomery Square**

(866) 475-4020 ext. 1748

1100 Avenel Boulevard
North Wales, PA 19454
Managed by: Privately Owned and
Managed

$100 Ren
Rew

If you've moved in here,
is waiting for you

CLAIM $100 REWA

 Save as Favorite | See All Favorites

 Send to a Friend

 Print this page

| Bedrooms | Bathrooms | Rent Range | Square Footage | Check Availa |
|----------|-----------|------------|----------------|--------------|
| 1 Bedroom | 1 | $1225 - $1490 | 779 - 991 | ☐ |
| 2 Bedroom | 2 | $1575 - $2070 | 1157 - 1722 | ☐ |

Contact n

 **Property Overview**

Floorplans

Map & Directions

"Brand New Construction Within Minutes of the SEPTA Lansc
Station and Less than 20 Miles from Philadelphia ...Open Pla
Gourmet Kitchen with Maple Cabinets...9-Foot Ceilings, 6-F
Windows..."

Moving Checklist

Before You Move

Free Credit Report

Free Moving Quotes

Moving Boxes

Truck Rental

Storage

After You Move

Car Insurance

Renter's Insurance

Health Insurance

Internet Access

Phone Service

Satellite TV

Checking Account

**Move-In Special:**
- Get a $100 reward from Rent.com if you move here  Learn more.

**Pet Policy:**
- Cats and dogs accepted.

**Apartment Features:**
- Fireplace
- Vaulted Ceiling
- Refrigerator
- Carpeting
- Balcony, Deck, Patio

- Walk-in closets
- High Speed Internet Available
- Dishwasher
- Cable Ready

- Washer and Drye
- Microwave
- Garbage Disposa
- Furnished Units

**Community Features:**
- Attached Garage
- Fitness Center
- Extra Storage Units
- Handicap Access

- Detached Garage
- Business Center
- Air Conditioning

- Pool
- Club House
- Elevator

Get free checking with
direct deposit.

**BankofAmerica** 

**Explore the
Neighborhood:**

Find Local ▼

**Property Description:**
Welcome to a place where the finer things are everything. Where the convenience
pied-a-terre meets the comfort of a country manor. And the heights of modern tech
are matched only by the depths of classic style and superior service. In this place, i
out of reach. In this place, there is nothing left to do but indulge. Welcome to Aver
Montgomery Square. Office Hours: Monday-Friday 9:00am-6:00pm, Saturday 10:00a
6:00pm, Sunday 12:00pm-6:00pm.

**Lease Terms:**
Lease Terms: 12 months. Security Deposit: $300 OAC. Pet Policy: Up to 35 lbs pet w
limit, up to 2 pets maximum, $20 pet rent, $300 refundable pet deposit, $300 non-
refundable pet fee.

¨Prices, specials and availability subject to change

---

## Your Quickest Way to $100 - Print a Guest Card
Give this to the leasing agent so they'll know you're from Rent.com.
Then return to Rent.com to claim your $100 reward!

✂ Cut Here



**Rent.com**
in eb Ycompany
GUEST CARD

I found Avenel at Montgomery Square on
Rent.com!

My Name:
Email: adownsmeyer@hotmail.com
Desired Move-In Date: 26-MAY-2005
Referred by: Rent.com

**Avenel at Montgomery
Square**

**(866) 475-4020 ext. 1748**

1100 Avenel Boulevard
North Wales, PA 19454
Privately Owned and Manag

## TAKE THIS WITH YOU!



About Rent.com | Help | Affiliate Program | Legal Notices | Broker Licensing | Privacy Policy | Contact Us
Copyright ©1999-2005 Viva Group, Inc. All Rights Reserved | ⌂ Equal Housing Opportunity

V 2587


**Rent.com**
an ebV company

Account  |  Search Preferer

| My Rent.com | RENTALS | ROOMMATES | MOVING CENTER | MANAGERS |

Rental Search North Wales          PA ▾          Advanced Search  By City

**MY SEARCH**

**Current Search**
☑ North Wales, PA

**Search History**
☐ Hauppauge, NY

**Rent Range**
$300 ▾  to  $5000+ ▾

**Bedrooms**          **Bathrooms**
Studio+ ▾            1+ ▾

**Pets**
No Preference ▾

**Move Month**       **Move Day**
May ▾               26 ▾

**Property Name**

**Parking**
No Preference ▾

**Laundry**
No Preference ▾

**Amenities**
☐ Walk-In          ☐ Fitness
  Closets            Center
☐ Fireplace        ☐ Pool

☐ Show listings with photos first

**MY FAVORITES**

Favorite Rentals

**CITIES NEARBY**

North Wales          map
Lansdale             map

**$100 Rent.com Reward**

▸ Find your new home on our website.
▸ Tell the property you found them
  on Rent.com.
▸ Claim your $100 Rent.com Reward.
  Get started!

How did you hea
☑ Internet
☐ Rent
☐ User

**Search Results:**
**332 Matching Rentals**          1 to 10 of 332 | 1 2 3 4 5 6 7 8 9 10  << Previo
Rentals in North Wales, PA

Moving here?
Claim your
$100 reward!

**English Village Apartments**  (more info)                        Save
"Great lifestyle in A Great Location.  Comfort, Convenien
Unique , Quiet Setting With Great Convenience..."
**City:** North Wales
**Address:** 700 Lower State Road, North Wales, PA (View
**Rent Range:** $785-$1015 /mo
**Unit Type:** Studio-2 Bed 1-2 Bath
**Pets:** Cat OK, Dog OK
**Property Features:** Pool, Fitness Center, Controlled Acc
Court, Business Center, Club House, Playground, Extra St
Units, Air Conditioning
**Move-In Special:**
• Get a $100 reward from Rent.com if you move here.

Moving here?
Claim your
$100 reward!

**Hunt Club (PA)**  (more info)                                   Save
"Quick Access to the PA Turnpike & Route 309...Tanning
Bed...Convenience, Recreation, Relaxation-You Are Only
Your Imagination!..."
**City:** North Wales
**Address:** 10 HUNT CLUB TRAIL, NORTH WALES, PA (View
**Rent Range:** $1009-$1789 /mo
**Unit Type:** 1-3 Bed 1-2 Bath
**Pets:** Cat OK, Dog OK
**Property Features:** Pool, Fitness Center, Tennis Court,
Playground, Covered Parking, Air Conditioning, Handicap
**Move-In Special:**
• Get a $100 reward from Rent.com if you move here.

Moving here?
Claim your
$100 reward!

**Avenel at Montgomery Square**  (more info)                      Save
"Brand New Construction Within Minutes of the SEPTA La
Station and Less than 20 Miles from Philadelphia . Open
Gourmet Kitchen with Maple Cabinets...9-Foot Ceilings,
Windows..."
**City:** North Wales
**Address:** 1100 Avenel Boulevard, North Wales, PA (View
**Rent Range:** $1225-$2070 /mo
**Unit Type:** 1 2 Bed 1-2 Bath
**Pets:** Cat OK, Dog OK

V 2588

| Ambler | map |
|--------|-----|
| Horsham | map |
| Hatfield | map |
| Blue Bell | map |
| Norristown | map |
| Willow Grove | map |
| Warrington | map |
| Conshohocken | map |
| Lafayette Hill | map |
| Souderton | map |
| Hatboro | map |
| Jenkintown | map |
| Doylestown | map |
| Eagleville | map |
| Collegeville | map |
| Philadelphia | map |
| King of Prussia | map |
| Jeffersonville | map |

View more cities

## MOVING CHECKLIST

**Before You Move**

Free Credit Report
Free Moving Quotes
Moving Boxes
Truck Rental
Storage

**After You Move**

Car Insurance
Renter's Insurance
Health Insurance
Internet Access
Phone Service
Satellite TV
Checking Account

## NEW SEARCH

⦿ Rentals
○ Roommates

[By City ▾] 

Get free checking with
direct deposit.

Bank of America 〰 Higher Standards

---

Property Features: Attached Garage, Detached Garage
Fitness Center, Business Center, Club House, Extra Stora
Conditioning, Elevator, Handicap Access
Move-In Special:
- Get a $100 reward from Rent.com if you move here

**Rentals within 2 miles of North Wales, PA**



Moving here?
Claim your
$100 reward!

Wissahickon Park Apartments (more info)        Save
"Free Hot Water, Cooking Gas, and Heat...Great Locatior
Affordable, and Spacious...What More Could You Want?..
City: Lansdale
Address: 757 East Main Street, Lansdale, PA (View Map)
Rent Range: $675-$841 /mo
Unit Type: Studio-2 Bed 1 Bath
Pets: Cat OK, No Dogs
Property Features: Pool, Tennis Court, Air Conditioning
Move-In Special:
- Get a $100 reward from Rent.com if you move here



Moving here?
Claim your
$100 reward!

Willowyck Apartments (more info)        Save
"Spacious Floor Plans ...Convenient Location...Beautiful /
Landscaping ..."
City: Lansdale
Address: 1 Marlbrook Lane, Lansdale, PA (View Map)
Rent Range: $1020-$1520 /mo
Unit Type: 1-3 Bed 1-2 Bath
Pets: Cat OK, Dog OK
Property Features: Pool, Fitness Center, Club House, A
Conditioning
Move-In Specials:
- 2 Months free on 1 or 2BRs with a 12 month lease!
- Get a $100 reward from Rent.com if you move here

**Rentals within 3 miles of North Wales, PA**



Moving here?
Claim your
$100 reward!

The Woods (more info)        Save
"Country Setting With City Style.. Amenties Galore...Bes
in Montgomery Country..."
City: Ambler
Address: 1410 East Butler Pike, Ambler, PA (View Map)
Rent Range: $877-$1170 /mo
Unit Type: 1-2 Bed 1-2 Bath
Pets: Cat OK, Dog OK
Property Features: Pool, Fitness Center, Tennis Court,
Center, Club House, Air Conditioning
Move-In Special:
- Get a $100 reward from Rent.com if you move here

**Rentals within 4 miles of North Wales, PA**



Moving here?
Claim your

Wynmere Chase (more info)        Save
"Peaceful Location, Convenient to Just About Everything
from Major Roadways, Employers and Shopping ...Firepla
Available..."
City: Horsham
Address: 9 Bridle Lane, Horsham, PA (View Map)
Rent Range: $1055-$1235 /mo
Unit Type: 2 Bed 1 Bath

---

$100 reward!    **Pets:** Cat OK, Dog OK
**Property Features:** Air Conditioning
**Move-In Special:**
- Get a $100 reward from Rent.com if you move here.

**Rentals within 5 miles of North Wales, PA**



Moving here?
Claim your
$100 reward!

**Hatfield Village Apartments** (more info)          Save
"Far from the Madening Croud...Convenient Ideal Locatic
Setting"
**City:** Hatfield
**Address:** 2058 Maple Avenue, Hatfield, PA (View Map)
**Rent Range:** $540-$1145 /mo
**Unit Type:** Studio-3 Bed 1-2 Bath
**Pets:** Cat OK, Dog OK
**Property Features:** Pool, Fitness Center, Tennis Court,
Playground, Extra Storage Units, Air Conditioning
**Move-In Specials:**
- 1 BR $100 off rent each mo, 2BR $150 off: on 1 yr lea
- Get a $100 reward from Rent.com if you move here.



Moving here?
Claim your
$100 reward!

**Blue Bell** (more info)                                    Save
"Corporate Suites and Unfurnished Townhomes...Washer
Fireplace in Each Unit...Pool, Tennis Courts and Fitness
Included..."
**City:** Blue Bell
**Address:** 1560 Wick Lane, Blue Bell, PA (View Map)
**Rent Range:** $1029-$4000 /mo
**Unit Type:** 1-4 Bed 1-2.5 Bath
**Pets:** Cat OK, Dog OK
**Property Features:** Detached Garage, Pool, Fitness Cen
Court, Business Center, Club House, Extra Storage Units,
Conditioning
**Move-In Specials:**
- $200/mo off 3BR TH and $100/mo off 2BR!
- Get a $100 reward from Rent.com if you move here.



Moving here?
Claim your
$100 reward!

**Jacobs Woods** (more info)                                Save
"Luxury, lifestyle, and convenience...Furnished corporat
homes available...Attached garages!"
**City:** Lansdale
**Address:** 100 Jacobs Hall Lane, Lansdale, PA (View Map
**Rent Range:** $1285-$1895 /mo
**Unit Type:** 1-3 Bed 1-2.5 Bath
**Pets:** No Cats, No Dogs
**Property Features:** Attached Garage, Pool, Spa/Hot Tu
Center, Business Center, Club House, Air Conditioning, H
Access
**Move-In Specials:**
- M/I by 3/31/05 & receive $500.00 off 1st month's ren
- Get a $100 reward from Rent.com if you move here.

1 to 10 of 332 | 1 2 3 4 5 6 7 8 9 10  << Previc



About Rent.com | Help | Affiliate Program | Legal Notices | Broker Licensing | Privacy Policy | Contact Us
Copyright ©1999-2005 Viva Group, Inc. All Rights Reserved | Equal Housing Opportunity

**V 2590**

V2591



V 2591

FRST STANDARD
US POSTAGE
PAID
PERMIT #130
HORSHAM, PA

*Avenel*

At Montgomery Square

*Call to schedule your tour today!*

215-699-9930

*Return card to use as $200.00 Avenel Cash
In addition to any current specials.*

- *9-foot ceilings & expansive 6-foot windows*
- *Private balcony or patio*
- *Pet friendly*
- *Unique loft homes available*
- *1 & 2 bedrooms with den*
- *High Speed Internet Access*
- *Gas heat & cooking*
- *Fitness Center with cardio & strength equipment*
- *Resort-style pool with sundeck*
- *Garage & Storage available*
- *Business Center with computer access & internet*
- *Minutes from Septa Train Service*

*www.Avenelapartments.com*

V 2592

°

Home    |    Advertise    |    About Us    |



Search Rentals        Help for Renters    |    1

**Avenel at Montgomery Square**
1100 Avenel Boulevard
North Wales, PA 19454



Leasing Contac

1
1100 A
North \

**Neighborhood**
North Wales

**Schools**
North Wales

Click

▸ **Photos**        ▸ **Overview**
Click here to see        The apartment homes at Avenel at Montgomery Square in North Wales feature exquisite architec
more pictures        unparalleled location, first class service, an array of resort-style amenities and many extras for ye
                     Choose from a variety of living spaces designed to meet your every need. You'll be close to trans
                     shopping and entertainment. Call today to make Avenel at Montgomery Square your new home!

▸ **Floor Plans**        SPECIAL – 1 Month Free, Restrictions apply. Call for details. Please mention 4 Walls.

Click here to see        ▸ **Financial Overview**
floor plans

| Rent | 1 Bedroom/1 Bath $1225 |
| | 1 Bedroom/1 Bath/Den $1450 |
| | 1 Bedroom/1 Bath/Loft $1490 |
| | 2 Bedroom/2 Bath $1575 |
| | 2 Bedroom/2 Bath/Den $1800 |
| | 2 Bedroom/2 Bath/Loft $1790 |
| Security Deposit | $300 Restrictions apply |
| Income Requirement | Yes |
| Application Fee | $40-60 |
| Co-signers allowed? | Yes |
| Short term lease? | No |

▸ **Utilities Included**

V 2618

Resident is responsible for utilities

▸ **Wiring**

- › Cable-ready
- › High speed internet access available
- › Pre-wired for multiple phone lines

▸ **Rooms**

- › 1 and 2 bedrooms
- › 1-2 Full baths
- › Living room
- › Dining room
- › Den in select apartments
- › Balcony/Patio
- › Deck
- › Loft in select apartments
- › Additional storage space available

▸ **Kitchen**

Open plan, Gourmet Kitchen with Gas Range

- › Refrigerator with icemaker
- › Dishwasher
- › Built-in microwave
- › Garbage disposal
- › Maple cabinetry
- › Breakfast bar

▸ **Special Features**

- › Central air conditioning
- › Full-size washer/dryer in all apartments
- › Wall-to-wall carpeting
- › Walk-in closets
- › 24 hour emergency maintenance
- › Onsite property management
- › 6' windows
- › 9' ceilings
- › Track lighting
- › Fireplaces available

▸ **Pets**

Pet friendly. Please call for more information on our pet policy.

▸ **Additional Comments**

New construction with classic brick-front architecture. Beautifully landscaped grounds and courty

Walking distance to Montgomery Mall, entertainment and restaurants.

V 2619

Less than 30 miles to Center City, Philadelphia.

▸ **Community Amenities**

› Pool with sundeck
› 24-hour Fitness center with cardio and strength equipment
› 24-hour Business center
› Club house with club room
› Resident lounge

▸ **Parking and Transportation**

Attached and detached garages available.

Easy access to Routes 309, 202 and the PA Turnpike.

▸ **Public Transportation**

Within minutes to SEPTA - Lansdale and Gwynedd-Penllyn stations.

▸ **Directions**

Take PA Turnpike to exit 339 (Ft. Washington). Go north on Route 309 approximately eight miles make left a left. Avenel is on your left.

From Philly/NJ (South), take Route 76 West to Route 476 North (the Blue Route). Proceed until y Turnpike (Route 276). Take the PA Turnpike East to Exit 339 (Ft. Washington) and go north on R Proceed approx 7-8 miles. Take a left on Route 202 South and Avenel will be 1 block on the left.

Home | Advertise | About Us |



Search Rentals       Help for Renters   | ↑

<u>Click here to return
to the Avenel at
Montgomery Square
main page.</u>

**Pictures of Avenel at Montgomery Square**









Pictures of Avenel at Montgomery Square











http://4wallsinphilly com/montco/avenelatmontgomerysquare/avenelpics.htm    3/2/2005

V 2622

Pictures of Avenel at Montgomery Square















Click here to return to the Avenel at Montgomery Square main page.

Home    | About Us  | Search Rentals |  Contact   |    Email

© Copyright 2002 4 Walls, LLC All Rights Reserved

V 2624

 **4WallsInPhilly**.com

**Search Rentals**      **Help for Renters**    |    1

<u>Click here to return
to the Avenel at
Montgomery Square
main page.</u>

**Floorplans of Avenel at Montgomery Square**

**1 Bedroom**

**Montgomery**



the Montgomery
773 Sq Ft    One Bedroom    One Bathroom

**Wales**

V 2625



842 Sq Ft    One Bedroom, One Bathroom

**Wales w/Loft**



**Chestnut**



**2 Bedroom**

**Dublin**



1137 Sq. Ft.    Two Bedrooms, Two Bathrooms

**Gwynedd 1**



1167 Sq. Ft.    Two Bedrooms, Two Bathrooms

V 2628





**Gwynedd 2 - w/Loft**



V 2629



**Penllyn**



**Warwick 1**

V 2630



The Warwick 1
1974 Sq. Ft.  Two Bedrooms Two Bathrooms

**Warwick 2 – w/Loft**



The Warwick 2
1722 Sq. Ft.  Two Bedrooms Two Bathrooms w/ Loft

Click here to return to the Avenel at Montgomery Square main page.

**Home**    | **About Us** | **Search Rentals** | **Contact** |    **Email**

© Copyright 2002 4 Walls, LLC All Rights Reserved

V 2631

# EXHIBIT BB

## FIRST DAY

## Germantown

## Northeast Sale

## Chestnut Hill/Mt. Airy Sale

## Northeast Sale

## E. TORRESDALE $394,900
### OPEN SUNDAY 1-4PM

Lovely single situated on a culdesac in beautiful neighborhood, 2 story, 3 bedroom, with 2 1/2 baths. Modern kitchen w/ample storage, family room with wood burning fireplace, full finished basement w/dedicated laundry room, 30X12 deck, garage. Come see – Won't last!

**FOR SALE BY OWNER**
Res: 215-824-2751
Cell: 215-869-2225

## We Make It Easy to Shop for a New Home.

Don't miss the *New Home Map Directory* every Sunday in The Inquirer.

Table (apartment directory — MONTGOMERY / MERCER county listings):

| Apartment | Town | ID | Phone |
|---|---|---|---|
| | Glassboro | 14415001 | 856-245-3015 |
| Heather Ridge Apartments | Mantua | 10264004 | 800-320-3104 |
| Washington Way Apartments | Washington Twp | 10273011 | 888-990-0990 |
| Westbrook Gardens | West Deptford | 12932007 | 866-314-7726 |
| Chestnut Lane | Washville | 12931008 | 888-905-5519 |
| Inverness Apartments | Washville | 12033019 | 856-885-3847 |
| Laureton Village Apartments | Williamstown | 10277016 | 866-223-6316 |
| Pine Tree Village | West Middlesex | 12705002 | 866-213-4653 |
| **MERCER** | | | |
| **MONTGOMERY** | | | |
| The Woods | Ambler | 10490053 | 877-210-5039 |
| Mill Grove | Audubon | 13380005 | 877-711-5892 |
| Harrison Richards Properties | Bala Cynwyd | 13324001 | 888-517-3816 |
| Korman Communities/Blue Bell | Blue Bell | 10269005 | 888-765-8745 |
| Townline Townhomes | Blue Bell | 12932008 | 888-459-4155 |
| Radcliff House | Bryn Mawr | 10491008 | 888-364-7040 |
| Plymouth Gardens Apartments | Conshohocken | 10482003 | 888-505-1977 |
| Riverwalk at Millennium | Conshohocken | 10881008 | 866-675-9531 |
| Sherry Lake Apartments | Conshohocken | 10278009 | 866-517-7200 |
| Dogwood Gardens Apartments | East Norristown | 12845000 | 866-557-5846 |
| Brookview at Elkins Park | Elkins Park | 10180072 | 866-549-8480 |
| Lynnwood Gardens | Elkins Park | 11554004 | 866-206-1917 |
| Montgomery Woods Townhomes | Hatboro | 10494019 | 866-246-0090 |
| Village Square Apartments | Horsham | 10278044 | 866-352-7867 |
| 429 Apartments | Horsham | 10042092 | 866-252-1282 |
| Korman Residential at Whitehall Apartments | Haverford | 10244014 | 866-285-8205 |
| Dreshertowne | Horsham | 14417003 | 866-393-5155 |
| Wynmere Chase | Horsham | 13573004 | 866-601-7460 |
| Greenwood Terrace | Jenkintown | 10516002 | 866-269-2607 |
| Valley Forge Towers North | King Of Prussia | 10272002 | 810-783-7700 |
| Kingswood Apartments | King Of Prussia | 10494004 | 866-887-9100 |
| Lincoln Woods | Lafayette Hill | 10105227 | 866-854-0300 |
| Brooklavia Manor Apartments & Townhomes | Lansdale | 10494006 | 866-316-8400 |
| Executive House Apartments | Lansdale | 10278043 | 866-400-9249 |
| Forge Gate Apartments | Lansdale | 10480013 | 866-316-6590 |
| Main Street Apartments | Melrose Park | 10494018 | 866-316-7200 |
| Melrose Station Apartments | Norristown | 10511009 | 866-923-8640 |
| Curren Terrace Apartments | Norristown | 10278045 | 866-382-7862 |
| Logan Square & Astor Apartments | Norristown | 12471002 | 866-775-6800 |
| Marshall Wood Apartments | Norristown | 14212001 | 866-676-7654 |
| Regatta Apartment Homes | Norristown | 10280010 | 866-678-2911 |
| Timberlake Apartments | Norristown | 10494036 | 866-353-9444 |
| Rolling Green Apartments | Narberth | 14223002 | 866-264-7232 |
| Airwell at Montgomery Square | North Wales | 14990801 | 215-669-9939 |
| English Village Apartments | North Wales | 13444001 | 888-867-1057 |
| Hunt Club Apartments | North Wales | 10236235 | 888-306-5459 |
| Penn Wynn Apartments | Oreland | 13610203 | 866-600-6700 |
| Plaza One | Plymouth Meeting | 10490025 | 866-441-6300 |
| Sussex Square Apartments | Plymouth Meeting | 11058012 | 866-866-0071 |
| Arbor Grove Apartments | Pottstown | 13927052 | 888-414-8146 |
| Colonial Pointe | Royersford | 13351001 | 888-214-8263 |
| Walnut Crossing Apartments | Royersford | 13351001 | 888-302-3633 |
| Melrose Apartments | Royersford | | |
| Regency Towers | Willow Grove | 10272006 | 866-277-6681 |
| Trilogy | Wyncote | 10495004 | 215-385-1200 |

04/28/2005 04:56 FAX

@002



# apartments.com™ Directory

| Community | Town | Web ID | Phone | Virtual Tour | Studio | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|---|---|---|---|---|
| **M O N T G O M E R Y** | | | | | | | | |
| The Woods | Ambler | 104904053 | 877-240-6439 | | | $890 | $1090 | |
| Mill Grove | Audubon | 133831005 | 877-711-5892 | Y | | $920 | $1060 | $1250 |
| Harrison Richards Properties | Bala Cynwyd | 132241001 | 888-917-3618 | | | $800 | $1070 | $1350 |
| Korman Communities/Blue Bell | Blue Bell | 102898005 | 888-786-8745 | Y | | $1029 | $1399 | $1599 |
| Townline Townhomes | Blue Bell | 133831006 | 888-459-4156 | Y | | $1085 | $1230 | $1660 |
| Radcliff House | Bryn Mawr | 130042003 | 888-384-7640 | | | $995 | $1180 | |
| Plymouth Gardens Apartments | Conshohocken | 110587008 | 866-879-1977 | | $730 | $855 | $950 | $1375 |
| Riverwalk at Millennium | Conshohocken | 102001062 | 866-795-0521 | | | $1165 | $1590 | |
| Sherry Lake Apartments | Conshohocken | 102798050 | 866-817-7200 | Y | | $968 | $1089 | $1531 |
| Dogwood Gardens Apartments | East Norristown | 128455003 | 866-857-8948 | | | $890 | $998 | $1114 |
| Brookview at Elkins Park | Elkins Park | 101600072 | 888-648-8460 | Y | | $1020 | $1155 | $1595 |
| Lynnewood Gardens | Elkins Park | 118549034 | 866-206-1817 | Y | | $650 | $837 | $1260 |
| Montgomery Woods Townhomes | Harleysville | 104904019 | 866-248-4900 | | | $695 | $1025 | |
| Village Square Apartments | Harleysville | 102798044 | 866-383-7851 | Y | | $859 | $829 | |
| 429 Apartments | Haverford | 130042002 | 888-252-1262 | | | $1000 | $1215 | |
| Korman Residential at Whitehall Apartments | Haverford | 102994014 | 866-266-8206 | | $649 | $929 | | |
| Dreshertowne | Horsham | 144167003 | 866-363-5155 | Y | | | $1290 | $1425 |
| Wynmere Chase | Horsham | 135753004 | 866-601-7466 | | | | $1070 | |
| Greenwood Terrace | Jenkintown | 105163002 | 888-269-2807 | | | $625 | $990 | $1395 |
| Valley Forge Towers North | King Of Prussia | 102728002 | 610-783-7700 | Y | | $1075 | $1092 | $1400 |
| Kingswood Apartments | King Of Prussia | 104904004 | 866-887-9100 | Y | $699 | $875 | $1075 | $1650 |
| Lincoln Woods | Lafayette Hill | 101005227 | 866-854-9300 | Y | | $1025 | $1530 | |
| Brookside Manor Apartments & Townhomes | Lansdale | 104904008 | 866-316-8400 | Y | | $605 | $1065 | $1430 |
| Executive House Apartments | Lansdale | 102798043 | 866-400-9249 | Y | | $820 | $1015 | |
| Forge Gate Apartments | Lansdale | 104904013 | 866-316-6500 | | | $605 | $945 | $1275 |
| Main Street Apartments | Lansdale | 104904018 | 866-316-7200 | | $735 | $850 | $960 | $1270 |
| Melrose Station Apartments | Melrose Park | 102519009 | 888-923-8640 | | | $860 | $950 | $1395 |
| Curren Terrace Apartments | Norristown | 102798045 | 866-383-7662 | Y | | $625 | $855 | |
| Logan Square & Astor Apartments | Norristown | 127471002 | 866-775-6800 | | | $614 | $714 | |
| Marshall Wood Apartments | Norristown | 142121001 | 866-676-7654 | Y | | $779 | $869 | |
| Rogatta Apartment Homes | Norristown | 102001066 | 866-879-2911 | Y | | $1188 | $1253 | $1910 |
| Timberlake Apartments | Norristown | 104904036 | 866-332-9444 | Y | | $940 | $1110 | |
| Rolling Green Apartments | Norriton | 142255002 | 866-260-7292 | | | $860 | $860 | |
| Avenel at Montgomery Square | North Wales | 149906001 | 215-699-9930 | Y | | $1225 | $1575 | |
| English Village Apartments | North Wales | 136440001 | 888-887-1057 | Y | | $795 | $955 | |
| Hunt Club Apartments | North Wales | 102392356 | 888-808-6459 | Y | | $1009 | $1177 | $1639 |
| Penn Weldy Apartments | Oreland | 136002003 | 866-603-5700 | | | | $840 | |
| Place One | Plymouth Meeting | 104904025 | 866-441-8300 | Y | | $1051 | $1336 | |
| Sussex Square Apartments | Plymouth Meeting | 110587012 | 866-886-9071 | | | $905 | $1010 | $1095 |
| Arbor Grove Apartments | Pottstown | 139927002 | 888-414-8146 | Y | | $645 | $745 | |
| Chestnut Pointe | Royersford | 133831004 | 888-214-6263 | Y | | $1050 | $1290 | $1665 |
| Walnut Crossing Apartments | Royersford | 133831001 | 888-302-0633 | Y | | $980 | $1125 | $1450 |
| Heritage Greene | Sellersville | 103673008 | 866-293-5846 | | | $1395 | $1595 | |
| Regency Towers | Willow Grove | 102728004 | 888-277-6641 | | | $1165 | $1365 | $1745 |
| Trilogy | Wyncote | 102495034 | 215-885-1300 | Y | $806 | $860 | $1600 | $2140 |

THE PHILADELPHIA INQUIRER  Saturday, April 16, 2005

V 2666

# LUXURY HAS A NEW ADDRESS!







- 9-FT' CEILINGS AND EXPANSIVE 6-FOOT WINDOWS
- 1 AND 2 BEDROOMS WITH DEN
- UNIQUE LOFT HOMES AVAILABLE
- PET FRIENDLY
- PRIVATE BALCONY AND PATIO
- GAS HEAT AND COOKING
- FITNESS CENTER WITH CARDIO AND STRENGTH EQUIPMENT
- RESORT-STYLE POOL WITH SUNDECK
- GARAGE AND STORAGE AVAILABLE
- BUSINESS CENTER WITH COMPUTER ACCESS AND INTERNET
- MINUTES FROM SEPTA TRAIN SERVICE
- REALTOR® REFERRAL FEE



1100 AVENEL BOULEVARD
NORTH WALES, PA 19454
www.avenelapartments.com

**(215) 699-9930**
FAX: (215) 699-9935





*Avenel*
At Montgomery Square



*Enter the property name at ApartmentGuide.com for photos, floorplans and more • ©HPC Publications*

avenel_ct.indd  1                                      5/12/05  11:23:23 AM

V 2667



**MONTGOMERY COUNTY, PA**

# AVENEL AT MONTGOMERY SQUARE

Now leasing brand new, distinctive apartment homes. Just moments away from Route 309, the PA Turnpike, I-76 and SEPTA, Avenel combines this exceptional location with gracious styling and extraordinary amenities to create the perfect apartment home for you

## VISIT US AT www.avenelapartments.com

**FEATURES**
- Nine-foot ceilings and expansive six-foot windows
- State-of-the-art fitness and business center
- Full-size washer & dryer
- Garages available
- Oversized walk-in closets
- Gourmet kitchens with maple cabinets, microwave and dishwasher
- Resort-style pool with sundeck
- Fireplaces available
- High-speed Internet access
- Across from Montgomery Mall, dining and entertainment
- Private patio or balcony
- Pet friendly



**DIRECTIONS:** Take the PA Turnpike to exit 339 (Ft. Washington). Go north on Route 309 approximately eight miles to a left on 202 South We are on the left.

**HOURS:** Mon-Fri 9-6; Sat 10-5; Sun 12-5

**FLOORPLANS**
1 BDR/1 BTH
1 BDR/1 BTH with den
1 BDR/1 BTH with loft
2 BDR/2 BTH
2 BDR/2 BTH with den
2 BDR/2 BTH with loft
Apartment homes starting at $1225

*Avenel*
At Montgomery Square
**1100 Avenel Boulevard
North Wales, PA 19454
(215) 699-9930**
FAX (215) 699-9935
E-mail:
info@avenelapartments.com

*Enter the property name at ApartmentGuide.com for photos, floorplans and more • ©HPC Publications*

avenelatmontgomerysq_sl_v2.indd  1                                    5/12/05  11:37:21 AM

V 2668

8/05

direct mailer for open house



*Avenel* at Montgomery Square

1100 Avenel Boulevard
North Wales, PA 19454
215-699-9930
www.avenelapartments.com

FIRST CLASS PRS
US P       5
PA...
PERMIT #130
HORSHAM, PA

# Open House
## August 20th & 21st

Resident
16 Lynwood Rd
Lansdale PA 19446-1215

This weekend only we will be
offering one month free on all
apartments, free cable for a year
and a waived amenity fee.

V 2753

9/05




I love visiting my Bubbe at Dresher Estates!

We Offer:
• Assisted Living Suites
• Reflections℠ Alzheimer's Neighborhood
• Respite Care
• Arts & Entertainment Program
• 24 Hour On-Site Nursing Care

Tell Bubbe to call for a tour at Dresher Estates (215) 591-9000
We're located at 1405 North Limekiln Pike in Dresher
www.brandycare.com

A Brandywine Senior Care Community

---

JAN VILLE
FREE ESTIMATES

Roofing & Siding
215-699-0118

Asphalt Shingle        $250 OFF
Cedar • Siding         Complete
Flat Roofs             Roofing Or
Slate/Tile             Siding Job
Gutters

---

KELLER WILLIAMS
REALTY
Lee Stiber REALTOR®

Office: 215-646-2900
Cell: 267-253-0216
Fax: 1-888-470-3556
E-mail: LeeStiber@kw.com
Web: www.LeeStiber.com

721 Skippack Pike, Suite 1 • Blue Bell, PA 19422
Each Office is Independently Owned and Operated

Achieving Goals......
Exceeding Expectations
Sellers: Call me today for a FREE video on
How To Sell Your Home
Buyers: Call me today for FREE daily updates on homes for sale

---

www.AvenelApartments.com

Luxury has a New Address.....

Phone: (215) 699-9930

---

Mike Cody's
Transmissions Inc.
100 Bethlehem Pike
Hatfield, PA 19440
215-997-1977

Foreign & Domestic
Transmissions
• Overhauls and Repairs
• Automatic and Manual
• Clutch Repairs & Overhauls
• Differentials • Free Estimates
• Maintenance Service

---

blu's

Performance Accuracy & Intelligence
Low Price Powered!

Over 300 Complaints Nationwide

---

215-631-9960

NEED A Home Inspection
Lois Inspector Independently
Owned & Operated
www.bestgetdata.com

Shower/ Drywalls
Wood Block Restoration
Stucco Exterior/Interior
Vinyl Siding
"Illuminate" Water Seals

Mold Inspection
30% OFF all window treatments
with coupon

---

Breakfast Lunch & Dinner


Pumpernick's

...a place where almost everybody knows your name... Paul & Seth Klein
Our continuing goal for over 30 years has been to create the food and setting where you can come and enjoy good meals, and relax with your friends

We specialize in Buffet Catering for all Occasions
Business Meetings • Birthday Parties • Sporting Events
• Graduation Parties • Shiva Trays & Dinners
• Bar / Bat Mitzvahs • Holiday Parties

215-393-5800

---





With one free call, we will find you a qualified lawyer who can help.

Montgomery Bar Association
LAWYER REFERRAL
Serving the community since 1993

Call: 610.279.9660
or 1.800.560.LAW (register #3)
E-mail: LRS@montgomerybar.org
www.pabcruisingtour.com

---



WE CAN PAINT YOUR SIDING

SJS
SPECIALTY
CONTRACTORS

• Custom Painting •
• Interior / Exterior
• Aluminum & Vinyl
Siding Painting
• Deck Cleaning
• Epoxy Floor Coatings
• Power Washing

www.sjscompanies.com
Lansdale, PA
215.362.2003

---

the
CRUISE
AGENCY

Specialize in Cruises From
Philadelphia, New York, & Baltimore
Now Featuring
All Inclusive Land Vacations

BESTCRUISEAGNCY.COM
1903 Grant Ave. Phila PA
215-969-6666

---

PREMIER BANK
General Hancock Shopping Center
710 Upper State Road
North Wales, PA 19454.
In front of Costco
215.412.3400
Fax: 215.412.0100
snanplano@premierbankonline.com
Joy Styles
Branch Manager

---

Hatfield Depot
SELF-STORAGE
FREE TRUCK RENTAL
Caren Center - Marketing Rep.
549 South Main Street
Hatfield, PA 19440
Phone: 215-855-9200
Fax: 215-855-1401

Mention this ad for 50% OFF
first 2 months of storage.

coupon



TO ADVERTISE YOUR BUSINESS HERE CALL JIM McDEVITT AT 215-620-9762

V 2806

9/05































**M.G.M. Roofing and Siding Inc.**
"Quality You Can Count On"
Roofing — Siding — Shingle — Vinyl — Flat Roof — Cedar — Aluminum — Cedar — Capping — Soundless — Windows — Gutters
215-938-1074
www.mgmgm.com

**CRUISE AMERICA RV RENTALS**
Give us a call to make your reservation
215-631-9373

**Free Rental Car with Deluxe Detail**
215-362-6117

**M.J.P. DETAILING**

**Hatfield Depot SELF-STORAGE**
Mention this ad for 50% OFF first 2 months of storage

**The Merican Star**
Daily Specials Available All Meals
Call Ahead For Pick-Ups
1200 Welsh Rd • North Wales, PA
215-368-4848
Open 24 Hours

**Happy Tree**
A Complete Tree and Landscaping Service
FULLY INSURED
REASONABLE RATES
215-257-7650
STEPHEN REDDING
176 Price Road • Green Lane, PA 18054

**Your Hometown Attorney Bruce Shaw**
from Accidents to Zoning
215-672-2977

**Hazzard Masonry**
215-721-2683
Brick • Block • Stone
Excavation • Demolition
Blocks • Concrete • Pavers
Residential and Commercial Construction
Free Estimates

**North Penn YMCA**
Something for Everyone!
FREE GUEST PASS

**TROPIANO TRANSPORTATION**
"Hourly Service To Philadelphia Intl Airport"
215-616-5370

**PREMIER BANK**

www.AvenelApartments.com
Luxury 1 & 2 Bedroom Apartments
Phone: (215) 699-9939

**Ralph Kettl III**
Associate Agent
Ralph Kettl Jr
Nationwide Insurance
121 East Main Street
Lansdale, PA 19446
Tel 215-855-8184
Cell 215-920-5783
Tel 800-999-2347
Fax 215-393-8293
Kettrl@nationwide.com

CALL JIM MCDEVITT FOR YOUR ADVERTISEMENT ON THIS MAT 215-820-9762

V 2807

*Introducing*

MONTGOMERY
COUNTY'S
NEWEST COMMUNITY
...LUXURY HAS
A NEW ADDRESS







Montgomery County

# Avenel at Montgomery Square

## Luxury Has A New Address

**(215) 699-9930**

When you want it all, it's nice to know where to find it. Avenel offers you a level of service and amenities unequalled in Montgomery County. So take note: luxury has a new address and it is just moments from Route 309, PA Turnpike and the best that the Philadelphia region has to offer. www.AvenelApartments.com

### Features/Amenities

- Luxury Living
- 9-Ft. Ceilings and
  Bright 6-Ft. Windows
- Resort-Style Pool w/Sundeck
- Gas Heat and Cooking
- Open Apartment Home Designs
- Fireplace and Cathedral Ceilings
- Full-Size Washer and Dryer
- Garage & Storage Available
- Private Balcony or Patio
- Unparalleled Service
- High-Tech Fitness Center
- Spacious Business Center

### Floorplans

- **BRAND NEW**
- 1 Bedroom 1 Bath and
  2 Bedroom 2 Bath Apartments
  With Dens and Lofts Available
  Prices Starting at $1225
  Call for Specials!

- Pet Friendly
- High-Speed Internet Access
- Minutes to SEPTA Lansdale Train
  Service
- Across from Montgomery Mall

| Office Hours | |
| --- | --- |
| Monday-Friday | 9:00 - 6:00 |
| Saturday | 10:00 - 5:00 |
| Sunday | 12:00 - 5:00 |

1100 Avenel Boulevard
North Wales, PA 19454

### Directions

From PA Turnpike: Exit 339-Ft.
Washington and go north on Rt.
309. Proceed approximately 8
miles. Turn left on Rt. 202 South
and Avenel will be 1 block on the
left.

*Avenel*
At Montgomery Square



V 2808





MONTGOMERY EAST



## AVENEL AT MONTGOMERY SQUARE
1100 Avenel Boulevard
North Wales, PA 19454

BE THE FIRST TO ENJOY LIFE AT THIS BEAUTIFUL NEW COMMUNITY. Just moments away from Route 309, the Pennsylvania Turnpike, I-76, and SEPTA, the Avenel combines this exceptional location with unique styling and extraordinary amenities to create the perfect apartment home for you. We are across the street from the Montgomery Mall and other great shopping and dining.

**FEATURES:**
- Luxury living
- Gas heat and cooking
- Spacious business center
- Resort-style pool with sun patio
- Gourmet, fully equipped kitchens
- Fireplace/cathedral ceilings*
- Garage/storage available
- Private balcony or patio
- Nine-foot ceilings and bright six-foot windows
- High-tech fitness center
- Full-size washer and dryer
- Pet friendly
- *In select units

### NOW LEASING
### BRAND NEW CONSTRUCTION

1 BDR/1 BTH from $1225    1 BDR/1 BTH w/den from $1450
1 BDR/1 BTH w/loft from $1490
2 BDR/2 BTH from $1575    2 BDR/2 BTH w/loft from $1790
2 BDR/2 BTH w/den from $1800

DIRECTIONS: Take PA Turnpike to exit 339 (Ft. Washington). Go north on Route 309 approximately eight miles to a left on 202 South. We are on the left.
OFFICE HOURS: Mon-Fri 9-6; Sat 10-5; Sun 12-5

**(215) 699-9930**

Avenel

Enter the property name at ApartmentGuide.com for photos, floorplans and more
CHFC Publications

301



LUXURY HAS A NEW ADDRESS

Avenel

(215) 699-9930

300

V 2809

V 2809A







THIS OUTDOOR DESIGN HAS BEEN CREATED BY CLEAR CHANNEL OUTDOOR.
REPRODUCTION OF THIS DISPLAY, IN WHOLE OR IN PART, WITHOUT PERMISSION
IS PROHIBITED.

47 1/2" X 68 1/2" Bus Shelter Template scaled to 5.94" X 8.56"
red line is live copy area bleed image to end of white box black represents
frame white area past red line is bleed

V 2810



*Montgomery Newspapers*

## BRAND NEW LUXURY APARTMENTS
## NOW LEASING!

### CALL FOR NEW CONSTRUCTION PRICING



*Avenel*
At Montgomery Square

- Furnished models now open!
- Perfect suburban setting, near shopping, dining, historic Doylestown and Chestnut Hill
- Within minutes of two SEPTA stations

1, 2 and 2-bedroom with den apartment homes • Open plan gourmet kitchen • Attached and detached garages available • Full-sized washer and dryer • Multiple phone lines and high-speed Internet access available • State-of-the-art fitness center • Resort-style pool with sundeck • Executive business center • Pet friendly

BOZZUTO MANAGEMENT
We bring you home™

EQUAL HOUSING OPPORTUNITY

888-597-1548 • AvenelApartments.com
5102 Avenel Boulevard • North Wales, Pennsylvania 19454

9/04

# EXHIBIT A

Application No. 6518467

### APPLICATION TO
### JOHN HANCOCK LIFE INSURANCE COMPANY
### FOR A FIRST MORTGAGE LOAN

July 30, 2004

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, MA 02116
Attn: Real Estate Investment Group

RE:   APPLICATION NO. 6518467
      APPLICANT:   Montgomery Square Partnership
      PROPERTY:   Avenel at Montgomery Square, 1100 Avenel Boulevard, North Wales,
      Montgomery County, PA 19454

      THE FOLLOWING EXHIBITS ARE ATTACHED:   A,B,C,D,E,F,G & H

      SUPPLEMENT OF 18 PAGES ATTACHED

Ladies and Gentlemen:

      The undersigned (the "Applicant") hereby applies to John Hancock Life Insurance Company ("John Hancock")
for a first mortgage loan (the "Loan") to Borrower in the principal amount and upon the terms and conditions set forth
below and in the Exhibits and in any Supplement referred to above (the "Terms and Conditions"):

1.   BORROWER

      Name:   Montgomery Square Partnership (the "Borrower")
      Type of Entity:   General Partnership
      State of Organization: PA
      Address:   490 Norristown Road, Suite 151, Blue Bell, PA 19422

      TAXPAYER IDENTIFICATION NO. OF BORROWER: 23-2865711
      BORROWER'S FISCAL YEAR ENDING DATE: December 31, 2004

      Applicant represents that the description of the Borrower and all constituent entities and the list of names, types of
      interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are
      truly, accurately, and completely described on Exhibits F and G attached to this Application.

2.   NOMINATION OF BORROWER

      If Borrower is not definitely named in Condition 1 hereof, Borrower shall be subject to approval by John Hancock in
      its sole discretion and shall be nominated in writing by Applicant to John Hancock; and said nomination shall be
      accompanied by information as to the identity, financial condition, background and experience (including Exhibits F
      and G) of Borrower and the proposed guarantors and indemnitors; and, if Borrower is an entity, of the principals (as
      determined as set forth in Condition 41) of Borrower; and Borrower so nominated shall furnish John Hancock with
      an agreement under which Borrower shall become jointly and severally liable with Applicant for performance of the

Ed. 1/28/2004

1

JH 00958

Application No. 6518467

obligations of Applicant and Borrower hereunder, and the proposed guarantors and indemnitors execute the acknowledgment sections thereof, such nomination and agreement to be consummated on the form attached hereto and made a part hereof marked Exhibit A and to be submitted to John Hancock within seven (7) days from the date of acceptance by John Hancock of this Application.

Applicant agrees to provide John Hancock and its agents in a timely fashion all of the information as requested in this Application or otherwise that John Hancock may reasonably request to appraise the Security and underwrite this Loan.

3.    LOAN TERMS

(a)  PRINCIPAL AMOUNT:          $32,000,000.00

(b)  INTEREST RATE:               **The interest rate shall be equal to the sum of the 10 year treasury at the time of rate lock, plus a spread of 175 basis points. This interest rate is subject to change based on market conditions such as movements in the treasuries and the swap curve (affecting both the treasuries and spread) until the rate is actually locked**

(c)  INTEREST RATE AND RATE LOCK:     The interest rate set forth in Condition 3(b) may be changed or confirmed if John Hancock, in its sole discretion, prior to acceptance of the Application issues a Rate Lock Confirmation to Applicant in the form attached hereto as Exhibit D (the "Rate Lock Confirmation"). If so issued, the Rate Lock Confirmation will amend the date of the Application to be the date of issuance of the Rate Lock Confirmation, will confirm or change the interest rate (the "Interest Rate"), the amount of the monthly payment of principal and interest (the "Monthly Payment"), the Amortization Period and establish the outside date for Closing (as hereinafter defined). If the terms of the Rate Lock Confirmation are satisfactory to the Applicant and the Applicant wishes to accept the proposed Rate Lock (hereinafter defined), the Applicant must execute the Rate Lock Confirmation and return such to John Hancock by telecopy to **Timothy J. Malik** at (617) 572-9699 within the time required on the Rate Lock Confirmation. The execution and delivery of said Rate Lock Confirmation by Applicant as described above will be deemed to amend this Application to incorporate herein the amended Application date, the Interest Rate, the Monthly Payment, the Amortization Period, the date of Closing and any other terms contained in said Rate Lock Confirmation. In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

It is understood and agreed that John Hancock is under no obligation to issue any Rate Lock Confirmation.

Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committees and John Hancock has accepted this Application in the place provided below, and then said obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

(d)  REPAYMENT TERMS:

(i)   Monthly installments of principal and interest will be based on an amortization period of 360 months, provided that all unpaid principal and all accrued and unpaid interest shall be due and payable at the end of the Term of the Loan specified in subparagraph (e) of this Condition 3. The amount of the monthly payment will be established at Rate Lock as set forth in Condition 3(c). Interest shall be computed on a monthly basis using a twelve (12) thirty- (30) day month formula, except that interest due and payable for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such partial month by a daily rate based on a three hundred sixty-five (365) day year

(e)  TERM OF LOAN: **120** months.

Application No. 6518467

(f)  REPAYMENT DATES: All payments are due on the first day of the month. Unless Closing occurs on the first day of a month, interest shall, at John Hancock's option, be payable at Closing to the first day of the following month; and in such event other time computations to be stipulated in the Loan Documents (as hereinafter defined) shall run from the latter date, except where otherwise required by John Hancock.

(g)  PREPAYMENT PRIVILEGE: Except as provided below, Borrower may not prepay the Loan in whole or in part.

On or after the end of the **4th** Loan Year (as hereinafter defined), on any scheduled payment date and subject to giving John Hancock not less than thirty (30) nor more than ninety (90) days' prior written notice specifying the scheduled payment date on which prepayment is to be made ("Prepayment Date"), Borrower may prepay the entire principal amount together with any and all accrued interest and other sums due under the Loan Documents and subject to payment of a prepayment premium equal to the greater of:

    (i)   the positive amount, if any, equal to (aa) the sum of the present values of all scheduled payments due under the Note from the Prepayment Date to and including the maturity date of the Note, minus (bb) the principal balance of the Note immediately prior to such prepayment; or

    (ii)  0.00% of the principal balance of the Note immediately prior to such prepayment.

All present values shall be calculated as of the Prepayment Date, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in The Wall Street Journal or other business publication of general circulation five (5) business days before the Prepayment Date.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

The Loan will be open to prepayment without premium during the last 90 days of the term of the Loan.

If any notice of prepayment is given, the principal balance of the Loan and the other sums required pursuant to this Condition shall be due and payable on the Prepayment Date unless Borrower provides written notice that it is revoking said prepayment notice no later than five (5) business days prior to the Prepayment Date.

Provided no default exists under the Loan Documents, the above premium shall not be applicable to a prepayment resulting from John Hancock's election to require insurance loss proceeds or condemnation awards to be applied to a payment of principal.

No partial prepayment shall be allowed.

The Loan Year is defined as any twelve-month period commencing with the date on which the first monthly installment is due or any anniversary thereof.

(h)  METHOD OF PAYMENT: Any amounts due John Hancock shall be paid via ACH debits against Borrower's account. The attached Exhibit H, Authorization Agreement for Direct Deposits (ACH), has been completed and executed and a voided check or deposit slip is attached thereto.

4  CLOSING AND CLOSING DATE

(a)  All References to closing in this Application shall mean the funding of the Loan by John Hancock (the "Closing")

(b)  The Closing shall occur on or before the date established by the Rate Lock Confirmation as set forth in Condition 3(c) (the "Closing Date").

JH 00960

3

Application No. 6518467

(c) It is understood and agreed that John Hancock shall have no obligation to extend the Closing Date. If Borrower has not complied with all the Terms and Conditions hereof by that time, and John Hancock in its sole discretion does not extend said date pursuant to Condition 32 hereof, John Hancock's obligation to Close and fund the Loan shall terminate pursuant to Condition 29 hereof; and any Rate Lock shall expire automatically.

5. THE SECURITY FOR THE LOAN

The Loan shall be secured by the Real Estate Security and Personal Property Security described below (collectively, the "Security"):

(a) REAL ESTATE SECURITY: The Loan will be secured by a first mortgage, first deed of trust, first security deed, first loan deed, or similar instrument, as determined by John Hancock (the "Mortgage"), upon the following described real estate, including without limitation, the buildings and improvements located thereon and all appurtenances thereto, including without limitation, all easements, licenses and permits in connection with the ownership and operation of the land and improvements (the "Real Estate Security"):

**A newly constructed three & four-story 256 unit garden apartment complex situated on approximately 8.35 acres and located in nine separate buildings at 1100 Avenel Boulevard, North Wales, PA 19454**

(b) PERSONAL PROPERTY SECURITY: In addition to the Real Estate Security, the Loan will be secured by the following security (the "Personal Property Security"):

(i) ASSIGNMENT OF LEASES AND RENTS: A first priority present, absolute and unconditional assignment to John Hancock of all present and future rents, issues and profits (including without limitation all accounts receivable) from the Security and of all present and future leases of personal property and leased property, including ground leases and master leases (all of the foregoing hereinafter referred to as "Other Leases"), and leases of space to occupancy tenants on the Security, more particularly referred to in Condition 15 hereof (the "Space Leases") and all rents and other sums payable thereunder by instruments satisfactory in form and substance to John Hancock and its counsel, which will be recorded and which will provide, among other things, that certain Space Leases and Other Leases will not be modified or amended, surrendered, canceled or terminated and new Space Leases and Other Leases may not be entered into without the prior written consent of John Hancock, and that no prepayment of rent will be accepted from any such tenant Leases.

(ii) SECURITY INTEREST IN PERSONAL PROPERTY: A first priority security interest in personal property under the Uniform Commercial Code combined with the Mortgage or by way of a chattel mortgage or other instrument satisfactory in form and substance to John Hancock and its counsel shall be granted to John Hancock and shall constitute a first and prior lien upon all articles of personal property now or hereafter attached to or used in any way in connection with the Real Estate Security or the operation thereof, including without limitation, fixtures, furniture, equipment, insurance proceeds, condemnation awards, tenant deposits, escrow deposits, transferable warranties, licenses, permits, plans and specifications, contracts and other items of tangible or intangible personal property, and the following property (the "Personal Property Security"):

**Anything owned by the borrowing entity used solely in the operation and management of the real estate, not including personal property owned or leased by tenants at the security, but including personal property owned by the Borrower if leased to the tenants.**

Such security interest shall be perfected by filing or recording as John Hancock shall require.

(iii) ASSIGNMENT OF AGREEMENTS, LICENSES AND PERMITS: A first priority present, absolute and unconditional assignment to John Hancock of all management agreements, franchise agreements,

4

JH 00961

Application No. 6518467

warranties, licenses, permits, plans and specifications, construction contracts and all other contracts and agreements with respect to the construction, use or operation of the Real Estate Security.

(c)  The Security for the Loan is more particularly described on Exhibit B attached hereto and made a part hereof.

(d)  Applicant hereby represents and warrants to John Hancock that the Security has not been subjected to a condominium or cooperative form of ownership, and Applicant and Borrower hereby represent and warrant that the Security shall not be so subjected prior to the Closing Date nor prior to the date on which the Loan is paid in full.

6.  THE LOAN DOCUMENTS

The Note (the "Note"), the Mortgage and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the "Loan Documents") shall be satisfactory in all respects in form and substance to John Hancock and its counsel, and, without in any way limiting the generality of the foregoing, the Loan Documents shall contain provisions satisfactory in form and substance to John Hancock and its counsel, including, without limitation, the following:

(a)  LATE CHARGES:  A covenant to the effect that the Borrower will pay a late charge of 5% of any installment of any principal and interest not paid within five (5) days of the due date, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated

(b)  DEFAULT INTEREST RATE:  A covenant requiring the Borrower to pay an increased interest rate ("Default Interest Rate") on the entire principal balance during default or after maturity at a rate equal to 7% above the interest rate on the Loan stipulated in Condition 3(c) hereof as amended by the Rate Lock Confirmation, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated.

(c)  RESERVE FUND FOR TAXES AND OTHER CHARGES:  A covenant to the effect that Borrower, at the option of John Hancock, will pay to John Hancock monthly such amounts as John Hancock estimates to be necessary to create and maintain a reserve fund or funds from which to pay before they become due, all taxes, assessments, liens, charges and hazard insurance premiums on or against or pertaining to the Security, together with ground rents under ground leases, if any, and any other sums required pursuant to Condition 18, which reserve fund(s) will be held by John Hancock without interest.

(d)  PAYMENT OF LOAN AFTER DEFAULT AND ACCELERATION:  A covenant to the effect that Borrower acknowledges that the Loan was made on the basis and assumption that John Hancock would receive the payments of principal and interest set forth herein for the full term of this Loan.  Therefore, whenever the maturity of the Loan has been accelerated by reason of a default under the Loan Documents, which default occurs prior to the time period, if any, in which prepayment is allowed and prior to the date on which the full amount of the balance of principal and interest then remaining unpaid shall be due, including an acceleration by reason of sale, conveyance, further encumbrance or other default (which acceleration shall be at John Hancock's sole option), there shall be due, in addition to the outstanding principal balance, accrued interest and other sums due under the Loan Documents, a premium equal to the greater of:

(i)   The sum obtained by adding:

(aa)  the positive amount, if any, equal to (x) the sum of the present values of all scheduled payments due under the Note from the date of said payment to and including the maturity date of the Note, minus (y) the then outstanding principal balance of the Note, and

(bb)  0.00% of the then outstanding principal balance of the Note; or

(ii)  An amount equal to 7.00% of the then outstanding principal balance of the Note.

Application No  6518467

All present values shall be calculated as of the date of said payment, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in the Wall Street Journal or other business publication of general circulation five (5) business days before the date of said payment.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

In the event default occurs on or after the date on which prepayment is permitted, then in lieu of the above premium, payment of a premium calculated in the manner set forth in Condition 3(g) hereof shall be required.

A tender of the amount necessary to satisfy the entire indebtedness, paid at any time following such default or acceleration, including at a foreclosure sale, shall be deemed a voluntary prepayment, and, at John Hancock's option, such payment shall include a premium as described above.

(e) FINANCIAL STATEMENTS: A covenant to the effect that the Borrower will furnish to John Hancock within ninety (90) days after the end of each fiscal year a statement of Borrower's financial condition, including a balance sheet and profit and loss statement and a statement of annual income and expenses satisfactory in form and substance to John Hancock in connection with the operation of the Security, in detail satisfactory to John Hancock, prepared, audited and certified by a certified public accountant who is a member of the American Institute of Certified Public Accountants; and in addition, within forty-five (45) days after the end of each fiscal quarter of Borrower, Borrower shall provide the above information except that it may be prepared and certified by the financial officer of Borrower who is responsible for the preparation of such annual financial statements.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is office, retail or multi-tenant industrial property, shall be a certified current rent roll, which shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase options and/or co-tenancy requirements, and any and all other fees paid by tenants and security deposits currently held.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is multifamily property, mobile home park, congregate care property or self-storage facility, shall be a certified current rent roll, which shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, and any and all other fees paid by tenants, including but not limited to utility reimbursements, and security deposits currently held.

For all other property types, accompanying the submission of the certified statements of annual and quarterly income and expenses shall be such additional financial information as John Hancock shall require.

(f) DUE ON SALE: A covenant to the effect that if the Borrower, whether voluntarily or by operation of law, sells, assigns or otherwise transfers the Security or any portion thereof or enters into an installment sale contract or similar agreement, without the prior written consent of John Hancock, or if a change shall occur in the ownership or control of the Borrower or Borrower permits or suffers any merger, consolidation or dissolution or syndication affecting Borrower, or permits or suffers the transfer, sale, assignment or pledge of any interest in Borrower or any entity or person, directly or indirectly, controlling Borrower or any general partner or member of Borrower (if applicable), whether at one time or in a series of related or unrelated transfers without the prior written consent of John Hancock, such event shall constitute a default under the Loan Documents; and John Hancock shall have the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

Notwithstanding the foregoing, John Hancock will permit a one-time transfer of the Real Estate Security together with assumption of the Loan during the term of the Loan, subject to John Hancock's prior written approval, provided that:

6

Application No. 6518467

(i)    no default or event which with the giving of notice or the passage of time would constitute a default under the Loan Documents shall have occurred and remain uncured;

(ii)    the proposed transferee (the "<u>Transferee</u>"), the proposed guarantors of non-recourse carveouts, and the proposed indemnitors of environmental liabilities shall be reputable entities or persons of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by John Hancock;

(iii)    the Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Security, and John Hancock shall be provided with reasonable evidence thereof (and John Hancock reserves the right to approve the Transferee without approving the substitution of the property manager);

(iv)    John Hancock receives a written request for approval from the Borrower at least sixty (60) days prior to the proposed transfer (including a description of the proposed terms of the transfer), together with a diagram as described in Exhibit F showing the structure of the Transferee, the proposed guarantor of non-recourse carveouts and the proposed indemnitor of environmental liabilities, and all of the constituent entities of each, after the contemplated transfer, and a list of the names, types of interests and ownership percentages of all persons to have ownership interests in any of the foregoing or any constituent entity thereof, financial statements, including a completed Exhibit G, for all such entities and an administrative fee of $5,000.00, which shall be deemed fully earned on the date of receipt and shall be retained by John Hancock regardless of whether or not the transfer occurs and whether or not approval is given;

(v)    The Transferee executes and delivers to John Hancock a Loan assumption agreement and delivers a guaranty of non-recourse carveouts from an approved guarantor and a separate environmental indemnity agreement from an approved indemnitor, and such other documentation as John Hancock may require, in form and substance satisfactory to John Hancock;

(vi)    John Hancock and its counsel receive (aa) certification from Borrower and the Transferee that the proposed terms of the transfer described in subparagraph (iv) of this Condition 6(f) are the actual terms of the transfer, (bb) evidence of casualty insurance and other applicable insurance, (cc) all corporate, partnership or other entity documents, and (dd) all other certificates, legal opinions, title materials and other documents which John Hancock may require, all in form and substance satisfactory to John Hancock, at least 30 days prior to the proposed transfer;

(vii)    John Hancock be provided satisfactory evidence concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change on the ability to generate a cash flow sufficient to pay the debt service on the Loan and to maintain a debt service coverage ratio satisfactory to John Hancock;

(viii)    John Hancock shall have received in writing evidence from the Rating Agencies to the effect that such transfer will not result in a re-qualification, reduction or withdrawal of any rating initially assigned or to be assigned in a secondary market transaction together with such legal opinions as may be requested by the Rating Agencies. The term "<u>Rating Agencies</u>" as used herein shall mean each of Standard & Poor's Ratings Group, Moody's Investors Service, Inc., Duff & Phelps Credit Rating Co., Fitch Investors Service, Inc. or any other nationally-recognized statistical rating agency who shall then be rating the certificates or securities issued in connection with the secondary market transaction;

(ix)    the Transferee and its constituent entities shall comply with all requirements pertaining to the Borrower's being a Special Purpose/Bankruptcy Remote Entity (as hereinafter defined) contained in this Application and in the Loan Documents;

(x)    the Transferee shall have delivered to John Hancock such legal opinions and title insurance endorsements as may be reasonably requested by John Hancock; and

7

JH 00964

Application No. 6518467

(xi) John Hancock shall have received an assumption fee equal to one percent (1%) of the then unpaid principal balance of the Note (against which the administrative fee shall be credited) in addition to the payment of all costs and expenses incurred by John Hancock in connection with such assumption (including reasonable attorney's fees and costs).

(g) OTHER INDEBTEDNESS AND LIENS: A covenant to the effect that no indebtedness (whether secured or unsecured) other than the Loan, no encumbrances other than those approved by John Hancock in its sole discretion in connection with the Closing, and no liens other than that of the Loan, shall be permitted to be secured by the Security, or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and any violation thereof shall be a default under the Loan Documents and shall give John Hancock the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

(h) USE OF SECURITY: A representation, warranty and covenant to the effect that the Security will at all times be operated as a **Class A Apartment** and for no other purpose.

(i) CONDOMINIUM OR COOPERATIVE: A covenant to the effect that Borrower has not filed and will not file a declaration of condominium, map or any other document having the effect of subjecting the Security to the condominium or cooperative form of ownership.

(j) FEES: A covenant to the effect that John Hancock may charge administrative fees and be reimbursed for all costs and expenses, including reasonable attorneys' fees and disbursements, associated with reviewing and processing post-closing requests of Borrower.

(k) DISCLOSURE: A representation and warranty to the effect that Borrower has fully disclosed to John Hancock all facts material to the Security, the Borrower, the Borrower's business operations and each guarantor listed in Condition 44 of this Application and each guarantor, if any, of the Loan required pursuant to this Application (collectively "Guarantors"), and each indemnitor of environmental liabilities listed in Condition 11(d)(ii)(cc) of this Application (collectively "Indemnitors"); and a misrepresentation or breach of any representation, warranty or covenant made in this Application shall be a default under the Loan Documents.

7  TITLE, TITLE EVIDENCE AND TITLE INSURANCE

(a) The title to the Real Estate Security and Personal Property Security and all documentation pertaining thereto shall be satisfactory in all respects to John Hancock and its counsel.

(b) Borrower shall furnish to John Hancock a policy of title insurance satisfactory in form and substance to John Hancock and its counsel issued by a title insurance company acceptable to John Hancock, in an amount not less than the amount of the Loan, insuring John Hancock and its successors and assigns that the Mortgage is a valid, first and prior lien on the Real Estate Security, subject only to such exceptions to and conditions of title as John Hancock may approve, and containing such endorsements as John Hancock may require. The seven (7) title companies (the "Title Companies") which are named below are acceptable to John Hancock. To facilitate the Closing, Borrower may wish to consider choosing one of them. Notwithstanding the foregoing, John Hancock's providing this information is merely to expedite the Closing of the Loan, and John Hancock is not responsible for the performance of any of said Title Companies. Borrower further acknowledges and agrees that whichever title company is selected, will provide their services directly to Borrower; and John Hancock is not responsible for any fees, costs or expenses of said company. Subject to the approval of John Hancock, Applicant hereby designates the following title insurance company as the title insurer for the loan:

Application No. 6518467

Name of Title Insurance Company:

1. ☐  First American Title Insurance Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

2. ☐  Chicago Title Insurance Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

3. ☐  Commonwealth Land Title Insurance Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

4. ☐  Lawyers Title Insurance Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

5. ☐  Transnation Title Insurance Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

6. ☐  Stewart Title Guaranty Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

7. ☐  Old Republic National Title Company
       Contact Person:
       Address:

       Telephone Number:
       Telecopy Number:

Ed. 1/28/2004

JH 00966

Application No. 6518467

In the event Applicant wishes to select a title company other than one of those listed above, Applicant must submit a written request to John Hancock. If title company is acceptable to John Hancock in its sole discretion, it will be approved in writing by John Hancock and will be included in the definition of Title Company.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the title insurance company, or the issuing agent, if a title company other than one of the Title Companies has been selected. John Hancock hereby reserves the right to impose reinsurance requirements and to approve the Closing medium, all in its sole discretion.

(c) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the Title Company John Hancock's title requirements. Applicant further agrees to provide the Title Company said written notification to proceed immediately after Rate Lock. It is understood that the Title Company will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Title Company whether or not the Loan Closes and for ensuring that the Title Company and title policy satisfy all the conditions of this Application.

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the preliminary evidence of title insurance satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock.

(e) Borrower shall furnish to John Hancock a chattel search certificate or other similar evidence satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock showing that such security interest is a first lien on the Personal Property Security, which evidence shall be updated through the date of Closing.

8   THE SURVEY

(a) Borrower shall furnish John Hancock a current instrument survey of the Real Estate Security, satisfactory in form and substance to John Hancock and its counsel, prepared by a licensed surveyor acceptable to John Hancock and its counsel and certified by such surveyor to John Hancock and its successors and assigns and to the title insurance company insuring the Loan, pursuant to a certification in form and substance satisfactory to John Hancock and its counsel, showing all final improvements, physical conditions and all other matters affecting the title to, use of and zoning of the Real Estate Security as required by John Hancock.

(b) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the surveyor designated below John Hancock's survey requirements. Applicant further agrees to provide the surveyor written notification to proceed immediately after Rate Lock. It is understood that the Surveyor will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Surveyor whether or not the Loan Closes and for ensuring that the Surveyor and the survey satisfy all the conditions of this Application.

(c) The name and address of Applicant's surveyor are set forth below:

Name of Surveyor:   **Stout & Traconelli Associates**
Address:            **2499 Knights Road, Pennsburg, PA 18073**
Phone No            **215-679-0200**

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the survey described in subparagraph (a) of this Condition 8 no later than twenty-one (21) days from the date of Rate Lock.

9   BORROWER REQUIREMENTS

(a) If the Borrower is a limited partnership, a limited liability company, or a corporation, or any other form of entity, then no later than fourteen (14) days from the date of acceptance by John Hancock of this Application,

10

JH 00967

Application No 6518467

Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, full and complete copies of the Borrower's partnership certificates and filings and partnership agreement, operating agreement, corporate articles, by-laws and resolutions or other organizational documents, as the case may be, which shall be satisfactory in form and substance to John Hancock and its counsel. In the event any of the foregoing need to be amended to comply with Condition 9(c) or any condition of this Application, said amended documents shall be furnished to John Hancock, or to John Hancock's Special Counsel designated herein, if any, no later than thirty (30) days from the date of acceptance by John Hancock of this Application.

(b) Borrower shall furnish evidence satisfactory to John Hancock and its counsel that the Borrower has, and the persons signing on behalf of the Borrower have, the legal capacity and authority to enter into this transaction and to execute the Loan Documents.

(c) Special Purpose/Bankruptcy Remote Entity. The Borrower must be one of the following types of entities: (aa) a corporation which meets the requirements of SPE (as defined below), (such corporation hereinafter referred to as an "SPE Corporation"), (bb) a limited partnership, in which at least one of its general partners is an SPE Corporation, (cc) a limited liability company, having a minimum of two members, one of which is an SPE Corporation, or (dd) a general partnership, in which at least two of its general partners are SPE Corporations. The following additional requirements shall apply. The Borrower must be now, or prior to Closing must become, a special purpose and bankruptcy remote entity ("SPE"). In general, this includes but is not limited to the following requirements:

(i)   The activities of Borrower must be limited by its organizational documents to the ownership and operation of the Security.

(ii)  The activities of the SPE Corporations must be limited by their organizational documents to the ownership of interests in the Borrower.

(iii) Borrower and its SPE Corporations must be limited by their organizational documents from owning any property unrelated to the Security.

(iv)  Borrower and its SPE Corporations must be prohibited by their organizational documents from incurring any indebtedness, secured or unsecured, other than, with respect to the Borrower, the Loan, and (aa) incurred in the ordinary course of business to vendors and suppliers of services to the Real Estate Security, (bb) not secured by the Security, or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and (cc) not accompanied by any rights to control or to obtain control of the Borrower or any constituent entity thereof.

(v)   Each of Borrower and its SPE Corporations must maintain separate assets, bank accounts, operations, books and records and tax returns so that it is not costly or difficult to segregate its assets and operations from those of any affiliate or any other person.

(vi)  Each of Borrower and its SPE Corporations must do all other things necessary, in the opinion of John Hancock's legal counsel, to establish and maintain its existence as an SPE.

(vii) Borrower and its SPE Corporations must be prohibited by their organizational documents from dissolving, liquidating, consolidating or merging, or selling all or substantially all of the assets of the Borrower or its SPE Corporations or transferring all or substantially all of the assets of the Borrower or its SPE Corporations, or engaging in any other business activity.

(viii) For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the organizational documents of Borrower and its SPE Corporations must require a unanimous vote or consent of the Borrower's directors, partners or members, as applicable, and the unanimous consent of the directors of the SPE Corporations, if applicable, to file a petition for bankruptcy protection or obtain any other relief from its creditors.

(ix)    For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the board of directors of Borrower or its SPE Corporations, if applicable, must include at least one Independent Director whose consent shall be required before such Borrower or its SPE Corporations shall be permitted to file for bankruptcy protection, or obtain any other relief from its creditors, on behalf of such Borrower or its SPE Corporations. Independent Director shall mean a director of the special-purpose, bankruptcy remote corporation serving as the Borrower or the SPE Corporations of the Borrower, who is not at the time of initial appointment and has not been at any time during the preceding five (5) years: (a) a stockholder, director, officer, employee or partner of such corporation, the Borrower or any affiliate of either of them; (b) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the corporation, the Borrower or any affiliate of either of them; (c) a person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other person; (d) an attorney or counsel to such corporation, the Borrower or any affiliate of either of them or (e) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other person. (As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.)

(x)    Non-Consolidation Opinion. For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the Borrower's legal counsel (who must be satisfactory to John Hancock's legal counsel) shall provide an opinion, in form and substance satisfactory to John Hancock's legal counsel to the effect that a bankruptcy proceeding involving,

   (aa)    the parent or an affiliate (including without limitation any affiliated property manager) of the Borrower,

   (bb)    a member, partner or shareholder of the Borrower, or

   (cc)    a partner of a partnership, a member of a limited liability company or shareholders of a corporation, which partnership, limited liability company or corporation serves as a special purpose, bankruptcy remote general partner or managing member of the Borrower,

shall not cause (1) the assets of the Borrower (including without limitation the Security) to be substantively consolidated with the assets of its bankrupt parent, affiliate, member, partner or shareholder and, (2) if applicable, the assets of the SPE Corporations of the Borrower to be substantively consolidated with the assets of its bankrupt partner, member or shareholder.

(xi)    Fraudulent Conveyance and Other Required Opinions. If the Security was transferred to the Borrower by an affiliated entity, John Hancock may require an additional opinion to establish that the transfer of the Security to the Borrower cannot be avoided as a fraudulent conveyance or pursuant to similar laws which would cause the Security to be included among the assets or estate of the transferor.

10. COMPLIANCE WITH ZONING, BUILDING LAWS, SUBDIVISION
     AND OTHER LAWS, REGULATIONS, ETC. AND SEPARATE TAX PARCEL

John Hancock shall be furnished within twenty-one (21) days of Rate Lock with evidence satisfactory in form and substance to John Hancock and its counsel, including, without limitation, affirmative title insurance in the form of an ALTA 3.1 (or CLTA 123.2) title endorsement (modified to cover parking) if issued in the jurisdiction where the Real Estate Security is located and a letter from the municipality evidencing that the Real Estate Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto. If said title endorsement is not issued in the jurisdiction, both an opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required. John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Real Estate Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel. John Hancock shall be provided with evidence that the Security and the use thereof

12

Application No. 6518467

comply with all building laws, ordinances, rules and regulations, including without limitation, permanent and unconditional certificates of occupancy and all other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, and evidence of rebuildability, all of which shall be satisfactory in form and substance to John Hancock and its counsel.

11. COMPLIANCE WITH ENVIRONMENTAL LAWS; LOAN DOCUMENTS

(a) Applicant furnishes to John Hancock herewith an environmental certificate and questionnaire (the "Environmental Certificate") completed and executed by Applicant, attached hereto and made a part hereof marked Exhibit C, which Applicant acknowledges is subject to the approval of John Hancock. Applicant agrees that the Closing of the Loan is conditioned upon the continued accuracy of the representations, warranties and certifications contained in Exhibit C.

(b) John Hancock shall also be furnished with such additional evidence as it may require, and satisfactory in form and substance to John Hancock and its counsel, that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, together with all certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, including without limitation, an engineering report in form and substance satisfactory to John Hancock and a certification by an engineer satisfactory to John Hancock and its successors and assigns, whose fees and expenses shall be paid by Applicant and/or Borrower, as to the structural and mechanical sufficiency of the improvements and equipment to meet municipal, state and federal environmental requirements.

(c) The Applicant shall provide to John Hancock an assessment, in form and substance satisfactory to John Hancock and its counsel, by one or more qualified registered professional engineers, hydrologists, or other scientists approved by John Hancock, whose report or reports shall be certified to John Hancock and its successors and assigns and the Applicant and whose fees and expenses shall be paid by the Applicant, and which shall be dated no earlier than one hundred eighty (180) days prior to the Closing, that based on a visual inspection and a thorough review of historical uses of the Real Estate Security and neighboring lands, review of all lists of actual or suspected sites of releases which are published by federal or state agencies, consultation with local officials and a records check of local agencies and authorities who might be knowledgeable with respect to the Real Estate Security:

(i) there exists no evidence of the past or ongoing release or threatened release at, upon, under, or within, or of the past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials, which term shall in this Application include hazardous waste, as that term is defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5), hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C §9601(14), pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM") and volatile organic compounds, including oil and petroleum products; and

(ii) there exists no evidence that ACM, polychlorinated biphenyls (PCBs), Mold (defined as the presence of any form of (i) multicellular fungi that live on plant or animal matter and an indoor environment (including without limitation Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor and Stchybotrys chartarum (SC) often found in water damaged building materials), (ii) spores, scents or byproducts produced or released by fungi, including mycotoxins and (iii) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living (collectively "Mold") or radon gas is present at the Real Estate Security.

If, in John Hancock's sole discretion, the report or reports provided pursuant to subparagraphs (b) and/or (c) above; the answers to any questions on the Environmental Certificate attached hereto as Exhibit C; the provisions of any federal, state, or local laws; and/or any other information which John Hancock has obtained

13

Application No. 6518467

so warrants, John Hancock may require, as a further condition to Closing the Loan, a further report at the Borrower's expense that there exists no evidence of the discharge, migration, or presence of Hazardous Materials, ACM, PCBs, Mold and/or radon gas at the Real Estate Security, said further report to be based on, in John Hancock's sole discretion, soil and groundwater sampling and monitoring, and/or sampling and analysis of building materials.

(d) The Loan Documents will contain, without limitation:

    (i)    warranties and representations by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

        (aa)    to the best of Borrower's knowledge, there have been no releases or threatened release at, upon, under, or within, nor past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials; and

        (bb)    Borrower has not received any notice from any governmental authority or from any tenant or other occupant or from any other person with respect to any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security; and

        (cc)    to the best of Borrower's knowledge, there is no ACM, PCBs, Mold or radon gas at or within the Real Estate Security; and

    (ii)    covenants by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

        (aa)    Borrower has not been, is not, and will not become involved in operations at the Real Estate Security which could lead to the imposition on Borrower of liability under RCRA, CERCLA, or any similar applicable federal or state laws or regulations;

        (bb)    Borrower will strictly comply with the requirements of RCRA, CERCLA, and all similar applicable federal and state laws and regulations, and of all federal and state laws and regulations relating to ACM, PCBs, Mold and radon gas, and will notify John Hancock of any release of Hazardous Materials at, upon, under, or within the Real Estate Security involving Borrower, or of the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, or of the receipt by Borrower of any notice from any governmental agency or authority or from any tenant or other occupant or from any other person with respect to any alleged such release or presence, promptly upon discovery of such release or presence or receipt of such notice, and will send John Hancock copies of all results of tests of underground storage tanks at the Real Estate Security; and

        (cc)    Notwithstanding any provisions in the Loan Documents limiting or negating Borrower's personal liability, Applicant, Borrower and **James R. Koller, Frank C. Palopoli & Joseph P. Kelly**, individually, will jointly and severally indemnify and hold John Hancock harmless from and against any and all loss, cost, damage, liability, and expense, including attorneys' fees, suffered or incurred by John Hancock in connection with this Loan, at any time, whether before, during, or after enforcement of its rights and remedies upon default, on account of any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security, or resulting from the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, including with respect to (i) the imposition by any governmental authority of any lien or so-called "super priority lien" upon the Real Estate Security, (ii) clean-up costs, (iii) liability for personal injury or property damage or damage to the environment, and (iv) fines, penalties, and punitive damages; provided, however, that the obligation of Applicant and the Indemnitors to indemnify John Hancock shall not apply to any release or presence of Hazardous Materials which (1) first occurs after (A) a repayment of the Loan in full in accordance with the Loan Documents, or (B) acquisition of title by John Hancock upon a foreclosure and surrender of possession and occupancy of the Security by Applicant and the Indemnitors, their agents, affiliates, employees and independent contractors, and (2) with respect to both (1) (A) and (1) (B) above, is not due to any action occurring prior to such repayment or acquisition.

14

Application No. 6518467

The Applicant, Borrower, Guarantors and Indemnitors shall have the burden of proving that the conditions in the foregoing clauses (1) and (2) were satisfied by clear and convincing evidence and shall continue to defend with counsel reasonably satisfactory to John Hancock and shall indemnify and hold harmless John Hancock for all matters set forth in Section 11(d)(ii)(cc), unless a court of competent jurisdiction finds that Indemnitors have met such burden.

(e) The Loan Documents will contain, without limitation, in form and content satisfactory to John Hancock and its counsel, (i) provisions to the effect that at any time while the Loan is outstanding, John Hancock may (but will not be obliged to) enter the Real Estate Security to make reasonable inspections of its condition, including but not limited to soil and groundwater sampling and monitoring, and including but not limited to inspections for Hazardous Materials, ACM, PCBs, Mold and/or radon gas, (ii) warranties and representations by Borrower that all of the answers on the Environmental Certificate attached hereto as Exhibit C are true and complete, (iii) covenants by Borrower that Borrower will notify John Hancock in writing immediately upon learning that any of the answers on the Environmental Certificate either was not true when made or is no longer true, and (iv) provisions to the effect that any event which causes any of the answers on the Environmental Certificate to be no longer true, or John Hancock's learning that any of the answers on the Environmental Certificate were not true when made, shall, if the change is in John Hancock's sole determination adverse, constitute a default under the Loan Documents, giving John Hancock all the rights and remedies available to it upon a default by Borrower.

(f) The title insurance required by Condition No. 7 shall include, if available in the jurisdiction where the Real Estate Security is located, affirmative assurances (i) that no liens or notices affecting the Real Estate Security or any part thereof under RCRA, CERCLA, or any similar applicable federal and state laws have been placed of record in any place of public record and (ii) that the records of the state environmental agency have been examined, and that no expenditures for clean-up of hazardous materials at the Real Estate Security have been incurred by any government agency or authority.

12. COMPLETION

Prior to Closing, all construction of buildings and other improvements shall be completed to the satisfaction of John Hancock.

13. THIRD PARTY INSPECTIONS

Borrower is obligated to deliver to John Hancock within thirty (30) days of the date of Rate Lock the reports and materials described below in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock:

(a) a structural report prepared by an engineer acceptable to John Hancock who will (i) conduct an engineering study of the Real Estate Security satisfactory to John Hancock including, without limitation, an inspection of the structural, mechanical, electrical, plumbing and roof systems and, if required, a termite inspection, and (ii) make an Americans with Disabilities Act review; and where applicable, a seismic study satisfactory to John Hancock, prepared by an engineer acceptable to John Hancock (collectively, "Property Condition Assessment");

(b) an environmental assessment or assessments (collectively, "Environmental Assessment") prepared by an environmental consultant acceptable to John Hancock who will perform a Phase I environmental assessment of the Real Estate Security as further described in Condition 11, and a Phase II environmental assessment, if recommended in the Phase I report and John Hancock determines that such additional assessment is advisable; and

(c) an appraisal (the "Appraisal") by a state licensed appraiser acceptable to John Hancock who will provide an appraisal acceptable to John Hancock as more fully described in Condition 14.

Reports from other third party contractors may be required to evaluate any issues raised in the underwriting process.

15

Ed 1/28/2004

JH 00972

Application No. 6518467

Applicant hereby designates, subject to approval by John Hancock, the following third party professionals:

Engineer:      **Con-Tech Services Inc., 388 Reed Road, Bldg.#1, 2nd Floor, Broomall, PA 19008**

Environmental
Consultant:    **RT Environmental**

Appraiser:     **Cushman & Wakefield, Att; Jerry McNamara, Bell Atlantic Tower, 1717 Arch
Street, 30th Floor, Philadelphia, PA 19103**

John Hancock is not responsible for the performance of said third party professionals. Applicant further acknowledges and agrees that said professionals will provide their services directly to Applicant.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the third party professionals. John Hancock hereby reserves the right to approve the third party professionals.

The costs of and in connection with reports from all third party professionals required pursuant to Condition 13 are defined as "Third Party Report Fees".

In order to facilitate the Closing process, Applicant hereby authorizes John Hancock to contact the third party professionals designated above, and to instruct them on behalf of Applicant to commence work as soon as possible after Rate Lock. It is understood that the third party professionals will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the third party professionals whether or not the Loan closes, and for making sure that the third party professionals and said reports satisfy all the conditions of this Application

14.  <u>APPRAISAL</u>

John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser acceptable to John Hancock with no interest, direct or indirect, in the Security or in any loan made on the Security, and whose compensation is not affected by the approval or disapproval of the Loan. The appraisal shall be addressed to John Hancock and its successors and assigns. The appraisal must support a loan-to-value ratio of not more than **75.00%**, calculated as determined by John Hancock in its sole discretion

15.  <u>LEASE REQUIREMENTS</u>

(a)  If the Security is occupied by any tenants under Space Leases, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on the rent roll attached hereto as Exhibit B and made a part thereof, and fully executed copies of the Space Leases so listed have already been delivered or are forwarded to John Hancock with this Application. The rent roll shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase option and/or co-tenancy requirements, any and all other fees paid by tenants, and security deposits currently held.

(i)   All additional Space Leases which are entered into prior to Closing, shall be furnished to John Hancock immediately upon execution thereof;

(ii)  All Space Leases and Other Leases shall be satisfactory in form and substance to John Hancock;

(iii) Prior to Closing, John Hancock shall be furnished with a Tenant's Estoppel Certificate in the form attached hereto and made a part hereof marked Exhibit E, executed by each tenant under each Space

Ed 1/28/2004                                                                                          JH 00973

Application No. 6518467

Lease and each other Lease, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities;

(b) If the Security consists of a multifamily property, a mobile home park, a congregate care property or a self-storage facility, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on a rent roll attached hereto as Exhibit B and made a part hereof. The rent roll shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, any and all other fees paid by tenants including but not limited to utility reimbursements, and security deposits currently held.

16  RENTAL AND DEBT SERVICE COVERAGE REQUIREMENTS.

(a) On the Closing Date rents at the rate of not less than **$4,221,126.00** per annum in the aggregate shall be currently collectible from actual occupants of the Security under Space Leases that are in form, for periods and at rentals satisfactory to John Hancock, under which Space Leases there shall be no concessions, free rent or rebates.

(b) On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues and expenses as John Hancock determines are appropriate.

17.  SUBORDINATION OF LEASES AND MANAGEMENT AGREEMENTS

John Hancock may, at its sole option, require (a) that any or all Space Leases and Other Leases and management agreements and other agreements affecting the Real Estate Security or Personal Property Security be made absolutely subject and subordinate to the lien of the Mortgage, (b) that any or all such Space Leases and Other Leases and agreements be made superior and prior to the Mortgage, or (c) that, except for Loans on multifamily properties, mobile home parks, congregate care properties or self-storage facilities, prior to Closing, John Hancock shall be furnished with a Subordination Non-Disturbance and Attornment Agreement in form and substance satisfactory to John Hancock, in its sole discretion, executed by each tenant required by John Hancock.

18.  ESTABLISHMENT ON CLOSING DATE OF RESERVE FUNDS

(a) TAXES AND OTHER CHARGES:  On the Closing Date Borrower will establish with John Hancock, a reserve fund in an amount satisfactory to John Hancock from which to pay taxes, assessments, liens, charges, hazard insurance premiums and ground rents, if any.

(b) REPLACEMENT RESERVE:  Borrower will be required to make monthly deposits pursuant to an approved capital expenditure budget equal to one twelfth (1/12) of the amount estimated by John Hancock to be necessary for capital repairs or replacements to the Real Estate Security during each calendar year.  John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

(c) TENANT IMPROVEMENT AND LEASING COMMISSION RESERVE:  Borrower may be required to make monthly deposits for tenant improvements and leasing commissions in amounts determined by John Hancock.

(d) IMPROVEMENTS/REPAIR AND REMEDIATION RESERVE:  In the event John Hancock's Property Condition Assessment, Environmental Assessment or any other report detects any deferred maintenance or other repair items, or the possibility that any Hazardous Materials described in Condition 11 are located in, on or under the Real Estate Security, and if John Hancock in its sole discretion approves the Loan for Closing, then a reserve with John Hancock equal to one hundred twenty-five percent (125%) of John Hancock's estimated cost to repair or remediate such items (as determined by a qualified engineer or environmental consultant, as the case may be, retained by John Hancock on behalf of Applicant, at Applicant's expense) will be established by Borrower at the Closing of the Loan and will be maintained until completion of the repairs or remediation, as

17

JH 00974

Application No. 6518467

determined by John Hancock. John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

19. INSURANCE

Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may require, satisfactory in form and substance to John Hancock, which insurance shall comply with the provisions of the Loan Documents pertaining to such insurance, and be issued by companies satisfactory to John Hancock and licensed to do business in the state where the Real Estate Security is located.

The policies for the insurance required above shall be delivered to John Hancock at least seven (7) days prior to the Closing of the Loan. All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance and provide full extended coverage, naming John Hancock and its successors and assigns as first mortgagee and otherwise covering John Hancock's interest in the Real Estate Security in a manner satisfactory to John Hancock.

20. FINANCIAL STATEMENTS

Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion. In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock.

21. CLOSING AND OTHER COSTS

Unless specifically stated to the contrary herein, whether or not the Loan closes, Applicant and Borrower shall be jointly and severally liable to pay on the earlier of the Closing date or termination of this Application all costs pertaining to the Loan and the Closing, including, without limitation, all Third Party Report Fees, all charges for title examination and title insurance and escrow, all survey costs, all recording and filing fees, all mortgage or similar taxes, and all attorneys' fees and costs of John Hancock (collectively "Costs").

22. BORROWER'S COUNSEL

The name, address and telephone number of counsel for the Borrower to be contacted by John Hancock's counsel are as follows:

Name:          Mitchell E. Russell
Address:       510 Township Line road, Suite 150, Blue Bell, Pa 19422
Telephone No : 215-653-0110
Fax No.:       215-653-0383

23 OPINION OF COUNSEL

Applicant and/or Borrower shall provide John Hancock on or prior to the Closing Date with an opinion satisfactory in form and substance to John Hancock and its counsel dated as of the Closing Date from an attorney approved by John Hancock and its counsel and, in addition, at John Hancock's option, from its counsel, that, among other things:

(a) the Borrower, if an entity, the Guarantors and Indemnitors, if entities, and all constituent entities thereof, are duly formed, validly existing and in good standing,

(b) the Borrower and any entity executing Loan Documents on behalf of Borrower or in addition to Borrower (e.g. owners of subordinated fees, Guarantors and Indemnitors) and all other constituent entities, if any, are duly authorized to execute, deliver and perform the obligations under the Loan Documents,

JH 00975

Ed. 1/28/2004

(c) the Loan Documents are legal, valid, binding and enforceable in accordance with their terms,

(d) the Loan Documents do not violate any law, regulation or ordinance, and

(e) the Loan Documents do not conflict with the Borrower's or any Guarantor's or Indemnitor's by-laws or any other documents creating or giving the Borrower or any Guarantor or Indemnitor authority, and are not in violation of or in conflict with any other agreement of Borrower or any Guarantor or Indemnitor.

If the Loan is in the principal amount of $15 million or more or if the box is checked, the opinions set forth in Conditions 9(c)(ix) and (x) shall be delivered.

Borrower will provide John Hancock and its counsel with the proposed form of said opinion no later than fourteen (14) days from the date of acceptance of this Application by John Hancock.

## 24. COOPERATION AND DISCLOSURE

Applicant, Borrower, each Guarantor and each Indemnitor acknowledge: (a) that John Hancock has advised them that it may sell, assign, pledge, securitize, participate or otherwise transfer the Loan or any interest therein, in whole or in part, (such transaction being called a "Transaction"), (b) that John Hancock may use and disclose in connection with such Transaction any information it receives in connection with the Loan and that such information will be reviewed and relied upon by John Hancock, its advisers, attorneys, underwriters, placement agents, rating agencies, investors and potential investors in connection with such Transaction, and (c) that they agree to cooperate in the Transaction and to provide required information at their own cost and expense.

## 25. REPRESENTATIONS, WARRANTIES AND COVENANTS

Applicant, Borrower and, as applicable, each Guarantor, and each Indemnitor, represent and warrant as follows in connection with this Application: (a) all material information submitted or to be submitted in connection with this Application and the Loan is or will be, respectively, true, correct and complete, including, but not limited to, the information on Exhibits B and G and the rent roll attached to this Application; (b) the financial and operating statements and other accounting information submitted, in connection with the Application are true, correct, complete, and fairly present the financial condition of the Applicant, Borrower, Guarantors and Indemnitors and their respective Principals and have been prepared consistent with proper accounting standards; (c) there is no litigation, action, claim, or other proceeding, pending or threatened which might, in any way, materially and/or adversely affect the Applicant, Borrower, any Guarantor, any Indemnitor or the Principals of any of them, or the Security, John Hancock's proposed first lien thereon, or the financial condition of the Security or any of the aforementioned persons; (d) that their respective Principals are truly, accurately, and completely described on Exhibit F; (e) neither the Applicant, the Borrower, any Guarantor and Indemnitor, nor their respective Principals has received notice of, or is otherwise aware of, any condemnation or other action against the Security; (f) Applicant and/or Borrower and/or the Security possess adequate assets, leases, licenses, franchises, rights, governmental and other permits, certificates, consents and approvals to conduct and/or operate the business of the Security and none of the foregoing contains any term or condition that is materially burdensome or different from those possessed or held by other parties conducting or operating a similar business; and (g) each has fully disclosed to John Hancock all facts material to the Security and the operation and tenants thereof, and all facts material to the Applicant, the Borrower, each Guarantor and each Indemnitor and their respective Principals and the background, creditworthiness, financial condition and the business operations of each

Applicant, Borrower and, as applicable, each Guarantor and each Indemnitor hereby (a) covenants that the foregoing representations and warranties are true, accurate and complete in all respects and will continue to be so from the date hereof through the Closing Date with the same effect as if made on the Closing Date and (b) agrees that the foregoing is a condition to Closing the Loan.

It is understood that other representations, warranties and covenants customary for loans of this nature, will be required by and set forth in the Loan Documents.

19

JH 00976

Application No. 6518467

26. COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and Borrower agree that prior to Closing they will satisfy and otherwise comply with all Terms and Conditions hereof at the earliest possible date, and in any event within any time limits specifically stipulated in the Terms and Conditions hereof, and so as to permit the Closing of the Loan to occur on or prior to the Closing Date, and, pursuant to the foregoing, Applicant and Borrower further agree that they will submit to John Hancock or to John Hancock's counsel, as the case may be, all instruments, documents, evidence, papers, information and other materials pertinent to the Loan, as soon as possible and in any event no later than (a) the date or dates, if any, specifically stipulated in the Terms and Conditions hereof, and (b) where such dates are not so specifically stipulated, twenty-one (21) days prior to the Closing Date.

27. ACCEPTANCE BY JOHN HANCOCK OF THIS APPLICATION

(a) Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committee and John Hancock has accepted this Application in the place provided below, and then said obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

(b) In the event that John Hancock accepts this Application in the place provided below and forwards an executed copy thereof to the Applicant, Applicant will borrow the Principal Amount; and provided that, after such acceptance by John Hancock, Applicant pays John Hancock the Commitment Fee within the time and as otherwise stipulated in condition 30(c) hereof, then John Hancock agrees to make the Loan upon and subject to the provisions contained in the Terms and Conditions hereof, and this Application will thereupon become a Commitment between Applicant and John Hancock.

(c) The acceptance of this Application by John Hancock shall not constitute approval by John Hancock of any leases or other materials heretofore submitted to John Hancock. Such leases and other materials will be the subject of separate communications from John Hancock.

28. ASSIGNABILITY

This instrument and the rights of Applicant and Borrower hereunder shall not be assignable by operation of law or otherwise, and any purported assignment thereof shall be null and void. John Hancock may assign its rights and obligations hereunder to any affiliate.

29. TERMINATION OF THIS INSTRUMENT

(a) In the event that a Rate Lock has occurred or John Hancock accepts this Application, (whether or not Applicant has timely paid the Commitment Fee) John Hancock may terminate its obligation to Close and fund the Loan (and the Rate Lock shall automatically expire) at John Hancock's option and in such manner as John Hancock may determine in the event that:

(i) Applicant or Borrower shall fail to fully and timely satisfy or otherwise comply with any of the Terms and Conditions contained in this instrument,

(ii) there is filed by or against any Applicant, any Borrower any Guarantor or any Indemnitor or Principal of any of them, or any constituent entity of any of them or against any tenant under any Space Lease or Other Lease referred to in Condition 15(a) hereof a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee or liquidator, or if any Applicant, Borrower, Guarantor or Indemnitor, or Principal of any of them or any constituent entity of any of them or any tenant makes an assignment for the benefit of creditors or files a petition for arrangement which is not withdrawn or dismissed, canceled and/or terminated, or which may exist, at the time herein or hereafter established for Closing of the Loan,

JH 00977

Ed. 1/28/2004

Application No. 6518467

    (iii)    there shall occur prior to the Closing Date a material and adverse change in the financial condition of any Applicant, Borrower, or any Guarantor or Indemnitor, or Principal of any of them, or any constituent entity of any of them, or of any tenant referred to in Condition 15(a) hereof,

    (iv)    the Security shall suffer any material damage or destruction and the same is not restored to the satisfaction of John Hancock prior to the Closing Date,

    (v)    any material information furnished to John Hancock by or on behalf of the Applicant, the Borrower, any Guarantor, any Indemnitor, any Principal of any of them or any constituent entity of any of them is or becomes untrue, incomplete, inaccurate or misleading, or

    (vi)    any representation, warranty or covenant contained in Condition 25 or elsewhere in this Application shall cease to be materially true, accurate and complete.

provided, however, that in the event of such termination of John Hancock's obligation to Close and fund the Loan by John Hancock (and the expiration of the Rate Lock), Applicant and Borrower shall continue to remain liable for all Costs.

(b)    Delay in the exercise of John Hancock's right to terminate said obligations as aforesaid shall not be construed as a waiver of such right by John Hancock to terminate with respect to any of the events specified in subparagraph (a) above, and John Hancock's failure to act as to any such event shall not be construed as a waiver by John Hancock of its rights as to any subsequent event of a similar or dissimilar nature

## 30  APPLICATION, PROCESSING AND COMMITMENT FEES

Applicant and Borrower covenant that they shall pay the following fees in connection with this Application and the Closing of the Loan:

(a)    Processing Fee: A processing fee, payable to John Hancock by cashier's check, in the amount of **$5,000.00** is enclosed herewith/has been paid prior hereto (the "Processing Fee"). This Processing Fee is deemed fully earned upon receipt, is non-refundable and will be retained by John Hancock whether John Hancock accepts this Application and whether or not the Loan Closes.

(b)    Application Fee: An application fee in the amount of **$640,000.00** (the "Application Fee"), payable to John Hancock by cashier's check is enclosed herewith. The Application Fee will be applied as follows:

    (i)    In the event the Loan Closes, John Hancock will return to the Applicant the Application Fee, less all Costs.

    (ii)    Unless the Applicant withdraws or revokes this Application, in the event John Hancock does not accept this Loan Application within sixty (60) days from the date of this Application, and John Hancock and Applicant are unable to agree on a modified Application within that time, John Hancock will return the entire Application Fee to the Applicant.

    (iii)    In the event that, before Rate Lock, Applicant withdraws or revokes this Application, John Hancock will return the Application Fee, less all Costs.

    (iv)    In the event that, after Rate Lock, but prior to John Hancock's acceptance of this Application, Applicant withdraws or revokes this Application, John Hancock will retain the Application Fee and Applicant shall be liable for all Costs.

    (v)    In the event John Hancock accepts this Loan Application and the Loan does not Close, John Hancock will retain the entire Application Fee in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

Application No. 6518467

(c) Commitment Fee: If John Hancock shall accept this Application, then in consideration of such acceptance by John Hancock and in recognition of the significant commercial value thereof, Applicant shall pay to John Hancock within five (5) days of such acceptance by John Hancock $320,000.00, the Commitment Fee. The Commitment Fee will be applied as follows:

   (i)    In the event the Loan Closes, $320,000.00 of the Commitment Fee will be returned to the Applicant.

   (ii)   In the event the Loan does not Close, the Commitment Fee will be retained by John Hancock in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

Payment of the entire amount of the Commitment Fee within the time period herein provided is a condition to Applicant's and Borrower's rights under this instrument.

(d) If John Hancock accepts this Application, and in the event that thereafter:

   (i)    Applicant or Borrower shall fail to satisfy or otherwise comply with any of the Terms and Conditions hereof in timely fashion, or

   (ii)   John Hancock shall terminate this instrument pursuant to Condition 29 hereof, or

   (iii)  in any event, if the Loan shall not have been Closed by the Closing Date or as the same may be extended by John Hancock as provided below, on which date John Hancock's obligation to Close and fund shall expire,

then all obligations of John Hancock hereunder shall thereupon immediately terminate and be of no further force or effect, and John Hancock shall be entitled to recover from Applicant and/or Borrower all damages, losses, costs and expenses suffered or incurred by John Hancock as a result of any of the events described in part (i), (ii) or (iii) of this subparagraph (d), including, without limitation, all such damages, losses, costs or expenses arising from the fact that, in reliance on the agreements of Applicant and Borrower contained herein, John Hancock allocated and set aside assets for the purpose of funding the Loan and made commitments to third parties based thereon, in addition to retention of the Processing Fee, the Application Fee and the Commitment Fee, provided, however, that Applicant and/or Borrower shall also continue to remain liable for all Costs.

31.  LIMITATION OF OUT-OF-POCKET COSTS FOR APPLICANT

Notwithstanding any other conditions of this Application and provided that the Applicant shall use its best efforts to satisfy all of the conditions of this Application, if the Applicant is not at fault in any way and John Hancock in its sole discretion, elects not to Close the Loan because the Security violates any zoning, building or environmental law, ordinance, code, rule, or regulation or the Property Condition Assessment, Environmental Assessment, Appraisal or title evidence are not satisfactory to John Hancock or its Special Counsel, and any of the foregoing problems cannot be cured to the satisfaction of John Hancock and its Special Counsel by monetary payment of a sum certain by the Applicant or Borrower, then John Hancock will return to Applicant any Application Fee or Commitment Fee paid hereunder, less Costs.

32.  EXTENSIONS OF TIME AND WAIVERS OF CONDITIONS

John Hancock reserves the right in its sole and absolute discretion to:

(a) extend the Closing Date specified in Condition 4(b) hereof, as amended by the Rate Lock Confirmation, if Borrower is not ready to close and, if Borrower has not complied with any of the Terms and Conditions hereof by the date herein provided, to extend any such date for the satisfaction of or compliance with such Terms and Conditions hereof, and

(b) waive any of the Terms and Conditions hereof.

Application No. 6518467

Any such extension or waiver, and any amendment or modification of this instrument, shall be in writing and be signed by John Hancock. In no event shall there be any obligation on the part of John Hancock to grant any extensions or waivers, or if any should in John Hancock's sole discretion be granted, there shall be no obligation to grant additional ones.

33. NOTICES

Any notices given hereunder by Applicant or Borrower to John Hancock shall be addressed as follows:

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, Massachusetts 02116
Attn: Real Estate Investment Group

34. PUBLICITY

In the event the Loan contemplated herein is made, John Hancock shall have the right to issue press releases, advertisements and other promotional materials describing John Hancock's participation in the origination of the Loan or the Loan's inclusion in any securitization.

35. GOVERNING LAWS

This Application shall be deemed to be executed and performable in and governed by the substantive laws of Massachusetts.

36. LIMITATION ON LIABILITY

The Loan Documents shall contain language satisfactory to John Hancock which will serve to negate the personal liability of the Borrower, with exceptions for loss, costs or damage arising from the following (collectively "Non-recourse Carveout Obligations"):

(a) Fraud, misrepresentation and waste.

(b) Any rents, issues or profits collected more than one (1) month in advance of their due dates.

(c) Any misapplication of rents, issues or profits, security deposits, and any other payments from tenants or occupants (including, without limitation, lease termination fees) insurance proceeds, condemnation awards, or other sums of a similar nature.

(d) Liability under environmental covenants, conditions and indemnity contained in the Mortgage and separate environmental indemnity agreement.

(e) Personalty or fixtures removed or allowed to be removed by or on behalf of Borrower and not replaced by items of equal or greater value or functionality than the personalty or fixtures so removed.

(f) Failure to pay taxes or assessments prior to delinquency, or to pay charges for labor, materials or other charges which can create liens on any portion of the Security and any sums expended by John Hancock in the performance of or compliance with the obligations of Borrower under the Loan Documents, including, without limitation, sums expended to pay taxes or assessments or hazard insurance premiums or bills for utilities or other services or products for the benefit of the Security.

(g) The unauthorized sale, conveyance or transfer of title to the Security or encumbrance of the Security.

(h) The failure of Borrower to maintain its status as a single purpose, bankruptcy-remote entity pursuant to its organizational documents and the Loan Documents.

23

Ed. 1/28/2004

JH 00980

(i)   Attorney's fees, court costs and other expenses incurred by John Hancock in connection with enforcement of Borrower's or Guarantors' personal liability as set forth herein.

37.   CORRESPONDENT

Applicant and Borrower agree that Carey, Kramer, Pettit, Panichelli & Associates, Inc. is acting solely as an independent contractor in connection with this Application and the Loan and not as an agent for John Hancock, and has no authority to bind or make any agreements, warranties or representations on behalf of John Hancock, and any agreement by said independent contractor in connection with this Application or the Loan or otherwise shall not be binding upon John Hancock.

38.   DISCLOSURE NOTICE

The Applicant is entitled to a statement of the action taken on this Application.  If such action is adverse and the Applicant so requests, the Applicant is entitled to receive the reasons for such action.  The statement of adverse action shall be provided by John Hancock. The Applicant may, within sixty (60) days of the Applicant's receipt of the statement of adverse action, request that John Hancock provide a statement of specific reasons for that adverse action by contacting John Hancock at John Hancock Tower, T-56, 200 Clarendon Street, Boston, Massachusetts 02116, Attention: Timothy J. Malik, telephone (617) 572-3891, and in such event, John Hancock will provide the Applicant the specific reasons for the adverse action within thirty (30) days.  Should John Hancock choose to provide the Applicant with oral notice of the adverse action taken on the Application and the reasons for that action, the Applicant may request written confirmation of those reasons, which will be provided to the Applicant within thirty (30) days of John Hancock's receipt of a written request for confirmation from Applicant.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The Federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

39   ACCESS TO REPORTS AND TO SECURITY

(a)   John Hancock is to be provided a complete credit history for the Applicant, Borrower, the Guarantors, the Indemnitors and the Principals of each (including but not limited to physical record searches for bankruptcy, pending suits, judgments, UCCs and tax liens) in all jurisdictions deemed necessary by John Hancock.  John Hancock is hereby authorized (i) to obtain credit reports on the Applicant, Borrower, each Guarantor and Indemnitor, and their respective Principals, as well as verification of statements made in this Application and any attachments hereto, and (ii) to obtain an environmental records search and a seismic screening with respect to the Security.

(b)   Applicant will give John Hancock and its consultants access to the Security and to Applicant's, the Borrower's, the Guarantors', the Indemnitors' (and those of the Principals of each) books and records to  conduct the investigations required by Condition 13, this Condition 39 and any other required investigations during normal business hours.

JH 00981

40. JOHN HANCOCK'S SPECIAL COUNSEL

The name, address and telephone number of John Hancock's Special Counsel are as follows:

| | |
|---|---|
| Name: | **Robert Schwartz, Esquire** |
| Firm: | **White & Williams** |
| Address: | **One Liberty Place, Suite 1800, 1650 Market Street** |
| City and State: | **Philadelphia, PA 19103-7301** |
| Telephone No. | **215-864-7000 and FAX 215-864-7123** |

41. APPLICANT REPRESENTATION

Applicant hereby warrants and represents that none of the Applicant, the Borrower, any Guarantor or any Indemnitor listed herein, nor any of the Principals (determined as described below) of any of them nor any entity in which any of the foregoing holds or has held an ownership interest has been in default under any loan or been given relief by any lender under the terms of any loan or been subject to a foreclosure or deed-in-lieu of foreclosure or been the subject of any bankruptcy, reorganization or insolvency proceeding, unless this box ☐ is checked.

Principal is determined as follows:

(a) Any individual or entity possessing management or operational control of Applicant, Borrower, any Guarantor or any Indemnitor;

(b) Any person or entity possessing at least 25% of the ownership interests in the Applicant, Borrower, any Guarantor or any Indemnitor;

(c) In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner;

(d) In addition, for a corporation, the Principal(s), will be the majority shareholder(s);

(e) In addition, for a limited liability company, the Principal(s) will be all the member(s) thereof and the majority shareholder(s) of any corporate member and the general partners of any partnership member.

42. AUTHORIZATION FOR DIRECT DEBITS

Borrower hereby agrees to authorize John Hancock to make direct debit entries as described on Exhibit H attached hereto and to execute said written authorization by completing and executing an agreement in the form of said Exhibit H.

43. COMPLIANCE WITH REGULATION U.

No part of the proceeds of the Loan will be used for the purpose (whether immediate, incidental or ultimate) of buying or carrying any margin stock within the meaning of Regulation U (12 CFR part 221) of the Board of Governors of the Federal Reserve System of the United States or for the purpose of reducing or retiring any indebtedness which was originally incurred for any such purpose, or for any other purpose which might constitute this Loan a "purpose credit" within the meaning of such Regulation U.

44. GUARANTORS OF NON-RECOURSE CARVEOUT OBLIGATIONS

**Borrower** and **James R. Koller, Frank C. Palopoli & Joseph P. Kelly** will guaranty the Non-Recourse Carveout Obligations.

45. Time is of the essence of this Application.

25

Ed. 1/28/2004

JH 00982

Application No. 6518467

Applicant (1) agrees to be fully bound by the Terms and Conditions hereof and (2) covenants that all facts and circumstances pertaining to this Application, the Loan and the Security are and shall continue to be as represented to John Hancock.

The undersigned hereby represents that the Applicant has, and all persons signing this Application on behalf of the Applicant have, the legal capacity and authority to enter into this transaction and to execute this Application.

MONTGOMERY SQUARE PARTNERSHIP
(Applicant) By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____

Its: PRESIDENT

Ed. 1/28/2004

JH 00983

Application No. 6518467

<u>INDEMNITORS' ACKNOWLEDGMENT</u>

By executing this Application in the space(s) provided below, each of the Indemnitors hereby agrees to execute the indemnification agreement required by Condition 11(d)(ii)(cc) and joins in the representations, warranties and covenants pertaining to the Indemnitors in Condition 25 of this Application.

INDEMNITOR(S): James R. Koller

By: _____

Date: 7- 30 - 04

INDEMNITOR(S): Frank C. Palopoli

By: _____

Date: _____

INDEMNITOR(S): Joseph P. Kelly

By: _____

Date: 7- 30 - 04

28

JH 00984

Ed 1/28/2004

Application No. 6518467

ACCEPTANCE BY JOHN HANCOCK

John Hancock hereby accepts the foregoing Application and agrees with the Terms and Conditions therein contained, as modified by the Rate Lock Confirmation, a copy of which is attached hereto.

JOHN HANCOCK LIFE INSURANCE COMPANY.

By: _____

Date: 8/17/04

Timothy J. Malik
Senior Investment Officer

GUARANTORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Guarantors hereby agrees, jointly and severally, to guaranty the Non-recourse Carveout Obligations of the Borrower under the Loan Documents and joins in the representations, warranties and covenants with respect to the Guarantors contained in Condition 25 of this Application.

GUARANTOR(S): James R. Koller

By: _____

Date: 7-30-04

GUARANTOR(S): Frank C. Palopoli

By: _____

Date: _____

GUARANTOR(S): Joseph P. Kelly

By: _____

Date: 7-30-04

27

Ed. 1/28/2004

JH 00985

Application No. 6518467

INDEMNITORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Indemnitors hereby agrees to execute the indemnification agreement required by Condition 11(d)(ii)(cc) and joins in the representations, warranties and covenants pertaining to the Indemnitors in Condition 25 of this Application.

INDEMNITOR(S): James R. Koller

By: _____

Date: 7-30-04

INDEMNITOR(S): Frank C. Palopoli

By: _____

Date:

INDEMNITOR(S): Joseph P. Kelly

By: _____

Date: 7-30-04

Ed. 1/28/2004

J11 00986

Application No. 6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 1 of 18

*CONDITION 46- INSURANCE PREMIUM RESERVE - SUSPENSION*

Condition Nos. 6(c) and No. 18(a) are amended as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for hazard insurance premiums as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding insurance, including without limitation providing John Hancock with timely evidence (1) that the required insurance is in place for the Real Estate Security and is never delinquent or suspended, and (2) that all insurance premiums are paid in full.

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Conditions 6 or 18 of the Application.

PLEASE NOTE: ALL RISK INSURANCE WITHOUT AN EXCLUSION FOR TERRORISM INSURANCE IS REQUIRED AT ALL TIMES.

*CONDITION 47- TENANT IMPROVEMENT AND LEASING COMMISSIONS - SUSPENSION*

Condition 18(c) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for tenant improvements and leasing commissions for the Real Estate Security as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding leases at the Real Estate Security.

JH 00987

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
#### Page 2 of 18

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the Application.

## CONDITION 48- REPLACEMENT RESERVE - SUSPENSION

Condition 18(b) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for capital repairs and replacements to the Real Estate Security as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding maintaining the Security, including without limitation maintaining the Security in good order and repair;

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the Application.

## CONDITION 49 - RENTAL ACHIEVEMENT

The Closing shall be no later than 365 days (12 months) from the Rate Lock Date and the outside date for Closing shall be set forth in the Rate Lock Confirmation.

The maximum permitted principal amount of the Loan shall be $32,000,000, which shall be funded in full at Closing subject to the Terms and Conditions of this Application, but a portion of the Loan may be deposited into a rental achievement reserve ("Rental Achievement Reserve") pursuant to the Rental Achievement Reserve Agreement (as defined below) if all of the following terms and conditions are satisfied:

(1) *Borrower Portion.*

If the Funding Conditions (as defined below) are satisfied, a portion of the Loan shall be funded and disbursed to the Borrower. The amount to be disbursed to the Borrower on the Closing Date (the "Borrower Portion") shall be an amount which does not cause the loan-to-value ratio as set forth in Condition 14 to exceed 75% (the "Loan to Value" or "LTV"), and at which amount there is minimum rental income (as described in Condition 16(a)) as modified by this Condition 49 to provide a component of Value (as defined below) and a Debt Service Coverage ("DSCR") of 1.25:1 (as described in Condition 16(b))

JH 00988

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 3 of 18

The amount of the Borrower Portion shall be determined by multiplying 75% by the "Value". The Value is computed by dividing the net operating income of the Security ("NOI") by a capitalization rate of 7.25%.

The NOI is determined by subtracting (a) the operating expenses of (1) $758,433, (2) stabilized taxes (estimated at $480,000) and (3) a management fee of 3.75% of Effective Gross Income (as defined below) from (b) the annualized monthly income from tenants that on the date of Closing occupy apartments and garages under leases reasonably acceptable to John Hancock ("Effective Gross Income")

(See Exhibit 1 for a sample calculation of the Borrower Portion and the amount of the reserves described below.

The DSCR will be determined by reducing the NOI by $64,000 (Replacement Reserve of $250/unit) and then dividing the remainder by the annual debt service payments due and payable upon the Loan, which debt service payments will be determined in connection with the Rate Lock and the applicable Principal Amount of the Loan and shall be deemed to include an amortization schedule of no greater than thirty (30) years.

The amount of the Borrower Portion calculated pursuant to this Section (1) shall be rounded downward to the nearest $1,000.

The amount the Effective Gross Income and the NOI will be determined by John Hancock prior to Closing based upon a review of the Certified Rent Roll (as defined below) and current operating statements submitted by Borrower to John Hancock.

(2) *Conditions to Funding and Provisions for Funding with Rental Achievement Reserve*

In the event that the Security has not achieved an NOI of $3,097,860 as calculated pursuant to Section (1) above within 10 business days prior to the Closing, then John Hancock shall still fund the Loan as long as:

(a)    Borrower satisfies timely the other Terms and Conditions of this Application;
(b)    Occupancy at the Security under Space Leases satisfying the terms of this Application is not less than 80% (which shall not include Space Leases the tenant or guarantor of which is subject to a bankruptcy or insolvency action);
(c)    Borrower establishes the required Rental Achievement Reserve (as defined below) pursuant to a Rental Achievement Reserve Agreement (as defined below) and otherwise satisfies the obligations of this Condition; and
(d)    The amount of the Rental Achievement Reserve is not greater than $5,380,000.

The foregoing conditions are referred to collectively as the "Funding Conditions." If all of the Funding Conditions are not satisfied, John Hancock shall have no obligation to fund any portion of the Loan.

The amount of the Rental Achievement Reserve shall be equal to the difference between the entire principal balance of the Loan as specified in Section 3(a) of this Application and the Borrower Portion (the "Rental Achievement Reserve Amount") and will be required to be held by John Hancock in reserve at Closing pursuant to a reserve agreement in form and substance acceptable to John Hancock ("Rental Achievement Reserve Agreement"). (See Exhibit 1 for sample

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
#### Page 4 of 18

calculation ). The Rental Achievement Reserve may be funded with a Letter of Credit (as defined below) acceptable to John Hancock.

(3) *Achieving Required NOI After Closing*

3, 258 452

After the Closing, upon the Security's reaching an NOI of $3,097,860, the Rental Achievement Reserve will be released to Borrower within ten (10) business days of receipt by John Hancock all of the requirements necessary to satisfy the Release Conditions (as defined below).

Notwithstanding the foregoing, if on or after six (6) months from the Closing the NOI is less than $3,097,860, the Rental Achievement Reserve Amount will be recomputed using the method set forth in Section (1) above. If the recalculated Rental Achievement Reserve Amount is less than the then existing Rental Achievement Reserve Amount, the excess reserve will be released to the Borrower (assuming the Release Conditions are satisfied), and at John Hancock's option, the remaining Reduced Principal Amount Rental Achievement Reserve (including without limitation, any accrued interest) (a) may be applied to reduce the principal balance of the Loan, without prepayment premium (in which case the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised); (b) may be applied as is otherwise provided in the Loan Documents; or (c) may continue to be held by John Hancock from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860.

If the recalculated Rental Achievement Reserve Amount is equal to or greater than the then existing Rental Achievement Reserve Amount, then (a) Borrower shall pay to John Hancock within ten (10) days of demand, the amount of such deficiency and (b) John Hancock, at its sole option, (a) may apply the entire Rental Achievement Reserve Amount (including without limitation any accrued interest) to reduce the principal balance of the Loan, without prepayment premium, (in which case, the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised) or as is otherwise provided in the Loan Documents or (b) may continue to hold the Rental Achievement Reserve Amount from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860. Failure to pay such deficiency shall be a default under the Loan

John Hancock shall have the option in its sole and absolute discretion to extend the six (6) month period described in the foregoing paragraphs in accordance with the provisions of Condition 32 of this Application. Borrower shall be responsible for all costs and expenses, including without limitation, all reasonable attorneys fees of John Hancock, pertaining to the amendment of the Loan Documents or otherwise incurred in connection with effecting the provisions contemplated hereby.

(4) *Full Amount of Loan Disbursed*

The Loan Documents shall provide that, notwithstanding the fact that the amount of the Borrower Portion may not be equivalent to the entire Principal Amount of the Loan, or that John Hancock has required the funding of one or more reserves at Closing, Borrower shall be required to pay interest on the entire Principal Amount of the Loan.

(5) *Expanding Definition of Costs.*

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the application of all or any

JRK

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 5 of 18

portion of the Rental Achievement Reserve, and the revision of the amortization schedule and the monthly payment as described in Condition 49 of this Application."

### *Definitions*

*Release Conditions* shall mean that all of the following are satisfied:

(a)   The Loan is not in default;

(b)   Borrower delivers to John Hancock a Certified Rent Roll dated not more than thirty (30) days prior to submission;

(c)   The result of the recalculation of the Rental Achievement Reserve Amount, when conducted at the time of the release, yields a figure that is less than or equal to the amount then held as the Rental Achievement Reserve Amount;

(d)   The LTV is not then more than 75% and the DSCR is not less than 1.25:1 in each case as calculated by John Hancock as provided above;

(e)   All tenants listed on the Certified Rent Roll submitted to John Hancock for the applicable request occupy apartments and garages under leases reasonably acceptable to John Hancock and occupancy at the Security under Leases satisfying the terms of this Application is not less than 80%; and

(f)   Borrower satisfies such other reasonable requirements as are contained in the Rental Achievement Reserve Agreement.

*Certified Rent Roll* shall mean the rent roll certified by the Borrower and submitted to John Hancock dated within thirty (30) days prior to submission, listing each building(s) designation, tenant names, lease commencement and expiration dates, monthly rent due and monthly rent collected, any rental or other tenant concessions, any and all other fees and reimbursements paid by tenants and security deposits currently held. For purposes of computing the gross annual rent, all tenant concessions shall reduce the gross annual rent of all tenants

*Letter of Credit* shall mean an irrevocable, unconditional, transferable evergreen letter of credit in the applicable amount in form and substance satisfactory to John Hancock and issued by a bank acceptable to John Hancock. The Letter of Credit shall permit partial draws. The Borrower shall execute an agreement satisfactory to John Hancock in connection with said Letter of Credit, providing, among other things, that in the event that Borrower fails to meet its obligations under said agreement, John Hancock shall have the right to require that the expiration date of the Letter of Credit be extended or, at its option, to draw upon the Letter of Credit and to apply the proceeds thereof to the reduction of the principal amount of the Loan, or otherwise in accordance with the Loan Documents or the Rental Achievement Reserve Agreement. It is further required that the bank issuing the Letter of Credit (or any substituted Letter of Credit) be acceptable to John Hancock in its sole discretion not only at the time of the issuance of said Letter of Credit but shall also continue to be so acceptable to John Hancock during the entire term of said Letter of Credit, including all extension and/or renewal periods. If John Hancock, in its sole discretion, shall determine that an issuing bank is or has become unacceptable, Borrower shall be obligated to provide a substitute Letter of Credit. If Borrower does not provide such substitute letter of credit within fourteen (14) days of written notice of the unacceptability of such bank, such failure shall entitle John Hancock to draw upon the existing Letter of Credit and hold and apply the proceeds in accordance with the Rental Achievement Reserve Agreement. Additionally, if Borrower uses a Letter of Credit for the Rental Achievement Reserve and fails to provide a replacement Letter of Credit at least thirty (30) days prior to its expiration, then John Hancock shall have the right, in its sole discretion, to draw on the Letter of Credit and to apply the proceeds as set forth above and to exercise its other remedies under the Loan Documents. All fees and expenses in connection with the Letter of Credit shall be paid by Borrower.

*JRL*

JH 00991

Application No 6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 6 of 18

*CONDITION 50 – CLOSING DATE AND EXTENSION OF CLOSING DATE*

Condition 4(b) of the Application hereby is deleted and the following hereby is substituted in its stead:

The Closing shall occur on or before the date established by the Rate Lock Confirmation executed by Borrower and John Hancock.

John Hancock shall allow the Borrower to extend the Closing Date for up to six (6) periods of up to thirty (30) days each for an aggregate period of one hundred eighty (180) days, provided that no later than ten (10) business days prior to the Closing Date (as the same may have been extended as described herein), John Hancock shall receive written notice that Borrower has elected to extend the Closing Date pursuant to this Condition 50. If Borrower elects to extend the Closing Date, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall increase by five (5) basis points for each 30-day period or portion of a 30-day period for which the Closing Date shall be extended (each, an "Interest Rate Adjustment"). For example if the Closing Date is extended by one hundred fifty one (151) days, the Interest Rate would increase by thirty (30) basis points; provided, however, that in the event that the Borrower extends the outside date for Closing for the aggregate one hundred eighty (180) day period, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall not be increased by more than thirty (30) basis points in the aggregate.

Each Interest Rate Adjustment shall be evidenced by an Extension Agreement which John Hancock shall provide and Borrower shall execute. The Extension Agreement shall set forth the period for which the Interest Rate (or if applicable, each Interest Rate) is locked, the Interest Rate (or, if applicable, each Interest Rate) as adjusted by the applicable Interest Rate Adjustment, the monthly loan payment, the revised outside date for Closing, and if applicable, the revised lock out period. Each Extension Agreement shall result in an Interest Rate Adjustment, which shall be cumulative. Borrower acknowledges that the Interest Rate Adjustments may affect the calculations under Condition 49 which may affect (a) the Borrower Portion; (b) the Rental Achievement Reserve Amount and/or (c) John Hancock's obligation to close the Loan.

*CONDITION 51 – ADDITIONAL APPLICATION FEE (Regarding Condition 30(b))*

After the Interest Rate for the Loan is locked, if the yield for the "on the run" 10-year U.S. Treasury Security ("10-Year Treasury Rate") is for a period of five (5) consecutive business days at least 45 basis points below the 10-Year Treasury Rate that was used to determine the locked Interest Rate for the Loan ("Initial Treasuries Trigger Point"), Borrower is required to deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (3) business days after written notice of such fact from John Hancock. Such additional amount shall be added to, and be deemed a part of, the Application Fee. Further, Borrower shall deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (3) business days after written notice from John Hancock for any additional 15-basis point drop below the Initial Treasuries Trigger Point which lasts for a period of five (5) consecutive business days. Any such additional amounts shall be added to, and be deemed a part of, the Application Fee. Regardless of how low the 10-Year Treasury Rate declines after Rate Lock, the amount of additional Application Fee which Borrower shall be obligated to add to the existing Application Fee shall be limited to 2% of the Loan amount ($640,000).

In the event that any additional deposit(s) for the Application Fee are made as outlined above, and subsequently, the 10-Year Treasury Rate rises above the threshold(s) for the additional deposit(s) for a period of five (5) consecutive business days, John Hancock will return the applicable portion of such

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 7 of 18

additional deposit for the Commitment Fee to the Borrower. In no event shall John Hancock be obligated to return an amount to Borrower which leaves less than $640,000 as the Application Fee being held by John Hancock.

Any additional deposit(s) for the ADDITIONAL APPLICATION FEE made pursuant to this Condition 51 shall be held, retained and disbursed by John Hancock pursuant to and in accordance with the terms and conditions applicable to the Commitment Fee described in this Application.

## CONDITION 52 - PAYMENT OF THE APPLICATION, COMMITMENT FEE OR ADDITIONAL APPLICATION FEE (LETTER OF CREDIT)

Condition Nos. 30(b) and (c) and Supplemental Condition No. 77 are expanded as follows: All of the Commitment Fee and all of the Application Fee required to be deposited under this Application may consist of one or more unconditional, irrevocable and transferable Letters of Credit, both in form and substance, and drawn on a commercial bank satisfactory, to John Hancock. Any and all Letters of Credit delivered to John Hancock in connection with this provision shall be in a form and subject to the conditions described in the last grammatical paragraph of Condition 49 of this Application

## CONDITION 53 - FORWARD COMMITMENT COMPONENT:  COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and John Hancock acknowledge and agree that, in the ordinary course, (a) the Interest Rate is locked for a period of sixty (60) days in accordance with, and subject to, the terms and conditions of this Application; and (b) the Closing is obligated to occur within such time period.

Borrower and Applicant desire that the Interest Rate be locked for more than a period of sixty (60) days. Accordingly, Applicant and John Hancock agree to amend the Application as follows to accommodate such longer period to close the Loan:

A.   *Extension of Rate Lock.*  The following language is deleted from the first paragraph of Condition 3(c) of the Application:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

and is replaced with the following:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of three hundred sixty five (365) days (the "Rate Lock") subject to receipt of the fee required pursuant to the terms and conditions of this Application (the "Commitment Fee") within the applicable time periods provided herein.

B.   *Additional Modifications to Application to Adjust Time Frames of Deliveries to Extended Rate Lock Period*

   1.   Section 7(c) is amended as follows:



JH 00993

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
#### Page 8 of 18

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior the expiration of Rate Lock."

2. Section 7(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

3. Section 7(e) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

4. Section 8(b) is amended as follows:

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior to the expiration of Rate Lock."

5. Section 8(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

6. Section 9(a) is amended as follows:

    (i)  delete the words "no later than fourteen (14) days from the date of acceptance by John Hancock of this Application" and insert "in no event fewer than forty-five (45) days prior to the expiration of Rate Lock"

    (ii)  delete the words "no later than thirty (30) days from the date of acceptance by John Hancock of this Application" and insert "no fewer than forty-five (45) days prior to the expiration of Rate Lock".

7. Section 10 is amended by deleting the words "within twenty-one (21) days of Rate Lock" in the first sentence and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

8. Section 13 is amended by deleting the words "within thirty (30) days of the date of Rate Lock" in the first line and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

9. Section 19 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

*JRK*

# MONTGOMERY SQUARE PARTNERSHIP
# (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 9 of 18

10. Section 20 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

11. Section 23 is amended by deleting the words "no later than fourteen (14) days from the date of acceptance of this Application by John Hancock" and replacing it with: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

## CONDITION 54 – FLOATING RATE OPTION IN THE 11TH YEAR

Borrower shall have the option to extend the term of the Loan for one (1) period of twelve (12) months from the maturity date of the Loan upon delivering to John Hancock written notice of the desire to so extend not less than one hundred eighty (180) days prior to the maturity date. The Loan shall accrue interest during such extended period at a variable rate. Notwithstanding the foregoing, the Loan shall only be extended if all of the following conditions are satisfied:

(a) There is no default then continuing under the Loan Documents;
(b) John Hancock and Borrower agree to terms for the extension period (including without limitation an interest rate index and spread and acceptable LTV and DSCR ratio given the then amount of the Loan and any subordinate financing which may be in place on the Security) no less than one hundred twenty (120) days prior to the then maturity date of the Loan;
(c) Borrower satisfies all of the conditions of John Hancock then imposed in its sole but reasonable discretion to extend the Loan;
(d) The Loan remains prior to any other lien, mortgage or encumbrance on the Security;
(e) Borrower satisfies all conditions of, and executes and delivers documents for, such extension on or before the then maturity date of the Loan;
(f) Borrower pays all of John Hancock's costs associated with such extension (including without limitation all attorneys' fees); and
(g) John Hancock is still making variable rate commercial mortgage loans on properties of similar size, credit quality, character, type and location at the time of such extension.

## CONDITION 55 – LOAN TERMS

Condition 3(g)- The 4th paragraph is deleted and replaced with, "The Loan will be open to prepayment without premium during the last 120 days of the term of the Loan".

Condition 3(h) is deleted in its entirety.

## CONDITION 56 – ASSIGNMENT OF LEASES

In Condition 5(b)(ii) insert in the last line "for more than two months" between "rent" and "will.

## CONDITION 57 – LOAN DOCUMENTS

Condition 6(a) delete 5% and insert 4%

JRK

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 10 of 18

Condition 6(b) delete 7% and insert 5%.

Condition 6(c) delete "without interest" at the end of the paragraph and insert "with interest at the prevailing rate with Borrower responsible for any set-up and annual maintenance fees.

## *CONDITION 58* – ANNUAL FINANCIAL STATEMENTS PROVIDED BY THE BORROWER

Condition No. 6(e):  ANNUAL FINANCIAL STATEMENTS is amended by adding the following: The Loan Documents will provide that John Hancock will accept a statement of annual income and expense prepared and certified by the Borrower, the Borrower's accountant or a financial officer of the Borrowing entity within 120 days after the end of each fiscal year, provided that the statement certified by a certified public accountant is not available and there has not been a default by the Borrower in the performance of any of its obligations under the Loan Documents.

## *CONDITION 59* – DUE ON SALE: CHANGE IN OWNERSHIP OR CONTROL

### *TRANSFER OF OWNERSHIP WITHIN THE PARTNERSHIP*

Borrower represents that the description of the Borrower and all constituent entities and the list of names, types of interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are accurately described on Exhibit F attached to this Commitment. It is understood that the following amendment to Condition 6(f) is conditioned upon the accuracy and completeness of the information provided on said Exhibit F.

Condition No. 6(f): DUE ON SALE is amended to add the following: The transfer of partnership interests shall be permitted between partners and their families as long as any of the existing partners as of Closing controls at least 51% of the combined general and limited partnership interests of the Borrower; provided:

1.    There shall be no default under the Loan Documents,

2.    John Hancock shall be provided with prior written notice of such transfer, together with a diagram showing the structure of the Borrower and all constituent entities after the contemplated transfer and a list of the names, types of interests and percentages of ownership of all owners of interests in the Borrower and any constituent entities after the contemplated transfer, and an administrative fee of $5,000, which shall be deemed fully earned upon receipt, and

3.    All fees and costs in connection with the transaction, including without limitation, John Hancock's attorneys' fees, shall be paid by the Borrower.

## *CONDITION 60* – DUE ON SALE

Condition 6(f)- In the last sentence delete "one-time" and replace with "two-time".

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 11 of 18

Condition 6(f)(vii)- In the 2nd and 3rd lines delete "concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change"

Condition 6(f)(vii)- Delete the 4th line and insert at the end of the 3rd line after "ratio", the words "of not less than 1.25:1 as determined by John Hancock"

Condition 6(f)(viii) is amended by inserting the following at the beginning of such section: "If the Loan is made part of a secondary market transaction,".

## *CONDITION 61* – SUBORDINATE FINANCING

Condition No. 6(f) SECONDARY FINANCING is amended to add the following: Notwithstanding the foregoing, John Hancock ("Lender") will permit secondary financing one time, provided that:

1. No default exists under the Loan Documents,

2. The Loan Documents contain a covenant whereby Borrower agrees not to make payments to the holder of any secondary financing during any period in which a monetary default exists under the Loan Documents,

3. The secondary financing will consist of a single mortgage which will be the only loan secured by the Security other than the Loan,

4. The secondary financing, by its terms, shall be and remain completely subject and subordinate to the Loan Documents and any additional fundings, extensions, modifications and amendments thereof, and to any subsequent advances made by the first mortgagee, whether obligatory or optional and Borrower and the secondary financing lender shall enter into such Subordination and Intercreditor Agreements as requested by Lender,

5. The secondary financing shall not violate the terms of any leases, and by its terms, shall be and remain subordinate to all present and future leases, and shall, by its terms, prohibit the second mortgagee from joining any tenants in any foreclosure action it may institute,

6. A default under the secondary financing will be a default under the Loan,

7. The secondary financing shall have a maturity date coterminous with or longer than the maturity date of the Loan,

8. The secondary financing shall be held by a regulated financial institution acceptable to Lender,

9. The secondary financing may be at a fixed or floating rate, but in either case shall have a constant amortization and require that all payments be on a current basis with no accruals for

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 12 of 18

interest or additional principal or advances. Furthermore, if the secondary financing has a floating rate of interest, the Borrower must purchase an interest rate cap and the debt service coverage ratio condition set forth below shall be calculated using the maximum interest rate achievable considering such cap and amortizing such secondary financing using the lesser of the (a) the actual amortization schedule and (b) a thirty (30) year amortization schedule.

10. The secondary financing must not be given in satisfaction of or to evidence any judgments or claims against the Borrower,

11. The secondary financing shall not be cross-defaulted or cross-collateralized with any loans encumbering any security other than the Security,

12. The holder of the secondary financing shall not be in any way affiliated with the Borrower,

13. The debt service coverage ratio for the combined loan payments of the secondary financing and the Loan (including without limitation any additional funding) shall not result in a debt service coverage ratio of less than 1.25:1, calculated to the satisfaction of Lender, and the loan-to-value ratio for the combined proposed mortgage and the Lender's mortgage (including without limitation any additional funding) shall not exceed 75%, calculated to the satisfaction of Lender.

14. Such secondary financing shall provide that all insurance proceeds and condemnation awards shall be applied solely as described in the Loan Documents,

15. The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan,

16. The mortgagee under such secondary financing shall have agreed in writing (a) to give simultaneous copies to Lender of any notices given by such mortgagee under said secondary financing, including without limitation, notices of default, (b) to collect no income, rents, issues, profits or proceeds from the Security, whether directly or through a receiver, unless the prior written consent of Lender is obtained, and (c) to be bound by any extensions, modifications or amendments to the Loan Documents,

17. All information necessary to determine whether or not the conditions provided herein have been satisfied shall be provided to Lender at the time of the request, together with an administrative fee of $5,000 which shall be deemed fully earned on the date of receipt and shall be retained by Lender regardless of whether or not the junior financing is obtained and whether or not consent is given,

18. The Non-Recourse Carve-Out Obligations shall be expanded to include liability for an amount equal to the sum of all payments made by Borrower to junior lienholders during any period in which a default exists under the Loan.

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 13 of 18

19. All costs and expenses in connection with the request for approval shall be paid by the Borrower, including, without limitation, Lender's attorneys' fees.

### CONDITION 62 – FEES

Condition 6(j)- Insert in the first line after "administrative fees", the words "not to exceed $5,000".

### CONDITION 63 – SPE WAIVER/TOTAL

Condition 9(c):  BORROWER REQUIREMENTS is amended by deleting Condition 9(c).

### CONDITION 64 – COMPLIANCE WITH ZONING

Condition 10- In the 4th line from the bottom after "certificates of occupancy" the words "or such temporary certificates of occupancy necessary to operate the security until final certificates are available".

### CONDITION 65 – COMPLIANCE WITH ENVIRONMENTAL LAWS

Condition 11(b)- In the first sentence insert "reasonably" before the word "satisfactory".

Condition 11(d)(ii)(cc)- Insert at the end of the paragraph, "This indemnification shall not apply to situations where the liability is as a result of or caused by conditions that exist or occur on real estate adjoining the Real Estate Security owned by the Borrower".

### CONDITION 66 – COMPLETION

Condition 12- Insert between "completed" and "to" the words "other than normal punch list items and final landscaping",

### CONDITION 67 – REPRESENTATIONS AND WARRANTIES

Condition 25- In the 3rd line after "complete" insert "in all material respects".

Condition 25- In the 7th line delete the words "and have been prepared consistent with proper accounting standards";

Condition 25- Insert in the 2nd line, 2nd paragraph after "all" the word "material"

JH 00999

Application No 6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 14 of 18

### CONDITION 68 -- TERMINATION OF THIS INSTRUMENT

Condition 29(a)(ii)- In the 2nd and 3rd lines delete "or against any tenant under any Space lease or Other Lease referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- At the end of the sentence delete "or of any tenant referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- Define "material adverse change in the financial condition" as an event or occurrence which causes the combined net worth of the Guarantors to decline below $10,000,000.

### CONDITION 69 -- APPLICATION, PROCESSING AND COMMITMENT FEES

Condition 30(b)(ii)- Delete "sixty (60) and insert twenty one (21).

### CONDITION 70 -- LIMITATION ON LIABILITY

Condition 36(f) - In the first line after "taxes" insert "excluding taxes escrowed by John Hancock".

Condition 36(h) - Delete in its entirety.

### CONDITION 71 -- ADDITIONAL FUNDING

1.  Additional Funding. Borrower shall have the right to request additional loan proceeds in the minimum amount of $1,000,000 ("Additional Funding") once between the 2nd and the end of the 5th Loan Years, provided the following conditions are satisfied:

    a   The rental and debt service coverage requirements of Condition 16 and the loan-to-value ratio requirement of Condition 14 are satisfied as of the date of the request for and the funding of the Additional Funding, as determined by John Hancock, taking into consideration the Loan and the Additional Funding;

    b   No default has occurred and is continuing under the Loan Documents;

    c   There shall be no partial funding of the Additional Funding;

    d   There shall be no subordinate financing requested for, or then in place on, the Security;

    e   The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan

    f   A request for Additional Funding shall be made in accordance with Section 2 below;

    g   John Hancock is continuing to finance loans of the same size, property type, location, character and credit quality as the Loan and the Additional Funding, and the interest rate on the Additional Funding shall be as set forth in Section 2 below and shall be established

JRK

JH 01000

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 15 of 18

as a fixed rate equal to the then interest rate being offered by John Hancock for loans of the same size, property type, location, character and credit quality;

h.  Except as set forth herein or in the Rate Lock Confirmation described below, the Additional Funding shall be on the same terms and conditions as the Loan and shall be evidenced by an amendment to the existing Loan Documents or by a second note and mortgage on the Security as determined by John Hancock. The Loan Documents shall be satisfactory to John Hancock;

i.  The Additional Funding shall be amortized over the remaining term of Loan (e.g. if drawn at the end of the 2nd year, with 28 years remaining on the Loan term, then Additional Funding will be amortized over 28 years); and

j.  The Additional Funding shall have the same loan maturity date as initial Loan maturity date.

2.  Rate Lock Process.

   Upon receipt of sufficient and satisfactory information from Borrower, including, but not limited to, (i) a rent roll for the Security certified by the Borrower which is no more than thirty (30) days old, (ii) current operating statements for the Security in form and for periods as John Hancock may reasonably request; (iii) financial statements from the Borrower, its Principals, Guarantors and Indemnitors, as set forth in Condition 20 of the Application, and (iv) current color photographs of the Security which are not more than thirty (30) days old showing the Security in a manner reasonably satisfactory to John Hancock ("Quote Package"), John Hancock may, in John Hancock's sole discretion, issue a Rate Lock Confirmation to Borrower in a form substantially shown on Exhibit D to the Application and the process described in Section 3(c) of the Application shall be followed. The Rate Lock Confirmation shall also set forth any Application Fee or Commitment Fee that must be paid in connection with the Additional Funding. John Hancock shall be under no obligation to issue a Rate Lock Confirmation for the Additional Funding, and any Additional Funding shall be subject to approval by John Hancock's internal committees.

3  Due Diligence Matters.

   The following shall be conditions precedent to the Additional Funding:

   a.  *Title, Title Evidence and Title Insurance.* Borrower shall provide an endorsement to the loan title insurance policy issued to John Hancock in connection with the initial closing of the Loan ("Title Endorsement"), reflecting the Additional Funding and satisfactory in form and content to John Hancock.

   b.  *Survey.* Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security since the date of the Survey. A recertification and update of the Survey will be required in form and substance satisfactory to John Hancock, dated within sixty (60) days of the Closing for the Additional Funding if (i) the Title Endorsement reveals any new title matters that are plottable; or (ii) there are any exterior additions, alterations or other changes to the Security,.

Application No. 6518467

MONTGOMERY SQUARE PARTNERSHIP
(AVENEL AT MONTGOMERY SQUARE)
SUPPLEMENT TO APPLICATION
Page 16 of 18

c. *Borrower Requirements.* Borrower shall provide a certificate from the Borrower, certifying that Borrower and its constituent entities continue to comply with the requirements of Condition 9 of the Application. Borrower will also provide a certified copy of all organizational documents pertaining to the Borrower and, if requested by John Hancock, its constituent entities.

d. *Compliance with Environmental Laws; Loan Documents.* Borrower shall provide a certificate from the Borrower and the Guarantors in form and substance satisfactory to John Hancock, certifying that there have been no changes to any matters contained in the Environmental Certificate, to any of the representations and warranties regarding environmental matters contained in the Loan Documents or to any other environmental matter related to the Security. In addition, John Hancock shall obtain at Borrower's expense, a report from an environmental database confirming that there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the last verification of the environmental database.

At John Hancock's option, Borrower shall provide an update to the environmental site assessment that Borrower delivered to John Hancock prior to the Loan Closing Date in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the initial assessment have been remediated as required and that otherwise there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the initial assessment.

e. *Compliance with Zoning, Building Laws, Subdivision and Other Laws, Regulations etc. and Separate Tax Parcel*

Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security and no changes of use or access or the parking have occurred, in each case since the initial funding of the Loan. In addition, Borrower shall provide (i) an updated letter from the municipality dated no earlier than thirty (30) days before the Closing Date for the Additional Funding, evidencing that the Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations, that there are no outstanding violations pending against the Security and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, and (ii) if a title endorsement covering zoning matters in a form satisfactory to John Hancock is not issued in the jurisdiction, both an updated opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required. If not previously furnished, John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel.

f. *Third Party Inspections.* Borrower shall provide a certificate from the Borrower and Guarantors, certifying that since the initial Loan no changes to the buildings or improvements have occurred on the Security and no significant repairs or replacements in any one instance have occurred which were not expressly contemplated in the Property Condition Assessment or pursuant to, and in compliance with, one of the reserve agreements established at the Closing of the Loan. Any matters disclosed by the original Property Condition Assessment which the Borrower agreed to remedy will be re-inspected by John Hancock or an engineer acceptable to John Hancock, at Borrower's

JRX

JH 01002

## MONTGOMERY SQUARE PARTNERSHIP
### (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 17 of 18

expense. John Hancock shall also have the right to re-inspect the Security to verify the condition of the Security and to assure that no adverse changes have occurred at the Security.

If requested by John Hancock, Borrower shall provide an update to the property condition report that Borrower delivered to John Hancock in connection with the Loan ("Initial PCR") in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the Initial PCR have been remedied and corrected as required and that otherwise there have been no adverse changes to the conditions at the Security since the date of the Initial PCR

g. *Lease Requirements.* Borrower, not more than fourteen (14) days prior to the Closing Date for the Additional Funding, shall provide an updated rent roll certified by Borrower identifying any changes to the rent roll submitted as part of the Quote Package.

h. *Appraisal.* An update of the Appraisal prepared by the appraiser who prepared the original Appraisal. The update must be acceptable to John Hancock.

i. *Reserve Funds.* The amounts, deposits and payments into the reserve accounts required by Section 18 and Section 49 of the Application will be evaluated and may be adjusted as part of the Rate Lock Process based upon the information obtained or revealed during the Rate Lock Process and subsequent due diligence and evaluation of John Hancock prior to the Additional Funding.

j. *Opinion of Counsel.* Borrower shall provide an update to all opinions issued in connection with the Loan satisfactory in form and substance to John Hancock dated as of the Closing of the Additional Funding from an attorney approved by John Hancock and its counsel opining to the matters set forth in Section 23 of the Application; provided, however, that any opinion issued regarding the Loan Documents shall apply to the loan documents executed in connection with the Additional Funding.

4    Closing and Other Costs

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the Additional Funding."

5.   Except as modified by this Supplement, the Terms and Conditions of the Application shall apply to the Additional Funding, including, but not limited to, Condition 39 of the Application

## CONDITION 72 – BORROWER COVENANT REGARDING OTHER HOLDINGS

Borrower, Montgomery Square Partnership, a general partnership, also owns two (2) vacant pieces of land in the vicinity of the Security and identified as Exhibit X. Borrower agrees (a) not to acquire any other real estate or other assets during the term of the Loan, other than those necessary to conduct the ordinary business of the Security and (b) not to incur indebtedness on these

JRK

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 18 of 18

properties during the term of the Loan unless ownership of the two properties is transferred to a third party not owned or controlled by the Borrowing Entity.

### *CONDITION 73* – OPINION OF COUNSEL

Condition 23(e)- Delete the next to last paragraph referencing "Conditions 9(c)(ix) and (x)" in its entirety.

Avenel_Supplement_7-29-04 doc

JH 01004

# EXHIBIT 1

## EXAMPLES OF RESERVE CALCULATIONS

AVENEL @ MONTGOMERY SQUARE

| | | | | EXAMPLE 1 | | EXAMPLE 2 | | EXAMPLE 3 |
|---|---|---|---|---|---|---|---|---|
| Units | 256 | | | | | | | |
| **INCOME** | | | | | | | | |
| | Base Rent | | | $4.638.600 | | $4.638.600 | | $4.638.600 |
| | Parking Income | | | $0 | | $0 | | $0 |
| | Other Income | | | $312.213 | | $312.213 | | $312.213 |
| Gross Income | | | | $4,950,813 | | $4,950,813 | | $4,950,813 |
| | Vacancy | @ | 20% | $990.163 | 15% | $742.622 | 9.00% | $445,573 |
| Effective Gross Income | | | | $3,960.650 | | $4,208,191 | | $4,505,240 |
| **EXPENSES** | | | | | | | | |
| **Operating Expenses** | | | | | | | | |
| | Real Estate Taxes | | | $480.000 | | $480.000 | | $480,000 |
| | Property Insurance | | | $82.480 | | $82.480 | | $82.480 |
| | Utilities | | | $87.749 | | $87.749 | | $87.749 |
| | Repairs & Maintenance | | | $182.741 | | $182.741 | | $182.741 |
| | Janitorial | | | $0 | | $0 | | $0 |
| | Management Fees @ 3.75% | | | $148,524 | 3.75% | $157,807 | 3.75% | $168,946 |
| | Payroll & Benefits | | | $294.781 | | $294.781 | | $294.781 |
| | Advertising & Marketing | | | $59.713 | | $59.713 | | $59.713 |
| | Professional Fees | | | $5.000 | | $5.000 | | $5.000 |
| | General & Administrative | | | $45.969 | | $45.969 | | $45.969 |
| | Other Expenses | | | $0 | | $0 | | $0 |
| Total Operating Expenses | | | | $1.386.957 | | $1.396.240 | | $1.407.379 |
| NET OPERATING INCOME | | | | $2.573.693 | | $2.811.951 | | $3,097.860 |
| | Value @ | 7.25% Cap | | $35,499,214 | | $38,785,529 | | $42,729,108 |
| Maximum Loan or | 75.00% | LTV | | $26,620,000 | | $29,090,000 | | $32.050.000 |
| | | Round To | | $26,620,000 | | $29,090,000 | | $32,000,000 |
| Locked Amount | | | | $32,000,000 | | $32,000,000 | | $32,000,000 |
| RESERVE | | | | $5,380,000 | | $2,910,000 | | $0 |
| Base Rent Required | | | | $3,710,880 | | $3,942,810 | | $4,221,126 |

JH 01005

Avenel Exhibit 1 revised 7-13-04.xls

Application No.

**EXHIBIT B**
**DESCRIPTION OF PROPERTY**

**SECTION A:**

| LOCATION | | | | | |
|---|---|---|---|---|---|
| Property Name:  Avenel at Montgomery Square | | | | | |
| Address:  1100 Avenel Boulevard | City:  North Wales Mont comget Township | | County:  Montgomery | State:  Pennsylvania | |
| Zoning: ECPOD | Streets:  private | | Water:  public | Gas:  Yes | |

| LAND | | | | | |
|---|---|---|---|---|---|
| Frontage:       1,220 Ft. | Depth:  0 Ft.  *IRREGULAR* | | Area:      799,116 Sq.ft. | Filled: | |
| Rights of Way: Describe:       see title report | | | | | |
| Easements: Describe:       see title report - Gas, electric, sewer, water, phone, cable | | | | | |
| Special Assessments: Describe:       N/A | | | | | |

| PROPERTY OVERVIEW | | | | |
|---|---|---|---|---|
| Net Rentable Area: 276,710 Sq.ft. | # of Buildings:  19 | # of Stories:  3/4 | # Bays: | |
| Year Built:   2004 | Year Last Renovated:      0 | | Current Occupancy Rate: | |
| Property Manager:  Bozzuto Management | | Fee:       3.75% | | |

| CURRENT OWNER PURCHASE INFORMATION | | | |
|---|---|---|---|
| Purchase Price: | Amount Financed: | Seller: | |
| Purchase Date: | | | |

| EXISTING FINANCING | | | |
|---|---|---|---|
| Holder: | Original Amount: | Rate: | Date: |
| Wilmington Trust of Pennsylvania | $30,732,000.00 | Floating – Libor | May 15, 2003 |
| Balance: | | | |

Application No.

SECTION B: (To be completed in all cases)

| BUILDING FRAMEWORK | | | |
|---|---|---|---|
| Wood: ☒ | Reinforced Concrete ☐ | Steel: ☒ | Solid Masonry: ☐ |
| Other: (explain):  Manor Building includes some steel | | | |

| BUILDING CONSTRUCTION | |
|---|---|
| Sidewall Construction: | 2*4 Stud with 1/2" plywood sheathing |
| Exterior Sidewall Finish: | Brick, vinyl, hardy board |
| Floor Construction: | Engineered wood truss with pylwood and gypsum floor |
| Roof Construction: | Engineered wood truss and sheathing sytem |
| Roofing Material: | 25 yr asphalt shingle |
| Window Type & Material: | vinyltech window |
| Exterior Door Type: | metal over foam core |

| MECHANICAL | | | |
|---|---|---|---|
| Heating Type:   Aquatherm | Fuel:   Gas | | Unit Location:   each unit |
| Air Conditioning Type:   Carrier | | Unit Location:   Each unit | |
| # of Elevators:   1 | | Type:   Hydraulic Schindler | |
| Fire Protection:  Wet Sprinkler in accordance with NFPA 13 | | | |
| Security System: N/A | | | |
| Sewerage System: | ☒ Public | ☐ Private | |
| Water System: | ☒ Public | ☐ Private | |

SECTION C: ( To be completed for Apartment Buildings Only)

Balcony Construction: (describe framing, flooring, railings):   ACQ framing and flooring with steel railings

Exterior Stairway Construction: (describe framing, flooring, railings):   Steel framing and railings with concrete treads

Interior Partitions:  2* 4 stud wit 1/2" drywall

Sound Proofing:

     Between Apartments:   insulated wall with sound batting

     Between Floors:       Channel system with gypsum floor

Insulation Method:   Exterior walls - R15 vapor barrier - Attic - R30

JHLICO
Ed 3/2/00

2

JH 01007

Application No.

| Finish Schedule | Floor | Walls | Ceiling | Trim |
|---|---|---|---|---|
| Living Room: | Carpet | Paint | Paint | Wood |
| Bedroom: | Carpet | Paint | Paint | Wood |
| Dining Room: | Carpet | Paint | Paint | Wood |
| Kitchen: | Vinyl | Paint | Paint | Wood |
| Baths: | Vinyl | Paint | Paint | Wood |
| Public Areas: | Ceramic/Wood | | | |

### KITCHEN EQUIPMENT

Range:  GE - JGBP28WGH   Oven:   GE - JVM1441WH   Refrigerator:   GE - GFC325F   Dishwasher:   GSDY200J

Disposal:  GE- WX9X18   Hood & Fan:   GE- JN327   Other:

Counter Tops:   Formica   Cabinets:  wood

---

**SECTION D: ( To be completed for Buildings Other than Apartments )**

Divisional Partitions: (Describe)

Ceiling System: (Describe)

Interior Wall Finish:

Floor Covering:

Sprinkler System:

Electric Lighting Fixture Type:

Toilet Rooms: (Describe fixture standards, room finish, number of locations, ADA compliance)

---

**SECTION E:**

### PARKING AND ON-SITE IMPROVEMENTS

Covered Parking Spaces:  112          Location:  32 Attached, 80 detached

Construction:    Concrete and stud

Open Parking Spaces:    404

Swimming Pool:  Yes

Other On-Site Improvements:     Landscaping, fountain, compactor pad

06/02/2004  09:49    6109419872                JHREF PA                        PAGE  02

Application No.

**SECTION F:  (To be completed for all property types)**

**RENT ROLL**

Correspondent will attach one copy of the rent roll for the Real Estate Security.  Correspondent will sign this Exhibit on the appropriate signature line below.

**CORRESPONDENT CERTIFICATION**

I have examined the property operating statements, rent roll, and any other supporting information given to me by the Applicant and have analyzed the Loan in accordance with such information.  In addition, I have examined the leases listed on the rent roll and have satisfied myself that the space is occupied as indicated, that there are no existing concessions, free rent, or rebates unless shown on the attached rent roll, and the rents are currently collectable under such leases.  I believe that all information heretofore submitted to John Hancock in connection with the Loan is complete, correct and accurately reflects the physical, leasing and financial status and history of the Real Estate Security.

Correspondent: _JHREF / BLUE BELL_

By: _JOHN D. FERRIC, REG. D.P._

Name: _Jake P. Ferris_

Title _REGIONAL  V.P._

Application No.

## EXHIBIT C
## ENVIRONMENTAL QUESTIONNAIRE AND CERTIFICATE

**DEFINITIONS.** The following two terms have the following meanings when used in this Questionnaire.

A. "Hazardous Materials" includes hazardous waste, as that term is defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5); hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14); pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C. §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM"), and volatile organic compounds, including oil and petroleum products.

B. "The Real Estate Security" means the land, the buildings thereon, and the other improvements thereon which are to be the security for the Loan from John Hancock being applied for by Borrower in the attached Application ("the Loan").

---

1. Are any Hazardous Materials generated, stored, treated, or disposed of or expected to be generated, stored, treated, or disposed of on the Real Estate Security?

   Yes ☐    No ☒

2. To the best of your knowledge, have any Hazardous Materials been disposed of or released at, on, or under the Real Estate Security, or at, on, or under land abutting the Real Estate Security, in the past, or have any such materials migrated from other land to the Real Estate Security?

   Yes ☐    No ☒

3. a. Are there any underground or other storage tanks on the Real Estate Security?

   Yes ☐    No ☒

   b. If the answer to 3.a is Yes, state the type and quantity of material that is being stored and the location and age of each tank; describe the leak detection system and the inventory control system which are being maintained for each tank; and describe the corrosion protection and spill/overfill protection methods which are being used for each tank. (Attach additional pages if necessary.)

   c. If the answer to 3 a. is Yes, state when each tank was last tested for tightness; state whether each tank is registered with any government entity, and attach copies of the most recent test results for each tank and all registration materials.

JHLICO
Ed 3/2/00

1

JH 01010

Application No

d.    Are there any empty or unused tanks on the Real Estate Security? (If yes, state the location of each.)

Yes ☐    No ☒

Location:

e.    To your knowledge, have any tanks been removed from the Real Estate Security?

Yes ☐    No ☒    To the best of our knowledge there were
                              NO UNDERGROUND TANKS.

f.    If the answer to 3.e. is Yes, state when each tank was removed; describe the location from which it was removed; and state whether during or after the removal any Hazardous Materials were found in the soil or groundwater.

4.    a.    Has there ever been an operating dry cleaner at the Real Estate Security?

Yes ☐    No ☒

b.    If the answer to 4 a. is Yes, state the name of the dry cleaner and the years in which it has operated.

5.    a.    Have any of the buildings at the Real Estate Security been tested for the presence of ACM?

Yes ☐    No ☒

b.    Do any of the buildings at the Real Estate Security contain ACM?

Yes ☐    No ☒

6.    Are there any transformers or other electrical equipment on the Real Estate Security which contain PCB's?

Yes ☐    No ☒

7.    (To be answered for multi-family residential properties:)

a.    Has the Real Estate Security ever been tested for the presence of radon gas?

Yes ☐    No ☒

b.    Have any of the buildings at the Real Estate Security ever been tested for the presence of lead paint?

Yes ☐    No ☒

Application No.

    c    Has any of the water at the Real Estate Security ever been tested for the presence of lead?

         Yes  ☐    No  ☒

    d    If the answer to 7.a., b., or c. is yes, attach copies of test results.

8.  a.    What is the name of the seller from whom you bought the Real Estate Security?

    b    Describe the use of the Real Estate Security at the time you acquired it.

9.   State the year in which each building at the Real Estate Security was constructed.

         2004

10.  a.    Was the Real Estate Security transferred out of or described as part of a larger parcel within the past five years?

         Yes  ☐    No  ☒

    b.    If the answer to 10 a. is Yes, describe by boundaries the larger parcel of which the Real Estate Security was a part.

11.  Has an environmental assessment report been prepared for the Real Estate Security, or any part of it, within the last ten years?  (If yes, attach copies of each report.)

         Yes  ☒    No  ☐

12.  Has the Real Estate Security ever been the subject of a notice of non-compliance, abatement or clean-up order, or lawsuit, relating to Hazardous Materials?

         Yes  ☐    No  ☒

13.  If the answer to any of questions 1, 2, 5 b., 6, 7, or 12 is Yes, explain in detail the nature of these items in the area below and on additional pages if necessary.

    I/We certify (a) that each of the above answers is true and complete; (b) that to the best of my/our knowledge there is no violation of federal, state, or local environmental laws on the Real Estate Security, except as described herein; and (c) that I/we will immediately notify John Hancock if at any time while the Loan is outstanding I/we learn that any of the above answers either was not true when made or is no longer true.

JHLICO
Ed 3/2/00

3

Application No.

    I/We understand that the answers to any of the above questions may cause John Hancock to require, as a condition or conditions to Closing the Loan, (a) satisfactory responses to further inquiries by John Hancock, and/or (b) further investigation of the Real Estate Security, including, in John Hancock's sole discretion, sampling and/or monitoring of soil, groundwater, air, water, or building materials, with results satisfactory to John Hancock, in its sole discretion.

APPLICANT: MONTGOMERY SQUARE PARTNERSHIP
By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____
        James R. Koller
Title: President

Date: _____

GUARANTOR(S):

_____
James R. Koller

Date: _____

_____
Frank C. Palopoi

Date: _____

_____
Joseph P. Kelly

Date: _____

# Memo

**To:**   Jim Koller

**From:**   Joe Kelly

**Date:**   6/11/2003

**Re:**   Montgomery Square Apartments – Land Development Agreement and Declaration of Covenants and Restrictions

Please note that the parcel and unit numbers recited in the Land Development Agreement and the Declaration of Covenants and Restrictions are not correct. The parcel and unit reference should be as follows:

| Address | Parcel | Block | Unit | Parcel # |
|---------|--------|-------|------|----------|
| 512 DeKalb Pike | 46-00-00784-00-7 | 011 | 048 | 00784007 |
| 500 DeKalb Pike | 46-00-00778-00-4 | 011 | 035 | 00778004 |
| 440 DeKalb Pike | 46-00-00772-00-1 | 011 | 028 | 00772001 |
| 440A DeKalb Pike | 46-00-00775-00-7 | 011 | 031 | 00775007 |
| 436 DeKalb Pike | 46-00-00769-00-4 | 011 | 047 | 00769004 |
| 430 DeKalb Pike | 46-00-00766-00-7 | 011 | 055 | 00766007 |
| 426 DeKalb Pike | 46-00-00763-001 | 011 | 027 | 00763001 |
| HDR | 46-00-00316-21-4 | 011c | 014 | 00316214 |
| 502 DeKalb Pike [Included ins HDR] | 46-00-00781-001 | 011 | 051 | 00781001 |

Attached is a copy of the real estate tax bills.

1

JH 01014

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA 19401 • 610-239-9920 • FAX 610-239-9921

August 27, 2003



Mr. Don Elly
Allen A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA  19490

RE: Asbestos Abatement
    Lead Paint Soil Remediation
    Montgomery Square Partnership

Dear Mr. Elly:

Attached is the manifest for the lead paint soil remediation work
at the above project.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

JH 01015

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

ep-19-03 10:46A ALLAN A. MYERS                    6103618062              P.02
09/18/2003 13:40   6J 0309921        PLYMOUTH ENVIRONMENT.            PAGE  02

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA 19401 • 610-239-9920 • FAX 610-239-9921

September 18, 2003

Mr. Don Elly
Allan A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA 19490

RE: Asbestos Abatement
    Lead Paint Abatement
    Montgomery Square Partnership
    Montgomery Township

Dear Mr. Elly:

This letter will certify that Plymouth Environmental Co.,Inc.
properly abated all asbestos containing materials and lead in soil
as noted in RT Environmental Services, Inc. survey reports. All
work was performed in accordance with all prevailing federal, state
and local regulations. Waste manifests and project air management
report was previously supplied to you.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

JH 01016

09/27/2003   13:53   +7338000000000000-8   00000000   PAGE  02

Bureau of Land Recycling and Waste Management
P.O. Box 8550
, Harrisburg, PA 17105-8550
OFFICIAL PENNSYLVANIA MANIFEST FORM

Form approved.
OMB No. 2050-0039

| UNIFORM HAZARDOUS WASTE MANIFEST | 1. Generator's US EPA ID No. P A D F P 0 0 1 0 6 3 9 | Manifest Document No. 1/67/C | 2. Page 1 of | Information within the bold red border is not required by Federal law but may be required by State law. |
|---|---|---|---|---|
| | | | A. State Manifest Document Number PAH 016776 | |

2. Generator's Name and Mailing Address   MONTGOMERY SQUARE PARTNERSHIP
490 NORRISTOWN ROAD
BLUE BELL PA 19422

B. State Gen. ID  SAME

4. Generator's Phone (  61D  )  238-0400

| 5. Transporter 1 Company Name REPUBLIC ENV SYS (TRANS GROUP) | 6. US EPA ID Number P A D 9 8 2 6 6 1 3 8 1 | C. State Trans. ID PA-AH 0 3 1 7 |
|---|---|---|

D. Transporter's Phone ( 215 ) 822-2676

| 7. Transporter 2 Company Name | 8. US EPA ID Number | E. State Trans. ID PA-AH |
|---|---|---|

F. Transporter's Phone (   )  -

9. Designated Facility Name and Site Address   REPUBLIC ENV SYS (PA), INC.
2869 SANDSTONE DRIVE
HATFIELD PA 19440

10. US EPA ID Number  P A D 0 8 5 6 9 0 5 9 2

G. State Facility's ID

H. Facility's Phone ( 215) 822-8995

| 11. US DOT Description (Including Proper Shipping Name, Hazard Class, and ID Number) | 12. Containers | | 13. Total Quantity | 14. Unit Wt/Vol | I. Waste No. |
|---|---|---|---|---|---|
| HM | No. | Type | | | |
| a. RQ HAZARDOUS WASTE, SOLID, N.O.S., 9, NA3077, PG III, (LEAD ), (D008) | x 1 | D M xx | 100 | 1 | D 0 0 8 |
| b. | | | | | |
| c. | | | | | |
| d. | | | | | |

| J. Additional Descriptions for Materials Listed Above S   1D64444 | K. Handling Codes for Wastes Listed Above a. S01   b. |
|---|---|
| | c.   d. |

15. Special Handling Instructions and Additional Information

EMERGENCY PHONE _____

16. GENERATOR'S CERTIFICATION:   I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packed, marked and labeled and are in all respects in proper condition for transport by highway according to applicable international and national government regulations. If I am a large quantity generator, I certify that I have a program in place to reduce the volume and toxicity of waste generated to the degree I have determined to be economically practicable and that I have selected the practicable method of treatment, storage, or disposal currently available to me which minimizes the present and future threat to human health and the environment; OR, if I am a small quantity generator, I have made a good faith effort to minimize my waste generation and select the best waste management method that is available to me and that I can afford.

| Printed/Typed Name D TIM Keller | Signature  Brian Keller | MONTH 07 | DAY 03 | YEAR 03 |
|---|---|---|---|---|

17. Transporter 1 Acknowledgement of Receipt of Materials

| Printed/Typed Name Gert O Passon | Signature  Brew Passon | MONTH 07 | DAY 03 | YEAR 03 |
|---|---|---|---|---|

18. Transporter 2 Acknowledgement of Receipt of Materials

| Printed/Typed Name | Signature | MONTH | DAY | YEAR |
|---|---|---|---|---|

18. Discrepancy Indication Space

19. Facility Owner or Operator: Certification of receipt of hazardous materials covered by this manifest except as noted in item 19.

| Printed/Typed Name JUNGNA WATKA | Signature | MONTH 07 | DAY 11 | YEAR 03 |
|---|---|---|---|---|

A-65884 1/1

HF 01017

COPY 1 - TSD: MAIL TO PA DEP

08/27/2003  13:53  +7330000000000000-0    00000000    PAGE  03

REPUBLIC ENVIRONMENTAL SYSTEMS

3859 SANDSTONE DRIVE / HATFIELD, PA 19440 / 215-822-8995
EPA I.D. PAD055090592

CERTIFICATE OF WASTE DISPOSAL  No  465884

THIS IS TO CERTIFY THAT WASTE MATERIAL RECEIVED FROM:
Generator    MONTGOMERY SQUARE PARTNERSHIP
E.P.A. ID    PADEF0010639
Address      490 MORRISTOWN ROAD / BLUE BELL, PA 19422

AS REFERENCED ON MANIFEST NUMBER:  PAHO16776

HAS BEEN ANALYZED AND ACCEPTED AS SPECIFIED UNDER THE FACILITY'S WASTE ANALYSIS PLAN.
ALL MATERIALS REPRESENTED HEREIN SHALL BE STORED, TREATED, MANAGED AND/OR
DISPOSED OF IN ACCORDANCE WITH ALL APPLICABLE LOCAL
STATE AND FEDERAL REGULATIONS IN THE MANNER DESCRIBED BELOW.

Storage/Treatment/Disposal Method
Hill H132

Lab Code/Clin #
1064444    RQ HAZARDOUS WASTE, SOLID, N.O.S.
            (D008)

            D.O.T./E.P.A. Description

Mary C. Steinborn
REPUBLIC ENV SYS (PA), Inc.
Representative - Title:Document Control

07/11/2003

JH 01018

**Exhibit D**

**Rate Lock Confirmation**

Date:   **August 2, 2004**

TO:     JOHN HANCOCK LIFE INSURANCE COMPANY

RE:     JOHN HANCOCK APPLICATION NO. 6518467

       Property Address:  Avenel @ Montgomery Square Apartments
                 1100 Avenel Blvd ,
                 Montgomeryville, PA 19454

John Hancock is willing to lock the interest rate in connection with the above-captioned Application on the terms set forth below:

    (a)    the Interest Rate will be locked on August 2, 2004 at 6.18% per annum for a period of 365 days from the Rate Lock Date (as hereinafter defined), subject to receipt by John Hancock of $320,000, the Commitment Fee, no later than five (5) days after the date of acceptance of the Application by John Hancock,

    (b)    the amount of the Monthly Payment is $195,574.96,

    (c)    the Amortization Period is 360 months,

    (d)    the date of the Application is amended to be August 2, 2004,

    (e)    the outside date for Closing is August 1, 2005,  and

    (f)    the Application is hereby modified to incorporate the terms and conditions hereof, time still being of the essence   In the event of any conflict between the terms hereof and those contained in the Application, the terms of this Rate Lock Confirmation shall prevail;

provided that:

    (g)    Applicant accepts and confirms said Interest Rate, subject to the above terms,

    (h)    makes the representations set forth below,

    (i)    telecopies this Rate Lock Confirmation back to John Hancock so that it is received no later than 4:30 PM, Boston time, on August 2, 2004 (the "Rate Lock Date"), and

    (j)    time being of the essence hereof.

                    JOHN HANCOCK LIFE INSURANCE COMPANY

                    By:  _____

                    Name:  Timothy J. Malik

                    Title:  Senior Investment Officer

                    Date:  August 2, 2004

JH 01019

The undersigned hereby:

(i)     requests that John Hancock lock the Interest Rate in connection with the above-captioned Application at the rate set forth above and accepts all of the terms and conditions set forth above, and agrees that the Application remains unchanged and in full force and effect, except as modified by the terms set forth above;

(ii)    acknowledges that, notwithstanding the locking of the Interest Rate, John Hancock is not obligated to make the Loan contemplated by and pursuant to the Application unless and until the Loan has been authorized by the John Hancock loan committees and John Hancock has accepted said Application by signing the Application in the place provided therein;

*EXCEPT AS AMENDED BY THE APPLICATION,*

(iii)   certifies that the title company designated by the undersigned in Condition 7(b) of the Application and, if applicable, approved by John Hancock ("Title Company") and the surveyor designated by the undersigned in Condition 8(c) of the Application (the "Surveyor") have received and acknowledged receipt of John Hancock's title requirements and survey requirements, respectively, and have agreed to deliver a title policy and materials and a survey, complying with said requirements, respectively, within twenty-one (21) days of receipt of notification to proceed from the undersigned; and

*EXCEPT AS MODIFIED BY THE APPLICATION*

(iv)    agrees to give the Title Company notice to proceed with the title and the Surveyor notice to proceed with the survey, and to provide John Hancock with a copy of said notice, no later than the next business day after the date at the tope of this Rate Lock Confirmation.

**APPLICANT:**

**Montgomery Square Partnership**

By: Vestmont Limited Partnership

By: Vesterra Corporation

By: _____

Name: _VJAMES R. KOLLER_

Title: _PRESIDENT_

2

JH 01020

Application No.

## EXHIBIT F

### BORROWER REPRESENTATION

Date:

Correspondent:

Please provide the following.  Attach additional sheets as needed.

1.   A diagram of the Borrower/Applicant and all constituent entities
2.   A list of the owners and their respective percentage interest in each entity and type of interest.
3.   With respect to Partnerships, please designate the General Partner(s), the Limited Partner(s), and the Managing General Partner.
4.   With respect to Limited Liability Companies, please designate the members and the managing members.

The Applicant/Borrower certifies that the information provided above is true, accurate and complete.

BORROWER: MONTGOMERY SQUARE PARTNERSHIP
BY: VESTMONT LIMITED PARTNERSHIP
BY: VESTERRA CORPORATION

By: _____

James R. Koller

Title: President

Montgomery Square Partnership
Ownership Structure

Montgomery Square Partnership  (general partnership)

| | Ownership | | | |
|---|---|---|---|---|
| 1 | 33.33% | | 23-2865711 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |

*Vestmont Limited Partnership  (limited partnership)*

| | Ownership | | | |
|---|---|---|---|---|
| | 1.0% | Vesterra Corporation - general partner | 23-2388602 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| 2 | 44.50% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| 3 | 44.50% | Frank C. Palopoli - limited partner | 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 | 1017 Lorien Drive, Gwynedd, PA  19437 |
| 4 | 10.0% | Joseph P. Kelly - limited partner | 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 | 851 Wright Drive, Maple Glen, PA  19002 |

| | | | | |
|---|---|---|---|---|
| 2 | 33.33% | | 01-0744096 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |

*Vestmont Limited Partnership II (limited partnership)*

| | | | | |
|---|---|---|---|---|
| 1 | 1.0% | Vesterra Corporation - general partner | 23-2388602 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| 2 | 38.28% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| 3 | 38.28% | Frank C. Palopoli - limited partner | 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 | 1017 Loren Drive, Gwynedd, PA  19437 |
| 4 | 22.44% | Joseph P. Kelly - limited partner | 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 | |

| | | | | |
|---|---|---|---|---|
| 2 | 33.33% | | 20-0671819 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |

*Vestmont Limited Partnership III (limited partnership)*

| | | | | |
|---|---|---|---|---|
| 1 | 1.0% | Vesterra Corporation - general partner | | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| 2 | 66.17% | Koller Kelly Partnership - limited partnership | 20-0671932 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| 3 | 32.83% | FCP GROUP LP | 20-0671819 | 490 Norristown Road, Suite 252, Blue Bell, PA  19422 |

JH 01022

Application No.

## EXHIBIT G
## BORROWER DUE DILIGENCE

Correspondent:

The Borrower, Applicant, the Guarantors, the Indemnitors, and Principal(s) of the Borrower and the Applicant, the Guarantors and the Indemnitors shall be responsible for completing or responding to Part I and Part II of this Exhibit H at the time of submission of the Application to John Hancock Life Insurance Company ("John Hancock").

The Principal(s) of the Borrower, the Applicant, the Guarantor(s) and the Indemnitor(s) are determined as follows:

- Any entity and/or individual who possesses management or operational control of the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- Any person or entity possessing at least 25% of the ownership interest in the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner,
- In addition, for a corporation, the Principal(s) will be the majority shareholder(s) of the Borrower,
- In addition, for a limited liability company, the Principal(s) will be the members and the general partners of any partnership member and the majority shareholder(s) of any corporate member.

## PART I

Provide John Hancock with the following information for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s),:

1) Financial statements (certified by a certified public accountant, if available) for the last year with a statement not more than 90 days old that there have been no material adverse changes since the date of the most recent statement. Such statements must include liquid assets (cash, stocks, bonds, marketable securities), non-liquid assets (real estate owned, businesses owned, ownership interests in other enterprises), cash flow (interest income, dividend income, wages, other income), liabilities and obligations (any refinancings during the term of the proposed mortgage, any partnership contributions or loans not yet made, any law suits, any personal guarantees or other contingent liabilities, current and potential tax obligations, any circumstances which may affect the individual or entity.)

2) For a corporate Borrower, Applicant, Guarantor(s), Indemnitor(s), corporate Principal(s) thereof, and major tenants or a REIT:

   a) Annual report for the last two years along with the most recent quarterly report (ex., 10K or 10Q for publicly traded companies and complete certified financial statements for the last two years for privately held companies).
   b) If not in the annual report, a detailed description of the business of the corporation,

3) Provide a social security number or tax identification number for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals.

4) Provide the country of domicile of each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and the home address of each Principal and the Guarantor(s) and the Indemnitor(s). USA

5) List other real estate assets in which the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) have an interest, including:

Application No.

    a)     Property type, location, size and occupancy.
    b)     Estimated market value, cash flow information, including effective gross income, expenses and net operating income.
    c)     Mortgage loan obligations, including each balance, rate (indicate whether fixed or floating), annual debt service, lender and whether recourse or non-recourse.
    d)     Any defaults, historically or currently.
    e)     Any modifications or restructurings, historically or currently.
    f)     Percentage of ownership interest.

6)     Describe the property management experience of the Borrower, the Applicant and their Principal(s), including property type, locations, sizes and conditions and ownership interest in any management companies. (If managed by other than the Borrower, the Applicant and each of their Principal(s), a description of the firm, including the year organized, type and variety of properties it manages, estimated number of units/square feet they manage).

7)     For the subject property, provide a statement of the acquisition or construction budget, including land acquisition cost, and a detailed list of subsequent capital expenditures, including when made. Include copies of internally or externally prepared audits indicating the capital improvements which should be made, if any, and a statement as to the capital improvements which are planned and their anticipated costs.

8)     Describe fully any financing which is secured by the Borrower's or the Applicant's interest in the entity which owns the subject real estate. (For example, debt which has as its collateral a limited partner's partnership interest or a corporate member's shares in the corporation.)

**TO BE COMPLETED BY EACH PRINCIPAL OF THE APPLICANT, BORROWER, GUARANTOR(S) AND INDEMNITOR(S)**

**PART II**

The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) must each complete the questionnaire which appears below and, for that reason, several copies are attached. By their signature each of them hereby represents and warrants that the responses to the following questions are accurate and complete with regard to each of them and the undersigned acknowledges John Hancock's reliance thereon. The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s), agree to provide John Hancock with prompt written notice of any change in financial condition. Otherwise, John Hancock will be entitled to rely on the continuing accuracy of the information provided.

If a response to a question is "yes," provide a written explanation supplementing the answer.

| YES | NO | | |
|-----|----|----|----|
| ☒ | ☐ | 1.) | Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) have any contingent liabilities (ex., endorser or co-maker on notes or guarantees, current or potential tax liabilities)? *See Financial Statements* |
| ☒ | ☐ | 2.) | Are any of the current assets of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) pledged as collateral (ex., cash, marketable securities, certificates of deposit)? *see Financial Statements* |

JH 01024

Application No.

☐ ☑ 3.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) or any entity in which they hold or have held an ownership interest, been involved in any lawsuits which might result in financial judgments against them? *not covered by insurance*

☐ ☑ 4.) Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, have any unsatisfied judgments against them?

☐ ☑ 5.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or are they in bankruptcy/insolvency/reorganization (whether voluntary or involuntary)?

☐ ☑ 6.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been foreclosed on or given deeds in lieu of foreclosure?

☐ ☑ 7.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been in default or been given relief (workout or restructuring by the lender under the terms of any mortgage loan, deed of trust or other financing agreement)?

☐ ☑ 8.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or convicted of a felony or been the subject of a complaint or indictment charging a felony?

☐ ☑ 9.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, ever borrowed funds from John Hancock or any affiliate of John Hancock? What is the status of those borrowings, regardless of whether outstanding or paid off?

☐ ☑ 10.) Do the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, hold an ownership interest in any of the tenants at the Real Estate Security?

Provide a list of banking and financial relationships of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and provide at least three specific lender references for the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals (individual contacts' names, addresses and telephone numbers) below. Include contact name and telephone number for the lender(s) holding the current mortgage(s) on the Real Estate Security.

Greg Hurtis
Wilmington Trust of Pennsylvania
116 East Court Street
Doylestown, PA 18901
(267) 880-7002

Glenn Gallagher
Wachovia Bank
PA 1295
123 South Broad Street, 15th Floor
Philadelphia, PA 19109
215-670-6522

The undersigned certifies that all of the information provided is accurate and complete.

Application No

_____

Signature of Borrower
Montgomery Square Partnership
By: Vestmont Limited Partnership
By: Vesterra Corporation

By: _____                    23-2865711
          James R. Koller                               Taxpayer Identification No..

Its: President


_____                        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
Signature of Guarantor                                  Social Security No.
Name:    James R. Koller
         900 Andorra Road
         Lafayette Hill, PA 19444


_____                        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
Signature of Guarantor                                  Social Security No.
Name:    Frank C. Palopoli
         1017 Lorien Drive
         Gwynedd, PA 19437


_____                        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
Signature of Guarantor                                  Social Security No.
Name:    Joseph P. Kelly
         851 Wright Drive
         Maple Glen, PA 19002

—

JH 01026

**Montgomery Square Apartments**

**Loan Budget**

|  | Project Costs | Equity | Budget |
|---|---|---|---|
| Land | $7,680,000 | $4,823,801 | $2,856,199 |
| Site Work | $3,284,000 | | $3,284,000 |
| Building Costs | $17,844,124 | | $17,844,124 |
| Sewer | $1,543,500 | | $1,543,500 |
| Water | $234,640 | | $234,640 |
| Building Permits & Township Fees | $278,104 | | $278,104 |
| Design & Engineering | $530,000 | | $530,000 |
| Construction Loan | $263,660 | | $263,660 |
| Permanent Loan | $300,490 | | $300,490 |
| Taxes and Insurance | $260,000 | | $260,000 |
| Miscellaneous Contingency | $1,279,243 | | $1,279,243 |
| Marketing | $481,600 | | $481,600 |
| Developer's Fee | $550,000 | | $550,000 |
| Debt Funded Operating Costs | $100,000 | | $100,000 |
| Interest | $926,440 | | $926,440 |
| | $35,555,801 | $4,823,801 | $30,732,000 |

JH 01027

## REPRESENTATIVE PROJECTS

- *East Gate Square*:  850,000 square foot shopping center located at the ramp from Interstate 295 and Nixon Drive, Mt. Laurel and Moorestown Townships, New Jersey. Anchored by Home Depot, Shop Rite Supermarket, Barnes & Noble Bookstore, Best Buy, Dick's Sporting Goods, Old Navy, CompUSA, Michael's Arts & Crafts and many other national retailers.

- *Montgomery Square*:  400,000 square foot shopping center located at Route 309 and Knapp Road, Montgomeryville, PA, and 256-unit apartment project currently under construction.

- *Normandy Farm*:  75 acres located at Route 202 and Morris Road, Whitpain Township, PA.  Created new zoning district to facilitate the development of 76 single-family homes selling in the $700,000 range and the preservation of the largest barn in Montgomery County, an historic mansion and several other historic homes, which will be used for offices and a conference and banquet center.

- *Fawn Creek*:  109 acres located in a bucolic setting with a stream flowing through it on Hollow Road, Worcester Township, Montgomery County, PA.  Developed for large lot (1.5 to 4 acres) single-family homes whose prices range from $800,000 to $1,700,000.

- *Mercer Square*:  91,400 square foot shopping center located at Route 611 and Old Dublin Pike, Doylestown, Pennsylvania, anchored by 44,000 square foot Genuardi Supermarket.

- *New Britain Village Square*:  140,000 square foot shopping center located at the intersection of Route 202 and County Line Road, Chalfont, Pennsylvania, anchored by Genuardi Supermarket, CVS Drugstore, McDonalds and First Union Bank.

- *Towamencin Shopping Village*:  140,000 square foot shopping center located at Forty Foot Road and Allentown Road, Towamencin Township, Pennsylvania, anchored by Genuardi Supermarket, Thrift Drug, Blockbuster and Wendy's.

- *Warwick Square*:  92,000 square foot shopping center located on Old York Road, Warwick Township, PA, anchored by Genuardi Supermarket, Blockbuster and McDonald's.

- *Dresher Plaza*:  96,500 square foot shopping center located at Limekiln Pike and Dreshertown Road, Dresher, Pennsylvania.

JH 01028

# EXHIBIT W

**From:**    Ferrie, John [jferrie@jhancock.com]

**Sent:**    Thursday, August 12, 2004 9:06 AM

**To:**      Malik, Timothy J.

**Subject:** RE: Request for approval to fund the Loan with 75% LTV - 1 25% DS CR:

Rob Kelly is the mortgage broker and the brother of principal Joe Kelly 610-341-0250 x 24. He works for Don Pettit (610-341-0250 x 12) of Carey, Kramer, Pettit, Panichelli & Associates. They are former Manu Life correspondents and supposedly Ivor thinks very highly of Don Pettit.

> -----Original Message-----
> **From:** Malik, Timothy J.
> **Sent:** Thursday, August 12, 2004 8:56 AM
> **To:** Ferrie, John
> **Subject:** FW: Request for approval to fund the Loan with 75% LTV - 1 25% DSCR:
>
> Revised
>
> Who is the broker you are working with at Carey Kramer and his phone number
>
> Ivor may want to call him
>
> **Timothy J. Malik**, CPM(c), CCIM
> Senior Investment Officer
> John Hancock Real Estate Investment Group
> 200 Clarendon Street, 56th Floor
> Boston, MA 02116-5021
> (617) 572-3891
> CELL (617) 791-6840
> FAX (617) 572-9699
> Email: tmalik@jhancock.com
> Website: www.jhancockrealestate.com
>
> *The information contained in this e-mail and any attachments is strictly confidential and is for the use of the intended recipient Any use, dissemination, distribution, or reproduction of any part of this e-mail or any attachment is prohibited. If you are not the intended recipient, please notify the sender by return e-mail and delete all copies including attachments.*
>
> -----Original Message-----
> **From:** Malik, Timothy J.
> **Sent:** Thursday, August 12, 2004 8:52 AM
> **To:** Thomas, Ivor
> **Cc:** David Henderson (Henderson, David); Coyne, Patricia C
> **Subject:** Request for approval to fund the Loan with 75% LTV - 1 25% DSCR:
>
> **Subject Loan:**    John Hancock Mortgage #6518467
>                      Avenel @ Montgomery Square Apartments
>                      Montgomeryville, PA

JH 00127

Borrower:           Montgomery Square Partnership
Original Approval Date: August 10, 2004
Original Loan Amount:  $32,000,000
Spread at Approval:    186 over average life
Current PBO:          not funded (one-year forward commitment)
Rate:                Locked on August 2, 2004 at 6.18%
Term/Amortization:    10/30 years
Maturity:            August 2015
Rating:              BAA1/BBB/Satisfactory
Specific Provisions:   $0

Status:              Not Funded

Remarks:             The Approval requires a 1.00:1 coverage based on a 10% constant at funding.
Funding is contemplated in the Loan Application to be based on a 75% LTV and
1.25:1 DSCR, which will provide 10% Constant Coverage of 0 96:1 and actual debt
service coverage of 1 30:1. An increase of only 3% in the property's occupancy
(8 additional apartment rentals) will alleviate this shortfall and will provide the 10%
Constant Coverage of 1.00:1. At the underwritten market occupancy of 95%, based
on net cash flow, the property will provide 10% Constant Coverage of 1.02:1 and
actual debt service coverage of 1.37:1. Actual market occupancy is 99% in this
submarket of 5,880 apartment units.

Our review of the rental-market demand factors indicates that the 10% Constant
Coverage shortfall should be relatively brief. We fully expect that, since the location
of the subject is excellent with few nearby properties that effectively compete with it,
the 10% Constant Coverage of 1 00:1 will occur within less than two (2) months from
funding and certainly not more than six (6) months from funding.

In addition, treasuries have dropped 15 bps since rate lock, making the interest rate
higher for the John Hancock Loan than for a loan the Borrower could garner today
from a competing lender. GMAC has also offered the Borrower a loan of $33 million,
$1 million higher than the John Hancock Loan.

Approval of this request to allow full funding at 75% LTV and a 1 25:1 DSCR is
recommended.


Approved:

        Ivor Thomas          David Henderson          Patricia Coyne
        Senior VP          Senior Investment Officer      Investment Officer


JH 00128

# EXHIBIT X

JOHN HANCOCK LIFE INSURANCE COMPANY V. VESTERRA CORP., *ET AL.*
(Civil Action No. 05-11614-WGY)
Privilege Log of John Hancock Life Insurance Company

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0001 | 5/9/2005 | Email | Thomas Rogers, Esq., White & Williams LLP | To: Jessica Leveroni, Esq., in-house counsel, John Hancock Life Insurance Company | Vesterra Loan | AC |
| PRIV0001-0002 | 5/9/2005 | Email | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq. | Title/survey for Avenel property | AC |
| PRIV0002 | 5/4/2005 | Email | Jessica Leveroni, Esq. | To: Timothy J. Malik, Robin L. Costa and Thomas Rogers, Esq. | Attorney contact information | AC |
| PRIV0003 | 5/16/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. cc: Helene McCole, Robin Costa and Timothy Malik | Discussion with Vesterra | AC |
| PRIV0004 | 5/31/2005 | Email | Thomas Rogers, Esq. | To: Helene McCole cc: Jessica Leveroni, Esq., Timothy Malik and Robin Costa | Call to Vesterra | AC |
| PRIV0005 | 6/14/2005 | Email | Thomas Rogers, Esq. | To: Timothy Malik, Jessica Leveroni, Esq. and John Ferrie | Discussion with Vesterra | AC |
| PRIV0006 | 7/15/2005 | Email | Thomas Rogers, Esq. | To: Timothy Malik, Jessica Leveroni, Esq. and John Ferrie | Discussion with Vesterra | AC |
| PRIV0008 | 7/23/2004 | Memorandum | Robin Costa | To: Michael Epstein, Esq., in-house counsel, John Hancock Life Insurance Company | Vesterra due diligence | AC |
| PRIV0009 | 7/28/2004 | Email | Timothy Malik | To: John Ferrie cc: Nathaniel Margolis, Esq., in-house counsel, John Hancock Life Insurance Company | Vesterra Loan | AC |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication; WP = Attorney Work Product*

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0010-0028 | 7/29/2004 | Email w/attachment | Timothy Malik | To: John Ferrie<br>cc: Nathaniel Margolis, Esq. | Draft Supplement to Vesterra Loan Application with attorney comments | AC |
| PRIV0029 | 7/29/2004 | Email | Timothy Malik | To: John Ferrie | Discussion regarding attorney comments | AC |
| PRIV0030 | 8/2/2004 | Email | Timothy Malik | To: John Ferrie | Forwarding draft Letter of Credit and attorney comments | AC |
| PRIV0030-0033 | 8/2/2004 | Email w/attachment | Nathaniel Margolis, Esq. | To: Timothy Malik | Draft Letter of Credit | AC |
| PRIV0034 | 8/3/2004 | Email w/attachment | Timothy Malik | To: John Ferrie | Forwarding attorney comments | AC |
| PRIV0034-0038 | 7/28/2004 | Email w/attachment | Nathaniel Margolis, Esq. | To: Timothy Malik | Loan Agreement provisions | AC |
| PRIV0039-0040 | 8/4/2004 | Letter | Nathaniel Margolis, Esq. | To: Robert M. Schwartz, White & Williams LLP<br>cc: Robin Costa, John Ferrie, and Timothy Malik | Vesterra Loan | AC |
| PRIV0041 | 8/5/2004 | Email | Robert Schwartz, Esq. | To: Timothy Malik | Vesterra construction loan | AC |
| PRIV0041 | 8/5/2004 | Email | Timothy Malik | To: David B. Henderson<br>cc: Nathaniel Margolis, Esq., John Ferrie and Patricia C. Coyne | Forwarding attorney comments regarding Vesterra construction loan | AC |
| PRIV0042-0045 | 8/11/2004 | Email w/attachment | Timothy Malik | To: Nathaniel Margolis, Esq.<br>cc: John Ferrie | Draft Amendment to Vesterra Loan Application | AC |
| PRIV0046-0051 | 8/11/2004 | Email w/attachment | Timothy Malik | To: John Ferrie | Forwarding draft Amendment to Vesterra Loan Application with attorney comments | AC |
| PRIV0052-0053 | 8/19/2004 | Letter | Nathaniel Margolis, Esq. | To: Robert Schwartz, Esq.<br>cc: Robin Costa and John Ferrie | Vesterra Loan Commitment | AC |

*Privilege Log of John Hancock Life Insurance Company -- Civil Action 05-11614-WGY*<br>*AC = Attorney-Client Communication, WP = Attorney Work Product*

2

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0054-0055 | | Duplicate of PRIV0001-0002 | | | | AC |
| PRIV0056 | 5/9/2005 | Email | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq. cc: Martha Lecaroz | Title/survey for Avenel property | AC |
| PRIV0056-0058 | | Duplicate of PRIV0001-0002 | | | | AC |
| PRIV0059 | 5/16/2005 | Email | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq. cc: Helene McCole, Robin Costa, and Timothy Malik | Vesterra Loan | AC |
| PRIV0059-0060 | 5/16/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. cc: Helene McCole, Robin Costa and Timothy Malik | Discussion with Vesterra | AC |
| PRIV0061 | 5/16/2005 | Email | Timothy Malik | To: John Ferrie | Forwarding attorney comments regarding discussion with Vesterra | AC |
| PRIV0061-0062 | 5/16/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. cc: Helene McCole, Robin Costa and Timothy Malik | Discussion with Vesterra | AC |
| PRIV0063 | 5/31/2005 | Email | Timothy Malik | To: John Ferrie | Forwarding attorney comments regarding discussion with Vesterra | AC |
| PRIV0063 | 5/31/2005 | Email | John Ferrie | To: Thomas Rogers, Esq. cc: Timothy Malik, Helene McCole, and Brian Depolis | Meeting with Vesterra | AC |
| PRIV0063-0064 | 5/31/2005 | Email | Thomas Rogers, Esq. | To: Helene McCole cc: Jessica Leveroni, Esq., Timothy Malik and Robin Costa | Call to Vesterra | AC |
| PRIV0065-0067 | 5/31/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Meeting with Vesterra | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-1161-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

3

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0068 | 5/31/2005 | Email | Timothy Malik | To: John Ferrie<br>cc: Timothy Roseen | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0068 | 5/31/05 | Email | John Ferrie | To: Thomas Rogers, Esq.<br>cc: Timothy Malik, Helene McCole and Brian Depolis | Meeting with Vesterra | AC/WP |
| PRIV0069 | 5/31/05 | Email | Timothy Malik | To: John Ferrie | Forwarding attorney comments regarding call to Vesterra | AC/WP |
| PRIV0069-0070 | 5/31/05 | Email | Thomas Rogers | To: Helene McCole<br>cc: Jessica Leveroni, Esq., Timothy Malik, and Robin Costa | Call to Vesterra | AC/WP |
| PRIV0071-0072 | 5/31/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Meeting with Vesterra | AC/WP |
| PRIV0073 | 5/31/2005 | Email | Timothy Malik | To: John Ferrie | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0075 | 6/1/2005 | Email | John Ferrie | To: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0075 | | DUPLICATE of PRIV0073 | | | | |
| PRIV0075-0077 | 6/1/2005 | Email | John Ferrie | To: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0078 | 6/1/2005 | Email | Timothy Malik | To: Jessica Leveroni, Esq. and John Ferrie | Vesterra deposits/Letters of Credit | AC/WP |
| PRIV0078 | 6/1/2005 | Email | Robin Costa | To: Timothy Malik | Vesterra Letters of Credit | AC/WP |
| PRIV0079 | 5/31/2005 | Email | Timothy Malik | To: Robin Costa | Vesterra Letters of Credit | AC/WP |
| PRIV0079-0080 | 5/31/2005 | Email | Robin Costa | To: Timothy Malik | Vesterra deposits | AC/WP |
| PRIV0080 | 5/31/2005 | Email | Timothy Malik | To: Robin Costa | Vesterra deposits | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-1161-4-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

4

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0081 | 6/1/2005 | Email | Timothy Malik | To: John Ferrie<br>cc: Jessica Leveroni, Esq. | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0083 | 6/1/2005 | Email | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq.<br>cc: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0083-0084 | | DUPLICATE of PRIV0081 | | | | |
| PRIV0085 | 6/6/2005 | Email | Timothy Malik | To: Jessica Leveroni, Esq.<br>cc: Thomas Rogers, Esq. | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0087 | 6/7/2005 | Email | Timothy Malik | To: Ken Cuffee | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0087-0090 | 6/7/2005 | Email w/attachment | Ken Cuffee | To: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0091 | 6/8/2005 | Email | John Ferrie | To: Timothy Malik<br>cc: Thomas Rogers, Esq. and Jessica Leveroni, Esq. | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0093 | 6/8/2005 | Email | Timothy Malik | To: John Ferrie | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0093 | | DUPLICATE of PRIV0091 | | | | |
| PRIV0095-0096 | 6/8/2005 | Email | Timothy Malik | To: William G. McPadden and Timothy Roseen<br>cc: Nathaniel Margolis, Esq;, Jessica Leveroni, Esq. and Michael Epstein, Esq. | Vesterra Loan Commitment | AC/WP |
| PRIV0096-0097 | | DUPLICATE of PRIV0087-0088 | | | | |

*Privilege Log of John Hancock Life Insurance Company—Civil Action 05-1161-I-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0098-0101 | 6/8/2005 | Email w/attachment | Thomas Rogers, Esq. | To: John Ferrie, Jessica Leveroni, Esq., and Timothy Malik | Draft letter to Vesterra | AC/WP |
| PRIV0102-0103 | 6/8/2005 | Email | Timothy Malik | To: Thomas Rogers. Esq., John Ferrie, Jessica Leveroni, Esq., and Timothy Malik | Draft letter to Vesterra | AC/WP |
| PRIV0104 | 6/8/2005 | Email | John Ferrie | To: Thomas Rogers. Esq. | Draft letter to Vesterra | AC/WP |
| PRIV0105 | 7/9/2005 | Email | Timothy Malik | To: John Ferrie  cc: Jessica Leveroni, Esq. and Thomas Rogers, Esq. | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0107-0108 | 06/04; 06/05 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0109-0110 | 6/9/04; 6/9/05 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0111-0112 | | DUPLICATE of PRIV0109-0110 | | | | |
| PRIV0113-0115 | 7/05 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0116-0117 | 6/9/04; 6/9/05 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0118-0120 | 6/9/2005 | Email w/attachment | Thomas Rogers, Esq. | To: John Ferrie, Jessica Leveroni, Esq., and Timothy Malik | Letter to Vesterra | AC/WP |
| PRIV0121 | 6/14/2005 | Email | Thomas Rogers, Esq. | To: Timothy Malik. Jessica Leveroni, Esq. and John Ferrie | Discussion with Vesterra | AC/WP |
| PRIV0121 | 6/15/2005 | Email | John Ferrie | To: Helene McCole | Forwarding attorney comments regarding discussion with Vesterra | AC/WP |
| PRIV0122-0123 | 6/21/2005 | Email w/attachment | Timothy Malik | To: Jessica Leveroni, Esq., and Thomas Rogers, Esq., | Determination of estimated losses prepared for potential legal claim | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0124 | 6/21/2005 | Email | Jessica Leveroni, Esq. | To: Timothy Malik<br>cc: Thomas Rogers, Esq. | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0124-0125 | | DUPLICATE of PRIV0122 | | | | |
| PRIV0126 | 6/21/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Email attachment | AC/WP |
| PRIV0127 | | DUPLICATE of PRIV0122 | | | | |
| PRIV0128-0130 | 6/21/2005 | Email w/attachment | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq.<br>cc: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0131, PRIV0132-0135 | 6/23/2005 | Fax Cover Letter (multiple copies) | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq., Timothy Malik, and John Ferrie | Letter from Vesterra | AC/WP |
| PRIV0136-0148 | 6/28/2005 | Email w/attachments | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq.<br>cc: Jessica Leveroni, Esq. | Research and analysis re potential legal claim | AC/WP |
| PRIV0149 | 6/29/2005 | Email | Brian Depolis | To: Jessica Leveroni, Esq.<br>cc: Timothy Malik, John Ferrie, Helene McCole, and Thomas Rogers, Esq. | Vesterra Loan Commitment | AC/WP |
| PRIV0150 | 6/29/2005 | Email | Helene McCole | To: Robin Costa | Forwarding email to attorney regarding Vesterra Loan Commitment | AC/WP |
| PRIV0151 | 6/30/2005 | Email | Timothy Malik | To: Jessica Leveroni, Esq., Brian Depolis, and Thomas Rogers. Esq.<br>cc: John Ferrie and Helene McCole | Vesterra Loan Commitment | AC/WP |
| PRIV0151 | 6/30/05 | Email | Jessica Leveroni, Esq. | Timothy Malik | Vesterra Loan Commitment | AC/WP |
| PRIV0151-0152 | | DUPLICATE of PRIV0149 | | | | |

Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WG)
AC = Attorney-Client Communication. WP = Attorney Work Product

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0153-0154 | | DUPLICATE of PRIV0151-0152 | | | | |
| PRIV0155-0163 | 7/5/2005 | Memorandum | Gordon P. Katz, Esq., and Robert J. Burns, Esq., Holland & Knight LLP | To: Michael Epstein, Esq., and Jessica Leveroni, Esq. | Research and analysis re potential legal claim | AC/WP |
| PRIV0164-0167 | 7/6/2005 | Email w/attachment | Thomas Rogers, Esq. | To: Timothy Malik, Jessica Leveroni, Esq., and John Ferrie | Draft letter to Vesterra | AC/WP |
| PRIV0168 | 7/6/2005 | Email | John Ferrie | To: Thomas Rogers, Esq. | Draft letter to Vesterra | AC/WP |
| PRIV0169-0172 | 7/7/2005 | Email w/attachment | Timothy Malik | To: Jessica Leveroni, Esq., and Thomas Rogers, Esq. | Draft letter to Vesterra | AC/WP |
| PRIV0173-0176 | 7/7/2005 | Email w/attachment | Thomas Rogers, Esq. | To: Timothy Malik, Jessica Leveroni, Esq., and John Ferrie | Draft letter to Vesterra | AC/WP |
| PRIV0177 | 7/7/2005 | Email | John Ferrie | To: Thomas Rogers, Esq. | Draft letter to Vesterra | AC/WP |
| PRIV0178 | 7/7/2005 | Email | Timothy Malik | To: Thomas Rogers, Esq. | Draft letter to Vesterra | AC/WP |
| PRIV0178-0179 | | DUPLICATE of PRIV0173 | | | | |
| PRIV0180 | 7/7/2005 | Email | Thomas Rogers, Esq. | To: Timothy Malik | Draft letter to Vesterra | AC/WP |
| PRIV0181 | | DUPLICATE of PRIV0173 | | | | |
| PRIV0182-0186 | 7/7/2005 | Email w/attachment | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq. and Timothy Malik | Draft letter to Vesterra | AC/WP |
| PRIV0187-0188 | 7/8/2004; 7/8/2005 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0189-0191 | 7/04; 7/05 | (Draft) Letter | Thomas Rogers, Esq. | | Vesterra Loan Commitment | AC/WP |
| PRIV0192 | 7/15/2005 | Email | Thomas Rogers, Esq. | To: Timothy Malik, Jessica Leveroni, Esq., and John Ferrie | Discussion with Vesterra | AC/WP |
| PRIV0193 | 7/19/2005 | Fax Cover Letter | Helene McCole | To: Jessica Leveroni. Esq. | Vesterra Letters of Credit | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

8

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0194 | 7/19/2005 | Email | Timothy Malik | To: William McPadden and Timothy Roseen | Potential legal claim | AC/WP |
| PRIV0195 | 7/19/2005 | Email | William McPadden | To: Timothy Malik, William McPadden, and Timothy Roseen | Potential legal claim | AC/WP |
| PRIV0195 | 7/19/2005 | Email | Timothy Roseen | To: William McPadden and Timothy Malik | Potential legal claim | AC/WP |
| PRIV0195-0196 | | DUPLICATE of PRIV0194 | | | | |
| PRIV0197 | 7/19/2005 | Email | Helene McCole | To: Robin Costa  cc: Thomas Rogers, Esq. | Vesterra Letters of Credit/ Potential legal claim | AC/WP |
| PRIV0197 | 7/19/2005 | Email | Robin Costa | To: Helene McCole | Vesterra Letters of Credit | AC/WP |
| PRIV0198-0199 | 7/19/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Vesterra Letters of Credit | AC/WP |
| PRIV0200 | 7/20/2005 | Email | Robin Costa | To: Helene McCole | Vesterra Letters of Credit/ Potential legal claim | AC/WP |
| PRIV0200-0201 | | DUPLICATE of PRIV0197 | | | | |
| PRIV0202 | 7/21/2005 | Email | Morgan Salmon | To: Timothy Malik | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0203 | 7/22/2005 | Email | Helene McCole | To: Thomas Rogers, Esq.  cc: Jessica Leveroni, Esq., Robin Costa, Timothy Malik, and Brian Depolis | Vesterra Letters of Credit | AC/WP |
| PRIV0204 | 7/22/2005 | Email | Thomas Rogers, Esq. | To: Helene McCole  cc: Jessica Leveroni, Esq., Robin Costa, Timothy Malik and Brian Depolis | Vesterra Letters of Credit/ Potential legal claim | AC/WP |
| PRIV0204-0205 | | DUPLICATE of PRIV0203 | | | | |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0206 | 7/26/2005 | Email | John Ferrie | To: Timothy Malik cc: Thomas Rogers, Esq., Helene McCole, and Brian Depolis | Vestera Letters of Credit | AC/WP |
| PRIV0207 | 7/26/2005 | Email | Timothy Malik | To: John Ferrie | Vestera Letters of Credit | AC/WP |
| PRIV0207-0208 | | DUPLICATE of PRIV0206 | | | | |
| PRIV0209 | 7/26/2005 | Email | Jessica Leveroni, Esq. | To: John Ferrie, Helene McCole, Brian Depolis, and Timothy Malik cc: Thomas Rogers, Esq. and Jessica Leveroni, Esq. | Vestera default | AC/WP |
| PRIV0210 | 7/29/05 | Memorandum | Mary E. Brundage | To: Thomas Rogers, Esq. | Vestera Letters of Credit | AC/WP |
| PRIV0211 | 7/29/2005 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq., Nathaniel Margolis, Esq., and Timothy Malik | Communication from Vestera counsel | AC/WP |
| PRIV0212 | 7/29/2005 | Email | Mary Brundage | To: Thomas Rogers, Esq. | Vestera Letters of Credit | AC/WP |
| PRIV0213 | 8/1/2005 | Email | Timothy Malik | To: Thomas Rogers, Esq., Jessica Leveroni, Esq., Nathaniel Margolis, Esq., and Timothy Malik | Communication from Vestera counsel | AC/WP |
| PRIV0213-0214 | | DUPLICATE of PRIV0211 | | | | |
| PRIV0215 | 8/1/2005 | Email | Jessica Leveroni, Esq. | To: Brian Davis, Esq., Choate, Hall & Stewart LLP cc: Thomas Rogers, Esq. | Potential legal claim | AC/WP |
| PRIV0215-0216 | 8/1/2005 | Email | Brian Davis, Esq. | To: Jessica Leveroni, Esq. | Call to Vestera counsel | AC/WP |
| PRIV0216 | 8/1/2005 | Email | Jessica Leveroni, Esq. | To: Brian Davis, Esq. | Communication from Vestera counsel | AC/WP |
| PRIV0216-0218 | 7/29/2005 | Email | Jessica Leveroni, Esq. | To: Brian A. Davis, Esq. cc: Nathaniel Margolis, Esq. | Communication from Vestera counsel | AC/WP |
| PRIV0219 | 8/1/05 | Email | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Vestera Letters of Credit | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

10

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0220-0222 | 8/1/2005 | Email w/attachment | Thomas Rogers, Esq. | To: Jessica Leveroni, Esq. | Draft form sight draft | AC/WP |
| PRIV0223 | 8/2/2005 | Email | Timothy Malik | To: Morgan Salmon cc: Jessica Leveroni, Esq., Joan Uzdavinis, and Timothy Roseen | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0224-0225 | 8/2/2005 | Letters | Arthur J. Francis | To: Thomas Rogers, Esq. | Vesterra Letters of Credit and sight draft | AC/WP |
| PRIV0226 | 8/2/2005 | Email | Morgan Salmon | To: Timothy Malik cc: Jessica Leveroni, Esq., Joan Uzdavinis, and Timothy Roseen | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0227 | 8/2/2005 | Email | Timothy Malik | To: Morgan Salmon cc: Jessica Leveroni, Esq., Joan Uzdavinis, and Timothy Roseen | Determination of estimated losses prepared for potential legal claim | AC/WP |
| PRIV0227-0228 | | DUPLICATE of PRIV0223 & PRIV0226 | | | | |
| PRIV0229-0239 | 8/2/2005 | Email w/attachments | Jessica Leveroni, Esq. | To: Thomas Rogers, Esq. and Joan Rosoff, Esq., White & Williams LLP | Draft form sight drafts | AC/WP |
| PRIV0240-0242 | 8/2/2005 | Email w/attachments | Jessica Leveroni, Esq. | To: Joan Rosoff, Esq. and Thomas Rogers, Esq. | Draft form sight drafts | AC/WP |
| PRIV0243-0249 | 8/2/2205 | Email w/attachments | Jessica Leveroni, Esq. | To: Joan Rosoff, Esq. and Thomas Rogers, Esq. | Vesterra Letters of Credit/ form sight drafts | AC/WP |
| PRIV0250-0252 | 8/2/2005 | Email w/attachments | Jessica Leveroni, Esq. | To: Joan Rosoff, Esq. and Thomas Rogers, Esq. | Draft form sight drafts | AC/WP |
| PRIV0253-0261 | 8/2/2005 | Email w/attachments | Jessica Leveroni, Esq. | To: Joan Rosoff, Esq. and Thomas Rogers, Esq. | Draft form sight drafts | AC/WP |
| PRIV0262-0265 | Undated | (Draft) Sight drafts | | | Draft form sight drafts with attorney comments | AC/WP |

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

11

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0266-PRIV0285 | 8/2/05 | (Draft) Letters | | | Draft correspondence regarding Vesterra Letters of Credit and form sight drafts | AC/WP |
| PRIV0330-0338 | Undated | Spreadsheets | | | Determination of estimated losses prepared for potential legal claim | WP |
| PRIV0339-0340 | Undated | Spreadsheet | | | Determination of estimated losses prepared for potential legal claim | WP |
| PRIV0341-0342 | Undated | Spreadsheet | | | Determination of estimated losses prepared for potential legal claim | WP |
| PRIV0343-0350 | | DUPLICATES of PRIV0341-0342 | | | | |
| PRIV0351 | | DUPLICATE of PRIV0334 | | | | |
| PRIV0352-0355 | | Spreadsheets | | | Determination of estimated losses prepared for potential legal claim | WP |
| PRIV0371 | 7/29/2005 | Attorney Notes | Thomas Rogers, Esq. | | Discussion with Vesterra | AC/WP |
| PRIV0372 | Undated | Attorney Notes | Thomas Rogers, Esq. | | Vesterra Letters of Credit | AC/WP |
| PRIV0373 | 7/15/2005 | Attorney Notes | Thomas Rogers, Esq. | | Discussion with Vesterra | AC/WP |
| PRIV0374 | 6/9/2005 | Attorney Notes | Thomas Rogers, Esq. | | Discussion with Vesterra | AC/WP |
| PRIV0375 | 6/8/2005 | Attorney Notes | Thomas Rogers, Esq. | | Attorney discussions | AC/WP |
| PRIV0376 | 6/6/2005 | Attorney Notes | Thomas Rogers, Esq. | | Attorney discussions | AC/WP |
| PRIV0377-0378 | 8/11/2004 | (Draft) Amendment to Loan Application | | | Draft Amendment to Loan Application with attorney comments | AC |
| PRIV0379-0380 | 8/11/2004 | (Draft) Amendment to Loan Application | | | Draft Amendment to Loan Application with attorney comments | AC |

| Control Number | Date | Document Type | Author | Recipient | Subject | Privilege |
|---|---|---|---|---|---|---|
| PRIV0381-0382 | 8/11/2004 | (Draft) Amendment to Loan Application | | | Draft Amendment to Loan Application | AC |
| PRIV0383-0402 | Undated | (Draft) Supplement to Loan Application | | | Draft Supplement to Loan Application with attorney comments | AC |
| PRIV0403-0407 | 6/18/2004 | (Draft) Quote | | | Draft Quote with attorney comments | AC |
| PRIV0408-0413 | 7/15/2004 | (Draft) Quote | | | Draft Quote with attorney comments | AC |
| PRIV0414-0533 | Undated | (Draft) Supplement to Loan Application (with multiple) | | | Draft Supplement to Loan Application with attorney comments | AC |
| PRIV0534-0538 | 8/11/2004 | Email w/attachment | Timothy Malik | To: John Ferrie | Forwarding draft Amendment to Loan Application with attorney comments | AC |
| PRIV0539-0761 | Undated | (Drafts) Supplement to Loan Application | | | Draft Supplement to Loan Application with attorney comments | AC |

4037912 1

*Privilege Log of John Hancock Life Insurance Company – Civil Action 05-11614-WGY*
*AC = Attorney-Client Communication, WP = Attorney Work Product*

13

# EXHIBIT Y

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, <br><br>     Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> VESTMONT LIMITED PARTNERSHIP, VESTMONT LIMITED PARTNERSHIP II, VESTMONT LIMITED PARTNERSHIP III, and VESTERRA CORPORATION d/b/a MONTGOMERY SQUARE PARTNERSHIP, <br><br>     Defendants/Counterclaim Plaintiffs. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO. 05-11614-WGY <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S RESPONSE TO DEFENDANTS' SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS

Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock"), by its attorneys, hereby responds and objects, pursuant to Fed. R. Civ. P. 34(b) and the Local Rules of this Court, to the Second Set of Requests for the Production of Documents and Things (the "Second Request") propounded by defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation d/b/a/ Montgomery Square Partnership (collectively, "Defendants") as follows.

### General Objections

1.    John Hancock generally objects to the Defendants' Second Request to the extent that it seeks the disclosure of any documents or materials that are protected by the attorney-client

privilege, the work product doctrine, or any other applicable privilege. To the extent that the Defendants' Second Request implicates such documents or materials, they are excluded from John Hancock's responses. The inadvertent disclosure of any document or material protected by any such privilege or immunity shall not constitute a waiver of that privilege or immunity.

2.      John Hancock generally objects to the Defendants' Second Request to the extent that it seeks documents or materials containing confidential or proprietary information. To the extent that relevant documents or materials containing confidential or proprietary information are produced, they shall be governed by the Stipulated Protective Order filed jointly by the parties on October 28, 2005 and any other confidentiality agreement negotiated by the parties.

3.      John Hancock generally objects to Defendants' definition of "you", "your", "Plaintiff" and/or "John Hancock" to the extent that it purports to include independent entities that John Hancock does not control (such as "affiliates"), and on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving or in any way compromising the foregoing objections, John Hancock will interpret the terms "you" "your", "Plaintiff" and/or "John Hancock" to mean John Hancock Life Insurance Company, John Hancock Real Estate Finance, Inc., their corporate predecessors and successors, as applicable, and the relevant employees, officers and directors, agents and attorneys of each.

4.    John Hancock generally objects to Instruction No. 3, incorporated by reference in its Second Request, on the grounds that is it overly broad and unduly burdensome. John Hancock will endeavor to produce relevant, non-privileged documents as they are kept in the ordinary course of business, but will not produce irrelevant documents merely because they may be "enclosed with" a responsive document.

5.    John Hancock generally objects to Instruction No. 8, incorporated by reference in its Second Request, on the grounds that it is overly broad and unduly burdensome in that it is not limited to a reasonable time period.

6.    John Hancock generally objects to the Defendants' Requests to the extent that they purport to require John Hancock to take actions or provide information not required by the Federal Rules of Civil Procedure, the Local Rules of this Court, or other applicable law.

7.    The provision of any specific response is not intended to, and does not, act as a waiver of any General Objection.

8.    Discovery in this action is ongoing. John Hancock expressly reserves the right to supplement or otherwise modify its responses to Defendants' Requests as it deems necessary or appropriate in light of additional information, documents or materials that are discovered or disclosed in the course of this proceeding.

### Specific Responses and Objections

Subject to and without waiving or compromising the foregoing general objections, each of which is hereby incorporated by reference into each of the following responses, John Hancock responds to the specific Requests propounded by the Defendants as follows:

-3-

## REQUEST NO. 1

All documents and things relating to your policies, guidelines, requirements, targets, practices, processes or methods for allocating assets among various types of investments such as, but not limited to, government bonds, commercial bonds, commercial real estate mortgages, other mortgages and other types of investments.

## RESPONSE NO. 1

John Hancock objects to this Request on the grounds that it is overly broad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 2

All documents and things, including but not limited to, the loan applications, relating to each of the loans approved by John Hancock and listed in Exhibit A hereto.

## RESPONSE NO. 2

John Hancock objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 3

All documents and things relating to the Regatta Apartments, including, but not limited to, any written communications or negotiations between Regatta Apartments and John Hancock relating to the decision not to close on the mortgage loan from John Hancock; all documents evidencing any damages that John Hancock suffered as a result of the failure to close; and all documents relating to John Hancock's decision not to seek damages above the fees already paid in connection with that loan application.

## RESPONSE NO. 3

John Hancock objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

-4-

**REQUEST NO. 4**

All communications between John Hancock and any third party not a party to this lawsuit that relate to the Loan Application.

**RESPONSE NO. 4**

John Hancock previously has produced all such responsive, non-privileged documents in its custody, possession and control in response to Requests Nos. 11-13 of Defendants' First Set of Requests for the Production of Documents and Things.

**REQUEST NO. 5**

All organizational charts or other documents depicting the internal structure or reporting relationships since January 2002 within the divisions or sections within John Hancock, or relating to the personnel within John Hancock, that relate to mortgage loans made by John Hancock and investment allocations and decisions by John Hancock.

**RESPONSE NO. 5**

John Hancock objects to this Request on the grounds that it is overly broad and unduly burdensome. Notwithstanding and without waiving or compromising the foregoing general and specific objections, John Hancock will produce non-privileged documents in its possession, custody or control reasonably responsive to this Request, to the extent that they exist.

**REQUEST NO. 6**

All documents and things containing the names and home and/or business addresses of all individuals contacted as potential witnesses in this lawsuit.

**RESPONSE NO. 6**

John Hancock objects to this Request on the grounds that it is overly broad, unduly burdensome, and seeks information protected by the work product privilege.

**REQUEST NO. 7**

All documents and things evidencing or relating to the policies, guidelines, requirements, targets, practices, processes or methods for underwriting or approving mortgage loans prior to April 28, 2004, including, but not limited to, any internal underwriting or other manuals.

**RESPONSE NO. 7**

John Hancock objects to this Request on the grounds that it is overly broad and unduly burdensome  Notwithstanding and without waiving or compromising the foregoing general and specific objections, John Hancock will produce non-privileged documents in its possession, custody or control reasonably responsive to this Request, to the extent that they exist, on an "Confidential - Outside Attorneys' Eyes Only" basis.

**REQUEST NO. 8**

All documents and things evidencing or relating to the policies, guidelines, requirements, targets, practices, processes or methods for underwriting or approving mortgage loans after April 28, 2004, including, but not limited to, any internal underwriting or other manuals.

**RESPONSE NO. 8**

John Hancock objects to this Request on the grounds that it is overly broad and unduly burdensome.  Notwithstanding and without waiving or compromising the foregoing general and specific objections, John Hancock will produce non-privileged documents in its possession, custody or control reasonably responsive to this Request, to the extent that they exist, on an "Confidential - Outside Attorneys' Eyes Only" basis.

**REQUEST NO. 9**

All documents and things evidencing or relating to the policies, guidelines, requirements, or practices for disbursing or closing mortgage loans after the loans have been approved, from January 1, 2000 to the present.

**RESPONSE NO. 9**

John Hancock objects to this Request on the grounds that it is vague, overly broad, and

-6-

unduly burdensome.  Notwithstanding and without waiving or compromising the foregoing

general and specific objections, John Hancock will produce non-privileged documents in its

possession, custody or control reasonably responsive to this Request, to the extent that they exist,

on an "Confidential - Outside Attorneys' Eyes Only" basis.

## REQUEST NO. 10

All documents and things evidencing or relating to the policies, guidelines, requirements,
or practices relating to the use and allocation of application fees and commitment fees that are
retained by John Hancock after a mortgage loan fails to close, including but not limited to the
specific use and allocation of the application fee and commitment fee relating to the Loan
Application.

## RESPONSE NO. 10

John Hancock objects to this Request on the grounds that it is overly broad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 11

The draft amendment referred to in Plaintiff's Privilege Log at PRIV0042-0045.

## RESPONSE NO. 11

John Hancock objects to this Request on the grounds that it seeks information protected

by the attorney-client privilege.

**REQUEST NO. 12**

All documents and things relating to the "hedge loss" protections obtained by, and any hedge-related costs incurred by, John Hancock relating to the Loan Application.

**RESPONSE NO. 12**

John Hancock objects to this Request on the grounds that it is overly broad and unduly burdensome. Notwithstanding and without waiving or compromising the foregoing general and specific objections, John Hancock will produce non-privileged documents in its possession, custody or control reasonably responsive to this Request, to the extent that they exist.

**REQUEST NO. 13**

Documents sufficient to show your projections of the annual returns on your investments, including by asset category, for the next ten (10) years.

**RESPONSE NO. 13**

John Hancock objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 14**

Documents sufficient to show the annual returns on your investments, including by asset category, for the past ten (10) years.

**RESPONSE NO. 14**

John Hancock objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 15**

Documents sufficient to show John Hancock's annual revenues and net worth from 2001 to date.

**RESPONSE NO. 15**

John Hancock objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 16**

All documents and things identified or which must be identified by you in your self-executing disclosures, and all documents and things identified in your answers to Defendants' Second Set of Interrogatories.

**RESPONSE NO. 16**

John Hancock will produce non-privileged documents in its possession, custody or control reasonably responsive to this Request.

JOHN HANCOCK LIFE INSURANCE COMPANY,

By its attorneys,

Brian A. Davis (BBO No. 546462)
Paul D. Popeo (BBO No. 567727)
Lisa M. Gaulin (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tele: 617-248-5000
Fax: 617-248-4000

Date: March 3, 2006

4051284 1

'

# EXHIBIT Z



FREE

METROPOLITAN PHILADELPHIA, DELAWARE & SOUTH NEW JERSEY

# APARTMENT SHOPPERS GUIDE

JANUARY 2006

ApartmentGuide.com

Enter the property name at ApartmentGuide.com for photos, floorplans and more

*Place One*
LUXURY APARTMENTS

FEATURE FINDER – PAGE 18
CORPORATE/TEMPORARY HOUSING – PAGE 338
SENIOR HOUSING – PAGE 108
STUDENT HOUSING – PAGES 119 & 344

Place One
866-757-7368

See page 156

V 2574





BUCKS COUNTY, PA

# : APARTMENTS

:t us accommodate you with a friendly and
spacious one and two bedroom floorplans
.enient location is minutes to the Pennsylvania
)ur desirable location makes us accessible to
me home to Arbor Lane.

## JDED AND BASIC CABLE



**FLOORPLANS**
One bedrooms from $815
Two bedrooms from $935

*Arbor Lane Apartments*

**600 Old Street Road**
**Trevose, PA 19053**
**(215) 357-6655**
FAX (215) 396-2980
E-mail: arborlane@uchweb.com

From Rte 1 (Roosevelt
ke Street Road West
At the Trevose Fire
:reet Road), turn right
and Arbor Lane is on
PA Turnpike, take exit
>ad West and proceed

:S: Mon-Fri 9:30-5:30;



# AVENEL AT MONTGOMERY SQUARE

Now leasing brand new, distinctive apartment homes. Just moments away from Route 309,
the PA Turnpike, I-76 and SEPTA, Avenel combines this exceptional location with gracious
styling and extraordinary amenities to create the perfect apartment home for you.

## VISIT US AT www.avenelapartments.com

**FEATURES**
- Nine-foot ceilings and bright six-foot windows
- Full-size washer and dryer
- Garages available and storage
- Gourmet kitchens with maple cabinets, microwave and dishwasher
- Resort-style pool with sundeck
- Fireplaces available
- Across from Montgomery Mall, dining and entertainment
- Private patio or balcony
- Pet friendly
- High-tech fitness center
- Fully equipped business center
- Brand new luxury living



**DIRECTIONS:** Take the PA Turnpike
to exit 339 (Ft. Washington). Go north
on Route 309 approximately eight
miles to a left on 202 South. We are
on the left.
**HOURS:** Mon-Thurs 9-6; Fri 8-5; Sat
10-5; Sun 12-5

**FLOORPLANS**
1 BDR/1 BTH
1 BDR/1 BTH with den
1 BDR/1 BTH with loft
2 BDR/2 BTH
2 BDR/2 BTH with den
2 BDR/2 BTH with loft
Apartment homes starting at
$1225



**1100 Avenel Boulevard**
**North Wales, PA 19454**
**(215) 699-9930**
FAX (215) 699-9935

 

BUCKS COUNTY, PA

27

V 2575

MONTGOMERY COUNTY, PA

127

# AVENEL AT MONTGOMERY SQUARE

Now leasing brand new, distinctive apartment homes. Just moments away from Route 309, the PA Turnpike, I-76 and SEPTA, Avenel combines this exceptional location with gracious styling and extraordinary amenities to create the perfect apartment home for you.

## VISIT US AT www.avenelapartments.com

**FEATURES**
- Nine-foot ceilings and bright six-foot windows
- Full-size washer and dryer
- Garages available and storage
- Gourmet kitchens with maple cabinets, microwave and dishwasher
- Resort-style pool with sundeck
- Fireplaces available
- Across from Montgomery Mall, dining and entertainment
- Private patio or balcony
- Pet friendly
- High-tech fitness center
- Fully equipped business center
- Brand new luxury living

**FLOORPLANS**
- 1 BDR/1 BTH
- 1 BDR/1 BTH with den
- 1 BDR/1 BTH with loft
- 2 BDR/2 BTH
- 2 BDR/2 BTH with den
- 2 BDR/2 BTH with loft
Apartment homes starting at $1225



*Avenel*
At Montgomery Square

1100 Avenel Boulevard
North Wales, PA 19454
(215) 699-9930
FAX (215) 699-9935





**DIRECTIONS:** Take the PA Turnpike to exit 339 (Ft. Washington). Go north on Route 309 approximately eight mile to a left on 202 South. We are on the left.

**HOURS:** Mon-Thurs 9-6; Fri 8-5; Sat 10-5; Sun 12-5

*Enter the property name at ApartmentGuide.com for photos, floorplans and more ★ ©HPC Publications*

---

# LUXURY HAS A NEW ADDRESS!



- 9-FT. CEILINGS AND EXPANSIVE 6-FOOT WINDOWS
- 1 AND 2 BEDROOMS WITH DEN
- UNIQUE LOFT HOMES AVAILABLE
- PET FRIENDLY
- PRIVATE BALCONY AND PATIO
- EFFICIENT GAS HEAT AND COOKING
- FITNESS CENTER WITH CARDIO AND STRENGTH EQUIPMENT
- RESORT-STYLE POOL WITH SUNDECK
- GARAGE AND STORAGE AVAILABLE
- BUSINESS CENTER WITH COMPUTER ACCESS AND HIGH-SPEED INTERNET
- SERVICE
- MINUTES FROM SEPTA TRAIN
- LUXURY LIVING SERVICES INCLUDED

*Avenel*
At Montgomery Square

(215) 699-9930
FAX (215) 699-9935
www.avenelapartments.com

1100 AVENEL BOULEVARD
NORTH WALES, PA 19454

*Enter the property name at ApartmentGuide.com for photos, floorplans and more ★ ©HPC Publications*

126

**PHILADELPHIA/
DELAWARE/NEW JERSEY**

*FREE*

# Apartment guide®

Apartmentguide.com

**A DIRECTORY FOR THE APARTMENT SHOPPER**          **OCTOBER 2005**

INCLUDES THE LEHIGH VALLEY – PAGE 59
BERKS COUNTY – PAGE 76 • CORPORATE/TEMPORARY HOUSING – PAGE 865

Enter the property name at ApartmentGuide.com for photos, floorplans and more



Thomas Meeting                    See Page 204, 205 ®

## Bucks County's Newest Luxury Rental Townhomes

### HERITAGE GREENE
Hilltown Township, Bucks County
Starting at $1,445 per month

- Huge 1, 2 and 3 Bedroom Townhomes up to 1,863 sq ft
- Scenic "Park-like" Setting
- Finished Basements, some with Walkouts
- Gas Fireplaces
- Sparkling Pool
- Two Pet Parks
- Detached Garages Available

### HERITAGE ORCHARD HILL
Hilltown Township, Bucks County
Starting at $1,355 per month

- Huge 1, 2 and 3 Bedroom Townhomes up to 2,645 sq ft
- Finished Basements, some with Walkouts
- Gas Fireplaces
- Spectacular Clubhouse
- Sparkling Oversized Pool
- Central AC
- Pet Park / Tot Lots

### HERITAGE Summer Hill
Doylestown, Bucks County
Starting at $1,600 per month

- Huge 2 and 3 Bedroom Townhomes up to 1,921 sq ft
- Gas Fireplaces
- Full-size Washers & Dryers
- Attached Garages
- Central Bucks Schools
- Finished Basements Available, some with Walkouts

### Heritage Pointe
COMING SOON!
Luxury Rental Townhomes
in New Britain Township

For directions and daily office hours call 215.257.7900 or visit us at heritagepropertyrentals.com
Ask about our flexible lease terms.

HERITAGE PROPERTY MANAGEMENT
AG 1105

---

### Avenel
At Montgomery Square
(215) 699-9930
FAX: (215) 699-9935
1100 AVENEL BOULEVARD, NORTH WALES, PA 19454
WWW.AVENELAPARTMENTS.COM  See page 282, 283

**HAS A NEW ADDRESS!**
**Luxury**
1, 2 AND 3 BEDROOM APARTMENTS WITH DENS
IMMEDIATE & FUTURE AVAILABILITY

**BRAND NEW**
9 ft. ceilings and expansive 6 ft. windows
Fitness center will cardio and strength equipment
Business center with computer access and internet
Private balcony and patio
Gas heat and cooking
Resort-style pool with sundeck
Garage and storage available
Minutes from aspen iron services
Luxury Living Services
Pet friendly

V 2580

*Apartment Guide*

**MONTGOMERY COUNTY**



**AVENEL AT MONTGOMERY SQUARE**
1100 Avenel Boulevard
North Wales, PA 19454

**BE THE FIRST TO ENJOY LIFE AT THIS BEAUTIFUL NEW COMMUNITY.** Just moments away from Route 309, the Pennsylvania Turnpike, I-76, and SEPTA, the Avenel combines this exceptional location with gracious styling and extraordinary amenities to create the perfect apartment home for you We are across the street from the Montgomery Mall and other great shopping and dining Call to schedule an appointment

**FEATURES:**
- 24-hour fitness center
- 24-hour business center
- Pool with sundeck
- Controlled access entry available
- Modern fully equipped kitchens
- Across from shopping dining and entertainment
- High-speed Internet access
- Large walk-in closets
- Six feet windows with lots of light
- Contemporary track lighting
- Full-size washer and dryer

**2004 BRAND NEW CONSTRUCTION**

1 BDR/1 BTH, 1 BDR/1 BTH w/loft
2 BDR/1 BTH, 2 BDR/2 BTH
2 BDR/2 BTH w/den, 2 BDR/2 BTH w/loft
Call for pricing

**DIRECTIONS:** Take PA Turnpike to exit 339 (Ft Washington) Go north on Route 309 approximately eight miles to a left on 202 South We are on the left

**(877) 256-5660**



BOZZUTO MANAGEMENT    Avenel

9/04

V 2812

*Apartment Shopper's Guide*



# AVENEL AT MONTGOMERY SQUARE

Be the first to enjoy life at this beautiful new community. Just moments away from Route 309, the PA Turnpike, I-76 and SEPTA, the Avenel combines this exceptional location with gracious styling and extraordinary amenities to create the perfect apartment home for you

## NOW LEASING BRAND NEW APARTMENT HOMES

**FEATURES**
- 24-hour fitness center
- 24-hour business center
- Pool with sundeck
- Controlled access entry available
- Modern fully equipped kitchens
- Across from Montgomery Mall, dining and entertainment
- High-speed Internet access
- Large walk-in closets
- 6-foot windows with lots of light
- Contemporary track lighting
- Full-size washer and dryer



DIRECTIONS: Take the PA Turnpike to exit 339 (Ft. Washington). Go north on Route 309 approximately eight miles to a left on 202 South We are on the left. Call for an appointment
HOURS: Mon-Fri 9-6; Sat 10-6; Sun 12-6

**FLOORPLANS**
1 BDR/1 BTH
1 BDR/1 BTH with loft
2 BDR/2 BTH
2 BDR/2 BTH with den
2 BDR/2 BTH with loft
Call for pricing



1100 Avenel Boulevard
North Wales, PA 19454
**(877) 257-0985**



*Bozzuto Brings You Home™*



116    Enter the property name at ApartmentGuide.com for photos, floorplans and more • CHPC Publications

9/04

V 2813