UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | : : : | Civil Action No. 05-11614 WGY |
| Plaintiff, | : : : | |
| v. | : : | |
| VESTMONT LIMITED PARTNERSHIP, et al., | : : : | JURY TRIAL DEMANDED |
| Defendants. | : : : : | |

**DEFENDANTS' STATEMENT OF DISPUTED FACTS
IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT
OF PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY**

Pursuant to Local Rule 56.1, Defendants/Counterclaim Plaintiffs Vestmont Limited

Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra

Corporation (collectively, "Vesterra") respectfully submit this Statement of Disputed Facts in

opposition to the motion for summary judgment of Plaintiff John Hancock Life Insurance

Company ("John Hancock"), and in response to John Hancock's "Statement of Undisputed

Facts."

**The Parties**

1.    Vesterra does not dispute the facts concerning John Hancock set forth in

paragraph 1 of John Hancock's "Statement of Undisputed Facts," but an omitted fact is that John

Hancock was acquired by ManuLife Financial Corporation of Canada on April 28, 2004,

resulting in certain changes at John Hancock including the introduction of Ivor Thomas, "the

new head of John Hancock's mortgage operations in the United States",[1] and new required terms and conditions for approving mortgage loans. *See* Exhibit B (January 27, 2006 deposition of Timothy Malik), at 45, 61-62 and Exhibit B (February 1, 2006 deposition of John Ferrie), at 32-35.[2]

2.    Vesterra disputes certain of the assertions contained in paragraph 2 of John Hancock's "Statement of Undisputed Facts." Vestmont Limited Partnership, Vestmont Limited Partnership II and Vestmont Limited Partnership III are limited partnerships existing under the law of the Commonwealth of Pennsylvania and each is a general partner of Montgomery Square Partnership ("Montgomery Square"). Affidavit of James R. Koller, dated March 13, 2006 ("Koller Aff."), ¶ 5. Montgomery Square was formed to develop a tract of land containing approximately 180 acres located in the suburban Philadelphia area. *Id.* at ¶ 5; Exhibit D (January 18, 2006 deposition of James R. Koller), at 33-36. This development eventually included a retail shopping center and a residential apartment complex. *Id.* Further, Vesterra Corporation is not a single-purpose entity, but holds interests in other commercial real estate as well. Koller Aff., ¶ 7; Exhibit D, at 19-21. Vesterra agrees that its three principals are experienced and sophisticated real estate developers. Koller Aff., ¶ 4; Exhibit E.

3.    Vesterra disputes certain of the assertions contained in paragraph 3 of John Hancock's "Statement of Undisputed Facts." Mr. Kelly is "inactive" as a Certified Public Accountant. Affidavit of Joseph P. Kelly, dated March 13, 2006 ("Kelly Aff."), ¶ 2. In addition, Mr. Kelly was not an "executive" with Price Waterhouse. He was a staff accountant. *Id.*

---

[1] *See* Plaintiff John Hancock Life Insurance Company's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, at ¶ 12.

[2] All exhibits referenced herein are attached to the Declaration of Brian J. McCormick, Jr. in Opposition to Plaintiff's Motion for Summary Judgment, filed herewith.

Vesterra does not dispute the remaining facts contained in paragraph 3 of John Hancock's "Statement of Undisputed Facts."

## The Negotiation and Terms of the Loan Application

4.    Vesterra agrees that Montgomery Square Partnership is the owner of a new 256-unit apartment complex known as "Avenel at Montgomery Square," in North Wales, Pennsylvania ("Avenel"). Construction of Avenel began in 2003, was originally scheduled have been completed in or about March 2005, but was not actually completed until in or about March 2006. Kelly Aff., ¶ 4; Koller Aff., ¶¶ 9-10.

5.    Vesterra disputes certain of the assertions contained in paragraph 5 of John Hancock's "Statement of Undisputed Facts." Vesterra agrees that, in the summer of 2004, it sought a forward commitment for a permanent mortgage loan of $32 million in order to lock in a favorable interest rate and to repay its existing construction loan and related costs. Koller Aff., ¶ 12-13. Vesterra further agrees that it negotiated the terms of a document that, in its final form, is entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application"). *Id* at ¶ 14. James R. Koller, on behalf of Montgomery Square Partnership, signed the Loan Application on July 30, 2004, and submitted it to John Hancock. *Id* at ¶ 15. Vesterra agrees that it obtained an interest rate lock for one year at 6.18%. Exhibit A, at JH1019. But Vesterra disputes the assertion that John Hancock agreed to provide Vesterra with $32 million in permanent financing (the "Loan") "at any time over the ensuing twelve months" or that this permanent financing was subject only to "various standard and negotiated conditions." Rather, the Loan Application contained what Vesterra believed were the essential terms and conditions under which John Hancock would make a forward commitment for up to $32 million with a locked interest rate based on certain occupancy achievements. In fact, John

Hancock admits in a writing sent on or about May 9, 2005, that the Loan remained subject to John Hancock's approval, which had not been finally granted. Exhibit F. In addition, the size and disbursement of the Loan was conditioned on and subject to certain considerations, such as the rental and occupancy of at least 80% of the units in the Avenel Apartments, *see* Exhibit A, at Conditions 49(2) (at JH0989), and was subject to the unfettered discretion of John Hancock so that it can not properly be called a "commitment." *See id*, at Conditions 6, 7, 8(a), 11(b), 12-14, 16(b), 19, 20 and 23. In addition, disbursement of the Loan was made subject to another condition that had not been agreed to by Vesterra and was not disclosed to Vesterra prior to this litigation -- the "10% Constant" or "10% Breakeven" disbursement requirement.[3] *See* Exhibit G, and ¶¶ 10-15, 36-39 below.

6.      Vesterra disputes certain of the assertions contained in paragraph 6 of John Hancock's "Statement of Undisputed Facts." Vesterra agrees that it was beneficial to be able to lock in an interest rate, but this benefit assumes that John Hancock was obligated to lend the money, which Vesterra disputes. In addition, Vesterra reimbursed John Hancock by obtaining two irrevocable transferable Letters of Credit payable to John Hancock in the amounts of $640,000 and $320,000. Kelly Aff., ¶¶ 20-22. Vesterra disputes certain other facts asserted by John Hancock in Paragraph 6. Vesterra denies that there was a meeting of the minds on the terms of the Loan Application, and thus denies that it legally "agreed" either to actually "borrow the Principal Amount" or to pay John Hancock certain damages. Furthermore, to the extent that there was any "agreement" to "borrow the Principal Amount," it was based explicitly on meeting certain conditions, including conditions relating to occupancy and revenue, that were included in

---

[3] John Hancock appears to use the terms "Constant" and "Breakeven" interchangeably in their documents. A "constant" requirement is the figure that results from adding the monthly principal and interest payment together, multiplying that sum by 12 and than dividing by the outstanding principal. The resulting figure needs to be greater than or equal to 10%.

the terms of the Loan Application, which conditions were never satisfied for reasons beyond the control of Vesterra.[4] Kelly Aff. ¶¶ 16, 18-19. In addition, to the extent that John Hancock asserts the existence of an agreement concerning the payment of its damages and losses, the Loan Application, which was negotiated by both parties, did not contain any provision for "prepayment preimium" damages for an unfunded loan. In fact, the Loan Application specifically describes only actual losses and costs up to the time that the Loan failed to close. *See* Exhibit A, at Condition 30(d), at JH00979. The "prepayment premium described in detail in Conditions 3(g) and 6(d) of the Loan Application applies by its terms only if John Hancock had made a loan, which it did not. *Id.* at JH0960, 0962-63. The provisions included in Condition 30(d) of the Loan Application do not reference or spell out such a prepayment premium, or any other "yield maintenance" penalty, in any terms, and certainly not in terms similar to those used in Condition 3(g) and 6(d).[5] Exhibit A, at JH0329 and JH0978-79; Koller Aff., ¶¶ 28-30. In fact, during the negotiations, when Vesterra asked to limit the damages from the unfunded loan to 5% of the loan amount fearing the hedge loss could exceed $1.5 million, John Hancock refused and insisted on its entitlement to recover its "Costs" using the capitalized defined term as used in the Loan Application. Exhibit H.

      7.    Vesterra disputes certain of the assertions contained in paragraph 7 of John Hancock's "Statement of Undisputed Facts." Vesterra agrees that the negotiation of the terms of the Loan Application took place in Pennsylvania. Vesterra also agrees that the parties recognized that Avenel might not be fully leased by August 1, 2005. However, Vesterra specifically disputes that it anticipated that the only reason Avenel might be less than 80% leased

---

[4] John Hancock asserts in its footnote 3 that Vesterra never exercised its right to request an extension of the closing date. As explained below, at no time did it appear that Vesterra would be even close to the minimum 80% occupancy within the foreseeable future, and it still had achieved only a 52% occupancy as of March 13, 2006. Kelly Aff., ¶¶ 14-15. Thus, any extension would have been an exercise in futility.
[5] *See* Vesterra's Cross-Motion for Partial Summary Judgment, filed concurrently.

by August 1, 2005, was due to a possible delay in the construction schedule. Koller Aff., ¶¶ 31-32. Several other factors affected the occupancy requirement, including an unexpected decline in mortgage interest rates and a resulting diminished demand for the rental of high quality apartments such as those in Avenel despite Vesterra's best efforts to promote and market these apartments. *Id*; Kelly Aff., ¶ 16.

8.    Vesterra disputes the assertions contained in paragraph 8 of John Hancock's "Statement of Undisputed Facts." In particular, Vesterra denies the assertion that John Hancock agreed in any **general** sense to fund the Loan even if Avenel was not fully leased. Rather, John Hancock agreed to lend a reduced amount to Vesterra, but only if Avenel was at least 80% occupied. *See* Exhibit A, at JH0989. In addition, the "Rental Achievement Reserve" was only available for the first six months after the Loan was funded. Exhibit A, at Condition 49(3) (at JH 0990).

9.    Vesterra does not dispute, for purposes of this Motion, the facts contained in paragraph 9 of John Hancock's "Statement of Undisputed Facts," except that, by way of clarification, Vesterra further states that once the Loan Application was signed by Vesterra and a $5000 fee paid, John Hancock's internal approval process began. Exhibit I. Further, Vesterra's submission of the Loan Application was almost immediately followed by the interest rate lock, whereupon John Hancock "allocated" the $32 million for the loan to various lines of business if and when the loan was funded. Exhibit J.

## John Hancock's Underwriting Process and the Addition of the 10% Constant Requirement

10.    Vesterra disputes and objects to the assertions contained in paragraph 10 of John Hancock's "Statement of Undisputed Facts." First, Vesterra objects to John Hancock's assertions about the internal underwriting procedures in place at John Hancock, because Vesterra

noticed a deposition of John Hancock under Fed.R.Civ.P. 30(b)(6) for topics that include John Hancock's policies and methods for approving mortgage loans (*see* Exhibit K, at 3), and John Hancock has thus far failed to produce a witness with sufficient knowledge of these matters. *See* Exhibit L. Second, Vesterra specifically disputes the implication that the "benchmarks" or "guidelines" pertinent to this lawsuit were somehow optional, because John Hancock's own documents and the deposition testimony of its employees confirm that certain guidelines were mandatory, including the 10% Constant, and that John Hancock commenced a process to obtain Vesterra's agreement to these guidelines until it learned that Vesterra would not agree to such guidelines. Rather than incur the loss of the fees and the cost of the hedge at that time, John Hancock decided not to inform Vesterra, and to deal with the failure to meet the 10% Constant when the loan would have to receive final approval for funding, which was anticipated to be in August 2005. *See* ¶¶ 11-15, 26-35 below.

11.    Vesterra disputes the assertions contained in paragraph 11 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra disputes the assertion that the "10% Constant" was "one underwriting benchmark that **could be** applied to the proposed Loan" (emphasis added). Rather, it is undisputed that the 10% Constant was a requirement both for the approval of the Loan *and* for subsequent disbursement of the Loan. *See* ¶¶ 11-15, 26-35 below. When the approval process began, the Loan Application was submitted by Timothy Malik, the Senior Investment Officer and Assistant Vice President who was responsible for Vesterra's Loan Application, for seriatim recommendation and approval by his superiors. When Ivor Thomas, a *ManuLife* Senior Vice President and the new head of John Hancock's United States mortgage operations, received Vesterra's application, he insisted on the application meeting the 10% constant requirement (which had been introduced to John Hancock by ManuLife) and

7

specifically <u>refused</u> to waive this requirement when requested to do by Mr. Malik.  Exhibits B, at 95-100 and M.  During the first consideration of the proposed Loan by the John Hancock officers whose approval was required, the "10% Breakeven" requirement was added, and the proposed loan had to be submitted again for approval on that basis, but it was decided to not submit the changes necessary to obtain the approval of John Hancock to Vesterra after it was learned that Vesterra would not agree to such changes.  *Compare* Exhibits N ("and 10% Breakeven" added to disbursement requirements in handwriting), and G (new requirement included in "Disbursement Requirements").  *See also* Exhibit C, at 84-85 (10% Constant requirement would be a "deal killer" for Vesterra).

      12.     Vesterra disputes the assertions contained in paragraph 12 of John Hancock's "Statement of Undisputed Facts."  Specifically, Vesterra disputes the characterizations and equivocal language contained in this paragraph.  John Hancock's internal documents demonstrate that far from raising a "possibility" that "in certain instances" the 10% Constant "might not be met," Mr. Thomas pointed out that, based on the projected income and expenses submitted by Vesterra with the Loan Application, the proposed loan did not and would not meet the 10% Constant requirement.  *See* Exhibit B, at 89-90.  For this reason, the loan had to be submitted again to the John Hancock officers who were required to approve it.  *See* Exhibit N.  At this point, Mr. Malik began to prepare an amendment to the application to include this new condition and to manipulate the projected income, expenses and reserves to meet the new condition, the 10% constant.  *See* ¶¶ 31-34 *infra*.  This amendment was never shown to or agreed to by the borrowers, although it was a requirement of John Hancock for disbursement of the loan.  *Id.*

13.    Vesterra disputes the assertions contained in paragraph 13 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra disputes John Hancock's characterization of Mr. Malik's manipulation of the figures provided to John Hancock by Vesterra. Vesterra disputes that Mr. Malik actually judged that the figures submitted to John Hancock overly conservative -- which is hardly the reaction of a typical lender to the figures provided by a proposed borrower. Rather, John Hancock's own documents make evident that Mr. Malik manipulated the figures in several different ways, in order to find a way to comply with the 10% Constant <u>requirement</u> imposed by ManuLife so that the proposed loan could be approved by John Hancock. *See* Exhibits M and O ("To make the numbers work, . . .").[6] Vesterra agrees that Mr. Malik found a way to manipulate the figures (reducing the anticipated expenses by $140,000 and the reserves by $26,500) to satisfy the 10% Constant on a *pro forma* basis for initial approval of the proposed loan, but disputes that this was the end of that requirement, since the "10% Breakeven" was also specifically added as a "<u>disbursement</u> requirement," *see* Exhibits G (emphasis added) and Q, which would not be on a *pro forma* basis.

14.    Vesterra disputes the assertions contained in paragraph 14 of John Hancock's "Statement of Undisputed Facts." Specifically, John Hancock approved the Loan using the figures as manipulated by Mr. Malik, but the approval included an additional "Disbursement Requirement" of "10% Breakeven." Thus, the Loan Application was <u>not</u> approved "without any changes," as John Hancock asserts. Rather, the Loan Application was approved in a way that made its <u>disbursement</u> specifically contingent on meeting the 10% Breakeven requirement, a requirement of which Vesterra was never informed. *See* Exhibits G; B, at 219-20; and C, at 81-

---

[6] Vesterra further submits that the credibility of Mr. Malik's stated motivation and reasons for manipulating these figures are dubious on their face, given his vested interest in having the Loan approved and avoiding a hedge fund loss of $355,000 at that time. *See* Exhibit P. Accordingly, Mr. Malik's credibility should be assessed in person by the trier of fact at a trial of this matter.

82; Koller Aff., ¶ 19; Kelly, Aff., ¶ 23. Mr. Malik also contacted John Ferrie, John Hancock's

regional manager for the Pennsylvania area, to tell him about the new requirement. Exhibits C,

at 36-37 and R. Mr. Ferrie then contacted Vesterra's broker, and learned that any amendment of

the application along those lines would be a " deal killer". Exhibits C, at 84-85 and S. Mr.

Ferrie immediately told Mr. Malik that the new requirement would cost John Hancock the loan.

Exhibit C, at 93-94. Mr. Ferrie never heard about the requirement again, and thought that the

10% Constant requirement had been eliminated. *See id.* at 74-76. However, this requirement

remained a fundamental part of the loan approval process, as was confirmed in a letter from

Patricia Coyne, an investment officer at John Hancock, to Timothy Malik. *See* Exhibit Q. Mr.

Malik and Mr. Thomas had decided to proceed without the borrower's knowledge and consent.

John Hancock modified the approval process by restarting the processing of the application,

without the borrower's knowledge or consent, to include Mr. Malik's new figures and the new

condition. The new approval document was prepared, the necessary signatures recommending

and approving were obtained, followed by the preparation of the approval letter, *see id.*, and by

the countersigning of the application which converted it into a "commitment." In anticipation of

approval without any additional conditions, Vesterra had obtained letters of credit totaling

$960,000. In fact, the final approval of the loan and its amount would not be made until closing,[7]

which was not expected to occur until August 2005, and which in fact never occurred. Thus, the

10% Breakeven or 10% Constant was not, as John Hancock asserts, merely a *pro forma*

condition for approval that had been met and would have no further relevance. Rather, as a

disbursement requirement, according to the testimony of John Hancock's own Mr. Malik,

---

[7] One of John Hancock's Assistant Vice Presidents, Jessica Yaffie Leveroni, indicated in May 2005 that the loan was still not yet approved. *See* Exhibit F ("*If* Lender [John Hancock] *approves the Proposed Loan*, . . . ") (emphasis added)

Vesterra would have to meet this guideline with its actual performance before John Hancock would close the Loan.

15.    Vesterra disputes the assertions contained in paragraph 15 of John Hancock's "Statement of Undisputed Facts." Specifically, as noted above, the 10% Breakeven was explicitly put into place as a "**Disbursement Requirement,**" and thus was not merely an internal John Hancock benchmark for approval of the loan. *See* Exhibit G. Mr. Malik testified that all such requirements would have to met before the loan would be disbursed. Exhibit B, at 130-33 and 219-20. Thus, the 10% Constant was an additional condition for obtaining the Loan, which Vesterra was never given the opportunity to accept or reject. Accordingly, because this condition was added without Vesterra's agreement, there was no meeting of the minds and hence any "agreement" or "commitment" was non-existent. In addition, Vesterra disputes the assertion that the disbursement requirements for this loan were later changed to a 9% Constant, on the basis that John Hancock has produced no documents applying such a changed disbursement requirement to this Loan. Finally, it is undisputed that Vesterra would not have met either the 9% or the 10% Constant if it had endeavored to close the Loan in 2005, because it had not leased anywhere near the 80% minimum required by John Hancock, *see* Kelly Aff., ¶ 18. Further, any loan based on the 10% constant requirement would have been "sized" below the amount needed to repay the construction loan. The apparent "commitment" manifested by the countersigned Loan Application did not reflect the state of the "mind" of John Hancock, and hence did not "meet" the written offer of Vesterra, limited to other specified disbursement conditions. Hence there was no meeting of the minds between Vesterra and John Hancock on the conditions for disbursement of the Loan. Vesterra offered to meet two conditions based on its numbers in "Exhibit 1" to the Loan Application. *See* Exhibit A, at JH1005. However, John Hancock

11

accepted using a third condition based on significantly modified numbers. Thus, there was no agreement formed.

### Despite Its Best Efforts, Vesterra Failed to Meet the Minimum Occupancy Requirements for Closing the Loan, and Consequently Pursued Other Options

16.    Vesterra disputes the assertions contained in paragraph 16 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra disputes the implication that Vesterra simply opted not to borrow the principal amount. Rather, John Hancock had consistently made it clear to Vesterra that its <u>minimum</u> requirement for closing the Loan was the 80% occupancy specified in the Loan Application (at which level Vesterra would receive a loan of only $26,620,000). *See* Exhibit A, at Conditions 49(2) (at JH0989); Koller Aff., ¶ 17, 26, 35. Despite Vesterra's best efforts (described below in ¶¶ 42-45), as of May 2005, only 38% of the apartment units were occupied, and it was apparent to Vesterra that it was not going to achieve the 80% occupancy required for John Hancock to consider disbursing the Loan proceeds. Kelly Aff., ¶¶ 15-16; Koller Aff., ¶¶ 21-22. Because Vesterra was having unexpected difficulties achieving the occupancy level required to obtain the permanent mortgage loan, Vesterra explored other alternatives, and learned that, unexpectedly, the real estate market was now such that apartment complexes in the same geographic area had sold without a requirement of any occupancy. Koller Aff., ¶ 23. Thus, realizing that it would be unable to meet the rental achievement requirements to close the Loan, Vesterra pursued a sale of Avenel instead. *Id* To this day, Avenel has not achieved the rental levels required by the Loan Application and is only 52% occupied. Kelly Aff., ¶ 14; Koller Aff., ¶ 27.

17.    Vesterra disputes the assertions contained in paragraph 17 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra both objects to and disputes the assertion that it "understood and acknowledged . . . that its conduct would expose it to liability

for John Hancock's resulting losses and expenses." John Hancock has improperly used statements made in the course of settlement negotiations to try to prove liability. *See* F.R.E. 408. Such statements were clearly made for the purpose of resolving the dispute and avoiding the present lawsuit. Furthermore, contrary to John Hancock's assertions, these statements made by Vesterra during settlement discussions did not acknowledge any particular obligation on the part of Vesterra. *See* Exhibit D, at 116-17, 136-37; Koller Aff., ¶¶ 24-26.

18.    Vesterra disputes the assertions contained in paragraph 18 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra both objects to and disputes John Hancock's use of statement made, by John Hancock's own admission, in "negotiations" that were clearly Vesterra's attempt to settle this dispute short of litigation. Koller Aff., ¶¶ 24-26; *see* F.R.E. 408. Vesterra did indeed make a good faith effort to resolve this dispute, but once John Hancock refused Vesterra's offer of settlement, Vesterra of course availed itself of its legal right to defend against John Hancock's lawsuit on all legitimate bases. These grounds include, *inter alia*, the fact that the purported contract was never an agreement in the first place because there was no meeting of the minds on the 10% Constant condition unilaterally added by John Hancock as a disbursement requirement, and the manipulation of its proposed financial projections which were made part of the loan proposal and the Loan Application and which Vesterra never agreed to change, and the fact that the purported agreement is illusory because John Hancock retained unfettered discretion not to fund the Loan. *See* ¶¶ 10-15, 36-39. As a matter of law, Vesterra was not required to perform the futile act of attempting to close the Loan when the occupancy rate was far below the minimum required by John Hancock, and the fact that John Hancock was thus not called upon to exercise its discretion does not alter the fact that John Hancock retained

such discretion, and would have been required by its own disbursement requirements, including the 10% Constant, to exercise its discretion in such a way as to avoid closing the Loan.

### John Hancock Has Not Proved Its Losses and Is Not Entitled as a Matter of Law to "Yield Maintenance" Damages

19.    Vesterra disputes the assertions contained in paragraph 19 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra disputes John Hancock's assertion that Conditions 21 and 30(d) of the Loan Application entitle it to the present value of the interest it would have received from the Loan if the Loan had been closed. Such a prepayment premium or penalty is provided for only in Conditions 3(g) and 6(d), as a prepayment premium or a default premium that would be applicable only when and if the Loan had been closed and the note signed. The provisions of Condition 30(d) only purport to render Vesterra liable for actual Costs (as defined in the Loan Application) and for John Hancock's other actual losses up until the Loan failed to close. *See* Exhibit A, at Condition 30(d). Pursuant to the standard legal principle of *expressio unius est exclusio alterius*, the penalty which is explicitly included in such particularized detail in Conditions 3(g) and 6(d), where the terms of the Loan are spelled out, but is not included in the terms of the Loan Application itself, must be found not to be included in the latter.

20.    Vesterra disputes the assertions contained in paragraph 20 of John Hancock's "Statement of Undisputed Facts." Specifically, Vesterra disputes John Hancock's assertion that Exhibit A to Mr. Malik's affidavit accurately reflects its lost opportunity costs. John Hancock has not met its burden of submitting sufficient evidence to establish its damages (another subject on which John Hancock has not yet produced its 30(b)(6) designee for deposition). In fact, John Hancock has presented no evidence of whether it in fact "allocated or set aside" any funds that it claims it had "allocated" for the proposed Loan. John Hancock has also not submitted any

14

evidence that it in fact chose to invest this money in ten-year treasury bills. Rather, John

Hancock has merely presented the Court with a purely hypothetical mathematical calculation

without offering any evidence that connects it to the facts of this case. As explained in ¶ 19,

there is no basis to apply this calculation, specifically designated for a prepayment premium and

a default premium after the loan had closed, to the circumstances here. Thus, John Hancock has

failed its burden of establishing its damages -- or for that matter of establishing that it has

suffered any damages from the purported breach. Vesterra also disputes that the so-called

"opportunity damages" are anywhere defined as Costs or other damages for which Vesterra

would be liable, even if the Loan Application were found to constitute a valid contract based on a

meeting of the minds and mutual commitments. Finally, because John Hancock concedes that it

had "substantial liquidity" at the pertinent times, it was able to take advantage of any investment

opportunities that became available to it, and so cannot have suffered any lost opportunities

because of the proposed Loan.

### Vesterra's Counterclaims

21.    Vesterra disputes the assertions contained in paragraph 21 of John Hancock's

"Statement of Undisputed Facts." Vesterra agrees that it has asserted Counterclaims seeking a

return of the $965,000 improperly retained by John Hancock. *See* Defendants' Amended

Counterclaim (filed February 16, 2006). Vesterra further agrees that it has recently added claims

for fraud and violation of Chapter 93A of the Massachusetts statutes. *Id.* However Vesterra

disputes that its "primary claims and defenses [] are premised on the legal proposition that the

entire Loan Commitment [Application] is 'illusory.'" Rather, as discovery has progressed, and

evidence has been uncovered, Vesterra relies first on the fact that there was no meeting of the

15

minds on the conditions for disbursement of the loan, and hence no contract formed. Vesterra also relies on fraudulent inducement and on its other asserted defenses and counterclaims.

22.    Vesterra disputes the assertions contained in paragraph 22 of John Hancock's "Statement of Undisputed Facts." Vesterra agrees that John Hancock has accurately recited paragraph 48 of Vesterra's Amended Counterclaim. Vesterra disputes that John Hancock was willing "to close the Loan . . . in accordance with the terms of the Loan Commitment [Application] irrespective of the 10% Constant." Rather, as the evidence has shown, the 10% Constant was a disbursement *requirement* that was necessary to the disbursement of the Loan proceeds.

23.    Vesterra disputes the assertions contained in paragraph 23 of John Hancock's "Statement of Undisputed Facts." Vesterra agrees that John Hancock has accurately recited paragraph 59 of Vesterra's Amended Counterclaim. Vesterra disputes that John Hancock was willing "to close the Loan . . . in accordance with the terms of the Loan Commitment [Application] irrespective of the 10% Constant." Rather, as the evidence has shown, the 10% Constant was a disbursement *requirement* that was necessary to the disbursement of the Loan proceeds.

## Additional Facts Demonstrating the Existence of Disputed Issues of Material Fact

### *Introduction of the 10% Constant Disbursement Requirement*

24.    John Hancock was acquired by ManuLife Financial Corporation of Canada on or about April 28, 2004, which caused the introduction of a "new head of John Hancock's mortgage operations in the United States" and new terms and conditions that were required for the approval of mortgage loans. *See* Exhibit B, at 45, 61-62.

25.    In June 2004, John Hancock's regional manager in Pennsylvania, John Ferrie, notified the home office of a potential loan opportunity in Montgomery County, Pennsylvania.

16

*See* Exhibit T. Thereafter, Vesterra and John Hancock negotiated the terms of the Loan Application. *See, e.g.*, Exhibits U and V. *See also* Exhibits C, at 182-83 and D, at 89-90. There was no mention of a 10% Breakeven or 10% Constant requirement in any of the documents forwarded by John Hancock or in the Loan Application as signed by Vesterra. Rather, the proposed terms were for a $32 million loan, and contained disbursement requirements of a Loan to Value ratio of 75% and a Debt Servicing Coverage Ratio of 1:25. *Id.*

26.     John Hancock's own internal documents make clear that Mr. Malik ran into an unexpected problem in getting Vesterra's Loan Application approved. That problem was the new 10% Constant requirement, which the projected revenues and expenses stated in the Loan Application did not meet. Exhibits M, P and S.

27.     On August 10, 2004, the John Hancock investment committee conditionally approved the loan to Vesterra. *See* Exhibit N. However, on the proposed approval, someone added a handwritten additional <u>disbursement requirement</u> of "10% Breakeven." *Id.*

28.     Late the next day, Mr. Malik requested approval to lower the reserves per unit from $250 to $150 in his underwriting in order to meet the 10% Constant requirement, and mentioned a *95% occupancy rate*. *See* Exhibit M. Mr. Malik also noted that GMAC had offered Vesterra a $33 million loan. *Id.*

29.     Mr. Malik forwarded the request to Mr. Ferrie with the note "I'll let you know how hard he [Mr. Malik's superior, Ivor Thomas] laughs." *Id. See also* Exhibit B, at 97.

30.     The next morning Mr. Malik created another proposal to meet the 10% constant requirement by increasing the assumed occupancy to 95%. *See* Exhibit W.

31.    In order "to make the numbers work" Mr. Malik proposed reducing the annual expenses which had been submitted and agreed to by Vesterra by $550 per unit (or a total of $140,000), which he described as "not <u>wholly</u> unreasonable" (emphasis added). *See* Exhibit O.

32.    In addition, sometime on August 11, 2004, after learning about the 10% Constant requirement, Mr. Malik had circulated a draft Amendment to the Vesterra Loan Application to several John Hancock employees, including Mr. Ferrie and in-house counsel. Exhibit X, at 2. *See also* Exhibit C, at 87-88 ("The application was being looked at to determine whether it would be approved or not. The 10 percent constant was requested by Hancock to be inserted into the application.").

33.    John Hancock has refused to produce this draft amendment based on the attorney-client privilege. *See* Exhibit Y, at 7.

34.    Vesterra believes and avers that this undisclosed Amendment to the Loan Application contained the 10% Constant requirement, in addition to the disbursement requirements to which Vesterra had agreed (loan to value ratio and debt service coverage ratio), and also contained a variety of changes to the projected net operating income for the property including reduction of reserves; reduction of the management fees, and other manipulations of Vesterra's submitted figures.

35.    In addition, around this time, Mr. Malik told Mr. Ferrie that John Hancock would suffer a loss of $355,000 if the deal was not approved. *See* Exhibit P. Thus, it appears that John Hancock was motivated by its desire to avoid a hedge loss and to retain certain fees when it decided not to seek the agreement of Vesterra to Mr. Malik's new numbers and Mr. Thomas' new condition. John Hancock knew it would be a "deal killer" to seek Vesterra's acceptance, so it did not.

36.    The John Hancock investment committee approved the loan to Vesterra again on August 16, 2004. This time, the loan approval documents expressly contained, as a "disbursement requirement," the 10% breakeven requirement. *See* Exhibit G.

37.    The Loan Application executed by the parties did not contain the 10% Constant requirement. *See* Exhibits B, at 110-11 and C, at 36-38.

38.    The 10% Constant requirement was a new requirement introduced by ManuLife. *See* Exhibits B, at 179-80 and C, at 35. Mr. Thomas is a ManuLife employee. Exhibit B, at 44-45.

39.    Also, the 10% Constant was listed as a disbursement requirement on an August 17, 2004 letter confirming approval from Patricia Coyne, John Hancock's credit officer. *See* Exhibit Q. This letter was addressed to Mr. Malik and carbon copied to John Hancock's "closing" department. *Id.*

### *Avenel Apartments*

40.    Before February 2005, Bozzuto Management Company ("Bozzuto") managed the Avenel project. Kelly Aff., ¶¶ 7, 10.

41.    In February 2005, Koller Kelly, LLC ("Koller Kelly") began to provide management services for Avenel. Kelly Aff., ¶¶ 5-6.

42.    As the property manager for Avenel, Koller Kelly is responsible for leasing, financial accounting and general property management. Bozzuto handled these same duties before February 2005. Kelly Aff., ¶¶ 6-10.

43.    Koller Kelly has performed numerous services while attempting to market and obtain leases for the properties at Avenel, including advertising on the Internet (e.g., www.apartmentguide.com; www.4wallsinphilly.com; www.rent.com); maintaining a website for

Avenel (www.avenelapartments.com); and advertising in housing guides in the Philadelphia, suburban Philadelphia and southern New Jersey area (e.g., *Apartment Guide*, *Apartment Finders* and *Apartment Shoppers Guide*). Kelly Aff., ¶ 12. *See also* Exhibits Z, AA and BB.

44.    In addition, Koller Kelly has established various leasing programs in the area, including a "Preferred Employer Program" with local employers which offers rent specials, a "Preferred Broker Program" where Koller Kelly pays a commission to any broker or agent that brings a client to Avenel for a visit and an active resident referral program.    Koller Kelly has also sent out direct mailings and placed advertising in the local print media, including local newspapers and newsletters. Finally, Koller Kelly does a substantial amount of roadside advertising.. *Id*

45.    The occupancy history at Avenel since February 2005 is as follows:

|        | Occupied | Percent Occupied |
|--------|----------|------------------|
| Feb-05 | 64       | 25%              |
| Mar-05 | 68       | 27%              |
| Apr-05 | 82       | 32%              |
| May-05 | 97       | 38%              |
| Jun-05 | 107      | 42%              |
| Jul-05 | 112      | 44%              |
| Aug-05 | 125      | 49%              |
| Sep-05 | 133      | 52%              |
| Oct-05 | 132      | 52%              |
| Nov-05 | 133      | 52%              |
| Dec-05 | 136      | 53%              |
| Jan-06 | 120      | 47%              |
| Feb-06 | 117      | 46%              |

Kelly Aff., ¶ 14.

46.    In late Spring 2005, Koller Kelly realized that there was no possibility Avenel would be able to meet the occupancy requirements set forth in Condition 49(2) of the Loan Application. Kelly Aff., ¶¶ 15-16; Koller Aff., ¶¶ 21-22. In fact, as of May 2005, only 38% of the units at Avenel were occupied. Kelly Aff., ¶ 14

47.    Avenel was unable to achieve the leasing requirements provided in the Loan Application for a number of reasons, including the fact that construction was behind schedule, and the fact that interest rates continued to be unexpectedly low so that individuals who would otherwise have leased apartments were able to afford to purchase homes instead. Kelly Aff., ¶ 16; Koller Aff., ¶ 32

48.    Since the anticipated cash flow or income for Avenel is to be derived primarily from its leasing, Avenel would not have met the revenue requirements of the Loan Application, even if the closing date had been postponed by six months. Kelly Aff., ¶¶ 14, 16-18.

Respectfully submitted,

Dated:  March 14, 2006

/s/ Robert D. Hillman
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

/s/ Howard D. Scher
Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation