UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP, et al.,<br><br>Defendants. | Civil Action No. 05-11614 WGY |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Defendants/Counterclaim Plaintiffs (collectively "Defendants" or "Vesterra") submit this Memorandum of Law in support of their Cross-Motion for Partial Summary Judgment. In the summer of 2004, Vesterra negotiated with Plaintiff John Hancock Life Insurance Company ("John Hancock") the terms and conditions of a mortgage loan application (the "Loan Application"), which Vesterra signed and submitted to John Hancock on July 30, 2004. However, as explained in more detail in Vesterra's opposition to John Hancock's motion for summary judgment, the loan never closed, and John Hancock filed this lawsuit, alleging that Vesterra had breached a contract.

Vesterra has learned during discovery that John Hancock did not accept the Loan Application based on the terms and conditions contained therein, but rather added a new requirement for disbursement of the loan in its internal approval process. Hence, there was no

meeting of the minds on the essential terms of the Loan Application, and thus no contract was ever created -- and thus Vesterra cannot have breached it.

One discrete issue that is presented by John Hancock's allegations in this lawsuit is the measure of its possible damages. John Hancock has claimed that it is entitled to recover from Vesterra an amount based on the value of the interest it would have collected over the ten years of the loan that was never closed. *See* John Hancock's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment, ¶¶ 19-20. However, because such a formula is *expressly* provided in the Loan Application *only* as a premium in the event of prepayment or default -- which could occur only after the loan had closed and the note had been signed -- Vesterra requests that this Court resolve this critical issue now as a matter of law. Thus, Vesterra moves this Court for a ruling that *IF* it were determined at trial that a valid and enforceable contract was formed between the parties, and *IF* it were determined that Vesterra breached this contract, the damages for which Vesterra could be found liable are limited to those contained in Condition 30(d) of the Loan Application, which under well-established legal principles do not include the "yield maintenance" premium which is explicitly provided only for prepayment of the loan and default on the loan.

## STATEMENT OF PERTINENT FACTS

Vesterra began construction of a residential apartment complex ("Avenel") in suburban Philadelphia in 2003. Defendants' Statement of Undisputed Facts in Support of Their Cross-Motion for Partial Summary Judgment (hereinafter, "Defs.' Facts"), at ¶¶ 2-3. In the summer of 2004, Vesterra sought to arrange for a permanent mortgage loan to pay off its construction loan in the following year. Defs.' Facts, ¶ 4. Accordingly, Vesterra negotiated with John Hancock the terms of a document entitled "Application to John Hancock Life Insurance Company for a

First Mortgage Loan" (the "Loan Application"). Defs.' Facts, ¶ 5; *see* Exhibit 1.[1] The Loan Application contains only a few provisions that are relevant to this motion, and some of these are terms that <u>would be included</u> as terms of the Loan and Note after the Loan was closed, as opposed to terms that applied to the Loan Application itself.

### The Prepayment Premium and Default Premium (After the Loan Had Closed)

First (using language provided by John Hancock), the Loan Application sets forth in detail the consequences of prepayment of the Loan or default on the Loan, once the Loan had been closed and the Note had been signed. Condition 3(g) of the Loan Application provides a very specific "prepayment premium" that would be included in the terms of the Loan. This provision would apply in the event that, after the Loan had been made, Vesterra chose to prepay the Loan:

> On or after the end of the **4th** Loan Year (as hereinafter defined) . . . Borrower may prepay the entire principal amount together with any and all accrued interest and other sums due under the Loan Documents and subject to payment of a prepayment premium equal to the greater of:
> (i) the positive amount, if any, equal to (aa) the sum of the present values of all scheduled payments due under the Note from the Prepayment Date to and including the maturity date of the Note, minus (bb) the principal balance of the note immediately prior to such prepayment; or
> (ii) **0.00%** of the principal balance of the Note immediately prior to such prepayment.
>
> All present values shall be calculated as of the Prepayment Date, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United State Treasury Security having the closest maturity date to the maturity date of the Note . . . .

Exhibit 1, Condition 3(g), at JH0960. (This is sometimes referred to as a "yield maintenance" provision, because it serves to maintain the "yield" once a loan has been closed.) This provision for a "prepayment premium" <u>also</u> describes precisely the damages that John Hancock seeks to

---

[1] The Exhibits referenced herein are attached to the Declaration of Brian J. McCormick, Jr. in Support of Defendants' Cross-Motion for Partial Summary Judgment, filed herewith.

3

recover from Vesterra in this lawsuit -- the present value of all scheduled payments, calculated with a discount rate based on United States Treasury Securities. However, John Hancock does not assert that Vesterra is covered by Condition 3(g) for the "prepayment premium." John Hancock alleges only that Vesterra has breached the Loan Agreement itself, by not closing the Loan -- and closing the Loan, of course was a precondition to the "prepayment premium" even taking effect.

Similarly, Condition 6(d) of the Loan Application explicitly describes a "covenant" that would be included in the terms of the Note, that would govern the "premium" that would be due as a consequence of default after the Loan has been funded:

> [W]henever the maturity of the Loan has been accelerated by reason of a default under the Loan Documents, which default occurs prior to the time period, if any, in which prepayment is allowed and prior to the date on which the full amount of the balance of principal and interest then remaining unpaid shall be due, including an acceleration by reason of sale, conveyance, further encumbrance or other default (which acceleration shall be at John Hancock's sole option), there shall be due, in addition to the outstanding principal balance, accrued interest and other sums due under the Loan Documents, a premium equal to the greater of:
> (i)   The sum obtained by adding:
>       (aa)   the positive amount, if any, equal to (x) the sum of the present values of all scheduled payments due under the Note from the date of said payment to and including the maturity date of the Note, minus (y) the then outstanding principal balance of the Note, and
>       (bb)   **0.00%** of the then outstanding principal balance of the Note; or
> (ii)  An amount equal to **7.00%** of the then outstanding principal balance of the Note.
>
> All present values shall be calculated as of the date of said payment, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United State Treasury Security having the closest maturity date to the maturity date of the Note . . . .

Exhibit 1, Condition 6(d), at JH0962-63. Again, this default "premium," another "yield maintenance" provision, is defined in great detail. As with the "prepayment premium," this

4

premium could only come into play after the Note had been signed and the Loan disbursed. A crucial part of this Condition 6 is the following requirement:

> [T]he Loan Documents [including the Note and Mortgage] shall contain provisions . . . including, without limitation, the following:
>
> . . .
>
> (d)     A covenant to the effect that Borrower acknowledges that the Loan was made on the basis and assumption that John Hancock would receive the payments of principal and interest set forth herein for the full term of this Loan.

Thus, a precondition to the "default premium" was the borrower's acknowledgment that the Loan was made by John Hancock on the assumption that it would receive all of the interest payments due under the Note for ten years. There is no analogous statement in the Loan Application acknowledging that the Application was submitted by Vesterra with the understanding that John Hancock expected to receive ten years' of interest payments, even if the Loan were not closed.

### The Costs and Damages Related to the Loan Application Itself

The Loan Application also addresses the situation here, where the Note was never signed and the Loan never disbursed, with very different provisions. First, the Loan Application explicitly sets forth liquidated damages -- the Application Fee and the Commitment Fee -- for a situation like the one at hand. The Loan Application provides, "[i]n the event John Hancock accepts this Loan Application and the Loan does not Close, John Hancock will retain the entire Application Fee in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs." Exhibit 1, Condition 30(b)(v), at JH0978. Likewise, "[i]n the event the Loan does not Close, the Commitment Fee will be retained by John Hancock in addition to its other rights and remedies under the Application, and the Applicant shall remain liable for all Costs." Id., at 30(c)(ii), at JH0979.

5

> Such "Costs" are also defined in the Loan Application:
>
>> Unless specifically stated to the contrary herein, whether or not the Loan closes, Applicant and Borrower shall be jointly and severally liable to pay on the earlier of the Closing date or termination of this Application all costs pertaining to the Loan and the Closing, including, without limitation, all Third Party Report Fees, all charges for title examination and title insurance and escrow, all survey costs, all recording and filing fees, all mortgage or similar taxes, and all attorneys' fees and costs of John Hancock (collectively "Costs"). . . . The definition of "Costs" shall be deemed to include all costs pertaining to the application of all or any portion of the Rental Achievement Reserve, and the revision of the amortization schedule and the monthly payment as described in Condition 49 of this Application.

Exhibit 1, Conditions 21 & 49(5), at JH0975 and 0990-91.

Finally, in addition to the liquidated damages and Costs, the Loan Application includes the following Condition 30(d), which would take effect if Vesterra failed to satisfy any of the terms or conditions in a timely fashion, or if the Loan failed to close by the closing date:

> (iii) . . . if the Loan shall not have been Closed by the Closing Date or . . . [on the date on which] John Hancock's obligation to Close and fund shall expire
>
> . . . John Hancock shall be entitled to recover from Applicant and/or Borrower all damages, losses, costs and expenses suffered or incurred by John Hancock as a result of any of the events described in part (i), (ii) or (iii) of this subparagraph (d), including, without limitation, all such damages, losses, costs or expenses arising from the fact that, in reliance on the agreements of Applicant and Borrower contained herein, John Hancock allocated and set aside assets for the purpose of funding the Loan and made commitments to third parties based thereon, in addition to retention of the Processing Fee, the Application Fee and the Commitment Fee, provided, however, that Applicant and/or Borrower shall also continue to remain liable for all Costs.

Exhibit 1, Condition 30(d), at JH0979. Read in context, it is evident that this Condition provided John Hancock with the ability to recover special damages -- in addition to the Costs and liquidated damages -- *IF* John Hancock incurred any damages or losses as a result of the fact that it "allocated and set aside" $32 million and "made commitments to third parties based thereon." John Hancock tries to stretch this provision beyond recognition by asserting that the words "all

6

damages, losses, costs and expenses suffered or incurred by John Hancock as a result of" the failure of the Loan to close, entitle it to recover the same "yield maintenance" remedy set out in such specific detail in Conditions 3(g) and 6(d) as a "prepayment premium" or a "default premium." However, the terminology contained in Condition 30(d) does not at all resemble the careful and detailed language included in Conditions 3(g) and 6(d). Furthermore, the "yield maintenance" premiums are specifically limited to a breach of the terms of the Loan and the Note, after disbursement of the Loan, and after the borrower's acknowledgement that John Hancock expected to receive all of the interest due over the life of the Loan. None of this would apply to a breach of the Loan Application itself. Accordingly, as explained below, reading Condition 30(d) in the context of the Loan Application as a whole, under well-established legal principles it simply cannot be given the interpretation urged by John Hancock.

### John Hancock's Description During Negotiations of Vesterra's Potential Liability

If the Court concludes that the Loan Application does not unambiguously confine the "yield maintenance" type of remedy to prepayment of the Loan and default on the Loan, after closing, then the Court should consider the following parol evidence. One key point during the negotiations concerned a limitation of Vesterra's liability for "Costs," a term that is defined in the Loan Application as described above. After initially agreeing to a cap of 5%, which would have limited Vesterra's liability for "Costs" to approximately $600,000 on top of its Application and Commitment Fees, John Hancock informed Vesterra on July 29, 2004, that it could not accept that limitation because "[i]f we don't close and interest rates move against us, we could be subject to unlimited losses. . . . Therefore, you need to deliver the loan or be liable for all Costs." Defs.' Facts, ¶ 6; see Exhibit 2. Thus, in its own contemporary explanation of the liability to which Vesterra might be exposed under the Loan Application, John Hancock described "losses"

7

that were compensable by "Costs" as defined in the Loan Application. Notably, when it had full opportunity and reason to do so, John Hancock did <u>not</u> inform Vesterra that it considered the "yield maintenance" remedy, explicitly included only in Conditions 3 and 6 concerning terms of the Loan and Note, to be implicitly included in Condition 30 as well, which concerned damages for any breach of the <u>Loan Application</u>. Defs.' Facts, ¶ 6.

Further, it is undisputed that Vesterra understood the "unlimited losses" to refer to hedge losses, not to ten years' of interest payments for a loan that did not close, and that Vesterra would not have signed the Loan Application if it had provided any kind of "yield maintenance" damages related to performance of the Loan Application itself. Defs.' Facts, ¶¶ 7-8; Affidavit of James R. Koller, dated March 13, 2006 ("Koller Aff."), ¶¶ 29-30.

## ARGUMENT

### I. The Standard for Summary Judgment

The standard for summary judgment is well established:

> In adjudicating a motion for summary judgment, a district court construes the facts "in the light most amiable to the nonmovant[ ] and indulge[s] all reasonable inferences favorable to [him]." The Civil Rules empower the court to render summary judgment only when this portrait of the case depicts "no genuine issue as to any material fact" and establishes "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual issue is "genuine" if "it may reasonably be resolved in favor of either party" and, therefore, requires the finder of fact to make "a choice between the parties' differing versions of the truth at trial."

*DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).

Here, the question is one of legal interpretation of the terms of the purported contract, so there is no issue of fact (disputed or otherwise). In the alternative, if the Court finds that the terms of the Loan Application are ambiguous, so as to permit consideration of parol evidence,

then Vesterra submits that the communication from John Hancock concerning Vesterra's liability establishes beyond any factual dispute that the parties did not understand Condition 30(d) to include "yield maintenance" damages.

## II. The Damages Recoverable Under the Loan Application, Even If It Is a Binding Contract, Do Not Include the Present Value of Ten Years' of Interest on a Loan that Never Closed

If the Loan Application were determined to be a valid, enforceable contract, and if the jury determined that Vesterra breached this contract, it is clear as a matter of law that the Loan Application specifies damages for such a breach, and that these do not include the equivalent of a prepayment premium or default premium. John Hancock knows perfectly well how to specify such a yield-maintenance provision, and in fact did so for two specific situations that might arise after the Loan had closed: prepayment and default after closing (described in detail above).

The specific language of the prepayment premium and the default premium, including such details as "present value" and the basis for determining the "discount rate" to apply, is totally lacking from the provisions that govern a breach of the Loan Application before the Loan has closed and before the Note has been signed. Also notably absent from the provisions relating to compliance with the terms and conditions of the Loan Application itself is <u>any</u> acknowledgement similar to the one required for the Note and Mortgage -- that the "Borrower acknowledges that the Loan was made on the basis and assumption that John Hancock would receive the payments of principal and interest set forth herein for the full term of this Loan." *See* Exhibit 1, Condition 6(d); *compare* Condition 30(d). At no time, and in no provision of the Loan Application, did Vesterra acknowledge that the Loan Application was signed with any assumption that John Hancock "would receive the payments of principal and interest set forth herein for the full term of this Loan." It is simply not credible for John Hancock to argue that, in

9

the absence of such an acknowledgment (which was to be included in the Loan Documents), a loan applicant undertakes to be liable for ten years of interest on a loan even if it is never disbursed.

For a breach of the Loan Application itself, the Loan Application sets forth a very different set of remedies that might be available to John Hancock: liquidated damages, which consist of the "Application Fee" and the "Commitment Fee"; "Costs," as defined in the Loan Application; and losses or expenses that may have been incurred by John Hancock in temporarily setting aside $32 million and making commitments to third parties. Especially when read in the context of the Loan Application as a whole, as is required, the language of Condition 30 does *not* imply or permit a yield maintenance measure of damages for withdrawal from the Loan Application in situations like the present one, in which the Loan never closed.

As noted, the parties -- and John Hancock in particular -- knew how to provide for "yield maintenance" premiums or damages where that was the intent. The maxim *expressio unius est exclusio alterius* "instructs that, when parties list specific items in a document, any item not so listed is typically thought to be excluded." *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995); *see also Chatham Pharmaceuticals, Inc v. Angier Chemical Co.*, 347 Mass. 208, 211, 196 N.E. 2d 852, 854-55 (Mass. 1964) (stating "when there is an omission of any provision for one party to assign obligations and in the same sentence there is a provision that in certain circumstances the other party may assign rights or obligations, we conclude that the omission was intentional").

Contracts "must be interpreted in the light of [their] context, and, in general, the same phrase used in different places in an instrument is to be given the same meaning, unless a different meaning is required by the context." *Eastern Massachusetts, St. Ry. Co. v. Boston*

10

*Elevated Ry. Co*, 310 Mass. 659, 664, 39 N.E.2d 647, 651 (Mass. 1942). Accordingly, one "particular application of the classic principle *expressio unius est exclusio alterius*" is the maxim that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States v. Councilman*, 418 F.3d 67, 73-74 (1st Cir. 2005) *quoting Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks and citation omitted; alteration in original). Likewise, in the present case, *expressio unius est exclusio alterius* indicates that by including specific, detailed "yield maintenance" premium language in two provisions of the Loan Application, the parties demonstrated their intentional omission of such language from the provisions governing failure of the Loan to close.

    Not only did John Hancock understand how to write a yield maintenance provision into the Loan Application, John Hancock was meticulous in protecting its interests by providing for specific and detailed remedies throughout the Loan Application. It set forth provisions for, *inter alia*, late charges (Exhibit 1, Condition 6(a), at JH00962), a default interest rate (*id.* at 6(b)), triggering of the default provision upon sale or assignment or indebtedness other than the Loan or misrepresentation of material facts (*id.* at 6(f), (g) & (k), 11(e)), post-closing administrative fees (*id.* at 6(j)), detailed provisions regarding reserve funds from which to pay taxes, assessments, liens, charges, hazard insurance premiums and ground rents (*id.* at 18(a)), payment of certain maintenance or repair items (*id.* at 18(d)), and a processing fee (*id.* at 30(a)). Accordingly, since John Hancock consistently ensured that its remedies were expressly specified throughout the Loan Application, the absence of the "yield maintenance" language in Condition 30(d) cannot be construed as merely accidental.

Further, as explained above, Condition 30(d) of the Loan Application carefully spells out the damages in case of breach before the Loan was closed. These provisions do not describe any yield-maintenance premium or damages, and are totally devoid of the language used in Conditions 3(g) and 6(d). In fact, the Loan Application provides liquidated damages to cover an ordinary breach, and allows special damages on top of those in the event that John Hancock could demonstrate losses due its "allocation" of funds and its commitments to third parties in reliance on the Loan Application.

Because the Loan Application contains clear liquidated damages provisions that apply to a breach of the Application itself, these are the provision that govern John Hancock's remedy here. Under Massachusetts law, "[w]here actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced." *New England Mutual Life Ins. Co. v. Stuzin*, Civ. A. Nos. 86-2470-S, 86-2471-S, 1990 WL 150065, *4 (D. Mass. Oct. 1, 1990) (quoting *A-Z Servicecenter, Inc. v. Segall*, 213 N.E.2d 866 (1966) (citations omitted)). A contract does not have to use the label "liquidated damages" in order for such a provision to be upheld. The Seventh Circuit held that a standby deposit provision was a damage provision because "[t]he fact that the retention of the deposit was contingent on breach indicates that this provision was viewed as one for damages." *Woodbridge Place Apartments*, 965 F.2d 1429, 1438 (7th Cir. 1992); *cf. Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.*, 259 F.2d 896, 900 (2d Cir. 1972) (holding that a commitment fee was not intended to serve as damages because "[t]he sum was payable whether or not the loan was made," and the language of the contract made it clear that the sum was not intended to serve as damages). The Loan Application in the present case provides that the Application Fee and Commitment Fee will be

12

returned to the Applicant if the Loan closes.[2] Exhibit 1, Condition 30 (b) - (c), at JH00978-79. Therefore, unlike the $5,000 Processing Fee, which "is deemed fully earned upon receipt, is non-refundable and will be retained by John Hancock whether John Hancock accepts this Application and whether or not the Loan Closes" (*id*, at 30(a)), the Application Fee and the Commitment Fee were intended to serve as liquidated damages in the event that the Loan did not close.

As to the additional special damages pursuant to Condition 30(d), John Hancock has provided no evidence that it incurred any losses based either on its "allocation" of the $32 million or on any commitments made to third parties. Accordingly, John Hancock may recover the liquidated damages, and the Costs (to the extent that John Hancock submits proof of such Costs), in addition to retaining the Processing Fee. The Loan Application does not permit the award of "yield maintenance" damages under any circumstances before the Loan has closed.

### III. If There Is Any Ambiguity in the Loan Application that Might Permit an Interpretation that Would Apply "Yield Maintenance" Damages to a Breach of the Application Itself, Parol Evidence from John Hancock Demonstrates that the Parties Did Not Construe the Loan Application in this Manner

As explained above, John Hancock was initially willing to limit Vesterra's liability to 5% of the Loan principal, but then informed Vesterra that it would have to "be liable for all Costs" because "[i]f we don't close and interest rates move against us, we could be subject to unlimited losses." Exhibit 2. Thus, John Hancock's own contemporaneous explanation of the liability to which Vesterra might be exposed under the Loan Application confined this to the defined term "Costs." Moreover, when it had this full opportunity and every reason to do so, John Hancock did not inform Vesterra that it considered the "yield maintenance" remedy, explicitly included

---

[2] John Hancock must return the Application Fee to Vesterra if the Loan closes, if John Hancock prevents the Loan from closing, or if Vesterra withdraws or revokes the Application before the Rate Lock, (Exhibit 1, Condition 30(b)(i)-(iii)), and must return the Commitment Fee to Vesterra if the Loan closes. *Id* at 30(c).

only in Conditions 3 and 6 for prepayment and default premiums, to be implicitly included in Condition 30 as well.

Further, if John Hancock did in fact understand the provisions of Condition 30(d) to include the same remedy or premium that was spelled out in such detail in Conditions 3 and 6, then there was no meeting of the minds on this material provision, and hence John Hancock cannot enforce the Loan Application against Vesterra. It is undisputed that Vesterra understood the "unlimited losses" to refer to hedge losses, not to ten years' of interest payments for a loan that did not close, and that Vesterra would not have signed the Loan Application if it had provided any kind of "yield maintenance" damages related to performance of the Loan Application itself.

## CONCLUSION

For the foregoing reasons, Vesterra respectfully requests that this Court grant its cross-motion for partial summary judgment, and rule that John Hancock is not entitled to recover "yield maintenance" damages for the alleged breach of the Loan Application, but is limited to the liquidated damages provided for in the Loan Application, and any Costs as defined therein.

Respectfully submitted,

Dated: March 14, 2006

/s/ Robert D. Hillman
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

/s/ Howard D. Scher
Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr. (admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

#756411-v2

15