UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                :

JOHN HANCOCK LIFE INSURANCE   :
COMPANY,                           :     Civil Action No. 05-11614 WGY
                                  :
              Plaintiff,           :
                                  :
              v.                  :
                                  :     JURY TRIAL DEMANDED
VESTMONT LIMITED PARTNERSHIP,    :
et al.,                                 :
                                  :
              Defendants.        :
_____ :

## **MOTION FOR LEAVE TO FILE SECOND AMENDED COUNTERCLAIM**

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively, "Vesterra"), by and through their undersigned attorneys, hereby move, pursuant to Fed. R. Civ. P. 15(a), 15(b) and 16(b), for leave to file a Second Amended Counterclaim in the form attached as Exhibit 1, as follows:

1.      On July 30, 2004, Vesterra applied for a mortgage loan (the "Loan") from plaintiff John Hancock Life Insurance Company ("John Hancock") by submitting to John Hancock a document entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application").

2.      In August, 2004, John Hancock "approved" the Loan Application, and "accepted" the Loan Application by countersigning it and returning it to Vesterra.

3.      For reasons explained elsewhere, the Loan did not close, and on August 3, 2005, John Hancock filed this lawsuit against Vesterra, alleging breach of the Loan Application.

4.      In January, 2006,  Defendants received the production of internal documents from John Hancock that for the first time disclosed a hidden, additional requirement that had to be met by Vesterra before John Hancock would disburse the Loan.  Specifically, at the same time that it "approved" and "accepted" the Loan Application, John Hancock also adopted the "10% Constant" requirement as another "disbursement requirement" that would have to be satisfied by Vesterra for the disbursement of the Loan.  These John Hancock documents also showed that John Hancock was aware that Vesterra's own figures showed that it would <u>not</u> meet this additional requirement, that John Hancock altered the financial projections submitted by Vesterra as part of the Loan Application, and that John Hancock knew that Vesterra would not have agreed to the additional 10% Constant disbursement requirement.

5.      In February, 2006, based upon this newly-discovered information, Vesterra amended its Counterclaim to add Counts V and VI, for fraudulent inducement and violation of chapter 93A of the Massachusetts statutes.

6.      However, in ruling on John Hancock's Motion for Summary Judgment, this Court found in its Memorandum and Order of March 20, 2006, that there could not have been fraudulent inducement, because John Hancock's "acceptance" of the Loan (and its adoption of the 10% Constant as an additional undisclosed disbursement requirement) did not occur until <u>after</u> Vesterra had signed and submitted the Loan Application.  *Id.* at 3-4.  The Court also ruled that the addition of the 10% Constant as a disbursement requirement did not prevent a meeting of the minds so as to form a contract, because it "was never incorporated into the terms of the Loan Application."  However, the Court then noted "a genuine issue of material fact" because John Hancock's "application of the 10% Constant to Vesterra's Loan Application raises a question as to Hancock's willingness to perform under the contract."  *Id.* at 2.

2

7.    In order to conform its pleadings to the Court's rulings of March 20, Vesterra seeks leave to file its Second Amended Counterclaim.  Specifically, the proposed Second Amended Counterclaim includes the following:

      a.    Count VI, for violation of chapter 93A of the Massachusetts statutes, has been revised to include specific references to John Hancock's non-disclosure of the 10% Constant disbursement requirement after Vesterra signed and submitted the Loan Application, at the time of, and subsequent to, John Hancock "acceptance" of the Loan Application.

      b.    Proposed Count VII seeks a declaration that John Hancock may not pursue a breach of contract action against Vesterra, because John Hancock breached any agreement based on the Loan Application, and was not ready, willing and able to perform the Loan Application according to its terms, as John Hancock had added the 10% Constant as a disbursement requirement for the Loan.

      c.    Proposed Count VIII pleads common law fraud, under Pennsylvania law, for John Hancock's non-disclosure of the 10% Constant disbursement requirement at the time of, and subsequent to, John Hancock's "acceptance" of the Loan Application.

8.    The Court's rulings on these issues was only received two days ago, on Monday, March 20, 2006.  Because Vesterra has thus been diligent in seeking leave to file its Second Amended Counterclaim, it has met the "good cause" requirement of Rule 16(b) .  Thus, Vesterra's motion must be evaluated under Rule 15(a), which "mandates that leave to amend is to be freely given when justice so requires unless the amendment would be futile, or reward,

*inter alia,* undue or intended delay." *Steir v. Girl Scouts of the USA,* 383 F.3d 7, 12 (1st Cir. 2004) (internal quotation marks and citations omitted).

9.    Permitting such an amendment at this point will not prejudice John Hancock in any way.  The factual evidence on which these amendments are based have already been the subject of discovery and legal disputes between the parties, as well as the subject of the Court's March 20 ruling.

10.    In the alternative, it is submitted that Vesterra's motion may, by analogy, be considered under Rule 15(b), for allowing amendments to conform to the evidence at trial. Vesterra seeks to conform its pleading to the Court's rulings on the evidence submitted by the parties for consideration related to the Motion of John Hancock for summary judgment.


WHEREFORE, for the foregoing reasons, Vesterra respectfully requests that this Court grant it leave to file a Second Amended Counterclaim, in the form attached hereto as Exhibit 1, to conform its counterclaims, and the legal remedies it seeks, with the Court's Memorandum and Order of March 20, 2006.

## <u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1</u>

The undersigned conferred with counsel for all parties in a good faith effort to resolve or narrow the issues contained in this motion.

*/s/ Robert D. Hillman*

_____

Respectfully submitted,

*/s/ Robert D. Hillman*

_____

Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.:  617-951-2300


Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

Dated: March 22, 2006

DWLIB 196981v1
8174/01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| JOHN HANCOCK LIFE INSURANCE COMPANY,     | : | Civil Action No. 05-11614 WGY |
|                                          | : |                               |
| Plaintiff,                               | : |                               |
|                                          | : |                               |
| v.                                       | : |                               |
|                                          | : | JURY TRIAL DEMANDED           |
| VESTMONT LIMITED PARTNERSHIP, et al.,    | : |                               |
|                                          | : |                               |
| Defendants.                              | : |                               |

_____

## SECOND AMENDED COUNTERCLAIM

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited

Partnership II, Vestmont Limited Partnership III and Vesterra Corporation (collectively,

"Vesterra"), by and through their undersigned attorneys, assert the following counterclaim

against Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company, and in support

thereof aver as follows:

1.      Vesterra repeats and realleges each and every statement contained in its Answer

and Affirmative Defenses as if the same were fully set forth herein.

## The Parties

2.      Defendant/Counterclaim Plaintiff Vestmont Limited Partnership is a limited

partnership existing under the laws of the Commonwealth of Pennsylvania with its principal

place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

3.      Defendant/Counterclaim Plaintiff Vestmont Limited Partnership II is a limited

partnership existing under the laws of the Commonwealth of Pennsylvania with its  principal

place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

4.     Defendant/Counterclaim Plaintiff Vestmont Limited Partnership III is a limited partnership existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1100 Avenel Boulevard, North Wales, Pennsylvania 19454.

5.     Defendant/Counterclaim Plaintiff Vesterra Corporation is a Pennsylvania corporation with a principal place of business at 892 Andorra Road, Lafayette Hill, Pennsylvania 19444.

6.     Plaintiff/Counterclaim Defendant John Hancock Life Insurance Company ("John Hancock") is a company existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts.

**Jurisdiction and Venue**

7.     Jurisdiction for this counterclaim is proper pursuant to Rule 13 of the Federal Rules of Civil Procedure.  In addition, this is an action for, *inter alia*, a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining a case of actual controversy between the parties.  Jurisdiction is also proper under 28 U.S.C. § 1332(a) because of diversity of citizenship, and the matter in controversy exceeds $75,000.

8.     Venue is proper under 28 U.S.C. § 1391.

**Underlying Facts**

9.     In 2004, John Hancock drafted and negotiated with Vesterra the terms of a document that, in its final form, is entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application").  A copy of the final Loan Application is attached hereto as Exhibit A; the loan applied for therein shall hereinafter be referenced as the "Loan."

10.     All of the negotiations over the terms of the Loan Application took place in Pennsylvania between Vesterra and representatives of John Hancock located in Pennsylvania.

2

11.    On or about July 30, 2004, Vesterra signed a copy of the Loan Application in Pennsylvania and submitted it to John Hancock's representative in Pennsylvania.

12.    On or about August 17, 2004, John Hancock indicated its "acceptance" of the Loan Application by countersigning a copy and returning it to Vesterra.

13.    Paragraph 35 of the Loan Application provides, "This Application shall be deemed to be executed and performable in and governed by the substantive laws of Massachusetts."

14.    Pursuant to paragraph 30 of the Loan Application, Vesterra provided John Hancock with the following fees:

       a) $5,000 for a "Processing Fee";

       b) $640,000 for an "Application Fee"; and

       c) $320,000 for a "Commitment Fee."

15.    Vesterra paid the Processing Fee by delivering a check in the amount of $5,000 to John Hancock's representative in Pennsylvania.

16.    Pursuant to "Condition 52" of the Loan Application, Vesterra provided the Application Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $640,000 and delivering it to John Hancock's representative in Pennsylvania, and provided the Commitment Fee by obtaining an irrevocable transferable Letter of Credit payable to John Hancock in the amount of $320,000 and delivering it to John Hancock's representative in Pennsylvania.

17.    Although the Loan Application was purportedly "accepted" by John Hancock on August 17, 2004, it contains terms and conditions that make illusory any purported "commitment" by John Hancock, in that it makes John Hancock's performance entirely optional.

18.    The Loan Application contains, *inter alia*, the following conditions that give to John Hancock the unfettered discretion to approve or deny the Loan Application subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

>    (a)    Condition 16(b) provides: "On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock <u>in its sole discretion</u>, including such allowances and adjustments (e.g., reserves) to both revenues <u>as John Hancock determines</u> are appropriate." (Emphasis added.)

>    (b)    Condition 20 provides: "Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is <u>satisfactory to John Hancock in its sole discretion</u>. In addition, Applicant shall provide to John Hancock <u>whatever subsequent financial statements may be required</u> by John Hancock." (Emphasis added.)

19.    The Loan Application also contains, *inter alia*, the following conditions that give to John Hancock the sole right to approve or deny the Loan Application, based on the "satisfaction" of John Hancock and its counsel, subsequent to its "acceptance" by John Hancock, so that John Hancock was free to make or not make any such mortgage loan to Vesterra:

>    (a)    Condition 6 provides that "The Note, the Mortgage, and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the 'Loan Documents') <u>shall be satisfactory in all respects in form and substance to John Hancock and its counsel</u>, and . . . shall contain provisions

4

satisfactory in form and substance to John Hancock and its counsel . . ." (Emphasis added.)

(b)      Condition 7 provides that the title and all documentation pertaining thereto "shall be satisfactory in all respects to John Hancock and its counsel," that title insurance shall be "satisfactory in form and substance to John Hancock and its counsel," (emphasis added), and contains similar provisions respecting other documentation.

(c)      Condition 8(a) provides that "a current instrument survey" shall be furnished that is "satisfactory in form and substance to John Hancock and its counsel." (Emphasis added.)

(d)      Condition 10 provides that "John Hancock shall be furnished within twenty-one (21) days of Rate Lock with evidence satisfactory in form and substance to John Hancock and its counsel . . . ." (Emphasis added.)

(e)      Condition 11(b) provides:  "John Hancock shall also be furnished with such additional evidence as it may require, and satisfactory in form and substance to John Hancock and its counsel, that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, . . ." (Emphasis added.)

(f)      Condition 12 provides:  "Prior to Closing, all construction of buildings and other improvements shall be completed to the satisfaction of John Hancock." (Emphasis added.)

(g)      Condition 13 provides that Vesterra is "obligated to deliver to John Hancock . . . the reports and materials described below in form and substance

satisfactory to John Hancock from third party professionals satisfactory to John
Hancock: . . ."  (Emphasis added.)

(h)     Condition 14 provides, in relevant part:  "John Hancock is to be provided
with an appraisal which is signed by a qualified state licensed appraiser acceptable
to John Hancock . . .  This appraisal must support a loan-to-value ratio of not
more than 75.00%, calculated as determined by John Hancock in its sole
discretion."  (Emphasis added.)

(i)     Condition 19 provides:  "Within twenty-one (21) days of the date of Rate
Lock, Borrower shall furnish to John Hancock evidence of such hazard and other
insurance as John Hancock may  require, satisfactory in form and substance to
John Hancock, . . .  All such policies shall have deductibles acceptable to John
Hancock and shall satisfy John Hancock's criteria for insurance . . . and otherwise
cover[] John Hancock's interest in the Real Estate Security in a manner
satisfactory to John Hancock."  (Emphasis added.)

(j)     Condition 23 provides that Vesterra "shall provide John Hancock on or
prior to the Closing Date with an opinion satisfactory in form and substance to
John Hancock and its counsel . . . from an attorney approved by John Hancock
and its counsel, . . ."  (Emphasis added.)

20.     Thus, in a number of conditions, John Hancock expressly retained the right to
determine whether it would or would not approve the Loan Application subsequent to its
"acceptance" by John Hancock, based on John Hancock's "sole discretion" or "satisfaction," so
that John Hancock was free to make or not make any such mortgage loan to Vesterra.

21.     Even if the unfettered discretion provided by the above-referenced conditions did
not render illusory any purported commitment by John Hancock, the Loan Application would

still be unenforceable because Vesterra was induced to sign the Loan Application by deceptive and fraudulent acts on the part of John Hancock.

22.     At the time Vesterra signed the Loan Application (and indeed until Vesterra received documents from John Hancock as a part of the discovery conducted in this action), Vesterra believed John Hancock's representations in the Loan Application that the terms and conditions that Vesterra needed to meet for the disbursement of the Loan were all set forth therein.

23.     For example, the Loan Application includes such specific requirements as the loan-to-value ratio (condition 14), minimum annual rent and debt service coverage ratio (condition 16), and specifies rental amounts, ratios, reserves, net operating income, and minimum occupancy, which with other conditions set forth are defined as the "Funding Conditions" (condition 49).

24.     The Loan Application represents that if, after acceptance by John Hancock, the Terms and Conditions therein were met by Vesterra, including the "Funding Conditions" set forth therein, then John Hancock would fund the Loan to Vesterra.  No reference is made to any additional terms or conditions, and the comprehensiveness and specificity of the entire Loan Application negate any understanding by Vesterra that there were any additional undisclosed terms or conditions.

25.     The documents produced by John Hancock in discovery, and the deposition testimony of one of its employees, Timothy Malik, demonstrate that John Hancock knowingly misrepresented to Vesterra the conditions that Vesterra would have to meet in order for the Loan to be funded.

26.     John Hancock's internal documents show that Vesterra was required to satisfy a never-disclosed *additional* material condition in order for the Loan to be disbursed.

27.    A John Hancock document, produced in this action on January 5, 2006 (Bates Numbers JH 405- JH 425), was explained by Mr. Malik to be the internal "commitment approval" or "loan approval" by John Hancock, and contains the conditions under which John Hancock would disburse the Loan to Vesterra.  (Attached as Exhibit B.)  The second page of this document (the "John Hancock Approval") contains the signatures indicating approval by the appropriate John Hancock employees.

28.    The John Hancock Approval, under "Specific Conditions," identifies the following "Disbursement Requirements":  "Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment."  *See* Exh. B, at JH 405.  *This* "10% breakeven" requirement was not included as a term or condition in the Loan Application, and was never communicated to Vesterra as a requirement for obtaining the Loan.

29.    Other John Hancock documents, as well as Mr. Malik's deposition testimony, confirm that meeting this "10% breakeven" or "10% constant" was a requirement for approval of the Loan and for actual disbursement of the Loan to Vesterra.

30.    Based on the figures and projections submitted by Vesterra to John Hancock, John Hancock knew that Vesterra would not meet this additional requirement for disbursement of the Loan.  In fact, in order to satisfy this requirement, in its internal calculations John Hancock changed the expense numbers that had been submitted to it by Vesterra.  Yet John Hancock never informed Vesterra of this additional requirement, or of the fact that Vesterra would not meet this undisclosed requirement for the disbursement of the Loan.

31.    By not disclosing to Vesterra this additional requirement for disbursement of the Loan, John Hancock intentionally misrepresented the conditions that Vesterra would have to

meet in order to obtain the Loan, and thereby induced Vesterra to sign the Loan Application and to pay or fund the Processing, Application, and Commitment Fees.

32.    Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.  Accordingly, but for John Hancock's knowing misrepresentation that all of the terms and conditions for disbursement of the Loan were set forth in the Loan Application, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

33.    In early August, 2005, John Hancock drew upon the Letters of Credit and thus wrongfully took possession of $960,000 that belongs to Vesterra.

## COUNTERCLAIM − COUNT I
### Declaratory Judgment

34.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

35.    Because John Hancock's "commitment" to make a mortgage loan was illusory, there was a lack of consideration, and thus no binding agreement.

36.    Accordingly, Vesterra is entitled to a declaration that any purported contract based on John Hancock's acceptance of the Loan Application is void and unenforceable, and John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM − COUNT II
**Unjust Enrichment**

37.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

38.     John Hancock has received or obtained $965,000 from Vesterra, and in the circumstances here it is inequitable for John Hancock to retain such monies.

39.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM − COUNT III
**Money Had and Received**

40.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

41.     John Hancock has obtained $965,000 from Vesterra under such circumstances that in equity and good conscience this money should be returned.

42.     Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

## COUNTERCLAIM − COUNT IV
**Conversion**

43.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

44.     Because any loan commitment by John Hancock was illusory, and because John Hancock fraudulently induced Vesterra to deposit the Letters of Credit totaling $960,000, Vesterra had a right to retain the $640,000 Application Fee and the $320,000 Commitment Fee.

45.     Notwithstanding Vesterra's right, John Hancock converted these monies to its own use, exercising dominion over these monies by wrongfully drawing down the Letters of Credit.

46.    Accordingly, John Hancock should return to Vesterra, with interest, the $960,000 wrongfully obtained by John Hancock, and Counterclaim Plaintiffs are entitled to additional damages in an amount to be determined at trial.

## COUNTERCLAIM − COUNT V
### Common Law Fraud and Deceit

47.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

48.    John Hancock misrepresented a material fact by indicating in the Loan Application that all of the requirements for disbursement of the Loan were contained therein. Whereas, in truth, John Hancock had an additional undisclosed requirement, namely that Vesterra meet the  10% "breakeven" or "constant" requirement.

49.    John Hancock knew that the 10% constant was a requirement for approval of the Loan and also for disbursement of the Loan, as indicated in its internal documents.  John Hancock also knew that this requirement was not disclosed in the Loan Application and was never communicated to Vesterra in any form.

50.    The secret 10% constant requirement was material to the transaction because it was a requirement for disbursement of the Loan.

51.    John Hancock made this material misrepresentation concerning the requirements for disbursement of the Loan by indicating that the Loan Application contained all the terms and conditions that needed to be met by Vesterra for disbursement of the Loan, and by not disclosing that the 10% breakeven or constant requirement was an additional condition, in order to induce Vesterra to sign the Loan Application and pay the Processing Fee, Application Fee, and Commitment Fee.

52.    Vesterra reasonably and justifiably relied upon the representations in the Loan Application, and John Hancock's representation that all of the terms and conditions required for

approval and disbursement of the Loan were contained therein was a prerequisite to Vesterra's signing of the Loan Application.

53.    Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own projections showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the Application Fee and Commitment Fee.

54.    Accordingly, but for John Hancock's knowing misrepresentation in the Loan Application that all of the terms and conditions for disbursement of the Loan were set forth therein, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.

55.    Thus, as a result of Vesterra's reasonable and justified reliance on the terms and conditions disclosed in the Loan Application, Vesterra was injured because John Hancock collected all of the Fees.

56.    Accordingly, John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra, and Vesterra should be awarded punitive damages.

## COUNTERCLAIM − COUNT VI
### Unfair and Deceptive Practices under Massachusetts G.L. c. 93A

57.    Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

58.    John Hancock and Vesterra engaged in "trade or commerce" within the meaning of Massachusetts G.L. c. 93A by negotiating the terms of the Loan Application and countersigning the Loan Application.

59.     John Hancock knowingly used an unfair method of competition and knowingly employed an unfair and deceptive act when it made material misrepresentations in the Loan Application about the requirements for disbursement of the Loan and when it "accepted" the Loan Application but failed to disclose the addition of the 10% constant as a new disbursement requirement for funding of the Loan, and failed to disclose that it had altered the financial projections submitted by Vesterra as part of the Loan Application.

60.     John Hancock's misrepresentation and intentional non-disclosure was unethical and would cause substantial injury to other businesspersons, and did, in fact, cause substantial injury to Vesterra.

61.     Vesterra reasonably and justifiably relied upon the representations in the Loan Application and upon John Hancock's "acceptance" of the  Loan Application without disclosure of any additional disbursement requirements, and without disclosure that John Hancock had altered the financial projections submitted by Vesterra as part of the Loan Application.

62.     Had Vesterra been informed of this additional requirement for disbursement of the Loan, which Vesterra's own financial projections as submitted showed that it would not meet, Vesterra would never have signed and submitted the Loan Application to John Hancock, and would not have deposited the Processing Fee or arranged for irrevocable Letters of Credit payable to John Hancock for the  Application Fee and Commitment Fee.  Had Vesterra been informed after John Hancock's "acceptance" of the Loan Application that the 10% constant had been added as a disbursement requirement, and that John Hancock had altered the financial projections submitted by Vesterra as part of the Loan Application, Vesterra would have immediately insisted that the Loan Application be rescinded and that the Letters of Credit be canceled.

63.     Accordingly, but for John Hancock's knowing misrepresentation in the Loan Application that all of the terms and conditions for disbursement of the Loan were set forth therein, and its "acceptance" of the Loan Application without disclosing the addition of the 10% constant disbursement requirement, and without disclosing that it had altered the financial projections submitted by Vesterra as part of the Loan Application, Vesterra would not have paid the $5,000 Processing Fee to John Hancock, and would not have obtained the Letters of Credit for an additional $960,000 for the Application Fee and Commitment Fee, all of which monies John Hancock now claims it has a right to retain.  In the alternative, if John Hancock had disclosed the additional disbursement requirement after Vesterra had submitted the Loan Application, but at the time John Hancock adopted the 10% constant as an additional disbursement requirement, Vesterra would have immediately insisted that the Loan Application be rescinded and that the Letters of Credit be canceled.

64.     Thus, as a result of Vesterra's reasonable and justified reliance on the terms and conditions disclosed in the Loan Application, and on John Hancock's "acceptance" of the Loan Application without disclosure of the additional disbursement requirement, Vesterra was injured because John Hancock collected all of the Fees, including drawing down the Letters of Credit in August, 2005.

65.     Accordingly, John Hancock should return to Vesterra, with interest, three times the $965,000 received and/or obtained by John Hancock from Vesterra for a total of $2,895,000, plus attorneys' fees and costs.

### COUNTERCLAIM − COUNT VII
### Declaratory Judgment − Breach of the Loan Application

66.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

14

67.     John Hancock alleges that Vesterra breached a contract that was formed when John Hancock countersigned and accepted the Loan Application.

68.     In addition to "accepting" the Loan Application, John Hancock imposed the additional disbursement requirement that required Vesterra to satisfy the 10% constant before the Loan would be funded by John Hancock.

69.     However, the disbursement requirements contained in the Loan Application (that constitutes the alleged contract) do not include a requirement that Vesterra satisfy the 10% constant in order for John Hancock to fund the Loan.

70.     This alteration of the disbursement terms as contained in the Loan Application was a breach by John Hancock of any agreement based thereon.  Also, as a result of the additional disbursement requirement, John Hancock was not ready, willing and able to perform the Loan Application according to its terms, without the additional 10% constant disbursement requirement.

71.     A breach of contract claim may not be maintained by a party that was not ready, willing and able to perform the contract in question, or by a party which first breached the contract.

72.     Accordingly, Vesterra is entitled to a declaration that John Hancock cannot maintain a breach of contract against Vesterra, and cannot recover from Vesterra for any alleged breach of contract based on the Loan Application, and John Hancock should return to Vesterra, with interest, the $965,000 received and/or obtained by John Hancock from Vesterra.

### COUNTERCLAIM − COUNT VIII
### Pennsylvania Common Law Fraud − Intentional Non-Disclosure

73.     Vesterra incorporates the allegations of the preceding paragraphs as though fully set forth herein.

74.    John Hancock alleges that Vesterra breached a contract that was formed when John Hancock countersigned and accepted the Loan Application.

75.    However, in addition to "accepting" the Loan Application, John Hancock imposed the additional "disbursement requirement" that required Vesterra to satisfy the 10% constant before the Loan would be funded by John Hancock, and unilaterally altered the financial projections submitted by Vesterra as part of the Loan Application because Vesterra's projections showed that it would not satisfy the 10% constant requirement.

76.    This additional requirement was not contained in the Loan Application, and John Hancock purposefully did not disclose to Vesterra the fact that Vesterra would have to satisfy the additional 10% constant disbursement requirement in order for the Loan to be disbursed, and did not disclose that it had altered the financial projections submitted by Vesterra as part of the Loan Application.

77.    John Hancock's "acceptance" of the Loan Application without disclosing that disbursement of the Loan was conditioned upon satisfying the additional 10% constant disbursement requirement, and without disclosing that it had altered the financial projections submitted by Vesterra as part of the Loan Application, was a knowing concealment of material facts, with the intent to deceive Vesterra, because John Hancock knew that disclosure of these facts would result in cancellation of the Loan Application.

78.    If the secret adoption of this additional disbursement requirement and the failure to disclose it to Vesterra did not occur primarily and substantially in Massachusetts, then this non-disclosure occurred in Pennsylvania (and may have occurred in both states).

79.    Vesterra reasonably and justifiably relied upon John Hancock's disclosures, and on John Hancock's "acceptance" of the Loan Application without disclosure of the additional 10% constant disbursement requirement, and without disclosure that it had altered the financial

projections submitted by Vesterra as part of the Loan Application, which together constituted John Hancock's on-going representation that all of the terms and conditions required for approval and disbursement of the Loan were contained in the Loan Application.

80.    If John Hancock had disclosed to Vesterra that the 10% constant had been added as a disbursement requirement for closing the Loan, Vesterra would have immediately insisted that the Loan Application be rescinded and that the Letters of Credit be canceled.  If necessary, Vesterra could have sought and would have obtained appropriate relief from this Court in the fall of 2004.

81.    As a result, but for John Hancock's intentional nondisclosure of the added disbursement requirement of the 10% constant, and nondisclosure that it had altered the financial projections submitted by Vesterra as part of the Loan Application, Vesterra would have retained the $960,000 (for the Application Fee and Commitment Fee) which John Hancock obtained from drawing upon the Letters of Credit in August, 2005.

82.    Accordingly, John Hancock should return to Vesterra, with interest, the $960,000 obtained by John Hancock from Vesterra, and Vesterra should be awarded punitive damages.

**WHEREFORE,** Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation request that the Court:

(1)    Enter judgment declaring that any contract, agreement or commitment based on John Hancock's "acceptance" of the Loan Application is void and unenforceable;

(2)    Enter judgment against John Hancock requiring restitution to Counterclaim Plaintiffs of $965,000, plus appropriate interest;

17

(3)     Enter judgment against John Hancock for compensatory and punitive damages by reason of its conversion of monies rightfully belonging to Counterclaim Plaintiffs, as determined by the jury;

(4)     Enter judgment against John Hancock for compensatory and punitive damages by reason of its fraud and deceit;

(5)     Enter judgment against John Hancock for treble damages for its violation of G.L. c. 93A. as well as Vesterra's attorneys' fees;

(6)     Enter judgment declaring that John Hancock may not maintain a breach of contract action against Vesterra based on the Loan Application;

(7)     Enter judgment against John Hancock for compensatory damages for breach of contract of $965,000, plus appropriate interest; and

(8)     Enter an order granting Counterclaim Plaintiffs the costs of this action, and such other and additional relief against John Hancock as may be just and proper in the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants/

Counterclaim Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.


Respectfully submitted,

*/s/ Robert D. Hillman*

_____
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.:  617-951-2300


Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

Dated: March 22, 2006

DWLIB 196978v1
8174/01

Application No. 6518467

**APPLICATION TO**
**JOHN HANCOCK LIFE INSURANCE COMPANY**
**FOR A FIRST MORTGAGE LOAN**

**July 30, 2004**

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, MA 02116
Attn: Real Estate Investment Group

RE:  APPLICATION NO.  6518467
   APPLICANT:   **Montgomery Square Partnership**
   PROPERTY:  **Avenel at Montgomery Square, 1100 Avenel Boulevard, North Wales, Montgomery County, PA 19454**

   THE FOLLOWING EXHIBITS ARE ATTACHED:   **A,B,C,D,E,F,G & H**

   SUPPLEMENT OF 18 PAGES ATTACHED

Ladies and Gentlemen:

   The undersigned (the "Applicant") hereby applies to John Hancock Life Insurance Company ("John Hancock") for a first mortgage loan (the "Loan") to Borrower in the principal amount and upon the terms and conditions set forth below and in the Exhibits and in any Supplement referred to above (the "Terms and Conditions"):

1.  BORROWER

   Name:    **Montgomery Square Partnership** (the "Borrower")
   Type of Entity:    **General Partnership**
   State of Organization: **PA**
   Address:    **490 Norristown Road, Suite 151, Blue Bell, PA 19422**

   TAXPAYER IDENTIFICATION NO. OF BORROWER: 23-2865711
   BORROWER'S FISCAL YEAR ENDING DATE: December 31, 2004

   Applicant represents that the description of the Borrower and all constituent entities and the list of names, types of interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are truly, accurately, and completely described on Exhibits F and G attached to this Application.

2.  NOMINATION OF BORROWER

   If Borrower is not definitely named in Condition 1 hereof, Borrower shall be subject to approval by John Hancock in its sole discretion and shall be nominated in writing by Applicant to John Hancock; and said nomination shall be accompanied by information as to the identity, financial condition, background and experience (including Exhibits F and G) of Borrower and the proposed guarantors and indemnitors; and, if Borrower is an entity, of the principals (as determined as set forth in Condition 41) of Borrower; and Borrower so nominated shall furnish John Hancock with an agreement under which Borrower shall become jointly and severally liable with Applicant for performance of the

Application No. 6518467

obligations of Applicant and Borrower hereunder, and the proposed guarantors and indemnitors execute the acknowledgment sections thereof, such nomination and agreement to be consummated on the form attached hereto and made a part hereof marked Exhibit A and to be submitted to John Hancock within seven (7) days from the date of acceptance by John Hancock of this Application.

Applicant agrees to provide John Hancock and its agents in a timely fashion all of the information as requested in this Application or otherwise that John Hancock may reasonably request to appraise the Security and underwrite this Loan.

3. **LOAN TERMS**

    (a) PRINCIPAL AMOUNT:       $32,000,000.00

    (b) INTEREST RATE:       **The interest rate shall be equal to the sum of the 10 year treasury at the time of rate lock, plus a spread of 175 basis points. This interest rate is subject to change based on market conditions such as movements in the treasuries and the swap curve (affecting both the treasuries and spread) until the rate is actually locked**

    (c) INTEREST RATE AND RATE LOCK:    The interest rate set forth in Condition 3(b) may be changed or confirmed if John Hancock, in its sole discretion, prior to acceptance of the Application issues a Rate Lock Confirmation to Applicant in the form attached hereto as Exhibit D (the "Rate Lock Confirmation"). If so issued, the Rate Lock Confirmation will amend the date of the Application to be the date of issuance of the Rate Lock Confirmation, will confirm or change the interest rate (the "Interest Rate"), the amount of the monthly payment of principal and interest (the "Monthly Payment"), the Amortization Period and establish the outside date for Closing (as hereinafter defined). If the terms of the Rate Lock Confirmation are satisfactory to the Applicant and the Applicant wishes to accept the proposed Rate Lock (hereinafter defined), the Applicant must execute the Rate Lock Confirmation and return such to John Hancock by telecopy to Timothy J. Malik at (617) 572-9699 within the time required on the Rate Lock Confirmation. The execution and delivery of said Rate Lock Confirmation by Applicant as described above will be deemed to amend this Application to incorporate herein the amended Application date, the Interest Rate, the Monthly Payment, the Amortization Period, the date of Closing and any other terms contained in said Rate Lock Confirmation. In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

    It is understood and agreed that John Hancock is under no obligation to issue any Rate Lock Confirmation.

    Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committees and John Hancock has accepted this Application in the place provided below, and then said obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

    (d) REPAYMENT TERMS:

        (i) Monthly installments of principal and interest will be based on an amortization period of 360 months, provided that all unpaid principal and all accrued and unpaid interest shall be due and payable at the end of the Term of the Loan specified in subparagraph (e) of this Condition 3. The amount of the monthly payment will be established at Rate Lock as set forth in Condition 3(c). Interest shall be computed on a monthly basis using a twelve (12) thirty- (30) day month formula, except that interest due and payable for a period less than a full month shall be calculated by multiplying the actual number of days elapsed in such partial month by a daily rate based on a three hundred sixty-five (365) day year.

    (e) TERM OF LOAN: 120 months.

2

JH 00328

Application No. 6518467

(f) REPAYMENT DATES: All payments are due on the first day of the month. Unless Closing occurs on the first day of a month, interest shall, at John Hancock's option, be payable at Closing to the first day of the following month; and in such event other time computations to be stipulated in the Loan Documents (as hereinafter defined) shall run from the latter date, except where otherwise required by John Hancock.

(g) PREPAYMENT PRIVILEGE: Except as provided below, Borrower may not prepay the Loan in whole or in part.

On or after the end of the **4th** Loan Year (as hereinafter defined), on any scheduled payment date and subject to giving John Hancock not less than thirty (30) nor more than ninety (90) days' prior written notice specifying the scheduled payment date on which prepayment is to be made ("Prepayment Date"), Borrower may prepay the entire principal amount together with any and all accrued interest and other sums due under the Loan Documents and subject to payment of a prepayment premium equal to the greater of:

(i) the positive amount, if any, equal to (aa) the sum of the present values of all scheduled payments due under the Note from the Prepayment Date to and including the maturity date of the Note, minus (bb) the principal balance of the Note immediately prior to such prepayment; or

(ii) 0.00% of the principal balance of the Note immediately prior to such prepayment.

All present values shall be calculated as of the Prepayment Date, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in The Wall Street Journal or other business publication of general circulation five (5) business days before the Prepayment Date.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

The Loan will be open to prepayment without premium during the last 90 days of the term of the Loan.

If any notice of prepayment is given, the principal balance of the Loan and the other sums required pursuant to this Condition shall be due and payable on the Prepayment Date unless Borrower provides written notice that it is revoking said prepayment notice no later than five (5) business days prior to the Prepayment Date.

Provided no default exists under the Loan Documents, the above premium shall not be applicable to a prepayment resulting from John Hancock's election to require insurance loss proceeds or condemnation awards to be applied to a payment of principal.

No partial prepayment shall be allowed.

The Loan Year is defined as any twelve-month period commencing with the date on which the first monthly installment is due or any anniversary thereof.

(h) METHOD OF PAYMENT: Any amounts due John Hancock shall be paid via ACH debits against Borrower's account. The attached Exhibit H, Authorization Agreement for Direct Deposits (ACH), has been completed and executed and a voided check or deposit slip is attached thereto

4. CLOSING AND CLOSING DATE

(a) All References to closing in this Application shall mean the funding of the Loan by John Hancock (the "Closing")

(b) The Closing shall occur on or before the date established by the Rate Lock Confirmation as set forth in Condition 3(c) (the "Closing Date").

3

Ed 1/28/2004

JH 00329

Application No. 6518467

(c) It is understood and agreed that John Hancock shall have no obligation to extend the Closing Date. If Borrower has not complied with all the Terms and Conditions hereof by that time, and John Hancock in its sole discretion does not extend said date pursuant to Condition 32 hereof, John Hancock's obligation to Close and fund the Loan shall terminate pursuant to Condition 29 hereof; and any Rate Lock shall expire automatically.

5. THE SECURITY FOR THE LOAN

The Loan shall be secured by the Real Estate Security and Personal Property Security described below (collectively, the "Security"):

(a) REAL ESTATE SECURITY: The Loan will be secured by a first mortgage, first deed of trust, first security deed, first loan deed, or similar instrument, as determined by John Hancock (the "Mortgage"), upon the following described real estate, including without limitation, the buildings and improvements located thereon and all appurtenances thereto, including without limitation, all easements, licenses and permits in connection with the ownership and operation of the land and improvements (the "Real Estate Security"):

A newly constructed three & four-story 256 unit garden apartment complex situated on approximately 18-3/4 acres and located in nine separate buildings at 1100 Avenel Boulevard, North Wales, PA 19454

(b) PERSONAL PROPERTY SECURITY: In addition to the Real Estate Security, the Loan will be secured by the following security (the "Personal Property Security"):

(i) ASSIGNMENT OF LEASES AND RENTS: A first priority present, absolute and unconditional assignment to John Hancock of all present and future rents, issues and profits (including without limitation all accounts receivable) from the Security and of all present and future leases of personal property and leased property, including ground leases and master leases (all of the foregoing hereinafter referred to as "Other Leases"), and leases of space to occupancy tenants on the Security, more particularly referred to in Condition 15 hereof (the "Space Leases") and all rents and other sums payable thereunder by instruments satisfactory in form and substance to John Hancock and its counsel, which will be recorded and which will provide, among other things, that certain Space Leases and Other Leases will not be modified or amended, surrendered, canceled or terminated and new Space Leases and Other Leases may not be entered into without the prior written consent of John Hancock, and that no prepayment of rent will be accepted from any such tenant Leases.

(ii) SECURITY INTEREST IN PERSONAL PROPERTY: A first priority security interest in personal property under the Uniform Commercial Code combined with the Mortgage or by way of a chattel mortgage or other instrument satisfactory in form and substance to John Hancock and its counsel shall be granted to John Hancock and shall constitute a first and prior lien upon all articles of personal property now or hereafter attached to or used in any way in connection with the Real Estate Security or the operation thereof, including without limitation, fixtures, furniture, equipment, insurance proceeds, condemnation awards, tenant deposits, escrow deposits, transferable warranties, licenses, permits, plans and specifications, contracts and other items of tangible or intangible personal property, and the following property (the "Personal Property Security"):

Anything owned by the borrowing entity used solely in the operation and management of the real estate, not including personal property owned or leased by tenants at the security, but including personal property owned by the Borrower if leased to the tenants.

Such security interest shall be perfected by filing or recording as John Hancock shall require

(iii) ASSIGNMENT OF AGREEMENTS, LICENSES AND PERMITS: A first priority present, absolute and unconditional assignment to John Hancock of all management agreements, franchise agreements,

4

JH 00330

Application No. 6518467

warranties, licenses, permits, plans and specifications, construction contracts and all other contracts and agreements with respect to the construction, use or operation of the Real Estate Security.

(c) The Security for the Loan is more particularly described on Exhibit B attached hereto and made a part hereof.

(d) Applicant hereby represents and warrants to John Hancock that the Security has not been subjected to a condominium or cooperative form of ownership, and Applicant and Borrower hereby represent and warrant that the Security shall not be so subjected prior to the Closing Date nor prior to the date on which the Loan is paid in full.

6.  THE LOAN DOCUMENTS

The Note (the "Note"), the Mortgage and all other documents evidencing or securing the Loan or otherwise pertaining thereto (collectively the "Loan Documents") shall be satisfactory in all respects in form and substance to John Hancock and its counsel, and, without in any way limiting the generality of the foregoing, the Loan Documents shall contain provisions satisfactory in form and substance to John Hancock and its counsel, including, without limitation, the following:

(a) LATE CHARGES:  A covenant to the effect that the Borrower will pay a late charge of 5% of any installment of any principal and interest not paid within five (5) days of the due date, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated.

(b) DEFAULT INTEREST RATE:  A covenant requiring the Borrower to pay an increased interest rate ("Default Interest Rate") on the entire principal balance during default or after maturity at a rate equal to 7% above the interest rate on the Loan stipulated in Condition 3(c) hereof as amended by the Rate Lock Confirmation, but in no event to exceed the highest rate permitted under the laws of the jurisdiction in which the Real Estate Security is situated.

(c) RESERVE FUND FOR TAXES AND OTHER CHARGES:  A covenant to the effect that Borrower, at the option of John Hancock, will pay to John Hancock monthly such amounts as John Hancock estimates to be necessary to create and maintain a reserve fund or funds from which to pay before they become due, all taxes, assessments, liens, charges and hazard insurance premiums on or against or pertaining to the Security, together with ground rents under ground leases, if any, and any other sums required pursuant to Condition 18, which reserve fund(s) will be held by John Hancock without interest.

(d) PAYMENT OF LOAN AFTER DEFAULT AND ACCELERATION:  A covenant to the effect that Borrower acknowledges that the Loan was made on the basis and assumption that John Hancock would receive the payment of principal and interest set forth herein for the full term of this Loan.  Therefore whenever the maturity of the Loan has been accelerated by reason of a default under the Loan Documents, which default occurs prior to the time period, if any, in which prepayment is allowed and prior to the date on which the full amount of the balance of principal and interest then remaining unpaid shall be due, including an acceleration by reason of sale, conveyance, further encumbrance or other default (which acceleration shall be at John Hancock's sole option), there shall be due, in addition to the outstanding principal balance, accrued interest and other sums due under the Loan Documents, a premium equal to the greater of:

(i)  The sum obtained by adding:

(aa)  the positive amount, if any, equal to (x) the sum of the present values of all scheduled payments due under the Note from the date of said payment to and including the maturity date of the Note, minus (y) the then outstanding principal balance of the Note, and

(bb)  0.00% of the then outstanding principal balance of the Note; or

(ii)  An amount equal to 7.00% of the then outstanding principal balance of the Note

5

JH 00331

Application No. 6518467

All present values shall be calculated as of the date of said payment, using a discount rate, compounded monthly, equal to the yield rate, converted to its monthly equivalent, of the United States Treasury Security having the closest maturity date to the maturity date of the Note as established in the Wall Street Journal or other business publication of general circulation five (5) business days before the date of said payment.

In the event that the yield rate on publicly traded United States Treasury Securities is not obtainable, then the nearest equivalent issue or index shall be selected, at John Hancock's reasonable determination, and used to calculate the prepayment premium.

In the event default occurs on or after the date on which prepayment is permitted, then in lieu of the above premium, payment of a premium calculated in the manner set forth in Condition 3(g) hereof shall be required.

A tender of the amount necessary to satisfy the entire indebtedness, paid at any time following such default or acceleration, including at a foreclosure sale, shall be deemed a voluntary prepayment, and, at John Hancock's option, such payment shall include a premium as described above.

(e) FINANCIAL STATEMENTS: A covenant to the effect that the Borrower will furnish to John Hancock within ninety (90) days after the end of each fiscal year a statement of Borrower's financial condition, including a balance sheet and profit and loss statement and a statement of annual income and expenses satisfactory in form and substance to John Hancock in connection with the operation of the Security, in detail satisfactory to John Hancock, prepared, audited and certified by a certified public accountant who is a member of the American Institute of Certified Public Accountants; and in addition, within forty-five (45) days after the end of each fiscal quarter of Borrower, Borrower shall provide the above information except that it may be prepared and certified by the financial officer of Borrower who is responsible for the preparation of such annual financial statements.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is office, retail or multi-tenant industrial property, shall be a certified current rent roll, which shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase options and/or co-tenancy requirements; and any and all other fees paid by tenants and security deposits currently held.

Accompanying the submission of the certified statements of annual and quarterly income and expenses, when the Real Estate Security is multifamily property, mobile home park, congregate care property or self-storage facility, shall be a certified current rent roll, which shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, and any and all other fees paid by tenants, including but not limited to utility reimbursements, and security deposits currently held.

For all other property types, accompanying the submission of the certified statements of annual and quarterly income and expenses shall be such additional financial information as John Hancock shall require.

(f) DUE ON SALE: A covenant to the effect that if the Borrower, whether voluntarily or by operation of law, sells, assigns or otherwise transfers the Security or any portion thereof or enters into an installment sale contract or similar agreement, without the prior written consent of John Hancock, or if a change shall occur in the ownership or control of the Borrower or Borrower permits or suffers any merger, consolidation or dissolution or syndication affecting Borrower, or permits or suffers the transfer, sale, assignment or pledge of any interest in Borrower or any entity or person, directly or indirectly, controlling Borrower or any general partner or member of Borrower (if applicable), whether at one time or in a series of related or unrelated transfers without the prior written consent of John Hancock, such event shall constitute a default under the Loan Documents; and John Hancock shall have the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

Notwithstanding the foregoing, John Hancock will permit a one-time transfer of the Real Estate Security together with assumption of the Loan during the term of the Loan, subject to John Hancock's prior written approval, provided that:

6

JH 00332

(i)    no default or event which with the giving of notice or the passage of time would constitute a default under the Loan Documents shall have occurred and remain uncured;

(ii)    the proposed transferee (the "Transferee"), the proposed guarantors of non-recourse carveouts, and the proposed indemnitors of environmental liabilities shall be reputable entities or persons of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by John Hancock;

(iii)    the Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Security, and John Hancock shall be provided with reasonable evidence thereof (and John Hancock reserves the right to approve the Transferee without approving the substitution of the property manager);

(iv)    John Hancock receives a written request for approval from the Borrower at least sixty (60) days prior to the proposed transfer (including a description of the proposed terms of the transfer), together with a diagram as described in Exhibit F showing the structure of the Transferee, the proposed guarantor of non-recourse carveouts and the proposed indemnitor of environmental liabilities, and all of the constituent entities of each, after the contemplated transfer, and a list of the names, types of interests and ownership percentages of all persons to have ownership interests in any of the foregoing or any constituent entity thereof, financial statements, including a completed Exhibit G, for all such entities and an administrative fee of $5,000.00, which shall be deemed fully earned on the date of receipt and shall be retained by John Hancock regardless of whether or not the transfer occurs and whether or not approval is given;

(v)    The Transferee executes and delivers to John Hancock a Loan assumption agreement and delivers a guaranty of non-recourse carveouts from an approved guarantor and a separate environmental indemnity agreement from an approved indemnitor, and such other documentation as John Hancock may require, in form and substance satisfactory to John Hancock;

(vi)    John Hancock and its counsel receive (aa) certification from Borrower and the Transferee that the proposed terms of the transfer described in subparagraph (iv) of this Condition 6(f) are the actual terms of the transfer, (bb) evidence of casualty insurance and other applicable insurance, (cc) all corporate, partnership or other entity documents, and (dd) all other certificates, legal opinions, title materials and other documents which John Hancock may require, all in form and substance satisfactory to John Hancock, at least 30 days prior to the proposed transfer;

(vii)    John Hancock be provided satisfactory evidence concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change on the ability of the Security to generate a cash flow sufficient to pay the debt service on the Loan and to maintain a debt service coverage ratio satisfactory to John Hancock;

(viii)    John Hancock shall have received in writing evidence from the Rating Agencies to the effect that such transfer will not result in a re-qualification, reduction or withdrawal of any rating initially assigned or to be assigned in a secondary market transaction together with such legal opinions as may be requested by the Rating Agencies. The term "Rating Agencies" as used herein shall mean each of Standard & Poor's Ratings Group, Moody's Investors Service, Inc., Duff & Phelps Credit Rating Co., Fitch Investors Service, Inc or any other nationally-recognized statistical rating agency who shall then be rating the certificates or securities issued in connection with the secondary market transaction;

(ix)    the Transferee and its constituent entities shall comply with all requirements pertaining to the Borrower's being a Special Purpose/Bankruptcy Remote Entity (as hereinafter defined) contained in this Application and in the Loan Documents;

(x)    the Transferee shall have delivered to John Hancock such legal opinions and title insurance endorsements as may be reasonably requested by John Hancock; and

7

JH 00333

Application No. 6518467

(xi) John Hancock shall have received an assumption fee equal to one percent (1%) of the then unpaid principal balance of the Note (against which the administrative fee shall be credited) in addition to the payment of all costs and expenses incurred by John Hancock in connection with such assumption (including reasonable attorney's fees and costs).

(g) OTHER INDEBTEDNESS AND LIENS: A covenant to the effect that no indebtedness (whether secured or unsecured) other than the Loan, no encumbrances other than those approved by John Hancock in its sole discretion in connection with the Closing, and no liens other than that of the Loan, shall be permitted to be secured by the Security, or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and any violation thereof shall be a default under the Loan Documents and shall give John Hancock the right to declare the Loan immediately due and payable and to accelerate the entire indebtedness.

(h) USE OF SECURITY: A representation, warranty and covenant to the effect that the Security will at all times be operated as a **Class A Apartment** and for no other purpose.

(i) CONDOMINIUM OR COOPERATIVE: A covenant to the effect that Borrower has not filed and will not file a declaration of condominium, map or any other document having the effect of subjecting the Security to the condominium or cooperative form of ownership.

(j) FEES: A covenant to the effect that John Hancock may charge administrative fees and be reimbursed for all costs and expenses, including reasonable attorneys' fees and disbursements, associated with reviewing and processing post-closing requests of Borrower.

(k) DISCLOSURE: A representation and warranty to the effect that Borrower has fully disclosed to John Hancock all facts material to the Security, the Borrower, the Borrower's business operations and each guarantor listed in Condition 44 of this Application and each guarantor, if any, of the Loan required pursuant to this Application (collectively "Guarantors"), and each indemnitor of environmental liabilities listed in Condition 11(d)(ii)(cc) of this Application (collectively "Indemnitors"); and a misrepresentation or breach of any representation, warranty or covenant made in this Application shall be a default under the Loan Documents.

7. TITLE, TITLE EVIDENCE AND TITLE INSURANCE

(a) The title to the Real Estate Security and Personal Property Security and all documentation pertaining thereto shall be satisfactory in all respects to John Hancock and its counsel.

(b) Borrower shall furnish to John Hancock a policy of title insurance satisfactory in form and substance to John Hancock and its counsel issued by a title insurance company acceptable to John Hancock, in an amount not less than the amount of the Loan, insuring John Hancock and its successors and assigns that the Mortgage is a valid, first and prior lien on the Real Estate Security, subject only to such exceptions to and conditions of title as John Hancock may approve, and containing such endorsements as John Hancock may require. The seven (7) title companies (the "Title Companies") which are named below are acceptable to John Hancock. To facilitate the Closing, Borrower may wish to consider choosing one of them. Notwithstanding the foregoing, John Hancock's providing this information is merely to expedite the Closing of the Loan, and John Hancock is not responsible for the performance of any of said Title Companies. Borrower further acknowledges and agrees that whichever title company is selected, will provide their services directly to Borrower; and John Hancock is not responsible for any fees, costs or expenses of said company. Subject to the approval of John Hancock, Applicant hereby designates the following title insurance company as the title insurer for the loan:

8

Ed 1/28/2004

Application No. 6518467

Name of Title Insurance Company:

1. ☐   First American Title Insurance Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

2. ☐   Chicago Title Insurance Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

3. ☐   Commonwealth Land Title Insurance Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

4. ☐   Lawyers Title Insurance Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

5. ☐   Transnation Title Insurance Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

6. ☐   Stewart Title Guaranty Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

7. ☐   Old Republic National Title Company
      Contact Person:
      Address:

      Telephone Number:
      Telecopy Number:

Ed. 1/28/2004

JH 00335

Application No. 6518467

In the event Applicant wishes to select a title company other than one of those listed above, Applicant must submit a written request to John Hancock. If title company is acceptable to John Hancock in its sole discretion, it will be approved in writing by John Hancock and will be included in the definition of Title Company.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the title insurance company, or the issuing agent, if a title company other than one of the Title Companies has been selected. John Hancock hereby reserves the right to impose reinsurance requirements and to approve the Closing medium, all in its sole discretion.

(c) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the Title Company John Hancock's title requirements. Applicant further agrees to provide the Title Company said written notification to proceed immediately after Rate Lock. It is understood that the Title Company will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Title Company whether or not the Loan Closes and for ensuring that the Title Company and title policy satisfy all the conditions of this Application.

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the preliminary evidence of title insurance satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock.

(e) Borrower shall furnish to John Hancock a chattel search certificate or other similar evidence satisfactory in form and substance to John Hancock and its counsel no later than twenty-one (21) days from the date of Rate Lock showing that such security interest is a first lien on the Personal Property Security, which evidence shall be updated through the date of Closing.

8. **THE SURVEY**

(a) Borrower shall furnish John Hancock a current instrument survey of the Real Estate Security, satisfactory in form and substance to John Hancock and its counsel, prepared by a licensed surveyor acceptable to John Hancock and its counsel and certified by such surveyor to John Hancock and its successors and assigns and to the title insurance company insuring the Loan, pursuant to a certification in form and substance satisfactory to John Hancock and its counsel, showing all final improvements, physical conditions and all other matters affecting the title to, use of and zoning of the Real Estate Security as required by John Hancock.

(b) Applicant hereby agrees that prior to Applicant's requesting that the interest rate be locked, it will give the surveyor designated below John Hancock's survey requirements. Applicant further agrees to provide the surveyor written notification to proceed immediately after Rate Lock. It is understood that the Surveyor will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the Surveyor whether or not the Loan Closes and for ensuring that the Surveyor and the survey satisfy all the conditions of this Application.

(c) The name and address of Applicant's surveyor are set forth below:

Name of Surveyor:    Stout & Traconelli Associates
Address:    2499 Knights Road, Pennsburg, PA 18073
Phone No.    215-679-0200

(d) Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, six (6) copies of the survey described in subparagraph (a) of this Condition 8 no later than twenty-one (21) days from the date of Rate Lock.

9. **BORROWER REQUIREMENTS**

(a) If the Borrower is a limited partnership, a limited liability company, or a corporation, or any other form of entity, then no later than fourteen (14) days from the date of acceptance by John Hancock of this Application,

10

Ed. 1/28/2004

JH 00336

Application No. 6518467

Borrower shall furnish to John Hancock, or to John Hancock's Special Counsel designated herein, if any, full and complete copies of the Borrower's partnership certificates and filings and partnership agreement, operating agreement, corporate articles, by-laws and resolutions or other organizational documents, as the case may be, which shall be satisfactory in form and substance to John Hancock and its counsel. In the event any of the foregoing need to be amended to comply with Condition 9(c) or any condition of this Application, said amended documents shall be furnished to John Hancock, or to John Hancock's Special Counsel designated herein, if any, no later than thirty (30) days from the date of acceptance by John Hancock of this Application.

(b)  Borrower shall furnish evidence satisfactory to John Hancock and its counsel that the Borrower has, and the persons signing on behalf of the Borrower have, the legal capacity and authority to enter into this transaction and to execute the Loan Documents.

(c)  Special Purpose/Bankruptcy Remote Entity. The Borrower must be one of the following types of entities: (aa) a corporation which meets the requirements of SPE (as defined below), (such corporation hereinafter referred to as an "SPE Corporation"), (bb) a limited partnership, in which at least one of its general partners is an SPE Corporation, (cc) a limited liability company, having a minimum of two members, one of which is an SPE Corporation, or (dd) a general partnership, in which at least two of its general partners are SPE Corporations. The following additional requirements shall apply. The Borrower must be now, or prior to Closing must become, a special purpose and bankruptcy remote entity ("SPE"). In general, this includes but is not limited to the following requirements:

   (i)   The activities of Borrower must be limited by its organizational documents to the ownership and operation of the Security.

   (ii)  The activities of the SPE Corporations must be limited by their organizational documents to the ownership of interests in the Borrower.

   (iii) Borrower and its SPE Corporations must be limited by their organizational documents from owning any property unrelated to the Security.

   (iv)  Borrower and its SPE Corporations must be prohibited by their organizational documents from incurring any indebtedness, secured or unsecured; other than, with respect to the Borrower, the Loan, and (aa) incurred in the ordinary course of business to vendors and suppliers of services to the Real Estate Security, (bb) not secured by the Security, or any portion thereof, or by interests in the Borrower or any constituent entity thereof, and (cc) not accompanied by any rights to control or to obtain control of the Borrower or any constituent entity thereof.

   (v)   Each of Borrower and its SPE Corporations must maintain separate assets, bank accounts, operations, books and records and tax returns so that it is not costly or difficult to segregate its assets and operations from those of any affiliate or any other person.

   (vi)  Each of Borrower and its SPE Corporations must do all other things necessary, in the opinion of John Hancock's legal counsel, to establish and maintain its existence as an SPE.

   (vii) Borrower and its SPE Corporations must be prohibited by their organizational documents from dissolving, liquidating, consolidating or merging, or selling all or substantially all of the assets of the Borrower or its SPE Corporations or transferring all or substantially all of the assets of the Borrower or its SPE Corporations, or engaging in any other business activity.

   (viii) For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the organizational documents of Borrower and its SPE Corporations must require a unanimous vote or consent of the Borrower's directors, partners or members, as applicable, and the unanimous consent of the directors of the SPE Corporations, if applicable, to file a petition for bankruptcy protection or obtain any other relief from its creditors

11

Application No. 6518467

(ix)   For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the board of directors of Borrower or its SPE Corporations, if applicable, must include at least one Independent Director whose consent shall be required before such Borrower or its SPE Corporations shall be permitted to file for bankruptcy protection, or obtain any other relief from its creditors, on behalf of such Borrower or its SPE Corporations. Independent Director shall mean a director of the special-purpose, bankruptcy remote corporation serving as the Borrower or the SPE Corporations of the Borrower, who is not at the time of initial appointment and has not been at any time during the preceding five (5) years: (a) a stockholder, director, officer, employee or partner of such corporation, the Borrower or any affiliate of either of them; (b) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the corporation, the Borrower or any affiliate of either of them; (c) a person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other person; (d) an attorney or counsel to such corporation, the Borrower or any affiliate of either of them or (e) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other person. (As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.)

(x)   Non-Consolidation Opinion. For Loans of $15 million or more, and for all other Loans in the event this box ☐ is checked, the Borrower's legal counsel (who must be satisfactory to John Hancock's legal counsel) shall provide an opinion, in form and substance satisfactory to John Hancock's legal counsel to the effect that a bankruptcy proceeding involving,

(aa)   the parent or an affiliate (including without limitation any affiliated property manager) of the Borrower,

(bb)   a member, partner or shareholder of the Borrower, or

(cc)   a partner of a partnership, a member of a limited liability company or shareholders of a corporation, which partnership, limited liability company or corporation serves as a special purpose, bankruptcy remote general partner or managing member of the Borrower,

shall not cause (1) the assets of the Borrower (including without limitation the Security) to be substantively consolidated with the assets of its bankrupt parent, affiliate, member, partner or shareholder and, (2) if applicable, the assets of the SPE Corporations of the Borrower to be substantively consolidated with the assets of its bankrupt partner, member or shareholder.

(xi)   Fraudulent Conveyance and Other Required Opinions. If the Security was transferred to the Borrower by an affiliated entity, John Hancock may require an additional opinion to establish that the transfer of the Security to the Borrower cannot be avoided as a fraudulent conveyance or pursuant to similar laws which would cause the Security to be included among the assets or estate of the transferor.

10.  COMPLIANCE WITH ZONING, BUILDING LAWS, SUBDIVISION
     AND OTHER LAWS, REGULATIONS, ETC. AND SEPARATE TAX PARCEL

John Hancock shall be furnished within twenty-one (21) days of Rate Lock with evidence satisfactory in form and substance to John Hancock and its counsel, including, without limitation, affirmative title insurance in the form of an ALTA 3.1 (or CLTA 123.2) title endorsement (modified to cover parking) if issued in the jurisdiction where the Real Estate Security is located and a letter from the municipality evidencing that the Real Estate Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto. If said title endorsement is not issued in the jurisdiction, both an opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required. John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Real Estate Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel. John Hancock shall be provided with evidence that the Security and the use thereof

12

Application No. 6518467

comply with all building laws, ordinances, rules and regulations, including without limitation, permanent and unconditional certificates of occupancy and all other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, and evidence of rebuildability, all of which shall be satisfactory in form and substance to John Hancock and its counsel.

11.  COMPLIANCE WITH ENVIRONMENTAL LAWS; LOAN DOCUMENTS

(a)  Applicant furnishes to John Hancock herewith an environmental certificate and questionnaire (the "Environmental Certificate") completed and executed by Applicant, attached hereto and made a part hereof marked Exhibit C, which Applicant acknowledges is subject to the approval of John Hancock. Applicant agrees that the Closing of the Loan is conditioned upon the continued accuracy of the representations, warranties and certifications contained in Exhibit C.

(b)  John Hancock shall also be furnished with such additional evidence as it may require, and satisfactory in form and substance to John Hancock and its counsel, that the Security is in compliance with all applicable environmental laws, ordinances, rules and regulations, together with all certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise, including without limitation, an engineering report in form and substance satisfactory to John Hancock and a certification by an engineer satisfactory to John Hancock and its successors and assigns, whose fees and expenses shall be paid by Applicant and/or Borrower, as to the structural and mechanical sufficiency of the improvements and equipment to meet municipal, state and federal environmental requirements.

(c)  The Applicant shall provide to John Hancock an assessment, in form and substance satisfactory to John Hancock and its counsel, by one or more qualified registered professional engineers, hydrologists, or other scientists approved by John Hancock, whose report or reports shall be certified to John Hancock and its successors and assigns and the Applicant and whose fees and expenses shall be paid by the Applicant, and which shall be dated no earlier than one hundred eighty (180) days prior to the Closing, that based on a visual inspection and a thorough review of historical uses of the Real Estate Security and neighboring lands, review of all lists of actual or suspected sites of releases which are published by federal or state agencies, consultation with local officials and a records check of local agencies and authorities who might be knowledgeable with respect to the Real Estate Security:

(i)  there exists no evidence of the past or ongoing release or threatened release at, upon, under, or within, or of the past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials, which term shall in this Application include hazardous waste, as that term is defined by the Resource Conservation und Recovery Act ("RCRA"), 42 U.S.C. §6903(5), hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14), pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C. §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM") and volatile organic compounds, including oil and petroleum products; and

(ii)  there exists no evidence that ACM, polychlorinated biphenyls (PCBs), Mold (defined as the presence of any form of (i) multicellular fungi that live on plant or animal matter and an indoor environment (including without limitation Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor and Stchybotrys chartarum (SC) often found in water damaged building materials), (ii) spores, scents or byproducts produced or released by fungi, including mycotoxins and (iii) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living (collectively "Mold")) or radon gas is present at the Real Estate Security.

If, in John Hancock's sole discretion, the report or reports provided pursuant to subparagraphs (b) and/or (c) above; the answers to any questions on the Environmental Certificate attached hereto as Exhibit C; the provisions of any federal, state, or local laws; and/or any other information which John Hancock has obtained

13

so warrants, John Hancock may require, as a further condition to Closing the Loan, a further report at the Borrower's expense that there exists no evidence of the discharge, migration, or presence of Hazardous Materials, ACM, PCBs, Mold and/or radon gas at the Real Estate Security, said further report to be based on, in John Hancock's sole discretion, soil and groundwater sampling and monitoring, and/or sampling and analysis of building materials.

(d)  The Loan Documents will contain, without limitation:

   (i)  warranties and representations by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

    (aa)  to the best of Borrower's knowledge, there have been no releases or threatened release at, upon, under, or within, nor past or ongoing migration from neighboring lands to, the Real Estate Security, of Hazardous Materials; and

    (bb)  Borrower has not received any notice from any governmental authority or from any tenant or other occupant or from any other person with respect to any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security; and

    (cc)  to the best of Borrower's knowledge, there is no ACM, PCBs, Mold or radon gas at or within the Real Estate Security; and

   (ii)  covenants by Borrower, in form and content satisfactory to John Hancock and its counsel, that:

    (aa)  Borrower has not been, is not, and will not become involved in operations at the Real Estate Security which could lead to the imposition on Borrower of liability under RCRA, CERCLA, or any similar applicable federal or state laws or regulations;

    (bb)  Borrower will strictly comply with the requirements of RCRA, CERCLA, and all similar applicable federal and state laws and regulations, and of all federal and state laws and regulations relating to ACM, PCBs, Mold and radon gas, and will notify John Hancock of any release of Hazardous Materials at, upon, under, or within the Real Estate Security involving Borrower, or of the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, or of the receipt by Borrower of any notice from any governmental agency or authority or from any tenant or other occupant or from any other person with respect to any alleged such release or presence, promptly upon discovery of such release or presence or receipt of such notice, and will send John Hancock copies of all results of tests of underground storage tanks at the Real Estate Security; and

    (cc)  Notwithstanding any provisions in the Loan Documents limiting or negating Borrower's personal liability, Applicant, Borrower and James R. Koller, Frank C. Palopoli & Joseph P. Kelly, individually, will jointly and severally indemnify and hold John Hancock harmless from and against any and all loss, cost, damage, liability, and expense, including attorneys' fees, suffered or incurred by John Hancock in connection with this Loan, at any time, whether before, during, or after enforcement of its rights and remedies upon default, on account of any release or threatened release of Hazardous Materials at, upon, under, or within the Real Estate Security, or resulting from the presence of ACM, PCBs, Mold or radon gas at the Real Estate Security, including with respect to (i) the imposition by any governmental authority of any lien or so-called "super priority lien" upon the Real Estate Security, (ii) clean-up costs, (iii) liability for personal injury or property damage or damage to the environment, and (iv) fines, penalties, and punitive damages; provided, however, that the obligation of Applicant and the Indemnitors to indemnify John Hancock shall not apply to any release or presence of Hazardous Materials which (1) first occurs after (A) a repayment of the Loan in full in accordance with the Loan Documents, or (B) acquisition of title by John Hancock upon a foreclosure and surrender of possession and occupancy of the Security by Applicant and the Indemnitors, their agents, affiliates, employees and independent contractors, and (2) with respect to both (1) (A) and (1) (B) above, is not due to any action occurring prior to such repayment or acquisition.

14

Application No. 6518467

The Applicant, Borrower, Guarantors and Indemnitors shall have the burden of proving that the conditions in the foregoing clauses (1) and (2) were satisfied by clear and convincing evidence and shall continue to defend with counsel reasonably satisfactory to John Hancock and shall indemnify and hold harmless John Hancock for all matters set forth in Section 11(d)(ii)(cc), unless a court of competent jurisdiction finds that Indemnitors have met such burden.

(e)   The Loan Documents will contain, without limitation, in form and content satisfactory to John Hancock and its counsel, (i) provisions to the effect that at any time while the Loan is outstanding, John Hancock may (but will not be obliged to) enter the Real Estate Security to make reasonable inspections of its condition, including but not limited to soil and groundwater sampling and monitoring, and including but not limited to inspections for Hazardous Materials, ACM, PCBs, Mold and/or radon gas, (ii) warranties and representations by Borrower that all of the answers on the Environmental Certificate attached hereto as Exhibit C are true and complete, (iii) covenants by Borrower that Borrower will notify John Hancock in writing immediately upon learning that any of the answers on the Environmental Certificate either was not true when made or is no longer true, and (iv) provisions to the effect that any event which causes any of the answers on the Environmental Certificate to be no longer true, or John Hancock's learning that any of the answers on the Environmental Certificate were not true when made, shall, if the change is in John Hancock's sole determination adverse, constitute a default under the Loan Documents, giving John Hancock all the rights and remedies available to it upon a default by Borrower.

(f)   The title insurance required by Condition No. 7 shall include, if available in the jurisdiction where the Real Estate Security is located, affirmative assurances (i) that no liens or notices affecting the Real Estate Security or any part thereof under RCRA, CERCLA, or any similar applicable federal and state laws have been placed of record in any place of public record and (ii) that the records of the state environmental agency have been examined, and that no expenditures for clean-up of hazardous materials at the Real Estate Security have been incurred by any government agency or authority.

12.  COMPLETION

Prior to Closing, all construction of buildings and other improvements shall be completed to the satisfaction of John Hancock.

13.  THIRD PARTY INSPECTIONS

Borrower is obligated to deliver to John Hancock within thirty (30) days of the date of Rate Lock the reports and materials described below in form and substance satisfactory to John Hancock from third party professionals satisfactory to John Hancock:

(a)   a structural report prepared by an engineer acceptable to John Hancock who will (i) conduct an engineering study of the Real Estate Security satisfactory to John Hancock including, without limitation, an inspection of the structural, mechanical, electrical, plumbing and roof systems and, if required, a termite inspection, and (ii) make an Americans with Disabilities Act review; and where applicable, a seismic study satisfactory to John Hancock, prepared by an engineer acceptable to John Hancock (collectively, "Property Condition Assessment");

(b)   an environmental assessment or assessments (collectively, "Environmental Assessment") prepared by an environmental consultant acceptable to John Hancock who will perform a Phase I environmental assessment of the Real Estate Security as further described in Condition 11, and a Phase II environmental assessment, if recommended in the Phase I report and John Hancock determines that such additional assessment is advisable; and

(c)   an appraisal (the "Appraisal") by a state licensed appraiser acceptable to John Hancock who will provide an appraisal acceptable to John Hancock as more fully described in Condition 14

Reports from other third party contractors may be required to evaluate any issues raised in the underwriting process.

15

JH 00341

Application No. 6518467

Applicant hereby designates, subject to approval by John Hancock, the following third party professionals:

Engineer:        **Con-Tech Services Inc., 388 Reed Road, Bldg.#1, 2nd Floor, Broomall, PA 19008**

Environmental
Consultant:      **RT Environmental**

Appraiser:       **Cushman & Wakefield, Att; Jerry McNamara, Bell Atlantic Tower, 1717 Arch
                 Street, 30th Floor, Philadelphia, PA 19103**

John Hancock is not responsible for the performance of said third party professionals.   Applicant further acknowledges and agrees that said professionals will provide their services directly to Applicant.

Acceptance of this Application by John Hancock shall not be deemed to be approval by John Hancock of the third party professionals. John Hancock hereby reserves the right to approve the third party professionals.

The costs of and in connection with reports from all third party professionals required pursuant to Condition 13 are defined as "Third Party Report Fees".

In order to facilitate the Closing process, Applicant hereby authorizes John Hancock to contact the third party professionals designated above, and to instruct them on behalf of Applicant to commence work as soon as possible after Rate Lock. It is understood that the third party professionals will be hired on behalf of Applicant, that the Applicant will be responsible for payment of all fees and expenses of the third party professionals whether or not the Loan closes, and for making sure that the third party professionals and said reports satisfy all the conditions of this Application

14. **APPRAISAL**

John Hancock is to be provided with an appraisal which is signed by a qualified state licensed appraiser acceptable to John Hancock with no interest, direct or indirect, in the Security or in any loan made on the Security, and whose compensation is not affected by the approval or disapproval of the Loan. The appraisal shall be addressed to John Hancock and its successors and assigns. The appraisal must support a loan-to-value ratio of not more than **75.00%**, calculated as determined by John Hancock in its sole discretion.

15. **LEASE REQUIREMENTS**

(a)   If the Security is occupied by any tenants under Space Leases, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on the rent roll attached hereto as Exhibit B and made a part thereof, and fully executed copies of the Space Leases so listed have already been delivered or are forwarded to John Hancock with this Application. The rent roll shall include among other things tenant names, lease commencement and expiration dates, square footage, annual rent, annual operating expense and real estate tax contributions, a statement as to whether or not there are any purchase option and/or co-tenancy requirements, any and all other fees paid by tenants, and security deposits currently held.

(i)   All additional Space Leases which are entered into prior to Closing, shall be furnished to John Hancock immediately upon execution thereof;

(ii)   All Space Leases and Other Leases shall be satisfactory in form and substance to John Hancock;

(iii)   Prior to Closing, John Hancock shall be furnished with a Tenant's Estoppel Certificate in the form attached hereto and made a part hereof marked Exhibit E, executed by each tenant under each Space

16

Application No. 6518467

Lease and each other Lease, excluding Space Leases in multifamily properties, mobile home parks, congregate care properties or self-storage facilities;

(b) If the Security consists of a multifamily property, a mobile home park, a congregate care property or a self-storage facility, then all Space Leases affecting the Security which are presently in full force and effect with tenants in actual occupancy thereunder are listed on a rent roll attached hereto as Exhibit B and made a part hereof. The rent roll shall include among other things each building designation, unit number, type of unit, tenant names, lease commencement and expiration dates, monthly rent collected, asking market rent, any and all other fees paid by tenants including but not limited to utility reimbursements, and security deposits currently held.

16. RENTAL AND DEBT SERVICE COVERAGE REQUIREMENTS.

(a) On the Closing Date rents at the rate of not less than $4,221,126.00 per annum in the aggregate shall be currently collectible from actual occupants of the Security under Space Leases that are in form, for periods and at rentals satisfactory to John Hancock, under which Space Leases there shall be no concessions, free rent or rebates.

(b) On the Closing Date, there shall be a minimum debt service coverage ratio of 1.25:1, calculated by John Hancock in its sole discretion, including such allowances and adjustments (e.g., reserves) to both revenues and expenses as John Hancock determines are appropriate.

17. SUBORDINATION OF LEASES AND MANAGEMENT AGREEMENTS.

John Hancock may, at its sole option, require (a) that any or all Space Leases and Other Leases and management agreements and other agreements affecting the Real Estate Security or Personal Property Security be made absolutely subject and subordinate to the lien of the Mortgage; (b) that any or all such Space Leases and Other Leases and agreements be made superior and prior to the Mortgage, or (c) that, except for Loans on multifamily properties, mobile home parks, congregate care properties or self-storage facilities, prior to Closing, John Hancock shall be furnished with a Subordination Non-Disturbance and Attornment Agreement in form and substance satisfactory to John Hancock, in its sole discretion, executed by each tenant required by John Hancock.

18. ESTABLISHMENT ON CLOSING DATE OF RESERVE FUNDS.

(a) TAXES AND OTHER CHARGES: On the Closing Date Borrower will establish with John Hancock, a reserve fund in an amount satisfactory to John Hancock from which to pay taxes, assessments, liens, charges, hazard insurance premiums and ground rents, if any.

(b) REPLACEMENT RESERVE: Borrower will be required to make monthly deposits pursuant to an approved capital expenditure budget equal to one twelfth (1/12) of the amount estimated by John Hancock to be necessary for capital repairs or replacements to the Real Estate Security during each calendar year. John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

(c) TENANT IMPROVEMENT AND LEASING COMMISSION RESERVE: Borrower may be required to make monthly deposits for tenant improvements and leasing commissions in amounts determined by John Hancock.

(d) IMPROVEMENTS/REPAIR AND REMEDIATION RESERVE: In the event John Hancock's Property Condition Assessment, Environmental Assessment or any other report detects any deferred maintenance or other repair items, or the possibility that any Hazardous Materials described in Condition 11 are located in, on or under the Real Estate Security, and if John Hancock in its sole discretion approves the Loan for Closing, then a reserve with John Hancock equal to one hundred twenty-five percent (125%) of John Hancock's estimated cost to repair or remediate such items (as determined by a qualified engineer or environmental consultant, as the case may be, retained by John Hancock on behalf of Applicant, at Applicant's expense) will be established by Borrower at the Closing of the Loan and will be maintained until completion of the repairs or remediation, as

17

JH 00343

Application No. 6518467

determined by John Hancock. John Hancock may make disbursements from the reserve account on a quarterly basis in increments to be determined by John Hancock.

19. INSURANCE

Within twenty-one (21) days of the date of Rate Lock, Borrower shall furnish to John Hancock evidence of such hazard and other insurance as John Hancock may require, satisfactory in form and substance to John Hancock, which insurance shall comply with the provisions of the Loan Documents pertaining to such insurance, and be issued by companies satisfactory to John Hancock and licensed to do business in the state where the Real Estate Security is located.

The policies for the insurance required above shall be delivered to John Hancock at least seven (7) days prior to the Closing of the Loan. All such policies shall have deductibles acceptable to John Hancock and shall satisfy John Hancock's criteria for insurance and provide full extended coverage, naming John Hancock and its successors and assigns as first mortgagee and otherwise covering John Hancock's interest in the Real Estate Security in a manner satisfactory to John Hancock.

20. FINANCIAL STATEMENTS

Within twenty-one (21) days of the date of Rate Lock, Applicant will cause to be provided to John Hancock financial statements from Borrower, each Guarantor, each Indemnitor and each of their respective principals in form and content satisfactory to John Hancock, evidencing a financial condition of such parties that is satisfactory to John Hancock in its sole discretion. In addition, Applicant shall provide to John Hancock whatever subsequent financial statements may be required by John Hancock.

21. CLOSING AND OTHER COSTS

Unless specifically stated to the contrary herein, whether or not the Loan closes, Applicant and Borrower shall be jointly and severally liable to pay on the earlier of the Closing date or termination of this Application all costs pertaining to the Loan and the Closing, including, without limitation, all Third Party Report Fees, all charges for title examination and title insurance and escrow, all survey costs, all recording and filing fees, all mortgage or similar taxes, and all attorneys' fees and costs of John Hancock (collectively "Costs").

22. BORROWER'S COUNSEL

The name, address and telephone number of counsel for the Borrower to be contacted by John Hancock's counsel are as follows:

Name:           **Mitchell E. Russell**
Address:        **510 Township Line road, Suite 150, Blue Bell, Pa 19422**
Telephone No.:  215-653-0110
Fax No :        215-653-0383

23. OPINION OF COUNSEL

Applicant and/or Borrower shall provide John Hancock on or prior to the Closing Date with an opinion satisfactory in form and substance to John Hancock and its counsel dated as of the Closing Date from an attorney approved by John Hancock and its counsel and, in addition, at John Hancock's option, from its counsel, that, among other things:

(a) the Borrower, if an entity, the Guarantors and Indemnitors, if entities, and all constituent entities thereof, are duly formed, validly existing and in good standing,

(b) the Borrower and any entity executing Loan Documents on behalf of Borrower or in addition to Borrower (e.g. owners of subordinated fees, Guarantors and Indemnitors) and all other constituent entities, if any, are duly authorized to execute, deliver and perform the obligations under the Loan Documents,

18

Ed. 1/28/2004

JH 00344

Application No. **6518467**

(c)  the Loan Documents are legal, valid, binding and enforceable in accordance with their terms,

(d)  the Loan Documents do not violate any law, regulation or ordinance, and

(e)  the Loan Documents do not conflict with the Borrower's or any Guarantor's or Indemnitor's by-laws or any other documents creating or giving the Borrower or any Guarantor or Indemnitor authority, and are not in violation of or in conflict with any other agreement of Borrower or any Guarantor or Indemnitor.

If the Loan is in the principal amount of $15 million or more or if the box is checked, the opinions set forth in Conditions 9(c)(ix) and (x) shall be delivered.

Borrower will provide John Hancock and its counsel with the proposed form of said opinion no later than fourteen (14) days from the date of acceptance of this Application by John Hancock.

24.  **COOPERATION AND DISCLOSURE**

Applicant, Borrower, each Guarantor and each Indemnitor acknowledge:  (a) that John Hancock has advised them that it may sell, assign, pledge, securitize, participate or otherwise transfer the Loan or any interest therein, in whole or in part, (such transaction being called a "Transaction"), (b) that John Hancock may use and disclose in connection with such Transaction any information it receives in connection with the Loan and that such information will be reviewed and relied upon by John Hancock, its advisers, attorneys, underwriters, placement agents, rating agencies, investors and potential investors in connection with such Transaction, and (c) that they agree to cooperate in the Transaction and to provide required information at their own cost and expense.

25.  **REPRESENTATIONS, WARRANTIES AND COVENANTS**

Applicant, Borrower and, as applicable, each Guarantor, and each Indemnitor, represent and warrant as follows in connection with this Application:  (a) all material information submitted or to be submitted in connection with this Application and the Loan is or will be, respectively, true, correct and complete, including, but not limited to, the information on Exhibits B and G and the rent roll attached to this Application; (b) the financial and operating statements and other accounting information submitted in connection with the Application are true, correct, complete, and fairly present the financial condition of the Applicant, Borrower, Guarantors and Indemnitors and their respective Principals and have been prepared consistent with proper accounting standards; (c) there is no litigation, action, claim, or other proceeding, pending or threatened which might, in any way, materially and/or adversely affect the Applicant, Borrower, any Guarantor, any Indemnitor or the Principals of any of them, or the Security, John Hancock's proposed first lien thereon, or the financial condition of the Security or any of the aforementioned persons; (d) that their respective Principals are truly, accurately, and completely described in Exhibit F; (e) neither the Applicant, the Borrower, any Guarantor and Indemnitor, nor their respective Principals has received notice of, or is otherwise aware of, any condemnation or other action against the Security; (f) Applicant and/or Borrower and/or the Security possess adequate assets, leases, licenses, franchises, rights, governmental and other permits, certificates, consents and approvals to conduct and/or operate the business of the Security and none of the foregoing contains any term or condition that is materially burdensome or different from those possessed or held by other parties conducting or operating a similar business; and (g) each has fully disclosed to John Hancock all facts material to the Security and the operation and tenants thereof, and all facts material to the Applicant, the Borrower, each Guarantor and each Indemnitor and their respective Principals and the background, creditworthiness, financial condition and the business operations of each.

Applicant, Borrower and, as applicable, each Guarantor and each Indemnitor hereby (a) covenants that the foregoing representations and warranties are true, accurate and complete in all respects and will continue to be so from the date hereof through the Closing Date with the same effect as if made on the Closing Date and (b) agrees that the foregoing is a condition to Closing the Loan.

It is understood that other representations, warranties and covenants customary for loans of this nature, will be required by and set forth in the Loan Documents.

19

Application No. 6518467

26. COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and Borrower agree that prior to Closing they will satisfy and otherwise comply with all Terms and Conditions hereof at the earliest possible date, and in any event within any time limits specifically stipulated in the Terms and Conditions hereof, and so as to permit the Closing of the Loan to occur on or prior to the Closing Date, and, pursuant to the foregoing, Applicant and Borrower further agree that they will submit to John Hancock or to John Hancock's counsel, as the case may be, all instruments, documents, evidence, papers, information and other materials pertinent to the Loan, as soon as possible and in any event no later than (a) the date or dates, if any, specifically stipulated in the Terms and Conditions hereof, and (b) where such dates are not so specifically stipulated, twenty-one (21) days prior to the Closing Date.

27. ACCEPTANCE BY JOHN HANCOCK OF THIS APPLICATION

(a) Applicant understands and agrees that, notwithstanding any Rate Lock, John Hancock is not obligated to make the Loan contemplated hereby unless and until the Loan has been authorized by John Hancock's loan committee and John Hancock has accepted this Application in the place provided below, and then such obligation is upon and subject to the provisions contained in the Terms and Conditions hereof.

(b) In the event that John Hancock accepts this Application in the place provided below and forwards an executed copy thereof to the Applicant, Applicant will borrow the Principal Amount; and provided that, after such acceptance by John Hancock, Applicant pays John Hancock the Commitment Fee within the time and as otherwise stipulated in condition 30(c) hereof, then John Hancock agrees to make the Loan upon and subject to the provisions contained in the Terms and Conditions hereof, and this Application will thereupon become a Commitment between Applicant and John Hancock.

(c) The acceptance of this Application by John Hancock shall not constitute approval by John Hancock of any leases or other materials heretofore submitted to John Hancock. Such leases and other materials will be the subject of separate communications from John Hancock.

28. ASSIGNABILITY

This instrument and the rights of Applicant and Borrower hereunder shall not be assignable by operation of law or otherwise, and any purported assignment thereof shall be null and void. John Hancock may assign its rights and obligations hereunder to any affiliate.

29. TERMINATION OF THIS INSTRUMENT

(a) In the event that a Rate Lock has occurred or John Hancock accepts this application, (whether or not Applicant has timely paid the Commitment Fee) John Hancock may terminate its obligation to Close and fund the Loan (and the Rate Lock shall automatically expire) at John Hancock's option and in such manner as John Hancock may determine in the event that:

(i) Applicant or Borrower shall fail to fully and timely satisfy or otherwise comply with any of the Terms and Conditions contained in this instrument,

(ii) there is filed by or against any Applicant, any Borrower any Guarantor or any Indemnitor or Principal of any of them, or any constituent entity of any of them or against any tenant under any Space Lease or Other Lease referred to in Condition 15(a) hereof a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee or liquidator, or if any Applicant, Borrower, Guarantor or Indemnitor, or Principal of any of them or any constituent entity of any of them or any tenant makes an assignment for the benefit of creditors or files a petition for arrangement which is not withdrawn or dismissed, canceled and/or terminated, or which may exist, at the time herein or hereafter established for Closing of the Loan,

20

JH 00346

Application No. **6518467**

(iii) there shall occur prior to the Closing Date a material and adverse change in the financial condition of any Applicant, Borrower, or any Guarantor or Indemnitor, or Principal of any of them, or any constituent entity of any of them, or of any tenant referred to in Condition 15(a) hereof,

(iv) the Security shall suffer any material damage or destruction and the same is not restored to the satisfaction of John Hancock prior to the Closing Date,

(v) any material information furnished to John Hancock by or on behalf of the Applicant, the Borrower, any Guarantor, any Indemnitor, any Principal of any of them or any constituent entity of any of them is or becomes untrue, incomplete, inaccurate or misleading, or

(vi) any representation, warranty or covenant contained in Condition 25 or elsewhere in this Application shall cease to be materially true, accurate and complete.

provided, however, that in the event of such termination of John Hancock's obligation to Close and fund the Loan by John Hancock (and the expiration of the Rate Lock), Applicant and Borrower shall continue to remain liable for all Costs.

(b) Delay in the exercise of John Hancock's right to terminate said obligations as aforesaid shall not be construed as a waiver of such right by John Hancock to terminate with respect to any of the events specified in subparagraph (a) above, and John Hancock's failure to act as to any such event shall not be construed as a waiver by John Hancock of its rights as to any subsequent event of a similar or dissimilar nature.

30. APPLICATION, PROCESSING AND COMMITMENT FEES

Applicant and Borrower covenant that they shall pay the following fees in connection with this Application and the Closing of the Loan:

(a) Processing Fee: A processing fee, payable to John Hancock by cashier's check, in the amount of $5,000.00 is enclosed herewith/has been paid prior hereto (the "Processing Fee"). This Processing Fee is deemed fully earned upon receipt, is non-refundable and will be retained by John Hancock whether John Hancock accepts this Application and whether or not the Loan Closes.

(b) Application Fee: An application fee in the amount of $640,000.00 (the "Application Fee"), payable to John Hancock by cashier's check is enclosed herewith. The Application Fee will be applied as follows:

(i) In the event the Loan Closes, John Hancock will return to the Applicant the Application Fee, less all Costs.

(ii) Unless the Applicant withdraws or revokes this Application, in the event John Hancock does not accept this Loan Application within sixty (60) days from the date of this Application, and John Hancock and Applicant are unable to agree on a modified Application within that time, John Hancock will return the entire Application Fee to the Applicant.

(iii) In the event that, before Rate Lock, Applicant withdraws or revokes this Application, John Hancock will return the Application Fee, less all Costs.

(iv) In the event that, after Rate Lock, but prior to John Hancock's acceptance of this Application, Applicant withdraws or revokes this Application, John Hancock will retain the Application Fee and Applicant shall be liable for all Costs.

(v) In the event John Hancock accepts this Loan Application and the Loan does not Close, John Hancock will retain the entire Application Fee in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

21

Application No. 6518467

(c) Commitment Fee:  If John Hancock shall accept this Application, then in consideration of such acceptance by John Hancock and in recognition of the significant commercial value thereof, Applicant shall pay to John Hancock within five (5) days of such acceptance by John Hancock $320,000.00, the Commitment Fee.  The Commitment Fee will be applied as follows:

    (i)    In the event the Loan Closes, $320,000.00 of the Commitment Fee will be returned to the Applicant.

    (ii)    In the event the Loan does not Close, the Commitment Fee will be retained by John Hancock in addition to its other rights and remedies under the Application, and Applicant shall remain liable for all Costs.

Payment of the entire amount of the Commitment Fee within the time period herein provided is a condition to Applicant's and Borrower's rights under this instrument.

(d) If John Hancock accepts this Application, and in the event that thereafter:

    (i)    Applicant or Borrower shall fail to satisfy or otherwise comply with any of the Terms and Conditions hereof in timely fashion, or

    (ii)    John Hancock shall terminate this instrument pursuant to Condition 29 hereof, or

    (iii)    in any event, if the Loan shall not have been Closed by the Closing Date or as the same may be extended by John Hancock as provided below, on which date John Hancock's obligation to Close and fund shall expire,

then all obligations of John Hancock hereunder shall thereupon immediately terminate and be of no further force or effect, and John Hancock shall be entitled to recover from Applicant and/or Borrower all damages, losses, costs and expenses suffered or incurred by John Hancock as a result of any of the events described in part (i), (ii) or (iii) of this subparagraph (d), including, without limitation, all such damages, losses, costs or expenses arising from the fact that, in reliance on the agreements of Applicant and Borrower contained herein, John Hancock allocated and set aside assets for the purpose of funding the Loan and made commitments to third parties based thereon, in addition to retention of the Processing Fee, the Application Fee and the Commitment Fee, provided, however, that Applicant and/or Borrower shall also continue to remain liable for all Costs.

31.  LIMITATION OF OUT-OF-POCKET COSTS FOR APPLICANT

Notwithstanding any other conditions of this Application and provided that the Applicant shall use its best efforts to satisfy all of the conditions of this Applic      , and applicant is not at f    in an    y        John Hancock i  its sole discretion, elects not to Close the Loan because the Security violates any zoning, building or environmental law, ordinance, code, rule, or regulation or the Property Condition Assessment, Environmental Assessment, Appraisal or title evidence are not satisfactory to John Hancock or its Special Counsel, and any of the foregoing problems cannot be cured to the satisfaction of John Hancock and its Special Counsel by monetary payment of a sum certain by the Applicant or Borrower, then John Hancock will return to Applicant any Application Fee or Commitment Fee paid hereunder, less Costs.

32.  EXTENSIONS OF TIME AND WAIVERS OF CONDITIONS

John Hancock reserves the right in its sole and absolute discretion to:

(a) extend the  Closing Date specified in Condition 4(b) hereof, as amended by the Rate Lock Confirmation, if Borrower is not ready to close, and, if Borrower has not complied with any of the Terms and Conditions hereof by the date herein provided, to extend any such date for the satisfaction of or compliance with such Terms and Conditions hereof, and

(b) waive any of the Terms and Conditions hereof.

22

JH 00348

Application No. 6518467

Any such extension or waiver, and any amendment or modification of this instrument, shall be in writing and be signed by John Hancock.  In no event shall there be any obligation on the part of John Hancock to grant any extensions or waivers, or if any should in John Hancock's sole discretion be granted, there shall be no obligation to grant additional ones.

33. NOTICES

Any notices given hereunder by Applicant or Borrower to John Hancock shall be addressed as follows:

John Hancock Life Insurance Company
John Hancock Tower, T-56
200 Clarendon Street
Boston, Massachusetts 02116
Attn:  Real Estate Investment Group

34. PUBLICITY

In the event the Loan contemplated herein is made, John Hancock shall have the right to issue press releases, advertisements and other promotional materials describing John Hancock's participation in the origination of the Loan or the Loan's inclusion in any securitization.

35. GOVERNING LAWS

This Application shall be deemed to be executed and performable in and governed by the substantive laws of Massachusetts.

36. LIMITATION ON LIABILITY

The Loan Documents shall contain language satisfactory to John Hancock which will serve to negate the personal liability of the Borrower, with exceptions for loss, costs or damage arising from the following (collectively "Non-recourse Carveout Obligations"):

(a) Fraud, misrepresentation and waste.

(b) Any rents, issues or profits collected more than one (1) month in advance of their due dates.

(c) Any misapplication of rents, issues or profits, security deposits, and any other payments from tenants or occupants (including, without l. . . . . . . . . ./ermination fees) insurance proceeds, condemnation awards, or other sums of a similar nature.

(d) Liability under environmental covenants, conditions and indemnity contained in the Mortgage and separate environmental indemnity agreement.

(e) Personalty or fixtures removed or allowed to be removed by or on behalf of Borrower and not replaced by items of equal or greater value or functionality than the personalty or fixtures so removed.

(f) Failure to pay taxes or assessments prior to delinquency, or to pay charges for labor, materials or other charges which can create liens on any portion of the Security and any sums expended by John Hancock in the performance of or compliance with the obligations of Borrower under the Loan Documents, including, without limitation, sums expended to pay taxes or assessments or hazard insurance premiums or bills for utilities or other services or products for the benefit of the Security.

(g) The unauthorized sale, conveyance or transfer of title to the Security or encumbrance of the Security.

(h) The failure of Borrower to maintain its status as a single purpose, bankruptcy-remote entity pursuant to its organizational documents and the Loan Documents.

23

Application No. 6518467

(i)    Attorney's fees, court costs and other expenses incurred by John Hancock in connection with enforcement of Borrower's or Guarantors' personal liability as set forth herein.

37.  CORRESPONDENT

Applicant and Borrower agree that **Carey, Kramer, Pettit, Panichelli & Associates, Inc.** is acting solely as an independent contractor in connection with this Application and the Loan and not as an agent for John Hancock, and has no authority to bind or make any agreements, warranties or representations on behalf of John Hancock, and any agreement by said independent contractor in connection with this Application or the Loan or otherwise shall not be binding upon John Hancock.

38.  DISCLOSURE NOTICE

The Applicant is entitled to a statement of the action taken on this Application.  If such action is adverse and the Applicant so requests, the Applicant is entitled to receive the reasons for such action.  The statement of adverse action shall be provided by John Hancock. The Applicant may, within sixty (60) days of the Applicant's receipt of the statement of adverse action, request that John Hancock provide a statement of specific reasons for that adverse action by contacting John Hancock at John Hancock Tower, T-56, 200 Clarendon Street, Boston, Massachusetts 02116, Attention: **Timothy J. Malik**, telephone (617) 572-3891, and in such event, John Hancock will provide the Applicant the specific reasons for the adverse action within thirty (30) days.  Should John Hancock choose to provide the Applicant with oral notice of the adverse action taken on the Application and the reasons for that action, the Applicant may request written confirmation of those reasons, which will be provided to the Applicant within thirty (30) days of John Hancock's receipt of a written request for confirmation from Applicant.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The Federal agency that administers compliance with this law concerning this creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

39.  ACCESS TO REPORTS AND TO SECURITY

(a)    John Hancock is to be provided a complete credit history for the Applicant, Borrower, the Guarantors, the Indemnitors and the Principals of each (including but not limited to physical record searches for bankruptcy, pending suits, judgments, UCCs and tax liens) in all jurisdictions deemed necessary by John Hancock.  John Hancock is hereby authoriz[...] the cash credit reports o[...] the Applicant, Borrower, each Guarantor and Indemnitor, and their respective Principals, as well as verification of statements made in this Application and any attachments hereto, and (ii) to obtain an environmental records search and a seismic screening with respect to the Security.

(b)    Applicant will give John Hancock and its consultants access to the Security and to Applicant's, the Borrower's, the Guarantors', the Indemnitors' (and those of the Principals of each) books and records to conduct the investigations required by Condition 13, this Condition 39 and any other required investigations during normal business hours.

24

Application No. 6518467

40. **JOHN HANCOCK'S SPECIAL COUNSEL**

The name, address and telephone number of John Hancock's Special Counsel are as follows:

| | |
|---|---|
| Name: | **Robert Schwartz, Esquire** |
| Firm: | **White & Williams** |
| Address: | **One Liberty Place, Suite 1800, 1650 Market Street** |
| City and State: | **Philadelphia, PA 19103-7301** |
| Telephone No. | **215-864-7000 and FAX 215-864-7123** |

41. **APPLICANT REPRESENTATION**

Applicant hereby warrants and represents that none of the Applicant, the Borrower, any Guarantor or any Indemnitor listed herein, nor any of the Principals (determined as described below) of any of them nor any entity in which any of the foregoing holds or has held an ownership interest has been in default under any loan or been given relief by any lender under the terms of any loan or been subject to a foreclosure or deed-in-lieu of foreclosure or been the subject of any bankruptcy, reorganization or insolvency proceeding, unless this box ☐ is checked.

Principal is determined as follows:

(a) Any individual or entity possessing management or operational control of Applicant, Borrower, any Guarantor or any Indemnitor;

(b) Any person or entity possessing at least 25% of the ownership interests in the Applicant, Borrower, any Guarantor or any Indemnitor;

(c) In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner;

(d) In addition, for a corporation, the Principal(s), will be the majority shareholder(s);

(e) In addition, for a limited liability company, the Principal(s) will be all the member(s) thereof and the majority shareholder(s) of any corporate member and the general partners of any partnership member.

42. **AUTHORIZATION FOR DIRECT DEBITS**

Borrower hereby agrees to authorize John Hancock to make direct debit entries as described on Exhibit H attached hereto and to execute said written authorization by completing and executing an agreement in the form of said Exhibit H.

43. **COMPLIANCE WITH REGULATION U**

No part of the proceeds of the Loan will be used for the purpose (whether immediate, incidental or ultimate) of buying or carrying any margin stock within the meaning of Regulation U (12 CFR part 221) of the Board of Governors of the Federal Reserve System of the United States or for the purpose of reducing or retiring any indebtedness which was originally incurred for any such purpose, or for any other purpose which might constitute this Loan a "purpose credit" within the meaning of such Regulation U.

44. **GUARANTORS OF NON-RECOURSE CARVEOUT OBLIGATIONS**

**Borrower and James R. Koller, Frank C. Palopoli & Joseph P. Kelly** will guaranty the Non-Recourse Carveout Obligations.

45. Time is of the essence of this Application

25

JH 00351

Application No. 6518467

Applicant (I) agrees to be fully bound by the Terms and Conditions hereof and (2) covenants that all facts and circumstances pertaining to this Application, the Loan and the Security are and shall continue to be as represented to John Hancock.

The undersigned hereby represents that the Applicant has, and all persons signing this Application on behalf of the Applicant have, the legal capacity and authority to enter into this transaction and to execute this Application.

(Applicant) MONTGOMERY SQUARE PARTNERSHIP
By: VESTMONT LIMITED PARTNERSHIP
By: VEMERRA CORPORATION

By: _____

Its: _____

26

JH 00352

Application No. 6518467

INDEMNITORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Indemnitors hereby agrees to execute the indemnification agreement required by Condition 11(d)(ii)(cc) and joins in the representations, warranties and covenants pertaining to the Indemnitors in Condition 25 of this Application.

INDEMNITOR(S): James R. Koller

By: _____
Date:        7-30-04

INDEMNITOR(S): Frank C. Palopoli

By: _____
Date: _____

INDEMNITOR(S): Joseph P. Kelly

By: _____
Date:        7-30-04

28

Ed. 1/28/2004                                        JH 00353

Application No. 6518467

ACCEPTANCE BY JOHN HANCOCK

John Hancock hereby accepts the foregoing Application and agrees with the Terms and Conditions therein contained, as modified by the Rate Lock Confirmation, a copy of which is attached hereto.

JOHN HANCOCK LIFE INSURANCE COMPANY.

By: _____

Date: _____   Timothy J. Malik
                                    Senior Investment Officer

GUARANTORS' ACKNOWLEDGMENT

By executing this Application in the space(s) provided below, each of the Guarantors hereby agrees, jointly and severally, to guaranty the Non-recourse Carveout Obligations of the Borrower under the Loan Documents and joins in the representations, warranties and covenants with respect to the Guarantors contained in Condition 25 of this Application.

GUARANTOR(S): James R. Koller

By: _____

Date: _____

GUARANTOR(S): Frank C. Patopoli

By: _____

Date: _____

GUARANTOR(S): Joseph P. Kelly

By: _____

Date: _____

27

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 1 of 18

*CONDITION 46- INSURANCE PREMIUM RESERVE - SUSPENSION*

Condition Nos. 6(c) and No. 18(a) are amended as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for hazard insurance premiums as long as all of the following conditions are satisfied:

(1)     No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)     Montgomery Square Partnership is and remains the owner of the Real Estate Security;

(3)     Borrower complies with all obligations in the Loan Documents regarding insurance, including without limitation providing John Hancock with timely evidence (1) that the required insurance is in place for the Real Estate Security and is never delinquent or suspended, and (2) that all insurance premiums are paid in full.

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Conditions 6 or 18 of the Application.

**PLEASE NOTE:  ALL RISK INSURANCE WITHOUT AN EXCLUSION FOR TERRORISM INSURANCE IS REQUIRED AT ALL TIMES.**

*CONDITION 47- TENANT IMPROVEMENT AND LEASING COMMISSIONS - SUSPENSION*

Condition 18(c) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for tenant improvements and leasing commissions for the Real Estate Security as long as all of the following conditions are satisfied:

(1)     No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)     Montgomery Square Partnership is and remains the owner of the Real Estate Security;

(3)     Borrower complies with all obligations in the Loan Documents regarding leases at the Real Estate Security.

JH 00355

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 2 of 18

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the Application.

## CONDITION 48- REPLACEMENT RESERVE - SUSPENSION

Condition 18(b) of the Application is hereby amended and supplemented as follows:

The Loan Documents shall contain a provision suspending the requirement that Borrower fund and maintain a reserve fund for capital repairs and replacements to the Real Estate Security as long as all of the following conditions are satisfied:

(1)    No default has occurred and is continuing under the Loan Documents beyond any applicable notice or cure period;

(2)    **Montgomery Square Partnership** is and remains the owner of the Real Estate Security;

(3)    Borrower complies with all obligations in the Loan Documents regarding maintaining the Security, including without limitation maintaining the Security in good order and repair;

Unless expressly provided elsewhere in this Supplement, this provision does not affect the obligation of Borrower to fund and maintain a reserve fund for any other item specified in Condition 18 of the Application.

## CONDITION 49 – RENTAL ACHIEVEMENT

The Closing shall be no later than 365 days (12 months) from the Rate Lock Date and the outside date for Closing shall be set forth in the Rate Lock Confirmation.

The maximum permitted principal amount of the Loan shall be $32,000,000, which shall be funded in full at Closing subject to the Terms and Conditions of this Application, but a portion of the Loan may be deposited into a rental achievement reserve ("Rental Achievement Reserve") pursuant to the Rental Achievement Reserve Agreement (as defined below) if all of the following terms and conditions are satisfied:

(1) *Borrower Portion*

If the Funding Conditions (as defined below) are satisfied, a portion of the Loan shall be funded and disbursed to the Borrower. The amount to be disbursed to the Borrower on the Closing Date (the "Borrower Portion") shall be an amount which does not cause the loan-to-value ratio as set forth in Condition 14 to exceed 75% (the "Loan to Value" or "LTV"), and at which amount there is minimum rental income (as described in Condition 16(a)) as modified by this Condition 49 to provide a component of Value (as defined below) and a Debt Service Coverage ("DSCR") of 1.25:1 (as described in Condition 16(b)).

JH 00356

Application No. 6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 3 of 18

The amount of the Borrower Portion shall be determined by multiplying 75% by the "Value". The Value is computed by dividing the net operating income of the Security ("NOI") by a capitalization rate of 7.25%.

The NOI is determined by subtracting (a) the operating expenses of (1) $758,433, (2) stabilized taxes (estimated at $480,000) and (3) a management fee of 3.75% of Effective Gross Income (as defined below) from (b) the annualized monthly income from tenants that on the date of Closing occupy apartments and garages under leases reasonably acceptable to John Hancock ("Effective Gross Income")

(See Exhibit 1 for a sample calculation of the Borrower Portion and the amount of the reserves described below.

The DSCR will be determined by reducing the NOI by $64,000 (Replacement Reserve of $250/unit) and then dividing the remainder by the annual debt service payments due and payable upon the Loan, which debt service payments will be determined in connection with the Rate Lock and the applicable Principal Amount of the Loan and shall be deemed to include an amortization schedule of no greater than thirty (30) years.

The amount of the Borrower Portion calculated pursuant to this Section (1) shall be rounded downward to the nearest $1,000.

The amount the Effective Gross Income and the NOI will be determined by John Hancock prior to Closing based upon a review of the Certified Rent Roll (as defined below) and current operating statements submitted by Borrower to John Hancock.

(2) *Conditions to Funding and Provisions for Funding with Rental Achievement Reserve*

   In the event that the Security has not achieved an NOI of $3,097,860 as calculated pursuant to Section (1) above within 10 business days prior to the Closing, then John Hancock shall still fund the Loan as long as:

   (a)   Borrower satisfies timely the other Terms and Conditions of this Application;
   (b)   Occupancy at the Security under Space Leases satisfying the terms of this Application is not less than 80% (which shall not include Space Leases the tenant or guarantor of which is subject to a bankruptcy or insolvency action);
   (c)   Borrower establishes the required Rental Achievement Reserve (as defined below) pursuant to a Rental Achievement Reserve Agreement (as defined below) and otherwise satisfies the obligations of this Condition; and
   (d)   The amount of the Rental Achievement Reserve is not greater than $5,380,000.

   The foregoing conditions are referred to collectively as the "Funding Conditions." If all of the Funding Conditions are not satisfied, John Hancock shall have no obligation to fund any portion of the Loan.

   The amount of the Rental Achievement Reserve shall be equal to the difference between the entire principal balance of the Loan as specified in Section 3(a) of this Application and the Borrower Portion (the "Rental Achievement Reserve Amount") and will be required to be held by John Hancock in reserve at Closing pursuant to a reserve agreement in form and substance acceptable to John Hancock ("Rental Achievement Reserve Agreement"). (See Exhibit 1 for sample

JH 00357

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 4 of 18

calculation.). The Rental Achievement Reserve may be funded with a Letter of Credit (as defined below) acceptable to John Hancock.

(3)  *Achieving Required NOI After Closing*

After the Closing, upon the Security's reaching an NOI of $3,097,860, the Rental Achievement Reserve will be released to Borrower within ten (10) business days of receipt by John Hancock all of the requirements necessary to satisfy the Release Conditions (as defined below).

Notwithstanding the foregoing, if on or after six (6) months from the Closing the NOI is less than $3,097,860, the Rental Achievement Reserve Amount will be recomputed using the method set forth in Section (1) above. If the recalculated Rental Achievement Reserve Amount is less than the then existing Rental Achievement Reserve Amount, the excess reserve will be released to the Borrower (assuming the Release Conditions are satisfied), and at John Hancock's option, the remaining Reduced Principal Amount Rental Achievement Reserve (including without limitation, any accrued interest) (a) may be applied to reduce the principal balance of the Loan, without prepayment premium (in which case the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised); (b) may be applied as is otherwise provided in the Loan Documents; or (c) may continue to be held by John Hancock from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860.

If the recalculated Rental Achievement Reserve Amount is equal to or greater than the then existing Rental Achievement Reserve Amount, then (a) Borrower shall pay to John Hancock within ten (10) days of demand, the amount of such deficiency and (b) John Hancock, at its sole option, (a) may apply the entire Rental Achievement Reserve Amount (including without limitation any accrued interest) to reduce the principal balance of the Loan, without prepayment premium, (in which case, the amortization schedule shall be revised by John Hancock, and the amount of the monthly payments will be revised) or as is otherwise provided in the Loan Documents or (b) may continue to hold the Rental Achievement Reserve Amount from time to time until it either elects to apply such amounts to the Loan as provided above or Borrower achieves an NOI of not less than $3,097,860. Failure to pay such deficiency shall be a default under the Loan.

John Hancock shall have the option in its sole and absolute discretion to extend the six (6) month period described in the foregoing paragraphs in accordance with the provisions of Condition 32 of this Application. Borrower shall be responsible for all costs and expenses, including without limitation, all reasonable attorneys fees of John Hancock, pertaining to the amendment of the Loan Documents or otherwise incurred in connection with effecting the provisions contemplated hereby.

(4)  *Full Amount of Loan Disbursed.*

The Loan Documents shall provide that, notwithstanding the fact that the amount of the Borrower Portion may not be equivalent to the entire Principal Amount of the Loan, or that John Hancock has required the funding of one or more reserves at Closing, Borrower shall be required to pay interest on the entire Principal Amount of the Loan.

(5)  *Expanding Definition of Costs.*

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the application of all or any

JH 00358

Application No. 6518467

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
## Page 5 of 18

portion of the Rental Achievement Reserve, and the revision of the amortization schedule and the monthly payment as described in Condition 49 of this Application."

*Definitions*

*Release Conditions* shall mean that all of the following are satisfied:

(a)     The Loan is not in default;

(b)     Borrower delivers to John Hancock a Certified Rent Roll dated not more than thirty (30) days prior to submission;

(c)     The result of the recalculation of the Rental Achievement Reserve Amount, when conducted at the time of the release, yields a figure that is less than or equal to the amount then held as the Rental Achievement Reserve Amount;

(d)     The LTV is not then more than 75% and the DSCR is not less than 1.25:1 in each case as calculated by John Hancock as provided above;

(e)     All tenants listed on the Certified Rent Roll submitted to John Hancock for the applicable request occupy apartments and garages under leases reasonably acceptable to John Hancock and occupancy at the Security under Leases satisfying the terms of this Application is not less than 80%; and

(f)     Borrower satisfies such other reasonable requirements as are contained in the Rental Achievement Reserve Agreement.

*Certified Rent Roll* shall mean the rent roll certified by the Borrower and submitted to John Hancock dated within thirty (30) days prior to submission, listing each building(s) designation, tenant names, lease commencement and expiration dates, monthly rent due and monthly rent collected, any rental or other tenant concessions, any and all other fees and reimbursements paid by tenants and security deposits currently held. For purposes of computing the gross annual rent, all tenant concessions shall reduce the gross annual rent of all tenants.

*Letter of Credit* shall mean an irrevocable, unconditional, transferable evergreen letter of credit in the applicable amount in form and substance satisfactory to John Hancock and issued by a bank acceptable to John Hancock. The Letter of Credit shall permit partial draws. The Borrower shall execute an agreement satisfactory to John Hancock in connection with said Letter of Credit, providing, among other things, that in the event that Borrower fails to meet its obligations under said agreement, John Hancock shall have the right to require that the expiration date of the Letter of Credit be extended or, at its option, to draw upon the Letter of Credit and to apply the proceeds thereof to the reduction of the principal amount of the Loan, or otherwise in accordance with the Loan Documents or the Rental Achievement Reserve Agreement. It is further required that the bank issuing the Letter of Credit (or any substituted Letter of Credit) be acceptable to John Hancock in its sole discretion not only at the time of the issuance of said Letter of Credit but shall also continue to be so acceptable to John Hancock during the entire term of said Letter of Credit, including all extension and/or renewal periods. If John Hancock, in its sole discretion, shall determine that an issuing bank is or has become unacceptable, Borrower shall be obligated to provide a substitute Letter of Credit. If Borrower does not provide such substitute letter of credit within fourteen (14) days of written notice of the unacceptability of such bank, such failure shall entitle John Hancock to draw upon the existing Letter of Credit and hold and apply the proceeds in accordance with the Rental Achievement Reserve Agreement. Additionally, if Borrower uses a Letter of Credit for the Rental Achievement Reserve and fails to provide a replacement Letter of Credit at least thirty (30) days prior to its expiration, then John Hancock shall have the right, in its sole discretion, to draw on the Letter of Credit and to apply the proceeds as set forth above and to exercise its other remedies under the Loan Documents. All fees and expenses in connection with the Letter of Credit shall be paid by Borrower.

JH 00359

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 6 of 18

*CONDITION 50 – CLOSING DATE AND EXTENSION OF CLOSING DATE*

Condition 4(b) of the Application hereby is deleted and the following hereby is substituted in its stead:

The Closing shall occur on or before the date established by the Rate Lock Confirmation executed by Borrower and John Hancock.

John Hancock shall allow the Borrower to extend the Closing Date for up to six (6) periods of up to thirty (30) days each for an aggregate period of one hundred eighty (180) days, provided that no later than ten (10) business days prior to the Closing Date (as the same may have been extended as described herein), John Hancock shall receive written notice that Borrower has elected to extend the Closing Date pursuant to this Condition 50. If Borrower elects to extend the Closing Date, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall increase by five (5) basis points for each 30-day period or portion of a 30-day period for which the Closing Date shall be extended (each, an "Interest Rate Adjustment"). For example if the Closing Date is extended by one hundred fifty one (151) days, the Interest Rate would increase by thirty (30) basis points; provided, however, that in the event that the Borrower extends the outside date for Closing for the aggregate one hundred eighty (180) day period, the Interest Rate (or, if applicable, each Interest Rate) applicable to the Principal Amount (as it may have been reduced pursuant to Condition 49 hereof) shall not be increased by more than thirty (30) basis points in the aggregate.

Each Interest Rate Adjustment shall be evidenced by an Extension Agreement which John Hancock shall provide and Borrower shall execute. The Extension Agreement shall set forth the period for which the Interest Rate (or if applicable, each Interest Rate) is locked, the Interest Rate (or, if applicable, each Interest Rate) as adjusted by the applicable Interest Rate Adjustment, the monthly loan payment, the revised outside date for Closing, and if applicable, the revised lock out period. Each Extension Agreement shall result in an Interest Rate Adjustment, which shall be cumulative. Borrower acknowledges that the Interest Rate Adjustments may affect the calculations under Condition 49 which may affect (a) the Borrower Portion; (b) the Rental Achievement Reserve Amount and/or (c) John Hancock's obligation to close the Loan.

*CONDITION 51 – ADDITIONAL APPLICATION FEE (Regarding Condition 30(i))*

After the Interest Rate for the Loan is locked, if the yield for the "on the run" 10-year U.S. Treasury Security ("10-Year Treasury Rate") is for a period of five (5) consecutive business days at least 45 basis points below the 10-Year Treasury Rate that was used to determine the locked Interest Rate for the Loan ("Initial Treasuries Trigger Point"), Borrower is required to deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (3) business days after written notice of such fact from John Hancock. Such additional amount shall be added to, and be deemed a part of, the Application Fee. Further, Borrower shall deposit with John Hancock an additional 1% of the entire Principal Amount of the Loan within three (10) business days after written notice from John Hancock for any additional 15-basis point drop below the Initial Treasuries Trigger Point which lasts for a period of five (5) consecutive business days. Any such additional amounts shall be added to, and be deemed a part of, the Application Fee. Regardless of how low the 10-Year Treasury Rate declines after Rate Lock, the amount of additional Application Fee which Borrower shall be obligated to add to the existing Application Fee shall be limited to 2% of the Loan amount ($640,000).

In the event that any additional deposit(s) for the Application Fee are made as outlined above, and subsequently, the 10-Year Treasury Rate rises above the threshold(s) for the additional deposit(s) for a period of five (5) consecutive business days, John Hancock will return the applicable portion of such

JRK

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 7 of 18

additional deposit for the Commitment Fee to the Borrower. In no event shall John Hancock be obligated to return an amount to Borrower which leaves less than $640,000 as the Application Fee being held by John Hancock.

Any additional deposit(s) for the ADDITIONAL APPLICATION FEE made pursuant to this Condition 51 shall be held, retained and disbursed by John Hancock pursuant to and in accordance with the terms and conditions applicable to the Commitment Fee described in this Application.

### CONDITION 52 - PAYMENT OF THE APPLICATION, COMMITMENT FEE OR ADDITIONAL APPLICATION FEE (LETTER OF CREDIT)

Condition Nos. 30(b) and (c) and Supplemental Condition No. 77 are expanded as follows: All of the Commitment Fee and all of the Application Fee required to be deposited under this Application may consist of one or more unconditional, irrevocable and transferable Letters of Credit, both in form and substance, and drawn on a commercial bank satisfactory, to John Hancock. Any and all Letters of Credit delivered to John Hancock in connection with this provision shall be in a form and subject to the conditions described in the last grammatical paragraph of Condition 49 of this Application.

### CONDITION 53 - FORWARD COMMITMENT COMPONENT: COMPLIANCE WITH TERMS AND CONDITIONS; SUBMISSION OF DOCUMENTS

Applicant and John Hancock acknowledge and agree that, in the ordinary course, (a) the Interest Rate is locked for a period of (60) days in accordance with, and subject to, the terms and conditions of this Application; and (b) the Closing is obligated to occur within such time period.

Borrower and Applicant desire that the Interest Rate be locked for more than a period of sixty (60) days. Accordingly, Applicant and John Hancock agree to amend the Application as follows to accommodate such longer period to close the Loan:

A. *Extension of Rate Lock.* The following language is deleted from the first paragraph of Condition 3(c) of the Application:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of sixty (60) days (the "Rate Lock") subject to receipt of the fee required pursuant to Condition 30(c) (the "Commitment Fee") within the time period provided in said Condition 30(c).

and is replaced with the following:

> In the event the Rate Lock Confirmation is issued and accepted as set forth above, the Interest Rate will be locked for a period of three hundred sixty five (365) days (the "Rate Lock") subject to receipt of the fee required pursuant to the terms and conditions of this Application (the "Commitment Fee") within the applicable time periods provided herein.

B. *Additional Modifications to Application to Adjust Time Frames of Deliveries to Extended Rate Lock Period*

1. Section 7(c) is amended as follows:

JH 00361

Application No.6518467

## MONTGOMERY SQUARE PARTNERSHIP
### (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
#### Page 8 of 18

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior the expiration of Rate Lock."

2.  Section 7(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

3.  Section 7(e) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

4.  Section 8(b) is amended as follows:

    (i)  delete "prior to Applicant's requesting that the interest rate be locked,", and insert the following in its place: "no fewer than seventy-five (75) days prior to the expiration of Rate Lock."

    (ii)  delete "immediately" in the second sentence, and insert the following after the words "Rate Lock: "but in no event fewer than seventy-five (75) days prior to the expiration of Rate Lock."

5.  Section 8(d) is amended by deleting "no later than twenty-one (21) days from the date of Rate Lock" and inserting in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

6.  Section 9(a) is amended as follows:

    (i)  delete the words "no later than fourteen (14) days from the date of acceptance by John Hancock of this Application" and insert "in no event fewer than forty-five (45) days prior to the expiration of Rate Lock".

    (ii)  delete the words "no later than thirty (30) days from the date of acceptance by John Hancock of this Application" and insert "no fewer than forty-five (45) days prior to the expiration of Rate Lock".

7.  Section 10 is amended by deleting the words "within twenty-one (21) days of Rate Lock" in the first sentence and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

8.  Section 13 is amended by deleting the words "within thirty (30) days of the date of Rate Lock" in the first line and inserting the following in its place: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

9  Section 19 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
# (AVENEL AT MONTGOMERY SQUARE)
# SUPPLEMENT TO APPLICATION
# Page 9 of 18

10. Section 20 is amended by deleting the words "Within twenty-one (21) days of the date of Rate Lock" in the first sentence and inserting the following in its place: "No fewer than forty-five (45) days prior to the expiration of Rate Lock."

11. Section 23 is amended by deleting the words "no later than fourteen (14) days from the date of acceptance of this Application by John Hancock" and replacing it with: "no fewer than forty-five (45) days prior to the expiration of Rate Lock."

## CONDITION 54 – FLOATING RATE OPTION IN THE 11TH YEAR

Borrower shall have the option to extend the term of the Loan for one (1) period of twelve (12) months from the maturity date of the Loan upon delivering to John Hancock written notice of the desire to so extend not less than one hundred eighty (180) days prior to the maturity date. The Loan shall accrue interest during such extended period at a variable rate. Notwithstanding the foregoing, the Loan shall only be extended if all of the following conditions are satisfied:

(a) There is no default then continuing under the Loan Documents;
(b) John Hancock and Borrower agree to terms for the extension period (including without limitation an interest rate index and spread and acceptable LTV and DSCR ratio given the then amount of the Loan and any subordinate financing which may be in place on the Security) no less than one hundred twenty (120) days prior to the then maturity date of the Loan;
(c) Borrower satisfies all of the conditions of John Hancock then imposed in its sole but reasonable discretion to extend the Loan;
(d) The Loan remains prior to any other lien, mortgage or encumbrance on the Security;
(e) Borrower satisfies all conditions of, and executes and delivers documents for, such extension on or before the then maturity date of the Loan;
(f) Borrower pays all of John Hancock's costs associated with such extension (including without limitation all attorneys' fees); and
(g) John Hancock is still making variable rate commercial mortgage loans on properties of similar size, credit quality, character, type and location at the time of such extension

## CONDITION 55 – LOAN TERMS

Condition 3(g)- The 4th paragraph is deleted and replaced with, "The Loan will be open to prepayment without premium during the last 120 days of the term of the Loan".

Condition 3(h) is deleted in its entirety.

## CONDITION 56 – ASSIGNMENT OF LEASES

In Condition 5(b)(ii) insert in the last line "for more than two months" between "rent" and "will.

## CONDITION 57 – LOAN DOCUMENTS

Condition 6(a) delete 5% and insert 4%

JRK

JH 00363

Application No. 6518467

## MONTGOMERY SQUARE PARTNERSHIP
### (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 10 of 18

Condition 6(b) delete 7% and insert 5%.

Condition 6(c) delete "without interest" at the end of the paragraph and insert "with interest at the prevailing rate with Borrower responsible for any set-up and annual maintenance fees.

## CONDITION 58 – ANNUAL FINANCIAL STATEMENTS PROVIDED BY THE BORROWER

Condition No. 6(e): ANNUAL FINANCIAL STATEMENTS is amended by adding the following: The Loan Documents will provide that John Hancock will accept a statement of annual income and expense prepared and certified by the Borrower, the Borrower's accountant or a financial officer of the Borrowing entity within 120 days after the end of each fiscal year, provided that the statement certified by a certified public accountant is not available and there has not been a default by the Borrower in the performance of any of its obligations under the Loan Documents.

## CONDITION 59 – DUE ON SALE: CHANGE IN OWNERSHIP OR CONTROL

### TRANSFER OF OWNERSHIP WITHIN THE PARTNERSHIP

Borrower represents that the description of the Borrower and all constituent entities and the list of names, types of interests and percentages thereof of all persons having ownership interests in the Borrower and in such entities are accurately described on Exhibit F attached to this Commitment. It is understood that the following amendment to Condition 6(f) is conditioned upon the accuracy and completeness of the information provided on said Exhibit F.

Condition No. 6(f): DUE ON SALE is amended to add the following: The transfer of partnership interests shall be permitted between partners and their families as long as any of the existing partners or Closing controls at least 51% of the combined general and limited partnership interests of the Borrower; provided:

1.    There shall be no default under the Loan Documents,

2.    John Hancock shall be provided with prior written notice of such transfer, together with a diagram showing the structure of the Borrower and all constituent entities after the contemplated transfer and a list of the names, types of interests and percentages of ownership of all owners of interests in the Borrower and any constituent entities after the contemplated transfer, and an administrative fee of $5,000, which shall be deemed fully earned upon receipt, and

3.    All fees and costs in connection with the transaction, including without limitation, John Hancock's attorneys' fees, shall be paid by the Borrower.

## CONDITION 60 – DUE ON SALE

Condition 6(f)- In the last sentence delete "one-time" and replace with "two-time".

JRL

JH 00364

Application No.6518467

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 11 of 18

Condition 6(f)(vii)- In the 2nd and 3rd lines delete "concerning the effect of any change in the real estate taxes to result from the sale and the effect of such change"

Condition 6(f)(vii)- Delete the 4th line and insert at the end of the 3rd line after "ratio", the words "of not less than 1.25:1 as determined by John Hancock".

Condition 6(f)(viii) is amended by inserting the following at the beginning of such section: "If the Loan is made part of a secondary market transaction,".

*CONDITION 61 – SUBORDINATE FINANCING*

Condition No. 6(f) SECONDARY FINANCING is amended to add the following: Notwithstanding the foregoing, John Hancock ("Lender") will permit secondary financing one time, provided that:

1.  No default exists under the Loan Documents,

2.  The Loan Documents contain a covenant whereby Borrower agrees not to make payments to the holder of any secondary financing during any period in which a monetary default exists under the Loan Documents,

3.  The secondary financing will consist of a single mortgage which will be the only loan secured by the Security other than the Loan,

4.  The secondary financing, by its terms, shall be and remain completely subject and subordinate to the Loan Documents and any additional fundings, extensions, modifications and amendments thereof, and to any subsequent advances made by the first mortgagee, whether obligatory or optional and Borrower and the secondary financing lender shall enter into such Subordination and Intercreditor Agreements as required by Lender,

5.  The secondary financing shall not violate the terms of any leases, and by its terms, shall be and remain subordinate to all present and future leases, and shall, by its terms, prohibit the second mortgagee from joining any tenants in any foreclosure action it may institute,

6.  A default under the secondary financing will be a default under the Loan,

7.  The secondary financing shall have a maturity date coterminous with or longer than the maturity date of the Loan,

8.  The secondary financing shall be held by a regulated financial institution acceptable to Lender,

9.  The secondary financing may be at a fixed or floating rate, but in either case shall have a constant amortization and require that all payments be on a current basis with no accruals for

JH 00365

Application No.6518467

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 12 of 18

interest or additional principal or advances. Furthermore, if the secondary financing has a floating rate of interest, the Borrower must purchase an interest rate cap and the debt service coverage ratio condition set forth below shall be calculated using the maximum interest rate achievable considering such cap and amortizing such secondary financing using the lesser of the (a) the actual amortization schedule and (b) a thirty (30) year amortization schedule.

10. The secondary financing must not be given in satisfaction of or to evidence any judgments or claims against the Borrower,

11. The secondary financing shall not be cross-defaulted or cross-collateralized with any loans encumbering any security other than the Security,

12. The holder of the secondary financing shall not be in any way affiliated with the Borrower,

13. The debt service coverage ratio for the combined loan payments of the secondary financing and the Loan (including without limitation any additional funding) shall not result in a debt service coverage ratio of less than 1.25:1, calculated to the satisfaction of Lender, and the loan-to-value ratio for the combined proposed mortgage and the Lender's mortgage (including without limitation any additional funding) shall not exceed 75%, calculated to the satisfaction of Lender.

14. Such secondary financing shall provide that all insurance proceeds and condemnation awards shall be applied solely as described in the Loan Documents,

15. The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan,

b. The mortgagee under such secondary financing shall have agreed in writing to give simultaneous copies to Lender of any notices given by such mortgagee under said secondary financing, including without limitation, notices of default, (b) to collect no income, rents, issues, profits or proceeds from the Security, whether directly or through a receiver, unless the prior written consent of Lender is obtained, and (c) to be bound by any extensions, modifications or amendments to the Loan Documents,

17. All information necessary to determine whether or not the conditions provided herein have been satisfied shall be provided to Lender at the time of the request, together with an administrative fee of $5,000 which shall be deemed fully earned on the date of receipt and shall be retained by Lender regardless of whether or not the junior financing is obtained and whether or not consent is given,

18. The Non-Recourse Carve-Out Obligations shall be expanded to include liability for an amount equal to the sum of all payments made by Borrower to junior lienholders during any period in which a default exists under the Loan.

JH 00366

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 13 of 18

19. All costs and expenses in connection with the request for approval shall be paid by the Borrower, including, without limitation, Lender's attorneys' fees.

## CONDITION 62 – FEES

Condition 6(j)- Insert in the first line after "administrative fees", the words "not to exceed $5,000".

## CONDITION 63 – SPE WAIVER/TOTAL

Condition 9(c): BORROWER REQUIREMENTS is amended by deleting Condition 9(c).

## CONDITION 64 – COMPLIANCE WITH ZONING

Condition 10- In the 4th line from the bottom after "certificates of occupancy" the words "or such temporary certificates of occupancy necessary to operate the security until final certificates are available".

## CONDITION 65 – COMPLIANCE WITH ENVIRONMENTAL LAWS

Condition 11(b)- In the first sentence insert "reasonably" before the word "satisfactory".

Condition 11(d)(ii)(cc)- Insert at the end of the paragraph, "This indemnification shall not apply to situations where the liability is as a result of or caused by conditions that exist or occur on real estate adjoining the Real Estate Security owned by the Borrower"

## CONDITION 66 – COMPLETION

Condition 12- Insert between "completed" and "to" the words "other than normal punch list items and final landscaping",

## CONDITION 67 – REPRESENTATIONS AND WARRANTIES

Condition 25- In the 3rd line after "complete" insert "in all material respects".

Condition 25- In the 7th line delete the words "and have been prepared consistent with proper accounting standards";

Condition 25- Insert in the 2nd line, 2nd paragraph after "all" the word "material".

JH 00367

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
# (AVENEL AT MONTGOMERY SQUARE)
# SUPPLEMENT TO APPLICATION
## Page 14 of 18

### *CONDITION 68* – **TERMINATION OF THIS INSTRUMENT**

Condition 29(a)(ii)- In the 2nd and 3rd lines delete "or against any tenant under any Space lease or Other Lease referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- At the end of the sentence delete "or of any tenant referred to in Condition 15(a) hereof".

Condition 29(a)(iii)- Define "material adverse change in the financial condition" as an event or occurrence which causes the combined net worth of the Guarantors to decline below $10,000,000.

### *CONDITION 69* – **APPLICATION, PROCESSING AND COMMITMENT FEES**

Condition 30(b)(ii)- Delete "sixty (60) and insert twenty one (21).

### *CONDITION 70* – **LIMITATION ON LIABILITY**

Condition 36(f) - In the first line after "taxes" insert "excluding taxes escrowed by John Hancock".

Condition 36(h) - Delete in its entirety.

### *CONDITION 71* – **ADDITIONAL FUNDING**

1.  <u>Additional Funding</u>.  Borrower shall have the right to request additional loan proceeds in the minimum amount of $1,000,000 ("Additional Funding") once between the 2nd and the end of the 5th Loan Years, provided the following conditions are satisfied:

    a.  The rental and debt ... ... ... requirements of Condition ... ... the loan-to-value ratio requirement of Condition 14 are satisfied as of the date of the request for and the funding of the Additional Funding, as determined by John Hancock, taking into consideration the Loan and the Additional Funding;

    b.  No default has occurred and is continuing under the Loan Documents;

    c.  There shall be no partial funding of the Additional Funding;

    d.  There shall be no subordinate financing requested for, or then in place on, the Security;

    e.  The entire Rental Achievement Reserve Amount has been disbursed and released to Borrower and none has been applied to the Loan

    f.  A request for Additional Funding shall be made in accordance with Section 2 below;

    g.  John Hancock is continuing to finance loans of the same size, property type, location, character and credit quality as the Loan and the Additional Funding, and the interest rate on the Additional Funding shall be as set forth in Section 2 below and shall be established

JH 00368

Application No.6518467

## MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 15 of 18

as a fixed rate equal to the then interest rate being offered by John Hancock for loans of the same size, property type, location, character and credit quality;

h.   Except as set forth herein or in the Rate Lock Confirmation described below, the Additional Funding shall be on the same terms and conditions as the Loan and shall be evidenced by an amendment to the existing Loan Documents or by a second note and mortgage on the Security as determined by John Hancock. The Loan Documents shall be satisfactory to John Hancock;

i.   The Additional Funding shall be amortized over the remaining term of Loan (e.g. if drawn at the end of the 2nd year, with 28 years remaining on the Loan term, then Additional Funding will be amortized over 28 years); and

j.   The Additional Funding shall have the same loan maturity date as initial Loan maturity date.

2.   Rate Lock Process.

Upon receipt of sufficient and satisfactory information from Borrower, including, but not limited to, (i) a rent roll for the Security certified by the Borrower which is no more than thirty (30) days old, (ii) current operating statements for the Security in form and for periods as John Hancock may reasonably request; (iii) financial statements from the Borrower, its Principals, Guarantors and Indemnitors, as set forth in Condition 20 of the Application, and (iv) current color photographs of the Security which are not more than thirty (30) days old showing the Security in a manner reasonably satisfactory to John Hancock ("Quote Package"), John Hancock may, in John Hancock's sole discretion, issue a Rate Lock Confirmation to Borrower in a form substantially shown on Exhibit D to the Application and the process described in Section 3(c) of the Application shall be followed. The Rate Lock Confirmation shall also set forth any Application Fee or Commitment Fee that must be paid in connection with the Additional Funding. John Hancock shall be under no obligation to issue a Rate Lock Confirmation for the Additional Funding, and any Additional Funding shall be subject to approval by John Hancock's internal committees.

3.   Due Diligence Matters.

The following shall be conditions precedent to the Additional Funding:

a.   *Title, Title Evidence and Title Insurance.*   Borrower shall provide an endorsement to the loan title insurance policy issued to John Hancock in connection with the initial closing of the Loan ("Title Endorsement"), reflecting the Additional Funding and satisfactory in form and content to John Hancock.

b.   *Survey.*   Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security since the date of the Survey. A recertification and update of the Survey will be required in form and substance satisfactory to John Hancock, dated within sixty (60) days of the Closing for the Additional Funding if (i) the Title Endorsement reveals any new title matters that are plottable; or (ii) there are any exterior additions, alterations or other changes to the Security,.

JKK

JH 00369

Application No. 6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 16 of 18

c.   *Borrower Requirements.*  Borrower shall provide a certificate from the Borrower, certifying that Borrower and its constituent entities continue to comply with the requirements of Condition 9 of the Application.  Borrower will also provide a certified copy of all organizational documents pertaining to the Borrower and, if requested by John Hancock, its constituent entities.

d.   *Compliance with Environmental Laws; Loan Documents.*  Borrower shall provide a certificate from the Borrower and the Guarantors in form and substance satisfactory to John Hancock, certifying that there have been no changes to any matters contained in the Environmental Certificate, to any of the representations and warranties regarding environmental matters contained in the Loan Documents or to any other environmental matter related to the Security.  In addition, John Hancock shall obtain at Borrower's expense, a report from an environmental database confirming that there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the last verification of the environmental database.

At John Hancock's option, Borrower shall provide an update to the environmental site assessment that Borrower delivered to John Hancock prior to the Loan Closing Date in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the initial assessment have been remediated as required and that otherwise there have been no changes to the environmental conditions or listings at the Security or any adjacent property since the date of the initial assessment.

e.   *Compliance with Zoning, Building Laws, Subdivision and Other Laws, Regulations etc. and Separate Tax Parcel.*

Borrower shall provide a certificate from the Borrower and Guarantors, certifying that no exterior changes to the buildings or improvements have occurred on the Security and no changes of use or access or the parking have occurred, in each case since the initial funding of the Loan. In addition, Borrower shall provide (i) an updated letter from the municipality dated no earlier than thirty (30) days before the Closing Date for the Additional Funding, evidencing that the Security and the use thereof comply with all applicable zoning, subdivision and other laws, ordinances, rules and regulations, that there are no outstanding violations pending against the Security and that there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, and (ii) if a title endorsement covering zoning matters in a form satisfactory to John Hancock is not issued in the jurisdiction, both an updated opinion of counsel in form and substance satisfactory to John Hancock and its counsel and the aforementioned letter from the municipality will be required.  If not previously furnished, John Hancock shall also be furnished with evidence satisfactory to John Hancock and its counsel that the Security has a tax map designation separate and distinct from that of any other property and is a separate legally subdivided parcel.

f.   *Third Party Inspections.*  Borrower shall provide a certificate from the Borrower and Guarantors, certifying that since the initial Loan no changes to the buildings or improvements have occurred on the Security and no significant repairs or replacements in any one instance have occurred which were not expressly contemplated in the Property Condition Assessment or pursuant to, and in compliance with, one of the reserve agreements established at the Closing of the Loan.  Any matters disclosed by the original Property Condition Assessment which the Borrower agreed to remedy will be re-inspected by John Hancock or an engineer acceptable to John Hancock, at Borrower's

JH 00370

JRK

Application No. 6518467

## MONTGOMERY SQUARE PARTNERSHIP
### (AVENEL AT MONTGOMERY SQUARE)
### SUPPLEMENT TO APPLICATION
### Page 17 of 18

expense. John Hancock shall also have the right to re-inspect the Security to verify the condition of the Security and to assure that no adverse changes have occurred at the Security.

If requested by John Hancock, Borrower shall provide an update to the property condition report that Borrower delivered to John Hancock in connection with the Loan ("Initial PCR") in form satisfactory to John Hancock and prepared by an engineer approved by John Hancock, confirming that any identified matters in the Initial PCR have been remedied and corrected as required and that otherwise there have been no adverse changes to the conditions at the Security since the date of the Initial PCR.

g. *Lease Requirements.* Borrower, not more than fourteen (14) days prior to the Closing Date for the Additional Funding, shall provide an updated rent roll certified by Borrower identifying any changes to the rent roll submitted as part of the Quote Package.

h. *Appraisal.* An update of the Appraisal prepared by the appraiser who prepared the original Appraisal. The update must be acceptable to John Hancock.

i. *Reserve Funds.* The amounts, deposits and payments into the reserve accounts required by Section 18 and Section 49 of the Application will be evaluated and may be adjusted as part of the Rate Lock Process based upon the information obtained or revealed during the Rate Lock Process and subsequent due diligence and evaluation of John Hancock prior to the Additional Funding.

j. *Opinion of Counsel.* Borrower shall provide an update to all opinions issued in connection with the Loan satisfactory in form and substance to John Hancock dated as of the Closing of the Additional Funding from an attorney approved by John Hancock and its counsel opining to the matters set forth in Section 23 of the Application; provided, however, that any opinion issued regarding the Loan Documents shall apply to the loan documents executed in connection with the Additional Funding.

4. Closing and Other Costs.

An additional sentence is added to the end of Condition 21 of the Application as follows: "The definition of "Costs" shall be deemed to include all costs pertaining to the Additional Funding."

5. Except as modified by this Supplement, the Terms and Conditions of the Application shall apply to the Additional Funding, including, but not limited to, Condition 39 of the Application.

## CONDITION 72 – BORROWER COVENANT REGARDING OTHER HOLDINGS

Borrower, Montgomery Square Partnership, a general partnership, also owns two (2) vacant pieces of land in the vicinity of the Security and identified as Exhibit X. Borrower agrees (a) not to acquire any other real estate or other assets during the term of the Loan, other than those necessary to conduct the ordinary business of the Security and (b) not to incur indebtedness on these

JH 00371

Application No.6518467

# MONTGOMERY SQUARE PARTNERSHIP
## (AVENEL AT MONTGOMERY SQUARE)
## SUPPLEMENT TO APPLICATION
### Page 18 of 18

properties during the term of the Loan unless ownership of the two properties is transferred to a third party not owned or controlled by the Borrowing Entity.

*CONDITION 73* – **OPINION OF COUNSEL**

Condition 23(e)- Delete the next to last paragraph referencing "Conditions 9(c)(ix) and (x)" in its entirety.

Avenel_Supplement_7-29-04.doc

JH 00372

# EXHIBIT 1

## EXAMPLES OF RESERVE CALCULATIONS

AVENEL @ MONTGOMERY SQUARE

| | | EXAMPLE 1 | | EXAMPLE 2 | | EXAMPLE 3 |
|---|---|---|---|---|---|---|
| Units | 256 | | | | | |
| **INCOME** | | | | | | |
| Base Rent | | $4,638,600 | | $4,638,600 | | $4,638,600 |
| Parking Income | | $0 | | $0 | | $0 |
| Other Income | | $312,213 | | $312,213 | | $312,213 |
| Gross Income | | $4,950,813 | | $4,950,813 | | $4,950,813 |
| Vacancy @ | 20% | $990,163 | 15% | $742,622 | 9.00% | $445,573 |
| Effective Gross Income | | $3,960,650 | | $4,208,191 | | $4,505,240 |
| **EXPENSES** | | | | | | |
| **Operating Expenses** | | | | | | |
| Real Estate Taxes | | $480,000 | | $480,000 | | $480,000 |
| Property Insurance | | $82,480 | | $82,480 | | $82,480 |
| Utilities | | $87,749 | | $87,749 | | $87,749 |
| Repairs & Maintenance | | $182,741 | | $182,741 | | $182,741 |
| Janitorial | | $0 | | $0 | | $0 |
| Management Fees @ 3.75% | | $148,524 | 3.75% | $157,807 | 3.75% | $168,946 |
| Payroll & Benefits | | $294,781 | | $294,781 | | $294,781 |
| Advertising & Marketing | | $59,713 | | $59,713 | | $59,713 |
| Professional Fees | | $5,000 | | $5,000 | | $5,000 |
| General & Administrative | | $45,969 | | $45,969 | | $45,969 |
| Other Expenses | | $0 | | $0 | | $0 |
| Total Operating Expenses | | $1,386,957 | | $1,396,240 | | $1,407,379 |
| NET OPERATING INCOME | | $2,573,693 | | $2,811,951 | | $3,097,860 |
| Value @ 7.25% Cap | | $35,499,214 | | $38,785,529 | | $42,729,108 |
| Maximum Loan or 75.00% LTV | | $26,620,000 | | $29,090,000 | | $32,050,000 |
| Round To | | $26,620,000 | | $29,090,000 | | $32,000,000 |
| Locked Amount | | $32,000,000 | | $32,000,000 | | $32,000,000 |
| **RESERVE** | | $5,380,000 | | $2,910,000 | | $0 |
| Base Rent Required | | $3,710,880 | | $3,942,810 | | $4,221,126 |

Avenel Exhibit 1 revised 7-13-04.xls

JH 00373

Application No.

**EXHIBIT B**
**DESCRIPTION OF PROPERTY**

**SECTION A:**

| LOCATION | | | | |
|---|---|---|---|---|
| Property Name: Avenel at Montgomery Square | | | | |
| Address: 1100 Avenel Boulevard | City: North Wales | County: Montgomery | | State: Pennsylvania |
| Zoning: ECPOD | Streets: private | Water: public | | Gas: Yes |

| LAND | | | | |
|---|---|---|---|---|
| Frontage: 1,220 Ft. | Depth: 0 Ft. | Area: 799,116 Sq ft. | | Filled: |
| Rights of Way: Describe: see title report | | | | |
| Easements: Describe: see title report - Gas, electric, sewer, water, phone, cable | | | | |
| Special Assessments: Describe: N/A | | | | |

| PROPERTY OVERVIEW | | | |
|---|---|---|---|
| Net Rentable Area: 276,710 Sq.ft. | # of Buildings: 9 | # of Stories: 4 | # Bays: |
| Year Built: 2004 | Year Last Renovated: 0 | | Current Occupancy Rate: |
| Property Manager: Bozzuto Management | | Fee: 3.75% | |

| CURRENT OWNER PURCHASE INFORMATION | | |
|---|---|---|
| Purchase Price: | Amount Financed: | Seller: |
| Purchase Date: | | |

| EXISTING FINANCING | | | |
|---|---|---|---|
| Holder: | Original Amount: | Rate: | Date: |
| Wilmington Trust of Pennsylvania | $30,732,000.00 | Floating - Libor | May 15, 2003 |
| Balance: | | | |

Application No.

**SECTION B: (To be completed in all cases)**

| | |
|---|---|
| **BUILDING FRAMEWORK** | |

Wood: ☒          Reinforced Concrete ☐    Steel: ☒          Solid Masonry: ☐

Other: (explain):  Manor Building includes some steel

**BUILDING CONSTRUCTION**

Sidewall Construction:      2*4 Stud with 1/2" plywood sheathing

Exterior Sidewall Finish:    Brick, vinyl, hardy board

Floor Construction:         Engineered wood truss with pylwood and gypsum floor

Roof Construction:          Engineered wood truss and sheathing sytem

Roofing Material:           25 yr asphalt shingle

Window Type & Material:   vinyltech window

Exterior Door Type:         metal over foam core

**MECHANICAL**

Heating Type:    Aquatherm        Fuel:    Gas          Unit Location:    each unit

Air Conditioning Type:    Carrier               Unit Location:    Each unit

# of Elevators:    1                          Type:    Hydraulic Schindler

Fire Protection:   Wet Sprinkler in accordnace with NFPA 13

Security System: N/A

Sewerage System:    ☒ Public          ☐ Private

Water System:       ☒ Public          ☐ Private

**SECTION C: ( To be completed for Apartment Buildings Only)**

Balcony Construction: (describe framing, flooring, railings):   ACQ framing and flooring with steel railings

Exterior Stairway Construction: (describe framing, flooring, railings):   Steel framing and railings with concrete treads

Interior Partitions:   2* 4 stud wit 1/2" drywal

Sound Proofing:

        Between Apartments:     insulated wall with sound batting

        Between Floors:         Channel system with gypsum floor

Insulation Method:    Exterior walls - R15 vapor barrier - Attic - R30

Application No.

| Finish Schedule | Floor | Walls | Ceiling | Trim |
|---|---|---|---|---|
| Living Room: | Carpet | Paint | Paint | Wood |
| Bedroom: | Carpet | Paint | Paint | Wood |
| Dining Room: | Carpet | Paint | Paint | Wood |
| Kitchen: | Vinyl | Paint | Paint | Wood |
| Baths: | Vinyl | Paint | Paint | Wood |
| Public Areas: | Ceramic / Wood | | | |

## KITCHEN EQUIPMENT

Range:  GE - JGBP28WGH    Oven:    GE - JVM1441WH    Refrigerator:    GE - GFC325F    Dishwasher:    GSDY200J

Disposal:  GE- WX9X18    Hood & Fan:    GE- JN327    Other:

Counter Tops:  Formica    Cabinets:  wood

## SECTION D: ( To be completed for Buildings Other than Apartments )

Divisional Partitions: (Describe)

Ceiling System: (Describe)

Interior Wall Finish:

Floor Covering:

Sprinkler System:

Electric Lighting Fixture Type:

Toilet Rooms: (Describe fixture standards, room finish, number of locations, ADA compliance)

## SECTION E:

## PARKING AND ON-SITE IMPROVEMENTS

Covered Parking Spaces:  112                    Location:  32 Attached, 80 detached

Construction:    Concrete and stud

Open Parking Spaces:    404

Swimming Pool: Yes

Other On-Site Improvements:    Landscaping, fountain, compactor pad

08/02/2004   09:49    6109419872-                    JHREF PA                            PAGE   02

Application No.

SECTION F: (To be completed for all property types)

RENT ROLL

Correspondent will attach one copy of the rent roll for the Real Estate Security.  Correspondent will sign this Exhibit
on the appropriate signature line below.

CORRESPONDENT CERTIFICATION

I have examined the property operating statements, rent roll, and any other supporting information given to me by
the Applicant and have analyzed the Loan in accordance with such information.  In addition, I have examined the
leases listed on the rent roll and have satisfied myself that the space is occupied as indicated, that there are no
existing concessions, free rent, or rebates unless shown on the attached rent roll, and the rents are currently
collectable under such leases.  I believe that all information heretofore submitted to John Hancock in connection
with the Loan is complete, correct and accurately reflects the physical, leasing and financial status and history of the
Real Estate Security.

Correspondent: _JHREF / BLUE BELL_
By: _JOHN D. FERRIO, REG. D.P._
Name: _Gabe P. Ferris_
Title _REGIONAL V.P._

JHLICO
Ed 7/17/01
4

JH 00377

Application No

### EXHIBIT C
### ENVIRONMENTAL QUESTIONNAIRE AND CERTIFICATE

**DEFINITIONS.** The following two terms have the following meanings when used in this Questionnaire.

A. "Hazardous Materials" includes hazardous waste, as that term is defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §6903(5); hazardous substances, as that term is defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601(14); pollutants or contaminants, as those terms are defined by CERCLA, 42 U.S.C. §9601(33), in each case, as those statutes may be amended from time to time, asbestos-containing materials ("ACM"), and volatile organic compounds, including oil and petroleum products.

B. "The Real Estate Security" means the land, the buildings thereon, and the other improvements thereon which are to be the security for the Loan from John Hancock being applied for by Borrower in the attached Application ("the Loan").

---

1. Are any Hazardous Materials generated, stored, treated, or disposed of or expected to be generated, stored, treated, or disposed of on the Real Estate Security?

    Yes ☐    No ☒

2. To the best of your knowledge, have any Hazardous Materials been disposed of or released at, on, or under the Real Estate Security, or at, on, or under land abutting the Real Estate Security, in the past, or have any such materials migrated from other land to the Real Estate Security?

    Yes ☐    No ☒

3. a. Are there any underground or other storage tanks on the Real Estate Security?

    Yes ☐    No ☒

   b. If the answer to 3.a. is Yes, state the type and quantity of material that is being stored and the location and age of each tank; describe the leak detection system and the inventory control system which are being maintained for each tank; and describe the corrosion protection and spill/overfill protection methods which are being used for each tank. (Attach additional pages if necessary.)

   c. If the answer to 3.a. is Yes, state when each tank was last tested for tightness; state whether each tank is registered with any government entity, and attach copies of the most recent test results for each tank and all registration materials.

JHLICO
Ed 3/2/00

1

JH 00378

Application No.

d.    Are there any empty or unused tanks on the Real Estate Security? (If yes, state the location of each.)

Yes ☐    No ☒

Location:

e.    To your knowledge, have any tanks been removed from the Real Estate Security?

Yes ☐    No ☒    To the best of our knowledge there were
NO UNDERGROUND TANKS.

f.    If the answer to 3.e. is Yes, state when each tank was removed; describe the location from which it was removed; and state whether during or after the removal any Hazardous Materials were found in the soil or groundwater.

4.    a.    Has there ever been an operating dry cleaner at the Real Estate Security?

Yes ☐    No ☒

b.    If the answer to 4.a. is Yes, state the name of the dry cleaner and the years in which it has operated.

5.    a.    Have any of the buildings at the Real Estate Security been tested for the presence of ACM?

Yes ☐    No ☒

b.    Do any of the buildings at the Real Estate Security contain ACM?

Yes ☐    No ☒

6.    Are there any transformers or other electrical equipment on the Real Estate Security which contain PCB's?

Yes ☐    No ☒

7.    (To be answered for multi-family residential properties:)

a.    Has the Real Estate Security ever been tested for the presence of radon gas?

Yes ☐    No ☒

b.    Have any of the buildings at the Real Estate Security ever been tested for the presence of lead paint?

Yes ☐    No ☒

JHLICO
Ed 3/2/00

2

Application No.

c.   Has any of the water at the Real Estate Security ever been tested for the presence of lead?

Yes ☐    No ☒

d.   If the answer to 7 a., b., or c. is yes, attach copies of test results.

8.   a.   What is the name of the seller from whom you bought the Real Estate Security?

b.   Describe the use of the Real Estate Security at the time you acquired it.

9.   State the year in which each building at the Real Estate Security was constructed.

*2004*

10.  a.   Was the Real Estate Security transferred out of or described as part of a larger parcel within the past five years?

Yes ☐    No ☒

b.   If the answer to 10 a. is Yes, describe by boundaries the larger parcel of which the Real Estate Security was a part.

*John Hancock*

11.  Has an environmental assessment report been prepared for the Real Estate Security, or any part of it, within the last ten years?  (If yes, attach copies of each report.)

Yes ☒    No ☐

12.  Has the Real Estate Security ever been the subject of a notice of non-compliance, abatement or clean-up order, or lawsuit, relating to Hazardous Materials?

Yes ☐    No ☒

13.  If the answer to any of questions 1, 2, 5.b., 6, 7, or 12 is Yes, explain in detail the nature of these items in the area below and on additional pages if necessary.

I/We certify (a) that each of the above answers is true and complete; (b) that to the best of my/our knowledge there is no violation of federal, state, or local environmental laws on the Real Estate Security, except as described herein; and (c) that I/we will immediately notify John Hancock if at any time while the Loan is outstanding I/we learn that any of the above answers either was not true when made or is no longer true.

JHLICO
Ed 3/2/00

3

JH 00380

Application No.

I/We understand that the answers to any of the above questions may cause John Hancock to require, as a condition or conditions to Closing the Loan, (a) satisfactory responses to further inquiries by John Hancock, and/or (b) further investigation of the Real Estate Security, including, in John Hancock's sole discretion, sampling and/or monitoring of soil, groundwater, air, water, or building materials, with results satisfactory to John Hancock, in its sole discretion.

APPLICANT: MONTGOMERY SQUARE PARTNERSHIP
By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____
         James R. Koller
Title: President

Date: _____


GUARANTOR(S):

_____
James R. Koller

Date: _____

_____
Frank C. Palopoi

Date: _____

_____
Joseph P. Kelly

Date: _____

JHUCO
Ed 3/2/00

4

JH 00381

*File*

# Memo

**To:** Jim Koller

**From:** Joe Kelly

**Date:** 6/11/2003

**Re:** Montgomery Square Apartments – Land Development Agreement and Declaration of Covenants and Restrictions

Please note that the parcel and unit numbers recited in the Land Development Agreement and the Declaration of Covenants and Restrictions are not correct. The parcel and unit reference should be as follows:

| Address | Parcel | Block | Unit | Parcel # |
|---|---|---|---|---|
| 512 DeKalb Pike | 46-00-00784-00-7 | 011 | 048 | 00784007 |
| 500 DeKalb Pike | 46-00-00778-00-4 | 011 | 035 | 00778004 |
| 440 DeKalb Pike | 46-00-00772-00-1 | 011 | 028 | 00772001 |
| 440A DeKalb Pike | 46-00-00775-00-7 | 011 | 031 | 00775007 |
| 436 DeKalb Pike | 46-00-00769-00-4 | 011 | 047 | 00769004 |
| 430 DeKalb Pike | 46-00-00766-00-7 | 011 | 055 | 00766007 |
| 426 DeKalb Pike | 46-00-00763-001 | 011 | 027 | 00763001 |
| HDR | 46-00-00316-21-4 | 011c | 014 | 00316214 |
| 502 DeKalb Pike [Included ins HDR] | 46-00-00781-001 | 011 | 051 | 00781001 |

Attached is a copy of the real estate tax bills.

1

JH 00382

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA  19401 • 610-239-9920 • FAX 610-239-9921

August 27, 2003

 **FILE COPY**

Mr. Don Elly
Allen A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA  19490

RE: Asbestos Abatement
    Lead Paint Soil Remediation
    Montgomery Square Partnership

Dear Mr. Elly:

Attached is the manifest for the lead paint soil remediation work
at the above project.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

JH 00383

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

ep-19-03 IO:46A ALLAN A. MYERS          6103618062          PAGE 02   P.02
09/18/2003 13:40    6102379921      PLYMOUTH ENVIRONMENT ─          PAGE 02

# PLYMOUTH ENVIRONMENTAL CO., INC.
## ENVIRONMENTAL CONTRACTORS

923 Haws Avenue • Norristown, PA 19401 • 610-239-9920 • FAX 610-239-9921

September 18, 2003

Mr. Don Elly
Allan A. Myers, Inc.
1805 Berks Road
P.O. Box 98
Worcester, PA  19490

RE: Asbestos Abatement
    Lead Paint Abatement
    Montgomery Square Partnership
    Montgomery Township

Dear Mr. Elly:

This letter will certify that Plymouth Environmental Co.,Inc.
properly abated all asbestos containing materials and lead in soil
as noted in RT Environmental Services, Inc. survey reports. All
work was performed in accordance with all prevailing federal, state
and local regulations. Waste manifests and project air management
report was previously supplied to you.

Don, should you have any questions please feel free to call.

Best regards,

James Kelly, President

Asbestos Abatement • Lead Abatement • Hazardous Waste Remediation

JH 00384

E5/27/2003  13:53  +733000000000000-0     00000000                         PAGE  82

Bureau of Land Recycling and Waste Management
P.O. Box 8550
Harrisburg, PA 17105-8550
OFFICIAL PENNSYLVANIA MANIFEST FORM

Form approved.
OMB No. 2050-0039

| UNIFORM HAZARDOUS WASTE MANIFEST | 1. Generator's US EPA ID No. P A D F P 0 0 1 0 6 3 9 | Manifest Document No. | | 2. Page 1 of | Information within the bold red border is not required by Federal law but may be required by State law. |
|---|---|---|---|---|---|

3. Generator's Name and Mailing Address
MONTGOMERY SQUARE PARTNERSHIP

490 NORRISTOWN ROAD
BLUE BELL PA 19422

A. State Manifest Document Number
PAH  016776

B. State Gen. ID  SAME

4. Generator's Phone (  61D) 238-0400

5. Transporter 1 Company Name
REPLUBIC ENV SYS (TRANS GROUP)   US EPA ID Number  P A D 9 8 2 6 6 1 3 8 1

C. Stnsf Trans. ID
PA-AH   0 3 1 7

6. Transporter 2 Company Name     US EPA ID Number

D. Transporter's Phone (  215) 822-2676
E. State Trans. ID  PA-AH

7. Designated Facility Name and Site Address
REPUBLIC ENV SYS (PA) , INC.
2869 SANDSTONE DRIVE
HATFIELD PA 19440    US EPA ID Number  P A D 0 8 5 6 9 0 5 9 2

F. Transporter's Phone (
G. State Facility's ID
H. Facility's Phone (  215) 822-8995

| 11. US DOT Description (including Proper Shipping Name, Hazard Class, and ID Number) HM | 12. Containers No. | Type | 13. Total Quantity | 14. Unit Wt/Vol | I. Waste No. |
|---|---|---|---|---|---|
| RQ HAZARDOUS WASTE, SOLID, N.O.S., 9, NA3077, PG III, (LEAD) , (D008) | x 1 | D M | x 100 | 1 | D008 |

J. Additional Descriptions for Materials Listed Above
S    1D64444

K. Handling Codes for Wastes Listed Above
a. S01

15. Special Handling Instructions and Additional Information

EMERGENCY PHONE _____

16. GENERATOR'S CERTIFICATION: I hereby declare that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packed, marked and labeled, and are in all respects in proper condition for transport by highway according to applicable international and national government regulations. If I am a large quantity generator, I certify that I have a program in place to reduce the volume and toxicity of waste generated to the degree I have determined to be economically practicable and that I have selected the practicable method of treatment, storage, or disposal currently available to me which minimizes the present and future threat to human health and the environment; OR, if I am a small quantity generator, I have made a good faith effort to minimize my waste generation and select the best waste management method that is available to me and that I can afford.

Printed/Typed Name   Jim Kelles         Signature  _____      MONTH 07  DAY 03  YEAR 03

17. Transporter 1 Acknowledgement of Receipt of Materials
Printed/Typed Name   Bert Passow        Signature  _____      MONTH 07  DAY 03  YEAR 03

18. Transporter 2 Acknowledgement of Receipt of Materials
Printed/Typed Name                      Signature

19. Discrepancy Indication Space

20. Facility Owner or Operator: Certification of receipt of hazardous materials covered by this manifest except as noted in Item 19.
Printed/Typed Name                      Signature  _____      MONTH 07  DAY 11  YEAR 03

COPY 1 - TSD: MAIL TO PA DEP

JH 00385

A65884 1/1

PAH 016776

08/27/2003  13:53  +7330000000000000-0          00000000          PAGE  03

REPUBLIC ENV SYS SYS EPA, INC.

2003 SANDSTONE DRIVE / MATTEDA, PA 11042 / 215-822-0395
EPA I.A. PANO1509352

C E R T I F I C A T E   O F   W A S T E   D I S P O S A L   No. 465884

THIS IS TO CERTIFY THAT WASTE MATERIAL RECEIVED FROM:

Generator      MONTGOMERY SQUARE PARTNERSHIP
E.P.A. ID      PADEP0010619
Address        690 MORRISTOWN ROAD / BLUE BELL, PA 19422

AS REFERENCED ON MANIFEST NUMBER: PAH015776

HAS BEEN ANALYZED AND ACCEPTED AS SPECIFIED UNDER THE FACILITY'S WASTE ANALYSIS PLAN.
ALL MATERIALS REPRESENTED HEREIN SHALL BE STORED, TREATED, MANAGED AND/OR
DISPOSED OF IN ACCORDANCE WITH ALL APPLICABLE LOCAL,
STATE AND FEDERAL REGULATIONS IN THE MANNER DESCRIBED BELOW.

Lab Code/Clin.#        D.O.T./E.P.A. Description        Storage/Treatment/Disposal Method
1064444  RQ HAZARDOUS WASTE, SOLID, N.O.S.                                        H11 H32
         (D008)

Mary C. Steinborn
REPUBLIC ENV SYS (PA), INC.
Representative - Title:Document Control

07/11/2003

JH 00386

Sep-17-03 03:50P ALLAN A. MYERS          6102018092          P.03

08/02/2004  14:35    6109419872              JHREF PA                        PAGE  02

**Exhibit D**

**Rate Lock Confirmation**

Date:    August 2, 2004

TO:      JOHN HANCOCK LIFE INSURANCE COMPANY

RE:      JOHN HANCOCK APPLICATION NO. 6518467

Property Address: Avenel @ Montgomery Square Apartments
1100 Avenel Blvd ,
Montgomeryville, PA 19454

John Hancock is willing to lock the interest rate in connection with the above-captioned Application on the terms set forth below:

(a)    the Interest Rate will be locked on August 2, 2004 at 6.18% per annum for a period of 365 days from the Rate Lock Date (as hereinafter defined), subject to receipt by John Hancock of $320,000, the Commitment Fee, no later than five (5) days after the date of acceptance of the Application by John Hancock,

(b)    the amount of the Monthly Payment is $195,574.96,

(c)    the Amortization Period is 360 months,

(d)    the date of the Application is amended to be August 2, 2004,

(e)    the outside date for Closing is August 1, 2005, and

(f)    the Application is hereby modified to incorporate the terms and conditions hereof, time still being of the essence.  In the event of any conflict between the terms hereof and those contained in the Application, the terms of this Rate Lock Confirmation shall prevail;

provided that:

(g)    Applicant accepts and confirms said Interest Rate, subject to the above terms,

(h)    makes the representations set forth below,

(i)    telecopies this Rate Lock Confirmation back to John Hancock so that it is received no later than 4:30 PM, Boston time, on August 2, 2004 (the "Rate Lock Date"), and

(j)    time being of the essence hereof.

JOHN HANCOCK LIFE INSURANCE COMPANY

By:

Name:  Timothy J. Malik

Title:  Senior Investment Officer

Date:  August 2, 2004

JH 00387

The undersigned hereby:

(i)     requests that John Hancock lock the Interest Rate in connection with the above-captioned Application at the rate set forth above and accepts all of the terms and conditions set forth above, and agrees that the Application remains unchanged and in full force and effect, except as modified by the terms set forth above;

(ii)    acknowledges that, notwithstanding the locking of the Interest Rate, John Hancock is not obligated to make the Loan contemplated by and pursuant to the Application unless and until the Loan has been authorized by the John Hancock loan committees and John Hancock has accepted said Application by signing the Application in the place provided therein;

*EXCEPT AS AMENDED BY THE APPLICATION,*

(iii)   certifies that the title company designated by the undersigned in Condition 7(b) of the Application and, if applicable, approved by John Hancock ("Title Company") and the surveyor designated by the undersigned in Condition 8(c) of the Application (the "Surveyor") have received and acknowledged receipt of John Hancock's title requirements and survey requirements, respectively, and have agreed to deliver a title policy and materials and a survey, complying with said requirements, respectively, within twenty-one (21) days of receipt of notification to proceed from the undersigned; and

*EXCEPT AS MODIFIED BY THE APPLICATION*

(iv)    agrees to give the Title Company notice to proceed with the title and the Surveyor notice to proceed with the survey, and to provide John Hancock with a copy of said notice, no later than the next business day after the date at the tope of this Rate Lock Confirmation.

APPLICANT:

Montgomery Square Partnership

By:  Vestmont Limited Partnership

By:  Vesterra Corporation

By:    _____

Name:  JAMES R. KOLLER

Title:  PRESIDENT

2

JH 00388

Application No.

## EXHIBIT F

## BORROWER REPRESENTATION

Date:

Correspondent:

Please provide the following. Attach additional sheets as needed.

1.   A diagram of the Borrower/Applicant and all constituent entities
2.   A list of the owners and their respective percentage interest in each entity and type of interest.
3.   With respect to Partnerships, please designate the General Partner(s), the Limited Partner(s), and the Managing General Partner.
4.   With respect to Limited Liability Companies, please designate the members and the managing members.

The Applicant/Borrower certifies that the information provided above is true, accurate and complete.

BORROWER: MONTGOMERY SQUARE PARTNERSHIP
By: VESTMONT LIMITED PARTNERSHIP
By: VESTERRA CORPORATION

By: _____
        James R. Koller

Title: President

JHLICO
Ed 3/2/00

JH 00389

Montgomery Square Partnership
Ownership Structure

**Montgomery Square Partnership  (general partnership)**

Ownership

| | Ownership | | Tax ID | Address |
|---|---|---|---|---|
| 1 | 33.33% | *Vestmont Limited Partnership (limited partnership)* | 23-2865711 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| | | Ownership | | |
| | 1 | 1.0% | Vesterra Corporation - general partner | 23-2865712 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| | 2 | 44.50% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| | 3 | 44.50% | Frank C. Palopoli - limited partner | 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 | 1017 Lorien Drive, Gwynedd, PA  19437 |
| | 4 | 10.0% | Joseph P. Kelly - limited partner | 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 | 851 Wright Drive, Maple Glen, PA  19002 |
| 2 | 33.33% | *Vestmont Limited Partnership II (limited partnership)* | 01-0744096 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| | 1 | 1.0% | Vesterra Corporation - general partner | 23-2388602 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| | 2 | 38.28% | James R. Koller - limited partner | 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 | 900 Andorra Road, Lafayette Hill, PA  19444 |
| | 3 | 38.28% | Frank C. Palopoli - limited partner | 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 | 1017 Lorien Drive, Gwynedd, PA  19437 |
| | 4 | 22.44% | Joseph P. Kelly - limited partner | 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 | |
| 2 | 33.33% | *Vestmont Limited Partnership III (limited partnership)* | 20-0671819 | 490 Norristown Road, Suuite 151, Blue Bell, PA  19422 |
| | 1 | 1.0% | Vesterra Corporation - general partner | 20-0671932 | 490 Norristown Road, Suite 151, Blue Bell, PA  19422 |
| | 2 | 66.17% | Koller Kelly Partnership - limited partnership | 20-0671819 | 490 Norristown Road, Suite 252, Blue Bell, PA  19422 |
| | 3 | 32.83% | FCP GROUP LP | | |

JH 00390

Application No.

**EXHIBIT G**
**BORROWER DUE DILIGENCE**

Correspondent:

The Borrower, Applicant, the Guarantors, the Indemnitors, and Principal(s) of the Borrower and the Applicant, the Guarantors and the Indemnitors shall be responsible for completing or responding to Part I and Part II of this Exhibit H at the time of submission of the Application to John Hancock Life Insurance Company ("John Hancock").

The Principal(s) of the Borrower, the Applicant, the Guarantor(s) and the Indemnitor(s) are determined as follows:

- Any entity and/or individual who possesses management or operational control of the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- Any person or entity possessing at least 25% of the ownership interest in the Borrower, the Applicant, the Guarantor(s) or the Indemnitor(s),
- In addition, for a general or limited partnership, the Principal(s) will be all general partners and the majority shareholder(s) of any corporate general partner,
- In addition, for a corporation, the Principal(s) will be the majority shareholder(s) of the Borrower,
- In addition, for a limited liability company, the Principal(s) will be the members and the general partners of any partnership member and the majority shareholder(s) of any corporate member.

**PART I**

Provide John Hancock with the following information for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s):

1) Financial statements (certified by a certified public accountant, if available) for the last year with a statement not more than 90 days old that there have been no material adverse changes since the date of the most recent statement. Such statements must include liquid assets (cash, stocks, bonds, marketable securities), non-liquid assets (real estate owned, businesses owned, ownership interests in other enterprises), cash flow (interest income, dividend income, wages, other income), liabilities and obligations (any refinancings during the term of the proposed mortgage, any partnership contributions or loans not yet made, any law suits, any personal guarantees or other contingent liabilities, current and potential tax obligations, any circumstances which may affect the individual or entity.)

2) For a corporate Borrower, Applicant, Guarantor(s), Indemnitor(s), corporate Principal(s) thereof, and major tenants or a REIT:

   a) Annual report for the last two years along with the most recent quarterly report (ex., 10K or 10Q for publicly traded companies and complete certified financial statements for the last two years for privately held companies).
   b) If not in the annual report, a detailed description of the business of the corporation,

3) Provide a social security number or tax identification number for each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals.

4) Provide the country of domicile of each of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and the home address of each Principal and the Guarantor(s) and the Indemnitor(s). U S A

5) List other real estate assets in which the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) have an interest, including:

Application No.

    a)    Property type, location, size and occupancy.

    b)    Estimated market value, cash flow information, including effective gross income, expenses and net operating income.

    c)    Mortgage loan obligations, including each balance, rate (indicate whether fixed or floating), annual debt service, lender and whether recourse or non-recourse.

    d)    Any defaults, historically or currently.

    e)    Any modifications or restructurings, historically or currently.

    f)    Percentage of ownership interest.

6)    Describe the property management experience of the Borrower, the Applicant and their Principal(s), including property type, locations, sizes and conditions and ownership interest in any management companies. (If managed by other than the Borrower, the Applicant and each of their Principal(s), a description of the firm, including the year organized, type and variety of properties it manages, estimated number of units/square feet they manage).

7)    For the subject property, provide a statement of the acquisition or construction budget, including land acquisition cost, and a detailed list of subsequent capital expenditures, including when made. Include copies of internally or externally prepared audits indicating the capital improvements which should be made, if any, and a statement as to the capital improvements which are planned and their anticipated costs.

8)    Describe fully any financing which is secured by the Borrower's or the Applicant's interest in the entity which owns the subject real estate. (For example, debt which has as its collateral a limited partner's partnership interest or a corporate member's shares in the corporation.)

**TO BE COMPLETED BY EACH PRINCIPAL OF THE APPLICANT, BORROWER, GUARANTOR(S) AND INDEMNITOR(S)**

**PART II**

The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s) must each complete the questionnaire which appears below and, for that reason, several copies are attached. By their signature each of them hereby represents and warrants that the responses to the following questions are accurate and complete with regard to each of them and the undersigned acknowledges John Hancock's reliance thereon. The Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principal(s), agree to provide John Hancock with prompt written notice of any change in financial condition. Otherwise, John Hancock will be entitled to rely on the continuing accuracy of the information provided.

If a response to a question is "yes," provide a written explanation supplementing the answer.

YES    NO

☒    ☐    1.)    Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) have any contingent liabilities (ex., endorser or co-maker on notes or guarantees, current or potential tax liabilities)? See FINANCIAL STATEMENTS

☒    ☐    2.)    Are any of the current assets of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) pledged as collateral (ex., cash, marketable securities, certificates of deposit)? see FINANCIAL STATEMENTS

Application No.

3.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s) or any entity in which they hold or have held an ownership interest, been involved in any lawsuits which might result in financial judgments against them? *not covered by insurance*

4.) Does the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, have any unsatisfied judgments against them?

5.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or are they in bankruptcy/insolvency/reorganization (whether voluntary or involuntary)?

6.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been foreclosed on or given deeds in lieu of foreclosure?

7.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been in default or been given relief (workout or restructuring by the lender under the terms of any mortgage loan, deed of trust or other financing agreement)?

8.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, been or convicted of a felony or been the subject of a complaint or indictment charging a felony?

9.) Has the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, ever borrowed funds from John Hancock or any affiliate of John Hancock?  What is the status of those borrowings, regardless of whether outstanding or paid off?

10.) Do the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), or any of their Principal(s), or any entity in which they hold or have held an ownership interest, hold an ownership interest in any of the tenants at the Real Estate Security?

Provide a list of business and financial relationships of the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals and provide at least three specific lender references for the Borrower, the Applicant, the Guarantor(s), the Indemnitor(s), and each of their Principals (individual contacts' names, addresses and telephone numbers) below.  Include contact name and telephone number for the lender(s) holding the current mortgage(s) on the Real Estate Security.

Greg Hartie
Wilmington Trust of Pennsylvania
116 East Court Street
Doylestown, PA 18901
(267) 880-7002

Glenn Gallagher
Wachovia Bank
PA 1295
123 South Brond Street, 15th Floor
Philadelphia, PA 19109
215-670-6522

The undersigned certifies that all of the information provided is accurate and complete.

JHLICO
Ed 3/2/00

3

JH 00393

Application No.

23-2865711
Taxpayer Identification No..

Signature of Borrower
Montgomery Square Partnership
By: Vestmont Limited Partnership
By: Vesterra Corporation

By: _____
      James R. Koller
Its: President

_____      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
Signature of Guarantor            Social Security No.
Name:   James R. Koller
          900 Andorra Road
          Lafayette Hill, PA  19444

_____      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
Signature of Guarantor            Social Security No.
Name:   Frank C. Palopoli
          1017 Lorien Drive
          Gwynedd, PA  19437

_____      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
Signature of Guarantor            Social Security No.
Name:   Joseph P. Kelly
          851 Wright Drive
          Maple Glen, PA  19002

JHLICO
Ed 3/2/00                          1                          JH 00394

**Montgomery Square Apartments**

**Loan Budget**

| | Project Costs | Equity | Budget |
|---|---|---|---|
| Land | $7,680,000 | $4,823,801 | $2,856,199 |
| Site Work | $3,284,000 | | $3,284,000 |
| Building Costs | $17,844,124 | | $17,844,124 |
| Sewer | $1,543,500 | | $1,543,500 |
| Water | $234,640 | | $234,640 |
| Building Permits & Township Fees | $278,104 | | $278,104 |
| Design & Engineering | $530,000 | | $530,000 |
| Construction Loan | $263,660 | | $263,660 |
| Permanent Loan | $300,490 | | $300,490 |
| Taxes and Insurance | $260,000 | | $260,000 |
| Miscellaneous Contingency | $1,279,243 | | $1,279,243 |
| Marketing | $481,600 | | $481,600 |
| Developer's Fee | $550,000 | | $550,000 |
| Debt Funded Operating Costs | $100,000 | | $100,000 |
| Interest | $926,440 | | $926,440 |
| | $35,555,801 | $4,823,801 | $30,732,000 |

JH 00395

## REPRESENTATIVE PROJECTS

- *East Gate Square*: 850,000 square-foot shopping center located at the ramp from Interstate 295 and Nixon Drive, Mt. Laurel and Moorestown Townships, New Jersey. Anchored by Home Depot, Shop Rite Supermarket, Barnes & Noble Bookstore, Best Buy, Dick's Sporting Goods, Old Navy, CompUSA, Michael's Arts & Crafts and many other national retailers.

- *Montgomery Square*: 400,000 square foot shopping center located at Route 309 and Knapp Road, Montgomeryville, PA, and 256-unit apartment project currently under construction.

- *Normandy Farm*: 75 acres located at Route 202 and Morris Road, Whitpain Township, PA. Created new zoning district to facilitate the development of 76 single-family homes selling in the $700,000 range and the preservation of the largest barn in Montgomery County, an historic mansion and several other historic homes, which will be used for offices and a conference and banquet center.

- *Fawn Creek*: 109 acres located in a bucolic setting with a stream flowing through it on Hollow Road, Worcester Township, Montgomery County, PA. Developed for large lot (1.5 to 4 acres) single-family homes whose prices range from $800,000 to $1,700,000.

- *Mercer Square*: 91,400 square foot shopping center located at Route 611 and Old Dublin Pike, Doylestown, Pennsylvania, anchored by 44,000 square foot Genuardi Supermarket.

- *New Britain Village Square*: 140,000 square foot shopping center located at the intersection of Route 202 and County Line Road, Chalfont, Pennsylvania, anchored by Genuardi Supermarket, CVS Drugstore, McDonalds and First Union Bank.

- *Towamencin Shopping Village*: 140,000 square foot shopping center located at Forty Foot Road and Allentown Road, Towamencin Township, Pennsylvania, anchored by Genuardi Supermarket, Thrift Drug, Blockbuster and Wendy's.

- *Warwick Square*: 92,000 square foot shopping center located on Old York Road, Warwick Township, PA, anchored by Genuardi Supermarket, Blockbuster and McDonald's.

- *Dresher Plaza*: 96,500 square foot shopping center located at Limekiln Pike and Dreshertown Road, Dresher, Pennsylvania.

JH 00396

**John Hancock Life Insurance Company**

| | | | | |
|---|---|---|---|---|
| Investment No: | 6518467 | | | |
| File Name: | Montgomery Square Partnership | | | |
| Regional Office/Correspondent: | John Hancock Real Estate Finance, Inc. - Philadelphia | | 040-03 | |
| Property Name: | Avenel @ Montgomery Square Apts | | Property Type: | Multifamily Garden Style |
| Location (city / state): | Montgomeryville    Pennsylvania | | Total # Units | 256 |
| Jun Han Rating: | MLI Rating:    BBB | | JH Rating: | BAA1 |

IMAGED

**Key Statistics:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Loan Amount: | $32,000,000 | | | Loan per Unit | $125,000 | |
| Term: (in years) | 10 | Amortization | 30 | Interest Only | 0 | Avg Life: 9.29 |
| Base Spread: | 134 | Forward BPS: | 45 | Embedded Fees: | 7 | Total Spread: 186 |
| Matrix Spread at JH Rating Level: | 145 | | | | Pricing Index | 10 year Treasury |
| As Is Vacancy: | n/a | | | | | |
| Stabilized Vacancy: | 5.0% | | | | | |

| | Current "As-Is" | | | Stabilized | | | Stabilized |
|---|---|---|---|---|---|---|---|
| | Valuation | $ / SF | LTV % | Valuation | $ / Unit | LTV % | Cap Rate |
| NOI Basis | Property is under construction. | | | $47,302,807 | $184,777 | 67.65% | 7.25% |
| NCF Basis | | | | $46,773,151 | $182,708 | 68.42% | 7.25% |
| Appraisal Basis | | | | | | | |
| Cost of Land and Estimate to Build | | | | $35,555,800 | $138,889.84 | 90.00% | |
| Other Basis | | | | | | | |
| Breakeven Interest Rate: | | | | 10.60% | | | |
| Connections: | No | | | | | | |

**Specific Conditions:**
**Principal Affiliates Requirements:** James R. Koller, Frank C. Palopoli and Joseph P. Kelley
**Guaranty Requirements:** Standard non-recourse carve-outs.
**Funding:** This is a one-year (365 days) forward commitment.
**Disbursement Requirements:** Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as described in commitment.
**Estoppel & SNDA Requirements:** N/A
**Escrow Requirements:** Real estate taxes. Replacement reserves and insurance escrow requirements have been suspended Rental Achievement Reserve, as described above, likely at closing, but limited to $5,380,000.
**Transfers Permitted:** Two-time right to transfer with 1% fee.
**Additional Proceeds:** One time right between the 2nd and 5th loan years the Borrower may request additional funds of not less than $1,000,000 at the then prevailing terms and rates. Amortization will be based on the remaining original amortization term.
**Extension Option:** Borrower as one time right to extend loan for 12 months at the then prevailing floating-rate terms and rates upon maturity of the original loan.
**Prepayment Terms:** Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the closest matching maturity to the maturity date of the loan. The yield maintenance premium shall be discounted to its present value. The loan will be open to prepayment at par during the last 120 days of the loan term.
**Monthly Payment Basis:** Monthly payments will be on a 30/360 day basis.
**Financial Statements:** Borrower certified acceptable if CPA audited not available. Quarterly statements not required unless loan is in default.
**Appraisal:** Required loan to value of 75%
**Borrower:** SPE and SAE status was waived since the Borrower owns a separate piece of land. The land, however, must be transferred if Borrower wishes to use it as security for a loan.
**Additional Application Fee:** Should the 10-year treasury drop more than 45 bps prior to the closing, Borrower shall deposit up to 2% of the Loan principal as an additional application fee, which amounts to be returned if that treasury shall increase above such threshold prior to closing.
**Credit Group Remarks:**
Great location, demographics and product type.
Funding at 80% occupied versus MLI requirement of 90% mitigated by the full economic holdback.
Credit recommends deal as structured.

JH 00405

John Hancock Life Insurance Company

Investment No:               6518467

File Name:                   Montgomery Square Partnership

Recommended By:
Investment Officer:
                Timothy J. Malik                          Date: 8/16/04

Credit Group:
                Patricia Coyne                            Date: 8-16-04

Team Leader:
                David Henderson    OUT OF OFFICE          Date: _____

Approved By:
                Barry Nectow                              Date: 8-16-04

                Ivor Thomas                               Date: 8-16-04

                Paul English                              Date: _____

                Warren Thomson                            Date: 8-16-04

JH 00406

John Hancock Life Insurance Company

| File Name: | Avenel @ Montgomery Square Apts | Date: | 8/16/2004 |
|---|---|---|---|
| | Mortgage Investment No.   6518467 Montgomery Square Partnership Multifamily 1100 Avenel Blvd. Montgomeryville    Pennsylvania | | |
| Rating:    MLI -        BBB        OSFI -    Satisfactory | | | New Loan |

**LOAN TERMS:**     10-Year Term, 30-Year Amortization, monthly payments on 30/360 basis; Option to extend Loan with a one-year floater.

**ARREARS HISTORY:**     None, project under construction

**Ground Lease:**     N/A

**PROJECT DESCRIPTION:**     The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting. The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

**LOCATION:**     The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast

**LOAN STATISTICS:**

| | | Stabilized |
|---|---|---|
| Loan Amount: | | $32,000,000 |
| Final Lending Value: | | $47,000,000 |
| Purchase Price: | $35,555,800  Cost to Build | |
| Income Value: | | $47,302,807 |
| Cap Rate: | | 7.25% |
| Value Adjustement: | | |
| Value / SF: | | $183,593.75 |
| Loan / SF: | | $125,000.00 |
| Loan / Value Ratio: | | 67.6% |
| Loan / SF @ Maturity | | $105,105.66 |
| Balloon Loan / Value: | | 56.8% |
| DSC - NOI: | | 1.46 |
| DSC - NCF: | | 1.44 |
| DSC (25 yr Amort) - NOI: | | 1.36 |
| DSC (25 yr Amort) - NCF: | | 1.35 |
| Average Rental Rate (actual): | | $1,509.95 |
| Average Rental Rate (market): | | $945.00 |
| Breakeven Interest Rate: | | 10.60% |

**Credit Rating:**

| MLI - BBB | OFSI - Satisfactory | John Hancock - BAA1 |
|---|---|---|

JH 00407

# INCOME, EXPENSE & LOAN ANALYSIS

John Hancock Life Insurance Company

| | | |
|---|---|---|
| Borrower | Montgomery Square Partnership | |
| Loan No. | 6518467 | |
| Property Address | Montgomeryville          Pennsylvania | |
| Property Type | Multifamily | |
| Date | 30Jul2004 | |

| | |
|---|---|
| Total Number of Units | 256 |
| Vacant Units | 0 |
| % Occupancy | 100% |
| % Vacancy | n/a |

Color Key [INPUT FIELD]

| | |
|---|---|
| Benchmark Rate | 6.180% |
| Benchmark Rate (per period) | 0.515% |
| Benchmark Amortization Period (yrs) | 25 |

| Financial Statements Reviewed by | Timothy J. Maik | |
| Date | 20May2004 | Vacancy as % Gross Income-> |

|  | | Actual | | | Current "In-Place" | | Pro Forma | | Stabilized | | Appraisal / CARS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | | 2004 | | 30Aug2004 | | 30Aug2005 | | | |
| Financial Statement Date | | 2000 | 2001 | 2002 | | | 5.0% | | 5.0% | | 0.0% | |
| Vacancy as % NRA | | | | | | | | | | | | |
|  | | | | | | $/unit | | $/unit | | $/unit | | $/unit |
| **INCOME** | | | | | | | | | | | | |
| Base Rent | | | Property is currently under construction. | | 0 | | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Occupied | | n/a | n/a | n/a | 0 | n/a | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Vacant | | | | | 0 | n/a | 4,638,600 | 18,120 | 4,638,600 | 18,120 | 0 | 0.00 |
| Total Rental Income | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Expense Reimbursement | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Percentage Rent | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Parking Income | | 0 | 0 | 0 | 0 | | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| Other Income | | 0 | 0 | 0 | 0 | | 312,213 | 1,220 | 312,213 | 1,220 | 0 | 0.00 |
| Total Other Income | | 0 | 0 | 0 | 0 | | 4,950,813 | 19,339 | 4,950,813 | 19,339 | 0 | 0.00 |
| **TOTAL GROSS INCOME** | | 0 | 0 | 0 | 0 | | 247,541 | 967 | 247,541 | 967 | 0 | 0.00 |
| Vacancy | | | | | | | | | | | | |
| **EFFECTIVE GROSS INCOME** | | 0 | 0 | 0 | 0 | | 4,703,272 | 18,372 | 4,703,272 | 18,372 | 0 | 0.00 |
| | | | | | | | | | | | | |
| **OPERATING EXPENSES** | | | | | | = Inflation factor | | | | | | |
| Real Estate Taxes | | 0 | 0 | 0 | 0 | | 456,540 | 1,783 | 456,540 | 1,783 | 0 | 0.00 |
| Property Insurance | | 0 | 0 | 0 | 0 | | 72,780 | 284 | 72,780 | 284 | 0 | 0.00 |
| Utilities | | 0 | 0 | 0 | 0 | | 51,200 | 200 | 51,200 | 200 | 0 | 0.00 |
| Repairs & Maintenance | | 0 | 0 | 0 | 0 | | 157,184 | 614 | 157,184 | 614 | 0 | 0.00 |
| Janitorial | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Management Fee | | 0 | 0 | 0 | 0 | | 164,815 | 643 | 164,815 | 643 | 0 | 0.00 |
| Payroll & Benefits | | 0 | 0 | 0 | 0 | | 280,000 | 1,094 | 280,000 | 1,094 | 0 | 0.00 |
| Advertising & Marketing | | 0 | 0 | 0 | 0 | | 51,500 | 201 | 51,500 | 201 | 0 | 0.00 |
| Professional Fees | | 0 | 0 | 0 | 0 | | 5,000 | 20 | 5,000 | 20 | 0 | 0.00 |
| General & Administrative | | 0 | 0 | 0 | 0 | | 35,000 | 137 | 35,000 | 137 | 0 | 0.00 |
| Other Expenses | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Sub Total - Operating Expenses | | 0 | 0 | 0 | 0 | | 1,273,819 | 4,976 | 1,273,819 | 4,976 | 0 | 0.00 |
| Ground Rent | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Total Expenses | | 0 | 0 | 0 | 0 | | 1,273,819 | 4,976 | 1,273,819 | 4,976 | 0 | 0.00 |
| **NET OPERATING INCOME** | | 0 | 0 | 0 | 0 | | 3,429,453 | 13,396 | 3,429,453 | 13,396 | 0 | 0.00 |
| T.I. Cost / Reserve | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| L.C. Cost / Reserve | | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0.00 |
| Cap Expenditures / Reserve | | 0 | 0 | 0 | 0 | | 38,400 | 150 | 38,400 | 150 | 0 | 0.00 |
| Reserves | | 0 | 0 | 0 | 0 | | 38,400 | 150 | 38,400 | 150 | 0 | 0.00 |
| **CASH FLOW** | | 0 | 0 | 0 | 0 | | 3,391,053 | 13,246 | 3,391,053 | 13,246 | 0 | 0.00 |
| | | | | | | | | | | | | |
| MANAGEMENT FEE as % EGI | | 0.0% | 0.0% | 0.0% | 0.0% | | 3.50% | | 3.50% | | 0.0% | |
| TOTAL EXPENSES as % EGI | | 0.0% | 0.0% | 0.0% | 0.0% | | 27.1% | | 27.1% | | 0.0% | |
| | | | | | | | | | | | | |
| NET OPERATING INCOME | | | | | 0 | | 3,429,453 | | 3,429,453 | | 0 | |
| NET CASH FLOW | | 0 | 0 | 0 | 0 | | 3,391,053 | | 3,391,053 | | 0 | |
| | | | | | | | | | | | | |
| Cap. Rate | | | | | | | 7.250% | | 7.250% | | 0.000% | |
| Income Value - NOI (calculated) | | | | 0 | 0.00 | | 47,302,800 | 184,777 | 47,302,807 | 184,777 | 0 | 0.00 |
| Income Value - NCF (calculated) | | | | 0 | 0.00 | 0 | 46,773,145 | 182,708 | 46,773,151 | 182,708 | 0 | 0.00 |
| Appraiser's Final Value | | | | | | | | | | | | |
| Appr. Indicated Cap. Rate - NOI | | | | | | | | | | | 0.00% | |
| Appr. Indicated Cap. Rate - NCF | | | | | | | | | | | 0.00% | |
| Purchase Price | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Max. Loan Calculations:** | | | | | | | | | | | | |
| - Max Loan to Value | | 75% | | 0 | 0.00 | | 35,477,100 | 138,582 | 35,477,105 | 138,582 | 0 | 0.00 |
| - Max Loan to Value @ ACLI Average | | 75% | | 0 | 0.00 | | 35,477,100 | 138,582 | 35,477,105 | 138,582 | 0 | 0.00 |
| - Min. DSC (NOI & Less Terms) | | 1.25 x | | 0 | 0.00 | | 37,408,502 | 146,127 | 37,408,507 | 146,127 | 0 | 0.00 |
| - Min. DSC (NCF & 25 yr Amort) | | 1.25 x | | 0 | 0.00 | | 34,866,781 | 136,276 | 34,866,786 | 136,277 | 0 | 0.00 |
| | | | | | | | | | | | | |
| Loan Amount | | | | | | | 32,000,000 | 125,000 | 32,000,000 | 125,000 | 0 | |
| Interest Rate | | | | | 0.000% | | 6.180% | | 6.180% | | 6.180% | |
| Loan Term | | | | | mths | | 120 mths | | 120 mths | | 120 mths | |
| Interest Only Period | | | | | mths | | mths | | mths | | mths | |
| Amortization | | | | | mths | | 360 mths | | 360 mths | | 360 mths | |
| Monthly Payment | Interest Only Basis | | | | 0.00 | | 185,574.96 | | 185,574.96 | | 0 | |
| Annual Debt Service | | | | | 0 | | 2,346,900 | | 2,346,900 | | 0 | |
| | | | | | | | | | | | | |
| Superior Debt Service Expense (Annual) | | | | | | | | | | | | |
| Subsequent Debt Service Expense (Annual) | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| DSC - NOI | | 0.00 x | | 0.00 x | | | 1.46 x | | 1.46 x | | 0.00 x | |
| DSC - NCF | | 0.00 x | | 0.00 x | | | 1.44 x | | 1.44 x | | 0.00 x | |
| DSC (25 yr Amort) - NOI | | 0.00 x | | 0.00 x | | | 1.36 x | | 1.36 x | | 0.00 x | |
| DSC (25 yr Amort) - NCF | | 0.00 x | | 0.00 x | | | 1.35 x | | 1.35 x | | 0.00 x | |
| Combined Total DSC - NOI | | N/A | | N/A | | | N/A | | N/A | | N/A | |
| Combined Total DSC - NCF | | N/A | | N/A | | | N/A | | N/A | | N/A | |
| Loan / Value (PBO / Value) | | 0.0% | | 0.0% | | | 67.65% | | 67.65% | | 0.0% | |
| Loan / Unit (PBO / $/unit) | | $0.00 | | $0.00 | | | $125,000 | | $125,000 | | $0.00 | |
| Breakeven Rent (Before Vacancy) | | $0.00 | | $0.00 | | | $14,806 | | $14,806 | | $0.00 | |
| Net Breakeven Rent (Before Vacancy) | | $0.00 | | $0.00 | | | $14,806 | | $14,806 | | $0.00 | |
| Breakeven Interest Rate (int only) - SNCF | | 0.00% | | 0.00% | | | 10.60% | | 10.60% | | 0 | |
| PBO @ End of Term (Balloon) | | $0 | | $0 | | | $26,907,048 | | $26,907,048 | | $0 | |
| Balloon / U | | $0.00 | | $0.00 | | | $105,105.66 | | $105,105.66 | | $0.00 | |
| Balloon Loan / Value | | 0% | | 0% | | | 57% | | 57% | | 0% | |

JH 00408

John Hancock Life Insurance Company



A meeting of the Mortgage and Real Estate Loan Committee was held on          8/16/04

Voted - To authorize the following investment:

| | | | Company | $ Allocation |
|---|---|---|---|---|
| Investment: | 6518467 | Avenel @ Montgomery Square Apts | JHLICO Allocation | $29,900,000 |
| Type of Investment: | Mortgage Loan | | | |
| | | | IPLICO Allocation | $2,100,000 |
| Lien Position or Priority | First | | | |
| Investment Amount | $32,000,000 | $125,000 per Unit | | |
| Rollover of Existing Loan | No | | | |
| Loan Term | 120 | months | | |
| Amortization Term | 360 | months | | |
| Summation Value | $47,000,000 | $184,804 per Unit | | |
| Maximum Loan to Value | 68.09% | | | |
| Minimum DSCR | 1.45 times | | | |

| | | | | |
|---|---|---|---|---|
| Interest Rate (Note Rate) | 6.180% per annum | Effective Yield Semi-Annual Rate (30/360 basis) | 6.260% |
| Interest Calculation | 30/360 | Average Life | 9.29 |
| | | Duration | 6.76 |
| Less: embedded Fee | -0.071% | Monthly Spread over Treasury | 179 |
| | | Semi-Annual Spread over Treasury | 187 |
| Effective Yield Monthly | 6.109% | REIG Department Rating | BAA1 |

**Collateral Property**    **Property Type/Sub-Type**    **Property Size**

Avenel @ Montgomery Square Apts    Multifamily    256    Units

Montgomeryville    Pennsylvania    Multifamily - Garden Apartments

| | |
|---|---|
| Investment Officer | Timothy J. Malik |
| 2nd Investment Officer | Ryan Hawley |
| Originating Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia   040-03 |
| Servicing Correspondent | John Hancock Real Estate Finance, Inc. - Philadelphia   040-03 |
| Closing Analyst | Robin Costa |
| Internal Counsel | Nathaniel Margolis |

Page 1

JH 00409

VOTED INVESTMENT

| Investment: | 6518467 | Investment Amount: | $32,000,000 |

Avenel @ Montgomery Square Apts

**Loan Overview:**

~ The security is a class-A, 256-unit apartment project under construction in Montgomeryville, Pennsylvania (suburban north Philadelphia). The property will be comprised of 256 garden-style apartments (125 one-bedrooms and 131 two-bedrooms) in eight three-story buildings and one four-story building (which will also hold the clubhouse).

~ Construction of the security is scheduled to be complete in March 2005, and 17 of the 22 units completed to date have been leased. Funding will occur when the property is fully constructed and is at least 80% occupied (August 2005 at the latest). A Rental Achievement Reserve will be funded if the property does not achieve the underwritten rents. Because of the construction and occupancy requirements, the Loan is priced as a one-year forward commitment.

~ The debt service coverage ratio for a 10% Constant is 1.06:1 and the breakeven interest rate is 10.6%.

**Loan Information - Voted Section:**

| | | | |
|---|---|---|---|
| Borrower/Applicant | Montgomery Square Partnership | | |
| Loan Amount | $32,000,000 | Underwriter's Capped Value | $47,309,708 |
| Loan per SF/Unit/Pad | $125,000 | Underwriter's LTV | 67.64% |
| Loan Term - years | 10 | Underwriter's NOI | $3,429,954 |
| Amortization - years | 30 | Underwriter's Cap Rate | 7.250% |
| Interest Only Period - years | 0 | Underwriter's Cash Flow | $3,391,554 |
| Interest Rate | 6.180% | Underwriter's DSCR | 1.45 |
| Contract Type | Fixed Rate | Annual Debt Service | $2,346,900 |
| Interest Method | 30/360 | Monthly Debt Service | $195,574.96 |
| Payment Constant | 7.334% | Service Fee | 0.029% |
| Balloon Balance | $26,963,760 | Secondary Financing in Place | No |
| Sanctified Loan (Yes/No) | Yes | Amount | |
| Ground Lease | No | Secondary Financing Type | N/A |
| Recourse to Borrower | No | Secondary Financing Permitted in Future | Yes |
| Recourse to Principal/Sponsor | No | Amount | |
| Due on Sale | Yes | Secondary Financing Type | Secured by Property |
| Partial Release Allowed | No | Lockbox | No |
| Cross Collateralized | No | Lockbox Status | |
| Cross Defaulted | N/A | Rate Reset/Loan Term Extension Option | Yes |
| Crossed Loans | | See Supplemental Page Attached to Vote | |

**Other Loan Information - Memorandum Section**

| | | | |
|---|---|---|---|
| Assumption Provision (# times) | 2 | Payment Due Date | 1st |
| Index Name | 10 year Treasury | Grace Day Period for Late Charge | 5 |
| 10 year Treasury | 4.43% | Late Charge | 4% |
| Fraud Carve out | | Grace Day Period for Default | 5 |
| Borrower | Yes | Default Interest Rate | 5% |
| Sponsor | Yes | | |
| Environmental Indemnification | | | |
| Borrower | Yes | | |
| Sponsor | Yes | | |

**Loan Terms Description - Voted Section**

~ The Borrower was given 365 days to close the Loan although the typical commitment is 60 days. The net spread includes 45 basis points for the cost of this extra 305 days of forward commitment. The closing date may be extended for up to 90 days at the cost of an adding five (5) basis point to the interest rate for each 30-day extension period or portion of a 30-day extension period. – Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.
~ The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR and other conditions, including approval of John Hancock. The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.
~ The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar-type apartment buildings in the Philadelphia metropolitan area.

JH 00410

VOTED INVESTMENT

Investment:           8519467                                                              Investment Amount:   $32,000,000
                      Avenel @ Montgomery Square Apts

LINES OF BUSINESS ALLOCATIONS - VOTED SECTION

JHLICO Accounts                                          IPLICO Accounts
                      $ Allocation                                           $ Allocation
GBRE                  $3,900,000                         IPLICo              $2,100,000
GRP.INS               $3,000,000
RLTC                  $5,000,000
Remain                $4,200,000
Open                  $2,800,000
IQA                   $10,000,000
REFA                  $1,200,000

Total JHLICO          $29,900,000                        Total IPLICO        $2,100,000

Prepayment Terms - Voted Section

Prepayment Premium
                                              Lo         48
                                              YM1        69
                                              Open       3

Partial Payment Allowed          No

Prepayment Terms Description - Voted Section

- Closed for 4 years; then open in full in the 5th year under a yield maintenance formula indexed to U.S. Treasury Securities having the
closest matching maturity to the maturity date of the loan.  The yield maintenance premium shall be discounted to its present value.  The loan
will be open to prepayment at par during the last 90 days of the loan term.

Key Date Information - Voted Section

Rate Lock Date        8/2/2004            Commitment Expiration     8/2/2005

Approval Date         8/16/2004           Vote Expiration           8/15/2005

Page 3

JH 00411

## INVESTMENT MEMORANDUM

Investment: 6518467                                    Investment Amount:  $32,000,000
        Avenel @ Montgomery Square Apts

**Strengths of Deal**

-- The security is a newly constructed, class-A apartment complex located in a strong apartment market that has not had new apartment construction in over 15 years.

-- The developers of the security have extensive construction experience and they have contracted with a very experienced management and marketing firm to direct the lease up and property operations.

**Weaknesses of Deal**

-- The property does not have an operating history since it is under construction and in its lease-up phase.   However, leasing for the first building has been strong.   In addition, a waiting list of 103 prospects has been assembled for certain units in other buildings now under construction.  Operating expenses were also conservatively estimated to be `5,527/unit per year, even though tenants pay for most utilities.

**Exceptions to Guidelines**
-- Funding will occur when the property is complete and is at least 80% occupied.  If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment.  The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.
-- The Borrower will have the one-time right to request additional Loan proceeds, with a minimum amount of $1.0 million, between the 2nd and 5th Loan Years at the then market interest rate, subject to a 75% LTV and 1.25 DSCR, and other conditions, including approval of John Hancock.  The Borrower shall also have the right to have one second mortgage by a third-party lender subject to these same LTV and DSCR conditions and other conditions.
-- The Loan may be extended for one (1) year with a floating-rate interest rate at an interest rate spread offered by John Hancock for loans of similar size, type, location and character secured by rental apartment buildings in the  'hiladelphia metropolitan area.   -- Late charges will be 4% instead of 5%, and the interest rate add-on for defaults was  reduced from 7% to 5%.   -- SPE and SAE status was waived since the Borrower owns a separate piece of land.  This land, however, must be transferred if Borrower wishes to use it as security for a loan.

JH 00412

## INVESTMENT MEMORANDUM

| | | | |
|---|---|---|---|
| Investment: | 6518457 | Investment Amount: | $32,000,000 |
| | Avenel @ Montgomery Square Apts | | |

| Use of Funds | | Borrower Purchase Information | |
|---|---|---|---|
| | | Purchase Date | 06/01/96 |
| Loan Purpose | Refinance | Purchase Price | $7,680,000 |
| Loan Amount | $32,000,000 | Capital Expenditures | $27,875,801 |
| Less Current Debt/Purchase Price | $30,742,000 Wilmington Trust & | Borrower Investment Basis | $35,555,801 |
| Closing Cost/Other Expenses | $5,063,801 Wachovia | | |
| Net Proceeds to Borrower | -$3,805,801 | | |

| Loan Fees | $ Amount | % of Loan | | |
|---|---|---|---|---|
| Processing Fee | $5,000 | 0.02% | | |
| Application Fee | $320,000 | 1.00% | | |
| Commitment Fee | $640,000 | 2.00% | | |
| Embedded Origination Fee | $160,000 | 0.50% | JHREF - Philadelphia | |
| Broker's Origination Fee | $160,000 | 0.50% | Carey, Kramer, Pettit, Panichelli & Associates | |

**Purchase Information / Previous History**

- The Borrower purchased the site in 1996, rezoned it, obtained building permits and started construction in late 2003. At closing, the Borrower will have an estimated $3.8 million of cash equity in the property.

**Borrower Information**

| | | | |
|---|---|---|---|
| Borrower/Applicant | Montgomery Square Partnership | | |
| Entity Type | Partnership | | |
| State of Incorporation | Pennsylvania | | |
| Single Asset Entity | No | Independent Director | No |
| Special Purpose Entity | No | Non-Consolidation Opinion | No |
| Bankruptcy Remote Entity | No | | |
| | | | |
| Property Management Company | Buzzuto Management | Affiliate of Borrower | No |

**Borrower Entity Information**

- The Borrower is a general partnership composed of three limited partnerships, all formed in Pennsylvannia. (1.) Vestmont Limited Partnership's general partner is Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli ) and the LP units are owned 44.5% by James R. Koller, 44.5% by Frank C. Palopoli, and 10% by Joseph P. Kelley. (2.) Vestmont Limited Partnership II's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 38.28% by James R. Koller, 38.28% by Frank C. Palopoli, and 22.44% by Joseph P. Kelley. (3.) Vestmont Limited Partnership III's general partner is also Vesterra Corporation (which 1% is owned equally by James P. Koller and Frank C. Palopoli) and the LP units are owned 66.17% by Koller Kelly Partnership, LP and 32.83% by FCP Group LP.

| Database Searched | Issue | Database Searched | Issue |
|---|---|---|---|
| Bankruptcy | No | UCC-1 | No |
| Credit Report | No | | |
| Civil Records | No | | |
| Judgments | No | | |
| Secretary of State | No | | |
| Tax Authority/Liens | No | | |

**Description of Credit Issues - Borrowing Entity Only**

- None known.

JH 00413

## INVESTMENT MEMORANDUM

| | | | | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|---|---|

Investment:          6518467
                     Avenel @ Montgomery Square Apts

### Principal/Sponsor Information

First Principal/Sponsor Name        James P. Koller
Net Worth        $25,100,415        as of        6/30/2004 Source        Financial Statement

| | |
|---|---|
| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

Second Principal/Sponsor Name        Frank C. Palopoli
Net Worth        $21,634,000        as of        6/30/2004 Source        Personal Balance Sheet

| | |
|---|---|
| Was the Principal/Sponsor ever convicted of a felony? | No |
| Was the Principal/Sponsor ever subject to a substantial lawsuit or judgment in the past 3 years? | No |
| Has the Principal/Sponsor ever failed to repay debt in full? | No |
| Was the Principal/Sponsor ever subject to foreclosure? | No |
| Was the Principal/Sponsor ever in bankruptcy? | No |

### Principal/Sponsor Comment

-- James P. Koller is an attorney who specialized in real estate law for 10 years until founding, in 1986, the Vesterra Corporation, the general partner of the Borrower. Vesterra develops both commercial properties and single-family homes. Mr. Koller was asociated with Dilworth Paxson Kalish & Kauffman and later with Dechert Price & Rhoads prior to his involvement with Vesterra. Mr. Koller guarantees the non-recourse carve outs and has a net worth of $25.1 million with liquid assets of $14.6 million.

-- Frank C. Palopoli has over 25 years of real estate experience and, prior to co-founding Vesterra, was a principal in Blue Bell Realty Services, Inc. and Berwind Realty Services, Inc. Both firms provided work-out, development and real estate services to corporate, institutional and private individuals. Mr. Palopoli guarantees the non-recourse carve outs and has a net worth of $21.6 million with liquid assets of $9 million.

-- Joseph P. Kelley joined Vesterra in 1987. Before joining Vesterra he was a financial manager for mergers and acquisitions for Foster Medical. He began his career as an auditor with Price Waterhouse. Mr. Kelley also guarantees the non-recourse carve outs and has a net worth of $3.6 million with liquid assets of $738,000.

### Principal/Sponsor related John Hancock Loans

-- None.

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

### Escrows

| Reserve Type | Required | Amount at Closing | Monthly Amount | Cap |
|---|---|---|---|---|
| Tax | Yes | | | |
| Insurance | No | | | |
| Capex | No | | | |
| Deferred Maintenance | No | | | |
| TI/LC | No | | | |
| Environmental | No | | | |

**Reserve Comments**

~ Funding will occur when the property is complete and is at least 80% occupied. If the Borrower closes before the gross underwritten rents are achieved, a Rental Achievement Reserve will be held by John Hancock for that portion of the Loan in excess of a 75% LTV and/or under 1.25 DSCR as described in the commitment. The Borrower will have a one-time right to request all or a portion of this reserve during the six-month period after the Closing for achieved rents. Any remaining reserve amount may be applied to the Loan principal, at John Hancock's discretion, but with no prepayment premium.

~ Reserves for insurance, replacements and leasing costs will be suspended as long as the Loan does not have an event of default, and subject to other customary conditions.

JH 00415

INVESTMENT MEMORANDUM

| Investment: | 6518467 | | Investment Amount: | $32,000,000 |
|---|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | | |

**Location Information**

| Property Name | Avenel @ Montgomery Square Apts | | County | Montgomery |
|---|---|---|---|---|
| Address | 1100 Avenel Blvd. | | MSA | Philadelphia |
| | Montgomeryville | Pennsylvania | 19454 | |

**Location Description**

~ The subject is located on a newly constructed dead-end road (Avenel Blvd.) that only serves the property. Avenel Boulevard intersects State Route 202 (DeKalb Pike) just south of where Route 202 intersects State Route 309 (Bethlehem Pike) and a half mile north of Route 63 (Welsh Road). Route 309 becomes a divided highway about two miles south of the subject and connects with the Pennsylvania Turnpike (I-276) about six miles south of the subject. I-476, the Blue Route, is about five mile southwest of the subject. The site is located between the Montgomery Mall and the Montgomery Square Shopping Center. Philadelphia is about 17 miles to the southeast.

~ The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000.

**Property Information**

| Property Type | Multifamily | Property Kind Code | B |
|---|---|---|---|
| Property Sub-Type | Multifamily – Garden Apartments | Property Type Code | 19 |
| Garden Apts. (1980+) | | Property Sub-Type Code | 101 |
| | | | |
| Total Number of Units | 256 | Land area | 18.35 |
| Total Net Rentable Sq. Ft. | 274,931 | Open Parking | 404 |
| Number of Buildings | 9 | Covered Parking | 112 |
| Number of Floors | 3 | Total Parking | 516 |
| Year Built | 2004-05 | Parking Ratio | 2.02 |
| Year Renovated | 0 | Sewer | Public |
| Elevators | 1 | Water | Public |
| Building Frame | Steel | HVAC System | Package Units |
| Exterior | Vinyl | Fuel | Electric |
| Roof Type | Pitched | Seismic Zone | 2 |
| Roof Material | Shingle | Alquist Priolo Zone | No |
| Ground Lease | No | PML Factor | |
| Ground Lease Expiration | N/A | Storm/Hurricane Zone | No |
| Ground Lease Subordinate | N/A | Flood Zone | |
| | | Environmental Issues | No |

**Property Description**

~ The subject will be comprised of eight (8) three-story buildings and one four-story building. The buildings are wood structures with vinyl, wonder board and brick exterior, with side-by-side, six-foot, double-hung, insulated windows, pitched roofs with gable features, enclosed balconies or patios, and covered staircases. The four-story building will offer an elevator, recreation room, exercise room and access to common pool and patio. The buildings also offer interior garages and storage space for rent, as well exterior garages. The site will be landscaped and have pole lighting.

~ The interior of the units will have 9-foot ceilings, track lighting, upgraded kitchens, walk-in closets, full-size washers and dryers, and security systems that can be leased on a monthly basis. All rooms will have phone lines and cable outlets. About 108 units will also have electric fireplaces.

JH 00416

INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

**Additional Property Information**

| Rent Controlled | No | Electric Paid By | Tenant |
|---|---|---|---|
| Rent Subsidized | No | Heat Paid By | Tenant |
| Section 42 | No | Water Paid By | Tenant |
| Section 8 | No | Sewerage Paid By | Tenant |

**Utilities/Expenses Paid by Tenant**

~ Tenants pay for all utilities to their units.

**Utilities/Expenses Paid by Landlord**

~ Landlord pays for common area utilities. Only the four-story building will have fully enclosed hallway and staircases.

**General Comments**

~ This is a project under construction.

**Amenities**

| Air Conditioning | Yes | Fireplace | Yes | Health Club | Yes |
|---|---|---|---|---|---|
| Washer/Dryer | Yes | Laundry | No | Club Room | Yes |
| Dishwasher | Yes | Security | Yes | Pool | Yes |
| Trash Compactor | No | Other Amenities | Yes | Hot Tub | No |
| | | | | Tennis | No |

**Amenities Comments**

~ These apartments will also offer security system rental, 9-foot ceilings, track lighting, multiple phone lines and high-speed cable outlets, private patios or balconies, full-size washer and dryer, walk-in closets, extra storgae space and attached or detached garages for rent.

~ The common area will offer a residence lounge, executive business center, exercise room and resort-style pool. Most units will have two parking spaces.

**Tenant Mix**

| Family | 40% | Senior | 10% | Military | 5% |
|---|---|---|---|---|---|
| Single | 60% | Student | 10% | Other | 5% |

**Tenant Mix Comment**

~ This is an upscale residential development that targets mid to upper income individuals and professionals.

**Environmental Issue Comment**

~ None known.

JH 00417

## INVESTMENT MEMORANDUM

| Investment: | 6518467 | Investment Amount: | $32,000,000 |
|---|---|---|---|
| | Avenel @ Montgomery Square Apts | | |

**Valuation Summary**

| | | | |
|---|---|---|---|
| NOI | $3,429,954 | | |
| Underwriter's Cap Rate | 7.250% | **Loan to Value Ratios** | |
| Underwriter's Capped Value | $47,309,708 | Underwriter's Capped | 67.64% |
| Discounted Cash Flow Value | | Discounted Cash Flow | 0.00% |
| External Appraisal | | External Appraisal | 0.00% |
| Summation Value | $47,000,000 | Summation Value | 68.09% |
| | | | |
| Land Area | 18.35 | **Physical Valuation** | |
| Land Value per Acre | $418,529 | Land | $7,680,007 |
| Total Gross Building Area | 274,931 | | |
| Building Cost per Sq. Ft. (net) | $101.39 | Building | $27,875,254 |
| Other Site Improvements | | Site Improvement | $0 |
| | | | |
| | | Total Physical Value | $35,555,261 |

**Valuation Comment**

~ RENTAL COMPS: Nine comparable properties were identified with one bedroom rents from $1,020 - $1,461/unit and two bedroom rents from $933 - $1,790/unit, while the subject projects rents of $1,197 - $1,790/unit for the one bedrooms and $1,609 - $1,846/unit for the two bedrooms and $1,895 - $2,200/unit for the three bedrooms. Only one comparable property is nearby but is over 20 years old. The remaining comparable properties will not compete with the subject since the distance is in excess of five mile, and most of those are much older properties as well. The rent-per-square-foot of the rental comps indicate that the subjects rents are similar to market rents, even though the subject has the advantage of being brand new.

~ Condominium sales comps range from $173,900 to $264,000 while the subjects valuation is $184,777/unit.

~ Capitalization rates range from 6.25% to 7.5%, with the newer apartment buildings going in the lower cap rates. The subject's valuation is based on a 7.25% cap rate.

~ Comparable sales for garden-style apartment building built since 1990 range from $104,000/unit to $149,000/unit. The Regatta Apartments in Norristown (an inferior location) is currently being marketed at $172,000/unit.

| Market/Sub-Market Performance | Market | Sub-Market | Competitive Group |
|---|---|---|---|
| Name of Market | Philadelphia | Lansdale/Gwynedd | |
| Total Units | 194,682 | 5,880 | |
| Total Vacancy (current/worst/best) | 3.8%/3.8%/1.6% | 4.9%/4.9%/.09% | |
| New Supply - Coming Year (units) | 1,461 | 100 | |
| New Supply last 12 months | 401 | 0 | |
| Net Absorption last 12 months | 303 | -18 | |
| Projected net absorption next 12 mths | 1,059 | 110 | |
| | | | |
| Effective Rent / Unit | $886 | $945 | |
| Peak Rent / Unit | $878 | $945 | |
| Last Year's Rent / Unit | $878 | $936 | |
| Median Operating Expenses / Unit | | | |
| Concessions | | | |

Source of Market Information        REIS, Marcus & Millichamp

**Market/Sub-Market Comment**

~ According to REIS, the Lansdale/Gwynedd apartment market (5,880 units in 29 projects) is 4.9% vacant and with a median vacancy rate of 3.4%. Rental growth should moderate after growing 2.7% during the previous year. The average asking rent is $945/month. No new units wave been constructed during the last four years and only 32 units have been built since 1999. The subject is the only complex under construction or planned in this submarket at this time. The Greater Philadelphia apartment market (194,270 units in 1,141 projects) is 3.8% vacant and rental growth should also moderate after growing 3.2% over the previous year. Roughly 1,461 units are under construction and are projected to be absorbed with minor effect on the overall vacancy.

~ Marcus & Millichap project slightly increasing vacancy for the Philadelphia market, but also rent increases of 3.8% in 2004.

~ Two apartment properties were recently built in different submarkets about eight miles south or west to the subject. The Glen at Lafayette Hill (139 units) located in Lafayette, PA was developed in 1999 and reached stabilization within 10 months. Henderson Square (128 units) located in King of Prussia was built in 2001 and was stabilized within 12 months. The subject's 256 units are projected to be stabilized within 20 months from the start of construction.

~ The population in a three mile radius is approximately 63,400 individuals and median household income is about $69,000 while average household income is about $89,000. Of that population, about 24% rent their homes.

JH 00418

## INVESTMENT MEMORANDUM

Investment: 6618467  
Property: Avenal @ Montgomery Square Apts

Investment Amount: $32,000,000  
No. of Units: 256

Statement Name — Cash Flow Analysis

| Period Ended | 12/31/00 | 12/31/01 | 12/31/02 | $ / Unit | % of EGI | Underwritten | $ / Unit | % of EGI | Appraisal | $ / Unit | % of EGI | Cash Flow Footnotes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME:** | | | | | | | | | | | | |
| Base Rent - Occupied | $0 | $0 | $0 | $0 | 0% | $4,638,800 | $1,510 | 99% | $0 | $0 | 0% | a |
| Base Rent - Vacant | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | a |
| Laundry/Vending Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Parking Income | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | b |
| Other Income | $0 | $0 | $0 | $0 | 0% | $312,213 | $102 | 7% | $0 | $0 | 0% | b |
| Gross Income | $0 | $0 | $0 | $0 | 0% | $4,950,813 | $1,612 | 105% | $0 | $0 | 0% | |
| Vacancy Allowance | $0 | $0 | $0 | $0 | 0% | $247,541 | $81 | 5% | $0 | $0 | 0% | c |
| Effective Gross Income | $0 | $0 | $0 | $0 | 0% | $4,703,272 | $1,531 | 100% | $0 | $0 | 0% | |
| **OPERATING EXPENSES:** | | | | | | | | | | | | |
| Real Estate Taxes | $0 | $0 | $0 | $0 | 0% | $456,540 | $1,783 | 10% | $0 | $0 | 0% | d |
| Property Insurance | $0 | $0 | $0 | $0 | 0% | $72,780 | $284 | 2% | $0 | $0 | 0% | e |
| Utilities | $0 | $0 | $0 | $0 | 0% | $51,200 | $200 | 1% | $0 | $0 | 0% | f |
| Repairs and Maintenance | $0 | $0 | $0 | $0 | 0% | $156,684 | $612 | 3% | $0 | $0 | 0% | g |
| Management Fees | $0 | $0 | $0 | $0 | 0% | $164,615 | $643 | 4% | $0 | $0 | 0% | f |
| Payroll & Benefits | $0 | $0 | $0 | $0 | 0% | $280,000 | $1,094 | 6% | $0 | $0 | 0% | f |
| Advertising & Marketing | $0 | $0 | $0 | $0 | 0% | $51,500 | $201 | 1% | $0 | $0 | 0% | f |
| Professional Fees | $0 | $0 | $0 | $0 | 0% | $5,000 | $20 | 0% | $0 | $0 | 0% | f |
| General and Administrative | $0 | $0 | $0 | $0 | 0% | $35,000 | $137 | 1% | $0 | $0 | 0% | f |
| Other Expenses | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Ground Rent | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | f |
| Total Operating Expenses | $0 | $0 | $0 | $0 | 0% | $1,273,319 | $4,974 | 27% | $0 | $0 | 0% | |
| Net Operating Income | $0 | $0 | $0 | $0 | 0% | $3,429,954 | $13,398 | 73% | $0 | $0 | 0% | |
| Reserves | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | h |
| Extraordinary Capital Expenditures | $0 | $0 | $0 | $0 | 0% | $0 | $0 | 0% | $0 | $0 | 0% | |
| Total LC, TI's and Capital | $0 | $0 | $0 | $0 | 0% | $38,400 | $150 | 1% | $0 | $0 | 0% | i |
| Cash Flow Available for D. S. | $0 | $0 | $0 | $0 | 0% | $3,391,554 | $13,248 | 72% | $0 | $0 | 0% | |
| Annual Debt Service | $2,346,900 | $2,346,900 | $2,346,900 | | | $2,346,900 | | | $2,346,900 | | | |
| Net Cash Flow after Debt Service | | | | | | $1,044,654 | | | | | | |
| DSCR | | | | | | 1.45 | | | | | | |

JH 00419

11

INVESTMENT MEMORANDUM

Investment: 6518467
Property:    Avenel @ Montgomery Square Apts

Investment Amount: $32,000,000
No. of Units        256

## Cash Flow Footnotes

General Comments
- The rents and expenses are based on market studies and projections by the developer.

a.) GPR is based on rental projections, a market study and some preleasing.

b.) Other income is based on rental of security systems, storage spaces, and garages, as well as application fees, and late fees.

c.) Vacancy allowance was taken at 5% which is below the sub-market vacancy rate.

d.) Real estate taxes were underwritten based on an estimate of final assessed value.

e.) Insurance was underwritten based on insurance bids.

f.) General operating expenses were underwritten based on the developer's budget and estimates of operating costs.

g.) Management fee was underwritten at 3.75%, which is a market rate for like-type properties.

h.) Replacement reserves were underwritten at $150 per unit since this new construction.

i.) Extraordinary capital items were not underwritten since this is project will me new construction.

12

JH 00420



INVESTMENT MEMORANDUM

Investment: 05118467
Property Name: Avant @ Montgomery Square Apts — Unit Mix Analysis
Property Type: Multifamily

Rent Roll Date: 1/01/1900

Investment Amount: $32,000,000
Total Number of Units: 256
Current Occupancy: 100.0%

| Type | Unit Description | Number of Units | Total Sq. Ft. | Average Sq. Ft./Unit | Number of Occupied Units | Physical Occupancy | OCCUPIED Total Monthly Rent for Occupied Units | Average Monthly Rent for Occupied Units | Average Monthly Rent per Sq. Ft. | Rental Range Low | High | VACANT Monthly Rent for Vacant Units (market) | Total Monthly Rent for Vacant Units | UNDERWRITTEN Total Underwritten Monthly Rent | Underwritten Rent per Unit | Underwritten Rent per Sq. Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 BR | A | 30 | 23,040 | 768 | 30 | 100% | $36,750 | $1,225 | $1.55 | | | | $0 | $36,750 | $1,225 | $1.55 |
| 1 BR | B | 48 | 40,896 | 852 | 48 | 100% | $60,000 | $1,250 | $1.47 | | | | $0 | $60,000 | $1,250 | $1.47 |
| 1 BR | C | 15 | 14,655 | 977 | 15 | 100% | $21,000 | $1,400 | $1.43 | | | | $0 | $21,000 | $1,400 | $1.43 |
| 1 BR | BL | 32 | 32,224 | 1,007 | 32 | 100% | $47,200 | $1,475 | $1.46 | | | | $0 | $47,200 | $1,475 | $1.46 |
| 2 BR | F | 8 | 9,264 | 1,158 | 8 | 100% | $12,600 | $1,575 | $1.36 | | | | $0 | $12,600 | $1,575 | $1.36 |
| 2 BR | E | 69 | 81,006 | 1,174 | 69 | 100% | $112,470 | $1,630 | $1.39 | | | | $0 | $112,470 | $1,630 | $1.39 |
| 2 BR | E-L | 34 | 46,034 | 1,351 | 34 | 100% | $60,350 | $1,775 | $1.31 | | | | $0 | $60,350 | $1,775 | $1.31 |
| 2 BR | G | 16 | 21,472 | 1,342 | 16 | 100% | $28,800 | $1,800 | $1.34 | | | | $0 | $28,800 | $1,800 | $1.34 |
| 2 BR | D | 4 | 5,840 | 1,460 | 4 | 100% | $7,380 | $1,845 | $1.26 | | | | $0 | $7,380 | $1,845 | $1.26 |
| Totals | | 256 | 274,431 | 1,074 | 256 | 100% | $388,550 | | | | | | $0 | $388,550 | | |

Total Annualized Rent $4,638,600

Rent Roll Comments:
- The project is under construction so the rents are projections of actual final lease up. If these rents are not achieved, the loan will only be funded up to a 75% LTV and 1.25 DSC based on the actual NOI and the appraisal.

13

JH 00421

ent Numbers: 0511601

erty Name: Ascent @ Montgomery Square Apts

ATION: Montgomeryville
Pennsylvania

ent Officers: Timothy J. Mahh

| | | |
|---|---|---|
| Loan Term - Mths / Amortization - Mths | 120 | 3t |
| Interest Rate / Payment Constant | 6.180% | 7.3245% |
| Semi-Annual Equivalent | 6.260% | |
| Average Life | 9.28 | |
| Duration | 6.76 | |
| Treasury Spread | 166.77 | |
| RATING: | BAA1 | |

inating Correspondent: John Hancock Real Estate Finance, Inc - Philadelphia
ding Correspondent: John Hancock Real Estate Finance, Inc - Philadelphia

**Total Security Rating Scale**

| | X | TOTAL |
|---|---|---|
| 5 | | 3 |
| 4 | | 6 |
| 3 | | 7 |
| 2 | | 2 |
| 1 | | 2 |
| | X | 21 |

**Total Underwriting Rating Scale**

| | | TOTAL |
|---|---|---|
| 6 | | 7.50 |
| 5 | | 6.10 |
| 4 | | 4.00 |
| | | 17.60 |

| | | |
|---|---|---|
| Total Points from Security Scale | | 22.00 |
| Total Points from Underwriting Scale | | 17.60 |
| Sub Total | | 39.60 |
| ADJUSTMENTS: | | 0 |
| GRAND TOTAL: | | 39.60 |
| | Rating: | BAA1 |

JH 00422

Manulife Financial - U.S. Mortgage
Risk Rating Worksheet

| ALL SHADED AREAS MUST BE FILLED IN |
|---|

Date:              8/16/2004

Loan #:            6518467

Borrower Name:     Montgomery Square Partnership
Property Name:     Avenel @ Montgomery Square Apts
Property Address:  Montgomeryville              Pennsylvania

Credit Rating:     Final:      BBB        Indicated:     BBB      Recommended:     BBB

                   Based on:      Quality Classification:     Good
                                  Loan to Value:              67.60%
                                  Debt Service Coverage:      1.35

QUALITY:           Award points, on a scale of -5 to +5, representing the project's quality ranging
                   from Unacceptable to Excellent taking into account competitive factors and future
                   trends.

| Project Characteristics | | Points | Multiplier | Total |
|---|---|---|---|---|
| 1. Location | | | | |
| a) | State Economics | | 1 | 5 |
| b) | City Economics | | 2 | 10 |
| c) | Neighbourhood Economics | | 2 | 10 |
| d) | Site Logistics | | 2 | 10 |
| | | | | |
| 2. Age, Condition | | | | |
| a) | Age (Old to New) | | 1 | 5 |
| b) | Attractiveness | | 2 | 10 |
| c) | Flexibility | | 2 | 6 |
| d) | Parking ratios | | 2 | 6 |
| e) | Construction Quality | | 2 | 10 |
| f) | Landscaping | | 1 | 4 |
| g) | Property Management | | 1 | 4 |
| h) | Environmental Risk (High to Low) | | 1 | 4 |
| | | | | |
| 3. Zoning Conformity | | | 2 | 10 |
| | | | | |
| 4. Market/Neighbourhood Suitability | | | 2 | 10 |
| | | | | |
| 5. Market Demand, Leasing Risk | | | | |
| a) | Comparison to Market Vacancy | | 1 | 1 |
| b) | Market Trends (Weak to Strong) | | 1 | 4 |
| c) | Lease Terms | | 1 | 4 |
| d) | Income Mix | | 1 | 3 |
| e) | Tenant Mix | | 1 | 3 |
| f) | Tenant Quality | | 1 | 4 |
| g) | Rental Rates (above to below mkt) | | 1 | 2 |
| h) | Lease Maturity Diversification | | 1 | 2 |

| Sponsor Characteristics | Points | Multiplier | Total |
|---|---|---|---|
| 1. Net Worth | 3 | 1 | 3 |
| 2. Financial Capacity | 3 | 1 | 3 |
| 3. Experience | 5 | 1 | 5 |
| 4. Reputation | 5 | 1 | 5 |
| 5. Monetary Recourse | 0 | 2 | 0 |

JH 00423

ver. JH 5-10-04

Manulife Financial - U.S. Mortgage
Risk Rating Worksheet

**Credit Structure**

| | | | |
|---|---|---|---|
| 1. Term (vs. Market, Longer to Less) | 2 | 1 | 2 |
| 2. Additional Security (Sufficiency) | 0 | 2 | 0 |
| 3. Covenants (Sufficiency) | 3 | 1 | 3 |
| 4. Guarantees (Sufficiency) | 3 | 2 | 6 |
| 5. Amortization (vs Market, Longer to Less) | 2 | 2 | 4 |
| 6. Interest Rate (vs Historical Trend, Lower to Higher) | 3 | 1 | 3 |

TOTAL QUALITY POINTS                    163

# SUMMARY

Loan #:            6518467

Borrower Name:    Montgomery Square Partnership

Quality:

The total points of    163    indicates a Quality classification of:    **Good**

Classification Table (Minimum):
Excellent = 180 points
Good = 140 points
Fair = 90 points, min. 18 pts. from Sponsor

**Debt Service Coverage Ratio**

DSC is ░░░░░░░ using a ░░░░░░░ vacancy factor and 25 year amortization.

**Loan to Value Ratio**

LTV is ░░67.60%░░ using a Capitalization rate of ░░░░░░░

| | | | | |
|---|---|---|---|---|
| Indicated Credit Rating: | MLI | BBB | OSFI | Satisfactory |
| Recommended Credit Rating: | MLI | ░BBB░ OSFI | ░Satisfactory░ | |

Remarks:    (justify if Indicated and Recommended ratings do not agree).

Borrower/Principal Affiliate(s)/Individuals:
Reviewed against Master Consolidated List of terrorist names/organizations/entities.    ░░░░░░

Signed: _Timothy J Malik_            Date: 8/16/04

JH 00424



**Regional Map**

JH 00425