UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> VESTMONT LIMITED PARTNERSHIP, VESTMONT LIMITED PARTNERSHIP II, VESTMONT LIMITED PARTNERSHIP III, and VESTERRA CORPORATION d/b/a MONTGOMERY SQUARE PARTNERSHIP, <br><br> Defendants/Counterclaim Plaintiffs. | ) ) ) ) ) ) ) ) CIVIL ACTION NO. 05-11614-WGY ) ) ) ) ) ) ) ) |

## AFFIDAVIT OF PAUL D. POPEO, ESQ.

I, Paul D. Popeo, on oath, depose and say as follows:

1.    I am a partner in the law firm of Choate, Hall & Stewart, LLP, and I serve as co-counsel to plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock") in this action. I submit this affidavit in support of John Hancock's Motion For Reconsideration Of March 30, 2006 Court Order Precluding Certain Testimony (the "Motion for Reconsideration"). The statements contained in this affidavit are based upon my own personal knowledge.

2.    Defendants Vestmont Limited Partnership, *et al.* (collectively, "Montgomery Partners" or the "Defendants") have noticed and taken the depositions of seven present or former John Hancock employees in this action. They are:

(a) *Mr. John Ferrie* - The Regional Vice President of John Hancock's Blue Bell, Pennsylvania office and a 16-year veteran of Hancock's Real Estate Finance Group, who personally originated and helped negotiate the Loan Commitment;

(b) *Mr. Timothy Malik* - An Investment Officer (now Assistant Vice President) at John Hancock's Boston, Massachusetts office and a 19-year veteran of Hancock's Real Estate Finance Group, who was primarily responsible for underwriting the Loan contemplated in the Loan Commitment;

(c) *Mr. David Henderson* - A former Senior Investment Officer at John Hancock's Boston, Massachusetts office and an 8-year veteran of Hancock's Real Estate Finance Group, who served as Mr. Malik's immediate supervisor and, in that capacity, personally considered and approved the Loan Commitment in August 2004;

(d) *Mr. Barry Nectow* - A former Vice President at John Hancock's Boston, Massachusetts office and an 16-year veteran of Hancock's Real Estate Finance Group, who served as Mr. Henderson's immediate supervisor and, in that capacity, personally considered and approved the Loan Commitment in August 2004;

(e) *Ms. Patricia Coyne* - An Investment Officer at John Hancock's Boston, Massachusetts office and an 13-year veteran of Hancock's Real Estate Finance Group, who personally considered and approved the Loan Commitment in August 2004, and who has extensive experience and familiarity with Hancock's commercial loan policies and procedures;

(f) *Mr. Ivor Thomas* - The Senior Vice President in charge of John Hancock's commercial mortgage operations after the merger between John Hancock and Manulife Financial in April 2004 and a 32-year veteran of the commercial lending industry, who personally considered and approved the Loan Commitment in August 2004; and

(g) *Ms. Joan Uzdavinis* - An Assistant Vice President in John Hancock's Portfolio Management Group and a 26-year veteran of the investment finance and pension industries, who was designated by Hancock to testify concerning the financial topics contained in the Defendants' Rule 30(b)(6) Notice, including Hancock's resulting losses.

3.    True copies of the full minuscript versions of the transcripts of the Malik,

Ferrie, Henderson, Nectow, Coyne and Uzdavinis depositions are appended to this affidavit as

Exhibits A through E, and G for the convenience of the court.    The final transcript of

Mr. Thomas' deposition had not arrived as of the date of this affidavit. A true copy of the rough transcript of Mr. Thomas' deposition is appended to this affidavit as Exhibit F.

4.    Montgomery Partners deposed Mr. Malik on January 27, 2006, and Mr. Ferrie on February 1, 2006. On the same day that Mr. Ferrie's deposition concluded, Montgomery Partners served John Hancock with an omnibus Rule 30(b)(6) Notice of Deposition listing many of the same topics already covered at the Malik and Ferrie depositions, as well as certain additional topics. Shortly thereafter, Montgomery Partners issued a combined Notice of Deposition for Messrs. Henderson, Nectow and Thomas and Ms. Coyne.

5.    Counsel for John Hancock worked cooperatively with counsel for Montgomery Partners to arrange mutually acceptable dates for the various depositions that had been noticed on both sides. In the course of making those arrangements, I personally notified Montgomery Partners that John Hancock: (a) would designate Mr. Henderson and Ms. Coyne to address various topics in the Defendants' Rule 30(b)(6) Notice of Deposition concerning Hancock's commercial lending practices, policies and procedures to the extent that those topics had not already been covered by Messrs. Malik and Ferrie at their depositions; (b) would produce an additional witness (Ms. Uzdavinis) to testify concerning the financial topics contained in the Defendants' Rule 30(b)(6) Notice, including Hancock's resulting losses; and (c) would agree to designate relevant portions of Mr. Malik and Mr. Ferrie's depositions as corporate testimony under Rule 30(b)(6) to the extent that the Defendants wished to do so. This course of action, as proposed by John Hancock, was acknowledged by counsel for Montgomery Partners during our discussions to be acceptable to the Defendants.

6.    The depositions of Mr. Henderson, Ms. Coyne, Mr. Nectow, Ms. Uzdavinis and Mr. Thomas occurred on March 1, March 10 (morning), March 10 (afternoon), March 21,

and March 31, 2006, respectively. After the depositions of Mr. Henderson and Ms. Coyne, Montgomery Partners made the argument that those witnesses had not been adequately prepared for their depositions. Specifically, Montgomery Partners complained in a letter dated March 3, 2006, that Mr. Henderson had no "'specific recollection'" of the approval of the Defendants' Loan Commitment, and in a letter dated March 10, 2006, that Ms. Coyne "did not speak with any other John Hancock employee" or "review any documents in preparation for her deposition."

7.    John Hancock responded promptly to Montgomery Partners complaints. In a telephone conference held on Monday, March 6, 2006, my partner, Brian Davis, and I explained to Montgomery Partners' counsel (Attorney Howard Scher), *inter alia*, that: (a) the Rule 30(b)(6) witnesses that Hancock was producing were personally knowledgeable regarding the topics about which they had been designated to testify and did not require extensive further preparation; (b) that they were the most logical Rule 30(b)(6) witnesses to appear and testify on Hancock's behalf because of their experience and personal involvement; and (c) that Hancock would work with the Defendants to identify and provide additional witness testimony, or to designate prior testimony from Messrs. Malik and Ferrie, as appropriate, to speak to any subject areas that the Defendants reasonably believed had not been adequately addressed.

8.    Two days later, on March 8, 2006, I repeated the same offer to Montgomery Partners' counsel (Attorney Brian McCormick) in writing. A true copy of my e-mail message to Mr. McCormick is appended to this affidavit as Exhibit H. In it, I said:

> the final portion of topic #2 (last sentence) seeks a designee with respect to "the negotiation of the [terms and conditions of the Loan Application] between Defendants and John Hancock". You have already deposed Malik and Ferrie, the Hancock individuals who negotiated that document with the defendants. ***Please let me know***

> *if there are legitimate areas of inquiry on that subject on which*
> *you were not able to question those witnesses.  If so, I am happy*
> *to speak with you and determine whether we can make another*
> *witness available – but I think you have already spoken with the*
> *most knowledgeable people.*

Exhibit H (emphasis added).

9.    Montgomery Partners did not take advantage of John Hancock's offers to address their concerns regarding Mr. Henderson's deposition, and did not identify any specific subject areas on which they wished to obtain additional testimony.

10.    I spoke again with Montgomery Partners' counsel (Attorney Howard Scher and, as I recall, Attorney Brian McCormick) in the aftermath of their March 10, 2006 letter concerning Ms. Coyne's deposition.  In a conference call conducted on Monday, March 13, 2006, I again explained, *inter alia*, that the Rule 30(b)(6) witnesses that John Hancock was producing, including Ms. Coyne, were personally knowledgeable regarding the topics for which they had been designated, and that Hancock would work with the Defendants to identify and provide additional testimony, or to designate prior testimony from Messrs. Malik and Ferrie, as appropriate, to speak to any subject areas that the Defendants reasonably believed had not been adequately addressed.  And again, Montgomery Partners counsel failed, in response, to identify any specific subject areas as to which they allegedly lacked sufficient information or testimony.  To the contrary, Defendants' counsel expressed satisfaction with John Hancock's proposal and indicated that they likely *would not* seek court intervention concerning the issues raised in their March 10, 2006 letter.

11.    Thereafter the parties were in nearly daily communication, working to schedule depositions and coordinating the various logistical details of the litigation.  In none of those

communications did Montgomery Partners' counsel raise what it now characterizes as John Hancock's "egregious[]" failure to comply with Rule 30(b)(6).

12.    To the contrary, on March 15, 2006, in the context of one of the parties' numerous scheduling communications, counsel for Montgomery Partners (Attorney Brian McCormick) e-mailed me to inquire about the logistics of implementing Hancock's offer to satisfy the Defendants' alleged concerns by designating testimony from the prior Malik and Ferrie depositions as official testimony of John Hancock. A true copy of his e-mail message to me is appended to this affidavit as Exhibit I. In it, he said:

> I also want to discuss how your proposal regarding post-designating portions of Mr. Malik's deposition as a 30(b)(6) witness would work.

Exhibit I.

13.    I responded to Attorney McCormick's e-mail message by promptly calling him on the telephone and offering that the entire transcript, or portions thereof, could be designated as Rule 30(b)(6) testimony, if that process was acceptable to the Defendants. By all indications, it was.

14.    On March 21, 2006, Montgomery Partners conducted the deposition of John Hancock's final Rule 30(b)(6) witness, Ms. Joan Uzdavinis. I defended Ms. Uzdavinis at her deposition. At no time during Ms. Uzdavinis' deposition, or in the week thereafter, did the Defendants make any complaint concerning the extent of her knowledge on the topics for which she was designated or the manner of her "preparation" leading up to her deposition.

15.    The first time I learned that Montgomery Partners was in any way dissatisfied with Ms. Uzdavinis' deposition preparation was in midst of a telephonic conference to discuss the content of the parties' Joint Pretrial Memorandum on March 28, 2006. During that call,

counsel for Montgomery Partners announced for the first time their alleged dissatisfaction with Ms. Uzdavinis' deposition preparation and their intention to seek unspecified relief from this Court. Defendants then waited an additional day, and filed their Motion late in the evening of March 29, 2006, thereby leaving John Hancock little time to review, and no opportunity to oppose, the Motion prior to the scheduled Pretrial Conference on Thursday, March 30, 2006.

16.    The Court allowed Montgomery Partners' Motion on March 30, 2006, without the benefit of any opposition papers from John Hancock. The Court, however, did encourage the parties at the Pretrial Conference to resolve their discovery disputes among themselves, and did invite John Hancock to submit a Motion for Reconsideration seeking relief from its March 30 Order.

17.    Since the Pretrial Conference on March 30, 2006, John Hancock once again has asked Montgomery Partners to identify specific subject areas on which the Defendants believe they are missing information, or the particular subject areas on which they believe that the proffered testimony to date is inadequate or incomplete, so that Hancock can address their concerns. A true copy of a letter on that topic that I sent to opposing counsel (Attorneys Scher and McCormick) on March 30, 2006 is appended to this affidavit as Exhibit J. A true copy of an e-mail message that I received in response from Attorney Scher on April 5, 2006 is appended to this affidavit as Exhibit K. In it, Attorney Scher informed me that the Defendants do not regard it as their burden to "identify areas where we believe information was missing or where testimony was incomplete...."

Signed under the pains and penalties of perjury this 7th day of April, 2006.

/s/ Paul D. Popeo

4067276.2

-7-

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 7, 2006.

*/s/ Brian A. Davis*
Brian A. Davis

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-11614-WGY
*********************************
JOHN HANCOCK LIFE INSURANCE
COMPANY,
      Plaintiff/Counterclaim
      Defendant
    Vs.
VESTMONT LIMITED PARTNERSHIP,
VESTMONT LIMITED PARTNERSHIP II,
VESTMONT LIMITED PARTNERSHIP III,
and VESTERRA CORPORATION d/b/a
MONTGOMERY SQUARE PARTNERSHIP,
      Defendants/Counterclaim
      Plaintiffs
*********************************
           VOLUME:  I
           PAGES:  1-224

DEPOSITION OF TIMOTHY J. MALIK
JANUARY 27, 2006
REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/Facsimile 617.786.7723

## Page 2

1  DEPOSITION of TIMOTHY J. MALIK, a witness
2  called on behalf of the Defendants/
3  Counterclaim Plaintiffs, pursuant to the
4  Federal Rules of Civil Procedure, before
5  Judith McGovern Williams, Certified
6  Shorthand Reporter, Registered
7  Professional Reporter, Certified Realtime
8  Reporter, Certified LiveNote Reporter, and
9  Notary Public in and for the Commonwealth
10  of Massachusetts, at the offices of
11  Deutsch, Williams, Brooks, DeRensis &
12  Holland, P.C., 99 Summer Street, Boston,
13  Massachusetts, on Friday, January 27,
14  2006, commencing at 9:30 a.m.

16  APPEARANCES:
17  CHOATE, HALL & STEWART, L.L.P.
18    Brian A. Davis, Esquire
19    Two International Place
20    Boston, Massachusetts 02110
21    617-248-5056
22    bad@choate.com
23    on behalf of the Plaintiff/
24    Counterclaim Defendant

## Page 3

1  APPEARANCES (Continued):

3  BUCHANAN INGERSOLL, P.C.
4    Howard D. Scher, Esquire
5    1835 Market Street
6    14th Floor
7    Philadelphia, Pennsylvania  19103-2985
8    215-665-3920
9    scherhd@bipc.com
10    on behalf of the Defendants/
11    Counterclaim Plaintiffs

13  ALSO PRESENT:
14    James Koller

## Page 4

I N D E X

Witness                            Page
TIMOTHY J. MALIK
  Direct Examination by Mr. Scher     8

E X H I B I T S

Number                           Page

1  Multipage loan approval,     65
   production numbers JH 00405
   through 00425

2  One-page memorandum dated    68
   August 17, 2004, to
   Mr. Malik from Ms. Coyne,
   production number JH 01174

3  Multipage Application to    83
   John Hancock Life Insurance
   Company for a First Mortgage
   Loan, production numbers
   JH 00327 through 00396

4  Two-page e-mail string, most   86
   recent e-mail dated

Page 5

1    August 11, 2004, to
2    Mr. Ferrie from  Mr. Malik,
3    production numbers JH 00131
4    and 00132
5
6  5  One-page e-mail dated        103
7    August 11, 2004, to
8    Mr. Kelly from Mr. Ferrie
9    and attachment, production
10   numbers JH 00133 and 00134
11
12 6  One-page e-mail dated        111
13   August 11, 2004, to
14   Mr. Ferrie from Mr. Malik,
15   production number JH 00135
16
17 7  Interest Rate Circle         115
18   Notification, production
19   numbers JH 00913 through
20   00920
21
22 8  One-page e-mail dated        120
23   August 12, 2004, to
24   Mr. Henderson from

Page 6

1    Mr. Malik, production number
2    JH 01175
3
4  9  Two-page e-mail string, most  135
5    recent e-mail dated May 31,
6    2005, to Mr. Roseen from
7    Mr. Malik, production
8    numbers JH 01211 through
9    01212
10
11 10 One-page e-mail dated        143
12   June 9, 2005, to Mr. Malik
13   from Mr. Ferrie, production
14   number JH 01196
15
16 11 One-page Preliminary Loan    164
17   Information Worksheet for
18   Multifamily Properties,
19   production number JH 00102
20
21 12 Two-page e-mail string, most  169
22   recent e-mail dated June 17,
23   2004, to Mr. Malik from
24   Mr. Ferrie and attachment,

Page 7

1    production JH 00100-00105
2
3  13 One-page fax cover sheet      182
4    dated July 14, 2004, to
5    Mr. Maguire from Mr. Kelly
6    and attachments, production
7    numbers V 1161 through 1168
8
9  14 One-page Examples of Reserve  197
10   Calculations, JH 00920
11
12 15 One-page Examples of Reserve  200
13   Calculations, production
14   numbers JH 00914
15
16 16 Multipage Interest Rate       200
17   Circle Notification, numbers
18   JH 00913 through 00920
19
20 17 One-page Examples of Reserve  203
21   Calculations, number
22   JH 01119

Page 8

1         P R O C E E D I N G S
2         MR. SCHER:  This is a case in
3  Federal Court, so there are no
4  stipulations.  We will operate under the
5  rules.
6              - - -
7         TIMOTHY J. MALIK, first having
8  been duly sworn, testified as follows in
9  answer to direct examination by MR. SCHER:
10             - - -
11 Q.  Good morning, Mr. Malik.
12 A.  Good morning.
13 Q.  Would you state your full name for the
14   record, please?
15 A.  Timothy James Malik.
16 Q.  And would you give me your address?
17 A.  9 Arthur Avenue, Marblehead, Mass.  01945.
18 Q.  And where are you officed?
19 A.  I am officed at 200 Clarendon Street,
20   56th floor, Boston.
21 Q.  That is the John Hancock building?
22 A.  It is.
23 Q.  Okay.  And what is your position?
24 A.  I am a senior investment officer and

Page 9

1    assistant vice president and now a credit
2    officer.
3  Q. So you have three titles?
4  A. Well, the title is assistant vice
5    president.
6  Q. And the functions are as you just stated?
7  A. Credit officer. Correct.
8  Q. And how long have you held that position?
9    Did you hold that position in the year
10   2004?
11 A. 2004, I believe I was an investment
12   officer and not an assistant vice
13   president.
14 Q. Okay.
15 A. I could have been senior investment
16   officer. I don't recall.
17 Q. In the years 2004 and 2005 -- well, let's
18   just say in 2004, how were you
19   compensated?
20 A. Salary plus bonus.
21 Q. Any other forms of compensation?
22 A. No. Other than the 401(k), pension, that
23   kind of thing.
24 Q. No. I presume that is in your salary.

Page 10

1  A. Correct.
2  Q. And what was your bonus based on?
3  A. It is based on the overall -- at that time
4    it was the overall department, investment
5    department, performance. A big part of
6    that was what was going on in the bond
7    department that we couldn't affect and the
8    overall company performance.
9  Q. So the investment department performance
10   dictated your bonus?
11 A. No. It was mostly the big -- the overall
12   company performance and the bond
13   department performance. We are a small
14   piece of the investment sector. We put
15   out a billion dollars a year to two
16   billion dollars a year. The bond
17   department puts out 10 to 20 billion
18   dollars a year, I believe. So in relative
19   terms, our -- what we contribute to the
20   department bonus at that time was not very
21   large.
22 Q. Okay.
23       MR. DAVIS: Please pause before
24   you answer, so I can object if necessary.

Page 11

1       THE WITNESS: Okay.
2       MR. DAVIS: Thank you.
3  BY MR. SCHER:
4  Q. The overall department is called what?
5  A. The overall department is called
6    investment and pension sector, I believe,
7    at that time --
8  Q. So in 2004 --
9  A. -- although I don't recall.
10 Q. In 2004, your bonus was dependent upon the
11   performance of what?
12 A. The company largely.
13 Q. Yes.
14 A. And the larger investment area. Right.
15 Q. The larger investment area?
16 A. Correct.
17 Q. Okay. And the larger investment area is
18   what you have been describing as the bond
19   area?
20 A. Yes.
21 Q. And your area?
22 A. Correct.
23 Q. And what is your area called?
24 A. Real estate investment group. Real estate

Page 12

1    investment group, REIG. Since then it has
2    changed to real estate finance group,
3    because we don't handle any equities
4    anymore, just mortgages.
5  Q. And beyond salary and bonus, what in 2004
6    was the process by which your performance
7    was evaluated?
8  A. I was given a performance evaluation by my
9    supervisor, and after that point, I don't
10   know. It depends on how they allocate the
11   bonus pool to the various departments and
12   subdepartments and individuals. I believe
13   my target bonus was 40 percent of salary.
14   It can go up or down, to zero, to plus
15   50 percent.
16 Q. Who was your supervisor at the time?
17 A. David Henderson.
18 Q. What was his title?
19 A. Senior investment officer as well.
20 Q. At that time you weren't a senior?
21 A. I think I was a senior investment officer.
22 Q. You do?
23 A. Right.
24 Q. How would you be able to find out what

## Page 13

1  your position was in 2004 at the time the
2  transactions that are the subject of this
3  litigation occurred?
4  A. I can ask.  I can go back and look at my
5  records or ask --
6  Q. Okay.
7  A. -- but.
8  Q. In any event, Mr. Dave Henderson was at
9  that time your supervisor?
10  A. Correct.
11  Q. Is he still your supervisor?
12  A. No.  He has since left the company.
13  Q. Who is your supervisor -- when did he
14  leave?
15  A. A good question.
16  Q. Thank you.  I hope you don't evaluate all
17  of my questions, but.
18  A. Of course I do.
19     (Laughter.)
20  A. I believe Dave left early summer of 2005
21  or late spring.
22  Q. In any event, it was prior to the time
23  that the letters of credit that are the
24  subject of this dispute were called?  Am I

## Page 14

1  right?
2  A. I don't recall when they were called.
3  Q. August.
4  A. Of this year?
5  Q. Of 2005.
6  A. Yes.
7  Q. Not of 2006.  We haven't hit that yet.
8  A. Yes.
9  Q. Okay.
10  A. Yes.
11  Q. So Mr. Henderson left before the letters
12  of credit were called?
13  A. Correct.
14     MR. DAVIS:  Can we take a break
15  for a minute?
16     MR. SCHER:  Sure.
17     MR. DAVIS:  I just want to talk
18  to my client.
19     MR. SCHER:  Sure.
20     (Mr. Davis and the witness
21  exiting the deposition room at 9:52 a.m.
22  and reentering the deposition room at
23  9:53 a.m.)
24  BY MR. SCHER:

## Page 15

1  Q. You took a brief recess to confer with
2  your counsel.  Am I right?
3  A. Correct.
4  Q. Did you discuss the substance of this
5  case?
6     MR. DAVIS:  Objection.  You want
7  to know what the substance of the
8  discussion was?
9     MR. SCHER:  Did you discuss the
10  substance of this case in that
11  conversation: yes or no?
12     MR. DAVIS:  The substance of
13  this case?  Objection.
14     And I instruct you not to
15  answer.
16     MR. SCHER:  Okay.
17  BY MR. SCHER:
18  Q. When you described to me the evaluation
19  process with Mr. Henderson, who else
20  participated in that evaluation process in
21  2004?
22  A. No one else.
23  Q. And who evaluates you now?
24  A. My immediate supervisor.

## Page 16

1  Q. And who is that?
2  A. Timothy Roseen, R-O-S-E-E-N.
3  Q. What was Mr. Roseen's position prior to
4  the time of Mr. Henderson's departure?
5  A. Senior credit officer.
6  Q. Was he superior to Mr. Henderson then?
7  A. I don't know.
8  Q. Have you ever seen an organization chart
9  of your department?
10  A. Yes.
11  Q. One exists?
12     MR. DAVIS:  Objection.
13  A. I haven't seen --
14     THE WITNESS:  Okay?
15     MR. DAVIS:  You can respond.
16     THE WITNESS:  Okay.
17  A. I haven't seen one recently.  I'm not
18  sure.
19  Q. Do you have anyone report to you?
20  A. No.
21  Q. Did anyone report to you in 2004?
22  A. No.
23  Q. Do you have dotted-line reporting from or
24  to you?

Page 17

1           MR. DAVIS:  Objection.
2           You can respond.
3  A.  Since I don't have a chart, I don't know
4      what that means.
5  Q.  Okay.
6  A.  Oh, oh, I think I know --
7  Q.  Okay.
8  A.  -- what you mean.
9  Q.  Okay.
10 A.  Yes.  I have an assistant, though, that I
11     share with other people.
12 Q.  All right.  Do you have any function with
13     -- with whom do you function?  That is --
14     well, let me ask you this specific
15     question.
16          You have working relationships
17     with other departments within John
18     Hancock?
19          MR. DAVIS:  Objection.
20          You can respond.
21 A.  Yes.
22 Q.  And what other departments?
23 A.  Legal department.
24 Q.  Any other departments?

Page 18

1           MR. DAVIS:  The same objection.
2  A.  Not that I can think of.
3  Q.  What about Mr. Ferrie?  Do you have any --
4      what department is he in?
5  A.  He is now -- now -- part of our investment
6      group.
7  Q.  In 2004, where was he?
8  A.  We had a subsidiary called John Hancock
9      Real Estate Finance Incorporated.
10 Q.  And what relationship did you have with
11     that subsidiary?
12          MR. DAVIS:  Objection.
13          Unless I instruct you otherwise,
14     you can respond after I object.  I am just
15     earning my pay.
16 A.  They originate loans.
17 Q.  What did you have to do with that?
18 A.  I worked on helping John understand what
19     loan parameters would work.
20 Q.  Do you have any relationship with John
21     now?
22 A.  Yes.
23 Q.  The same?
24 A.  Yes.

Page 19

1  Q.  Now you said your target bonus was
2      40 percent of your salary in 2004.  Am I
3      right?
4  A.  Yes.
5  Q.  What does that mean?  What is target
6      bonus?
7  A.  That means if we hit our goals, I should
8      get about that amount.
9  Q.  And what goals did you have in 2004?
10 A.  To originate as much as we could at a
11     spread above what we think is reasonable.
12 Q.  Was there any more specificity than that
13     to your goals?
14 A.  The department goals or my goals?
15 Q.  The goals that would lead to the target
16     bonus of 40 percent.
17 A.  Could you rephrase the question?
18 Q.  You said that your target bonus was
19     40 percent of your salary; right?  And I
20     asked you what was the -- what was the --
21     what did that goal consist of?
22 A.  Oh.  The goal consisted of company-wide
23     parameters.
24 Q.  And the company-wide parameters were make

Page 20

1      as much money as you can?  Is that it?
2           MR. DAVIS:  Objection.
3  A.  The company-wide parameters is to invest
4      -- is to -- yes, to make as much money as
5      you can for the company itself and the
6      department to invest as much money as we
7      can.
8  Q.  Okay.  And that is what the goal was;
9      right?
10          MR. DAVIS:  Objection.
11 A.  In general.
12 Q.  So I am asking you in specific.  What was
13     the goal that would result in your
14     achieving a 40 percent target?
15          MR. DAVIS:  Objection.
16 A.  I -- you know, when they explained where
17     we were in relationship to our goals and
18     groups, even then I didn't understand it,
19     so it's overall company performance and
20     department performance.
21 Q.  Well, how do you know if your performance
22     achieved the goal or not, if you wanted
23     to?
24 A.  You couldn't -- independent of what was

## Page 21

1    given to us in a group, you couldn't.
2 Q.  And what was given to you in a group?
3 A.  If we were close to achieving our goals or
4    not close to achieving our goals, as a
5    company and as an overall department.
6 Q.  And what were your goals as a company and
7    as an overall department?
8 A.  It was to, probably to make as much money
9    as possible for the investors, and for the
10   investment area, to place as much money at
11   a reasonable return as possible.
12 Q.  Was there any greater definition to the
13   goals than what you just articulated now?
14 A.  There are -- there is, but I don't recall
15   it.
16 Q.  Where -- is that -- are those goals in
17   writing anywhere?
18 A.  I'm not sure if they still are. We have a
19   different system now. But I would have to
20   -- I don't know. Probably. Probably
21   somewhere.
22 Q.  Were they in writing when they were
23   articulated to you?
24 A.  Were they in writing when they were

## Page 22

1    articulated to me? I believe they were,
2    but I don't keep copies of it.
3 Q.  So you had a copy?
4 A.  So I don't understand it. I didn't --
5 Q.  I understand. You had a guide -- you had
6    a document that set forth the goals of the
7    company, set forth the goals of the
8    overall department, and it contained
9    specific goals, percentages, numbers? Am
10   I right about that?
11 A.  Yes. Probably.
12          MR. DAVIS: He is not asking you
13   to speculate. If you know, you can
14   respond.
15          THE WITNESS: Yes.
16 Q.  Well, "probably" is good enough. I don't
17   want you to speculate.
18          MR. DAVIS: I don't want him to
19   either.
20          MR. SCHER: Good.
21          MR. DAVIS: So please don't
22   speculate.
23          MR. SCHER: Fine.
24   BY MR. SCHER:

## Page 23

1 Q.  And what would make your target bonus go
2    up from 40 percent?
3 A.  If the company --
4          MR. DAVIS: Objection. Do you
5    mean go above the 40 percent?
6          MR. SCHER: Yes. Up from the
7    40 percent. That's what I mean.
8 A.  If the company and the department exceeded
9    the goals on a weighted average basis,
10   let's say, and my performance was strong.
11 Q.  Okay. And what would cause your target
12   bonus of 40 percent to go below that?
13 A.  If they -- if -- if the company and the
14   department did not hit its goals and my
15   performance was weak.
16 Q.  Describe what "strong performance" would
17   be for you.
18 A.  Originate as many loans as possible in
19   terms of dollars with high quality and
20   good spreads.
21 Q.  And was that performance goal set forth in
22   writing anywhere?
23 A.  I don't recall.
24 Q.  Was the evaluation of -- when you say "as

## Page 24

1    many loans," you mean as much in terms of
2    dollars, not in terms of number of loans;
3    right?
4 A.  Correct.
5 Q.  And in terms of high quality, is there any
6    articulation of what that means?
7 A.  Well --
8 Q.  Can you describe to me what you mean by,
9    what was meant by that?
10 A.  That the loans are as safe and
11   conservative as possible, and the relative
12   spreads are high relative to that risk.
13 Q.  And what do you mean by "spreads"?
14 A.  A spread is the difference between the
15   interest rate and the treasury at the time
16   we do lock the rates, taking out any
17   forward costs.
18 Q.  So the interest rate in the loan less the
19   treasury rate is the spread, taking out
20   the costs, the forward costs?
21 A.  Correct.
22 Q.  Not every loan has forward costs? Only
23   loans that are forward loans; right?
24          MR. DAVIS: Objection.

## Page 25

1  A.  A typical loan has a 60-day close.

2  Q.  Okay.

3  A.  So there is always embedded a small

4      forward 60 day. We don't count that.

5      That is included in the spread.

6  Q.  All right. So then I was right?

7  A.  Yes. If it is an extraordinary forward,

8      right, beyond that.

9  Q.  The situation in this case was an

10     extraordinary forward? Am I right?

11 A.  Yes.

12 Q.  Are there any other performance standards

13     for your personal performance than those

14     which you have already articulated?

15 A.  Helping my associates; helping with any

16     special projects within the department;

17     those kind of things.

18 Q.  For the year 2004, did you receive your

19     target bonus?

20 A.  I believe I did.

21 Q.  Did you receive greater than your target

22     bonus?

23 A.  2005? I believe I did.

24 Q.  And can you tell me what the reason as you

## Page 26

1      understand it for that achievement?

2  A.  I believe the company exceeded its goals,

3      and the department exceeded its goals.

4  Q.  Was your performance strong?

5  A.  Yes.

6  Q.  And can you tell me whether the making of

7      the $32 million loan to Avenel was part of

8      your performance?

9  A.  Let me think about that a second.

10         (Pause.)

11 A.  Yes. I believe it was.

12 Q.  And was --

13 A.  Hold on a second. Let me think.

14         (Pause.)

15 A.  No, it wasn't actually. No, it wasn't

16     actually.

17 Q.  And why was it not?

18 A.  Because it wasn't counted after we

19     received, I believe, indication that they

20     wouldn't continue with the commitment.

21 Q.  So let's --

22 A.  Let me think about that a second. Hold on

23     a second.

24 Q.  Maybe I can help you.

## Page 27

1  A.  The loan was signed in August. I think it

2      was counted, now that I think about it.

3  Q.  All right.

4  A.  Yes, it was.

5  Q.  So your performance in 2004 is evaluated

6      at what time of the year?

7  A.  The first quarter.

8  Q.  Of the subsequent year?

9  A.  Yes.

10 Q.  So sometime before March 31, 2005, there

11     was a performance evaluation of Timothy

12     Malik's performance? Am I right?

13 A.  I believe the performance evaluation was

14     done at the end of 2004.

15 Q.  Okay.

16 A.  And in 2005, the numbers come in for

17     accounting to determine if the company

18     actually hit its targets.

19 Q.  Okay. But in your performance, your

20     personal performance, that is done at the

21     end of 2004 for 2004?

22 A.  Correct.

23 Q.  And within that performance was included

24     the $32 million Avenel loan?

## Page 28

1  A.  I think. I'm not sure. I don't recall

2      when exactly we received indication they

3      weren't going to close the loan.

4  Q.  The first indication would be in the

5      spring of 2005. I represent that to you.

6  A.  Okay. Then it would have been, yes, it

7      would have been counted.

8  Q.  Certainly not in 2004.

9  A.  All right.

10 Q.  So would it have been counted?

11 A.  Yes.

12 Q.  So I'm just trying to understand. It is

13     good for your personal performance

14     evaluation to have made the $32 million

15     loan to Avenel?

16 A.  Yes.

17 Q.  Am I right?

18 A.  Yes.

19 Q.  Okay. In 2005, did your performance

20     evaluation include anything to do with the

21     Avenel loan and its not being closed?

22 A.  Not to my knowledge.

23 Q.  Did the collection, or commitment fees have any

24     application, or commitment fees have any

## Page 29

```
1      effect on the performance of -- on your
2      performance?
3              MR. DAVIS:  Objection.
4   A.  Not to my knowledge.  A de minimus amount
5      of money.
6   Q.  The $965,000 is a de minimus amount of
7      money in your --
8   A.  It hasn't been --
9              MR. DAVIS:  Let him finish his
10     question before you begin to respond.
11  Q.  -- in your world?
12             MR. DAVIS:  Objection.
13             You may respond.
14  A.  The only thing that would have been taken
15     into the company's books would be the
16     nonrefundable processing fee.  The other
17     money hasn't been taken in, I believe,
18     yet.
19  Q.  Okay.
20  A.  It sits there.
21  Q.  The nonrefundable processing fee?
22  A.  Is $5,000.
23  Q.  Is the $5,000?
24  A.  Yes.
```

## Page 30

```
1   Q.  And the balance --
2   A.  2004.  MR. DAVIS:  Let him finish his
3      question before you answer.
4              MR. SCHER:  I apologize.  I
5      stepped on your answer.  I apologize.
6   Q.  So the $960,000 processing and application
7      fee -- processing and commitment fees have
8      not yet been taken into the revenues of
9      the company?  Am I right?
10  A.  It is the application and commitment fee.
11  Q.  I am sorry.  Processing is the $5,000 one?
12  A.  Yes.
13  Q.  Thank you.  And the answer to my question
14     is yes, the application and commitment
15     fees have not yet been taken into the
16     revenues of the company?
17  A.  I believe that's the case.
18  Q.  Well, what does that mean that the
19     application and commitment fees have not
20     been taken into the revenues of the
21     company?  Where are they recorded?
22  A.  I don't know.
23  Q.  When those applications -- when the
```

## Page 31

```
1      application and commitment fees are taken
2      into the revenues of the company, will
3      that reflect on your performance?
4   A.  I really don't know.
5   Q.  Will that reflect on the performance of
6      your department?
7   A.  Possibly, but again I don't know.
8   Q.  And why don't you know?
9              MR. DAVIS:  Objection.
10  A.  Because I am focused on production and not
11     counting.
12  Q.  So the application and commitment fees
13     would be counting in your mind, and that's
14     not what you are --
15  A.  How it is recorded --
16             MR. DAVIS:  Please let him
17     finish his question --
18             MR. SCHER:  Right.
19             MR. DAVIS:  -- before you begin
20     to respond.
21  BY MR. SCHER:
22  Q.  So by counting, you mean how it is
23     recorded?
24  A.  (The witness nodding his head.)
```

## Page 32

```
1   Q.  That is not of your concern?
2   A.  (The witness nodding his head.)
3   Q.  Is that what you are saying?
4              MR. DAVIS:  Objection.
5              You may respond.
6   A.  Yes.
7   Q.  Now you said that the 960 or 965 thousand
8      dollars is de minimus.  What did you mean
9      by that?
10             MR. DAVIS:  Objection.  I think
11     he referred to the 5,000 as de minimus.
12             MR. SCHER:  Yes.
13             MR. DAVIS:  But you may respond.
14             THE WITNESS:  Yes.
15  BY MR. SCHER:
16  Q.  Is that what you were saying?
17  A.  Yes.
18  Q.  That the 5,000 is de minimus?
19  A.  Correct.
20  Q.  The 960 is not de minimus?  Am I right?
21             MR. DAVIS:  Objection.
22             You can respond.
23  A.  It seems like a lot of money to me.
24  Q.  But, of course, you and I are not talking
```

Page 33

1    about our personal money. We are talking
2    about your performance within the company.
3           Is a $960,000 fee a significant
4    fee to the company?
5           MR. DAVIS:  Objection.
6  A.  It depends on who you ask. I don't know.
7  Q.  I am asking you.
8  A.  To the company?
9           MR. DAVIS:  Objection.
10 Q.  I am asking is it significant to your
11   performance.
12          MR. DAVIS:  Objection.
13 A.  Oh, that clarifies it.
14 Q.  Is the receipt of a $960,000 fee of
15   significance to your performance?
16 A.  No.
17 Q.  Is it insignificant to your performance?
18          MR. DAVIS:  Objection.
19 A.  I don't know how it is accounted, how it
20   is counted towards my performance.
21 Q.  Okay. Is it fair to say that it was in
22   your personal interest, that is your
23   interest as an employee of John Hancock,
24   to make the $32 million loan to Avenel

Page 34

1    because it would reflect favorably on your
2    performance?
3  A.  Anything that I do that creates return for
4    the investors is important.
5  Q.  Okay. So could you answer my specific
6    question? Is that in "anything"? That is
7    does the making of the $32 million loan,
8    the process of approving the $32 million
9    loan to Avenel, reflect favorably on your
10   performance?
11          MR. DAVIS:  Objection.
12 A.  I hope so. Yes.
13 Q.  And in fact it did in the year 2004?
14 A.  Any loan that becomes approved reflects
15   positively on my performance.
16 Q.  That is what you are supposed to do? Am I
17   right?
18 A.  You are right.
19 Q.  That's your job?
20 A.  Yes.
21 Q.  Okay. Can you quantify or approximate the
22   number of loans that you had approved
23   during the year 2004?
24 A.  Oh, the number of loans?

Page 35

1  Q.  The quantity.
2  A.  The quantity of loans?
3           MR. DAVIS:  When you say "you,"
4    do you mean him personally, Mr. Malik,
5    that he had a hand in, or --
6           MR. SCHER:  Yes. That you had a
7    hand in.
8           THE WITNESS:  Okay.
9           MR. SCHER:  Thank you.
10          THE WITNESS:  I would say
11   200 million to 350 million.
12 BY MR. SCHER:
13 Q.  And how would you characterize your role
14   in securing the approval of the Avenel
15   loan?
16 A.  It was approved.
17 Q.  How would you describe your role? Were
18   you the principal mover in your
19   department? Were you the only one, you
20   know, someone? How would you characterize
21   your role?
22 A.  My role -- to get it approved, you mean?
23 Q.  Yes.
24 A.  I presented the loan to the real estate

Page 36

1    investment committee.
2  Q.  Okay. How many other -- what is the
3    quantity of loans for which you were the
4    presenter in 2004?
5  A.  Ten to fifteen loans.
6  Q.  The quantity, the amount of money in
7    loans.
8  A.  2004?
9  Q.  Yes.
10 A.  Didn't I just say?
11 Q.  I am sorry. I didn't realize that you
12   were the presenter on all 200 million to
13   350 million.
14 A.  Yes.
15 Q.  I am sorry. I apologize. I didn't
16   understand that.
17          Were any of those other loans
18   other than the Avenel loan a forward
19   commitment, beyond the 60-day normal?
20 A.  I believe there were others that were
21   forward, yes.
22 Q.  Can you quantify in dollar amount?
23 A.  No.
24 Q.  Did any of those other forward commitments

## Page 37

1    actually result in the lending of money by
2    John Hancock?
3    A.  They all related.
4    Q.  Every one but Avenel? Am I right?
5    A.  In 2004? You are talking about 2004?
6    Q.  Yes.
7    A.  I believe one other did not.
8    Q.  Which one is that?
9    A.  And I think -- the Regatta, that was 2004,
10    wasn't it? Regatta Apartments.
11    Q.  Regatta did not?
12    A.  I believe it did not, now that I think
13    about it.
14    Q.  And is it fair to say that the Regatta
15    loan was a loan for which you were the
16    presenter?
17    A.  Correct.
18    Q.  And it is a loan which is a forward
19    commitment?
20    A.  Correct.
21    Q.  And it is a loan which did not close?
22    A.  Correct.
23    Q.  Have you sued Regatta or the developers of
24    Regatta?

## Page 38

1    A.  No.
2    Q.  Have you sought to recover -- make whole
3    damages from the owners of Regatta?
4    A.  I believe we only kept the deposits.
5    Q.  The deposits are the application and
6    commitment fees?
7    A.  Correct.
8    Q.  And the processing fee?
9    A.  Correct.
10    Q.  And why is that?
11         MR. DAVIS:  Objection.
12         Go ahead.  I just caution in
13    responding to not disclose any attorney
14    communications, please.
15         THE WITNESS:  Okay.
16    A.  The reasons?
17    Q.  Yes.
18    A.  I can only speculate.
19    Q.  You don't know why the company did not
20    seek to recover more than the application
21    and commitment and processing fees from
22    the Regatta developers? Am I right?
23    A.  The reasoning? The reasoning of the
24    decision makers? No.  I'm not sure.

## Page 39

1    Q.  I just wanted to know why.  Do you know
2    why?
3    A.  Do I know why?
4    Q.  Correct.
5    A.  They chose not to?
6    Q.  Correct.
7    A.  Not entirely.  No.
8    Q.  Do you know anything as to why?
9    A.  Different philosophy at the time, I guess.
10    Q.  And what time was that? Well, how is the
11    time different? I mean not in day, but
12    what was different about the time?
13    A.  Different decision makers.
14    Q.  Who were the decision makers then at the
15    time of the Regatta decision?
16    A.  The decision makers were the original John
17    Hancock officers.
18    Q.  Do they have names? I don't mean to be
19    facetious, but.
20    A.  No.  Go ahead.
21    Q.  Don't invite me to be facetious.
22         (Laughter.)
23    Q.  I am only kidding.
24    A.  The head of the department was Sam Davis,

## Page 40

1    and Barry Nectow.
2    Q.  Do you have a spelling?
3    A.  N-E-C-T-O-W.
4    Q.  Okay.  And who were they at the time the
5    decision was made to sue --
6    A.  Sam was a senior --
7         MR. DAVIS:  Oh, objection.
8    Would you please finish your question? He
9    didn't -- I don't think he finished his
10    question.
11    Q.  -- the defendants in this case.
12         MR. SCHER:  Thanks.  Brian is
13    protecting me now.
14         MR. DAVIS:  I am just trying to
15    keep a clear record.  Go ahead.
16         MR. SCHER:  Thanks.  I
17    apologize.
18    BY MR. SCHER:
19    Q.  Go ahead.
20    A.  Sam's title, I believe, was senior vice
21    president, and Barry's was vice president.
22    Q.  Obviously you missed my question.  Who
23    made the decision to sue the defendants in
24    this case?

## Page 41

1   A.   I don't know.

2   Q.   Who were the decision makers that differed

3        from Mr. Davis and Mr. Nectow?

4   A.   Well, I communicate with Dave Henderson,

5        and who he chooses to communicate to make

6        a decision is up to him.  I'm assuming he

7        communicated with Sam or Barry.

8   Q.   But you said that Mr. Henderson had left

9        the company --

10  A.   Yes.

11  Q.   -- by the spring of 2005?

12  A.   Correct.

13  Q.   Was the decision to sue Avenel made -- the

14       defendants in this case -- made before

15       Mr. Henderson left?

16  A.   I believe it was.

17  Q.   And what is the basis for that belief?

18  A.   I believe he left before we received their

19       letter and after I had met with Jim.

20  Q.   I see.  And could you -- so you reported

21       to Mr. Henderson, Dave Henderson, your

22       lunch -- the results of your lunch, the

23       subject of your lunch with Mr. Koller and

24       Mr. Kelly?

## Page 42

1   A.   Yes.

2   Q.   Do I have that right?

3   A.   Yes.

4   Q.   Okay.  And you also conveyed to him the

5        letter Mr. Koller had written on the

6        subject of the fact they were not going to

7        close the loan; right?

8   A.   I'm not sure if I gave him the letter.

9   Q.   All right.

10  A.   I may have.

11  Q.   In any event, as a result of that, you

12       learned that the company had made a

13       decision to sue?  Am I right?

14            MR. DAVIS:  Objection.

15  A.   They made a decision to enforce their

16       rights.

17  Q.   Through a lawsuit?

18  A.   I don't know if a lawsuit was decided at

19       this time.

20  Q.   Okay.

21  A.   Maybe later.

22  Q.   And do you know anything about the process

23       by which Mr. Henderson -- do you know

24       anything about the process by which the

## Page 43

1        decision to enforce their rights was made?

2   A.   No.  I wasn't there for that conversation.

3   Q.   Do you know anything about the process by

4        which the decision not to sue Regatta was

5        made?

6   A.   No, I don't.  I wasn't there for that

7        conversation either.

8   Q.   You mentioned --

9   A.   Mr. --

10  Q.   I am sorry?

11  A.   Maybe some clarification.

12  Q.   Yes.

13  A.   Mr. Henderson and the controller of the

14       department had changed regarding this most

15       recent decision to maintain our rights.

16  Q.   So --

17  A.   Different decision makers in either case.

18  Q.   So the -- who was Mr. Henderson's

19       comparable when the decision with regard

20       to Avenel was made?

21  A.   Mr. Henderson -- Dave was there for both

22       instances.

23  Q.   Okay.

24  A.   Who reported to changed.

## Page 44

1   Q.   And to whom did he report to then at the

2        time of Regatta and now at the time of

3        Avenel?

4   A.   I believe Sam Davis or Barry Nectow.

5   Q.   Okay.  And to whom did Mr. Henderson

6        report after -- with respect to the Avenel

7        decision?

8   A.   It would -- he would have discussed this

9        with either Barry Nectow or I believe

10       possibly Ivor Thomas.

11  Q.   Ivor Thomas, I-V-O-R?

12  A.   Yes.

13  Q.   T-H-O-M-A-S?

14  A.   Yes.

15  Q.   And who is Mr. Thomas?

16  A.   He is a -- his title is senior vice

17       president, North American Mortgage

18       Operations --

19  Q.   Did he succeed --

20  A.   -- for Manulife.

21  Q.   Did he succeed Mr. Davis?

22  A.   In the transition when he -- yes.  He

23       succeeded Mr. Davis.  Correct.

24  Q.   In terms of the role that Mr. Davis was

11  (Pages 41 to 44)

Page 45

1    playing at this time --
2  A.  Correct.
3  Q.  -- with respect to the Regatta loan?
4  A.  Yes.
5  Q.  Now during this period of time, that is
6       2004 to 2005, is it accurate to say that
7       there were changes occurring throughout
8       the John Hancock Company?
9  A.  Yes.
10 Q.  And could you just describe to me in
11      general what, you know, what caused that,
12      which is the obvious?
13 A.  Manulife acquired John Hancock in
14      April 28, 2004.
15 Q.  And over the period of time after that
16      acquisition, certain personnel changes
17      occurred?
18 A.  Correct.
19 Q.  One of which was Mr. Davis' change of his
20      position and Mr. Thomas' assumption of his
21      position; is that right?
22 A.  Yes.
23 Q.  As far as you know with respect to the
24      Regatta and Avenel decisions, were there

Page 46

1       any other personnel changes that caused
2       those decisions to be made as they were
3       made?
4            MR. DAVIS:  Objection.
5  A.  Possibly, but I'm not entirely sure.
6  Q.  The one that you do know of is Davis is
7       not there; Thomas is there; right?
8  A.  I believe that's the case.
9  Q.  Okay.  So as far as you know, the Regatta
10      loan documents, the loan application, the
11      approval process and so forth were
12      essentially the same as those for the
13      Avenel?  Am I right about that?
14           MR. DAVIS:  Objection.  The
15      documents will speak for themselves.
16           You can respond.
17 Q.  So far as you know.
18           MR. DAVIS:  Objection.
19 A.  Sort of.
20 Q.  What -- do you know of any significant
21      differences?
22 A.  I haven't compared them.
23 Q.  Okay.  So you don't know of any
24      significant differences?  Am I right about

Page 47

1       that?
2            MR. DAVIS:  Objection.
3  A.  I'm not entirely --
4            MR. DAVIS:  The entire period
5       of --
6  A.  I'm not entirely sure.
7  Q.  So it has never come to your attention
8       that, oh, there is a big difference or
9       there is a difference between the Regatta
10      loans and the Avenel loans which connects
11      somehow to the decision by John Hancock to
12      sue these defendants?
13 A.  Give it to me again.
14 Q.  Easy.  You said you haven't reviewed the
15      two documents to compare them word for
16      word to see if there are any differences?
17 A.  Yes.
18 Q.  I can do that, you can do that, Mr. Davis
19      can do that better than both of us.  I am
20      asking if it has come to your
21      consciousness, to your attention, that
22      there is a difference in the documents
23      which resulted in the two different
24      decisions:  one, not to sue Regatta, and,

Page 48

1       two, to sue these defendants?
2  A.  It has not come to my attention.
3  Q.  So as far as you know -- as far as you
4       know -- and there may be differences in
5       the documents, there may be a whole lot of
6       things, but as far as you know, the big
7       difference was the change from Mr. Davis
8       to Mr. Thomas?
9            MR. DAVIS:  Objection.
10 A.  I'm not sure.
11 Q.  Do you know of any other, any other
12      change?
13 A.  I haven't studied it that closely to be
14      able to highlight anything.
15 Q.  Without studying it closely to highlight
16      anything, just tell me.  Do you know of
17      anything that has changed other than
18      Mr. Davis has been supplanted by Ivor
19      Thomas?
20           MR. DAVIS:  Objection.  Asked
21      and answered.
22           You can respond again.
23           THE WITNESS:  Okay.
24 A.  No.

12 (Pages 45 to 48)

Page 49

1  Q.  Okay. Did the acquisition by Manulife --
2      I do have that right? Manulife?
3  A.  Manulife, right.
4  Q.  -- have any change on your compensation,
5      evaluation, standards?
6  A.  Yes.
7  Q.  And what? How did that happen?
8  A.  The --
9  Q.  What effect?
10 A.  I was eventually promoted.
11 Q.  And do you understand why it was you were
12     promoted?
13 A.  I'm a nice guy.
14 Q.  That has been established beyond Cavil in
15     this deposition. It is now 10:33, and I
16     am prepared to go on the record on that.
17     You are a nice guy.
18         (Laughter.)
19 Q.  Is there any other reason? Because
20     otherwise I would be chairman of the board
21     by now.
22 A.  Hard working, I guess. Maybe it is
23     because a lot of the senior guys left, and
24     I'm an older fellow with more experience.

Page 50

1      It is hard to say.
2  Q.  Were there -- was there a number of
3      personnel changes after the acquisition?
4  A.  Yes.
5  Q.  And what precipitated them in general?
6      Was there an offer to have senior people
7      leave?
8  A.  I don't know if there was something
9      especially offered to the senior people.
10     I suspect there may have been.
11 Q.  Okay.
12         MR. DAVIS: I caution you not to
13     speculate.
14         THE WITNESS: Okay.
15 A.  I don't know specifically. Other people
16     left for other reasons, personal reasons.
17 Q.  Why did Mr. Henderson leave?
18 A.  I believe he was downsized.
19 Q.  And could you just explain, as if I didn't
20     understand what that means? What does
21     that mean?
22 A.  They felt his position was unnecessary.
23 Q.  So he was asked to leave?
24 A.  Yes.

Page 51

1  Q.  Was his having been asked to leave, was it
2      either you or he who would leave, or was
3      it -- how did that work?
4  A.  No. It wasn't. It wasn't either/or.
5  Q.  It was him?
6  A.  He was -- yes.
7  Q.  And was it his performance that indicated
8      the necessity of his being asked to leave
9      or --
10 A.  I can --
11         MR. DAVIS: Objection.
12         THE WITNESS: I can only
13     speculate.
14         MR. DAVIS: Then don't.
15         MR. SCHER: I don't want you to
16     speculate.
17 BY MR. SCHER:
18 Q.  How did you learn his position was
19     downsized as opposed to his --
20 A.  He told me.
21 Q.  And what did he tell you?
22 A.  I don't recall. He --
23 Q.  The gist of it was that he was downsized?
24 A.  Correct.

Page 52

1  Q.  Can you recall anything else of the gist
2      of that conversation you had with
3      Mr. Henderson or those conversations you
4      had with Mr. Henderson?
5  A.  I understand he was unhappy.
6  Q.  Unhappy because of what?
7  A.  Because he was downsized.
8  Q.  Was he unhappy with his compensation?
9  A.  No. He -- that didn't come up as an
10     issue.
11 Q.  What else do you recall in the
12     conversations with Mr. Henderson regarding
13     his being downsized?
14 A.  He thought it may have been a blessing in
15     disguise.
16 Q.  New opportunities?
17 A.  Correct.
18 Q.  What else?
19 A.  And that he was buying a boat.
20 Q.  What did he name the boat? Avenel?
21 A.  Avenel 2.
22 Q.  Exactly.
23 A.  I'm kidding.
24 Q.  Okay. I understand that.

13 (Pages 49 to 52)

Page 53

1              (Laughter.)
2    Q.   Anything else?
3    A.   No.  Not that I can recall.
4    Q.   Did Mr. Ivor Thomas have anything to do
5         with the decision to downsize
6         Mr. Henderson?
7    A.   I don't know.
8    Q.   Do you know who did have a role in the
9         decision to downsize Mr. Henderson?
10   A.   I could only speculate.
11   Q.   Don't speculate.
12              MR. SCHER:  We have been going
13         about an hour.  Do you want to take a
14         break?
15              MR. DAVIS:  Sure.  If you want
16         to.  That's fine.
17              MR. SCHER:  Okay.
18              MR. DAVIS:  Take a break for
19         five minutes?
20              MR. SCHER:  Five minutes.
21              (Recess taken at 10:37 a.m.)
22              (Recess ended at 10:47 a.m.)
23   BY MR. SCHER:
24   Q.   Mr. Malik, what was your total

Page 54

1         compensation for 2004?
2    A.   I don't recall.  2004?
3    Q.   What was your compensation without bonus?
4    A.   $103,000.
5    Q.   And what was your percentage bonus?
6    A.   The bonus I received in 2004 would have
7         been work I did for 2003, and before -- I
8         can only guess.
9              MR. DAVIS:  Don't speculate.
10             THE WITNESS:  Okay.
11   Q.   So your salary for 2004 was 103.  What was
12        your bonus for your performance in 2004?
13   A.   Which I receive in 2005; right?
14   Q.   Right.
15   A.   Roughly 60,000.
16   Q.   And what was your salary in 2005?
17   A.   Well, I received a promotion --
18   Q.   Right.
19   A.   -- so the salary went up.  All in,
20        including the bonus that I received for
21        the previous year, 175.
22   Q.   So if you subtract the $60,000 bonus --
23   A.   Right.
24   Q.   -- then your salary was about 115?

Page 55

1    A.   Yes.
2    Q.   And has your bonus for 2005's performance
3         yet been set?
4    A.   No.
5    Q.   What is your educational background?  You
6         graduated from college?
7    A.   Yes.
8    Q.   Do you have a degree in a particular area?
9    A.   I have three degrees.  An A.B. from Case
10        Western Reserve University, Cleveland, in
11        psychology and sociology; I have an M.A.
12        in education and counseling from Arizona
13        State; and I have an M.B.A. in finance
14        from U.C. Berkley.
15   Q.   Could you review your employment history,
16        full-time employment history?
17   A.   Since I went to Berkley maybe.
18   Q.   Okay.
19   A.   A different career prior to that.
20   Q.   Okay.  When did you get your M.B.A.?
21   A.   I graduated in '84.
22   Q.   Okay.  So your full-time employment after.
23   A.   So my first job, I was president of a
24        regional syndication company called

Page 56

1         Enterprises Entrenous -- well, my company
2         was EEN Property Management in the Bay
3         area.
4    Q.   Could you just say what the uninitialed,
5         you know, what the full name of the
6         company was?
7    A.   Enterprises Entrenous, E-N-T-R-E-N-O-U-S.
8    Q.   Okay.
9    A.   French.
10   Q.   Okay.
11   A.   Enterprises Entrenous.
12   Q.   Was it a French company?
13   A.   No.
14   Q.   And you were regional president -- you
15        were president of a region?
16   A.   I was -- the company was only in the Bay
17        area, so it was a regional syndication
18        company for real estate.
19   Q.   Okay.  And what -- you were president?
20   A.   I was president of the property management
21        company --
22   Q.   Okay.
23   A.   -- which is called --
24             MR. DAVIS:  Please let him

Page 57

1    finish his questions before you begin to
2    answer.
3  Q.  Which was called EEN; right?
4        MR. DAVIS:  Did you get the
5    whack on the record?
6        (Laughter.)
7  A.  EEN Property Management.
8  Q.  Okay.  And I take it you managed
9    properties?
10  A.  Correct.
11  Q.  And that means lease?  Sell?
12  A.  We would buy a property, mostly apartment
13    buildings, in Oakland and Contra Costa
14    County, which is the East Bay, redevelop
15    them, which would mean retenant them,
16    rebuild the interiors of the units and the
17    exteriors of the buildings, and then sell
18    them within a period of five to seven
19    years usually.
20  Q.  How long were you with EEN?
21  A.  Just two years.
22  Q.  And then what did you do?
23  A.  Then I took a job at John Hancock.
24  Q.  And what did you -- what was your starting

Page 58

1    position?
2  A.  I was a vice president of John Hancock
3    Property Management Incorporated, which I
4    managed all of the syndicated properties.
5    They had a limited partnership business
6    they had just started, and I managed the
7    syndicated properties, mostly apartments
8    at the time, and was involved with the
9    development of a condominium project.
10  Q.  Where was that condominium project?
11  A.  Manchester, New Hampshire.  It is a mid-
12    rise, six stories, 74 units --
13  Q.  And how long did you remain in that
14    position?  What was your next position?
15  A.  I would like to say I was there for five
16    years, I believe, and then -- maybe four
17    years -- and then I was transferred to, in
18    the same group, in a subsidiary, you know,
19    in the mortgage area, and this is all part
20    of the mortgage area, but we were doing --
21    we had some subsidiaries that we were
22    managing -- investing in real estate
23    limited partnerships.
24        Without going into a long-winded

Page 59

1    explanation of how everything transformed
2    during that period of time, a couple of
3    times, I then started managing properties
4    that we had foreclosed on, mostly on the
5    west coast, mostly office buildings, some
6    shopping centers, and I would be
7    responsible for taking the property in,
8    hiring all the managers and the leasing
9    agents and the contractors and the
10    architects to rebuild the properties,
11    retenant the properties, and sell them.
12        And I did that for I have got to
13    say, oh, eight years, nine years, first
14    with mostly apartments.  Then I became a
15    retail specialist.  So I had all regional
16    shopping centers and malls all over the
17    country.
18  Q.  And then what did you do?
19  A.  Then I -- the company decided to go
20    public, and they had to sell off all the
21    real estate, but they asked me to come
22    over to the mortgage department after they
23    got most of that done and be a loan
24    officer, which is also known as an

Page 60

1    investment officer.
2  Q.  And can you place that in time?
3  A.  Oh, let's see.  I would say 1999 possibly.
4  Q.  Coincident --
5  A.  Late '99.
6  Q.  About the same time as John Hancock went
7    public?
8  A.  Yes.  Close.  Before that.
9  Q.  Just before that?
10  A.  Right.
11  Q.  And did you -- from that time until 2005,
12    did you change positions?
13  A.  No.  I was a loan officer, investment
14    officer.  Right.
15  Q.  What is the difference between a loan
16    officer and an investment officer?
17  A.  The same thing.
18  Q.  Okay.
19  A.  An investment officer could also be
20    working in the bond area, too.  But, you
21    know, in my area, it is still a loan
22    officer.  Right.
23  Q.  So the subject of your duties and
24    responsibilities as a loan officer

## Page 61

1   beginning late 1999 --
2   A.  Yes.  Probably.  Or early 1999.
3   Q.  Okay.  Well, at the time you assumed that
4       position --
5   A.  Yes.
6   Q.  -- could you just describe them for me,
7       what your duties and responsibilities
8       were?
9   A.  My duties were to work with either
10      correspondents or personnel like John
11      Ferrie in the field offices to help them
12      originate mortgage loans on commercial
13      real estate of any sort.
14  Q.  And those duties and responsibilities
15      remain unchanged, even to today?
16  A.  Pretty much.
17  Q.  Have your duties --
18  A.  Excuse me.  There is a change.  I am now
19      considered a credit officer.
20  Q.  And how does that change your duties and
21      responsibilities?
22  A.  I still work with John and other field
23      offices, but now I work with fellow
24      investment officers who work with

## Page 62

1   correspondents to help them get their
2   deals approved.  It has gone, under
3   Manulife, it has gone from a committee
4   process with John Hancock to a signature
5   process for approval, and I am one of the
6   signators now on deals that I'm involved
7   with.
8   Q.  Okay.  The committee process, could you
9       just describe what the committee process
10      is?
11  A.  The committee process is a formal
12      presentation of a written mortgage loan to
13      get it approved so we can send our
14      commitment out in a group setting, where
15      anywhere from four to eight officers, and
16      anybody else who wants to sit in and hear
17      it, hears the presentation and your
18      response to questions asked by the
19      committee.
20  Q.  The signature process is all in writing?
21  A.  The signature is more of a written
22      process, with greater written
23      descriptions, and the loan officer -- John
24      is considered a loan officer, and so are

## Page 63

1   other investment officers at the home
2   office.  They write up the loan, describe
3   the loan and the security and the market
4   and present it, and I help them edit it,
5   and then I'm a -- one of the initial
6   signers of the approval.
7       It then goes up the authority
8   chain, depending on the size of the loan
9   and how many other loans that particular
10  borrower has with us.
11  Q.  The risk?
12  A.  Yes -- well, maybe not the risk, but, you
13      know, just by the gross amount of loans
14      that the person has with us may make it go
15      to a higher signature level.
16  Q.  I see.
17  A.  Or if it is a bigger loan, it goes to a
18      higher signature level.  And so I would
19      recommend those loans by my signature.
20  Q.  What process, committee or signature, was
21      employed with respect to the Avenel loan?
22  A.  Signature -- oh, yes.  Signature.
23      Signature.  Right.
24  Q.  Was there a -- about how many signature

## Page 64

1   transactions had been -- had you
2   participated in as of the time of the
3   Avenel loan, which is mid August is when
4   the approval was made of 2004?
5   A.  I don't recall.
6   Q.  Had there been any, or was this your
7       first?
8   A.  Possibly.
9       MR. DAVIS:  I would caution you
10      not to speculate.
11      THE WITNESS:  Okay.
12  A.  I can only speculate.
13  Q.  Are there records of approvals of loans
14      like the Avenel loan?
15  A.  I assume there would be.  Yes.
16  Q.  And who maintains those records?
17  A.  Oh, anybody in our department can probably
18      get it.
19  Q.  You are in the department.  Can you get
20      it?
21  A.  What are you asking for?
22  Q.  The loan approvals.
23  A.  I'm not quite sure if I have authority to
24      give that out, but --

Page 65

1   Q.   Okay.
2   A.   -- I will ask. You will have to be
3        specific as to what you are looking for.
4            MR. SCHER: Let's look back a
5        couple of pages on that one. I want to
6        make sure I have a copy for -- let's mark
7        that as Malik Exhibit 1.
8            (Multipage loan approval,
9            production numbers JH 00405
10           through 00425 marked Exhibit
11           No. 1 for identification.)
12  BY MR. SCHER:
13  Q.   I have placed before you a document which
14       is marked Malik Exhibit 1.
15           (Handing Exhibit No. 1 to the
16       witness.)
17  A.   Yes.
18  Q.   And just the process, I will describe it
19       to you, and you just tell me whether I
20       have accurately described it. It is a
21       document which has on the front page John
22       Hancock Life Insurance Company. At the --
23       in the bottom right-hand corner, it says
24       JH 00405, which we call a Bates stamp.

Page 66

1   A.   Yes.
2   Q.   And it continues through Bates stamp
3        JH 00425.
4   A.   Yes.
5   Q.   Is that the document you have in front of
6        you?
7   A.   Yes.
8   Q.   What is this document called?
9   A.   This is called an approval. It used to be
10       called a vote by John Hancock, but it is
11       called an approval, a commitment approval,
12       loan approval.
13  Q.   And is it accurate to say that this is an
14       example of the signature process?
15  A.   A begetting example. It has changed since
16       then. It has become more descriptive than
17       this form.
18  Q.   So my question is: How many other
19       approvals had you presented? You
20       presented this loan?
21  A.   Yes.
22  Q.   How many others had you presented in this
23       process prior to August 16, 2004?
24  A.   I don't recall.

Page 67

1   Q.   Was this form introduced following the
2        Manulife acquisition?
3   A.   Yes. Some of the form.
4   Q.   All right.
5   A.   Hold on a second. Let me look.
6            (Pause.)
7            (The witness viewing Exhibit
8        No. 1.)
9   A.   The first four pages are new.
10  Q.   And JH 00409 is an old John Hancock form?
11  A.   Yes.
12  Q.   At the top of JH 00410, it says "Voted
13       Investment." Do you see that?
14  A.   Which page are you on?
15  Q.   410, at the very top.
16  A.   Yes, yes.
17  Q.   What is a voted investment?
18  A.   A voted investment is the form -- is one
19       that is -- relates to the investment
20       committee. It is the original -- from 409
21       on is the form used to present to the
22       original John Hancock investment committee
23       that no longer was in place. The
24       signature process was added to the front

Page 68

1        of it.
2   Q.   I see. Now is Malik Exhibit 1 the
3        approval of John Hancock Life Insurance
4        Company for the what we have called the
5        Avenel loan?
6   A.   Yes.
7            MR. SCHER: So the next exhibit
8        number.
9            (One-page memorandum dated
10           August 17, 2004, to Mr. Malik
11           from Ms. Coyne, production
12           number JH 01174 marked Exhibit
13           No. 2 for identification.)
14  BY MR. SCHER:
15  Q.   I show you what I have had marked as Malik
16       Exhibit 2.
17           (Handing Exhibit No. 2 to the
18       witness.)
19  A.   Yes.
20  Q.   And it is a document that is Bates stamped
21       JH 01174. It appears to be a memorandum
22       from Patricia C. Coyne, investment
23       officer, to you?
24  A.   Yes.

Page 69

1  Q.  Can you tell me what this is?
2  A.  This is a summary memo indicating the
3      general terms of the approval.
4  Q.  But the actual approval is Malik 1?
5  A.  Correct.
6  Q.  What use do you put to Malik 2 in your
7      work?
8  A.  It relates to the credit function.
9      Manulife, because of their country's
10     regulators, has in place credit officers
11     who check the work of loan officers or
12     investment officers, and this is an
13     indication that she checked the work and
14     it met the credit standards of the
15     company. That's what I do now as well.
16 Q.  So Patricia Coyne is a credit evaluator?
17 A.  A credit officer.
18 Q.  A credit officer?
19 A.  Yes.
20 Q.  And she reviews the Malik 1, the approval?
21 A.  She also signed the approval, if you
22     noticed.
23 Q.  Yes. Okay.
24 A.  Yes.

Page 70

1  Q.  And her function was to perform a credit
2      evaluation of the approval?
3  A.  Yes.
4  Q.  Is that right?
5  A.  Yes.
6  Q.  What country owns -- what country are you
7      referring to?
8  A.  Canada.
9  Q.  So Manulife is a Canadian company?
10 A.  Correct.
11 Q.  And in Canada, there is a requirement that
12     the loan and credit functions be separate?
13 A.  Correct.
14 Q.  And that was introduced into John Hancock
15     after the acquisition?
16 A.  Yes.
17 Q.  And your new position has you as a credit
18     evaluator as well?
19 A.  Credit officer.
20 Q.  Credit officer. Excuse me. And what
21     specifically do you do as a credit officer
22     as contrasted with that as a loan officer?
23 A.  I am still trying to figure that out.
24 Q.  Okay. Then I will ask my next question.

Page 71

1          (Laughter.)
2  Q.  If you have an answer, I would appreciate
3      it.
4  A.  Sure. I evaluate other investment
5      officers' loans to see if they meet the
6      company guidelines and advise them on
7      various loan parameters as a result.
8  Q.  Are the 11 items listed in Malik Exhibit 2
9      numbered down that memo -- do you see
10     them?
11 A.  Yes.
12 Q.  Do any of them represent company
13     guidelines?
14         MR. DAVIS: Objection.
15 Q.  Do any of them record, refer, or reflect
16     company guidelines to which you made
17     reference?
18 A.  Yes.
19 Q.  And could you specify which ones?
20 A.  Sure.
21         MR. DAVIS: Objection. Could we
22     pause a moment?
23         THE WITNESS: Let me think a
24     second.

Page 72

1          MR. DAVIS: This goes to
2      underwriting guidelines?
3          THE WITNESS: Yes.
4          MR. DAVIS: And this is
5      information that I would prefer -- is this
6      information that --
7          THE WITNESS: This doesn't
8      really specify guidelines here. It really
9      gives parameters, and because of the memo,
10     you know they are inside the guidelines.
11         MR. SCHER: Okay.
12         MR. DAVIS: If we are going to
13     get into a discussion of the actual
14     guidelines, that is information that I
15     think Hancock would regard as highly
16     confidential, and so Mr. Koller's presence
17     here, in that respect, this would be
18     information that probably shouldn't be out
19     in the general public or would be --
20     shouldn't be available to potential loan
21     applicants. You are always welcome to
22     come back, Mr. Koller, and apply again.
23     So if we are going to get into that
24     subject area, I would ask that Mr. Koller

Page 73

1   not stay in the room for purposes of that
2   portion of Mr. Malik's deposition.
3   BY MR. SCHER:
4   Q.  Go ahead.  You can answer the question.
5       Certainly if we go into an area --
6   A.  What was the question again?
7   Q.  Do any of the items on this document,
8       JH 1174, which was produced to us in
9       discovery in this case, does it refer,
10      reflect -- let's see -- refer, reflect, or
11      record the company guidelines to which you
12      made reference in your earlier testimony
13      just moments ago?
14  A.  No.
15  Q.  Do they refer, record, or reflect in any
16      way the company's guidelines?
17  A.  Only in the sense that they are within the
18      guidelines.
19  Q.  Okay.  And which of those numbered items,
20      1 through 11, record, refer, or reflect --
21      I am trying to see if I can get that triad
22      correct this time -- record, refer, or
23      reflect the company's guidelines?
24          MR. DAVIS:  Objection.  I think

Page 74

1   he said they don't record, refer, or
2   reflect the guidelines except they are
3   within the guidelines, so.
4       MR. SCHER:  Okay.
5   Q.  So which ones of those 11?  Is 8 one that
6       reflects the -- that describes that it is
7       within the guidelines?
8   A.  It describes the parameters of the loan
9       commitment but doesn't describe the
10      guidelines.
11  Q.  No.  But is 8 one that is relevant to that
12      consideration?
13      I'm not saying this clearly?  Do
14      you understand what I'm asking you?
15          MR. DAVIS:  Objection.
16  A.  Well, no, I don't, because you can look at
17      any one of these and, with the exception
18      of 11 --
19  Q.  All right.
20  A.  -- and --
21          MR. SCHER:  Mr. Koller, step out
22      of the room for a moment.
23          (Mr. Koller exiting the
24      deposition room at 11:15 a.m.)

Page 75

            MR. SCHER:  Counsel has
    requested that this portion of the
    deposition be designated as highly
    confidential.

Page 76

1   BY MR. SCHER:
2   Q.  What are the company's guidelines?
3           MR. DAVIS:  That is fine.  Do
4       you want specific items here?  Or do you
5       want --
6           MR. SCHER:  Just tell me what
7       they are --
8           MR. DAVIS:  Sure.
9           MR. SCHER:  -- as they relate to
10      the Avenel loan.
11  A.  The guidelines are --
12  Q.  Yes.
13  A.  -- are that given the rating of a loan --
14  Q.  The?
15  A.  The rating of the loan.
16  Q.  The rating being the letter?
17  A.  Yes.
18  Q.  The letter description?
19  A.  Yes.
20  Q.  BAA1?
21  A.  Right.
22  Q.  Okay.
23  A.  Actually, BBB.
24  Q.  On Malik 1, it says BAA1?

# HIGHLY CONFIDENTIAL

## Page 77

1   A.   Well, to the left of it.

2   Q.   I am sorry?

3   A.   MLI, BBB, that is the controlling one.

4   Q.   Okay.  Thank you.  I apologize.

5   A.   It has to have, for instance, 75 percent

6        is a guideline.  You can't go above

7        75 percent.

8   Q.   75 percent loan to value?

9   A.   Correct.

10  Q.   Okay.

11  A.   That the cash -- that the debt service

12       coverage ratio has to be at least 120 or

13       the debt service coverage ratio has to be

14       at least 130, depending on the rating for

15       the loan, or 150.

16            So it depends on the rating of

17       the loan, and then the quality of the

18       loan, certain guidelines have to be met.

19  Q.   The 120, as applied to a BBB loan, what is

20       the debt service coverage ratio required

21       by the guidelines?

22  A.   It depends on if -- how the loan is -- if

23       it gets a very good rating or not.

24            (Pause.)

## Page 78

1            (The witness viewing Exhibit

2        No. 1.)

3   A.   It has a "good" quality classification in

4        Exhibit 1.

5   Q.   What Bates number?

6   A.   423.

7   Q.   Yes.

8   A.   You see the quality classification is

9        "good."

10  Q.   Yes.

11  A.   So the minimum LTV would be 75 percent.

12       For the 67 percent LTV, I would need a 120

13       debt service coverage, on a 25-year

14       amortization schedule, and a 25-year

15       amortization schedule gives you 135 with

16       the underwriting in place.  So we would

17       have to get a 120.

18            However, there could be

19       exceptions to those guidelines if they're

20       stated in the approval.

21  Q.   And were they stated in the approval?

22  A.   No need.

23  Q.   Because it was within --

24  A.   Exceeded.

## Page 79

1   Q.   -- 120?

2   A.   Yes.

3   Q.   Now what other guidelines?

4   A.   What other guidelines?  Those are -- those

5        are the essential financial guidelines.  I

6        would have to look at the book to

7        understand what the rest of it is.  For

8        instance, another guideline --

9            THE WITNESS:  How much more do

10       you want me to give?  I can give examples.

11           MR. DAVIS:  I think you answered

12       his question.

13           THE WITNESS:  All right.

14           MR. DAVIS:  He will ask you

15       additional questions as necessary.

16           THE WITNESS:  Okay.

17  BY MR. SCHER:

18  Q.   The 10 percent breakeven interest rate, is

19       that -- does that reflect a guideline?

20  A.   Yes.

21  Q.   And what guideline is that?

22  A.   That is the constant guideline.  It has to

23       be a certain constant.

24  Q.   And could you just explain to me what the

## Page 80

1        constant guideline is?

2   A.   When you add the principal payment and the

3        interest payment together times 12 divided

4        by the principal, outstanding principal,

5        that's the constant.

6   Q.   That has to equal 10?

7   A.   10 or greater at that time, I believe.

8        Right.

9   Q.   All right.

10  A.   If you look at page 405.

11  Q.   Yes.

12  A.   In the center it says, "Breakeven interest

13       rate, 10.6 percent," right there.

14           (Witness pointing.)

15  Q.   Oh, yes.  And what does that mean?

16  A.   That means it exceeds the guidelines of

17       10 percent.

18  Q.   Okay.  Are there any other criteria

19       reflected in the Malik 2?

20  A.   Let me think.

21           (Pause.)

22  A.   Not that I can think of, besides the

23       75 percent.  An 8 -- 5.38 million dollars

24       rental achievement reserve.

# HIGHLY CONFIDENTIAL

## Page 81

1  Q.  Is that reflective of a guideline?
2  A.  It indicates that it is not going to be
3      fully -- may not be fully occupied at
4      closing, and we would hold money back in
5      order to maintain the guidelines.
6  Q.  And the reserve is $150 per unit?
7  A.  No. The reserve is -- references the
8      breakeven. In other words, $150 a unit
9      for apartments is what was used after the
10     NOI, net operating income, to get the net
11     cash flow. That is just a descriptive
12     phrase, a descriptive number, that can
13     deal with the reserve.
14 Q.  Were there any loan sizing criteria
15     reflected in Malik 2?
16 A.  Loan sizing. That is the inverse of any
17     criteria, so yes.
18 Q.  So they are implicit -- loan sizing is
19     implicit in each of these criteria?
20 A.  Sort of, without stating it clearly.
21 Q.  Okay. Is the loan sizing criteria stated
22     in Malik 1?
23 A.  I believe they are similar. Yes.
24 Q.  Can you find the reference to the loan

## Page 82

1      sizing criteria in Malik 1?
2  A.  Page 410, the last box, the fourth line
3      down after the first word.
4  Q.  "Funding"?
5  A.  Yes.
6          MR. SCHER:  I think we can
7      invite Mr. Koller back in.
8          MR. DAVIS:  I will get him.
9          MR. SCHER:  Thanks.
10         (Mr. Koller reentering the
11     deposition room at 11:26 a.m.)
12         (End of confidential portion of
13     transcript.)
14
15
16
17
18
19
20
21
22
23
24

## Page 83

1          MR. SCHER:  Can we mark this as
2      the next exhibit, please?
3          (Multipage Application to John
4          Hancock Life Insurance Company
5          for a First Mortgage Loan,
6          production numbers JH 00327
7          through 00396 marked Exhibit
8          No. 3 for identification.)
9  BY MR. SCHER:
10 Q.  I will show you what I have had marked as
11     Malik Exhibit 3.
12         (Handing Exhibit No. 3 to the
13     witness.)
14 Q.  This is a copy of the July 30, 2004
15     application to John Hancock life insurance
16     company for a first mortgage loan, Bates
17     stamped JH 0327, and you can look through
18     it, but this is the version which is, I
19     believe, fully executed.
20 A.  Okay.
21 Q.  Can you tell me where in Malik 3 the loan
22     sizing criteria is set forth?
23         (Pause.
24         (The witness viewing Exhibit

## Page 84

1      No. 3.)
2  A.  356, provision 49, and -- hold on a second
3      -- in a couple of places.
4  Q.  Okay.
5          (Further pause.)
6          (The witness continues to view
7      Exhibit No. 3.)
8  A.  Bates 343, 516.
9  Q.  343?
10 A.  Yes.
11 Q.  How does --
12 A.  And page --
13 Q.  I am sorry?
14 A.  Page 342, clause 14.
15 Q.  Can you tell me how clause 14 on JH 342
16     relates to the loan sizing criteria?
17 A.  The appraisals needs to be -- needs to
18     allow that the loan is not more than
19     75 percent of that value.
20 Q.  Therefore, the loan would be less than
21     $32 million if the value would not support
22     75 percent?
23 A.  That is one of the criteria from the
24     appraisal. Yes.

Page 85

1  Q.  And how does the JH 343, clause 16, relate
2      to the loan sizing?
3  A.  It indicates that you need a rate of not
4      less than -- rent of not less than
5      4.221126 -- 4,221,126, and a minimum debt
6      service coverage ratio of 1.25 to 1.
7  Q.  How does that relate to the loan sizing?
8  A.  If the debt service coverage ratio is less
9      than that, then the loan could be reduced.
10 Q.  And where does -- just is that what you
11     believe paragraph 16 says?
12 A.  It is very specific.  I think you need to
13     read it yourself.
14 Q.  Okay.  And the condition 49 on Bates stamp
15     JH 00356?
16 A.  Yes.
17 Q.  And how does that relate to loan sizing
18     criteria?
19 A.  Well, this was a project under
20     construction that was partially built and
21     leased, and condition 49 was the -- was
22     negotiated by us and the borrower in order
23     to give them flexibility to be able to
24     fund the loan, even though they were not

Page 86

1      fully occupied and they did not meet the
2      criteria of clause 14 and 16, by placing a
3      portion of the $32 million in a reserve at
4      John Hancock until they met the criteria
5      14 and 16.
6              MR. SCHER:  Let's take a short
7      break.
8              (Recess taken at 11:35 a.m.)
9              (Recess ended at 11:42 a.m.)
10             MR. SCHER:  Mark this.
11             (Two-page e-mail string, most
12               recent e-mail dated August 11,
13               2004, to Mr. Ferrie from
14               Mr. Malik, production numbers
15               JH 00131 and 00132 marked
16               Exhibit No. 4 for
17               identification.)
18     BY MR. SCHER:
19 Q.  I show you what I have had marked as Malik
20     Exhibit 4.
21             (Handing Exhibit No. 4 to the
22     witness.)
23 Q.  This is a document Bates stamped JH 00131
24     and 132?

Page 87

1  A.  Yes.
2  Q.  Do you have that before you?
3  A.  Yes.
4  Q.  At the top, it says, "FW:  Request for
5      approval to lower the Reserves to
6      $150/unit and to fund the Loan with 7..."
7  A.  Where are you reading?
8  Q.  At the very, very top.  Do you see that at
9      the very top of the page, the first -- the
10     very, very top?
11             (Counsel pointing.)
12 Q.  In other words, not just the top, but the
13     very top?
14 A.  Yes.
15 Q.  Have you got me?
16 A.  Yes.
17 Q.  "FW colon"?  Can you see that?
18 A.  I see it.
19 Q.  In other words, I am above your name?
20     Okay?
21 A.  But I don't recognize --
22 Q.  Okay.
23 A.  -- where the rest of the e-mail is.
24 Q.  Okay.

Page 88

1  A.  Do you have the rest of the e-mail?
2  Q.  I have -- it says, "Page 1 of 2"?
3  A.  But it is not -- it is -- something is
4      missing.
5  Q.  Okay.  What is -- how do you -- why do you
6      say that?
7  A.  I just don't -- I don't see -- understand
8      the reference of "FW:  Request for
9      approval."
10 Q.  Okay.  From the line, Timothy Malik to
11     John Ferrie, August 11, 2004, at
12     7:39 p.m., do you see that?
13 A.  Yes.
14 Q.  And then down below, you see an e-mail
15     from you to Ivor Thomas with copies to
16     David Henderson and Patricia Coyne dated
17     August 11, 2004, at 7:32 p.m.  Do you see
18     that?
19 A.  Um-hmm.
20 Q.  You might want to say yes --
21 A.  Yes.
22 Q.  -- because it makes you seem more
23     intelligent on the record.
24             MR. SCHER:  That was a joke.

Page 89

1            MR. DAVIS:  Stipulated.
2            MR. SCHER:  Okay.
3            (Laughter.)
4  Q.  Let's take the earlier e-mail first, --
5  A.  Yes.
6  Q.  -- the one that is seven minutes earlier.
7  A.  Yes.
8  Q.  Is it accurate to say that you were
9      seeking approval to lower the reserves to
10     $150 per unit and to fund the loan with a
11     75 percent loan to value ratio and a
12     1.25 percent debt service coverage ratio?
13  A.  I don't remember this, so let me read this
14     first before I answer.
15  Q.  Please.  I didn't mean to --
16      (Pause.)
17      (The witness viewing Exhibit
18     No. 4.)
19  A.  Okay.
20  Q.  Can you tell me --
21  A.  What was the question again?
22  Q.  Yes.  Is it accurate to say that by this
23     memorandum -- this e-mail you were seeking
24     to reduce the reserves to $150 per unit?

Page 90

1  A.  Yes.
2  Q.  Why?
3  A.  Well, I believe I recall now that when I
4     first -- we first sent the approval up the
5     chain for Ivor to sign, he noticed that in
6     some -- one instance that it did not meet
7     the 10 constant at the 1.25 cover for the
8     rental achievement.
9  Q.  Okay.  And because it did not meet the 10
10     constant coverage, it -- you --
11  A.  It didn't meet the credit guidelines.
12  Q.  It didn't meet the credit guidelines.  Did
13     you tell that to the borrower?
14  A.  No.  It is not relevant to the borrower.
15  Q.  Okay.  Why is it not relevant to the
16     borrower to know that it did not meet the
17     credit guidelines with a $250 per unit
18     reserve?
19  A.  This is internal underwriting that we
20     never discuss with the borrower.  That is
21     how we -- it has only to do with the
22     Hancock credit guidelines.
23  Q.  The --
24  A.  There was a --

Page 91

1  Q.  Go ahead.
2  A.  Go ahead.
3  Q.  No.  I am sorry.
4  A.  No.  I am done.
5  Q.  I understand that you never discuss with
6     the borrower this constant -- this -- is
7     that true that you never discuss with the
8     borrower the --
9  A.  We typically don't discuss --
10      MR. DAVIS:  Please let him
11     finish.
12      THE WITNESS:  Yes.
13  Q.  -- the 10 percent constant coverage; is
14     that right?
15  A.  Not --
16      MR. DAVIS:  Objection.
17     You can respond.
18  A.  Not to my knowledge, I mean.
19  Q.  You said "typically," and that's what I am
20     asking about.
21  A.  Right.
22  Q.  So why is it not relevant to the borrower
23     to know that there is this 10 percent
24     constant coverage requirement?

Page 92

1  A.  It's a decision -- a way of us within the
2     company to discuss risk.
3  Q.  How does the 10 percent constant coverage
4     way of discussing risk differ from the
5     other ways in which you discuss risk, like
6     the 75 percent loan to value and the
7     1.25 percent debt service coverage ratio?
8     Are they all the -- all mechanisms for
9     discussing risk?
10  A.  Yes.
11  Q.  So why is it that the loan-to-value ratio
12     and debt service coverage ratio is
13     discussed with the borrower and the
14     10 percent constant is not?
15  A.  Because --
16      MR. DAVIS:  Objection.
17     You can respond.
18      MR. SCHER:  Let me meet that
19     objection.
20  Q.  The loan-to-value ratio is disclosed to
21     the borrower; right?
22  A.  Um-hmm.
23  Q.  Yes?
24      MR. DAVIS:  You have to respond.

Page 93

1  A.  Yes.

2  Q.  And the debt service coverage ratio is

3      disclosed to the borrower?

4  A.  Yes.

5  Q.  In fact, the precise numbers that the

6      borrower is required in this case, in the

7      Avenel situation, are set forth in the

8      application and agreed to in the loan

9      application; am I right?

10 A.  Yes.

11 Q.  Why is the debt service coverage -- sorry

12     -- why is the 10 percent constant coverage

13     not?

14 A.  It seems irrelevant.

15 Q.  Why is it irrelevant to the borrower?

16 A.  Because the 10 percent constant relates to

17     our credit policy internally, and the

18     industry standard is ordinarily debt

19     service coverage ratio and LTV.

20 Q.  It is true that the 10 percent constant

21     coverage is a criteria which was required

22     to be satisfied in order for the loan to

23     be approved; am I right?

24         MR. DAVIS:  Objection.

Page 94

1          MR. SCHER:  What is your basis?

2          MR. DAVIS:  I think it

3      mischaracterizes the record actually, but

4      go ahead.

5          MR. SCHER:  Well, that is not --

6  A.  It is not required.  Another way to do it

7      would be to state it as an exception in

8      the approval and the reasons for it.

9  Q.  Okay.  But it is certainly a hurdle over

10     which a loan approval must be overcome in

11     order to be granted?

12 A.  Yes.

13 Q.  So why is it irrelevant to the borrower if

14     it's a -- if the approval of the loan is

15     contingent on satisfying this criteria?

16 A.  Because whether we state it as an

17     exception in our approval documents or we

18     change our estimate of reserves, it is --

19     it doesn't make any difference to the

20     borrower.  All the borrower should care

21     about is getting the commitment, which he

22     has gotten.  How we do our approvals is

23     irrelevant.

24 Q.  How does the reserve requirement impact

Page 95

1      the borrower?

2  A.  Not at all.

3  Q.  Why not?

4  A.  Because we're not requiring him to hold

5      those reserves.  They are purely

6      theoretical reserves in the underwriting.

7  Q.  So if it is purely theoretical, why do you

8      need approval to do it?

9  A.  We don't need approval to do it.  We need

10     approval to get the commitment.

11 Q.  Well, you are asking for approval to lower

12     the reserves?

13 A.  Within the -- within our underwriting.  In

14     underwriting, it is a proforma estimate of

15     what we think is a relative, reasonable

16     characterization of the cash flow to be

17     expected from the security.

18 Q.  If the request for approval to lower the

19     reserves had been refused -- am I -- is it

20     accurate to say that the loan commitment

21     would not have been made?

22 A.  The signing authority has to -- asked me

23     to write -- to put the memo together so

24     that we could lower the reserves.

Page 96

1  Q.  You didn't know in advance of making the

2      request that it would be granted, did you?

3  A.  I did.

4  Q.  You did?

5  A.  Yes.  Paper the file with this.  Correct.

6  Q.  Say again?

7  A.  Yes.  I papered the file with this.

8  Q.  You papered the file with this?

9  A.  Yes.

10 Q.  But there was a moment in time when you

11     did not know whether or not the request

12     would be granted; am I right?

13 A.  No.  I knew it would always be granted.

14     He caught a technical error with my

15     approval document and just corrected it.

16 Q.  What are you -- so can you explain to me

17     the e-mail that you sent seven minutes

18     later to Mr. Ferrie in which you say, "I

19     guess I will try, one more time, the

20     bureaucratic approach"?

21         I won't criticize your spelling

22     of "bureaucratic."  It is just a typo.

23 A.  It must be.

24 Q.  "I'll let you know how hard he laughs."

Page 97

```
 1              What are you -- isn't it
 2    accurate to say that "I'll let you know
 3    how hard he laughs" suggests that he was
 4    going to refuse the request?
 5            MR. DAVIS:  Objection.
 6  A.  I'm not quite sure who I am relating --
 7    who I am referring to as the "he."
 8  Q.  Ivor Thomas?
 9  A.  Yes.
10  Q.  So --
11  A.  I don't know if it is Ivor or not.
12  Q.  I want you to explain to me why you say in
13    this August 11th, 7:39 p.m. e-mail, sent
14    seven minutes after you sent your e-mail
15    to Ivor Thomas, why you said to
16    Mr. Ferrie, "I'll let you know how hard he
17    laughs."
18  A.  I can only speculate.
19  Q.  You have no recollection whatsoever; is
20    that right?
21  A.  I recall that Ivor caught the error with
22    the coverage and asked us to lower
23    something to make it work, and I could
24    only assume and I can only speculate that
```

Page 98

```
 1    that refers to John's idea to lower the
 2    reserves to $150.
 3  Q.  Why would that cause laughter on the part
 4    of Mr. Thomas?
 5            MR. DAVIS:  Objection.
 6  Q.  Why would the lowering of the reserves to
 7    $150 per unit to meet the deficiency
 8    Mr. Thomas had identified cause him to
 9    laugh?
10            MR. DAVIS:  Objection.
11            MR. SCHER:  What is your basis?
12            MR. DAVIS:  The basis of the
13    objection is that it calls for
14    speculation.
15            MR. SCHER:  Okay.
16  Q.  If you know, tell me.
17            MR. SCHER:  I withdraw that.
18  Q.  Tell me why you thought that it would
19    cause Mr. Thomas to laugh.
20  A.  I believe that was written for John's
21    benefit to let him know that we don't like
22    to lower reserves to $150 a unit.
23  Q.  Is that your best answer?
24            MR. DAVIS:  Objection.
```

Page 99

```
 1  A.  Yes.  He rarely laughs.
 2  Q.  Honestly, Mr. Malik, I don't understand.
 3    "I guess I will try, one more time, the
 4    bureaucratic approach."  What is the
 5    bureaucratic approach?
 6  A.  The bureaucratic approach must be to get
 7    Ivor to lower the reserves, to go along
 8    with lowering the reserves from 250 to 150
 9    so at a full rental achievement reserve
10    and a 1.25 coverage it still will equal --
11    you will still cover the constant, 10, the
12    10 constant, 10.
13  Q.  What is it about lowering the reserve from
14    250 to 150 that would cause Mr. Thomas or
15    a person in his position to laugh?
16  A.  Because --
17            MR. DAVIS:  Objection.
18  A.  -- it goes outside the guidelines of
19    typically wanting 250 a unit for reserves
20    in our abstract analysis of what the
21    property will cash flow, but because this
22    was a brand new property that didn't need
23    a lot of -- a lot of work on units when
24    people vacated and came back, 150 turned
```

Page 100

```
 1    out to be fine.
 2            My comment was meant to let John
 3    Ferrie know that we don't like lowering
 4    reserves if we can avoid it.
 5  Q.  So who is the one who wanted the reserves
 6    lowered from 250 to 150?
 7  A.  Well, I can only speculate, but I think it
 8    was John.  Ivor wanted us to make the 150
 9    -- wanted us to make the 10 constant, and
10    my memo explains -- my memo explains how
11    to do it.
12  Q.  Your e-mail to Mr. Thomas explains how to
13    do it; right?
14  A.  Right.
15  Q.  Why did Mr. Ferrie want that accomplished?
16  A.  He wanted to fund the loan.  He wanted to
17    commit the loan.
18  Q.  And why is that?
19  A.  Because that's his job.
20  Q.  Is his desire to commit the loan any
21    different than your desire to commit the
22    loan --
23            MR. DAVIS:  Objection.
24  Q.  -- as far as you know?
```

25 (Pages 97 to 100)

1       MR. DAVIS: Objection.
2   Q.  For example, does he get a commission for
3       committing the loan?
4   A.  No.
5   Q.  It is just as good for him as it is for
6       you?
7       MR. DAVIS: Objection.
8   Q.  Is that right?
9   A.  Yes.
10  Q.  It goes as much to his performance as it
11      goes to your performance?
12  A.  Yes. Similar.
13  Q.  And you both wanted to get this loan
14      committed?
15  A.  Yes.
16  Q.  Right?
17  A.  Yes.
18  Q.  In your e-mail to Mr. Thomas at page
19      JH 00132, you make reference to -- you
20      make, I guess, arguments favoring the
21      reduction of the reserve amount to 150;
22      right?
23  A.  Yes.
24  Q.  And one of them is that the rental market

1       demand is strong; right?
2   A.  Yes.
3   Q.  What is the basis for that?
4   A.  They had a very good leasing -- initial
5       lease up, with a long waiting list.
6   Q.  And then you make a reference to the rate
7       for -- of interest on treasuries; right?
8   A.  Right.
9   Q.  And just explain to me what the dropping
10      of -- by 15 bps since the rate lock --
11  A.  Basis.
12  Q.  -- has to do with this subject of your
13      e-mail.
14  A.  Bps means basis points.
15  Q.  Yes.
16  A.  It is pointed out to Mr. Thomas that the,
17      if we were to put the loan out, if we were
18      to -- didn't give the commitment, it would
19      be hard to replace it with as high an
20      interest rate with another loan at that
21      time.
22  Q.  So that motivated -- that further
23      justified making this exception to your
24      general policies; right?

1   A.  It highlighted another production issue,
2       yes.
3   Q.  And finally you made reference to
4       competition from GMAC; right?
5   A.  Yes.
6   Q.  And why was that reference made?
7   A.  So that he -- just to indicate that it was
8       a good deal for John Hancock.
9   Q.  The corroboration of GMAC's willingness to
10      lend at $33 million suggested that this
11      would be a good loan for John Hancock; is
12      that right?
13  A.  Yes.
14      MR. SCHER: Mark this.
15      (One-page e-mail dated
16      August 11, 2004, to Mr. Kelly
17      from Mr. Ferrie and attachment,
18      production numbers JH 00133 and
19      00134 marked Exhibit No. 5 for
20      dentification.)
21  BY MR. SCHER:
22  Q.  I show you what I have had marked as Malik
23      Exhibit 5.
24      (Handing Exhibit No. 5 to the

1       witness.)
2   Q.  This is an e-mail from you -- I am sorry
3       -- from John Ferrie to kelly@ckpp.com re:
4       Avenel.
5   A.  Right.
6   Q.  That is Bates stamped JH 00133 and 134.
7       (Pause.)
8       (The witness viewing Exhibit
9       No. 5.)
10  Q.  Have you before today ever seen this?
11  A.  Probably.
12  Q.  Can you tell me -- at or about the time it
13      was sent? It doesn't show your name on
14      it.
15  A.  It says August 11th.
16  Q.  Yes.
17  A.  3:34. Right. 2004. What else do you
18      want?
19  Q.  Did you see it on or about the time it was
20      sent?
21  A.  I don't recall.
22  Q.  Do you know who Rob is?
23  A.  Rob Kelly?
24  Q.  Yes.

## Page 105

1   A.  Yes.

2   Q.  Who is that?

3   A.  Isn't he one of the principals of the

4       borrower?

5   Q.  No.

6   A.  The brother of one of the principals of

7       the borrower.

8   Q.  Have you ever met him?

9   A.  Yes.

10   Q.  Rob Kelly?

11   A.  I believe I did.

12   Q.  Do you know why John characterized -- what

13       John was characterizing as a slight

14       hiccup?

15   A.  I can only speculate, but I would

16       speculate --

17             MR. DAVIS:  Don't speculate.

18             THE WITNESS:  Okay.

19             MR. DAVIS:  If you know.

20   Q.  Attached to the e-mail at JH 00134 is a

21       document at the top of which says

22       Exhibit 1A?

23   A.  Yes.

24   Q.  And at the bottom, it says, "Avenel

## Page 106

1       Exhibit 1A 8-11-04.xls"; right?

2   A.  Yes.

3   Q.  So that is an Excel sheet with that date

4       on it?

5   A.  Yes.

6   Q.  Is that right?

7   A.  Yes.

8   Q.  And this is one of many, many Excel sheets

9       in this format?

10   A.  Yes.

11   Q.  And they all come from your computer?

12   A.  Or John's.

13   Q.  Or John Ferrie's computer?

14   A.  Yes.

15   Q.  Is this a template that is used by John

16       Hancock in connection with the preparation

17       of reserve calculations?

18   A.  I believe John and I used this on a number

19       of deals.  Yes.

20   Q.  Okay.  And can you tell me by reviewing

21       this edition of Exhibit 1A, the August 11,

22       '04 edition, what the slight hiccup was?

23   A.  I can only speculate what the difference

24       is between this one and prior exhibits.

## Page 107

1   Q.  This one shows reserves based on loan to

2       value and reserves based on 10 percent

3       constant.

4   A.  Okay.  Then this 10 percent constant is

5       there.  That's good.

6   Q.  That's good?

7   A.  Yes.

8   Q.  Why?  Why is that good?

9   A.  More criteria.

10   Q.  What do you mean by that?

11   A.  More fully outlines what is important to

12       us.

13   Q.  So that the 10 percent constant is

14       important to you?

15   A.  It looks like it was in this instance.

16   Q.  But it looks like the loan would not

17       have been funded had the 10 percent

18       constant not been met --

19             MR. DAVIS:  Objection.

20   Q.  -- based on the --

21   A.  I don't recall.  I think the basis for

22       funding is still in the commitment,

23       clause 46.  Now this is -- becomes part of

24       the commitment, so I'm not sure how they

## Page 108

1       tie in without reading the commitment

2       again.

3   Q.  I'm sure I don't understand what you mean

4       by that.  Could you explain?

5   A.  Ordinarily the funding limit is debt

6       service coverage, and instead of constant,

7       ordinarily there is debt service coverage

8       there.  But I'm not quite sure what -- how

9       the document evolved, the commitment

10       evolved.

11           In a typical loan, they meet LTV

12       coverage -- LTV limits and debt service

13       coverage.

14   Q.  Right.

15   A.  In this instant, I see constant --

16   Q.  Introduced?

17   A.  -- as a hurdle as opposed to debt service

18       coverage.  So I'm not quite sure if that

19       is a change and if the commitment changed

20       accordingly.  I have to go back and review

21       the commitment.

22   Q.  So the commitment is contained in Malik

23       Exhibit 1; right?

24   A.  Malik Exhibit 3.

Page 109

```
1   Q.   Exhibit 3?  I apologize.
2   A.   Let's see.
3             (Pause.)
4             (The witness viewing Exhibit
5        No. 3.)
6   A.   And reviewing that, the commitment only
7        deals with debt service coverage, so.
8   Q.   So the 10 percent constant was introduced
9        into the commitment process?
10            MR. DAVIS:  Objection.
11  A.   I don't know.
12  Q.   Well, you know --
13  A.   Possibly.
14  Q.   It appears that way?
15  A.   I don't know.
16  Q.   Why don't you know?  You were the
17       presenter of the loan?
18  A.   Yes.
19  Q.   You have the loan approval?
20  A.   But John was the presenter of this
21       (pointing to Exhibit No. 5).
22  Q.   So?
23  A.   So you would have to ask him.
24  Q.   Where did he present that?
```

Page 110

```
1   A.   Didn't he present it to Rob, he said?  Rob
2        Kelly.
3   Q.   But Rob Kelly doesn't approve the loan,
4        does he?  Of course not.
5             So what are you suggesting?  The
6        fact that Rob Kelly received Malik
7        Exhibit 5, does that change what is in the
8        application or commitment?
9   A.   Because you put "Malik Exhibit 5" doesn't
10       mean it came from me.
11  Q.   I am not suggesting it came from you.  I
12       am asking you whether the introduction of
13       the new criteria, namely the 10 percent
14       constant, --
15  A.   I don't know.
16            MR. DAVIS:  Please, let him
17       finish his question --
18            THE WITNESS:  Okay.
19            MR. DAVIS:  -- because I want to
20       get my objection in.
21            THE WITNESS:  Okay.
22  BY MR. SCHER:
23  Q.   Is it accurate to say that the loan
24       constant hurdle was introduced into the
```

Page 111

```
1        loan commitment process after the loan
2        application was submitted?
3             MR. DAVIS:  Objection.
4   A.   I'm not quite sure what you mean by "loan
5        commitment process."
6   Q.   The application.
7   A.   The application?
8             MR. DAVIS:  The same objection.
9   A.   I -- the commitment -- I think the
10       commitment speaks for itself.
11  Q.   Okay.
12  A.   I don't see it in there.
13  Q.   Okay.  That is fair enough.
14            MR. SCHER:  Mark this.
15            (One-page e-mail dated
16            August 11, 2004, to Mr. Ferrie
17            from Mr. Malik, production
18            number JH 00135 marked Exhibit
19            No. 6 for identification.)
20  BY MR. SCHER:
21  Q.   I show you what I have had marked as Malik
22       Exhibit 6.
23            (Handing Exhibit No. 6 to the
24       witness.)
```

Page 112

```
1   A.   Um-hmm.
2   Q.   It is an e-mail from you to John Ferrie
3        dated August 11, 2004, in the morning,
4        10:54 a.m., Bates stamped JH 00135.
5             (Pause.)
6             (The witness viewing Exhibit
7        No. 6.)
8   Q.   What do you mean -- the subject is Avenel
9        hedge loss.
10  A.   Yes.
11  Q.   What does that mean?  What information are
12       you conveying in this e-mail?
13  A.   That we would -- if we unwound what we had
14       hedged, it would cost 355 -- $355,000 as
15       of that date.
16  Q.   So what does unwound mean?
17  A.   If we sold off the securities that fixed
18       the -- the derivatives that fixed the
19       interest rate for a portion of the loan.
20  Q.   How much did you sell off?
21  A.   How much?  We wouldn't -- we didn't sell
22       off.  If we would have sold off.
23  Q.   Well, I don't understand.  That is
24       probably not the first thing.
```

Page 113

1          So if you had hedged, just
2     explain to me what you mean by that.
3  A.  I believe you buy securities, fixed
4     securities, that if interest -- the
5     treasuries go up or down would be
6     irrelevant to the return on a certain
7     portion of funds, so it fixes the treasury
8     risk. That portion of the interest rate,
9     it fixes the rate of return, the interest,
10    the yield at a certain amount.
11 Q.  Had there in fact been a hedge?
12 A.  I believe there was. Yes.
13 Q.  And the hedge was on the date of the
14    interest rate lock?
15 A.  Yes, yes.
16 Q.  What was the amount of the hedge?
17 A.  I don't recall.
18 Q.  Was it in the entire $32 million?
19 A.  I don't think it was.
20 Q.  All right.
21 A.  Certain accounts require that you hedge
22    immediately because of their commitments.
23    Not all of them. So a portion of it was
24    hedged.

Page 114

1  Q.  And who participates in this hedging
2     process? Do you?
3  A.  No.
4  Q.  How do you know of it?
5  A.  I eventually get back something -- the day
6     it is rate locked, commit the funds, they
7     allocate the funds to the funds, and then
8     immediately the funds hedge if they need
9     to hedge to their portion of the loan.
10 Q.  And what records are there that show the
11    extent to which the loan was hedged?
12 A.  We get back -- well, there should be --
13    eventually -- I mean you immediately see,
14    a day or so after, if not the same day,
15    which funds took a piece -- what portion
16    of the loans that they took.
17 Q.  That is on the date of the hedge?
18 A.  Pretty much.
19 Q.  On the date of the interest lock?
20 A.  The date of the interest lock. The way
21    Hancock did is they allocated the funds
22    before they unlocked the rate, so I could
23    know which funds immediately have which
24    portion of the loan. And sometimes I

Page 115

1     don't get it until the next day in
2     writing, but whatever.
3          But I don't -- at that -- I
4     don't have knowledge of which funds need
5     to hedge their bets at the day of interest
6     rate. Somebody else knows that.
7  Q.  Okay.
8          MR. SCHER: Mark this.
9          (Interest Rate Circle
10              Notification, production
11             numbers JH 00913 through 00920
12             marked Exhibit No. 7 for
13             identification.)
14 BY MR. SCHER:
15 Q.  I show you what I have marked as Malik
16    Exhibit 7.
17          (Handing Exhibit No. 7 to the
18    witness.)
19 Q.  Is that the information that you received
20    regarding the hedge loan?
21          (Pause.)
22          (The witness viewing Exhibit
23    No. 7.)
24 A.  Yes.

Page 116

1  Q.  And is it accurate to say that the
2     allocation is indicated at the bottom
3     third of the page Bates stamped JH 00913?
4  A.  Yes.
5  Q.  And but you don't know the extent to which
6     any one of these allocated -- allocatees
7     is required to hedge; is that right?
8  A.  Not -- no. Typically I don't, no.
9  Q.  Do you know in this case?
10 A.  In this case, I believe when I asked about
11    the hedging I was told later which funds
12    had hedged, but I don't recall now.
13 Q.  Who knows what funds hedged?
14 A.  Whoever I asked, and I forget who I asked.
15 Q.  What department? What country was it?
16 A.  To the U. S.
17 Q.  Get me as close as you can.
18 A.  ISG, I think it is called. I'm not sure
19    what that means, and I'm not quite sure
20    who hedges that. I think it is somebody
21    on a trading desk in the bond department,
22    but I'm not positive.
23 Q.  Are there records which record, refer or
24    reflect the extent to which the

## Page 117

```
1        $32 million was hedged?
2    A.  Yes.  I believe there should be.
3    Q.  And what are those records called?
4    A.  What are they called?
5    Q.  Yes.
6    A.  I don't know what they are called.
7    Q.  What are --
8    A.  I just asked what -- who -- when I asked
9        for what the hedge loss was if we broke
10       the hedge, I came up with the $355,000.
11       Somebody knew what it was, and they had it
12       on probably a worksheet, an Excel
13       worksheet, and broke out what the loss
14       would be.  We may have produced that, I
15       believe, but.
16   Q.  You have the --
17   A.  I wouldn't know unless I asked that
18       somebody produce it.
19   Q.  So are you saying that Malik 6, that is
20       that number, $355,000, is a result of a
21       conversation you had with someone --
22   A.  Right.
23   Q.  -- whose responsibility it is to --
24   A.  And --
```

## Page 118

```
1             MR. DAVIS:  Let him finish his
2        question.
3    Q.  -- to measure, measure the hedge loss;
4        right?
5    A.  Yes.  And they may have sent me something,
6        you know, in writing, too, but I don't
7        know.  And so --
8    Q.  Yes.
9    A.  Okay.  Whatever.
10            MR. SCHER:  I probably just have
11       overlooked it, but I don't see it in my
12       records.
13            MR. DAVIS:  I can check.
14            MR. SCHER:  I would appreciate
15       that.
16            MR. DAVIS:  We have done our
17       best to comb the files.  I would have to
18       go back and take a look.
19            MR. SCHER:  I understand.
20   BY MR. SCHER:
21   Q.  And that hedge is at that -- in a forward
22       commitment, persists for the duration of
23       the commitment; is that right?
24   A.  Yes.
```

## Page 119

```
1    Q.  Is there any manipulation trading to --
2    A.  Usually not.
3    Q.  Okay.
4    A.  Usually not.
5             MR. DAVIS:  Please let him
6        finish his question before you begin
7        answering.
8             Whack.
9             MR. SCHER:  I don't mind.
10   BY MR. SCHER:
11   Q.  Do you know whether in this case there was
12       any change in the hedge?
13   A.  No.
14   Q.  You don't know?
15   A.  No.
16   Q.  And who is responsible for that area
17       today?
18            MR. DAVIS:  For that area, you
19       mean hedging?
20            MR. SCHER:  Hedging.
21   A.  I really don't know.
22   Q.  Somebody in the bond department?
23   A.  Possibly.  That is our -- a subdepartment
24       of the bond department.
```

## Page 120

```
1    Q.  Okay.
2             MR. SCHER:  Mark this.
3             (One-page e-mail dated
4                August 12, 2004, to
5                Mr. Henderson from Mr. Malik,
6                production number JH 01175
7                marked Exhibit No. 8 for
8                identification.)
9    BY MR. SCHER:
10   Q.  I show you what I have had marked as Malik
11       Exhibit 8.
12            (Handing Exhibit No. 8 to the
13       witness.)
14   Q.  This is an e-mail from you to David
15       Henderson --
16   A.  Yes.
17   Q.  -- dated August 12, 2004, at 5:32 p.m.  I
18       ask you to take a moment and review it.
19       When you have completed your review,
20       please let me know.
21            (Pause.)
22            (The witness viewing Exhibit
23       No. 8.)
24   A.  Okay.
```

1  Q.  Is it accurate to say that after you sent

2      your e-mail to Mr. Thomas on August 11th

3      at 7:32 p.m. --

4  A.  Yes.

5  Q.  -- Mr. Thomas did laugh?

6  A.  No.  He rarely laughs.

7  Q.  Was there -- do you have any recollection

8      -- is it accurate to say that there was

9      push-back or resistance to the proposal

10     that you were making?

11 A.  I can't recall.  I really can't.

12 Q.  Is there -- can you tell me, number one,

13     Mr. Henderson was your team leader?

14 A.  Yes.

15 Q.  Is that right?

16 A.  Yes.

17 Q.  And Mr. Thomas was the approver --

18 A.  Yes.

19 Q.  -- of the loan?  And --

20 A.  Well, yes, I think so.

21 Q.  Among the approvers of the loan?

22 A.  Yes.

23 Q.  In this e-mail, your second paragraph, you

24     say, "To make the numbers work, we would

1      need to assume that the expense per unit

2      is 4,957 a unit instead of the original

3      $5,527 a unit"?

4  A.  Yes.

5  Q.  Right?

6  A.  That's what -- I think that's what it

7      says.

8  Q.  What do you mean by "making the numbers

9      work"?

10 A.  Looking at the memo or the e-mail, it

11     looks like the 10 constant, coming up with

12     another way of making the 10 constant

13     hurdle work, other than lowering the

14     reserve estimate down to 150, explaining

15     the risk inherent in the property.

16 Q.  How can you just change the expenses per

17     unit from what was the borrower's

18     estimate?

19 A.  Because the borrower's --

20         MR. DAVIS:  Objection.

21         You can respond.

22         THE WITNESS:  Okay.

23 Q.  The borrower's estimate is this 5,200 --

24     5,500 dollar amount?

1  A.  Right.

2  Q.  How can you --

3  A.  Because his estimate is based on his

4      judgment, and our estimate is based on our

5      judgment.

6  Q.  There was an element of not wanting to

7      lose the deal in connection with your

8      making the numbers work; am I right about

9      that?

10 A.  Yes.

11 Q.  And so you were asking Mr. Henderson to

12     help you out to figure out a way to make

13     the numbers work so that the criteria,

14     including the 10 percent constant, in this

15     case, so that the criteria, the 10 percent

16     constant --

17         MR. SCHER:  Let me start all

18     over.

19 Q.  So you were asking Mr. Henderson to help

20     you out to figure out a way to make the

21     numbers work so that the 10 percent

22     constant criteria could be satisfied; am I

23     right?

24 A.  Partially.

1  Q.  Well, how am I wrong?

2  A.  You will notice that Mr. Thomas is also

3      copied on it.

4  Q.  Yes.  So you are asking him as well?

5  A.  I am just outlining the risks.

6  Q.  Okay.

7  A.  And how conservative a loan it already is,

8      so.  He considered all of those factors in

9      deciding if a 10 percent constant is an

10     important hurdle the way it is

11     underwritten.

12 Q.  And agreed to reduce the reserves so that

13     the 10 percent constant hurdle could be

14     achieved?

15 A.  I assume so.  Yes.

16 Q.  And that assumption is based on your

17     knowledge; right?

18 A.  That assumption is based on the

19     information I have today without pulling

20     out my calculator and see how it was

21     actually done.

22 Q.  I see.

23         MR. SCHER:  We can take a break

24     now for the lunch hour, and you can take

Page 125

```
 1    -- is 45 minutes okay with you?
 2              MR. DAVIS:  Yes.  We will shoot
 3    for that.
 4              (Whereupon, a luncheon recess
 5    was taken at 12:30 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 126

```
 1              AFTERNOON SESSION
 2                 1:25 P.M.
 3    CONTINUED DIRECT EXAMINATION OF MR. MALIK
 4    BY MR. SCHER:
 5  Q.  Am I correct when I say that Malik
 6      Exhibit 1, the document which is Bates
 7      stamped JH 00405 through 425, was the
 8      internal loan approval?
 9  A.  Yes.
10  Q.  And this document was never provided to
11      the borrower; am I right?
12  A.  Yes.
13  Q.  And the, likewise, the document Malik
14      Exhibit 2, which is the e-mail or the
15      memorandum from you to Patricia Coyne, the
16      credit officer, of August 17, 2004, which
17      is Bates stamped JH 01174, that document
18      was not provided to the borrower; am I
19      right?
20  A.  Yes.
21  Q.  I don't know.  Somehow I have the Bates
22      stamp number somewhere else.  The document
23      which is Bates stamped JH 00135, your
24      August 11, 2004 e-mail to John Ferrie,
```

Page 127

```
 1    notes that the hedge loss was $355,000 on
 2    August 11th.  Do you recall reviewing that
 3    document?
 4  A.  Yes.
 5  Q.  Did you calculate the amount of hedge loss
 6      which would have occurred on the date the
 7      loan approval was made, August 17, 2004?
 8  A.  No.
 9  Q.  Is that calculation capable of being
10      performed?
11  A.  I would think so -- oh, at that date?
12  Q.  Could one now today calculate what the
13      hedge loss would have been on August 17,
14      2004?
15  A.  I don't know.
16  Q.  And is it accurate to say that if the loan
17      commitment had not been made that John
18      Hancock would have put out $355,000 as of
19      August 11th -- we don't know what the
20      amount would be as of August 17th -- and
21      would have had to refund all but the
22      $5,000 application fee?
23              MR. DAVIS:  Objection.  You say
24      that that's what was required under the
```

Page 128

```
 1    terms of the agreement?
 2  Q.  Would that have happened?
 3              MR. DAVIS:  Objection.
 4              MR. SCHER:  Okay.
 5  A.  I don't understand your question.  You
 6      will have to give it to me again.
 7  Q.  Okay.  So we are at August 17, 2004, and
 8      the loan approval is not given, rejected,
 9      the signatures are not obtained.  As a
10      result of that, the application fee and
11      processing fee are refunded?
12  A.  The application --
13              MR. DAVIS:  Objection.
14              You can respond.
15  A.  The application and commitment fee are
16      refunded.
17  Q.  Yes.
18  A.  The processing fee was the $5,000 that is
19      not refundable.
20  Q.  That's not refundable?
21  A.  Right.
22  Q.  As of August 17, 2004, the -- whatever
23      hedge loss had been sustained as of that
24      moment would be sustained?
```

Page 129

1           MR. DAVIS:  Objection.
2   A.  I believe that's the case, but I would
3       have to again look at the loan document --
4       at the commitment to get confirmation on
5       that.
6   Q.  That is that if the loan application is
7       rejected, does John Hancock get to keep
8       any of the processing fees?
9   A.  I don't believe so.
10  Q.  Or commitment fees?
11  A.  I don't believe so.
12  Q.  So based on your best belief --
13  A.  Excuse me.  You said processing fees?
14  Q.  I keep on saying that.  I apologize.  It
15      is the 960?
16  A.  Right.
17  Q.  Not the 965, not the five?
18  A.  Right.
19  Q.  So is it accurate to say that the hedge
20      loss as of August 17, if any, would have
21      to have been absorbed by John Hancock had
22      the loan commitment not been made?
23          MR. DAVIS:  Objection.
24  A.  I'm not sure, but I believe so.

Page 130

1   Q.  Continuing in the process, after the loan
2       commitment was made, the borrower would,
3       within the period of time provided for in
4       the loan commitment, request that the loan
5       be funded, the $32 million loan be funded?
6       That would be the normal process; am I
7       right?
8           MR. DAVIS:  Objection.
9   A.  I am not quite -- you have to again
10      rephrase that question.
11  Q.  Okay.  I am trying to have you tell me
12      what the closing of the loan process
13      includes.  So could you do that?
14  A.  Sure.  There is a whole bunch of criteria
15      in the commitment regarding reports,
16      physical report, environmental reports,
17      title work, title insurance, and a certain
18      occupancy, and a certified rent roll to
19      verify that occupancy, and other criteria
20      that are outlined.
21  Q.  All right.
22  A.  When all of that is provided, then the
23      borrower would estimate what he thinks --
24      when he would like to close it, and we

Page 131

1       close --
2   Q.  What --
3   A.  -- as long as it is inside the outside
4       closing date.
5   Q.  All right.
6   A.  As long as the requested closing date is
7       within the outside closing date.
8   Q.  Okay.  Internally within John Hancock,
9       what process is undertaken to fund the
10      loan?  In other words, prior to the time
11      that the $32 million is disbursed to the
12      borrower, what does John Hancock have to
13      do internally?
14  A.  We collect all the documents.  We produce
15      a closing statement.  We have the borrower
16      sign the closing statement.  We request
17      the funds and close the loan on the day
18      that it's required.  There is no other
19      approvals required as long as the loan
20      meets the criteria of the commitment.
21  Q.  So the form work that, if you will, to get
22      the cash from the John Hancock, what form
23      is employed for that purpose?
24  A.  I don't know.  That -- we have a closer

Page 132

1       who is assigned to it --
2   Q.  Yes.
3   A.  -- who is on the other side of the floor.
4       They gather and coordinate all the
5       information that is needed, and I think
6       they just call to say, "We'll need these
7       funds," and they send the loan disbursal
8       statement, called LDS, to whoever is at
9       treasury, and they produce the funds
10      through the wiring source, wire the funds
11      to the escrow agent, and then our outside
12      counsel makes sure that we have everything
13      we need to close the loan.
14  Q.  Does the securing of the cash, the wire
15      transfer of the funds, require a review of
16      the loan approval?
17  A.  Yes.  The closer reviews that --
18  Q.  And --
19  A.  -- as the information comes in.
20  Q.  And the credit review that Patricia Coyne
21      prepared in this case?
22  A.  They may look at that.
23  Q.  Okay.
24  A.  Ordinarily just looked at the approval.

## Page 133

1    Q.    Ordinarily, the closer would just take
2          Malik 1?
3    A.    Right.
4    Q.    The approval?
5    A.    Right.
6    Q.    The commitment letter -- the commitment --
7          the loan approval document?
8    A.    Yes.
9    Q.    Malik 1?
10   A.    Yes.
11   Q.    And take that, and then call upon the --
12         so long as all the criteria set forth in
13         Malik 1 had been satisfied, --
14   A.    Right.
15   Q.    -- send me the money?
16   A.    Right.
17   Q.    Prior to today, is it accurate to say that
18         you have been in Mr. Koller's company on
19         one occasion?
20   A.    I believe that's the case.
21   Q.    And the same with respect to Joe Kelly?
22   A.    Yes.  I think so.
23   Q.    And that was the same occasion?  That was
24         a lunch?

## Page 134

1    A.    Yes.
2    Q.    A luncheon you had?
3    A.    Yes.
4    Q.    And Mr. Ferrie was in attendance as well?
5    A.    Yes.
6    Q.    Was there anyone else there besides the
7          four of you?
8    A.    No.
9    Q.    Do you have any recollection of what
10         occurred at that luncheon?
11   A.    I believe -- and I knew ahead of time --
12         that they wanted to discuss doing away
13         with the commitments and being relieved of
14         the obligations under it.
15   Q.    And what was discussed?  What was the gist
16         of what you recall being discussed?
17   A.    Well, I think I just told you what was
18         discussed.
19   Q.    That was it?  You knew in advance that was
20         going to be discussed, and in fact it was
21         discussed?
22   A.    Yes.
23   Q.    And do you recall anything else about that
24         discussion?

## Page 135

1    A.    I recall that Jim talked about the
2          previous deals that they had sold, and
3          they had plenty of cash, and that they
4          were happy with their development, that it
5          was doing well, that it was leasing okay,
6          that he would like to have us withdraw the
7          commitment for the cost of the deposits,
8          and that I replied it wasn't my decision,
9          and I would let him know if that's
10         possible or not.
11               MR. SCHER:  Let's mark this as
12         the next exhibit.
13               (Two-page e-mail string, most
14               recent e-mail dated May 31,
15               2005, to Mr. Roseen from
16               Mr. Malik, production numbers
17               JH 01211 through 01212 marked
18               Exhibit No. 9 for
19               identification.)
20   BY MR. SCHER:
21   Q.    This is Malik Exhibit No. 9.
22   A.    Yes.
23               (Handing Exhibit No. 9 to the
24         witness.)

## Page 136

1    Q.    Why don't you take a moment, if you would.
2          It is -- first let me identify it.  It
3          appears to have been printed from Timothy
4          Roseen's printer?
5    A.    Um-hmm.
6    Q.    You can say yes, so it makes you seem much
7          more intelligent.
8    A.    Well, you are assuming a lot.
9                (Laughter.)
10   Q.    Bates stamped JH 01210 and 1212.  So now
11         take a moment and review it.  Take as much
12         time as you need and review it, and let me
13         know when you have completed your review.
14               (Pause.)
15               (The witness viewing Exhibit
16         No. 9.)
17   Q.    Have you had an opportunity to review that
18         document?
19   A.    Briefly, yes.
20   Q.    And is it accurate to say that Timothy
21         Roseen is the person to whom you report
22         since Mr. Henderson left?
23   A.    That's probably the case.
24   Q.    Okay.  You say "probably."  Are you being

Page 137

1   facetious?

2   A.  I'm not sure.

3   Q.  And Barry Nectow is the same person to

4       whom you made reference earlier with

5       respect to the subject of Regatta and

6       Avenel?

7   A.  Yes.

8   Q.  And is the description from Mr. Ferrie in

9       the lunch accurate in all respects to the

10      best of your knowledge?

11              MR. DAVIS:  Take a moment and

12      read it, please.

13              (Pause.)

14              (The witness viewing Exhibit

15      No. 9.)

16              MR. DAVIS:  Howard, I want to

17      note for the record that I think the lunch

18      meeting that is referred to in

19      Mr. Ferrie's May 31 e-mail is a different

20      lunch meeting --

21              MR. SCHER:  Okay.

22              MR. DAVIS:  -- than the one that

23      Mr. Malik just referred to.

24              MR. SCHER:  Okay.  Sorry.

Page 138

1               THE WITNESS:  Okay.  So I guess

2       I don't -- that's my response.

3       BY MR. SCHER:

4   Q.  So can you tell me whether that lunch

5       occurred before or after May 31?

6   A.  I really don't know the date actually.

7   Q.  You testified that -- so you testified

8       that at the lunch that you remember you

9       replied that the decision with respect to

10      the unwinding or withdrawal of the

11      commitment for the costs of the deposits

12      was not yours, and you didn't know whether

13      it was possible or not.  What, if

14      anything, did you do following that event

15      to determine whether or not it was

16      possible?

17  A.  I mentioned what happened -- transpired to

18      Dave Henderson and what the situation was.

19  Q.  Anything else?

20  A.  And that's about it.

21  Q.  Did you hear anything back from Dave

22      Henderson or anyone else?

23  A.  At some point I did, yes.

24  Q.  Do you recall --

Page 139

1               MR. DAVIS:  I caution you that

2       in responding you shouldn't disclose any

3       attorney-client communications that took

4       place within Hancock.

5               THE WITNESS:  I don't know what

6       you are referring to.

7               MR. DAVIS:  It --

8               MR. SCHER:  You are safe.

9               MR. DAVIS:  Let me talk to my

10      client just for a moment about that,

11      please.

12              MR. SCHER:  Sure.

13              MR. DAVIS:  Come on out here.

14              THE WITNESS:  Okay.

15              (The witness and Mr. Davis

16      exiting the deposition room at 1:43 p.m.

17      and reentering the deposition room at

18      1:44 p.m.)

19      BY MR. SCHER:

20  Q.  Did you hear anything back from Dave

21      Henderson or anyone else regarding the

22      unwinding of the commitment?

23  A.  Yes.  At some point, I did.

24  Q.  And can you tell me first from whom you

Page 140

1       heard back?

2   A.  I believe I heard from Dave.

3   Q.  And anyone else?

4   A.  Not that I recall.

5   Q.  What did you hear from Dave?

6   A.  That management was -- did not want to

7       accept only the deposits.

8   Q.  Was any other information provided, such

9       as the identification of who in management

10      did not want to accept just the deposits?

11  A.  No.  That was not provided.

12  Q.  So Dave Henderson just told you management

13      did not want to accept just the deposits;

14      is that right?

15  A.  Yes.

16  Q.  Where is Dave Henderson today?

17  A.  I believe he is working for GE.

18  Q.  Where?

19  A.  In Boston.

20  Q.  On his boat or -- no?

21  A.  No.  It won't fit in his office, I'm

22      afraid.

23  Q.  Okay.  Oh.

24              MR. DAVIS:  I thought that was a

**35 (Pages 137 to 140)**

Page 141

1      good come-back actually.
2                MR. SCHER:  I did, too.
3                (Laughter.)
4      BY MR. SCHER:
5   Q.  In the exhibit you have before you, Malik
6      Exhibit 9, --
7   A.  Yes.
8   Q.  -- there is a reference at the bottom
9      which says, "My assessment"?
10  A.  Yes.
11  Q.  And it is obviously Mr. Ferrie's
12     assessment to you --
13  A.  Yes.
14  Q.  -- of Mr. Koller?
15  A.  Yes.
16  Q.  Do you have any information inconsistent
17     with what Mr. Ferrie reports to you
18     regarding Mr. Koller's character and the
19     character of Mr. Kelly?
20            MR. DAVIS:  Objection.
21  A.  Do I have any other additional
22     information?
23  Q.  Yes.
24  A.  About?

Page 142

1   Q.  Do you?
2   A.  About?
3   Q.  Their honesty, trustworthiness, of
4      Messrs. Kelly, Koller, or Palopoli.
5            MR. DAVIS:  Same objection.
6   A.  I have nothing more to add or to detract
7      from what he says.
8   Q.  Okay.  I know you don't know who in
9      management made the decision that
10     Mr. Henderson reported to you, but do you
11     know what individuals had the authority to
12     make such a decision at the time?
13  A.  I'm not quite sure who had the authority
14     to make the decision at the time.
15  Q.  Well, who do you think did?
16            MR. DAVIS:  Objection.
17  A.  I don't want to speculate.
18  Q.  Really?  Would it be speculation to
19     identify the people?  Would it be
20     speculation to say that Mr. Nectow was
21     involved or that Mr. Roseen was involved
22     or Mr. --
23  A.  Anybody could have been involved --
24  Q.  Okay.

Page 143

1   A.  -- above me who was in management.
2   Q.  And you have no idea who it was?
3   A.  No, I don't.
4   Q.  That's your testimony?
5   A.  It is.
6            MR. SCHER:  Let me do this.
7      Mark this.
8            (One-page e-mail dated June 9,
9            2005, to Mr. Malik from
10           Mr. Ferrie, production number
11           JH 01196 marked Exhibit No. 10
12           for identification.)
13  BY MR. SCHER:
14  Q.  I show you what I have marked as Malik
15     Exhibit 10.
16           (Handing Exhibit No. 10 to the
17     witness.)
18  Q.  This is a document Bates stamped JH 01196,
19     and it is from Mr. Ferrie to you dated
20     June 9, 2005, at 10:06 a.m., showing
21     carbon copies to Jessica Yaffie Leveroni
22     and Tom Rogers.  Do you see that?
23  A.  Yes, I do.
24  Q.  Can you tell me who Jessica Yaffie

Page 144

1      Leveroni is?
2   A.  Jessica is a John Hancock in-house lawyer.
3      Was.  Is no longer with us.
4   Q.  Where is she now?
5   A.  I'm not sure.
6   Q.  When did she leave?
7   A.  Six months ago, eight months ago.
8   Q.  What were the circumstances of her
9      leaving?
10  A.  New baby.
11  Q.  So -- okay.  And Tom Rogers is outside
12     counsel for John Hancock on this
13     transaction?
14  A.  Correct.
15  Q.  Did you have any conversations with
16     Mr. Koller or representatives of the
17     borrower subsequent to your lunch outside
18     their physical presence?
19  A.  You know, not that I recall.
20  Q.  Okay.  And take a moment and review this
21     e-mail, if you would.
22           (Pause.)
23           (The witness viewing Exhibit
24     No. 10.)

Page 145

1  A.  Okay.  I have done it.
2  Q.  Did you do so?
3  A.  Yes.
4  Q.  Can you tell me what, if any, reaction you
5      had to it?
6  A.  Neutral.
7  Q.  Did you learn that -- do you have an
8      understanding as to why the -- well, who
9      made the decision to seek yield
10     maintenance penalty and hedge costs as
11     well as payment of third-party costs that
12     is reflected in this June 9 e-mail?
13 A.  I think John represented that to the
14     borrower.
15 Q.  Do you know who made the decision to seek
16     those?
17 A.  I'm not sure he is seeking it.  He is
18     stating what we have the right to -- what
19     he believes we have the right to --
20 Q.  Okay.
21 A.  -- without review of counsel or me.  I'm
22     speculating here.
23         MR. DAVIS:  Don't speculate.
24         THE WITNESS:  All right.  I

Page 146

1      won't.
2  Q.  Are you aware of John Hancock's hedge
3      costs as of August 2005?
4  A.  I know there were hedge costs.  I'm not
5      quite sure what they are off the top of my
6      head.
7  Q.  This -- the hedge costs in August of 2004
8      were $355,000 on one date, and this e-mail
9      suggests that the hedge costs were
10     $86,000.  Can you explain to me how both
11     can be accurate?
12         MR. DAVIS:  Objection.
13 A.  How they can be accurate?
14 Q.  Yes.  Are they both accurate as far as you
15     know?
16 A.  I don't -- as far as I know, they are
17     accurate.  I don't know how accurate they
18     are.
19         Since a hedge is based on
20     relative interest rates, the relative
21     interest rates -- the derivative you buy
22     and market shifts, then the hedge costs
23     will shift up and down, so over time, they
24     could change.

Page 147

1  Q.  So it is conceivable that the hedge cost
2      could be zero?
3  A.  Yes.
4  Q.  And do you know how the yield maintenance
5      penalty is calculated?
6  A.  Yes.
7  Q.  How?
8  A.  It is the present value of the debt
9      service -- it is the present value of the
10     difference between a certain treasury and
11     the interest rate over the life of the
12     loan.
13 Q.  Do you know what the actual difference is
14     between the interest rate over the life of
15     the loan present value and the amounts
16     earned by John Hancock for any period of
17     time?
18         MR. DAVIS:  Objection.
19 A.  I don't think you could have said that one
20     in a more vague fashion.
21 Q.  Okay.  I can try.
22         (Laughter.)
23 Q.  If we take the period -- take a period of
24     time, and looking backward, do you know

Page 148

1      the earning of -- first of all, do you
2      know whether any portion of the
3      $32 million was actually earmarked?
4          MR. DAVIS:  Objection.
5  A.  I'm not quite sure what the cash
6      management policies are of John Hancock.
7  Q.  Okay.  Who would know?
8  A.  What individual?
9  Q.  What group, organization, anything you can
10     tell me.
11 A.  Possibly treasury.  I'm not sure.
12 Q.  Okay.  Does the allocation reflected in
13     the loan commitment have anything to do
14     with the realization by John Hancock of
15     the -- or the earmarking by John Hancock?
16         MR. DAVIS:  Objection.
17 A.  Buyer marking, do you mean setting the
18     funds aside or --
19 Q.  Yes.
20 A.  -- posting a date in the future when you
21     need to have some funds set aside?  Either
22     of those?  Right; right?
23 Q.  Yes.
24 A.  I'm sure it does.  Yes.

37 (Pages 145 to 148)

Page 149

1  Q.  So the -- I didn't get the identification
2      of these entities, but GBRE, what does
3      that represent?  Do you know?
4  A.  I believe that is the line of business
5      that issues GICs, guaranteed income
6      contracts.
7  Q.  And so what literally does the allocation
8      of $3.9 million to GBRE on the date of
9      approval, August 17, 2004, mean?
10 A.  It means that we will take that much money
11     from them and return a certain return to
12     them based on that percentage of the loan.
13 Q.  When the loan is closed?
14 A.  Yes.
15 Q.  So it means nothing with respect to --
16     there is no change with respect to -- no
17     change, no internal financial change is
18     made at the time of the commitment?
19         MR. DAVIS:  Objection.
20 A.  I'm not quite sure.
21 Q.  Who would know?
22 A.  I'm not quite sure.
23 Q.  Since the loan was never closed, this
24     allocation in the commitment is academic,

Page 150

1      meaning it has no consequence; am I right
2      about that?
3         MR. DAVIS:  Objection.
4  A.  I believe there are hedge costs that will
5      have to be paid when we sell off the
6      derivatives.  Right.
7  Q.  Okay.  So when you sold off the
8      derivatives -- have you sold off the
9      derivatives?
10 A.  I believe they unwound that position.
11 Q.  They?
12 A.  Unwound that position, yes.
13 Q.  And did they unwind that position -- who
14     is "they" that unwound that position?
15 A.  The people who placed the hedge initially,
16     the department in the bond department.
17 Q.  Okay.  And that -- the bond department
18     which placed the hedge originally and
19     notified you of the interest circle lock
20     are the same people who unwound that hedge
21     position when it became known that the
22     loan would not close; am I right?
23 A.  I believe that's the case.
24 Q.  And those people would know what the cost

Page 151

1      of that hedge was for its duration; am I
2      right?
3  A.  Yes.
4  Q.  Do you know what the cost was or an
5      estimate of what that cost was other than
6      what is contained in the e-mail that I
7      just showed you, $86,000?
8  A.  I believe there was a cost.  I don't know
9      what it is off the top of my head.
10 Q.  Was it four figures, five figures, six
11     figures?  Do you remember?
12 A.  I'm not sure.  I think it was six, but.
13 Q.  Okay.  And where did you see this
14     calculation?
15 A.  I don't know if I saw the calculation or
16     it was told to me.
17 Q.  Who told it to you?
18 A.  I don't recall.
19 Q.  When did they tell it to you, whoever it
20     was that told it to you?
21 A.  I recall that even less.
22 Q.  That is even less?
23 A.  Yes.
24 Q.  Okay.  Is there a process by which the

Page 152

1      hedge cost is calculated on the occasion
2      of the nonfunding of a loan?
3  A.  It would be the same calculation as it
4      would when you are speculating as to what
5      it costs any time.  Yes.
6  Q.  Did you receive formal notification that
7      the hedge had been eliminated for this
8      loan?
9  A.  No.  I just asked them to unwind it
10     because it wasn't going to close, and then
11     they unwound it.
12 Q.  When did you ask them to unwind it?
13 A.  Shortly after we received their letter, I
14     believe.
15 Q.  In June of '05?
16 A.  Whenever that happened to be.
17 Q.  And did you ask them to unwind the hedge
18     in a writing?
19 A.  No.
20 Q.  How did you do it?
21 A.  Just told portfolio management that we --
22     the loan was dead, unwind the position,
23     and that's the last I heard of it.
24 Q.  When you called portfolio, did you have a

Page 153

1    name that you called?
2  A.  At that time I believe either Barry Nectow
3      or Diane Crisileo, and Diane is no longer
4      there. One of those two.
5  Q.  And is it fair to say that that unwinding
6      occurred at or about the time of the
7      e-mail from John Ferrie to you, Malik
8      Exhibit 10?
9          MR. DAVIS: Objection.
10 A.  I don't know. I think I already testified
11     I didn't know.
12 Q.  Was it -- do you know in relationship to
13     that e-mail whether it was before or after
14     you met with Mr. Koller?
15 A.  I'm not sure. It would have to be after I
16     met with Mr. Koller.
17 Q.  After?
18 A.  Yes.
19 Q.  Was it shortly after you met with
20     Mr. Koller?
21 A.  If I'm not mistaken, I think I said
22     shortly after I received their letter
23     formally cancelling the commitment.
24 Q.  Okay. Just to go back to a question I was

Page 154

1      asking you earlier, is it accurate to say
2      that other than the hedge that you
3      identified that you testified occurred in
4      early August 2004 and the costs attendant
5      with that hedge, there was no change made
6      to and in anticipation of the funding of
7      the $32 million loan to Avenel?
8          MR. DAVIS: Objection. Asked
9      and answered, I believe.
10 A.  Could you say that a little faster?
11 Q.  Yes. There is no change, no internal
12     financial change, made at the time of the
13     commitment except that there is a hedge
14     acquired at the time of the rate lock?
15         MR. DAVIS: Objection. Asked
16     and answered.
17 A.  No other internal change to what?
18 Q.  Financial. No internal financial change.
19         MR. DAVIS: Objection.
20 A.  I still don't understand. A corporation
21     the size of Hancock is changing all the
22     time. I don't know what you are referring
23     to.
24 Q.  Okay.

Page 155

1          MR. DAVIS: I object, Howard. I
2      think he testified earlier that he didn't
3      know whether that was the case or not.
4          MR. SCHER: He said he wasn't
5      quite sure, and I am just trying to
6      understand if he knows anything about
7      that.
8          MR. DAVIS: All right.
9  BY MR. SCHER:
10 Q.  Other than the hedge costs that were paid
11     when the derivatives were paid off at the
12     time that the borrower, prospective
13     borrower, indicated to you that it was not
14     going to close the loan, are there any
15     other costs of which you are aware?
16         MR. DAVIS: Objection.
17 A.  I believe the only other costs would be
18     legal costs. We started no other reports
19     before they asked to blow up the
20     commitment.
21 Q.  Thank you.
22         MR. DAVIS: I am going to ask
23     for two seconds.
24         MR. SCHER: Sure.

Page 156

1          (Recess taken at 2:09 p.m.)
2          (Recess ended at 2:15 p.m.)
3  BY MR. SCHER:
4  Q.  To the best of your knowledge -- by the
5      way, that comment about speaking slowly,
6      it is impossible to follow people who talk
7      slowly, and I agree with you, and I
8      empathize with you, and I resonate.
9          Was there ever a time that the
10     borrower was qualified for the loan, had
11     met the qualifications to have the loan
12     made?
13 A.  Yes.
14 Q.  When was that?
15 A.  At the commitment.
16 Q.  Okay. From the time of the commitment to
17     August of 2005, are you aware of any time
18     when the borrower was qualified to have
19     the loan funded --
20         MR. DAVIS: Objection.
21 Q.  -- in the amount of $32 million?
22         MR. DAVIS: Objection.
23         You can respond.
24 A.  The loan commitment was designed so that

## Page 157

1    by the time of August 1st it would be
2    funded.
3  Q.  Right.  So on August 1st, 2005, do you
4    have any information which would support
5    or refute the statement that the fund
6    would -- the $32 million loan would be
7    funded?
8  A.  At the time I met with Jim and his
9    partner, I thought that they were making
10   good progress with the leasing and it was
11   likely to be funded within the guidelines.
12 Q.  Okay.  Did there ever come a time when you
13   were disabused of that?
14 A.  Oh, I can't say that I was.
15 Q.  Okay.  Did you ever undertake to determine
16   whether or not the rental rate was
17   sufficient to cause the loan to be funded
18   as of today?
19 A.  When they wanted to blow up the loan, it
20   was no longer a concern of mine.
21 Q.  Okay.  So from the time that you learned
22   that they wanted to not close the loan,
23   you were no longer concerned as to whether
24   or not they qualified for -- to have the

## Page 158

1    loan funded?
2  A.  Not as -- no.  Of course not.
3  Q.  Then what did you mean?  What did you mean
4    by that time?
5  A.  No -- I am agreeing with you.  Yes.
6  Q.  Okay.  So other than your knowledge that
7    they were well on their way to being
8    qualified to have the loan funded as of
9    the time you met with them, you don't have
10   any information as to whether or not they
11   were qualified to have the loan closed; is
12   that right?
13 A.  I --
14         MR. DAVIS:  Objection.
15         You can respond.
16 A.  I understand that John conveyed to me some
17   times after the point that they started
18   negotiating the blowup of the loan that
19   they weren't leasing at a high enough
20   rate.
21 Q.  Okay.  And that -- and you do know that?
22 A.  Yes.
23 Q.  And, of course, the rental rate
24   achievement was one of the criteria for

## Page 159

1    the funding of the loan; am I right?
2  A.  Yes.
3  Q.  Okay.  Okay.  I say funding, but closing
4    the loan?
5  A.  Right.
6  Q.  And you know I was just -- I mentioned the
7    rental rate.  I was talking about
8    occupancy.  You knew that; right?
9  A.  Yes.
10 Q.  That I meant occupancy?  You knew that?
11   Yes?
12 A.  Yes.
13 Q.  And do you recall on the occasion when you
14   met with Messrs. Koller and Kelly that you
15   made the comment that you learned that
16   there was a prospect or a possibility on
17   the part of the owners, the borrowers, to
18   sell the development?
19 A.  Yes.
20 Q.  And what did you learn about that?  What
21   do you recall learning about that?
22 A.  That they wanted to sell the --
23 Q.  Okay.  Did you learn anything else?
24   Price?  Value?

## Page 160

1  A.  That they were approached by another
2    broker who thought he could sell it for
3    much more than they thought they could
4    sell it for, even before it was leased up,
5    and they were happy about that, and that's
6    what they wanted to do.
7  Q.  And do you remember your comment?
8  A.  No.
9  Q.  Do you recall saying, "It's nice to have
10   options"?
11 A.  No.  I don't recall that.
12 Q.  Did you report that to anyone at John
13   Hancock?
14 A.  I told Dave Henderson about the meeting
15   afterwards.
16 Q.  Did you tell him specifically that the
17   borrowers had a new plan and that plan
18   involved selling the property before it
19   became fully occupied?
20 A.  I told him that's what they wanted to do.
21 Q.  And did you tell him what the prospects
22   were -- the prospects they had been told
23   existed with respect to a resale price or
24   sale price?

## Page 161

1  A.  I think there was a vague price, but I
2      don't recall what it was.
3  Q.  Was it --
4  A.  It was much more than they thought they
5      were going to be able to get for it fully
6      occupied.
7  Q.  It was a very attractive price?
8  A.  Yes, it was.  I believe so.
9  Q.  Okay.
10  A.  They were pretty happy.
11  Q.  Right.  Is it accurate to say that John
12     Hancock wanted to participate in that
13     upside to a certain -- to some extent?
14          MR. DAVIS:  Objection.
15  A.  I believe we wanted to have our commitment
16     honored.
17  Q.  You wanted to have your commitment
18     honored?
19  A.  Correct.
20  Q.  Nothing more; is that right?
21  A.  I believe that's the case.
22  Q.  Okay.  And you have no explanation as to
23     why John Hancock wanted to have their
24     commitment honored with respect to Avenel

## Page 162

1      differently than they wanted to have it
2      honored with respect to Regatta?
3          MR. DAVIS:  Objection.
4  A.  I don't think I need to explain that.
5  Q.  Again?  Because you have explained it once
6      already?
7  A.  Well, I don't think Regatta -- I don't
8      think I need to explain the difference.
9  Q.  And why is that?  Why don't you think you
10     need to explain it?  I ask you to explain
11     it.
12          MR. DAVIS:  I object, in part
13     because I think -- I still don't
14     understand the relevance here of what
15     Hancock did with respect to another
16     contract.
17          MR. SCHER:  All right.
18          MR. DAVIS:  Hancock certainly
19     has the right to enforce contracts as it
20     sees fit, as permitted by the law.
21          MR. SCHER:  Right.
22          MR. DAVIS:  So I don't
23     understand the relevancy, in any respect,
24     of the Regatta deal.

## Page 163

1          THE WITNESS:  Yes.
2          MR. DAVIS:  But I haven't raised
3      relevance objections, because I think that
4      those are reserved.
5          MR. SCHER:  Absolutely.
6          THE WITNESS:  And it is also not
7      my decision as to one was not and the
8      other one was, as I already explained.
9      Therefore, I would be speculating a whole
10     bunch as to why different parties had
11     different decisions.
12  BY MR. SCHER:
13  Q.  You said you didn't think you needed to --
14     needed to explain the difference.  I am
15     asking you why don't you think you need to
16     explain the difference.
17  A.  Because I have already explained it.
18          MR. DAVIS:  Objection.
19  Q.  Because you have already explained it?
20  A.  Correct.
21  Q.  So whatever you said in this deposition is
22     the explanation; am I right?
23          MR. DAVIS:  Objection.  I think
24     you are arguing with him now.

## Page 164

1  A.  The explanation is it wasn't my decision
2      in either case.
3  Q.  Okay.
4  A.  And it was made by different parties.  So
5      I -- for me to explain what different
6      parties' thinkings are --
7  Q.  Not for you?  You can't do that?
8  A.  I don't see how I can.
9  Q.  Okay.
10  A.  Poorly worded, I know.
11  Q.  Yours was perfect; mine was poorly worded.
12          MR. SCHER:  Okay.  If we could
13     mark that.
14          (One-page Preliminary Loan
15           Information Worksheet for
16           Multifamily Properties,
17           production number JH 00102
18           marked Exhibit No. 11 for
19           identification.)
20  BY MR. SCHER:
21  Q.  I will show you what has been marked as
22     Malik Exhibit 11.
23          (Handing Exhibit No. 11 to the
24           witness.)

41 (Pages 161 to 164)

Page 165

1  Q.  This is a document that is Bates stamped
2      JH 00102.
3          (Pause.)
4          (The witness viewing Exhibit
5      No. 11.)
6  Q.  This is a John Hancock Real Estate
7      Investment Group form; is that right?
8  A.  Yes.
9  Q.  And it is entitled "Preliminary Loan
10     Information Worksheet for Multifamily
11     Properties"; is that right?
12 A.  Yes.
13 Q.  And was this -- this was prepared by John
14     Ferrie and Brian Depolis?
15 A.  Depolis, yes.
16 Q.  The correspondent firm is JHREF. Do you
17     know what that is?
18 A.  John Hancock Real Estate Finance. That's
19     the sub that they worked for.
20 Q.  That is who they worked for then; is that
21     right?
22 A.  Yes.
23 Q.  And the contact was Rob Kelly, the brother
24     of one of the principals; right?

Page 166

1  A.  Yes.
2  Q.  And this -- and you are identified as the
3      Boston underwriter?
4  A.  Yes.
5  Q.  Is that an accurate description of your
6      role in this case?
7  A.  Yes.
8  Q.  And the -- can you tell me where you got
9      this? Did you ever -- did you get this at
10     or about the time --
11 A.  The date in the upper right-hand corner
12     there, 12-05-05, 1:33 p.m.
13 Q.  That is when it was printed or updated?
14 A.  Yes.
15 Q.  Do you recall when you -- what -- where
16     this form comes in the process?
17 A.  This is a -- it is linked to a larger
18     worksheet that has the rent roll and the
19     roll schedule so you can get a sense of
20     the turnover schedule, and not -- not --
21     excuse me. That's for apartment -- office
22     buildings. This one will have a rent roll
23     and operating income on another worksheet
24     attached to it that works into this

Page 167

1      worksheet. It is a way of quickly trying
2      to understand what the loan parameters
3      are.
4          Do you need an explanation of
5      how it works?
6  Q.  First of all, I just wanted to observe to
7      you that that very tiny print down at the
8      bottom has Avenel June 11, '04 xls.
9  A.  Yes.
10 Q.  Is that the date on or about it was
11     prepared?
12 A.  I'm not sure.
13 Q.  Okay. Yes. Would you tell me --
14 A.  It says on the right-hand side "last
15     updated" on the bottom.
16 Q.  January 8, '04?
17 A.  Yes.
18 Q.  Now that -- I am assuming that that is
19     when the form was last updated?
20 A.  Right.
21 Q.  And that its application to the Avenel
22     situation occurred on June 11, '04?
23 A.  You know, that is interesting. Because it
24     doesn't fit to the date it was printed,

Page 168

1      updated. The one on the top I think is
2      the accurate one. I'm not sure where --
3      why it has two different dates on the
4      bottom.
5  Q.  Okay.
6          MR. DAVIS: I suspect the date
7      at the top, the 12-05-05 date, is when it
8      was printed for discovery purposes.
9          MR. SCHER: Yes. That would be
10     my assumption as well.
11         THE WITNESS: Oh, okay. That
12     makes sense.
13 BY MR. SCHER:
14 Q.  It is an Excel form; is that right?
15 A.  Yes.
16 Q.  And was this form used in connection with
17     the Avenel project on more than this first
18     occasion?
19 A.  Probably. It is updated and played with
20     regularly, just as -- as you stress test
21     the property with different ideas as to
22     what, you know, the reserves would be,
23     what the -- you don't see it, because it
24     is behind this sheet. There are two other

## Page 169

1  pages that go with it, what the reserves
2  are, what the vacancy factor is, what the
3  expenses are, what the rents are, what the
4  occupancy is -- the same thing as vacancy.
5  Yes. And then what comes out is as the
6  interest -- as the treasury changes or as
7  interest rate changes, you see the
8  coverage down below. It says debt service
9  coverage calculation. You will see
10  changes to the loan to value.
11 Q.  Here we go.
12 A.  Right. It is a way to quickly -- it is a
13     form you use for all apartment loans for
14     all correspondents at all offices, so that
15     when you compare different projects, they
16     all come up with the same type of
17     calculation.
18 Q.  Okay.
19 A.  It is the way of making the underwriting
20     across the whole portfolio consistent.
21         (Two-page e-mail string, most
22         recent e-mail dated June 17,
23         2004, to Mr. Malik from
24         Mr. Ferrie and attachment,

## Page 170

1         production numbers JH 00100
2         through 00105 marked Exhibit
3         No. 12 for identification.)
4  BY MR. SCHER:
5  Q.  Now I will show you what I have had marked
6      Malik Exhibit 12.
7          (Handing Exhibit No. 12 to the
8      witness.)
9  Q.  And this document appears to be an e-mail
10     which originated with a Kevin Collins
11     dated June 4, 2004, and then forwarded
12     from John Ferrie to you on June 17, 2004?
13 A.  Yes.
14 Q.  And it indicates that attached are two
15     Excel sheets: One is Avenel, June 11,
16     xls, and the other one is Avenel rating,
17     June 17, xls?
18 A.  Right.
19 Q.  And then you can see the Bates stamp
20     numbers --
21 A.  Yes.
22 Q.  -- sequentially?
23 A.  Yes.
24 Q.  So these are JH 102. Now you see JH 103

## Page 171

1      and JH 104?
2  A.  Right. Those are the two sheets behind I
3      mentioned.
4  Q.  And JH 105?
5  A.  Okay.
6  Q.  And that -- then that -- is that accurate
7      to say that that was the initial
8      submission by the field, John Hancock's
9      field operators, to initiate this loan
10     possibility?
11 A.  You know, I don't recall Scott McIsaac
12     being involved in this, but apparently he
13     was. I'm not quite sure if this is
14     another broker who heard of the
15     transaction and sent it to us through --
16     through Scott and got that John was
17     already working on it. I don't -- you
18     know, I really am not sure.
19 Q.  Okay.
20 A.  But somehow it got to John and possibly
21     went through Scott McIsaac. For some
22     reason, I thought it came in another
23     fashion to John.
24 Q.  Now on that first page, JH -- I am sorry

## Page 172

1      -- JH 102, it indicates that the
2      refinancing constant is 9.66 percent?
3  A.  Yes.
4  Q.  Is that the constant?
5  A.  That was the constant that John Hancock
6      used for many years based on what the
7      securitization world was looking for.
8  Q.  Is that the same 10 percent constant
9      that --
10 A.  But Manulife has a 10 percent constant.
11 Q.  Okay. Page JH 104, which is a June 11th
12     date prepared, operating history and pro
13     forma, it shows a vacancy allowance of
14     five percent. Do you see that?
15 A.  Yes.
16 Q.  Do you know what the source of that five
17     percent vacancy allowance was?
18 A.  Whose idea that was?
19 Q.  Yes.
20 A.  I imagine Scott's, but I'm not sure.
21 Q.  Okay. And then there is a, further down,
22     there is a management fee of four percent?
23 A.  Yes.
24 Q.  Do you see that?

Page 173

1   A.   Yes.
2   Q.   Do you know where that came from?
3   A.   That's typically what we use for a
4        management fee. Again that is from the
5        securitization world. I don't think it is
6        realistic, but it is conservative.
7   Q.   So the normal management fee would be
8        higher than that or --
9   A.   Well --
10  Q.   I just want to know what conservative
11       means in this context.
12  A.   Conservative means that ordinarily a
13       management fee would be lower than that.
14  Q.   Lower than that?
15  A.   Yes. In my estimate.
16  Q.   Okay. And then it has the total operating
17       expenses per unit of $5,889?
18  A.   Yes.
19  Q.   And that represents -- that is a number
20       that John Hancock uses in connection with
21       its evaluation of a loan?
22  A.   That is the total operating expenses
23       divided by the number of units, but the
24       number we use in our underwriting in

Page 174

1        general changes depending on our judgment
2        and the circumstances. Some apartments in
3        some markets have higher taxes or lower
4        taxes, or utilities are done a different
5        way. They are either done totally by --
6        paid for by the tenants. Sometimes
7        they're not. Sometimes tenants pay for
8        water. Sometimes they don't. Marketing
9        costs would change over time.
10       Professional fees is a guess. It's --
11       it's -- it is a lot of variables in the
12       expenses. So the dollar per unit changes
13       from market to market, location to
14       location, age of the property building,
15       the kind of property building it is, if it
16       is two stories or four stories or one
17       story or high rise. There isn't a fixed
18       number.
19  Q.   Does it change from day to day on the same
20       project?
21  A.   It changes as underwriting -- as the
22       underwriter has a better knowledge of the
23       situation.
24  Q.   So is it your testimony that for every

Page 175

1        change in that number, for example, that
2        is the unit cost, there is an
3        underwriting-based reason for that?
4   A.   It is based on the underwriter's judgment.
5   Q.   Underwriting judgment for each change; is
6        that right?
7   A.   With backup, yes. But most of those
8        judgments are based on backup.
9   Q.   And are any of them not based on backup?
10  A.   Yes. It can be not based on backup. For
11       instance, you are guessing at what the
12       repair and maintenance is going to be for
13       a new building. Very often we rely on the
14       developer to give us their estimate. If
15       it seems reasonable, we take that. Other
16       times, we don't.
17  Q.   In the absence of developer
18       information, --
19  A.   Yes.
20  Q.   -- is it your testimony that any change in
21       that per unit operating expense is based
22       on backup?
23  A.   Any change? No. It is based on judgment.
24  Q.   And when you say "judgment," do you mean a

Page 176

1        reason related to the project itself or
2        any reason?
3   A.   It's -- it's a reason related to an
4        underwriter's experience with the product
5        type.
6   Q.   The product? Not with respect to the
7        desire by John Hancock to make the deal
8        happen? Am I right about that?
9   A.   You would be right about that as far as
10       I'm concerned.
11  Q.   Okay. So every change with respect to
12       this per unit expense is one that is based
13       upon a project-connected reason, not a
14       John-Hancock-wants-to-make-the-deal
15       reason?
16  A.   Ordinarily that's the case, yes.
17  Q.   In this case, as far as you know, every
18       one of those changes is connected to the
19       project itself and not John Hancock wants
20       to make the deal?
21            MR. DAVIS: Objection.
22            You can respond.
23  A.   Well, I wish life was as black and white
24       as that.

**44 (Pages 173 to 176)**

Page 177

1  Q.  You are laughing?

2  A.  I am laughing, because even in a case with

3      a person who has as much experience as me,

4      there is -- an intelligent person

5      recognizes margin for error, plus or

6      minus.

7  Q.  Plus or minus what percent?

8  A.  Five, ten, fifteen percent. It depends on

9      the situation and the particular line

10     item.

11 Q.  Do you recall any instances where changes

12     were made with respect to the dollar unit

13     expenses that were not based on

14     underwriter judgment connected to the

15     project itself?

16 A.  Not based on underwriter -- one more time?

17 Q.  Do you recall any instances in this case

18     where changes were made with respect to

19     the dollar unit expenses that were not

20     based on underwriter judgment connected to

21     the project's expenses themselves?

22     MR. DAVIS:  Objection.

23 A.  Okay.  Well, I think we talked earlier

24     today about the 10 constant, and I believe

Page 178

1      the underwriting was changed based upon

2      the recognition of the probability of plus

3      or minus an error -- an error in judgment

4      or in accuracy of the underwriting.

5  Q.  So that -- that --

6  A.  That is possible that that's --

7      underwriting may have been adjusted for

8      that reason.  Yes.

9  Q.  So the underwriting may have been adjusted

10     so that the 10 percent constant criteria

11     could be met rather than that the expenses

12     of the project themselves should be

13     revised because of reality?

14     MR. DAVIS:  Objection.

15 A.  In that instance, I think it appears that

16     the reserves were adjusted based on the

17     fact that it is a new project and not what

18     -- not a typical project that has been

19     around for five to twenty years, yes.  So

20     it was both instances -- both cases, I

21     believe, it was adjusted because it didn't

22     make the ten percent constant and also

23     because the underwriting was overly

24     conservative.

Page 179

1  Q.  So the changes that were made on the eve

2      of the commitment approval contained

3      within them elements of making the deal

4      happen as well as some reality?

5  A.  It was mostly for presentation.  Right.

6  Q.  Mostly for presentation, though;

7      right?

8  A.  Yes.

9  Q.  And not because the expenses really or the

10     reserves really should be adjusted?

11 A.  It is because the reserves weren't that

12     important.  Right.

13 Q.  Right?

14 A.  Yes.

15 Q.  Take a look at JH 00105, the commercial

16     rating sheet, if you would.

17 A.  Okay.

18         (Witness complying.)

19 Q.  There is a block down there called

20     "Refinance Sizing Constant."

21 A.  Yes.

22 Q.  And then that's the old John Hancock

23     securities industry standard as contrasted

24     with the 10 percent constant that new

Page 180

1      Manulife --

2  A.  Right.

3  Q.  -- required?

4  A.  Right.

5  Q.  And the refinance annual DSCR, could you

6      tell me what that is?

7  A.  That I believe -- I'm not quite sure what

8      that is.  Hold on.  Let me think about

9      this for a second.

10 Q.  Okay.

11         (Pause.)

12 A.  The underwriter cash flow available for

13     debt service, which is 3.5 million, and

14     the debt service of the balloon balance at

15     the end of the loan, which is 27.28 --

16     27.2 million, the debt service with the

17     current interest rate would be 2.7, so the

18     coverage is 3.1 million divided by

19     2.79 million.  So, in essence, it is

20     saying if the interest rate was

21     9.66 percent, with the balloon balance at

22     the end of the loan, the refinancing

23     annual debt service coverage ratio would

24     be 1.12 to 1.

Page 181

1  Q.  Okay.

2  A.  So they are applying the re -- the 9.66

3      constant to the outstanding balloon

4      balance and assuming that the underwriting

5      cash flow doesn't change.

6  Q.  Could you explain that, I mean further

7      than you have already?

8  A.  Sure.  You take the -- when the loan ends,

9      balloon -- the loan will have a balance of

10     2.7, roughly 3 million dollars.

11 Q.  I see.

12 A.  Okay?  And if the interest rate at the

13     time -- the constant was applied at the

14     time of 9.66, given the underwriter cash

15     flow, the coverage would be 1.12 to 1.1.

16     In other words, it is above the 9.66

17     hurdle.

18 Q.  I see.

19 A.  And then if you look above at refinancing

20     scale, --

21 Q.  Yes.

22 A.  -- it applies -- it puts it in the less

23     than 1.13, which is worth minus one point

24     to the rating, so minus one times 4 equals

Page 182

1      minus 4, and then all of those numbers in

2      that right-hand column are added up to get

3      20.5.

4  Q.  28.5?

5  A.  28.5.  I am sorry.

6  Q.  And that equals?

7  A.  That equals a rating of BAA2.  It is one

8      of the factors taken into account in

9      rating the loan.

10 Q.  I see.

11         MR. SCHER:  Mark this.

12         (One-page fax cover sheet dated

13         July 14, 2004, to Mr. Maguire

14         from Mr. Kelly and attachments,

15         production numbers V 1161

16         through 1168 marked Exhibit

17         No. 13 for identification.)

18 BY MR. SCHER:

19 Q.  I show you what I have had marked Malik

20     Exhibit No. 13.

21         (Handing Exhibit No. 13 to the

22     witness.)

23 Q.  This is a document Bates stamped V 1161.

24     It is on the letterhead of Koller Kelly,

Page 183

1      and the date is July 14, 2004.

2         (Pause.)

3         (The witness viewing Exhibit

4      No. 13.)

5  Q.  Within that document is contained the

6      second page, V 1162, which is the

7      Montgomery Square Apartments operating

8      budget.  Do you see that?

9  A.  Okay.

10 Q.  Is it accurate to say that it was this

11     budget that was submitted by the

12     prospective borrower in connection with

13     the $32 million loan?

14         MR. DAVIS:  Objection.

15 A.  I'm not sure.  Who is Owen Maguire?

16         MR. DAVIS:  I think, Howard,

17     Owen Maguire was a gentleman who was

18     trying to do the GMAC deal.

19         MR. SCHER:  Well --

20         MR. DAVIS:  I don't know if any

21     of these materials showed up in Hancock's

22     files, at least based on our review.

23         MR. SCHER:  Okay.

24 BY MR. SCHER:

Page 184

1  Q.  Let's take a look at and see if we can

2      sleuth this.  Attached to -- let me make

3      sure that I am going to make an accurate

4      representation, but I think I am.  Give me

5      a moment.

6         (Pause.)

7  Q.  Attached to Malik Exhibit 3 -- and you

8      don't have to go into it -- is an

9      Exhibit 1 -- oh, you are doing the same.

10     You are doing exactly what I was going to

11     ask you to do.

12 A.  Yes, yes.

13 Q.  And if you look at the sheet within Malik

14     Exhibit 3 Bates stamped 00373, --

15 A.  Yes.

16 Q.  -- you will see what is marked Exhibit 1.

17 A.  Yes.

18 Q.  And if you review that, Exhibit 1, which

19     is Avenel Exhibit 1, revised July 13,

20     2004, you will see that that example 3

21     contains several of the same numbers that

22     appear on V 1162; right?

23 A.  Yes.

24 Q.  So based on your review, are you able to

Page 185

```
1     say the source of example 3 on Exhibit 1
2     attached to Malik Exhibit 3?
3  A. Much of it.  Yes.
4  Q. Okay.  And what is that source?
5  A. The --
6  Q. The submission by the borrower; right?
7          MR. DAVIS:  Objection.  I am
8     sorry.  I am lost here.
9          MR. SCHER:  Okay.
10         MR. DAVIS:  And I apologize, but
11    I don't see the same numbers.  I see base
12    rent and different numbers.
13         THE WITNESS:  These numbers here
14    (pointing).
15         MR. DAVIS:  Okay.
16         THE WITNESS:  Expense numbers.
17         MR. DAVIS:  I see the expense
18    numbers.  Okay.  Some of those match up.
19    Are you talking about income numbers, too?
20    Because they do not match up.
21         MR. SCHER:  I agree with you.  I
22    agree.  Okay.  I am just trying to sleuth
23    and figure out the source of the numbers
24    on example 3, Exhibit 1, attached to
```

Page 186

```
1     Malik 3.
2     BY MR. SCHER:
3  Q. And you do see some identity in those
4     numbers?
5  A. Yes.  Most of them came from the borrower.
6  Q. And Exhibit 1 shows a vacancy rate in
7     Exhibit 3 of 9 percent?
8  A. Right.
9  Q. And that is different than the example
10    used in the exhibit we were just looking
11    at, --
12 A. Yes.
13 Q. -- the earlier one?
14 A. Yes.
15 Q. Can you tell me the source of that vacancy
16    rate?
17 A. I -- either that is a negotiated number or
18    it is the number that fell out of the
19    existing rents in place and the expenses
20    that we used.
21 Q. And then the management fee as you
22    observed -- well, the management fee shown
23    on V 1162 is 3.75 percent, and that is the
24    management fee that is used in example 3?
```

Page 187

```
1  A. Yes.
2  Q. The number that results is different than
3     the number -- the number that results in
4     example 3 is different than the number on
5     V 1162 because the multiplier -- the
6     multiplicand or something is different?
7     Because the effective gross income is
8     different?
9  A. Okay.  You are referring to? -- yes, yes,
10    of course.
11 Q. Okay.
12 A. Yes.
13 Q. Now does -- is there a reserve contained
14    in this example 3?
15 A. No.
16         (Pause.)
17 A. Well, hold on a second.  Is there a
18    reserve contained in this example?  Which
19    example?  Example 3 on the commitment?
20 Q. Yes, yes.  The loan application.
21 A. You are talking about the $150 unit
22    reserve when you are talking?
23 Q. Yes.  Right.
24 A. No.  There isn't.
```

Page 188

```
1  Q. Okay.  And applying the 10 percent
2     constant criteria, would this example 3
3     result in a $32 million loan?
4  A. You wouldn't apply it to the example 3,
5     because you also have to take off the
6     reserve that is not included here.
7  Q. Okay.
8  A. Again that goes back to the coverage,
9     which is defined more clearly in I think
10    it is clause 49.
11 Q. Now this example 3 includes the
12    7.25 percent cap?
13 A. Yes.
14 Q. And the -- and a 75 percent loan-to-value
15    ratio?
16 A. Yes.
17 Q. Are those two criteria are criteria of
18    John Hancock at the time?
19 A. The 75 percent cap is, and -- the
20    7.25 percent cap is what we deemed to be a
21    reasonable cap for the market and product
22    type.
23 Q. All right.
24 A. And the 75 percent LTV is a requirement.
```

Page 189

1    Yes.
2  Q.  Okay.
3  A.  Minimum of 75 percent -- a maximum of 75
4      percent criteria.  I'm sorry.
5  Q.  The debt-to-service ratio is not shown on
6      this example?
7  A.  It is not.
8  Q.  Okay.  And the loan --
9  A.  And --
10 Q.  I am sorry?
11 A.  -- it wouldn't be.
12 Q.  Why is that?
13 A.  Because it hasn't been rate locked yet.
14 Q.  I see.  And the loan size criteria is not
15     shown on this?
16 A.  The what?
17 Q.  Loan size criteria.
18 A.  Loan size criteria?
19 Q.  That is a criteria unfamiliar to you?
20 A.  Loan size criteria sounds pretty --
21 Q.  Unfamiliar to you?
22 A.  What are you --
23 Q.  Do you know what the loan size criteria
24     is?

Page 190

1  A.  What are you referring to?
2           MR. DAVIS:  Objection.  He
3      obviously --
4  Q.  Capital L, capital S, capital C.  Are you
5      familiar with that criteria, John
6      Hancock's criteria?
7  A.  There are a lot of criterias, not just
8      one.
9  Q.  Okay.
10 A.  Debt service, there is the -- I can go
11     through it for you if you want.
12 Q.  All of them result in determining the loan
13     size, but I am speaking specifically of a
14     loan size criteria, something called a
15     loan size criteria.
16          MR. DAVIS:  Plural?  Loan?
17          MR. SCHER:  What?
18          MR. DAVIS:  Loan size criteria,
19     plural?
20          MR. SCHER:  Yes.  It shouldn't
21     be, but that is the way it is described in
22     the documents I have seen.  I will show
23     you the document when we get to it.  Okay?
24 BY MR. SCHER:

Page 191

1  Q.  You are not familiar with it?
2  A.  I will be familiar with it when I see it.
3  Q.  When you see it?
4  A.  Yes.
5  Q.  And if I were to tell you that the per
6      unit expense for this in example 3 is
7      $5,497, you would not disagree with me?
8  A.  If that's what it comes out to.
9  Q.  I show you Malik Exhibit 5.  You can find
10     it there, I think.
11 A.  Okay.
12 Q.  And it has attached to it an Exhibit 1A,
13     which is on a sheet Bates stamped
14     JH 00134.
15 A.  Okay.
16 Q.  And that one is dated August 11, 2004,
17     after the loan commitment -- after the
18     loan application has been made and before
19     the commitment has been made; correct?
20 A.  Yes.
21 Q.  It shows a vacancy of 6.05 percent?
22 A.  Yes.
23 Q.  Can you tell me the source of that?
24 A.  It looks like John -- this is attached to

Page 192

1      something that John sent somebody.
2  Q.  Right.  So John is using the Excel sheet
3      to accomplish what?
4  A.  Explain something out.
5  Q.  Okay.  You don't know?
6  A.  I'm not positive.  I don't recall.
7  Q.  And then on this one, it does show the
8      reserves at $150 a unit?
9  A.  Yes.
10 Q.  And so it reflects a total of $38,400;
11     right?
12 A.  Yes.
13 Q.  Yes?
14 A.  Yes.
15 Q.  And this example 3 on this chart shows
16     that there is a shortfall in base rent, is
17     that right, of $136,839?
18 A.  Let me think about this a second.
19 Q.  Okay.  Take your time.  I certainly took
20     some.
21          (Pause.)
22 A.  You know, it would be better if I had it
23     on a computer so I could see what the
24     calculation is, but.

Page 193

1 Q. This -- that raises a question I had. You
2    have a computer on which the various
3    iterations of Exhibit 1 and 1A were
4    prepared; is that right?
5 A. Yes. I believe we already gave you
6    everything. Right. Yes.
7 Q. So is it your testimony that you searched
8    that computer to determine whether there
9    were any iterations, any variations on
10   this Excel sheet that perhaps were not
11   printed but exist nonetheless?
12 A. I thought I did, but, you know -- yes. I
13   mean this should be there somewhere, if I
14   had the e-mail. I don't know if I was
15   copied on this e-mail.
16 Q. Did this --
17 A. I don't think I was.
18 Q. Okay.
19 A. Maybe I was. That is not to say I don't
20   have it.
21        MR. DAVIS: We did look for
22   computer records in this case.
23        MR. SCHER: Okay.
24        MR. DAVIS: And we did collect

Page 194

1    some electronic data and print it out. To
2    the extent we were able to locate computer
3    records, I believe they have been
4    produced.
5 BY MR. SCHER:
6 Q. Mr. Malik, is it accurate to say that both
7    Mr. Ferrie and you had the capability of
8    manipulating, in the neutral sense of the
9    word, the data reflected on the Excel
10   sheet, which is Avenel Exhibit 1A?
11 A. I think that is the purpose of a computer.
12   Yes.
13 Q. Both of you could, though?
14 A. Yes.
15 Q. My only point was --
16 A. Yes.
17 Q. -- that both of you had access to that?
18 A. Oh, absolutely. Sure.
19 Q. Is it on a network that he was able to
20   manipulate the one that you had access to,
21   or would you literally have to send them
22   back and forth?
23 A. I think a better word is change.
24 Q. I apologize. Alter. Whatever.

Page 195

1 A. Okay.
2 Q. But my question is did he have -- was it
3    the same data?
4 A. I imagine it would be.
5 Q. It's on a network?
6 A. Yes -- well, it is in our computers.
7    Right.
8 Q. It is not --
9 A. It could be trans --
10 Q. It can be downloaded?
11 A. Can be sent back and forth. Right.
12 Q. But what changes he made, you were able to
13   see?
14 A. Yes.
15 Q. By accessing the same document?
16 A. Yes.
17 Q. Okay. Now can you answer my question?
18 A. But he would have to send it to me to see
19   it.
20 Q. Oh, he would?
21 A. Yes.
22 Q. So he has on his computer various
23   iterations, presumably this one in
24   particular?

Page 196

1 A. Yes.
2 Q. Which you might not have unless he had
3    sent them to you?
4 A. Right.
5        Now to answer your question,
6    after looking at this, it seems that with
7    a six percent vacancy --
8 Q. 6.05?
9 A. 6.05 vacancy, in both instances, they make
10   the 10 percent constant and the 75 LTV
11   hurdles, and his iteration at the bottom,
12   his calculation at the bottom seems to
13   indicate that the 10 percent constant is
14   the higher hurdle, and you need a little
15   bit more rent to meet that hurdle.
16       So I suspect -- I don't know --
17   that may have something to do with the
18   conversation and the reason he sent it to
19   Mr. Kelly.
20 Q. But so far as you know, there never was a
21   change in the Exhibit 1 to the loan
22   application?
23 A. I don't believe so, no. It looks like the
24   complete application that you handed me.

49 (Pages 193 to 196)

Page 197

1   Q.   Okay.
2        MR. SCHER: Mark this.
3        (One-page Examples of Reserve
4        Calculations, production
5        number JH 00920 marked Exhibit
6        No. 14 for identification.)
7   BY MR. SCHER:
8   Q.   This is JH 920.
9        (Handing Exhibit No. 14 to the
10       witness.)
11       MR. DAVIS: Let me just look
12  over your shoulder, and I will get a copy
13  before we go.
14  Q.   It is Avenel Exhibit 1, revised 8-16.xls.
15  A.   Okay.
16  Q.   And it shows as Exhibit 1?
17  A.   Yes.
18  Q.   Do you know whether you generated this or
19  Mr. Ferrie generated this?
20  A.   I don't. I don't.
21  Q.   This one shows vacancy rates of 20, 15,
22  and then 5.5 in example 3; right?
23  A.   Right.
24  Q.   Do you know where the 5.5 came from?

Page 198

1   A.   Well, the vacancy, it is the plug number,
2        and that's the number that you change to
3        see what the loan -- what -- at what point
4        you fully fund the loan.
5   Q.   Okay.
6   A.   So it is a number that goes up and down
7        until you see what point the -- do you see
8        where it says "Maximum loan" down below,
9        the "10 percent constant"?
10  Q.   Yes.
11  A.   When that number gets as close to 32 even
12       as possible is the vacancy that you use.
13  Q.   Okay.
14  A.   When you go to the one on -- is it
15       Exhibit 5? Yes. Exhibit 5. You will see
16       the 6.05, which is a pretty odd number.
17       5.5 is a pretty even number. 6.05 seems
18       to get very close to the $32 million even.
19  Q.   So let's just spend a second on plug
20       number, because sometimes it has a
21       pejorative notion associated with it, but
22       you don't mean it in a negative way?
23  A.   No.
24  Q.   It is the sensitivity number perhaps?

Page 199

1   A.   Yes. True.
2   Q.   So it is the number that you use to -- you
3        raise or lower in order to achieve the
4        result of getting as close to 32 million
5        as you can?
6   A.   Correct.
7   Q.   Okay. And that is what was going on here?
8   A.   I think so.
9   Q.   And this one, which is dated subsequent to
10       the last one I showed you, the reserves
11       are $150 a unit, but they show $64,000
12       rather than 38,400. Can you explain that
13       to me? That is just the heading?
14  A.   I think it is the heading.
15  Q.   Okay.
16  A.   I think this is the wrong -- 64,000
17       doesn't work. 256 times 150.
18  Q.   Yes.
19  A.   It should be 38,400.
20  Q.   Okay.
21  A.   It looks like the heading was changed but
22       not the actual calculated formula there.
23  Q.   Okay.
24  A.   Right. A good pickup.

Page 200

1   Q.   That is why -- never mind.
2        MR. SCHER: Mark that.
3        (One-page Examples of Reserve
4        Calculations, production
5        number JH 00914 marked Exhibit
6        No. 15 for identification.)
7   BY MR. SCHER:
8   Q.   I show you the next exhibit, and that is
9        Malik Exhibit 15.
10       (Handing Exhibit No. 15 to the
11       witness.)
12  Q.   This is a document Bates stamped JH 00914,
13       and -- just in the event I don't have --
14       let me just have this marked.
15       MR. SCHER: I will mark this as
16       well.
17       (Multipage Interest Rate Circle
18       Notification, production
19       numbers JH 00913 through 00920
20       marked Exhibit No. 16 for
21       identification.)
22       MR. SCHER: It is in there as
23       well.
24       MR. DAVIS: 15 is in here?

## Page 201

1    MR. SCHER: Yes.

2    (Handing Exhibit No. 16 to the

3    witness.)

4    BY MR. SCHER:

5  Q.  This is Malik 16 I have presented to you.

6    And you will see that Malik 15 is the

7    second page of Malik 16, just to make

8    things complicated.

9    (Pause.)

10    (The witness viewing Exhibit

11    No. 16.)

12  Q.  Okay. That is Bates stamped 00914. And

13    in that, there is examples of reserve

14    calculations, this document, and it -- and

15    it changes the $64,000 reserve from the

16    original into a new calculation of

17    $38,400; right?

18  A.  Yes.

19  Q.  Can you -- this appears to be a slightly

20    different form than the ones that we have

21    been reviewing?

22  A.  Yes.

23  Q.  And can you tell me what this document is?

24    Is this a new form?

## Page 202

1  A.  It looks like it is a new form. Yes.

2  Q.  Are you the one who prepared this?

3  A.  I think I did.

4  Q.  Okay. And this one shows line item

5    reduction?

6  A.  I don't recall.

7  Q.  And at the end --

8  A.  Yes.

9  Q.  -- of the analysis it shows the final per

10    unit expense, and in this case, $4,947?

11  A.  Right.

12  Q.  Can you recall what your purpose was in

13    preparing this line item reduction aspect

14    to the Avenel new expenses Excel sheet?

15  A.  I believe it was to show somebody that

16    we're overly conservative and we can

17    probably trim some things.

18  Q.  And if I understood you correctly, what

19    this one shows is that at a reserve of

20    $64,000 the loan funding amount would be

21    30 million, but at a 38,400 reserve, the

22    loan amount would be 32 million; is that

23    right?

24  A.  It is not purely the reserve. If you look

## Page 203

1    at it, the total operating expenses drop,

2    too.

3  Q.  Okay.

4  A.  They go up to $140,000.

5  Q.  Okay. I see. By reducing certain

6    expenses by $140,000 --

7  A.  Right.

8  Q.  -- plus the reserve, then you can achieve

9    a loan funding amount of exactly

10    32 million?

11  A.  Right.

12    MR. SCHER: Let me show you the

13    next exhibit.

14    (One-page Examples of Reserve

15    Calculations, production

16    numbers JH 01119 marked Exhibit

17    No. 17 for identification.)

18    BY MR. SCHER:

19  Q.  This is Malik Exhibit 17.

20    (Handing Exhibit No. 17 to the

21    witness.)

22  Q.  It shows an Avenel Exhibit 1A, new

23    expenses Excel sheet, and shows a vacancy

24    rate at 9 percent, and a handwritten note?

## Page 204

1  A.  Yes.

2  Q.  Whose handwritten note is that?

3  A.  That is my handwriting.

4  Q.  Could you read that?

5  A.  You wouldn't be the first to ask me.

6  Q.  I can read it. I just want you to.

7  A.  "Lower than application reserve of 5.38

8    because more conservative. (Under

9    application scenario we fund less)."

10  Q.  And that is referring to the 10 percent

11    constant?

12  A.  The 10 constant. Right. So I know -- I

13    believe it is saying -- a note to myself

14    or to somebody that under the application

15    we're required to fund more than a

16    10 percent constant would allow us to.

17  Q.  And so do you believe that this is the --

18    what precipitated -- what caused you to

19    seek a reduction in the reserve so that

20    the 10 percent constant could be achieved?

21  A.  I believe what was -- what I was doing and

22    based on Ivor's comment that we weren't

23    achieving the 10 percent constant at

24    80 percent occupancy in a full funding of

Page 205

1    the rental achievement reserve was stress
2    testing it from different ways as to so --
3    so to see what that means in terms of
4    reserves or returns of expenses or how
5    important that really was in terms of the
6    margin of error within underwriting.
7    Q.  You are basically trying to see how you
8        can get to the $32 million loan amount?
9    A.  Well, yes.  From an in-house guidelines
10       credit policy guidelines point of view,
11       right.  But it had nothing to do with the
12       commitment.  The commitment was already
13       set.
14   Q.  Well, the commitment hadn't been made yet?
15   A.  The commitment was rate locked on --
16   Q.  Oh, that.
17   A.  -- 8-02.  It was signed and committed --
18       signed but not committed at this time.  It
19       hadn't been changed since then.
20   Q.  Okay.
21   A.  So we didn't go back and change the
22       commitment.  We purely were playing with
23       the numbers in terms of trying to figure
24       out the risks of being over or under the

Page 206

1    10 percent constant and how to paper it
2    for the internal approval process.
3    Q.  And to get it papered for your internal
4        approval process, you had to get the
5        permission of Mr. Thomas; am I right about
6        that?
7    A.  Yes.
8    Q.  If you would turn back to --
9            MR. DAVIS:  When you have a
10       minute, why don't we take a break, but we
11       can do this first, if you would like to.
12           MR. SCHER:  Let's take a break,
13       because we're in good shape.
14           (Recess taken at 3:19 p.m.)
15           (Recess ended at 3:28 p.m.)
16   BY MR. SCHER:
17   Q.  Would you take a look at Malik Exhibit 1
18       again, please?  Is that the loan approval?
19   A.  Yes.
20   Q.  The internal loan approval document?
21   A.  Yes.
22   Q.  Now is this document prepared by you?
23   A.  Yes.
24   Q.  And are you kind of like the secretary to

Page 207

1    the meeting, and you record all that
2    occurs there?  Or is --
3    A.  Sometimes I feel like that's correct, but
4        no.
5    Q.  Okay.  But you do -- you are the one who
6        prepares this document?
7    A.  I present the document.
8    Q.  Okay.
9    A.  And then I present it -- then it gets
10       passed around for signature, after
11       everybody wants me to change things in it.
12   Q.  Okay.  Do you recall whether anything was
13       changed after the first presentment of it?
14   A.  No, I don't.
15   Q.  Okay.  Just turning back for a split
16       second to that hedge cost e-mail, which
17       said, you know, as of today your cost is
18       $355,000, did anybody say, "Oh, my God,
19       that's a lot of money," or "Geez," or
20       anything?
21   A.  Not to my knowledge, no.
22   Q.  Take a look at this Malik 1 again.  The
23       first box there that says "Current
24       'As-Is'," "Stabilized," "Stabilized Cap

Page 208

1    Rate" --
2    A.  Yes.
3    Q.  -- can you explain to me what that is?
4    A.  Well, ordinarily you have three numbers
5        below it, like you do underneath the
6        "Stabilized" box.
7    Q.  Right.
8    A.  Three rows.
9    Q.  But you can't have it, because it is under
10       construction?
11   A.  There is no history.
12   Q.  And you have a valuation of 47,302,000 and
13       a cap rate of 7.25?  Do you see that?
14   A.  Yes.
15   Q.  What if the cap rate at the time of the
16       closing of the loan had spiked to 10?
17   A.  That doesn't make any difference.
18           MR. DAVIS:  Objection.
19   Q.  None whatsoever?
20   A.  No.  We had a commitment.  We honor our
21       commitments.
22   Q.  Okay.  On the JH 00407 --
23   A.  Yes.
24   Q.  -- at the bottom of the page, there are

Page 209

1    average rental rate actual and average
2    rental rate market? Do you see that in
3    the middle of the page at the bottom, just
4    above that box, the box which results in
5    the BAA?
6 A. Yes.
7 Q. So where did you get the information to
8    support that average rate market?
9 A. Average rate market, I believe John Ferrie
10    gave to me.
11 Q. Okay.
12 A. Or it could have come off of an external
13    report of some sort.
14 Q. Isn't that a significant disparity between
15    the actual and the market rate in that
16    instance?
17 A. No.
18 Q. No?
19 A. Not in this instance.
20 Q. Why is that? Because it is a good
21    project?
22 A. Because it is an upper end, newly
23    constructed -- well constructed, I might
24    add -- project in a market that has

Page 210

1    largely older, smaller units.
2 Q. You liked this project?
3 A. Yes.
4 Q. On JH 00408, there is a vacancy rate of
5    5 percent shown?
6 A. Right.
7 Q. And that's the -- is that the vacancy rate
8    that was assumed for this approval?
9 A. That is the vacancy rate that I think we
10    expect in the long term. We expect that
11    as a stabilized year-to-year vacancy rate.
12 Q. Okay. And on this document, you show a
13    total operating expense per unit of 4,900;
14    is that right? I can't -- I'm not sure my
15    eyes are --
16 A. I think that is right.
17 Q. 4,976?
18 A. Right.
19 Q. Is that -- and you show a management fee
20    of 3.50. That is down from the 4 that was
21    originally --
22 A. Yes.
23 Q. -- set forth?
24 A. Yes. That original, that is -- the reason

Page 211

1    it is called a preliminary loan
2    underwriting worksheet, or a preliminary
3    worksheet, is because it is very
4    preliminary.
5 Q. Okay.
6 A. It is adjusted over time as we learn more.
7 Q. Can you explain to me -- I think three
8    lines up from the bottom -- well, the net
9    breakeven rent and the breakeven interest
10    rate, interest only, what is SNCF, can you
11    explain what those rows are?
12 A. The breakeven interest rate?
13 Q. Yes.
14 A. Hold on a second.
15         (Pause.)
16 A. So you are talking about the third line
17    from the bottom?
18 Q. I think it is the fourth line from the
19    bottom. Do you see it? 10.80?
20 A. 10.60?
21 Q. 10.6. It could be 6. Yes.
22 A. That is the -- that is the constant. That
23    is the breakeven interest rate. That is
24    the constant. So it -- the cash flow from

Page 212

1    this underwriting equals 10.6 percent of
2    the loan balance.
3 Q. Okay. So?
4 A. So if you take the cash flow and divide
5    the $32 million into it, you will get
6    10.6 percent.
7 Q. Turn to the next page.
8 A. That is similar to the constant.
9 Q. Okay.
10 A. In comparison to the constant.
11 Q. Okay. Now this -- the next page is
12    JH 00409?
13 A. Yes.
14 Q. And it says "John Hancock Life Insurance
15    Company, A meeting of the Mortgage and
16    Real Estate Loan Committee was held on" --
17 A. Yes.
18 Q. -- "August 16, 2004, voted to authorize
19    the following investment."
20 A. Right.
21 Q. Is this the actual record of what was
22    voted on and approved by John Hancock?
23 A. There was not an investment -- there was
24    not a -- well, there was not a meeting --

53 (Pages 209 to 212)

Page 213

1    investment committee meeting.

2  Q.  There was not a meeting?

3  A.  A committee meeting.  It is the form only.

4  Q.  Okay.

5  A.  Because there is a signature form on top

6      of it.

7  Q.  Okay.  But this is what was voted on and

8      approved?

9  A.  Yes.

10 Q.  What appears on this sheet?

11 A.  Sure.

12 Q.  This says that the maximum loan to value

13     is 68.09 percent?

14 A.  Yes.

15 Q.  Is that the 75 percent that was to be

16     achieved?

17 A.  We're saying -- what this means is that

18     when it is stabilized at 5 percent

19     vacancy, we expect it to be a 68 percent

20     LTV.

21 Q.  I see.  And similarly, when the SCR is

22     1.45, and that differs from the 1.25?

23 A.  Yes.

24 Q.  But this is at a stabilized point?

Page 214

1  A.  Correct.

2  Q.  It lists you as the investment officer;

3      Ryan Hawley as the second investment

4      officer.  Who was he?

5  A.  He was my analyst to help with some

6      things.

7  Q.  Is he still with the company?

8  A.  He is not.

9  Q.  Where is he?

10 A.  I'm not quite sure.

11 Q.  Was he downsized?

12 A.  No.  He chose to leave of his own accord.

13 Q.  Okay.

14 A.  A better job.  A better person to work

15     for.

16 Q.  I can see that.

17          (Laughter.)

18 Q.  And the closing analyst is Robin Costa?

19 A.  Yes.

20 Q.  What job did she have?

21 A.  The job I described earlier of --

22 Q.  Closing?

23 A.  -- accumulating all the information for

24     closing --

Page 215

1  Q.  Okay.

2  A.  -- and effecting the closing.

3  Q.  So that assignment was made right at the

4      time of the loan approval; is that right?

5  A.  Actually before the loan approval.

6  Q.  Okay.

7  A.  But yes.

8  Q.  And the internal counsel, is that

9      Nathaniel Margolis?

10 A.  Yes.

11 Q.  Is he still in-house counsel --

12 A.  Yes.

13 Q.  -- at John Hancock?

14 A.  Yes.

15 Q.  What role did he play in this?

16 A.  Nathaniel would have helped me with the

17     looking at the language and the supplement

18     to the commitment and the commitment and

19     seeing, also checking to see if the loan

20     approval matches what the commitment

21     requires and if the loan approval

22     highlights everything that needed to be

23     highlighted out from the commitment or

24     describes everything of importance that is

Page 216

1      unusual.

2  Q.  Now as I understand it, this JH 409 is

3      intended to reflect the project, the

4      development Avenel at Montgomery Square,

5      at its stabilized point?

6  A.  Yes.

7  Q.  And the front page of this document,

8      JH 00405, is intended to show the very

9      same thing, the valuation -- the property

10     as at stabilized; right?

11 A.  Yes.  For the most part.

12 Q.  Okay.  Well, can you explain to me the

13     disparity between JH 405, in particular

14     the stabilized unit -- per unit value of

15     184,777 and the 184,804 per unit as the

16     summation value on page JH 00409?

17 A.  So you want me to look at 409 and 405?

18 Q.  Yes.  405, 409; 188,477, 184,804.

19 A.  Okay.  And 409, I rounded up the number

20     that is on 405.

21 Q.  Okay.

22 A.  If you will look at the NCF, net cash flow

23     basis.  Or I rounded down the number.  If

24     you look at the NOI basis, it is 47,302.

Page 217

1   For presentation on the rest of the
2   document, I rounded it down to an even
3   number.
4   Q.  The next page is JH 410, and that is
5   headed "Voted Investment." What is the
6   purpose of this document as compared with
7   the other documents? Is this what was
8   voted and approved?
9   A.  407.
10  Q.  410. Is this what was voted and approved?
11  A.  It is all part of the same approval.
12  Q.  Okay. On page JH 412, there is a box
13  headed "Weaknesses of Deal"?
14  A.  Yes.
15  Q.  And here it says that the operating
16  expenses were conservatively estimated to
17  be 5,527 a unit per year. Right?
18  A.  It says that.
19  Q.  Yes?
20  A.  Yes.
21  Q.  A conservative estimate would be to have
22  higher operating expenses; right?
23  A.  Pardon?
24  Q.  A conservative, in this context, means to

Page 218

1   have higher expenses?
2   A.  Yes.
3   Q.  Right?
4   A.  Yes. It also looks like the wrong
5   number.
6   Q.  It looks like what?
7   A.  The wrong number.
8   Q.  The wrong number?
9   A.  Yes.
10  Q.  And what is the right number?
11  A.  The number that is on page JH 419.
12  Q.  Is that just a mistake?
13  A.  It looks like it. Yes, it is.
14  Q.  JH 419 shows what?
15  A.  4,974.
16  Q.  4,974?
17  A.  Right.
18  Q.  But is this assertion that it is a
19  conservative number accurate?
20  A.  I think it is still accurate. Yes. It is
21  reduced 10 percent, but it is still
22  accurate.
23  Q.  And then you think that 4,900 is
24  conservative as well?

Page 219

1   A.  Yes.
2   Q.  JH -- to back up -- JH 408, that shows
3   4,900? That is where the 4,900 comes
4   from; right?
5   A.  408?
6   Q.  Yes. 4,976?
7   A.  Well, for the obvious reason that this --
8   that page is part of the entire link in
9   the Excel, where the block on 412 is not
10  part of the Excel. It is in the sheet,
11  but it is a Word document embedded in
12  there, so you have to go back and manually
13  change it.
14  Q.  I see.
15  A.  It doesn't change automatically with the
16  other numbers.
17  Q.  Right. On the first page of Malik
18  Exhibit 1, it has the disbursement
19  requirements. Do you see that?
20  A.  Malik Exhibit 1, disbursement
21  requirements?
22  Q.  Specific conditions?
23  A.  Okay.
24  Q.  And the disbursements requirements are to

Page 220

1   have certain rents, a minimum net cash
2   flow, debt service coverage ratio?
3   A.  Yes.
4   Q.  And the 10 percent breakeven, according to
5   underwriting; right?
6   A.  Yes.
7   Q.  Now that 10 percent breakeven according to
8   underwriting is not contained in the loan
9   application, is it?
10  A.  No.
11          MR. DAVIS: Objection.
12          You can respond.
13          MR. SCHER: I think I am going
14  to ask you to step outside, just for a
15  couple of minutes.
16          THE WITNESS: Okay.
17          MR. SCHER: I think I am close
18  to the end.
19          MR. DAVIS: Okay.
20          (Recess taken at 3:46 p.m.)
21          (Recess ended at 3:48 p.m.)
22          MR. SCHER: I have no further
23  questions.
24          MR. DAVIS: Okay. I have no

## Page 221

1  questions.

2      (Whereupon, at 3:48 p.m., the

3  deposition was adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## Page 223

ATTACH TO DEPOSITION OF: TIMOTHY J. MALIK

CASE: JOHN HANCOCK LIFE INSURANCE COMPANY
VS. VESTMONT LIMITED PARTNERSHIP ET ALS

ERRATA SHEET
INSTRUCTIONS: After reading the
transcript of your deposition, note any
change or correction to your testimony and
the reason therefor on this sheet. DO NOT
make any marks or notations on the
transcript volume itself. Sign and date
this errata sheet (before a Notary Public,
if required). Refer to Page 222 the
transcript for errata sheet distribution
instructions.

PAGE  LINE

        CHANGE:
        REASON:
        CHANGE:
        REASON:
        CHANGE:
        REASON:
        CHANGE:
        REASON:
        CHANGE:
        REASON:

    I have read the foregoing transcript
of my testimony, and except for any
corrections or changes noted above, I
hereby subscribe to the transcript as an
accurate record of the statements made by
me.

                TIMOTHY J. MALIK

## Page 222

1      DEPONENT'S ERRATA SHEET

2      AND SIGNATURE INSTRUCTIONS

3          The original of the Errata Sheet

4  has been delivered to Brian A. Davis, Esq.

5          When the Errata Sheet has been

6  completed by the deponent and signed, a

7  copy thereof should be delivered to each

8  party of record and the ORIGINAL delivered

9  to Howard D. Scher, Esq., to whom the

10  original deposition transcript was

11  delivered.

12

13      INSTRUCTIONS TO DEPONENT

14

15          After reading this volume of

16  your deposition, indicate any corrections

17  or changes to your testimony and the

18  reasons therefor on the Errata Sheet

19  supplied to you and sign it. DO NOT make

20  marks or notations on the transcript

21  volume itself.

22

23  REPLACE THIS PAGE OF THE TRANSCRIPT WITH

24  THE COMPLETED AND SIGNED ERRATA SHEET WHEN

25  RECEIVED.

## Page 224

                CERTIFICATE
Commonwealth of Massachusetts
Plymouth, ss

    I, Judith McGovern Williams, a
Registered Professional Reporter and
Notary Public in and for the Commonwealth
of Massachusetts, do hereby certify:
    That TIMOTHY J. MALIK, the
witness whose deposition is hereinbefore
set forth, was duly sworn by me and that
such deposition is a true record of the
testimony given by the said witness.
    IN WITNESS WHEREOF, I have
hereunto set my hand this      day of
            , 2006.


        Judith McGovern Williams
        Registered Professional Reporter
        Certified Realtime Reporter
        Certified LiveNote Reporter
    Certified Shorthand Reporter No. 130993

My Commission expires:

April 2, 2010

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN HANCOCK LIFE          CIVIL ACTION
INSURANCE COMPANY,

    Plaintiff/Counterclaim
    Defendant,

    vs.

VESTMONT LIMITED
PARTNERSHIP, et al.,

    Defendant/Counterclaim
    Plaintiff.          NO. 0511614 WGY


        Oral deposition of JOHN PATRICK FERRIE, taken at the law offices of BUCHANAN INGERSOLL, P.C., Eleven Penn Center, 14th Floor, 1835 Market Street, Philadelphia, Pennsylvania, on Wednesday, February 1, 2006, at 9:36 a.m., before Rosemary Locklear, Registered Professional Reporter, Certified Shorthand Reporter (NJ), Certified Realtime Reporter and Notary Public, pursuant to notice.



**James DeCrescenzo Reporting, LLC**
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

## 2

```
1   APPEARANCES:
2   CHOATE HALL & STEWART, L.L.P.
      BY: BRIAN A. DAVIS, ESQUIRE
3     bad@choate.com
      Two International Place
4     Boston, Massachusetts 02110
      (617) 248-5000
5     Appearing on behalf of Plaintiff
6   BUCHANAN INGERSOLL, P.C.
      BY: HOWARD D. SCHER, ESQUIRE
7     scherhd@bipc.com
      Eleven Penn Center, 14th Floor
8     1835 Market Street
      Philadelphia, Pennsylvania 19103
9     (215) 665-8700
      Appearing on behalf of Defendant
10
    ALSO PRESENT:
11
    JAMES KOLLER
12
13      EXAMINATION INDEX
14  JOHN PATRICK FERRIE
      BY MR. SCHER          6
15
16      EXHIBIT INDEX
17              MARKED
18  Ferrie
      1  1-page copy of E-mail      89
19     dated 8/11/04 from John
       Ferrie, plus attachment
20     JH 00133-JH 00134
21     2  28-page copy of document  109
       dated 7/30/04 entitled
22     "Application to John
       Hancock Life Insurance
23     Company For A First Mortgage
       Loan," plus attachments, JH
24     00327-JH 01121
```

## 4

```
1      EXHIBIT INDEX (CONTINUED)
2                 MARKED
3   Ferrie
       11  2-page copy of letter    161
4      dated 7/29/04 to
       Montgomery Square
5      Partnership from John P.
       Ferrie, JH 00220-JH 00221
6
       12  2-page copy of E-mail    162
7      dated 7/30/04 to John
       Ferrie from Timothy J.
8      Malik, JH 00160-JH 0161
9      13  2-page copy of E-mail    165
       dated 7/30/04 to John
10     Ferrie from Timothy J.
       Malik, JH 00162-JH 00163
11
       14  1-page copy of E-mail    167
12     dated 8/2/04 to John
       Ferrie from Timothy J.
13     Malik, JH 00140
14     15  1-page copy of document  169
       entitled "Interest Rate
15     Circle Form," plus
       attachments, JH 00397-JH
16     00404
17     16  2-page copy of document  172
       entitled "John Hancock
18     Life Insurance Company"
       plus attachments, JH
19     00405-JH 00425
20     17  1-page copy of document  174
       dated 8/17/04 entitled
21     "Memorandum," JH 01174
22     18  2-page copy of E-mail    176
       dated 5/31/05 to Timothy
23     A. Roseen from Timothy J.
       Malik, JH 01211-JH 01212
24
```

## 3

```
1      EXHIBIT INDEX (CONTINUED)
2                 MARKED
3   Ferrie
       3  1-page copy of E-mail     120
4      dated 8/11/04 to John
       Ferrie from Timothy J.
5      Malik, plus attachment
       JH 00131-JH 00132
6
       4  1-page copy of E-mail     135
7      dated 8/11/04 to John
       Ferrie from Timothy J.
8      Malik, JH 00135
9      5  2-page copy of E-mail     142
       dated 6/17/04 to Timothy
10     J. Malik from John
       Ferrie, plus attachments
11     JH 00100-JH 00105
12     6  4-page copy of letter     146
       dated 6/18/04 to Robert
13     W. Kelly from John P.
       Ferrie, JH 00074-JH 00077
14
       7  4-page copy of letter     147
15     dated 6/18/04 to Robert
       W. Kelly from John P.
16     Ferrie, plus attachments
       V 1181-V 1188
17
       8  4-page copy of letter     148
18     dated 7/21/04 to Robert
       W. Kelly from John P.
19     Ferrie, plus attachment
       JH 00733-JH 00737
20
       9  1-page copy of E-mail     149
21     dated 7/29/04 from John
       Ferrie, JH 00219
22
       10  1-page copy of E-mail    157
23     dated 7/29/04 to John
       Ferrie from Timothy J.
24     Malik, JH 00173
```

## 5

```
1      EXHIBIT INDEX (CONTINUED)
2                 MARKED
3   Ferrie
       19  1-page copy of E-mail    180
4      dated 6/6/05 to Joe Kelly
       from John Ferrie, JH
5      01101
6      20  1-page copy of E-mail    181
       dated 6/7/05 to John
7      Ferrie from Jim Koller
       JH 00149
8
       21  1-page copy of E-mail    181
9      dated 6/9/05 to Timothy
       J. Malik from John
10     Ferrie, plus attachments
       JH 01196-JH 01210
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

6

1       JOHN PATRICK FERRIE, having
2   been duly sworn, was examined and
3   testified as follows:
4           EXAMINATION
5   BY MR. SCHER:
6       Q.  Would you state your name
7   for the record, please.
8       A.  John Ferrie.
9       Q.  My name is Howard Scher.
10  We just introduced ourselves to one
11  another informally.  I represent the
12  defendants in this case.
13      You understand that?
14      A.  Yes.
15      Q.  Have you ever had your
16  deposition taken before?
17      A.  Yes.
18      Q.  Roughly how many times or
19  precisely how many times?
20      A.  Once.
21      Q.  Once?
22      A.  Yeah.
23      Q.  Okay.  And what was the
24  context of that case?  What kind of

7

1   case was it?  What was the subject?
2       A.  It was a -- it was a
3   condemnation.
4       Q.  Okay.  So that you know
5   that my questions and your answers
6   are being memorialized by the court
7   reporter and will ultimately be
8   transcribed in writing and so that
9   when you see -- when you hear my
10  questions and you give your answers,
11  that's the way they'll appear in a
12  writing.
13      You understand that?
14      A.  Yes.
15      Q.  If at any time during the
16  course of this deposition you don't
17  understand my question, you have the
18  perfect right, and in fact I
19  encourage you, to ask for a
20  clarification.
21      Is that understood by you?
22      A.  Yes.
23      Q.  What have you done to
24  prepare for this deposition other

8

1   than scheduling the time convenient
2   for you?
3       A.  I met with my attorney.
4       Q.  And when did that meeting
5   occur?
6       A.  Yesterday.
7       Q.  And what was the duration
8   of that meeting, approximately?
9       A.  Three hours.
10      Q.  Did you review documents in
11  connection with that?
12      A.  Yes.
13      Q.  What, in general terms, was
14  your role in this -- in the
15  arrangements with -- in connection
16  with the work with Vesterra
17  Corporation, the defendants in this
18  case?  What was your role?
19      A.  Originate the transaction.
20      Q.  And what does that mean?
21      A.  Act as a go-between.
22      Q.  What did originating and
23  acting as a go-between result in your
24  doing in connection with this

9

1   transaction?
2       A.  Finding -- no, I can't say
3   I did that because -- meeting with
4   the borrower.
5       Q.  What else?
6       A.  Bringing the loan to John
7   Hancock.
8       Q.  What else?
9       A.  That's it.
10      Q.  Okay.  After you met with
11  the borrower and brought the loan to
12  John Hancock, what else did you do in
13  connection with the prospective loan?
14      A.  Gave the borrower the
15  application.
16      Q.  Okay.  What's your job with
17  John Hancock in 2004, spring, summer
18  of 2004?  What was your job?
19      A.  Manage the regional office.
20      Q.  And what are your duties
21  and responsibilities?  Is that what
22  your job is now?
23      A.  Uh-huh.  Yes.
24      Q.  What region is covered by

**James DeCrescenzo Reporting, LLC**

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
                        1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
                                www.JDReporting.com

10

1 the office you manage?
2   A.  Pennsylvania, New Jersey,
3 Delaware, and Puerto Rico.
4       MR. DAVIS:  Like the First
5 Circuit.
6 BY MR. SCHER:
7   Q.  Not the Virgin Islands?
8   A.  No.
9   Q.  Okay.  And what are your
10 duties and responsibilities as
11 manager of that region?
12   A.  Manage the office.
13   Q.  Hire, fire, promote the
14 employees who work in that office?
15   A.  Yes.
16   Q.  And how many employees work
17 in that office?
18   A.  Three, counting myself.
19   Q.  And who are they?
20   A.  Myself, Brian Depolis,
21 D-E-P-O-L-I-S, and Helene McCole,
22 H-E-L-E-N-E M-C-C-O-L-E.
23   Q.  What's Ms. McCole's duty?
24 What's her job?

11

1   A.  A combination.
2   Q.  Of?
3   A.  Closer, admin.
4   Q.  Anything else?
5   A.  We all fill in.
6   Q.  I'm asking about her job.
7   A.  That's the major duties.
8   Q.  And Mr. Depolis, what's his
9 job?
10   A.  He's second in command.
11   Q.  And what's your job besides
12 managing the office?
13   A.  Originate loans.
14   Q.  What else?
15   A.  Service the loans.
16   Q.  What else?
17   A.  That's it.
18   Q.  Okay.  What do you do to
19 originate the loans?
20   A.  I call on prospective
21 borrowers, developers.
22   Q.  And how do you identify
23 them?
24   A.  Any way I can.

12

1   Q.  In what ways do you
2 identify them?
3   A.  Contacts I've made over the
4 years.
5   Q.  Anything else?
6   A.  Newspaper articles,
7 associations, referrals.
8   Q.  Anything else?
9   A.  Not that I can think of.
10   Q.  And you said you service
11 the loans?
12   A.  Yes.
13   Q.  What does that entail?
14   A.  Once the loans are closed,
15 we do an annual inspection.
16   Q.  Anything else?
17   A.  Evaluate the rent roll and
18 the income and expense for the prior
19 year.
20   Q.  Anything else?
21   A.  If it -- if there's a
22 problem, we report it to home office.
23   Q.  How is your performance
24 evaluated in connection with -- in

13

1 your employment?
2   A.  What do you mean?
3   Q.  How is your performance as
4 an employee judged?  In other words,
5 what is the process by which your
6 employment is judged, evaluated?  Are
7 you subjected to an annual review,
8 for example?  Does your superior --
9   A.  Yes.  I have an annual
10 review.
11   Q.  Okay.  And what are the
12 criteria employed in connection with
13 your annual review?
14   A.  Well, they're -- number
15 one, am I a team player?  Number two,
16 how is my closed loan production?
17 Number three, how are the closed
18 loans performing?
19   Q.  Anything else?
20   A.  I'd say how am I perceived
21 overall by the home office personnel?
22   Q.  Is your compensation
23 affected in any way by your
24 performance?

James DeCrescenzo Reporting, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**14**

1  A. Yes.
2  Q. Can you tell me, how are
3  you compensated? What's your
4  compensation?
5  A. You mean dollars?
6  Q. Dollars and what's it
7  consist of?
8  THE WITNESS: Is that —
9  MR. DAVIS: You can provide
10  it to him.
11  THE WITNESS: Salary and
12  commission.
13  BY MR. SCHER:
14  Q. And what's the salary?
15  A. Salary is 150.
16  Q. Has that changed from 2004
17  to 2005?
18  A. Yes.
19  Q. How did it change?
20  A. 2004, it was probably 120.
21  Q. You received a $30,000
22  salary increase, approximately,
23  between 2004 and 2005?
24  A. Uh-huh. Yes.

**15**

1  Q. What was that based on?
2  A. Performance.
3  Q. And the performance
4  criteria that you've just
5  articulated?
6  A. Yes.
7  Q. Nothing else. Nothing
8  else.
9  A. For example?
10  Q. No. I mean, have you
11  identified all of the criteria that
12  were employed —
13  A. Yes. Yes.
14  Q. And you said — and part of
15  it is commission. Could you describe
16  to me the commission program —
17  A. Yes.
18  Q. — that is, what are the
19  criteria?
20  A. We are — for every closed
21  loan we're allocated a certain fee.
22  And we're also charged with
23  controlling office expenses. To the
24  extent that the credited fee exceeds

**16**

1  the office expenses, there is a
2  sliding scale from 10 to 20 percent,
3  10 percent for the first — for the
4  doubling of the expense.
5  So if the expense is worth,
6  let's say, 500,000, the first level
7  would be a million. If your fees
8  were a million, you'd get 10 percent
9  of the differential and over that you
10  get 20 percent.
11  Q. And what's the fee on a
12  closed loan?
13  A. Typically, half a point,
14  which if it's a million-dollar loan,
15  that would be $5,000.
16  Q. Is your commission
17  influenced at all by the originating
18  of loans that don't close?
19  A. No.
20  Q. So in this instance, the
21  Avenel loan, which did not close, the
22  fees generated, the $965,000 in fees
23  that were generated, had absolutely
24  no effect on your compensation. Do I

**17**

1  have that right?
2  A. Yes.
3  Q. Are they accounted for in
4  the production of your office in any
5  way?
6  In other words, are the
7  fees generated by the — the
8  application processing commitment
9  fees generated in connection with the
10  Avenel loan, are they recorded in the
11  results of your office?
12  A. No.
13  Q. Where are they reflected?
14  Do you know?
15  A. I don't know.
16  Q. You said you acted as a
17  go-between.
18  What did you — between the
19  borrower and who?
20  A. And home office.
21  Q. And who in home office —
22  do you report to someone in home
23  office?
24  A. I report to — my boss is

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103     FAX  215.751.0581
www.JDReporting.com

18

1 Bill McPadden, M-C-P-A-D-D-E-N.
2    Q.  And what's his title?
3 Something.
4       What's his duties?  What
5 are his duties?  Forget his title.
6    A.  He's head of all the
7 production in the U.S.
8    Q.  Okay.  U.S. production.
9       How many offices are there,
10 approximately, across the United
11 States?
12    A.  Nine.
13    Q.  And do you work with others
14 in the home office besides Mr.
15 McPadden?
16    A.  Yes.
17    Q.  And who do you work with?
18    A.  Tim Malik.
19    Q.  And what's his function?
20    A.  He's a credit officer.
21    Q.  In 2004 what was he?
22    A.  2004, he was an investment
23 officer.
24    Q.  Did you work with him in

19

1 2004 as well?
2    A.  Yes.
3    Q.  And who else in the home
4 office do you work with -- did you
5 work with in 2004?
6    A.  On Avenel or --
7    Q.  Yes, on Avenel.
8    A.  I believe Nathaniel
9 Margolis.
10    Q.  And he's counsel?
11    A.  Yes.  Inside counsel.
12    Q.  What matters did you work
13 on with him in connection with
14 Avenel?
15    A.  He was the -- he and Tim
16 would make the decisions on
17 negotiated items.
18    Q.  And when you say
19 "negotiated items," you mean
20 negotiated items in the loan
21 application?
22    A.  Yes.
23    Q.  Anywhere else?  Any other
24 negotiated items?

20

1    A.  On the term sheet.
2    Q.  Any others?
3    A.  No.
4    Q.  Did your office originate
5 the Regatta loan?
6    A.  Yes.
7    Q.  And when was that loan
8 originated, to the best of your
9 recollection, approximately?  It was
10 before the Avenel loan; right?
11    A.  Yes.  I would say
12 approximately late 2003 to early
13 2004.
14    Q.  And when was the -- when
15 did it become known that that loan
16 would not close?
17    A.  Late 2004.
18    Q.  And did you participate in
19 the decision with respect to the
20 consequence of the loan not closing
21 in connection with Regatta?
22    A.  No.
23       MR. DAVIS:  Objection.
24       Just pause briefly before

21

1 you respond.
2       THE WITNESS:  I'm sorry.
3       MR. SCHER:  What was the
4 basis for the objection?
5       MR. DAVIS:  I think the
6 question was vague.
7       MR. SCHER:  Okay.
8 BY MR. SCHER:
9    Q.  In connection with the
10 Regatta loan, a decision was made to
11 keep the application processing and
12 commitment fees and to seek no more
13 in the way of damages.
14       What, if any, role did you
15 play in that decision?
16       You can answer that
17 question.
18    A.  None.
19    Q.  Who did make that decision?
20    A.  I don't know everybody
21 involved, but --
22    Q.  Identify any --
23    A.  Tim Malik.
24    Q.  In the spring of 2005 a



**James DeCrescenzo Reporting**, LLC

**22**

1  decision was made not to accept the
2  fees paid by Avenel, paid in
3  connection with the Avenel project,
4  but, rather, to seek damages.
5       What, if any, role did you
6  play in that decision?
7       MR. DAVIS: Objection.
8       You can respond.
9       MR. SCHER: What was that?
10 What was the basis?
11      MR. DAVIS: The timing of
12 that is — I don't think it's quite
13 accurate.
14      MR. SCHER: Okay.
15 BY MR. SCHER:
16      Q. Forget the timing. What,
17 if any, role did you play in
18 connection with the decision to seek
19 damages beyond the fees paid by the
20 borrower, prospective borrower, in
21 connection with the Avenel project?
22      MR. DAVIS: You can
23 respond.
24      THE WITNESS: None.

**23**

1  BY MR. SCHER:
2       Q. And who did make that
3  decision?
4       A. Again, I don't know
5  everybody involved, but Tim Malik was
6  my source.
7       Q. Okay. Do you know anyone
8  else who was involved in that
9  decision?
10      A. No.
11      Q. Do you know why that
12 decision was made?
13      MR. DAVIS: Objection.
14      And I instruct you that in
15 answering Mr. Scher's question, you
16 should not disclose any information
17 that you obtained from counsel or
18 from other people at Hancock that
19 would disclose communications with
20 counsel.
21      MR. SCHER: Okay.
22 BY MR. SCHER:
23      Q. So my first question is, do
24 you know why that decision was made?

**24**

1  And just answer yes or no.
2       A. No.
3       Q. Do you know any reason why?
4       MR. DAVIS: Same
5  instruction, same objection.
6  BY MR. SCHER:
7       Q. Yes or no.
8       A. No.
9       Q. On how many occasions did
10 you meet with Messrs. Koller, Kelly,
11 or Palopoli?
12      MR. DAVIS: I'm assuming
13 you're talking about with respect to
14 Avenel?
15      MR. SCHER: Yes.
16      THE WITNESS: Over what
17 period of time?
18 BY MR. SCHER:
19      Q. Between 2004 and 2005.
20      A. I'm not completely sure,
21 but I would say probably four to six
22 times.
23      Q. Did you ever meet with
24 Frank Palopoli?

**25**

1       A. Yes.
2       Q. About how many times did
3  you meet with him?
4       A. I believe only two.
5       Q. Okay. And can you recall
6  when those meetings occurred?  In
7  general terms.
8       A. Once we went to lunch at
9  Myrna's with Mr. Koller and Mr.
10 Kelly, and the other time I saw him
11 at the Avenel office.
12      Q. Did you know any of those
13 gentlemen prior to the time of the
14 Avenel?
15      A. Yes.
16      Q. And how did you know them?
17      A. Mr. Koller and I used to be
18 on a Chicago Title board of advisors.
19      Q. And approximately when was
20 that?
21      A. Ten years?
22      Q. Is that one of the
23 associations that you belong to from
24 which you generate — originate

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

---

26

1  loans?
2      A.  It's no longer active.
3      Q.  Was that one?
4      A.  At that time, yes.
5      Q.  Yes.
6          What other associations do
7  you participate in -- what other
8  associations have you participated in
9  in order to originate loans?
10     A.  Tri-State Real Estate
11 Organization.
12         And again, what's the time
13 frame?  Recent?  Since I've been in
14 business?
15     Q.  Since you've been in
16 business.
17     A.  Mortgage Bankers
18 Association, Urban Land Institute,
19 Apartment Association of Greater
20 Philadelphia.
21     Q.  Would you tell me your
22 background and experience in this
23 area?  What have you done in the area
24 of originating loans in your career

---

27

1  other than employment by John
2  Hancock?
3      A.  Are you talking about who
4  else I've worked for?
5      Q.  Yes.
6      A.  Fidelity Bond & Mortgage.
7      Q.  Can you tell me when you
8  worked for Fidelity Bond & Mortgage?
9      A.  Yes.  1988 to mid-1990.
10     Q.  Is that your first job in
11 connection with originating loans?
12     A.  No.
13     Q.  Let's then do it
14 chronologically.
15         After you --
16     A.  I'm going backwards from
17 Hancock.
18     Q.  Let's go forward for me.
19     A.  Okay.
20     Q.  It's easier.
21         After you completed formal
22 education where?
23     A.  University -- or Penn State
24 University.

---

28

1      Q.  And what year did you --
2  did you graduate from Penn State?
3      A.  Yes.
4      Q.  And what year was that?
5      A.  1967.
6      Q.  Okay.  And after graduating
7  from Penn State what employment --
8  what was your first full-time
9  employment?
10     A.  I was a detail person for
11 Merck Sharp & Dohme.
12     Q.  And what was your next
13 employment?  What was your next
14 employer?
15     A.  Equitable Life Insurance.
16     Q.  And what did you do for
17 them?
18     A.  Sold life insurance.
19     Q.  And what was your next
20 employer?
21     A.  Charles Rollison & Company.
22     Q.  And what did you do for
23 them?  For it?
24     A.  Sold houses.  Listed and

---

29

1  sold houses.
2      Q.  And after that?
3      A.  After that.  Land Tech
4  Corporation.
5      Q.  And what did you do for it?
6      A.  Sold industrial property.
7      Q.  And then what did you do?
8      A.  Korman Corporation.
9      Q.  What did you do for Korman?
10     A.  Sold industrial property.
11     Q.  And then what?
12     A.  Industrial and office
13 property.
14         Then Heritage Mortgage,
15 where I started in mortgage banking.
16     Q.  Heritage Bank was --
17 Heritage Mortgage was a mortgage
18 bank?
19     A.  Yes.  Mortgage banker.
20     Q.  Mortgage banker?
21     A.  Uh-huh.
22     Q.  And what did you do for
23 Heritage?
24     A.  Originated commercial

---

**James DeCrescenzo Reporting**, LLC
215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

30

1  loans.
2  Q. Okay. And when was that,
3  approximately?
4  A. 1978.
5  Q. And after Heritage, by whom
6  were you employed?
7  A. Central Mortgage.
8  Q. And what did you do for
9  Central?
10  A. Originated commercial
11  loans.
12  Q. And approximately when was
13  that?
14  A. It was 1982, that I recall.
15  Q. Why did you leave Heritage?
16  A. The president of Heritage
17  became the president of Central
18  Mortgage.
19  Q. Okay. And then what
20  happened in terms of your employment?
21  A. And Central Mortgage was
22  acquired by Meritor Savings Bank.
23  Q. Okay. And you went to work
24  for Meritor?

31

1  A. Yes.
2  Q. And then what happened?
3  A. Then I left Meritor to go
4  with Fidelity Bond & Mortgage.
5  Q. In 1988?
6  A. 1988, yes.
7  Q. And you originated
8  commercial loans?
9  A. Originated commercial
10  loans, yes.
11  Q. In 1990 you left Fidelity
12  and joined John Hancock?
13  A. Yes.
14  Q. And what were your duties
15  and responsibilities then when you
16  first joined John Hancock?
17  A. Pretty much the same as
18  they are now.
19  Q. Okay. Did you create the
20  office or had the office existed
21  before you —
22  A. The John Hancock office?
23  Q. Yes.
24  A. The John Hancock office

32

1  existed before I came with them.
2  Q. Who did you replace?
3  A. Pat Hollenbach.
4  Q. So from 1990 to the present
5  you've been manager of the regional
6  office covering Pennsylvania, New
7  Jersey, Delaware, and Puerto Rico?
8  A. Yes.
9  Q. In 2004 Manulife acquired
10  John Hancock; is that right?
11  A. Yes.
12  Q. What, if any, effect did
13  that have on your duties and
14  responsibilities?
15  A. None.
16  Q. What, if any, effect did
17  that have on your person to whom you
18  report?
19  A. None.
20  Q. What, if any, effect did it
21  have on you at all?
22  A. Well, a little
23  disconcerting to have somebody else
24  buy you. I guess psychologically a

33

1  little feeling of uncertainty.
2  Q. Any policies or procedures
3  or methods of doing business that
4  changed after the acquisition by
5  Manulife?
6  A. Yes.
7  Q. Could you tell me what they
8  are?
9  A. Well, we went from a real
10  estate committee process to a
11  signature process.
12  Q. And what does that mean?
13  A. Prior to Manulife, loans
14  were approved at a real estate
15  committee.
16       After Manulife they were
17  approved by — they were indicated
18  approved by signature authority up to
19  the loan amount that that person was
20  allowed to sign for.
21  Q. Okay. What other changes?
22  A. None that I can think of.
23  Q. Were there any new or
24  different criteria requirements for



---

**34**

1  loans after Manulife acquired John
2  Hancock?
3      A. Well – how do I want to
4  say this?
5      Nothing in – nothing
6  specifically that I can think of.
7      Q. All right. Are you
8  familiar with the 10 percent constant
9  requirement?
10     A. Yes.
11     Q. Did that requirement exist
12  in John Hancock when John Hancock –
13     A. No.
14     Q. – prior to acquisition?
15     A. No.
16     Q. And that –
17     MR. DAVIS: Please let him
18  finish his questions before you begin
19  to answer.
20     THE WITNESS: Oh, okay.
21  All right. All right.
22     MR. SCHER: I was mumbling,
23  I apologize. I'll try not to
24  whisper.

---

**35**

1  BY MR. SCHER:
2      Q. Was that 10 percent
3  constant requirement introduced after
4  the acquisition by Manulife?
5      A. Yes.
6      Q. And was that criteria
7  reflected in the loan application at
8  the time Avenel completed its loan
9  application?
10     MR. DAVIS: Objection.
11  BY MR. SCHER:
12     Q. Was it contained in it?
13     MR. DAVIS: Objection.
14     MR. SCHER: Okay.
15  BY MR. SCHER:
16     Q. You can answer it anyway.
17     THE WITNESS: Is that – is
18  that okay?
19     MR. SCHER: Yes.
20     MR. DAVIS: Yes. You can
21  answer. That's fine.
22     MR. SCHER: He'll say "I
23  instruct you not to answer" if he
24  doesn't want you to answer.

---

**36**

1      THE WITNESS: Okay. Can
2  you repeat the question, please.
3      MR. SCHER: Sure.
4  BY MR. SCHER:
5      Q. Was the 10 percent constant
6  criteria contained in the Avenel loan
7  application?
8      A. No.
9      Q. When did the 10 percent
10  constant criteria, when was that
11  introduced into the requirements for
12  a loan after the Manulife
13  acquisition?
14     A. Between the application and
15  the approval.
16     Q. How did you learn that the
17  new criteria, the 10 percent constant
18  criteria, was introduced?
19     A. Tim told me, Tim Malik.
20     Q. And how did he tell you
21  that? Do you remember? Was it an
22  E-mail or a telephone conversation?
23     A. As far as I can remember,
24  it was a phone call.

---

**37**

1      Q. The application is dated
2  July 30, the approval is dated August
3  17, I believe.
4      Can you approximate with
5  any greater precision when that
6  approval – when you learned the 10
7  percent constant had been introduced?
8      A. To clarify?
9      Q. Yes.
10     A. Can I ask a clarifying
11  question?
12     Q. Yes.
13     MR. DAVIS: You can ask.
14     MR. SCHER: You're entitled
15  to, yes.
16     THE WITNESS: For this
17  specific deal, you mean?
18     MR. SCHER: Yes. Yes.
19     THE WITNESS: Sometime
20  between July 30th and the approval
21  date.
22     MR. SCHER: Okay.
23     THE WITNESS: Yeah.
24  BY MR. SCHER:

---

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**38**

1    Q. And what, if anything, did
2  you do after you learned that this
3  new criteria, the 10 percent
4  constant, had been introduced into
5  the approval process with respect to
6  the Avenel loan? What did you do?
7    A. Well, I complained to Tim.
8    Q. And do you recall the gist
9  of what you complained?
10   A. I complained that it
11  shouldn't be inserted now because it
12  wasn't in the original application.
13   Q. Okay. And what else did
14  you do?
15   A. I contacted the broker, Rob
16  Kelly.
17   Q. And what did you —
18   A. And I told him, I think I
19  said there may be a potential
20  problem.
21   Q. Okay. And what else did
22  you do?
23   A. I think that's it.
24   Q. Did you undertake to modify

**39**

1  the loan application to reflect this
2  new criteria?
3    A. No.
4    Q. Did you participate in any
5  efforts to modify the loan
6  application to reflect the new
7  criteria?
8    A. I believe we — we — Tim
9  sent me a new exhibit, new Exhibit 1,
10  which was subsequently eliminated.
11   Q. And he sent you a new
12  Exhibit 1 which had new numbers on
13  it, I take it?
14   A. Right. It had the — it
15  referenced the 10 percent constant.
16   Q. And it showed the 10
17  percent constant.
18   A. Right.
19   Q. And then you said it was
20  eliminated. What do you mean by
21  that?
22   A. I mean it was not part of
23  the final approval.
24   Q. Okay. So it was not made

**40**

1  part of the loan application; right?
2    A. Yes.
3    (Discussion off the
4  record.)
5  BY MR. SCHER:
6    Q. On August 11th, 2004,
7  according to your — according to the
8  privilege log which has been produced
9  in this case — you don't have to
10  know about that, but that's the
11  source of my information — there's a
12  document that is marked PRIV 0042
13  through 0045.
14        And it's an E-mail with an
15  attachment and it's from Tim Malik
16  and it's to Nathaniel Margolis,
17  Esquire, with a carbon copy to you
18  and the subject is a draft amendment
19  to Vesterra loan application.
20        Knowing that, does that
21  refresh your recollection as to
22  whether there was a draft amendment
23  to the Vesterra loan application at
24  or about August 11th, 2004?

**41**

1    A. I don't remember.
2    Q. On August 11th also, a
3  document marked PRIV 0046-0051,
4  there's an E-mail with an attachment
5  from Tim Malik to you and it
6  forward — it is described as
7  forwarding draft amendment to
8  Vesterra loan application with
9  attorney comments.
10        Do you have any
11  recollection of receiving a draft
12  amendment to Vesterra loan
13  application?
14   A. No.
15   Q. Did you ever see a version
16  of the Vesterra loan application
17  which contained the 10 percent
18  constant, a version that was
19  unsigned?
20   A. I saw an Exhibit 1.
21   Q. Just that Exhibit 1 that
22  you made reference to in your earlier
23  testimony?
24   A. Right. Yes.

**JDR**

**James DeCrescenzo Reporting,** LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

42

1    Q.  After you learned that
2    the -- this 10 percent constant
3    criteria had been introduced and --
4    into the approval process, did you
5    learn that the loan had in fact been
6    approved?
7        MR. DAVIS:  Objection.
8        You can respond.
9    BY MR. SCHER:
10    Q.  Did you learn that the loan
11    to Avenel had been approved?
12    A.  Before the 10 percent
13    constant or after the 10 percent?
14    Q.  After the 10 percent
15    constant.
16    A.  The 10 percent constant was
17    introduced, I vehemently objected, it
18    was subsequently eliminated, then the
19    loan was approved.
20    Q.  How do you know that the --
21    that it was eliminated?
22    A.  Because it's not part of
23    the executed application.
24    Q.  Okay.  Have you ever seen

43

1    the loan approval?
2    A.  Yes.
3    Q.  And are you a recipient of
4    that loan approval document?
5    A.  Not officially.
6    Q.  How did you come to get a
7    copy of that loan approval document?
8    A.  I believe Tim sent it to
9    me.
10    Q.  And in that loan approval
11    document the 10 percent constant does
12    appear; am I right?
13    A.  I don't know.
14    Q.  You didn't look at it
15    that --
16    A.  I don't remember.  I don't
17    remember.
18    Q.  Okay.  After the loan
19    approval, what role do you have in
20    connection with the loan?
21    A.  Closing the loan.  My
22    office.
23    Q.  And what -- by what do
24    you -- what responsibilities do you

44

1    have for closing the loan?
2    A.  A member of my staff
3    coordinates the legal and the
4    business items, orders third-party
5    reports.
6    Q.  Who is responsible for
7    obtaining the funds that are used to
8    close the loan?  How are the funds
9    obtained?
10    A.  I don't understand.
11    Q.  Well, on the eve of
12    closing, we're approaching a closing,
13    the person on your staff has
14    coordinated with legal with respect
15    to the preparation of documents and
16    so forth, scheduled and arranged for
17    the borrower and whatever signatures
18    are necessary.
19        How is the money arranged
20    for?
21    A.  A loan disbursement is
22    executed by the borrower.  The money
23    is wire-transferred from Boston
24    generally to a title company.

45

1    Q.  After the borrower prepares
2    this loan disbursement document --
3    what is the loan disbursement
4    document?  What does that say?  What
5    he's going to do with the proceeds?
6    A.  Yes.  Yes.
7    Q.  That loan disbursement
8    document, then what happens to it?
9    Where does it go?
10    A.  It goes to the closing
11    attorney.
12    Q.  Okay.
13    A.  In this case it would have
14    been --
15    Q.  White and Williams?
16    A.  -- Tom Rogers --
17    Q.  Tom Rogers.
18    A.  -- White and Williams.
19    Q.  Right.
20        And then where does it go?
21    A.  Tom Rogers makes sure that
22    everything is in order, all the
23    documents have been signed, all the
24    business items have been adhered to,

**JD̄R**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

**46**

1  and he notifies Boston that all is
2  good to go.
3      Q.  And what happens in Boston?
4      A.  Money gets put on the wire.
5      Q.  Do you know to whom the
6  Boston -- who in Boston is notified
7  by Mr. Rogers?
8      A.  Tim Malik.
9      Q.  And do you know who Mr.
10  Malik informs to put it on the wire?
11      A.  No.
12      Q.  And do you know what
13  process is employed by Mr. Malik to
14  have the money put on the wire?
15      A.  He informs the Treasury
16  Department.
17      Q.  Do you know how he informs
18  the Treasury Department?
19      A.  No.
20      Q.  Do you know what forms are
21  used to instruct the Treasury
22  Department to put the money on the
23  wire?
24      A.  No.

**47**

1      Q.  Do you know what documents
2  are -- what documents relating to the
3  loan itself are used to instruct the
4  treasury to make the disbursement?
5      A.  Again, I don't -- I don't
6  follow the --
7      Q.  Okay.  Let me clarify it.
8          Do you know whether the
9  loan application document or the loan
10  approval document is used in
11  connection with the instructions to
12  the treasurer to disburse?
13      A.  No.
14      Q.  So you don't know whether
15  the 10 percent constant requirement
16  was or was not contained in the
17  instructions to treasury with respect
18  to the disbursement of the loan --
19      MR. DAVIS:  Objection.
20  BY MR. SCHER:
21      Q.  -- would be contained.
22      MR. DAVIS:  Objection.
23  Calls for speculation.
24      You can respond.

**48**

1      THE WITNESS:  I don't know.
2  BY MR. SCHER:
3      Q.  You would defer to Mr.
4  Malik on that subject?
5      A.  Yes.
6      (Discussion off the
7  record.)
8  BY MR. SCHER:
9      Q.  By the way, I've failed to
10  tell you that any time you want to
11  take a break, we can take a break, so
12  whatever is convenient for you.
13      A.  Fine.  Thanks.
14      Q.  There is a criteria called
15  the loan sizing criteria.
16          Have you ever heard of
17  that?
18      A.  Yes.
19      Q.  And what is that -- is that
20  a John Hancock or a Manulife
21  criteria?
22      A.  It's both.
23      Q.  Okay.  So the loan sizing
24  criteria existed prior to the

**49**

1  acquisition by Manulife?
2      A.  Yes.
3      Q.  And what is that loan
4  sizing criteria?  Can you articulate
5  it?
6      A.  Then?  Now?  It changes,
7  depending on market.
8      Q.  Okay.  Well, then could you
9  describe to me how it -- what it is
10  and then how it changes, depending on
11  market?
12      A.  Prior to Manulife, it was a
13  constant, arbitrary constant -- I
14  wouldn't say arbitrary.  It was a
15  Fitch constant used by one of the
16  rating agencies.
17      Q.  Fitch is a rating agency?
18      A.  Is a rating agency, yeah.
19      Q.  Yes.  And what was that?
20      A.  To determine at the end --
21  at the maturity of a loan whether the
22  debt service coverage would be equal
23  to 1.0 using a Fitch constant.
24      Q.  Is that the letter

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

---

50

1 combination, a Fitch rating?
2     No. It's not a quality of
3 the loan, it's --
4     A. No. It's an actual number.
5     Q. Okay.
6     A. It's a factor.
7     Q. And the computation of the
8 Fitch rating is -- the calculation is
9 accomplished through some internal
10 underwriting process?
11     A. The -- yes. Yes. The
12 Fitch constant times the loan
13 proceeds at the maturity of the
14 loan --
15     Q. Okay.
16     A. -- equals what the assumed
17 debt service would be at that time.
18     Q. And how did that change?
19     A. It went down. Started --
20 originally was, for many years,
21 10.54, then it went to 10, and right
22 now it's at 9.
23     Now, the Fitch constant is
24 10 -- was at 10.54. Hancock and

51

1 Manulife subsequently adjusted it
2 downwards to cope with competitive
3 market conditions.
4     Q. So in order to qualify
5 loans, loan applications, they
6 reduced the Fitch constant from 10.54
7 to 10 and now to 9?
8     A. Yes.
9     Q. So when you said
10 pre-Manulife, you were referring to
11 the fact that pre-Manulife it was
12 10.54 and then subsequently it was
13 reduced; is that right?
14     A. Yes.
15     Q. And you were explaining to
16 me the changes that related to
17 marketing -- market conditions and
18 you have answered that part of the
19 question as well, haven't you?
20     MR. DAVIS: Objection.
21 BY MR. SCHER:
22     Q. You said that the changes
23 were -- that the loan sizing criteria
24 had existed prior to the acquisition

52

1 by Manulife and that there were
2 changes depending on market; right?
3     A. They --
4     MR. DAVIS: Objection.
5     You can respond.
6     THE WITNESS: Okay.
7 They've been adjusted based on
8 competitive market conditions. Yes.
9     MR. SCHER: Okay.
10 BY MR. SCHER:
11     Q. Is the loan sizing criteria
12 contained in the loan application?
13     A. Specifically Avenel?
14     Q. Yes.
15     A. No.
16     Actually, not contained in
17 any of them.
18     Q. They're not contained in
19 any of the loan applications?
20     A. Yes. Because it's only an
21 indicator, it's not a -- it's not an
22 absolute fact of life.
23     Q. Okay. When you say "an
24 indicator, not an absolute fact of

53

1 life," that means that this -- the
2 loan sizing criteria simply indicates
3 the amount of the loan, but it's not
4 an absolute requirement for the size
5 of the loan; is that right?
6     A. No. There are --
7     MR. DAVIS: You can
8 respond.
9     THE WITNESS: There are
10 several underwriting criteria, one of
11 which is the loan sizing. The loan
12 sizing criteria can be waived pending
13 other attributes in the deal.
14     MR. SCHER: Okay.
15 BY MR. SCHER:
16     Q. What are the other
17 criteria?
18     A. Well, loan to value.
19     Q. That's called LTV?
20     A. Yes.
21     Debt service coverage.
22     Q. DSCR?
23     A. DSC.
24     Q. DSC?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

**54**

1    A.  Actually put the ratio in
2  there, it would be a DSC, DSCR, yes.
3    Q.  Okay.  Any other?
4    A.  They're the major ones.
5    Q.  Okay.  And the LTV, or loan
6  to value, and the DSC are contained
7  in the loan application; right?
8    A.  Yes.
9    Q.  And the specific ratios
10  that are required are contained in
11  the loan application; right?
12    A.  Yes.  Yes.
13    Q.  And the borrower signs a
14  loan application containing those two
15  criteria and the numbers associated
16  with them; right?
17    A.  Yes.
18      MR. DAVIS:  Please pause
19  before you respond.
20      THE WITNESS:  Okay.
21  BY MR. SCHER:
22    Q.  And in the Avenel case the
23  loan-to-value criteria and the debt
24  service coverage or debt service

**56**

1    Q.  In your dealings with
2  Messrs. Koller, Kelly, and Palopoli,
3  have you found them to be honest,
4  trustworthy people?
5    A.  Yes.
6    Q.  And in connection with your
7  work in this case, from the time that
8  the dispute arose, what role have you
9  played in connection with this
10  dispute?
11      In other words, after the
12  decision was made to institute a
13  lawsuit and collect the fees and
14  the -- from the Letter of Credit,
15  what role have you played?
16      MR. DAVIS:  Objection.
17      You're asking since --
18      MR. SCHER:  The lawsuit.
19      MR. DAVIS:  -- the loan
20  didn't close and a decision was made
21  to institute a lawsuit, what role has
22  he played?
23  BY MR. SCHER:
24    Q.  What have you done?  Right.

**55**

1  coverage ratio were contained in the
2  application and the borrower signed
3  an application containing those two
4  criteria; right?
5      MR. DAVIS:  Objection.
6      You can respond.
7      THE WITNESS:  Yes.
8  BY MR. SCHER:
9    Q.  And the loan sizing
10  criteria was not contained in the
11  loan application by the borrower in
12  the Avenel deal; right?
13      MR. DAVIS:  You can
14  respond.
15      THE WITNESS:  Yes.
16  BY MR. SCHER:
17    Q.  And the 10 percent constant
18  was not contained in the loan
19  application in the Avenel deal;
20  right?
21      MR. DAVIS:  Objection.
22      You can respond.
23      THE WITNESS:  Yes.
24  BY MR. SCHER:

**57**

1    A.  Nothing.
2    Q.  Have you collected
3  documents --
4    A.  Yes.
5    Q.  -- to produce in this case?
6    A.  Yes.
7    Q.  And what did your document
8  collection process entail?  How did
9  you do that?
10    A.  Notifying everybody in my
11  office to produce whatever notes they
12  had, copying all the documents in our
13  file, checking our E-mails, Outlook,
14  anything that had to do with Avenel.
15    Q.  And did you produce those
16  documents to your counsel?
17    A.  Yes.
18    Q.  How were you informed to do
19  that collection, that process of
20  collecting documents?
21      MR. DAVIS:  Objection.
22      Are you asking about his
23  communications with counsel on the
24  topic?



**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

**58**

1     MR. SCHER: I just —
2  BY MR. SCHER:
3     Q.  How was the communication
4  made to you?
5     MR. DAVIS: You can tell
6  him from whom you received your
7  communications in that regard.
8     THE WITNESS: I received it
9  from Lisa Gaulin at Mr. Davis's
10  office.
11     MR. SCHER: Okay.
12  BY MR. SCHER:
13     Q.  Can you tell me when the —
14  well, how the first notion of the
15  Avenel deal came to your attention?
16     In other words, when did
17  you first learn about or how did you
18  first learn about the possibility of
19  what eventually became the loan
20  application on the Avenel
21  transaction?
22     A.  My associate, Brian
23  Depolis, had been talking with Joe
24  Kelly for a while, and he brought it

---

**59**

1  to my attention.
2     Q.  What did you learn from
3  Brian Depolis?
4     A.  That they were building
5  a — an apartment complex.
6     Q.  What else?
7     A.  It was a potential loan
8  opportunity.
9     Q.  Did Brian tell you that
10  they had a construction loan already?
11     A.  I don't recall.
12     Q.  What happened next in the
13  process?
14     A.  Subsequent to that, Rob
15  Kelly, a mortgage broker, approached
16  me with the transaction.
17     Q.  And when you say
18  "approached me with a transaction,"
19  what does that mean? What did that
20  mean?
21     A.  To me it meant that since
22  Rob and Joe were related, that Rob
23  probably had the inside track on
24  placing the mortgage.

---

**60**

1     Q.  Okay.
2     A.  So my contact was with Rob
3  from that point on.
4     Q.  So when he approached you
5  with the loan, what did he tell you
6  about it? Do you have any
7  recollection? What did he provide to
8  you?
9     A.  He gave me a pro forma with
10  a description of the completed
11  project.
12     Q.  And he had that — was that
13  pro forma prepared for John Hancock
14  or was it a generalized pro forma
15  that was prepared for whatever source
16  of borrowing they could obtain?
17     MR. DAVIS: Objection.
18  BY MR. SCHER:
19     Q.  If you know.
20     A.  I don't recall.
21     Q.  And then what did you do?
22  What, if anything, did you do after
23  you had this contact with Rob Kelly
24  where he turned over the pro forma?

---

**61**

1     A.  As best as I can remember,
2  I initiated contact with Joe Kelly
3  and Jim Koller.
4     Q.  When you say "initiated
5  contact," what did you do? Call
6  them? Write them?
7     A.  I believe Rob set up a
8  meeting.
9     Q.  And so you did have a
10  meeting with them?
11     A.  Yes.
12     Q.  And what happened at the
13  meeting?
14     A.  I tried to present Hancock
15  in its most favorable light in order
16  to generate a favorable decision to
17  proceed with our loan application.
18     Q.  And how did you go about
19  doing that?
20     A.  Smile.
21     Q.  Okay. I haven't seen that
22  yet, so I just wanted to know.
23     Did you have materials
24  about John Hancock with you when you

---

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

## 62

1  made this presentation?
2      A.  I don't remember.
3      Q.  Did you understand that you
4  were in a competitive situation; that
5  is, that there were other lenders
6  available?
7      A.  Oh -- very much.
8      Q.  Did you know who those
9  other potential sources were?
10     A.  Not specifically.
11     Q.  Did you ever learn who
12  those other sources were?
13     A.  Yes.
14     Q.  And how did you learn who
15  the other sources were?
16     A.  I think Rob told me.
17     Q.  And who were the other
18  sources?
19     A.  I believe it was GMAC.
20     Q.  Do you know what GMAC's
21  practices and procedures are with
22  respect to loan applications?
23     A.  No.
24     Q.  Do you know whether they

## 63

1  require the payment of application --
2  processing application and commitment
3  fees?
4      A.  No.
5      Q.  Do you know whether they
6  have criteria -- what their criteria
7  are for making loans?
8      A.  No.
9      Q.  So how did you make your
10  case for John Hancock?  What did you
11  say?
12     A.  Well, the borrower wanted
13  specific items in the application and
14  we attempted -- we, Hancock --
15  attempted to solve their requests.
16     Q.  And do you remember what
17  those items were?
18     A.  Well, one, they wanted a
19  forward -- a one-year forward.
20     Q.  Okay.  So they wanted a
21  loan commitment from Hancock that
22  would not close for a year.
23     A.  Right.  They wanted to lock
24  the rate one year in advance of the

## 64

1  loan closing.
2      Q.  Okay.  What else?  What
3  other items?
4      A.  They wanted to have a -- on
5  our forward program we typically have
6  a three-month extension.  They wanted
7  a six-month extension.
8      Q.  So that it would take the
9  loan 18 months out?
10     A.  Yes.
11     Q.  And what else?
12     A.  They wanted to have the --
13  it was a ten-year loan.  They wanted
14  to have the loan open to prepayment
15  in the tenth year, which I priced it
16  and found it was not economical.
17      So we offered a -- an
18  eleventh year option, open in the
19  eleventh year, at, you know, whatever
20  the rate would be.
21     Q.  And what else?  What other
22  items?
23     A.  The borrower wanted to
24  limit their exposure under I think

## 65

1  it's Paragraph 30 of the loan
2  application to the 3 percent that
3  they had put up plus another 2
4  percent.
5      Q.  Exposure against what
6  contingency?
7      A.  Against Hancock's losses.
8      Q.  Okay.
9      A.  Whatever.  Whatever the
10  language is on that paragraph.
11     Q.  Right.  And what --
12     A.  So it would be a total of 5
13  percent.
14      And we ran it up the
15  flagpole and that -- we couldn't do
16  that.
17     Q.  And you informed them of
18  that --
19     A.  Yes.
20     Q.  -- in writing; am I right?
21     A.  Informed them in writing?
22     Q.  You informed them that you
23  couldn't do that in an E-mail?
24     A.  Jeez, I don't -- I don't

**James DeCrescenzo Reporting**, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

### 66

1  know if I did or not.
2      Q.  Okay.  What other items?
3      A.  Nothing that I remember
4  without looking at the -- at the
5  application and the supplement
6  itself.
7      Q.  Okay.  And did you learn
8  that the -- that your smiling had a
9  positive effect on the decision by
10  the Avenel developers?
11      A.  Yes.
12      Q.  Right on the spot or did
13  they let you know later?
14      A.  No.  It was a -- it was a
15  prolonged negotiation.
16      Q.  Okay.  Did you have a
17  meeting subsequent to this first
18  meeting?
19      A.  Yes.
20      Q.  Yes?
21          Can you recall anything
22  about any of the subsequent meetings
23  between the time of your first
24  meeting and the time the loan

### 67

1  application was prepared and
2  submitted on July 30, 2004?
3      A.  No.
4      Q.  Can you approximate the
5  amount of time between your
6  original -- your initial smiling
7  presentation and the time that the
8  loan application was completed and
9  submitted?  Weeks?
10      A.  I would say within a couple
11  of weeks.
12      Q.  After the loan application
13  was submitted, with the exception of
14  your communication with Rob Kelly
15  regarding the bump in the road that
16  had arisen, did you have any other
17  contact -- any contact with the
18  borrowers after the loan application
19  was submitted?
20      MR. DAVIS:  Objection.
21      THE WITNESS:  I can't
22  remember specifically, but their
23  offices were, you know, a -- a short
24  walk away at the time, so I

### 68

1  occasionally went over, just stopped
2  in and, you know, said hello.
3  BY MR. SCHER:
4      Q.  And said hello.
5          After the loan approval had
6  been made by John Hancock on about
7  August 17th, did you communicate that
8  to the borrowers, prospective
9  borrowers?
10      A.  Yes.
11      Q.  And how did you do that?
12  Do you recall?
13      A.  Not specifically.  What I
14  normally do is they send from Boston
15  the approved document.  I give it to
16  Helene, who then sends it off to the
17  borrower along with our checklist.
18      Q.  And that approved document
19  was the loan application itself
20  signed by the people at --
21      A.  Officer of Hancock.
22      Q.  -- John Hancock?
23          And from that time forward,
24  the next activities were in

### 69

1  connection with the planning toward
2  the closing of the loan; is that
3  right?
4      A.  The next activity would be
5  to put a tickler on it sometime -- so
6  that sometime around the beginning of
7  2005 we'd start to coordinate the
8  third party's appraisals, et cetera.
9      Q.  How did you first learn
10  that the loan was not going to close?
11      A.  Either Jim or Joe called
12  me, told me they wanted to get
13  together.
14      Q.  And you did get together
15  with them?
16      A.  Yes.
17      Q.  And can you tell me when
18  that was, approximately?
19      A.  Sometime in the spring,
20  between the spring and summer of
21  2005.
22      Q.  And where did that meeting
23  occur?
24      A.  I can't recall

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

70

1 specifically.
2 Q. And what was the gist of
3 the meeting?
4 A. Gist of the meeting was
5 that Jim said that he wanted to be up
6 front and tell me that they had heard
7 that apartments were commanding
8 exorbitant prices, and if it were
9 true, they were going to explore the
10 market or -- to find out whether or
11 not it was true.
12 And recognizing he still
13 had obligations to Hancock, he just
14 wanted to be up front and tell me
15 that this is what they were doing.
16 Q. And what, if anything, did
17 you say?
18 A. I said, "Jim, it's a
19 business decision."
20 Q. What did you do with that
21 information?
22 A. I relayed it to Tim.
23 Q. And then what happened?
24 What happened internally at John

71

1 Hancock, as far as you know, after
2 you relayed it to Tim?
3 A. Nothing I know of.
4 Q. Did you ever get word back
5 from John Hancock about their
6 reaction to this notion that Mr.
7 Koller advanced?
8 MR. DAVIS: Objection.
9 Again, I'll just caution
10 you here that to the extent that
11 there was feedback that included
12 communications with counsel, advice
13 of counsel or the like, you should
14 not disclose it in response to Mr.
15 Scher's question.
16 BY MR. SCHER:
17 Q. So the question is, did you
18 ever get word back from John Hancock
19 about their reaction to the notion
20 that Jim, Mr. Koller, had advanced?
21 And you can answer that yes or no.
22 A. Yes.
23 Q. And then who conveyed word
24 back to you?

72

1 MR. DAVIS: You can answer
2 that.
3 BY MR. SCHER:
4 Q. And if it's counsel, you
5 should tell me that.
6 A. Tim Malik.
7 Q. Tim Malik, okay.
8 What did Mr. Malik tell
9 you?
10 MR. DAVIS: Again, the same
11 instruction, that to the extent that
12 Mr. Malik told you things that were
13 conveyed to him by counsel --
14 THE WITNESS: Uh-huh.
15 MR. DAVIS: -- you should
16 exclude that from your response. And
17 if you can't exclude it from your
18 response, then you should decline to
19 answer the question. I don't want
20 you to disclose any communications
21 with counsel.
22 THE WITNESS: Well, I did
23 send an E-mail to Jim reciting what
24 Tim had sent to me.

73

1 MR. SCHER: Okay.
2 BY MR. SCHER:
3 Q. And that's the E-mail where
4 you list the items that -- of damage
5 that you were going to claim; is that
6 right?
7 MR. DAVIS: You can respond
8 to that.
9 THE WITNESS: Yes.
10 MR. SCHER: Okay.
11 BY MR. SCHER:
12 Q. And that's approximately
13 when you got word back from John
14 Hancock as to the idea advanced by
15 Mr. Koller; right?
16 A. No. Mr. Koller didn't
17 advance any idea. He just told me
18 that he was going to explore.
19 Q. A sale.
20 A. A sale, right.
21 Q. Okay. Do you know who
22 participated in the decision Mr.
23 Malik conveyed to you in which you in
24 turn conveyed to Mr. Koller?

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

74

1    MR. DAVIS: Objection.
2    THE WITNESS: No.
3    MR. SCHER: No.
4    MR. DAVIS: If we could
5  take a break at some point.
6    MR. SCHER: Sure. Now is
7  fine.
8    MR. DAVIS: Okay.
9    (Recess, 10:50-10:58 a.m.)
10  BY MR. SCHER:
11    Q. You testified earlier that
12  the 10 percent constant criteria was
13  objected to by you; is that right?
14  You objected to that.
15    A. I objected to having it.
16  Yes.
17    Q. And you testified that it
18  was not contained in the loan
19  application; right?
20    A. The original -- yes.
21  Exactly.
22    Q. And you testified that you
23  understood that that requirement had
24  been eliminated; am I right about

75

1  that?
2    A. Yes.
3    Q. And could you tell me the
4  basis for that belief, that it was
5  eliminated?
6    A. That we committed on the
7  loan without the 10 percent constant.
8    Q. And that's because the loan
9  application doesn't contain the 10
10  percent constant and it was signed by
11  John Hancock?
12    MR. DAVIS: Sorry. Would
13  you read back the question.
14  BY MR. SCHER:
15    Q. Could you tell me the basis
16  for your belief that it was
17  eliminated?
18    MR. DAVIS: And I thought
19  there was a question subsequent to
20  that, but go ahead.
21    All right. You can
22  respond.
23    THE WITNESS: The
24  application was executed without it

76

1  by the borrower and approved by
2  Hancock, so we were prepared to honor
3  our commitment.
4  BY MR. SCHER:
5    Q. And that's the basis for
6  it; right?
7    A. Yes.
8    Q. Did anyone ever tell you
9  from John Hancock internally that
10  that criteria had been eliminated?
11  Did anybody tell you separate and
12  apart from the fact that the loan
13  application was signed by John
14  Hancock?
15    A. No.
16    Q. Did Malik say, well, your
17  objection has been sustained; that
18  is, the loan criteria has now -- the
19  loan criteria has now -- the criteria
20  required has now been reduced to only
21  those which are contained in the loan
22  application and this 10 percent
23  constant is no longer in the mix?
24    A. He signed the --

77

1    MR. DAVIS: Objection.
2  You can respond.
3    THE WITNESS: Oh. Excuse
4  me.
5  BY MR. SCHER:
6    Q. Did he ever tell you that?
7    MR. DAVIS: Objection.
8    THE WITNESS: He signed the
9  commitment.
10  BY MR. SCHER:
11    Q. Other than the signing of
12  the commitment.
13    A. No.
14    Q. Okay. You described for me
15  in general terms what duties and
16  responsibilities you and your office
17  have with respect to closing and
18  that's the subject of my next
19  question to you.
20    In connection with the
21  closing, do you have any
22  responsibility for reviewing the
23  then-current financial condition of
24  the borrower with respect to rent

James DeCrescenzo Reporting, LLC

215.564.3905                InnovatingLitigation                FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**78**

1  levels, net operating income, debt
2  service coverage, loan to value?
3     A. Prior to closing?
4     Q. Yes.
5     A. Yes.
6     Q. Who does that?
7     A. I would do it.
8     Q. And what is that process?
9     A. Well, the commitment
10  outlines certain criteria. We had an
11  exhibit outlining those criteria.
12  And I would make sure that the --
13  when we close the loan that the
14  current levels of income were within
15  those criteria.
16     Q. And what do you literally
17  do? Do you fill out a form? Do you
18  write okay on it? Do you -- you
19  know, what literally do you -- how do
20  you accomplish that function?
21     A. Take a current rent roll,
22  add it up, deduct the expenses,
23  determine what the level of net
24  operating income was.

**79**

1     Q. And that's it.
2     A. Uh-huh.
3     Q. Yes?
4     A. Yes.
5     Q. How do you communicate that
6  the rent roll, net operating income,
7  whatever are within -- are in
8  conformity with the criteria of John
9  Hancock as set forth in the loan
10  application?
11     A. There's an Affidavit --
12  well, actually, there's an exhibit on
13  the application, commitment, which
14  has to be signed by me.
15     Q. And once you've signed that
16  Affidavit and then you've dispatched
17  your responsibilities with respect to
18  evaluating the loan at the time that
19  the closing is to occur?
20     A. Yes.
21     Q. Okay. You knew that at the
22  time you were smiling at your initial
23  meeting with the prospective
24  borrowers that the size of the loan,

**80**

1  that is, $32 million, was important
2  to them; am I right?
3     A. Yes.
4     Q. You knew that there was
5  competition from at least GMAC at $33
6  million; right?
7     A. At that time I'm not sure I
8  knew what the competition dollar
9  amount was. I certainly knew there
10  was competition.
11     Q. But in any event, you knew
12  that the size of the loan was
13  important to the borrowers?
14     A. Yes.
15     Q. They wanted 32 million;
16  right?
17     A. Yes.
18     Q. Again, this 10 percent
19  constant, you never discussed that 10
20  percent constant criteria or raised
21  it or referenced it with Jim, Joe, or
22  Frank, Mr. Koller, Mr. Kelly, or Mr.
23  Palopoli; am I right about that?
24       MR. DAVIS: Objection.

**81**

1       MR. SCHER: What's the
2  basis?
3       MR. DAVIS: I think that
4  mischaracterizes the record. I think
5  he already said he talked to Rob
6  Kelly about it and that Mr. Kelly, I
7  think, was their representative.
8       MR. SCHER: Okay.
9       MR. DAVIS: But you can
10  respond.
11       MR. SCHER: All right.
12  BY MR. SCHER:
13     Q. Other than the one
14  communication you had with Rob Kelly,
15  did you have any other communications
16  on the subject of the 10 percent
17  constant?
18     A. I don't recall.
19     Q. Can you recall any
20  conversations with Mr. Koller on the
21  subject of the 10 percent constant?
22     A. I don't recall.
23     Q. Any conversations with Mr.
24  Joe Kelly on the subject of the 10



**82**

1  percent constant?
2  　A.  I don't recall.
3  　Q.  And any conversations with
4  Mr. Frank Palopoli on the 10 percent
5  constant?
6  　A.  Definitely not Frank.
7  　Q.  Okay.  In connection with
8  your communication with Rob Kelly,
9  did that communication take the form
10  of anything other than the E-mail you
11  sent to Rob Kelly?  In other words,
12  did you call him besides E-mail him?
13  　A.  Well, I called him.
14  　Q.  You called him.
15  　A.  Called Rob Kelly, yes.
16  　Q.  What did you tell him?
17  　A.  Paraphrasing, that there
18  may be a potential problem.  We had
19  a new underwriting criteria and we'd
20  like to insert the 10 percent
21  constant.
22  　Q.  And did you tell him
23  anything else at that time?
24  　A.  Not that I recall.

**83**

1  　Q.  Did you ask him to do
2  anything else?
3  　A.  I relayed the information.
4  　Q.  You just relayed that
5  information and that's it.
6  　A.  And he told me he would
7  discuss it with the borrower.
8  　Q.  He said he would discuss it
9  with the borrower?
10  　A.  Uh-huh.
11  　　　MR. DAVIS:  You have to
12  respond yes or no.  You have to
13  verbalize your response.
14  　　　THE WITNESS:  Oh, okay.
15  I'm sorry.
16  BY MR. SCHER:
17  　Q.  And was this the only time
18  you communicated to Rob Kelly on the
19  subject of the loan application after
20  the application had been completed?
21  　A.  I don't remember.
22  　Q.  Did he ever report back to
23  you that he had discussed it?
24  　A.  Yes.  Yes.

**84**

1  　Q.  What did he say to you?
2  　A.  He said it could be a deal
3  killer.
4  　Q.  Did he report that in that
5  same conversation, in the one
6  conversation you had?
7  　A.  In the initial
8  conversation?
9  　Q.  Yes.
10  　A.  No.
11  　Q.  So he got back to you?
12  　A.  Yes.
13  　Q.  And can you approximate how
14  long it took?
15  　A.  Short period of time.
16  　Q.  Day?  Hour?
17  　A.  Within a few days.
18  　Q.  Within a few days?
19  　　　And Rob Kelly called you
20  back.
21  　A.  Right.
22  　Q.  And what did he say to you?
23  　A.  He said it was a problem.
24  　Q.  Could be a deal killer?

**85**

1  　A.  Uh-huh.
2  　Q.  Yes?
3  　A.  Yes.
4  　Q.  Did he amplify?  Did he
5  expand on that?
6  　A.  That's pretty explanatory.
7  　Q.  That's it.
8  　　　And if it had — if the
9  deal had been killed at that moment,
10  you would have lost the $965,000 in
11  fees; am I right about that?
12  　　　MR. DAVIS:  Objection.
13  Calls for speculation, calls for a
14  legal conclusion.
15  　　　THE WITNESS:  At that point
16  we didn't have any fees.
17  BY MR. SCHER:
18  　Q.  Well, the $5,000 fee had
19  been paid when the —
20  　A.  Yes.
21  　Q.  — application fee was
22  made.
23  　A.  Right.
24  　Q.  Okay.  So your testimony is

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905　　　InnovatingLitigation　　　FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 86

1  that at the time that you had this
2  conversation with Rob Kelly, your
3  distinct recollection is that there
4  were no fees.
5       MR. DAVIS: Objection.
6  BY MR. SCHER:
7       Q. No other fees had been
8  posted or paid?
9       A. No. I didn't say that.
10      Q. Okay. So you had a Letter
11  of Credit?
12      A. Yes.
13      Q. Okay. And you had a Letter
14  of Credit for the full 960?
15      A. For 2 percent, as I recall.
16      Q. Okay. So that would be the
17  2 percent of the amount, whatever it
18  is.
19      A. Right.
20      Q. The four --
21      A. 640.
22      Q. 640. 640.
23          You would have -- that 640
24  would have been refunded to the

## 87

1  prospective borrower had the deal
2  been killed, am I right about that,
3  as far as you know?
4       A. Yes.
5       MR. DAVIS: Objection.
6       Pause before you respond.
7       Objection.
8       MR. SCHER: What's the
9  basis?
10      MR. DAVIS: Again, I think
11  it calls for a legal conclusion.
12      MR. SCHER: Okay.
13  BY MR. SCHER:
14      Q. And the practice at John
15  Hancock, if the deal is killed prior
16  to the approval of the loan
17  application, the Letter of Credit
18  posting is refunded to the
19  prospective borrower.
20      A. If the deal is changed and
21  it's not approved by the borrower,
22  the money is refunded.
23      Q. Okay. And that's exactly
24  what was being discussed at that

## 88

1  point, the change of the deal to
2  include a new criteria, the 10
3  percent constant; right?
4       MR. DAVIS: Objection.
5       THE WITNESS: The
6  application was being looked at to
7  determine whether it would be
8  approved or not.
9          The 10 percent constant was
10  requested by Hancock to be inserted
11  into the application. It was not.
12         And subsequently it was
13  eliminated from the application,
14  which became a commitment, and
15  therefore, it didn't matter. There
16  are lots of things that are
17  negotiated.
18  BY MR. SCHER:
19      Q. Can you recall anything
20  that Mr. Kelly said to you in that
21  conversation other than what you've
22  already -- that is, the second
23  conversation when he reported back to
24  you, other than what he's already --

## 89

1  what you've already reported?
2       A. Not that I recall.
3       MR. SCHER: Let me take a
4  two-minute break.
5          I have a computer problem
6  here.
7          (Recess, 11:11-11:25 a.m.)
8          (Exhibit Ferrie-1 was
9  marked for identification.)
10  BY MR. SCHER:
11      Q. I'll show you what I've had
12  marked as Ferrie Exhibit 1. And the
13  drill is as follows: I'll identify
14  the document.
15         It's a document from you to
16  kelly@ckpp.com and it's -- the body
17  of the E-mail says Rob, and then it
18  consists of two pages which are Bates
19  stamped JH 00133 and 134.
20         Is that the document you
21  have in front of you?
22      A. Yes.
23      Q. Okay. Do you -- so does
24  that refresh your recollection as to

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

90

1  the sequence of events which you've
2  been describing in connection with
3  your communications with Rob Kelly?
4      MR. DAVIS: Objection.
5      You can respond.
6      THE WITNESS: I don't -- I
7  don't follow you.
8  BY MR. SCHER:
9      Q.  Does that refresh your
10  recollection as to your
11  communications with Rob Kelly?
12      MR. DAVIS: Objection.
13      I think he testified to
14  this.
15      But you can go ahead and
16  respond.
17      THE WITNESS: Right. I --
18  this E-mail is sent to Rob Kelly,
19  which I think I already told you I
20  sent him an E-mail.
21      MR. SCHER: Okay.
22  BY MR. SCHER:
23      Q.  Let me -- let's -- let me
24  just review, if I understand this

91

1  correctly.
2      You learned from Tim Malik
3  that there was a new requirement
4  called a 10 percent constant; right?
5      MR. DAVIS: Objection.
6      You can respond.
7      THE WITNESS: Yes.
8  BY MR. SCHER:
9      Q.  And did you object to Mr.
10  Malik at that point, to the
11  introduction of a new criteria?
12      A.  I don't remember.
13      Q.  And you took that
14  information and conveyed it to Rob
15  Kelly; am I right about that?
16      A.  Yes.
17      Q.  Did you convey that to Rob
18  Kelly in this E-mail, which has been
19  marked Ferrie-1, or did you convey it
20  in a phone conversation?
21      A.  Don't recall specifically.
22  I would -- I would have called him
23  first. That would be my normal --
24      Q.  Okay.

92

1      A.  -- protocol.
2      Q.  From the time -- let me ask
3  you this: Until this communication
4  with Rob Kelly, you said that --
5  strike that.
6      Why didn't you tell Jim
7  Koller or Joe Kelly or Frank Palopoli
8  about this what you describe as a
9  slight hiccup?
10      A.  I wanted to get --
11      MR. DAVIS: Objection.
12      You can respond.
13      THE WITNESS: Okay.
14      I wanted to get Rob's
15  input.
16  BY MR. SCHER:
17      Q.  And why did you talk to Rob
18  about this at all?  You hadn't spoken
19  to Rob in connection with the loan
20  application, had you?
21      A.  I don't recall.
22      Q.  Why did you want his input?
23      A.  Because he was the
24  borrower's representative.

93

1      Q.  From -- except for this
2  E-mail, all your other communications
3  are directly with the borrower.
4      Can you explain to me
5  any -- in any greater detail than you
6  have already why it is you chose to
7  communicate with Rob Kelly on -- in
8  connection with this new criteria?
9      MR. DAVIS: Objection.
10      THE WITNESS: I believe I
11  had constant communication with Rob
12  Kelly with regard to how the
13  application was proceeding.
14      MR. SCHER: Okay.
15  BY MR. SCHER:
16      Q.  Now, you told me that in
17  your second conversation -- telephone
18  conversation with Rob Kelly he said
19  it was a deal killer and it was a
20  problem; right?
21      A.  Yes.
22      Q.  Did you communicate that to
23  anyone?
24      A.  Yes.

**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

94

1     Q.  Who did you communicate
2  that to?
3     A.  Tim Malik.
4     Q.  And what did you tell him?
5     A.  I told him it's a -- it's a
6  problem.  It wasn't in the original
7  application, it should be stricken,
8  and it subsequently was.
9     Q.  What did Malik say to you
10  in that conversation?
11     A.  I don't recall.
12     Q.  How did you learn that it
13  was stricken?
14     A.  Because we committed
15  without that constant being in there.
16     Q.  Right.
17        So if I have the sequence
18  correctly, you called Rob Kelly, told
19  him there was a problem and it was a
20  new criteria, you sent him Ferrie-1,
21  the E-mail; is that right?
22     MR. DAVIS:  Objection.
23     You can respond.
24     THE WITNESS:  I can't say

95

1  definitively that -- it sounds like
2  what I would have done.
3  BY MR. SCHER:
4     Q.  And then between the time
5  that you communicated with Mr. Kelly
6  by phone and E-mail and the time that
7  you received word back from Mr. Kelly
8  by phone, is it accurate to say that
9  you did nothing in connection with
10  the Avenel loan?  Is that accurate?
11     MR. DAVIS:  Objection.
12     THE WITNESS:  I don't --
13     MR. DAVIS:  If you know.
14     THE WITNESS:  I don't know
15  what -- I don't follow.
16  BY MR. SCHER:
17     Q.  What else did you do?
18        So you're told of the new
19  criteria.
20     A.  Right.
21     Q.  Other than your
22  communications with Rob Kelly, what
23  else did you do?
24     A.  I called Rob, I wanted to

96

1  get his input.  He said he'd check
2  with the borrower, get back to me.
3  And I waited to hear back from him.
4     Q.  Okay.  And other than your
5  communicating with Mr. Malik and
6  conveying to him what Rob Kelly told
7  you, deal killer, big problem, and
8  Mr. Malik -- other than that
9  communication with Mr. Malik, was
10  there -- did you have any other
11  communication with anyone on the
12  subject of the 10 percent constant?
13     A.  I didn't have any
14  communication with Mr. Malik until
15  after I got a response from Rob
16  Kelly.
17     Q.  Okay.  So you got a
18  response from Rob Kelly and you
19  communicated that response in essence
20  to Tim Malik; right?
21     A.  Yes.
22     Q.  What else?  What else did
23  you do with the information you
24  obtained from Mr. Kelly?  Anything

97

1  else other than communicate to Mr.
2  Malik?
3     A.  I don't know what else I
4  would be doing.
5     Q.  Call, you know, Mr.
6  McPadden.
7     A.  No.
8     Q.  Okay.  Called someone else
9  in Boston.
10     A.  No.
11     Q.  Okay.  And what was Mr.
12  Malik's response to you at that time?
13     MR. DAVIS:  Objection.
14     I think this has been asked
15  and answered.
16     You can respond.
17     THE WITNESS:  I don't
18  recall.
19     MR. SCHER:  Okay.
20  BY MR. SCHER:
21     Q.  And that, as far as you
22  know, that is all -- those are all
23  the communications that you had on
24  the subject of the 10 percent

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

---

98

1 constant that you can recall; am I
2 right?
3    A. As far as I can remember,
4 that's it.
5    Q. Okay.
6    A. And it was subsequently
7 removed and committed without it,
8 so...
9    Q. Right. That's -- you've
10 told me that several times.
11       Subsequent to the Avenel
12 deal, have you included in loan
13 applications the 10 percent constant?
14    A. No.
15    Q. Has the 10 percent constant
16 criteria been eliminated from the
17 criteria that are employed by John
18 Hancock?
19    A. There still is a loan
20 sizing constant.
21    Q. But not a 10 percent
22 constant.
23    A. As I --
24       MR. DAVIS: You can

---

99

1 respond.
2       THE WITNESS: As I said,
3 it's been adjusted and it's not a
4 absolute indicator, it's just an
5 indicator along with other things.
6       MR. SCHER: Okay.
7 BY MR. SCHER:
8    Q. So subsequent to the Avenel
9 situation, the 10 percent constant
10 has been modified --
11       MR. DAVIS: Objection.
12 BY MR. SCHER:
13    Q. -- in the ways in which
14 you've described it; right?
15       MR. DAVIS: Objection.
16 BY MR. SCHER:
17    Q. In other words, I'm just
18 trying to get the timing of the
19 changes to the 10 percent constant.
20 The changing of the 10 percent
21 constant occurred after this episode
22 in August of 2004.
23    A. Probably.
24       Wait. Can I --

---

100

1    Q. Yes.
2    A. Prior to August of 2004?
3    Q. Yes.
4    A. When we -- yes. Okay.
5    Q. Is that right?
6    A. When we committed on it,
7 yes.
8    Q. Yes. Okay.
9       You testified that one of
10 the changes which had been introduced
11 by -- subsequent to the acquisition
12 of John Hancock by Manulife was the
13 introduction of the signature process
14 as compared with the committee
15 process for loan approvals; right?
16    A. Yes.
17    Q. Is it accurate to say that
18 this is the first loan which you
19 originated which employed that new
20 procedure?
21    A. I don't recall.
22    Q. When the committee process
23 was employed, did you as the loan
24 originator receive a copy of the

---

101

1 approval?
2    A. The commitment?
3    Q. Yes.
4    A. Yes.
5    Q. The minutes of the meeting?
6 You would receive a copy of the
7 minutes of the meeting?
8    A. The minutes of the -- no.
9 Unh-unh.
10    Q. Okay. And, of course,
11 after the signature --
12    A. I would say -- let me --
13 there are no -- there were no minutes
14 to the meeting.
15    Q. Okay. And after the loan
16 approval process changed to the
17 signature process, you did not
18 receive any notification of the
19 signing of that loan approval other
20 than the loan application.
21    A. No. I'd get a call saying
22 it's been approved.
23    Q. Okay. And informally just
24 as you've described it.

---

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

102

1    A.  Right.  Tim would call me
2  and say it's -- you know, all the
3  signatures have been obtained, it's
4  approved.
5    Q.  Okay.  He would not tell
6  you chapter and verse on the criteria
7  employed to approve the loan; right?
8    A.  No.
9    Q.  Is that right?
10    A.  That's correct.
11    Q.  Okay.  What -- in terms of
12  the volume of loans that you generate
13  through your office, what percentage,
14  if you can state it in percentage or
15  number, of loans are originated in
16  your office annually?
17      MR. DAVIS:  Objection.
18      Percentage based on what?
19  BY MR. SCHER:
20    Q.  What's the number of loans
21  that are originated in your office?
22  How many?  20?  70?  150?
23    A.  We're typically 150 to 200
24  million dollars a year.

103

1    Q.  In dollar volume?
2    A.  Right.
3    Q.  And of that 150 to 200
4  million a year, what percentage are
5  forward commitments?  In other words,
6  of a duration greater than 60 days
7  from the time of the loan application
8  approval to the closing of the loan.
9    A.  Well, in 2004, 2005,
10  probably 50 percent of my business
11  was forwards.
12    Q.  And why is that?  That's
13  unusual; right?
14    A.  Yes.
15    Q.  Typically, prior to 2004,
16  what would the percentage be?  10
17  percent?  5 percent?
18    A.  I'm not -- I'm not sure.
19  But minimal.
20    Q.  Minimal.
21      And just, you know, state
22  the obvious as to why this 50 percent
23  level is --
24    A.  Because borrowers were

104

1  concerned with interest rates rising.
2    Q.  So this was an unusual
3  phenomenon in your experience; am I
4  right?
5      MR. DAVIS:  Objection.
6  BY MR. SCHER:
7    Q.  The seeking of forward
8  commitments was an unusual phenomenon
9  in your experience.
10      MR. DAVIS:  Objection.
11      THE WITNESS:  No.
12  BY MR. SCHER:
13    Q.  The volume of seeking of
14  forward commitments was unusual.
15    A.  No.
16    Q.  Well, had this happened
17  before, this --
18    A.  Yeah.  Each time that
19  interest rates swing they're
20  taking a major swing up, borrowers
21  would be concerned about having a
22  commitment later, so they'd prefer to
23  lock the rate today rather than
24  tomorrow.

105

1    Q.  Has John Hancock always
2  been in the business of, as long as
3  you've been with them, in the
4  business of making forward commitment
5  loans?
6    A.  I don't know.
7    Q.  Have you been making
8  forward commitment loans for John
9  Hancock from the time you started
10  with them?
11    A.  I have to check my loan
12  portfolio.  I can't recall offhand.
13    Q.  Okay.  Was it unusual
14  when -- out of the ordinary when you
15  started making this -- the forward
16  loan commitment at a volume of 50
17  percent?
18      MR. DAVIS:  Objection.
19      You can answer.
20      THE WITNESS:  I'd say that
21  volume was atypical.  Yes.
22      MR. SCHER:  Okay.
23  BY MR. SCHER:
24    Q.  When had it last occurred,

---

**106**

1 a volume of 50 percent of forward
2 commitments, in your memory?
3    A. I can't recall.
4    Q. Are you still -- are you
5 still making loan commitments at that
6 level now?
7      MR. DAVIS: Objection.
8 BY MR. SCHER:
9    Q. Are you still making
10 forward loan commitments at that
11 level now, at that percentage now?
12    A. If we had the
13 opportunities, we would be willing to
14 do that, yes.
15    Q. Okay. In fact, what is the
16 volume of -- in -- in 2004 and 2005
17 it was 50 percent; right? 50 percent
18 of your loans --
19    A. I'll just -- no, that's off
20 the top of my head.
21    Q. Ballpark?
22    A. Right.
23    Q. Ballpark of the 150 to 200
24 million --

---

**107**

1    A. Right. Right.
2    Q. -- approximately 75 million
3 or so were forward commitments.
4    A. Forward commitments. Yes.
5 Correct.
6    Q. Now, in Ferrie Exhibit 1
7 you say it's a slight hiccup.
8     Is that -- it was really a
9 deal breaker; right? I mean, you
10 knew it was going to be a deal
11 breaker, didn't you?
12      MR. DAVIS: Objection.
13      THE WITNESS: No.
14 BY MR. SCHER:
15    Q. Why did you think it was a
16 slight hiccup?
17    A. Because it was a change to
18 the original application.
19    Q. And this Exhibit 1-A, which
20 is attached to your E-mail, that's a
21 document that was generated from Mr.
22 Malik; right?
23    A. Yes.
24    Q. He had sent that to you?

---

**108**

1    A. Yes.
2    Q. That's not the Exhibit 1 to
3 the loan application, is it?
4      MR. DAVIS: Objection.
5     Are you saying it is the
6 same document that's attached to the
7 loan?
8      MR. SCHER: Right.
9 BY MR. SCHER:
10    Q. That's not the same
11 document, is it?
12    A. No. The 10 percent
13 constant was eliminated from the
14 commitment.
15    Q. The loan application does
16 not contain an Exhibit A which shows
17 a 10 percent constant; right?
18    A. Correct. The application
19 does not show the 10 percent
20 constant.
21    Q. There are a number of other
22 changes on that Exhibit 1-A that's
23 attached to your Ferrie Exhibit 1.

---

**109**

1 Did you have anything to do with
2 making the changes from the exhibit
3 attached to the loan application?
4    A. Not that I recall.
5      MR. DAVIS: Objection.
6      THE WITNESS: Oh, okay.
7     Not that I recall.
8      MR. SCHER: Let's mark this
9 as Ferrie-2.
10     (Exhibit Ferrie-2 was
11 marked for identification.)
12 BY MR. SCHER:
13    Q. I'll show you what I've had
14 marked as Ferrie Exhibit 2, and that
15 is a copy of the application to John
16 Hancock Life Insurance Company for a
17 first mortgage loan dated July 30,
18 2004, Bates stamped JH 00327 through
19 396.
20     Do you have that in front
21 of you?
22    A. Yes.
23    Q. This is the loan
24 application to which you made

---

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

110

1  reference which is fully executed by
2  the prospective borrower and by John
3  Hancock; am I right?
4      A.  It appears to be.
5      Q.  On Bates stamp JH 00373
6  there is a — an Exhibit 1.
7      Do you see that?
8      A.  And where would that be?
9      Q.  JH 373.  So if you look at
10 the Bates stamp number that's —
11     MR. DAVIS:  Look in the
12 lower right-hand corner.
13 BY MR. SCHER:
14     Q.  That's a good way — that's
15 a constant numbering process.  So if
16 you go to 373, you'll see the page
17 I'm looking at.
18     A.  Okay.  I have it.
19     Q.  That's the version of
20 Exhibit 1 which was submitted by the
21 borrower in connection with the loan
22 application; am I right?
23     A.  This is the Exhibit 1 that
24 was submitted with the application

111

1  and subsequently approved by Hancock.
2      Q.  Okay.  Did you participate
3  in any of the various modifications
4  to Exhibit 1 which appear in this
5  document?
6      A.  Could you repeat the
7  question, please?
8      Q.  Yes.  Exhibit 1 appears in
9  various iterations, the example in
10 Ferrie-1 called Exhibit 1-A, and
11 there are several others in these —
12 in the documents produced by John
13 Hancock.
14     My preliminary question to
15 you is, did you participate in any
16 way in any of the modifications to
17 Exhibit 1 which are reflected in the
18 documents produced by John Hancock?
19     MR. DAVIS:  Objection.
20     You may respond.
21     THE WITNESS:  Specifically
22 on 373?
23     MR. SCHER:  Yes.
24     THE WITNESS:  Document 373?

112

1      I may have.  I don't have
2  any specific recollection.
3  BY MR. SCHER:
4      Q.  Did you participate in the
5  modification of — to Exhibit 1 which
6  appears as Page 2 of Ferrie Exhibit
7  1?
8      A.  That's the one with the 10
9  percent constant?
10     Q.  Correct.
11     A.  Not to my recollection.
12     Q.  Okay.  Did you ever discuss
13 with the prospective borrower
14 modifications to Exhibit 1?
15     A.  This one?
16     Q.  Yes.
17     A.  There was no need to
18 because there wasn't any
19 modification.
20     Q.  No modifications?
21     A.  The one that — the Exhibit
22 1 that was approved by Hancock is the
23 one that's in the application.
24     Q.  And it's the one that

113

1  you're looking at right now?
2      A.  Yes.
3      Q.  And is that the practice of
4  John Hancock that you're describing;
5  that is, that what's contained in the
6  loan application is the — is the
7  exhibit contained in the loan
8  application ever the subject of
9  modification after the loan
10 application is made, originally made?
11     In other words,
12 underwriting issues arise, questions
13 arise with respect to the amount of
14 reserves or operating expenses are
15 analyzed and evaluated and adjusted.
16     Is that — is there a
17 process by which those numbers which
18 are reflected on Exhibit 1 are
19 modified, that John Hancock employs?
20     MR. DAVIS:  Objection.
21 BY MR. SCHER:
22     Q.  That was a long question.
23 Do you want me to shorten it up?
24     A.  No.  I know — I think I

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX 215.751.0581

### 114

1  get the gist.
2     Q.  Okay.
3     A.  The application is subject
4  to modification in any form until
5  it's approved.
6     Q.  Okay. All right.
7     So that -- so is it typical
8  or unusual for John Hancock to say,
9  we have your application, it will not
10  be approved in its current form, it
11  needs to be modified.
12     If it can be modified in
13  these certain respects like, you
14  know, get the signature of your wife
15  on it or change the expense that
16  you're identifying on Exhibit 1, it
17  will not be approved?
18     MR. DAVIS: Objection.
19     THE WITNESS: If that were
20  to be done, it would be done by way
21  of an approval with an amendment.
22     MR. SCHER: Okay.
23  BY MR. SCHER:
24     Q.  So typically in the event

### 115

1  that is necessary in a loan
2  application, there would be an
3  amendment prepared and it would be
4  signed by everyone; am I right?
5     A.  I don't know if it would be
6  necessary to have it signed by
7  anybody. It depends on the scope of
8  the change.
9     Q.  Okay. So that could be --
10  but there would be a writing which
11  would record, refer, or reflect the
12  modification to the loan application.
13     A.  There would be an amendment
14  that would have to be signed by the
15  borrower --
16     Q.  Okay.
17     A.  -- okaying the change.
18     Q.  And would you agree that
19  the -- that changes to Exhibit 1,
20  were any of those changes material to
21  the loan application approval
22  process, they would have been
23  reflected in a writing?
24     MR. DAVIS: Objection.

### 116

1     MR. SCHER: If there --
2     MR. DAVIS: Are you saying
3  if the parties had agreed to modify
4  Exhibit 1 --
5     MR. SCHER: It would be in
6  writing.
7     MR. DAVIS: -- that would
8  be in writing?
9     MR. SCHER: Yes.
10  BY MR. SCHER:
11     Q.  Am I right about that?
12     A.  Between -- well, when the
13  loan is approved, when the investment
14  officer signs it, what's in the
15  application has been approved. If
16  there's a change, it would be in the
17  form of an amendment.
18     Q.  And that amendment would be
19  in writing?
20     A.  And that amendment would be
21  in writing. That's correct.
22     Q.  Okay. Now, from the time
23  that the loan application is approved
24  until the time that the loan is

### 117

1  closed --
2     A.  Excuse me --
3     Q.  -- there are a number of
4  things which occur in connection with
5  a forward commitment like the one in
6  the Avenel transaction; am I right
7  about that?
8     MR. DAVIS: Objection.
9     You can respond.
10     THE WITNESS: I don't --
11  can you clarify it?
12     MR. SCHER: Sure.
13  BY MR. SCHER:
14     Q.  From the time of the
15  approval of the loan until the time
16  that the loan is closed there are a
17  number of changes, facts which
18  change, including the leasing of the
19  apartments and the reaching of a
20  vacancy rate or an occupancy rate and
21  generation of expenses; am I right
22  about that?
23     A.  Still, I'm not clear.
24     Q.  Okay. What I'm asking you

**JDR**
**James DeCrescenzo Reporting**, LLC
215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

118

1  is — let me ask it this way: Prior
2  to the time of the closing of the
3  loan, what level of — what type of
4  due diligence do you do to verify
5  that there has been compliance with
6  the requirements set forth in the
7  loan application?
8     A.  I think I've already stated
9  that I sign a Amendment to this
10  application.
11    Q.  The Affidavit that's
12  attached to this —
13    A.  I forget what the exhibit
14  number is.
15       Page 377.
16    Q.  Now, you have already
17  signed Page 377, so my question is,
18  after this loan application is
19  completed —
20    A.  There would be a
21  subsequent.
22    Q.  Okay.
23    A.  Right.
24    Q.  So meaning a subsequent —

119

1  there would be simply a blank
2  correspondence certification that had
3  not yet been signed and you would
4  sign it again as of the date of the
5  closing on the loan?
6     A.  Generally, within a couple
7  weeks of the loan closing. Yes.
8     Q.  Okay. But it would be this
9  form.
10    A.  Yes.
11    Q.  So what we're looking at is
12  Exhibit B, which begins on Page 374,
13  Sections A through F; is that right?
14  That's the document that you would
15  sign off on?
16    A.  No. I'm signing off on the
17  operating statements and rent roll.
18  The first part of the Exhibit B is
19  prepared by the borrower.
20    Q.  Okay. So it's only that
21  correspondent certification that
22  you're signing off on; right?
23    A.  Yes.
24    Q.  And you're the

120

1  correspondent, right, in this case?
2     A.  I am the John Hancock
3  representative. Yes.
4     Q.  Right. JH —
5     A.  Well, I mean, in terms of
6  this — this reference here,
7  correspondent certification, JHREF,
8  John Hancock Real Estate Finance is
9  the correspondent.
10    Q.  And Blue Bell is your
11  office?
12    A.  Yes.
13    Q.  And then that's — you're
14  the regional vice-president.
15    A.  Right.
16    Q.  And that's your signature.
17    A.  Yes.
18    Q.  And your title is regional
19  vice-president; right?
20    A.  Right.
21    Q.  Okay.
22       (Exhibit Ferrie-3 was
23  marked for identification.)
24  BY MR. SCHER:

121

1     Q.  I'll show you what I've had
2  marked as Ferrie Exhibit 3, which is
3  the August 11th E-mail from Tim Malik
4  to you.
5        Do you have that in front
6  of you?
7     A.  Yes.
8     Q.  This was on the subject of
9  a request for approval to lower the
10  reserves to fund the loan with a 75
11  percent loan to value and a 1.25
12  percent DSCR.
13       Do you recall receiving
14  this E-mail at or about the date it
15  was sent?
16    A.  No. But I — looking at —
17  it certainly got to me, it appears.
18    Q.  Do you recall Mr. Malik
19  trying something to secure the
20  approval of the loan?
21    A.  Not — no, I don't.
22    Q.  Do you see the second page
23  of this E-mail, JH 132? Can you tell
24  me what that is?



**James DeCrescenzo Reporting**, LLC

215.564.3905                InnovatingLitigation                FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

**122**

1    A.  No.
2    Q.  You received a copy of it
3  at or about the time attached to this
4  E-mail, as far as you know?
5    A.  As far as I know, yeah.
6    Q.  It looks like a loan
7  approval form, doesn't it?
8        MR. DAVIS:  Objection.
9        THE WITNESS:  I don't know.
10  BY MR. SCHER:
11    Q.  Never seen anything like it
12  before?
13    A.  Not to my recollection.
14    Q.  Do you see it calls for
15  approvals by Ivor Thomas —
16    A.  Uh-huh.
17    Q.  — David Henderson, and
18  Patricia Coyne?
19    A.  Right.
20    Q.  Those are the people who
21  approve loans; right?
22    A.  No.
23    Q.  You don't know who they
24  are?

---

**123**

1    A.  Oh, yeah, I know who they
2  are.
3    Q.  What role do they have in
4  connection with the approval of
5  loans?
6    A.  Ivor is the senior
7  vice-president, Dave is a senior
8  investment officer, and Patty Coyne
9  is an investment officer in the
10  credit division.
11    Q.  I can read that.  I'm just
12  asking what role did they play in
13  connection with the approval of
14  loans.
15    A.  Ivor Thomas is the head of
16  the department. Dave Henderson at
17  that time was my boss. He was
18  replaced by Bill McPadden. And Patty
19  Coyne is a credit officer.
20    Q.  So before Mr. Henderson was
21  downsized, he was your boss as well
22  as Mr. Malik's boss; right?
23    A.  Yes. Uh-huh.
24    Q.  And is it your testimony

---

**124**

1  that a form like this, which is JH
2  132, has never been — never before
3  been seen by you?
4        MR. DAVIS:  Objection.
5        You can respond.
6        THE WITNESS:  No. I'm not
7  saying that. I'm saying I don't
8  recall it.
9        MR. SCHER:  Okay.
10        THE WITNESS:  This is dated
11  August the 11th.
12        MR. SCHER:  Right.
13        THE WITNESS:  The approval
14  is dated August the 17th.
15        MR. SCHER:  Correct.
16        THE WITNESS:  The debt
17  service coverage in Paragraph 16 and
18  the loan to value are 125 and 75
19  percent, so —
20  BY MR. SCHER:
21    Q.  Just as it sets forth in
22  that document; right?
23    A.  Just as it was set forth in
24  the original application.

---

**125**

1    Q.  Right.
2    A.  Which was subsequently
3  approved.
4    Q.  So what approval is Mr.
5  Malik seeking that he's making
6  reference to in this E-mail to you?
7        MR. DAVIS:  Objection.
8        I'd caution you —
9  BY MR. SCHER:
10    Q.  Do you know?
11        MR. DAVIS:  — not to
12  speculate.
13        THE WITNESS:  I don't know.
14  BY MR. SCHER:
15    Q.  You just got this
16  E-mail as — to the best of your
17  recollection today, sitting here
18  today, you get an E-mail from Tim
19  Malik, it says: I guess I will try
20  one more time the bureaucratic
21  approach. I'll let you know how hard
22  he laughs.
23        Do you have any idea what
24  he was referring to?

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

126

1  A. Sure.
2  Q. Oh, could you explain to
3  me?
4  A. Yeah. The application was
5  still in the approval process.
6  Q. Yes.
7  A. He needed the signatures of
8  certain people up to a certain loan
9  level.
10  Q. Yes.
11  A. And evidently he did not
12  have those signatures at that point.
13  Q. Okay.
14  A. And subsequently he got the
15  signatures, evidently, because he
16  signed off on the application.
17  Q. All right. So that -- does
18  it -- is that all you can tell me?
19  Is it -- you have no
20  recollection that the preliminary
21  review of the loan application was
22  rejected and he was trying again to
23  seek approval or is that just you
24  just don't have any recollection of

127

1  that at all?
2  MR. DAVIS: Objection.
3  I again caution you not to
4  speculate.
5  THE WITNESS: What I'm
6  saying is that this is an internal
7  discussion. The loan was approved
8  based on the original application. I
9  don't have anything to do with
10  internal discussions.
11  BY MR. SCHER:
12  Q. And yet Mr. Malik wanted
13  to -- shared with you an internal
14  discussion regarding the approval of
15  the loan; right? He shared that with
16  you.
17  MR. DAVIS: If you know.
18  THE WITNESS: In what case?
19  MR. SCHER: In this case
20  right here.
21  THE WITNESS: This is not
22  the approval. This is an internal
23  discussion.
24  MR. SCHER: Right.

128

1  BY MR. SCHER:
2  Q. He shared the internal
3  discussion with you; am I right?
4  A. Evidently.
5  Q. Evidently.
6  But you have no independent
7  recollection of anything at all about
8  the discussion that Mr. Malik is
9  sharing with you.
10  A. No.
11  Q. That's correct? I'm
12  correct?
13  A. I have no independent
14  recollection of what discussion he
15  was having at that time.
16  Q. Okay. And the E-mail that
17  is below the E-mail to you, which is
18  from Mr. Malik to Ivor Thomas seven
19  minutes earlier than the E-mail to
20  you, reflects a request for approval
21  to lower reserves to $150 a unit and
22  to fund the loan with 75 percent LTV
23  and 1.25 percent DSCR.
24  The unit reserves were at

129

1  $250 a unit in Exhibit 1 attached to
2  the loan application; am I right
3  about that?
4  A. Let me check the Exhibit 1
5  again.
6  Q. Sure.
7  Do you see what the loan
8  amount is, the reserved amount is, in
9  Exhibit 1?
10  A. I'm trying to locate it.
11  Q. 38,400?
12  What's it reflected on
13  Exhibit 1? It's not reflected? Is
14  that what you're saying?
15  MR. DAVIS: Howard, maybe
16  you can point it out to him, the
17  number that you're referring to, and
18  he can confirm whether that's the
19  loan, the unit reserve.
20  MR. SCHER: Okay.
21  BY MR. SCHER:
22  Q. Take a look at JH 357.
23  On the one, two, three,
24  fourth paragraph begins, The DSCR

**JDR**

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905

FAX 215.751.0581

---

130

1  will be determined, and it shows a
2  replacement reserve of $250 per unit;
3  right?
4      A.  Yes.
5      Q.  And now if you'd look at
6  the Ferrie Exhibit -- what is that?
7  3?
8      A.  Right.
9      Q.  You'll see that the
10  discussion is lowering the reserves
11  to $150 a unit; right?
12      A.  Right.
13      Q.  Now, do you have any
14  recollection of any discussion
15  regarding lowering the reserves to
16  $150 a unit?
17      A.  Not that I recall.  I may
18  have.
19      Q.  And is it accurate to say
20  that were the reserves lowered to
21  $150 a unit for the purpose of
22  approving the loan, that would be
23  reflected in a writing --
24      MR. DAVIS:  Objection.

---

131

1  BY MR. SCHER:
2      Q.  -- amending the loan
3  application?
4      MR. DAVIS:  Objection.
5  That calls for speculation.
6      You can respond.
7      THE WITNESS:  I think the
8  reserve requirement is a -- is an
9  underwriting situation, not a change.
10  This is a change that benefits the
11  borrower.
12  BY MR. SCHER:
13      Q.  So changes which benefit
14  the borrower can be made without
15  amending the loan application and
16  changes which don't benefit the
17  borrower cannot be.  Is that what
18  you're saying?
19      A.  No.  It's not what I'm
20  saying.
21      Q.  Okay.  Then what is it that
22  you're saying?  Why would not the --
23  why would the reduction in the
24  reserves, which is reflected in the

---

132

1  loan application at 250, changed to
2  150, not be the subject of a written
3  amendment?
4      MR. DAVIS:  Objection.
5      Are you saying -- Howard,
6  are you saying a change to the actual
7  loan application?
8      MR. SCHER:  I'm just
9  asking, would the change to $150
10  necessitate a change to the loan
11  application?
12      MR. DAVIS:  But again, are
13  you saying a change in the
14  application itself?  Because the
15  application says 250, but you're
16  saying that if the -- if it was a
17  change in that agreement between the
18  parties?
19      MR. SCHER:  Right.
20  BY MR. SCHER:
21      Q.  If you --
22      A.  If there was a change in
23  the agreement, yes.
24      Q.  It would be in writing.

---

133

1      A.  Yes.
2      Q.  Okay.  Whether it favored
3  the borrower or not.
4      A.  Yes.
5      Q.  And it's your testimony
6  that you don't have any idea of why
7  Ivor Thomas would laugh with the
8  suggestion that the reserve be
9  reduced to $150 a unit.
10      A.  That's correct.
11      Q.  At one point in time the
12  interest rate was locked; am I right
13  about that?
14      A.  Yes.
15      Q.  What, if any, role did you
16  play in connection with the locking
17  of the interest rate?
18      A.  I can't tell you
19  specifically.  I can tell you what I
20  normally do.
21      Q.  What do you normally do?
22      A.  Normally, we have a rate
23  that's posted in the morning by
24  Boston.  I would call the borrower

---

**James DeCrescenzo Reporting**, LLC

215.564.3905     Innovating Litigation     FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

35 (Pages 134 to 137)

---

134

1   and tell them that rate plus the
2   spread that we negotiated would be
3   the rate if you locked it today.
4       If the borrower agrees, he
5   signs the exhibit rate lock
6   agreement, we send it back to Hancock
7   and they countersign it and the rate
8   is locked.
9      Q.  And what's the consequence
10  of locking the rate?  What is the
11  economic consequence of locking the
12  rate?
13     A.  I don't follow you.
14     Q.  Does anybody pay for that,
15  rate lock?
16     A.  What do you mean?
17     Q.  Does it cost anything to
18  lock the rate?
19     A.  Does it cost anything -- it
20  costs the borrower 2 percent.
21     Q.  2 percent.
22       Does it cost John Hancock
23  anything to lock the rate?
24     A.  I don't know.

---

135

1     Q.  Does John Hancock hedge,
2  that is, buy an instrument to
3  forestall the possibility that they
4  would lose money on closing the loan
5  at the rate that it was locked in?
6     A.  Specifically on Avenel?
7     Q.  Yes.
8     A.  I don't know.
9     Q.  Do they generally do that?
10     A.  I don't know.  Sometimes
11  they do, sometimes they don't.
12     Q.  Let me show you the next
13  document.
14      (Exhibit Ferrie-4 was
15  marked for identification.)
16  BY MR. SCHER:
17     Q.  Again on August 11, 2004,
18  I'll show you what's been marked as
19  Ferrie Exhibit 4, and Mr. Malik is
20  telling you for your information that
21  the hedge loss today on August 11
22  would be $355,000.
23      Do you see that?
24     A.  Yes.

---

136

1     Q.  Does that -- why -- do you
2  know why he told you that?  Do you
3  know why?
4       MR. DAVIS:  Objection.
5       You can respond.
6       THE WITNESS:  I would think
7  it's probably because I asked him the
8  question.
9  BY MR. SCHER:
10     Q.  And do you recall asking
11  him that question?
12     A.  No.
13     Q.  Why was the -- what is a
14  hedge loss?
15     A.  I don't know.  Specifically
16  I don't know.  I have a general idea
17  of what it is.
18     Q.  Well, what's your general
19  idea of what it is?
20     A.  It's a loss that occurs
21  when the treasury rates move below
22  the rate that the loan was locked at.
23     Q.  And is the hedge loss an
24  actual loss or is it a paper loss?

---

137

1       MR. DAVIS:  Objection.
2       THE WITNESS:  I don't know.
3  BY MR. SCHER:
4     Q.  Do you know what Mr. Malik
5  was trying to -- well, you think you
6  asked him what the hedge loss would
7  be as of August 11th?
8     A.  Yes.
9     Q.  And why would you -- why
10  did you ask him that?
11     A.  It appears from reading
12  your exhibits here that I probably
13  asked him what the hedge loss would
14  be in order to get the application
15  approved as it was submitted since
16  treasuries had dropped.
17       And consequently, if we did
18  not approve the application as
19  submitted, the borrower would have
20  the opportunity to walk.
21     Q.  And what does that have to
22  do with the $355,000?
23     A.  Hancock would have suffered
24  a loss.

---

**JDR**

**James DeCrescenzo Reporting, LLC**

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905               FAX  215.751.0581

138

1    Q.  So don't let me
2  mischaracterize what you're saying,
3  but is it your testimony that you
4  were saying in connection with
5  your -- you and Boston's
6  decision-making process regarding the
7  approval of the loan application,
8  please keep in mind that as of today,
9  there would be a hedge loss that John
10  Hancock would suffer because of the
11  change in the interest rates?
12       MR. DAVIS: Objection.
13  BY MR. SCHER:
14    Q.  Is that a fair
15  characterization?
16    A.  What I --
17       MR. DAVIS: Objection.
18       THE WITNESS: What I'm
19  saying is that in order to expedite
20  the application being approved as it
21  was submitted, I asked Tim what the
22  potential losses would be to Hancock.
23  BY MR. SCHER:
24    Q.  And you believed at the

139

1  time that it would expedite Hancock's
2  favorable decision on the loan
3  application if they were to know what
4  their hedge loss would be as of that
5  time.
6    A.  I thought it would be a
7  contributing factor.  Yes.
8    Q.  And you did not observe in
9  this E-mail or otherwise that the
10  Letter of Credit would be rescinded
11  if the loan application were not
12  granted; am I right about that?
13       MR. DAVIS: Objection.
14       THE WITNESS: I don't
15  follow.
16  BY MR. SCHER:
17    Q.  You didn't point that out
18  when you sent this E-mail, but that
19  was true as well, wasn't it?
20    A.  Well, it's in the
21  application.  Borrower gets -- if the
22  application gets changed, the
23  borrower gets his money back.
24    Q.  Okay.  What made you think

140

1  that it would be a contributing
2  factor to John Hancock's
3  decision-making process with respect
4  to the loan application were they to
5  know that the hedge loss would be
6  $355,000 on that day?  Common sense?
7    A.  Well, the fact that you
8  would suffer a loss as opposed to
9  approving the loan.
10    Q.  And I know it's
11  self-evident to you, but why did you
12  think that would be a contributing
13  factor to influence John Hancock's --
14    A.  Because --
15    Q.  -- decision?
16    A.  Because the -- if the loan
17  were not approved as submitted in the
18  application, the borrower has the
19  right to walk unless you can come to
20  some, you know, modification.
21       The fact that we're going
22  to suffer a loss is a negative, and,
23  therefore, be aware that if you
24  change the application and the

141

1  borrower doesn't agree to it, you are
2  not only going to lose this deal, but
3  you're going to suffer a loss in
4  hedge costs.
5    Q.  Did you ask Malik to
6  calculate the hedge loss because you
7  knew it was going to be a positive
8  number of some size?
9    A.  Well, I knew the treasury
10  rates had dropped.  I didn't know
11  what the -- what the sum would be.
12    Q.  Okay.  Do you know what, if
13  any, action Mr. Malik took with the
14  calculation he performed?  The hedge
15  loss calculation?
16    A.  No.
17       MR. DAVIS: Is this a good
18  time to stop for lunch --
19       MR. SCHER: Oh.
20       MR. DAVIS: -- or you tell
21  me.
22       MR. SCHER: Sure.
23       MR. DAVIS: We can go for
24  another -- but I think we'd probably

142

1 want to take a break for lunch --
2 MR. SCHER: Okay. Let's
3 take a -- we can take a break right
4 now.
5 MR. DAVIS: Okay.
6 MR. SCHER: And I believe
7 I'm going to have to take a 15-minute
8 break -- doesn't really matter --
9 around 2:00.
10 MR. DAVIS: Uh-huh.
11 MR. SCHER: I don't think
12 I'll be done by then, but I'm going
13 to try to see how far we can get and
14 see if we can't move it along.
15 MR. DAVIS: Okay.
16 (Luncheon recess,
17 12:22-1:12 p.m.)
18 AFTERNOON SESSION
19 (Exhibit Ferrie-5 was
20 marked for identification.)
21 BY MR. SCHER:
22 Q. I'll show you what I've had
23 marked as Ferrie Exhibit 5. It's a
24 document -- an E-mail from you to Tim

143

1 Malik dated June 17th, 2004, Bates
2 stamped JH 100 through 105.
3 You prepared the E-mail and
4 the enclosure?
5 A. Yes.
6 Q. And that enclosure is a
7 John Hancock Real Estate Investment
8 Group form?
9 A. Yes.
10 Q. Which is entitled
11 "Preliminary Loan Information
12 Worksheet For Multi-Family
13 Properties"; right?
14 A. Yes.
15 Q. And it's an XLS, meaning an
16 Excel form, that's preformatted;
17 right?
18 MR. DAVIS: Objection.
19 If you can respond.
20 BY MR. SCHER:
21 Q. Is it an Excel form?
22 A. What do you mean
23 "preformatted"?
24 Q. Well, it's got these black

144

1 lines in it and stationery.
2 A. Yes. It requires input.
3 Q. Yes.
4 A. Yes.
5 Q. And you obtained the
6 information which you input from the
7 prospective borrower; am I right?
8 A. And his representative.
9 Q. Yes.
10 A. In case of a, you know,
11 mortgage banker or broker.
12 Q. Right.
13 And this form ultimately
14 results in a commercial rating?
15 A. The form doesn't result in
16 a rating. The --
17 Q. I'm looking at 105.
18 A. Okay. The 105, yeah,
19 indicates a rating, correct.
20 Q. Okay. And this form was
21 used in connection with initiating
22 the loan-generating process --
23 originating process; right?
24 A. Yes.

145

1 Q. Do you recall how you
2 obtained the operating budget for
3 Avenel, the Montgomery Square
4 apartments, which is that -- which
5 forms the basis for the Exhibit 1 to
6 the loan application?
7 MR. DAVIS: Objection.
8 THE WITNESS: Not
9 specifically, but I can tell you how
10 I normally do it.
11 BY MR. SCHER:
12 Q. Tell me how you normally do
13 it.
14 A. In this case it came from a
15 broker. It went originally to Scott
16 McIsaac in Boston, who in turn sent
17 it to me.
18 The original would have
19 been prepared by the broker in
20 conjunction with the borrower and
21 then subsequently we would have
22 ironed out the final numbers with the
23 borrower, again, in conjunction with
24 his representative.

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

146

1    Q.  And then ultimately the
2  ironed-out numbers would be reflected
3  on Exhibit 1 and attached to the loan
4  application.
5    A.  Right.  And as best we
6  could determine at that time.
7    Q.  Right.
8      (Exhibit Ferrie-6 was
9  marked for identification.)
10  BY MR. SCHER:
11    Q.  I'll show you what I've had
12  marked as Ferrie Exhibit 6, which is
13  an E-mail dated June 18, 2004, Bates
14  stamped JH 74 through 77.
15      Can you tell me what this
16  is?
17    A.  I could tell you what it
18  appears to be.  It's unexecuted.
19    Q.  Okay.
20    A.  It appears to be a term
21  sheet for the Avenel property.
22    Q.  And you made reference to a
23  term sheet earlier in your testimony
24  and this is what you were referring

147

1  to; right?
2    A.  In what context?
3    Q.  You referred to the
4  existence of a term sheet and --
5    A.  I did?
6      MR. DAVIS:  Objection.
7      I think earlier in your
8  testimony you made some reference to
9  a term sheet.
10      But you're not saying that
11  this is the final term sheet; you're
12  just saying that this is a term
13  sheet; right?
14      MR. SCHER:  Right.
15  BY MR. SCHER:
16    Q.  This is a form of a term
17  sheet; right?
18    A.  Yes.
19    Q.  But since it's not
20  executed, it's not the term sheet?
21    A.  Right.
22      (Exhibit Ferrie-7 was
23  marked for identification.)
24  BY MR. SCHER:

148

1    Q.  I'll show you what I've had
2  marked as Ferrie Exhibit 7.  It's a
3  document dated June 18th, 2004, Bates
4  stamped V, indicating it was produced
5  by Vesterra, 1181 through 1188.
6      Can you tell me what this
7  is?
8    A.  This appears to be again a
9  term sheet with notes on it.
10    Q.  Okay.  Do you recall that
11  there was a term sheet executed in
12  connection with this transaction?
13    A.  I don't recall.  There may
14  have been.
15    Q.  Okay.
16    A.  We do it both ways.
17      MR. SCHER:  Let's mark this
18  as the next exhibit.
19      (Exhibit Ferrie-8 was
20  marked for identification.)
21  BY MR. SCHER:
22    Q.  I'll show you what I've had
23  marked as Ferrie Exhibit 8.  And
24  believe it or not, it's the only copy

149

1  I have, I took it from my own
2  notebook, and it is Bates stamped JH
3  733 through 737 and it was previously
4  marked Koller Exhibit 6 at Mr.
5  Koller's deposition.
6      Is that the executed term
7  sheet?
8    A.  I don't see my signature,
9  so -- it appears to be.
10      MR. DAVIS:  I don't see the
11  date down here.  Okay.  Thank you.
12      (Exhibit Ferrie-9 was
13  marked for identification.)
14  BY MR. SCHER:
15    Q.  I'll show you what I've had
16  marked as Ferrie Exhibit 9, which is
17  a document Bates stamped JH 219,
18  appears to be an E-mail from you to
19  jkelly@kollerkelly with a carbon copy
20  to Rob Kelly and Tim Malik dated July
21  29 at 11:25 a.m.
22      Do you see that?
23    A.  Right.
24    Q.  Could you take a moment and



**James DeCrescenzo Reporting**, LLC

215.564.3905                    InnovatingLitigation                    FAX  215.751.0581
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

150

1  review it and tell me whether this
2  was your response to the discussion
3  you had with respect to a maximum
4  exposure of 5 percent in the event
5  the loan was not closed?
6      A.  Just to make sure I've got
7  the right paragraph.
8      Yes.
9      Q.  And you've looked at the
10  loan application and specifically at
11  Paragraph 30 in the application and
12  Condition 69 in the supplement?
13     A.  Yes.
14     Q.  And essentially you copied
15  the language from Paragraph 30
16  from -- in the application, JH 348,
17  in your E-mail; right?
18     A.  You mean did I attach it as
19  a --
20     Q.  No.  You copied the
21  language from that paragraph.
22     A.  In my E-mail?
23     Q.  Yes.  In other words, the
24  phrase you use in your E-mail is,

151

1  Therefore, you need to deliver the
2  loan or be liable for all, capital C,
3  costs.
4      A.  Uh-huh.
5      Q.  And in the Paragraph 30 it
6  says -- at the end of that paragraph,
7  it says, you shall -- Borrower shall
8  also continue to remain liable for
9  all costs.  Page 348 Bates stamp.
10     A.  Uh-huh.
11     Q.  At the very end of
12  Paragraph 30.
13         MR. DAVIS:  Objection.
14         You can respond.
15         THE WITNESS:  Now, which
16  part are you saying is a copy?
17  BY MR. SCHER:
18     Q.  The phrase "liable for all
19  Costs."
20     A.  I don't know whether it's
21  from there or not, but -- I mean,
22  that's only, one, two, three, four
23  words --
24     Q.  Right.

152

1      A.  -- out of that -- you know.
2  May have been, may have not.
3      Q.  Well, one of the words is
4  capitalized --
5      A.  Right.
6      Q.  -- namely, the word
7  "costs."
8      A.  Right.
9      Q.  Do you agree that you used
10  the capital C costs because that's
11  what it was in the loan application
12  form?
13         MR. DAVIS:  Objection.
14         THE WITNESS:  I don't know
15  whether I did or not.
16  BY MR. SCHER:
17     Q.  You can't recall?
18     A.  Right.
19     Q.  One way or the other?
20     A.  No.
21     Q.  Sitting here today, you
22  don't know whether it was from this
23  form that you found that capital C
24  costs; right?

153

1      A.  I can't tell you for sure.
2      Q.  Okay.  Do you think so?
3      A.  I don't know.
4      Q.  I don't want you to
5  speculate, but if you have a reason
6  to believe that you copied this
7  language from Paragraph 30 since you
8  referred to Paragraph 30 in your
9  E-mail, I'd like to know that.
10     A.  Well, as I say, it's only
11  three words.  I don't know -- or four
12  words.  So I don't know whether those
13  four words came out of, you know,
14  some prior, you know, negotiation or
15  whether they came from this
16  paragraph.
17     Q.  Okay.  And you understand
18  the convention when you use a
19  capitalized term that --
20     A.  Yes.
21     Q.  -- that's typically a
22  defined term?
23     A.  Right.
24     Q.  And did you have any reason

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

154

1 for using a capital C costs there
2 other than that it was referring to a
3 defined term?
4       MR. DAVIS: Objection.
5 It's been asked and answered.
6       But you can respond.
7       THE WITNESS: Yeah. Well,
8 I'm not an attorney. I meant to
9 convey the message that there was a
10 penalty involved if the loan was
11 committed by Hancock and subsequently
12 the borrower did not close.
13       MR. SCHER: Right.
14 BY MR. SCHER:
15   Q. And that penalty was,
16 capital C, costs.
17   A. And that penalty is based
18 on the application, which was
19 subsequently approved.
20   Q. Right.
21   A. So --
22   Q. That's Paragraph 30.
23   A. Yeah. But my letter
24 doesn't override the application.

---

155

1   Q. No. The application -- oh,
2 I understand.
3   A. Right.
4   Q. You're referring to the
5 application in Condition 69 in the
6 application.
7   A. Referring to Paragraph 30.
8   Q. Right.
9   A. And Condition 69.
10   Q. Right.
11   A. Not just those four words.
12   Q. Oh, I understand.
13       Sitting here today, you
14 can't give me any explanation for the
15 capital C costs being listed; right?
16       MR. DAVIS: Objection.
17 Asked and answered.
18       THE WITNESS: Pardon me?
19       MR. DAVIS: Asked and
20 answered.
21       You can respond again.
22       THE WITNESS: I think I've
23 responded already. Would you like me
24 to respond again?

---

156

1       MR. SCHER: Yes.
2 BY MR. SCHER:
3   Q. Sitting here today, you
4 can't give me any explanation as to
5 why the capital -- there is a capital
6 C in the word "costs" in your
7 E-mail --
8       MR. DAVIS: Objection.
9 BY MR. SCHER:
10   Q. -- March 30, Exhibit 9?
11       MR. DAVIS: Objection.
12       THE WITNESS: Can I answer?
13       MR. DAVIS: You may answer
14 again.
15       THE WITNESS: Okay.
16       What I said was it may have
17 come from this paragraph or it may
18 have come from other prior
19 negotiated, you know, applications
20 that I had dealt with.
21       MR. SCHER: Okay.
22 BY MR. SCHER:
23   Q. Had you had a discussion
24 with Mr. Malik on the subject of the

---

157

1 request by the borrower that the
2 exposure be limited to 5 percent?
3   A. I can't recall a specific
4 discussion, but since I am responding
5 to their request to negotiate a 5
6 percent limit to their exposure, I
7 must have had the conversation with
8 him.
9   Q. Okay.
10   A. Because he made that
11 decision.
12   Q. He's shown as a carbon copy
13 recipient on the E-mail, so does that
14 jar your recollection that you did in
15 fact discuss that with him?
16   A. Well, I have no
17 recollection that I verbally
18 discussed it with him, but it would
19 appear that I -- I would have to.
20   Q. Okay.
21   A. Because only Boston makes
22 those decisions, not me.
23       (Exhibit Ferrie-10 was
24 marked for identification.)

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905            InnovatingLitigation            FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

**158**

1    BY MR. SCHER:
2    Q.  I'll show you what's been
3  marked as Ferrie Exhibit 10, which is
4  a —
5    MR. DAVIS: This one is
6  already marked.
7    THE WITNESS: Okay.
8    MR. DAVIS: Let's just get
9  these out of your way so we can keep
10  the pile straight.
11  BY MR. SCHER:
12    Q.  That's an E-mail from Mr.
13  Malik to you dated July 29th, 2004,
14  Bates stamped JH 173.
15    A.  Uh-huh. Right.
16    Q.  The sentence, Regatta's
17  were too low, meaning Need sales
18  comps as soon as possible, Regatta's
19  were too low, do you have any
20  recollection as to what this means?
21    A.  Yes.
22    Q.  What is that?
23    A.  Part of our underwriting
24  process is to secure sales

---

**159**

1  comparables. And the sales price for
2  Regatta — I forget what it was —
3  was lower than what we were
4  underwriting the value of Avenel.
5    Q.  The sales price for the
6  entire complex was lower?
7    A.  The sales price per unit or
8  for the entire complex —
9    Q.  Doesn't matter.
10    A.  — whatever, were lower —
11  the actual sales price for Avenel was
12  lower than the sales price that was
13  indicated by our valuation.
14    MR. DAVIS: You said "for
15  Avenel." Are you —
16    THE WITNESS: Oh, okay.
17    MR. DAVIS: Are you meaning
18  Regatta?
19    THE WITNESS: For Regatta,
20  yes. Let me rephrase that.
21    The sales price for Regatta
22  was lower than the valuation on our
23  worksheet for Avenel. So we were
24  looking for sales comparables in

---

**160**

1  order to justify the valuation.
2    MR. SCHER: Okay.
3  BY MR. SCHER:
4    Q.  So Regatta's sales prices
5  would not be a good comparable to
6  justify Avenel's loan application.
7  Is that what this is saying?
8    A.  No. What —
9    Q.  I don't understand how
10  Regatta gets into the picture.
11    A.  Okay. What Mr. Malik is
12  saying is that the sales price for
13  Regatta on a per unit basis was lower
14  than we were underwriting for Avenel.
15    Q.  What difference does that
16  make?
17    A.  Well, I mean, you're
18  looking at sales price per unit.
19  It may have been — it may
20  have been perfectly comparable on a
21  square-foot basis, it may have been
22  comparable on other bases, but in
23  terms of a sales price, he's saying
24  that he needed additional

---

**161**

1  confirmation from the marketplace.
2    Q.  So you were using Regatta's
3  sales price as a comparable and you
4  needed other sales price comparables?
5    A.  I probably submitted with
6  my — or maybe an original package,
7  we had sales prices from several
8  complexes.
9    Q.  One of which was Regatta?
10    A.  I would guess so since
11  that's what he's referring to.
12    MR. DAVIS: Don't guess. I
13  would ask you not to speculate.
14    THE WITNESS: Okay. I'm
15  sorry. Okay. All right.
16    (Exhibit Ferrie-11 was
17  marked for identification.)
18  BY MR. SCHER:
19    Q.  I'll show you what I've
20  marked as Ferrie Exhibit 11. It's a
21  copy of your E-mail of July 29, 2004,
22  from Joe — to Joe Kelly at Koller
23  Kelly showing a carbon copy to Tim
24  Malik and Rob Kelly.

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          Innovating Litigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

162

1    A.  Yes.
2    Q.  Is this your E-mail of July
3  29, 2004, enclosing the exhibits to
4  which reference is made?
5    A.  Yes.
6      (Exhibit Ferrie-12 was
7  marked for identification.)
8  BY MR. SCHER:
9    Q.  I'll show you what I've had
10  marked as Ferrie Exhibit 12, which is
11  an E-mail stream beginning with a --
12  an E-mail from Tim Malik dated July
13  30, 2004, at 9:20 a.m. and a
14  subsequent E-mail from you to Mr.
15  Malik at 10:11 a.m. and then a third
16  E-mail from Mr. Malik to you at
17  10:22 a.m.
18      Do you have that document,
19  which is Bates stamped JH 160, in
20  front of you?
21    A.  Yes.
22    Q.  Can you tell me why you
23  referred to the Regatta 6.25 cap and
24  sales price of $58 million?

---

163

1    A.  Because the -- one of the
2  ways of valuing a property is the
3  income approach using the cap rate.
4    Q.  And Mr. Malik responds to
5  that by saying: This is still not
6  even up to we have per unit in the
7  underwriting.
8    A.  Right.
9    Q.  So was Mr. Malik telling
10  you that that cap rate did not
11  justify the loan amount for Avenel?
12    A.  He was saying --
13    MR. DAVIS: Objection.
14    THE WITNESS: Okay.
15    MR. DAVIS: I'd caution you
16  not to speculate as to what Mr. Malik
17  was telling you.
18  BY MR. SCHER:
19    Q.  If you know.
20    THE WITNESS: Right.
21    Again, I don't know what
22  he's telling me. I can tell you what
23  I think.
24  BY MR. SCHER:

---

164

1    Q.  What did you think?
2    MR. DAVIS: Objection.
3    THE WITNESS: Don't
4  speculate.
5  BY MR. SCHER:
6    Q.  Well, you received this
7  E-mail; right?
8    A.  Right.
9    Q.  Did you have any
10  understanding of what he was trying
11  to convey to you?
12    A.  Sure. We're going through
13  the underwriting process and he
14  wanted additional comparables in
15  order to justify the underwriting.
16    Q.  Okay. And apparently the
17  comparables that you had provided
18  him, namely, the Regatta, still
19  didn't justify the underwriting;
20  right?
21    A.  Well, they eventually did
22  because we got an application which
23  was approved by Hancock.
24    Q.  Right. But Regatta didn't

---

165

1  justify it.
2    MR. DAVIS: Objection.
3    THE WITNESS: We weren't
4  underwriting Regatta.
5    MR. SCHER: Right.
6  BY MR. SCHER:
7    Q.  But the Regatta comparable
8  didn't justify it?
9    MR. DAVIS: Objection.
10    You can respond.
11    THE WITNESS: I don't know
12  what the Regatta comp has to do with
13  Avenel.
14    MR. SCHER: Okay.
15  BY MR. SCHER:
16    Q.  So you don't understand
17  what Mr. Malik's reference is.
18    A.  No. I told you what his
19  reference was. Our -- no. Let me --
20  no, I don't.
21    Q.  Okay.
22    (Exhibit Ferrie-13 was
23  marked for identification.)
24  BY MR. SCHER:

---

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

166

1    Q.  I'll show you what I've
2  marked as Ferrie Exhibit 13.  It's
3  an E-mail stream which begins with
4  a — an E-mail from Kevin Collins to
5  you —
6    A.  Uh-huh.
7    Q.  — of July 30 at 9:56 a.m.
8  followed by your forwarding it to Mr.
9  Malik and then an E-mail from Mr.
10  Malik to you at 10:20 a.m. regarding
11  Avenel sales comps.
12    Can you explain to me
13  what — when Mr. Malik says, I now
14  have doubts about the projected NOI
15  at Avenel, do you know to what he's
16  making reference?
17    A.  I can only speculate.
18    Q.  When you received it, did
19  you tell him you didn't understand
20  what he was talking about?
21    A.  No.
22    Q.  Okay.  Did you understand?
23  Did you have an understanding of what
24  he was talking about when you

167

1  received it?
2    A.  I knew what I was going to
3  do.
4    Q.  What would you do?  What
5  did you do as a result of this?
6    A.  Attempt to justify the
7  valuation or look for sales comps to
8  justify the valuation.
9    Q.  And evidently, you did
10  succeed in doing that because the
11  loan application was approved.
12    A.  No.  Evidently because the
13  property sold for far in excess of
14  what we valued it at.
15    Q.  Right.
16    A.  That's the proof of the
17  pudding.
18    Q.  That's the proof.
19    (Exhibit Ferrie-14 was
20  marked for identification.)
21  BY MR. SCHER:
22    Q.  I'll show you what I've had
23  marked as Ferrie Exhibit 14, which is
24  a document Bates stamped JH 140.

168

1    In this E-mail from Mr.
2  Malik to you the — he's telling you
3  that the Letter of Credit should be
4  longer than a year, since that would
5  force us to cash if — early if they
6  can't close by August 2nd, 2004.
7    Were you contemplating
8  drawing down on a Letter of Credit
9  before the loan was approved?
10    MR. DAVIS:  Objection.
11    You can respond.
12    THE WITNESS:  No.  I mean,
13  there was a — typically, we have a
14  Letter of Credit that extends 60 to
15  90 days beyond the term of the
16  forward.
17    So in the case of one year,
18  it should have been one year and 60
19  days or one year and 90 days.  So
20  when the — Tim was commenting on
21  that fact.
22    MR. SCHER:  Okay.
23  BY MR. SCHER:
24    Q.  And was that accomplished?

169

1    A.  I haven't — I don't have
2  the Letter of Credit here.  I can —
3  you know, if I could look at it, I
4  can tell you.
5    Q.  Okay.
6    (Exhibit Ferrie-15 was
7  marked for identification.)
8  BY MR. SCHER:
9    Q.  I'll show you what I've had
10  marked as Ferrie Exhibit 15, a copy
11  of a document Bates stamped JH 397
12  through 404.  The first page is an
13  interest rate circle form and appears
14  to be signed by Barry Neclow.
15    Do you know who he is?
16    A.  Barry Neclow?
17    Q.  Yes.
18    A.  Yes.
19    Q.  Who's he?
20    A.  He's no longer with the
21  company.
22    Q.  Okay.
23    A.  He was the — he was one of
24  the senior officers.



**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

170

1    Q. And was he a John Hancock
2  person rather than a Manulife person?
3    A. Yes.
4    Q. And is this the standard
5  form by which the interest rate is
6  locked?
7    A. I don't have anything to do
8  with it.
9    Q. Okay. Well, you say
10  nothing to do with it, but JH 403 and
11  404, you signed that Exhibit D?
12    A. 403.
13    Q. Oh. I'm sorry. Tim Malik.
14  I'm sorry. I apologize.
15        Did you participate in the
16  transmission of this rate lock form
17  to John Hancock from Mr. Koller?
18    A. You mean 403 and 404?
19    Q. Yes, sir.
20    A. I can't recall
21  definitively. Either I would have
22  transmitted or it would have been
23  sent directly by Jim and Joe.
24    Q. Okay. And this is -- and

---

171

1  when this form was sent in, that's
2  when the hedge was created?
3        MR. DAVIS: Objection.
4        THE WITNESS: I don't --
5        MR. DAVIS: Objection.
6        Don't speculate, please.
7        THE WITNESS: Okay.
8        I don't know anything about
9  it.
10        MR. SCHER: Okay.
11  BY MR. SCHER:
12    Q. Do you know what a 10
13  percent break-even requirement is?
14    A. 10 percent -- in what
15  context?
16    Q. In the context of a loan
17  application.
18    A. 10 percent break -- I --
19    Q. Have you ever heard that
20  criteria as an underwriting criteria
21  for a John Hancock loan?
22    A. I need to know what context
23  it was in.
24    Q. Context of an approval of a

---

172

1  loan.
2    A. I --
3    Q. The requirement for the
4  disbursement of a loan.
5        MR. DAVIS: Don't
6  speculate. If you know.
7        THE WITNESS: No, I don't
8  know.
9        MR. SCHER: Okay. Let me
10  see if I can help.
11        (Exhibit Ferrie-16 was
12  marked for identification.)
13  BY MR. SCHER:
14    Q. I'll show you what's been
15  marked as Ferrie Exhibit 16, which is
16  a document Bates stamped 405 through
17  425. And my question is directed to
18  the first page where it says
19  "specific conditions," that box.
20        Do you see where I'm
21  referring?
22    A. Yes. Uh-huh.
23    Q. And then the first bold is
24  principal affiliates requirements,

---

173

1  guarantee requirements, the third is
2  funding, and the fourth is
3  disbursement requirements.
4        Do you see that?
5    A. Yes.
6    Q. And then it lists rents of
7  at least $4,221,126; right?
8    A. Right.
9    Q. Plus other income.
10        And then it says, a minimum
11  NCFDSCR of 1.25 to 1. That's the
12  debt service coverage ratio --
13    A. Uh-huh.
14    Q. -- to which -- which is
15  contained in the loan application;
16  right?
17    A. Right.
18    Q. And then it says: 10
19  percent break-even, according to
20  underwriting herein.
21        What does that mean?
22    A. That would be the same
23  thing you referred to earlier as the
24  10 percent constant.

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905                InnovatingLitigation                FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

174

1    Q. I see.
2        And then the next criteria
3    indicated is the possibility of a
4    rent achievement reserve subject to
5    the 75 percent LTV and 1.25 to 1 DSCR
6    as described in the commitment.
7        So that's the -- those are
8    the two criteria that are contained
9    in the loan application; right? The
10   LTV and the DSCR.
11       A. They are two of the
12   criteria. Yes.
13       Q. Yes. Okay.
14           (Exhibit Ferrie-17 was
15   marked for identification.)
16   BY MR. SCHER:
17       Q. I'll show you what I've had
18   marked as Ferrie Exhibit 17. And
19   it's a document that's Bates stamped
20   JH 01174.
21       First, have you ever before
22   today seen JH 16, the last one I
23   showed you, or JH 17?
24       A. I don't have any

175

1    independent recollection. No.
2        Q. Okay. And -- Ferrie-16 or
3    Ferrie-17. I misspoke. It just --
4        A. This one?
5        Q. Right.
6        A. Yeah.
7        Q. You have never seen that
8    before -- you don't --
9        A. I don't remember. I could
10   have.
11       Q. And you don't remember
12   seeing this one before?
13       A. No.
14       Again, I could have; I just
15   don't remember.
16       Q. And you see Item 8 of this
17   August 17 --
18       A. Yes.
19       Q. -- 2004 memorandum --
20       A. Uh-huh.
21       Q. -- references that 10
22   percent break-even and that's the 10
23   percent constant to which we've made
24   reference earlier; am I right?

176

1        MR. DAVIS: Objection.
2        THE WITNESS: Yes.
3        MR. SCHER: Okay.
4            (Exhibit Ferrie-18 was
5    marked for identification.)
6    BY MR. SCHER:
7        Q. I'll show you what I've had
8    marked as Ferrie Exhibit 18. It's a
9    document from the -- E-mail stream.
10       The first is an E-mail from
11   you to Mr. Malik with a carbon copy
12   to Tom Rogers at White and Williams,
13   a man named Depolis -- your
14   colleagues, Brian Depolis and Helene
15   McCole; am I right about that?
16       A. Can you repeat the
17   question?
18       Q. Yes.
19       Basically, I was
20   identifying that E-mail from you.
21   And it is from you to Tim Malik with
22   copies to Tom Rogers, who is your
23   lawyer at White and Williams, and
24   your two colleagues in your office.

177

1        A. Yes.
2        Q. Brian Depolis and Helene
3    McCaan -- McCole.
4        A. McCole. Yes.
5        Q. Right. Okay.
6            Now, in this you are
7    reporting a lunch with Mr. Kelly and
8    Mr. Koller; am I right?
9        A. Yes.
10       Q. And they paid for lunch?
11       A. Exactly. Yes.
12       Q. Now, do you remember where
13   that lunch was?
14       A. Myrna's.
15       Q. Okay. Take a moment and
16   review this E-mail and tell me if you
17   have any other recollection of the --
18   what transpired at that lunch.
19       A. It's a long time ago. I
20   don't remember anything specifically.
21       Q. Okay. Is there anything in
22   this E-mail which you regard as
23   inaccurate in retrospect?
24           MR. DAVIS: Take a moment

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905     InnovatingLitigation     FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

### 178

1  and read it, please.
2        THE WITNESS: Uh-huh.
3  BY MR. SCHER:
4        Q.  Public school for his kids?
5  Is that what you --
6        A.  Yeah.  Uh-huh.
7           Is anything -- what was the
8  last question?
9        Q.  Is there anything in that
10  E-mail which in retrospect you
11  believe is inaccurate or incomplete?
12        A.  No.
13        Q.  Mr. Malik forwarded it to
14  Messrs. Roseen and Neclow.
15           Do you know who they are?
16        A.  Tim Roseen is in the -- the
17  head of the credit department.
18        Q.  Okay.
19        A.  And Barry Neclow was the --
20  whatever his title was -- debt
21  investment manager.
22        Q.  Okay.  Do you know why Mr.
23  Malik communicated with Mr. Roseen
24  and Mr. Neclow in connection with the

### 179

1  subject of your E-mail?
2        A.  No.
3        Q.  What's the process through
4  which John Hancock goes in the event
5  a loan to which the company has
6  committed has decided not to proceed
7  with the loan?
8        A.  Well, in my 16 years with
9  Hancock and the two and a half years
10  before that with Fidelity Bond &
11  Mortgage, the only two loans that
12  never closed were Avenel, which was a
13  negotiated settlement, and -- I mean
14  Regatta.
15        Q.  Which was a --
16        A.  Which was a negotiated
17  settlement, and Avenel.
18        Q.  Okay.  Do you know why
19  Regatta was not asked to pay the old
20  maintenance penalty?
21        MR. DAVIS: Objection.
22           I think we've covered this
23  earlier today.
24        MR. SCHER: Okay.

### 180

1        MR. DAVIS: Asked and
2  answered.
3  BY MR. SCHER:
4        Q.  You can answer it again.
5        A.  No.
6           (Exhibit Ferrie-19 was
7  marked for identification.)
8  BY MR. SCHER:
9        Q.  I'll show you what I've had
10  marked Ferrie Exhibit 18, which is a
11  copy of --
12        MR. DAVIS: 19, I think.
13        MR. SCHER: I'm sorry.  Is
14  it 19?  I apologize.
15  BY MR. SCHER:
16        Q.  -- 19, which is a copy of
17  an E-mail from you to Joe Kelly with
18  a carbon copy to Jim Koller and Tim
19  Malik on the subject of Avenel unwind
20  costs.
21           Is this your E-mail of June
22  7 -- June 6, 2005, at 11:27 a.m.?
23        A.  Yes.
24           (Exhibit Ferrie-20 was

### 181

1  marked for identification.)
2  BY MR. SCHER:
3        Q.  This is Ferrie Exhibit 20,
4  a copy of an E-mail from Mr. Koller
5  to you, which is the E-mail stream
6  which began with your E-mail, Bates
7  stamped JH 149.
8           Did you ever explain to Mr.
9  Koller what the $86,000 hedge cost
10  was?
11        A.  No.
12        Q.  Do you know what it was?
13        A.  No.  But I didn't make it
14  up.  It came from Hancock.
15        Q.  Okay.
16           (Exhibit Ferrie-21 was
17  marked for identification.)
18  BY MR. SCHER:
19        Q.  I'll show you what I've had
20  marked Ferrie Exhibit 21, which is an
21  E-mail, the first page of which is JH
22  01196.
23           Is that your E-mail to
24  Tim Malik with a copy to Jessica

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**182**

1    Leveroni —
2        A. Yes.
3        Q. — and Tom Rogers?
4            And those two are lawyers;
5    am I right?
6        A. Yes.
7        Q. Jessica is in house and —
8        A. Tom is out house.
9        Q. — Tom Rogers is out house;
10   is that right?
11       A. Yes.
12           MR. DAVIS: I'm going to
13   object to that characterization of
14   "out house."
15   BY MR. SCHER:
16       Q. And that's your E-mail; am
17   I right? You wrote that?
18       A. Of June the 9th. Yes.
19       Q. Yes. Okay.
20           Is it accurate to say that
21   you negotiated the terms of the loan
22   commitment — the loan application
23   with the prospective borrower?
24       A. No.

**183**

1        Q. Who did?
2        A. I conveyed the — other
3    than the boilerplate, I conveyed the
4    requests from the borrower to home
5    office and home office subsequently
6    decided.
7        Q. Earlier in your testimony
8    you described yourself as a
9    go-between. Is that what you meant?
10       A. Yes. Right. Yeah.
11       Q. So you took the information
12   that the borrower conveyed to you,
13   passed it on to Boston home office,
14   John Hancock, and then received their
15   response and passed it back to the
16   borrower; is that right?
17       A. Right. For example, when
18   the borrower asked for rather than
19   three one-month extensions, six
20   one-month extensions, I either
21   verbally or written would communicate
22   that with Boston and they would tell
23   me whether they would be able to go
24   for that or not.

**184**

1        Q. Are you familiar with the
2    interpretation of the loan
3    application, the language contained
4    in the loan application?
5            MR. DAVIS: Objection.
6            You can respond.
7            THE WITNESS: I don't
8    follow.
9    BY MR. SCHER:
10       Q. Are you able to interpret
11   the meaning of the language in the
12   loan application?
13           MR. DAVIS: Objection.
14           I think you're asking him
15   for a legal opinion, but, you know.
16   You're asking whether he's capable of
17   rendering a legal opinion. I object.
18           THE WITNESS: I know what's
19   in the loan application.
20   BY MR. SCHER:
21       Q. You can't interpret it,
22   though, can you?
23       A. If there's —
24           MR. DAVIS: Objection.

**185**

1            You can respond.
2            THE WITNESS: I would be
3    uncomfortable in answering that
4    question.
5            MR. SCHER: Okay.
6    BY MR. SCHER:
7        Q. You would be uncomfortable
8    in interpreting the loan application;
9    right?
10           MR. DAVIS: Objection.
11           THE WITNESS: No. I would
12   be uncomfortable in telling you that
13   I can interpret the entire loan
14   application.
15           MR. SCHER: Okay.
16           THE WITNESS: I mean, if
17   something says 360-month
18   amortization, I can tell you that's
19   what it means.
20           MR. SCHER: No problem.
21   Right.
22   BY MR. SCHER:
23       Q. To the best of your
24   knowledge, how did Vesterra fail to

**JDR**
**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

**186**

1  fulfill its obligations under the
2  loan commitment?
3      A.  They didn't close.
4      Q.  And how did it default on
5  the loan commitment?
6      A.  The deadline passed and
7  they didn't close. In spite of
8  repeated efforts to get third parties
9  ordered, they never responded.
10     Q.  How did -- how was John
11 Hancock damaged as a result of what
12 happened in this case?
13         MR. DAVIS:  Objection.
14         You're asking his
15 understanding?
16         MR. SCHER:  Yes.
17         THE WITNESS:  We committed
18 funds, we were prepared to honor our
19 commitment, and the borrower should
20 have honored his commitment.
21 BY MR. SCHER:
22     Q.  Well, how were you damaged?
23 How did -- what --
24     A.  You're talking about

---

**187**

1  dollars and cents?
2      Q.  Yes.
3      A.  I don't know.  You'd have
4  to cover that with Boston.
5      Q.  Did Brian Depolis report to
6  you?
7      A.  Yes.
8      Q.  And did Helene McCole
9  report to you?
10     A.  Yes.
11     Q.  Are you aware of anything
12 they did in connection with this loan
13 that they did not report to you?
14         In other words,
15 subsequently learn that they had done
16 something or not done something in
17 connection with the loan, that they
18 hadn't reported to you
19 contemporaneous with the events?
20         MR. DAVIS:  If you
21 understand, you can respond.
22         THE WITNESS:  I think it's
23 kind of broad.
24 BY MR. SCHER:

---

**188**

1      Q.  Well, you might call it --
2  I'm assuming that your answer is they
3  reported everything to me?
4          But I -- if you know of
5  something that they didn't report to
6  you that you've subsequently learned
7  they hadn't reported to you that they
8  had agreed that Avenel's loss damages
9  would be limited to, you know, the
10 hedge loss or something.
11     A.  Can I rephrase it --
12     Q.  Yes.
13     A.  -- and see if you agree?
14     Q.  Go ahead.
15     A.  Is there anything unusual
16 about this process that they
17 subsequently reported to me?
18     Q.  Correct.
19     A.  No.
20     Q.  Okay.  Turning back to
21 the --
22         MR. DAVIS:  Which one?
23         MR. SCHER:  The last
24 document.

---

**189**

1          MR. DAVIS:  21?
2          MR. SCHER:  Yes.
3          THE WITNESS:  21?
4          MR. SCHER:  21.
5  BY MR. SCHER:
6      Q.  Where did you get that
7  information contained in the first
8  paragraph, The application is under
9  Massachusetts law and provides for
10 the collection of the following
11 amounts, end of quote?
12     A.  That's probably from the
13 application.  Oh, I shouldn't say
14 probably.
15         I can't say for sure.  I
16 believe it's from the application.
17     Q.  Where did you get the
18 information that the yield
19 maintenance penalty would be
20 $5,600,000?
21     A.  From Tim Malik.
22     Q.  And the hedge costs would
23 be 86,000.
24     A.  From Tim.

---

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

190

1     Q. And the payment of
2 third-party costs?
3     A. Well, there aren't any
4 costs.
5     Q. Okay. And the —
6     A. They never ordered any
7 reports.
8     Q. Okay. So do you know where
9 Tim got those hedge and yield
10 maintenance costs?
11     A. No.
12     MR. SCHER: Let's take a
13 short break.
14     (Recess, 2:08-2:19 p.m.)
15 BY MR. SCHER:
16     Q. I'd like you to take a look
17 at Ferrie Exhibit 20 again, which is
18 your June 9 E-mail. That's it. I
19 think you have it in your --
20     MR. DAVIS: It's one page.
21     MR. SCHER: Top page. Yes.
22     THE WITNESS: This is 21.
23     MR. DAVIS: This is 21.
24     Look at the E-mail.

191

1     MR. SCHER: Oh, I'm sorry.
2 It is 21. It is 21. It is.
3     MR. DAVIS: It is one page.
4     MR. SCHER: No. It's 21.
5     THE WITNESS: That's 21.
6 Okay.
7     MR. DAVIS: Oh, you want
8 him to look at 21.
9     MR. SCHER: Yes. I want
10 him to look at 21.
11 BY MR. SCHER:
12     Q. And that's JH 1196?
13     MR. DAVIS: Yes?
14     THE WITNESS: Yes.
15     MR. SCHER: Okay.
16 BY MR. SCHER:
17     Q. If you look down the page,
18 it says: Jim said he had reviewed
19 the application?
20     A. Right.
21     Q. And then it goes, He
22 further stated -- he stated and he,
23 he, and then there's a sentence that
24 begins: Maybe Hancock could make a

192

1 case for the difference between the
2 committed rate and the current market
3 rate but that would only be about 1
4 percent per year.
5     A. Right. That's Jim.
6     Q. That's Jim saying that?
7     A. Uh-huh.
8     MR. SCHER: Okay. I have
9 no other questions.
10     MR. DAVIS: I have no
11 questions.
12     MR. SCHER: Could you
13 change that uh-huh to a yes?
14     THE WITNESS: Yes. Sorry.
15     MR. DAVIS: Most
16 definitively, you can change it.
17     MR. SCHER: All right.
18     (Whereupon the deposition
19 concluded at 2:20 p.m.)
20     TESTIMONY CLOSED
21
22
23
24

193

1     WITNESS CERTIFICATION
2
3     I hereby certify that I
4 have read the foregoing transcript of
5 my deposition testimony, and that my
6 answers to the questions propounded,
7 with the attached corrections or
8 changes, if any, are true and
9 correct.
10
11
12 _____
    DATE     JOHN PATRICK FERRIE
13
14
15
16
17 _____
    PRINTED NAME
18
19
20
21
22
23
24

**JDR**

**James DeCrescenzo Reporting**, LLC

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905      FAX 215.751.0581

**Page 1**

```
                                        1
 1                          VOLUME:   I
                            PAGES:    1 - 88
 2                          EXHIBITS: 1 - 8

 3
 4            UNITED STATES DISTRICT COURT

 5            FOR THE DISTRICT OF MASSACHUSETTS

 6
 7    JOHN HANCOCK LIFE            )
      INSURANCE COMPANY,           )
 8        Plaintiff/Counterclaim   )
          Defendant,               )
 9                                 )    Case No.
      VS.                          )    05-11614-WGY
10                                 )
      VESTMONT LIMITED             )
11    PARTNERSHIP, ET AL.,         )
          Defendants/Counterclaim  )
12        Plaintiffs.              )

13        30(b)(6) DEPOSITION OF JOHN HANCOCK LIFE
      INSURANCE COMPANY by DAVID B. HENDERSON, a
14    witness called by and on behalf of the
      Defendants, taken pursuant to the applicable
15    provisions of the Federal Rules of Civil
      Procedure, before Sandra L. Bray, Registered
16    Diplomate Reporter, CSR Number 103593, and
      Notary Public in and for Commonwealth of
17    Massachusetts, at the offices of Deutsch
      Williams Brooks DeRensis & Holland, P.C.,
18    99 Summer Street, Boston, Massachusetts, on
      Wednesday, March 1, 2006, commencing at
19    9:03 a.m.

20
21
22                REPORTERS, INC.
23        GENERAL & TECHNICAL COURT REPORTING
          23 MERRYMOUNT ROAD, QUINCY, MA 02169
24         617.786.7783/FACSIMILE 617/786.7723
```

**Page 2**

```
 1    APPEARANCES:

 2    CHOATE, HALL & STEWART, L.L.P.

 3        (By Paul D. Popeo, Esquire)
          Two International Place
 4        Boston, Massachusetts  02110
          for the Plaintiffs/Counterclaim
 5        Defendants

 6    BUCHANAN INGERSOLL, PC
          (By Howard D. Scher, Esquire)
 7        1835 Market Street
          Philadelphia, Pennsylvania  19103
 8        for the Defendants

 9               -------------

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1               I N D E X
 2    WITNESS:              EXAMINATION
 3    DAVID B. HENDERSON
 4     (By Mr. Scher)              4
 5
 6
 7             E X H I B I T S
 8    NO.            FOR IDENTIFICATION
 9    No. 1  Amended Notice of Deposition    4
10    No. 2  Defendants' Notice of
              Rule 30(b)(6) Videotape
11            Deposition of Plaintiff John
              Hancock Life Insurance
12            Company                        8
13    No. 3  John Hancock Life Insurance
              Company Documents            55
14    No. 4  Copy of E-mails              59
15
16    No. 5  Copy of E-mail to
              Mr. Henderson from
17            Mr. Malik, dated 8-12-04     62
18    No. 6  John Hancock Life Insurance
              Company Documents            71
19    No. 7  Memorandum to Mr. Thomas from
              Mr. Henderson, dated 8-16-04  73
20
21    No. 8  Memorandum to Mr. Malik from
              Ms. Coyne, dated 8-17-04     74
22
23
24
```

**Page 4**

```
 1               P R O C E E D I N G S
 2         (The Massachusetts driver's license
 3     number as identification of the deponent
 4     was noted for the record.)
 5         DAVID B. HENDERSON, having duly sworn
 6     or affirmed that his testimony would be the
 7     truth, the whole truth, and nothing but the
 8     truth, testified as follows:
 9                  *   *   *
10     EXAMINATION BY MR. SCHER:
11  Q. Good morning, Mr. Henderson.  We've formally
12     introduced ourselves.  I've informally
13     introduced myself to you, and you've introduced
14     yourself to me.  I represent Vesterra
15     Corporation and the other Defendants in this
16     lawsuit for which you have been noticed as a
17     deponent.  You understand that?
18  A. I do.
19         MR. SCHER:  Let's just mark this --
20     we're marking with the witness' name, so
21     Henderson 1.
22         (Amended Notice of Deposition was marked
23          Exhibit Number 1 for identification.)
24  Q. Mr. Henderson, I'll show you what's been marked
```

5

1 as Henderson Exhibit 1. It's a notice of your
2 deposition. And you are here today represented
3 by counsel for John Hancock. Am I right about
4 that?
5 A. Correct.
6 Q. And what compensation have you received for
7 testifying here today?
8 A. None.
9 Q. Do you have any agreement with John Hancock to
10 reimburse you for your time or expenses with
11 respect to your appearing here today or anything
12 else in connection with this lawsuit?
13 A. None.
14 Q. When were you last employed by John Hancock?
15 A. I believe my employment terminated on
16 February 28th, '05.
17 Q. And after February 28, '05, did you have any
18 role whatsoever in connection with John Hancock?
19 A. None whatsoever.
20 Q. What did you do when you left in February of
21 '05?
22 A. I took a week off and then began employment one
23 week later with General Electric Real Estate
24 here in Boston.

6

1 Q. And are you currently employed by General
2 Electric Real Estate in Boston?
3 A. I am.
4 Q. And what are your duties and responsibilities
5 for General Electric Real Estate?
6 A. My title is senior vice president. The
7 functional responsibility is business
8 development manager, which means that I am
9 charged with finding investment opportunities
10 for GE Real Estate involving acquiring
11 companies, investing in companies, and doing
12 joint venture investment with companies.
13 Q. When you left the John Hancock, you were a
14 senior investment officer?
15 A. That was my title, I believe.
16 Q. And Tim Malik reported to you?
17 A. Correct.
18 Q. And what were your duties and responsibilities
19 as senior investment -- what were your duties
20 and responsibilities at the time you left John
21 Hancock?
22 A. I managed a team of underwriters, including Tim
23 Malik, as well as managed a team of originators
24 in field offices -- five field offices in the

7

1 eastern half of the United States.
2 Q. One of those field offices was the office
3 outside of Philadelphia; is that right?
4 A. Correct.
5 Q. And John Ferrie's office was within your
6 jurisdiction, the head of that office?
7 A. Yes.
8 MR. POPEO: Howard, if we pick up too
9 much speed, would you mind if I just put on the
10 record that I have in front of me a notice of
11 Rule 30(b)(6) deposition which was served upon
12 us by Vesterra Limited Partnership, et al., and
13 I'll note for the record that this witness will
14 be John Hancock's corporate designee with
15 respect to Topic 1, Topic 3, and Topic 4 of that
16 notice.
17 MR. SCHER: Let's just put it on the
18 record. Let's mark this the next one, if you
19 don't mind.
20 MR. POPEO: Let me also do a little
21 carve-out. Topic 3 of the notice of deposition
22 applies to -- by its terms, to certain events
23 and practices which occurred before April 28,
24 2004. This witness will speak to those

8

1 practices and events. The notice also
2 contemplates the witness will testify to that
3 same topic subsequent to April 28th, 2004, and
4 we will designate a separate witness for that
5 portion of the testimony.
6 (Defendants' Notice of Rule 30(b)(6)
7 Videotape Deposition of Plaintiff John
8 Hancock Life Insurance Company was
9 marked Exhibit Number 2 for
10 identification.)
11 Q. I'll show you what I've had marked as Henderson
12 Exhibit Number 2, and that is the notice to
13 which your counsel just made reference, our
14 notice -- that is, Defendants' notice of a
15 30(b)(6) videotaped deposition. We're not
16 videotaping, and it indicates that there are
17 multiple topics in that deposition notice. If
18 you wouldn't mind just turning to Page 1 -- the
19 second page of the -- third page of the notice,
20 which is Exhibit A. And Topic Number 1 is the
21 decision by John Hancock to accept the loan
22 application referenced in Paragraph 10 of the
23 complaint, including all of the factors,
24 requirements, and guidelines that were involved

9

1    in John Hancock's internal consideration of the
2    loan application.
3         You've been designated by John Hancock
4    Corporation as its corporate designee on that
5    topic. Are you aware of that?
6  **A.**  I am.
7  **Q.**  What have you done to prepare for your testimony
8    on that topic?
9  **A.**  Nothing in particular.
10 **Q.**  Nothing at all?
11 **A.**  My memory is pretty good. I remember how we
12   processed loans, what the policies and
13   procedures were.
14 **Q.**  Okay. The Loan Application is capitalized. You
15   see that?
16 **A.**  I do.
17 **Q.**  That makes specific reference to Definition 2 in
18   Exhibit A, which is the loan application to John
19   Hancock Life Insurance Company for a first
20   mortgage loan, Application Number 6518467 by
21   applicant Montgomery Square Partnership, dated
22   July 30, 2004. And you've been designated as
23   the corporate designee on that subject; is that
24   right?

10

1  **A.**  Which paragraph is that again? I'm sorry.
2  **Q.**  You see the words "loan application" are
3    capitalized in Topic 1?
4  **A.**  Yes.
5  **Q.**  And if you want to see what the definition of
6    that capitalized term is, you'd look above, and
7    you'd see the definition for Item 2 is loan
8    application; and that refers to the specific
9    loan application involved in this case. Do you
10   understand that?
11 **A.**  I understand. I do.
12 **Q.**  And is your testimony that you have done nothing
13   to prepare for your testimony as a 30(b)(6)
14   designee on that topic?
15       MR. POPEO: Independent from any
16   meeting which he may have had with counsel prior
17   to the time he had to show up for this
18   deposition?
19       MR. SCHER: I didn't ask you to
20   condition his testimony. If you have an
21   objection, you can state an objection.
22 **Q.**  But please, I want to know what you've done for
23   your testifying as a 30(b)(6) designee on Topic
24   Number 1, and you said nothing other than

11

1    relying on your memory. Then I asked you what
2    about with respect to this very loan
3    application, are you relying on your memory as
4    the 30(b)(6) designee. That's all I want to
5    know.
6  **A.**  I met with my counsel this past Friday afternoon
7    to talk briefly about this deposition today, but
8    I did not do anything further than have a
9    general conversation about what would transpire
10   today.
11 **Q.**  Okay. In that general conversation, were
12   documents reviewed?
13 **A.**  They were.
14 **Q.**  What documents were reviewed in preparation for
15   your 30(b)(6) testimony?
16 **A.**  I briefly looked at the underwriting document,
17   the loan application, and I can't recall
18   specifically what the others were.
19 **Q.**  So you recall looking at the underwriting
20   document and the loan application or is that one
21   and the same?
22 **A.**  They're not the same.
23 **Q.**  Okay. So the underwriting document and the loan
24   application?

12

1  **A.**  Correct.
2  **Q.**  And it's your testimony you can't recall
3    reviewing any other document, but there were
4    other documents you reviewed?
5  **A.**  There were.
6  **Q.**  I'd like to know what you did to prepare for
7    your testimony as a 30(b)(6) designee. Have you
8    reported to me all you can recall you've done as
9    a 30(b)(6) designee on Topic Number 1?
10 **A.**  Correct.
11 **Q.**  Let's turn to Topic Number 3 on which you have
12   now been designated the corporate designee for
13   all but the last part of that designation, the
14   topic. So the topic for which you have been
15   designated is the policies, guidelines,
16   requirements, targets, practices, processes or
17   methods that apply to the making of mortgage
18   loans by John Hancock and any differences in any
19   of the foregoing before April 28, 2004.
20       Now, your counsel has told me that
21   you're not going to report on the after
22   April 28, 2004. So I'm not sure what you're
23   going to report on. What have you done to
24   prepare for Topic 3?

13

| 1 | A. | I've not done anything in particular other than |
| 2 | | have the conversation with my counsel on Friday |
| 3 | | afternoon. |
| 4 | Q. | Okay. What was the duration of that |
| 5 | | conversation? |
| 6 | A. | It was, I want to say, 90 minutes approximately. |
| 7 | Q. | Basically, you reviewed the deposition |
| 8 | | process -- |
| 9 | A. | Correct. |
| 10 | Q. | -- do I have that right? And you reviewed more |
| 11 | | than two documents? |
| 12 | A. | Correct. |
| 13 | Q. | Can you approximate? Was it six documents or |
| 14 | | 600 documents? |
| 15 | A. | It was a binder full of documents that we |
| 16 | | briefly went through. |
| 17 | Q. | About how much time was spent on reviewing those |
| 18 | | documents? |
| 19 | A. | I don't recall. Fifteen, twenty minutes. |
| 20 | Q. | Among those documents, were there any documents |
| 21 | | relating to the policies, guidelines, |
| 22 | | requirements, targets, practices, processes or |
| 23 | | methods that applied to the making of mortgage |
| 24 | | loans by John Hancock before April 28, 2004? |

14

| 1 | A. | I don't recall seeing any documents like that. |
| 2 | | However, I lived with those processes, |
| 3 | | procedures for seven years. It was my |
| 4 | | responsibility for seven years. I didn't feel a |
| 5 | | need to review them. |
| 6 | Q. | Okay. But to answer my question -- and I |
| 7 | | appreciate your helping me out on that. To |
| 8 | | answer my question, you did not review any |
| 9 | | documents on Topic 3? Instead, you're relying |
| 10 | | on your memory of seven years of familiarity |
| 11 | | with those processes, correct? |
| 12 | | MR. POPEO: Objection. |
| 13 | | Mischaracterizes the answer, but you can answer |
| 14 | | it again. |
| 15 | Q. | If I mischaracterized, please correct me. |
| 16 | | MR. POPEO: He testified he did not |
| 17 | | recall if those documents were in the binder, |
| 18 | | but you can answer. |
| 19 | A. | I don't recall whether the documents were in the |
| 20 | | binder, but I'm comfortable relying on my |
| 21 | | memory. |
| 22 | Q. | And what -- can you describe the policies, |
| 23 | | guidelines, requirements, targets, practices, |
| 24 | | processes or methods that applied to the making |

15

| 1 | | of mortgage loans by John Hancock? Can you |
| 2 | | describe what those documents look like? |
| 3 | | MR. POPEO: Objection. |
| 4 | A. | I can because there was a manual of guidelines |
| 5 | | that we all used day to day, and I referred to |
| 6 | | them often in my work at John Hancock over the |
| 7 | | course of seven years. |
| 8 | Q. | This manual of guidelines, it was in a binder? |
| 9 | A. | Yes, I kept mine in a binder. I assume most |
| 10 | | people did. |
| 11 | Q. | And it was revised from time to time? Revised |
| 12 | | and updated from time to time? |
| 13 | A. | Yes, it was. |
| 14 | Q. | So there'd be inserts added to it from time to |
| 15 | | time; is that right? |
| 16 | A. | Yes. |
| 17 | Q. | And it was updated up to the time that ManuLife |
| 18 | | acquired John Hancock? Do I have that right? |
| 19 | A. | Yes. |
| 20 | Q. | And it was updated after ManuLife took over John |
| 21 | | Hancock? Do I have that right? |
| 22 | A. | I don't recall because when ManuLife took over, |
| 23 | | the whole procedures changed, and I'm not sure |
| 24 | | what happened to the guidelines after that date. |

16

| 1 | Q. | Okay. In the binder you reviewed on Friday |
| 2 | | afternoon, was the manual of guidelines |
| 3 | | included? |
| 4 | A. | I don't recall seeing it. |
| 5 | Q. | How thick is it -- was it as of April 28th, |
| 6 | | 2004? |
| 7 | A. | I want to say about an inch. |
| 8 | Q. | And did that manual of guidelines influence the |
| 9 | | processing of the loan application in this case? |
| 10 | | MR. POPEO: Objection. |
| 11 | Q. | In other words, did the policies, guidelines, |
| 12 | | requirements, targets, practices of John Hancock |
| 13 | | which existed as of April 28, 2004 affect the |
| 14 | | loan application in this case? |
| 15 | | MR. POPEO: Same objection. |
| 16 | A. | I have no specific recollection of the |
| 17 | | processing of the application in this case. |
| 18 | Q. | So you can't answer one way or the other? |
| 19 | A. | Correct. |
| 20 | Q. | Do you recall what policies, guidelines, |
| 21 | | requirements, targets, practices, processes or |
| 22 | | methods did apply to this loan application in |
| 23 | | this case? |
| 24 | | MR. POPEO: Same objection. |

17

1  **A.**  The guidelines as they existed in the binder
2      that I've referred to applied generally to all
3      of the loans that were underwritten and approved
4      by John Hancock.
5  **Q.**  So by that answer, I'm hearing you say that the
6      manual of guidelines did apply to the loan
7      application in this case?
8  **A.**  Yes, they probably did, but, again, I have no
9      specific recollection that they did.
10 **Q.**  Now, the fourth topic on which you've been
11     designated as the 30(b)(6) designee is described
12     as the manner, methods and/or process by which
13     John Hancock approved mortgage loans during the
14     period from January 1, 2000 through April 28,
15     2004.
16         What have you done to prepare for your
17     testimony as the 30(b)(6) designee?
18 **A.**  During my meeting with counsel on Friday
19     afternoon, we discussed this topic.
20 **Q.**  Did you review any documents to prepare for your
21     testimony on that subject?
22         MR. POPEO: Objection.
23 **A.**  Again, I reviewed -- the only documents I
24     reviewed during that meeting were the documents

18

1      contained in the binder that we went through.
2  **Q.**  And that binder was not a John Hancock binder?
3      It was a binder assembled by counsel? Do I have
4      that right?
5  **A.**  Correct.
6  **Q.**  And was that binder organized in chronological
7      order?
8  **A.**  I don't recall.
9  **Q.**  Did you look -- how thick was that binder?
10 **A.**  Several inches. Three or four inches or more.
11 **Q.**  And it's from -- and it's that binder that you
12     used to prepare for your testimony as the
13     30(b)(6) designee on the three topics. Am I
14     right about that?
15         MR. POPEO: Objection. You can answer
16     the question.
17 **A.**  That's the only written information I reviewed
18     to prepare for my testimony today.
19 **Q.**  You don't have any documents at home outside of
20     John Hancock that relate to the processing of
21     this application? Am I right about that?
22 **A.**  Correct, you are right.
23         MR. SCHER: Well, I think we'll
24     formalize this, but we certainly should

19

1      be produced the manual of guidelines and that
2      binder, the materials that were used to prepare
3      the 30(b)(6) designee. I'll take that up with
4      you, Mr. Popeo.
5  **Q.**  Now, you said that after ManuLife acquired John
6      Hancock on April 28th, 2004, the whole procedure
7      changed. Do I have that right?
8  **A.**  That's right.
9  **Q.**  And can you tell me how it changed?
10 **A.**  ManuLife introduced some changes to the
11     procedures, including the elimination of the
12     loan committee and the substitution of an
13     individual signatory approval process.
14 **Q.**  And what is -- just, if you would, describe to
15     me in words what the difference between a loan
16     committee process is and a signatory process is
17     as it applies to the change that was made by
18     ManuLife after its acquisition?
19 **A.**  Under the committee structure, to obtain
20     approval for a loan, the loan officer would sit
21     before the loan committee and make a verbal
22     presentation of the facts surrounding the
23     application, and the committee would vote to
24     approve or to decline the application.

20

1         When ManuLife took over, instead of
2      going to a committee, there was a series of
3      approval authorities, dollar amounts authorities
4      assigned to individuals, and the loan officer
5      would go see those individuals and obtain their
6      signature approval on the application in a
7      one-off, one-at-a-time setting as opposed to
8      going before a committee.
9  **Q.**  And did you understand what practical difference
10     that had --
11         MR. POPEO: Objection.
12 **Q.**  -- on the approval process?
13 **A.**  I'm not sure I understand your question.
14 **Q.**  Do you know why that change was introduced by
15     ManuLife?
16 **A.**  To the best of my knowledge, it was only because
17     ManuLife had used that signature process in
18     their past, and they bought Hancock. So they
19     instituted the policies and procedures they were
20     accustomed to.
21 **Q.**  Was there a period of adjustment following the
22     acquisition by ManuLife where ManuLife changes
23     were introduced into the John Hancock process?
24 **A.**  I don't recall.

21

1   Q.   Was it done overnight?  In other words, on the
2        day after the acquisition occurred, the loan
3        committee process ended and the signatory
4        process began?
5             MR. POPEO:  Objection.
6   A.   I don't recall the specifics of how it was
7        transitioned.
8   Q.   How were you told about the change?
9   A.   I believe my superior, Ivor Thomas, informed me.
10  Q.   And Ivor Thomas was a ManuLife North American
11       vice president?
12  A.   I don't recall his title.  He was my boss.
13  Q.   Okay.  And he came in -- he came -- he became
14       your superior when ManuLife acquired John
15       Hancock?
16  A.   Correct.
17  Q.   Who had been your superior previously?
18  A.   Sam Davis.  However, I don't recall exactly when
19       Sam left.  There may have been an interim person
20       between Sam and Ivor Thomas.
21  Q.   Okay.  And was it -- but it's your recollection
22       that Ivor Thomas is the one who instructed you
23       that the loan approval process would no longer
24       be the committee process and, instead, would be

22

1        the signatory process, right?
2             MR. POPEO:  Objection.
3   A.   I don't recall who specifically instructed me.
4   Q.   What other -- you said the whole procedure was
5        changed.  Was there any change other than a
6        change from a loan committee process to a
7        signatory process that resulted from the
8        acquisition by ManuLife of John Hancock?
9   A.   I'm sure there must have been some changes to
10       the underwriting practices.  I just don't
11       specifically recall what they were.
12  Q.   So you -- sitting here today, you have no
13       recollection of any other changes that were
14       introduced by ManuLife subsequent to its
15       acquisition of John Hancock?
16  A.   That's right.
17  Q.   Was the 10 percent constant requirement a
18       requirement of John Hancock before it was
19       acquired by ManuLife?
20            MR. POPEO:  Objection.
21  A.   John Hancock had a sizing constant requirement.
22       Whether that was theirs or ManuLife's, I don't
23       recall.
24  Q.   So the sizing constant was -- there was a sizing

23

1        constant in existence at the time that ManuLife
2        acquired John Hancock?
3   A.   That's right.
4   Q.   Was the sizing constant the same constant as the
5        one that ManuLife introduced?
6   A.   Same meaning the same number, ten?
7   Q.   Yes, yes.
8   A.   I don't recall.
9   Q.   And was the -- was its inclusion in the approval
10       process the same as it was in -- was the
11       10 percent constant of the same significance in
12       the John Hancock approval process as it was in
13       the ManuLife approval process?
14            MR. POPEO:  I object to the form of
15       the question.
16  A.   I really don't remember.
17  Q.   From the time that you began working in this
18       area for John Hancock until the time you left,
19       was the 10 percent constant requirement ever
20       included in the loan application itself?
21            MR. POPEO:  Objection.
22  A.   Not to my recollection.
23  Q.   Are you aware of any occasion when it was
24       proposed that that requirement be included?

24

1   A.   No.
2   Q.   Your position as senior investment manager,
3        senior -- was unchanged until the time you
4        departed from the company?
5   A.   I believe that's right.
6   Q.   So the acquisition by ManuLife did not change
7        your duties and responsibilities at the company?
8   A.   No, that's not right.
9   Q.   Tell me how your duties and responsibilities
10       changed after ManuLife acquired the company.
11  A.   Well, as I indicated, we went from a committee
12       form of approval to an individual signature
13       process, and I had no additional signing
14       authority postmerger.
15  Q.   And do you know why that happened?
16            MR. POPEO:  Objection.
17  A.   No, I don't.
18  Q.   How did it come about that, as Mr. Malik
19       described it, you were downsized or your job was
20       eliminated at John Hancock?
21            MR. POPEO:  Objection.
22  A.   Could you repeat that question?
23  Q.   Sure.  Let me ask it directly.  Tell me why it
24       is you left John Hancock.

25

1  **A.** I was told my job was eliminated.

2  **Q.** And who told you your job was eliminated?

3  **A.** Barry Nectow.

4  **Q.** And did he tell you why your job was eliminated?

5  **A.** He did not.

6  **Q.** Had you -- was that -- did that occur in just

7      one face-to-face meeting?

8  **A.** It did. It was very brief.

9  **Q.** And was the -- were there others whose jobs were

10     eliminated at or about the same time?

11 **A.** I recall that there were two others at the same

12     time.

13 **Q.** And is it your understanding that you were not

14     replaced by anyone?

15 **A.** That's -- I wouldn't know, honestly.

16 **Q.** Were either of the others replaced by anyone?

17 **A.** I wouldn't know.

18 **Q.** Were you -- were your duties and

19     responsibilities eliminated sometime prior to

20     February 28, 2005?

21 **A.** They were --

22         MR. POPEO: Objection. You may

23     answer.

24 **A.** I was told I was relieved of my responsibilities

26

1      prior to February. I can't remember the exact

2      date.

3  **Q.** Okay. And can you tell me who told you that?

4  **A.** Barry Nectow.

5  **Q.** And was that the same conversation in which he

6      told you that your job was eliminated?

7  **A.** Correct.

8  **Q.** So sometime prior to February -- prior to the

9      day you left the company, Barry Nectow sat down

10     with you and said, "Your duties and

11     responsibilities have been eliminated in this

12     company, and, therefore, you are not to be

13     employed here any longer"? Is that basically

14     it?

15 **A.** I was told I was not to be employed after

16     February 28th; however, I was free to come in

17     and use the office effectively for job search

18     purposes, but I had no further job duties with

19     John Hancock.

20 **Q.** Was this conversation with Mr. Nectow before or

21     after the 1st of the year?

22 **A.** It was on January 16th.

23 **Q.** So it was after. January 16th, 2005. Prior to

24     January 16th, 2005, had your duties and

27

1      responsibilities changed at the company?

2  **A.** Only insofar as I've already described.

3  **Q.** The signatory committee?

4  **A.** Correct.

5  **Q.** Other than being the signatory on approval of

6      loans -- do I have that right; that was

7      eliminated?

8  **A.** That's right.

9  **Q.** Was that immediately eliminated upon the

10     acquisition of ManuLife?

11         MR. POPEO: Objection. Asked and

12     answered. You can answer it again.

13 **A.** I don't recall the specific date, so

14     approximately at the time the merger occurred or

15     shortly thereafter.

16 **Q.** But other than the signatory on the loan

17     applications and loan approvals -- sorry. Your

18     signature approval authority was eliminated on

19     the approval of loan applications?

20 **A.** On the approval of loans.

21 **Q.** Approval of loans. Other than eliminating your

22     signature authority on the approval of loans,

23     were your duties and responsibilities changed in

24     any other way?

28

1  **A.** To the best of my recollection, no.

2  **Q.** Were you as fully occupied before January 16,

3      '05 as you had been prior to the acquisition by

4      ManuLife --

5         MR. POPEO: Objection.

6  **Q.** -- except for the signatory -- signing of the

7      approval of loans?

8         MR. POPEO: Objection. You can

9     answer.

10 **A.** I was busy. I was busy through the date that I

11     was told my job had been eliminated.

12 **Q.** So you were as busy on January 16th as you had

13     been on the day before ManuLife's acquisition,

14     April 27th, for example, relatively?

15 **A.** In general terms?

16 **Q.** Yes.

17 **A.** Yes.

18 **Q.** How much time did it take to sign a loan

19     approval?

20         MR. POPEO: Objection.

21 **A.** It varied from deal to deal. I couldn't begin

22     to guess.

23 **Q.** Okay. We're not just talking about the manual

24     act of signing, but the approval of loans, which

29

1 is a process that takes more than just signing a
2 piece of paper, right?
3 **A.** Is that what you're asking me?
4 **Q.** Yes, I'm asking you that.
5 **A.** Yes.
6 **Q.** So when you say that your approval of loan
7 responsibility had been eliminated, that
8 eliminated other duties and responsibilities
9 than just signing; didn't it?
10 **A.** No, it did not.
11 **Q.** I see. So you still were involved in the loan
12 approval process short of the signing of the
13 approval; is that right?
14 **A.** That's right.
15 **Q.** Could you describe to me the loan approval
16 process that -- your role in the loan approval
17 process?
18 **A.** Before April 28th?
19 **Q.** Yes, before April 28th.
20 MR. POPEO: Sorry. Objection to form.
21 You may answer the question.
22 **A.** The field office originators and/or mortgage
23 banker, third-party correspondents, would source
24 a loan, find the opportunity, and submit it to

30

1 the investment officer. The investment officer
2 would do the preliminary evaluation of the loan,
3 determine whether or not it had merit, whether
4 John Hancock would be interested in it. They
5 would perform some preliminary underwriting, and
6 then if they thought that the loan would be an
7 attractive opportunity for Hancock, they would
8 bring it to me; and we would go through it,
9 evaluate it together, and I would indicate my
10 concurrence that it was a good opportunity or I
11 might kill the loan and decline it right then
12 and there.
13 If we agreed it was a good opportunity
14 mutually, we would move forward and complete the
15 full underwriting, negotiate the application
16 with the borrower, and after the borrower signed
17 the application and put up his points, we would
18 then take it to loan committee for approval.
19 **Q.** After April 28, what were your duties and
20 responsibilities -- what was your role in
21 connection with the loan approval process?
22 MR. POPEO: Object to the form. You
23 can answer if you can.
24 **A.** My role and responsibilities in the process and

31

1 procedure didn't change very much at all, only
2 my signature on the approval -- on the
3 underwriting document no longer had weight as an
4 approving authority.
5 **Q.** As of the time you left John Hancock, the loan
6 for the Montgomery Square property had gone
7 through the ManuLife approval process. Am I
8 right?
9 MR. POPEO: Objection.
10 MR. SCHER: Basis?
11 MR. POPEO: Form.
12 MR. SCHER: I want to fix the form.
13 What's the form basis?
14 MR. POPEO: It's compound.
15 **Q.** As of the time you left the employ of John
16 Hancock, had the loan application which is the
17 subject of this dispute been approved by John
18 Hancock?
19 **A.** I have no specific recollection of this loan
20 having been approved by John Hancock. However,
21 I can't imagine that we'd be sitting here today
22 if it had not been approved by John Hancock.
23 **Q.** Okay. Putting aside your logic, you have no
24 recollection if this loan was approved or not.

32

1 Am I right about that?
2 **A.** No specific recollection of this loan being
3 approved, correct.
4 **Q.** And as of the time you left John Hancock, were
5 you aware of any possibility that the loan would
6 not close?
7 **A.** No recollection of that possibility.
8 **Q.** And as of the time you left John Hancock, did
9 you have -- did you have any awareness of any
10 effort by John Hancock to seek damages for the
11 failure of the loan to close?
12 **A.** None.
13 **Q.** So a suggestion that you participated in the
14 decision to sue John Hancock would be wrong. Am
15 I right about that?
16 MR. POPEO: Objection to the form.
17 Mischaracterizes.
18 **A.** I don't understand the question.
19 **Q.** You did not participate in a decision to seek
20 recover damages from Montgomery Square by John
21 Hancock; am I right?
22 **A.** I have no recollection of participating in that.
23 MR. POPEO: Objection.
24 **Q.** And at the time you left John Hancock, who was

33

1    it within the organization as of this time who
2    had responsibility for making a decision to
3    pursue damages again st a borrower who had not
4    closed on a loan?
5         MR. POPEO: Objection.
6  A.  I don't recall anyone specifically having
7    responsibility for that kind of decision. It
8    was an incredibly infrequent type of occurrence,
9    so I'm not sure anyone was designated.
10 Q.  Okay. Are you familiar with a project called
11   the Regatta project?
12 A.  The name sounds vaguely familiar, but I don't
13   recall it.
14 Q.  Principal with the last name Lordi?
15 A.  Means nothing.
16 Q.  Do you have any recollection of participating in
17   a decision to accept the deposits paid or the
18   points paid by the borrower upon the borrower's
19   decision not to close the loan?
20 A.  I have no recollection of that event.
21 Q.  After your responsibility as the loan approver
22   had been completed, whether by the John Hancock
23   method of committee or by the signatory method,
24   individuals signing off, of which you were not

34

1    one, what role, if any, did you have in
2    connection with a loan?
3         MR. POPEO: Objection.
4         MR. SCHER: What's the basis?
5         MR. POPEO: It's compound; it's vague;
6    it's asked and answered. You can answer it
7    again if you understand the question.
8         MR. SCHER: You didn't object to it
9    last time.
10 Q.  Go ahead.
11 A.  Could you repeat the question, please?
12 Q.  Sure. What role, if any, did you have in the
13   loan approval process after your role as you
14   described it as loan approver had been
15   completed?
16 A.  The loan approval process ended when the loan
17   was approved, so I don't understand your
18   question.
19 Q.  Okay. So did you have any responsibility for
20   securing title insurance -- assuring that there
21   was title insurance on the property after the
22   loan was approved?
23 A.  No.
24 Q.  Or assuring that there was -- a rental level

35

1    achievement had been achieved after the loan was
2    approved?
3  A.  If a loan had not met a rental achievement
4    threshold, I may have been consulted about it.
5    I would be involved on an exception basis,
6    perhaps --
7  Q.  Okay.
8  A.  -- in some of those kinds of decisions.
9  Q.  What role, if any, would you have -- did you
10   have in the preparation of loan documents?
11 A.  None.
12 Q.  What role, if any, did you have in connection
13   with the disbursement of the loan itself?
14 A.  To the best of my recollection, none.
15 Q.  And in particular with respect to the Montgomery
16   Square property, the exception did not apply,
17   that is, you had no involvement in the
18   processing of the loan after the loan approval
19   process had been completed?
20        MR. POPEO: Objection to form. You
21   can answer if you can.
22 A.  I don't remember any specifics about a
23   Montgomery Square loan.
24 Q.  Do you remember any specifics at all about the

36

1    Montgomery Square loan?
2  A.  The only thing I vaguely recall is the name.
3  Q.  Okay. And that recollection was not refreshed
4    by your review of the two or three-in ch binder
5    your counsel provided you; am I right?
6  A.  No, it was not.
7  Q.  Do you have a recollection of a meeting between
8    Timothy Malik and the developers of the
9    Montgomery Square property?
10 A.  A specific meeting?
11 Q.  Yes.
12 A.  No, none.
13 Q.  Do you have a recollection of Mr. Malik
14   reporting to you what occurred at that meeting?
15 A.  No, I don't.
16 Q.  Do you recall participating in a process for the
17   calculation of losses that John Hancock contends
18   it suffered as a result of the loan not closing?
19        MR. POPEO: Objection.
20 A.  No recollection of that.
21 Q.  Now, this loan was a forward commitment. Do you
22   have an understanding of what that means?
23 A.  I do.
24 Q.  About how many forward commitment loans did you

37

1    participate in -- and if it's thousands, just
2    tell me that -- between -- for as long as you
3    were with John Hancock?
4  A. I'd have to guess. To come up with a number
5    like that would be just guessing.
6  Q. During the year 2004, the year in which ManuLife
7    acquired John Hancock or let's say for the year
8    prior to your leaving the company -- so that
9    would be from February 28, 2004 to February 28,
10   2005 -- how many forward commitment loan
11   approvals did you participate in?
12 A. I couldn't possibly guess what that specific
13   number was.
14 Q. So it's obviously more than two or three?
15 A. It may be more than two or three, but I would --
16   I think we did a hundred or so loans in 2004 --
17   2003, we did a hundred or so loans. I don't
18   know how many we did in 2004. How many of those
19   were forwards, I simply don't recall.
20 Q. And your definition -- could you give me your
21   definition of a forward commitment?
22 A. It's a loan where we lock the interest rate on
23   the loan at time of application signing and loan
24   approval, but the loan doesn't fund until

38

1    sometime in the future.
2  Q. And generally speaking, is that -- isn't it true
3    that every loan has that characteristic, that
4    you lock in the rate and the loan doesn't close
5    for a while? Is it longer than two-month
6    duration? Is that what you're talking about?
7  A. That is what I'm talking about. Typical
8    nonforward loan will fund in two months
9    approximately, and a loan that funds beyond two
10   months is generally considered a forward.
11 Q. Can you approximate the number of forwards that
12   occurred in the year 2000 when you had a hundred
13   loans?
14       MR. POPEO: Object to the form.
15   Mischaracterizes. You can answer.
16 A. That wasn't 2000.
17 Q. 2003. I'm sorry.
18 A. 2003. I couldn't possibly. It was a smaller
19   number.
20       MR. POPEO: If you know, you know.
21 A. But I couldn't possibly estimate.
22 Q. Do you have any recollection of the number of
23   forwards which did not close in the year prior
24   to 2-28-05?

39

1  A. I definitely don't remember the specific number
2    that did not close. However, I'd be shocked if
3    there were any. It was extremely unusual for a
4    forward not to close.
5  Q. Can you recall in your time at John Hancock and
6    your position as senior investment officer a
7    forward not closing?
8  A. I can't specifically recall any forward not
9    closing.
10 Q. So then would it be fair to say that in your
11   experience at John Hancock, you never sought to
12   recover damages from a lender -- from a
13   borrower, forgive me, from a borrower for not
14   closing a loan? You have no recollection?
15 A. I'm sorry. Say the question again, please.
16 Q. Yes. Is it accurate that you do not recall ever
17   having sought to recover damages from a borrower
18   for not closing a loan?
19 A. I do not specifically recall ever trying to
20   recover damages.
21 Q. While you were at John Hancock, had you heard
22   within the John Hancock company of such an
23   instance, where John Hancock sought to recover
24   damages from a prospective borrower on a loan

40

1    which did not close?
2  A. I don't recall specifically hearing of such an
3    instance.
4  Q. When you say specifically, you mean you just
5    don't recall any such instance? Am I right
6    about that?
7  A. I don't recall any single specific instance of
8    that occurrence.
9  Q. When you say single, you mean you don't recall
10   hearing of such an instance?
11 A. Correct.
12 Q. Am I right about that?
13 A. Correct.
14 Q. Is it -- how long were you at John Hancock in
15   the position you left on February 28th, 2004 --
16   2005, rather?
17 A. From June of 1997 until the dates that I've
18   already told you that I left.
19 Q. And before -- and were you hired for the
20   position you left?
21 A. No.
22 Q. What position were you hired for?
23 A. I was hired for an investment officer position.
24 Q. And to whom did you report?

41

1           MR. POPEO: When he was first hired?
2           MR. SCHER: Yes. I'm sorry.
3   A.   I believe a fellow by the name of Don Brown,
4        long since retired.
5   Q.   And after your initial position, did you -- were
6        you subsequently promoted to a higher position?
7   A.   That's right.
8   Q.   And what position was that?
9   A.   The senior investment officer position.
10  Q.   And you reported to Sam Davis in that position?
11  A.   I believe I was promoted in approximately 2000,
12       and reported to Debbie McInerny, who was then
13       manager of the position, and when she left and
14       Sam took over, I reported to Sam.
15  Q.   And there may have been an interim position
16       between Sam and Ivor Thomas, but basically that
17       describes your employment history with John
18       Hancock?
19  A.   That's right.
20  Q.   Prior to your employment with John Hancock, did
21       you have real estate-related employment?
22  A.   I did.
23  Q.   Could you go back in time perhaps after your
24       completion of formal education and give me your

42

1        job history?
2   A.   Sure. I in June of 1979 graduated from the
3        M.B.A. program at the University of Rhode Island
4        and then immediately started with what was the
5        Industrial National Bank of Providence, Rhode
6        Island, and quickly became Fleet Bank, in their
7        Providence office, and after a couple years in
8        their credit lending program, took a job in the
9        real estate department in approximately 1981,
10       and stayed with Fleet until 1990. In 1990, I
11       left Fleet and went to work for Shawmut Bank in
12       their real estate department as a real estate
13       loan officer. Stayed with Shawmut Bank until
14       they were acquired by Fleet, ironically, in
15       1995. Found myself back at Fleet. Stayed on
16       for two more years until I ultimately left and
17       went to John Hancock.
18  Q.   So that's it.
19  A.   That's a summary.
20  Q.   And after -- you are now with General Electric,
21       and your duties and responsibilities have
22       remained unchanged from the time you were hired
23       there?
24  A.   Correct.

43

1   Q.   In connection with your employment at John
2        Hancock, was your compensation connected to your
3        job performance?
4   A.   I was -- I participated in an incentive
5        compensation plan, which gave me a bonus every
6        year, and the bonus was calculated on a complex
7        formula which, frankly, I and I doubt many of my
8        colleagues understood.
9   Q.   Did that complex formula include to any extent
10       the volume of loans which had been approved?
11  A.   I was told that it did. I believe that it did,
12       but I'd be hard-pressed to explain it to you.
13  Q.   And did it relate in any way to the volume of
14       fees collected?
15  A.   I don't recall.
16  Q.   And by fees, I mean points. You used the word
17       "points." You understand what I mean by that?
18  A.   I do, and I just don't recall.
19  Q.   Do you have any recollection of John Hancock's
20       role in connection with the Avenel at Montgomery
21       Square project?
22          MR. POPEO: Object to the form of the
23       question.
24  A.   John Hancock's role?

44

1   Q.   Yes.
2   A.   I have no specific recollection of the Avenel's
3        loan other than the name of the project.
4   Q.   Do you recall how the prospect of this loan came
5        to John Hancock?
6   A.   I don't specifically recall. I would have to
7        assume it came through John Ferrie, but I have
8        no specific recollection of that.
9   Q.   It may have come from a third-party broker?
10  A.   It could have. However, in Philadelphia, we had
11       none.
12          MR. POPEO: If you know. Please
13       testify to what you know.
14  Q.   You had no relationship with a broker because
15       John Ferrie was there?
16  A.   Correct.
17  Q.   So you're assuming that it came through John
18       Ferrie?
19  A.   I am speculating it came through John Ferrie. I
20       would have no other way to know. I don't
21       recall.
22  Q.   Do you recall that the loan prospect came to Tim
23       Malik?
24  A.   Came -- could you define "came to Tim Malik"?

45

1  Q.  That Mr. Ferrie brought the prospect of this
2      loan to Mr. Malik?
3          MR. POPEO: Object to the form.
4  Q.  Do you have a recollection of that?
5  A.  I recall that Tim Malik was assigned to work
6      with John Ferrie.
7  Q.  Who assigned him to that?
8  A.  I did.
9  Q.  Do you have a recollection of assigning
10     Mr. Malik to the Avenel loan?
11 A.  I don't recall the action of assigning him or
12     communicating it specifically to either one of
13     them, but I recall that they were assigned to
14     work together.
15 Q.  Do you recall any involvement in the loan
16     proposal made by John Hancock?
17 A.  On the Avenel apartments?
18 Q.  Yes, on the Avenel apartments.
19 A.  None.
20 Q.  None whatsoever?
21 A.  No.
22 Q.  In connection with your preparation for your
23     testimony, did you review the loan proposal
24     document?

46

1  A.  Could you define "loan proposal document" for
2      me.
3  Q.  The document that is from John Hancock to the
4      prospective borrower or its representative in
5      which the first paragraph says, "Enclosed is --
6      this is our loan proposal," and it outlines the
7      terms of the loan.
8  A.  I did not review that document in any detail.
9  Q.  In that document, it states the total amount of
10     the loan, $32 million in this case. Do you have
11     a recollection of reviewing that document in
12     connection with your preparation here?
13         MR. POPEO: Object to the form. You
14     can answer if you can.
15 A.  I did not review that document in any detail.
16 Q.  Well, in any detail. Did your review of that
17     document refresh your recollection, if you did
18     see it?
19 A.  I think I saw the document. I glanced at it,
20     but I did not read it.
21 Q.  Do you have any recollection of the negotiation
22     of the loan proposal?
23 A.  No, none.
24 Q.  Do you have any recollection of any of the

47

1      preparation of the loan application document by
2      John Hancock for completion by the prospective
3      borrower at the Avenel in Montgomery Square
4      property?
5  A.  No recollection.
6  Q.  Was that the responsibility of the loan officer,
7      Mr. Malik?
8  A.  My recollection is that generally a field office
9      person, such as John Ferrie, would prepare the
10     draft of the application and then show it to the
11     investment officer for his review and comment.
12 Q.  Do you have any recollection of the field
13     officer or the investment officer preparing the
14     loan application?
15         MR. POPEO: In this particular case?
16         MR. SCHER: In this case.
17 A.  No, none.
18 Q.  In this case, the rate -- interest rate was
19     locked as it was a forward commitment and a rate
20     lock agreement was signed. Do you have any
21     recollection of participating or knowing of the
22     locking of the interest rate on this loan?
23 A.  For this loan, no.
24 Q.  When a -- you're familiar with the rate lock

48

1      process, I take it?
2  A.  It's been a while. My memory is a little foggy.
3      I participated in it, I know.
4  Q.  Can you describe to me what the rate lock
5      process is?
6          MR. POPEO: Objection. During what
7      period of time?
8  Q.  At the time that you were employed by John
9      Hancock.
10 A.  When the borrower signed the application and
11     submitted his points with the application, that
12     is when we typically locked a rate on a loan.
13 Q.  And what -- literally, what economic consequence
14     is there at John Hancock at that time for
15     engaging in a rate lock?
16         MR. POPEO: Object to the form.
17 A.  Well, when we locked a rate, we typically
18     purchased a hedge to protect us from movements
19     in the treasuries, and if a borrower were to not
20     then close on a loan and interest rates moved in
21     a direction, then we would incur a breakage
22     loss, an actual cash loss.
23 Q.  Do you know whether that hedge purchase occurred
24     for the entire amount of the prospective loan?

49

1           MR. POPEO: Objection.

2   A.   I don't know.

3   Q.   Is that what the practice was?

4   A.   That was my understanding.

5   Q.   And if interest rates moved in the wrong

6        direction between the time that the rate lock

7        was completed and the time that the loan was

8        approved, if the loan were not approved, is it

9        fair to say that that hedge loss would be borne

10       by John Hancock?

11          MR. POPEO: Object to the form. You

12       can answer if you can.

13  A.   I don't honestly recall how we managed that

14       issue.

15  Q.   Do you have a recollection that after the rate

16       was locked on this loan that the loan approval

17       process on the signatory method ran into a

18       problem?

19          MR. POPEO: Objection. This

20       particular loan?

21          MR. SCHER: Yes.

22          MR. POPEO: If you recall that.

23  A.   I don't recall that.

24  Q.   Do you recall among the documents that you

50

1        reviewed communications from Mr. Malik along

2        those lines?

3   A.   I don't recall any communications with Mr. Malik

4        about this loan.

5   Q.   Do you recall reviewing documents in which he

6        expressed concerns regarding this loan?

7           MR. POPEO: Objection.

8   A.   No.

9   Q.   Do you recall in connection with this loan that

10       there was a -- there were two loan approvals

11       undertaken; one on or about August 10th and the

12       second one on or about August 17th?

13          MR. POPEO: Objection.

14  A.   I definitely don't.

15  Q.   Is it unusual for there to be two loan approval

16       processes using either the committee or the

17       signatory method?

18          MR. POPEO: Objection.

19  A.   I would say no.

20  Q.   It's not unusual?

21  A.   Every loan is different. A second trip to the

22       approval authority is entirely possible.

23

24          MR. POPEO: If we could take a quick

51

1        break when you get a chance.

2           MR. SCHER: Oh, sure.

3   Q.   So then is it your testimony that every loan has

4        unique requirements and characteristics that

5        John Hancock has to evaluate and approve? Is

6        that right?

7   A.   That's right.

8   Q.   Are you familiar with the concept of yield

9        maintenance?

10  A.   I am.

11  Q.   And is it typical for John Hancock to require

12       that its yield be maintained following the

13       making of a loan?

14  A.   Yes.

15  Q.   Have you ever had the experience of John Hancock

16       requiring that its yield be maintained for the

17       making of a -- for the approval of an

18       application?

19          MR. POPEO: Object to the form.

20  A.   I don't understand the question.

21  Q.   So have you ever participated or known of a

22       situation where John Hancock required that its

23       yield be maintained on a loan which it didn't

24       make?

52

1           MR. POPEO: Objection. You can answer

2        if you can.

3   A.   I don't understand the question.

4   Q.   Okay. When a loan is made, it typically

5        contains -- is documented with a mortgage and a

6        note --

7   A.   Correct.

8   Q.   -- and those documents, and John Hancock will

9        provide for yield maintenance, and any attempt

10       to prepay the loan must be accompanied by the

11       payment of the expected yield to John Hancock.

12       Am I right about that?

13          MR. POPEO: Objection. You can

14       answer.

15  A.   That's right.

16  Q.   Now, I'm asking you about a situation where the

17       loan is not funded, the loan is not made. Are

18       you aware of any situation in which John Hancock

19       has sought to obtain the amount that it would

20       have yielded on a loan if it had made that loan?

21          MR. POPEO: Objection to the form.

22       You can answer if you can.

23  A.   Don't recall.

24  Q.   Have you ever participated in the preparation of

53

1  a document which would have entitled John
2  Hancock to recover yield maintenance amount for
3  simply processing a loan application as compared
4  with funding a loan?
5      MR. POPEO: Objection to form. You
6  may answer.
7  A. I recall no such instance.
8      MR. SCHER: We can take a break.
9  (Recess taken from 10:11 a.m. to
10     10:19 a.m.)
11 Q. I'm going to stay with this notion of recovering
12 yield maintenance for a loan which didn't close.
13 You understand what I'm talking about?
14 A. Yes, I think I do.
15 Q. And your testimony is that you have never
16 participated in the approval of a loan
17 application which entitled John Hancock to
18 recover yield maintenance for a loan that didn't
19 close?
20     MR. POPEO: Object to the form. You
21 may answer the question.
22 A. I don't recall ever participating in a
23 discussion about such an application.
24 Q. Okay. Now, to the best of your knowledge, you

54

1  testified that the rental achievement level in
2  connection with a particular loan might be
3  something that you would involve yourself in
4  after the loan application had been approved.
5  Do you recall having participated in any way in
6  the Avenel Montgomery Square property after the
7  loan application had been approved?
8  A. No, I do not.
9  Q. There are -- there is attached to the loan
10 application an exhibit which sets forth three
11 scenarios of the financial condition of the
12 property at the time of the prospective loan
13 closing pro formas. Are you familiar with that
14 consent?
15     His hand is moving toward you every
16 time I ask a question. I don't know why.
17     MR. POPEO: I object to the form of
18 the question, but you may answer.
19 A. For this specific loan, is that what you're
20 asking?
21 Q. Yes.
22 A. I don't recall any part of the application for
23 this specific loan.
24 Q. And in connection with this specific loan, do

55

1  you recall any modifications of the projected
2  income or expenses after the loan application
3  had been submitted?
4  A. No, I do not recall.
5      MR. SCHER: Mark this as the next
6  exhibit.
7  (John Hancock Life Insurance Company
8      Documents were marked Exhibit Number 3
9      for identification.)
10 Q. I'll show you what I've had marked as Henderson
11 Exhibit 3. It's a document, the first page of
12 which is Bates-stamped JH 1128, produced by John
13 Hancock in this case, and the last page is JH
14 1148.
15     Can you tell me what this document is?
16 A. This looks like the credit approval document for
17 Montgomery Square partnership, as I read it from
18 the document.
19 Q. And you'll see -- on the second page that's
20 Bates-stamped 1129, three lines down, you see
21 your signature?
22 A. That looks like my signature.
23 Q. And it shows you as the team leader?
24 A. Correct.

56

1  Q. And it shows that this signature was purportedly
2  placed on it on August 9, 2004?
3  A. Correct.
4  Q. Do you see that?
5  A. Yes.
6  Q. If you take a moment and review this document,
7  can you tell me whether it refreshes your
8  recollection as to the credit approval of the
9  Montgomery Square partnership by John Hancock?
10 A. Not particularly. I mean it's one of many, many
11 loans that we approved during the course of a
12 year.
13 Q. Is this one of the documents that you reviewed
14 in preparation for your deposition here today?
15 A. I don't recall seeing this document before,
16 within the last week.
17 Q. And that would include the Friday when you
18 prepared -- began your preparation for this
19 deposition, right?
20 A. That's right.
21 Q. Now, you see on this document, it says,
22 "Original redone"?
23     MR. POPEO: The handwriting on the top
24 of the document.

57

1   **A.**  Yes, I see that comment.

2   **Q.**  And the other handwriting, "Insert NCF" and

3   insert 10 percent breakeven"?

4   **A.**  Yes, I see it.

5   **Q.**  Can you identify whose handwriting that is?

6   **A.**  No, I cannot.

7   **Q.**  And focusing specifically on those two

8   interlineations on the document, does that

9   refresh your recollection as to new conditions

10  required for the credit approval of this loan?

11  **A.**  No, it does not.

12  **Q.**  You said that you didn't have signatory

13  authority with respect to loan approval after

14  the ManuLife acquisition?

15  **A.**  That's right.

16  **Q.**  And seeing this document is not inconsistent

17  with your statement; am I right?

18  **A.**  That's correct.

19  **Q.**  So I see your signature on this. Why is this

20  not your signature -- why isn't -- how is your

21  signature approval changed after ManuLife's

22  acquisition?

23  **A.**  I seem to recall being told that I was now, in

24  effect, recommending with the investment officer

58

1   the investment but not approving it.

2   **Q.**  I see. So to the outside world, the uninformed

3   world, your signing of the loan -- credit

4   approvals was unchanged, but the effect

5   internally at John Hancock was changed?

6   **MR. POPEO:** Objection to the form. If

7   you know.

8   **Q.**  Do I have that right?

9   **A.**  I believe so. I think that's clearly indicated

10  by the approved wording on this document, where

11  those below that were the approvers, and I was

12  not part of that.

13  **Q.**  If I understand correctly -- and I'm trying

14  to -- if we move that "approved by" to the line

15  above your signature, that's the way it was

16  before ManuLife acquired John Hancock? Is that

17  right?

18  **A.**  Prior to the acquisition, I was a member of the

19  loan committee, and the committee approved the

20  loans.

21  **Q.**  Turning to the third page of this document,

22  first of all, is all of Henderson Exhibit 3 a

23  form which was used by Hancock before the

24  acquisition by ManuLife?

59

1   **MR. POPEO:** If you don't mind, is the

2   form that we're looking at of the type that was

3   generally used by Hancock?

4   **MR. SCHER:** Thank you.

5   **A.**  Do I have time to go through this before I

6   answer that question?

7   **Q.**  Absolutely. You have as much time as you need.

8   **A.**  To the best of my recollection, the top four

9   pages were a new addendum that was added at the

10  request of the ManuLife personnel, and the pages

11  after -- fifth page and beyond were what John

12  Hancock used to use.

13  **Q.**  So the page that is Bates-stamped JH 1132, which

14  says at the top "John Hancock Life Insurance

15  Company, a meeting of the mortgage and real

16  estate loan committee was held on," that begins

17  the old John Hancock form; am I right?

18  **A.**  I believe that's correct.

19  **Q.**  And the documents that begin JH 1128 through

20  1131 appear to be documents introduced by --

21  subsequently by ManuLife?

22  **A.**  Correct.

23  (Copy of E-mails was marked Exhibit

24  Number 4 for identification.)

60

1   **Q.**  I'll show you what I've had marked as Henderson

2   Exhibit 4, which is a document Bates-stamped JH

3   00131 and 132. Do you have that before you,

4   sir?

5   **A.**  I do.

6   **Q.**  This appears to be a stream of e-mails -- I

7   don't know -- string of e-mails, I guess, the

8   first of which in time is dated August 11, 2004,

9   at 7:32 p.m., from Tim Malik to Ivor Thomas with

10  copies shown to you and Patricia Coyne. Do you

11  see that?

12  **A.**  I do.

13  **Q.**  And I'd like you to take a minute and review it.

14  You've reviewed it?

15  **A.**  Yes.

16  **Q.**  Does your review of the -- first of all, did you

17  review this document in connection with your

18  preparation for the deposition?

19  **A.**  I saw this document. I didn't read it

20  carefully.

21  **Q.**  Okay. Does the review of the document either

22  now or at the time of your preparation refresh

23  your recollection as to the events surrounding

24  the e-mail?

61

1  **A.**  No, it does not.

2  **Q.**  You have -- Patricia Coyne is shown as a carbon

3      copy recipient. What was her job at the time in

4      connection with this?

5  **A.**  After the merger, she was appointed a member of

6      a brand-new -- I forget what they call it --

7      credit approval group. I don't recall the

8      correct name. So she was involved in the

9      approval of new loans after the merger.

10          MR. POPEO: Just to be clear for the

11      record, the e-mail is August 11, 2004, and your

12      answer and testimony applies to the time period

13      of this e-mail, true?

14          THE WITNESS: True.

15          MR. POPEO: Sorry.

16  **Q.**  This is a form, the second page of which at

17      least appears to be a -- the e-mail from

18      Mr. Malik to you appears to be a form calling

19      for Mr. Thomas, you, and Patricia Coyne to

20      approve. Can you tell me -- can you describe to

21      me what this process was?

22          MR. POPEO: Objection to the form.

23      You may answer the question.

24  **A.**  I'm really not sure. This doesn't appear to me

62

1      to be anything that was done routinely. It's

2      not a standard form. I'm not sure what prompted

3      Tim to do this in this format.

4  **Q.**  I have not seen the version of this e-mail

5      that's been signed. Can you recall having

6      signed this document?

7  **A.**  No, I can't.

8  **Q.**  Do you recall anything in the content of this

9      document regarding -- do you recall that the,

10      capital A, Approval of the loan required a

11      one-to-one coverage based on a 10 percent

12      constant at funding?

13  **A.**  Do I specifically recall that as a condition of

14      this loan?

15  **Q.**  Yes.

16  **A.**  I do not.

17  **Q.**  Was that a condition of all loans at John

18      Hancock at that time?

19  **A.**  As I said earlier, we had a constant -- a sizing

20      constant requirement at John Hancock, and

21      ManuLife had one of their own. I would guess

22      this is ManuLife's.

23          (Copy of E-mail to Mr. Henderson from

24          Mr. Malik, dated August 12, 2004 was

63

1          marked Exhibit Number 5 for

2          identification.)

3  **Q.**  I'll show you what I've had marked as Henderson

4      Exhibit 5, which is a document Bates-stamped JH

5      1175. Do you have that before you, sir?

6  **A.**  I do.

7  **Q.**  And it's an e-mail from Timothy Malik, dated

8      August 12, at 5:32 p.m., to you with a copy to

9      Ivor Thomas on the subject of Avenel. Would you

10      take a moment and review it?

11  **A.**  Yes.

12  **Q.**  When you have, let me know.

13  **A.**  Okay. I've read it.

14  **Q.**  Does it refresh your recollection as to the

15      events surrounding the Avenel loan in or about

16      August 12th, 2004?

17  **A.**  No, it does not.

18  **Q.**  Mr. Malik in this e-mail says, "I may lose the

19      deal because of my conservatism," words to that

20      effect. Do you have any understanding what he

21      meant by that?

22          MR. POPEO: Objection. You can

23      answer.

24  **A.**  It sounds like he felt a need to modify the

64

1      underwriting or he might lose the deal to

2      competition. I don't know for sure. I can only

3      speculate that's what he intended.

4  **Q.**  So you have no recollection of any manipulation

5      of the numbers which the prospective borrower

6      submitted to John Hancock in order to meet John

7      Hancock's requirements?

8  **A.**  We approved many, many loans every year and

9      evaluated many, many more than that. To

10      remember tweaking the underwriting on one loan,

11      I just don't.

12  **Q.**  Is tweaking the underwriting something that John

13      Hancock does routinely?

14  **A.**  As I indicated earlier, we had a published set

15      of underwriting guidelines. They're entitled as

16      such for a reason. They're not policies.

17      They're not set in stone. They're guidelines,

18      and the loan officers are free to deviate from

19      them where they feel it's justified so long as

20      they can show justification for their action and

21      convince the approval authority it's the thing

22      to do. That's the way the system operates, is

23      designed to operate that way.

24  **Q.**  Is it your testimony that the borrower is not

65

1    told what the underwriting decisions where?

2        MR. POPEO: Objection to form. You

3    can answer the question.

4  **A.**  The borrower is told if the loan is approved or

5    not.

6  **Q.**  That's it?

7  **A.**  That's essentially it, yes.

8  **Q.**  This particular requirement, the loan sizing

9    requirement, determines the size of the loan,

10    right?

11  **A.**  It's meant to guide you in determining what the

12    size of the loan ought to be, correct.

13  **Q.**  And if a borrower, in this case, Avenel, is

14    seeking a loan of $32 million, would you agree

15    that the borrower -- that it matters to the

16    borrower what the size of the loan that John

17    Hancock is approving is?

18        MR. POPEO: Object to the form of the

19    question. You can answer.

20  **A.**  That's a confusing question. Could you try it

21    one more time, please?

22  **Q.**  Sure. Do you agree that the borrower, in this

23    case, Avenel at Montgomery Square, wanted a

24    particular loan amount to be approved by John

66

1    Hancock, right?

2  **A.**  I believe that every borrower is looking for a

3    particular loan amount to be approved, correct.

4  **Q.**  And if John Hancock had a loan sizing criteria

5    that affected the size of the loan such that the

6    amount the borrower wanted was not going to be

7    achieved, that mattered to the borrower, right?

8        MR. POPEO: Objection. You can

9    answer.

10  **A.**  I believe the only thing that matters to the

11    borrower is what loan amount John Hancock

12    commits to.

13  **Q.**  John Hancock did not commit to a loan amount in

14    this case, did it, as of the time you left?

15  **A.**  I assume we approved the loan. That's why we're

16    here. We had that conversation earlier.

17  **Q.**  We have the approval process that you saw. I'll

18    show you the next one. August 17 is when the

19    next series of signatures appears, so yes.

20  **A.**  I have no -- was that yes, we did --

21  **Q.**  Yes, you did approve the loan. You did

22    participate in the approval of this loan.

23  **A.**  I have no specific recollection of approving

24    this loan or committing this loan to the

67

1    borrower. Again, I assume we're here because we

2    did both of those things. Is that right?

3  **Q.**  If you committed to the borrower, did you commit

4    to loan the borrower $32 million?

5  **A.**  Without reading documents carefully, I can't

6    answer that question.

7  **Q.**  If you committed to loan the borrower

8    $32 million subject to a sizing requirement,

9    would you agree that the loaning of $32 million

10    is not absolute but, rather, conditioned on a

11    sizing requirement?

12        MR. POPEO: Object to the form of the

13    question.

14  **A.**  Whatever conditions there are attached to the

15    funding of the loan are specifically spelled out

16    in the commitment letter. Those are the only

17    conditions that would be used to test whether or

18    not we would fund the loan.

19  **Q.**  And have you ever seen a commitment letter in

20    this case?

21  **A.**  I assume I saw it back when I was involved in

22    2004. I think I glanced at it last Friday

23    afternoon in the binder of documents that I

24    looked at.

68

1  **Q.**  Is the commitment letter the loan application

2    signed by John Hancock?

3  **A.**  When the loan application is countersigned by

4    John Hancock, we then tend to refer to it as the

5    commitment because it, in effect, then binds

6    Hancock to commit the loan subject to the terms

7    in that letter.

8  **Q.**  I see. It looks less like a letter than it does

9    an agreement.

10  **A.**  True enough.

11  **Q.**  But that is your meaning? That is what you're

12    referring to?

13  **A.**  Right.

14  **Q.**  So your testimony is that a $32 million

15    commitment subject to a 10 percent constant

16    approval is a $32 million commitment?

17        MR. POPEO: Object to the form of the

18    question. You can answer.

19  **A.**  I'm confused by the question. A $32 million

20    commitment is subject to the terms and

21    conditions spelled out in the commitment.

22  **Q.**  Well, there were additional conditions set forth

23    in the loan approval. You know that?

24        MR. POPEO: Object to the form.

69

1    **A.**    No, I don't know that.

2    **Q.**    Assume for the purpose of my question that there

3        was a 10 percent constant contained in the loan

4        approval which is not contained in the

5        commitment, the loan application.

6    **A.**    They're independent issues.

7    **Q.**    Okay. And can you explain to me what you mean

8        by that?

9    **A.**    If the approval authorities who signed off on

10       the loan approval felt that all of the

11       information in the loan approval was

12       satisfactory, then they would then authorize the

13       loan officer to commit to the loan subject to

14       the conditions in the commitment.

15    **Q.**    What if the loan approval contains conditions

16       that are not in the application?

17            MR. POPEO: Objection. You can

18       answer.

19    **A.**    Then my understanding based on all the advice I

20       had received from Hancock counsel over the years

21       was that the only conditions that mattered to

22       funding the loan were the conditions contained

23       in the commitment.

24    **Q.**    So why does the loan approval process occur at

70

1       all?

2    **A.**    There would be no commitment without a loan

3       approval.

4    **Q.**    Why is the loan approval anything more than

5       approve the loan application?

6            MR. POPEO: Objection.

7    **A.**    Because as part of the underwriting process, you

8       evaluate the risk of the deal, and that involves

9       running various forms of analysis.

10    **Q.**    So if the forms of analysis show that the

11       $32 million will not be funded under any

12       scenario that is set forth in the loan

13       application, is it fair to say that the

14       underwriting decision is to not fund the

15       $32 million loan while John Hancock is

16       committing to fund the $32 million loan?

17            MR. POPEO: Object to the form.

18    **A.**    John Hancock was never in the habit of investing

19       the time and energy and cost to evaluate and

20       underwrite a loan, which was an extensive amount

21       of time and costs, to commit to a loan we had no

22       intention of funding. That makes no sense.

23    **Q.**    What time and effort -- well, that's what the

24       fees are for, right? The $965,000 in fees that

71

1       were collected on this, the points is to

2       compensate John Hancock for processing and

3       committing to the loan, right?

4            MR. POPEO: Objection. You can

5       answer.

6    **A.**    Our goal at Hancock was not to generate fee

7       income. Our goal was to put earning assets on

8       the books that would generate a long-term income

9       stream.

10    **Q.**    And the way to do that is to loan money?

11    **A.**    Is to close loans.

12            (John Hancock Life Insurance Company

13            Documents were marked Exhibit Number 6

14            for identification.)

15    **Q.**    Mr. Henderson, I'll show you what's been marked

16       Henderson 6, which is a document that's been

17       marked JH 0405 and ending with a map at Page

18       00425. Do you have that document in front of

19       you, sir?

20    **A.**    I do.

21    **Q.**    You can take a moment or as long as you like to

22       review it. The first question I have is it

23       says, "Imaged" at the top there. Do you know

24       what that means?

72

1    **A.**    I suspect it means that document had been imaged

2       into the data processing system where they copy

3       these documents electronically.

4    **Q.**    You'll see on the second page it shows you were

5       out of office and does not have your signature

6       on that.

7    **A.**    Right.

8    **Q.**    Does that mean you didn't recommend this loan?

9    **A.**    I don't know -- it means -- all I can assume is

10       it means what it says, I was out of the office.

11    **Q.**    Okay. Now, this is a -- the same form of

12       document which you -- which was presented to you

13       as the Henderson Exhibit 3, if I'm not mistaken.

14            MR. POPEO: We'll just dig it out.

15    **Q.**    Am I right about that?

16    **A.**    It appears to be the same form.

17    **Q.**    And that the interlineations or the red-lined

18       additions have been included, the "NCF" and the

19       "10 percent breakeven" have been typed into

20       Henderson 6, right?

21    **A.**    Yes.

22    **Q.**    If you'd like to take a moment to review it, I'm

23       going to ask you if you can tell me if you can

24       recall any other changes or any changes at all

73

1    in the loan approval for the Avenel loan.
2  A. I recall no changes, but I don't recall the loan
3    being approved.
4        (Memorandum to Mr. Thomas from
5        Mr. Henderson, dated August 16, 2004 was
6        marked Exhibit Number 7 for
7        identification.)
8  Q. I'll show you what I've had marked Henderson
9    Exhibit 7, and that's a document Bates-stamped
10    JH 1176; and it's another version of that form
11    which you testified you'd not seen before. Do
12    you recall receiving this memorandum from
13    Mr. Malik to Mr. Thomas and you on or about
14    August 16?
15  A. I do not.
16  Q. If you take a moment to review it, tell me if it
17    refreshes your recollection.
18  A. I've read it. It does not refresh my
19    recollection.
20  Q. And you mentioned that Patricia Coyne was given
21    a new title or new responsibilities after the
22    ManuLife acquisition as a credit officer?
23  A. That's right.
24        MR. SCHER: Let me mark the next.

74

1        (Memorandum to Mr. Malik from Ms. Coyne,
2        dated August 17, 2004 was marked Exhibit
3        Number 8 for identification.)
4  Q. I show you what I've had marked as Henderson
5    Exhibit 8. Is that right?
6        MR. POPEO: Yes.
7  A. Yes.
8  Q. And it is a copy of a document Bates-stamped JH
9    1174. Appears to be from Patricia Coyne to
10    Timothy Malik. Does not show your name anywhere
11    on it. I ask you to take a look at it and tell
12    me if you can tell me what it is.
13  A. I think as a part of Patty Coyne's new
14    responsibilities that were created when ManuLife
15    took over, one of the requirements was she issue
16    this type of memo after each loan was approved.
17  Q. And this sets forth the terms and conditions of
18    the approval of the loan. Do I have that right?
19  A. It sets forth some of the terms and conditions.
20    I don't know if it's all the terms and
21    conditions.
22  Q. Okay. And in particular, if you look at the
23    disbursement requirements, these -- the
24    disbursement requirements are the requirements

75

1    that must be met before disbursement of the loan
2    is made; do I have that right?
3  A. Generally speaking, that's what disbursement
4    requirements mean, correct.
5  Q. And is that -- is it fair to say that your
6    understanding was that after ManuLife assumed
7    responsibility or acquired the company that
8    Patricia Coyne -- Patricia Coyne's job was to
9    set forth the terms and conditions under which
10    the loan would be disbursed?
11        MR. POPEO: Objection.
12  A. My understanding was she was to issue a memo
13    like this one.
14  Q. Okay. Do you know who Jessica Leveroni was?
15  A. I believe she was one of the in-house attorneys
16    at Hancock.
17  Q. And did her duties and responsibilities include
18    collecting those materials necessary for the
19    closing of loans?
20  A. Yes.
21  Q. And --
22  A. Excuse me. Could I just correct that?
23  Q. Yes.
24  A. My understanding was she would collect the legal

76

1    documentation for closing the loan.
2  Q. Including title insurance?
3  A. I would guess she would have reviewed the title
4    insurance, sure.
5        MR. POPEO: Just what you know,
6    please.
7  Q. Now, if Timothy Malik testified that he had a
8    lunch with the prospective borrowers in May of
9    2005 and that following that lunch, he reported
10    to you what had transpired and that -- would you
11    say he's just mistaken?
12        MR. POPEO: Object to the form. You
13    can answer the question.
14  A. I can't imagine what would prompt him to say
15    such a thing. Obviously, I was long gone.
16  Q. And if he were to testified that you came
17    back to him after he reported what had
18    transpired at the lunch and you told him that
19    John Hancock had decided to seek damages from
20    the prospective borrower, would you say he was
21    mistaken?
22        MR. POPEO: Same objection. You can
23    answer the question.
24  A. Did you say this was in May of 2005?

77

1   Q.   After May 31, 2005.
2   A.   I don't recall such conversation.
3   Q.   Have you had any conversations with Mr. Malik
4        since you left the company on the subject of the
5        Avenel loan?
6   A.   None that I can recall.
7   Q.   On the subject of any loans?
8   A.   None that I can recall.
9   Q.   On any subject?
10  A.   I've spoken to Tim Malik less than ten times
11       since I left.
12  Q.   And you talk about your boat and other stuff or
13       you talk about business?
14  A.   I can't recall the content of any of the
15       conversations. They've been brief, and they are
16       probably, now that I think about it longer, five
17       or six times or less since I left John Hancock.
18  Q.   Five or six times or fewer, and none included
19       his reporting to you what transpired in
20       connection with a meeting with the borrowers or
21       prospective borrowers of Avenel, right?
22  A.   None that I recall.
23  Q.   And none included a conversation in which you
24       reported the decision by John Hancock to sue or

78

1        pursue damages from the prospective borrowers?
2   A.   I reported?
3   Q.   You reported.
4   A.   I have no recollection of such a conversation.
5   Q.   It has to be wrong; doesn't it?
6            MR. POPEO: Objection.
7   A.   I would have no way to know.
8   Q.   You would know if you reported a decision by
9        John Hancock to pursue damages against the
10       borrowers; wouldn't you?
11  A.   I can't remember it.
12  Q.   Did you ever learn that John Hancock -- other
13       than in preparation for this deposition, did you
14       ever learn that John Hancock decided to pursue
15       damages against the prospective borrowers of the
16       Avenel project?
17  A.   I don't recall knowing it.
18  Q.   If you don't recall knowing it, are you prepared
19       to say you don't recall reporting it to
20       Mr. Malik?
21  A.   Yes, I am.
22  Q.   Do you recall Mr. Malik reporting to you that
23       the prospective borrowers at the Avenel at
24       Montgomery Square property had decided to pursue

79

1        other options, in particular, the possible sale
2        of the property to a third party?
3            MR. POPEO: Objection.
4   A.   No, I don't recall.
5   Q.   Did you know that before I had it in my question
6        today? Did you know that the owners of the
7        Avenel property had decided to sell it?
8            MR. POPEO: Objection.
9   A.   I believe counsel had mentioned that to me last
10       Friday afternoon.
11  Q.   And that was the first time you learned it?
12           MR. POPEO: First of all, I object.
13       He's testified he doesn't recall. Second of
14       all, please don't report on any conversations
15       between you and counsel regarding anything. You
16       may answer the question.
17           THE WITNESS: Thank you.
18  Q.   Let's do it this way, the easy way. Other than
19       in a privileged communication between you and
20       counsel, do you have any knowledge whatsoever
21       regarding an intention by the prospective
22       borrowers at the Avenel at Montgomery Square
23       property to sell that property?
24  A.   No, no recollection.

80

1   Q.   Have you ever participated in any way in the
2        calculation of on-line costs that the
3        prospective borrowers of the Avenel property
4        would have to pay John Hancock?
5   A.   I don't recall ever being involved in that.
6   Q.   Do you have any recollection of the prospective
7        borrowers at the Avenel at Montgomery Square
8        property communicating the occupancy level at
9        the property, the rental occupancy level at the
10       property?
11  A.   No, no recollection.
12  Q.   At the time that the internal loan approval was
13       completed, can you tell me -- you describe --
14       strike that. You described to me what you
15       understood happened when the rate lock was
16       completed, what economic consequence of that
17       agreement was. Can you tell me what economic
18       consequence, if any, resulted from the loan
19       approval process?
20           MR. POPEO: Object to the form.
21       Generally speaking?
22           MR. SCHER: At John Hancock.
23           MR. POPEO: As a general matter?
24           MR. SCHER: Yes.

81

1  **A.**  I'm not sure I understand the question. Could
2  you try it again, please?
3  **Q.**  Okay. So let's just take the Henderson Exhibit
4  6. As a consequence of the action which
5  Henderson 6 evidences -- you've called it loan
6  approval, I think --
7  **A.**  Uh-huh.
8  **Q.**  -- what economic changes occurred, if any? In
9  other words, was $32 million put into an escrow
10  account or not? I don't want to know the answer
11  to that specific question. I'm giving you an
12  example of an economic consequence. Can you
13  give me an example of any economic consequence
14  that resulted from the Henderson 6 loan
15  approval?
16       MR. POPEO: Object to form. You can
17  answer if you can.
18  **A.**  No, I cannot describe the economic consequences.
19  **Q.**  Now, back in the day when John Hancock before
20  acquisition after the loan committee met and
21  approved the loan in a forward commitment, what
22  economic consequence occurred?
23       MR. POPEO: Objection. You may
24  answer.

82

1  **A.**  When the loan committee approved?
2  **Q.**  Yes.
3  **A.**  Well, as I testified earlier, we would have
4  locked the rate, and Hancock would have hedged
5  the investment at that point.
6  **Q.**  Any other consequence?
7  **A.**  None that I'm aware of.
8  **Q.**  So if I have it right, when John Hancock
9  approved the loan on or about August 16, 2004,
10  other than the hedge loss which you testified
11  about or -- the hedge cost, there were no other
12  economic consequences?
13       MR. POPEO: Object to the form of the
14  question. You may answer the question if you
15  can.
16       MR. SCHER: What's the basis?
17       MR. POPEO: It mischaracterizes the
18  testimony.
19       MR. SCHER: Okay.
20  **Q.**  Other than what you described as the consequence
21  of the rate lock, from the time that the loan
22  application was made until the loan was approved
23  on August 16, there were no economic
24  consequences, right?

83

1  **A.**  I'm sorry. I just got distracted. From the
2  time the loan was -- could you repeat that last
3  part?
4  **Q.**  Let's start from the beginning. As of the time
5  of the loan approval on August 16, 2004, as of
6  that date, there were no economic consequences
7  resulting from the loan approval itself?
8       MR. POPEO: Objection. Answer.
9  **A.**  I've already said that purchasing the hedge
10  would have been an economic consequence.
11  **Q.**  That occurred in this case on August 1st or 2nd.
12  So we're at August 16, and I'm asking you what
13  changes -- economic changes occurred following
14  the August 16 loan approval?
15  **A.**  None that I can think of.
16       MR. SCHER: Okay. Why don't we take a
17  short break if you don't mind.
18       (Recess taken from 11:11 a.m. to
19       11:16 a.m.)
20  **Q.**  At the time the loan approval occurred on
21  August 16, 2004, was there any allocation of
22  funds or setting aside of funds that occurred in
23  connection with the loan application?
24       MR. POPEO: Objection.

84

1  **A.**  It simply wasn't a part of my job
2  responsibility. My responsibility was
3  origination of new loans. There were other
4  people at Hancock who handled that part of it.
5  **Q.**  Who were they?
6  **A.**  When we locked a rate, the people who allocated
7  the funds sat down that handled the form. I'm
8  sorry. I'm trying to think of their names, and
9  they're not coming to me.
10  **Q.**  Titles are fine.
11  **A.**  They were part of Barry Nectow's capital markets
12  group, reported to Barry.
13  **Q.**  So when the rate lock occurred, the hedge was
14  acquired, and you've already described to me if
15  the interest rates went the wrong way, that
16  would cost money; if the interest rates went the
17  right way, that would not cost money?
18  **A.**  Correct.
19  **Q.**  Other than that, there was no setting aside or
20  allocating of funds, as far as you know?
21       MR. POPEO: Objection.
22  **A.**  I don't know. That wasn't my concern.
23  **Q.**  So in all of your years at John Hancock, you
24  were never made aware of any allocation or

85

1    setting aside of funds following a loan
2    approval?  Am I right?
3  A.  I was not aware of any specific allocation of
4    funds.  However, that was not part of my job
5    responsibility.
6  Q.  Understood.  I understand why you didn't know of
7    any.  I just want to know, did you know of any
8    allocation or setting aside of funds as a
9    consequence of a loan approval?
10 A.  No.
11 Q.  And as -- did you know of any expenses incurred
12    by John Hancock in connection with the Avenel
13    loan approval other than the hedge loss or the
14    hedge commitment that resulted from the interest
15    rate lock?
16 A.  I don't remember any of the specifics
17    surrounding the Avenel loan.
18 Q.  Do you know Diane Crisilleo?
19 A.  That's one of the names I couldn't think of.
20    Diane Crisilleo, I think is how she pronounces
21    it.
22 Q.  And she is somebody who sits on the other side
23    of the room or sat on the other side of the
24    room?

86

1  A.  Other side of the floor.  Worked for Barry.
2        MR. SCHER:  I have no other questions.
3        MR. POPEO:  I have no questions.
4        (Deposition concluded at 11:20 a.m.)

87

C E R T I F I C A T E
I, DAVID B. HENDERSON, do hereby certify that
I have read the foregoing transcript of my
testimony, given on March 1, 2006, and I further
certify that said transcript is a true and
accurate record of said testimony (with the
exception of the corrections listed below):
Page     Line        Correction

Dated at _____, this _____

day of _____, 2006.

_____
DAVID B. HENDERSON

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

slb

88

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, SS
I, Sandra L. Bray, Registered Diplomate
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, do hereby
certify:
That DAVID B. HENDERSON, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is a
true record of my stenotype notes taken in the
foregoing matter, to the best of my knowledge,
skill and ability.
IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of March, 2006.

_____
Sandra L. Bray, RDR
Registered Diplomate Reporter

## Page 1

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
              CIVIL ACTION NO. 05-11614-WGY
       **********************************
       JOHN HANCOCK LIFE INSURANCE
       COMPANY,
                   Plaintiff/Counterclaim
                   Defendant
               Vs.
       VESTMONT LIMITED PARTNERSHIP,
       VESTMONT LIMITED PARTNERSHIP II,
       VESTMONT LIMITED PARTNERSHIP III,
       and VESTERRA CORPORATION d/b/a
       MONTGOMERY SQUARE PARTNERSHIP,
                   Defendants/Counterclaim
                   Plaintiffs
       **********************************
                        VOLUME:  I
                        PAGES:  1-66

          DEPOSITION OF BARRY S. NECTOW
                    MARCH 10, 2006
                    REPORTERS, INC.
        GENERAL & TECHNICAL COURT REPORTING
        23 MERRYMOUNT ROAD, QUINCY, MA 02169
        617.786.7783/Facsimile 617.786.7723
```

## Page 2

1  DEPOSITION of BARRY S. NECTOW, a witness
2  called on behalf of the Defendants/
3  Counterclaim Plaintiffs, pursuant to the
4  Federal Rules of Civil Procedure, before
5  Judith McGovern Williams, Certified
6  Shorthand Reporter, Registered
7  Professional Reporter, Certified Realtime
8  Reporter, Certified LiveNote Reporter, and
9  Notary Public in and for the Commonwealth
10  of Massachusetts, at the offices of
11  Deutsch, Williams, Brooks, DeRensis &
12  Holland, P.C., 99 Summer Street, Boston,
13  Massachusetts, on Friday, March 10, 2006,
14  commencing at 12:50 p.m.
15
16  APPEARANCES:
17  CHOATE, HALL & STEWART, L.L.P.
18    Paul D. Popeo, Esquire
19    Two International Place
20    Boston, Massachusetts  02110
21    617-248-5000
22    ppopeo@choate.com
23    on behalf of the Plaintiff/
24    Counterclaim Defendant

## Page 3

1  APPEARANCES (Continued):
2
3  BUCHANAN INGERSOLL, P.C.
4    Howard D. Scher, Esquire
5    1835 Market Street
6    14th Floor
7    Philadelphia, Pennsylvania  19103-2985
8    215-665-3920
9    scherhd@bipc.com
10      and
11  DEUTSCH, WILLIAMS, BROOKS, DeRENSIS &
12  HOLLAND, P.C.
13    Robert D. Hillman, Esquire
14    99 Summer Street
15    Boston, Massachusetts  02110-1213
16    617-951-2300
17    rhillman@dwboston.com
18    both on behalf of the Defendants/
19    Counterclaim Plaintiffs
20
21
22
23
24

## Page 4

```
1              I N D E X
2  Witness                              Page
3  BARRY S. NECTOW
4    Direct Examination by Mr. Scher      5
5
6
7
8
9            E X H I B I T S
10  Number                              Page
11
12    1  Multipage document, first      31
13       page headed Interest Rate
14       Circle Notification,
15       JH 01109 through 01117
```

Page 5

```
1              P R O C E E D I N G S
2              MR. SCHER:  Would you administer
3    the oath to the witness?
4              - - -
5              BARRY S. NECTOW, first having
6    been duly sworn, testified as follows in
7    answer to direct examination by MR. SCHER:
8              - - -
9    Q.   Would you state your full name for the
10        record, please?
11   A.   Barry Nectow.
12   Q.   And your home residence is?
13   A.   541 Grove Street, Needham, Massachusetts.
14   Q.   And by whom are you currently employed?
15   A.   ARCAP, A-R-C-A-P, REIT, Inc.
16   Q.   And where are they located?
17   A.   Boston and Dallas.
18   Q.   And where are you officed?
19   A.   In Boston, 125 Summer Street.
20   Q.   And what position do you hold?
21   A.   Managing director, loan origination.
22   Q.   What are your duties and responsibilities
23        in general terms?
24   A.   We are a commercial real estate lender,
```

Page 6

```
1         and I head up the team that makes
2         commercial real estate loans.
3    Q.   When did you leave John Hancock?
4    A.   July 27th or July 29th.
5    Q.   And that would be 2005?
6    A.   Yes.
7    Q.   And what did you do for John Hancock while
8         you were employed with them?
9              MR. POPEO:  Objection.
10             You can answer.
11   Q.   When did you start with John Hancock?
12   A.   In 1989.
13   Q.   What had you done prior to 1989?  Had you
14        been employed?
15   A.   Yes.
16   Q.   By whom?
17   A.   US Trust Company.
18   Q.   And before that?
19   A.   College.
20   Q.   Where did you go to college?
21   A.   Bentley College.
22   Q.   And what year did you graduate?
23   A.   1982.
24   Q.   And what concentration or degree did you
```

Page 7

```
1         receive?
2    A.   A B.S. in finance.
3    Q.   And then you went to work for US Trust?
4    A.   Correct.
5    Q.   And what position did you start out in?
6    A.   I was a trainee.
7    Q.   And what position did you leave?
8    A.   I was a commercial lender.
9    Q.   Okay.  And what position did you take with
10        John Hancock when you joined them?
11   A.   Commercial real estate lender.
12   Q.   Could you just report to me when your
13        positions changed at John Hancock and what
14        they changed to, your employment history
15        at John Hancock?
16   A.   I don't know the specific dates.
17   Q.   That's okay.
18   A.   You know, I worked my way up through the
19        commercial real estate finance
20        organization and over the 16 years I was
21        there.
22   Q.   And at the time that Manulife acquired
23        John Hancock, which is April 28, 2004,
24        what was your position?
```

Page 8

```
1    A.   It was a vice -- assistant -- assistant
2         vice president in the real estate
3         investment group.
4    Q.   The acronym is REIG?
5    A.   Yes.
6    Q.   And you were an AVP in the REIG?
7    A.   Yes.
8    Q.   And who reported to you?
9    A.   I couldn't name everybody.
10   Q.   Patricia Coyne?
11   A.   Not directly.
12   Q.   Okay.  What group within REIG were you
13        assistant vice president?  Or just the
14        entire group?
15   A.   I was an assistant vice president in the
16        real estate investment group, right, so --
17   Q.   Did you have any particular
18        responsibilities in that group?
19   A.   Yes.
20   Q.   What side?
21   A.   I was in the commercial mortgage group --
22        commercial mortgage area.  Commercial
23        mortgage-backed securities.  That is
24        probably the most relevant.
```

Page 9

1  Q.  Have you heard of teams within the real
2      estate investment group, the investment
3      team and the credit team?  Have you heard
4      it described that way?
5  A.  Yes.
6  Q.  Were you involved with one team or the
7      other?
8  A.  Do you want to put a date on that?
9  Q.  Oh, okay.  At April 28, 2004, the date on
10     which Manulife acquired John Hancock.
11 A.  I was involved in those functions, but
12     that is not what they were called then.
13 Q.  Okay.  Subsequent to the acquisition,
14     there were some changes made at John
15     Hancock?
16 A.  Correct.
17 Q.  And let's turn to the summer of 2004.
18     What, if any, changes occurred with
19     respect to your title by August of 2004?
20 A.  August of 2004?
21 Q.  Sixty, ninety days.
22 A.  I don't recall if my title had changed
23     then.
24 Q.  Were there any changes in your duties and

Page 10

1      responsibilities?
2  A.  Yes.
3  Q.  And what were they?
4  A.  Subtle -- subtle changes due to the new
5      ownership of the company; functionally not
6      many.
7  Q.  Okay.  Could you describe any of the --
8      can you describe those subtle changes?
9  A.  I think the changes would have occurred
10     more in the process in which we did things
11     rather than what the organization did.
12 Q.  Okay.
13 A.  For instance, a change due to different --
14     different people being involved in
15     transactions that may or may not have been
16     with the company premerger.
17 Q.  Okay.  So let's put some flesh on this
18     abstract discussion.  Ivor Thomas joins
19     the company?
20 A.  Yes.
21 Q.  From Manulife?
22 A.  Correct.
23 Q.  Right?
24 A.  Yes.

Page 11

1  Q.  And as a result of which he takes on some
2      duties and responsibilities?  He is senior
3      to you; right?
4  A.  Correct.
5  Q.  And there are changes implemented.  The
6      one I have heard is that the loan approval
7      process had been the committee process,
8      and it changed to the signature process?
9  A.  Correct.
10 Q.  Were there any other changes like that
11     that occurred on that level?
12         MR. POPEO:  Objection.
13 A.  That would be the biggest change.
14 Q.  Okay.  Were there any policies that
15     changed after Manulife's acquisition which
16     were implemented by the summer of 2004?
17 A.  Yes.
18 Q.  What policy changes occurred?
19 A.  I think we adopted Manulife's policies and
20     procedures or began to.  I'm not -- I'm
21     not certain they were all implemented by
22     August of 2004.
23 Q.  Before you is an unmarked document.  It is
24     called John Hancock Real Estate Financial

Page 12

1      Group Lending Guidelines, January 25,
2      2005.  Is this the body of policies that
3      -- under which you operated while you were
4      at John Hancock, putting aside the date?
5          MR. POPEO:  Objection.
6  A.  Without seeing what is in there, I'm not
7      -- I can't be certain.
8  Q.  Okay.  But it was -- these, the policy
9      changes, were reflected in a document that
10     was a looseleaf document that changed from
11     time to time, but essentially it was the
12     lending guidelines; right?
13 A.  Essentially, yes.
14 Q.  Okay.  Your testimony is over time, from
15     the time of the acquisition until the time
16     you left the company, various of
17     Manulife's policies were introduced and
18     incorporated into the policies of John
19     Hancock?
20 A.  Correct.
21 Q.  Is that right?
22 A.  Correct.
23 Q.  Can you identify any of them?  Can you
24     report any of them to me, any of those

Page 13

1    policy changes?
2  A.  I think what I can suggest is that Hancock
3      may have had a similar policy, and it may
4      have been replaced by a Manulife policy
5      that may or may not have been
6      substantially similar.
7  Q.  Did you have supervisory responsibility
8      for Tim Malik, the investment officer?
9  A.  Yes.
10 Q.  And did you report to --
11 A.  I'm sorry. Let me go back for one second.
12 Q.  Sure.
13 A.  Directly? Indirectly?
14 Q.  Directly or indirectly.
15 A.  That's a question?
16 Q.  Yes.
17 A.  Yes.
18 Q.  And to whom did Mr. Malik report directly?
19 A.  Tim Roseen.
20 Q.  And did Mr. Roseen report to you?
21 A.  Yes.
22 Q.  Are you aware of any Manulife or John
23     Hancock policies which govern the
24     occasions when a loan application would

Page 14

1      need to be amended?
2         MR. POPEO: Objection.
3  A.  I'm not sure I understand the question.
4  Q.  You are familiar with the loan application
5      process, I take it?
6  A.  Yes.
7  Q.  And you know that the loan application
8      contains a variety of terms and
9      conditions, including loan amount and
10     duration of the loan, interest rate, so
11     forth; right?
12 A.  Yes.
13 Q.  In connection with the approval of a loan
14     application, are there policies or
15     guidelines which govern when an
16     application would need to be amended
17     because the approval would not be given as
18     the application -- in the form in which
19     the application was made?
20        MR. POPEO: Objection.
21 Q.  Do you follow me?
22 A.  I think you asked a lot of questions
23     there.
24 Q.  Okay. Can you answer any of them?

Page 15

1         MR. POPEO: Which one would you
2      like an answer to?
3  Q.  Are there policies or guidelines which
4      govern when an application would need to
5      be amended?
6  A.  No.
7  Q.  Is that amendment decision in the
8      discretion of the investment officer? The
9      decision whether or not to seek an
10     amendment of the loan application, is that
11     in the discretion of the loan officer?
12        MR. POPEO: Objection.
13        You can answer.
14 A.  No.
15 Q.  What governs -- what controls the loan
16     officer's discretion? What governs that?
17        MR. POPEO: Objection.
18 A.  I think it depends on the circumstance.
19 Q.  All right. Well, give me an example of a
20     circumstance where a loan officer would
21     not have the discretion to amend or not.
22        MR. POPEO: Objection.
23        You can answer.
24        THE WITNESS: What is that?

Page 16

1         MR. POPEO: You can answer the
2      question, if you can.
3  A.  To reduce the interest rate.
4         THE WITNESS: Can we stop for
5      one second?
6         MR. SCHER: Sure. Yes.
7         THE WITNESS: Can you talk to me
8      one second?
9         MR. POPEO: Sure.
10        (Recess taken at 1:05 p.m.)
11        (Recess ended at 1:06 p.m.)
12        THE WITNESS: I need a point of
13     clarification.
14 BY MR. SCHER:
15 Q.  Sure. You conferred with your counsel,
16     and now you would like a point of
17     clarification?
18 A.  Correct.
19 Q.  Sure.
20 A.  The point of clarification is when you are
21     referring to the loan application, --
22 Q.  Yes.
23 A.  -- are you referring to the loan
24     application prior to the transaction being

4 (Pages 13 to 16)

Page 17

1    approved or --
2  Q.  Yes.
3  A.  Okay.  Then can we back up and ask the
4      same questions again?  Because I think I
5      would answer them differently.
6  Q.  Okay.  Let's go over the process then.
7      The words that I am using are the words
8      that I think I heard Patricia Coyne use,
9      and that is why I am using them, but let's
10     back up.
11         MR. POPEO:  Let's back up.  The
12     issue is merely he is confused, and he
13     wants to make sure that his testimony is
14     accurate.
15         MR. SCHER:  Absolutely.
16         MR. POPEO:  It is nothing more.
17         MR. SCHER:  I understand.  And
18     we need to get on the same page or this is
19     going to be a mess.  Nobody is going to
20     know what we're talking about.
21     BY MR. SCHER:
22  Q.  So here is Coyne exhibit 5.  It is a
23      document that was marked previously.
24         (Handing Coyne exhibit number 5

Page 18

1      to the witness.)
2  Q.  If I may take it from your hands.
3         (Handing Coyne exhibit number 5
4      back to counsel.)
5  Q.  Now this is a loan application, as I
6      understand it, until -- until it is signed
7      by John Hancock?  Do I have that right?
8  A.  Correct.
9  Q.  And after it is signed by John Hancock,
10     which in this case it has been, it becomes
11     a loan commitment?
12  A.  Correct.
13  Q.  And as I understand the process, while it
14     is a loan application, while it is still
15     in the application form, it is -- there is
16     an approval process that occurs at John
17     Hancock?
18  A.  Correct.
19  Q.  And that the signature by John Hancock on
20     the loan application which converts it to
21     a commitment is the result of that
22     approval process?
23  A.  Correct.
24  Q.  So my question is are there policies or

Page 19

1      procedures for investment officers to --
2      by which investment officers are governed
3      which tell them when a loan application
4      needs to be modified in order to secure
5      approval?
6         MR. POPEO:  Objection.
7         You can answer.
8  A.  No.
9  Q.  And so it is in the discretion of the
10     investment officer to seek or not to seek
11     an amendment to the application in order
12     to secure approval?
13  A.  Yes.
14  Q.  All right.  I am not intending to play a
15     kind of logical game or something with
16     you.  I am really trying to understand.
17         You said that if the loan
18     approval were at a -- I think you said
19     lower interest rate than the application,
20     that the application would have to be
21     modified; right?
22  A.  That's the point that I got confused.
23  Q.  Okay.
24  A.  Because that -- that -- I -- what I

Page 20

1      thought you were asking was if the
2      commitment were to be changed, does the
3      investment officer have the authorization
4      -- I forget what words you used.
5  Q.  Required to go back to the borrower and
6      seek an amendment.
7  A.  But you are now asking that same question
8      in the context of the loan application?
9  Q.  Yes.
10  A.  And the investment officer has the -- has
11     the ability to change the application
12     prior to proposing the transaction
13     embedded in the application for approval?
14  Q.  Okay.  What I am trying to understand is
15     this is not -- I assume that this is not
16     an all or nothing --
17         MR. SCHER:  Strike that.
18  Q.  As I understand it, after the application
19     has been made and while the application --
20     while the loan proposal is in the
21     recommendation process going from
22     signatory to signatory, through the
23     process, that there are occasions where
24     the signatory can decline to recommend?

Page 21

1           MR. POPEO:  Objection.
2    Q.    Am I right about that?
3           MR. POPEO:  Objection.
4           You can answer.
5    A.    Yes.
6    Q.    So in this particular instance, we have a
7          loan approval -- we have several loan
8          approvals of this particular loan -- but
9          this appears to be the last one, and we
10         have Mr. Malik as the -- this is Coyne
11         exhibit 3 -- we have Mr. Malik signing on
12         August 16, and then we have Patricia Coyne
13         signing on August 16.
14              Assume for the purposes of my
15         question that she declined to sign, she
16         declined to recommend this loan at that
17         point, and because for whatever reason.
18         Would the investment officer have an
19         opportunity to go back to the borrower and
20         suggest an amendment to the application so
21         as to secure the approval of the next
22         recommender in line?
23              MR. POPEO:  Objection.
24   A.    Yes.

Page 22

1              THE WITNESS:  Sorry.
2              MR. POPEO:  That's all right.
3    Q.    Are there any guidelines that would
4          suggest when such a -- when such a
5          renegotiation of the loan application
6          occurs, should occur?
7              MR. POPEO:  Objection.
8    A.    None that I'm aware of.
9    Q.    So it is within the discretion of the
10         investment officer as to whether or not to
11         seek an amendment of a loan application;
12         is that right?
13   A.    At that point in time, yes.
14   Q.    Okay.  Now if the investment officer
15         learned that the proposed amendment would
16         break the deal, that is cause the borrower
17         to abandon the application, would that
18         suggest to the investment officer that he
19         ought not take the proposed amendment to
20         the borrower?
21              MR. POPEO:  Objection.
22   A.    Can you ask the question again, please?
23   Q.    Sure.  If let's say the proposed
24         modification were the introduction of a

Page 23

1          10 percent constant requirement in a loan,
2          a loan sizing requirement there was a loan
3          sizing requirement, that came up in the
4          approval process, and the loan investment
5          officer tested the waters and discovered
6          that the borrower would not sign a loan
7          application that contained a loan sizing
8          requirement that was being discussed in
9          the approval process, what discretion did
10         the investment officer have to not require
11         that amendment?
12              MR. POPEO:  Objection.
13   A.    The loan sizing requirement is a -- is an
14         underwriting criteria.
15   Q.    Yes.
16   A.    So it doesn't really transfer to an
17         amendment to the, at that point, the
18         application.
19   Q.    Why then would the investment officer
20         raise a question regarding the
21         acceptability of a loan sizing requirement
22         to the borrower?  Why would he communicate
23         the requirement at all --
24              MR. POPEO:  Objection.

Page 24

1    Q.    -- if it didn't matter to the borrower, --
2              MR. POPEO:  Objection.
3    Q.    -- if it wasn't the borrower's business?
4              MR. POPEO:  Sorry.  Objection.
5    A.    I don't know.
6    Q.    So is it fair to say that you can't offer
7          me any explanation as to why John Hancock
8          would ask or inform the prospective
9          borrower of the existence of a new
10         underwriting criteria like the 10 percent
11         constant; is that right?
12              MR. POPEO:  Objection.
13   A.    I'm not sure.  Is that --
14   Q.    Yes.  The question is --
15   A.    I don't quite get the question.
16   Q.    Because you didn't know where I was going
17         when I began it, so let me just give you
18         the beginning, and I'm not sure I did
19         either, but anyway.
20              (Laughter.)
21   Q.    Can you explain to me why John Hancock's
22         investment officer would inform a
23         prospective borrower of the existence of a
24         new underwriting criteria like the

Page 25

| | |
|---|---|
| 1 | 10 percent constant? Can you offer any |
| 2 | explanation as to why? |
| 3 | MR. POPEO: Objection. |
| 4 | A.  No. |
| 5 | Q.  Does it make any sense to you at all? |
| 6 | MR. POPEO: Objection. |
| 7 | A.  No. |
| 8 | Q.  Let's just continue with your progress at |
| 9 | John Hancock after the Manulife |
| 10 | acquisition. You reported to me some |
| 11 | changes had begun or an evolutionary |
| 12 | process. Did any of those changes include |
| 13 | the introduction of an underwriting |
| 14 | requirement, a 10 percent constant |
| 15 | underwriting requirement? |
| 16 | MR. POPEO: Objection. |
| 17 | A.  Yes. |
| 18 | Q.  And when did that requirement -- when was |
| 19 | that introduced? Do you remember? |
| 20 | A.  No. |
| 21 | Q.  How was it introduced? |
| 22 | A.  How was it introduced? I don't -- I don't |
| 23 | recall. |
| 24 | Q.  Did Mr. Thomas have anything to do with |

Page 26

| | |
|---|---|
| 1 | the introduction of that underwriting |
| 2 | requirement? |
| 3 | A.  Yes. |
| 4 | Q.  And how was the introduction of that |
| 5 | underwriting requirement implemented? |
| 6 | A.  I don't recall. |
| 7 | Q.  Do you recall whether the 10 percent |
| 8 | constant requirement was introduced for |
| 9 | the first time in connection with the |
| 10 | Avenel loan? |
| 11 | MR. POPEO: I object. |
| 12 | A.  Do I recall if it was introduced? |
| 13 | Q.  Correct. |
| 14 | A.  No. |
| 15 | Q.  Do you recall approximately when it was |
| 16 | first introduced? |
| 17 | A.  No, I don't recall. |
| 18 | Q.  About August of 2004? |
| 19 | A.  It may have been. I don't recall. |
| 20 | Q.  Okay. Are you aware of the preparation of |
| 21 | an amended loan application in connection |
| 22 | with the Avenel loan? |
| 23 | A.  No. |
| 24 | Q.  Following the summer of 2004, can you tell |

Page 27

| | |
|---|---|
| 1 | me were there any other changes to your |
| 2 | duties and responsibilities at the company |
| 3 | other than the subtle changes that you |
| 4 | described? |
| 5 | A.  No. |
| 6 | Q.  What occasioned your leaving the company? |
| 7 | A.  I got a job offer that was attractive to |
| 8 | me from a -- my current employer. |
| 9 | Q.  Were you looking for work? |
| 10 | A.  No. |
| 11 | Q.  Were you in the job market? |
| 12 | A.  No. |
| 13 | Q.  Who replaced you? |
| 14 | (Pause.) |
| 15 | Q.  Irreplaceable? |
| 16 | A.  Yes. |
| 17 | Q.  Is that the word that you were seeking? |
| 18 | (Laughter.) |
| 19 | MR. POPEO: That's obvious, but |
| 20 | if you know the answer to the question, |
| 21 | you can answer it. |
| 22 | A.  I don't know the specific answer. |
| 23 | Q.  Do you have a recollection of the Avenel |
| 24 | deal? |

Page 28

| | |
|---|---|
| 1 | A.  I don't have specific recollection of it. |
| 2 | Q.  Do you have a general recollection of it? |
| 3 | A.  I can't give you a lot of specifics about |
| 4 | it. I have a general idea about deals |
| 5 | that we were doing at the time but not |
| 6 | specific to this deal. |
| 7 | Q.  Okay. Did you do anything to prepare for |
| 8 | this deposition today? |
| 9 | A.  Not -- not -- nothing in particular. |
| 10 | Q.  Did you meet with counsel? |
| 11 | A.  I did. |
| 12 | Q.  What was the duration of that meeting? |
| 13 | A.  Maybe an hour, an hour and a half. |
| 14 | Q.  When was it? |
| 15 | A.  A couple of weeks ago, two weeks ago. |
| 16 | Q.  Did you review any documents? |
| 17 | A.  Not specific documents. |
| 18 | Q.  Did you review general documents? |
| 19 | A.  Well, I looked at a -- a -- I looked at |
| 20 | documents. |
| 21 | Q.  Oh, you did? |
| 22 | A.  I don't know what specific documents, but |
| 23 | there were documents. |
| 24 | Q.  Did you look at documents with your name |

Page 29

1    on it?
2            MR. POPEO: Did some of the
3    documents that he reviewed have his name
4    on it?
5  A.  Yes.
6  Q.  Did that refresh your recollection with
7    respect to this loan or anything about it?
8  A.  Not particularly.
9  Q.  Did it generally?
10 A.  No. Not really.
11 Q.  Let me just get in broad terms what your
12   involvement was in connection with the
13   Avenel loan application. Can you report
14   that to me?
15           MR. POPEO: Objection.
16 A.  What my involvement was?
17 Q.  Yes. Involvement.
18 A.  With the loan application?
19 Q.  With the loan. With this loan.
20 A.  It would have been originated and
21   structured while I was in a senior role in
22   the department. I had no day-to-day
23   hands-on role in the loan.
24 Q.  Okay. You participated in the locking of

Page 30

1    the interest rate at the time the loan
2    application was made?
3  A.  I may or may not have.
4  Q.  You participated in the loan approval
5    process?
6  A.  Yes.
7  Q.  You participated in the unwinding process?
8            MR. POPEO: Objection.
9  A.  Did I participate in the?
10 Q.  Unwinding.
11           MR. POPEO: Objection.
12 A.  No, no.
13 Q.  Were you informed in any way with respect
14   to the intention of the borrower not to
15   close the loan?
16 A.  No.
17 Q.  Were you aware that the borrower had
18   decided not to close the loan?
19 A.  No.
20 Q.  Were you aware that John Hancock had
21   decided to institute a lawsuit against the
22   borrower for not closing the loan and from
23   damages from not closing the loan?
24 A.  Well, I'm aware now, but I wasn't --

Page 31

1  Q.  At the time?
2  A.  -- when it happened.
3  Q.  So this lawsuit was filed in early August
4    2005. You left at the end of July of
5    2005. And it is your testimony that you
6    had no knowledge, information, whatsoever,
7    regarding the unwinding, the decision not
8    to close or decision to sue the
9    prospective borrower?
10           MR. POPEO: Objection.
11 A.  I had no knowledge, none specific to this
12   transaction, that.
13 Q.  Okay.
14           MR. SCHER: Off the record.
15           (Discussion off the record.)
16           MR. SCHER: Nectow 1.
17           MR. POPEO: On the board.
18           (Multipage document, first page
19             headed Interest Rate Circle
20             Notification, JH 01109 through
21             01117 marked exhibit number 1
22             for identification.)
23 BY MR. SCHER:
24 Q.  I will show you what I have marked as

Page 32

1    Nectow exhibit number 1, and that is a
2    multipage -- so let's see what that is.
3            MR. POPEO: Do you want this?
4            MR. SCHER: Yes. Let me see.
5            MR. POPEO: Do you want to use
6    my copy?
7            MR. SCHER: No. That's okay.
8    Oh, here it is. Okay.
9  BY MR. SCHER:
10 Q.  This is a multipage document which begins
11   at JH 1109 and runs through JH 1117.
12           (Handing exhibit number 1 to the
13   witness.)
14 Q.  Can you tell me whether you have seen this
15   document before today?
16           (Pause.)
17           (The witness viewing exhibit
18   number 1.)
19 A.  Well, I see my signature is on it.
20 Q.  Yes?
21 A.  So the answer would be yes.
22 Q.  Did you review this in preparation for
23   this deposition?
24 A.  No.

Page 33

1   Q.   Can you tell me what it is?
2   A.   It is an interest rate circle
3        notification.
4   Q.   And what does this mean?  What does it
5        mean that there is a notification of
6        interest rate circle?  Is that the rate
7        lock?
8   A.   That would be notice of an interest rate
9        lock.  Correct.
10  Q.   Okay.  And to whom is this notice given?
11  A.   Well, there might be a list in here.
12                (Pause.)
13                (The witness viewing exhibit
14        number 1.)
15  A.   There is not.
16             It is delivered to a long list
17        of folks in and around John Hancock.
18  Q.   Okay.  And what is it that you are
19        approving on JH 1110?
20             MR. POPEO:  Objection.
21  Q.   Do you see your signature there?
22  A.   I do.
23  Q.   And it says "Approved by"?
24  A.   Correct.

Page 34

1   Q.   What is it that you are approving?
2   A.   I am approving that this interest rate is
3        an acceptable interest rate for a loan of
4        this type.
5   Q.   Okay.
6   A.   With -- a loan with these interest --
7        these loan terms.
8   Q.   The e-mail seems or this form -- I am
9        still looking at that same page on which
10       your signature appears.
11  A.   Yes.
12  Q.   It looks like it is from Tim Malik to Sam
13       Wainwright?
14  A.   Correct.
15  Q.   Who is Sam Wainwright?
16  A.   Sam Wainwright would be an individual who
17       works in the real estate investment
18       group's portfolio management department.
19  Q.   And is that someone who reported to you as
20       debt investment manager?
21  A.   Did he report to me?  He reported to me.
22       It may have been indirectly at that time.
23  Q.   Okay.  And then the next entry is the
24       date, and I guess the word "circle" or

Page 35

1        "rate lock date" are equivalent; is that
2        right?
3   A.   Correct.
4   Q.   And the loan name and commitment number,
5        identification of the borrower,
6        self-evident, collateral, location,
7        property type, number of units.  It
8        indicates the loan amount and the interest
9        rate and the loan term.  What is the
10       average life at 9.29, that number?
11             MR. POPEO:  What does that
12       represent?
13             MR. SCHER:  Yes.
14  A.   I am not -- I know the context in which it
15       is used, but I don't know specifically how
16       it is calculated.
17  Q.   Okay.
18  A.   And it is a -- it is -- it is another way
19       to express on a mathematical formulaic
20       basis sort of the term of the loan.
21  Q.   And this was a ten-year term; right?
22  A.   Yes.  120 months.
23  Q.   And do you know what that duration entry
24       is?

Page 36

1   A.   The same.  The same answer as average
2        life.
3   Q.   Okay.  And the next shows prepayment, and
4        this is the occasions for prepayment after
5        the loan is funded; right?
6   A.   The occasions for prepayment?
7   Q.   Yes.  I think one is at 48 months.  I am
8        sorry.  What is the prepayment listing
9        here?
10  A.   It is the terms under which the borrower
11       can prepay the loan.
12  Q.   Okay.  That is prepaying the loan after it
13       has been funded?
14  A.   Correct.
15  Q.   And the take-down delay is the duration of
16       the forward commitment?
17             MR. POPEO:  Objection.
18  A.   That is one way to express it, yes.
19  Q.   And at this point, there have been no fees
20       received, but I guess this form has not
21       been completed; right?  Do you know?
22             MR. POPEO:  Objection.
23             You can answer, if you know.
24  A.   I'm -- I'm not aware of whether fees were

9 (Pages 33 to 36)

## Page 37

1    received or not received.

2    Q.    Okay.  And then the loan-to-value ratio is

3          shown.  What is that?

4    A.    70.55?

5    Q.    Yes.  What does that represent?

6    A.    It is a representation of the -- a ratio

7          of the loan amount divided by the value of

8          the property.

9    Q.    And the debt service coverage?

10   A.    It is a ratio of the cash flow of the

11         property divided by the annual debt

12         service from the borrower to the lender.

13   Q.    Okay.  Do you know why the loan-to-value

14         ratio and debt service coverage are

15         included on this form?

16   A.    I don't know.

17   Q.    What is it that you are approving?

18   A.    On this form?

19   Q.    Yes.

20   A.    The interest rate.

21   Q.    Can you tell me what those items are

22         immediately to the right, the interest

23         rate column, weighted JH treasury?  The

24         interest rate I know.  That is the

## Page 38

1          interest rate for this loan; right?

2    A.    Yes.

3    Q.    And the weighted JH treasury?  What is

4          that?

5    A.    It would be a calculation based on -- it

6          is often referred to as the interpolated

7          treasury.  Here it is called the weighted

8          average -- weighted JH treasury.  It is an

9          interpolation between two treasuries, a

10         shorter treasury and a longer treasury

11         than the term of this loan, to come up

12         with a treasury that matches the term of

13         the loan.

14   Q.    Okay.  So like a five-year and a fifteen-

15         year, and this is a ten-year loan, so you

16         would interpolate the break point; is that

17         right?

18   A.    Something like that, yes.

19   Q.    All right.  Is there backup in this

20         document that reflects how that

21         calculation was performed?

22   A.    No.

23   Q.    Can you tell me what the monthly spread

24         is, not the number, but what that category

## Page 39

1          represents, that description represents?

2    A.    In this context, I can't.  I don't know.

3    Q.    Okay.  It says "less the BAA2 curve"?

4    A.    Yes.

5    Q.    This appears to have been rated at BAA1.

6          Can you tell me what the BAA2 curve is?

7    A.    The BAA2 curve would be a pricing --

8          pricing that is published by another group

9          at John Hancock, with the language that

10         John Hancock would have called it the BAA2

11         curve.

12   Q.    Is that reflected internally in these

13         documents attached to the --

14   A.    Yes.

15   Q.    -- Bates stamped number 1113?  Is that

16         right or not?

17   A.    Oh, here it is.  Yes.

18   Q.    Okay.  Did you perform these calculations

19         or --

20   A.    No.

21   Q.    And the less take-down delay, I guess

22         those are BPS, am I right?  BPS, is that

23         the next?

24   A.    That is basis points.  Correct.

## Page 40

1    Q.    What is that category, the take-down

2          delay, of basis points?

3    A.    It is a -- it is pricing associated with

4          how long it takes from commitment to

5          funding of the loan.

6    Q.    What do you mean by funding?

7    A.    Basis points or pricing.  Basis points are

8          probably a better way to describe it.

9    Q.    So it says you deduct the basis points

10         represented by the delay, right, and the

11         -- why do you deduct that?

12              MR. POPEO:  Objection.

13              You can answer.

14   A.    I don't recall the mechanics of this

15         calculation.

16   Q.    Who is -- what area of John Hancock is

17         responsible for this calculation?  Is it

18         the investment officer or --

19   A.    The investment officer and a member of

20         portfolio management.

21   Q.    And that could be Sam Wainwright or --

22   A.    Correct.

23   Q.    And that take-down delay is a result of

24         this table, which is JH 1114?

Page 41

1   A.   JH 1114, yes.
2   Q.   Does the interest rate lock approval do
3        anything more than appraise the difference
4        between the interest rate at which the
5        loan will ultimately be made at and the
6        appraisal of the John Hancock risk on that
7        loan?
8             MR. POPEO: Objection.
9   A.   I'm not sure I understand the question.
10  Q.   I'm trying to understand what your
11       criteria for approving this is. Can you
12       amplify that? You said you look at the
13       interest rate, the 6.180, and how do you
14       decide whether this is one I will approve
15       or this is one I won't approve?
16  A.   And the approval you are asking about is
17       the interest rate?
18  Q.   Yes.
19  A.   Not the transaction?
20  Q.   Right. This approval. The approval that
21       is reflected on this document.
22            MR. POPEO: Reflected by his
23       signature on the page, which is JH 1110?
24            MR. SCHER: Right.

Page 42

1   A.   I think there is a -- the -- I think it
2        would be market based, and if transactions
3        such as this were proposed, and there
4        would be many at the time, based on some
5        criteria that would be generated
6        internally, you would compare the
7        transaction to the criteria, and decide if
8        it was within, you know, so your tolerance
9        around the criteria for transactions of
10       this type.
11  Q.   And if I wanted to check on your approval
12       process, how could I tell whether this was
13       an approval that was easy to give or that
14       was difficult to give, that was close or
15       not?
16            MR. POPEO: Objection.
17  A.   You are talking about the interest rate
18       here?
19  Q.   Yes.
20            MR. POPEO: Objection.
21            Go ahead and answer.
22  A.   I'm not sure how it would be checked.
23  Q.   Are you aware -- can you recall the volume
24       of forward commitments that John Hancock

Page 43

1        was engaged in in the summer of 2004?
2   A.   No.
3   Q.   Was it a large percentage or negligible
4        or --
5   A.   I'm not sure.
6   Q.   Do you have a recollection of the Regatta
7        loan, --
8   A.   No.
9   Q.   -- a loan for a development called
10       Regatta?
11  A.   No.
12  Q.   Are you aware of any instances when an
13       approved application, a commitment, was
14       not funded because of the borrower's
15       decision not to proceed with funding?
16  A.   Specific instances?
17  Q.   Yes.
18  A.   No.
19  Q.   Are you aware that this instance resulted
20       in no funding?
21  A.   Only that that's why I'm here today.
22  Q.   Okay. Other than this instance, is it
23       your testimony that you know of no other
24       instance when a borrower with an approved

Page 44

1        commitment did not choose to proceed with
2        funding?
3   A.   I don't know of any other instances.
4   Q.   Did Dave Henderson report to you?
5   A.   At?
6   Q.   At the time that you were there -- at the
7        time he was there?
8             MR. POPEO: At any time.
9   A.   Any time, yes. I don't remember
10       specifically on -- well, if you asked me a
11       date, I might not know specifically when,
12       but at sometime, he did.
13  Q.   At the time that he left the company, was
14       he reporting to you?
15  A.   Yes.
16  Q.   And do you recall him reporting anything
17       to you about the Avenel loan?
18  A.   I don't recall him reporting anything, no.
19       No.
20  Q.   It looks like he is the person who is down
21       the chain from you, if you look at
22       Coyne 3.
23            (Handing Coyne exhibit number 3
24       to the witness.)

Page 45

| | | |
|---|---|---|
| 1 | Q. | Or maybe -- let's see.  Coyne 1? |
| 2 | | (Handing Coyne exhibit number 1 |
| 3 | | to the witness.) |
| 4 | Q. | Do you see Dave Henderson is the next one |
| 5 | | above you on the chain of signatures on |
| 6 | | Coyne exhibit 1? |
| 7 | A. | Correct. |
| 8 | Q. | Did he deliver this loan approval to you? |
| 9 | A. | I don't recall. |
| 10 | Q. | Looking at Coyne 1, do you have any |
| 11 | | recollection, putting aside my handwriting |
| 12 | | here, do you have any recollection of this |
| 13 | | loan approval? |
| 14 | | MR. POPEO:  Does he recall |
| 15 | | seeing this document? |
| 16 | | MR. SCHER:  Right. |
| 17 | A. | Well, I have seen the document before or |
| 18 | | ones like it.  Not this particular one. |
| 19 | Q. | Do you recall this one? |
| 20 | A. | Not this one in particular. |
| 21 | Q. | Do you see on this one there is |
| 22 | | interlineation there within the special |
| 23 | | conditions? |
| 24 | A. | Right. |

Page 46

| | | |
|---|---|---|
| 1 | Q. | Specific conditions, forgive me. |
| 2 | A. | Yes. |
| 3 | Q. | NCF and 10 percent breakeven? |
| 4 | A. | Right. |
| 5 | Q. | Do you recall whether or not that writing |
| 6 | | was on your copy of this document at the |
| 7 | | time you signed it? |
| 8 | A. | I don't recall. |
| 9 | Q. | Is it the practice at John Hancock that |
| 10 | | the loan approval documents be |
| 11 | | interlineated -- have interlineations on |
| 12 | | them, or is it generally speaking that |
| 13 | | they are typed clean? |
| 14 | | MR. POPEO:  Objection. |
| 15 | A. | It can happen.  I wouldn't say it is |
| 16 | | practice, but it can -- it can and did |
| 17 | | happen. |
| 18 | Q. | Can you recognize the handwriting? |
| 19 | A. | I can't. |
| 20 | Q. | No? |
| 21 | A. | (The witness shaking his head.) |
| 22 | | MR. POPEO:  You have to say yes |
| 23 | | or no for her. |
| 24 | | THE WITNESS:  No. |

Page 47

| | | |
|---|---|---|
| 1 | Q. | To the best of your knowledge, has John |
| 2 | | Hancock ever sought to recover yield |
| 3 | | maintenance on a loan it didn't make? |
| 4 | | MR. POPEO:  Objection. |
| 5 | A. | I don't recall. |
| 6 | Q. | Are you aware of any costs associated with |
| 7 | | the making of the commitment by John |
| 8 | | Hancock? |
| 9 | A. | Costs? |
| 10 | | MR. POPEO:  Objection.  This |
| 11 | | particular commitment? |
| 12 | | (Pointing to Coyne exhibit |
| 13 | | number 3.) |
| 14 | | MR. SCHER:  Yes. |
| 15 | A. | Am I aware of any? |
| 16 | Q. | Costs that were incurred by John Hancock |
| 17 | | in connection with its making this |
| 18 | | commitment, a commitment to Avenel. |
| 19 | A. | I'm not aware of any. |
| 20 | Q. | If you look at Nectow 1, the first page. |
| 21 | A. | This? |
| 22 | Q. | That's it.  It shows a proposed |
| 23 | | allocation? |
| 24 | A. | Um-hmm. |

Page 48

| | | |
|---|---|---|
| 1 | Q. | And are those various lines of business |
| 2 | | within John Hancock that are abbreviated |
| 3 | | there in that column to the right of the |
| 4 | | words "Proposed allocation"? |
| 5 | A. | Yes. |
| 6 | Q. | As a result of the interest rate circle |
| 7 | | notification, was there any economic |
| 8 | | consequence to this proposed allocation? |
| 9 | | MR. POPEO:  Objection. |
| 10 | A. | I'm not sure I understand what you mean. |
| 11 | Q. | Is this proposed allocation the allocation |
| 12 | | that would occur when the loan is funded? |
| 13 | | MR. POPEO:  Objection. |
| 14 | A. | Yes. |
| 15 | Q. | I mean after the $32 million is lent to |
| 16 | | the borrower, that is when the allocation, |
| 17 | | simultaneous, that is when the allocation |
| 18 | | would be made; is that right? |
| 19 | | MR. POPEO:  Objection.  Are you |
| 20 | | asking when the allocation occurs? |
| 21 | | MR. SCHER:  Yes. |
| 22 | | MR. POPEO:  Okay.  If you know |
| 23 | | the answer, you can answer the question. |
| 24 | A. | Can you ask the question again? |

12 (Pages 45 to 48)

Page 49

1   Q.   Am I right that the allocation occurs when
2        the loan is made?
3   A.   No.
4   Q.   When does the allocation occur?  When does
5        the allocation occur?
6   A.   At the time the interest rate circle --
7   Q.   Why?
8   A.   -- trans --
9   Q.   Go ahead.  What is the allocation?  Just
10       tell me what that is, not to whom.  But
11       what is the process of allocation?
12  A.   The investment groups, the investment
13       divisions, the real estate investment
14       group as well as others are given
15       investment guidelines and targets by these
16       -- these accounts that are listed on this
17       page as well as others that they get
18       updated during the year, and the
19       investment divisions, as their originating
20       transactions, are allocating or assigning
21       transactions to the accounts that are
22       willing to invest in the type of assets
23       that a particular division originates, in
24       this case, a mortgage.  So these accounts

Page 50

1        on this page -- and I am sure there are
2        others -- have identified investment
3        criteria where this transaction would have
4        been attractive to them.
5   Q.   And what accounting transpires after the
6        proposed allocation is made?
7            MR. POPEO:  Objection.
8   Q.   How is this proposed allocation accounted
9        for?
10           MR. POPEO:  Objection.
11  A.   In the real estate investment group?
12  Q.   Right.
13  A.   Just someone in portfolio management would
14       follow or track how many transactions
15       would have been allocated or dollar amount
16       of transactions allocated to each one of
17       the accounts.
18  Q.   So is there a paper trail that could trace
19       this -- these proposed allocations to the
20       various groups and be found on the
21       accounts of those groups?
22           MR. POPEO:  Objection.
23  A.   Yes.
24           THE WITNESS:  Sorry.

Page 51

1            MR. POPEO:  That's okay.
2   Q.   And what accounts of those groups would
3        they -- would these allocations be found?
4        In what accounts?  Would they be accounts
5        that would be funded in August of 2005
6        when the loan was made, or would they be
7        funded as of the date of the interest rate
8        circle?  When would the funding occur?
9            MR. POPEO:  Objection.
10  A.   The funding occurs when the loan closes.
11  Q.   Right.  Okay.
12  A.   That's the funding.
13  Q.   Right.
14  A.   Right?  Is that what you're getting at?
15  Q.   Right.  The funding.
16           So there is no money set aside
17       as of the interest rate circle totaling
18       $32 million somewhere, is there?
19           MR. POPEO:  Objection.
20  A.   There is.
21  Q.   Where is that?
22  A.   Well, each account is different, and you
23       would have to ask each account how they
24       account individually, but each -- each

Page 52

1        account identifies what their target would
2        be for say commercial mortgages, and as
3        mortgages are committed, the account
4        would, because a commitment is committing
5        John Hancock to fund that loan, they would
6        set aside those funds and say, "Based on
7        this chart, okay, I'm committing to making
8        a loan based on these terms on the date
9        that this loan funds."  Those funds are
10       set aside and reserved for that -- for
11       this transaction.
12  Q.   On that date?  On the date that it funds?
13  A.   No.  On the date of this.  On the date of
14       this rate lock.
15  Q.   I think you said, "I'm committing to
16       making a loan based on these terms on the
17       date that this loan funds."  Right?
18  A.   That's what I said.  Yes.
19  Q.   And the date the loan funds is the date
20       the loan is made?
21  A.   The date the loan funds is the date the
22       loan is made.
23  Q.   And the date the loan is made in this case
24       is August of 2005?

Page 53

```
1   A.  Well, it would have been in August of
2       2005.
3   Q.  Yes.  Yes.  Right?
4   A.  That's correct.
5   Q.  Okay.  And you say it varies for each of
6       these lines as to what they in fact do,
7       how they in fact account for this --
8           MR. POPEO:  Objection.
9   Q.  -- proposed allocation?
10          MR. POPEO:  Objection.
11  A.  I'm unaware of their accounting.
12  Q.  Okay.  Can you just tell me, quickly, or
13      slowly, what these various abbreviations
14      stand for?  I was going to say tell me
15      quickly what they are, but you don't have
16      to do it quickly.
17  A.  I don't know them all.
18  Q.  Tell me the ones you do know.  GBRE?
19  A.  Hold on a second.
20          (Pause.)
21  A.  If you gave me a while, I think I could
22      come up with the answer.
23  Q.  Okay.
24  A.  I don't know it off the top of my head.
```

Page 54

```
1       As you see, there are a lot of them here,
2       and a lot more that aren't --
3   Q.  Okay.
4   A.  I don't recall.
5   Q.  If you look at Coyne 1, the loan approval,
6       and you turn to page 1134.
7           (Witness complying.)
8   Q.  You see at the top "Lines of business
9       allocations voted" section?
10  A.  Yes.
11  Q.  And those are the same abbreviations.  I
12      think, except that they put IBILCO onto
13      the right column.  Do you have any idea as
14      to why?
15  A.  No idea.
16  Q.  And who would know?  Someone in the
17      portfolio management?
18  A.  Correct.
19  Q.  Your interest rate circle notification
20      approval document, which is Nectow
21      exhibit 1, was copied to Robin Costa, who
22      is the closing analyst, and Nathaniel
23      Margolis, the internal counsel.  Do you
24      know why?
```

Page 55

```
1           MR. POPEO:  Which page?
2           MR. SCHER:  JH 1110.
3           MR. POPEO:  Okay.
4   Q.  Do you know why?
5   A.  I do.
6   Q.  Could you tell me?
7   A.  It would notify in this case Robin and
8       Nathaniel that this was a transaction that
9       was likely to end up -- likely to be
10      assigned to them to -- to work on in their
11      various roles.
12  Q.  Robin's being a closing person and
13      Nathaniel Margolis being the attorney who
14      would -- what?  Coordinate the closing
15      documents?
16  A.  That would be an internal attorney
17      involved in the closing of the
18      transaction.  That's in general, not
19      specific to this transaction.
20  Q.  Okay.
21          MR. POPEO:  We should take five
22      when you get a chance.
23          MR. SCHER:  What is that?
24          MR. POPEO:  We should take a
```

Page 56

```
1   quick break when you have a chance.
2           MR. SCHER:  Sure.  Absolutely.
3           (Recess taken at 2:03 p.m.)
4           (Recess ended at 2:14 p.m.)
5   BY MR. SCHER:
6   Q.  Showing you what has been marked as
7       Coyne 3, and you have before you Coyne 1,
8       I believe, it shows you having signed on
9       August 9th the Coyne exhibit 1, probably
10      on August 16 -- yes -- Coyne 3.  Do you
11      have any recollection of your recommending
12      the approval of the John Hancock loan to
13      Avenel Montgomery Square Apartments on
14      these two occasions?
15  A.  No.
16  Q.  Was this, looking at the loan approvals,
17      is it routine or is it unusual for there
18      to be two approval documents for this one
19      loan?
20          MR. POPEO:  Objection.
21  A.  Would you say that one more time?
22  Q.  Coyne 1 and Coyne 3 are approving the same
23      loan on two different dates?
24  A.  Yes.
```

14 (Pages 53 to 56)

Page 57

1  Q.  Is that usual, unusual?

2  A.  It is not typical. No.

3  Q.  Okay.

4  A.  Not -- it is unusual.

5  Q.  Can you think of any other instance when

6       it happened, when such a thing happened?

7  A.  No.

8  Q.  And if I were to tell you that after

9       Coyne 1 was signed, consideration was

10      given to the modification of the loan

11      application to include a 10 percent

12      constant requirement and to reflect

13      accurately the projected financials of the

14      borrower, and it was decided not to do

15      that, and then Coyne 3 was prepared, would

16      that --

17  A.  Can you --

18  Q.  -- jar your recollection?

19  A.  Can you --

20          MR. POPEO: Objection.

21  A.  Can you start over, please?

22  Q.  Yes. You said it was unusual, not

23      typical, for there to be two loan

24      approvals. To the best of your

Page 58

1      recollection, had it ever happened before?

2      Did it ever happen during the time you

3      have been with John Hancock?

4          MR. POPEO: Objection.

5  A.  I don't recall.

6  Q.  And if the loan was approved the first

7      time with signatures on it, why was it

8      needed to be approved a second time with

9      signatures on it?

10  A.  I -- I have no idea.

11  Q.  What was Mr. Thomas' level of activity in

12      connection with a loan like this in August

13      of 2004?

14          MR. POPEO: Objection.

15  A.  When you say "activity"?

16  Q.  Involvement.

17  A.  He was the head of the group at the time.

18  Q.  Right. So that means he had nothing to do

19      with it? He looked at it for a

20      millisecond, or he was heavily involved?

21          MR. POPEO: Objection.

22          If you know the answer, you can

23      answer.

24  A.  I don't know the answer.

Page 59

1  Q.  If you look over Coyne 1 and Coyne 3, can

2      you tell me -- I don't want you to go page

3      by page, although you are welcome to --

4      can you tell me what the differences are

5      between that warranted the resubmission of

6      this application, of this approval?

7          MR. POPEO: Objection.

8          But you can answer.

9          (Pause.)

10          (The witness viewing Coyne

11      exhibit number 1 and Coyne exhibit

12      number 3.)

13  A.  Probably the one that sticks out the most

14      is on the cash flow analysis page.

15  Q.  Right.

16  A.  It looks like some of the underwriting

17      assumptions were changed. I mean without

18      staring at it for a long time, I couldn't

19      tell you what it is.

20  Q.  Are the underwriting assumptions that were

21      changed on the cash flow analysis

22      assumptions about which the lender should

23      have -- the borrower should have been

24      informed?

Page 60

1          MR. POPEO: Objection.

2  A.  It is highly unlikely. It is just an

3      underwriting internal document.

4  Q.  This is -- the cash flow analysis is

5      forecasting the income and expenses from

6      the operation of the apartment

7      development; right?

8  A.  Correct.

9  Q.  Why is that something that the borrower

10      shouldn't be involved -- shouldn't have

11      been informed of?

12          MR. POPEO: Objection. Asked

13      and answered.

14          You can answer again, if you

15      can.

16  A.  Can you ask that one more time for me?

17  Q.  Sure. Why is it that the borrower should

18      not be informed of changes made in the

19      projected income and expenses from his

20      development?

21  A.  On this loan? Why --

22  Q.  Yes.

23  A.  -- should he not be informed?

24  Q.  Yes.

Page 61

1   A.   I don't know why he should not be
2        informed.  I don't know the circumstances
3        of the -- of why he was or wasn't
4        informed.
5   Q.   Would it be fair to say that the borrower
6        should be informed if assumptions
7        regarding income and expenses were
8        modified in connection with the loan
9        approval process?
10            MR. POPEO:  I object to the
11       form.  With reference to these
12       underwriting documents --
13            MR. SCHER:  Yes.
14            MR. POPEO:  -- or to some other
15       time?
16            You can answer if you can.
17            I object.
18            MR. SCHER:  With reference to
19       the loan approval.
20            MR. POPEO:  The same objection.
21   A.   I don't -- I don't -- I don't know.  I
22       don't know the answer.
23   Q.   So if a borrower -- when the borrower in
24       this case provided estimates of its income

Page 62

1        and expenses in connection with its loan
2        application and those forecasts of income
3        and expenses were modified by the loan
4        officer in connection with the loan
5        approval process, it is your position that
6        the borrower should not be informed of
7        that?
8             MR. POPEO:  Objection.
9   A.   That's not -- that's not what I said.  I
10       said he -- he may or may not be informed.
11   Q.   Should he be?
12   A.   It's not -- it's not -- it's not a
13       requirement.  It is not a practice.  It
14       may or may not happen.
15   Q.   And can you explain to me why it would not
16       be material, why it wouldn't matter to a
17       borrower that the operating expenses of
18       the development that are used by the
19       lender are different than those that he
20       provided?  Why isn't that important to the
21       borrower?
22            MR. POPEO:  Objection.
23   A.   I don't know why it would be important or
24       not important --

Page 63

1   Q.   Okay.
2   A.   -- to the borrower.
3   Q.   Well, if the size of the loan to be made
4        to the borrower were governed by the net
5        operating income of the investment, the
6        size of the loan would matter to the
7        borrower, wouldn't it?
8             MR. POPEO:  Objection.
9             You can answer the question.
10   A.   Does the size of the loan matter to the
11       borrower?
12   Q.   Yes.
13   A.   Yes.
14            MR. SCHER:  Why don't we take a
15       short break.
16            (Recess taken at 2:26 p.m.)
17            (Recess ended at 2:33 p.m.)
18            MR. SCHER:  I have no other
19       questions.
20            (Whereupon, at 2:33 p.m., the
21       deposition was adjourned.)

Page 64

DEPONENT'S ERRATA SHEET
AND SIGNATURE INSTRUCTIONS
        The original of the Errata Sheet
has been delivered to Paul D. Popeo, Esq.
        When the Errata Sheet has been
completed by the deponent and signed, a
copy thereof should be delivered to each
party of record and the ORIGINAL delivered
to Howard D. Scher, Esq., to whom the
original deposition transcript was
delivered.

        INSTRUCTIONS TO DEPONENT

        After reading this volume of
your deposition, indicate any corrections
or changes to your testimony and the
reasons therefor on the Errata Sheet
supplied to you and sign it.  DO NOT make
marks or notations on the transcript
volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH
THE COMPLETED AND SIGNED ERRATA SHEET WHEN
RECEIVED.

Page 65

```
1    ATTACH TO DEPOSITION OF:  BARRY S. NECTOW
2
3    CASE:  JOHN HANCOCK INSURANCE COMPANY VS.
     VESTMONT LIMITED PARTNERSHIP ET ALS
4
5              ERRATA SHEET
6    INSTRUCTIONS:  After reading the
     transcript of your deposition, note any
7    change or correction to your testimony and
     the reason therefor on this sheet.  DO NOT
8    make any marks or notations on the
     transcript volume itself.  Sign and date
9    this errata sheet (before a Notary Public,
     if required).  Refer to Page 64 of the
10   transcript for errata sheet distribution
     instructions.
11
     PAGE  LINE
12
               CHANGE:
13             REASON:
               CHANGE:
14             REASON:
               CHANGE:
15             REASON:
               CHANGE:
16             REASON:
               CHANGE:
17             REASON:
               CHANGE:
18             REASON:
19
20       I have read the foregoing transcript
     of my testimony, and except for any
21   corrections or changes noted above, I
     hereby subscribe to the transcript as an
22   accurate record of the statements made by
     me.
23
24             BARRY S. NECTOW
```

Page 66

```
1              CERTIFICATE
2    Commonwealth of Massachusetts
3    Plymouth, ss.
4
5         I, Judith McGovern Williams, a
6    Registered Professional Reporter and
7    Notary Public in and for the Commonwealth
8    of Massachusetts, do hereby certify:
9         That BARRY S. NECTOW, the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the said witness.
14        IN WITNESS WHEREOF, I have
15   hereunto set my hand this       day of
16             , 2006.
17
18
19
             Judith McGovern Williams
20          Registered Professional Reporter
              Certified Realtime Reporter
21            Certified LiveNote Reporter
       Certified Shorthand Reporter No. 130993
22
23   My Commission expires:
24   April 2, 2010
```

17 (Pages 65 to 66)

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-11614-WGY
*********************************

JOHN HANCOCK LIFE INSURANCE
COMPANY,
                Plaintiff/Counterclaim
                Defendant
        Vs.
VESTMONT LIMITED PARTNERSHIP,
VESTMONT LIMITED PARTNERSHIP II,
VESTMONT LIMITED PARTNERSHIP III,
and VESTERRA CORPORATION d/b/a
MONTGOMERY SQUARE PARTNERSHIP,
                Defendants/Counterclaim
                Plaintiffs
*********************************

                        VOLUME: I
                        PAGES:  1-130


        DEPOSITION OF PATRICIA COYNE
                MARCH 10, 2006
                REPORTERS, INC.
        GENERAL & TECHNICAL COURT REPORTING
        23 MERRYMOUNT ROAD, QUINCY, MA 02169
        617.786.7783/Facsimile 617.786.7723


Page 2

1   DEPOSITION of PATRICIA COYNE, a witness
2   called on behalf of the Defendants/
3   Counterclaim Plaintiffs, pursuant to the
4   Federal Rules of Civil Procedure, before
5   Judith McGovern Williams, Certified
6   Shorthand Reporter, Registered
7   Professional Reporter, Certified Realtime
8   Reporter, Certified LiveNote Reporter, and
9   Notary Public in and for the Commonwealth
10  of Massachusetts, at the offices of
11  Deutsch, Williams, Brooks, DeRensis &
12  Holland, P.C., 99 Summer Street, Boston,
13  Massachusetts, on Friday, March 10, 2006,
14  commencing at 9:15 a.m.
15
16  APPEARANCES:
17  CHOATE, HALL & STEWART, L.L.P.
18    Paul D. Popeo, Esquire
19    Two International Place
20    Boston, Massachusetts  02110
21    617-248-5000
22    ppopeo@choate.com
23    on behalf of the Plaintiff/
24    Counterclaim Defendant


Page 3

1   APPEARANCES (Continued):
2
3   BUCHANAN INGERSOLL, P.C.
4     Howard D. Scher, Esquire
5     1835 Market Street
6     14th Floor
7     Philadelphia, Pennsylvania  19103-2985
8     215-665-3920
9     scherhd@bipc.com
10            and
11  DEUTSCH, WILLIAMS, BROOKS, DeRENSIS &
12  HOLLAND, P.C.
13    Robert D. Hillman, Esquire
14    99 Summer Street
15    Boston, Massachusetts  02110-1213
16    617-951-2300
17    rhillman@dwboston.com
18    both on behalf of the Defendants/
19    Counterclaim Plaintiffs
20
21
22
23
24


Page 4

1              I N D E X
2   Witness                           Page
3   PATRICIA COYNE
4   Direct Examination by Mr. Scher      6
5
6
7
8
9
10
11            E X H I B I T S
12  Number                            Page
13
14  1  Multipage documents, headed      39
15     John Hancock Life Insurance
16     Company, Investment
17     Number 6518467, JH 01128
18     through 01148
19
20  2  Two-page e-mail chain, most      47
21     recent e-mail dated
22     August 11, 2004, to
23     Mr. Ferry from Mr. Malik
24

Page 5

```
1    3   Multipage documents, headed      51
2        John Hancock Life Insurance
3        Company, Investment
4        Number 6518467, JH 00405
5        through 00425
6
7    4   One-page memorandum dated        60
8        August 17, 2004, to
9        Mr. Malik  from Ms. Coyne
10
11   5   Multipage Application to         78
12       John Hancock Life Insurance
13       Company for a First Mortgage
14       Loan, JH 00958 through 01028
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
1            P R O C E E D I N G S
2            MR. SCHER:  Administer the oath
3    to the witness, please.
4            - - -
5            PATRICIA COYNE, first having
6    been duly sworn, testified as follows in
7    answer to direct examination by MR. SCHER:
8            - - -
9    Q.  Good morning, Ms. Coyne.
10   A.  Good morning.
11   Q.  My name is Howard Scher.  I represent the
12       defendants in this case in a dispute
13       between John Hancock and Vesterra
14       Corporation, among others.
15           You are aware of that?
16   A.  Yes.
17   Q.  You have been -- first of all, would you
18       give me your full name, please?
19   A.  Patricia Coyne.
20   Q.  And where do you reside?
21   A.  121 Beechnut Road in Westwood.
22   Q.  And by whom are you employed?
23   A.  John Hancock.
24   Q.  And what is your current position?
```

Page 7

```
1    A.  Investment officer.
2    Q.  Was your position investment officer in
3        the summer of 2004?
4    A.  Yes.
5    Q.  Have you had any changes in your duties
6        and responsibilities since the summer of
7        2004?
8    A.  No.
9    Q.  You are here pursuant to a deposition
10       notice.  Have you done anything to prepare
11       for this deposition, other than scheduling
12       your appearance here?
13   A.  No.
14   Q.  Have you reviewed any documents in
15       connection with your appearance here?
16   A.  No.
17   Q.  Are you -- you have been designated as a
18       30(b)(6) designee.  Are you aware of that?
19   A.  Yes.
20   Q.  And you have been designated as a 30(b)(6)
21       designee on three or three and a half
22       topics.  The first is topic number 2 in
23       the notice, and it reads, "The terms and
24       conditions contained in the loan
```

Page 8

```
1    application, including but not limited to
2    any and all conditions that defendants
3    were required to meet for disbursement of
4    the loan."
5            Did you prepare for your
6    testimony as the designee for that topic?
7    A.  No.
8    Q.  And the second topic is topic number 5,
9        "the manner, method and/or process by
10       which John Hancock approved mortgage loans
11       during the period from April 28, 2004, to
12       the present."
13           Have you done anything -- are
14       you aware that you were designated as the
15       30(b)(6) designee on that topic?
16   A.  Yes.
17   Q.  And have you done anything to prepare for
18       that?
19   A.  No.
20   Q.  And the third topic is "the requirements
21       and conditions that, following John
22       Hancock's acceptance of the loan
23       application, would have to have been met
24       by defendants in order for John Hancock to
```

Page 9

```
1    fund or disburse the loan applied for in
2    the loan application."
3         Are you aware that you were
4    designated as the 30(b)(6) designee on
5    that topic?
6  A. Yes.
7  Q. And have you done anything to prepare for
8    your testimony on that topic?
9  A. No.
10 Q. Did you have occasion to meet with your
11   counsel in advance of this deposition,
12   other than walking over here?
13 A. Yes.
14 Q. What was the duration of that preparation?
15 A. Oh, I don't remember.  Maybe a couple of
16   hours.
17 Q. And what did you -- did you review
18   documents during the course of that?
19 A. There were some documents there, but we
20   didn't really look at them.
21 Q. So you didn't really look at them?
22 A. Well, we didn't look at them.  Excuse me.
23 Q. They were there, but you didn't look at
24   them?  Is that your testimony?
```

Page 10

```
1  A. Correct.
2  Q. Okay.  Was reference made to those
3    documents at all?
4  A. Yes.
5  Q. By whom?
6  A. Paul.
7         (The witness pointing to
8    Mr. Popeo.)
9  Q. Did you say you did not look at those
10   documents?  Is that right?
11 A. No.  They were in front of him.
12 Q. All right.  Do you have any recollection
13   of the loan application associated with
14   this case?
15 A. No.
16 Q. The application to John Hancock Life
17   Insurance Company for a first mortgage
18   loan, it was made in the summer of 2004.
19   The application was dated July 30, 2004.
20   Do you have any recollection of that at
21   all?
22 A. No.
23 Q. Do you have any recollection of your
24   involvement in the processing of the
```

Page 11

```
1    commitment at all?
2  A. No.
3  Q. Do you have any recollection of the
4    policies or procedures that were in place
5    in connection with the approval of the
6    loan commitment at that time?
7  A. The policies and procedures?
8  Q. Yes.
9  A. Yes.  I'm aware of those.
10 Q. What are the -- what were the policies and
11   procedures in the end of July, early
12   August 2004 with respect to approval of
13   loan applications?
14 A. What do you mean what were they?  We
15   have --
16 Q. What were --
17 A. We have a big thick binder of what they
18   are.  A particular one you are interested
19   in?  Or?
20 Q. So the policies and procedures are
21   contained in a big thick binder; right?
22         MR. POPEO:  As of the date of
23   the question?
24         MR. SCHER:  That's right.
```

Page 12

```
1  A. Yes.
2  Q. As of that date?
3  A. Yes.
4  Q. And can you tell me what the cover of
5    those policies and procedures was?
6  A. The cover?
7  Q. What it said on the cover?  How could I
8    identify it?
9  A. Lending guidelines.
10 Q. Is that what it was called?
11 A. Yes.
12 Q. And were there any other guidelines or
13   rules and regulations that governed your
14   activities in connection with that loan
15   application?
16         MR. POPEO:  I object to the
17   form.
18         You can answer the question.
19 Q. Other than the lending --
20 A. I'm not sure I understand the question.
21 Q. You said there are lending guidelines?
22 A. Yes.  For every loan.
23 Q. For every loan?
24 A. Correct.
```

Page 13

1    Q.    And for every loan, were there any other
2          processes or procedures that -- policies
3          or procedures other than the lending
4          guidelines?
5    A.    No.
6    Q.    So the lending guidelines contained the
7          universe of policies and procedures --
8    A.    Well --
9    Q.    -- associated with the approval of loan
10         commitments?
11               MR. POPEO:  I object to the
12         form.
13               You can answer the question.
14   A.    No.  I wouldn't say that was true.
15   Q.    Okay.  Is it the -- well, how would you
16         characterize what the policies and
17         procedures are?
18   A.    Well, we have lending guidelines --
19   Q.    Right.
20   A.    -- that we look at.  They are guidelines.
21         They don't govern anything.  What governs
22         is the actual signed commitment.
23   Q.    Okay.
24   A.    Everything in the signed commitment is

Page 14

1          what is needed to close a loan.  There
2          isn't anything else.  That's what rules.
3                MR. SCHER:  Do you want to mark
4          this as -- well, let's just refer to it,
5          so we don't kill too many trees.
6    Q.    This is a photocopy of a document produced
7          by your counsel to me in the past several
8          days.  It is called John Hancock Real
9          Estate Financial Group Lending Guidelines,
10         January 25, 2005, and the first Bates
11         stamp number on it is JH 02278.
12               Can you tell me to what extent
13         this document, which runs through JH
14         02514, contains -- are the lending
15         guidelines in place as of the time of the
16         loan commitment in connection with this
17         case?
18               MR. POPEO:  Objection.
19               You can answer.
20   A.    Yes.
21   Q.    Please do.
22               (The witness pointing to the
23         binder.)
24   Q.    Oh, these are the guidelines that were in

Page 15

1          place as of the time of approval of the
2          loan commitment -- loan application in
3          this case?
4                MR. POPEO:  Objection.
5    A.    They might have had some revisions,
6          because it has a January 25th date.
7    Q.    Right.
8    A.    But it's -- I don't revise them and send
9          out new copies, so.
10   Q.    So but your testimony is that as far as
11         you know, this is essentially -- these are
12         essentially the lending guidelines that
13         were in place in late July-early August of
14         2004?
15   A.    Yes.
16   Q.    And is it your testimony that there were
17         no significant changes in respect to the
18         policies and procedures for forward-
19         commitment loans?
20               MR. POPEO:  Objection.
21               You can answer the question.
22   A.    No.  There isn't any -- there weren't any
23         changes.
24   Q.    All right.  Would your testimony be there

Page 16

1          weren't any significant changes with
2          respect to any loan, whether it was a
3          forward commitment or a regular one?
4    A.    Yes.  I mean they are guidelines --
5    Q.    Okay.
6    A.    -- so.
7    Q.    But having said that they are
8          guidelines, --
9    A.    Right.
10   Q.    -- does that mean that there weren't any
11         significant changes?
12   A.    Not that I'm aware of.
13   Q.    Okay.  Can you report to me what the
14         process was -- what your duties and
15         responsibilities were in connection with
16         the processing of a loan application in
17         the summer of 2004?
18   A.    I wasn't involved in the processing of a
19         loan application.
20   Q.    What did you do with respect to loan
21         applications?
22   A.    I didn't do anything with --
23               MR. POPEO:  Well, wait.
24         Objection.  Let me make sure we all

Page 17

1   understand.
2           THE WITNESS:  Okay.
3           MR. POPEO:  He is asking I
4   believe generically for loan applications.
5           THE WITNESS:  Right.
6           MR. POPEO:  Not this particular
7   one.
8           THE WITNESS:  Right.  I am not
9   involved in the negotiation or anything to
10  do with the application.
11  BY MR. SCHER:
12  Q.  What involvement did you have in the
13      summer of 2004 in connection with the
14      making of -- approval of loan
15      applications?
16  A.  None within loan applications.
17  Q.  And what role, if any, did you have with
18      respect to credit evaluation?
19  A.  I looked at the -- I looked -- any loans
20      that are coming, I am one of the
21      recommenders for the loan approval.  So
22      after it is all negotiated.
23  Q.  Had you finished your sentence?
24  A.  Yes.

Page 18

1   Q.  So after the loan application has been
2       fully negotiated, --
3   A.  Um-hmm.
4   Q.  -- it is -- somehow it comes to your
5       attention.  Can you tell me what that
6       process is?
7           MR. POPEO:  Objection.
8           You can answer.
9   A.  It doesn't come to my attention until it
10      is coming for approval.
11  Q.  Okay.  When it is coming for approval, how
12      is it presented to you?
13  A.  In an approval format.  Probably 10 pages
14      of.
15  Q.  Okay.
16  A.  All the numbers, you know, just the deal,
17      in essence the deal.
18  Q.  And literally I am trying to find out what
19      comes to your consciousness in connection
20      with a particular loan, specifically this
21      loan, but I'm just interested in generally
22      in what your involvement is.  So your
23      testimony is that you get about a 10-page
24      document containing all the numbers of the

Page 19

1   deal as submitted to you as one of the
2   recommenders?
3   A.  Um-hmm.
4   Q.  Is that right?
5   A.  Yes, yes.
6           MR. POPEO:  By way of
7   clarification, is this question directed
8   to what happens in the present time or may
9   have happened?
10          MR. SCHER:  I am sorry.  Let me
11  confine myself to --
12  Q.  I am curious -- my question is in the
13      summer of 2004, July 30 through August 17
14      or 18.  Is what you just testified to what
15      you did?
16  A.  Yes.
17  Q.  Beyond the 10 pages -- and I will show you
18      the specimen that I have in connection
19      with this deal momentarily -- but beyond
20      those 10 pages, do you receive anything
21      else?
22  A.  Pictures, maps.
23  Q.  Okay.  So is that part of the 10-page
24      submission?

Page 20

1   A.  Yes.  It is probably about eight pages,
2       and then you have a couple of pictures,
3       maps, an aerial.
4   Q.  I am not testing your memory on the number
5       of pages, but approximately?
6   A.  Yes.  And they are all different.
7   Q.  So it could be --
8   A.  It could be twelve.
9   Q.  -- fifteen pages?
10  A.  Or it could be eight.
11  Q.  But at the back, there are some maps and
12      photographs --
13  A.  Yes.
14  Q.  -- of the property?
15  A.  Yes.
16  Q.  In the middle, there are numbers and
17      columns and containing projections of the
18      financial condition of the property?  Is
19      that --
20          MR. POPEO:  Objection.
21  Q.  -- generally what is in the middle?
22  A.  It varies --
23  Q.  Okay.
24  A.  -- for each different deal.

Page 21

1  Q.  And in the front, there is a signature --
2      there is a place in the early part of the
3      document for signatures; is that right?
4  A.  It is actually in the back.
5  Q.  In the back --
6  A.  Yes.
7  Q.  -- for the recommenders?
8  A.  In the back. The recommenders are in the
9      back.
10 Q.  Okay. Now does that -- does the material
11     submitted to a recommender include
12     anything other than you just described
13     generally?
14 A.  Generally, no.
15 Q.  Do you have any recollection that in this
16     instance it included things other than
17     what were generally included, that is in
18     the instance of the Avenel transaction?
19 A.  I don't have any recollection.
20 Q.  Other than receiving the 10-, 12-, 15-page
21     document -- what is that called?
22 A.  Approval document.
23 Q.  Approval document?
24 A.  Yes.

Page 22

1  Q.  Other than your receipt of the approval
2      document, do you have any other activity
3      in connection with your role as a
4      recommender?
5  A.  For this deal?
6  Q.  Prior to receiving the approval document.
7          MR. POPEO: Objection.
8          You can answer.
9  A.  No.
10 Q.  Generally speaking, the first you hear of
11     a loan that you are being asked to
12     recommend is when you receive the approval
13     document? Is that?
14 A.  Typically that is how it works.
15 Q.  Okay. Do you have any recollection that
16     it was different in this case?
17 A.  No.
18 Q.  Following your receipt of the approval
19     document, what do you do?
20 A.  Take a look at it, review it, analyze it,
21     see if the numbers work. If I have any
22     questions, I will talk to the investment
23     officer. If I like the deal, I'll
24     recommend it.

Page 23

1  Q.  Let's start at the end. If you recommend
2      it, that means you will sign it?
3  A.  Correct.
4  Q.  Was one of the loan officers Timothy
5      Malik?
6  A.  He was the investment officer, yes.
7  Q.  He was the investment officer on this
8      transaction?
9  A.  Correct.
10 Q.  Do you recall having conversations with
11     him on the subject of this loan?
12 A.  I don't recall.
13 Q.  Now when you look at the approval
14     document, what are you looking for that
15     you say you see if the numbers work? Can
16     you amplify that at all?
17         MR. POPEO: Objection.
18         You may answer.
19 A.  I mean this is my job. I know what a good
20     loan looks like.
21 Q.  Okay.
22 A.  So I don't know -- I don't think I could
23     sit here and explain everything on years
24     of knowledge of what makes a good deal or

Page 24

1      what doesn't, so I don't think I could.
2  Q.  All right. And in any event, if you think
3      it is a good deal, you will approve it;
4      right?
5  A.  I will recommend it for approval.
6  Q.  You will recommend it for approval?
7  A.  Yes.
8  Q.  Following your recommendation for approval
9      -- well, let me ask you this. If you
10     don't approve it, what happens to the
11     document -- approval document or the loan?
12         MR. POPEO: Objection.
13 A.  Well, I don't have approval rights.
14 Q.  All right. If you don't recommend it,
15     what happens?
16 A.  It goes to -- I can write "Recommend
17     denied."
18 Q.  And then what happens?
19 A.  It goes to the next level of approval or
20     recommendation authority level.
21 Q.  And in the summer of 2004, what was that
22     level? Who was in the position of that
23     level, the higher level?
24 A.  It depends on the loan amount.

Page 25

```
1   Q.  Okay.
2   A.  I don't recall the list of characters,
3       because several of them have left.
4   Q.  Okay.  How does it work?  Are you a
5       recommender -- did you have approval
6       authority for any loans?
7   A.  Back then?
8   Q.  Yes.
9   A.  No.
10  Q.  Do you now?
11  A.  Yes.
12  Q.  When did that change occur?
13  A.  Oh, you know, I don't remember.
14  Q.  What occasioned it changing?
15  A.  I have five million now.
16  Q.  What was the occasion of your securing, of
17      your obtaining approval?
18  A.  I don't know.  They just came in and said
19      I had it one day, and I said, "Great."
20  Q.  Was there a change in your compensation or
21      your duties and responsibilities
22      associated with that?
23  A.  No.
24  Q.  Was your job title changed at all?
```

Page 26

```
1   A.  No.
2   Q.  Okay.  So following your recommending the
3       loan, what role do you have?
4   A.  What do you mean what role do I have?
5   Q.  Is that where --
6   A.  After I recommend it?
7   Q.  Yes.
8   A.  Bring it to the next signing authority
9       level.
10          MR. POPEO:  Objection.
11  Q.  And you literally carry it to the next
12      signing level?
13  A.  Typically.  Sometimes the IO will come
14      back and take it.  Typically I take it to
15      the next person.
16          MR. POPEO:  Just by
17      clarification, you are still speaking of?
18          MR. SCHER:  The summer of 2004.
19          THE WITNESS:  The same thing.
20      The summer of 2004 is the same as now.
21      BY MR. SCHER:
22  Q.  And you will bring it to the next approval
23      level or it will get to the next approval
24      level.  After that, what, if any,
```

Page 27

```
1       involvement do you have in connection with
2       the approval of a loan?
3   A.  After it is executed, approval, the
4       signer.
5   Q.  Yes.
6   A.  It comes back on my desk, and I attach the
7       one-page letter that says, "Here are the
8       terms on which it is approved," and then
9       I'm done with it.
10  Q.  Now could you tell me the process you
11      employed in the summer of 2004, in or
12      about August 17, 2004, to create that
13      letter?
14  A.  Could I tell you what?
15  Q.  The process.  How did you go about
16      creating the letter?  Cut and paste or --
17  A.  No.  Just draft a new letter, and just put
18      the relative terms.  They're basically the
19      same for each deal.
20  Q.  Okay.  Is there a place on the form that
21      you extract those -- that one-page
22      letter, --
23          MR. POPEO:  Objection.
24  Q.  -- the information contained on that
```

Page 28

```
1       one-page letter?
2   A.  All the information that goes on that
3       one-page letter is found somewhere within
4       that document.
5   Q.  Within the approval document?
6   A.  Correct.
7   Q.  And if I may just ask one more obvious
8       question in a series of obvious questions,
9       I take it that that is where your
10      involvement ends?
11  A.  Yes.
12  Q.  So you have no involvement whatsoever in
13      connection with the preparation for
14      closing or the closing or the disbursement
15      of the loan?  Am I right about that?
16  A.  You're right about that.
17  Q.  So if I can just clarify in my mind, you
18      receive the 10-, 12-, 15-page approval
19      document.  In the event you have questions
20      about it, you may confer with the IO,
21      investment officer, in this case,
22      Mr. Malik.  You either recommend or
23      decline the recommendation, and perhaps I
24      should just break it down.  The first step
```

Page 29

1       is the receipt of the approval document,
2       which is 10, 12, 15 pages long; right?
3   A.  Correct.
4   Q.  And that approval document is not the loan
5       application?  Do I have that right?
6   A.  You have that right.
7   Q.  And if -- sometimes you will talk to the
8       investment officer; sometimes you won't
9       talk to the investment officer.  But one
10      way or the other, you will either
11      recommend or decline recommending the
12      approval of the loan?
13  A.  Correct.
14  Q.  And then a third step, you transmit that
15      recommendation or declination of
16      recommendation to the next person on the
17      chain, but your third involvement is,
18      assuming the loan is approved, then you
19      will attach a one-page letter that you --
20      you will create a one-page letter --
21          MR. POPEO:  Objection.
22  Q.  -- from the approval document; is that
23      right?
24  A.  Once it gets approved --

Page 30

1   Q.  Yes.
2   A.  -- I attach a one page.
3   Q.  Okay.
4   A.  Correct.
5   Q.  In this lending guidelines document, could
6       you help me?  Is there any place or places
7       in there where your role is described, the
8       functions that you perform are described?
9   A.  There might be, but I can't -- I don't --
10      I haven't memorized the whole thing, so.
11  Q.  Would you just take a moment and take a
12      look at it and see if there are any?  You
13      can take longer than a moment if you would
14      like to.
15  A.  It may take longer than a moment.
16  Q.  That's all right.  Take a look at the
17      table of contents, if you would like.  If
18      you see any areas that cover the functions
19      that you described, I would like to know
20      that.
21          MR. POPEO:  The document is in
22      excess of 100 pages.  Is the question
23      merely to look at the document and
24      determine whether the document itself

Page 31

1       articulates her roles and
2       responsibilities --
3           MR. SCHER:  Correct.
4           MR. POPEO:  -- in the approval
5       process?
6           MR. SCHER:  Yes.
7           MR. POPEO:  You can try to do
8       that.
9           THE WITNESS:  Do you want me to
10      look at the whole thing?
11          MR. POPEO:  Just do the best
12      that you can.
13          Why don't we go off while she
14      takes a look at it.
15          MR. SCHER:  Sure.
16          (Discussion off the record.)
17          (The witness proceeds to view
18      contents of binder.)
19          THE WITNESS:  There is a
20      definition.  A credit officer is a member
21      of the credit team.
22  BY MR. SCHER:
23  Q.  There you go.
24  A.  I think that might be it.  I don't recall

Page 32

1       seeing anything in here.
2           MR. POPEO:  Howard can ask the
3       question.  I think you probably have
4       performed the exercise.
5           THE WITNESS:  Okay.
6   BY MR. SCHER:
7   Q.  Did you play any role in the preparation
8       of these guidelines?
9   A.  Yes.
10  Q.  And what role did you play?
11  A.  I was one of the team -- one of the
12      members of the team that was responsible
13      for taking the Manulife underwriting
14      guidelines and John Hancock guidelines and
15      coming up with one set.
16  Q.  Okay.
17  A.  And they were quite similar.
18  Q.  And previously the Manulife and the John
19      Hancock were quite similar, and there were
20      little differences between the two?  Is
21      that what you are saying?
22  A.  Well, I mean there were differences, but
23      for the most part, they were pretty
24      similar.

1  Q.  Okay.  In particular in connection with
2      the process you have described, receiving
3      approval, documents, recommending, and
4      attaching the one-page letter you prepare
5      -- what do you call that one-page letter,
6      by the way?
7  A.  The approval letter.
8  Q.  Okay.  What difference did you see between
9      what Manulife had been doing and what John
10     Hancock had been doing prior to the
11     acquisition?
12         MR. POPEO:  Objection.
13  A.  I can't remember all the differences.
14  Q.  Can you remember any?
15  A.  Yes.  They had smaller loan amounts.  You
16     know, again they're just guidelines, but
17     they would look at loans say from one
18     million up, where Hancock wanted to start
19     at five million and up.  You know, simple
20     little things like that.
21  Q.  Are you familiar with a portfolio
22     management?
23  A.  Yes.  I am familiar with that.
24  Q.  What is portfolio management?

1  A.  I'm not a member of their team.
2  Q.  What team --
3  A.  I am on the credit team.
4  Q.  Okay.  Is Mr. Nectow on the portfolio
5      management team -- was he?
6  A.  Was he?
7  Q.  Yes.
8  A.  Yes.
9  Q.  What, if any, role did you have as a
10     member of the credit team in connection
11     with a rate lock?
12  A.  I can't recall if I signed the rate lock
13     sheet on this particular deal.
14  Q.  You didn't.
15  A.  Oh, okay.  Sometimes we do; sometimes we
16     don't.
17  Q.  So sometimes the credit team will sign off
18     on the rate lock and sometimes it won't?
19  A.  Right.
20  Q.  Are there different occasions that warrant
21     whether you -- whether the credit team
22     signs off on a rate lock or not?
23  A.  Yes.  If we are around.  If we are not
24     around, they will go above us.

1  Q.  Okay.
2  A.  If we are around, they will show it to us
3      and ask us if we want to sign off on it.
4  Q.  Available, meaning being in the office?
5  A.  In the office.
6  Q.  Was Mr. Nectow above you --
7  A.  Yes.
8  Q.  -- at the time --
9  A.  Yes.
10  Q.  -- in the summer of 2004?
11  A.  Yes.  He was my boss.
12  Q.  He was your boss?
13  A.  Yes.
14  Q.  So you as a member of the credit team
15     reported to Mr. Nectow, who was part of
16     the portfolio management?
17  A.  He was in charge of it.
18  Q.  So he was in charge of portfolio
19     management.  Is the person to whom you
20     reported?
21  A.  Yes.
22  Q.  And who worked for you?
23  A.  No one.
24  Q.  You mentioned that you worked with

1      investment officers, including Mr. Malik.
2      Did you work with any other personnel in
3      -- at John Hancock in connection with your
4      job?
5          MR. POPEO:  Objection.
6  A.  There were other people in the department.
7      I'm not sure what you need to know.
8  Q.  On the credit team?
9  A.  The credit team, Jim Rosen was part of the
10     credit team and Joan Falvey.
11  Q.  What is that last name?  Joan?
12  A.  Falvey.  She is no longer with the
13     company.
14  Q.  Did they both have the same level of
15     recommendation authority as you?
16  A.  Well, it is not a level.  You just -- you
17     are one of the recommenders.
18  Q.  Okay.  Were they both recommenders?
19  A.  Yes.  At that time.
20  Q.  Is Mr. Rosen still with the company?
21  A.  Yes.
22  Q.  Does he still have his same job duties and
23     responsibilities?
24  A.  No.  He has been promoted.

Page 37

1   Q.   And what is his job now?
2   A.   He is AVP.  He is a VP of the credit team.
3   Q.   And Ms. Falvey is no longer with the
4        company?
5   A.   Correct.
6   Q.   What are the circumstances of her
7        departure?
8                MR. POPEO:  Objection.
9                If you know.
10  A.   She just left on her own.  I know that
11       much.
12  Q.   Has she been replaced?
13  A.   No.
14  Q.   So the credit team previously was headed
15       by Mr. Nectow and included you, Mr. Rosen,
16       and Ms. Falvey.  And who has replaced
17       Mr. Nectow?
18                MR. POPEO:  Objection.
19                THE WITNESS:  Do you want me to
20       answer it?
21                MR. POPEO:  Yes.  Please.
22  A.   I don't know that anybody has.  Bill
23       McPadden is kind of in that slot.  There
24       was a whole reorganization.

Page 38

1   Q.   Okay.
2   A.   I don't know if you could say somebody
3        replaced somebody else or they just did a
4        reorg.
5   Q.   When did that reorganization occur?
6   A.   You know what?  I don't remember.
7   Q.   Was it in 2005?
8   A.   It might have been.  I can't remember when
9        Barry left.  How bad is that?  I don't
10       remember.
11  Q.   Earlier I reviewed the topics for which
12       you had been designated as the 30(b)(6)
13       designee.  There is a piece of topic
14       number 3 for which you have been
15       designated, and that is "the policies,
16       guidelines, requirements, targets,
17       practices, processes or methods that apply
18       to the making of mortgage loans by John
19       Hancock and any differences in any of the
20       foregoing before and after April 28,
21       2004," and you have been designated for
22       the period after April 28, 2004.
23                Are you aware that you have been
24       designated as the 30(b)(6) designee on

Page 39

1        that topic?
2   A.   Yes.
3   Q.   And what, if anything, have you done to
4        prepare for your testimony on that topic?
5   A.   I haven't done anything.
6   Q.   And can you report to me what, if any,
7        differences there are in the policies,
8        guidelines, requirements, targets,
9        practices, processes or methods that apply
10       to the making of mortgage loans by John
11       Hancock?
12  A.   Any differences from the Manulife?
13  Q.   From the prior.
14  A.   From the previous underwriting?
15  Q.   Yes, yes.
16  A.   I can't recall any differences.
17  Q.   Okay.
18                MR. SCHER:  Mark this.
19                (Multipage documents, headed
20                John Hancock Life Insurance
21                Company, Investment
22                Number 6518467, JH 01128
23                through 01148 marked exhibit
24                number 1 for identification.)

Page 40

1                MR. SCHER:  I am going to
2        apologize in advance.  There is some of my
3        handwriting on it, so I don't know how
4        much of this -- I don't think I have
5        written that much.  I think I wrote
6        "credit approval" at the top.
7                MR. POPEO:  Of course your
8        writing on the document constitutes an
9        absolute waiver of all privilege?
10                MR. SCHER:  Exactly.  Exactly.
11                (Laughter.)
12  BY MR. SCHER:
13  Q.   Let me show you what I have had marked as
14       Coyne exhibit one.
15                (Handing exhibit number 1 to the
16                witness.)
17  Q.   And I ask you to take a moment and review
18       it and then tell me whether this is the
19       approval document to which you made
20       reference in your earlier testimony.
21                MR. POPEO:  Objection.
22                You can answer the question.
23  A.   The approval document at the time this was
24       approved or the approval document now?

Page 41

1   Q.   At the time it was approved.
2            (Pause.)
3            (The witness viewing exhibit
4        number 1.)
5   A.   Yes.
6   Q.   What is the approval document now?
7   A.   Slightly different.
8   Q.   In what respect is it different?  Can you
9        recall?
10  A.   Yes.  We don't have this on the fronts.
11       It is now in the back.
12  Q.   I see.  That is why you said you signed on
13       the back?
14  A.   Yes.  I didn't realize, because it has
15       been so long --
16  Q.   That's okay.
17  A.   -- that we used to sign on the front.
18  Q.   So the two pages that are JH 1128 and 1129
19       in the new process are at the back of the
20       document?
21  A.   Well, the signature page is at the back of
22       the document, the last page.
23  Q.   Okay.
24  A.   And this information is just incorporated

Page 42

1        on this front page.
2   Q.   I see.
3   A.   So it -- it has --
4   Q.   "On this front page" is the JH 1130?
5   A.   Yes.
6   Q.   Okay.  All right.  So now --
7   A.   And this is different, too.  You have a
8        lot more narrative.
9   Q.   You have a lot more narrative now than you
10       did then?
11  A.   It is the same narrative as is in here.
12  Q.   Okay.
13  A.   It is just taken out of boxes, and it is
14       just free-flowing form.  It contains all
15       the same information.  It is just in a
16       different format.
17  Q.   Okay.
18  A.   But it is in essence the same -- the same
19       information to recommend a loan.  It is
20       just presented differently.
21  Q.   So my original question was:  Is this the
22       approval document at the time?
23  A.   At the time.
24  Q.   At the time?

Page 43

1   A.   Yes.
2   Q.   And on the second sheet of the document is
3        your signature on August 6, 2004?
4   A.   It looks like my signature.  Yes.
5   Q.   Okay.  Now looking at this document, do
6        you have any recollection of the loan
7        credit approval that John Hancock
8        considered in late July-early August 2004?
9   A.   No.
10  Q.   Do you recall the Avenel project?
11  A.   No.
12  Q.   Do you recall in connection with the
13       Avenel project any introduction of a new
14       condition or conditions for the
15       disbursement of the loan?
16           MR. POPEO:  Objection.
17  A.   No.
18  Q.   Do you recall the introduction of a
19       10 percent breakeven in this -- in
20       connection with this loan?
21           MR. POPEO:  Objection.
22  A.   No.
23  Q.   Do you know what the 10 percent breakeven
24       requirement is?

Page 44

1   A.   Yes.
2   Q.   And can you tell me was that a requirement
3        of John Hancock prior to acquisition by
4        Manulife?  Was a 10 percent breakeven a
5        requirement of John Hancock prior to the
6        acquisition by Manulife?
7            MR. POPEO:  I object to the
8        form.
9            You may answer the question.
10           THE WITNESS:  Excuse me?
11           MR. POPEO:  You can answer it.
12           THE WITNESS:  Oh.
13  A.   No.
14  Q.   Was it a requirement of John Hancock after
15       the acquisition by Manulife?
16  A.   Yes.
17  Q.   How was the introduction of the 10 percent
18       breakeven as a requirement by Manulife
19       after acquisition made known to you?
20           MR. POPEO:  Objection.
21  A.   I can't recall how it was made known.
22  Q.   Were there any other conditions for
23       disbursement in addition to the 10 percent
24       breakeven that were introduced subsequent

Page 45

1      to the acquisition of John Hancock by
2      Manulife --
3 A.   No.
4 Q.   -- of which you're aware?
5        MR. POPEO: Objection.
6 Q.   No?
7 A.   Not that I'm aware.
8 Q.   Seeing this document, Coyne 1, and seeing
9      that the 10 percent breakeven is
10     interlineated, that is it is written in
11     after the document was typed, does that
12     refresh your recollection that the
13     10 percent breakeven requirement was
14     introduced at or -- during the course of
15     the summer of 2004?
16        MR. POPEO: Objection.
17 A.   No.
18 Q.   Is that your handwriting?
19 A.   No.
20 Q.   Do you know whose handwriting it is?
21 A.   I don't.
22 Q.   Do you know who required that the
23     10 percent breakeven be included in the
24     approval document?

Page 46

1        MR. POPEO: Objection.
2 A.   I don't.
3 Q.   Do you know why the breakeven -- the
4      10 percent breakeven was required to be
5      included in the approval document?
6        MR. POPEO: Objection.
7 A.   No.
8 Q.   Do you know whether you recommended this
9      loan document -- approval document, sorry,
10     whether you recommended it on with or
11     without the 10 percent breakeven in it?
12 A.   I don't recall.
13 Q.   What is the source of the information
14     contained -- who prepares the loan
15     document -- I am sorry -- this approval
16     document?
17        MR. POPEO: Who prepared this
18     very one or who is responsible for
19     preparing them generally?
20 Q.   Who prepared this very one?
21 A.   I don't know.
22 Q.   The investment officer?
23 A.   I would think it was Mr. Malik.
24 Q.   And who generally prepares the approval

Page 47

1      document?
2 A.   The investment officer.
3 Q.   Okay. Do you have any reason to believe
4      it wasn't the investment officer,
5      Mr. Malik, in this case?
6 A.   No.
7 Q.   Do you recall whether subsequent to the
8      recommending of this loan that there was a
9      pickup or a problem in the loan approval
10     process?
11        MR. POPEO: Objection.
12 A.   No, I don't.
13        MR. POPEO: We have been going
14     about an hour. When you come to a
15     convenient place, let's take a break.
16        MR. SCHER: Okay. Would you
17     mark this as the next exhibit?
18        (Two-page e-mail chain, most
19          recent e-mail dated August 11,
20          2004, to Mr. Ferry from
21          Mr. Malik marked exhibit
22          number 2 for identification.)
23 BY MR. SCHER:
24 Q.   I will show you what I have marked as

Page 48

1      Coyne exhibit 2.
2        (Handing exhibit number 2 to the
3     witness.)
4 Q.   Again I apologize. The handwriting on
5      credit app by your name is my handwriting.
6 A.   Okay.
7 Q.   If you take a moment, it appears to be a
8      copy of an e-mail stream. The first
9      e-mail is the one I am directing your
10     attention to. It is from Mr. Malik to
11     Ivor Thomas with copies to you and
12     Mr. Henderson.
13        Do you see that?
14 A.   Um-hmm. Yes.
15 Q.   Have you any recollection of receiving
16     that e-mail from Mr. Malik on or about
17     August 11, 2004?
18 A.   No recollection.
19 Q.   Do you recall that after you had
20     recommended this loan on August 6, 2004,
21     there were further communications with
22     respect to reducing the reserves on the
23     unit to $150?
24        MR. POPEO: Objection.

Page 49

1  A.  I don't recall.
2  Q.  Can you tell me what the document is that
3      is the e-mail, what -- is this a form that
4      is used at John Hancock at or about that
5      time, the e-mail, with the subject, the
6      borrower information, the rating
7      information, the status, not funded, and
8      the approval provision at the bottom?
9          MR. POPEO:  Objection.
10         You can answer.
11 A.  Is it a form of -- a method we use?
12 Q.  Yes.
13 A.  Not to my knowledge.
14 Q.  Is this kind of the only time you have
15     ever seen it?
16 A.  I can't say that.  I mean my name is on
17     it.  I don't recall seeing this one, so.
18 Q.  Okay.  Have you ever been asked to approve
19     or recommend approval of a loan on a
20     document of this form?
21         MR. POPEO:  Objection.
22 A.  No.  You -- you generate another one of
23     these --
24         (Pointing to exhibit number 1.)

Page 50

1  A.  -- to sign off on.  This isn't acceptable.
2  Q.  Okay.  And a "these" is an approval
3      document that is Coyne 1; right?
4  A.  This is an approval document, correct.
5          (Pointing to exhibit number 1.)
6          MR. POPEO:  Coyne 1?
7  Q.  Coyne 1?
8  A.  Coyne 1.
9          MR. POPEO:  Why don't we take --
10         if you are going to go to another
11         document, why don't we take a break.
12         MR. SCHER:  Yes.  Let's take a
13     break.
14         (Recess taken at 10:04 a.m.)
15         (Recess ended at 10:10 a.m.)
16 BY MR. SCHER:
17 Q.  After you received Coyne 2, which you
18     don't recall receiving, do you recall
19     having any conversations with anyone about
20     that document or the contents of that
21     document?
22 A.  About this document?
23         (Pointing to Coyne exhibit
24     number 2.)

Page 51

1  A.  No.
2          MR. POPEO:  Referencing?
3          THE WITNESS:  Referencing
4      Coyne 2.  No, I do not.
5          MR. SCHER:  Mark this.
6          (Multipage documents, headed
7          John Hancock Life Insurance
8          Company, Investment
9          Number 6518467, JH 00405
10         through 00425 marked exhibit
11         number 3 for identification.)
12 BY MR. SCHER:
13 Q.  I will show you what I have had marked as
14     Coyne exhibit 3.
15         (Handing exhibit number 3 to the
16     witness.)
17 Q.  And that appears to me to be another
18     version of the approval document.  Do I
19     have that right?
20 A.  Yes.  That's what it looks like.
21 Q.  And on this one, you will see that your
22     signature, which appears on page JH 00406,
23     is dated August 16, '04.  Do you see that?
24 A.  Yes.

Page 52

1  Q.  And again this one has typed in the box on
2      the first page of Coyne 3 the letters
3      "NCF," which were interlineated on the
4      earlier version?
5  A.  Yes.
6  Q.  And the 10 percent breakeven?  Do you see
7      that?
8  A.  Yes.
9  Q.  Does reviewing this refresh your
10     recollection that there were in fact two
11     approval documents on this loan?
12 A.  I can see there are two, but I don't
13     recall it.
14 Q.  And do you recall reviewing this income,
15     expense, and loan analysis, or any part of
16     this loan approval document which -- do
17     you have any recollection at all of
18     reviewing this second version of the
19     approval document?
20 A.  No, I don't.  I mean typically the
21     investment officer, if they are going to
22     ask you to sign it again, they point out
23     the things that are different.  Now I
24     don't recall that he did that, but that's

Page 53

1 -- because we have many versions of
2 approval documents. Changes happen before
3 the final approval. So they give it back
4 to you to sign. They may say, "I did
5 this, I lowered the reserves," or
6 whatever, "sign it again."
7 Q. As part of your duties and
8 responsibilities at John Hancock in the
9 summer of 2004, was it your responsibility
10 to make certain that the investment
11 officer had secured the acceptance of the
12 borrower to any terms and conditions
13 contained in the approval document?
14 MR. POPEO: Objection.
15 A. No. That wasn't -- that wasn't my job.
16 Q. Was it John Hancock's policy and procedure
17 to in fact have the investment officer
18 secure the approval of the borrower for
19 any changes in the terms and conditions of
20 the loan application?
21 MR. POPEO: Objection.
22 A. This isn't what governs. The borrower is
23 not concerned with that. They are
24 concerned with what is in the commitment.

Page 54

1 So the borrower doesn't even see this.
2 (Pointing to Coyne exhibit
3 number 3.)
4 A. This is for us. So the borrower is not
5 concerned with what we require. He just
6 wants to know if we are going to fund the
7 loan or not.
8 Q. And what Coyne 2 and Coyne 3 represent --
9 I might have the numbers wrong -- I guess
10 it is Coyne 1 and Coyne 3 represent the
11 approval documents, those documents are
12 what the John Hancock will require in
13 order to fund the loan? Is --
14 A. No.
15 Q. Is that right?
16 A. No. That's not right. What is required
17 is in the loan commitment. These are just
18 how we got comfortable with the risk of
19 any loan. This is what we determine, and
20 then whatever gets in the loan commitment
21 is what the borrower knows about and cares
22 about, and that is how we fund the loan.
23 Q. So is it your testimony that there is or
24 there could be no relationship whatsoever

Page 55

1 between the approval document and the loan
2 application?
3 MR. POPEO: Objection.
4 A. I don't know what you mean by "no
5 relationship."
6 Q. Could there be a requirement in the
7 approval document that there be a
8 10 percent constant and that that
9 requirement not be contained in the loan
10 application?
11 MR. POPEO: Objection.
12 A. The 10 percent constant is an assessment
13 of risk for Hancock. Again just what's in
14 the commitment, if we're going to give
15 them 50 million, 100 million, 20 million,
16 that's all they care about. They don't
17 care how we got there. They just want to
18 know what we're going to give them.
19 So none of this stuff -- not
20 none. But this is our underwriting to get
21 whoever the top approver is comfortable
22 that this is a good loan to make. The
23 loan commitment is separate. That's just
24 the dollar amount and, you know, any other

Page 56

1 condition.
2 Q. When the approval document sets forth the
3 disbursement requirements, does that mean
4 what it says, that those are the
5 requirements for disbursement?
6 MR. POPEO: Objection.
7 A. What do you mean "does that mean what it
8 says"?
9 Q. In other words, are disbursement
10 requirements the requirements for
11 disbursement?
12 A. No. Those are the requirements for how it
13 got approved. Quite frequently it can be
14 different. You know, if you have a
15 requirement in here that, you know, your
16 rents are at least, in this example, say
17 4,221,126, but then they are 4 million,
18 you can still fund the loan. You just
19 have to get somebody to sign off on it.
20 These are just what you think at the time
21 you get it approved.
22 Q. I see.
23 A. And then when you fund, they can be
24 different.

14 (Pages 53 to 56)

Page 57

1  Q.  And all you would have to do is get
2      approval of somebody if that change
3      remained?
4  A.  Well, sometimes they are immaterial
5      changes, and you just -- you know, not
6      everything that is in here -- you know,
7      again these are just guidelines to get our
8      guys comfortable with making a loan of any
9      loan amount.
10 Q.  Right.  But if the --
11 A.  You may still choose to fund it if you
12     don't meet them all.
13 Q.  Right.
14 A.  Because they are just guidelines.
15 Q.  And the choice to fund it would be made at
16     the time the request to fund the loan is
17     made; right?
18 A.  At the time of funding.
19 Q.  Right.  And that in this case was
20     contemplated to be August of 2005; right?
21          MR. POPEO:  Objection.
22          You can answer the question.
23 A.  I don't remember when it was supposed to
24     fund.  My involvement ended when it was

Page 58

1      approved.
2  Q.  Okay.  At the time of funding, if there
3      were requirements contained in the
4      approval document that were not met by the
5      borrower at the time of funding, those
6      requirements could be modified or changed
7      by John Hancock at that time; is that
8      right?
9          MR. POPEO:  Objection.
10 A.  I don't view these as requirements.  I
11     mean these are what you think your hurdles
12     are going to be and that you are going to
13     meet them.
14 Q.  Right.
15 A.  But when you fund, you look at it when it
16     -- at the time you're going to fund and
17     where you are.
18 Q.  I see.
19 A.  And then you fund.
20 Q.  So the decision to fund is made at the
21     time of funding; is that right?
22          MR. POPEO:  I object to the form
23     of the question.
24 A.  I don't know.  I don't think that's right.

Page 59

1      No.  That isn't right.
2  Q.  Did you --
3  A.  We agreed to give -- in this particular
4      case, we agreed to fund $32 million.
5  Q.  Right.
6  A.  That's what we were going to give them,
7      32 million.
8  Q.  And at the time of funding -- at the time
9      of funding, no matter what they're --
10 A.  It doesn't matter what this says.
11 Q.  It doesn't matter?
12 A.  It matters what the loan commitment says.
13     If we agreed to give them 32 million, we
14     will give them 32 million.
15 Q.  And if you agreed to give them 32 million
16     subject to certain ratios, then it would
17     be 32 million subject to certain loan
18     sizing ratios, for example; right?
19          MR. POPEO:  Objection.
20          You can answer the question.
21 A.  It is whatever is spelled out in the
22     commitment.  I don't have it in front of
23     me, so I don't know what they were
24     required to meet.

Page 60

1  Q.  You never had it in front of you?
2  A.  Right, right.
3  Q.  So if I were to show it to you today, it
4      would be the first time you had seen it?
5  A.  Correct.
6          MR. SCHER:  Can we mark this as
7      the next exhibit?
8          (One-page memorandum dated
9          August 17, 2004, to Mr. Malik
10         from Ms. Coyne marked exhibit
11         number 4 for identification.)
12 BY MR. SCHER:
13 Q.  I will show you what I have marked as
14     Coyne exhibit 4.
15          (Handing exhibit number 4 to the
16     witness.)
17 Q.  That is a memorandum from you to Timothy
18     Malik showing copies to a number of
19     people, Arthur Francis, Frank Vitukevich,
20     Patricia Wilson, and Kolby Mitnik.  Do I
21     have that right?
22 A.  Vitukevich.  Yes.  That is a tough one.
23 Q.  I was close.
24          And this was prepared by you;

Page 61

1      right?
2  A.  Yes.
3  Q.  And this is the one-page letter that you
4      described in your earlier testimony which
5      you attach to the approval document?  Am I
6      right about that?
7          MR. POPEO:  Objection.
8          You can answer the question.
9  A.  Yes.  It is the one-page letter I
10     attached.
11 Q.  Okay.  Now this makes reference to "The
12     above-referenced mortgage was approved on
13     August 10, 2004."  Do you see that?
14 A.  Yes.
15 Q.  So if you look at Coyne exhibit 1, which I
16     will do in a moment, which is Bates
17     stamped JH 1128 --
18         (Handing Exhibit number 1 to the
19     witness.)
20 Q.  -- it shows that the latest signature is
21     August 10, 2004; right?
22 A.  Yes.
23 Q.  If you look at Coyne 3, you will see that
24     the latest signature is August 16, 2004?

Page 62

1  A.  Correct.
2  Q.  And my question is was the mortgage loan
3      approved on August 10, 2004, or August 16?
4  A.  Well, the final approval looks like it was
5      the 16th.  That probably should have said
6      the 16th.
7          (Pointing to exhibit number 4.)
8  Q.  That may have been a mistake, that?
9  A.  It could have been.  Yes.
10 Q.  Did it make any difference?
11 A.  Not as far as I'm concerned.
12 Q.  And where did you obtain the information
13     for this letter?  Was it from the Coyne 1
14     or Coyne 3 --
15         MR. POPEO:  Objection.
16 Q.  -- or somewhere else?
17 A.  Oh, it was probably the latest one.
18     Probably Coyne 3.
19 Q.  Could you take a moment and verify that?
20         (Pause.)
21         (The witness viewing exhibits.)
22 A.  Well, Coyne 3, the reserves underwritten
23     at $150 a unit, so I am guessing that I
24     took it from number 3.

Page 63

1  Q.  Again when it says disbursement
2      requirements in item number 8, does that
3      mean those are the requirements before
4      disbursal?
5          MR. POPEO:  Objection.
6  A.  No.
7  Q.  Why do you use the phrase "disbursement
8      requirements" if that is not a
9      disbursement requirement?
10 A.  It is a Manulife-originated letter that we
11     just tried to mimic.
12 Q.  I see.
13 A.  It was right after the merger, and we were
14     trying to do it their way.
15 Q.  What should that be called?  What is it
16     called now?
17 A.  It is probably still called disbursement
18     requirements.  I would have to have a
19     current one in front of me to confirm
20     that.
21 Q.  Arthur Francis is shown as a carbon copy
22     recipient of this, and he is in the
23     closing department; is that right?
24 A.  He is in charge of the closing department.

Page 64

1  Q.  And is it accurate to say that he -- this
2      is his only information regarding this
3      loan?  This is his first information
4      regarding this loan?
5          MR. POPEO:  I object to the
6      form.
7          You can answer, if you know.
8  A.  I don't know.  I can't say that.
9  Q.  In the Manulife -- in the John Hancock
10     process and procedure, when does the
11     closing department learn of the approval
12     of a loan?
13         MR. POPEO:  Objection.
14 A.  They get a copy of this letter and this
15     approval.  I don't know when.  That's the
16     first time they hear that it's approved.
17     I don't know when their involvement
18     begins.
19 Q.  And the other three people, who are they?
20 A.  Frank was in systems.  I don't -- to be
21     honest with you, I don't know why he
22     needed it.
23         Tricia Wilson is gone, and Kolby
24     is gone.

## Page 65

1  Q.  But do you know why either of them needed
2      it?
3  A.  You know, I don't know why they needed it.
4      I think they must have had to do something
5      somewhere, but I don't know what it is.
6  Q.  Do you know who Jessica Yaffie Leveroni
7      was?
8  A.  She was one of the in-house counsel.
9  Q.  And was she an in-house counsel who
10     operated on behalf of John Hancock in
11     connection with preparing documents for
12     closing of loans?
13         MR. POPEO:  Objection.
14 A.  For this loan?
15 Q.  For any loan.
16 A.  She is one of our in-house counsel.
17 Q.  Okay.  She is no longer with the company,
18     is she?
19 A.  No.
20 Q.  And do you know is she competent to
21     describe the -- was she competent?  Was
22     she fired from her position at John
23     Hancock?
24         MR. POPEO:  Objection.

## Page 66

1  A.  I don't know the answer to that.
2  Q.  Would it surprise you if I were to tell
3      you that she considered the approval of
4      the loan to be conditional in May of 2005?
5         MR. POPEO:  Objection.
6  A.  Would it surprise me?  In what way?
7  Q.  In other words, is it your understanding
8      that the loan was approved as of
9      August 17, 2004, when you prepared your
10     approval letter?
11 A.  It was my understanding --
12         MR. POPEO:  Objection.
13         You can answer the question.
14     You can tell him what your understanding
15     was.
16 A.  My understanding was that the loan was
17     approved.
18 Q.  As of?
19 A.  October -- August.
20 Q.  17th?
21 A.  Yes.
22 Q.  The date of your letter?
23 A.  Well, 16th actually, the date that it was
24     actually approved.

## Page 67

1  Q.  And you say that any of the conditions
2      contained in the approval that you signed
3      could be waived at the time of closing?
4         MR. POPEO:  Objection to the
5      form of the question.
6         You can answer.
7  A.  Well, the -- there are internal
8      conditions.
9  Q.  Yes.
10 A.  They're not the conditions that the
11     borrower understands.
12 Q.  Those conditions --
13 A.  Those are different.  Those are the
14     conditions.  These are just our comfort
15     level, how we got comfortable, where we
16     think it needs to be.
17 Q.  And anything that is contained in your
18     internal conditions could have been waived
19     at the time of the funding of the loan?
20         MR. POPEO:  Objection.
21 A.  Could have been waived?  They can be
22     changed.
23 Q.  Changed?
24 A.  Yes.  They can be changed.

## Page 68

1  Q.  So that if at the time of the funding of
2      the loan the investment officer sought to
3      have one or more of the conditions
4      changed, that could have been achieved?
5         MR. POPEO:  Objection to the
6      form of the question.  Are we talking
7      about the commitment letter conditions, or
8      are you talking about the conditions on
9      this form here?
10         (Pointing to exhibit number 4.)
11         MR. SCHER:  On the form.  On the
12     -- sorry -- the approval letter.
13         MR. POPEO:  I think we are
14     having confusion about --
15         THE WITNESS:  Yes.  I don't
16     think I understand the --
17 BY MR. SCHER:
18 Q.  Let me ask it.
19 A.  These are -- you know, you have got to
20     look at the commitment letter to fund the
21     loan.  These are -- you know, these are
22     put aside.
23 Q.  A commitment letter to fund the loan, are
24     you talking about the loan application?

Page 69

1  A.  Well, we call it the commitment. Every
2      application once it gets executed is a
3      commitment. I think I need to see that to
4      see what needed to be done to fund this
5      particular loan.
6  Q.  So whatever is contained in that, that is
7      the loan application signed by John
8      Hancock which you say constitutes the
9      commitment?
10 A.  Correct.
11 Q.  We will call that the commitment letter.
12     That is what you call it?
13 A.  No. It is the commitment.
14 Q.  The commitment agreement?
15 A.  The commitment.
16 Q.  The commitment?
17 A.  It is the commitment.
18 Q.  So whatever is contained in that
19     commitment is what John Hancock -- or
20     contains the terms and conditions of the
21     funding of the loan?
22 A.  Yes.
23 Q.  And that the whatever is contained in the
24     loan approval and in particular

Page 70

1      disbursement requirements can be waived or
2      modified or changed at the time of the
3      funding of the loan?
4            MR. POPEO: I object to the
5      form.
6  A.  We're done with these.
7            (Pointing to exhibit numbers 1
8      through 4.)
9  A.  They don't come into play at the time of
10     funding. Just the commitment.
11 Q.  Why do you send those to the closing
12     person at John Hancock after the -- and
13     not send the commitment to the closing
14     person?
15           MR. POPEO: Objection.
16 A.  The closing person does get a copy of the
17     commitment.
18 Q.  Oh, where is that? That is part of the
19     process?
20 A.  Yes. That is part of the process. They
21     get a copy of the commitment.
22 Q.  When was --
23 A.  Because they have to refer it down to the
24     attorneys so they know what the deal is,

Page 71

1      so if they are going to use outside
2      counsel, they know what the deal is.
3  Q.  So where in the process does John Hancock
4      provide a copy of the commitment to
5      persons at John Hancock who are
6      responsible for disbursing loans?
7  A.  Well, that is different. The people who
8      disburse -- the closing -- once it is
9      approved, the commitment is signed by
10     somebody from Hancock, because we already
11     have the borrower's signature. It goes
12     over to closing. They get everything at
13     the same time.
14 Q.  They get?
15 A.  They get a copy of the commitment and a
16     copy of the approval.
17 Q.  So they get a copy of your loan approval,
18     which is appended to the recommendation
19     document, that August 16 and August 10
20     document; right?
21 A.  Well, there is only one document now. The
22     August 10th is gone, and we just have the
23     August 16th. That is the approval
24     document.

Page 72

1  Q.  Okay. So they get the approval document,
2      and they get the commitment document;
3      right?
4  A.  Correct.
5  Q.  And they take those documents, and that is
6      what they use to prepare for the closing
7      and funding of the loan?
8  A.  No.
9  Q.  Is that right?
10           MR. POPEO: Objection.
11 A.  No. That is not right. They just use the
12     commitment.
13 Q.  Why do they get the approval?
14 A.  Why do they get it?
15 Q.  Yes.
16 A.  I mean you have to have an approval so you
17     know we actually looked at it. You just
18     can't give them a commitment and say we
19     are going to fund and not have any thought
20     that we actually looked at the deal to see
21     if it works.
22 Q.  All right.
23 A.  This is for us to make sure we are
24     comfortable with whatever loan amount we

Page 73

1    are going to ultimately fund.
2  Q.  Well, why does the closing person need to
3      see the data upon which you made the
4      decision to approve the loan? Why doesn't
5      the closing person simply need a copy of
6      the commitment signed by John Hancock?
7          MR. POPEO: Objection.
8  A.  Well, there is a lot of information in
9      here, like where the property is located,
10     the size of it, you know, for insurance
11     requirements, there is a whole host of
12     things that are included in our approval
13     document that isn't in the commitment.
14 Q.  As well as 10 percent constant and --
15 A.  But --
16 Q.  -- some other requirements as well?
17 A.  Well --
18 Q.  So how do you know which is -- so what are
19     you telling me? That some of the
20     information contained in the approval
21     letter is used by the closing person and
22     some isn't?
23         MR. POPEO: I object to the form
24     of the question.

Page 74

1          If you understand it, you can
2      answer it.
3  A.  That's not what I am telling you. If you
4      want to --
5  Q.  Yes.
6  A.  Well, I am not telling you that. I'm --
7          MR. POPEO: Stop.
8  A.  If you want to ask me a question, ask me a
9      question.
10 Q.  All right. I am asking you a question.
11     The question is what does the closing
12     person, the person who gets a copy of your
13     letter, Arthur Francis' department, what
14     does he need your approval letter for.
15 A.  I don't know. I'm not a closer. So I
16     don't -- I don't know their functions.
17 Q.  So you don't know what the policies or
18     procedures of John Hancock are in
19     connection with closing a loan; right?
20         MR. POPEO: Objection.
21 A.  I'm not a closer, so I don't know what
22     they do from day to day. I only know what
23     my responsibilities are.
24 Q.  But you do know that they get a copy of

Page 75

1      the commitment?
2  A.  I do know that. Yes.
3  Q.  How do you know that?
4  A.  Because I used to be an IO, and I used to
5      provide them with one.
6  Q.  So the IO provides a copy of the
7      commitment to the closing person; right?
8  A.  Through their admin.
9  Q.  And you -- you as the credit person --
10     provides a copy of the loan approval and
11     the approval letter?
12 A.  I don't give them a copy of the closing.
13 Q.  You don't? You don't?
14 A.  When I sign -- attach my letter to the
15     approval, give it back to the IO, and then
16     they do what they do with it.
17 Q.  But in this case you sent a copy to the
18     closer?
19 A.  No, no. They are copied. I didn't send
20     it. I give it back to the IO.
21 Q.  All right.
22 A.  And then they will have their admin
23     disperse the copies to whoever gets them.
24 Q.  But you know that the IO distributes to

Page 76

1      the closer both a copy of the approval
2      letter and the attachment as well as the
3      commitment?
4  A.  They're supposed to. Yes.
5  Q.  And do you know what the procedures of a
6      closer are with respect to deciding what
7      information from the approval letter they
8      are to use and what information they're
9      not to use?
10         MR. POPEO: Objection.
11 A.  No.
12 Q.  If the numbers in the commitment are
13     materially different than the numbers in
14     the approval letter, your testimony is
15     that the commitment controls?
16         MR. POPEO: Objection.
17 Q.  Is that right?
18         MR. POPEO: Objection.
19         You can answer the question.
20 A.  Can you repeat it for me?
21 Q.  Yes. Let's take a particular example. If
22     the reserve requirement in the commitment
23     is $250 a unit and the reserve requirement
24     in the approval letter is $150 a unit,

Page 77

1   what is -- it is your testimony that the
2   reserve requirement is which of those two?
3          MR. POPEO:  I object to the
4   form.
5          You can answer the question.
6  A.  The $250 doesn't show up in the
7   commitment.  That's a tool that we use to
8   assess risk.  So I don't believe -- and I
9   -- I don't have it in front of me.  I need
10  to look at it again, because I don't have
11  that memorized.  It is not in there.  What
12  is typically in the commitment is the loan
13  amount, the debt service coverage, and the
14  loan to value.
15 Q.  Well, you just said that you don't have it
16  in front of you and that you need to look
17  at it again.  Have you looked at it?  Have
18  you looked at the --
19 A.  This particular one?
20 Q.  Yes.
21 A.  No, no.
22 Q.  Okay.
23 A.  No, I haven't looked at that.
24 Q.  Okay.

Page 78

1  A.  I am familiar with our commitment.  I
2   haven't looked at that one.  We don't list
3   -- again this is all our stuff for us to
4   get comfortable.  It doesn't make it into
5   the commitment.
6  Q.  Okay.
7  A.  The borrower would have no idea if we used
8   800 dollars for reserves or 50 bucks for
9   reserves.
10 Q.  Let's go with my hypothetical.  I will
11  show you the loan commitment if you want
12  to, but if you have never seen it before,
13  I don't know what purpose it would serve.
14         MR. POPEO:  Objection.
15 Q.  Do you want to take a look at it?
16 A.  You said "go with my hypothetical."  I
17  don't hear a question.
18         MR. SCHER:  Mark this.
19         (Multipage Application to John
20         Hancock Life Insurance Company
21         for a First Mortgage Loan,
22         JH 00958 through 01028 marked
23         exhibit number 5 for
24         identification.)

Page 79

1  BY MR. SCHER:
2  Q.  I show you what has been marked as Coyne
3   exhibit 5.  It is a copy of the
4   commitment.
5          (Handing exhibit number 5 to the
6   witness.)
7  Q.  The first question is take a look at it
8   and tell me if you have ever seen it
9   before today.
10         (Pause.)
11         (The witness viewing exhibit
12  number 5.)
13 A.  I have not.
14 Q.  Okay.  Take a look at page JH 01005.
15         (Witness complying.)
16         MR. POPEO:  Have you got it?
17         THE WITNESS:  Yes.
18 Q.  Do you see that there is a reserve set
19  forth in this exhibit?
20 A.  I see examples --
21 Q.  Okay.
22 A.  -- of a reserve.
23 Q.  Right.  And this is part of the loan
24  commitment; right?

Page 80

1  A.  It appears to be.  Yes.
2  Q.  Okay.  And if I represent to you that if
3   you did the division you would see that
4   the loan reserves are $250 per unit.
5  A.  Okay.
6  Q.  And you know that the approval letter
7   contains reserves of $150 a unit; right?
8  A.  Right.
9  Q.  Which controls?
10         MR. POPEO:  I object.
11         You can answer.
12 A.  This is an example.  This isn't saying you
13  have to use 250.  This is an example of
14  what they would look like.
15 Q.  Okay.  So --
16 A.  This is an approval to use $150 for
17  reserves so we can get to the loan amount.
18 Q.  What effect does the changing of the
19  reserves have on the loan amount?
20 A.  It doesn't have any effect.  I mean it is
21  32 million.  It just got us over our
22  underwriting hurdle of the 10 percent
23  constant.
24 Q.  So it is your testimony that what this

Page 81

1      loan commitment constitutes is a
2      commitment to loan $32 million in August
3      of 2005? Is that what you are saying?
4 A.   Correct.
5 Q.   No ifs, ands, or buts?
6 A.   I don't see any.
7 Q.   So that the fact that this loan commitment
8      contains ratios that need to be met, those
9      ratios don't need to be met with respect
10     to loan to value, with respect to debt
11     service coverage? They were -- and even
12     though they are in the commitment, they
13     are optional?
14 A.   Well, I see 125.
15         MR. POPEO: Objection.
16         THE WITNESS: Oh.
17 Q.   Right?
18 A.   I wouldn't say that. On page 17, I see
19      one of 125.
20 Q.   That is part of the commitment then;
21      right?
22 A.   That is part of the commitment, but it is
23      -- in my opinion, when you get to loan
24      closing, if it was 1.20 --

Page 82

1 Q.   Right.
2 A.   -- and the powers that be still wanted to
3      do the loan, the loan would still get
4      funded at 32.
5 Q.   I see. What if the powers to be or the
6      powers that be didn't want to do the loan?
7      Then it wouldn't get funded at 32 million;
8      right?
9         MR. POPEO: Objection.
10 Q.   Isn't that?
11 A.   Well, I don't know. Every case is
12     different. So I don't know the answer to
13     that.
14 Q.   And the difference is it would have to be
15     appraised and evaluated at the time of
16     closing; right?
17        MR. POPEO: Objection.
18 A.   I don't know what would happen in that
19     case.
20 Q.   You have no idea?
21 A.   No.
22 Q.   Is there anything in the policies and
23     procedures of John Hancock or Manulife as
24     you have studied and reviewed them from

Page 83

1      August -- from April 28th when Manulife
2      acquired it to August of 2005 when the
3      closing was to have occurred that speak to
4      this subject?
5         MR. POPEO: Objection.
6 A.   Not that I'm aware of.
7 Q.   Now that you have had an opportunity to
8      look at the commitment, do you agree that
9      the commitment is not simply Manulife --
10     John Hancock will fund a $32 million loan
11     on August 1, 2005, but rather contains a
12     variety of terms and conditions that could
13     result in the loan being in an amount less
14     than 32 million?
15        MR. POPEO: Objection.
16        You can answer the question.
17 A.   No. I don't agree to that.
18 Q.   You don't? You think it was a commitment
19     to loan at $32 million, notwithstanding
20     anything that is contained in the
21     commitment to the contrary?
22 A.   That's my understanding.
23 Q.   Okay. And basically if the powers that be
24     wanted this loan to occur on August 1,

Page 84

1      2005, it would occur at 32 million?
2         MR. POPEO: Objection.
3 A.   Yes.
4 Q.   Is that right?
5 A.   I mean I don't know what they're going to
6      do but.
7 Q.   Right?
8 A.   But we committed to 32 million. We have
9      to fund 32 million.
10 Q.   To the best of your knowledge, are there
11     policies with respect to closing, just as
12     there are with respect to lending?
13 A.   Not to my knowledge.
14 Q.   Would you turn to page 2445 in the
15     unmarked John Hancock real estate finance
16     group lending guidelines, January 25, 2005
17     document?
18        (Witness complying.)
19 Q.   Are you familiar with this asset summary
20     data quality review?
21 A.   No.
22 Q.   Do you have -- item 2, numbered 2, is the
23     review stage. Is it your -- do you
24     participate in the review stage?

21 (Pages 81 to 84)

Page 85

1  A.  I do not.
2  Q.  Do you participate in the commitment
3      stage?
4  A.  No.  I'm out after that, after it has been
5      approved.  I don't -- I don't have
6      anything to do with it.
7  Q.  You have nothing to do with the commitment
8      stage, and you have nothing to do with the
9      review stage; right?
10 A.  Correct.
11 Q.  And you have nothing to do with the
12     closing stage; is that right?
13 A.  Correct.
14 Q.  Looking at page 2446, you see the
15     commitment stage is described in different
16     words.  Does that refresh your
17     recollection as to whether or not you
18     participate in the commitment stage?
19         MR. POPEO:  I object to the
20     form.
21 A.  No, it does not.
22 Q.  Do you see the resource keys identified in
23     that box?  The closing analyst, the
24     underwriter, and the portfolio manager,

Page 86

1      are you any of those?
2  A.  I am not.
3  Q.  What is your role?  What is your resource
4      described as?
5  A.  Credit officer.
6  Q.  Are you aware of an amendment, a draft
7      amendment, to the commitment loan
8      application prepared in this case?
9  A.  I'm not.
10 Q.  Have you been involved in instances where
11     loan applications were amended?
12 A.  Yes.
13 Q.  What is the policy of John Hancock with
14     respect to the amendment of a loan
15     application?  What occasions the
16     amendment?
17 A.  On occasion if the loan is going to be
18     extended to closing, you amend to it just
19     say the loan -- the outside closing date
20     is amended from X to X.
21 Q.  Any other procedures for amending a loan
22     application of which you're aware?
23 A.  Not that I'm aware.  I mean I am -- there
24     could be, but not that I'm aware.

Page 87

1  Q.  Are you -- are there any policies or
2      procedures of John Hancock which govern
3      when loan applications should be amended?
4         MR. POPEO:  Objection.
5  A.  Not that I'm aware of.
6  Q.  Who is in charge of that function, that is
7      whether or not a loan application should
8      be amended?
9  A.  The investment officer.
10 Q.  And you were an investment officer.  What
11     guided you as to whether or not a loan
12     application should be amended?
13 A.  When I was an investment officer, again if
14     I had to extend the closing, it wasn't
15     going to close on time, if we were going
16     to extend it, we have to amend it.
17 Q.  What if the amount of the loan were not
18     going to be funded at the amount that the
19     borrower was seeking?  Would you amend the
20     loan?
21         MR. POPEO:  Objection.
22 A.  I can't recall that happening when I was
23     an IO.
24 Q.  Are there situations -- when you were an

Page 88

1      IO, are there situations where a
2      modification to a loan application were
3      considered but it was decided that it
4      would be a, quote, deal breaker and,
5      therefore, such a modification would not
6      be submitted to the borrower?
7         MR. POPEO:  Objection.
8  A.  I don't really understand what you're
9      getting at.
10 Q.  Well, what I am getting at is in this case
11     the field officer, the man in Blue Bell,
12     Pennsylvania, concluded that the inclusion
13     of the 10 percent constant in the loan
14     application would be a deal breaker; that
15     the borrower would never sign an
16     application that contained that provision.
17     Are you aware of circumstances where a
18     deal breaker was perceived by the
19     investment officer or the field officer,
20     and it was decided not to propose a loan
21     application modification?
22         MR. POPEO:  Objection.
23 Q.  Has that ever happened?
24         MR. POPEO:  Objection.

Page 89

1  A.  I don't really understand your question.
2  Q.  Okay.
3  A.  The 10 percent doesn't get into the
4      commitment to my knowledge, so I don't
5      know. I'm not sure what you're asking.
6  Q.  What if John Hancock had decided that the
7      10 percent constant should be in the loan
8      commitment? Have you ever seen an
9      instance where a loan sizing requirement
10     were included in a loan commitment?
11         MR. POPEO: Objection.
12 A.  I haven't seen that. I mean again the
13     constant is something we get comfortable
14     with. If we had to -- if they wanted us
15     to stick to that 10 percent, we couldn't
16     get to the loan dollars, that might be a
17     deal breaker, because someone might go
18     somewhere else. So, you know, we -- it is
19     a guideline, so we can adjust that if we
20     think it is a good deal, and when you
21     adjust it down to get that good deal, I
22     mean the only thing the borrower cares
23     about is his loan amount and the dollars
24     that he wants.

Page 90

1  Q.  That's what he cares about, and in this
2      particular -- in this case, he wanted
3      enough money to fund the repayment of his
4      construction loan?
5          MR. POPEO: Objection.
6  Q.  Right?
7  A.  I don't know that.
8  Q.  Well, you do know that the size of the
9      loan is all that the borrower is
10     interested in; right?
11 A.  That is typically what any borrower is
12     interested in, getting to their loan
13     amount.
14 Q.  And if there were a requirement of John
15     Hancock that would affect the size of the
16     loan, the borrower should know about it;
17     right?
18         MR. POPEO: Objection.
19 A.  No, I don't think the borrower should know
20     about it. We need to get comfortable when
21     we assess risk and then tell the borrower
22     if we can get to his loan amount or not.
23     He doesn't care how we get there in my
24     opinion. He just wants to know that we

Page 91

1      are comfortable lending what he wants.
2  Q.  And under your criteria, under John
3      Hancock's criteria, you can get to the
4      loan amount that he wants? That's all you
5      want to know?
6  A.  In this particular case?
7  Q.  Yes.
8  A.  We did --
9  Q.  That --
10 A.  We did get to the 32 million.
11 Q.  Right. And the process that was employed
12     included the modification of the projected
13     revenues, net operating income, reduction
14     in the reserves? You know that; right?
15         MR. POPEO: Objection.
16 A.  I wasn't involved in that.
17 Q.  Did you know that?
18 A.  You know, when it came to me for approval,
19     what it was was what it was. I had no --
20     I wasn't involved in any negotiations. I
21     wasn't involved in how they got to it.
22 Q.  Did you --
23 A.  I was just comfortable with the number
24     that they presented me to recommend for

Page 92

1      approval.
2  Q.  And you hadn't seen the loan application
3      at all; right?
4  A.  No, I didn't.
5  Q.  The first time you saw it was today at
6      this deposition?
7  A.  Correct.
8  Q.  Are you familiar with any policies or
9      procedures at John Hancock with respect to
10     yield maintenance?
11 A.  Yes.
12 Q.  And what are they? Are they contained in
13     this document?
14 A.  I don't believe so.
15 Q.  Okay. What policies and procedures are
16     you familiar with?
17 A.  Yield maintenance, whatever is contained
18     in the note. That's what they have to pay
19     for yield maintenance. I don't calculate
20     it, but I understand how to calculate it.
21 Q.  And are you aware of the -- is there any
22     yield which needs to be maintained from
23     the time of the commitment to the time of
24     the funding?

23 (Pages 89 to 92)

Page 93

| | |
|---|---|
| 1 | MR. POPEO: Objection. |
| 2 | A. That's not my job to understand that. |
| 3 | Q. So you -- |
| 4 | A. Portfolio management handles all of that |
| 5 | stuff. I don't. I don't get involved in |
| 6 | it. |
| 7 | Q. That is from the rate lock to the funding |
| 8 | of the loan? |
| 9 | A. What do you mean? |
| 10 | Q. That is where the portfolio manager is |
| 11 | involved? |
| 12 | A. Well, the portfolio is in charge of when |
| 13 | they rate lock it, allocating it to |
| 14 | whatever account wants it or needs it. |
| 15 | Q. Okay. |
| 16 | A. I know they do other stuff. I just don't |
| 17 | know what it is. |
| 18 | Q. Okay. Do you know of any requirement by |
| 19 | John Hancock that yield maintenance be |
| 20 | required of borrowers at the time of rate |
| 21 | lock? |
| 22 | MR. POPEO: Objection. |
| 23 | A. I don't know. Yield maintenance is |
| 24 | something when -- |

Page 94

| | |
|---|---|
| 1 | Q. It is in the note? |
| 2 | A. Yes. It is in the note. |
| 3 | Q. It is when you fund the loan? |
| 4 | A. Well, that's what -- that's my |
| 5 | understanding of yield maintenance. |
| 6 | Q. Right. Can you explain why Jessica Yaffie |
| 7 | Leveroni would say to a title company, |
| 8 | quote, "If the lender approves the loan |
| 9 | for $32 million such and such needs to |
| 10 | happen"? Do you have any idea why she |
| 11 | would use the word "if approval is |
| 12 | provided"? |
| 13 | MR. POPEO: Objection. |
| 14 | A. I have no idea. |
| 15 | Q. She is just plain wrong? |
| 16 | A. I -- |
| 17 | MR. POPEO: I object to the form |
| 18 | of the question. |
| 19 | You can answer it, if you can. |
| 20 | A. I have no idea. I can't explain what |
| 21 | anyone does except for me. |
| 22 | Q. You say that Barry Nectow was your |
| 23 | immediate supervisor? |
| 24 | A. For a while, yes. |

Page 95

| | |
|---|---|
| 1 | Q. And to whom did he report? |
| 2 | A. Ivor -- Warren Thompson, I believe. |
| 3 | Q. And to whom did Mr. Thompson report? |
| 4 | A. Don Guloien. |
| 5 | Q. Where is Ivor Thomas in this hierarchy? |
| 6 | A. I think there may have been a dotted line |
| 7 | from Barry to Ivor, but that was never -- |
| 8 | never written anywhere, so another I'm not |
| 9 | sure. Barry might be able to tell -- help |
| 10 | you out with that one. |
| 11 | Q. Ivor Thomas was a Manulife employee -- |
| 12 | A. Yes. |
| 13 | Q. -- who came to John Hancock after the |
| 14 | acquisition? |
| 15 | A. Yes. |
| 16 | Q. Are there other Manulife employees who |
| 17 | came to John Hancock after the acquisition |
| 18 | in the area where you worked? |
| 19 | A. In investment and pension or right in the |
| 20 | real estate finance group. |
| 21 | Q. In the real estate finance group. |
| 22 | A. No. Just Ivor and Warren. |
| 23 | Q. Did you ever learn that the prospective |
| 24 | borrowers had elected not to close the |

Page 96

| | |
|---|---|
| 1 | loan? |
| 2 | A. Did I ever learn it? |
| 3 | Q. Yes. |
| 4 | A. No. I heard about it when I was going to |
| 5 | be deposed. |
| 6 | Q. So prior to your learning of the lawsuit |
| 7 | and your having been requested as a |
| 8 | deponent, you didn't know that the loan |
| 9 | hadn't closed? |
| 10 | A. No. |
| 11 | Q. I'm right? |
| 12 | A. You're right. Yes, I didn't know. |
| 13 | Q. Did you have any involvement in the |
| 14 | calculation of any losses that John |
| 15 | Hancock may have suffered as a result of |
| 16 | the unwinding of the commitment? |
| 17 | MR. POPEO: Objection. |
| 18 | A. No. |
| 19 | MR. SCHER: Why don't we take a |
| 20 | brief recess. |
| 21 | (Recess taken at 11:04 a.m.) |
| 22 | (Recess ended at 11:14 a.m.) |
| 23 | BY MR. SCHER: |
| 24 | Q. I would like to turn back for a moment to |

24 (Pages 93 to 96)

Page 97

1    Coyne exhibit 1 and Coyne exhibit 3.  Now
2    you recommended both of those documents,
3    and what I'm interested in knowing is what
4    did you do in order to satisfy yourself
5    that you were performing your job function
6    in recommending these two.
7            MR. POPEO:  Objection.
8            You can answer the question.
9  A.   One thing in particular is --
10  Q.   Well, you said -- you said -- you used the
11    phrase "numbers work" or whatever.  I am
12    just trying to understand what it is that
13    you did in connection with this loan
14    application that warranted you
15    recommending it on August 6th and again on
16    August 16th.
17            MR. POPEO:  Objection.
18  A.   I don't remember everything I did, but,
19    you know, this is my job, and I recognize
20    a good loan opportunity when I see one,
21    and I reviewed all the information that
22    was provided, and, you know, this is a
23    great loan, a great location, a great
24    property type.  I recommended it.

Page 98

1  Q.   I know you recommended it, but what I am
2    trying to understand is what part of this
3    did you look at.  Are there, you know, are
4    there criteria?  I mean you know the
5    location, so that spoke to you.  What
6    else?  Are there any of these underwriting
7    criteria?  Are there any of the numbers
8    that are contained in these pages?  This
9    is the only information you had, right,
10    about the loan?
11            MR. POPEO:  Objection.  14
12    questions there.
13  Q.   The last one is:  This is the only
14    document information you had about the
15    loan?
16  A.   I can't say that for certain.  I am
17    guessing I had pictures and maps and --
18    that I don't see attached to this.
19            (Pointing to exhibit number 1.)
20  Q.   The second one has a regional map.  The
21    one on Coyne 3 has a map attached to it in
22    the copy I have.
23  A.   There is a lot of information in here if
24    you know what you are looking for, so.

Page 99

1  Q.   What I want to know is what were you
2    looking for and what did you find?
3  A.   Well, there is enough in here.  You look
4    for lots of stuff, I mean.
5  Q.   Can you tell me?
6  A.   Well, I don't know if I can tell you
7    exactly, but I mean you look to see if the
8    -- you have a good borrower, a good
9    location, a good asset type, property
10    type, you know, see if all your numbers
11    work, brand new apartments.  You know, it
12    is -- it is a good -- it is a good loan.
13    I don't know if I could be more specific
14    than that.  But it hit, you know, all of
15    our, you know, criteria for a good loan.
16  Q.   And the criteria for a good loan are what?
17  A.   Well, it is too numerous to say.  I mean I
18    just rattled off a few of the main salient
19    points.
20  Q.   Okay.  Did the fact that this loan was a
21    forward commitment do anything -- have any
22    place in your evaluation?
23  A.   No.  We do forwards.
24  Q.   That didn't cut one way or the other?

Page 100

1  A.   No.
2  Q.   Did the fact that the loan came to your
3    attention twice, once on August 6th and
4    once on August 16th, cause you any concern
5    or --
6  A.   No.
7  Q.   At the time that you reviewed them, did
8    you note that there were two submissions
9    for the same loan and try to detect what
10    the differences were between the two?
11  A.   No.  I think I said earlier that the IO
12    will come to you and say, "You need to
13    re-sign this because this was changed or
14    this was changed."
15  Q.   But you have no recollection of that
16    having happened in connection with this
17    case?
18  A.   I have no recollection.
19  Q.   If you were to review Coyne 1 and Coyne 3
20    right now, could it refresh your
21    recollection as to whether or not
22    Mr. Malik came to see you and told you
23    what the differences were?
24            MR. POPEO:  Objection.

25 (Pages 97 to 100)

## Page 101

1   A.   No.

2   Q.   No?

3   A.   No.

4   Q.   On page JH 1132 in Coyne 1 and JH 409 in

5        Coyne 3, there is -- it looks like it is a

6        second cover sheet, and it says "John

7        Hancock Life Insurance Company, a meeting

8        of the mortgage and real estate loan

9        committee was held on," August 10 in the

10       one case and August 16 in the other case,

11       "voted to authorize the following

12       investment."

13            There was no meeting, was there?

14  A.   No, I don't recall a meeting. We had done

15       away with meetings, I believe, at that

16       point.

17  Q.   And you had the signature process; is that

18       correct?

19  A.   Correct.

20  Q.   Where you would recommend and pass it on

21       to the next signatory?

22  A.   Correct.

23  Q.   On page 1133, and 410, there is other loan

24       information, memorandum section. Do you

## Page 102

1        see that?

2   A.   Yes.

3   Q.   And it has a fraud carve-out. What does

4        that mean?

5   A.   Just the bad boy carve-outs, the borrower

6        isn't going to -- there is a whole list of

7        them. He isn't going to misappropriate

8        funds; you know, he is not going to do --

9   Q.   Okay.

10  A.   -- all the stuff that would make him a bad

11       boy.

12  Q.   And the "yes" says that he has agreed

13       to --

14  A.   He will sign the nonrecourse carve-outs.

15  Q.   And these are all requirements at the time

16       of the funding of the loan?

17            MR. POPEO: Objection.

18  Q.   Am I right?

19  A.   Not requirements. It is just information.

20  Q.   Information that is that the borrower has

21       agreed to sign such a carve-out at the

22       time of the borrowing?

23  A.   It could be. Sometimes the commitment

24       isn't fully negotiated when you get the

## Page 103

1        approval.

2   Q.   I see.

3   A.   I don't know about this case.

4   Q.   On page 1134 in the August 6th version and

5        411 in the other version, you have --

6        there are "Lines of business allocations

7        voted" section?

8   A.   Yes.

9   Q.   What does that mean?

10  A.   That is who is going to get a piece of the

11       loan.

12  Q.   Does that --

13  A.   I don't have anything to do with it, but I

14       know that is what it is.

15  Q.   Okay. That is at the time the loan is

16       funded, that is how the allocations were

17       going to be made?

18            MR. POPEO: Objection.

19  A.   I'm not sure. I think the -- I don't

20       know.

21  Q.   What does it mean when it refers to a

22       voted section?

23  A.   Well, this is our old form. We don't use

24       this anymore. But that is what was voted.

## Page 104

1        Some of the stuff is information purposes

2        only for the committee when we used to

3        have a committee to make a decision, and

4        the voted section is what they actually

5        voted on. The other stuff is just

6        information.

7   Q.   I see. On page 1134, it says that the

8        approval date was August 10, and then on

9        JH 411 in Coyne 3, it says the approval

10       date was August 16, and it is your

11       testimony that the approval date was

12       August 16?

13  A.   The final approval, yes.

14            MR. SCHER: All right. Another

15       two minutes, and I think I am done.

16            (Pause.)

17  Q.   My question is this. In this case,

18       Mr. Malik is the investment officer. He

19       has negotiated the loan application to the

20       point of submitting it for approval. Do I

21       have that right?

22  A.   Submitting the loan app?

23  Q.   Yes. He has negotiated a loan application

24       with the borrower; right?

## Page 105

1  A.  He did.  Yes.

2  Q.  And then he takes information and prepares

3      an approval document?

4  A.  Yes.

5  Q.  Is that right?

6  A.  Yes.

7  Q.  What are the bounds within which he is

8      required to operate in submitting the

9      approval document?  In other words, is he

10     bound to what is contained in the loan

11     application or not?

12         MR. POPEO:  Objection.

13 A.  I'm not sure I understand the question.

14 Q.  To the extent that there is information in

15     the approval document which differs from

16     the information contained in the loan

17     application, what are the bounds within

18     which the investment officer is required

19     to operate?

20         MR. POPEO:  Objection.

21 A.  Typically the loan commitment -- the

22     commitment is negotiated before you seek

23     approval.

24 Q.  Right.

## Page 106

1  A.  I don't know what the case was here.

2  Q.  Okay.  That seems to have been the case

3      here.

4  A.  Okay.  So.

5  Q.  He has to take the information contained

6      in the loan application, extract it from

7      the loan application, and use it in

8      connection with the loan approval

9      document, doesn't he?

10         MR. POPEO:  I object to the

11     form.

12 A.  No.  They're mutually exclusive.

13 Q.  Well, they are not mutually exclusive,

14     but.

15 A.  Well --

16 Q.  So what are the bounds within which the

17     investment officer has to operate in

18     connection with the preparation of the

19     approval document?

20         MR. POPEO:  Objection.

21 A.  I don't know that there are any.  I mean

22     you create an approval document with the

23     loan amount that you want and the evidence

24     to support, and you show the risks

## Page 107

1      associated with making that loan for

2      32 million.  I don't see how it ties with

3      the commitment.

4  Q.  So it's your testimony that the

5      information contained in the approval

6      document is unrelated to the information

7      contained in the loan application except

8      perhaps with respect to the description of

9      the property and the borrowers?

10         MR. POPEO:  Objection.

11 A.  That's not my testimony.

12 Q.  There are numbers contained in the loan

13     application that are not contained in the

14     approval document that are changed in the

15     approval document.  What limits the loan

16     -- the investment officer from just willy-

17     nilly making up numbers that are contained

18     in the approval document?

19         MR. POPEO:  Objection.

20 A.  I can't answer that.

21 Q.  Aren't there bounds within which he has to

22     operate?

23 A.  Well I think we have a fiduciary

24     responsibility to report the truth and

## Page 108

1      accuracy.  So I can't see how anyone would

2      continue with their job if they made up

3      stuff.

4  Q.  Okay.  The investment officer in preparing

5      the approval document can't make up stuff?

6      He has to use the stuff that the borrower

7      gave him; right?

8          MR. POPEO:  Objection.

9  A.  No.  That's not --

10 Q.  That's not true?

11 A.  No.  I'm not saying it is not true, but

12     you get information from all kinds of

13     places, not just the borrower.

14 Q.  Well, if the borrower --

15 A.  The borrower doesn't give you the market

16     information.  You get the market

17     information from your sources.

18 Q.  Let's just say the borrower says, "I

19     intend to charge a management fee of X

20     dollars."  Let's say it is 5 percent of

21     the rental rate -- of the rents at this

22     particular property.  Does the investment

23     officer have to use that management rate

24     in seeking approval or can he just change

Page 109

1    it to a lower number so that the numbers
2    work?
3            MR. POPEO:  Objection.
4  A.  You can use -- if you -- I mean the way
5      you look at it, it is a level of risk.  So
6      if he wants to charge a particular
7      borrower, any borrower wants to charge
8      5 percent or 6 percent, because it is self
9      managed, you can underwrite 4, because you
10     think if you ever took this property back
11     you could get a property management
12     company in there for 4 percent.  So the
13     borrower provides an estimate of numbers,
14     but we have to get comfortable with them,
15     and we may adjust them up and down to look
16     at like properties in the same area to see
17     where expenses are and see if they are in
18     line with other expenses.
19 Q.  So --
20 A.  So it is a management tool for us to
21     assess a level of risk.
22 Q.  So the investment officer is permitted to
23     make modifications to the numbers
24     submitted by the borrower but only if

Page 110

1    those numbers are grounded in reality?
2            MR. POPEO:  Objection.
3  A.  I can't speak for other investment
4      officers.
5  Q.  Well, that is what your fiduciary
6      obligation would dictate; right?
7            MR. POPEO:  Objection.
8  A.  I'm not sure.
9  Q.  Well, you mean they could imagine numbers?
10           MR. POPEO:  Objection.
11 Q.  Really they have to be grounded in
12     reality, don't they?
13 A.  I don't know what reality you're speaking
14     about, I mean.
15 Q.  The reality of the marketplace, you said.
16     You said that there might be situations
17     where the investment officer could modify
18     the reality presented by the borrower and
19     use his own knowledge or knowledge he
20     obtains regarding what the management
21     charge would be for a property like this
22     in a community like this?
23           MR. POPEO:  I object to the form
24     of the question.  That was not in fact her

Page 111

1    testimony.  She has testified to her
2    knowledge about what the process is.  If
3    you have got a particular question, you
4    should ask it.  Otherwise, I think we have
5    plowed this ground.
6  BY MR. SCHER:
7  Q.  Answer my question.
8            MR. POPEO:  The same objection.
9        You can answer, if you can.
10 A.  Which one?  There were a few of them.
11 Q.  The marketplace reality is the boundary in
12     which the investment officer must operate;
13     am I right or wrong?
14           MR. POPEO:  Objection.
15 A.  I don't understand your definition of
16     "reality."
17 Q.  You said the investment officer is
18     permitted to make modifications to the
19     numbers submitted by the borrower but only
20     if those numbers are grounded in some
21     reality; right?
22           MR. POPEO:  Objection.
23 A.  I don't know if I said that.
24 Q.  Well, what are they grounded in?

Page 112

1            MR. POPEO:  I object to the
2    form.  I think we are getting tangled in
3    some esoteric discussion about realities.
4    Why don't you ask her what the policies or
5    practices are or why don't you ask her
6    what happened in the particular case?
7  BY MR. SCHER:
8  Q.  What are the policies and practices within
9      which are the bounds that an investment
10     officer can operate in modifying the
11     information provided by the borrower?
12 A.  Well, I gave you an example of a
13     management fee.  Sometimes the borrower
14     provides an 8 percent management fee, and
15     we know if we took this property back, we
16     could get somebody in there for 4, so we
17     can underwrite 4.  I don't think there are
18     bounds and -- I mean that is an example of
19     what we -- of how we modify.  And, you
20     know, when we modify, it is to get to the
21     loan amount that the borrower wants.
22 Q.  Of course, if the borrower is saying, "I
23     am going to charge 8 percent management
24     fee and will you loan me $32 million if I

Page 113

1  do that," and then the investment officer
2  says, "Well, I know if I took back this
3  property, I could manage it for 4
4  percent," you're not going to loan him
5  $32 million; are you?
6          MR. POPEO:  Objection.
7  A.  What does that have to do with an 8 or a
8  4 percent?
9  Q.  It doesn't have any effect?
10 A.  No.  I don't understand the question that
11 I think you have in there.
12 Q.  No.  My question is if the net operating
13 income as a result of the deduction of
14 these expenses brings the net operating
15 income way down from what you underwrote
16 the loan to be, wouldn't that influence
17 the size of the loan that you would be
18 willing to make?
19         MR. POPEO:  Objection.
20 A.  Again these are assessment risks that we
21 use.  So if he wants to underwrite 8, we
22 would underwrite 4.  Chances are we're not
23 going to underwrite 8, because 8 is an
24 unrealistic number.  So we would

Page 114

1  underwrite 4.  So --
2  Q.  So you underwrite 4.  That means you
3  approve the funding of the $32 million
4  loan?
5  A.  I don't know what we used in this case.
6  What did we use?
7  Q.  Well, you used --
8  A.  When I thought you were tying it back to
9  the 32 million, I thought you were tying
10 it back to this loan.
11 Q.  No.  We could bother going through and
12 seeing what the difference is.  It is
13 about double, but.  It is about half the
14 amount that the borrower projected.
15         But putting that aside, is it
16 your testimony that you would loan
17 $32 million even if the borrower charged a
18 management rate well above the
19 underwriting management rate?
20         MR. POPEO:  Objection.
21         If you can answer it in that
22 form --
23 A.  I don't think I can answer it.  If you
24 want to rephrase it so I can answer it --

Page 115

1  Q.  Okay.  Is it your testimony that the
2  approval -- the approval of the loan --
3  well, my question -- you are saying that
4  the investment officer's preparation of
5  the approval document with numbers that
6  are not in the application is irrelevant
7  to the application and commitment process?
8          MR. POPEO:  Objection.
9  Q.  Is that right?
10 A.  I don't -- I don't know what you just
11 said --
12 Q.  Okay.
13 A.  -- I mean.
14 Q.  So let me say it again.  Does the
15 investment officer have to use the
16 information provided by the prospective
17 borrower in the loan application in
18 preparing the approval document?
19         MR. POPEO:  Objection.  Asked
20 and answered.
21         You can answer it again.
22 A.  I don't really know how to answer it.  I
23 mean the application slash commitment is
24 different from our internal underwriting.

Page 116

1  So I don't know what you're asking.
2  Q.  Well, we have gone down this path, and I
3  will take you down it again.  There is
4  information contained in the approval
5  document which is contained in the loan
6  application; right?
7  A.  In this case?
8  Q.  Yes.
9  A.  I don't know.  I would have to compare the
10 two of them.
11 Q.  Generally speaking?
12 A.  Generally?  Usually what is in the
13 commitment is the loan amount.  So that
14 would be in the approval document.
15 Q.  Right.
16 A.  So yes.  I guess you could say there is
17 some information the same in both.
18 Q.  The required ratios are contained in the
19 loan application and contained in the
20 approval document?
21         MR. POPEO:  Objection.
22 A.  Sometimes, yes.
23 Q.  In this case, they were?
24 A.  Okay.

29  (Pages 113 to 116)

Page 117

1 Q. Could the investment officer under your
2    description change the loan-to-value ratio
3    contained in the application commitment
4    from what appears in the application
5    commitment to a different ratio in the
6    approval document?
7         MR. POPEO: I object to the
8    form. When you are saying "application
9    commitment" --
10        MR. SCHER: That's the way the
11   witness described it.
12        MR. POPEO: Well, actually,
13   respectfully, no, but you can answer it.
14        THE WITNESS: The application
15   becomes the commitment.
16        MR. SCHER: That's okay.
17        THE WITNESS: If it is in the
18   application stage, it is still being
19   negotiated.
20   BY MR. SCHER:
21 Q. Here we have a situation where there is a
22   75 percent loan-to-value ratio contained
23   in the loan application, and in the
24   approval document, there is a different

Page 118

1    ratio. Is that permitted under your
2    description?
3 A. Did you say it was 75 percent?
4 Q. Yes.
5 A. Well, it would have to be 75 or less in
6    the approval document.
7 Q. Okay. So that is a boundary of what the
8    investment officer can do; right? He
9    can't increase the loan-to-value ratio?
10 A. 75 percent is Hancock's maximum level of
11   lending. So if it is 75 percent, we can
12   lend 75 percent.
13 Q. Now if the loan-to-value ratio in the
14   approval document were 50 percent, --
15 A. Um-hmm.
16 Q. -- would that necessitate informing the
17   prospective borrower of the change?
18        MR. POPEO: Objection.
19 A. Commitment. Whatever is in the
20   commitment. If the commitment says
21   75 percent, that's what he gets.
22 Q. That's what he gets. So the fact that the
23   approval process has a loan-to-value ratio
24   of 50 percent is irrelevant?

Page 119

1 A. Does it have 50 percent in this case?
2 Q. No. But if it were changed.
3 A. Well, you are typically not going to
4    approve a 50 percent loan to value if you
5    are going to give the borrower 75 percent.
6    They should be similar.
7 Q. Why?
8 A. Because you have said that you are going
9    to commit this particular loan. Because
10   you -- you can't -- you are not going to
11   have -- I am not going to say you never
12   can, because typically you approve what
13   you have told the borrower we are going to
14   give you. If we are going to give
15   somebody 50 million and that ends up being
16   a 75 percent LTV, that is what you are
17   going to have in your approval. I don't
18   see how you are going to make it
19   50 percent. I can't see a case where that
20   would happen. I'm not saying it hasn't,
21   but I -- I haven't seen that.
22 Q. So the loan -- the L in the LTV is the
23   loan amount? 32 million; right?
24 A. That's the loan amount. Yes.

Page 120

1 Q. And the value is the -- is what? Is the
2    appraised value?
3 A. It is our internal value.
4 Q. So the 75 percent of the loan amount to
5    your internal value is what is in the
6    application?
7 A. No. The -- the loan amount of 32 million,
8    we must have valued it greater than that,
9    25 percent greater than that. I don't
10   have my calculator, but.
11 Q. In order to achieve the 32 million?
12 A. In order to get to the 32 million.
13 Q. Okay. You are saying that the approval of
14   that loan could not be with a
15   loan-to-value ratio that was significantly
16   lower than 75?
17 A. I didn't say --
18        MR. POPEO: Objection.
19 A. -- it couldn't be.
20        MR. POPEO: Objection.
21        You can answer.
22 A. I didn't say it couldn't be. I said
23   typically they mirror each other or pretty
24   close to it.

Page 121

1   Q.   Why is that?

2   A.   Because that's -- that's what it is.  I

3        mean you are not -- if in your loan

4        commitment if you have a 50 percent LTV at

5        32 million, you would say, "We'll give you

6        32 million."  Your debt service coverage

7        has to be -- it is probably 2.0 at that

8        point, and your loan to value is going to

9        be 50 percent.  So why would you approve

10       it differently?

11  Q.   I don't know why.

12  A.   Yes.  It doesn't make any sense.  That's

13       what I'm saying.  I don't -- I don't

14       understand, because you wouldn't do that.

15  Q.   Why wouldn't you do that?

16            MR. POPEO:  Objection.

17  A.   I don't know how else I can answer it.

18  Q.   I still don't understand, so let me try it

19       again.

20  A.   Does it have it?

21  Q.   The loan-to-value ratio and the debt

22       service coverage ratios are both -- are

23       contained in the loan application and

24       contained in the approval document, the

Page 122

1        same numbers are there.

2   A.   Okay.  That makes sense.

3            MR. POPEO:  Wait.  There is a

4        question coming, I predict.

5            THE WITNESS:  Sorry.

6   Q.   The 10 percent breakeven is contained in

7        the approval document but not contained in

8        the application.

9            MR. POPEO:  Hold on.

10           THE WITNESS:  I am.

11  Q.   So why is that?

12           MR. POPEO:  I object.

13           You can answer the question.

14  A.   Ten percent constant is our underwriting

15       level, assessment of risk.  It is not

16       supposed to be in the commitment.

17  Q.   Why is the loan-to-value and the debt

18       service coverage ratios not underwriting

19       risks?

20           MR. POPEO:  Objection.

21  A.   I didn't say they weren't.

22  Q.   But why are they contained in the

23       application and the 10 percent constant is

24       not?

Page 123

1   A.   Because that is our self-imposed

2        underwriting guideline.

3   Q.   Which is?  The 10 percent constant?

4   A.   The 10 percent.  Yes.

5   Q.   But the 75 percent loan-to-value and the

6        debt service coverage ratios are not

7        internal controls?

8   A.   They are -- they are what you are willing

9        to lend on.  You are willing to lend on

10       something based on this coverage and that

11       coverage.  How we get comfortable with a

12       10, a 9, or an 8, that is Hancock's own

13       internal decision to do what they want.

14  Q.   Could you explain to me the difference

15       between the loan-to-value and debt service

16       coverage ratio as something with which

17       Hancock has to be comfortable and the

18       10 percent constant as something with

19       which Hancock has to be comfortable?

20           MR. POPEO:  Objection.

21           You can answer.

22  A.   The 75 percent is just -- for this

23       particular loan, we're willing to lend up

24       to 75 percent of the value.  And typically

Page 124

1        with the LTV goes a certain debt coverage

2        ratio.  That is all that is.

3            Then the 10 percent is just

4        another little internal test.  If it meets

5        this, it gets somebody a little more

6        comfortable.  That is all it is.  And if

7        it doesn't meet it and we still like the

8        loan, the 10 percent constant goes out the

9        window.

10  Q.   Well, I am still not sure I understand the

11       difference, but what I do understand is

12       that if the loan-to-value ratio and debt

13       service coverage ratios were not met by

14       the borrower, John Hancock might borrow

15       the money anyway; right?

16           MR. POPEO:  Objection.

17  Q.   Might lend the money anyway; right?

18  A.   I have no idea what we would do.

19  Q.   No?

20  A.   I have no idea.  I'm not going to say no,

21       because I don't know.

22  Q.   And you don't have any idea whether John

23       Hancock would lend the money whether the

24       borrower met the 10 percent breakeven or

Page 125

1    not?
2              MR. POPEO:  Objection.
3  Q.  The same thing; right?
4              MR. POPEO:  The same objection.
5  A.  I don't know.
6  Q.  You don't know one way or the other?
7  A.  No.
8  Q.  So what is the difference between the
9      loan-to-value debt service coverage ratio
10     on the one hand and the 10 percent
11     constant ratio on the other hand as it
12     applies to the borrower?
13             MR. POPEO:  Objection.
14 Q.  They are both required to make John
15     Hancock comfortable; right?  Aren't they?
16 A.  No.  The borrower doesn't have to know
17     about our 10 percent.  That is us only.
18     That has nothing to do with the borrower.
19     The borrower is only concerned with how
20     much money are you going to give me and if
21     I hit my 75 percent LTV.
22 Q.  If the borrower knew that you had a
23     10 percent constant requirement that would
24     affect the size of the loan, doesn't that

Page 126

1      matter to the borrower?
2              MR. POPEO:  Objection.
3  A.  I don't know what matters to the borrower.
4  Q.  Okay.  You know that the size of the loan
5      matters to the borrower, or you don't know
6      that?
7  A.  I would imagine that is what the borrower
8      wants, how much money I can get.
9  Q.  And if the 10 percent constant would
10     result in the borrower not achieving
11     $32 million in loan proceeds, that would
12     be material to the borrower, wouldn't it?
13             MR. POPEO:  Objection.  Lacks
14     foundation; mischaracterizes the prior
15     testimony.
16             You can answer the question.
17 A.  I don't know what matters to the borrower.
18 Q.  Okay.  You don't know whether borrowing
19     sufficient money to pay off the
20     construction loan matters to the borrower?
21             MR. POPEO:  Objection.
22 A.  I didn't know it had a construction loan.
23     I wasn't involved in the negotiation of
24     this transaction.

Page 127

1  Q.  All right.
2              MR. SCHER:  Another 30 seconds.
3              (Pause.)
4              MR. SCHER:  It sounds like it is
5  a wrap.
6              THE WITNESS:  Okay.
7              (Whereupon, at 11:52 a.m., the
8  deposition was adjourned.)

Page 128

DEPONENT'S ERRATA SHEET
AND SIGNATURE INSTRUCTIONS

        The original of the Errata Sheet
has been delivered to Paul D. Popeo, Esq.

        When the Errata Sheet has been
completed by the deponent and signed, a
copy thereof should be delivered to each
party of record and the ORIGINAL delivered
to Howard D. Scher, Esq., to whom the
original deposition transcript was
delivered.

        INSTRUCTIONS TO DEPONENT

        After reading this volume of
your deposition, indicate any corrections
or changes to your testimony and the
reasons therefor on the Errata Sheet
supplied to you and sign it.  DO NOT make
marks or notations on the transcript
volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH
THE COMPLETED AND SIGNED ERRATA SHEET WHEN
RECEIVED.

Page 129

```
1    ATTACH TO DEPOSITION OF:  PATRICIA COYNE
2
3    CASE:  JOHN HANCOCK INSURANCE COMPANY VS.
     VESTMONT LIMITED PARTNERSHIP ET ALS
4
5             ERRATA SHEET
6    INSTRUCTIONS:  After reading the
     transcript of your deposition, note any
7    change or correction to your testimony and
     the reason therefor on this sheet.  DO NOT
8    make any marks or notations on the
     transcript volume itself.  Sign and date
9    this errata sheet (before a Notary Public,
     if required).  Refer to Page 128 of the
10   transcript for errata sheet distribution
     instructions.
11
     PAGE  LINE
12
               CHANGE:
13             REASON:
               CHANGE:
14             REASON:
               CHANGE:
15             REASON:
               CHANGE:
16             REASON:
               CHANGE:
17             REASON:
               CHANGE:
18             REASON:
19
20       I have read the foregoing transcript
     of my testimony, and except for any
21   corrections or changes noted above, I
     hereby subscribe to the transcript as an
22   accurate record of the statements made by
23   me.
                    PATRICIA COYNE
24
```

Page 130

```
1             CERTIFICATE
2    Commonwealth of Massachusetts
3    Plymouth, ss.
4
5        I, Judith McGovern Williams, a
6    Registered Professional Reporter and
7    Notary Public in and for the Commonwealth
8    of Massachusetts, do hereby certify:
9        That PATRICIA COYNE, the witness
10   whose deposition is hereinbefore set
11   forth, was duly sworn by me and that such
12   deposition is a true record of the
13   testimony given by the said witness.
14       IN WITNESS WHEREOF, I have
15   hereunto set my hand this        day of
16                    , 2006.
17
18
19
             Judith McGovern Williams
20         Registered Professional Reporter
             Certified Realtime Reporter
21           Certified LiveNote Reporter
        Certified Shorthand Reporter No. 130993
22
23   My Commission expires:
24   April 2, 2010
```

33 (Pages 129 to 130)

06mr31-ROUGH DRAFT Thomas.txt

1

```
1                    **** ROUGH DRAFT ****
2                This is a rough draft transcript, unproofed
3    and uncertified.  It may contain translation, spelling and
4    punctuation errors.  This rough draft is not to be
5    circulated beyond the recipient or quoted from in any
6    proceeding.
7    /                    _____
8
9    REPORTED AND ROUGH DRAFT
10   PREPARED BY:
11   Karin Jenkner, C.R.R., R.P.R., C.S.R.
12   Neeson & Associates Court Reporting and Captioning, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                    06mr31-ROUGH DRAFT Thomas.txt
                    *** ROUGH DRAFT ***
            Neeson & Associates, Toronto
                                                    2
```

```
 1                  FRIDAY, MARCH 31, 2006
 2                  ---Upon commencing at 9:06 a.m.
 3                  IVOR THOMAS, sworn
 4                  EXAMINATION
 5                  BY MR. SCHER:
 6     1            Q.    Good morning, Mr. Thomas.  Let me
 7     formally introduce myself.  My name is Howard Scher.  I
 8     represent the defendants in this lawsuit, which has been
 9     brought by John Hancock Life Insurance Company, including
10     Vesterra corporation.  I'll refer to the defendants
11     collectively as Vesterra.  Is that acceptable to you?
12                  A.    Mm-hm.
13     2            Q.    And you understand that I am the
14     attorney for the defendants in this case?
15                  A.    Yes, I do.
16     3            Q.    And you are here and you're represented
17     by John Hancock's counsel, Mr. Davis; am I right about that?
18                  A.    That's correct.
19                  MR. DAVIS:  Sorry to interrupt, but I take it
20     since we're in Toronto, we should probably make it clear.
21     We're proceeding under the United States Federal Rules of
22     Civil Procedure; correct?
23                  MR. SCHER:  Correct.
24     4            Q.    And that's acceptable to you,
25     Mr. Thomas?
```

06mr31-ROUGH DRAFT Thomas.txt

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

3

1              A.    Yes, it is.
2    5         Q.    Could you identify yourself for the
3    record, please?
4              A.    My name is Ivor Thomas.  What else would
5    you like to know?
6    6         Q.    Well, what is your position?
7              A.    My position with Manulife is senior
8    vice-president, North American mortgage operations.
9    7         Q.    What are your duties and
10   responsibilities as they relate to the John Hancock
11   operation in Boston?
12             A.    My responsibilities are to ensure we
13   have the proper origination loan origination people in
14   place, that we have the proper policies in place.  I'm
15   responsible for all the credit functions within the approved
16   guidelines as given out by the various boards of Manulife
17   and Hancock.  I'm responsible for the overall credit quality
18   of the mortgage portfolio in the U.S. and the same applies
19   in Canada.
20   8         Q.    Prior to the -- well, at the time that
21   Manulife acquired John Hancock, and I believe that was April
22   28th of 2004, do I have that right?
23             A.    I believe so.
24   9         Q.    Did you replace someone at John Hancock?

Page 3

06mr31-ROUGH DRAFT Thomas.txt

25                A.    I replaced Mark Davis.

                      *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                      4


1   10          Q.    And were there any other personnel
2   changes at John Hancock in Boston as a result of the
3   acquisition, in the mortgage area as a result of the
4   acquisition by Manulife?
5                A.    Well, I'd like to point out that Mark
6   Davis left of his own accord, so it wasn't a personnel
7   change instituted by Manulife.  No, as far as, to my
8   knowledge, no, not at that time, no.
9   11          Q.    In the year following the acquisition,
10  so that would be from April 28th, 2004, to April 2005, were
11  there other personnel changes as a result of the acquisition
12  by Manulife within your department?
13               A.    Within the department, there were some
14  people that left.
15  12          Q.    But not at the instance of Manulife?
16               A.    Not at the instance of Manulife.  April
17  2005... I'm trying to remember when that was.
18  13          Q.    There's a Mr. Henderson.
19               A.    Yeah, there's David Henderson.  I'm just
20  trying to get the dates straight in my mind.
21  14          Q.    Okay.
22               A.    But April 2005.  David Henderson was
23  one.
                        Page 4

06mr31-ROUGH DRAFT Thomas.txt

24    15          Q.    I know that David Henderson left the
25    company, I've taken his deposition, and he left the company,

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
                                                    5


1     I believe, in early 2005, perhaps the first quarter of 2005?
2                     A.    Yeah, I think it was probably March.
3     March, April, in that range.  Yeah.
4     16          Q.    Can you tell me the circumstances of his
5     leaving the company?
6                     A.    The circumstances leaving.  What we were
7     doing was trying to reduce the -- how do I put this
8     politely, the body count.  We'd gone through.  We'd decided
9     there were too many people on staff, and then we identified
10    the various people we thought would be best to leave.
11    17          Q.    Okay.
12                    A.    It was a re-engineering, put it that
13    way.
14    18          Q.    And in connection with the
15    re-engineering, Mr. Henderson was asked to leave; is that
16    right?
17                    A.    That's correct.
18    19          Q.    Were there others within the area of
19    your responsibility at John Hancock in Boston who were asked
20    to leave?
21                    A.    Jeez.
22                    MR. DAVIS:  Objection.  Howard, I don't
                          Page 5

06mr31-ROUGH DRAFT Thomas.txt

23    understand how -- whether other people within 2 organization

24    were asked to leave has any relevance whatsoever in this

25    case.

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                    6


1                    MR. SCHER:  Okay, well, just bear with me

2     just for a minute.

3     20         Q.   Mr. Nectow left the organization as well

4     in around this time; is that right?

5                    A.   No, he left in July of 2005, of his own

6     accord.

7     21         Q.   Okay.  Were there others within the area

8     of the mortgage lending at John Hancock in Boston who were

9     asked to leave as Mr. Henderson was?

10                   A.   I'm trying to think.  In Boston.  Can't

11    recall.  Put it that way.  Yes, there was one other.  Jun

12    J-u-n, Han, H-a-n.

13    22         Q.   And that is the -- the responsibilities

14    that person held?

15                   A.   He was not involved on the lending side

16    of the operation.

17    23         Q.   Okay.

18                   A.   He was in market research.  That sort of

19    thing.

20    24         Q.   Fine.  In connection with your oversight

21    of the mortgage lending function at John Hancock in Boston,

                              Page 6

06mr31-ROUGH DRAFT Thomas.txt

22  can you tell me about how much time you allocate to that

23  responsibility, beginning in the end of April 2004?

24              A.   Okay.   There are several time periods

25  involved.   But in April 2004 I was full-time.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    7


1   25          Q.   Okay.   And then when did that full-time

2   condition end?

3               A.   The full-time condition ended in,

4   essentially, November of 2004.

5   26          Q.   Okay.   And since then what's the level

6   of your involvement in the operation of the John Hancock

7   mortgage lending function in Boston?

8               A.   I'm still involved in it a hundred

9   percent of the time, but actually, physically, I'm only

10  there 50 percent of the time.   I'm a week there and a week

11  in Toronto, but I'm still a hundred percent involved in

12  things that go on.

13  27          Q.   In connection with your full-time

14  involvement until November of 2004 -- strike that.

15              Was there something that occurred in 2004

16  that caused you to reduce your physical presence there?

17              A.   The Canadian vice president, a gentleman

18  by the name of Lorne Down, passed away in October of 2004,

19  and so his job was given to me.   So my new responsibilities

20  at that time were to manage the U.S. portfolio, manage the

06mr31-ROUGH DRAFT Thomas.txt

21  Canadian portfolio.

22  28        Q.    So --

23            A.    In addition, the Canadian portfolio is

24  split between Toronto and there's another portfolio in

25  Halifax.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                          8


1   29        Q.    And your responsibility was -- as of

2   November of 2004, became all of North America?

3             A.    That's correct.

4   30        Q.    Do I have that right.  Prior to November

5   of 2004, so let's take it from April 28th, 2004, to November

6   2004, what was your title?

7             A.    Senior vice-president, U.S. mortgages.

8   31        Q.    Okay.  In connection with your

9   responsibilities as the senior vice-president U.S.

10  mortgages, were there changes you implemented in addition to

11  personnel changes from the time you began your position

12  there?

13            A.    Since that time there have been several

14  changes.  Change number 1 would have been the institution of

15  the Manulife credit policy, and subsequent to that we've

16  introduced new mortgage systems from what were previously in

17  place.

18  32        Q.    Could you tell me what a mortgage system

19  is?

                        Page 8

06mr31-ROUGH DRAFT Thomas.txt

20          A.    That's a system whereby you collect all

21  the payments of principal and interest.  It's the accounting

22  system.  It's the servicing system, how you keep track of

23  all your loans.

24  33          Q.    When you say "system" is that a software

25  system?

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                        9


1           A.    It's a software system.

2   34          Q.    So you have introduced the Manulife

3   software system which monitors the collection of mortgage

4   loans in the John Hancock operation?

5           A.    Well, what actually happened, there

6   were, at the time of the merger, there were three systems in

7   place.  There was one in place by Maritime Life, which is

8   known as Plexus, there was one in place by Manulife, known

9   as Comet, and John Hancock was using a system known as

10  Strategy put out by McCracken.

11          Since the merger, and finally by March 1 of

12  this year, we put all those three systems on to one external

13  system run by Midland Loan Services.

14  35          Q.    Okay.

15          A.    Known as Enterprise.

16  36          Q.    So as of March of '06, you now have one

17  mortgage system?

18          A.    Right.

                            Page 9

06mr31-ROUGH DRAFT Thomas.txt

19   37         Q.   From the time of acquisition until March
20   of '06 you were moving toward the integration and creating
21   of a uniform mortgage collection system?
22             A.   That's correct.  The Hancock portfolio
23   was integrated October, I think it was October 31st of 2005.
24   I could be wrong by a month, but October 31st.
25   38         Q.   The third change that you identified was

                    *** ROUGH DRAFT ***
               Neeson & Associates, Toronto
                                                    10


1    the institution of a Manulife policy -- credit policy.  And
2    could you tell me what that is?
3              A.   How do I put this in a few words?  It's
4    a policy that has been drafted and it's basically
5    guidelines.  It has received board approval and the
6    understanding is that the lending group, in this particular
7    case mortgages, follows those -- follows the parameters of
8    that policy.
9    39         Q.   And I've seen a rather thick binder that
10   has a heading: "Manulife credit policy," and is that where
11   the Manulife credit policy is contained?
12             MR. DAVIS:   Objection.  You may respond.
13             MR. SCHER:   Yeah, I'm just dropping something
14   vaguely.
15             THE DEPONENT:   Well, I'm not sure what book
16   you looked at.
17                  BY MR. SCHER:

06mr31-ROUGH DRAFT Thomas.txt

18  40              Q.   Right.

19                  A.   But there is a book, maybe you saw one

20  that had "policy" written on it.  The policy part of it's

21  only about that thick and the procedures part is that thick

22  (indicating).

23  41              Q.   Right.

24                  A.   So the procedures part interprets what

25  the policy says.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

11

1   42              Q.   Now, in connection with the Manulife

2   credit policy, was there introduced a loan-sizing criteria

3   that we've referred to as the 10% constant?

4                   A.   It's referred to, I think, in the U.S.

5   as a 10% constant but it's really referred to in the policy

6   as a 10 percent break-even rate.

7   43              Q.   Okay.

8                   A.   And the concept is really not much

9   different than what was in place in the Hancock policy.

10  They called it a constant and it was used in a slightly

11  different position in the guidelines and in the Manulife

12  policy.

13  44              Q.   Could you articulate what that

14  difference was?

15                  A.   Well, the Hancock, basically, looked at

16  a constant sort of aimed towards the end of the loan in

Page 11

06mr31-ROUGH DRAFT Thomas.txt

17    terms of renewal and whether it would carry that or not.

18    The Manulife point of view was basically concerned with

19    rising interest rates, in terms of when you do a lean, one

20    of your main concerns is, somewhere down the road interest

21    rates may rise significantly, to the point where you may not

22    be able to refinance the loan externally and you wouldn't

23    get repaid.

24                    So it was instituted, basically, as a check

25    on how much room you had between today's rates and any

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    12


1    potential rate and what kind of risk that gave you.

2    45          Q.   So the John Hancock view with respect to

3    the 10% break-even or constant, and I take it that those are

4    interchangeable words; is that right?

5                    A.   I don't think so.

6    46          Q.   Okay.

7                    A.   Well, I don't think they're

8    interchangeable because for umpteen years now, 20-some

9    years, I've been using break even.

10   47          Q.   And you're not about to use "constant."

11                   A.   And I'm not about to use "constant."

12   Yeah.

13   48          Q.   All right.  Well --

14                   A.   And I think that the constant comes in

15   in a slightly different form of calculation.

                            Page 12

06mr31-ROUGH DRAFT Thomas.txt

16            There's different ways of telling whether a

17  loan can maintain its payment stream and cover the amounts

18  owed.  Cover the amounts by the principal and interest

19  payments.  It's a slightly different concept.  It's kind of

20  hard to explain what the difference in the concept is.

21  49          Q.    That's the concept between referring to

22  it as a "constant" or referring to it as a "break-even"?

23            A.    Correct.  As I've said, I've always been

24  used to break-even interest rate, and it's used for a

25  particular purpose, to guess or estimate what your risk is

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    13


1  if interest rates move up.

2  50          Q.    Okay.

3            A.    It's slightly different than what is

4  used or it was used by Hancock or others who kind of use it

5  to say... jeez, how to explain this?  You throw the number

6  in to see what the loan will carry or what the payments will

7  be.

8  51          Q.    So you said in your testimony that there

9  are several tests regarding the ability of a borrower to

10  carry a loan.

11            A.    Mm-hm.

12  52          Q.    And that they include the Loan to Value,

13  do I have that right?

14            A.    Correct.

                            Page 13

06mr31-ROUGH DRAFT Thomas.txt

15  53          Q.    The Debt Service Coverage Ratio?

16              A.    Correct.

17  54          Q.    And this constant or break-even policy;

18  is that right?

19              A.    Right.

20  55          Q.    And all three are designed for what

21  purpose?

22              A.    Well, the primary purpose is to rate the

23  loan.  Under our policy, we're not allowed to do any loans

24  that are rated less than, and this is going to be a

25  difference in terminology between Canada and the U.S., but

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto

                                                14


1   the Manulife rating would be a triple B is your minimum.  So

2   the policy would say you have to have a minimum Debt Service

3   Ratio.  You have to have a minimum Loan to Value or maximum

4   Loan to Value.  You got the break-even issue.  And then

5   you've got a quality issue.

6               And all of those wrap together to tell you

7   what your rating should be.

8   56          Q.    Okay.  And as I understand it, it's your

9   testimony that in order for there to be the approval of a

10  loan, the borrower has to satisfy those four criteria:

11  Quality, plus the three ratios, Loan to Value, Debt Service

12  Coverage, and break-even or constant; is that right?

13              A.    Well, the transaction has to satisfy

                              Page 14

06mr31-ROUGH DRAFT Thomas.txt

14  those.

15  57          Q.   Okay.

16              A.   Has to satisfy a minimum credit rating

17  of triple B.

18  58          Q.   And the way you arrive at a credit

19  rating of triple B is by appraising those four criteria?

20              A.   Right.

21  59          Q.   Quality, Loan to Value, Debt Service

22  Coverage, and constant or break-even; is that right?

23              MR. DAVIS:  Objection.  You may respond.

24              THE DEPONENT:  Correct.

25              BY MR. SCHER:

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

15

1   60          Q.   Now, you said that the triple B rating

2   was the Manulife system, and I take it from that that there

3   is a parallel system that John Hancock used and uses to rate

4   loans?

5               A.   Since merger they're using the Manulife

6   system.

7   61          Q.   Okay.  So since merger, since April

8   28th, 2004, in order for a loan to be approved by John

9   Hancock, the loan would have to satisfy the four criteria

10  that you articulated, and the result of that -- is that

11  right?

12              A.   That's right.

06mr31-ROUGH DRAFT Thomas.txt

13  62        Q.   As far as I've gotten?

14            MR. DAVIS:  Objection.

15            BY MR. SCHER:

16  63        Q.   And the result of that evaluation of

17  those four criteria had to create a triple B rating?

18            A.   Correct.

19  64        Q.   And unless those four criteria were

20  satisfied and a triple B rating achieved, the loan would not

21  be approved.  Am I right?

22            A.   Correct.

23  65        Q.   In the Manulife world, does Manulife use

24  a loan application form?

25            A.   Yeah, the answer is to that yes, but

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                    16


1   it's not always.

2   66        Q.   Okay.  Can you tell me the circumstances

3   where a loan application form would not be used, just in

4   general terms?

5             A.   In general terms, depends on the timing.

6   67        Q.   If a loan needs to be done quickly, then

7   they might not use an application?

8             A.   That's correct.

9   68        Q.   But generally speaking there is a loan

10  application required by Manulife?

11            A.   Well, I'm referring to in the Manulife

                          Page 16

06mr31-ROUGH DRAFT Thomas.txt

12    days there were sort of a one or two page form that the

13    borrower would fill in.  That's what I'm calling the

14    application.

15    69           Q.    I see.  I see?

16                 A.    Okay.  And there's -- application gets

17    kind of confused, because there's a credit application which

18    is an internal document, and there's the external document.

19                 And the Hancock system was always slightly

20    different.

21    70           Q.    I see.  And so the credit -- so the loan

22    application was a two-page document.  Can you just give me

23    the gist of the information, the identification of the

24    property and the --

25                 A.    And the borrower's name, the major

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto

                                                            17


1     partners, identification of the property, the amount being

2     applied for.  You know, general sorts of simple little

3     conditions like that.  That often might be followed up by a

4     term sheet that went back outlining the terms and then...

5     And then you follow from that into the application format.

6     And after a credit application had been approved, then a

7     commitment letter was issued.

8     71           Q.    So the credit application would be the

9     place where the prospective borrower would include financial

10    projection information and creditworthiness information, I

                              Page 17

06mr31-ROUGH DRAFT Thomas.txt

11  take it?

12              A.   Well, the credit application is where we

13  would take all the information provided by the borrower,

14  where all the financial statements he gave us, the rent

15  rolls, property descriptions, et cetera, et cetera, analyze

16  it and my opinion the numbers into a format that we

17  generally understand.  And based on that rating and

18  describing what the transaction is, and then forwarding it,

19  we would get approval.

20  72          Q.   I see.  And in included in that credit

21  application, I take it, the quality of the borrowing would

22  be included?

23              A.   Mm-hm.

24              MR. DAVIS:  Objection.

25              BY MR. SCHER:

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    18


1   73          Q.   The borrower?

2               A.   Borrower.

3   74          Q.   Is that what the quality characteristic

4   ascertains?

5               MR. DAVIS:  Objection.  Pause for a moment,

6   sorry.  I have an objection.

7               Objection.  You may respond.

8               BY MR. SCHER:

9   75          Q.   You refer to four criteria, the three

                        Page 18

06mr31-ROUGH DRAFT Thomas.txt

10  numeric ratios or numeric qualities and -- ratios and then

11  the quality.  What is the quality referred to?

12              A.    Have you got an hour?

13  76          Q.    Okay.  The intangible subjective

14  factors?

15              A.    I'll go back to the creating -- credit

16  rating system that we have -- had in place and still have in

17  place today.

18              Under various scenarios, there are minimum

19  Debt Service Ratios that are permitted.  So the higher the

20  quality, in general, the higher the quality is, the higher

21  the rating of the quality, then the lower the Debt Service

22  Coverage Ratio that's allowed within a various rating --

23  whatever rating category you are using.

24              So the quality, if you look through the

25  manual you'll see there's a whole review which analyzes the

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    19


1   quality, how's the economy doing in that particular

2   neighbourhood?  What is the quality of the building, what

3   are the quality of the sponsors? -- I'm using quality too

4   many times but...

5               Where the person underwriting the loan

6   transaction would justify his rating, whether this is

7   excellent, good, or fair or poor or whatever the case may

8   be.  And based on that, that would allow you to use one debt

                    Page 19

06mr31-ROUGH DRAFT Thomas.txt

9    service credit ratio over another.

10                   For example, in one case where you had an

11   excellent, you might go to a Debt Service Coverage Ratio of

12   1.15.

13   77          Q.    If it was poor you might go to?

14                   A.    You know, if you had the manual I'd show

15   you, but it would be a higher number.

16   78          Q.    Okay.

17                   A.    So that's what I'm trying to explain.

18   That's how the quality came out.  It looked at a variety of

19   different angles of the transaction from the general overall

20   economy to the economy of the state, the economy of the

21   state, location of the property, quality of the borrowers,

22   quality of the people managing the property.  All these

23   sorts of aspects were wrapped into there to justify whether

24   it was excellent, poor, bad, or whatever.  And then that

25   would then justify what Debt Service Ratio would be the

                      *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
6                                                                    20


1    limiting factor on the rating.

2                   I know I've thoroughly confused you now.

3    79          Q.    Not thoroughly.

4                   MR. DAVIS:  He started out confused, that's

5    okay.

6                   BY MR. SCHER:

7    80          Q.    And so when you arrived at John Hancock,

06mr31-ROUGH DRAFT Thomas.txt

8   did you find that their loan approval process differed from

9   that which Manulife had employed previously?

10              A.   Their process differed.  Yes, it

11  differed.

12  81         Q.   Is it accurate to say that their loan

13  application included the credit application as well as the

14  fundamental loan application which Manulife had previously

15  used?

16              MR. DAVIS:  Objection.  Would you read back

17  the question, please.

18              BY MR. SCHER:

19  82         Q.   Let me restate it.  Did you find that

20  the loan application used by John Hancock included the

21  credit application information which you just described,

22  which Manulife had been using?

23              A.   Okay.  Let me try to explain it this

24  way.

25              The basic bare bones of the Hancock

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                    21


1   application were not that much different than the basic bare

2   bones of the Manulife application.

3              Generally all the same things, you considered

4   the same financial characteristics were reviewed and

5   considered, the rating system, which I've been -- was

6   referring to earlier, was basically the same.  It included

                              Page 21

06mr31-ROUGH DRAFT Thomas.txt

7  an aspect for quality in it as well that talked about Debt

8  Service Ratio, it talked about Loan to Value, it talked

9  about all those sorts of things.  There really was not a

10  major difference.

11         The major difference in the overall credit

12  application process, and pardon me for rambling here, is the

13  start to finish was slightly different.  In the Hancock

14  system, all the terms and conditions of a loan were

15  negotiated basically before the loan was approved.  In the

16  Manulife system those kinds of things were negotiated after

17  the loan was approved.

18         And in the approval process at Hancock was a

19  presentation to a committee, whereas the Manulife process

20  was a walk-around.  It went to one level, to another level,

21  to another level.  It was not presented to a committee.

22         So in the Hancock system, a lot more work was

23  done by the Hancock folks up front, before the application,

24  credit application or the application for loan or the

25  borrower's request was even considered by a committee or by

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

22

1  any approval authority.

2         But in terms of the rating system, it's very

3  close to the same.

4  83          Q.   Okay.

5              A.   And in terms of the items looked at and

Page 22

06mr31-ROUGH DRAFT Thomas.txt

6   the issues considered, identical.

7   84          Q.   So the end of the process for Manulife

8   and John Hancock were virtually the same, is that what

9   you're saying?

10              A.   Yes.

11              MR. DAVIS:  Objection.

12              BY MR. SCHER:

13  85          Q.   But the --

14              MR. DAVIS:  The end of the process?

15              MR. SCHER:  Yes.  Y.

16  86          Q.   In other words, the end of the

17  processing of the loan application -- of the request to

18  borrow?

19              MR. DAVIS:  Objection.  You may respond.

20              THE DEPONENT:  In terms of the loan being

21  approved?

22              BY MR. SCHER:

23  87          Q.   Yes.

24              A.   I would say yes.  I would say a loan

25  processed the Hancock way and a loan processed the Manulife

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                   23

1   way at the end would be very similar.

2   88          Q.   Right.

3               A.   The only differences being in who wrote

4   it up and that sort of stuff, but it wouldn't be a major

                    Page 23

06mr31-ROUGH DRAFT Thomas.txt

5   difference.

6                  ---Brief Recess

7                  BY MR. SCHER:

8   89           Q.   Mr. Thomas, you've had an opportunity to

9   take a break.  Did you confer with your attorney on the

10  subject matter of this deposition?

11                 MR. DAVIS:  The answer -- objection.

12                 MR. SCHER:  I'm just asking the question, yes

13  or no?

14                 MR. DAVIS:  Subject matter, no.  Objection.

15                 THE DEPONENT:  No.

16                 MR. DAVIS:  You don't have to answer.  That's

17  okay.  I instruct him not to answer on what we talked about.

18                 BY MR. SCHER:

19  90           Q.   Did you confer with your attorney?

20                 A.   Yes.

21  91           Q.   And was the subject of your conference,

22  your testimony here at this deposition --

23                 MR. DAVIS:  Objection.  I instruct you not to

24  answer.  He's not entitled to know what the subject matter

25  of our discussion was.  R/F.

                 *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto

                                                    24


1                  BY MR. SCHER:

2   92           Q.   In preparation for this deposition other

3   than the scheduling of the date and the place for your

                 Page 24

06mr31-ROUGH DRAFT Thomas.txt

4  appearance here, have you done anything to prepare for this

5  deposition?

6          A.    What do you mean?  Done what?

7  93      Q.    Have you met with your attorney?

8          A.    Yes, met with the attorney.

9  94      Q.    What was the duration of the meeting?

10         A.    All told, two hours, maybe.

11 95      Q.    Was that -- when was that?

12         A.    Last week in Boston and this morning at

13 breakfast.

14 96      Q.    And did you review documents in

15 connection with your preparation?

16              MR. DAVIS:  You can answer that yes or no.

17              THE DEPONENT:  Yes.

18              BY MR. SCHER:

19 97      Q.    And what documents did you review?

20              MR. DAVIS:  Objection.  I instruct you not to

21 answer.  R/F.

22              BY MR. SCHER:

23 98      Q.    Were those documents selected by your

24 counsel?

25              MR. DAVIS:  You can answer that.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                              25


1              THE DEPONENT:  Yes.

2              BY MR. SCHER:

Page 25

06mr31-ROUGH DRAFT Thomas.txt

3   99          Q.   I'd like to understand, if it is
4   possible, and of course that requires me to have mental
5   capacity, but I'd like to understand the 10% constant
6   requirement that John Hancock had.  I've heard it referred
7   to as a loan-sizing criteria.  Do you understand it to be a
8   loan-sizing criteria?
9               MR. DAVIS:  Objection.  You may respond.
10              THE DEPONENT:  Can you clarify for me which
11  one you're referring to, the Hancock system or the Manulife
12  system?
13              BY MR. SCHER:
14  100         Q.   Well, let's take the Hancock system,
15  which I believe refers to it as a 10% constant.  Do you have
16  an understanding of what that is?
17              A.   Vaguely.
18  101         Q.   Can you tell me what your vague
19  understanding is, sir?
20              A.   The 10% constant, as I think I tried to
21  explain earlier, relates to what the size of the loan will
22  be or at maturity.
23  102         Q.   So when you say size at maturity, could
24  you tell me what that means?  The amount left of the loan?
25              A.   Unamortized.

                *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
I                                                          26

1   103         Q.   Unamortized.  But isn't the amount zero?
                          Page 26

06mr31-ROUGH DRAFT Thomas.txt

2          A.    No.

3    104    Q.    Oh, okay.  When is maturity?

4          A.    Maturity alone could be anywhere from

5    zero to 40 years.

6    105    Q.    Oh, okay.  So and maturity is the last

7    date of the existence of the loan?

8          A.    Correct.

9    106    Q.    Okay.  So the loan constant, the loan

10   constant is the size of the loan at the maturity of the loan

11   in the John Hancock system?

12         A.    That's my understanding.

13   107    Q.    And what is the 10% coverage criteria

14   that Manulife introduced to John Hancock?

15         MR. DAVIS:  Objection.  You may respond.

16         THE DEPONENT:  Wasn't a coverage, it was a

17   break-even interest rate.

18         BY MR. SCHER:

19   108    Q.    Sorry?

20         A.    Calculation.

21         BY MR. SCHER:

22   109    Q.    I'm sorry.  What was the 10% break-even?

23         A.    Do you want to know how it's calculated?

24   Is that what you mean.

25   110    Q.    What's the difference between the 10

                    *** ROUGH DRAFT ***
               Neeson & Associates, Toronto
                                              27


                        Page 27

06mr31-ROUGH DRAFT Thomas.txt

1    percent constant and the 10% break-even?

2                MR. DAVIS:  Objection.  Asked and answered.

3    You can respond.

4                BY MR. SCHER:

5    111          Q.   You've described to me what the 10%

6    constant is.  Could you tell me what the 10% break-even is

7    in comparison with that?

8                A.   The 10% break-even was used to actually

9    stress-test the loan to see what it would carry in terms of

10   maximum interest rates which would be in effect at maturity.

11   And it was used to assist you in determining what the credit

12   rating was.

13   112          Q.   Okay. I used the phrase loan-sizing

14   criteria.  Is it accurate to say that the 10% constant is a

15   loan-sizing criteria?

16               MR. DAVIS:  Objection.  You may respond.

17               THE DEPONENT:  It could have an ect on the

18   size of the loan, sure.

19               BY MR. SCHER:

20   113          Q.   Because if the -- it talks about the

21   size of the loan at maturity, and therefore it would dictate

22   what the size of the loan at maturity -- what the property

23   borrowing could bear with respect to loan size at maturity,

24   right?

25               A.   Correct.

                   *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                                    28

                        Page 28

06mr31-ROUGH DRAFT Thomas.txt

1    114          Q.   And does the 10% break-even have a
2    loan-sizing aspect to it?
3                   A.   It could have.
4    115          Q.   So that if the stress, as you said,
5    would exceed the 10% level, then the amount of the loan
6    would need to be reduced; is that right?
7                   MR. DAVIS:  Objection.
8                   THE DEPONENT:  Not necessarily.
9                   BY MR. SCHER:
10   116          Q.   What else could be done?
11                  A.   In what regard?
12   117          Q.   With respect to meeting the 10%
13   break-even?
14                  A.   You could reduce the requirement for the
15   10% break-even.
16   118          Q.   Okay.  So you could modify the 10%
17   break-even, but if you were to use the 10% break-even
18   criteria, that too would have an effect on the loan size; is
19   that right?
20                  MR. DAVIS:  Objection.  You can respond.
21                  THE DEPONENT:  It would have an effect on it,
22   certainly.
23                  BY MR. SCHER:
24   119          Q.   So if I've understood you correctly, and
25   please correct me if I am wrong, both the 10% constant and

                 *** ROUGH DRAFT ***
                     Page 29

1   the 10% break-even could have an effect on the loan size,

2   right?

3                 A.    Correct.

4   120           Q.    But the 10% constant is more clearly

5   correlated to loan size than the 10% break-even; do I have

6   that right?

7                 MR. DAVIS: Objection. You may respond.

8                 THE DEPONENT: I think it involved -- in some

9   form or other, correlated to loan size. I mean, there's a

10  lot of factors that correlate to loan size. This is one of

11  several. Debt service coverage ratio, Loan to Value, market

12  trends, maturity of tenants, there's a variety of things

13  that could have an impact on that.

14                BY MR. SCHER:

15  121           Q.    Okay. Can you explain to me why the

16  Manulife break-even criteria is called "break-even"?

17                A.    It's called "break-even" because of the

18  way it's calculated. You take net operating income and

19  divide it by the loan amount, which basically only considers

20  the interest cost of the loan and not the amortization

21  factor.

22                And basically, as I've tried to explain to

23  you earlier, if you're in an interest rate environment where

24  the interest rates are 3 percent, and you factor the loan

25  and say, hey, great, it covers at 3 percent, but you expect

                            Page 30

06mr31-ROUGH DRAFT Thomas.txt

\*\*\* ROUGH DRAFT \*\*\*
Neeson & Associates, Toronto

30

1    inflation and the interest rates to go to 15 percent, you

2    know that at maturity the loan will not be able to be

3    refinanced.  There's going to be a problem.

4              So it's used as a guideline, as an idea, some

5    sort of indication of what your risk is with regard to

6    rising interest rates.

7    122          Q.    You described to me some of the process

8    changes, some of the process differences, between Manulife

9    and John Hancock, and one of them was that John Hancock

10   literally had a meeting at which a loan would or would not

11   be approved while Manulife had a process whereby signatures

12   would be secured for the -- going up the chain for the

13   approval of loans.  Do I have that right?

14              A.    Correct.

15   123          Q.    During the transition from the meeting

16   format to the signature format process, was there a

17   transition?

18              MR. DAVIS:  Objection.  You may respond.

19              THE DEPONENT:  I'm not sure I understand your

20   question.

21              BY MR. SCHER:

22   124          Q.    So that the John Hancock process or

23   forms associated with that process remained in existence

24   while the Manulife process was introduced?

Page 31

06mr31-ROUGH DRAFT Thomas.txt
25          MR. DAVIS:  Objection.  You may respond.

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                      31


1                THE DEPONENT:  You mean... okay, I'm still
2    kind of lost.  What do you mean by the Hancock forms?  You
3    mean the...
4                BY MR. SCHER:
5    125          Q.    In other words, I've seen minutes of
6    meetings that apparently didn't occur.  A form that says the
7    meeting with respect to the approval of a loan.  And then
8    appended to that was a form indicating a series of
9    signatures by the signing authorities.  It appears to me to
10   have been a melding of two processes, one, the meeting
11   process, and the other, the signature process.
12               Is that an accurate description of what
13   happened?
14               MR. DAVIS:  Objection.  You may respond.
15               THE DEPONENT:  I don't think it is.  I think
16   the meetings basically ended at the date of the merger, and
17   we switched to the new system.
18               BY MR. SCHER:
19   126          Q.    Okay.
20               A.    That's basically what happened.
21   127          Q.    Right.  Now, in connection with the new
22   system, there were other changes in the processing of the
23   approval and disbursement of loans.  Am I right?

                          Page 32

```
                          06mr31-ROUGH DRAFT Thomas.txt
24                 A.   I don't think so.
25     128         Q.   Well, for example, was there --

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    32


1                  A.   I mean --
2      129         Q.   -- a separation between the credit
3      evaluation and the loan approval process?
4                  A.   It's all part of one and the same
5      process.
6      130         Q.   --
7                  A.   I'm not really sure what you mean there
8      either.
9      131         Q.   Okay.  There's a John Hancock employee
10     named Coyne, Patricia Coyne?
11                 A.   Mm-hm.
12     132         Q.   She assumed different responsibilities
13     after the acquisition by Manulife.  Do I have that right?
14                 A.   That's correct.
15     133         Q.   And her responsibilities were in the
16     credit area, do I have that right?
17                 A.   That's correct.
18     134         Q.   And is it your understanding that that
19     was a new responsibility for John Hancock in connection with
20     the approval of loans?
21                 A.   Yes, it was.
22     135         Q.   Okay.  That's the one I was alluding to

                                Page 33
```

06mr31-ROUGH DRAFT Thomas.txt
23    in that category.  What change was that?  Could you describe

24    that for me?

25                    A.   Well, I created a credit department, a

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

33

1    group of people who would evaluate the various loan

2    proposals as they came in.

3    136           Q.   Okay.  And that evaluation process was

4    to have been separate and apart from the -- what other

5    process?

6                    MR. DAVIS:  Objection.

7                    THE DEPONENT:  It wasn't separate from any

8    other process, it was just separating the origination

9    function from the credit function.

10                    BY MR. SCHER:

11    137           Q.   Okay.  And is it accurate to say that

12    the credit evaluation was a pre-requisite that -- and if you

13    need clarification I will, but... was a pre-requisite to

14    loan approval?

15                    A.   Generally.

16    138           Q.   How would an exception to that rule --

17    what exceptions to that rule would exist?

18                    A.   If, for example, none of the credit

19    people were there.

20    139           Q.   Fine?

21                    A.   They're on vacations or they're away.

Page 34

06mr31-ROUGH DRAFT Thomas.txt
22  Depending on the speed of the transaction, how much legwork

23  had gone into the deal beforehand, how much had been

24  discussed with, you know, the authorized levels, with the

25  transaction, they might have been bypassed.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

34

1   140         Q.   But generally speaking the credit

2   evaluation and the credit approval occurs prior to the loan

3   approval; is that right?

4               A.   No, it's originated.  It goes through a

5   credit process, and then it's approved.

6   141         Q.   Yes.

7               A.   That's the general process.

8   142         Q.   Okay.  That's what I was trying to say.

9   I probably misspoke.  I apologize.

10              So the loan is, first originated, then credit

11  approved -- and then credit-evaluated, and then, assuming

12  it's passed all the tests, it's approved.  Is that right?

13              A.   Correct.  Or declined.

14  143         Q.   If it hasn't passed the test.  Okay.

15              A.   Well, even if it has passed the test it

16  can still be declined.

17  144         Q.   Okay.  Now, following the loan approval,

18  there is the process which results in the disbursement of

19  the loan.  Do I have that right?

20              A.   There is a process known as the closing

Page 35

06mr31-ROUGH DRAFT Thomas.txt

21  process.

22  145         Q.   Okay.  And I've heard that described as

23  taking down the loan.  That the vernacular?

24              A.   That's the colloquialism.

25  146         Q.   And then there's, and I've heard it

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

35

1   referred to as the disbursement.  Is that synonymous with

2   the closing?

3              MR. DAVIS:  Objection.  You may respond.

4              THE DEPONENT:  I've always seen it as a

5   separate function.  The loan is closed.  The documents are

6   signed.  The borrower has signed the commitment letter, all

7   the loan documents, et cetera, et cetera and then, once all

8   those documents are signed, then the disbursement occurs.

9   147         Q.   Okay.  Thank you.  I appreciate that

10  clarification.  So, after the closing, there is the

11  disbursement of the loan proceeds?

12              A.   Mm-hm.

13  148         Q.   Is that right?  And is it accurate to

14  say that there are requirements associated with the

15  disbursement?

16              A.   There can be.

17  149         Q.   Was there anything in the Manulife/John

18  Hancock worlds pre-acquisition about which you're familiar

19  that suggested that the disbursement requirements at John

Page 36

06mr31-ROUGH DRAFT Thomas.txt
20    Hancock and the disbursement requirements at Manulife were

21    different?

22                    MR. DAVIS:  Objection.

23                    THE DEPONENT:  Not that I'm aware of.

24                    BY MR. SCHER:

25    150          Q.    Not as far as you're aware?


                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                        36


1                     A.    Not that I am aware of.

2     151          Q.    And is it accurate to say that the

3     disbursement requirements include a checklist of criteria

4     which must be met before disbursement can be made?

5                     A.    It can.

6     152          Q.    Is that typical, that the disbursement

7     requirements would have such a characteristic, that is,

8     they'd have criteria which must be met before disbursement

9     can be made?

10                    A.    It could have criteria.  The criteria

11    would be based on the loan documentation.  All that would be

12    set out in the loan documentation, as to what the criteria

13    was.

14    153          Q.    Okay.  So it would be accurate to say

15    that the closing function has requirements which must be met

16    before the closing can occur?

17                    MR. DAVIS:  Objection.  Asked and answered.

18    You may respond again.

                        Page 37

06mr31-ROUGH DRAFT Thomas.txt

19              THE DEPONENT:  I'm not sure I really

20  understand the question.  That's the problem.  You got me

21  confused.

22              BY MR. SCHER:

23  154         Q.   Okay.  I'm just trying to understand the

24  major elements of the process from the origination of the

25  loan to the disbursement of the loan.

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                    37

1               And I think you said that one of those major

2   processes was the closing.

3               A.   The closing, as I defined it, yes.

4   155         Q.   And as you defined it, it includes a

5   list of elements which must be satisfied before it can

6   occur?

7               MR. DAVIS:  Objection.  He testified

8   generally, that's the case.

9               MR. SCHER:  Right.

10              MR. DAVIS:  Previously.  So we've covered

11  this ground.  You may respond.

12              THE DEPONENT:  Yeah. The closing covers all

13  the legal documentation that has to be in place, and

14  whatever it was conditional on getting that legal

15  documentation has to be in place.

16              BY MR. SCHER:

17  156         Q.   All right.

06mr31-ROUGH DRAFT Thomas.txt
18              A.    It's difficult to close a loan if the

19   borrower hasn't signed the mortgage.

20   157          Q.    Difficult but not impossible.

21              ---OFF THE RECORD DISCUSSION

22              BY MR. SCHER:

23   158          Q.    Let me ask you just another general

24   question.  You have been -- why don't we just, if you don't

25   mind, report your educational background and experience from

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                      38


1    the time you completed your highest level of formal

2    education.  When did you graduate from college?  University?

3              A.    I graduated honors BA in History and

4    political science in 1972 from the University of Western

5    Ontario, located in London, Ontario.  1974, I graduated with

6    a masters in business administration from the same

7    university.

8              Since that time I have been in the lending

9    area, and anything from personal loans, commercial loans,

10   international lending, leasing, corporate loans, real

11   estate, lending, commercial mortgages, the whole gamut.

12   159          Q.    When did you begin your employment with

13   Manulife?

14              A.    November of 1994.

15   160          Q.    And what position did you assume when

16   you began with Manulife?

                        Page 39

06mr31-ROUGH DRAFT Thomas.txt

17                    A.   Vice president of U.S. mortgages.

18   161        Q.   And so your position has remained the

19   same until November of 2004, do I have that right?

20                   A.   Essentially, yes.

21   162        Q.   Did your duties and responsibilities

22   change over that period of time, from the time you began

23   with Manulife until November of 2004?

24                   A.   No, essentially the same.

25   163        Q.   Okay.  Can you tell me in general terms

                      *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
I                                                            39


1    your personal involvement in connection with the loan in

2    question here, the borrower in question here, Vesterra, the

3    Avenel project in Pennsylvania, in general terms what has

4    been your involvement?

5                    A.   In general terms my involvement's been

6    more of a supervisory level.  Part of the credit approval

7    process.  That's basically it.

8    164        Q.   Did you have any involvement in

9    connection with the initial contact between the originator

10   and the borrower, prospective borrower?

11                   A.   No.

12   165        Q.   Did you have any involvement in the

13   negotiation of the proposal by the lender to the prospective

14   borrower?

15                   A.   No.

06mr31-ROUGH DRAFT Thomas.txt
16    166            Q.    Were you aware of the negotiations

17    regarding the loan application, its preparation and

18    completion?

19                    A.    No.

20    167            Q.    Can you report when you first learned of

21    the existence of this loan?  What occasioned your learning

22    of it?

23                    A.    I don't... I don't know.  It would have

24    come up in conversation, or working on some deal or

25    whatever, but...

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                        40


1    168            Q.    Okay.

2                     A.    I don't know the date.

3    169            Q.    That's fine.  I'm just trying to get

4    your recollection.  I'll show you some documents, which

5    perhaps will refresh your recollection.

6                            Following the loan approval -- following the

7    credit approval, did you have any involvement in the -- you

8    signed off on the loan approval as well, right?

9                     A.    Correct.

10    170            Q.    And then, following the loan approval,

11    did you have any involvement in connection with the events

12    which led to the borrower's not taking down or closing on

13    the loan?  Did you become aware --

14                    MR. DAVIS:  Objection.

                            Page 41

```
                                06mr31-ROUGH DRAFT Thomas.txt
15                      BY MR. SCHER:
16   171       Q.   -- that the borrower --
17             A.   I'm not sure what events you're talking
18   about.
19   172       Q.   Did you become aware that the loan would
20   not close?
21             A.   Yes.
22   173       Q.   And can you tell me generally how you
23   became aware of that?
24             A.   I became aware of it through
25   conversation with people in the department who told me the
```

```
                        *** ROUGH DRAFT ***
                     Neeson & Associates, Toronto
                                                      41
```

```
1    loan was not going to close.
2    174       Q.   Can you be more specific with respect to
3    that?  Who in the department?
4              A.   I don't remember who exactly.
5    175       Q.   Do you recall what your reaction was
6    when you learned that the loan would not close?
7              MR. DAVIS:  Objection.  You may respond.
8              THE DEPONENT:  I was disappointed.
9              BY MR. SCHER:
10   176       Q.   And anything else besides
11   disappointment?
12             A.   No.
13   177       Q.   Did you participate in any -- in any way
```

Page 42

06mr31-ROUGH DRAFT Thomas.txt
14    in the decision to seek damages from the prospective

15    borrower?

16              A.    Yes.

17    178         Q.    And can you tell me what participation

18    you had in that decision?

19              MR. DAVIS:  Objection.  To the extent that

20    those discussions took place with counsel, either in-house

21    counsel or outside counsel, you should exclude that from

22    your response, and if those are the only discussions that

23    you recall having on the topic, then you should simply tell

24    that fact to Mr. Scher.  Do not please close the content of

25    your communications with counsel or in the presence of

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                        42

1     counsel.

2              THE DEPONENT:  Discussions I had, I believe,

3     were held with Bill McPadden concerning that the loan was

4     not going to close, and that we were entitled to the damage

5     under the loan documentation that had been signed by the

6     borrower.

7     179         Q.    And that's Bill McPadden, right?

8              A.    Yes.

9     180         Q.    P-a-d-d-e-n.

10              And so Mr. McPadden reported to you, am I

11    right about that?

12              A.    I'm pretty sure he was the one.  Either

                    Page 43

06mr31-ROUGH DRAFT Thomas.txt
13    he did or -- it could have been several people, but...

14    either Bill or there's a couple of other guys.

15    181         Q.    And either Bill McPadden or someone else

16    subordinate to you reported to you that the loan would not

17    close and can you recall was that a meeting or a chance

18    conversation or how did that come about?

19                     A.    I don't know how it came about.

20    182         Q.    Was it in your office?  Do you remember

21    where you were when it happened?

22                     A.    It could have been on the phone.  Could

23    have been many my office.  Could have been in his office.

24    It could have been anywhere.

25    183         Q.    Okay.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
                                                                    43


1                      A.    We chat daily, so a variety of

2     locations.

3     184         Q.    It's not a significant event in your

4     life for sure.  Am I right about that?

5                      MR. DAVIS:  Objection.

6                      THE DEPONENT:  What do you mean by

7     significant?  Like having a child?

8                      BY MR. SCHER:

9     185         Q.    No, I mean like something that you

10    remember?

11                     MR. DAVIS:  Objection.  You can respond.

Page 44

06mr31-ROUGH DRAFT Thomas.txt

12           THE DEPONENT:  I remember... I remember the

13  effect.

14  186        Q.   Okay.  And what is it about the event

15  you remember?

16             A.   What I remember about it?  The borrower

17  was not going to live up to his obligations and draw the

18  money.

19  187        Q.   Okay.  Is that all that you remember

20  about that?

21             MR. DAVIS:  Other than what he's already

22  testified to?

23             MR. SCHER:  Yeah.

24             THE DEPONENT:  Yeah, I think so.

25             BY MR. SCHER:

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
I                                                    44


1   188        Q.   Okay.

2              A.   I don't think what else would be.

3   189        Q.   And who said that you were entitled to

4   damages, you or the person with whom you were speaking,

5   either Mr. McPadden or someone else?

6              A.   Well, my question would have been, this

7   is a forward, because I remember the deal being a forward.

8   Are there damages involved, and what's going to happen with

9   that?  That would have been my response.

10  190        Q.   So by that you mean it was a rate lock

                        Page 45

06mr31-ROUGH DRAFT Thomas.txt

11  forward commitment; is that right?

12          A.  That's correct.

13  191     Q.  And your question was, are there damages

14  associated in such a situation, right?

15          A.  That's correct.

16  192     Q.  And was your question answered?

17          A.  Yes.

18  193     Q.  And was it answered at that occasion?

19          A.  Yes.

20  194     Q.  And that answer was that -- was what?

21          A.  That there are damages.

22  195     Q.  Was there any specificity with respect

23  to the damages?  Any formula or?

24          A.  Not at that time, no.

25  196     Q.  Subsequent to -- was there anything else

                *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                                45


1   that occurred in that conversation you had with respect to

2   the first time you learned that the borrower was not going

3   to close?

4           A.  Not that I recall.

5   197     Q.  Did you know why the borrower had

6   elected not to close?

7           A.  Something came up about the property had

8   been sold.  The comment had been made that the property had

9   been sold. The borrower had sold the property.

                        Page 46

06mr31-ROUGH DRAFT Thomas.txt
10   198         Q.   All right.  So it was your understanding
11   based on what the communication you had with your
12   subordinate, either Mr. McPadden or someone else, that the
13   borrower had elected not to take down the loan, not to
14   borrow the money, because he had decided -- because he had
15   sold the property, right?
16              A.   That's correct.
17   199         Q.   And your question was, are you entitled
18   to damages under those circumstances?  Right?
19              A.   Correct.
20   200         Q.   And the answer given to you was that you
21   are entitled to damages?
22              MR. DAVIS:  Objection.  Asked and answered.
23   You can respond again.
24              THE DEPONENT:  Correct.
25              BY MR. SCHER:

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
6                                                          46

1    201         Q.   And in response to that -- but that the
2    amount of damages was not known at that time, right, the
3    person with whom you were speaking didn't have the amount of
4    damages at that time, right?
5              MR. DAVIS:  Objection.  Calls for
6    speculation.  You can respond.
7              THE DEPONENT:  I didn't ask.
8              BY MR. SCHER:

                        Page 47

```
                              06mr31-ROUGH DRAFT Thomas.txt
 9   202                 Q.    You weren't given that information?

10                       A.    I did not ask and I was not given.

11   203                 Q.    Okay.  Were you ever told from that day

12   forward that you were wrong about the property having been

13   sold?  That you were misinformed?

14                       MR. DAVIS:  Objection.

15                       THE DEPONENT:  Not that I am aware of.

16                       BY MR. SCHER:

17   204                 Q.    Were you ever informed that the property

18   in fact had not achieved the rent roll level that was

19   required in order for the loan to be made?

20                       MR. DAVIS:  Objection.

21                       THE DEPONENT:  No.

22                       MR. DAVIS:  I caution you, in responding to

23   these questions, that if you had discussion with counsel on

24   any of these topics, you should exclude those from any of

25   your responses.

                         *** ROUGH DRAFT ***
                         Neeson & Associates, Toronto
 6                                                              47


 1                       MR. SCHER:  I'm going to try to cure, then.

 2   205                 Q.    So, other than conversations with

 3   counsel, have you ever learned that the property had not

 4   been sold at the time you had your conversation with

 5   Mr. McPadden?

 6                       MR. DAVIS:  Same instruction.  Other than

 7   communication with counsel.

                                Page 48
```

06mr31-ROUGH DRAFT Thomas.txt
8                    BY MR. SCHER:

9    206         Q.   My question said that.

10                    Other than your conversation with counsel,

11   were you ever told, were you ever told, that the property

12   had, in fact, not be sold at the time Mr. McPadden reported

13   it to you?

14                    A.   No.

15   207         Q.   And except for conversations with

16   counsel, had you ever been told that the borrower had not

17   achieved the rent level necessary to take down the loan?

18                    A.   No.

19   208         Q.   Were you ever reported other than by

20   counsel the amount of damages that John Hancock could pursue

21   in this matter?

22                    A.   Not that I can remember.  Probably, but

23   not that I can remember.

24   209         Q.   Okay.  Now, you asked the question at

25   this first meeting, at this first occurrence when you

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
6                                                        48

1    learned about the fact that the borrower was not going to

2    take the borrowing, you asked:  Are there damages in

3    connection with this situation where it was a forward

4    commitment; right?

5                    MR. DAVIS:  Objection.  Asked and answered.

6                    BY MR. SCHER:

                    Page 49

```
                              06mr31-ROUGH DRAFT Thomas.txt
 7   210            Q.   Okay.  Fine, fine, fine.

 8                  Why did you ask that question?

 9                  A.   Because that is in the documentation,

10   that there be damages.

11   211            Q.   So you just didn't know whether the

12   documents contained an entitlement to damages in such a

13   situation, right?

14                  A.   I had not read the documents myself, so

15   the question was, are there damages coming out of this, yes.

16   212            Q.   Okay.  And other than communications

17   with counsel, you never got an answer to that that you can

18   recall?

19                  MR. DAVIS:  Objection.  Asked and answered.

20                  THE DEPONENT:  I thought I answered that one.

21                  MR. DAVIS:  You did.

22                  BY MR. SCHER:

23   213            Q.   You can answer it again, though.

24                  MR. DAVIS:  Objection.  If you recall, other

25   than communication with counsel.

                        *** ROUGH DRAFT ***
                        Neeson & Associates, Toronto
                                                              49


 1                  THE DEPONENT:  Can you repeat the question,

 2   please?  I've forgotten already.

 3                  BY MR. SCHER:

 4   214            Q.   Yeah, I can understand why.  I don't

 5   know why Mr. Davis is choosing to do this today, but we'll

                                Page 50
```

06mr31-ROUGH DRAFT Thomas.txt

6    find out.

7                 All right.  So here's the same question.

8                 MR. DAVIS:  Because you're asking the same

9    question several times over.

10                MR. SCHER:  You have a standing objection to

11   my repeating the question, so I'm going to continue doing

12   that, so you can have a standing objection.  You don't need

13   to preserve it.  You know that you're not permitted to make

14   such an objection at a deposition but you persist in doing

15   so --

16                MR. DAVIS:  I'm certainly am entitled to make

17   an objection and I will continue to make the objections as

18   appropriate.

19                BY MR. SCHER:

20   215           Q.   Other than communications with counsel,

21   you never got an answer to your question with respect to

22   whether or not John Hancock was entitled to damages in a

23   situation involving a forward commitment?

24                MR. DAVIS:  Objection.  Asked and answered,

25   and also contrary to the testimony he provided earlier.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    50


1                 THE DEPONENT:  I thought I'd answered that I

2    did get an answer, that we were entitled to damages.

3                 BY MR. SCHER:

4    216           Q.   Other than your communication with

                        Page 51

06mr31-ROUGH DRAFT Thomas.txt
```
 5   counsel, did you ever get an amount?

 6                    MR. DAVIS:  Objection.

 7                    THE DEPONENT:  Oh, you didn't ask it.  You

 8   didn't mention an amount.

 9                    BY MR. SCHER:

10   217          Q.   That's okay.

11                    A.   You said an answer to the question

12   whether we were entitled to damages.

13   218          Q.   Understood.

14                    MR. DAVIS:  Objection.

15                    BY MR. SCHER:

16   219          Q.   That's fine.  He keeps on saying

17   "objection" but can you answer my question?

18                    MR. DAVIS:  Objection.

19                    THE DEPONENT:  Did I ever get -- I never -- I

20   don't know if I ever asked as to what the amount was in the

21   first place.

22   220          Q.   Okay?

23                    A.   So how could I get an answer to whether

24   or not I got that?  So...

25   221          Q.   Bottom line is --
```

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
I                                                              51

```
 1                    A.   ... bottom line --

 2   222          Q.   -- you never got an answer?

 3                    A.   No.
```

                              Page 52

06mr31-ROUGH DRAFT Thomas.txt

4    223            Q.   You never got the amount of damages,

5    right?

6                    MR. DAVIS:  Objection.

7                    THE DEPONENT:  I never heard what the amount

8    was.

9                    BY MR. SCHER:

10   224            Q.   Okay.

11                   ---Query by reporter

12                   MR. DAVIS:  I did object.  And I want to

13   instruct the witness that -- it's the same instruction,

14   which is, other than, if you had communications with counsel

15   on that point, you should exclude them from your response.

16   That was not included in Mr. Scher's question, and I want to

17   make it clear that you should not disclose any privileged

18   communications with counsel.

19                   BY MR. SCHER:

20   225            Q.   Do you want to start it again?  So let

21   me ask you the question again.

22                   A.   Sure.

23   226            Q.   Sure.  Other than communications with

24   counsel, did you ever get an answer to your question --

25   strike that.

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
I                                                          52


1                    Other than communications with counsel, did

2    you ever learn whether you sought to learn or not, did you

                    Page 53

06mr31-ROUGH DRAFT Thomas.txt

3    ever learn the amount of damages to which John Hancock

4    claimed entitlement?

5                      A.    No.

6    227          Q.    Let me show you what I had marked as

7    Thomas Exhibit 1.  And the convention is as follows.  I'll

8    tell you the Bates stamp number, and that's the number

9    that's been applied to this document by John Hancock.  But

10   it's JH 00074.  Does that appear at the bottom of the page

11   that you have?

12                      A.    Mm-hm.

13                      ---EXHIBIT 1 marked for identification

14                      BY MR. SCHER:

15   228          Q.    And this document includes, in sequence

16   through JH 77, right?

17                      A.    Correct.

18   229          Q.    And it's a copy of a communication from

19   John Ferrie to appears to be to Avenel at Montgomery Square

20   or nominee care of Robert W. Kelly.  Have I accurately

21   described the document dated June 18, 2004?

22                      A.    Based on those numbers you've given me,

23   yes.

24   230          Q.    Okay.  Have you ever, before today, seen

25   this document?

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto

                                                          53

1                     THE DEPONENT:  Excluding discussions with

                              Page 54

```
                         06mr31-ROUGH DRAFT Thomas.txt
2   counsel?
3                   MR. DAVIS:  No, if you've seen it before
4   today, you may tell him whether you've seen it before, if
5   you recall it.
6                   THE DEPONENT:  Yeah.  But I don't recall
7   whether I have or not.
8                   BY MR. SCHER:
9   231          Q.   Okay.  Is this a loan proposal?
10                  MR. DAVIS:  Objection.  You can respond.
11                  THE DEPONENT:  I don't know what it is.  I
12  haven't read it.
13  232          Q.   Okay.  The first sentence reads:
14                  "John Hancock Life Insurance Company..."
15  And then I'll skip the next words:
16                  "... proposing the following loan terms."
17  Would you call this a loan proposal by John Hancock?  Or
18  not?
19                  MR. DAVIS:  Objection.  Howard, I note that
20  this version isn't signed.  Are you aware -- can you confirm
21  that this is the -- a signed version of this is what was
22  sent out, because I know that there were several drafts of
23  this document that floated around.  And I believe a signed
24  version was produced.
25                  (witness perusing document)

                 *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                               54


                       Page 55
```

```
                    06mr31-ROUGH DRAFT Thomas.txt
 1              BY MR. SCHER:
 2    233           Q.   Can you answer my question, Mr. Thomas?
 3              MR. DAVIS:  Objection.
 4              THE DEPONENT:  It appears to be a loan
 5    proposal.
 6              BY MR. SCHER:
 7    234           Q.   Okay.  In this loan proposal there are
 8    listed in the funding criteria, and you can take as much
 9    time as you need, a description of a funding criteria called
10    the Loan to Value criteria.  You see that?  What?
11                  A.   Page is that on?
12    235           Q.   I'm sorry, it's on the second page, and
13    it's Bates-stamped JH 75?
14                  A.   Mm-hm.
15              MR. DAVIS:  There's a reference to it also on
16    page 1 that you should see.
17              BY MR. SCHER:
18    236           Q.   So you want to interrogate the witness
19    too?
20              MR. DAVIS:  If you're going to be pointing
21    him to the relevant section of the document, I want to make
22    sure he sees all of the relevant sections.
23              BY MR. SCHER:
24    237           Q.   All right.  Why don't we do this.
25    Mr. Thomas... why don't you take a moment and review this
```

06mr31-ROUGH DRAFT Thomas.txt

1  document, and then I'm going to ask you some questions about

2  it.  Tell me when you're ready.

3                  (witness perusing document)

4                  A.    Okay.

5  238        Q.    You note that the Loan to Value and Debt

6  Service Coverage Ratios are included in this -- requirement,

7  sorry, are included in this proposal, right?

8                  A.    Correct.

9  239        Q.    The 10% break-even, 10% constant, is

10  not, right?

11                 A.    Correct.

12  240        Q.    Do you know why?

13                 MR. DAVIS:  Objection.

14                 THE DEPONENT:  I don't know why.  It's not a

15  normal item you put in.

16                 BY MR. SCHER:

17  241        Q.    Okay.  It's not a normal item to put in.

18                 There's a reference to funding.  I'm trying

19  to understand what that means.  Does that mean disbursement,

20  on the second page?

21                 MR. DAVIS:  Objection.

22                 THE DEPONENT:  That would be my

23  understanding.

24                 BY MR. SCHER:

25  242        Q.    Yes.  Now, you offered, in answer to my

06mr31-ROUGH DRAFT Thomas.txt

1    question regarding the 10% constant and 10% break-even, that
2    it's not a normal item you put into a proposal.  Right?
3                    A.    That's correct.
4    243            Q.    Why?  You're gesturing "it's so
5    obvious," but...
6                    A.    Why would you?
7    244            Q.    Okay.  You can't offer any explanation
8    better than that, can you?
9                    MR. DAVIS:  Objection.
10                   THE DEPONENT:  A proposal is, basically a
11   proposal, when you put it in broad terms, we're willing to
12   lend 75 percent of the value, certain Debt Service Coverage
13   Ratio is a general kind of proposal.  You don't go into all
14   the nitty gritty in a proposal as to what basis you're
15   looking at to deal.  What's that have to do with that?
16   245            Q.    Okay.  You put that in the application,
17   right?
18                   MR. DAVIS:  Objection.
19                   THE DEPONENT:  Which application are you
20   talking about?
21   246            Q.    The loan application?
22                   A.    There's two loan applications.  You mean
23   the borrower's application?
24   247            Q.    Yes.
25                   A.    I don't believe so.  In the credit

Page 58

06mr31-ROUGH DRAFT Thomas.txt
*** ROUGH DRAFT ***
Neeson & Associates, Toronto

57

1   application.
2   248          Q.    Why don't you put it in the loan
3   application?
4                A.    Why?
5   249          Q.    Why don't you put it in a loan
6   application?
7                MR. DAVIS:  You talk about when you say it,
8   you mean the 10% constant.
9                MR. SCHER:  Yes.
10               MR. DAVIS:  Or break even?
11               THE DEPONENT:  But which application are you
12  speaking about?
13               BY MR. SCHER:
14  250          Q.    The loan application.  The John Hancock
15  loan application, not Manulife.  I'm talking about the John
16  Hancock loan application where all the work is done up
17  front?
18               A.    You mean the one where the borrower
19  signs?
20  251          Q.    Yes?
21               A.    Why do we not put it in?
22  252          Q.    Correct?
23               A.    Because it's the John Hancock one.
24  253          Q.    Because it's the John Hancock one.  I
25  see.  But if it were the Manulife one, it would be included;
                              Page 59

06mr31-ROUGH DRAFT Thomas.txt

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

I                                                                    58

1    am I right about that?
2                    A.    No.  Not necessarily.
3    254            Q.    Well, why don't you put the John
4    Hancock -- why doesn't John Hancock put the 10% constant
5    requirement in its loan application?
6                    A.    Because we don't feel like putting it
7    in.
8    255            Q.    Because they didn't feel like it?
9                    A.    Yeah.
10   256            Q.    Okay.  And that's the best answer you
11   can give me on that, isn't it?
12                   MR. DAVIS:  Objection.  That's the answer he
13   did give you.
14                   BY MR. SCHER:
15   257            Q.    Is that the best answer you can give me
16   on that?
17                   MR. DAVIS:  Objection.
18                   BY MR. SCHER:
19   258            Q.    Is that the best answer you can give me
20   on that?
21                   A.    Yes.
22   259            Q.    Okay.  Did you ever ask anyone at John
23   Hancock why they did not include the 10% constant
24   requirement in the loan application?
                         Page 60

06mr31-ROUGH DRAFT Thomas.txt

25          A.   Well, how do I know that they didn't?

              *** ROUGH DRAFT ***
            Neeson & Associates, Toronto
                                              59


1    260      Q.   Okay.  So you don't know whether it's in
2    or not, do you?
3             A.   No, I don't.
4    261      Q.   It could be --
5             A.   You told me it wasn't in it.
6    262      Q.   That's fine.  It could be in the loan
7    application, couldn't it?
8             MR. DAVIS:  Objection.  Calls for
9    speculation.
10            BY MR. SCHER:
11   263      Q.   You can answer.
12            A.   It could be.  Yeah.  It could be.
13   264      Q.   So it's not a criteria that's so far
14   into a loan application that no one in the world would ever
15   include a -- no one at John Hancock would ever include a 10%
16   constant requirement; am I right about that?
17            MR. DAVIS:  Objection.
18            THE DEPONENT:  Well, you're asking for an
19   answer that says it happens every time.  That's not
20   necessarily the issue.
21            BY MR. SCHER:
22   265      Q.   But it could happen?
23            A.   It could happen, it could not happen, it
                       Page 61

06mr31-ROUGH DRAFT Thomas.txt

24    could.

25    266          Q.    There's no rule that says never ever

                  *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                    60


1     ever put in a loan application in the John Hancock world

2     that has the 10% constant articulated, right?

3                  A.    To my knowledge, there's no rule.

4     267          Q.    And the 10% constant requirement affects

5     the size of the loan, right?

6                  MR. DAVIS:  Objection.  Asked and answered.

7                  THE DEPONENT:  It can affect the size of the

8     loan.

9     268          Q.    And the size of the loan makes a

10    difference to the borrower, doesn't it?

11                 A.    I guess it would, yeah.

12    269          Q.    You say I guess but you're being a

13    little bit facetious in that regard, right?

14                 MR. DAVIS:  Objection.

15                 THE DEPONENT:  Some borrowers apply for a

16    certain size of loan and they're quite happy with a

17    different amount that's approved.

18    270          Q.    Okay.

19                 A.    So that's why I say I guess.

20    271          Q.    I see.  Okay.  And you don't know

21    whether, in the circumstances of this particular borrower,

22    whether the size of the loan mattered?

                            Page 62

06mr31-ROUGH DRAFT Thomas.txt

23              A.   No, I don't.

24   272        Q.   That's fair enough.

25              MR. DAVIS:  Can we take a break.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                              61


1               MR. SCHER:  Any time.

2               ---Upon recessing at

3               ---Upon resuming at 10:54 a.m.

4               BY MR. SCHER:

5    273        Q.   Have you had an opportunity to confer

6    with your counsel during break?

7               A.   Yes.

8    274        Q.   Good.  And did you discuss the substance

9    of your testimony here?

10              MR. DAVIS:  Objection.  You need not disclose

11   to him what we discussed.  That's privileged.

12              BY MR. SCHER:

13   275        Q.   My next series of questions relates to

14   the inclusion of the 10% constant requirement in loan

15   applications by John Hancock.  Are you aware of any instance

16   in which the 10% constant requirement was contained in a

17   loan application?

18              A.   No.

19   276        Q.   The 10% break-even requirement of

20   Manulife, are you aware of any instance where the 10%

21   break-even requirement of Manulife was contained in the

                        Page 63

06mr31-ROUGH DRAFT Thomas.txt

22  comparable document at Manulife?

23          A.   I'm aware it's happened.  I wouldn't be

24  able to tell you which one.

25  277         Q.   Okay.  So there are occasions where the

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                              62


1   10% break-even requirement is contained in the comparable

2   document at Manulife, right?

3           A.   That's correct.

4   278         Q.   Can you tell me whether there are

5   criteria for the inclusion or exclusion for the 10%

6   break-even criteria in a Manulife application?

7           A.   No.

8   279         Q.   That's not contained in the Manulife

9   process binder, am I right about that?

10          A.   Meaning?

11  280         Q.   When the 10% break-even criteria should

12  be included --

13          A.   Should or should not be included?

14  281         Q.   Yes.

15          A.   No.

16  282         Q.   It's not included?

17          A.   No.

18  283         Q.   It's not in the binder?

19          A.   It's not in the binder.

20  284         Q.   And can you explain to me why it is that

                         Page 64

06mr31-ROUGH DRAFT Thomas.txt

21    Manulife on occasion includes the 10% break-even and, to

22    your knowledge, John Hancock does not include a 10%

23    constant?

24                MR. DAVIS:  Objection.

25                THE DEPONENT:  Well, let me correct that.  To

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    63


1    my knowledge I have not seen it, but then again I haven't

2    been around Hancock for years and years and years.

3                BY MR. SCHER:

4    285         Q.   Right?

5                A.   So I'm just going off what I know, and

6    I'm saying only a few times in the Manulife that I am aware

7    of.  So why it would be in mine and not theirs, or in

8    Manulife's, I should say, not mine, Manulife's, and not

9    Hancock's, I have no idea.

10   286         Q.   Okay.  Now, you reported to me a

11   conversation you had either with Mr. McPadden or another

12   employee at John Hancock when you learned that the loan

13   which is the subject of this dispute would not close.  And

14   I'd like to ask you a question about that.

15               You told me that one question that you asked

16   at that time was:  Are we damaged?  I may have gotten that

17   wrong.  Is that what you said?

18               MR. DAVIS:  Objection.  Asked and answered.

19               BY MR. SCHER:

                        Page 65

06mr31-ROUGH DRAFT Thomas.txt

20    287          Q.    Did you have in mind at that time any

21    loss that you suffered as a result of the loan not closing?

22                       A.    No.

23    288          Q.    Now, you said that you were under the --

24    you were of the belief that the property had been sold, the

25    subject property had been sold.  You recall that testimony?

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                          64


1                       A.    I was of the belief that's the reason

2     why the loan was not closing, was because the property had

3     been sold.

4     289          Q.    Correct.  I understood that's what you

5     said.

6                        Did you subsequently learn that the reason

7     for the loan not closing was the fact that the rental

8     achievement level was well below what was required for the

9     loan to close?

10                      A.    No.

11    290          Q.    I'd like to show you what I've had

12    marked as Thomas Exhibit 2.  If you would take a look at

13    that, sir, and let me know when you've completed a review of

14    that document.

15                      (witness perusing document)

16                      ---EXHIBIT 2 marked for identification.

17                      BY MR. SCHER:

18    291          Q.    Just so you think that I'm not -- it's

                              Page 66

06mr31-ROUGH DRAFT Thomas.txt

19   my belief that the pages 733 through 736 are identical to

20   Thomas 1, except that this one is signed by Mr. Koller and

21   dated.

22           MR. DAVIS:  I point out, Howard, that that's

23   not the case.  Because, for example, if you just look under

24   spread and interest rate --

25           MR. SCHER:  You're absolutely right.

                    *** ROUGH DRAFT ***
               Neeson & Associates, Toronto
                                                    65


1            MR. DAVIS:  -- you can see that there's a

2    different interest rate cited there.

3            BY MR. SCHER:

4    292      Q.   I apologize, Mr. Thomas.  You should

5    take your time and review that document, if you'd like.

6            THE DEPONENT:  Okay.

7            BY MR. SCHER:

8    293      Q.   If you look at the last page of the

9    Exhibit, the document headed "Exhibit 1," it's on a page

10   that's Bates-stamped JH 00737.  Do you see that?

11           A.   Mm-hm.

12   294      Q.   Now, is that, Exhibit 1, examples of

13   reserve calculations, is that a document that's derived from

14   information from the borrower?

15           MR. DAVIS:  Objection.

16           A.   I would assume so.

17   295      Q.   And is it accurate to say that by

                            Page 67

06mr31-ROUGH DRAFT Thomas.txt

18    countersigning this loan proposal the borrower is agreeing

19    that the examples of reserve calculations shown on Exhibit 1

20    are accurate?

21                    MR. DAVIS:  Objection.  Calls for a legal

22    conclusion.

23                    THE DEPONENT:  I would have no idea.

24                    BY MR. SCHER:

25    296            Q.   Okay.  Is it fair to say that John

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                        66


1     Hancock is using Exhibit 1 in connection with its loan

2     proposal?

3                     MR. DAVIS:  Objection.

4                     THE DEPONENT:  What do you mean by using?

5                     BY MR. SCHER:

6     297            Q.   Employing, including the calculations

7     contained on Exhibit 1 as part of their loan proposal?

8                     MR. DAVIS:  Objection.

9                     THE DEPONENT:  It may or may not.  I don't

10    know.

11                    BY MR. SCHER:

12    298            Q.   Is Exhibit 1 part of Thomas Exhibit 2?

13    Yes?

14                    A.   Yeah.

15    299            Q.   Yes, it is?

16                    A.   Yes, it is.

                          Page 68

06mr31-ROUGH DRAFT Thomas.txt

17  300          Q.   Does Manulife have a comparable

18  calculations that they employ in connection with the credit

19  review and loan approval process?

20              MR. DAVIS:  Objection.

21              THE DEPONENT:   What do you mean by

22  comparable?  You mean the same format?

23              BY MR. SCHER:

24  301          Q.   No, I mean using projected rent, net

25  operating income, and loan criteria tests?

                     *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                              67


1               A.   I think every institution uses whatever

2   they need to use in order to get a handle on the

3   transaction.

4   302          Q.   And does Manulife do that?

5               A.   Yes.

6   303          Q.   Is this form of loan proposal which is

7   Thomas Exhibit 2 a Manulife form of loan proposal or a John

8   Hancock legacy form of proposal?

9               MR. DAVIS:  Objection.

10              BY MR. SCHER:

11  304          Q.   Or something else?

12              THE DEPONENT:   It's a form of proposal that's

13  pretty well standard through the industry.

14  305          Q.   Okay.

15              A.   So I don't know.

                        Page 69

06mr31-ROUGH DRAFT Thomas.txt

16  306        Q.   There's nothing unusual about it?

17             A.   Nothing unusual, I don't think.

18  307        Q.   Nothing peculiar to John Hancock or

19  Manulife that leaps to your eye?

20             A.   Right.

21  308        Q.   Am I right about that?

22             A.   No.

23  309        Q.   I'm right about that?

24             A.   Yeah, you're right about that.

25  310        Q.   Okay.  And is it accurate to say that

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto              68

6

1   the Exhibit 1 to Thomas Exhibit 2 was -- let me strike that.

2                   The loan proposal is part of the origination

3   process; is that right?

4             A.   It may or may not be.

5   311        Q.   But it could be part of the approval

6   process as well?

7             A.   Could be or could not be.

8   312        Q.   Okay.  And John Hancock, in the John

9   Hancock world in whatever time it is, June of 2004, was the

10  loan proposal part of the origination process?

11            A.   It appears that it was in this case.

12  313        Q.   Okay.  And the reason you know that is

13  because it's from John Ferrie?

14            A.   Yes.

                    Page 70

06mr31-ROUGH DRAFT Thomas.txt

15    314        Q.    And John Ferrie was the field

16    representative for John Hancock in connection with this

17    transaction, right?

18                    A.    That's correct.

19    315        Q.    I'll show you what I've had marked as

20    Thomas Exhibit 3.  That's a copy of an e-mail from John

21    Ferrie to Joe Kelly at Koller Kelly with carbon copies to

22    another Kelly and to Timothy Malik.  It's a Bates-stamped

23    document, JH 00219.  Do you have that in front of you, sir?

24                    A.    Yes, I do.

25    316        Q.    If you would take a minute to review it

                        *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
6                                                              69


1    and tell me when you've completed it, I'd like to ask you a

2    question about it.

3                        (witness perusing document)

4                        ---EXHIBIT 3 marked for identification

5                        THE DEPONENT:  Okay.

6                        BY MR. SCHER:

7    317        Q.    Having reviewed this document, do you

8    recall participating in any discussions in which a change

9    from a proposal to limit exposure for not closing to a

10    maximum of 5 percent was eliminated?

11                    A.    I'm not aware.

12    318        Q.    Did Manulife have any process whereby

13    damages resulting from the non-closing of a loan would be

                            Page 71

06mr31-ROUGH DRAFT Thomas.txt

14   limited to 5 percent?

15                  A.   It's hard to answer.  It depends.

16   319          Q.   Some dealing maybe, some deals not.

17                  A.   Yeah.

18   320          Q.   You see in this e-mail there's a

19   sentence that reads:

20                       "Therefore, you need to deliver the loan or

21                       be liable for all Costs."

22   Do you see that?

23                  A.   Mm-hm.

24   321          Q.   Do you have any understanding as to why

25   the word "costs" is capitalized?

                      *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                          70


1                   A.   I have no idea.

2    322          Q.   You see the sentence that reads:

3                        "We had originally agreed to limit your

4                        exposure to a maximum of 5 percent."

5    Do you see that?

6                   A.   Yeah.

7    323          Q.   Do you have any understanding as to --

8    or did you ever know that John Hancock had originally agreed

9    to limit the exposure to a maximum of 5 percent?

10                  A.   No.

11   324          Q.   We talked earlier about the damages.

12   This document talks about losses.  Are you aware of any

                              Page 72

06mr31-ROUGH DRAFT Thomas.txt

13    losses that John Hancock suffered as a result of the loan

14    not closing, other than conversations with counsel?

15                   A.    It hasn't been quantified.

16    325          Q.    Hasn't, has not been quantified?

17                   A.    To my knowledge.  I've not seen any

18    quantification of it.

19    326          Q.    In this Thomas Exhibit 2 there's a

20    sentence reads:

21                   "Based on the volume of forwards we are

22                   doing, this risk is not acceptable."

23                        (quote as read)

24                   My question focuses on that first phrase.

25    Are you aware of the volume of forwards that John Hancock

                        *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
                                                        71

1    was doing as of July 29th, 2004?

2                   A.    I am aware to the extent that I know we

3    were doing quite a few forwards.

4    327          Q.    Okay.  And by forwards we're talking

5    about forward commitments, right?

6                   A.    Forward commitments.

7    328          Q.    And then the sentence immediately before

8    that says:

9                   "If we don't close and interest rates have

10                  moved against us, we could be subject to

11                  unlimited losses."

                        Page 73

06mr31-ROUGH DRAFT Thomas.txt

12                    (quote as read)

13   Do you have any idea to what that sentence is referring?

14                    MR. DAVIS:  Objection.  Calls for

15   speculation.

16                    THE DEPONENT:  I don't.  I don't know what

17   it's referring to.

18                    BY MR. SCHER:

19   329          Q.   Okay.  You don't know what Mr. Ferrie is

20   referring to in that sentence?

21               A.   That's correct.

22   330          Q.   Now, can you tell me where in the

23   processing of a loan the forward commitment occurs, that is,

24   presumably it's after the origination, but can you tell me

25   where in the process with respect to credit and approval the

                   *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                              72


1    forward commitment occurs?

2                    MR. DAVIS:  Objection.

3                    THE DEPONENT:  It can occur...

4                    MR. DAVIS:  Sorry.  Objection.  You can

5    respond.

6                    THE DEPONENT:  It can occur anywhere.

7                    BY MR. SCHER:

8    331          Q.   Anywhere along the line?

9               A.   Yeah.

10   332          Q.   Okay.  Is there a credit evaluation made
                         Page 74

06mr31-ROUGH DRAFT Thomas.txt

11    prior to the time the forward commitment is undertaken?

12                  A.    It depends.

13    333          Q.    What does it depend on?

14                  A.    Well, it depends on -- maybe I should

15    bake up.  Clarify what you mean by "credit evaluation."  Of

16    the borrower?  Of the property?  Of... what are you

17    referring to.

18    334          Q.    Is there any credit evaluation, whether

19    of the borrower or the property or anything else?

20                  A.    There is a credit evaluation.  Depends

21    how far... how far you are into the process, and it depends

22    too on how far forward the forward is.

23    335          Q.    Okay.  So let's say we have a forward of

24    one year, and what I'm asking you is not where you are in

25    the process, but I'm asking you where you have to be in the

                  *** ROUGH DRAFT ***
                Neeson & Associates, Toronto                    73

6

1    process in order to secure a forward commitment.  Is there

2    any requirement that you be advanced in the process in order

3    to secure a forward commitment?

4                  A.    There is -- well, you have to be sure

5    that the loan will be approved before you actually enter

6    into a forward agreement.

7    336          Q.    Okay.  And how do you know that the loan

8    will be approved under those circumstances?

9                  A.    How do you know?

                          Page 75

06mr31-ROUGH DRAFT Thomas.txt

10  337        Q.   Yes?

11             A.   You don't.

12  338        Q.   Okay.

13             A.   You don't know for sure.

14  339        Q.   You conduct pipeline meetings every two

15  weeks at John Hancock?

16             A.   I don't conduct them, no.

17  340        Q.   They are conducted?

18             A.   They are conducted.

19  341        Q.   Were they conducted before Manulife

20  assumed ownership of John Hancock?

21             A.   I believe so.

22  342        Q.   And did you ever participate in those

23  pipeline meetings?

24             A.   The odd one, yes.

25  343        Q.   The odd?

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
6                                                        74


1              A.   The odd one.

2   344        Q.   And did you ever indicate that prior to

3   making a forward commitment the application had to be

4   approved?

5              A.   No.

6   345        Q.   Was that the case at John Hancock before

7   Manulife made the acquisition?

8              A.   I don't know.

                        Page 76

06mr31-ROUGH DRAFT Thomas.txt

9   346          Q.    In terms of authority, is it accurate to

10  say that you personally were the person who was responsible

11  for making the decision to approve a forward commitment?

12               A.    That wasn't my decision.  The size of

13  loan, it went up.  You saw the last signature.

14  347          Q.    I was speaking in specific terms with

15  respect to a forward commitment.

16               Was there a different process for the

17  approval of a forward commitment than for the approval of a

18  loan?

19               MR. DAVIS:  Objection.  How, when you say

20  forward commitment versus the approval of a loan, are you

21  talking about the loan commitment?

22               MR. SCHER:  You know what?  Let me clarify

23  that.

24  348          Q.    In fact, let me just ask you this.  Rate

25  lock is what I'd like to ask you about.

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                              75


1               You're familiar with the concept of a rate

2   lock?

3               A.    Yes.

4   349          Q.    And are you familiar with the concept of

5   a rate lock before a loan is approved?

6               A.    Yes.

7   350          Q.    And is it accurate to say that you are

                         Page 77

06mr31-ROUGH DRAFT Thomas.txt

8   personally responsible, during the period of time of this
9   loan, that would be July/August of 2004, for agreeing to a
10  rate lock?
11              A.   No, I wasn't.
12  351         Q.   Who was?
13              A.   Barry Nectow.
14              Well, to a rate lock.  I mean, once again, as
15  I explained earlier, it depends on the length of the rate
16  lock.
17  352         Q.   We're talking about a rate lock for a
18  year.  That the rate would be locked for a year.  Are you
19  the person who's responsible for that?
20              A.   That is part of the credit application
21  process.
22  353         Q.   Okay.  So what does that mean, that...
23  who is in charge of the credit application process to
24  approve a rate lock?
25              A.   Sorry, I don't understand your question.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    76


1   354         Q.   Okay.  Let me try again.  Let me do
2   this.
3               I'll show you what I've marked as Thomas
4   Exhibit 4.
5               ---EXHIBIT 4 marked for identification.
6               BY MR. SCHER:
                    Page 78

06mr31-ROUGH DRAFT Thomas.txt

7    355           Q.   And it's a document that's an e-mail

8    from Mr. Malik to Mr. Ferrie Bates-stamped JH 00218.  Do you

9    have that before you, sir?

10                  A.   Mm-hm.

11   356           Q.   And you can read it?

12                  A.   Yeah.

13   357           Q.   Can you explain to me why Mr. Malik says

14   in this e-mail that he has to see Ivor prior to making the

15   rate lock?

16                  MR. DAVIS:  Objection.  Calls for

17   speculation.  You can answer that.

18                  BY MR. SCHER:

19   358           Q.   Do you know?

20                  A.   No.

21   359           Q.   Is it accurate to say that there could

22   not be a rate lock without your approval?

23                  A.   I'm sure there could be.  Yes.

24   360           Q.   There could be without your approval?

25                  A.   Yes.

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                    77


1    361           Q.   And is it accurate to say that once a

2    rate lock had been made, the loan was effectively approved?

3                  MR. DAVIS:  Objection.  Calls for a legal

4    conclusion.

5                  THE DEPONENT:  No.

                         Page 79

06mr31-ROUGH DRAFT Thomas.txt

6          BY MR. SCHER:

7   362        Q.   At the time that the rate lock was

8   approved, had the loan application been reviewed?

9          A.   I don't know.

10  363        Q.   What are the economic consequences of a

11  rate lock by John Hancock?

12             MR. DAVIS:  Objection.  You can respond.

13             THE DEPONENT:  The economic consequences of a

14  rate lock?  One generally is, you would twin deal.  You

15  would be able to offer something that the competition

16  couldn't.  If you lock the rate, maybe somebody else isn't

17  willing to lock the rate.

18  364        Q.   Okay.

19          A.   That's one consequence of a rate lock.

20  365        Q.   Any others?

21             MR. DAVIS:  Objection.

22             THE DEPONENT:  What other kind of

23  consequences are you thinking of?

24             BY MR. SCHER:

25  366        Q.   Well, when a rate lock is concluded,

            *** ROUGH DRAFT ***
         Neeson & Associates, Toronto
6                                              78


1   does that have a financial effect on John Hancock or

2   Manulife?

3             MR. DAVIS:  Objection.

4             THE DEPONENT:  At the date of approval of a
            Page 80

06mr31-ROUGH DRAFT Thomas.txt

5  rate lock.

6  367        Q.   Yes?

7             A.   Other than winning the deal, no.

8  368        Q.   Okay.  It's a competitive tool.  Am I

9  right about that?

10            A.   It can be.

11 369        Q.   Are you familiar with the Regatta loan?

12            A.   I've heard the name.

13 370        Q.   Other than in connection with counsel,

14 or communication from counsel, are you aware of the decision

15 by John Hancock to walk away from the Regatta loan for the

16 amount of fees paid by Regatta?

17            A.   No.

18            MR. DAVIS:  Objection.  You can respond.

19            BY MR. SCHER:

20 371        Q.   Are you aware that in connection with

21 the Regatta loan, John Hancock did not claim entitlement to

22 losses beyond the amount of the fees paid by Regatta?

23            MR. DAVIS:  Objection.

24            THE DEPONENT:  This is outside of legal

25 counsel?

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                     79


1             BY MR. SCHER:

2  372        Q.   Outside of legal counsel; yes?

3             A.   No.

                         Page 81

06mr31-ROUGH DRAFT Thomas.txt

4    373        Q.    To the best of your knowledge, did the
5    Regatta loan and its non-closing have any effect whatsoever
6    on the decision by John -- the handling of the Avenel loan
7    by John Hancock?
8              A.    To the best of my knowledge, no.
9    374        Q.    I'll show you what I've marked as Thomas
10   Exhibit 5.
11              ---EXHIBIT 5 marked for identification
12              BY MR. SCHER:
13   375        Q.    And it's a document Bates-stamped JH
14   1128 through 1148.  Do you have that before you, sir?
15              A.    Yes, I do.
16   376        Q.    Can you tell me what this is?  Just the
17   form.  What do you call it?
18              A.    Well, the first two pages are a summary
19   and authorized signature page.  Actually, the first -- yeah,
20   the first two pages are that.  The next two pages are a
21   brief summary of the deal with the financial statement
22   analysis in the Manulife format.  And 32 on are in the
23   Hancock format.
24   377        Q.    Okay.  So let me see if I have it right.
25              A.    And, sorry...

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                    80


1    378        Q.    That's all right.
2              A.    I lied to you.  And 19 is... 19 and
                    Page 82

06mr31-ROUGH DRAFT Thomas.txt

3  20... where's 22?  Anyway, 19 and 20 are the risk-rating

4  worksheet, Manulife format.

5            MR. DAVIS:  I think when you were

6  referring -- Mr. Thomas said 19 and 20, I think you were

7  referring to the numbers in the middle of the page, middle

8  of the bottom, not the Bates stamp.

9            THE DEPONENT:  Sorry.  My error, sorry.  I'm

10  not good at numbers.  47 and 48 are the Manulife format for

11  risk-rating.

12            BY MR. SCHER:

13  379        Q.  So let me see if I have this right.

14  Starting at the beginning, JH 1128 and 1129 are the summary

15  of the proposed transaction, including --

16            A.  Well, 28, 29 -- 28, 29, 30, and 31 is a

17  summary of 32 through 46.

18  380        Q.  Okay.  And 32 through 46 are the

19  Manulife form --

20            A.  No, it's the Hancock form.

21  381        Q.  That's the Hancock form?

22            A.  That's the Hancock form.

23  382        Q.  Okay.

24            A.  It was basically a translation into a

25  Manulife format.

            *** ROUGH DRAFT ***
        Neeson & Associates, Toronto
                                        81


1  383        Q.  And then 47 and 48 are the rating of --
                        Page 83

06mr31-ROUGH DRAFT Thomas.txt

2           A.   The Manulife rating.

3    384    Q.   The Manulife rating form; correct?

4           A.   Correct.

5    385    Q.   Now, you'll see that on page 1128 there

6    are the words "original red line" or original -- I don't

7    know what it is.  Do you know whose handwriting that is?

8           A.   You talking about the upper right-hand

9    corner?

10   386    Q.   Yes.

11          A.   No, I don't.

12   387    Q.   Okay.  And then you'll see interlineated

13   in the -- within that box, the specific conditions box.

14          A.   Mm-hm.

15   388    Q.   In the phrase headed disbursement

16   requirements?

17          A.   Correct.

18   389    Q.   There is three letters, "NCF."  Do you

19   know what NCF stands for?

20          A.   Net cash flow.

21   390    Q.   And then, following the ratio, there is

22   the inclusion of the 10% break-even?

23          A.   Correct.

24   391    Q.   You see that?

25          A.   Yes, I do.

06mr31-ROUGH DRAFT Thomas.txt

1   392         Q.   Do you know whose handwriting that is?

2               A.   Yes, I do.

3   393         Q.   And whose is it?

4               A.   It's mine.

5   394         Q.   Ah.  I'm sorry.  I feel like Sherlock

6   Holmes.  Just kidding?

7               MR. DAVIS:  The Grail, the Grail.

8               BY MR. SCHER:

9   395         Q.   I presumed as much but regardless.

10              And do you recall -- strike that.

11              Why did you add that to the disbursement

12  requirements on Thomas Exhibit 5?  Why did you add the words

13  "NCF" and "10% break-even"?

14              A.   I added that as a condition so that

15  subsequent people -- so we knew why, on what basis -- let me

16  rephrase -- on what basis it was being approved.  It wasn't

17  just a straight debt service or whatever, it was based on

18  the Manulife rating system.

19              So it would meet the Manulife rating system.

20  So as part of the conversion from the Hancock rating system

21  to the Manulife rating system.

22  396         Q.   And that's why you added the 10%

23  break-even at that point?

24              A.   That's correct.

25  397         Q.   And that is included in the disbursement

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto

                                                        83

                        Page 85

06mr31-ROUGH DRAFT Thomas.txt

1    requirements so that, when the loan reached the disbursement
2    process, the disburser would know that that 10% break-even
3    requirement needed to be met.  Am I right about that?
4              MR. DAVIS:  Objection.
5              THE DEPONENT:  It wasn't for the person doing
6    the disbursements.  It was for the person who would be
7    finalizing the loan documentation to make sure that the
8    numbers they were coming up with would support that
9    guideline.
10             BY MR. SCHER:
11   398       Q.   Okay.  So that in the closing and
12   disbursement processing, the instructions contained in
13   disbursement requirements would be followed?
14             MR. DAVIS:  Objection.
15             BY MR. SCHER:
16   399       Q.   Is that right?
17             MR. DAVIS:  Objection.  That's contrary to
18   what he just testified to.  But if you could please respond.
19             THE DEPONENT:  This is telling the credit
20   people that the numbers that are showing there have to work
21   on the Manulife basis.  So when they are sending the
22   approval letter back out to the field or to whomever they're
23   sending it, and whoever the lawyers, whoever is going to be
24   working on the documentation, they have to make sure -- this
25   isn't a subsequent condition, they have to make sure that

                    *** ROUGH DRAFT ***
                        Page 86

06mr31-ROUGH DRAFT Thomas.txt
Neeson & Associates, Toronto
6                                                            84

1    the numbers that they're using here were according to that

2    formula.

3                    BY MR. SCHER:

4    400         Q.    You said that when the --

5                A.    Not something that shows up later on

6    when the monies are to be disbursed, somebody pulls it out

7    and says, do this.

8    401         Q.    All right.

9                A.    This is to make sure that when we say

10   rents of that number and that number, those numbers are

11   calculated on the basis of providing that sort of break-even

12   rate.

13   402         Q.    So when the loan documentation was

14   finalized, would be finalized, the numbers had to meet the

15   guideline, do I have that right?

16               A.    Yes.

17   403         Q.    And when you say "the loan documentation

18   finalized," you mean the loan documentation that is used at

19   the closing?

20                    MR. DAVIS:    Objection.    You can respond.

21                    THE DEPONENT:    What I'm saying is, if the

22   numbers show it up in the documentation, if there were

23   anything showing in the documentation, the disbursement

24   would be made according to this condition, this condition,

25   this condition, whatever number going in there, we had to be

Page 87

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
                                                    85


1    sure that that number gave us this 10% break-even.

2    404        Q.    Okay.  And I'm just trying to get where

3    in time that review of numbers occurred.  Occurs.

4               A.    It occurs right up front.  Well, depends

5    on the document.  The document may say, we'll review this a

6    year out, two years out.  Or it may say, the number we need

7    before we can do anything is this dollar number.

8    405        Q.    And the anything that we can do, "the

9    number we need before we can do anything," meaning, fund the

10   loan?

11              A.    Mm-hm.

12   406        Q.    Isn't that right?

13              A.    Yes.

14   407        Q.    Okay.  So the documentation --

15              A.    If that's in the loan document.

16   408        Q.    If it's in the loan document.  So what

17   this specific condition is stating with respect to

18   disbursement requirements is that when the loan is

19   documented and before disbursement of the loan is made, the

20   criteria set forth there must be met.  Is that right?

21              MR. DAVIS:  Objection I don't think it's

22   quite what he testified to but you can respond.

23              THE DEPONENT:  No.

24              BY MR. SCHER:

                         Page 88

06mr31-ROUGH DRAFT Thomas.txt
25    409          Q.    Well, please clarify.

\*\*\* ROUGH DRAFT \*\*\*
Neeson & Associates, Toronto
86

1              A.    I'm trying.

2    410          Q.    I know.  I apologize for being opaque?

3              A.    The purpose of this -- well, I'll start

4    again.

5                   The purpose of this was to make sure that the

6    numbers that were in this line and would be reviewed by

7    people above me in the signing authority range, understood

8    these numbers were calculated on the basis of meeting

9    Manulife's standard of a 10% break-even.

10                  Now, this would go back to a credit person,

11   who would then write up a letter to John Ferrie or somebody

12   or other saying:  This is the situation.

13                  So, if those numbers showed up in the final

14   loan document, then whatever is in the final loan document

15   governs what's going to happen and what's going to be

16   disbursed.

17                  So, if this number of 4 million-2 will not

18   give the 10% break-even, then the loan document should show

19   what the right number would be that gives that 10%

20   break-even.

21                  This is an internal document.  This document

22   is giving instructions to the people who are in the process

23   of trying to finalize the loan.

Page 89

```
                          06mr31-ROUGH DRAFT Thomas.txt
24   411            Q.   Right?
25                  A.   This is not something we send the

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                        87


 1   borrower.
 2   412            Q.   Oh, I understand that.  This document is
 3   exclusively internal, right?
 4                  A.   That's correct.
 5   413            Q.   And this information that's contained in
 6   this document is not shared with the borrower, right?
 7                  MR. DAVIS:  Objection.  You mean none of the
 8   information or you're saying that --
 9                  BY MR. SCHER:
10   414            Q.   This document is not shared with the
11   borrower, am I right about that?
12                  A.   I can't answer that.  I don't know
13   whether it would be or not.  Normally it would not be.
14   415            Q.   Would not be.  But it is shared with the
15   person responsible for the closing and disbursement, right?
16                  A.   Correct.
17   416            Q.   And so the person responsible for
18   closing and disbursement would know that the 10% break-even
19   had to be met by the numbers that were produced at the time
20   of the closing, right?
21                  A.   Not necessarily.  Depends what ends up
22   in the loan document.

                          Page 90
```

                              06mr31-ROUGH DRAFT Thomas.txt
23   417              Q.   Well, if that's what ends up in the loan

24   document.  If this approval --

25                    A.   If this showed up in the loan document,

                         *** ROUGH DRAFT ***
                      Neeson & Associates, Toronto
                                                        88

1    then, yes.  But I don't know whether this showed up in the

2    loan document or not.

3    418              Q.   What's the loan document you're making

4    reference to?

5                     A.   The mortgage document.  The commitment

6    letter, mortgage document, whatever documents are in place

7    that guide these issues.

8    419              Q.   So what's a mortgage document?  Is it

9    the mortgage?

10                    A.   Yes.

11   420              Q.   So it's the agreement between the

12   borrower and the lender which evidences the obligation,

13   right?

14                    MR. DAVIS:  Objection.  I think it's very

15   confused.  There are a lot of those out there but you can...

16                    THE DEPONENT:  Well, there's promissory

17   notes, there's commitment letters, there's mortgages,

18   there's side agreements.  You know.  So --

19                    BY MR. SCHER:

20   421              Q.   I just want to know what you're

21   referring to.  When you say "loan document," I just want to

                              Page 91

06mr31-ROUGH DRAFT Thomas.txt
22   know, you're talking about --

23                    A.    I'm referring to...

24   422            Q.    All the documents...

25                    A.    All the documents.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                        89

1    423            Q.    All the documents that are used --

2                     A.    Signed by both parties.

3    424            Q.    Okay.   That's what I thought you meant.

4    The documents that are signed by both parties, although if

5    it's a note it's probably only signed by the borrower, but

6    whatever, it's signed by the borrower to evidence the

7    promise to repay and evidence the impediment on title that

8    the mortgage reflects, right?

9                     MR. DAVIS:   Objection.   You can respond.

10                    BY MR. SCHER:

11   425            Q.    Isn't that what you mean by loan

12   documents?

13                    MR. DAVIS:   Objection.   You can respond.

14   It's already asked and answered, but that's fine.

15                    BY MR. SCHER:

16   426            Q.    Okay?

17                    A.    I'm thoroughly confused.   You're asking

18   me to rhyme off a list of possible documents we might use,

19   and I don't know which ones we used in this case.

20                    BY MR. SCHER:

                        Page 92

06mr31-ROUGH DRAFT Thomas.txt
21  427        Q.   Okay.

22             A.   And they differ.

23  428        Q.   Whichever documents were used in this

24  case at the time the loan would have been taken down or

25  closed would, by this requirement, have to contain numbers

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                      90


1   to support the 10% break-even.  Am I right about that?

2                   MR. DAVIS:  Objection.  You can respond.

3                   THE DEPONENT:  Should include it.

4   429        Q.   Yes?

5              A.   But not necessarily -- would not

6   necessarily mention the 10%.

7   430        Q.   But the numbers would meet it?

8              A.   As far as I'm concerned, if the

9   number -- the number in that... whatever document it is

10  should meet this test up front, going in.

11  431        Q.   And if it doesn't, then the loan is not

12  made or is made -- or is sized in accordance with the 10%

13  break-even?

14             A.   No.  If it's in the loan document that

15  that is the dollar amount, the loan is made and the loan is

16  advanced.  We've made a mistake.

17  432        Q.   I see.  So then by the time the loan

18  document is prepared, the size of the loan has been

19  determined by the numbers which support it, right?

                          Page 93

```
                            06mr31-ROUGH DRAFT Thomas.txt
20                  A.    That's correct.  Or should be.

21   433            Q.    That's the way it's supposed to work?

22                  A.    Depends a lot on the transaction.

23   434            Q.    Right?

24                  A.    Some are determined later and some

25   aren't.  I mean, every deal is different.
```

                        *** ROUGH DRAFT ***
                     Neeson & Associates, Toronto
                                                    91


```
 1   435            Q.    Okay.  But you added this phrase "and

 2   10% break-even" because it mattered to you, right?  It

 3   mattered to Manulife?

 4                  A.    It mattered to Manulife because I was

 5   introducing and reinforcing the Manulife rules for these

 6   kinds of transactions.

 7   436            Q.    After this occurred, and can we

 8   approximate that your signature, take a look at that was on

 9   August 10, 2004?

10                  A.    Correct.

11   437            Q.    And so your interlineation, that is,

12   that 10% break-even, occurred at about the time you signed

13   it?

14                  A.    That's correct.

15   438            Q.    And looks like the last day on it is the

16   same date, August 10th, 2004, including Mr. English and

17   Mr. Thomson, right?

18                  A.    Correct.
```

                             Page 94

06mr31-ROUGH DRAFT Thomas.txt
19   439           Q.   Did you have any conversations or

20   communications with anyone with respect to your modification

21   of Thomas Exhibit 5, that is, the interlineations?

22                   A.   I don't remember any specific discussion

23   but most likely with Tim Malik.

24   440           Q.   The investment officer?

25                   A.   Yeah.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
                                                          92


1    441           Q.   Do you recall that you did have a

2    conversation with Mr. Malik?

3                   A.   No, I don't recall whether I did or not.

4    I would make the assumption I did.

5    442           Q.   Okay.  And did you tell Mr. Malik that

6    he had to get this 10% constant or this 10% break-even into

7    the loan application process?

8                   MR. DAVIS:  Objection.  You can respond.

9                   THE DEPONENT:  Sorry?

10                   MR. DAVIS:  You can respond.

11                   THE DEPONENT:  Oh.  I'm not quite sure what

12   you mean by pitting it... I've tried to explain to you

13   before.  It relates to the size of that number, that 4

14   million -- I'm sorry, whatever.

15                   BY MR. SCHER:

16   443           Q.   4 million 2 as you pointed out?

17                   A.   The idea is, when you're calculating the

Page 95

06mr31-ROUGH DRAFT Thomas.txt
18    net income or all your income numbers, it's got to work out

19    that the end result is this provides the 10% break-even.

20    That would have been the discussion with Mr. Malik.

21    444          Q.    Okay.  Did you, in your discussion with

22    Mr. Malik, tell Mr. Malik that he should have that 10%

23    break-even in the loan application document signed by the

24    prospective borrower?

25                      A.    No.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
93

1    445          Q.    Do you know whether or not he sought to

2    prepare a loan application which included that criteria --

3    criterion?

4                      A.    Do you mean a loan application signed by

5    the borrower?

6    446          Q.    Correct.  Yes.

7                      A.    I'm not aware.

8    447          Q.    Did you know whether the field

9    officer -- I call him field officer -- Mr. Ferrie?

10                     A.    Yeah, John Ferrie.

11    448          Q.    John Ferrie.  What's his position?

12                     A.    Regional manager, regional VP, whatever.

13    449          Q.    Did you know that the regional

14    manager -- did you suggest that the regional manager contact

15    the prospective borrower to inform it of this criterion?

16                     A.    No.

Page 96

06mr31-ROUGH DRAFT Thomas.txt

17   450        Q.   Did you tell Mr. Malik to not tell the

18   borrower, Vesterra, of the 10% break-even criteria?

19              A.   No.

20   451        Q.   Did you tell Mr. Ferrie not to tell

21   Vesterra?

22              A.   No.

23   452        Q.   Do you know what happened after you put

24   in the interlineation of 10% break-even with respect to this

25   particular loan application?  Do you know anything that

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    94


1    happened as a consequence of your interlineation?

2              A.   In general or do you mean in this

3    particular case or?

4    453        Q.   In this particular case.

5              A.   Particular case?  The numbers were

6    reworked.

7    454        Q.   Okay.  Anything else?  Other than the

8    numbers being reworked, was there anything else that was a

9    consequence of your interlineating that requirement?

10             MR. DAVIS:  Objection.

11             THE DEPONENT:  I'm sorry, I don't understand

12   what you mean by "consequence."

13             BY MR. SCHER:

14   455        Q.   Well the numbers were reworked.

15   Anything else like that?

                        Page 97

06mr31-ROUGH DRAFT Thomas.txt
16                    MR. DAVIS:  Objection.

17                    THE DEPONENT:  The numbers were reworked.

18                    BY MR. SCHER:

19    456     Q.   That's all you know?

20            A.   Yeah.

21                    MR. DAVIS:  Objection.

22                    BY MR. SCHER:

23    457     Q.   And when you say "numbers were

24    reworked," do you mean that the numbers which were contained

25    in the loan application were changed, right?

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                    95


1                     MR. DAVIS:  Objection.  You're saying that he

2     changed the application?

3                     MR. SCHER:  I don't know.  I didn't ask him

4     whether he did.  Let's listen to the question.  Maybe I got

5     it wrong.

6     458     Q.   When you say said the numbers were

7     reworked --

8             A.   How come I don't get one of those

9     machines?

10    459     Q.   When you said the numbers were reworked,

11    what do you mean by that?  They were changed, right?

12                    MR. DAVIS:  I don't think you're reading the

13    whole question.  Would you reread the whole question?

14                    MR. SCHER:  No, I'm not asking him the same

                    Page 98

06mr31-ROUGH DRAFT Thomas.txt
15  question.  I withdrew that question.  Let me ask this

16  question.

17  460          Q.    When you say "the numbers were

18  reworked," what do you mean?

19              A.    My understanding was that when people

20  looked at the numbers to try to meet this criteria, the

21  amount of money available to the borrower would have

22  changed.  The borrower was not happy with that.  The

23  borrower asked us to reconsider.  And that led to another

24  look at the calculation of these sorts of numbers

25  (indicating) to see if indeed through that recalculation

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

96

1  that 10% break-even rate was in place.

2  461          Q.    Okay.  And did you learn that that

3  process, that did, in fact, occur, what you just described?

4              A.    That it worked?

5  462          Q.    That it occurred?

6              A.    Sorry.  You're losing me again.

7  463          Q.    Okay.

8              A.    What occurred?  I just told you we...

9  464          Q.    The borrower was unhappy.  The borrower

10  asked you to reconsider.

11              THE DEPONENT:  Can we take a break?

12              MR. DAVIS:  Yeah.  Why don't we take a break.

13  It's about lunchtime.  Want to take a break for lunch?

Page 99

06mr31-ROUGH DRAFT Thomas.txt
14            MR. SCHER:  We're not going to take a break

15   for lunch while there's a question outstanding.  And you

16   know that.

17            MR. DAVIS:  There wasn't a question

18   outstanding.  He just said he didn't understand what you

19   just said.

20            BY MR. SCHER:

21   465      Q.   Okay.  Let me explain.

22            You said your understanding was that when

23   people looked at the numbers to try to meet the criteria,

24   that the amount of the money available to be borrowed would

25   have changed, right?

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                    97


1            A.   Yes.

2    466      Q.   And it would have changed downward,

3    right?

4            A.   I didn't say it would change downward,

5    it changed --

6    467      Q.   Well, would it have changed downward or

7    would it have changed upward?

8            A.   I don't know.

9    468      Q.   Okay.  But they didn't like the change?

10           A.   Yeah.

11   469      Q.   You don't know whether it was down or

12   up, right?

                         Page 100

06mr31-ROUGH DRAFT Thomas.txt

13               A.   I assume if they didn't like it it must

14  have been downward.

15  470         Q.   That's what I assumed as well but I

16  guess I didn't want to reach for that.  So let's just say

17  the number reached downward, right?

18               MR. DAVIS:  Objection.

19               MR. SCHER:

20  471         Q.   Am I right?

21               MR. DAVIS:  Objection.

22               THE DEPONENT:  I respond that the borrower

23  was not happy with the number.

24               BY MR. SCHER:

25  472         Q.   Okay.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

98

1               A.   And I assumed that it had gone down but

2  I was not party to conversations of it being downward or

3  upward or sideways.

4  473         Q.   Right.

5               A.   So --

6  474         Q.   Anyway, it wasn't sideways because it

7  changed, right?

8               MR. DAVIS:  Objection.

9               MR. SCHER:  What's the basis of that

10  objection?

11               MR. DAVIS:  I think that's an improper

Page 101

06mr31-ROUGH DRAFT Thomas.txt
12    question.

13                    MR. SCHER:  Okay.  That's fine.

14    475          Q.    Go ahead.  You know the number changed,

15    right, so it didn't go sideways, did it?

16                    MR. DAVIS:  Objection.

17                    THE DEPONENT:   What number changed?

18                    BY MR. SCHER:

19    476          Q.    Oh, what number?  What number are we

20    talking about?

21                    A.    That's what I'm asking you.

22    477          Q.    So you don't know what number we're

23    talking about.  We've had this exchange for about five

24    minutes or so.  And we talked about what number changed.

25    And you don't even know what number you're referring to in

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    99


1    your answer.

2                    MR. DAVIS:  Objection.

3                    BY MR. SCHER:

4    478          Q.    Is that right?

5                    MR. DAVIS:  Objection.

6                    BY MR. SCHER:

7    479          Q.    I want to know if you're serious about

8    this.

9                    MR. DAVIS:  Objection.  Please don't argue

10    with the witness.  If you have a question to put to the

                        Page 102

06mr31-ROUGH DRAFT Thomas.txt

11    witness, put the question to the witness.

12                BY MR. SCHER:

13    480         Q.    Sir, are you serious when you say you

14    don't know what number we are talking about?

15                A.    I am serious.

16    481         Q.    Okay.

17                A.    I do not know what number you're talking

18    about because there are two sets of numbers.  In fact, there

19    may be three sets of numbers.  There's the loan amount, and

20    then there's the rental stream required, and so on, so

21    forth.

22                So you keep talking about a number went down.

23    Well, if... which number are you talking about went down?

24    I'm saying I don't know which number you're talking about

25    went down.  Was it the loan number went down?  Was it a

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto

                                                    100


1     requirement of the NOI went down or the effect on the Debt

2     Service Coverage ratio went down?

3                Because we were talking all along about the

4     disbursement requirements.  That's why I'm now confused when

5     you start saying some other numbers went down.  Are you

6     talking about disbursement requirements went down or that

7     the loan number went down?

8                Pardon me.  I'm frustrated.

9                MR. DAVIS:  It's just about 1:00.  Why don't

                        Page 103

06mr31-ROUGH DRAFT Thomas.txt
10   we break there for lunch.  This would be a good time.

11                   MR. SCHER:  Let's just finish this point.

12   Just a sec.

13                   MR. DAVIS:  All right.  Give it five more

14   minutes.  We'll break at noontime.

15                   BY MR. SCHER:

16   482          Q.   The amount of the money available to be

17   borrowed changed as a result of your interlineation.

18                   MR. DAVIS:  Objection.

19                   BY MR. SCHER:

20   483          Q.   Do you agree?

21                   MR. DAVIS:  Objection.

22                   THE DEPONENT:  I don't know.  I don't know

23   what happened.  I don't know what happened in that

24   conversation.  I don't know if the amount went down or it

25   was some other requirement that changed.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    101


1                    BY MR. SCHER:

2    484          Q.   You reported to me earlier today,

3    perhaps three minutes ago, that the borrower was unhappy.

4                    A.   That is what I heard.

5    485          Q.   And you don't know why the borrower was

6    unhappy; is that right?

7                    A.   No, I don't.

8    486          Q.   What was reported to you with respect to

                             Page 104

06mr31-ROUGH DRAFT Thomas.txt
9    why the borrower was unhappy, if you recall?

10                   A.   The borrower was unhappy because of

11   whatever result came out of asking for a 10% break-even

12   calculation to fit into the numbers internally, had some

13   effect on the borrower.  That could have been a reduced loan

14   amount.  It could have been a requirement for a higher

15   rental achievement or whatever.  I don't know which number

16   was the effective number and what affected the borrower.

17   All I know is, the borrower did not like the response he got

18   coming out of this and asked us to reconsider.

19   487          Q.   So is it your testimony now that it was

20   not the amount of the money available to the borrower that

21   was what the borrower was upset about?

22                   MR. DAVIS:  Objection.

23                   THE DEPONENT:  I said I didn't know which it

24   was.

25                   BY MR. SCHER:

                     *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    102


1    488          Q.   Okay.

2                    A.   I didn't...

3    489          Q.   Other than the communication between the

4    field officer or the investment officer and the borrower on

5    the subject of this criteria, do you know of any other

6    communication with the borrower?

7                    A.   No.

                          Page 105

06mr31-ROUGH DRAFT Thomas.txt

8   490         Q.   And who reported this to you with

9   respect to the happiness or unhappiness of the borrower?

10              A.   That would have been Tim Malik.

11  491         Q.   Did you tell Mr. Malik to go to the

12  borrower and tell him about the new criteria that you had

13  interlineated?

14              MR. DAVIS:  Objection.  Asked and answered.

15              THE DEPONENT:  I already answered that

16  question.

17              BY MR. SCHER:

18  492         Q.   And?

19              MR. DAVIS:  Asked and answered.  Objection.

20              BY MR. SCHER:

21  493         Q.   You can answer it again?

22              MR. DAVIS:  Objection.

23              THE DEPONENT:  I did not tell him.

24              BY MR. SCHER:

25  494         Q.   Do you know why he did?

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                    103


1               MR. DAVIS:  Objection.  Calls for

2   speculation.

3               MR. SCHER:  No.

4   495         Q.   Do you know why he did?

5               A.   why he did what?

6   496         Q.   Went to the borrower?

                        Page 106

```
                              06mr31-ROUGH DRAFT Thomas.txt
 7                    A.    I didn't know he went to the borrower.

 8    497             Q.    Okay.

 9                    A.    So, if I don't know why he went to the

10   borrower, I don't know why he did.

11    498             Q.    Okay.  Do you know why the borrower was

12   contacted by a John Hancock representative?

13                    A.    As part of the normal process of things

14   you speak to the borrower as part of).

15    499             Q.    Okay.  And it's normal to tell the

16   borrower that criteria have changed, right?

17                    MR. DAVIS:  Objection.

18                    THE DEPONENT:  I can't -- don't know if

19   that's true or not.

20                    BY MR. SCHER:

21    500             Q.    Okay.  So is it your testimony that it's

22   normal process of things you get to the -- you tell the

23   borrower but you don't know whether it's normal or not?

24                    MR. DAVIS:  Objection.

25                    THE DEPONENT:  Sorry.  I don't understand the

                        *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
                                                      104


 1   question.

 2                    BY MR. SCHER:

 3    501             Q.    Okay.

 4                    A.    Maybe I can help you out here.

 5    502             Q.    Go ahead.
```

Page 107

06mr31-ROUGH DRAFT Thomas.txt

6        A.    The process is always one of

7    negotiation.  I'm sure they applied for something under

8    certain terms and conditions.  I'm sure somebody came back

9    to then and said, hey, what you exactly applied for we can't

10   deliver.  And the borrower said, well, can you reconsider?

11   Is there some other way we can make this work?  And that's

12   when they came back and we reconsidered.

13   503          Q.    And reworked the numbers?

14                A.    And reworked the numbers.  Now, what I'm

15   saying is I was not party to any of those conversations so I

16   don't know what was said.  I don't know why it was said or

17   in which manner it was said.  But in general that's the kind

18   of thing that happens, and that's why I said that's kind of

19   normal.  That's a dialogue that goes on.

20   504          Q.    I see.  And you don't know whether that

21   happened in this case or not?

22                A.    I'm assuming it did because the request

23   came back to reconsider.

24   505          Q.    Okay.

25                A.    And I was told the borrower was not

                    *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                              105


1    happy.

2    506          Q.    And, in fact, the loan was reconsidered,

3    right?

4                A.    Yes.

                        Page 108

```
                            06mr31-ROUGH DRAFT Thomas.txt
 5   507              Q.   And the numbers were reworked, right?
 6                    MR. DAVIS:  Objection.
 7                    THE DEPONENT:  Right.
 8                    MR. DAVIS:  You say "the numbers."  You mean
 9   what numbers?
10                    BY MR. SCHER:
11   508              Q.   The numbers that you referred to in your
12   answer.
13                    MR. DAVIS:  Objection.  He's referred to a
14   lot of numbers.  To which numbers are you referring?
15                    BY MR. SCHER:
16   509              Q.   Well, what numbers were you referring
17   to?
18                    MR. DAVIS:  No, the question is -- my
19   objection is, you're asking the numbers.  If you could
20   clarify please what numbers you were referring to in your
21   question.
22                    THE DEPONENT:  How am I supposed to know?
23                    BY MR. SCHER:
24   510              Q.   Here's my question.  Were numbers
25   reworked?

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                        106


 1                    MR. DAVIS:  Objection.
 2                    THE DEPONENT:  The income statement, the
 3   internal income statement backing up the application, was

                           Page 109
```

06mr31-ROUGH DRAFT Thomas.txt

4    reworked.

5                    BY MR. SCHER:

6    511              Q.    Okay.  So those are the numbers that

7    were reworked.  Is that right?

8                    MR. DAVIS:  Objection.  Asked and answered.

9                    THE DEPONENT:  Didn't I just say that?

10                   BY MR. SCHER:

11   512              Q.    Yes.  Just listen to my question.  Just

12   listen to my question; answer my question,okay?

13                    A.    I'm trying to.

14                   MR. DAVIS:  He did.

15                   THE DEPONENT:  I'm trying to.  But I have a

16   hard time understanding.

17                   BY MR. SCHER:

18   513              Q.    Let me ask you a second time.  I'm

19   opaque, okay?  I'm not as clever as you are, and so I'm

20   asking you these questions and I just want to make sure it's

21   clear to me.  Please indulge me and answer my question.

22                   Your attorney can object "asked and answered"

23   repeatedly; it's fine with me.  It doesn't offend me.  I'm

24   going to ask a question several times to make sure I have it

25   clear because I'm searching for the truth.  Is that fair?

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                   107


1                    MR. DAVIS:  Objection.  That's not what

2    you're doing.

                        Page 110

06mr31-ROUGH DRAFT Thomas.txt

3          MR. SCHER:  Okay.

4          MR. DAVIS:  And you're not entitled to ask

5    him the same question over and over again in an attempt to

6    get a different answer that you would prefer over the one

7    that is truthful.

8          MR. SCHER:  I'm very happy with the answers

9    Mr. Thomas is providing because they're truthful answers.

10   Right, Mr. Thomas?  You've been truthful this morning,

11   haven't you?

12         MR. DAVIS:  He's sworn to give truthful

13   testimony.  You know that, Mr. Scher.

14         BY MR. SCHER:

15   514    Q.   Your answers have been truthful this

16   morning, haven't they?

17         A.   Yes, they have.

18   515    Q.   To the best of your knowledge,

19   information and belief, right?

20         A.   Yes, they have.

21   516    Q.   Okay.

22         A.   Why do you doubt me?

23   517    Q.   I have no doubt whatsoever.  I'm

24   absolutely confident that that's the case.

25         MR. DAVIS:  All right.  We're going to take a

                   *** ROUGH DRAFT ***
            Neeson & Associates, Toronto

                                              108

1    break for lunch now.  We'll be back in an hour.

                   Page 111

06mr31-ROUGH DRAFT Thomas.txt

2                MR. SCHER:  I'm not prepared to take a lunch

3  break.

4                MR. DAVIS:  Well, it's a little past 12.  We

5  are now going to take a lunch break, so...  Unless you're

6  telling me you're done.

7                MR. SCHER:  Oh, I'm far from done.

8                MR. DAVIS:  Okay.  Well, then we're going to

9  need to take a lunch break.  When would you like to resume?

10               MR. SCHER:  As soon as possible.

11               MR. DAVIS:  Well, how much longer do you

12  have?

13               MR. SCHER:  I have quite a bit.  Quite a bit.

14               MR. DAVIS:  That's fine.  Well, can you give

15  me a better estimate than that?

16               MR. SCHER:  No, I can't.

17               MR. DAVIS:  Okay.  Then we'll be back from

18  lunch in a reasonable time.

19               MR. SCHER:  I'd appreciate it, if you could

20  do it in 45 minutes.  I'd appreciate it.

21               MR. DAVIS:  Okay.  Well, we will certainly do

22  everything we can to be within a reasonable time.  I can't

23  be any more specific than that.

24               MR. SCHER:  Okay.

25               ---Upon recessing at 12:05 p.m.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

109

Page 112

06mr31-ROUGH DRAFT Thomas.txt

1

2          ---Upon resuming at 12:55 p.m.

3          BY MR. SCHER:

4   518        Q.   You said just before lunch that your

5   understanding was that the borrower asked you to reconsider,

6   not you personally, but to ask John Hancock to reconsider.

7              A.   Mm-hm.

8   519        Q.   And what was it that you understood you

9   were being asked to reconsider?

10             A.   Well, reconsider whatever the changed

11  conditions were so that we could go back to the original

12  borrower application, the same terms and conditions that

13  were previously agreed to in principle by the various

14  parties.

15  520        Q.   All right.

16             A.   So that meant what we had to do was take

17  a look internally, look at our internal-generated numbers

18  for cash flows and all that sort of thing, and see whether

19  those numbers would still support that 10 percent break-even

20  condition I had put in the first approval.  Basically, we

21  were just asked to reconsider:  Would we actually do the

22  deal that was first discussed?

23  521        Q.   Okay.  And as a result of the

24  reconsideration, do I understand that the process, the what

25  you described as the loan approval process, was restarted?

06mr31-ROUGH DRAFT Thomas.txt

1           A.   Correct.

2    522    Q.   And as a result of which there were

3    changes made to the loan approval process?

4           A.   Well, to the information backing up the

5    loan approval, yeah.

6    523    Q.   And the information backing up the loan

7    approval process are the numbers contained in the loan

8    approval document.

9           A.   Mm-hm.

10          MR. DAVIS:  You have verbalize your response.

11          THE DEPONENT:  Sorry?

12          MR. DAVIS:  You have to verbalize your

13   response so that she can put it down.

14          THE DEPONENT:  Oh, sorry.  Yes.

15          You can't put me down for nodding my head?

16          BY MR. SCHER:

17   524    Q.   And the loan approval document to which

18   I'm making reference, the first version of it is Exhibit 5.

19          A.   Okay.

20   525    Q.   Is that right?  Is that the loan

21   approval document?

22          A.   Yes.

23          MR. DAVIS:  The first version.

24          BY MR. SCHER:

25   526    Q.   That's the first version of it?

06mr31-ROUGH DRAFT Thomas.txt
                                                    111

1                   A.    Yes.
2      527          Q.    Okay.   Just so I know what we're talking
3      about.
4                         There was no hedge instrument purchased for
5      this loan in particular, was there, at the time -- at the
6      rate lock?
7                   A.    I don't know.
8      528          Q.    I'll show you what I've marked as Thomas
9      Exhibit 6, if you would just look it over for a moment, and
10     then I'd like to ask you some questions about it.
11                        (witness perusing document)
12                        ---EXHIBIT 6 marked for identification
13                   BY MR. SCHER:
14     529          Q.    It's Bates-stamped JH 131 and 132.
15                   A.    Mm-hm.
16     530          Q.    Is that what you have before you, sir?
17                   A.    Yes.
18     531          Q.    And you'll see it's an e-mail stream, is
19     what I always call it.   I'm not sure that's the correct
20     description.   But at the bottom half of the first page,
21     continuing on to the second page is, an e-mail from
22     Mr. Malik to you showing carbon copies to David Henderson
23     and Patricia Coyne.   Have I accurately described that?
24                   A.    Yes.
25     532          Q.    And do you recall receiving this e-mail

                              Page 115

06mr31-ROUGH DRAFT Thomas.txt
*** ROUGH DRAFT ***
Neeson & Associates, Toronto

112

1    on or about August 11,2004, from Mr. Malik?

2                    A.   No, I don't recall in the specific.

3    533         Q.   Okay.  The document itself contains

4    another e-mail from Mr. Malik to Mr. Ferrie.  Do you recall

5    ever having seen that document, that part of it?

6                    A.   No.

7    534         Q.   No.  Mr. Malik states in his e-mail to

8    Mr. Ferrie:

9                    "I guess I will try one more time the

10                   bureaucratic approach.  I'll let you know how

11                   hard he laughs."

12                   Now, do you have any idea to what Mr. Malik

13   is referring?

14                   MR. DAVIS:  Objection.  You can respond.

15                   MR. SCHER:  What's the basis?

16                   MR. DAVIS:  You're calling for speculation.

17                   MR. SCHER:  No.

18   535         Q.   Do you have --

19                   MR. DAVIS:  He said he hasn't seen it.  But

20   go ahead.

21                   BY MR. SCHER:

22   536         Q.   Do you have any understanding as to what

23   Mr. Malik is referring?

24                   A.   I really don't but I would speculate --

25                   MR. DAVIS:  I caution you not to speculate.

Page 116

06mr31-ROUGH DRAFT Thomas.txt

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

113

1                THE DEPONENT:  Okay.  I can't speculate.  Can
2     I assume?
3                MR. DAVIS:  No.
4                BY MR. SCHER:
5     537         Q.    What's your reasoned estimate as to what
6     it is he is saying?
7                MR. DAVIS:  Objection.  He's already said he
8     doesn't want to speculate.
9                BY MR. SCHER:
10    538         Q.    And what do you think Mr. Malik's
11    talking about here?
12               MR. DAVIS:  Objection.
13               MR. SCHER:  You can answer.
14               THE DEPONENT:  Can I answer?
15               MR. DAVIS:  Yeah, you can answer over my
16    objection.
17               THE DEPONENT:  Okay.  What I think he was
18    talking about is having to write it up again.
19               BY MR. SCHER:
20    539         Q.    Okay.  So the bureaucratic approach is
21    to write it up again.
22               A.    And re-present it.
23    540         Q.    Okay.  And what about "laughing"?  Why
24    does he think that you would laugh when you saw this?
                              Page 117

06mr31-ROUGH DRAFT Thomas.txt

25                   MR. DAVIS:  Objection.

                    *** ROUGH DRAFT ***
               Neeson & Associates, Toronto
                                        114

1                 BY MR. SCHER:
2   541        Q.   No idea?
3                 MR. DAVIS:  Objection.
4                 THE DEPONENT:  Can I answer?
5                 MR. DAVIS:  Yes.
6                 MR. SCHER:  Yes.
7                 THE DEPONENT:  I have no idea.
8                 BY MR. SCHER:
9   542        Q.   Okay.  Now, the part of the e-mail that
10  is directed to you appears to be a form of some kind with
11  approval provision at the bottom of it.  You see what I'm
12  referring to?
13               A.   Mm-hm.  Yes.
14  543        Q.   What is this form?  Have you ever seen a
15  form like this before?  Had you ever seen a form like this
16  before?
17               A.   This -- well, this form would be a loan
18  modification request form, although it's not entitled that,
19  it is a form of that.
20  544        Q.   Okay.
21               A.   And representation of that.
22  545        Q.   And what is being... what is being asked
23  to be modified?
                    Page 118

06mr31-ROUGH DRAFT Thomas.txt

24           A.   He's asking that the income statement

25   that we were using internally and had put in some reserves

                      *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                        115


 1   250 bucks a unit be reduced to $150 a unit.  Let's see what

 2   else is he asking?

 3   546          Q.   Okay.  Well, I guess what I was asking

 4   was a more general -- a broader question and my question was

 5   insufficiently clear.

 6                So what he's asking for is that the approval,

 7   which is Thomas Exhibit 5, be modified.  Is that right?

 8           A.   Yes.

 9   547          Q.   In this loan approval modification form,

10   he makes reference or reference is made in the paragraph

11   before the end, the penultimate paragraph, where it begins

12   "in addition."  Would you direct your attention to that?

13           A.   Yes.  Mm-hm.

14   548          Q.   Can you tell me, is it fair to say that

15   the fact that "treasuries," meaning that the rate of

16   treasury notes has dropped 15 basis points since the August

17   2nd rate lock; is that what that's referring to?

18                MR. DAVIS:  Objection.

19                THE DEPONENT:  As I read it, it refers to a

20   rate lock.  I don't know which date of rate lock that is.

21                BY MR. SCHER:

22   549          Q.   Okay.  All right.  And he's making a

                              Page 119

06mr31-ROUGH DRAFT Thomas.txt

23   reference and he suggests that the "Borrower could garner

24   today" a lower interest rate than he had secured from John

25   Hancock; is that right?

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

116

1                    MR. DAVIS:  Objection.

2                    THE DEPONENT:  I think what he's saying is,

3   well, he's saying the interest based on... the spread has

4   widened because he... interest on the treasury has dropped.

5                    ---Query by reporter.

6                    THE DEPONENT:  Sorry.  I'll try again.  I

7   didn't understand myself.

8                    Since the rate lock, treasury had dropped.

9   So that meant that, given the same spread as we were

10  charging, that some other outside lender, other lender,

11  would take treasuries plus that spread and would end up

12  resulting in a lower rate for the borrower.

13  550          Q.   I see.  So is it fair to say that he's

14  referring to the risk that a competitor could secure this

15  borrower in the event the loan were not approved as it was

16  requested in this modification?

17                   MR. DAVIS:  Objection.

18                   THE DEPONENT:  I think what he's telling me

19  is that if the borrower decided not to go with the original

20  deal, he could probably find a better rate somewhere else.

21                   BY MR. SCHER:

Page 120

06mr31-ROUGH DRAFT Thomas.txt

22  551         Q.    Okay.  And isn't it, if the lender

23  doesn't go with the original deal, the borrower could go

24  elsewhere?

25              MR. DAVIS:  Objection.

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
6                                                    117


1              BY MR. SCHER:

2   552         Q.    Isn't that what he's saying?

3              MR. DAVIS:  Objection.

4              THE DEPONENT:  No.  No, I don't... I wouldn't

5   put it that way.  I think what he's saying is, remember

6   there's competitive pressures.

7              BY MR. SCHER:

8   553         Q.    Okay.

9              A.    So if we make things too difficult or

10  make the borrower too unhappy, he may go elsewhere.

11  554         Q.    And Mr. Malik was asking for this loan

12  to be modified to avoid losing the borrower; is that right?

13             A.    That's correct.

14             MR. DAVIS:  Objection.  When you say the loan

15  modified, do you mean the loan application or the --

16             BY MR. SCHER:

17  555         Q.    This loan modification request.  He was

18  making this loan modification request to avoid losing the

19  borrower.  Right?

20             MR. DAVIS:  Objection.
                        Page 121

06mr31-ROUGH DRAFT Thomas.txt

21              THE DEPONENT:  That's the way I'd understand

22   it.

23              BY MR. SCHER:

24   556        Q.    Now, as far as you know, the projections

25   which are reflected in the loan application, Exhibit --

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
6                                                         118


1    sorry.  We don't have a loan application yet.  Well, let's

2    get one.

3              I'll show you what I've marked as Thomas

4    Exhibit 7.

5              ---EXHIBIT 7 marked for identification

6              BY MR. SCHER:

7    557        Q.    That's a copy of the loan application.

8    It's dated July 30 on the front page, and then there's

9    handwriting on that front page which says something "8/23."

10   August 23rd.  And it is -- and it has been countersigned by

11   Mr. Malik.

12             Have you reviewed this loan application?

13             A.    No, I have not.

14   558        Q.    The loan application having been signed

15   by Mr. Malik, which you can verify if you choose to on page

16   JH 354, is dated August 17, 2004.  Do you have any reason to

17   believe that the projections which are part of this loan

18   application were made to conform to the projections and

19   numbers contained in the loan approval?

                              Page 122

06mr31-ROUGH DRAFT Thomas.txt

20          MR. DAVIS:  Objection.

21          THE DEPONENT:  I have no idea.

22          BY MR. SCHER:

23  559     Q.   Is it your understanding that -- strike

24  that.

25          You don't have any reason to believe that the

*** ROUGH DRAFT ***
Neeson & Associates, Toronto
119

1   modification to the financial projections which Mr. Malik

2   undertook were shared with the borrower, do you?

3           A.   I have no idea.

4   560     Q.   Now, if you would turn to the page which

5   is Bates-stamped JH00357, you'll see, it's a continuation of

6   the Condition 49, rental achievement.  And at the top it

7   says:  "Page 3 of 18."

8           A.   Mm-hm.

9   561     Q.   And the last paragraph, in the middle of

10  the page, reads:

11              "The amount the Effective Gross Income and

12              the NOI will be determined by John Hancock

13              prior to closing based upon a review of the

14              Certified Rent Roll ..... and current

15              operating statements submitted by Borrower to

16              John Hancock."

17  I left out "as defined below."

18              Have I accurately read that provision?

Page 123

06mr31-ROUGH DRAFT Thomas.txt

19                    A.   I think so.
20   562             Q.   And can you tell me what that means?
21                    MR. DAVIS:  Objection.  You asking him to
22   interpret the contract?
23                    BY MR. SCHER:
24   563             Q.   Well, do you have an understanding what
25   that means?

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
I                                                        120


1                    MR. DAVIS:  Objection.
2                    THE DEPONENT:  My understanding would be what
3    it says:
4                        "... the Effective Gross Income and the NOI
5                        will be determined by John Hancock prior to
6                        closing based upon a review of the Certified
7                        Rent Roll (as defined below) and current
8                        operating statements submitted by the
9                        Borrower to John Hancock."
10                   And I assume that relates into something else
11   within the document that would explain why that would take
12   place.
13   564             Q.   Okay.  And is it fair to say that the
14   amount of the borrowing would be dictated by the actual
15   operating statements submitted by the borrower at the time
16   of closing?
17                    MR. DAVIS:  Objection.  Calls for a legal
                          Page 124

06mr31-ROUGH DRAFT Thomas.txt

18  conclusion.
19           THE DEPONENT:  I don't know if I can answer
20  that because I don't know this document inside and out.
21           BY MR. SCHER:
22  565      Q.   Okay.  If you look at Condition 49 it
23  describes the circumstances under which the maximum
24  permitted principal amount of the loan shall be funded.
25           A.   Mm-hm.

                *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                              121


1   566      Q.   And it sets forth the criteria for that
2   funding, including the Loan to Value and Debt Service
3   Coverage Ratios?
4            MR. DAVIS:  You still on page 357?
5            MR. SCHER:  356 and 357.  Condition 49 starts
6   on page 356, you'll see, and then it continues on to page
7   357.
8   567      Q.   So my question is, am I right?
9            MR. DAVIS:  Objection.  Calls, I think, for a
10  legal conclusion.  The document speaks for itself.
11           BY MR. SCHER:
12  568      Q.   Can you answer my question, sir?
13           MR. DAVIS:  Objection.
14           THE DEPONENT:  Do I answer this question?
15           MR. DAVIS:  Would you reread the question,
16  please?
                    Page 125

06mr31-ROUGH DRAFT Thomas.txt

17          THE REPORTER:  "Question:  And it sets for

18  the criteria for that funding, including the Loan to Value

19  and Debt Service Coverage Ratios?"  And it continues,

20          "So my question is, am I right?"

21          MR. DAVIS:  And you got my objections noted?

22          THE REPORTER:  I didn't read the whole

23  passage.  I've got your objections.

24          THE DEPONENT:  I don't know if you're right

25  or not, to tell you the truth.  I mean, all I know is it

                *** ROUGH DRAFT ***
            Neeson & Associates, Toronto
                                            122


1   says... (reading)

2           ---Query by reporter

3           MR. DAVIS:  I was having trouble following

4   that one too.

5           THE DEPONENT:  Sorry, I'm just trying to help

6   you guys get out of here.

7           MR. DAVIS:  No problem.

8           THE DEPONENT:  Can you repeat the original

9   question again, because I've lost my train of thought.

10          THE REPORTER:  "Question:  If you look at

11  Condition 49, it describes the circumstances under which the

12  maximum permitted principal amount of the loan shall be

13  funded.

14          "Answer:  Mm-hm.

15          "Question:  And it sets forth the criteria

                        Page 126

06mr31-ROUGH DRAFT Thomas.txt

16  for that funding, including the Loan to Value and Debt

17  Service Coverage Ratios?  Am I right?"

18              THE DEPONENT:  Okay, my answer was, yeah,

19  you're right.  I don't know if it sets forth the criteria as

20  you outlined it for funding the loan.

21              Sorry (to reporter), I gave you the wrong

22  answer.  I do not know if he's right that it sets forth the

23  criteria.

24              BY MR. SCHER:

25  569         Q.   I show you what I've marked as Thomas

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    123


1   Exhibit 8.

2               ---EXHIBIT 8 marked for identification

3               BY MR. SCHER:

4   570         Q.   It's a document that's Bates-stamped JH

5   127 and 128.  You have that before you, sir?

6               A.   Yes, I do.

7   571         Q.   And if you compare that with Thomas

8   Exhibit 6, I think you'll see that this document was

9   prepared after -- I mean, sorry, the document, Exhibit 8,

10  was prepared before Exhibit 6, and it's in the reverse

11  chronological order.  And what I'm referring specifically to

12  is the loan modification request portion.

13              MR. DAVIS:  You say 8 was prepared before 6?

14              MR. SCHER:  Yes.  8... sorry.

                    Page 127

06mr31-ROUGH DRAFT Thomas.txt

15   572         Q.   No, no, no.  I'm sorry.  I'm wrong.

16   I've given it to you in the right order.

17              Okay.  Let's start again.

18              Exhibit 8 is a copy of the loan modification

19   request dated Thursday, August 12, 2004, at 8:52 a.m. and

20   Exhibit 6 is an e-mail transmitted to you on August 11,

21   2004, at 7:32 p.m.  Do you see that?

22              A.   Mm-hm.  Yes.

23   573         Q.   Do you know what precipitated the

24   resubmission of the loan application -- of this loan

25   modification request?  No?

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto

                                              124


1               A.   No.

2    574         Q.   Okay.  Did you discuss with anyone the

3    reduction in the reserve level for the apartment units?

4               A.   I discussed it with Tim Malik.

5    575         Q.   You did.  And did you include -- did you

6    discuss wit him after you received his first loan

7    modification request?

8               A.   I wouldn't know the timing.  I can't

9    remember the timing.  Could have been before, during, and

10   after.

11   576         Q.   In the first version, Thomas Exhibit 6,

12   the first paragraph indicates that the reserves in the

13   executed approval are at $250 a unit and requests that the

                         Page 128

06mr31-ROUGH DRAFT Thomas.txt

14    reserves in the approval be reduced to $150 a unit.

15                    Do you know why that reference was not

16    contained in Thomas Exhibit 8, the second version of the

17    loan request?

18                    A.    I'm just reading... (perusing document).

19    577           Q.    Sure.

20                    A.    The answer is no, I don't know.

21    578           Q.    Okay.  You see in the... sorry...

22                    You see in Exhibit 8 there's an e-mail from

23    Mr. Ferrie to Mr. Malik regarding the Cary, Kramer firm, and

24    it makes reference to the fact that:

25                    "They are former Manu Life correspondents and

                        *** ROUGH DRAFT ***
                     Neeson & Associates, Toronto
                                                        125

1                     supposedly Ivor thinks very highly of Don

2                     Pettit."

3     Do you know, is that the case?

4                     A.    That I think highly of Don Pettit?

5     579           Q.    Right?

6                     A.    Yes, I do.

7     580           Q.    And were they, in fact, former Manulife

8     correspondents?

9                     A.    Yes, they were.

10    581           Q.    I'll show you what I have marked as

11    Thomas Exhibit 9.

12                    ---EXHIBIT 9 marked for identification
                              Page 129

06mr31-ROUGH DRAFT Thomas.txt

13              BY MR. SCHER:

14   582          Q.    Which is a document Bates-stamped JH

15   1175.   You have that before you, sir?

16              A.    Yes.

17   583          Q.    And that's an e-mail from Mr. Malik to

18   Mr. Henderson with a copy to you.  And this appears to have

19   been sent to you at the end of the day in which Exhibit 8

20   was sent to you.  It's 5:32 p.m., and the Exhibit 8 is sent

21   to you at 8:52 a.m.  Do you see that?

22              A.    Mm-hm.

23   584          Q.    Do you recall discussing with Mr. Malik

24   the content of this e-mail?

25              A.    I don't recall, no.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                              126


1    585          Q.    Do you recall discussing with him how to

2    make the numbers work in general?

3              A.    Yes, I did have discussions with him on

4    that.

5    586          Q.    And do you recall discussing with him

6    that by changing the reserves and changing -- do you recall

7    discussing with him changing the reserves?

8              A.    Yes.

9    587          Q.    Do you recall discussing with him

10   changing the expenses per unit?

11             A.    Yes.

                         Page 130

06mr31-ROUGH DRAFT Thomas.txt

12    588          Q.    Do you recall discussing with him that

13    this information should be shared with the prospective

14    borrower?

15                    A.    No.

16    589          Q.    Do you recall telling him that he should

17    not share this information with the prospective borrower?

18                    A.    No.

19    590          Q.    Is it the practice of John

20    Hancock/Manulife not to share changes in the reserves and

21    operating expenses of property with the prospective

22    borrower?

23                    MR. DAVIS:   Objection.   Misstates.

24                    THE DEPONENT:   No, we don't share that.

25    These are our own calculations based on our own market

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                            127


1    information and on the information already provided to us by

2    the borrower.   The numbers can change dramatically,

3    depending on our own view of the world.   No, we don't, as a

4    matter of course, share them back and forth.

5                    BY MR. SCHER:

6    591          Q.    In Thomas Exhibit 9, the last sentence

7    says:

8                    "I look forward to your advice on what to do

9                    about solving the 10% constant problem

10                    without losing the deal."

                    Page 131

06mr31-ROUGH DRAFT Thomas.txt

11  Did you understand that the deal was at risk?

12              A.   Yes.

13  592         Q.   And is it fair to say that what you

14  decided to do to avoid losing the deal was not to tell the

15  borrower anything?

16              MR. DAVIS:  Objection.

17              THE DEPONENT:  No, that's not fair to say.

18              BY MR. SCHER:

19  593         Q.   No?

20              A.   No.

21  594         Q.   What did you tell the borrower?

22              A.   I didn't tell the borrower anything.

23  595         Q.   Did you tell anyone to tell the borrower

24  anything?

25              A.   No, I did not.

                    *** ROUGH DRAFT ***
               Neeson & Associates, Toronto
                                              128


1   596         Q.   Do you know whether the borrower was

2   told anything?

3               A.   I don't know.

4               MR. DAVIS:  Other than the loan was approved?

5               MR. SCHER:  Your deposition is coming up so

6   we don't need you to testify right now.

7   597         Q.   Did you discuss with Mr. Malik,

8   Mr. Margolis, Mr. Ferrie, or anyone at John Hancock that a

9   modification to the loan application ought to be prepared to

                           Page 132

06mr31-ROUGH DRAFT Thomas.txt

10   reflect the changes in the numbers and the changes in the

11   criteria?

12              MR. DAVIS:  Objection.  Mr. Margolis is an

13   attorney, to the extent you had any discussions with

14   Mr. Margolis on that topic, then you should exclude that

15   response, that information from your response.

16              THE DEPONENT:  I do recall there were

17   discussions with Tim Malik that if we were going to be doing

18   anything different than what had been originally approved by

19   Mr. Thomson that we'd have to re-present.

20              BY MR. SCHER:

21   598        Q.   Now, you said Mr. Thomson.

22              A.   Mm-hm.

23   599        Q.   What is Mr. Thomson?

24              A.   Well, Exhibit 5, the loan transaction

25   was approved by Warren Thomson.

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                   129


1    600        Q.   Forgive me?

2              A.   On August the 10th.

3    601        Q.   I see.

4              A.   So if there was going to be anything

5    different to this, it had to go back to Mr. Thomson.

6    602        Q.   Okay.  So you did tell him that if there

7    were going to be changes with respect to the reserve amount

8    or with respect to the operating expenses, or with respect

                         Page 133

06mr31-ROUGH DRAFT Thomas.txt

9    to the inclusion of new criteria, that would have to go back
10   to Mr. Thomson, the person who's superior to you?
11                    A.    That's correct.
12   603              Q.    But you didn't tell Mr. Malik or anyone
13   else that if there were changes made in those criteria, in
14   the criteria, in the operating expenses, or in the reserves,
15   that those changes would have to go back to the prospective
16   borrower?
17                    MR. DAVIS:  Objection.
18                    BY MR. SCHER:
19   604              Q.    Am I right about that?
20                    MR. DAVIS:  Objection.
21                    BY MR. SCHER:
22   605              Q.    Subject to your attorney-client
23   privilege.
24                    A.    You're right about that.
25                    MR. DAVIS:  (overspeaking) And the prior

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                        130


1    objection as well.
2                    BY MR. SCHER:
3    606              Q.    Now, the modification to the loan
4    application form, do you have any information, subject to
5    your not reporting to me attorney-client-privileged
6    communications, do you have any information about the
7    preparation of an amendment to the Vesterra loan
                    Page 134

06mr31-ROUGH DRAFT Thomas.txt

```
 8   application.
 9                A.   I don't know what you're talking about.
10   607          Q.   Okay.  I think the answer, is you have
11   no information, then.  Is that right?
12                A.   I don't know what amendment you're
13   talking about, sir.
14   608          Q.   Okay.  You don't know even of the
15   existence of a draft amendment to the Vesterra loan
16   application?
17                A.   What amendment are you talking about?
18   609          Q.   To Vesterra.  An application in the
19   form --
20                A.   The document that went --
21   610          Q.   Yes?
22                A.   -- to Vesterra?
23   611          Q.   Yes.
24                A.   Changing...
25   612          Q.   Terms and conditions?
```

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

131

```
 1                A.   I'm not aware.
 2   613          Q.   Not aware.  Do you recall learning that
 3   the changes contemplated that you said had to go to
 4   Mr. Thomson would have killed the deal had they been
 5   submitted to the borrower?
 6                MR. DAVIS:  Objection.  I think that
```
Page 135

06mr31-ROUGH DRAFT Thomas.txt

 7  misstates the evidence.

 8                    THE DEPONENT:  You lost me again.

 9                    BY MR. SCHER:

10  614           Q.    Let me start... One, you told Mr. Malik

11  that if there were to be changes in the reserves, changes in

12  the operating expenses, inclusion of new criteria, that

13  needed to be approved anew by Mr. Thomson, am I right about

14  this?

15                    MR. DAVIS:  Objection.  You can respond.

16                    THE DEPONENT:  To go back a bit, the original

17  approval, and however it was transmitted to borrower,

18  resulted in the borrower saying he was not happy with the

19  deal, and would we reconsider providing the loan on the

20  basis originally contemplated.  What I told Mr. Malik was

21  that if we were going to do that that would necessitate

22  rewriting the numbers that we use in our own analysis to

23  prove that the loan worked according to our criteria.

24                    If he could do that, then it had to be

25  written up in a format that had to be approved by

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
I                                                        132

 1  Mr. Thomson because we wanted the loan.

 2                    BY MR. SCHER:

 3  615           Q.    Okay.  So when you say that "the

 4  borrower was not happy," is that the rough equivalent to a

 5  deal-killer?

                    Page 136

06mr31-ROUGH DRAFT Thomas.txt

6                    MR. DAVIS:  Objection.

7                    THE DEPONENT:  That would be an assumption.

8    The borrower's not happy.  But I've had unhappy borrowers go

9    ahead with the deal because it was in their best interests.

10                   BY MR. SCHER:

11   616          Q.    I guess what I'm asking you, and I

12   should know, did you hear the phrase "deal-killer" applied

13   to the borrower's state of mind or the borrower's expressed

14   view?

15                   MR. DAVIS:  Objection.

16                   THE DEPONENT:  Mm, I don't believe so.

17                   BY MR. SCHER:

18   617          Q.    Is it accurate to say that if the deal

19   is changed and it's not approved by the borrower, the

20   money's refunded?  The fees are refunded?

21                   A.    Yes.

22   618          Q.    Some of the fees.  Maybe not the 5

23   grand.

24   619          Q.    I understand that.  Yeah.  The

25   application fee, the $5,000 application fee, would not be

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                    133


1    refunded but the 320 and the 640 would be?

2                    A.    Mm-hm.

3    620          Q.    Is that right?

4                    A.    Correct.

                         Page 137

06mr31-ROUGH DRAFT Thomas.txt

```
 5  621            Q.   Was the... the next document is Thomas
 6  Exhibit 10.
 7                  ---EXHIBIT 10 marked for identification
 8                  BY MR. SCHER:
 9  622            Q.   And that is a document that's
10  Bates-stamped JH 00405 and concludes at JH 425.  Do you see
11  that?
12                  A.   Mm-hm.  Yes.
13  623            Q.   And it is similar to Thomas Exhibit 5
14  except, among others, it doesn't have the interlineation of
15  NCF and 10% break-even.  Instead those are typewritten in,
16  you see that, in the disbursement requirements?
17                  MR. DAVIS:  Objection.
18                  THE DEPONENT:  This on page 405?
19                  BY MR. SCHER:
20  624            Q.   Yes.  In the disbursement requirements
21  it says:
22                  "At a minimum NCF" -- in part -- "at a
23                  minimum, NCF Debt Service Coverage Ratio..."
24                  THE DEPONENT:  Right.
25                  BY MR. SCHER:
```

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                      134

```
 1  625            Q.
 2                  "... and a 10% break-even..."
 3                  MR. DAVIS:  "According to the underwriting
```
                              Page 138

06mr31-ROUGH DRAFT Thomas.txt

4    herein."

5                    MR. SCHER:

6    626        Q.    I'm sorry.

7                    "... according to the underwriting herein."

8                A.    Okay.

9    627        Q.    And there are some other differences in

10   Exhibit 10.  Is this the final loan approval?

11               A.    To my knowledge, it is.

12   628        Q.    It appears to have been signed by you on

13   August 16, 2004?

14               A.    Correct.

15   629        Q.    As I understand it from your earlier

16   testimony the credit approval had already occurred.  Am I

17   right about that?

18               A.    It had occurred with Exhibit 5.

19   630        Q.    It had even occurred back then; right?

20               A.    Correct.  With... (indicating) it's not

21   exactly the same.

22   631        Q.    Right.  Okay.  So that the credit

23   approval would be modified to reflect the change from --

24               A.    A credit had been approved.

25   632        Q.    Okay.  A credit.  The final credit --

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                    135


1                A.    The final credit for this transaction is

2    Exhibit 10, as far as we know.

                    Page 139

06mr31-ROUGH DRAFT Thomas.txt

3    633              Q.    And it had been approved as of -- and

4    the credit had been approved prior to the approval of the

5    loan.  Right?

6                    A.    No.   The loan... okay, let's get the

7    definitions correct.  The loan slash credit, which I'm

8    calling the same thing, were approved, originally approved,

9    on this August 10th date.

10                   Subsequently, based on conversations various

11   people had with the borrower in our attempt to satisfy the

12   borrower's request for the loan that he really wanted, it

13   was resubmitted and approved again on... approved with

14   slightly different numbers or whatever you want to call it,

15   same loan amount, on the 16th.

16   634              Q.    Let me show you what's been marked as

17   Thomas Exhibit 11, which is a document that's Bates-stamped

18   JH 1176.

19                   ---EXHIBIT 11 marked for identification

20                   ---OFF THE RECORD DISCUSSION

21                   BY MR. SCHER:

22   635              Q.    Now, Thomas Exhibit 11 is the third

23   version of the loan modification approval form.  Am I right

24   about that?

25                   MR. DAVIS:  I'm sorry, I thought you said it

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                        136

1    was the third version?

                         Page 140

06mr31-ROUGH DRAFT Thomas.txt

2                MR. SCHER:  Yes.

3                THE DEPONENT:  I don't know which version it

4     is.

5                BY MR. SCHER:

6     636          Q.    Well... yes.  Okay.  In this version...

7     the first question is, was it necessary that the loan

8     application modification, loan approval modification, form

9     be completed as well as the loan approval form, Thomas

10    Exhibit 10?

11               A.    No, it was not necessary.

12    637          Q.    Okay.

13               A.    What was necessary is that the right

14    people had approved it.

15    638          Q.    Okay.  And Thomas Exhibit 11 didn't have

16    the right people approving it but Thomas Exhibit 10 did?

17               A.    Yes.

18    639          Q.    Now, Thomas Exhibit 11 makes reference

19    to the fact that the basis point have now dropped 19 points

20    since the date of the rate lock.

21               A.    Mm-hm.

22    640          Q.    You see that?

23               A.    Yes.

24    641          Q.    That's just making the same point again,

25    right?

06mr31-ROUGH DRAFT Thomas.txt

1                    MR. DAVIS:  Objection.

2                    BY MR. SCHER:

3     642         Q.   The same point that you made reference

4     to in your earlier testimony?

5                    MR. DAVIS:  Objection.

6                    THE DEPONENT:  The point earlier was that

7     treasuries had dropped 19 bps.

8     643         Q.   Well, the point earlier was that they

9     had dropped 15 bps, actually.

10                   A.   Well, it's 15 before and now...

11    644         Q.   Now it's 19.

12                   A.   A few days later it's dropped 19, mm-hm.

13    645         Q.   So that again the borrower would have

14    been able to presumably get the same spread, gone out and

15    got a more favourable rate.

16                   A.   That's correct.

17    646         Q.   Now, in Exhibit 10, in that paragraph

18    that says:  "Disbursement requirements," that is describing

19    in part what will be required at the time of the closing and

20    disbursement of the loan; is that right?

21                   MR. DAVIS:  Objection.

22                   THE DEPONENT:  I think it's describing the

23    rents of $4.2 million, et cetera, et cetera, et cetera, and

24    other income, so much is required.

25                   BY MR. SCHER:

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                    138

                        Page 142

06mr31-ROUGH DRAFT Thomas.txt

1  647          Q.    At the time of the disbursement, right?
2                     MR. DAVIS:  Objection.
3                     BY MR. SCHER:
4  648          Q.    Isn't --
5                     THE DEPONENT:  No, it means we have to be
6  comfortable that that is possible before we can disburse the
7  funds.
8                     BY MR. SCHER:
9  649          Q.    Okay.  So it says that --
10                    A.    But this, of course, does not govern the
11 arrangement with the borrower.  This is the internal
12 document, right?  Are you saying this governs the
13 relationship with the borrower?
14 650          Q.    No, I'm just saying this governs the
15 requirements for disbursement.
16                    A.    But requirements for disbursement are in
17 the relationship with the borrower.
18 651          Q.    Okay?
19                    A.    And this is an internal document.
20 652          Q.    And this is different than the
21 relationship with the borrower, or not?
22                    A.    Well, I'm assuming that the commitment
23 letter would outline -- signed by the borrower, would relate
24 and outline all the conditions for disbursement.  Those
25 would be the conditions that would rule, not what is in this

                    *** ROUGH DRAFT ***
                       Page 143

06mr31-ROUGH DRAFT Thomas.txt
Neeson & Associates, Toronto
                                                            139

1   internal document.

2   653         Q.   So what Mr. Thomas approved and what you

3   approved is irrelevant to what the conditions and the

4   requirements of disbursement are; is that right?

5              MR. DAVIS:  Objection.

6              THE DEPONENT:  Not irrelevant, but if you're

7   asking can a commitment letter not reflect what has been

8   approved, it can.

9              BY MR. SCHER:

10  654         Q.   And so it's your testimony that

11  notwithstanding the fact that you had to go back to

12  Mr. Thomas --

13             A.   I'm Mr. Thomas.

14  655         Q.   Thomson, sorry.  You had to go back to

15  Mr. Thomas and to Mr. Thomson to get approval to the

16  modification to reduce the reserves and modify the expenses

17  and add the condition, that all of those changes were

18  immaterial to the amount that would be disbursed at the time

19  of the closing?

20             A.   No, I didn't say it would be immaterial.

21  What I'm saying is, I'm just pointing out that sometimes

22  mistakes are made.  You could have certain conditions

23  internally approved, but they might not show up in the

24  commitment letter.  Whatever the commitment letter says in

25  any loan documents that both parties have signed, that is

                        Page 144

06mr31-ROUGH DRAFT Thomas.txt

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

140

1   what we live up to and that's what we expect the borrower to

2   live up to.

3   656            Q.   And those loan documents are the notes

4   and the mortgage, right?

5                  MR. DAVIS:  Objection.

6                  THE DEPONENT:  The note and the mortgage and

7   the commitment letter.

8                  BY MR. SCHER:

9   657            Q.   The note, the mortgage, the commitment

10  letter and all that.  Is that right?

11                 A.   Yes.

12  658            Q.   And the note and the mortgage would be

13  prepared would be prepared based on the conditions set forth

14  in the disbursement requirements?

15                 MR. DAVIS:  Objection.

16                 THE DEPONENT:  No, they would be prepared

17  upon the commitment letter.

18                 BY MR. SCHER:

19  659            Q.   Okay.  So you're saying that after the

20  loan's originated and after the credit department has

21  approved, based on these disbursement requirements, that, in

22  fact, they are immaterial to the arrangement and all that

23  matters is what's in the commitment letter?

24                 A.   That's what I'm saying.

Page 145

```
                              06mr31-ROUGH DRAFT Thomas.txt
25   660                Q.   Okay.

                        *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
                                                      141


1                   MR. DAVIS:  Pause for a second.
2                   ---OFF THE RECORD DISCUSSION.
3                   BY MR. SCHER:
4    661            Q.   I'll show you what's been marked as
5    Thomas Exhibit 12.
6                   ---EXHIBIT 12 marked for identification
7                   BY MR. SCHER:
8    662            Q.   And that's a document that's
9    Bates-stamped JH 1174.  Do you have that in front of you,
10   sir?
11                  A.   Yes, I do.
12   663            Q.   And this is the e-mail or the memorandum
13   from Patricia Coyne, the credit person, right?
14                  A.   Yes.
15   664            Q.   And she's sending it to Timothy Malik,
16   right?
17                  A.   Yes.
18   665            Q.   And this is the credit approval, am I
19   right?
20                  MR. DAVIS:  Objection.  He gave testimony to
21   the contrary.  Go ahead.
22                  THE DEPONENT:  This is a memorandum advising
23   whoever it's addressed to that the credit has been approved.
```

                        Page 146

```
                         06mr31-ROUGH DRAFT Thomas.txt
24                  BY MR. SCHER:
25    666           Q.   Okay.  And a copy of it is sent to

                    *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                142
```

1    Arthur Francis, who is head of closing, head of the closing

2    department, right?

3                    A.   Correct.

4    667           Q.   And it's giving him the instructions as

5    to what to do, right?

6                    MR. DAVIS:  Objection.

7                    THE DEPONENT:  No, I don't think it is.

8                    BY MR. SCHER:

9    668           Q.   Well, why is it sent to Mr. Francis?  Do

10   you have any idea?

11                   A.   Well, he's head of the closing

12   department.  He has to schedule closings.  He has to know

13   what manpower he needs, people-power, I'm sorry, in order to

14   get it in the right -- people to handle the transaction in a

15   timely fashion.  I guess it's a head-up.

16   669           Q.   So can you tell me why the disbursement

17   requirements are included in this memorandum from Patricia

18   Coyne?

19                   MR. DAVIS:  Objection.  Caution not to

20   speculate.

21                   THE DEPONENT:  The approval letter basically

22   sets out, regurgitates, all the basic conditions of the

                              Page 147

                        06mr31-ROUGH DRAFT Thomas.txt
23   credit approval.

24                    BY MR. SCHER:

25   670           Q.   Okay.  And this --

                   *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                                143


1                    A.   And it's to remind people that, you

2    know, if they had any ideas otherwise one way or the other,

3    these are the terms.

4    671           Q.   Okay.  And this --

5                    A.   And that's in the event of sometimes

6    other things are added or deleted just for, hopefully,

7    clarity purpose.

8    672           Q.   And the "this" that you're making

9    reference to, for the purpose of the record is Thomas

10   Exhibit 12?

11                   A.   Yes.  Exhibit 10 supercedes Exhibit 12.

12   Overrules it.

13   673           Q.   Okay.  So Exhibit 12 --

14                   A.   Sorry, by that I mean Patricia Coyne

15   cannot now turn around and approve the loan on some

16   completely different basis, somebody can't say, well, that's

17   the way it was approved and run off with that.  They have to

18   refer back to this.

19   674           Q.   So Exhibit 10 -- so Exhibit 12 is, it

20   should be, an extraction from Exhibit 10.

21                   A.   Yes.

                        Page 148

06mr31-ROUGH DRAFT Thomas.txt
22            MR. DAVIS:  Objection.  I don't think that's

23   what he said.

24            MR. SCHER:  Okay, that's what he just said.

25   And Exhibit 12 --


                 *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                              144


 1            MR. DAVIS:  Please, go ahead.

 2            BY MR. SCHER:

 3   675      Q.   Sorry, do you want clarify something?

 4            THE DEPONENT:  Never mind.

 5            MR. DAVIS:  I really wish you would stop

 6   misquoting him and . . .

 7            THE DEPONENT:  I don't have the same

 8   advantage you do of having a laptop in front of me.

 9            MR. DAVIS:  The record will reflect what the

10   witness testified to and then what Mr. Scher regurgitated.

11            BY MR. SCHER:

12   676      Q.   So you said that Patricia Coyne can't

13   approve something different than -- Patricia Coyne meaning

14   the Exhibit 12 -- can't be approving something different

15   than what's reflected in Exhibit 10.  Isn't that right?

16            A.   Yes.

17   677      Q.   Okay.  So Exhibit 12 is an extraction of

18   information from Exhibit 10?

19            MR. DAVIS:  Objection.

20            BY MR. SCHER:

                    Page 149

06mr31-ROUGH DRAFT Thomas.txt
21  678          Q.   Right?

22              THE DEPONENT:   Summary of.

23              BY MR. SCHER:

24  679          Q.   Yeah.   Okay.

25              So, and you say Patricia Coyne can't approve

                *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                        145


1   something different than what's contained in Exhibit 10,

2   right?

3               A.   Correct.

4   680          Q.   And Mr. Malik can't approve something

5   different than what's in Exhibit 10, can he?

6               A.   No.

7   681          Q.   Mr. Ferrie can't?

8               A.   No.

9   682          Q.   In fact, even you can't?

10              A.   In this case, no.

11  683          Q.   I'll show you what's marked as Thomas

12  Exhibit 13.

13              ---EXHIBIT 13 marked for identification

14              BY MR. SCHER:

15  684          Q.   It's a letter dated May 9, 2005, from

16  Jessica Yaffie Leveroni to a Leonard Shatz at First American

17  Title Insurance Company.  And it's Bates-stamped JH 505

18  through 508.  Have you that letter before you, sir?

19              A.   Yes.

                        Page 150

06mr31-ROUGH DRAFT Thomas.txt
20    685         Q.    You've never seen this letter before,

21    have you?

22              A.    I don't believe so.

23    686         Q.    You know who Jessica Yaffie Leveroni is,

24    don't you?

25              A.    No.


                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                            146


1     687         Q.    It says:  "Assistant Vice President and

2     Counsel" of John Hancock.  Do you know who she was when she

3     was employed at John Hancock?

4               A.    No.

5     688         Q.    Third paragraph reads:

6                     "If Lender approves the Proposed Loan, it is

7                     scheduled to close on or before August 1,

8                     2005."

9                     Is that an accurate statement of the

10    condition that existed as of May 9, 2005, that the lender

11    had not yet approved the proposed loan?

12              MR. DAVIS:  Objection.

13              THE DEPONENT:  Sorry, where do you get that

14    from?

15              BY MR. SCHER:

16    689         Q.    Okay.  The third paragraph says:

17                    "If Lender approves the Proposed Loan..."

18              A.    Right.

                    Page 151

06mr31-ROUGH DRAFT Thomas.txt
19  690            Q.    And it's making reference to this loan.
20  You can read the commitment number and so forth and so on.
21  But what I'm asking you:  Is it accurate to say that the
22  proposed loan had not yet been approved as of May 9, 2005?
23            MR. DAVIS:  Objection.  You can respond.
24            THE DEPONENT:  I would assume it's accurate
25  to say.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    147


1            BY MR. SCHER:
2   691            Q.    Okay.  And the basis of your assumption
3   is is that this letter would not be saying something
4   inaccurate or is there some other basis for it?
5            MR. DAVIS:  Objection.
6            THE DEPONENT:  Well, the assumption is I've
7   not seen any prior approval.  And where was this...
8            MR. DAVIS:  No, the dates are --
9            BY MR. SCHER:
10  692            Q.    That's okay.  I'll take care of it.
11            MR. DAVIS:  I knew you would.
12            THE DEPONENT:  And the one above that is
13  dated July 30th.  Another one....
14            BY MR. SCHER:
15  693            Q.    I don't want to confuse you.  This is
16  '05.  This says May of '05?
17            A.    Yeah.

                        Page 152

06mr31-ROUGH DRAFT Thomas.txt

18            MR. DAVIS:  Right.  So this follows this.

19            THE DEPONENT:  Oh.  I see.

20            BY MR. SCHER:

21    694       Q.   It's later in time.  It's later in time

22    by eight months, nine months.

23            So I'm asking you, can you explain to me, can

24    you tell me whether or not the statement made in that

25    later-dated letter is accurate?

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                              148


1             MR. DAVIS:  Objection.  A letter he's never

2    seen.  You can respond.

3             BY MR. SCHER:

4    695       Q.   A letter you've never seen.  Don't tell

5    me what the lawyer said to you.  All of those conditions,

6    okay?

7             MR. DAVIS:  Go ahead.

8             THE DEPONENT:  The letter says if the lender

9    approves the proposed loan. I do not know what they mean by

10   "proposed loan."

11            BY MR. SCHER:

12   696       Q.   Okay.

13            A.   I do know that this other loan was

14   (indicating) approved and signed off before that date, so

15   where that comment comes from or the purpose of it, I don't

16   know.  I didn't write the letter.

                        Page 153

06mr31-ROUGH DRAFT Thomas.txt
17    697              Q.    Well, the proposed loan is defined above

18    and the loan is the loan reflected in the commitment, that

19    number is the number associated with the loan in question in

20    this case.  There's only one.

21                    So now I'm asking you, do you have any

22    understanding as to why Ms. Leveroni, counsel to John

23    Hancock financial services, do you have any idea as to why

24    she wrote:

25                    "If the lender approves the proposing loan."

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                            149


1                    MR. DAVIS:  Objection.  Asked and answered.

2                    MR. SCHER:  Right.

3                    MR. DAVIS:  Just a minute ago.

4                    BY MR. SCHER:

5     698              Q.    Okay.  Go ahead?

6                    THE DEPONENT:  I have no idea.

7                    BY MR. SCHER:

8     699              Q.    Thank you.

9                    THE DEPONENT:  But since the loan was

10    approved, I'd have to assume that the "if" condition was

11    met.

12                    BY MR. SCHER:

13    700              Q.    I see?

14                    A.    But she's a lawyer.  Don't ask me.

15    701              Q.    Exactly.  Mr. Malik had occasion to meet

Page 154

                              06mr31-ROUGH DRAFT Thomas.txt
16   with the prospective borrower's representatives at the end

17   of May 2005.  Do you have any knowledge regarding that

18   meeting or its results?

19                    A.   No.

20   702            Q.   You testified very early today that you

21   understood that the borrower had decided to sell the

22   property.  Other than what you reported to me earlier today

23   on that subject, do you have any information about that?

24                    A.   No.

25                    MR. DAVIS:  No.  Objection.  Other than what

                         *** ROUGH DRAFT ***
                      Neeson & Associates, Toronto
                                                        150


1    you've heard from counsel.

2                    BY MR. SCHER:

3    703            Q.   Oh, other than what you've heard from

4    counsel.

5                    A.   And I think earlier I'd said that -- I

6    had understood they'd sold the property.

7    704            Q.   Right.  That's right.

8                    A.   They had not decided to sell it.  They

9    had sold the property.

10   705            Q.   All right.  I'd like to take a short

11   break.

12                    ---Brief Recess

13                    BY MR. SCHER:

14   706            Q.   I'm looking at Exhibit 10, and I'd like

                              Page 155

06mr31-ROUGH DRAFT Thomas.txt
15  you to as well, if you would.

16              A.   Yeah.

17  707         Q.   And the phrase "according to

18  underwriting herein," can you tell me what that phrase

19  means?

20              A.   Well, I understood it to mean, and I

21  think it's meant to be read that way or understood that way,

22  to the whole package, whatever is written in the package.

23  708         Q.   Is it your testimony that "underwriting

24  herein" does not mean the actual operating results at the

25  time of the loan closing and disbursement?

                     *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
                                                        151


1               MR. DAVIS:  Objection.

2               THE DEPONENT:  It's a hard question to answer

3   because I don't know, don't know the file well enough at

4   this point in time to know whether it talked about that or

5   not.  What I was referring to, it refers to the numbers we

6   see here.

7               BY MR. SCHER:

8   709         Q.   What page is that you're looking at,

9   that you're making reference to, just for the record?

10              A.   There doesn't seem to be a -- oh, there

11  it is.

12  710         Q.   The Bates stamp.

13              A.   408.

                            Page 156

06mr31-ROUGH DRAFT Thomas.txt
14   711          Q.   Okay.

15                A.   Page 408 are our internal financial

16   statement...

17   712          Q.   Yes?

18                A.   ... numbers for what we thought the

19   property could produce.  And it was based on these rents

20   being in place.  And we assumed that those rents would be in

21   place and these numbers produce the break-even interest rate

22   of 10%.

23   713          Q.   And when you say "in place," you mean --

24   do you mean actually achieved at the time of the closing and

25   disbursement?

                      *** ROUGH DRAFT ***
                  Neeson & Associates, Toronto
                                                          152


1                A.   It's our belief that at the 80 percent

2    that these would be the numbers in place.

3                     ---OFF THE RECORD DISCUSSION

4    714          Q.   And when you say "the numbers that would

5    be in place," just the phrase "in place" is not familiar to

6    me.  Do you mean the numbers that would actually have been

7    the results of organization operations of the apartment

8    unit?

9                     MR. DAVIS:  Objection.

10                    THE DEPONENT:  When we prepared this income

11   statement.

12                    BY MR. SCHER:

                        Page 157

06mr31-ROUGH DRAFT Thomas.txt
13   715              Q.   Yes?

14                    A.   We understood in this case that this is

15   somewhat of a projection because the property hasn't been

16   constructed yet.

17   716              Q.   It's as a forward commitment?

18                    A.   Right.  So what we're saying is, to

19   ourselves, will this thing at the 80 percent level throw off

20   enough cash flow to meet our internal requirements.  And

21   based on this underwriting, it throws off, for example,

22   break-even interest rate of 10.6 percent, Loan to Value in

23   the 67 percent range so it appeared to meet all our internal

24   standards.  So on that basis, as underwritten herein, the

25   loan was approved.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                        153

1    717              Q.   Okay.  But before closing and

2    disbursement would occur, there would be an accounting of

3    the actual income/expenses to determine the amount of the

4    loan and the disbursement of the loan, right?

5                    MR. DAVIS:  Objection.

6                    THE DEPONENT:  What did it say in the

7    commitment letter?  I'd have to say I don't know.  Show me

8    the commitment letter and I might be able to answer you.

9                    BY MR. SCHER:

10   718              Q.   Okay.  So if the commitment letter said

11   that the loan would be determined based on the actual income

                            Page 158

06mr31-ROUGH DRAFT Thomas.txt
12  and expenses that were achieved, then you would agree that

13  the underwriting herein refers ultimately to the actual

14  expenses and income?

15                  MR. DAVIS:  Objection.  That's exactly

16  contrary to what he testified to.  Please don't

17  mischaracterize the record in your questions.

18                  MR. SCHER:  Okay.

19  719         Q.   Go ahead.  You can answer my question.

20              A.   You're getting me confused again.

21  720         Q.   Well, don't be confused by your

22  counsel's trying to coach you.  These are improper coaching

23  objections.

24                  MR. DAVIS:  I object to your attempt times to

25  mischaracterize the record.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                              154


1                   MR. SCHER:  Don't interrupt me again.

2                   MR. DAVIS:  And your --

3                   MR. SCHER:  Don't interrupt me again.

4                   MR. DAVIS:  No.  I'm entitled to make

5   objections, particularly to what I think are intentionally

6   devious questions.

7                   MR. SCHER:  Okay.

8   721         Q.   Mr. Thomas, don't be confused.  Here's

9   the question.

10                  If the commitment letter said that the loan

                            Page 159

06mr31-ROUGH DRAFT Thomas.txt

11    would be determined based on the actual results at the time

12    of the closing and disbursement, then would you agree that

13    "underwriting herein" is referring to that event?

14            MR. DAVIS:  Objection.  Calls for legal

15    conclusion.

16            THE DEPONENT:  And there is a time difference

17    between closing, in this case, and disbursement.

18            BY MR. SCHER:

19    722    Q.   What's that time difference?

20            A.   well, you asked me to respond if the

21    numbers are in place at closing and disbursement.

22    723    Q.   Oh, okay.

23            A.   There's two different time differences

24    so I wasn't sure what your -- what time point you're

25    referring to.

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

155


1    724    Q.   Closing.

2            MR. DAVIS:  Objection.  You can respond.

3            THE DEPONENT:  What I'm trying to say is, we

4    would follow whatever it was written in the commitment

5    letter.  We wanted to do this deal.  We took the borrower's

6    request to heart to see if we could do the deal.  We went

7    back.  We got it reapproved on the basis that we believed

8    the borrower would accept, we believed the borrower accepted

9    those terms and conditions, and that's the basis on which we

Page 160

06mr31-ROUGH DRAFT Thomas.txt
10    were prepared to operate.

11                   I don't have a commitment letter in front of

12    me so I can't...

13                   MR. DAVIS:  Actually, it's Exhibit 7.

14                   THE DEPONENT:  Exhibit 7?  Sorry.  But I'm

15    going to have to read it through.

16                   BY MR. SCHER:

17    725            Q.    Okay.  All right.  I guess really what

18    I'm asking you, and I don't know why I'm having so much

19    trouble articulating it -- it must be my fault -- isn't it

20    accurate to say that if the result of the operations of this

21    apartment unit, the borrower, were a complete collapse?

22                   A.    Mm-hm.

23    726            Q.    ... at the time of the closing or

24    disbursement, whichever, that you wouldn't make the loan?

25                   MR. DAVIS:  Objection.  You can respond.

                     *** ROUGH DRAFT ***
                   Neeson & Associates, Toronto
                                                    156


1                    THE DEPONENT:  Depends, depends what the

2     commitment letter says.

3                    BY MR. SCHER:

4     727            Q.    Okay.

5                    A.    In that regard.

6     728            Q.    So, if the commitment letter -- have

7     you --

8                    A.    The commitment letter said if the place

                              Page 161

06mr31-ROUGH DRAFT Thomas.txt
9    were in full shambles and we were willing to advance it

10   anyway, we'd advance it anyway.

11   729          Q.    Okay.  But I'd point out to you in

12   Exhibit 7, at Condition 49, the rental achievement

13   requirement.  Why don't you take a minute and review the

14   rental achievement requirement and tell me whether that

15   informs you as to whether or not the actual results, current

16   operating statements, would dictate.

17                A.    Can you tell me what page that's on?

18   730          Q.    Yeah, it's JH 357.  That's the easiest

19   way.  356 is where Condition 49 begins.

20                MR. DAVIS:  Objection.  I think these

21   questions were asked and answers.

22                MR. SCHER:  Right.

23                MR. DAVIS:  You specifically pointed him to

24   this language before and asked him for his interpretation of

25   the contract.

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                              157


1                 MR. SCHER:  Right.

2                 MR. DAVIS:  And he specifically answered

3    that.  Are you asking him to do that again?

4                 MR. SCHER:  Right.  I'm not.  But the record

5    reflects what I'm asking him, and I'm not going to restate

6    it for you.

7                 MR. DAVIS:  Would you reread the question,

                         Page 162

06mr31-ROUGH DRAFT Thomas.txt
8   please.

9          THE REPORTER:  "Question:  But I'd point out

10  to you in Exhibit 7, at Condition 49, the rental achievement

11  requirement.  Why don't you take a minute and review the

12  rental achievement requirement and tell me whether that

13  informs you as to whether or not the actual results, current

14  operating statements, would dictate."

15          MR. DAVIS:  It has been asked and answered,

16  in my objection.

17          THE DEPONENT:  All right.  Let me read all

18  this stuff and see if I can give --

19          BY MR. SCHER:

20  731        Q.   Good.

21             A.   -- some form of opinion on this.

22             (witness perusing document)

23          THE REPORTER:  "Question:  But I'd point out

24  to you in Exhibit 7, at Condition 49, the rental achievement

25  requirement.  Why don't you take a minute and review the

                *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                            158


1   rental achievement requirement and tell me whether that

2   informs you as to whether or not the actual results, current

3   operating statements, would dictate."

4          THE DEPONENT:  So the question was whether --

5   if those were not there, whether...

6   732        Q.   That's correct.

                    Page 163

                              06mr31-ROUGH DRAFT Thomas.txt
 7                       A.    whether Hancock had the obligation to

 8   fund or not?

 9   733              Q.    Correct.

10                   MR. DAVIS:  Objection.  Misstates.

11                   THE DEPONENT:  The only thing I can refer to

12   is, under 2, on page 357, the following conditions referred

13   to collectively as funding conditions.  If all the funding

14   conditions are not satisfied --

15   734              Q.    You have to keep your voice up.  If the

16   reporter is going to transcribe it, you need to in a way

17   that she can transcribe it.

18                   A.    Section (2), 49(2) on page 357:

19   "Conditions to Funding and Provisions for Funding with

20   Rental Achievement Reserve."

21                   The bottom of that paragraph:

22                   "The foregoing conditions are referred to

23                   collectively as the 'Funding Conditions.'

24                   (space)If all of the Funding Conditions are

25                   not satisfied, John Hancock shall have no

                         *** ROUGH DRAFT ***
                         Neeson & Associates, Toronto
                                                      159


 1                   obligation to fund any portion of the Loan."

 2                   BY MR. SCHER:

 3   735              Q.    Okay.

 4                   A.    That's it.

 5   736              Q.    Is that your answer?

                              Page 164

06mr31-ROUGH DRAFT Thomas.txt
6                    A.   Yeah.

7    737            Q.   Yeah.  Now, you, that is, John

8    Hancock -- strike that.

9                         Turning back to Exhibit 10, it mattered to

10   John Hancock that the document contained the phrase "10%

11   break-even according to underwriting herein."  Am I right

12   about that?

13                    MR. DAVIS:  Objection.  You can respond.

14                    THE DEPONENT:  I'm not clear what you mean by

15   "mattered."

16   738            Q.   (overspeaking) You in fact insisted upon

17   it -- you were still speaking.  I'm sorry.

18                    A.   Oh.  Never mind.  Okay, go on.

19   739            Q.   It made a difference, and we know that,

20   because you interlineated on the original document this type

21   of document, inserting the 10% break-even.  So we know that

22   it mattered to you that in this document, Exhibit 10, the

23   10% break-even, according to underwriting herein, be

24   included, right?

25                    MR. DAVIS:  Objection.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    160

1                    THE DEPONENT:  That it mattered?

2                    BY MR. SCHER:

3    740            Q.   Yes.

4                    A.   "Underwriting herein" just refers to

                         Page 165

06mr31-ROUGH DRAFT Thomas.txt

5   this underwriting.

6   741        Q.   I'm not asking you that.  The 10%

7   break-even...

8              A.   Yeah.

9   742        Q.   ... that phrase, was included in this

10  document?

11             A.   Right.

12  743        Q.   Because you wrote it in in the earlier

13  version of it, right?

14             A.   Yes.

15  744        Q.   So it mattered to you that it be

16  included?

17             A.   Yes.

18  745        Q.   Am I right?

19             A.   Yes.

20  746        Q.   Okay.  And you know that it mattered to

21  the borrower as to what the amount of the loan was, right?

22             A.   Yes.

23             MR. DAVIS:  Objection.

24             BY MR. SCHER:

25  747        Q.   And you know that there is not in the

                *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                              161


1   commitment any reference whatsoever to the 10% break-even,

2   right?

3              A.   To the extent I've read it I haven't

                        Page 166

06mr31-ROUGH DRAFT Thomas.txt

4    seen it.

5    748         Q.   Okay.  And the reason it's not in the

6    commitment is because the borrower would not have agreed to

7    it.  Am I right?

8              A.   I have no idea whether they would have

9    or not have.

10   749         Q.   Now, this disbursement requirement says

11   that the 75 percent Loan to Value and 1.25 to 1 debt service

12   commitment ratios are described in the commitment, right?

13   You see that?

14             A.   Okay.  Sorry, which document are you on?

15   10?

16   750         Q.   10.

17             A.   Okay and this is described where?

18   751         Q.   In the commitment.  It's at disbursement

19   requirements?

20             A.   Right.

21   752         Q.   That same sentence we're looking at over

22   and over again.

23             A.   Yeah, yeah, yeah.

24   753         Q.   At the very end, it says:

25             "Subject to 75 percent Loan to Value and 1.25

                    *** ROUGH DRAFT ***
                Neeson & Associates, Toronto
                                              162


1              to 1?

2              A.   Right.

                    Page 167

06mr31-ROUGH DRAFT Thomas.txt

3   754         Q.   "Debt Service Coverage Ratio as

4   described in the commitment."

5                    Right?

6                    A.   Yeah.

7   755         Q.   Those two criteria are described in the

8   commitment, right?

9                    A.   Well, I'm not -- well, we got the clause

10  right.   It doesn't it I'm just clarifying whether he's

11  carving it off separate with the possibility of a rental

12  achievement reserve.

13  756         Q.   A rental achievement reserve is included

14  in the loan commitment as well.   But the 10 percent

15  break-even is in accordance with the underwriting in this

16  document, 10?

17                   A.   Mm-hm.

18  757         Q.   Not in accordance with what's contained

19  in the commitment, right?

20                   MR. DAVIS:  Objection.

21                   THE DEPONENT:  It's not in the commitment.

22                   MR. SCHER:  I have nothing further.

23                   MR. DAVIS:  Okay.

24                   EXAMINATION BY Mr. Davis

25  758         Q.   Mr. Thomas, first, will be take a look

                    *** ROUGH DRAFT ***
              Neeson & Associates, Toronto
                                                    163


1   at Exhibit 7, which is the loan commitment that was signed

                        Page 168

```
                           06mr31-ROUGH DRAFT Thomas.txt
 2    by John Hancock and the borrower?
 3                      A.   Yeah.
 4    759            Q.   You signed -- this document was signed
 5    by Mr. Malik; correct?  If you take a look at page 354?
 6                      MR. SCHER:  I'll stipulate to that.
 7                      THE DEPONENT:  That's correct.
 8                      BY MR. DAVIS:
 9    760            Q.   Okay.  Mr. Malik, was he authorized to
10    sign this document on Hancock's behalf, to your knowledge?
11                      A.   Yes, he was.
12    761            Q.   And by signing this document on
13    Hancock's behalf, was Hancock agreed to be bound by the
14    terms of the commitment as stated in the commitment?
15                      MR. SCHER:  Objection.
16                      THE DEPONENT:  Yes.
17                      BY MR. DAVIS:
18    762            Q.   Now, did Hancock change the terms of the
19    commitment, okay, the operative terms of the commitment at
20    any point in time before approving it?
21                      MR. SCHER:  Objection.
22                      THE DEPONENT:  Not to my knowledge.
23                      BY MR. DAVIS:
24    763            Q.   Now, you said that, I think you
25    testified earlier today that at some point in time between
```

06mr31-ROUGH DRAFT Thomas.txt

1   when the loan application was submitted by the borrower on

2   July 30th, 2004 and when it was finally approved by Han on

3   about August 16th or 17th of 2004, that you heard that the

4   borrower was unhappy about some possible change to the

5   commitment; is that right?

6                   MR. SCHER:  Objection.

7                   THE DEPONENT:  That's right.

8                   BY MR. DAVIS:

9   764             Q.    What did you understand to be the case

10  at the time?

11                  MR. SCHER:  Objection.

12                  MR. DAVIS:  What's the objection to that?

13                  MR. SCHER:  I have no idea what the case is

14  at the time.  So it's a vague and indefinite.  And that's

15  the basis.  You can cure it.

16                  BY MR. DAVIS:

17  765             Q.    Go ahead and answer the question,

18  Mr. Thomas, if you can.

19                  A.    Can you ask the question again?

20  766             Q.    Certainly.  Making reference back to the

21  understanding that you had at the time that the borrower was

22  unhappy about some potential change to the terms...

23                  A.    Right.

24  767             Q.    ... what did you understand to be the

25  case at that time?

                    *** ROUGH DRAFT ***
                    Neeson & Associates, Toronto
                                                        165

                            Page 170

06mr31-ROUGH DRAFT Thomas.txt

1                    MR. SCHER:  Objection.

2                    THE DEPONENT:  I understood that because the

3     way the transaction had been approved, with that 10 percent

4     break-even factor put in, that it had some effect on some

5     number that the borrower would have had to live with, and we

6     were told the borrower could not live with that, was unhappy

7     with that, and they wanted us to reconsider it on the

8     original basis as first proposed.

9                    BY MR. DAVIS:

10    768          Q.   Mm-hm.  Did you reconsider it?

11                   MR. SCHER:  Objection.

12                   THE DEPONENT:  Yes, we did.

13                   BY MR. DAVIS:

14    769          Q.   And what decision was made as a result

15    of the reconsideration?

16                   A.   The decision was made to go ahead with

17    the loan.

18    770          Q.   On what terms?

19                   MR. SCHER:  Objection.

20                   THE DEPONENT:  On the terms presented at the

21    10.

22                   BY MR. SCHER:

23    771          Q.   No, Exhibit 10 is what you're looking

24    for?

25                   THE DEPONENT:  On Exhibit 10.

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                         Page 171

1            BY MR. DAVIS:
2    772        Q.    And was Hancock willing to go forward
3    with the commitment on the terms that are contained in
4    Exhibit 7?
5            MR. SCHER:  Objection.
6            THE DEPONENT:  Yes, because it's signed by
7    Tim Malik.
8            BY MR. DAVIS:
9    773        Q.    Now, I understand that there was some
10   change made in some of the financial assumptions, that
11   Hancock was using for purposes of approving the loan; is
12   that correct?
13           MR. SCHER:  Objection.
14           THE DEPONENT:  That's correct.
15           BY MR. DAVIS:
16   774        Q.    Now, so how did you go about, how did
17   Hancock go about, dealing with this 10% break-even issue for
18   purposes of approving the loan as submitted by the borrower?
19           MR. SCHER:  Objection.
20           THE DEPONENT:  Essentially reduced the
21   expenses such that the NOI calculation divided by the loan
22   amount factored out a 10% rate given the interest rate.
23           BY MR. DAVIS:
24   775        Q.    Now, so the 10% break-even, according to
25   the "underwriting herein" that Mr. Scher has been

1   questioning you about in Exhibit 10, did that 10% break-even

2   impose any additional restrictions on the loan as approved

3   by Hancock?

4                   MR. SCHER:  Objection.

5                   THE DEPONENT:  Not to my knowledge, no.  That

6   would not be our intent.

7                   BY MR. DAVIS:

8   776         Q.   Fine.  Did it change any of the terms of

9   the loan commitment?

10                  MR. SCHER:  Objection.

11                  THE DEPONENT:  Not to my knowledge.

12                  BY MR. DAVIS:

13  777         Q.   And did it, for example, did the use of

14  the 10% break-even that's referenced in Exhibit 10, did it

15  affect the amount of the loan that the borrower would

16  receive under the terms of the loan commitment?

17                  MR. SCHER:  Objection.

18                  THE DEPONENT:  Not to my knowledge, no.

19                  BY MR. DAVIS:

20  778         Q.   Is it fair to say that the 10%

21  break-even was effectively assumed away for purposes of

22  approving this loan?

23                  MR. SCHER:  Objection.

24                  THE DEPONENT:  I believe so.

25                  BY MR. DAVIS:

                        Page 173

06mr31-ROUGH DRAFT Thomas.txt

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

168

1    779        Q.    Then why was it, Mr. Thomas, that if

2    that was the case, John Hancock still made reference to the

3    10% break-even in the final approval form that's been marked

4    as Exhibit 10?

5              MR. SCHER:  Objection.

6              THE DEPONENT:  It was there to point tout the

7    readers and the approver that the numbers as now constituted

8    on, it's my understanding, anyway, on 408, when calculated

9    out, gave a 10% break-even interest rate.

10             BY MR. DAVIS:

11   780        Q.    Were those the numbers that Hancock

12   would use for -- those are the numbers that Hancock used for

13   approving the loans; correct?

14             A.    Right.

15   781        Q.    Were those the same numbers that Hancock

16   would use for funding the loan?

17             A.    The numbers we'd use for funding the

18   loan would be the numbers derived from the commitment

19   letter.

20   782        Q.    But there was nothing about the 10%

21   break-even that would change the amount of funding, right?

22             MR. SCHER:  Objection.

23             THE DEPONENT:  It's not in the commitment

24   letter, no.

Page 174

06mr31-ROUGH DRAFT Thomas.txt

25                 BY MR. DAVIS:

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    169


1   783         Q.   Now, would Hancock rely upon the 10%
2   break-even to change the amount of funding if the 10%
3   break-even was not stated in the commitment letter?
4                 THE DEPONENT:   No.
5                 MR. SCHER:   Objection.
6                 BY MR. DAVIS:
7   784         Q.   And in changing some of the financial
8   assumptions that Hancock utilized for purposes of approving
9   the loan, is that unusual, in your experience?
10                A.   No.
11  785         Q.   Have you seen that done in other deals?
12                A.   Do it all the time.
13  786         Q.   Okay.  Why?
14                A.   Because we want to do business.  There
15  is always a first cut at it.  Sometimes we come up with loan
16  amounts or whatever that the borrowers are unhappy with.  We
17  look at market conditions.  We try to see, is there some
18  way, something we missed?  Is there some positive aspect
19  that we lover looked and we try to factor all those in.  So
20  we can come up with a loan amount and terms and conditions
21  that the borrower would be happy with.
22                BY MR. DAVIS:
23  787         Q.   Are all of John Hancock's or Manulife's
                        Page 175

06mr31-ROUGH DRAFT Thomas.txt

24    underwriting guidelines stated in loan applications or loan

25    commitments?

*** ROUGH DRAFT ***
Neeson & Associates, Toronto

170

1              A.   Not all stated in the commitments, they

2    are in the internal credit applications.

3    788        Q.   But the underwriting guidelines that you

4    use and the various criteria, they're not all stated in the

5    loan commitments?

6              MR. SCHER:  Objection.

7              THE DEPONENT:  In the commitment?

8              BY MR. DAVIS:

9    789        Q.   In the commitment.

10             A.   No.  No.

11   790        Q.   Are there underwriting guidelines

12   besides Loan to Value?

13             A.   There's debt service, there's

14   environmental, there's... building condition, occupancy

15   levels.

16   791        Q.   After Hancock approved the loan

17   application as submitted by the borrower in August of 2004,

18   was Hancock ready, willing, and able to close this loan

19   according to the terms of that commitment?

20             MR. SCHER:  Objection.

21             THE DEPONENT:  Yes.

22             BY MR. DAVIS:

Page 176

06mr31-ROUGH DRAFT Thomas.txt

23  792        Q.   I have no further questions.

24             EXAMINATION BY Mr. Scher

25             BY MR. SCHER:


                    *** ROUGH DRAFT ***
             Neeson & Associates, Toronto
                                                    171


1   793        Q.   When you say that you frequently make

2   changes to the numbers that borrowers submit, tell me what

3   instances you can report when such changes were made?

4              A.   We don't change the borrower's numbers,

5   we change our interpretation of the borrower's numbers.

6   794        Q.   But you said you make changes that would

7   make the borrower happy.

8              A.   Yeah.

9              MR. DAVIS:  Objection.  Can you read -- if

10  you want to read a portion of the transcript, then direct

11  his attention to it, please.

12             BY MR. SCHER:

13  795        Q.   Okay.  So you said:

14                  "So you make changes so you can come up with

15                  a loan amount in terms and conditions that

16                  the borrower would be happy with."

17  Right?

18             A.   Changes to our assumptions, changes to

19  our mathematical underwriting.

20  796        Q.   Right?

21             A.   Sure.

                    Page 177

06mr31-ROUGH DRAFT Thomas.txt

22  797           Q.   So if the borrower's happy with them,

23  then the borrower knows about them, right?

24                 MR. DAVIS:  Objection.

25                 THE DEPONENT:  No, not necessarily.  In my

                *** ROUGH DRAFT ***
            Neeson & Associates, Toronto
                                                172


1   experience all the borrower really cares about is, what is

2   the loan amount he's going to get.

3                  MR. SCHER:  Okay.  That's all I have.

4                  A.   So...

5   798            Q.   That's it?

6                  MR. DAVIS:  Are you done with your answer?

7                  THE DEPONENT:  So sometimes your analysis or

8   underwriting of the numbers may result in a loan amount less

9   than what the borrower wants, sometimes it could be a number

10  higher.  Depends, and sometimes the borrower says, you know,

11  I can't live with that.  Is there anything you can do?

12                 And then you try to condition the loan in

13  such a way.  You might take additional security.  You might

14  revaluate the numbers and say, oh, we made a mistake, we

15  took too high an allowance on this or that.  You get to the

16  point where we are happy making the commitment.

17                 BY MR. SCHER:

18  799            Q.   Right.

19                 MR. DAVIS:  Do you have additional questions.

20                 MR. SCHER:  No.
                         Page 178

06mr31-ROUGH DRAFT Thomas.txt

21          MR. DAVIS:  Okay, I have a few more.

22          EXAMINATION BY

23          BY MR. DAVIS:

24   800          Q.   Mr. Thomas, quickly, Mr. Scher asked you

25   earlier about whether you could approve something that was

                    *** ROUGH DRAFT ***
                 Neeson & Associates, Toronto
                                                    173


1    different than what was in the commitment, whether anyone

2    else, Mr. Malik or Ms. Coyne, could approve anything that

3    was different than what was in the commitment.  Do you

4    remember those questions?

5              A.   Yes.

6    801          Q.   Right.  To your knowledge, did anyone at

7    John Hancock approve this loan on terms that were different

8    than what are stated in the loan commitment?

9              THE DEPONENT:  No, not to my knowledge, no.

10             MR. SCHER:  Objection.

11             MR. DAVIS:  No further questions.

12             ---On adjourning at 2:45 p.m.

13                    _____

14

15   REPORTED AND ROUGH DRAFT

16   PREPARED BY:

17   Karin Jenkner, C.R.R., R.P.R., C.S.R.

18

19

                    Page 179

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 05-11614-WGY
************************************
JOHN HANCOCK LIFE INSURANCE
COMPANY,
                    Plaintiff/Counterclaim
                    Defendant
        Vs.
VESTMONT LIMITED PARTNERSHIP,
VESTMONT LIMITED PARTNERSHIP II,
VESTMONT LIMITED PARTNERSHIP III,
and VESTERRA CORPORATION d/b/a
MONTGOMERY SQUARE PARTNERSHIP,
                    Defendants/Counterclaim
                    Plaintiffs
************************************
                    VOLUME:   I
                    PAGES:  1-143


        DEPOSITION OF JOAN M. UZDAVINIS
                MARCH 21, 2006
                REPORTERS, INC.
        GENERAL & TECHNICAL COURT REPORTING
        23 MERRYMOUNT ROAD, QUINCY, MA 02169
        617.786.7783/Facsimile 617.786.7723

Page 2

1   DEPOSITION of JOAN M. UZDAVINIS, a witness
2   called on behalf of the Defendants/
3   Counterclaim Plaintiffs, pursuant to the
4   Federal Rules of Civil Procedure, before
5   Judith McGovern Williams, Certified
6   Shorthand Reporter, Registered
7   Professional Reporter, Certified Realtime
8   Reporter, Certified LiveNote Reporter, and
9   Notary Public in and for the Commonwealth
10  of Massachusetts, at the offices of
11  Deutsch, Williams, Brooks, DeRensis &
12  Holland, P.C., 99 Summer Street, Boston,
13  Massachusetts, on Tuesday, March 21, 2006,
14  commencing at 2:17 p.m.
15
16  APPEARANCES:
17  CHOATE, HALL & STEWART, L.L.P.
18    Paul D. Popeo, Esquire
19    Two International Place
20    Boston, Massachusetts  02110
21    617-248-5000
22    ppopeo@choate.com
23    on behalf of the Plaintiff/
24    Counterclaim Defendant

Page 3

1   APPEARANCES (Continued):
2
3   BUCHANAN INGERSOLL, P.C.
4     Howard D. Scher, Esquire
5     1835 Market Street
6     14th Floor
7     Philadelphia, Pennsylvania  19103-2985
8     215-665-3920
9     scherhd@bipc.com
10    on behalf of the Defendants/
11    Counterclaim Plaintiffs
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              I N D E X
2   Witness                              Page
3   JOAN M. UZDAVINIS
4     Direct Examination by Mr. Scher      8
5
6
7
8
9
10            E X H I B I T S
11  Number                               Page
12
13    1  Defendants' Notice of            11
14       Rule 30(b)(6) Videotape
15       Deposition of Plaintiff John
16       Hancock Life Insurance
17       Company
18
19    2  Interest Rate Circle           104
20       Notification, production
21       numbers JH 01109 through
22       01117
23
24    3  Multipage document headed      115

Page 5

```
1    John Hancock Life Insurance
2    Company, production numbers
3    JH 00405 through 00425
4
5  4 John Hancock Cash Balances -    121
6    JHLICO, production numbers
7    JH 01382 through 01387
8
9  5 John Hancock Cash Balances -    124
10   JHLICO, production numbers
11   JH 01388 through 01391
12
13 6 John Hancock Cash Balances -    126
14   JHVLICO & MIC (formerly
15   IPLICO), production numbers
16   JH 01392 and 01393
17
18 7 John Hancock Cash Balances -    127
19   JHLICO, production numbers
20   JH 01394 through 01397
21
22 8 John Hancock Cash Balances -    128
23   JHVLICO & MIC (formerly
24   IPLICO), production numbers
```

Page 6

```
1    JH 01398 and 01399
2
3  9 John Hancock Cash Balances -    129
4    JHLICO, production numbers
5    JH 01400 through 01404
6
7  10 John Hancock Cash Balances -   131
8    JHFS/JHRECO, production
9    number JH 01405
10
11 11 John Hancock Cash Balances -   131
12   JHLICO, production numbers
13   JH 01406 through 01411
14
15 12 John Hancock Cash Balances -   132
16   JHLICO, production numbers
17   JH 01412 through 01417
18
19 13 John Hancock Cash Balances -   133
20   JHVLICO & MIC (formerly
21   IPLICO), production numbers
22   JH 01418 and 01420
23
24 14 Plaintiff John Hancock Life    135
```

Page 7

```
1    Insurance Company's Response
2    to Defendants' First Set of
3    Interrogatories
4
5  15 One-page memorandum dated     139
6    August 17, 2004, to
7    Mr. Malik from Ms. Coyne,
8    production number JH 01174
```

Page 8

```
1         P R O C E E D I N G S
2         MR. SCHER:  Administer the oath
3    to the witness, please.
4
5         JOAN M. UZDAVINIS, first having
6    been duly sworn, testified as follows in
7    answer to direct examination by MR. SCHER:
8              -  -  -
9  Q.  Good afternoon.
10 A.  Good afternoon.
11 Q.  My name is Howard Scher.  I represent
12   Vesterra and the other defendants in this
13   case.  You are here as a 30(b)(6) designee
14   on behalf of John Hancock; do you
15   understand that?
16 A.  Yes, I do.
17 Q.  Have you ever previously been deposed?
18 A.  No, I have not.
19 Q.  I will ask you questions.  Your responses
20   will be considered as answers.  They will
21   be transcribed by the court reporter.  Do
22   you understand that?
23 A.  Yes.
24 Q.  And if during the course of my questioning
```

Page 9

| | |
|---|---|
| 1 | you don't understand one of my questions |
| 2 | or don't understand something about it, |
| 3 | you are perfectly welcome to ask me to |
| 4 | clarify it, to restate it. Is that |
| 5 | agreeable? |
| 6 | A. Yes, it is. |
| 7 | Q. If during the course of the deposition you |
| 8 | need to take a break or choose to take a |
| 9 | break, I would ask you -- you certainly |
| 10 | are entitled to. Just indicate that to me |
| 11 | somehow. I just ask that if there is a |
| 12 | question pending, that you answer the |
| 13 | question, and then break. Will you agree |
| 14 | to that? |
| 15 | A. I will. |
| 16 | Q. What have you done to prepare for today's |
| 17 | deposition? |
| 18 | A. I have met with Mr. Popeo so I could know |
| 19 | what to expect today, and other than that, |
| 20 | my normal course of business. |
| 21 | Q. Okay. Did you do anything in particular |
| 22 | to prepare as a 30(b)(6) witness for John |
| 23 | Hancock in this case? |
| 24 | MR. POPEO: Objection. |

Page 10

| | |
|---|---|
| 1 | You may answer. |
| 2 | MR. SCHER: What is the basis? |
| 3 | MR. POPEO: Vague. |
| 4 | You may answer the question. |
| 5 | BY MR. SCHER: |
| 6 | Q. Did you do anything in particular to |
| 7 | prepare for your testimony as John |
| 8 | Hancock's 30(b)(6) designee? |
| 9 | A. The only thing I did is be certain that I |
| 10 | knew what it was I was a designee for and |
| 11 | I was the proper person to have access to |
| 12 | any information. |
| 13 | Q. And did you access information in |
| 14 | connection with your preparation for this |
| 15 | deposition today? |
| 16 | A. The only stuff that I looked at was |
| 17 | related to my regular business work. It |
| 18 | was similar matters to my day-to-day |
| 19 | activities. |
| 20 | Q. And what are those? What are they, the |
| 21 | matters that are similar to the things |
| 22 | that you do day to day? |
| 23 | A. I am in the -- in charge of the portfolio |
| 24 | management group, and we look at cash |

Page 11

| | |
|---|---|
| 1 | balances, the allocation of commitments, |
| 2 | and the general status of the general |
| 3 | funds of the U. S. mortgages. |
| 4 | Q. Did you look at the cash balances, |
| 5 | allocation of commitments, and the general |
| 6 | status of the general funds of the U. S. |
| 7 | mortgages to prepare for this deposition? |
| 8 | A. No, I did not. |
| 9 | Q. Did you look at any historical data, for |
| 10 | example, historical meaning from 2005, |
| 11 | August or -- August 2004 -- |
| 12 | MR. POPEO: Objection. |
| 13 | Q. -- to prepare for this deposition? |
| 14 | MR. POPEO: Objection. |
| 15 | You may answer the question. |
| 16 | A. Not in preparation of this deposition. I |
| 17 | look at that as a matter of my regular |
| 18 | course of business. |
| 19 | Q. Okay. |
| 20 | MR. SCHER: Let's mark this as |
| 21 | Uzdavinis exhibit number 1. |
| 22 | (Defendants' Notice of |
| 23 | Rule 30(b)(6) Videotape |
| 24 | Deposition of Plaintiff John |

Page 12

| | |
|---|---|
| 1 | Hancock Life Insurance Company |
| 2 | marked exhibit number 1 for |
| 3 | identification.) |
| 4 | BY MR. SCHER: |
| 5 | Q. I will show you what I have had marked as |
| 6 | exhibit number 1. |
| 7 | (Handing exhibit number 1 to the |
| 8 | witness.) |
| 9 | Q. This is a document filed in this case. It |
| 10 | is entitled Defendants' Notice of |
| 11 | Rule 30(b)(6) Videotape Deposition, and |
| 12 | attached to it is an exhibit A, and listed |
| 13 | on exhibit A are 15 topics. Have you |
| 14 | reviewed all or a part of this exhibit in |
| 15 | preparation for this deposition? |
| 16 | A. I reviewed the last -- |
| 17 | Q. From 10 on? |
| 18 | A. Yes. From 10 on as a part of this. |
| 19 | Q. Okay. And you understand that you have |
| 20 | been designated as the corporate |
| 21 | representative on those topics 10 through |
| 22 | 15? |
| 23 | A. Yes, I do. |
| 24 | Q. Okay. Have you done anything to prepare |

Page 13

```
1    for your testimony as the corporate
2    designee on topics 10 through 15 other
3    than your normal day-to-day activities?
4  A. Nothing outside of my normal day-to-day
5    activities.
6  Q. With respect to item number 10, "The
7    losses allegedly suffered by John Hancock
8    as a result of the failure of the Loan to
9    close, as referenced in Paragraph 16 of
10   the Complaint, including: the basis,
11   policy and practice relating to decisions
12   whether to invest funds in mortgage loans
13   or other investment vehicles; the
14   projected return on all investments by
15   John Hancock over the ten years beginning
16   on August 1, 2005; and the actual return
17   on all investments by John Hancock for the
18   10 year period ending August 1, 2005,"
19   have you done anything to prepare to
20   testify with respect to that?
21 A. I attempted to find whatever data I could
22   with respect to projections.
23 Q. And could you explain to me what you mean
24   by projections?
```

Page 14

```
1  A. Well, this is specifically asking the
2    projected return on all assets by John
3    Hancock over the 10 years beginning
4    August 1, 2005. That to me indicates a
5    projection.
6  Q. Okay. What, if anything, did you review
7    in connection with that?
8  A. I attempted to find out what may exist in
9    the way of projected returns for not only
10   the commercial mortgage asset class but
11   more importantly all of the assets, since
12   this is referencing all investments by
13   John Hancock. It goes well beyond the
14   realm of commercial mortgages. It
15   includes equity, common stock, and oil and
16   gas partnerships, a whole host of
17   information that I do not see normally.
18 Q. And did you look at those projections?
19 A. I was unable to obtain any projected data
20   on that.
21 Q. Okay. Why did you want to see projected
22   data? Because it was requested?
23 A. Because this says that I should be the
24   designee on the projected return for all
```

Page 15

```
1    investments.
2  Q. I see. Now is it your testimony that
3    there is no such projection or that you
4    just weren't able to find it?
5  A. I am unaware of any projections. I'm not
6    sure if it exists or doesn't exist.
7  Q. You are not aware of any projections
8    sitting here today; is that right?
9  A. For -- for -- that contain all asset
10   classes of John Hancock, that is correct.
11 Q. Do you have information on any asset
12   classes of John Hancock?
13 A. The information that I manage is
14   specifically the U. S. commercial mortgage
15   portfolio, for which we project a
16   three-year period, but not in terms of
17   total return. We project an anticipated
18   spread on new commitments.
19 Q. Could you explain to me what "an
20   anticipated spread on new commitments"
21   is?
22 A. When we commit to a deal, we agree to a
23   spread over some index. It is typically
24   treasuries. It could be LIBOR or some
```

Page 16

```
1    other commonly published index, so we --
2  Q. Just for the record, LIBOR is L-I-B-O-R?
3  A. L-I-B-O-R.
4  Q. I am sorry?
5  A. Loan Interbank Offer Rate, to be specific.
6  Q. Yes.
7  A. We agree typically to some spread over an
8    index. We may agree to an entire rate,
9    but what we are projecting is the
10   anticipated spread over a common index,
11   which we reference as the treasuries. We
12   convert everything to a treasury
13   equivalent.
14 Q. Okay. So you are saying that the U. S.
15   commercial mortgage portfolio projects and
16   has a projection for the three-year period
17   beginning August 1, 2005, which measures
18   the spread between new commitments and T
19   bills or --
20 A. That's correct.
21            MR. POPEO: Objection.
22            Just let him finish.
23 A. The -- but I would like to expand on that.
24 Q. Yes.
```

Page 17

1    A.   We do this as a very detailed.  We don't
2         give one number.  We break our portfolio
3         down into groupings.  And so I will
4         estimate not for a given date, but for a
5         year's worth of commitments.
6    Q.   So is there information regarding the
7         losses that John Hancock suffered as a
8         result of this particular loan in question
9         in this case not having closed?
10                  MR. POPEO:  Objection.
11   A.   I don't follow your question.
12   Q.   Does John Hancock have anywhere a measure
13        of the losses it suffered as a result of
14        the failure of the loan in dispute in this
15        case having not closed?
16                  MR. POPEO:  Objection.
17                  You can answer the question, if
18        you understand it.
19   A.   I -- I am still unclear.  I do not have a
20        calculation.  I did not produce a
21        calculation of the losses in question.  I
22        am certain somebody produced one.  I don't
23        know who in fact did.
24   Q.   Okay.  So as far as the losses suffered by

Page 18

1         John Hancock as a result of the failure of
2         the loan in this case to close, you don't
3         have any measure of that; is that
4         accurate?
5                   MR. POPEO:  Objection.
6         Mischaracterizes.
7                   You can answer the question.
8                   MR. SCHER:  It is a new
9         question.  I am not characterizing or
10        mischaracterizing your prior testimony.
11   Q.   Do you have a measure of the losses
12        suffered by John Hancock as a result of
13        the failure of this loan to close?
14                  MR. POPEO:  I object to the
15        form.  Does she have a measure, or can she
16        testify for you today about that topic?  I
17        don't understand the question.
18                  THE WITNESS:  Yes.  I am still
19        confused by his question.
20                  MR. SCHER:  Okay.
21        BY MR. SCHER:
22   Q.   The measure -- the measure is what is
23        confusing you?
24   A.   No.  The question is confusing me.

Page 19

1    Q.   Okay.  Do you have a calculation of the
2         losses that John Hancock suffered as a
3         result of the failure of the loan to
4         close?
5    A.   Do I physically have that calculation?
6         No, I don't have that calculation with me.
7    Q.   Do you know what that calculation is,
8         whether it is in writing or in your head?
9    A.   I'm not certain of the exact number of
10        that calculation.  No.
11   Q.   Do you know what it consists of?
12                  MR. POPEO:  I object to the
13        form.  How was it calculated, Howard?
14   Q.   How was it calculated?
15   A.   It should reflect what I would call the
16        lost opportunity, that being once we
17        commit to funds, we hold cash aside to
18        follow through on a commitment, and so
19        there is underlying changes in interest
20        rates over that time period as well as
21        predominant changes in the spread
22        environment over that time period.  That
23        should reflect what I would refer to as an
24        opportunity cost associated with a lost

Page 20

1         investment.
2    Q.   Well --
3    A.   Additional to that would be any real
4         out-of-pocket costs for potential hedges
5         or any other instruments needed.
6    Q.   Okay.  You say you don't have the
7         calculation; is that right?
8    A.   That is correct.
9    Q.   But you have performed such calculations
10        in the past?
11   A.   I personally have not performed those
12        calculations.  No.
13   Q.   How do you know that the calculation
14        should be performed that way?
15   A.   It is a function of the portfolio
16        management area to opine on approaches
17        used in all pricing aspects.
18   Q.   Okay.  And this is a pricing aspect?
19   A.   That is correct.
20   Q.   That is a loss on a loan that doesn't
21        close is a pricing aspect?
22   A.   That is correct.
23   Q.   And you said it would include the measure
24        of the lost opportunity?  That would be

5 (Pages 17 to 20)

## Page 21

1    one component of it? Am I right about
2    that?
3  A.  Um-hmm.
4  Q.  Yes?
5  A.  Yes.
6  Q.  And another component would be any real
7    out-of-pocket costs for potential hedges
8    or any other instruments needed; right?
9  A.  That's correct.
10 Q.  Were there any others? Are there any
11   other losses of which you're aware?
12 A.  None that I'm aware of.
13 Q.  Okay. Now you say that the calculation
14   should reflect the lost opportunity, and
15   you defined that as being the loss
16   suffered from the moment that funds were
17   committed, is that right, --
18 A.  That is correct.
19 Q.  -- at the beginning date?
20 A.  Yes.
21 Q.  And is it accurate to say that the end
22   date is the date on which the loan did not
23   close?
24          MR. POPEO: I object to the

## Page 22

1    form.
2          You can answer, if you can.
3  A.  Yes. Could you rephrase that? I want to
4    be certain I'm answering properly.
5  Q.  So I have the beginning date of the lost
6    opportunity?
7  A.  Um-hmm.
8  Q.  Is it accurate to say that the
9    opportunity, the lost opportunity, would
10   be measured by the beginning date you gave
11   and the end date, meaning the date on
12   which the loan did not close?
13          MR. POPEO: Objection.
14 A.  I think it encompasses more than just that
15   limited time frame. That time frame is --
16   is what you use to establish those changes
17   in spreads or changes in rates, but the
18   losses actually suffered over the entire
19   anticipated life of the investment, it
20   does not stop on the date that a decision
21   is made to not go forward.
22 Q.  And why is that?
23 A.  Because we commit to funds and allocate at
24   commitment, and a line of business is,

## Page 23

1    therefore, expecting that return until the
2    anticipated maturity date of that
3    commitment.
4  Q.  And in this case when the John Hancock
5    knew that the loan would not close, what,
6    if anything, did it do with respect to the
7    commitment that you describe?
8          MR. POPEO: Objection.
9          You can answer.
10 Q.  Do you understand what I am saying?
11 A.  I believe I understand what you're saying.
12 Q.  Okay.
13 A.  And this is still to the best of my
14   knowledge an outstanding commitment in all
15   of our reports. We must make a line of
16   business whole, since funds are allocated
17   at time of commitment. So until we have a
18   way to disburse funds back to each line of
19   business to make them whole for the entire
20   anticipated loan, this remains an
21   outstanding commitment.
22 Q.  What is the form of that commitment to
23   funds?
24 A.  I'm not sure I follow your question.

## Page 24

1  Q.  You said that the measure -- the
2    calculation that you perform begins at the
3    time you commit to funds?
4  A.  That is correct.
5  Q.  I am using your phrase.
6  A.  Yes.
7  Q.  I'm not sure -- I'm not familiar with it.
8  A.  Yes. That is correct.
9  Q.  And what I want to know is what in fact
10   happens when the commit to funds occurs.
11 A.  When a loan is committed to, we take the
12   total proceeds, and we allocate it to what
13   I will call a line of business or among a
14   series of lines of businesses. That makes
15   its way into a system that will pair up
16   the assets of that line of business with
17   the liabilities of that line of business
18   to do what we refer to as duration
19   tracking. They view it as a firm and
20   solid commitment at that point in time.
21 Q.  Who is the "they"?
22 A.  The lines of business.
23 Q.  Okay. And then what happened?
24 A.  It is treated as if it would be a regular

Page 25

1  asset in the portfolio.  If it is expected
2  to close at a point in the future, it is
3  anticipated to be an asset at that
4  anticipated take-down date, as we refer to
5  it.
6  Q.  What was the take-down date for this loan?
7  A.  The anticipated -- well, it was not taken
8      down.  The anticipated take down, I
9      believe, was August of 2005.
10 Q.  And how do you know that?
11 A.  I believe that is what I read.
12 Q.  Where did you read that?
13 A.  In the initial loan document.
14 Q.  Did you review the initial loan document
15     for the purpose of preparing for this
16     deposition?
17 A.  No, I did not.  We review the loan
18     documents for the purposes of performing
19     bonus calculations.
20 Q.  What bonus calculations?
21 A.  The investment sector bonus calculations.
22 Q.  What is the investment sector bonus
23     calculation?
24 A.  It is a measure on which we pay incentive

Page 26

1  compensation.
2  Q.  Could you explain to me what -- so this is
3      an incentive compensation paid to
4      employees of John Hancock?
5  A.  That is correct.
6  Q.  And that is based on what?  What is your
7      role in calculating that?
8          MR. POPEO:  I am going to
9      object.
10         I am going to let you go on this
11     line of questioning.  I observe it is not
12     a topic of the 30(b)(6) notice that you
13     served on me and the witness.
14         MR. SCHER:  Okay.
15         MR. POPEO:  I expect you are
16     going to hustle through it, and we are not
17     going to get derailed today.
18         MR. SCHER:  I am not hustling
19     through it.  She used this document.  She
20     knows about the loan.  I want to know what
21     she know about it.
22         MR. POPEO:  The basis, Howard,
23     is what?
24         MR. SCHER:  She made reference

Page 27

1  to it in the testimony.
2          MR. POPEO:  Is this a fact
3      witness or 30(b)(6) witness?  What are we
4      doing today?
5          MR. SCHER:  I know what we are
6      doing today.
7  BY MR. SCHER:
8  Q.  Please answer the question.
9          MR. POPEO:  I will give you a
10     short leash.
11         MR. SCHER:  You will give me
12     what I take.
13 BY MR. SCHER:
14 Q.  Go ahead.
15         MR. POPEO:  Let's be clear.
16     This deposition will end right now,
17     Mr. Scher.  Okay?  The witness is not
18     going to be badgered.  We are not going to
19     have arguments today among each other.  We
20     have done this enough together that I
21     think we both know what we are doing.  If
22     you have a legitimate line of inquiry, you
23     may pursue it.
24 BY MR. SCHER:

Page 28

1  Q.  You reviewed the loan documents for the
2      purpose of determining incentive
3      compensation for investment officers who
4      make loans; correct?
5  A.  That is correct.
6  Q.  In this case you reviewed the initial loan
7      document for the purpose of calculating
8      the bonus that Mr. Malik, for example,
9      would receive on this?
10         MR. POPEO:  Objection.
11 A.  Let me try to summarize it very --
12 Q.  Please do.
13 A.  -- briefly for you.
14 Q.  Please do.
15 A.  This -- what I am doing is not specific to
16     any individual loan officer.  It is an
17     overall factor that applies to the entire
18     U. S. mortgage operation, not to any given
19     individual, and we look at and measure all
20     activity done over the year, whether that
21     be a commitment, a disposition, a
22     prepayment, expenses, revenue, many
23     components that go into our incentive
24     compensation plan.  The reason I would

Page 29

1   have looked at this one is we flag each
2   and every forward commitment, which this
3   was, to be certain that it is properly
4   being reflected in our data.
5  Q.   So this one sticks out in your memory as a
6   forward commitment; is that right?
7  A.   That is correct.
8  Q.   And this one being the loan to Avenel in
9   the amount of $32 million; right?
10 A.   That is correct.
11 Q.   And how could this forward commitment --
12   what is it that you are worried about?
13   That the forward commitment will not be
14   accurately recorded?
15         MR. POPEO:  Objection.
16         You can answer.
17 A.   It is not a worry I have.  I want to be
18   certain that we are properly reflecting
19   all forward commitments in fact as forward
20   commitments as opposed to immediate take
21   downs.
22 Q.   I see.  I see.  And is it fair to say that
23   there is an effect on the bonus
24   calculation as between a forward

Page 30

1   commitment and an immediate take down?
2  A.   No.  There is no effect.
3  Q.   Okay.  So they are valued in the bonus
4   calculation exactly the same way?
5  A.   Identically.
6  Q.   So what is the accounting difference?
7  A.   There is no accounting difference from a
8   pure accounting standpoint.  There is the
9   concern of a proper projection difference
10   to the line of business, since we allocate
11   these deals when they are committed based
12   on the funds that they will have available
13   at the anticipated time of take down.
14 Q.   Okay.
15 A.   So I need to know that the take down is
16   correct, so that the allocation is
17   correct.
18 Q.   All right.  So if I have this right, as of
19   August 2004 there was a forward commitment
20   in connection with this loan, and you are
21   concerned that the books and records of
22   John Hancock might reflect that as an
23   immediate take down when it makes an
24   allocation to lines of business; is that

Page 31

1   right?
2         MR. POPEO:  Objection.
3         You can answer the question.
4  A.   I'm not -- I'm not sure exactly what you
5   mean by the books of John Hancock.  I am
6   concerned about the projections of the
7   real estate finance group.
8  Q.   So the projections of the real estate
9   finance group is your concern, and you
10   want to be sure that the allocation with
11   respect to this $32 million loan is
12   reflected as a forward commitment as
13   contrasted with an immediate take down?
14 A.   That is correct.
15 Q.   Am I right about that?
16 A.   That is correct.
17 Q.   Now how is that difference reflected?
18 A.   There isn't a difference reflected so much
19   as a difference in how we would allocate.
20   We allocate funds based on accounts,
21   segments, lines of business -- whatever we
22   wish to call them -- based on their
23   investment demand, and investment demand
24   is provided monthly for a period going

Page 32

1   forward 16 months.  So to properly
2   allocate it, I have to be certain that I
3   am using the proper anticipated take-down
4   period.
5  Q.   Okay.  So if I understand you correctly,
6   in August of 2004 you wanted to be sure
7   that there was no line of business which
8   anticipated the receipt of the 32 million
9   -- a portion of the $32 million
10   immediately?
11         MR. POPEO:  Objection.
12 A.   That is correct.
13 Q.   And instead, you wanted to be sure that
14   those lines of business, if we can call
15   them lines of business, would not
16   anticipate the receipt of that investment,
17   that portion of the $32 million loan,
18   until the anticipated take down of that
19   loan?
20 A.   I'm not 100 percent sure I followed your
21   question.
22         We take a line of business, and
23   we will indicate the asset at the time of
24   commitment, reflecting that line's

## Page 33

1 anticipated demand at the point of take
2 down, but we report immediately to that
3 line of business that they have made a
4 commitment.
5 Q. I understand.
6 A. Okay.
7 Q. Okay. So that they know that beginning in
8 in this case August of 2005 at the --
9 well, that -- let's just use that --
10         MR. SCHER: Let's strike that
11 date.
12 Q. They are informed, the line of business is
13 reported immediately that it will have a
14 portion of the $32 million loan in this
15 case? They know that; is that right?
16 A. That is correct.
17 Q. And but you want to be sure that they know
18 that their portion of the $32 million will
19 not be received by them until the take
20 down, which is sometime in the future?
21 A. I want to be certain that they are aware
22 that that asset will not physically appear
23 on the company's books until some point in
24 the future.

## Page 34

1 Q. Okay.
2 A. They have already begun planning, assuming
3 that asset is going to happen.
4 Q. So you know that the line of business
5 begins planning on the take down of the
6 loan when they receive the report that
7 they will be given a portion of it?
8 A. No. That is incorrect. They begin
9 planning from the date of commitment.
10 Q. So they begin planning for the portion of
11 the $32 million loan on the date of
12 commitment?
13 A. That is correct.
14 Q. And what does that planning consist of?
15 A. When we put on a forward asset, if that
16 asset and liability duration that I
17 referenced earlier happens, there may be
18 the need to put on portfolio-level hedges.
19 They are treating it as a known and actual
20 commitment.
21 Q. What in fact happened with respect to this
22 $32 million loan from the date of
23 commitment at the lines of businesses to
24 which it was allocated?

## Page 35

1 A. Each of the lines of business was made
2 aware that they had been allocated X
3 dollars.
4 Q. They were reported that?
5 A. And that gets reported as well to the
6 duration management team, the asset
7 liability management area, to put into a
8 duration tracking system, and it is viewed
9 as an asset. If there is the need for a
10 portfolio hedge, it is applied at that
11 time.
12 Q. Anything else?
13 A. Not that I can think of at this time.
14 Q. Did the lines of business do anything else
15 beyond that at all in the history of this
16 loan, this $32 million loan?
17         MR. POPEO: I object to the
18 form.
19         If you understand that question,
20 you can answer it.
21         THE WITNESS: I don't. I don't
22 really understand that question.
23 Q. Okay. So I said -- you said that each of
24 the lines of business was made aware that

## Page 36

1 they had been allocated X dollars, a
2 portion of the 32 million?
3 A. Um-hmm.
4 Q. Do I have that right?
5 A. You have that correct.
6 Q. And then you said that that information,
7 that is the portion of the $32 million to
8 which each line of business has been
9 allocated, is also put into a duration
10 tracking system. I assume that is a
11 computer measuring system?
12 A. It is an application. That's correct.
13 Q. It is an application in a computer; right?
14 A. Yes.
15 Q. Okay. And then you said that if there is
16 a need for a portfolio hedge, it is
17 applied at that time. Was there a need
18 for a portfolio hedge with respect to any
19 of these lines of business for any portion
20 of the $32 million?
21 A. I believe I understand your question now.
22 So I will answer what I believe your
23 question is.
24         The portfolio-level hedges are

Page 37

```
 1    done by the asset liability management
 2    area, not the line of business, and they
 3    are done at the overall portfolio level,
 4    meaning the total general funds of John
 5    Hancock, as opposed to at a given owner's
 6    line of business.
 7  Q.  So what is the size of the portfolio?
 8           MR. POPEO:  I object to the
 9    form.
10           You can answer, if you can.
11  Q.  Just approximate.
12  A.  The total portfolio?
13  Q.  Yes.
14  A.  Or the mortgage portfolio?
15  Q.  The mortgage portfolio.  Let's stay with
16    that.
17  A.  Well, the mortgage portfolio is
18    12 billion.
19  Q.  Okay.
20  A.  But we do not hedge at an asset-specific
21    level.
22  Q.  That is what you are saying?  You are
23    saying that again?
24  A.  Um-hmm.
```

Page 38

```
 1  Q.  So that no portion -- you couldn't trace
 2    any portfolio hedge to the $32 million
 3    commitment?  Am I right about that?
 4           MR. POPEO:  Objection.
 5           You may answer.
 6  A.  I have not attempted to trace it.  That is
 7    outside of my function.
 8  Q.  Okay.  And you do not know whether in fact
 9    there was a portfolio hedge that could be
10    traced to any portion of the $32 million?
11    Am I right about that?
12  A.  That's correct.  I am not sure if there
13    was.
14  Q.  What else, if anything, occurs at the time
15    that the commitment is made beyond the
16    reporting of that commitment to the lines
17    of business and the duration tracking
18    system input and the possibility that
19    there would be a portfolio hedge?
20           MR. POPEO:  Objection.
21           You may answer.
22  A.  I'm not 100 percent sure I'm following you
23    there.  For each and every commitment we
24    get, we begin recording it and treating it
```

Page 39

```
 1    as an asset that is or will be on the
 2    books at the expected take-down date.
 3  Q.  What does that treatment consist of?
 4  A.  Measuring and recording them for a whole
 5    host of uses.  We report to agencies such
 6    as the American Council of Life Insurers
 7    on our commitment activity.  We report to
 8    the Canadian government's OSFI on our
 9    commitment activities.  I don't -- I could
10    not rattle off for you right now an
11    extensive list of all the reports we do,
12    but there is a whole host of reporting,
13    both internally and externally, that is
14    based on our commitment data.
15  Q.  Were any of those reports, did any of
16    those reports --
17           MR. SCHER:  Strike that.
18  Q.  Were any of the reports that you just
19    recited made with respect to the
20    $32 million loan commitment in August of
21    2004?
22           MR. POPEO:  Objection.
23           MR. SCHER:  What is the basis?
24           MR. POPEO:  I didn't understand
```

Page 40

```
 1    the question.
 2           MR. SCHER:  Okay.
 3  A.  We report --
 4  Q.  Do you understand that question?
 5  A.  I believe I do.
 6  Q.  Okay.
 7  A.  We report periodically, and so depending
 8    on the frequency of which we report and to
 9    whom we were reporting, this commitment
10    would have been included.
11  Q.  Sitting here today, do you know whether in
12    fact the $32 million commitment made in
13    August of 2004 was reported to any agency?
14  A.  Sitting here today without looking back in
15    time, I could not answer that question.
16  Q.  Okay.  Now in about June of 2005, the John
17    Hancock was informed that the borrower
18    would not borrow the $32 million.  Do you
19    know that?
20  A.  I did not know the date.  You have just
21    informed me.
22  Q.  Okay.  Let's assume for the purposes of my
23    question --
24  A.  All right.
```

Page 41

1  Q.  -- that it was in June of 2005. What, if
2      any, action did John Hancock take with
3      respect to this particular loan and its
4      commitment following June of 2005?
5          MR. POPEO: Objection.
6  A.  That question I'm not sure I do follow.
7  Q.  Okay. Did John Hancock do anything, for
8      example, when it learned that the loan
9      would not close, did it do anything to
10     report to anyone, whether to the lines of
11     business, to agencies in Canada or the
12     United States, to anyone anywhere that
13     fact, that the loan was not going to close
14     to the best of your knowledge?
15         MR. POPEO: Objection.
16 A.  Right. I can't answer to what happened on
17     this specific loan without going back and
18     looking at a trail of how reports may have
19     changed as a result of this loan. The
20     standard practice when we know a loan for
21     whatever reason will have a change is to
22     report those changes.
23 Q.  All right.
24 A.  Whether it is extending the anticipated

Page 42

1      take-down date, moving it forward, any
2      status change, as I would refer to it,
3      gets reported --
4  Q.  All right.
5  A.  -- since people must begin to plan
6      financially for that.
7  Q.  So that implicit in your answer was that
8      is how the report to the lines of business
9      occurs; right?
10 A.  That is correct.
11 Q.  Do you know whether in fact the lines of
12     business were notified that the loan would
13     not be taken down?
14 A.  Sitting here right now, I do not. I would
15     have to go back and look that up.
16 Q.  You have no information on that subject?
17 A.  Not at my fingertips, no.
18 Q.  Okay. You did not prepare to report to me
19     on that subject?
20 A.  That is correct.
21 Q.  Similarly, do you know whether John
22     Hancock notified any of the governmental
23     agencies or trade associations, I'm not
24     sure what those agencies were, with

Page 43

1      respect to the elimination of the take
2      down of that loan?
3  A.  Without looking at the report, I couldn't
4      tell you, but I can tell you the
5      directions that are provided to us. It is
6      report on commitments, the understanding
7      is that all commitments will close. We do
8      not include loans until they have been
9      fully committed to.
10 Q.  Okay.
11 A.  So the directions make no allowance for a
12     deal that does not fund.
13 Q.  And so that loan, the $32 million -- the
14     report of the commitment with respect to
15     the $32 million will remain unchanged
16     until the expiration of the 10-year
17     duration of the loan; is that right?
18         MR. POPEO: Objection.
19 A.  The reports that we make externally to
20     groups like the ACLI are exclusively on a
21     commitment basis. We report to them once
22     and only once when the commitment is made.
23 Q.  You don't report when the loan has been
24     paid off?

Page 44

1  A.  That is correct.
2  Q.  So the only reporting of the non-take down
3      of the loan would have been made to lines
4      of businesses, and you can't tell me
5      whether any such reports were made?
6          MR. POPEO: Objection.
7          You can answer.
8  A.  It would have been made to both lines of
9      businesses as well as our asset liability
10     management area, but I cannot tell you as
11     to whether or not those reports were made.
12     You are correct.
13 Q.  Would it also be made to the duration
14     tracking system?
15 A.  That is the asset liability management
16     area.
17 Q.  All right.
18 A.  They run the duration tracking system.
19 Q.  Sorry.
20 A.  That's okay.
21 Q.  You forgive me for not knowing that.
22         What is the form of notification
23     to the lines of businesses and the
24     duration tracking system? E-mail? Or --

Page 45

1  A.  Form -- I will tell you the form for
2      commitments. For commitments, we produce
3      what are referred to as internal trade
4      tickets, and those are e-mailed to all
5      parties, lines of businesses and ALM.
6  Q.  ALM is?
7  A.  The asset liability management area.
8  Q.  All right.
9  A.  That runs the duration tracking system.
10 Q.  ALM. Good. From now on, I promise I will
11     use ALM.
12 A.  That's okay.
13 Q.  So are these trade tickets, just
14     physically, are they attachments to
15     e-mails? Is that what they --
16 A.  That is correct.
17 Q.  What program generates the trade tickets?
18     What computer software program?
19 A.  I believe it is Excel, but I'm not sure.
20 Q.  Okay. And your testimony is that if this
21     loan had been properly treated, the
22     $32 million loan --
23          MR. SCHER: Strike that.
24 Q.  Do you know whether in fact this

Page 46

1      $32 million loan commitment in August of
2      2004 resulted in the distribution of
3      internal trade tickets to the lines of
4      business and to ALM?
5  A.  Yes.
6  Q.  You do know that?
7  A.  I do.
8  Q.  How do you know that?
9  A.  I was the recipient of that e-mail.
10 Q.  Okay. And now does the -- does John
11     Hancock notify the lines of business
12     and/or ALM when a loan does not close,
13     that a take down -- when it is learned
14     that a take down will not occur?
15 A.  That question I cannot answer with
16     certainty, because I'm unaware of any loan
17     other than this one that did not fund.
18 Q.  Do you know whether the internal trade --
19     whether the lines of business or ALM were
20     notified when it was determined that this
21     loan would not fund?
22 A.  I'm not aware of the method that -- used
23     when -- when it was determined this loan
24     didn't fund.

Page 47

1  Q.  You weren't a recipient of any
2      notification that the loan would not fund?
3      Is that what you are saying?
4  A.  I don't recall getting any notification.
5  Q.  So sitting here today, and what is it --
6      in what capacity did you receive the trade
7      ticket for this loan?
8  A.  In two capacities: the first is the
9      measurement of the investment performance
10     for the incentive plan.
11 Q.  Okay. And what is the other?
12 A.  The second is the overall portfolio-level
13     review.
14 Q.  Now when -- for the purposes of the
15     incentive plan, was there any effect on
16     the incentive plan as a result of the loan
17     not closing?
18          MR. POPEO: Objection.
19 A.  That question is harder to answer, since
20     the plan changes each year, and the plan
21     that would be in effect in the year 2004
22     and the plan that would be in effect in
23     the year 2005 could have had different
24     measurement metrics.

Page 48

1  Q.  But in any event, you don't recall knowing
2      that the loan was not going to close as of
3      June of 2005?
4  A.  That is correct.
5  Q.  Is that right?
6  A.  That is correct.
7  Q.  And likewise the overall portfolio level
8      review, did you ever -- did the fact that
9      the loan was not going to close as of July
10     -- as of June of 2005, did that have any
11     effect on the overall portfolio level
12     review?
13          MR. POPEO: Objection.
14          You can answer the question.
15 A.  I'm still unsure if I would have even have
16     been notified that this loan was not going
17     to close --
18 Q.  Okay.
19 A.  -- in June of 2005, so I can't give you an
20     answer as to an effect on the portfolio
21     review.
22 Q.  So if I have it right, sitting here today
23     you don't know what that means.
24          To the best of your knowledge,

## Page 49

| | | |
|---|---|---|
| 1 | | you know of no notification that the loan |
| 2 | | was not going to close? |
| 3 | A. | I am unaware of any notification. There |
| 4 | | may have been some, but I'm unaware of |
| 5 | | any. |
| 6 | Q. | Okay. Are you aware of any -- is your |
| 7 | | description of the notification process -- |
| 8 | | could your description of the notification |
| 9 | | process be considered the setting aside an |
| 10 | | allocation of funds? |
| 11 | | MR. POPEO: Objection. |
| 12 | A. | Could you rephrase that? I'm not sure I |
| 13 | | am following that. |
| 14 | Q. | Do you know whether funds were set aside |
| 15 | | and allocated in connection with the |
| 16 | | commitment made with respect to the |
| 17 | | $32 million loan? |
| 18 | A. | Yes. At the time of commitment, funds |
| 19 | | were allocated and notification was made. |
| 20 | Q. | Okay. And the form of allocation and |
| 21 | | setting aside, you have just -- you have |
| 22 | | described to me in your testimony today as |
| 23 | | the notification to lines of business |
| 24 | | and ALM; is that right? |

## Page 50

| | | |
|---|---|---|
| 1 | A. | That is correct. |
| 2 | Q. | Is there anything else beyond that which |
| 3 | | you consider to have constituted the |
| 4 | | setting aside or allocating of funds? |
| 5 | | MR. POPEO: Objection. |
| 6 | | You can answer. |
| 7 | A. | I'm not sure I follow it. |
| 8 | Q. | Other than what you have testified to, |
| 9 | | that is notification to the lines of |
| 10 | | business and to ALM of the existence of a |
| 11 | | commitment, and the information contained |
| 12 | | in that notification would include the |
| 13 | | portion of the $32 million each line of |
| 14 | | business had been allocated, -- |
| 15 | A. | Yes. |
| 16 | Q. | -- is there any other allocation or |
| 17 | | setting aside that occurs? |
| 18 | | MR. POPEO: The same objection. |
| 19 | A. | For that particular loan, no. We allocate |
| 20 | | it once at commitment. |
| 21 | Q. | Okay. And since the loan didn't close, |
| 22 | | was there any other action -- was there |
| 23 | | any action taken by any of the lines of |
| 24 | | business or by ALM to the best of your |

## Page 51

| | | |
|---|---|---|
| 1 | | knowledge after learning that the -- after |
| 2 | | the loan didn't close, did the lines of |
| 3 | | business or ALM take any action? |
| 4 | | MR. POPEO: Objection. |
| 5 | A. | I would have to actually ask each of those |
| 6 | | groups to find out how they were informed |
| 7 | | of the loan not closing. Typically, there |
| 8 | | can be a change in an anticipated take- |
| 9 | | down date, and they would take action |
| 10 | | simply on that change, whether it is a |
| 11 | | loan not closing or just changing the |
| 12 | | date. |
| 13 | | I do not know how they know when |
| 14 | | a loan is not going to close. I would |
| 15 | | have to go back and research that. |
| 16 | Q. | Okay. |
| 17 | A. | It doesn't happen often -- |
| 18 | Q. | Okay. |
| 19 | A. | -- if at all. |
| 20 | Q. | And so you don't know of any action that |
| 21 | | the lines of business or ALM took with |
| 22 | | respect to the loan not closing? |
| 23 | A. | I am unaware of any action. That is |
| 24 | | correct. |

## Page 52

| | | |
|---|---|---|
| 1 | Q. | After the June of 2005 when it was known |
| 2 | | that the loan would not close, are you |
| 3 | | aware of any action that John Hancock took |
| 4 | | to reduce whatever loss it might suffer |
| 5 | | from the fact that the loan was not going |
| 6 | | to be taken down? |
| 7 | | MR. POPEO: Objection. |
| 8 | A. | Could you rephrase that? |
| 9 | Q. | Yes. After John Hancock learned that the |
| 10 | | loan would not be taken down, do you know |
| 11 | | of any action taken by anyone at John |
| 12 | | Hancock, including the lines of business |
| 13 | | or ALM, to reduce whatever loss John |
| 14 | | Hancock might suffer? |
| 15 | | MR. POPEO: Objection. |
| 16 | | You can answer. |
| 17 | | MR. SCHER: What is the basis? |
| 18 | | MR. POPEO: You have so many |
| 19 | | problems with that question, I am not |
| 20 | | going to go through seriatim. I object to |
| 21 | | the form of the question. |
| 22 | | MR. SCHER: Okay. Let's just do |
| 23 | | it this way. |
| 24 | | BY MR. SCHER: |

Page 53

1  Q.  You know that John Hancock learned that
2      the loan would not close, would not be
3      taken down; right?
4  A.  You told me they know that. I do not -- I
5      am not aware of how we learned that the
6      loan wouldn't close or to whom that
7      notification was given.
8  Q.  Okay. Do you know of any action, anything
9      that any of the lines of business did
10     after they learned that the loan wouldn't
11     close?
12 A.  Lines of businesses would not directly
13     take action. It is an asset matter. It
14     is an asset input to the lines of
15     businesses portfolio. To the extent there
16     is any change in asset makeup, there ends
17     up being a rebalancing of the portfolio,
18     and the moneys would be sitting in cash
19     until such time as a replacement asset
20     could be found. So I would have to
21     surmise -- I have no proof of any of this
22     -- that the money is -- would be sitting
23     in cash.
24 Q.  Okay. So to the best of your knowledge,

Page 54

1      the money in question is sitting in
2      cash, --
3  A.  To the --
4  Q.  -- the $32 million?
5  A.  To the best of my knowledge, that is
6      correct.
7  Q.  And when you say cash, do you mean cash?
8  A.  I mean what we refer to as cash and money
9      market operations. It could physically be
10     in cash; it could be in commercial paper,
11     any one of the short-term instruments that
12     is managed by our money market operations
13     group.
14 Q.  And what are those instruments?
15 A.  I don't know the full breadth of that. We
16     would have to -- you would have to ask the
17     money management, the money market
18     operations group.
19 Q.  Is that reported anywhere, the various?
20 A.  It is the cash and short-term holdings of
21     the company that gets reported on all the
22     annual statements, annual reports.
23 Q.  Okay. And there, as I understand your
24     testimony, there is no effort to maximize

Page 55

1      the return for that particular $32 million
2      loan --
3          MR. POPEO: I object.
4  Q.  -- money; right?
5          MR. POPEO: I object to the form
6      of the question.
7          You can answer.
8  A.  I wouldn't characterize anything as saying
9      there is no effort to maximize return.
10     The process we use is we are given money
11     when we make an investment. It comes out
12     of the cash pool for us to have a
13     commitment. It -- and any time, for any
14     reason, a maturity, a prepayment, any
15     moneys that come back to the company, go
16     back into a cash pool until such time as
17     they are reallocated to another asset
18     class. So implicit in that would be the
19     maximizing of return, but it has to fall
20     under the general allocations among asset
21     classes for the total assets of the
22     company.
23 Q.  Do you know whether the $32 million has
24     been allocated to an asset class?

Page 56

1  A.  That particular $32 million? I have no
2      knowledge of. But our cash balance has
3      been steadily growing.
4  Q.  So to the best of your knowledge, the
5      $32 million loan commitment made in August
6      of 2004 --
7          MR. SCHER: Strike that.
8  Q.  Was that -- was there -- let me see if I
9      am -- I am trying to understand.
10         When the internal trade ticket
11     was sent to the line of business, that
12     didn't result in the line of business
13     placing a portion of the $32 million in
14     cash, did it?
15         MR. POPEO: Objection.
16 A.  The lines of business don't have their own
17     individual cash accounts. There is an
18     overall cash account for the company. The
19     lines of business were notified so they
20     could know what future asset they would
21     have an ownership interest in. They will
22     be earning money on a combination of their
23     actual assets, which include cash, at any
24     given point in time.

Page 57

1  Q.  Well, when the decision to make the
2      commitment occurred, other than the
3      notifications that you have described, was
4      there any change in the allocation of
5      assets at the company as a result of the
6      $32 million commitment having been made?
7          MR. POPEO:  I object to the
8      form.  She has testified about a change in
9      the allocation.  Other than what she has
10     testified to?
11         MR. SCHER:  Yes.  That's all.
12 A.  There are asset allocation targets set by
13     the ALM group for how much money should be
14     in collections of assets, fixed income and
15     nonfixed income and some subasset classes.
16     No given investment would change the
17     target percentages.
18 Q.  Okay.  And likewise when an asset -- when
19     a commitment either is paid, whether a
20     loan is made and it is repaid or a loan is
21     not funded or not taken down, there is no
22     change in the asset allocation, is there?
23         MR. POPEO:  Objection.
24 A.  The target asset allocations do not in

Page 58

1      fact change unless there is an underlying
2      investment strategy change throughout the
3      company.  Where the actual assets lie
4      relative to that target could be anywhere,
5      and we have been underweighted in
6      commercial mortgages for at least a year.
7      We cannot place enough commercial
8      mortgages.  So the targets as a result of
9      this would not have changed whatsoever,
10     but our ability to meet that target would
11     be falling farther behind.
12 Q.  Who is -- what else is included in the
13     target?  In other words, what other kinds
14     of investments?
15 A.  There is an asset allocation for fixed
16     income and nonfixed income, and then it
17     varies, based on ALM's strategy, how far
18     refined they go.
19 Q.  Okay.
20 A.  It includes mortgages.  It could include
21     public bonds and private bonds.  There is
22     -- they have varying targets that they set
23     by companies.
24 Q.  And how do they set those targets?

Page 59

1  A.  I'm unaware of the practices they use.
2  Q.  And that is at -- is that at the Manulife
3      level?
4          MR. POPEO:  Objection.
5  A.  It is at a company level, legal entity
6      level.  So it would be John Hancock.
7  Q.  John Hancock?
8  A.  -- Manulife Canada.  They would set
9      targets for each of the companies.
10 Q.  And you don't know what the targets were
11     for the companies in 2004-2005?
12 A.  I could look up at any point in time.
13     They publish that data.  I do know that
14     the target for commercial mortgages is
15     between 20 and 28 percent of total
16     invested assets.
17 Q.  And hasn't been met for at least a year?
18 A.  That is correct.
19 Q.  Can you approximate how much prior -- how
20     long prior to 2005 was the mortgage loan
21     portfolio target not met?
22         MR. POPEO:  Objection.  Do you
23     mean how many years other than 2005 was
24     the target not met?

Page 60

1          MR. SCHER:  How many years
2      prior.
3          MR. POPEO:  In each of the prior
4      years, was it met or not met?
5  BY MR. SCHER:
6  Q.  Was it met in 2004?
7  A.  The question is not as difficult as it
8      sounds like it could be, since those
9      targets were imposed by Manulife.
10 Q.  Ah-ha.
11 A.  And they were first given to us --
12 Q.  April 28th?
13 A.  -- with the year beginning 2005.
14 Q.  Okay.  So for the only year for which
15     there was a target, it was not met; is
16     that right?
17 A.  As measured for John Hancock.
18 Q.  Right.  And now you are not testifying
19     that it was not met by $32 million, are
20     you?
21 A.  No, I am not.
22 Q.  The target was not met by a long shot?
23 A.  That is correct.
24 Q.  Can you approximate in billions?

15 (Pages 57 to 60)

## Page 61

1  A.   For commercial mortgages?

2  Q.   Yes.

3  A.   I could tell you for the one year we

4       measured, we are shy by four to six

5       hundred million --

6  Q.   Okay.

7  A.   -- depending on which lines of business

8       you include.

9  Q.   Are you aware of any costs pertaining to

10      this particular loan or closing charges

11      associated with this particular loan?

12          MR. POPEO:   Objection.

13          You may answer the question.

14  A.   I'm not aware of those costs.   That would

15      be done by another group.

16  Q.   What group?

17  A.   Presumably the closing and/or servicing

18      group.

19  Q.   And who is the head of the closing group?

20      Arthur?

21  A.   Arthur Francis is currently the head of

22      the closing division.

23  Q.   Okay.   And what are his duties and

24      responsibilities?

## Page 62

1  A.   I do not know his full extent of duties

2       and responsibilities.

3  Q.   But he would know what costs pertaining to

4       this particular loan were?

5  A.   To the best of my knowledge, he would be

6       the person --

7  Q.   Okay.

8  A.   -- to go to.

9  Q.   And do you know whether there were any

10      commitments made to third parties in

11      connection with this loan?

12  A.   I'm unaware of any third-party

13      commitments.

14  Q.   Would that be Mr. Francis' knowledge as

15      well or not?

16  A.   I don't know.

17  Q.   Okay.   And other than the internal trade

18      ticket process which you have described,

19      are you aware of any calculation --

20          MR. SCHER:   Strike that.

21  Q.   Have you calculated what damages, losses,

22      costs or expenses resulted from the

23      internal trade ticket having been

24      distributed and the loan not closing?

## Page 63

1          MR. POPEO:   Objection.

2          Answer the question, if you can.

3  A.   I have not calculated any costs specific

4       to this loan.

5  Q.   Have you calculated any losses specific to

6       this loan?

7  A.   No.   I have not made any calculations as a

8       result of this loan not closing.

9  Q.   Okay.   Do you know how the application and

10      commitment fees that are in this case were

11      applied?

12  A.   In any loan when we get application and

13      commitment fees, it will vary with the

14      type of fee that is received, but in cases

15      such as this when it is a forward

16      commitment, they are put into a suspense

17      account and held in suspense until such

18      time as the loan would fund.

19  Q.   And what in fact happened with these fees?

20  A.   They were put into suspense.

21  Q.   And where are they now?

22  A.   They are sitting in suspense.

23  Q.   And is that the result of an investigation

24      that you undertook to verify?

## Page 64

1          MR. POPEO:   Object.   Does she

2       know that because of an investigation?

3  Q.   How do you know that?

4  A.   I know that because I have asked the

5       finance people where the fee income of all

6       types of fees that we collect gets

7       recorded.

8  Q.   And what about the fee income for this

9       particular loan?

10  A.   I have not looked up this particular loan,

11      but my assumption is if all deposits and

12      fees are booked through suspense, that

13      this one likewise was booked into

14      suspense.

15  Q.   And when is that suspense ended, other

16      than at the funding?

17  A.   To the best of my knowledge, it is at the

18      funding.   I'm unaware of loans that have

19      not closed.

20  Q.   Well, will that suspense be in perpetuity

21      as far as you know?

22  A.   Clearly at some point some action would

23      have to be taken to release funds from

24      suspense.   I'm not sure other than funding

## Page 65

1      what notification would happen to remove
2      moneys from suspense.
3   Q.   Okay. So sitting here today or whatever,
4      that preparatory remark is -- you don't
5      know how a fee is removed from suspense
6      other than by funding?
7   A.   That is correct.
8           MR. POPEO: Let's take a break
9      when you have a chance, Howard.
10           MR. SCHER: Okay. Just give me
11      a second.
12           (Pause.)
13           BY MR. SCHER: Okay. This is a
14      good time.
15           (Recess taken at 3:17 p.m.)
16           (Recess ended at 3:23 p.m.)
17   BY MR. SCHER:
18   Q.   Now you testified that there was an
19      opportunity cost associated with a lost
20      investment; is that right?
21   A.   That's correct.
22   Q.   And I would like to ask you to describe to
23      me what that opportunity cost was with
24      respect to the loss of the Avenel

## Page 66

1      $32 million loan in June of 2005.
2   A.   Okay. I think my answer actually has to
3      have two parts to it, if I'm following you
4      correctly.
5           The loss that is listed in this
6      case is -- I think it was 4.7 million or
7      thereabouts -- is viewed as the loss
8      between the rate on the deal and the
9      10-year treasury rate, which is what
10      someone is quantifying as opportunity
11      cost.
12           From my vantage point in
13      portfolio management, I feel that is too
14      conservative a measure of opportunity
15      cost. I feel that the real cost should be
16      measured down to the earnings rate where
17      the funds would be, namely, the yield on
18      our money market operations, our cash and
19      short term.
20           So I have seen the calculation
21      for this, and I understand it and follow
22      it under the assumption that we could earn
23      a 10-year treasury rate, but I would argue
24      the opportunity cost is really where our

## Page 67

1      marginal dollar would get invested, namely
2      at the cash and short-term rate.
3   Q.   And in what connection did you see that
4      $4.7 million calculation?
5   A.   I saw it as an attachment to one of the
6      legal pieces of paper that were floating
7      around the office.
8   Q.   Okay. And was it in connection with your
9      preparation for this testimony?
10   A.   No. I actually saw it in an REFG
11      management meeting.
12   Q.   REFG?
13   A.   REFG management meeting, because I was
14      sitting beside a lawyer.
15      And you saw the exhibit which calculated
16      $4.7 million as the loss?
17   A.   That is correct.
18   Q.   And that calculation was the rate of the
19      deal, meaning the interest rate at which
20      John Hancock had committed to loan
21      $32 million in that forward commitment and
22      subtracted from that was the 10-year
23      treasury; is that right?
24   A.   At the time the deal was no longer going

## Page 68

1      to be funded.
2   Q.   Now what is the earnings rate in cash or
3      short-term money that John Hancock is
4      experiencing beginning in August of 2005
5      or June of 2005?
6   A.   I don't know those numbers off the top of
7      my head. I would have to go back and get
8      them. They are expressed monthly by the
9      money market operations area.
10   Q.   And your testimony is that they are lower,
11      that the interest rates are lower in the
12      cash and short term than 10-year treasury?
13   A.   That is correct.
14   Q.   It is not your testimony that the earnings
15      on cash and short term is the best return
16      that John Hancock can realize, is it?
17   A.   No, it is not my testimony. That is where
18      incremental dollars are currently sitting
19      until such time as we can meet our target
20      asset allocations.
21   Q.   Could you explain that to me? In other
22      words, until you met that 400 to 600
23      million dollars shortfall?
24   A.   That's correct. We have the investment

Page 69

1  strategy group which is trying to take all
2  asset classes and work with the asset
3  liability management folks to develop
4  strategies to maximize returns. That
5  means they are developing target asset
6  mixes for each and every asset class that
7  they will allow the company to invest in,
8  and they set those targets. So
9  incremental moneys sit in cash until such
10  time as each one of the asset managers can
11  meet their targets.
12  Q.  And that is a decision made by what group?
13        MR. POPEO: Objection. Which
14  decision?
15        MR. SCHER: The decision that it
16  sits in cash.
17  A.  I'm unaware that there is an actual
18  decision to sit in cash. I'm aware that
19  both the chief investment strategist and
20  the chief financial officer set investment
21  strategies and investment targets for each
22  of the asset managers to hit, but the
23  asset managers are self-included, have
24  underwriting standards which we will not

Page 70

1  do business. So we will not go out and
2  just blatantly meet that target and damage
3  our underwriting standards. So they
4  understand and recognize that at any given
5  point in time an asset manager may have a
6  shortfall relative to their target. How
7  specifically they address repetitive
8  shortfalls and what alternative asset
9  class they put it into, I'm not aware.
10  Q.  That is yet to be seen; is that right?
11  This is a relatively new program?
12        MR. POPEO: Objection.
13  A.  The program for Manulife is not a new
14  program. The inclusion of John Hancock
15  into this measurement metric is new. But
16  even under John Hancock's world, we had a
17  significant cash position, because we
18  could not get enough of the ultimate
19  investments we wanted to make in fixed
20  income securities.
21  Q.  So even before the Manulife acquisition,
22  your testimony is that you had
23  insufficient mortgage loan opportunities?
24  A.  That met our underwriting standards.

Page 71

1  Q.  That met --
2  A.  That is correct.
3  Q.  And is the shortfall greater now or less
4  than it was since Manulife has acquired
5  John Hancock?
6  A.  I think it would be hard to say it is
7  greater or less, because it --
8  Q.  The targets have changed?
9  A.  Lines of business have been realigned;
10  segments have been realigned. There has
11  been a shifting in the way assets get
12  recorded, so.
13  Q.  Okay. What other investment opportunities
14  are there that -- for which you are
15  responsible?
16  A.  For which I am responsible?
17  Q.  Yes.
18  A.  The only opportunities that I'm
19  responsible for in terms of actually
20  making or overseeing the making of
21  investments are for lower quality 144A
22  classed CMBS investments that the real
23  estate finance group makes.
24  Q.  I see. But the total of the 25 to

Page 72

1  28 percent assets which are allocated,
2  what other investments are there? What
3  other investment types are there?
4  A.  That total mortgage allocation, which is
5  the 20 to 28 percent, is a combination of
6  agricultural mortgages and commercial
7  mortgages. It is solely a mortgage total.
8  Q.  All right.
9  A.  It is commercial mortgages and
10  agricultural mortgages.
11        MR. POPEO: What is the range?
12        THE WITNESS: My understanding
13  is that the range is 20 to 28.
14        MR. SCHER: Sorry.
15        THE WITNESS: If I misspoke
16  earlier --
17        MR. SCHER: It doesn't matter.
18  BY MR. SCHER:
19  Q.  What is the rest of the investment package
20  made of other than agricultural and
21  commercial mortgage loans?
22        MR. POPEO: Aside from the 20 to
23  28 percent allocation?
24        MR. SCHER: Yes.

Page 73

1  A.  I don't know the specifics of as to how
2     refined each asset class goes.  They show
3     a fixed income number and a nonfixed
4     income number.  Some segments break fixed
5     income down into more discrete points than
6     others.  I'm unaware of how specifically
7     they track it all, but there would clearly
8     be a number of asset subclasses beneath a
9     public bond, for example, and in nonfixed
10    income, they show a total for nonfixed
11    income.  Likewise, they most likely have
12    defined targets for each of the equity
13    types we invest in, but I'm unaware of
14    them.
15 Q.  Are the equity types outside the assets
16    that you are describing?
17       MR. POPEO:  Objection.
18 Q.  Are they assets within that 20 -- are
19    they, that make up the balance of the 20
20    to 28 percent?
21 A.  The 20 to 28 percent is solely the
22    allocation to mortgages.
23 Q.  Right.
24 A.  So the nonfixed income and the equity

Page 74

1     investments make up the balance -- the
2     remaining of the fixed income, I should
3     say.
4  Q.  Fixed, nonfixed, which includes equity?
5  A.  That is correct.
6  Q.  Now you earlier testified that loss on a
7     loan that doesn't close is a pricing
8     aspect.  Could you explain that to me?
9  A.  Pricing refers to not only the activity
10    that we do on new deals but activity as it
11    relates to lines of business, and we meet
12    monthly.  Collections of lines of business
13    have asset managers, and the lines of
14    business folks present in these meetings,
15    and they view a commitment as in fact a
16    commitment, and that brings its way into
17    the pricing of our liability products.
18       So I view a cancellation or a
19    change in any asset as a pricing issue,
20    because we must make sure that the lines
21    of business are somehow made whole since
22    they will have priced their product under
23    the assumption that all loans close.
24 Q.  And what, if any, measures were taken with

Page 75

1     respect to this $32 million loan that
2     didn't close?
3  A.  I'm unaware of any specifics relative to
4     this loan without looking it up.
5  Q.  And you haven't looked it up in connection
6     with your preparation for this deposition?
7  A.  I have not.
8  Q.  Now you say this is the only loan that
9     didn't close as far as you -- to the best
10    of your knowledge; is that right?
11 A.  That is correct.
12 Q.  Would it be your best estimation that no
13    action was taken by any of the lines of
14    business when they learned that the loan
15    wouldn't close?
16       MR. POPEO:  Objection.
17       You can answer the question.
18 A.  No.  It is not my estimation that no
19    action was taken.  32 million is a
20    significant loan relative to our loans, so
21    my estimation is that action was taken.
22    I'm just not sure what that action may
23    have been.
24 Q.  Okay.  And you don't know how those lines

Page 76

1     of business were notified that they should
2     take action?  Am I right about that?
3  A.  That's correct.
4  Q.  Okay.
5  A.  I do not know how they were notified.
6  Q.  In fact, whether or not they were
7     notified?
8  A.  That is correct.
9  Q.  You don't know whether or not they were
10    notified?
11 A.  That is correct.
12 Q.  Are you aware of any hedge losses that
13    were associated with this loan?
14 A.  Any specific hedge losses on this loan?
15 Q.  Correct.
16 A.  I'm not aware of.
17 Q.  Is it your testimony that the hedge, if
18    any, would occur at the portfolio level?
19 A.  That is correct.  The -- all of the assets
20    and all of the liabilities are looked at
21    periodically, some segments weekly, some
22    monthly, to rebalance, at which time
23    portfolio hedges are put on to correct for
24    it.  Now that includes all new commitments

Page 77

| | |
|---|---|
| 1 | made, all new liabilities, changes in |
| 2 | their cash flows. So there are numbers of |
| 3 | factors that go into the decision to put a |
| 4 | portfolio-level hedge on. |
| 5 Q. | And would it be accurate to say that the |
| 6 | learning that the $32 million loan on the |
| 7 | Avenel project was not going to occur had |
| 8 | no effect on the portfolio-level hedging? |
| 9 | MR. POPEO: Objection. |
| 10 A. | I wouldn't say that that knowledge would |
| 11 | have no effect. It would be yet another |
| 12 | piece of information exactly like the |
| 13 | commitment that there would now be no |
| 14 | anticipated flow coming in, and they would |
| 15 | factor in that assumed lack of cash flow. |
| 16 Q. | And do you know what, if any, effect that |
| 17 | had on -- what, if any, cost that was? |
| 18 A. | I don't know what that cost may have been. |
| 19 | No. |
| 20 Q. | Whether there was a cost or whether there |
| 21 | wasn't a cost? |
| 22 A. | Yes, yes. I'm unaware. |
| 23 Q. | So going back to your viewing, if not |
| 24 | reviewing, the calculation of lost |

Page 78

| | |
|---|---|
| 1 | opportunity of $4.7 million, you do not |
| 2 | believe that is an accurate calculation? |
| 3 | Do I have that right? |
| 4 A. | No, you don't. I believe the calculation |
| 5 | that was shown is accurate for what it is |
| 6 | representing. |
| 7 Q. | I see. |
| 8 A. | I believe it, in my estimation, it is a |
| 9 | conservative estimate of the actual loss, |
| 10 | since it assumes the reinvestment would be |
| 11 | at a 10-year treasury, and that is not our |
| 12 | current marginal investment. |
| 13 Q. | Do you have any idea why the 10-year |
| 14 | treasury was chosen as the number -- as |
| 15 | the number to deduct from the rate of the |
| 16 | deal? |
| 17 A. | I don't know why the 10-year treasury was |
| 18 | chosen. It may have been the basis for |
| 19 | which the spread on the commitment was |
| 20 | tied to, but I do not know for a fact why |
| 21 | the 10-year treasury was chosen. |
| 22 Q. | And what do you mean by that, the spread |
| 23 | on the commitment? |
| 24 A. | Many deals have, when they commit, will |

Page 79

| | |
|---|---|
| 1 | set to a spread over a treasury rate at |
| 2 | which they will fund. |
| 3 Q. | Can you explain that? You mentioned that |
| 4 | at the outset of your testimony about |
| 5 | treasury and LIBOR. Could you explain to |
| 6 | me what that setting process is? |
| 7 A. | When we have a deal in which we say the |
| 8 | spread -- the commitment includes a spread |
| 9 | set, so one has not agreed to a defined |
| 10 | rate, but they have agreed, I will use an |
| 11 | example, to 150 basis points over the |
| 12 | 10-year treasury as published three days |
| 13 | prior to funding, so that somebody would |
| 14 | know at that point, we are going to look |
| 15 | up the 10-year treasury date three days |
| 16 | prior to funding and add 150 basis points |
| 17 | to it. That will be the coupon rate on |
| 18 | the deal. |
| 19 Q. | And to the best of your knowledge, that |
| 20 | spread set was not agreed to in connection |
| 21 | with this transaction? |
| 22 | MR. POPEO: Objection. |
| 23 A. | I don't know whether there was a spread |
| 24 | set or a rate that was agreed to in this |

Page 80

| | |
|---|---|
| 1 | transaction. |
| 2 Q. | Okay. You said that you had looked at the |
| 3 | loan application, but if you were to -- in |
| 4 | connection with your other calculations |
| 5 | that you were doing. Did you notice |
| 6 | whether or not there was a rate commitment |
| 7 | or a spread set? |
| 8 A. | I didn't. |
| 9 Q. | Assume for the purposes of my question |
| 10 | that it was a rate commitment. Can you |
| 11 | offer me an explanation as to why the |
| 12 | 10-year treasury was used as the number to |
| 13 | subtract from the rate? |
| 14 A. | My supposition -- |
| 15 | MR. POPEO: Objection. |
| 16 A. | -- is that when somebody was arriving at |
| 17 | that rate the benchmark they were |
| 18 | employing at that time was in fact a |
| 19 | 10-year treasury. |
| 20 Q. | So when the someone who was calculating |
| 21 | the rate at which this mortgage would be |
| 22 | lent, they were using a 10-year treasury |
| 23 | as the basis for that; is that right? |
| 24 A. | That is what I am supposing, yes. |

Page 81

1  Q.  Okay. But other than that supposition,
2      and I don't mean to minimize it, but other
3      than that supposition, you have no idea
4      why the 10-year treasury was used?
5  A.  No. Without asking the person who did the
6      calc why they chose the ten-year, I do not
7      know.
8  Q.  And do you know who did the calculation?
9  A.  I do not know who actually did the
10     calculation, no.
11 Q.  Do you know what interest rates John
12     Hancock used for mortgages in June of
13     2005?
14         MR. POPEO: Objection.
15         You may answer.
16 A.  No, I don't. I would have to go back and
17     look up what we had at the time.
18 Q.  And that answer would be the same up to
19     and including today?
20 A.  That is correct.
21 Q.  Do you know the rate, interest rate, at
22     which John Hancock is making -- made loan
23     commitments in June of 2005?
24         MR. POPEO: Objection.

Page 82

1  A.  No. All of those numbers, I would have to
2      go back and look, and there is -- there
3      are two reasons for that. One is they
4      vary greatly based on the term of the
5      loan, the quality of the loan, and the
6      type of property. And the second is that
7      the majority of my analysis is based upon
8      spreads as opposed to overall rates.
9  Q.  When you said that 20 to 28 percent of
10     your assets are kept in commercial -- in
11     mortgages, did you mean agricultural and
12     commercial?
13 A.  Yes. And let's clarify. It is not -- it
14     is the target for the company is 20 to
15     28 percent. We are falling shy of that
16     target. It is a total mortgage target
17     that includes both agricultural and
18     commercial mortgages.
19 Q.  And can you estimate or can you tell me
20     what the portion is attributable -- the
21     target for commercial?
22         MR. POPEO: How many are
23     commercial versus how many are
24     agricultural?

Page 83

1          MR. SCHER: Yes. What
2      percentage.
3  A.  Percentage terms, I would have to do the
4      math backwards, but in general, we have
5      got twelve billion of commercial mortgages
6      and we have got about four billion of
7      agricultural.
8  Q.  Okay. And --
9  A.  So three quarters of it is agricultural --
10     is commercial.
11 Q.  And how far short are you in terms of
12     commercial mortgages?
13 A.  They do not set a target for the
14     underlying asset class, simply the overall
15     mortgage asset class.
16 Q.  So all you have is the 20 to 28 percent?
17 A.  That is correct.
18 Q.  And you can't tell me whether it is all
19     agricultural that is short or it is all
20     commercial or a combination of?
21         MR. POPEO: Objection.
22 A.  The target is set at the total level. We
23     are far enough behind the target that it
24     must be a mix of the two.

Page 84

1  Q.  Okay. Is it accurate to say that John
2      Hancock invested funds in corporate bonds
3      in 2005?
4  A.  That would be an accurate statement.
5  Q.  Is there any reason why it could not have
6      invested another $32 million in corporate
7      bonds?
8          MR. POPEO: Objection.
9  A.  I'm unaware of exactly how the
10     mortgage-to-bond relationship goes. Money
11     -- when we do not do a mortgage, it still
12     is sitting in cash. How money gets
13     released from cash to be allocated to the
14     bond group, I am unclear on. But I can
15     tell you that regardless of the asset
16     class we go into, there is the time demand
17     for individuals to make the trades as well
18     as finding the appropriate assets, and
19     they may have very well -- I do not know
20     their targets -- they may have already
21     been above the target that is set for
22     public bonds.
23 Q.  But you do not know that?
24 A.  I do not know that.

## Page 85

1  Q.  So you don't know of any reason why the
2      $32 million in June of 2005 could not have
3      been invested in corporate bonds?
4          MR. POPEO:  Objection.
5  Q.  Sitting here today, you don't know of any
6      reason?
7  A.  Right.  I don't know any reason why that
8      32 million wasn't -- was or was not
9      invested in any other asset class.
10 Q.  Okay.  And you don't know whether -- do
11     you invest in commercial mortgage-backed
12     securities?
13 A.  We invest in the 144A class of commercial
14     mortgage-backed securities.
15 Q.  And is there any reason why the
16     $32 million could not have been invested
17     in commercial mortgage-backed securities?
18         MR. POPEO:  Objection.
19 A.  We have -- we have specific targets which
20     we have been unable to meet and
21     underwriting standards even for our
22     commercial mortgage-backed securities that
23     are 144As.
24 Q.  Were you testifying that you are over-

## Page 86

1      invested in high-grade corporate bonds?
2  A.  No, I was not testifying as to that.
3          MR. POPEO:  Objection.
4  Q.  You said that was a possibility?
5          MR. POPEO:  Objection.
6  A.  I am unaware of where they stand relative
7      to their target.
8  Q.  You do you know what the expected rate of
9      return for John Hancock is for the next 10
10     years?
11 A.  No, I do not.
12 Q.  It does have expected rates of return,
13     doesn't it?
14 A.  We forecast returns for a three -- well,
15     we forecast in my case spreads -- I'm not
16     exactly sure how all the asset managers
17     report theirs; it may be a spread; it may
18     be a return -- for a three-year window.
19     We do not forecast for a ten-year window.
20 Q.  And why is that?
21 A.  Three years is viewed as the most valuable
22     of the projections.  Beyond that, they are
23     viewed as suspect.
24 Q.  And suspect because they're?

## Page 87

1  A.  Too far out in the future to be reliable.
2  Q.  Is there a risk associated with mortgage
3      loans?
4  A.  There is a risk associated with any
5      investment.  So, yes, there is a risk
6      associated with a mortgage loan.
7  Q.  And is that risk included in your
8      opportunity cost calculation?
9  A.  In any specific opportunity cost
10     calculation, there would not be a risk
11     per se.  There are many risks with
12     mortgages.  We include risks in some of
13     our pricing, such as default, but we don't
14     include a risk of a loan not closing.
15 Q.  Other than your observation with respect
16     to the calculation of that lost
17     opportunity, did you note any other, other
18     than what you have already testified to,
19     did you note any other deficiencies or any
20     other questions you had about that
21     calculation?
22         MR. POPEO:  Objection.
23 A.  No.  But I was also not asked to review
24     that calculation.

## Page 88

1  Q.  Okay.  In your estimation, is there any
2      difference between the amount -- the lost
3      opportunity, the calculation of the lost
4      opportunity and the loan actually going to
5      maturity and being fully repaid?
6          MR. POPEO:  I object to the form
7      of the question.
8          THE WITNESS:  Yes.
9  A.  I'm not sure I am following your question.
10 Q.  In other words, in terms of the
11     calculation of the opportunity loss, is
12     that amount larger, greater, or the same
13     as the opportunity, the value to John
14     Hancock of the loan being made and being
15     repaid to its maturity?
16         MR. POPEO:  Objection.
17 A.  If the loan came on the books at its
18     regular 32 million and paid us right
19     through the expected maturity at the end
20     with no other defaults or any other lost
21     cash flows, that opportunity cost simply
22     reflects what the alternative investment
23     in a 10-year treasury would yield us.  It
24     does not reflect the loss to the company,

Page 89

1  which is actually an asset earning what
2  the full yielding mortgage was, since we
3  have targets that we have to make, and we
4  are still far shy of the target. So while
5  it reflects what we have lost down to a
6  treasury as an assumed alternative
7  investment, that is not the alternative
8  investment we would like to have. We
9  would like to have a commercial mortgage
10 on the books that is yielding that.
11 Q.  Well, but why wouldn't you like to have,
12     if the commercial mortgage was not
13     available, why wouldn't you like to have
14     the next highest yielding asset?
15          MR. POPEO: Objection.
16 A.  Presumably the next highest yielding asset
17     also has a target they are trying to
18     meet. In theory, cash would be your
19     default asset when you have to fall short
20     in all of your other targets.
21 Q.  And that is the theory that you would
22     apply to your calculation of the loss in
23     this case?
24 A.  That is correct.

Page 90

1  Q.  Now is it accurate to say that there was
2      no lost opportunity cost from the time of
3      the commitment to the time that the loan
4      was not funded?
5          MR. POPEO: Objection.
6  Q.  In other words, from August of 2004 until
7      August of 2005, is it accurate to say that
8      you do not know of any loss that John
9      Hancock suffered?
10         MR. POPEO: Objection.
11         MR. SCHER: What is the basis?
12         MR. POPEO: I am not going to go
13     through the basis, Howard. You are taking
14     too much time. I object to the form.
15         MR. SCHER: What is the basis?
16         MR. POPEO: I object to the
17     form.
18 BY MR. SCHER:
19 Q.  Okay. Go ahead.
20 A.  I'm not sure how to properly answer your
21     question. There is no quantified dollar
22     amount for any given period before a loan
23     is closed, but the assumption built into
24     all of our pricing, both on the asset side

Page 91

1  and the liability side, is that all loans
2  will in fact close.
3  Q.  Okay. But that's not quite my question.
4      It is my fault. Let me see if I can
5      restate it.
6          From August of 2004 when the
7      loan commitment was presumably made until
8      John Hancock became aware that the loan
9      would not close, did John Hancock suffer
10     any loss of which you're aware?
11 A.  I'm not aware of any loss simply because I
12     am making the assumption that the loan in
13     fact would still close.
14 Q.  Right. But now from August -- from the
15     time that John Hancock learned that the
16     loan would not close, you have testified
17     with respect to your calculation --
18 A.  Yes.
19 Q.  -- of the lost opportunity; is that
20     correct?
21 A.  That is correct.
22 Q.  Are you aware of the rate lock in
23     connection with a forward commitment?
24 A.  In connection with this specific

Page 92

1  commitment?
2  Q.  Yes.
3  A.  No.
4  Q.  Are you familiar with the process under
5      which a -- when a rate lock is executed by
6      John Hancock?
7  A.  Yes. I -- within my group, rate locks are
8      done, and when there is a commitment and
9      the rate is to be locked, someone in my
10     team actually goes and looks up the basis
11     for that rate lock, whether it be the
12     LIBOR or the treasury and the agreed-upon
13     spread, and actually locks and sets the
14     rate for that deal and communicates such
15     rate lock.
16 Q.  To whom does that person communicate the
17     rate lock?
18 A.  To the investment officers, to the folks
19     within the asset liability management
20     area, the global investment strategy area,
21     myself, and I would have to look at the
22     full distribution list to see how far a
23     rate lock is communicated.
24 Q.  And is the notification process the same

Page 93

1    as the ticket -- the trade ticket process?
2  A. It is all an e-mail notification process.
3  Q. So it is not the trade ticket? It is --
4     or is it the same?
5  A. It is possible that it could be all in one
6     document.
7  Q. Okay. In this case, the interest rate
8     lock was accomplished on August 1, and the
9     loan commitment approval process did not
10    occur until August 17. Would that suggest
11    to you that there would be separate trade
12    tickets?
13 A. That would not suggest to me separate
14    trade tickets. A trade ticket is produced
15    at time of commitment, which is when we
16    allocate funds. We would have the -- the
17    dates prior to that is when it is listed
18    as rate locked but not yet approved.
19 Q. So then there would be no economic
20    consequence to the rate lock; is that
21    right?
22        MR. POPEO: Objection.
23 A. Well, I'm not sure I completely follow
24    your question. The rates can be locked

Page 94

1     basically at any point from the beginning
2     right up through the commitment. We view
3     the deal as a committed deal which we
4     allocate at the time of commitment.
5  Q. I see. Is there a cost associated with
6     the rate lock to John Hancock?
7  A. There is an exposure to John Hancock of
8     movements in interest rates from the point
9     in time any rate is locked until approval
10    is done.
11 Q. Is that exposure any different than the
12    exposure you described to me at the
13    portfolio level with respect to hedging
14    interest rates?
15        MR. POPEO: Objection.
16 A. The exposure is changes in both the
17    underlying interest rates, which can be
18    hedged, as well as our spreads, which get
19    added on top of interest rates, which we
20    cannot hedge.
21 Q. That is at the portfolio level, though?
22    Am I right?
23 A. The analysis is done at the portfolio
24    level. That is correct.

Page 95

1  Q. Is there any hedge associated with this
2     loan at the time of the circle -- of the
3     interest rate loan?
4  A. I'm unaware of any hedge put on
5     specifically for this loan.
6  Q. Okay. Is that done routinely or --
7  A. The standard practice is to do
8     portfolio-level hedging as opposed to
9     individual-deal hedging.
10 Q. All right.
11 A. It doesn't mean that occasionally
12    individual deals are not hedged, but the
13    practice is portfolio-level hedging.
14        MR. SCHER: Off the record.
15        (Discussion off the record,
16          followed by a recess taken at
17          3:59 p.m.)
18        (Recess ended at 4:04 p.m.)
19 BY MR. SCHER:
20 Q. After the rate would lock and before the
21    commitment is made, I think you described
22    to me that the lines of business are given
23    notification as well as ALM?
24 A. No, I don't think that is what I

Page 96

1     described.
2  Q. I'm sorry.
3  A. We -- we internally -- categorize deals
4     like that as rate locked but not yet
5     approved.
6  Q. And if the loan is not approved, what
7     happens?
8  A. If the loan is not approved or committed
9     to, it simply disappears from that list,
10    because we don't view it as, if you will,
11    a real asset at that point.
12 Q. Is there an opportunity cost to John
13    Hancock for the period of time from the
14    rate lock to the nonapproval of the loan?
15        MR. POPEO: Objection.
16 A. Without going back and looking at all the
17    stats, I cannot think of a single loan
18    that was rate locked and not ultimately
19    approved. We do not like to rate lock
20    loans unless we feel they will be fully
21    committed to, because we would be exposing
22    ourselves to economic costs should the
23    approval not go through.
24 Q. So there is an incentive to rate lock

Page 97

1      loans that are going to be approved?
2  A.  No.  I wouldn't say that either, since
3      rate locking exposes us to a loss in
4      either direction from that point.  There
5      is an incentive to not rate lock a loan
6      until you are either certain it will be
7      approved or until you are close to
8      approval.
9  Q.  Okay.  So -- and is that the policy of
10     Manulife or John Hancock?
11  A.  We do not have a written policy, but the
12     expressed policy within the department is
13     that no loan should be rate locked if it
14     does not feel that it could be approved
15     within a short period of time, and that
16     short period is undefined.
17  Q.  And where does that understanding come
18     from?
19  A.  That comes from the head of the mortgage
20     operation area, Ivor Thomas, who oversees
21     both Canadian and U. S. mortgages.
22  Q.  How do you assure that this policy is
23     followed, that is that rate locks are not
24     made on loans that are not fully

Page 98

1      committed?
2          MR. POPEO:  Objection.
3  A.  I'm not assuring.  It is an unwritten
4     policy.  It is a general understanding.
5     And as we go through our pipeline
6     meetings, which happen every two weeks,
7     investment officers are reminded that they
8     shouldn't agree to a rate lock if they
9     don't feel they can get it approved
10     quickly after that.
11  Q.  These are called pipeline meetings?
12  A.  We have pipeline meetings that discuss all
13     the deals that are under consideration.
14  Q.  That are in the pipeline?
15  A.  That is correct.
16  Q.  And do you recall that the Avenel
17     $32 million loan was in the pipeline at a
18     pipeline meeting?
19  A.  I don't recall that.  No.
20  Q.  Is it literally -- Mr. Thomas chairs these
21     pipeline meetings?
22  A.  No.  He does not.  He oversees all
23     mortgage operations, both in the U. S. and
24     in Canada.  And in the U. S. Bill McPadden

Page 99

1      oversees the U. S. pipeline meeting.  I'm
2      not sure who oversees the one in Canada.
3  Q.  And but you know that it is Mr. Ivor
4     Thomas' policy that rate locks should not
5     be made on loans unless they're going to
6     be committed to?
7  A.  I know it is Mr. Thomas' desire that no
8     rate lock be entered into if they don't
9     feel that they can get the approval
10     shortly thereafter because we are both
11     exposed to a real cost as well as a PR
12     issue.  If the rates were to go up after
13     we rate locked and he did not want the
14     loan for an underwriting purpose, it would
15     appear we are walking away from a loan
16     simply because rates rose.  So there are a
17     number of reasons that he has the policy,
18     an unwritten policy, that we do not rate
19     lock until we are close to approval.
20  Q.  Are there circumstances where a yield
21     maintenance calculation would be required
22     of a borrower at the time of a rate lock?
23         MR. POPEO:  Objection.
24  A.  In any new commitment that is part -- that

Page 100

1      contains entirely or partially a
2      refinancing of an existing commitment,
3      what we refer to as a rollover, there
4      could be yield maintenance associated with
5      that old loan that could be factored into
6      the new loan.
7  Q.  So it is only in connection with rollovers
8     that a yield maintenance calculation would
9     be applicable; is that right?
10        MR. POPEO:  Objection.
11  A.  My understanding of what you are referring
12     to as yield maintenance, which is making
13     us hold to the loan documents on a prior
14     loan, the only time they apply in a new
15     loan is when there is a rollover of
16     existing finances.
17  Q.  Is there an allocation of investment
18     expenses to mortgage loans by John
19     Hancock?
20  A.  This is an allocation of investment
21     expenses to different lines of business.
22     I am not aware of how low they go, if they
23     go to the given asset class level or only
24     at the investment total level.

Page 101

1  Q.  And do you know what those expenses are
2      with respect to mortgage loans?
3  A.  I don't know the total of what they would
4      allocate back to us as investment
5      expenses.
6  Q.  Are they measured in basis points or --
7  A.  I may be misinterpreting some of your
8      questions.  There are a number of costs
9      that are associated with and called
10     investment expenses, and they would
11     include all of the costs associated with
12     originating the loans, closing the loans,
13     servicing the loans, as well as our field
14     offices, as well as any of the legal or
15     correspondent networks we use.
16             Now that would be the sum total
17     of all the expenses that would then go
18     into the total which gets allocated, but
19     I'm unaware of the current processes for
20     allocating those back to a line of
21     business.
22 Q.  Does John Hancock have a set aside for
23     mortgage loan impairment?
24 A.  We have two elements relative to

Page 102

1      impairment, so I want to be certain that
2      we're clear.
3              With each loan we do, we build
4      in an assumed level of default for the
5      overall quality level of that loan.  That
6      is what we assume a portfolio made up of
7      that quality loans will lose.
8              We actually have, different from
9      that, but it would encompass that, is what
10     any actual impairments are that have been
11     taken on loans.  That is a real impaired
12     value, a real figure, that in theory
13     should be part of that assumed level of
14     default.
15 Q.  And do you know what those amounts are?
16         MR. POPEO:  Objection.
17 A.  The amounts in basis points that we hold
18     on every loan would vary based on each and
19     every commitment, based on its term and
20     its quality.
21 Q.  Is that described in the loan approval?
22 A.  No.  That is not described in the loan
23     approval.
24 Q.  Where is that?

Page 103

1  A.  That is part of our internal proprietary
2      pricing matrix where we identify what our
3      estimated default level is.
4  Q.  Here is a very difficult question.  Is MLI
5      Manulife?
6          MR. POPEO:  In what context?
7  Q.  Do you want to see a document?
8  A.  No.  The reason I am confused by the
9      question a bit is there are many MLIs.
10     MLI is Manufacturers Life Insurance
11     Company, but we also have the John Hancock
12     Mutual Life Insurance Company --
13 Q.  I see.
14 A.  -- which is occasionally referred to
15     internally as MLI.
16 Q.  All right.
17 A.  So there is a great deal of confusion when
18     just using the term MLI.
19 Q.  Does MLI have a rating system and John
20     Hancock have rating systems for evaluating
21     mortgages?
22 A.  Yes.  All of our mortgages are rated and
23     evaluated.
24 Q.  And MLI has a rating system?

Page 104

1  A.  We are using the same rating system for
2      our mortgages.
3          MR. POPEO:  And using MLI
4      synonymous with Manufacturers Life
5      Insurance?
6          MR. SCHER:  Right.
7          THE WITNESS:  Thank you.
8  Q.  Right?
9  A.  Yes.
10 Q.  Okay.  Are you aware of any drop in
11     interest rates between the execution of
12     the commitment, at the time of the
13     commitment --
14         MR. POPEO:  And?
15 Q.  -- and August of 2004?
16         MR. POPEO:  Objection.  You may
17     answer.
18 A.  Interest rates fluctuate every day.  Over
19     that course of time, they certainly rose
20     and they certainly dropped on any given
21     day.
22 Q.  Okay.
23         MR. SCHER:  Mark this.
24         (Interest Rate Circle

Page 105

1           Notification, production
2           numbers JH 01109 through 01117
3           marked exhibit number 2 for
4           identification.)
5    BY MR. SCHER:
6    Q.   I will show you what I have had marked as
7         Uzdavinis 2.
8              (Handing exhibit number 2 to the
9         witness.)
10   Q.   This is a copy of the interest rate circle
11        notification, JH 1109 Bates stamped at the
12        bottom through 1117.  Do you have that in
13        front of you?
14   A.   1109.
15   Q.   How far do you go?
16   A.   There is 1109.  Not 1117.
17   Q.   No.  Through.  I am sorry.
18   A.   I am sorry.  Yes.  1117.  Yes.
19   Q.   Okay.  And the question I have for you on
20        this is:  Are you familiar with this form?
21   A.   Yes, I am.
22   Q.   And is the proposed allocation what you
23        were describing to me that is done in your
24        department with respect to the allocation

Page 106

1         of interest rate locks?
2    A.   Yes.
3    Q.   Can you tell me what those lines of
4         business are?  Can you translate those
5         abbreviations?
6    A.   Sure.  The first one, GBRE, is the
7         guaranteed benefit separate account
8         reinsurance.
9              The second one is group
10        insurance.
11             The third is retail long-term
12        care.
13             The fourth we refer to as the
14        remainder block.
15             The fifth is the open segment.
16        IPLICo stood for our subsidiary
17        that was IPLICo.
18             IQA is individual qualified
19        annuities.
20             And REFA was reinsurance of the
21        fixed annuities.
22   Q.   Now is this proposed allocation decided
23        upon?
24   A.   We determine allocation at the time of

Page 107

1         commitment based upon the estimated
2         investment demand of each and every
3         segment available to us, if I refer to
4         these as segments.  Each of the segments
5         has an expressed investment demand
6         provided to us by the time Global
7         Investment Strategy, GIS, that indicates
8         what their demand is over the coming 16
9         months.  We look at the segments, demands
10        as well as any restrictions placed on
11        those segments and allocate at the time
12        pro rata based on a segment's available
13        investment demand for mortgages.
14   Q.   You said this was at the time of
15        commitment, but, of course, this is an
16        interest rate circle notification.  So did
17        you -- is this proposed allocation
18        something -- well, how is this proposed
19        allocation, is it performed the same way
20        you just described it at the time of the
21        interest rate?
22   A.   Yes, it is.
23   Q.   So you would agree that the proposed
24        allocation at the time of the interest

Page 108

1         rate circle notification is the same as
2         when the commitment is made?
3              MR. POPEO:  Objection.
4    A.   The basis of the allocation is at the time
5         of commitment.  Commitment is viewed as
6         when we have approval.  The approach that
7         we take and the unwritten policy is that
8         we should not be rate locking a deal until
9         we know that the deal is likely to go
10        through.  The implied assumption is that
11        any deal we rate lock will in fact be
12        committed to.  So the approach is the
13        same, and we use -- the information is the
14        same.
15   Q.   Who makes this proposed allocation
16        decision?
17   A.   That is done within portfolio management,
18        within my group --
19   Q.   And --
20   A.   -- based upon the information that we are
21        given relative to each segment's
22        investment demand.
23   Q.   For the ensuing 16-month period?
24   A.   That is correct.

27 (Pages 105 to 108)

Page 109

1  Q.  Now what happens at the end of the
2      16-month period?
3  A.  It is a rolling 16-month period we are
4      provided.  So each month we make
5      allocations on all new commitments based
6      on the then current investment demand for
7      commercial mortgages by segment.
8  Q.  At the expiration of the 16-month period,
9      assuming the commitment has been converted
10     into a take-down loan, what happens?  Is
11     there a new allocation decided upon?
12 A.  I may be misinterpreting your question.  A
13     loan is allocated once and only once.  It
14     is assumed that it will go on the books in
15     the manner that it is allocated.
16         The investment demand figures
17     that are provided to us are meant to be
18     reflective of new investment activity
19     needed.  Once we say a deal has been
20     committed to, it is assumed that deal will
21     go on the company's books and no further
22     activity is needed on that deal.
23 Q.  Okay.  Now when you say for 16 months
24     forward, why -- does it have something to

Page 110

1      do with when this loan is going to close?
2      Is that what you are looking at?
3          MR. POPEO:  Objection.  First of
4      all, the testimony is rolling 16 months.
5      You may answer the question.
6          THE WITNESS:  Yes.
7  A.  It is nothing to do with this specific
8      loan.  Investment demand is always
9      produced in a rolling 16-month window to
10     avoid any seasonal blips that given lines
11     of business will have with when they may
12     experience contractual cash flows.
13 Q.  I see.  So are you looking backward 16
14     months or forward 16 months?
15 A.  We are looking forward only.
16 Q.  Okay.  And you are taking the information
17     from the lines of business as to what
18     their demand will be for investments of
19     this type?
20 A.  I am given a total investment demand
21     number by asset type.  I do not say -- I
22     do not contact the lines of business.
23     Global Investment Strategy provides
24     investment demand.  They coordinate with

Page 111

1      each of the lines of business and each of
2      the asset managers to know what has
3      already been -- when it has already been
4      committed to, it is off the books, it is
5      assumed to fund.  It is no longer a
6      component of investment demand.
7          So we are given updated numbers
8      that reflect the current information of
9      both liability flows and needed asset
10     flows to arrive at a demand figure by
11     asset category.  So I am provided a
12     commercial mortgage demand number, which I
13     will try to find assets to allocate to.
14 Q.  And this one line of business,
15     "remainder," what is that?
16 A.  The remainder block is a function of the
17     demutualization.  We had a closed block of
18     business, and the balance of those assets
19     went into -- of the liability insurance
20     policyholders went into what was called a
21     remainder block.
22 Q.  Is any of this, any of this allocation, to
23     cash or cash equivalent?
24         MR. POPEO:  Objection.  The

Page 112

1      allocation that we are looking at on the
2      form?
3          MR. SCHER:  Yes.
4  A.  This is an allocation of this mortgage.
5  Q.  Right.
6  A.  So it is an allocation of a mortgage.
7  Q.  So the entire mortgage is allocated to
8      lines of business?
9  A.  Completely allocated to a line of
10     business.
11 Q.  Now this shows an average life of the
12     mortgage as 9.29.  Can you tell me what
13     that means?
14 A.  That means the present value of the
15     principal cash flows on this loan would
16     equate to a loan that would be the
17     equivalent of having an asset on our books
18     that had a zero payout at the year 9.29 in
19     terms of principal flows.
20 Q.  Given the fact that this loan was not to
21     fund for -- it could -- it might not fund
22     for a year, how does that -- is that
23     average life calculated?
24 A.  Any average life is calculated on the

Page 113

1    anticipated flows associated with that
2    deal.  So one would take all of the flows
3    -- and they would begin on the closing
4    date.  They would begin August 1, 2005,
5    and they would go out through maturity.
6    They would be discounted back to create
7    the average life.
8            (The witness pointing to exhibit
9    number 2.)
10           MR. POPEO:  Just to be clear,
11   the witness is referencing the anticipated
12   closing date on the document JH 01109.
13           MR. SCHER:  Where is that?
14           MR. POPEO:  Midway down the
15   page.
16           MR. SCHER:  Oh, I'm sorry.  Yes.
17   BY MR. SCHER:
18   Q.   And what is the duration 6.76?  What does
19        that mean?
20   A.   The duration is the present value of both
21        principal and interest cash flows, and it
22        is the measure by which we balance -- we
23        being the John Hancock -- balance our
24        assets and our liabilities on each asset's

Page 114

1    and liability's duration.
2    Q.   And the next is the LTV.  That is the
3         loan-to-value ratio?
4    A.   Yes.  That is correct.
5    Q.   And what is that?  Is that an
6         underwriting?
7    A.   It is an underwriting term, loan to value.
8         It is one of the parameters by which we
9         must measure loans.
10   Q.   The next is the debt service coverage?
11   A.   That is correct.  Another calculation.
12   Q.   Is this form a John Hancock form?
13   A.   Yes.
14   Q.   Rather than a Manulife form?
15   A.   It is a John Hancock form.
16   Q.   And so it is missing the 10 percent
17        constant underwriting?
18           MR. POPEO:  I object to the form
19   of the question.
20   A.   I don't follow you.
21   Q.   Do you know what the 10 percent constant
22        factor is?
23   A.   I'm not -- no.
24   Q.   No?

Page 115

1    A.   No, I do not.
2            MR. SCHER:  Mark this.
3            (Multipage document headed John
4            Hancock Life Insurance Company,
5            production numbers JH 00405
6            through 00425 marked exhibit
7            number 3 for identification.)
8    BY MR. SCHER:
9    Q.   I will show you what I have had marked as
10        Uzdavinis exhibit 3.
11           (Handing exhibit number 3 to the
12   witness.)
13   Q.   And on the first page is Bates stamped
14        JH 00405.  There is a copy for your own.
15        You can look on with counsel if you would
16        like.
17           At the bottom of the page, it
18        indicates that "Funding at 80 percent
19        occupied versus MLI requirement of
20        90 percent...."
21   A.   I see that.
22   Q.   And that MLI is referring to Manulife?
23   A.   I am assuming it is referring to Manulife.
24        Yes.

Page 116

1    Q.   Now on page 411, JH 00411, there is a
2         section called "Lines of Business
3         Allocations - Voted Section."
4    A.   I see that.
5    Q.   Can you tell me what that is?
6    A.   I don't put these documents together, but
7         I am assuming that would represent the
8         allocation that we make to each one of
9         those lines of business for the full
10        amount of the loan.
11   Q.   Can you describe to me exactly what this
12        trade ticket looks like?
13   A.   Well, what I am referring to as a trade
14        ticket is actually your circle
15        notification.
16   Q.   There we go.  So --
17   A.   That may be simpler.
18           MR. POPEO:  We call that a
19   wakeup moment.
20           MR. SCHER:  Thank you.
21   Q.   It is this interest rate circle
22        notification which -- is it this form
23        itself, the first page of it, or all of
24        it?

Page 117

| | | |
|---|---|---|
| 1 | A. | The first page of it is what is e-mailed |
| 2 | | out to let people know this is the |
| 3 | | allocation that will be coming to them. |
| 4 | Q. | And is there a cover e-mail that transmits |
| 5 | | this interest rate circle notification, or |
| 6 | | is it this document itself? |
| 7 | A. | This document is attached in an e-mail. |
| 8 | | The topic of which -- each -- each loan is |
| 9 | | individually sent out with its loan number |
| 10 | | as the subject. |
| 11 | Q. | Okay. |
| 12 | A. | In this case, it would be commitment |
| 13 | | number 6518467. |
| 14 | Q. | That would be the reference, and it would |
| 15 | | be sent to each of the lines of business |
| 16 | | and attached to which -- I am sorry? |
| 17 | A. | I would have to look at the full |
| 18 | | distribution list. I do not send it out. |
| 19 | Q. | Okay. |
| 20 | A. | I know it is sent to the investment |
| 21 | | officers, to the ALM folks, to myself. I |
| 22 | | am not exactly sure if each segment |
| 23 | | receives it directly or indirectly through |
| 24 | | another party. I would have to look at |

Page 118

| | | |
|---|---|---|
| 1 | | the actual distribution list. |
| 2 | Q. | So do I understand correctly whether the |
| 3 | | loan is a forward commitment -- I am sorry |
| 4 | | -- what loan is a lock or a signing of |
| 5 | | a -- |
| 6 | | MR. SCHER: Strike that. |
| 7 | Q. | This interest rate circle notification is |
| 8 | | sent generally speaking at the time of |
| 9 | | commitment; is that right? |
| 10 | A. | It is sent always at the time of |
| 11 | | commitment. There may or may not be a |
| 12 | | specific interest rate indicated based on |
| 13 | | whether or not the rate has been locked or |
| 14 | | a spread has simply been set for rate lock |
| 15 | | at a future time. |
| 16 | Q. | If there is -- are there instances where |
| 17 | | there are more than one interest rate |
| 18 | | circle notification, that is at the time |
| 19 | | of the circle lock -- at the time of the |
| 20 | | interest rate lock and then again at the |
| 21 | | time of the commitment? |
| 22 | A. | There are instances where the interest |
| 23 | | rate circle notification is revised to |
| 24 | | fill in information that was not present |

Page 119

| | | |
|---|---|---|
| 1 | | at the initial loan or potentially |
| 2 | | incorrect. |
| 3 | Q. | Okay. So is it your testimony that there |
| 4 | | should have been an interest rate circle |
| 5 | | notification which would include the NA |
| 6 | | categories of information or at least -- |
| 7 | A. | No. That is not my testimony. |
| 8 | Q. | All right. |
| 9 | A. | I don't know whether or not there was. I |
| 10 | | do not know whether or not there was a |
| 11 | | rollover of an existing loan or what the |
| 12 | | characteristics of this particular field |
| 13 | | are. If it existed, there should have |
| 14 | | been a revised circle sent out that |
| 15 | | indicated that. |
| 16 | Q. | Okay. Well, it says "New Money" in the |
| 17 | | "Type of Transaction," so let's assume |
| 18 | | there was no rollover. What I am trying |
| 19 | | to understand is is it your testimony that |
| 20 | | this form, interest rate circle |
| 21 | | notification, the first page of this |
| 22 | | exhibit, Uzdavinis 2, was sent by e-mail |
| 23 | | to at least ALM and that no subsequent |
| 24 | | interest rate circle notification was sent |

Page 120

| | | |
|---|---|---|
| 1 | | on this loan? |
| 2 | | MR. POPEO: Objection. |
| 3 | A. | I can't -- I can tell you I know one was |
| 4 | | sent. Whether or not subsequent ones were |
| 5 | | sent or not, I cannot tell you. I would |
| 6 | | have to actually go back and talk to the |
| 7 | | person who sends them to see if he had any |
| 8 | | reason to revise any piece of information |
| 9 | | on this. |
| 10 | Q. | In any event, you don't know of any |
| 11 | | notification to anyone that would say, |
| 12 | | "Remember that interest rate circle |
| 13 | | notification? Forget about it. The loan |
| 14 | | is not closing"? |
| 15 | | MR. POPEO: Objection. |
| 16 | A. | I don't recall any notification of that, |
| 17 | | but that -- of the loan not closing, but |
| 18 | | that may very well have happened, and I |
| 19 | | may just be unaware of it. |
| 20 | Q. | There is certainly no form for such an |
| 21 | | event, is there? |
| 22 | A. | I am unaware of any form. I am unaware of |
| 23 | | a loan ever having not closed that was |
| 24 | | committed to. |

Page 121

1      MR. SCHER:  Off the record.
2      (Discussion off the record,
3      followed by a recess taken at
4      4:36 p.m.)
5      (Recess ended at 4:47 p.m.)
6      MR. SCHER:  Mark this.
7      (John Hancock Cash Balances -
8      JHLICO, production numbers
9      JH 01382 through 01387 marked
10     exhibit number 4 for
11     identification.)
12  BY MR. SCHER:
13  Q.  I show you what I have marked as Uzdavinis
14      exhibit 4.
15      (Handing exhibit number 4 to the
16      witness.)
17  Q.  It is Bates stamped JH 1382 through 1387,
18      I think.
19  A.  Yes.
20  Q.  Can you tell me what it is?
21  A.  This is a daily cash balance report that
22      gets produced for the John Hancock Life
23      Insurance Company as an entity with two
24      carve-outs, one being the GBSA segment and

Page 122

1      the other being the balance of the general
2      account assets.
3          The top portion reflects the
4      total cash balance for the John Hancock
5      Life Insurance Company, JHLICO as it is
6      referenced at the top, in millions, at
7      each one of those points in time.  The
8      first section shows it graphically.
9          If you continue on, you will see
10     the numbers that are associated with it.
11     So for this particular exhibit, the
12     balances as of June 30, 2005, the John
13     Hancock Life Insurance Company entity had
14     715 million that was sitting in cash or
15     short terms as managed by the money market
16     operations group.
17  Q.  And I presume -- does this indicate the
18      return on this?
19  A.  No.  This does not indicate the return.
20      This is simply a picture of the current
21      cash level at any given point in time.
22          The other piece of information
23      that is on here which would relate to the
24      allocation and the desired allocation is

Page 123

1      immediately to the right of the "Current
2      Cash Balance."  You would see our cash
3      target as a total company is 250 million.
4      So part of that strategy is to have no
5      more than 250 million in cash, but at the
6      current -- at that point in time, June
7      30th, we were sitting with 715 million in
8      cash.
9  Q.  Just for the record, you are referring to
10     JH 1384 and pointing out the entries in
11     the 715 million being the entry to the far
12     left-hand column and repeated again in the
13     third column from the left and then
14     250 million in that "Cash Target" column?
15  A.  That is correct.
16  Q.  And then the 465 is simply the calculation
17     of A minus B?
18  A.  That's right.  The excess cash relative to
19     where we wish we could be invested.
20  Q.  And this cash balance -- I will show you a
21     series of them -- go to -- just end in
22     what is it?  June of?
23  A.  This particular exhibit is June 30, 2005.
24         MR. SCHER:  Mark this.

Page 124

1      (John Hancock Cash Balances -
2      JHLICO, production numbers
3      JH 01388 through 01391 marked
4      exhibit number 5 for
5      identification.)
6  BY MR. SCHER:
7  Q.  I will show you what I have marked as
8      exhibit 5.
9          (Handing exhibit number 5 to the
10     witness.)
11  Q.  Can you tell me -- that appears to be
12      similar to the exhibit 4?
13  A.  This is simply the exact same exhibit but
14      with an effective date of August 31, 2005,
15      as shown on page 1390, rather than the
16      June date we just saw.
17  Q.  Okay.
18  A.  And here again the data represents we
19      currently have a cash balance at that
20      point in time was up to almost
21      1.3 billion, a growing deficit to our
22      target of 250 million.
23  Q.  And can you explain how the change from 4
24      to 5 occurred?  Do you know how that

31 (Pages 121 to 124)

Page 125

1    occurred?

2  A.  That is the sum total of all of the

3      activity of all of the investment

4      managers, and that can come about from a

5      whole host of situations. We could have a

6      security that is maturing. The cash would

7      come back to us. It would go into cash.

8      We could have the inability to make

9      investments and not be able to draw down

10     on cash. There could be premiums coming

11     into the company. Any source of cash flow

12     to the company from either the asset side

13     or the liability side would ultimately be

14     reflected in the total cash balance

15     number.

16  Q.  And in excess of $400 million, that the

17      cash balance -- that has increased; is

18      that about right?

19  A.  Well --

20  Q.  From 4 to 5?

21  A.  Yes. June we have gone up from

22      715 million of cash to the end of August

23      when we went up to 1 billion 295 million.

24  Q.  Not a penny of that is --

Page 126

1          MR. SCHER: No. Strike that.

2          MR. POPEO: Wrong question?

3          MR. SCHER: Yes.

4          (John Hancock Cash Balances -

5          JHVLICO & MIC (formerly

6          IPLICO), production numbers

7          JH 01392 and 01393 marked

8          exhibit number 6 for

9          identification.)

10  BY MR. SCHER:

11  Q.  I will mark as exhibit 6 a document that

12      has been Bates stamped JH 1392 and 93.

13      Can you tell me what that is?

14  A.  This is a similar exhibit to the one we

15      just looked at, but unlike the first

16      exhibit, which was for the John Hancock

17      Life Insurance Company, this is for the

18      two combined entities John Hancock

19      Variable Life Insurance Company and what

20      we are referring to now as MIC, and I

21      don't recall what that acronym is for, but

22      it is what we used to refer to as IPLICo,

23      Investor Partners Life Insurance Company.

24  Q.  And these both end in July of '05?

Page 127

1  A.  That's right. That is -- let me see --

2      yes, July 29, 2005. That is correct. So

3      this is stating that those particular

4      companies had a current cash balance of

5      167 million for the Variable Life

6      Insurance Company and 21 million for what

7      was formerly IPLICo.

8          (John Hancock Cash Balances -

9          JHLICO, production numbers

10         JH 01394 through 01397 marked

11         exhibit number 7 for

12         identification.)

13  BY MR. SCHER:

14  Q.  And here is 7.

15         (Handing exhibit number 7 to the

16      witness.)

17  A.  Okay.

18  Q.  And that is JH 1394 through 97. This one

19      shows as of August?

20  A.  This is repetitive of exhibit 5.

21  Q.  Yes, it is.

22         MR. POPEO: Do you want to leave

23      that marked?

24         MR. SCHER: Yes. It is a

Page 128

1      separate Bates stamp. Okay. It appears

2      to be a duplicate.

3          (John Hancock Cash Balances -

4          JHVLICO & MIC (formerly

5          IPLICO), production numbers

6          JH 01398 and 01399 marked

7          exhibit number 8 for

8          identification.)

9  BY MR. SCHER:

10  Q.  And this is exhibit 8.

11         (Handing exhibit number 8 to the

12      witness.)

13  Q.  This is a duplicate, Bates stamped 1398

14      through 1399; is that right? No, it is

15      not a duplicate?

16  A.  This is not a duplicate. This is the

17      Variable Life Insurance Company and IPLICO

18      at the end of August, as opposed to

19      Exhibit 6, the end of July.

20  Q.  It shows the current balance and the

21      variance to target?

22  A.  For each of those companies at that point

23      in time, yes.

24  Q.  And then the second page is cash balances

Page 129

1      for two other lines of business?
2  A.  Yes.  JH Financial Services and JHRECO,
3      two small legal entities.
4  Q.  Right.
5  A.  That is correct.
6  Q.  And JHFS CP borrowing balance shows zero?
7                (Counsel pointing.)
8  Q.  On page 1399?
9  A.  Yes, yes.
10 Q.  What does that mean?
11 A.  I don't know what that means.  I don't
12     allocate to any element of JH Financial
13     Services.
14               (John Hancock Cash Balances -
15               JHLICO, production numbers
16               JH 01400 through 01404 marked
17               exhibit number 9 for
18               identification.)
19 BY MR. SCHER:
20 Q.  Okay.  I am going to show you exhibit 9.
21               (Handing exhibit number 9 to the
22     witness.)
23 A.  Okay.
24 Q.  It is 1400?

Page 130

1  A.  It is, appears to be the JHLICO companies
2      at the end of July.  Not to -- I know the
3      look of these, since I see them daily, but
4      if the latest one we have is in fact
5      August, the chart will actually show us
6      each of the periods prior to that.  So,
7      for example, we see in this exhibit 9 on
8      page 1402, we see the current balance as
9      being 1 billion 070 million.
10 Q.  Right.
11 A.  But if we were to go back to exhibit 7,
12     which has the August date, and though the
13     actual dollar figure is not represented,
14     if you look at the chart on page 1394, you
15     will see the representation of how the
16     cash position has changed from July of '04
17     through August of '05.  Each of these
18     exhibits shows the actual specific dollar
19     amount on those days, but the relative
20     changes in the cash level is evidenced in
21     any of those graphs for that point in
22     time.
23
24               THE WITNESS:  I will be happy to

Page 131

1      keep looking at them.  I see them daily.
2                MR. SCHER:  I am glad you like
3      your work.
4                (Laughter.)
5                (John Hancock Cash Balances -
6                JHFS/JHRECO, production number
7                JH 01405 marked exhibit
8                number 10 for identification.)
9  BY MR. SCHER:
10 Q.  I show you JH 1405.
11               (Handing exhibit number 10 to
12     the witness.)
13 A.  Okay.
14 Q.  And what is this?
15 A.  This is the legal entity John Hancock
16     Financial Services and the company
17     JHRECO's cash balance as of those two
18     points in time, and likewise, neither of
19     those are segments which we allocate to.
20     Those are simply legal entities of the
21     corporation.
22               (John Hancock Cash Balances -
23               JHLICO, production numbers
24               JH 01406 through 01411 marked

Page 132

1                exhibit number 11 for
2                identification.)
3  BY MR. SCHER:
4  Q.  I show you what I had marked as Uzdavinis
5      exhibit 11, JH 1406 through 1411.
6                (Handing exhibit number 11 to
7      the witness.)
8  Q.  This looks like a duplicate?
9  A.  Yes.  It looks like a duplicate of
10     exhibit 4, but, at least on the surface.
11 Q.  Is it?
12 A.  It appears to be to me.
13 Q.  All right.
14               (John Hancock Cash Balances -
15               JHLICO, production numbers
16               JH 01412 through 01417 marked
17               exhibit number 12 for
18               identification.)
19 BY MR. SCHER:
20 Q.  I show you exhibit 12.
21               (Handing exhibit number 12 to
22     the witness.)
23 A.  This is through the end of August.  This
24     appears to be repetitive of exhibit 7, but

## Page 133

```
 1        I will turn page by page to be sure.
 2              (Pause.)
 3              (The witness viewing exhibit
 4        number 7 and exhibit number 12.)
 5   A.   It is not, only with respect to the fact
 6        that this exhibit also includes the
 7        Variable Life Insurance Company and MIC.
 8   Q.   Through August?
 9   A.   Right.  And that particular portion of it
10        was exhibit 8.
11   Q.   Okay.
12   A.   So it does --
13   Q.   It is duplicative, at least in that part?
14   A.   Yes.
15              (John Hancock Cash Balances -
16               JHVLICO & MIC (formerly
17               IPLICO), production numbers
18               JH 01418 and 01420 marked
19               exhibit number 13 for
20               identification.)
21   BY MR. SCHER:
22   Q.   And here is 13, which even my own
23        untrained eye sees is highly likely to be
24        duplicative, but maybe I am wrong.  Here
```

## Page 134

```
 1        is Uzdavinis 13.
 2              (Handing exhibit number 13 to
 3        the witness.)
 4   Q.   This is Bates stamped 1418 through 1420?
 5   A.   Yes.  Just in a different order.
 6   Q.   The pages are in a different order?
 7   A.   Yes.  This is similar to exhibit 12, but
 8        the pages are in a different order and the
 9        format is slightly different on one of the
10        pages to save paper, and print it all on
11        one page.
12   Q.   Okay.
13   A.   We should have done that for all of our
14        pages.
15   Q.   So with respect to those charts and
16        graphs, some ending in July and some in
17        August, there are charts and graphs for
18        every day from, you know, from August 1st,
19        2004, through to the present time; is that
20        right?
21   A.   That is correct.
22   Q.   And in fact you receive such charts daily?
23   A.   Daily.  Business days.
24   Q.   Okay.  That's good.  You said you didn't
```

## Page 135

```
 1        know who performed the calculation which
 2        resulted in the $4.7 million figure.  Can
 3        you tell me who you think prepared that?
 4              MR. POPEO:  Objection.
 5              You can answer.
 6   A.   It could have been the investment officer.
 7        It could have been the credit officer.  It
 8        could have been a host of people.
 9   Q.   Okay.
10   A.   I really don't --
11   Q.   Okay.
12   A.   -- have any idea who did prepare that.
13   Q.   Okay.
14              MR. SCHER:  Let me have a couple
15        of minutes.  I may be at the end.
16              MR. POPEO:  Okay.
17              (Recess taken at 5:09 p.m.)
18              (Recess ended at 5:11 p.m.)
19              MR. SCHER:  Mark this.
20              (Plaintiff John Hancock Life
21               Insurance Company's Response to
22               Defendants' First Set of
23               Interrogatories marked exhibit
24               number 14 for identification.)
```

## Page 136

```
 1   BY MR. SCHER:
 2   Q.   I show you what has been marked as
 3        exhibit 14.
 4              (Handing exhibit number 14 to
 5        the witness.)
 6   Q.   That is a document entitled Plaintiff John
 7        Hancock Life Insurance Company's Response
 8        to Defendants' First Set of
 9        Interrogatories.  Have you seen this
10        document before today?
11   A.   I don't recall seeing this document.
12   Q.   On page 12, among others you are listed as
13        a person who assisted in answering the
14        interrogatories and in compiling
15        documents.  Can you tell me what role you
16        played?
17              MR. POPEO:  Objection.
18              You can answer the question.
19        Just make sure that you don't disclose in
20        the course of your answer any
21        conversations that you had with me or
22        others inside John Hancock or at Hancock
23        legal office.
24   A.   I can tell you to the best of my knowledge
```

Page 137

```
 1      what I did.  That is I would have had
 2      discussions with people as to what we
 3      should be doing in terms of recouping
 4      expenses, which as I said before I feel is
 5      all the way down to the level of which
 6      we're actually earning moneys, down to the
 7      commercial paper level, if you will, as
 8      well as telling people that lines of
 9      business would be impacted since the
10      commitments are all assumed to close.
11          I would actually have to read
12      through this to find out what is fully in
13      here, but it would have been from a
14      portfolio management perspective, so that
15      somebody could understand what the
16      implication would be of a loan that was
17      committed to not in fact closing.
18  Q.  Included in these answers, on the very
19      last page, which is Exhibit A, do you have
20      that in front of you?
21  A.  I do.
22  Q.  And is that the calculation, the lost
23      opportunity calculation, to which you made
24      reference in your earlier testimony?
```

Page 138

```
 1  A.  That is the calculation I made reference
 2      to earlier.
 3  Q.  Can you tell me the source of the
 4      information on this, the source of any of
 5      the information on this?
 6  A.  Well, I didn't prepare it, so I can't tell
 7      you the actual source of the information,
 8      but information such as the targeted date
 9      of closing and the maturity date and the
10      loan term and the loan amount should have
11      all come directly from the loan commitment
12      document, as would have what the payments
13      would have been, both the timing and the
14      amortization of the payments.
15          Presumably when this document
16      was put together somebody went to
17      Bloomberg or some other format to get the
18      then current ten-year treasury rate which
19      they converted to a discount rate, at
20      which point it is my assumption that this
21      present value is a calculated field using
22      that discount rate to indicate what the
23      sum total of the present value of this
24      loan is on that day's environment to the
```

Page 139

```
 1      John Hancock, with the loss of interest
 2      and opportunity here simply reflecting the
 3      difference between the sum of those
 4      present values and the original
 5      anticipated loan amount of 32 million.
 6  Q.  And is it -- does it appear that the date
 7      of the interest rate, today's ten-year
 8      treasury rate -- sorry -- ten-year
 9      treasury rate was August 1, '05?
10          MR. POPEO:  Objection.
11  A.  I cannot tell from this exhibit what is
12      today's ten-year treasury rate.
13  Q.  Okay.
14  A.  There is no date that I can find on this
15      exhibit, so I would not assume it to be
16      10-1 -- 8-1 by default, no.
17  Q.  You made reference to the loan commitment
18      document.  And is that Uzdavinis 3?
19  A.  That would be the loan commitment
20      document.  Yes.
21  Q.  Okay.
22          MR. SCHER:  Mark this.
23          (One-page memorandum dated
24          August 17, 2004, to Mr. Malik
```

Page 140

```
 1          from Ms. Coyne, production
 2          number JH 01174 marked exhibit
 3          number 15 for identification.)
 4  BY MR. SCHER:
 5  Q.  I show you what I have had marked
 6      Uzdavinis 15.
 7          (Handing exhibit number 15 to
 8      the witness.)
 9  Q.  Can you tell me what this is?
10  A.  It appears to be a memo that Tim Malik got
11      from Patty Coyne in August of 2004.
12  Q.  Is it a form that John Hancock uses?
13  A.  I'm not familiar with seeing this, but I
14      would not necessarily get all of the memos
15      that would go from a credit officer --
16      from one credit officer to another.
17  Q.  Okay.  So it is your testimony that you
18      hadn't seen this before today?
19  A.  I had not seen this before today.
20          MR. SCHER:  Well, I think I am
21      done.
22          (Whereupon, at 5:19 p.m., the
23      deposition was adjourned.)
24
```

Page 141

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3         The original of the Errata Sheet
4    has been delivered to Paul D. Popeo, Esq.
5         When the Errata Sheet has been
6    completed by the deponent and signed, a
7    copy thereof should be delivered to each
8    party of record and the ORIGINAL delivered
9    to Howard D. Scher, Esq., to whom the
10   original deposition transcript was
11   delivered.
12
13         INSTRUCTIONS TO DEPONENT
14
15         After reading this volume of
     your deposition, indicate any corrections
16   or changes to your testimony and the
     reasons therefor on the Errata Sheet
17   supplied to you and sign it.  DO NOT make
     marks or notations on the transcript
18   volume itself.
19
20   REPLACE THIS PAGE OF THE TRANSCRIPT WITH
21   THE COMPLETED AND SIGNED ERRATA SHEET WHEN
22   RECEIVED.
23
24

Page 142

1    ATTACH TO DEPOSITION OF:  JOAN M.
     UZDAVINIS
2
3    CASE:  JOHN HANCOCK INSURANCE COMPANY VS.
     VESTMONT LIMITED PARTNERSHIP ET ALS
4
5         ERRATA SHEET
6    INSTRUCTIONS:  After reading the
     transcript of your deposition, note any
7    change or correction to your testimony and
     the reason therefor on this sheet.  DO NOT
8    make any marks or notations on the
     transcript volume itself.  Sign and date
9    this errata sheet (before a Notary Public,
     if required).  Refer to Page 141 of the
10   transcript for errata sheet distribution
     instructions.
11
     PAGE  LINE
12
             CHANGE:
13           REASON:
             CHANGE:
14           REASON:
             CHANGE:
15           REASON:
             CHANGE:
16           REASON:
             CHANGE:
17           REASON:
             CHANGE:
18           REASON:
19
20        I have read the foregoing transcript
     of my testimony, and except for any
     corrections or changes noted above, I
21   hereby subscribe to the transcript as an
     accurate record of the statements made by
22   me.
23
             JOAN M. UZDAVINIS
24

Page 143

1         CERTIFICATE
2    Commonwealth of Massachusetts
3    Plymouth, ss.
4
5         I, Judith McGovern Williams, a
6    Registered Professional Reporter and
7    Notary Public in and for the Commonwealth
8    of Massachusetts, do hereby certify:
9         That JOAN M. UZDAVINIS, the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the said witness.
14        IN WITNESS WHEREOF, I have
15   hereunto set my hand this      day of
16        , 2006.
17
18
19
20        Judith McGovern Williams
          Registered Professional Reporter
          Certified Realtime Reporter
21        Certified LiveNote Reporter
     Certified Shorthand Reporter No. 130993
22
23   My Commission expires:
24   April 2, 2010

## Denton, Brenda

| | |
|---|---|
| **From:** | Popeo, Paul |
| **Sent:** | Wednesday, March 08, 2006 2:31 PM |
| **To:** | Davis, Brian |
| **Subject:** | FW: John Hancock v. Vestmont Limited Partnership |

forgot to cc you.

Paul D. Popeo

C H O A T E

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-4074
f 617-248-4000
ppopeo@choate.com
www.choate.com
-----Original Message-----
**From:** Popeo, Paul
**Sent:** Wednesday, March 08, 2006 2:23 PM
**To:** 'McCormick, Brian'
**Subject:** RE: John Hancock v. Vestmont Limited Partnership

Brian: Nectow will not testify as a corporate designee. Coyne will be the Hancock designee on topic #s
2, 5, 6, and will supplement the testimony already provided on topic # 3. Call if you have questions.

Also, by way of clarification, the final portion of topic #2 (last sentence) seeks a designee with respect to
the "negotiation of the [terms and conditions of the Loan Application] between Defendants and John
Hancock". You have already deposed Malik and Ferrie, the Hancock individuals who negotiated that
document with the defendants. Please let me know if there are legitimate areas of inquiry on that subject
on which you were not able to question those witnesses. If so, I am happy to speak with you and
determine whether we can make another witness available - but I think you have already spoken with the
most knowledgeable people.

Paul D. Popeo

C H O A T E

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-4074
f 617-248-4000
ppopeo@choate.com
www.choate.com
-----Original Message-----
**From:** McCormick, Brian [mailto:mccormickbj@bipc.com]
**Sent:** Wednesday, March 08, 2006 1:47 PM

4/6/2006

**To:** Davis, Brian; rhillman@dwboston.com; Popeo, Paul
**Subject:** John Hancock v. Vestmont Limited Partnership

Brian,

     Please see the attached letter and Amended Notice of Depositions.

---

**Brian J. McCormick, Jr.**
**Buchanan Ingersoll PC**
1835 Market Street, 14th Floor
Philadelphia, PA 19103

215-665-3957 (direct)
215-687-7965 (cell)
215-665-8760 (fax)
mccormickbj@bipc.com (e-mail)

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

4/6/2006

## Wilson, Sarah

**From:** McCormick, Brian [mccormickbj@bipc.com]
**Sent:** Wednesday, March 15, 2006 4:36 PM
**To:** Popeo, Paul
**Subject:** RE: John Hancock v. Vesterra

Paul,

To confirm our conversation.

When Brian canceled Ivor Thomas for the 21st last week, I told him we could not take Mr. Thomas's deposition on Wednesday, (3/22), because Howard and I have a mediation in Detroit, Michigan that day. Brian was going to get dates from Mr. Thomas and get back to me. I had not heard back from Brian yet.

Please provide me with some available dates for Mr. Thomas.

I also want to discuss how your proposal regarding post-designating portions of Mr. Malik's deposition as a 30(b)(6) witness would work.

Brian

_____

**Brian J. McCormick, Jr.**
**Buchanan Ingersoll PC**
1835 Market Street, 14th Floor
Philadelphia, PA 19103

215-665-3957 (direct)
215-687-7965 (cell)
215-665-8760 (fax)
mccormickbj@bipc.com (e-mail)

---

**From:** Popeo, Paul [mailto:PPopeo@choate.com]
**Sent:** Wednesday, March 15, 2006 4:24 PM
**To:** McCormick, Brian
**Subject:** RE: John Hancock v. Vesterra

Thanks. You are doing Thomas the morning of the 22d also, right?

Paul D. Popeo

C H O A T E

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-4074
f 617-248-4000

4/5/06

ppopeo@choate.com
www.choate.com
-----Original Message-----
**From:** McCormick, Brian [mailto:mccormickbj@bipc.com]
**Sent:** Wednesday, March 15, 2006 3:53 PM
**To:** Popeo, Paul
**Subject:** John Hancock v. Vesterra

Paul,

    This will confirm our email exchange of yesterday. We will conduct Ms. Uzdavinis's deposition on Tuesday, March 21, after the ADR. Please ask her to be at Rob Hillman's offices at 1 p.m.

**Brian J. McCormick, Jr.**
**Buchanan Ingersoll PC**
1835 Market Street, 14th Floor
Philadelphia, PA 19103

215-665-3957 (direct)
215-687-7965 (cell)
215-665-8760 (fax)
mccormickbj@bipc.com (e-mail)

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including attachments) was

4/5/06

not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege. If you are not the intended recipient, please advise the sender immediately. Unauthorized use or distribution is prohibited and may be unlawful.

4/5/06

**CHOATE**

CHOATE HALL & STEWART LLP

Paul D. Popeo
(617) 248-4074
ppopeo@choate.com

March 30, 2006

## BY ELECTRONIC MAIL AND REGULAR MAIL

Howard Scher, Esq.
Brian J. McCormick, Jr., Esq.
Buchanan Ingersoll PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985

RE: *John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.*
     C.A. No. 05-11614-WGY

Dear Howard and Brian:

I write concerning the Motion to Compel you filed last night, and in light of the Judge's comments during our in-chambers pretrial conference this afternoon.

As Brian Davis and I mentioned to you after the conference, if it is possible to do so we would like to resolve any remaining discovery concerns which you have cooperatively. Toward that end I ask that you please identify for us any 30(b)(6) subject area(s) on which you believe you are missing information, or any particular subject area(s) on which the testimony you received was inadequate or incomplete.

Once we have received this information from you we will promptly identify an appropriate witness or witnesses to provide you with additional deposition testimony. I remind you also of our previous offer of several weeks ago to designate portions of the depositions of Timothy Malik and Jonathan Ferry as responsive to your 30(b)(6) notice, and binding upon Hancock as though the designations had been made prior to the depositions. Please let me know if that approach is of interest to you.

If you are available, I would like to set up a call to discuss this matter on April 3, 2006 (this Monday) at 10:00 a.m. Please let me know at your earliest convenience.

Sincerely,



Paul D. Popeo

PDP/slw:4065660

## Davis, Brian

| | |
|---|---|
| **From:** | Scher, Howard [scherhd@bipc.com] |
| **Sent:** | Wednesday, April 05, 2006 9:16 AM |
| **To:** | Popeo, Paul; Davis, Brian |
| **Cc:** | Ross, C. Randolph; McCormick, Brian; Pearce, Cheri |
| **Subject:** | Motion for Reconsideration |

Paul,

I have your letter of March 30th, and am following up on our discussions last week and Monday. I apologize for not being available to talk but a personal emergency has taken me out of the office for the week.

We agree that the parties should continue to work together to avoid any further discovery disputes similar to the one that caused us to file our Motion to Compel.

However, Judge Young has already ruled that John Hancock improperly prepared its Rule 30(b)(6) designees and that John Hancock is now "precluded from proffering any new evidence on the designated 30(b)(6) topics not testified to in those depositions." It is not our burden to remedy that situation. Thus, rather than identify areas where we believe information was missing or where testimony was incomplete (we think that these are self-evident from the depositions), we believe it is your burden to supplement, if possible and timely, your witnesses' deficient testimony. We are not agreeing that we will permit such a supplement at this late date, but would be agreeable to reviewing such an attempt.

We have no intention of bypassing your offer to designate retrospectively the portions of Malik and Ferrie which you wish to make binding on the corporation. However in no way will we agree in the abstract that such designations satisfy your obligations.

We will undertake to review promptly any proposed designations we receive from you, and will get back you within a few days with our response to any such proposal.

Howard

Howard D. Scher
Buchanan Ingersoll, PC
1835 Market Street
14th Floor
Philadelphia, PA 19103
email: scherhd@bipc.com
215.665.3920 office
215.665.8760 fax
215.990.9989 mobile
412.973.9985 mobile 2
215.985.0692 home

TAX ADVICE DISCLAIMER: Any federal tax advice contained in this communication (including

attachments) was not intended or written to be used, and it cannot be used, by you for the purpose of (1) avoiding any penalty that may be imposed by the Internal Revenue Service or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein. If you would like such advice, please contact us.

Above email is for intended recipient only and may be confidential and protected by attorney/client privilege.
If you are not the intended recipient, please advise the sender immediately.
Unauthorized use or distribution is prohibited and may be unlawful.