UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 05-11614-WGY |
| VESTMONT LIMITED PARTNERSHIP, VESTMONT LIMITED PARTNERSHIP II, VESTMONT LIMITED PARTNERSHIP III, and VESTERRA CORPORATION d/b/a MONTGOMERY SQUARE PARTNERSHIP, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF'S AFFIDAVIT OF IVOR THOMAS
## FILED IN RESPONSE TO COURT ORDER OF APRIL 12, 2006

I, Ivor Thomas, hereby state under oath that:

1.     I am employed as the Senior Vice President in charge of John Hancock Life Insurance Company's ("John Hancock" or "Hancock") commercial mortgage operations, a position I assumed after the merger between John Hancock and Manulife Financial Corporation ("Manulife") in April 2004. I also continue to serve as the Senior Vice President of North American mortgage operations for Manulife. I have worked for 32 years in the commercial lending industry. At present, I am responsible for all credit functions within the approved lending guidelines as given out by the various boards of Manulife and John Hancock. In August 2004, I personally considered and recommended the $32 million loan from John

Hancock to defendants Vestmont Ltd. Partnership, *et al.* for the "Avenel at Montgomery Square" apartment complex (the "Avenel Apartments") that forms the subject matter of this litigation (the "Loan").

2.    Based on my knowledge and review of available information, I can testify on behalf of John Hancock with respect to the following matters set forth by Montgomery Partners in Exhibit A of "Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company."

### Topics and Responses

I.    *Topic No. 1:   The decision by John Hancock to accept the Loan Application, referenced in paragraph 10 of the Complaint, including all of the factors, requirements and guidelines that were involved in John Hancock's internal consideration of the Loan Application.*

3.    On April 28, 2004, Manulife, a Canadian entity, acquired (through a merger) John Hancock and all of John Hancock's businesses, including John Hancock Life Insurance Company and John Hancock Real Estate Finance, Inc. Immediately following the April 2004 merger with Manulife, John Hancock continued to follow in most substantive respects its Prior Guidelines, but also incorporated some elements of Manulife's lending guidelines, which generally were quite similar to Hancock's then-existing policies.

4.    Manulife's overall credit policy (including its lending guidelines) establishes the framework necessary to ensure prudent management and control of Manulife's exposure to credit risk. Manulife's credit risk philosophy is guided by the "prudent person approach," which provides that Manulife will conduct its lending activities in a manner that a prudent person would apply in respect of a portfolio of investments and loans to avoid undue risk of loss and a reasonable return. Manulife's mortgage credit policy, in turn, adheres to the

-2-

policies of the overall credit policy through specific policies related to commercial mortgage lending by Manulife and its subsidiaries.

5.     Manulife's overall and mortgage credit policies are implemented through board-approved investment guidelines, the parameters of which John Hancock follows in considering and approving mortgage loan applications.     Manulife's policies ensure reasonable diversification of investments by geographic region and property type, which is necessary to meet various regulatory requirements.     They also ensure that lending activities meet the "prudent person approach" through the use of approval limits for new and renewing loans. The lending guidelines are designed to be flexible, however, and exceptions to them can be made for what is perceived to be a good investment opportunity.

6.     Before the merger, John Hancock had its own set of lending guidelines.  After the merger, however, a team was formed at John Hancock for the purpose of formally integrating Manulife's and Hancock's respective lending guidelines for commercial mortgage loans. Because the lending guidelines used by Manulife and John Hancock already were quite similar, the ultimate product of the team's effort did not differ materially from Manulife's guidelines.

7.     To the extent that there are differences between John Hancock's prior guidelines and Manulife's guidelines, one difference is that, prior to the merger, Hancock focused on funding loans for $5 million and up, whereas Manulife also funded smaller loans, starting at $1 million and up.

8.     Another difference is in the process for approving commercial mortgage loans. Under John Hancock's procedure, all of the material terms and conditions of the loan application were negotiated with the borrower, then the loan application was presented to an

investment committee for approval.    Under the Manulife process, the loan application is approved through a "walk-around" or "signature" process.    In Manulife's signature process, the proposed loan application is analyzed and recommended by one authority level to the next until it receives final approval (or disapproval). Because it took some time after the April 2004 merger for Manulife's signature approval process to be implemented at John Hancock, there was an interim period during which Hancock investment officers followed elements of both processes. Montgomery Partners' Loan Application for the Avenel Apartments property was approved by John Hancock during this interim period.

9.    Another difference between John Hancock's and Manulife's process of approving mortgage loans was Manulife's use of the "10% Constant" guideline, also sometimes referred to as the "10% breakeven" or the "10% benchmark."    These terms sometimes mean different things to different people.    As a general matter, however, this particular guideline requires that a property's cash flow -- typically equal to its estimated net operating income ("NOI"), less any assumed cash reserve amount determined on a per unit basis -- must be equal to 10% or greater than the loan amount funded to the borrower.    From Manulife's perspective, this guideline focused on interest rates and the possibility that, if interest rates did rise in the future, Manulife might not be able to externally finance the loan. Regardless, because the assessment of the 10% Constant is a function of a property's estimated cash flow, its projected income, expenses and reserves are examined during the loan approval process.

10.    In all instances, however, the 10% Constant guideline is just that: a guideline. The primary purpose of Manulife and John Hancock's lending guidelines has been, and remains, to assist company personnel in assessing a proposed borrower's ability to repay and,

-4-

the company's risk in making, a particular loan. The various factors, requirements and benchmarks contained in those lending guidelines are each a different means to this same ultimate end. Accordingly, it is not imperative that a particular guideline be satisfied if Manulife or John Hancock otherwise believes that the loan under assessment is a good investment, and exceptions can be and often are made in the underwriting process so that a proposed loan that does not meet all of Manulife or John Hancock's underwriting benchmarks still can be approved.

11. Aside from the procedure involving the loan application and approval process, Manulife's lending guidelines consider essentially the same factors as did John Hancock under its prior guidelines in assessing a proposed loan. Both sets of lending guidelines focus on the overall investment opportunity and risk presented by a proposed loan. The evaluation is based, in part, on the borrower's experience, the location and construction of the subject property, current market demands and evidence of other lenders competing to place the loan.

12. One measure of risk is the loan-to-value ("LTV") number. The debt service coverage ratio ("DSCR") also sheds light on the risk attendant to the proposed loan. The higher the quality rating of the loan, the lower the acceptable DSCR can be. The quality rating of the loan is analyzed by considering characteristics of the subject property such as the location, age, condition, and zoning of the property along with factors such as the market/neighborhood suitability, market demands and trends and the diversity and quality of tenants. The quality rating also typically considers characteristics of the sponsor, or borrower, (*e.g.*, estimated net worth, financial capacity experience, reputation and monetary recourse) and the proposed credit structure (*e.g.*, term/amortization, additional security, covenants, gurantees and current interest rates versus historical trends).

13.    Quality ratings usually fall into separate categories based on the issuer's DSCR: "excellent," "good" or "fair."    Under Manulife's lending guidelines, if the proposed transaction sufficiently satisfies DSCR measures and falls within acceptable ranges for the LTV percentage, the transaction receives a Mortgage Risk Rating System ("MRRS") of "Satisfactory," covering loans rated AAA through BBB. Triple B or BBB, the lowest rating in the "Satisfactory" category, is the lowest rating for a new loan to be approved under Manulife's credit policy.  A rating of BBB equals a quality rating of either "excellent" (a DSRC of not less than 1.15); "good" (a DSRC of not less than 1.2); or "fair" (a DSCR of not less than 1.3) and a LTV not exceeding 75.00%.  This same system was employed by John Hancock after the April 2004 merger.

14.    In the Avenel Apartments project, John Hancock recognized a particularly good investment in a newly-constructed, well-built apartment complex, located in a desirable suburb of Philadelphia, and developed by an experienced, sophisticated, and financially-sound real estate partnership.

15.    During my review of the initial approval documents for the Avenel Apartments loan, I raised the possibility that, in certain instances using Montgomery Partners' projected operating expenses, the 10% Constant guideline might not be met.    Specifically, if Montgomery Partners were to exercise the "Rental Achievement Reserve" provision because the Avenel Apartments were not fully leased (and, thus, its rental income was not fully realized), with vacancy of more than 9%, the 10% Constant guideline would not be satisfied if Montgomery Partners' projected expenses, as they were outlined in the Loan Application, were adopted for use in that calculation.

-6-

16.    John Hancock personnel raised the possibility of amending the Loan Application to include a specific reference to the 10% Constant guideline with Montgomery Partners in early August 2004.  In response, Montgomery Partners indicated that it would not agree to the imposition of the 10% Constant guideline if doing so would result in a reduction in the amount of loan funding available to Montgomery Partners.  As a result, John Hancock reconsidered whether and how to apply the 10% Constant guideline to the proposed Loan for the Avenel Apartments.    John Hancock reconsidered that guideline because it regarded the Avenel Apartments loan as a desirable investment opportunity and wished to finalize the investment and close the loan on the terms that had been negotiated by the parties, if possible.

17.    In the course of John Hancock's reconsideration of the application of the 10% Constant guideline, I spoke with Timothy Malik, the lead investment officer on the deal, who explained to me that the projected expenses for the Avenel Apartments initially provided by Montgomery Partners, which had been used in conjunction with the projected rental income to assess the 10% Constant benchmark, were likely overly conservative.  Mr. Malik further judged that, because the Avenel Apartments were newly-constructed, the $250 per-unit rental reserve contained in Montgomery Partners' projections was too high, so he lowered that number to $150 per unit.    He also determined that operating expenses were probably overstated by approximately $140,000 per year.    With these changes to John Hancock's internal underwriting assumptions, the *pro forma* for the Avenel Apartments in the John Hancock confidential loan approval satisfied John Hancock's 10% Constant guideline, and did not reduce or otherwise restrict the loan funding that Montgomery Partners would receive under the terms of the existing Loan Application.  Accordingly, no change or amendment to the Loan Application was necessary.

-7-

18.    Mr. Malik reviewed his revised expenses and reserve assumptions with me and with others at John Hancock before Hancock acted on Montgomery Partners' Loan Application. I agreed that the 10% Constant guideline was satisfied for purposes for the loan approval and loan disbursement using the revised assumptions that Mr. Malik proposed, and indicated that I would recommend the Loan based upon those assumptions. In doing so, I understood that John Hancock was effectively waiving the 10% Constant guideline for purposes of the Avenel Apartments loan.

19.    John Hancock's decision to use revised financial projections for the purpose of internally evaluating and applying the 10% Constant benchmark was permissible under John Hancock's Lending Guidelines. In order to assist in documenting that decision, John Hancock incorporated the revised financial assumptions, including the reduced operating expenses and per-unit rental reserves, in its internal Loan Approval Form. (JH 00419.) Hancock also noted on the first page of the Loan Approval Form that the "10% breakeven" was to be applied for the purpose of disbursing the Avenel Apartments loan "according to the underwriting herein," whereas the "75% LTV and 1.25:1 DSCR" requirements were to be applied "as described in the [loan] commitment." (JH 00405.)

20.    John Hancock made these notations not only to document the revised assumptions that had been made, but also to ensure that, if any question later arose, it would be clear that the 10% Constant guideline was to be applied to Hancock's revised internal assumptions as set forth in the Loan Approval Form, and not to any financial projections or information supplied by Montgomery Partners. In this way, John Hancock was able to confirm that its internal consideration and use of the 10% Constant guideline would not inadvertently result in a reduction in the amount of loan funding available to Montgomery

-8-

Partners. A specific notation also was made in the Loan Approval Form to the effect that the rental reserves had been reduced to $150 per unit. (JH 00420.) I considered these written notations, combined with the information that had been supplied directly to me and to various other people involved in the loan approval process, to be sufficient to satisfy John Hancock's internal documentation requirements.

21.    Based in large part on its analysis of the various lending criteria, its projections regarding the likely financial performance of the property, and its resulting belief in the considerable attractiveness of the investment opportunity that it presented, John Hancock accepted and approved Montgomery Partners' Loan Application for the Avenel Apartments, in its entirety and without any changes, on or about August 17, 2004. Mr. Malik was authorized to, and did, sign the Loan Application on John Hancock's behalf on that date. Pursuant to the terms of the Loan Application, Hancock's acceptance of that Application, combined with the borrower's payment of the required commitment fee, converted the Application into a formal Loan Commitment that was binding on both sides.

22.    The 10% Constant guideline never was a term or condition of the Loan Application or Commitment but, rather, was one of several internal benchmarks used to determine whether Montgomery Partners' Loan Application would be approved by John Hancock in the first instance. Further, because the Loan Application ultimately was approved by John Hancock with the express caveat that the 10% Constant guideline be applied, for loan disbursement purposes, to the revised financial projections contained in Hancock's confidential Loan Approval Form, Hancock's internal use of the 10% Constant guideline did not impose any additional restrictions on, or impediments to, funding the Loan.

II.    *Topic No. 6: The requirements and conditions that, following John Hancock's*
*acceptance of the Loan Application, would have to have been met by Defendants in*
*order for John Hancock to fund or disburse the Loan applied for in the Loan*
*Application.*

23.    The only terms and conditions that Montgomery Partners were required to meet
for disbursement of the Loan were those stated in the Loan Commitment, including but not
limited to the "Rental Achievement Reserve" requirements set forth in Condition 49 of the
Supplement to the Loan Application. No other disbursement terms or conditions were imposed
by John Hancock on Montgomery Partners. As stated previously in this affidavit, John
Hancock's internal Loan Approval Form expressly provided that the 10% Constant guideline
was to be applied, for loan disbursement purposes, to the revised financial projections
contained in that Form (JH 00405), with the result that no additional disbursement obligations
or requirements were placed upon Montgomery Partners.

24.    John Hancock was ready, willing and able at all relevant times to perform under
the Loan Commitment according to its terms.

Signed under the pains and penalties of perjury this 25th day of April, 2006.

*/s/ Ivor Thomas*

Ivor Thomas

4070931.1

-10-

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 25, 2006.

/s/ *Brian A. Davis*
Brian A. Davis

4070931v1