UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>VESTMONT LIMITED PARTNERSHIP, )<br>VESTMONT LIMITED PARTNERSHIP II, )<br>VESTMONT LIMITED PARTNERSHIP III, )<br>and VESTERRA CORPORATION d/b/a )<br>MONTGOMERY SQUARE PARTNERSHIP, )<br><br>Defendants. ) | CIVIL ACTION NO. 05-11614-WGY |

## PLAINTIFF'S AFFIDAVIT OF PATRICIA COYNE
## FILED PURSUANT TO COURT ORDER OF APRIL 12, 2006

I, Patricia Coyne, hereby state under oath that:

1.     I am employed as an investment officer in the Boston, Massachusetts office of the plaintiff John Hancock Life Insurance Company's ("John Hancock" or "Hancock") Real Estate Finance Group (formerly named the "Real Estate Investment Group"). I have been employed by John Hancock in various positions since August 13, 1993. I have extensive personal experience and familiarity with Hancock's commercial loan policies and procedures. I did not serve as the lead investment officer for the proposed $32 million loan by John Hancock to defendants Vestmont Limited Partnership, *et al.* (collectively, "Montgomery Partners") for the "Avenel at Montgomery Square" apartment complex (the "Avenel

Apartments") that forms the subject matter of this litigation (the "Loan"), but I was directly involved in the review and approval of Montgomery Partners' Loan Application.

2.      Based on my personal knowledge and review of available information regarding John Hancock's policies and procedures for commercial loan transactions, I testify on behalf of John Hancock with respect to the following matters set forth by Montgomery Partners in Exhibit A of "Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company."

### Topics and Responses

I.      *Topic No. 2: The terms and conditions contained in the Loan Application, including but not limited to, any and all conditions that Defendants were required to meet for disbursement of the Loan, and the negotiation of these terms and conditions between Defendants and John Hancock.*

3.      The terms and conditions of the Loan Application (hereinafter the "Loan Commitment") are those stated in the approved Loan Commitment itself. (JH 00327 through JH 00396.) In general, the terms and conditions of the Loan Commitment provide that John Hancock will finance, and Montgomery will take, a secured, first-mortgage loan on the Avenel Apartments property in the amount of $32,000,000. The Loan could be closed by Montgomery Partners at any time over the ensuing twelve months (with possible multiple extensions) at a locked rate of 6.18% *per annum* (subject to various potential adjustments set forth in the text of the Loan Commitment); was to extend for a period of ten years; and required monthly payments of interest and principal using a 30 year amortization schedule with a single balloon payment at the conclusion of the Loan. The terms and conditions of the Loan Commitment further obligate Montgomery Partners to actually close on the Loan with John Hancock on or before August 1, 2005, or to pay "all damages, losses, costs and expenses

-2-

suffered or incurred by John Hancock as a result of" Montgomery Partners' failure to close the Loan. These terms and conditions, as well as all others in the Loan Commitment, have been described by Montgomery Partners' own industry expert, Ms. Linda C. Spevacek, as "detailed and plainly worded," with "meticulous definitions and descriptions of each and every point, and clearly specified calculations with examples that show exactly how a specified figure is to be determined whenever a financial measurement is required with the transaction." Expert Report of Linda C. Spevacek, dated March 24, 2006, at 4-5.

4.     The only terms and conditions that Montgomery Partners was required to meet for disbursement of the Loan were those stated in the Loan Commitment, including but not limited to the "Rental Achievement Reserve" requirements set forth in Condition 49 of the Supplement to the Loan Application. No other disbursement terms or conditions were imposed by John Hancock on Montgomery Partners.

I.     *Topic No. 4: The manner, method and/or process by which John Hancock approved mortgage loans during the period from January 1, 2000 through April 28, 2004.*

II.    *Topic No. 5: The manner, method and/or process by which John Hancock approved mortgage loans during the period from April 28, 2004 to the present.*

5.     John Hancock's current policies, procedures and guidelines for approving commercial mortgage loans are contained in a thick binder titled "Lending Guidelines, January 25, 2005" (the "2005 Guidelines"). (JH 02278 through JH 02514.) John Hancock's lending guidelines constitute a confidential, internal document that typically is not shared with the prospective borrower. They explain in considerable detail the process and the primary considerations that typically go into the evaluation of a proposed commercial lending opportunity.    John Hancock's 2005 Guidelines are in most material respects the same

-3-

guidelines that Hancock used in approving commercial mortgage loans in and before August 2004 under Hancock's then-existing lending guidelines (the "Prior Guidelines"). The specific policies, guidelines, requirements, target, practices, processes and methods used by John Hancock in the making of commercial mortgage loans, both before and after April 28, 2004, are discussed below.

6.    On April 28, 2004, Manulife, a Canadian entity, acquired (through a merger) John Hancock and all of John Hancock's businesses, including John Hancock Life Insurance Company and John Hancock Real Estate Finance, Inc. Immediately following the April 2004 merger with Manulife, John Hancock continued to follow in most substantive respects its Prior Guidelines, but also incorporated some elements of Manulife's lending guidelines, which generally were quite similar to Hancock's then-existing policies. Thereafter, a team was formed at John Hancock for the purpose of formally integrating Manulife's and Hancock's respective lending guidelines for commercial mortgage loans. Because the lending guidelines used by Manulife and John Hancock already were quite similar, the ultimate product of the team's effort (*i.e.*, the 2005 Guidelines) did not differ materially from John Hancock's Prior Guidelines.

7.    To the extent that there are any differences between John Hancock's Prior Guidelines and the 2005 Guidelines adopted after the Manulife merger, one difference is that, prior to the merger, Hancock focused on funding loans for $5 million and up, whereas Manulife also funded smaller loans, starting at $1 million and up. There also are minor technical differences in each company's formatting for their respective internal loan approval documents, including, as discussed below, the placement of the signature pages where the recommending investment officers would note their approval (or disapproval) of the proposed

loan. John Hancock's present loan approval form has more of a free-flowing narrative regarding the proposed loan, as opposed to its old form which used various boxed segments with text to describe the loan transaction. Additionally, Manulife's loan approval documents used terms such as "disbursement requirements" to describe the conditions upon which Manulife *approved* commercial mortgage loans. After the merger, John Hancock adopted Manulife's terminology in its internal loan approval documents, despite the fact that the "disbursement requirements" do not necessarily govern the loan transaction with the borrower, but rather reflect the analysis upon which Hancock based its approval. In all instances, the actual disbursement requirements are those that are set forth in the written loan commitment that has been executed by the parties.

8.     Another difference between John Hancock's and Manulife's process of approving mortgage loans was Manulife's use of the "10% Constant" guideline, also sometimes referred to as the "10% breakeven" or the "10% benchmark." To meet this particular guideline, a property's cash flow -- generally equal to its estimated net operating income ("NOI"), less any assumed cash reserve amount determined on a per unit basis -- must be equal to 10% or greater than the loan amount funded to the borrower. Because the assessment of the 10% Constant is a function of a property's estimated cash flow, its projected income, expenses and reserves are examined during the loan approval process.

9.     The breakeven constant that John Hancock had used for many years prior to its April 2004 merger with Manulife Financial Corporation ("Manulife") was a refinancing constant of 9.66%, but Manulife used a 10% constant. After its April 2004 merger with Manulife, however, John Hancock, in its own loan approval process, also began to focus on a proposed loan's ability to meet the 10% Constant guideline. The 10% Constant guideline is

just that, however: a guideline.  The primary purpose of all of John Hancock's lending

guidelines has been, and remains, to assist Hancock personnel in assessing a proposed

borrower's ability to repay and, John Hancock's risk in making, a particular loan.  The various

factors, requirements and benchmarks contained in those lending guidelines are each a different

means to this same ultimate end.  Accordingly, it is not imperative that a particular guideline

be satisfied if John Hancock otherwise believes that the loan under assessment is a good

investment, and exceptions can be and often are made in the underwriting process so that a

loan that does not meet all of John Hancock's underwriting benchmarks still can be approved.

Indeed, John Hancock's Prior Guidelines explicitly state that not all of the factors or

requirements set forth therein must be satisfied in order for a proposed loan to be approved.

They say:

> [e]ach Loan may not meet all of the criteria of these Guidelines.
> Exceptions to these Guidelines must be disclosed, and where
> required, approved by an Investment Officer or Team Leader for
> business items and the Law Department for legal items.

(JH 01505.)  They further state:

> [b]y allowing exceptions to these Lending Guidelines, [John
> Hancock] recognizes that some flexibility is necessary to be
> competitive for quality Loan opportunities.  Flexibility is limited
> by the need for consistent underwriting practices, standard
> documentation and rating agency and investor requirements.  If
> any aspect of the transaction deviates from these Lending
> Guidelines, each exception should be documented as early in the
> process as possible and approved by the Investment Officer or
> Team Leader, as necessary.

(JH 01508.)

Ultimately, it is the specific terms and conditions of the loan commitment -- *i.e.*, the executed

and approved loan application -- that describe and govern the agreement between the parties.

-6-

10.     John Hancock's policy concerning flexibility in the use of its lending guidelines has not changed since April 2004. Under the lending guidelines both before and after John Hancock's merger with Manulife, exceptions to the guidelines were, and still are, permitted because both Hancock and Manulife recognize that some flexibility is necessary to be competitive for quality loan opportunities. This flexibility, however, was and still is limited by the need for consistent underwriting practices, standard documentation, and adherence to rating agency and investor requirements. When any aspect of a proposed loan transaction materially deviates from the lending guidelines, the exception must be documented in the loan approval process and approved by the appropriate investment officers.

11.     In general, the manner, method and/or process by which John Hancock traditionally has approved, and currently approves, commercial mortgage loans is as follows: Once the loan application has been fully negotiated between a John Hancock loan investment officer and the prospective borrower, and once it has been signed by the prospective borrower, that originating investment officer drafts an internal, confidential loan approval form that summarized the proposed deal and discusses the critical details of the loan. Once that investment officer has drafted the loan approval form, he or she gives the loan approval form to another investment officer -- the "recommending" investment officer -- for the preliminary loan approval. This second, recommending investment officer analyzes and evaluates the proposed loan. Based on this evaluation, the recommending investment officer makes a recommendation to the next level of approval authority regarding whether the loan should be approved or denied.

12.     More specifically, after the loan application has been completed, the originating investment officer, who negotiated the proposed loan with the borrower, creates an internal

-7-

loan approval form incorporating relevant content from the loan application.  Again, John Hancock's loan approval form constitutes a confidential, internal document that typically is not shared with the prospective borrower.  It sets out John Hancock's independent, subjective analysis of the loan opportunity, provides appropriate justification for approval of the opportunity (if approval is, in fact, recommended), and provides documentation and support for material deviations from the Company's lending guidelines, if any.  The loan approval form's format consists of a paper packet, usually between 8 to 15 pages, containing the gist of the loan's material terms and conditions.  It also can include maps, photographs and aerial layouts of the property in regards to which the loan is sought.  In the back of the package is a sheet for the signatures of each of the loan recommenders.  Prior to, and shortly after the John Hancock/Manulife merger, the signature page typically was placed on the front of the packet as opposed to the back.  This was the case with the Avenel Apartments loan approval form as it went through the approval process in the summer of 2004, just a few months after the John Hancock/Manulife merger on April 28, 2004.

13.    While the signed and executed loan commitment represents the critical document governing the deal between the borrower and John Hancock, the loan approval form is for John Hancock's *internal use only* in evaluating whether to approve the proposed loan.  The content of the loan approval form reflects John Hancock's private analysis by which Hancock becomes "comfortable" with the loan proposal and the associated investment opportunity.

14.    The loan approval form typically contains basic identifying information about the borrower, and in the case of a mortgage loan, important information about the subject property.  It lists the basic, proposed loan terms, such as the loan amount, term in years, amortization, financial spreads, fees, pricing indices, loan-to-value ratio, average rental rates

-8-

(if applicable) and other essential financial factors. The loan approval form also may make reference to a breakeven interest rate, such as the 10% Constant guideline that John Hancock uses, along with many other factors, in evaluating a proposed loan's risk.

15.     The loan approval form also typically contains a proposed credit rating on the loan according to John Hancock's internal rating system. Factors that are given consideration in determining a proposed loan's credit rating include the debt service coverage ratio ("DSCR" -- *i.e.*, the stabilized net cash flow from the property divided by the debt service), the loan-to-value percentage ("LTV" -- *i.e.*, the amount of the loan divided by the assumed value of the property), and the overall quality of the security. According to Manulife's credit policy guidelines, which are considered by John Hancock in its approval process, the minimum acceptable rating for new loans is "BBB," meaning the DSCR is between 1.15-1.3, and the LTV figure does not exceed 75.00%. The stabilized net cash flow typically represents revenues less vacancy/collection loss, less operating expenses, less appropriate leasing commissions, tenant improvement costs and capital expenditures. The debt service generally is calculated using the contract rate and a 25-year amortization schedule. The "value" of the property reflects the estimated market value of the property as determined by either an internal or external appraisal using rental values, vacancies, expenses and capitalization rates considered to be appropriate for the quality of the security and market conditions, or by the purchase price of the property, where the loan forms part of the closing proceeds. All of these numbers and calculations can vary, however, in appropriate circumstances.

16.     John Hancock's loan approval form also usually contains specific conditions governing the individual loan. These include guaranty requirements, funding representations (if the loan is a forward commitment), escrow requirements for real estate taxes, replacement

reserves and insurance fees, and requirements for a rental achievement reserve, if appropriate in the particular proposed loan. The specific conditions also may discuss prepayment options, extension options, the allowance of transfers and the borrower's request for additional proceeds. In addition, the loan approval form typically addresses terms for monthly basis payments, financial statements provided by borrower and provides for the possibility of an additional application fee.

17.    John Hancock's loan approval form also usually contains information and recommendations from the credit group regarding the favorable and unfavorable qualities of the proposed loan, including statements about the underlying property. In the case of commercial mortgage loans, the loan approval form may contain a detailed summary of the property for which the loan is sought by the borrower. It also may contain spreadsheets or charts breaking down the various financial aspects of the transaction, including projected income from the subject property, related expenses and their impact on the loan analysis.

18.    Prior to April 2004, John Hancock's loan approval form also usually contained a section regarding a meeting of Hancock's Real Estate Loan Committee, which was the committee that decided whether to authorize the individual loan. While this format and language still may appear in some loan approval documents, no meeting actually takes place any longer because John Hancock now approves proposed commercial mortgage loans by means of a signature process. A signature process was employed by John Hancock in the summer of 2004 in approving Montgomery Partners' Loan Application for the Avenel Apartments property.

19.    John Hancock's loan approval form also usually contains an investment memorandum outlining the credit team's analysis of the strengths and weaknesses of the deal.

-10-

The investment memorandum may contain a section outlining exceptions to the lending guidelines, if any.  The investment memorandum typically also contains financial and other information concerning the proposed borrower, as well as information regarding the plans for the property for which the loan is being sought.  In the case of an apartment complex, this information may discuss such things as the location of the complex, the features of the complex itself, the fixtures, amenities and layout of the individual apartments, the tenant profile mix, and potential environmental issues.  It also may include a valuation summary regarding loan statistics in relation to the value of the specific land being developed.  In this section of the investment memorandum, the originating investment officer and recommending investment officer typically analyze the real estate market and related sub-markets surrounding the property for which the loan is being sought.  The investment memorandum also may contain a cash flow analysis containing John Hancock's financial projections of the net income expected from the borrower's property:  total estimated income (rents, laundry/vending income, parking income, vacancy allowances) minus estimated operating expenses (real estate taxes, property insurance, utilities, repairs/maintenance, management fees, payroll and benefits, advertising and marketing, professional fees, general and administrative fee, ground rent and other expenses).  The estimated net income then is reduced by reserves, any extraordinary capital expenditures, and the annual debt service to get the projected net cash flow after debt service.

20.    In evaluating a proposed loan, John Hancock typically does not accept the information or financial projections submitted by the loan applicant without question.  Rather, John Hancock conducts its own analysis and makes its own determination as to what is likely or reasonable from Hancock's perspective.  John Hancock's independent, subjective analysis

-11-

can lead to results that are more conservative, or sometimes more liberal, than those supplied by the loan applicant.

21.    Since April 2004, John Hancock's internal loan approval form also usually has contained a "Manulife Financial – U.S. Mortgage Risk Rating Worksheet" (the "Rating Worksheet"), whereby the originating investment officer evaluates the proposed loan.    The Rating Worksheet typically contains a credit rating and an evaluation of project characteristics using a scale of -5 to +5, or unacceptable to excellent, representing the project's quality in several categories and taking into account competitive factors and future trends relating to the property.    These project characteristics can include state, city, neighborhood and site economics; the age, attractiveness, flexibility, parking ratios, construction quality, landscaping, property management and environmental risk of the project; zoning conformity; market and neighborhood suitability; and factors contributing to market demand and leasing risk.    The Rating Worksheet also asks the originating investment officer to evaluate characteristics of the sponsor, or borrower, including its net worth, financial capacity, experience, reputation and monetary recourse, as well as to evaluate the credit structure of the proposed loan in relation to its duration, additional security, sufficiency of covenants, sufficiency of guaranties, amortization and interest rate trends.

22.    The John Hancock loan approval form described above typically is generated by the originating investment officer who negotiates the loan application with the prospective borrower.    The originating investment officer then hands the loan approval form to a recommending investment officer who makes a recommendation regarding the proposed loan. Once the recommending investment officer receives the loan approval form, he or she performs a due diligence analysis of the proposed mortgage loan.    In particular, the

recommending investment officer evaluates the financial risk of the proposed loan before passing the form along to the next authority level for approval or rejection.

23.    The recommending investment officer, primarily relying on years of institutional knowledge and experience, analyzes the proposed loan on a number of levels, including consideration of the borrower's loan repayment capacity and John Hancock's ability to realize a sufficient return on the investment given current and anticipated interest rates and market trends. He or she usually evaluates whether there are any apparent weaknesses or undesirable features in the proposed loan that could jeopardize the ultimate collection of all principal and interest.    These could include such things as the borrower's undercapitalization and/or continuing losses on the subject property. The investment officer also checks the borrower's financial affairs and experience in the relevant industry. The investment officer runs financial projections on the loan numbers to obtain a hypothetical, yet reasonable, view of how John Hancock could finance the loan in light of the borrower's financial situation. In the case of a commercial mortgage loan, the recommending investment officer, in assessing risk and profit potential, also typically considers the location and type of property subject to the loan.

24.    The recommending investment officer also usually analyzes the proposed loan to see how risky an investment it may be for John Hancock. John Hancock must be comfortable with the credit risk that the loan poses -- *i.e.*, the risk of financial loss to Hancock despite any realization of collateral security or property resulting from the failure of the debtor to honor its obligations to pay or close on the loan.    This analysis may include the use of internal guidelines or benchmarks, including the 10% Constant guideline.

25.    In reviewing the loan approval, if the investment officer has any questions regarding the proposed loan, he or she will consult and discuss the loan with the originating

-13-

investment officer who assisted in negotiating the loan application with the borrower and who drafted the loan approval form. After any such follow-up discussions, the recommending investment officer will make a recommendation to either approve the loan or reject it. If the recommending investment officer decides to recommend approval of the loan, he or she typically will sign the loan approval form with that recommendation. If the recommending investment officer decides not to recommend the loan, he or she typically will sign the document "Recommend decline."

26.    After giving his or her recommendation, the recommending investment officer then will physically hand off or forward the loan approval form to the next level of approval authority. Frequently, the originating investment officer who negotiated the loan will come back to take the loan approval form to the next signing authority. The identity of the other personnel at John Hancock who currently must review and approve the proposed loan depends on the loan amount, as described in Hancock's 2005 Guidelines. Each level of signing authority further analyzes the loan approval documents, considering the same factors discussed above, and then makes its own recommendation or approval decision on the proposed loan.

27.    Over the course of this approval process, the loan approval form often is revised, edited and changed to account for various revisions in the proposed loan transaction, or for questions or issues that arise in the course of John Hancock's analysis of the deal. These revisions frequently reflect John Hancock's evaluation of how to best structure the proposed loan in order to secure the borrower's desired amount, while still making the transaction financially viable and attractive for John Hancock. When the revisions are made, the author of the changes (usually the originating investment officer) identifies and discusses the changes with the recommending investment officer. The author must then obtain additional

-14-

approval and sign-off from the recommending investment officer and his or her superiors. This process can naturally result in several versions of the loan approval document and, in most cases, does not require any changes to the loan application itself. In such circumstances, the borrower does not need to be concerned with any changes to the internal loan approval document. Only the terms and conditions stated in the final loan commitment -- *i.e.*, the signed and executed loan application -- affect the borrower's funding.

28.    Once the final level of signing authority has approved the loan and signed off the final loan approval form, the signed form comes back to the recommending investment officer who first recommended the loan. The recommending investment officer drafts and attaches a one-page letter to the front of the approval form that summarizes the basic terms upon which the loan has been approved. The letter is not intended to, and does not, supplant or vary the terms of the loan application or the final loan commitment. It is simply a summary that is for Hancock's *internal use only*. In all instances, the actual loan terms and conditions are those set forth in the final loan commitment.

29.    After the loan has been approved, the recommending investment officer then gives the loan approval form, along with the one-page attached approval letter, back to the originating investment officer who, in turn, typically executes the approved loan application on John Hancock's behalf and returns a fully executed copy to the borrower. Pursuant to the terms of John Hancock's standard loan application, Hancock's acceptance of the application, and the borrower's payment of the required commitment fee, converts the application it into a formal loan commitment that is binding on both sides. Copies of the final loan commitment also are distributed to the members of John Hancock's closing team.

-15-

30.    Because Montgomery Partners' "Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company" does not request information concerning John Hancock's policies, practices and procedures for closing approved commercial mortgage loans, those topics are not addressed in this affidavit.

III.    *Topic No. 6: The requirements and conditions that, following John Hancock's acceptance of the loan application, would have been met by Defendants in order for John Hancock to fund or disburse the Loan applied for in the Loan Application.*

31.    The only terms and conditions that Montgomery Partners was required to meet for disbursement of the Loan were those stated in the Loan Commitment, including but not limited to the "Rental Achievement Reserve" requirements set forth in Condition 49 of the Supplement to the Loan Application. No other disbursement terms or conditions were imposed by John Hancock on Montgomery Partners.

32.    John Hancock was ready, willing and able at all relevant times to perform under the Loan Commitment according to its terms.

Signed under the pains and penalties of perjury this 25th day of April, 2006.


/s/ Patricia Coyne

Patricia Coyne


4074373.1

-16-

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 25, 2006.

/s/ *Brian A. Davis*
Brian A. Davis