UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP,<br>VESTMONT LIMITED PARTNERSHIP II,<br>VESTMONT LIMITED PARTNERSHIP III,<br>and VESTERRA CORPORATION d/b/a<br>MONTGOMERY SQUARE PARTNERSHIP,<br><br>Defendants. | CIVIL ACTION NO. 05-11614-WGY |

## AFFIDAVIT OF TIMOTHY J. MALIK
### FILED PURSUANT TO COURT ORDER OF APRIL 12, 2006

I, Timothy J. Malik, hereby state under oath that:

1. I am employed as an Assistant Vice President in the Boston, Massachusetts office of plaintiff John Hancock Life Insurance Company's ("John Hancock" or "Hancock") Real Estate Finance Group (formerly named the "Real Estate Investment Group"). I have been employed by John Hancock in various positions since May 19, 1986. As of the summer of 2004, I was an Investment Officer in Hancock's Real Estate Investment Group. My primary duties and responsibilities then and now consist of processing and approving post-closing borrower requests and loan assumptions; assisting personnel in John Hancock's field offices with originating and structuring commercial loans; making an initial assessment as to

the strength of a particular proposed loan investment; developing, applying and assessing loan underwriting criteria; and assisting with the loan approval process. In this capacity, I was personally involved in the negotiation, underwriting and approval of the $32 million loan by John Hancock to defendants Vestmont Limited Partnership, *et al.* (collectively, "Montgomery Partners") for the "Avenel at Montgomery Square" apartment complex (the "Avenel Apartments") that forms the subject matter of this litigation (the "Loan").

2. Based on my personal knowledge and review of available information regarding John Hancock's policies and procedures for commercial loan transactions, I testify on behalf of John Hancock with respect to the following matters set forth by Montgomery Partners in Exhibit A of "Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company."

### Topics and Responses

I. *Topic No. 1: The decision by John Hancock to accept the Loan Application, referenced in Paragraph 10 of the Complaint, including all of the factors, requirements and guidelines that were involved in John Hancock's internal consideration of the Loan Application.*

3. In the summer of 2004, John Hancock and Montgomery Partners negotiated the terms and conditions of a 70-page written loan application, whereby John Hancock agreed, subject to various standard and negotiated conditions provided for in the Loan Application, to provide Montgomery Partners with $32 million in permanent financing on the Avenel Apartments project at any time over the ensuing twelve months at a "locked" interest rate of 6.18% per annum.

4. The goal of John Hancock's Real Estate Finance group, and the John Hancock company overall, is to generate as high a return on its investments as possible for the benefit of

the company's policyholders and investors. For the specific investment area, this means placing as much money in reasonable and safe investments as possible. To this end, Montgomery Partners' proposed loan for the Avenel Apartment appeared to fit with John Hancock's, and the Real Estate Finance Group's, financial strategy and ultimate goals.

5. Montgomery Partners signed the Loan Application in Pennsylvania, and submitted the application and deposit to John Hancock's representative in Pennsylvania on or about July 30, 2004. In accordance with John Hancock's standard loan approval process, once a Loan Application was negotiated and Montgomery Partners "locked in" an interest rate, a loan approval package containing, among other things, a description of the proposed loan terms and information regarding the Avenel Apartments, was circulated to designated Hancock officers for their review.

6. In reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments, John Hancock considered many factors, requirements and guidelines which are described in detail in John Hancock's then-current Lending Guidelines. (JH 01496 thorough JH 01893.) John Hancock's Lending Guidelines constitute a confidential, internal document that typically is not shared with the prospective borrower. They explain in considerable detail the process and the primary considerations that typically go into the evaluation of a proposed commercial lending opportunity.

7. The primary purpose of John Hancock's Lending Guidelines is to assist Hancock personnel in assessing a proposed borrower's ability to repay and, John Hancock's risk in making, a particular loan. The various factors, requirements and benchmarks contained in those Guidelines are each a different means to this same ultimate end. Accordingly, it is not imperative that a particular benchmark be satisfied if John Hancock otherwise believes that the

loan under assessment is a good investment, and exceptions can be, and often are, made in the underwriting process so that a proposed loan that does not meet all of John Hancock's underwriting benchmarks still can be approved. Indeed, John Hancock's Lending Guidelines explicitly state that not all of the factors or requirements set forth therein must be satisfied in order for a proposed loan to be approved. They say:

> [e]ach Loan may not meet all of the criteria of these Guidelines. Exceptions to these Guidelines must be disclosed, and where required, approved by an Investment Officer or Team Leader for business items and the Law Department for legal items.

(JH 01505.) They further state:

> [b]y allowing exceptions to these Lending Guidelines, [John Hancock] recognizes that some flexibility is necessary to be competitive for quality Loan opportunities. Flexibility is limited by the need for consistent underwriting practices, standard documentation and rating agency and investor requirements. If any aspect of the transaction deviates from these Lending Guidelines, each exception should be documented as early in the process as possible and approved by the Investment Officer or Team Leader, as necessary.

(JH 01508.)

      8. The principal factors, requirements and guidelines that John Hancock considered in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments are reflected in the loan approval form that has been produced in discovery in this action (the "Loan Approval Form"). (JH 00405 through JH 00425.) Again, John Hancock's Loan Approval Form constitutes a confidential, internal document that typically is not shared with the prospective borrower. It sets out John Hancock's independent, subjective analysis of the loan opportunity, provides appropriate justification for approval of the opportunity (if

approval is, in fact, recommended), and provides documentation and support for material deviations from the Company's Lending Guidelines, if any.

9.   One factor that John Hancock considered in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments was the likely stabilized occupancy rate for the property. John Hancock understood from representations made by Montgomery Partners that Montgomery Partners was experiencing strong demand for units in the Avenel Apartment complex even though construction was not yet complete. Montgomery Partners represented that they had leased up a significant number of units from the construction trailer and that they were developing a tenant waiting list.

10.   However, because there was the possibility that Montgomery Partners would not have the Avenel Apartments completed and fully occupied prior to the loan's funding, and in order to give Montgomery Partners flexibility in securing the loan, John Hancock and Montgomery Partners negotiated and added to the Loan Application a "Rental Achievement Reserve," whereby a portion of the $32 million loan proceeds would be held in reserve until the rental income on the property had reached a certain level. The terms of the Rental Achievement Reserve are set out in Condition 49 of the Supplement to the Loan Application. The amount of funds actually disbursed to Montgomery Partners would depend upon Montgomery Partners' demonstrated compliance with those terms, including a loan-to-value ratio ("LTV") of not more than 75.00% (as calculated by John Hancock in its sole discretion pursuant to Condition 14 of the Loan Application), and a minimum debt service coverage ratio ("DSCR") of 1.25 to 1 (as calculated by John Hancock in its sole discretion pursuant to Condition 16(b) of the Loan Application).

11. Additional factors considered by John Hancock in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments include the estimated capitalized value of the property, the location of the property, the estimated operating expenses for the property (including estimated management fees, utilities, taxes, leasing expenses, insurance, *etc.*), the estimated cash flow, and the estimated net operating income. In evaluating these factors, John Hancock typically does not accept the information or financial projections submitted by the loan applicant without question. Rather, John Hancock conducts its own analysis and makes its own determination as to what is likely or reasonable from Hancock's perspective. John Hancock's independent, subjective analysis can lead to results that are more conservative, or sometimes more liberal, than those supplied by the loan applicant.

12. Among the factors that John Hancock independently analyzed in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments were the estimated management fees and vacancy allowances for the property, as well as the estimated operating expenses on a per-unit basis. The per-unit operating expense figure was derived from the total operating expenses for the property divided by the number of units (in this case, 256).

13. Another factor that John Hancock considered in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments was the creditworthiness of Montgomery Partners, focusing specifically on their ability to satisfy their financial obligations set forth in the loan application documents. We reviewed the information submitted with the Loan Application and analyzed past credit and financial reports for Montgomery Partners and for the three individuals constituting the partnership: Mr. James

Koller, Mr. Frank Palopoli, and Mr. Joseph Kelly. The information that John Hancock reviewed indicated that Mr. Koller is an attorney and highly-successful real estate developer who had (as of mid-2004) an estimated net worth of approximately $25.1 million, with liquid assets (*i.e.*, cash, stocks, bonds, mutual funds, *etc.*) of approximately $14.6 million. It further indicated that Mr. Palopoli is an experienced real estate developer who had (as of mid-2004) an estimated net worth of approximately $21.6 million, with liquid assets of approximately $9.0 million, and Mr. Kelly is a former corporate executive for Foster Medical and auditor with Price Waterhouse who had (as of mid-2004) an estimated net worth of approximately $3.6 million, with liquid assets of approximately $738,000.

14. John Hancock also investigated and reviewed Montgomery Partners' prior experience in commercial real estate development and the suitability of their business organization to operate and manage a commercial property throughout the term of a mortgage. We considered Montgomery Partners' property management experience (and that of their independent property manager), as well as their knowledge of marketing practices, their experience in the geographic area of the complex (and other suburban communities outside of major cities such as Philadelphia), and their procedures for evaluating prospective tenants.

15. Additional factors that John Hancock considered in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments included physical aspects of the property, such as the build quality, location, environmental aspects and construction progress. We completed a description of the property which addressed the location and municipal/utility parameters of the complex; the dimension, total area and total rentable area of the property; the building's framework (wood and steel); the materials used in the building's construction; the mechanical components of the complex, including details on the heating, air

conditioning, elevator, fire alarm, security, sewerage and water systems; additional information on the construction of apartment features such as balconies, exterior stairways; descriptions of kitchen equipment; and details on parking and site improvements such as landscaping.

16. Another factor that John Hancock considered in reviewing and analyzing Montgomery Partners' Loan Application for the Avenel Apartments was the "10% Constant" guideline, also sometimes referred to as the "10% breakeven" or the "10% benchmark." To meet this particular guideline, a property's cash flow -- generally equal to its estimated net operating income ("NOI"), less any assumed cash reserve amount determined on a per unit basis -- must be equal to 10% or greater than the loan amount funded to the borrower. Because the assessment of the 10% Constant is a function of a property's estimated cash flow, its projected income, expenses and reserves are examined during the loan approval process.

17. The breakeven constant that John Hancock had used for many years prior to its April 2004 merger with Manulife Financial Corporation ("Manulife") was a refinancing constant of 9.66%, but Manulife used a 10% constant. In the summer of 2004, after the companies' merger, Manulife's 10% Constant guideline was used by John Hancock to evaluate the risk on Montgomery Partners' proposed loan for the Avenel Apartments property.

18. During review of the initial approval documents for the Avenel Apartments Loan, the new head of John Hancock's commercial mortgage operations in the United States, Ivor Thomas, raised the possibility that, in certain instances using Montgomery Partners' projected operating expenses, the 10% Constant guideline might not be met. Specifically, if Montgomery Partners were to exercise the Rental Achievement reserve provision because the Avenel Apartments were not fully leased (and, thus, its rental income was not fully realized),

with vacancy of more than 9%, the 10% Constant guideline would not be satisfied if Montgomery Partners' projected expenses, as they were outlined in the Loan Application, were adopted for use in that calculation.

19.   John Hancock personnel raised the possibility of amending the Loan Application to include a specific reference to the 10% Constant guideline with Montgomery Partners in early August 2004. In response, Montgomery Partners indicated that it would not agree to the imposition of the 10% Constant guideline if doing so would result in a reduction in the amount of loan funding available to Montgomery Partners. As a result, John Hancock reconsidered whether and how to apply the 10% Constant guideline to the proposed Loan for the Avenel Apartments. John Hancock reconsidered that guideline because it regarded the Avenel Apartments loan as a desirable investment opportunity and wished to finalize the investment and close the proposed loan on the terms that had been negotiated by the parties, if possible.

20.   In the course of John Hancock's reconsideration of the application of the 10% Constant guideline, I spoke with Mr. Thomas and explained to him that the projected expenses for the Avenel Apartments initially provided by Montgomery Partners, which had been used in conjunction with the projected rental income to assess the 10% Constant benchmark, were likely overly conservative. Because this project was newly-constructed, I further judged that the $250 per-unit rental reserve contained in Montgomery Partners' projections to be too high, so I lowered it to $150 per unit. I also determined that operating expenses were probably overstated by approximately $140,000 per year. With these changes to John Hancock's internal underwriting assumptions, the *pro forma* for the Avenel Apartments in the John Hancock confidential loan approval satisfied John Hancock's 10% Constant guideline, and did not reduce or otherwise restrict the loan funding that Montgomery Partners would receive

under the existing terms of the Loan Application. Accordingly, no change or amendment to the existing Loan Application was necessary.

21. I ran some calculations in early August 2004 for the purpose of confirming that John Hancock's revised financial assumptions for purposes of applying the 10% Constant guideline would not reduce or otherwise restrict the loan funding that Montgomery Partners would receive under the existing terms of the Loan Application. (JH 01119.) After examining those calculations, I was satisfied that John Hancock's internal use of the 10% Constant guideline using the revised financial assumptions would have no adverse impact on the amount of loan funding that Montgomery Partners would receive under the terms of the existing Loan Application.

22. I reviewed my revised expenses and reserve assumptions with Mr. Thomas and others at John Hancock before Hancock acted on Montgomery Partners' Loan Application. They agreed that the 10% Constant guideline was satisfied for purposes for the loan approval and loan disbursement using the revised assumptions that I proposed, and indicated that they would approve the Loan based upon those assumptions.

23. John Hancock's decision to use revised financial projections for the purpose of internally evaluating and applying the 10% Constant benchmark was permissible under Hancock's Lending Guidelines. In order to assist in documenting that decision, John Hancock incorporated the revised financial assumptions, including the reduced operating expenses and per-unit rental reserves, in its internal Loan Approval Form. (JH 00419.) Hancock also noted on the first page of the Loan Approval Form that the "10% breakeven" was to be applied for the purpose of disbursing the Avenel Apartments loan "according to the underwriting herein,"

whereas the "75% LTV and 1.25:1 DSCR" requirements were to be applied "as described in the [loan] commitment." (JH 00405.)

24. John Hancock made these notations not only to document the revised assumptions that had been made, but also to ensure that, if any question later arose, it would be clear that the 10% Constant guideline was to be applied to Hancock's revised internal assumptions as set forth in the Loan Approval Form, and not to any financial projections or information supplied by Montgomery Partners. In this way, John Hancock was able to confirm that its internal consideration and use of the 10% Constant guideline would not inadvertently result in a reduction in the amount of loan funding available to Montgomery Partners. A specific notation also was made in the Loan Approval Form to the effect that the rental reserves had been reduced to $150 per unit. (JH 00420.) These written notations, combined with the information that had been supplied directly to the various people involved in the loan approval process, were considered sufficient to satisfy John Hancock's internal documentation requirements.

25. Based in large part on its analysis of the various lending criteria, its projections regarding the likely financial performance of the property, and its resulting belief in the considerable attractiveness of the investment opportunity that it presented, John Hancock accepted and approved Montgomery Partners' Loan Application for the Avenel Apartments, in its entirety and without any changes, on or about August 17, 2004. I signed the Loan Application on John Hancock's behalf on that date. Pursuant to the terms of the Loan Application, Hancock's acceptance and execution of that Application, and Montgomery Partners' subsequent payment of the required Commitment Fee, converted the Application into a formal Loan Commitment that was binding on both sides.

26. The 10% Constant guideline never was a term or condition of the Loan Application or Commitment but, rather, was one of several internal benchmarks used to determine whether Montgomery Partners' Loan Application would be approved by John Hancock in the first instance. Further, because the Loan Application ultimately was approved by John Hancock with the express caveat that the 10% Constant guideline be applied, for loan disbursement purposes, to the revised financial projections contained in Hancock's confidential Loan Approval Form, Hancock's internal use of the 10% Constant guideline did not impose any additional restrictions on, or impediments to, funding the Loan.

27. Because Montgomery Partners' "Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company" does not request information concerning John Hancock's policies, practices and procedures for closing approved commercial mortgage loans, those topics are not addressed in this affidavit.

II. *Topic No. 2: The terms and conditions contained in the Loan Application, including but not limited to, any and all conditions that Defendants were required to meet for disbursement of the Loan, and the negotiation of these terms and conditions between Defendants and John Hancock.*

28. The terms and conditions of the Loan Application (hereinafter the "Loan Commitment") are those stated in the approved Loan Commitment itself. (JH 00327 through JH 00396.) In general, the terms and conditions of the Loan Commitment provide that John Hancock will finance, and Montgomery will take, a secured, first-mortgage loan on the Avenel Apartments property in the amount of $32,000,000. The Loan could be closed by Montgomery Partners at any time over the ensuing twelve months (with possible multiple extensions) at a locked rate of 6.18% *per annum* (subject to various potential adjustments set forth in the text of the Loan Commitment); was to extend for a period of ten years; and

required monthly payments of interest and principal using a 30 year amortization schedule, with a single balloon payment at the conclusion of the Loan. The terms and conditions of the Loan Commitment further obligate Montgomery Partners to actually close on the Loan with John Hancock on or before August 1, 2005, or to pay "all damages, losses, costs and expenses suffered or incurred by John Hancock as a result of" Montgomery Partners' failure to close the Loan. These terms and conditions, as well as all others in the Loan Commitment, have been described by Montgomery Partners' own industry expert, Ms. Linda C. Spevacek, as "detailed and plainly worded," with "meticulous definitions and descriptions of each and every point, and clearly specified calculations with examples that show exactly how a specified figure is to be determined whenever a financial measurement is required with the transaction." Expert Report of Linda C. Spevacek, dated March 24, 2006, at 4-5.

29.     Other specific terms and conditions of the Loan Commitment provide, *inter alia*, that, upon proper notice and satisfaction of substantially all of the requirements and conditions set forth therein, Montgomery Partners could request than an actual interest rate be set for the loan (the "Rate Lock"). The rate of interest would be calculated at the time of the rate lock request by adding the agreed-upon rate lock spread (*i.e.*, 175 basis points) to the U.S. Treasury Bill rate having a commensurate maturity date to the anticipated Loan (*i.e.*, 10 years).

30.     Pursuant to these terms and conditions, Montgomery Partners locked in its interest rate on August 2, 2004 at 6.18% *per annum* after it had signed and submitted the Loan Application, but before that Application had been approved and committed by John Hancock. The standard rate lock fixed the interest rate for 60 days, but Hancock agreed to extend Montgomery Partners' rate lock to 365 days, subject to Hancock's receiving a $320,000.00

commitment fee from Montgomery Partners within five days of Hancock approving the loan application. The outside closing date for the Loan (absent any extensions by Montgomery Partners) was established as August 1, 2005.

31. The only terms and conditions that Montgomery Partners was required to meet for disbursement of the Loan were those stated in the Loan Commitment, including but not limited to the "Rental Achievement" requirements set forth in Condition 49 of the Supplement to the Loan Application. No other disbursement terms or conditions were imposed by John Hancock on Montgomery Partners. As stated previously in this affidavit, John Hancock's internal Loan Approval Form expressly provided that the 10% Constant guideline was to be applied, for loan disbursement purposes, to the revised financial projections contained in that Form (JH 00405), with the result that no additional disbursement obligations or requirements were placed upon Montgomery Partners.

32. John Hancock and Montgomery Partners negotiated the terms and conditions of the Loan Commitment in late spring and summer of 2004. Montgomery Partners was seeking a $32,000,000, one-year forward commitment from John Hancock. Extending the rate lock period for twelve months was highly beneficial to Montgomery Partners because it allowed Montgomery Partners to take advantage of then-existing low interest rates and protect itself from future, potentially unfavorable rate fluctuations.

33. All of the negotiations for the Loan took place in the Commonwealth of Pennsylvania. John Hancock was represented in the negotiations by John Ferrie, a Regional Vice President in Hancock's Real Estate Investment Group and the manager of Hancock's Blue Bell, Pennsylvania office, with support primarily from me. Montgomery Partners was represented primarily by Mr. James Koller and Mr. Joseph Kelly. The negotiations were

conducted through a series of face-to-face meetings, telephone discussions, and written and electronic communications between the parties. They included the negotiation and execution of a written term sheet (JH 00733 through 00737), as well as the negotiation and execution of a comprehensive, 70-page written Loan Application (including an eighteen-page, individualized Supplement).

34.  Montgomery Partners demanded and received numerous modifications and changes to both the Term Sheet and the Loan Application in the course of the parties' negotiations. At no time during the negotiations did any of Montgomery Partners' representatives indicate that they did not or could not understand any of the terms or conditions of the Term Sheet or the Loan Application. To the contrary, they seemed extremely knowledgeable about and well-versed in their needs and the details of the proposed transaction.

35.  Montgomery Partners executed and submitted the final version of the Loan Application to John Hancock, through Mr. Ferrie, on July 30, 2004. John Hancock subsequently approved and accepted Montgomery Partners' Loan Application on or about August 17, 2004, thereby converting that Application into a formal Loan Commitment that was binding on both sides.

   III.   *Topic No. 3: The policies, guidelines, requirements, targets, practices, processes or methods that apply to the making of mortgage loans by John Hancock, and any differences in any of the foregoing before April 28, 2004 and after April 28, 2004.*

36.  The policies, guidelines, requirements, targets, practices, processes or methods that apply to the making of commercial mortgage loans by John Hancock prior to April 28, 2004, are set forth in considerable detail in Hancock's then-current Lending Guidelines. (JH 01496 through JH 01893.) As of that time, a wholly-owned Hancock subsidiary named "John Hancock Real Estate Finance, Inc." originated commercial mortgage loans for John Hancock.

The investment officers on the John Hancock credit team, such as myself, would help fellow investment officers in field offices negotiate and obtain approval of their proposed loans through John Hancock's committee process for approving mortgage loans. The investment officer would help the field office investment teams negotiate the terms of the loan application and understand what loan parameters would work to allow Hancock to fund a particular loan opportunity.

37. After the loan application had been negotiated with the prospective borrower, the originating investment officer would draft a loan approval document that set forth the primary terms and conditions of the proposed loan as well as risk evaluations and financial statistics relevant to assessing the risk and return on the transaction. John Hancock's investment officers and other personnel typically employed the various procedures and criteria set forth in Hancock's Lending Guidelines in evaluating a proposed loan. Because of the complexity of commercial mortgage loan underwriting, and because each transaction is different, however, it was not possible to provide specific or formulaic guidance in all cases.

38. In drafting loan approval forms prior to April 28, 2004, various internal underwriting benchmarks generally were used by John Hancock to assess the borrower's ability to repay, and Hancock's risk in making, a particular loan. The various benchmarks all represented different avenues to assessing these basic factors. It was not imperative, however, for a particular benchmark to be satisfied if John Hancock otherwise believed that the loan under consideration was a good investment. Therefore, exceptions to the Lending Guidelines often were made in the underwriting process so that an otherwise desirable loan that did not meet all of John Hancock's underwriting benchmarks still could be approved.

39.     Prior to April 28, 2004, once the loan approval form was complete, it was presented by the investment officer John Hancock's Real Estate Loan Committee, which was a group of 4-8 investment officers and other Hancock personnel who would review the proposed transaction, question the investment officer regarding the underwriting of the proposed loan, and ultimately decide whether to approve the loan.

40.     On April 28, 2004, Manulife, a Canadian entity, acquired (through a merger) John Hancock and all of John Hancock's businesses, including John Hancock Life Insurance Co. and John Hancock Real Estate Finance, Inc. Immediately following the April 2004 merger with Manulife, John Hancock continued to follow in most substantive respects its existing Lending Guidelines, but also incorporated elements of Manulife's lending guidelines, which generally were quite similar to Hancock's then-existing policies. Thereafter, a team was formed for the purpose of integrating Manulife's and John Hancock's respective lending guidelines for commercial mortgage loans. Because the guidelines used by Manulife and John Hancock already were similar, the ultimate product of the team's effort was a set of lending guidelines that did not differ materially from John Hancock's then-existing Lending Guidelines.

41.     One change in John Hancock's Lending Guidelines that resulted from the Manulife acquisition in April 2004 was the use of the 10% Constant guideline. The breakeven constant that John Hancock had used for many years prior to the merger with Manulife was 9.66%, but Manulife used a 10% figure. In the summer of 2004, after the companies' merger, Manulife's 10% Constant guideline was used to evaluate the risk on properties such as the Avenel Apartments. For various business reasons, John Hancock subsequently reduced the 10% Constant guideline to a 9% Constant guideline in late 2004 for all commercial loans with

interest rates of less than 6.5%. Thus, by the summer of 2005, John Hancock was using a 9% Constant guideline for loans such as the proposed Loan for the Avenel Apartments property. Even on the basis of Montgomery Partners' own projected financials, the Loan for the Avenel Apartments property easily met the 9% Constant guideline.

42.     After April 28, 2004, John Hancock's process for making commercial mortgage loans has remained largely unchanged, with the exception that John Hancock Real Estate Finance, Inc. has been eliminated and most of its former members, who still work with and receive assistance and guidance from Hancock's investment officers, now officially are a part of John Hancock's "Real Estate Finance Investment Group." In addition, the role of Hancock's Real Estate Loan Committee has been replaced by a signature process, whereby the investment officer who is responsible for a particular loan opportunity (or his or her superiors) must bring the completed loan approval form around to various executives and officers of the Company for their review and approval. As a practical matter, this signature process requires that the proposed loan be described in greater written detail prior to recommendation and approval.

> IV.    *Topic No. 4: The manner, method and/or process by which John Hancock approved mortgage loans during the period from January 1, 2000 through April 28, 2004.*
>
> V.     *Topic No. 5: The manner, method and/or process by which John Hancock approved mortgage loans during the period from April 28, 2004 to the present.*

43.     As discussed above, John Hancock employed a Real Estate Loan Committee to review and approve commercial mortgage loans prior to April 28, 2004. Subsequent to its merger with Manulife on April 28, 2004, John Hancock began employing a signature approval process. In all other material respects, John Hancock's manner, method and/or process for

approving commercial mortgage loans has remained largely unchanged. Montgomery Partners' Loan Application for the Avenel Apartments property was approved by John Hancock through a signature process.

VI. *Topic No. 6: The requirements and conditions that, following John Hancock's acceptance of the Loan Application, would have been met by Defendants in order for John Hancock to fund or disburse the Loan applied for in the Loan Application.*

44. The only terms and conditions that Montgomery Partners were required to meet for disbursement of the Loan were those stated in the Loan Commitment, including but not limited to the "Rental Achievement Reserve" requirements set forth in Condition 49 of the Supplement to the Loan Application. No other disbursement terms or conditions were imposed by John Hancock on Montgomery Partners. As stated previously in this affidavit, John Hancock's internal Loan Approval Form expressly provided that the 10% Constant guideline was to be applied, for loan disbursement purposes, to the revised financial projections contained in that Form (JH 00405), with the result that no additional disbursement obligations or requirements were placed upon Montgomery Partners.

45. John Hancock was ready, willing and able at all relevant times to perform under the Loan Commitment according to its terms.

Signed under the pains and penalties of perjury this 25th day of April, 2006.

/s/ *Timothy J. Malik*
Timothy J. Malik

4073608.1

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 25, 2006.

                                                   */s/ Brian A. Davis*
                                                   Brian A. Davis