UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> VESTMONT LIMITED PARTNERSHIP, <br> VESTMONT LIMITED PARTNERSHIP II, <br> VESTMONT LIMITED PARTNERSHIP III, <br> and VESTERRA CORPORATION d/b/a <br> MONTGOMERY SQUARE PARTNERSHIP, <br><br> Defendants. | CIVIL ACTION NO. 05-11614-WGY |

## AFFIDAVIT OF JOAN UZDAVINIS
## FILED PURSUANT TO COURT ORDER OF APRIL 12, 2006

I, Joan Uzdavinis, hereby state under oath that:

1. I am employed as an Assistant Vice President in charge of the Portfolio Management Group of John Hancock Life Insurance Company ("John Hancock" or "Hancock"). I am a Chartered Financial Analyst, and I have been employed by John Hancock in various finance and actuarial capacities for 26 years. I have extensive experience and familiarity with Hancock's various finance and accounting practices, including its policies and procedures for allocation of investment assets generally, and its practices relating specifically to commercial mortgage loans. My duties and responsibilities consist of management of Hancock's general funds for U.S. mortgages.

2. Based on my personal knowledge and review of available information regarding John Hancock's policies and procedures applicable to John Hancock's investment practices, allocation of investment assets, and financial accounting practices, I testify on behalf of the corporation with respect to the following matters set forth by Montgomery Partners in Exhibit A of "Defendants' Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company."

### Topics and Responses

I. *Topic No. 10: The losses allegedly suffered by John Hancock as a result of the failure of the Loan to close, as referenced in Paragraph 16 of the Complaint, including: the basis, policy and practice relating to decisions whether to invest funds in mortgage loans or other investment vehicles; the projected return on all investments by John Hancock over the ten years beginning on August 1, 2005; and the actual return on all investments by John Hancock for the 10 year period ending August 1, 2005.*

II. *Topic No. 15: The "commitments made to third parties," as referenced in paragraph 11 of the Complaint.*

3. When defendants Vestmont Limited Partnership, *et al.* (collectively, "Montgomery Partners") failed to close the binding loan commitment that forms the subject matter of this litigation (the "Loan Commitment") in accordance with its terms, John Hancock incurred damages. A reasonable estimate of those damages is reflected in the lost investment opportunity suffered by Hancock -- that is, the difference between the return that Hancock bargained for and expected to receive from the Loan Commitment, as compared to the return that Hancock likely will be forced to accept as a result of Montgomery Partners' breach.

4. The loss that Hancock is seeking in this case is approximately $4.6 million -- which is calculated as the difference between the fixed interest rate return that Hancock would have received on the $32 million commercial loan called for in Montgomery Partners' Loan

Commitment (the "Loan"), and a reasonable estimate of the interest that Hancock is likely to earn on the excess cash resulting from the Defendants' breach of their obligation to close that loan as measured by reference to 10-year United States Treasury Bills. This method of calculating John Hancock's damages is reasonable in the circumstances because it uses a fixed (and therefore predictable) return rate, just like the Loan at issue in this case, and it is for a 10-year term, just like the Loan in this case. I have confirmed that the opening rate on 10-year Treasury Bills on August 1, 2005 (*i.e.*, the date by which Montgomery Partners was required to close the Loan), was 4.30%. Investing the $32 million in excess cash made available by Montgomery Partners' failure to close the Loan in 10-year Treasury Bills on that date results in reasonable net damages due John Hancock, as expressed above, of approximately $4.6 million.

5.  It is important to note in this context that, while this calculation yields a reasonable estimate of John Hancock's financial loss using 10-year Treasury Bills as an assumed alternative investment, that is not the alternative investment that Hancock would prefer to own. Hancock would rather have a low-risk $32 million commercial mortgage on its books (like the Avenel Apartments Loan) yielding the rate Montgomery Partners agreed to pay so that it can obtain the contractual benefit of its bargain. Montgomery Partners' breach of the Loan Commitment did not create any additional investment opportunities for John Hancock, however, beyond those already available. As of August 2005, John Hancock already had hundreds of millions of dollars of available cash assets that it was actively and unsuccessfully seeking to invest in suitable commercial mortgage investment opportunities. The problem facing John Hancock, like many institutional investors, was not (and is not) a lack of available cash to invest, but rather a relative dearth of quality investment

opportunities in which to invest the cash that it possesses. John Hancock already had more than sufficient cash to invest in any other commercial mortgage investment opportunities that became available *in addition to* the Avenel Apartments Loan. Accordingly, the $32 million that John Hancock would have invested in the Avenel Apartments Loan has remained in Hancock's money market operations, thereby increasing Hancock's available cash and causing Hancock to fall further behind in meeting its mortgage investment goals.

6.   Furthermore, while measuring John Hancock's damages by reference to the 10-year Treasury Bill rate is eminently reasonable in the circumstances, it is, in my view, an overly-conservative approximation of Hancock's actual losses because it assumes that Hancock's return on the $32 million in excess funds will be at the 10-year Treasury Bill rate, which is considerably higher than Hancock's true, current marginal investment rate.

7.   As a matter of practice, and as happened in this instance, once John Hancock issues a loan commitment to a borrower, it holds cash aside to follow through on that commitment and it formally allocates funds to its internal lines of business. Those internal lines of business, in turn, make various budgetary and planning decisions based upon John Hancock's internal allocation and expect to receive the bargained-for rate of return up through the anticipated maturity date of the committed loan. As previously explained, John Hancock had more than sufficient cash available in August 2005 to fund this Loan. As a result of Montgomery Partners' breach of the Loan Commitment, John Hancock lost the opportunity to lend at the agreed-upon interest rate. Instead, the $32 million allocated for the Avenel Apartments Loan remained a part of Hancock's overall money market operation, which earns significantly lower returns than commercial mortgage loans generally, including this particular

Loan's interest rate of 6.18%. On August 1, 2005, the money market operations at Hancock were investing funds and generating returns of approximately 3.47% *per annum*. Calculating John Hancock's loss based upon this actual rate of return results in estimated damages of approximately $6.9 million.

8.  Topic No. 15 of Defendants' Notice of Rule 30(b)(6) Videotape Deposition seeks information regarding certain "commitments made to third parties as referenced in paragraph 11 of the Complaint." When Hancock agrees to a forward commitment, as was the case of the Loan that Montgomery Partners committed to close, John Hancock may determine to execute portfolio-level hedge instruments in order to help protect Hancock's portfolio from interest rate fluctuations, and the potential losses which could result as a consequence. The portfolio-level hedges are arranged and executed as necessary with third parties by the Asset Liability Management Group of Hancock. Such hedges are executed at the aggregate portfolio level, meaning the total general funds of John Hancock, as opposed to at the discrete, internal line of business or segment level. I understand that, in this particular action, John Hancock is not seeking to recover any hedge costs from the Defendants, notwithstanding their breach of the Loan Commitment and notwithstanding the fact that Hancock did engage in hedging activity during the time period that it committed to the Loan.

9.  Topic No. 10 of Defendants' Notice of Rule 30(b)(6) Videotape Deposition requests the "projected return on all investments by John Hancock over the ten years beginning on August 1, 2005." I have investigated and confirmed that John Hancock does not perform 10-year rate-of-return projections for its overall investment portfolio because Hancock does not regard such projections to be reasonably reliable. Accordingly, the requested data does not exist.

10.     Topic No. 10 of Defendants' Notice of Rule 30(b)(6) Videotape Deposition also requests the "actual return on all investments by John Hancock for the 10 year period ending August 1, 2005." John Hancock does not maintain this information in the precise form requested. It does calculate historical returns in accordance with the guidelines provided by the National Association of Insurance Commissioners, which are based upon Statutory Annual Statement filings for the period covering 1996 through 2004 (the values being calculated only on an annual basis). This data reflects returns only on certain fixed asset classes, including bonds, mortgages, and preferred stocks. Combined returns for those asset classes for the period 1996 through 2004 were as follows:

| Year | Return |
|------|--------|
| 2004 | 7.49% |
| 2003 | 7.59% |
| 2002 | 6.92% |
| 2001 | 7.57% |
| 2000 | 8.11% |
| 1999 | 8.51% |
| 1998 | 9.20% |
| 1997 | 8.85% |
| 1996 | 8.93% |

III.    *Topic No. 11: The policies, guidelines, requirements, targets, practices, processes or methods pursuant to which John Hancock allocates assets among various types of investments such as, but not limited to, government bonds, commercial bonds, commercial real estate mortgages, other mortgages and other types of investments.*

11.     John Hancock's Investment Strategy Group, along with the Asset Liability Management Group, are responsible for developing and applying strategies to try to maximize the returns that Hancock receives on its assets. The specific policies through which those strategies are developed and implemented are set forth in the company's investment guidelines. (JH 01468 through JH 01893.) The Investment Strategy Group interacts with the individuals in Hancock's Asset Liability Management Group, who are tasked with assisting in providing the

information necessary to develop that asset return strategy. In practice, the Investment Strategy Group develops and sets target asset mixes for each and every asset class in which the company is permitted to invest. It is John Hancock's goal to generate as high a return on its investments as reasonably possible for the benefit of the company's policyholders and investors. For any specific investment area, this means placing as much money in reasonable and safe investments as possible. Incremental moneys sit in cash (or cash equivalents) in the company's money market operation until such time as each one of the asset managers can meet their targeted investments.

12. John Hancock's target asset mixes and allowable ranges (minimums and maximums) and the portfolio benchmarks are established by major segments, reflecting both the characteristics of the liabilities (including the required level and stability of investment returns or yields, embedded guarantees, embedded options and the term profile), as well as the overall company-wide limits incorporated in Hancock's investment guidelines. The overall company allowable asset mix range reflects an aggregation of the various segment-level asset mixes, based upon the current mix of businesses. The aggregate asset mix varies throughout any given year based upon changes to the mix of businesses. Asset mix targets, ranges, portfolio benchmarks and trading limits of all of John Hancock's major business segments typically are reviewed annually to ensure they continue to be appropriate, considering any changes in the nature of the liabilities, the external economic, tax, regulatory and competitive environment and company management's risk tolerances.

13. For purposes of John Hancock's investment guidelines, the aggregate permissible asset mix minimum and maximum levels are established. The total company limits usually are derived and expressed as an accumulation of segment level ranges. (JH 01474.)

For instance, the minimum and maximum ranges for fixed income investments (including cash, short-term public and private bonds, and all preferred share investments) is between 62% and 83%. I have confirmed that the minimum and maximum range for mortgages is 13% to 21%. The minimum and maximum range for public equities is 2% to 8%. The minimum and maximum range for real estate is 2% to 5%. The minimum and maximum range for alternate assets (including, but not limited to, oil and gas investments, timber and farmland investments, private equity, power and infrastructure equity, mezzanine investments, hedge funds, hedge fund funds, and other investments not included in the asset class categories already referenced) is 0% to 5%. John Hancock's ability to invest in these various areas is restricted, of course, by the availability of quality investment opportunities in each area. Commercial mortgage investments, in particular, have fallen short of Hancock's internal targets over the past few years due to the competitiveness of the market generally and the relative lack of acceptable credit risks. At present, the accumulated gap between John Hancock's desired level of investments and its actual level of investments continues to grow.

    IV.    *Topic No. 12: The steps taken by John Hancock to mitigate any losses allegedly suffered by it as a result of the failure of the Loan to close, including but not limited to: the actual use or uses to which monies "allocated" for this loan have been put; the alternative investment vehicles which have been available to John Hancock that govern the choice of such alternative investment vehicles.*

    14.    As discussed above, at the time that Montgomery Partners decided to breach the Loan Commitment, John Hancock had available cash significantly in excess of its minimum liquidity guidelines. Hancock's cash balance as of June 30, 2005 was approximately $715 million, and the liquidity guideline for cash or equivalents on that date was $250 million. (JH 01384.) By the end of August 2005, John Hancock's cash balance had grown to $1.295 billion, or $1.045 billion in excess of its $250 million

liquidity guideline. This excess cash reflects, once again, the relative lack of quality investment opportunities in the market. John Hancock would not keep such substantial amounts of money invested in cash if suitable investment opportunities for that cash were available. For example, John Hancock has not been fully invested under its internal Investment Guidelines for commercial mortgages for several years, and has been actively looking for additional suitable investment opportunities. As set forth above, John Hancock's investment strategy is to maximize its return on its investments by placing as much money as possible in reasonable investments, provided those investments conform to the general allocations among asset classes established in Hancock's Investment Guidelines, and meet the underwriting standards of the company. Consistent with Hancock's policies to maximize return by investing in *reasonable and safe* investments, asset managers (including myself) have underwriting standards below which we are not authorized to make investments. We are, therefore, not permitted to make sub-standard or risky investments merely to reduce the amount of the company's cash or to meet the targets set by the Investment Strategy Group.

15.  The relative dearth of suitable alternative investments at the time of, and subsequent to Montgomery Partners' breach, combined with John Hancock's already existing excess cash balance, means that Hancock effectively was prevented from investing the $32 million in cash allocated for the Avenel Apartments Loan into another mortgage, real estate or alternative asset class investment. Consequently, the monies allocated for the Montgomery Partners' Loan have remained in Hancock's money market operations, or at best been invested in some form of very liquid public bond such as a government security, causing Hancock to fall further behind in meeting its desired commercial mortgage investment allocation. By keeping the $32 million invested in this

manner, however, John Hancock has been able to partially mitigate it damages resulting from Montgomery Partners' breach of the Loan Commitment. Montgomery Partners already has received the benefit of that mitigation effort in Hancock's damage calculations in this case.

V. *Topic No. 14: The decision to "allocate[] and set aside assets for the purpose of funding the Loan," as referenced in paragraph 11 of the Complaint, and the nature of such allocation and set aside, as well as any hedge costs or other costs associated therewith.*

16.   In accordance with Hancock's policies and practices, when a loan is committed to, we take the total proceeds expected as a consequence of that committed loan and we allocate those proceeds to discrete, internal lines of business or among a series of lines of businesses. The allocation is recorded in a system that then pairs up the assets of that line of business with its liabilities to perform what we refer to internally as "duration tracking." The lines of business treat that allocation as a firm and solid commitment at that point in time, and thereafter make various planning determinations based upon an expected monetary return from the allocated asset.

17.   In John Hancock's Portfolio Management Group, we typically determine allocation for a commercial loan at the time of commitment based upon the estimated investment demand of each and every segment, or line of business, available to us. If the loan has a rate lock date prior to the commitment date, however, the allocation is determined at the time of rate lock and revised later on, if necessary, to accommodate any changes made to the investment between the time of rate lock and the time of commitment. Each of the segments has an expressed investment demand provided to the Portfolio Management Group by the Global Investment Strategy Group. That expressed investment demand indicates what the

segment-by-segment demand is throughout the company over the coming sixteen months. Portfolio Management then reviews the segments' projected demand, as well as any restrictions placed on those segments, and allocates at the time of commitment *pro rata* based on a segment's available investment demand for mortgages. The allocation decision is made within the Portfolio Management Group based upon the information that we are given relative to each segment's investment demand for the ensuing sixteen-month period. Investment demand is produced in a rolling sixteen-month window in an effort to avoid seasonal fluctuations or anomalies that may cause cash-flow restrictions for given segments or lines of business.

18.  In the case of the Loan Commitment that Montgomery Partners breached in the summer of 2005, funds were set aside and allocated on or about the time John Hancock issued a rate lock commitment for that Loan. At that time, funds were allocated and notification was made to the lines of business informing them of their particular allocation of the loan proceeds. The particular notification for the allocation was made in what we refer to internally at John Hancock as a "trade ticket." Trade tickets were e-mailed to all affected lines of businesses and to Asset Liability Management on or about the time of the rate lock and commitment of the Loan on or about August 3, 2004. (JH 01109.) I personally received a trade ticket notification for the Avenel Apartments Loan in my capacity as a member of the Strategic Investment Management area at that time. The trade ticket outlined (among other issues) the allocation of proceeds for the Loan and set forth the following proposed business segment allocation:

| | |
|---|---|
| Guaranteed Benefit Separate Account Reinsurance: | $3,900,000 |
| Group Insurance: | $3,000,000 |
| Retail Long-Term Care: | $5,000,000 |
| Remainder Block: | $4,200,000 |
| Open Segment: | $2,600,000 |

| | |
|---|---|
| IPLICO: | $2,100,000 |
| Individual Qualified Annuities: | $10,000,000 |
| Reinsurance of the Fixed Annuities: | $1,200,000 |

This business segment allocation later was confirmed in an attachment to John Hancock's internal loan approval form, which was executed on or about August 16, 2004. (JH 00411.)

19. When John Hancock committed to making a $32 million commercial mortgage loan to Montgomery Partners, each of the company's lines of business was made aware that they had been allocated investment dollars as set forth above. That allocation also was reported to the Strategic Investment Management Team and the Asset Liability Management Group, and it was inputted into the duration tracking system. At that point, the Montgomery Partners Loan Commitment was regarded as an asset of John Hancock, and it was treated by the various business segments as an asset that would be on the books of the company at the expected take-down date of the Loan. Additionally, on or about that time, John Hancock began preparing, and subsequently submitted, reports to various agencies, such as the American Council of Life Insurers and to the Canadian government's OSFI, which reflected John Hancock's commitment activity.

VI. *Topic No. 13: The manner in which John Hancock accounts for the application and commitment fees that John Hancock retains when a loan fails to close, to what departments or individuals such fees are credited, how such fees are recognized on John Hancock's books, and how they are thereafter invested, including the fees related to the Loan Application.*

20. Based on my 26-year experience as a John Hancock employee, instances in which the borrower has failed to close a commercial mortgage loan after receiving a binding loan commitment from Hancock are exceedingly rare. Accordingly, John Hancock does not

have a standard practice or procedure for dealing with application and commitment fees in such circumstances.

21.    In this particular case, the letters of credit that John Hancock received from Montgomery Partners in payment of its application and commitment fees under the Loan Commitment were placed in a vault at John Hancock's offices. When Montgomery Partners formally breached the Loan Commitment in early August 2005, John Hancock drew down those letters of credit and place the proceeds, for bookkeeping purposes, in a suspense account, where they currently remain.

Signed under the pains and penalties of perjury this 26th day of April, 2006.

/s/ Joan Uzdavinis
Joan M. Uzdavinis

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 26, 2006.

/s/ Brian A. Davis
Brian A. Davis

4074427.2