UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>VESTMONT LIMITED PARTNERSHIP,<br>VESTMONT LIMITED PARTNERSHIP II,<br>VESTMONT LIMITED PARTNERSHIP III,<br>and VESTERRA CORPORATION d/b/a<br>MONTGOMERY SQUARE PARTNERSHIP,<br><br>Defendants. | CIVIL ACTION NO. 05-11614-WGY |

**PLAINTIFF JOHN HANCOCK LIFE INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
RENEWED MOTION FOR SUMMARY JUDGMENT
ON DEFENDANTS' COUNTERCLAIM UNDER M.G.L. c. 93A**

Plaintiff John Hancock Life Insurance Company ("John Hancock" or "Hancock") submits this Memorandum of Law in support of its Renewed Motion for Summary Judgment on the Defendants' Counterclaim under M.G.L. c. 93A, § 11 (the "Motion"). Discovery in this action is now closed, and there is no dispute but that defendants Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation d/b/a Montgomery Square Partnership (collectively, "Montgomery Partners" or the "Defendants") cannot offer admissible evidence sufficient to convince a rational trier of fact that John Hancock "made material misrepresentations in the Loan Application about the requirements for disbursement of the Loan" as alleged by the Defendants. To the contrary, the

undisputed documentary and testimonial evidence -- including the sworn testimony of the Defendants' own expert witness, Ms. Linda C. Spevacek -- establishes that John Hancock *did not* change or misrepresent the requirements for disbursement of the Loan at issue, and thus can have no liability to the Defendants under Chapter 93A. Accordingly, John Hancock is entitled to judgment on that counterclaim as a matter of law for the reasons set forth below.

## Statement of Undisputed Material Facts

1. In the summer of 2004, Montgomery Partners negotiated and entered into a 70-page written loan commitment with John Hancock (the "Loan Commitment"), whereby Hancock agreed, subject to various standard and negotiated conditions, to provide Montgomery Partners with $32 million in permanent financing on a new, 256 unit apartment complex known as "Avenel at Montgomery Square" (the "Avenel Apartments") at any time over the ensuing twelve months at a "locked" interest rate of 6.18% per annum ("Loan"). Affidavit of Timothy J. Malik Filed Pursuant to Court Order of April 12, 2006, dated April 26, 2006 ("Malik 30(b)(6) Aff."), ¶ 3.

2. In its approval process John Hancock used various internal underwriting benchmarks to assess Montgomery Partners' ability to repay, and John Hancock's risk in making, the Avenel Apartments loan. Malik 30(b)(6) Aff., ¶ 16; Affidavit of Patricia Coyne Filed Pursuant to Court Order of April 12, 2006, dated April 26, 2006 ("Coyne 30(b)(6) Aff."), ¶¶ 8-9; Affidavit of Ivor Thomas Filed Pursuant to Court Order of April 12, 2006, dated April 26, 2006 ("Thomas 30(b)(6) Aff."), ¶¶ 9-10. One of the internal benchmarks considered was the 10% constant benchmark, also sometimes referred to as the "10% breakeven" or the "10% benchmark." *Id.* To meet this particular guideline, a property's cash flow -- generally equal to its estimated net operating income ("NOI"), less any assumed cash reserve amount determined

on a per unit basis -- must be equal to 10% or greater than the loan amount funded to the borrower. *Id.* Because the assessment of the 10% Constant is a function of a property's estimated cash flow, its projected income, expenses and reserves are examined during the loan approval process. *Id.*

3.   In the course of John Hancock's consideration of the application of the 10% Constant guideline, John Hancock revised its internal financials on the rental reserve and operating expenses for the Avenel Apartments. Malik 30(b)(6) Aff., ¶ 20; Thomas 30(b)(6) Aff., ¶ 17. With these changes to John Hancock's internal underwriting assumptions, the *pro forma* for the Avenel Apartments in the John Hancock confidential loan approval satisfied John Hancock's 10% Constant guideline, and did not reduce or otherwise restrict the loan funding that Montgomery Partners would receive under the existing terms of the Loan Application. Accordingly, there was no change or amendment made to the existing Loan Application. *Id.*

4.   John Hancock incorporated the revised financial assumptions, including the reduced operating expenses and per-unit rental reserves, in its internal Loan Approval Form. Malik 30(b)(6) Aff., ¶ 23; Thomas 30(b)(6) Aff., ¶ 19. Hancock also noted on the first page of the Loan Approval Form that the 10% constant or breakeven was to be applied for the purpose of disbursing the Avenel Apartments loan "according to the underwriting herein," whereas the other disbursement requirements, the "75% LTV and 1.25:1 DSCR" requirements, were to be applied "as described in the [loan] commitment." *Id.* John Hancock made these notations not only to document the revised assumptions that had been made, but also to ensure that, if any question later arose, it would be clear that the 10% Constant guideline was to be applied to Hancock's revised internal assumptions as set forth in the Loan Approval Form, and not to any financial projections or information supplied by Montgomery Partners. Malik 30(b)(6) Aff., ¶ 24; Thomas

30(b)(6) Aff., ¶ 20.  In this way, John Hancock was able to confirm that its internal consideration and use of the 10% Constant guideline would not inadvertently result in a reduction in the amount of loan funding available to Montgomery Partners.  *Id.*

5. The 10% Constant guideline never was a term or condition of the Loan Application or Commitment but, rather, was one of several internal benchmarks used to determine whether Montgomery Partners' Loan Application would be approved by John Hancock in the first instance.  Malik 30(b)(6) Aff., ¶ 26; Thomas 30(b)(6), ¶ 22.  Further, because the Loan Application ultimately was approved by John Hancock with the express caveat that the 10% Constant guideline be applied, for loan disbursement purposes, to the *revised* financial projections contained in *Hancock's* confidential Loan Approval Form, Hancock's internal use of the 10% Constant guideline did not impose any additional restrictions on, or impediments to, funding the Loan.  *Id.*  Accordingly, there were no additional terms or conditions added to the Loan Commitment.  *Id.*

6. According to Montgomery Partners' expert witness, Ms. Linda C. Spevacek ("Ms. Spevacek"), there was nothing wrong or improper about John Hancock using its own, revised financial projections to apply the 10% Constant guideline or to approve the Defendants' Loan, so long as Hancock's conduct had no financial impact on the Defendants.  Transcript of Deposition of Linda C. Spevacek, dated April 21, 2006 ("Spevacek Deposition"), at 197-200 (true excerpts of which are appended to this memorandum as Exhibit A).  *Id.*  In addition, Ms. Spevacek confirmed that John Hancock's application of the 10% Constant guideline using the revised financial projections contained in its internal Loan Approval form *would not* have impacted Montgomery Partners' funding under the terms and conditions as set forth in the Loan Commitment in this instance.  *Id.* at 193-195.

**Argument**

JOHN HANCOCK'S RENEWED MOTION FOR SUMMARY JUDGMENT ON THE DEFENDANTS' CHAPTER 93A COUNTERCLAIM SHOULD BE ALLOWED BECAUSE MONTGOMERY PARTNERS DOES NOT POSSESS, AND CANNOT OFFER, ANY ADMISSIBLE EVIDENCE TO ESTABLISH THAT HANCOCK CHANGED OR MISREPRESENTED THE REQUIREMENTS FOR DISBURSEMENT OF THE LOAN AT ISSUE.

Summary judgment should be granted where "there is no genuine issue as to any material fact" and the "moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of fact exits only if, on the evidence presented, a reasonable jury could return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Moreover, in opposing a motion for summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading." Id., 477 U.S. at 256, 106 S.Ct. at 2514. Rather, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir.1993).

In this case, Montgomery Partners alleges in Count VI of its Second Amended Counterclaim that John Hancock engaged in unfair or deceptive acts or practices under M.G.L. c. 93A, § 11, because Hancock purportedly "made material misrepresentations in the Loan Application about the requirements for disbursement of the Loan." Second Amended Counterclaim, ¶ 59. More specifically, Montgomery Partners alleges that John Hancock imposed a "10% constant" requirement with the knowledge that Montgomery Partners "would not meet this requirement for disbursement of the Loan." Id., ¶¶ 29-30.

Montgomery Partners has no admissible evidence, however, to support this counterclaim. To the contrary, the undisputed evidence in this case is that Hancock's internal use of the 10% Constant guideline in evaluating the Defendants' Loan, when applied "according to the underwriting" figures contained in its confidential Loan Approval form as plainly stated on the face of that form, *would not* have impacted Montgomery Partners' funding under the terms and conditions agreed-to by the parties in the Loan Commitment. *See* Statement of Undisputed Material Facts, *supra*, ¶¶ 3-5. Even the Defendants' own expert witness, Ms. Spevacek, admits this fact. *Id.*, ¶ 6. It also is undisputed that John Hancock made the foregoing notation on the face of its internal Loan Approval form not only to document the revised assumptions that had been made, but also to ensure that, if any question later arose, it would be clear that the 10% Constant guideline was to be applied to Hancock's revised assumptions as set forth in the internal Loan Approval Form, and not to any financial projections or information supplied by Montgomery Partners. *Id.*, ¶ 4. In this way, John Hancock was able to confirm that its internal consideration and use of the 10% Constant guideline would not inadvertently result in a reduction in the amount of loan funding available to Montgomery Partners. *Id.*

These undisputed facts leave no room for any conclusion but that John Hancock did not make any "material misrepresentations in the Loan Application about the requirements for disbursement of the Loan" and, thus, did not violate Chapter 93A in its dealings with the Montgomery Partners as a matter of law. *See* <u>Cheswell, Inc. v. Premier Homes and Land Corp.</u>, 319 F. Supp.2d 135, 142 (D. Mass. 2004) (summary judgment granted on 93A claim when bank did not engage in any unfair or deceptive acts or practice as a matter of law).

## Conclusion

For the foregoing reasons, John Hancock respectfully requests that the court enter summary judgment in John Hancock's favor on the Defendants' counterclaim under M.G.L. c. 93A, § 11, as a matter of law.

>                JOHN HANCOCK LIFE INSURANCE
>                COMPANY
>
>                By its attorneys,
>
>                /s/ Brian A. Davis
>                Brian A. Davis (BBO No. 546462)
>                Paul D. Popeo (BBO No. 567727)
>                Elizabeth A. Castellani (BBO No. 663818)
>                CHOATE, HALL & STEWART LLP
>                Two International Place
>                Boston, MA 02110
>                Tele: 617-248-5000
>                Fax: 617-248-4000

Date:   April 28, 2006

4076100v1

-8-

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 28, 2006.

*/s/ Brian A. Davis*
Brian A. Davis

# EXHIBIT A

ESQUIRE DEPOSITION SERVICES

Page 1

1     UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF MASSACHUSETTS
2

3

4  JOHN HANCOCK LIFE      : CIVIL ACTION
   INSURANCE COMPANY      : No. 05-11614-WGY
5                         :
         v.               :
6                         :
   VESTMONT LIMITED       :
7  PARTNERSHIP, et al     :

8                — — —

9           April 21, 2006

10               — — —

11     Videotaped oral deposition of

12  LINDA SPEVACEK, taken pursuant to notice,

13  was held at the law offices of WHITE &

14  WILLIAMS, One Liberty, 18th Floor,

15  Philadelphia, Pennsylvania, beginning at

16  10:04 a.m., on the above date, before

17  Nancy D. Ronayne, a Professional Court

18  Reporter and Notary Public in the

19  Commonwealth of Pennsylvania.

20               — — —

21

22         ESQUIRE DEPOSITION SERVICES
                Four Penn Center
23   1600 John F. Kennedy Boulevard-12th Floor
          Philadelphia, Pennsylvania 19103
24               (215) 988-9191

ESQUIRE DEPOSITION SERVICES

Page 2

```
 1  APPEARANCES:
 2
 3    CHOATE HALL & STEWART, LLP
      BY: BRIAN A. DAVIS, ESQUIRE
 4    Two International Place
      150 Oliver Street
 5    Boston, Massachusetts 02110
      (617) 248-5000
 6    Representing the Plaintiff
 7
 8    BUCHANAN INGERSOLL, PC
      BY: C. RANDOLPH ROSS, ESQUIRE
 9    1835 Market Street
      14th Floor
10    Philadelphia, PA 19103
      (215) 665-3957
11    Representing the Defendants
12
13
14
15
16
      ALSO PRESENT: Jason Hoffmann
17                  Videographer
18              - - -
19
20
21
22
23
24
```

Page 4

```
 1                  - - -
 2       DEPOSITION SUPPORT INDEX
 3                  - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line    Page Line    Page Line
 7  (NONE)
 8
 9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12   82   6
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  (NONE)
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  (NONE)
23
24
```

Page 3

```
 1              - - -
 2            I N D E X
 3              - - -
 4  Testimony of: LINDA SPEVACEK
 5                 PAGE
    By Mr. Davis      6
 6
 7              - - -
 8           E X H I B I T S
 9              - - -
10
    NO.     DESCRIPTION         PAGE
11
12  Spevacek-1  Notice of Video Dep    7
    Spevacek-2  Report                19
13  Spevacek-3  LS0131-0160           33
    Spevacek-4  Retention Letter      56
14  Spevacek-5  Application First
                Mortgage Loan         82
15  Spevacek-6  E-Mail JH00149       132
    Spevacek-7  JH01468-01893
16              Lending Guidelines   138
    Spevacek-8  JH00405-00425        152
17  Spevacek-9  JH01119 examples of
                Reserve calculations 176
18  Spevacek-10 4/18/2006 e-mail
                LS0001               208
19  Spevacek-11 E-mail regarding
                Engagement letter review 211
20  Spevacek-12 LS0009               214
    Spevacek-13 LS0018               221
21  Spevacek-14 LS0058-0066          233
    Spevacek-15 Important document list
22              For Deposition/Testimony
                LS0077-0104          240
23  Spevacek-16 Expert witness report
                Of Walter E. Mercer & CV 246
24
```

Page 5

```
 1       THE VIDEOGRAPHER: Good
 2  morning. We're now on the record.
 3  My name is Jason Hoffman, I'm a
 4  videographer employed by Esquire
 5  Deposition Services, 1600 JFK
 6  Boulevard, 12th Floor,
 7  Philadelphia, Pennsylvania 19103.
 8  This is a video deposition for the
 9  United States District Court,
10  District of Massachusetts.
11  Today's date is April 21, 2006 and
12  the time is 10:04 a.m. This
13  deposition is being held at White
14  and Williams in Philadelphia,
15  Pennsylvania in the matter of John
16  Hancock Life Insurance Co., versus
17  Vestmont Limited Partnership, et
18  al.. The deponent is Linda
19  Spevacek. Present today, all
20  counsel will be noted on the
21  stenographic record. And the
22  court reporter will now swear in
23  the witness.
24              - - -
```

ESQUIRE DEPOSITION SERVICES

Page 6

1  LINDA SPEVACEK, after having
2  been duly sworn, was examined and
3  testified as follows:
4       - - -
5       DIRECT EXAMINATION
6       - - -
7  BY MR. DAVIS:
8       Q.  Good morning, Ms. Spevacek.
9       A.  Good morning.
10      Q.  My name is Brian Davis. I'm
11 attorney representing John Hancock in
12 this matter. Welcome. You have been
13 designated as an expert in this matter;
14 is that right?
15      A.  Yes.
16      MR. ROSS: Speak up.
17 BY MR. DAVIS:
18      Q.  Have you testified as an
19 expert before?
20      A.  I have never testified as an
21 expert witness before.
22      Q.  What is your current home
23 address?
24      A.  My current home address is

Page 7

1  24 Holcomb Ridge, West Granby,
2  Connecticut 06090.
3       Q.  And your current business
4  address?
5       A.  Current business address is
6  64 Pratt Street, Hartford, Connecticut
7  06103.
8       Q.  Why don't we mark this as
9  Exhibit 1, please.
10      (Spevacek-1 marked for
11      identification.)
12      MR. ROSS: Spevacek-1?
13      MR. DAVIS: Correct, I'm
14      going to ask the court reporter to
15      mark them with her name and a
16      number.
17 BY MR. DAVIS:
18      Q.  Ms. Spevacek, you have what
19 has been marked as Exhibit 1. Have you
20 seen that document before?
21      A.  I'm not sure.
22      Q.  This is a notice of
23 deposition for your deposition in this
24 matter. You don't recall seeing this

Page 8

1  document in the past?
2       A.  I don't believe I've seen
3  this, I don't recall seeing this
4  document, no.
5       Q.  If you take a look at the
6  second page of Exhibit 1. Do you see
7  that it says, Hancock further demands the
8  production of the following documents by
9  the deponent, Ms. Spevacek, in advance of
10 her deposition; do you see that?
11      A.  I do.
12      Q.  Do you see the list of
13 documents there?
14      A.  Yes.
15      Q.  Have you seen that list
16 before?
17      A.  Not in this form, no.
18      MR. ROSS: Could I help some
19 misunderstanding there?
20      MR. DAVIS: You can try.
21      MR. ROSS: She didn't see it
22 because I read it to her.
23 BY MR. DAVIS:
24      Q.  Let's go through the various

Page 9

1  categories here for a moment, Ms.
2  Spevacek and see if you searched for and
3  produced all of these documents. The
4  first category of documents you were
5  instructed to produce were all documents
6  reviewed, consulted, examined by you in
7  forming your opinions in this action.
8  Have you produced all of those documents?
9       A.  I have produced all of those
10 documents.
11      Q.  And second category is all
12 documents actually relied upon you in
13 forming your opinions. Have you produced
14 all of those?
15      A.  Yes, I have.
16      Q.  The third is all -- all
17 documents constituting or concerning any
18 partial or complete drafts of any report
19 or opinion issued by you in this action.
20 Have all of those documents been
21 produced?
22      A.  I have submitted a draft to
23 Buchanan Ingersoll, counsel for Vesterra.
24 I do not know whether or not that was

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

Page 190

1  -- that's the number that the borrower
2  cares about, right, how much they're able
3  to borrow at the effective gross income,
4  correct?
5     A.  Correct.
6     Q.  So looking again at example
7  number two across these two documents, we
8  see in the Exhibit 1 to the loan
9  commitment that at an effective gross
10 income of $4,208,191 that it was
11 projected that the borrower would receive
12 funding of $29,090,000, correct?
13    A.  Yes.
14    Q.  And under the examples of
15 reserve calculations contained in
16 Exhibit 9 using the revised projections
17 that Hancock came up with we see that at
18 the same gross -- effective gross income
19 number that the loan funding amount would
20 be $29,138,000; do I have that correct?
21    A.  You do but again, the --
22 this number, the numbers on --
23    MR. ROSS:  This?
24    THE WITNESS:  The numbers on

Page 191

1  Exhibit 1 to the application have
2  not yet been subjected to the 10
3  percent constant so these may have
4  been reduced.
5  BY MR. DAVIS:
6     Q.  Well, there's no call in the
7  loan commitment for application of a ten
8  percent constant, correct?
9     A.  Yes, that's -- that's the
10 problem.
11    Q.  So what I'm trying to
12 confirm through this exercise with you is
13 that at the same effective gross income
14 levels for the property that the loan
15 funding amounts would not have varied or
16 at least they wouldn't have been reduced,
17 do you agree with that based on what you
18 see in Exhibit number 9?
19    A.  If we caveat that with --
20 without applying the 10 percent constant
21 to the numbers in Exhibit 1 then there
22 would have been no changes.
23    Q.  And when the parties entered
24 into this loan commitment they did not

Page 192

1  expect a ten percent constant would be
2  applied, correct?
3     A.  I don't know about the
4  parties.  The applicant certainly was not
5  subject to that, but John Hancock was
6  because it was in their guidelines.
7     Q.  So in looking at Exhibit 1
8  to the loan commitment and looking under
9  example two, at what Mr. Koller and Mr.
10 Kelly and Mr. Palopoli were expecting
11 based on your knowledge was that at an
12 effective gross income level of
13 $4,208,191 that they would receive
14 funding of approximately $29,090,000,
15 correct?
16    A.  Yes.
17    Q.  And that an effective gross
18 income level of $4,505,240 that they
19 would receive funding of 32 million?
20    A.  Yes.  Without application of
21 the ten percent constant.
22    Q.  And if I have it correct Mr.
23 Malik's calculations that were reflected
24 in Exhibit 9 demonstrate that at the same

Page 193

1  effective gross income levels that Mr.
2  Koller, Mr. Kelly and Mr. Palopoli would
3  receive at least the same amount and
4  perhaps more funding?
5     A.  Except that on the bottom of
6  page 9 there is a calculation that says
7  maximum loan at 10 percent constant, it's
8  on the Malik exhibit and it is not in
9  this exhibit, and were it in this exhibit
10 then the funding amounts would be
11 different.
12    Q.  But --
13    A.  As they stand they are the
14 same.
15    Q.  If you use the numbers that
16 Hancock employed in its internal
17 underwriting you would agree with me that
18 it does not reduce the amount of funding
19 available to these borrowers, correct?
20    MR. ROSS:  Exhibit 9, you
21 mean?  Exhibit 9, I was confused
22 between when you said these
23 numbers and these numbers.
24    MR. DAVIS:  I'm referring to

49 (Pages 190 to 193)

ESQUIRE DEPOSITION SERVICES

Page 194

1   the numbers contained in
2   Exhibit 9.
3       THE WITNESS: Yes, and I
4   guess I'm saying not all the
5   numbers are reflected on
6   Exhibit 1, not all of the
7   calculations.
8   BY MR. DAVIS:
9       Q.  Understood, but that's not
10  my question.
11      A.  Okay.
12      Q.  My question is that looking
13  at Exhibit 9, if you use the numbers
14  contained in Exhibit 9, then the amount
15  of borrowing, the amount of funding
16  available to these borrowers was the same
17  across or slightly greater across the
18  same effective gross income?
19      A.  Without applying the
20  constant, yes, that is correct.
21      Q.  Well, this document
22  Exhibit 9 applies the 10 percent constant
23  using the revised numbers; does it not?
24      A.  Yes, it does, but this one

Page 195

1   doesn't.
2       Q.  Again, I'm not asking you
3   about Exhibit 1 to the loan commitment
4   right now.
5       A.  Okay. All right.
6       Q.  I'm asking you about Exhibit
7   9 which is, as I represented to you, Mr.
8   Malik's calculations of the application
9   of the 10 percent constant using the
10  revised projections that Hancock
11  employed?
12      A.  Uh-huh.
13      Q.  So we get it absolutely
14  clear. Applying the 10 percent constant
15  using those revised projections as
16  reflected in Exhibit 9, it did not reduce
17  the amount of funding available to these
18  borrowers across the same effective gross
19  income levels, correct?
20      A.  Yes. Yes. According to
21  these numbers.
22          MR. ROSS: Are you between
23      exhibits, we've been about another
24      hour now?

Page 196

1           MR. DAVIS: Do you want to
2       take a break?
3           MR. ROSS: Yes, sure.
4           (A break occurred.)
5           THE VIDEOGRAPHER: We're
6       back on the record, time is 2:28.
7   BY MR. DAVIS:
8       Q.  Ms. Spevacek, would you take
9   a look again at your report which is
10  Exhibit 2 on page 15.
11      A.  All right.
12      Q.  And there's a reference
13  there at the bottom of page 15 to the
14  revisions that were developed to, quote,
15  make the numbers work, close quote, are
16  detailed in Exhibit C of this report.
17  Did you prepare Exhibit C?
18      A.  Yes, I did.
19      Q.  And where did you get that
20  information that's reflected in Exhibit
21  C?
22      A.  I believe the -- the
23  document numbers are noted here, so
24  that's where I got the information.

Page 197

1       Q.  Now, you mentioned here that
2   many of those revisions were not in
3   accordance with John Hancock's lending
4   guidelines. By those revisions you mean
5   the Hancock's revisions to the projected
6   financials; is that right?
7       A.  Yes. The revisions to the
8   -- yes, the revisions to the financials
9   in the approval document.
10      Q.  It says that were not in
11  accordance with Hancock's lending
12  guidelines. You will agree with me
13  however that Hancock had the ability or
14  the discretion to modify or alter its
15  lending guidelines if it wished to do so,
16  correct?
17      A.  Yes, I would agree with
18  that.
19      Q.  And including in the
20  borrower's favor if Hancock wishes to do
21  that, correct?
22      A.  Yes, if they wish to.
23      Q.  There's nothing improper
24  about Hancock doing that, correct?

50 (Pages 194 to 197)

ESQUIRE DEPOSITION SERVICES

Page 198

1   A.   Well, what's -- what's
2   unusual if not improper would be to
3   reduce -- would be -- to increase the
4   prospective net operating income in an
5   underwriting process is quite unusual but
6   not prohibited.
7   Q.   Not improper? Doesn't hurt
8   the borrower to increase --
9   A.   No.
10  Q.   -- the net operating income,
11  does it?
12  A.   No, but I'm thinking
13  somewhat internally because not
14  everything is documented well and so
15  there could be some improper -- let's say
16  improper documentation of the changes
17  that were made.
18  Q.   You saying that that could
19  hypothetically happen or that did happen?
20  A.   No, that did happen. That
21  did happen.
22  Q.   You think that these changes
23  were improperly documented internally at
24  Hancock?

Page 199

1   A.   Yes.
2   Q.   What leads you to believe
3   that?
4   A.   Not all of the changes that
5   were made were noted as they should have
6   been in the guidelines and there's two
7   sets of numbers in this second approval
8   document, which is potentially a cause
9   for concern.
10  Q.   Are you aware of anyone
11  within Hancock who believes that these
12  changes were not properly documented?
13  A.   No, I'm not.
14  Q.   And would it matter to these
15  borrowers if Hancock properly or
16  improperly internally documented changes
17  that it was making in favor of the
18  borrowers?
19  A.   Changes to the numbers, it
20  would not matter; changes to the
21  requirements of the loan, yes, it would
22  matter.
23  Q.   Changes to requirements of
24  the loan that it had the potential to

Page 200

1   impact, financially impact the borrowers,
2   correct?
3   A.   Yes, thank you.
4   Q.   Looking on page 17 of your
5   report. The very last line on page 17
6   says, there is no doubt in my mind that
7   at closing the disbursement -- this
8   disbursement requirement would have been
9   evaluated against the applicants'
10  submitted and certified property
11  operating financials; do you see that?
12  A.   I do.
13  Q.   First when you say this
14  disbursement requirement, you're talking
15  about the 10 percent constant or
16  10 percent breakeven, correct?
17  A.   Yes.
18  Q.   What is the basis for your
19  belief that -- that that requirement
20  would have been evaluated against the
21  borrowers' submitted and certified
22  property operating financials?
23  A.   As is typical of an industry
24  closing and is called for within John

Page 201

1   Hancock's policies and procedures, at
2   closing, prior to closing the borrower
3   must submit actual property operating
4   figures in order to prove up that the
5   property is earning enough to -- to
6   qualify for the loan funds or the various
7   reserve amounts that are structured
8   within the documents. And also within
9   John Hancock's policies is a requirement
10  that those cash flows provided by the
11  borrower at closing based on actual
12  property figures are to be evaluated
13  against the approval documents within
14  John Hancock.
15  Q.   Now, would you agree with me
16  that between you and the people who are
17  actually going to perform this closing
18  that the people who were actually going
19  to perform this closing for Hancock would
20  know better as to what the 10 percent
21  constant would be applied against if at
22  all for purposes of closing this loan?
23  A.   Sorry. You're going to have
24  to break that one down.

51 (Pages 198 to 201)