UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN HANCOCK LIFE INSURANCE COMPANY, | : <br> : <br> : Civil Action No. 05-11614 WGY <br> : |
| Plaintiff, | : |
| v. | : <br> : JURY TRIAL DEMANDED |
| VESTMONT LIMITED PARTNERSHIP, et al., | : <br> : |
| Defendants. | : |

**DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE THE INTRODUCTION OF EVIDENCE BY JOHN HANCOCK CONTRADICTING THE PLAINTIFF'S POLICIES AND PROCEDURES RELATED TO THE "CLOSING STAGE" THAT WERE PRODUCED IN THIS LITIGATION**

Defendants/Counterclaim Plaintiffs (collectively "Defendants" or "Vesterra") hereby move *in limine* for entry of an Order barring Plaintiff John Hancock Life Insurance Company ("John Hancock") from introducing any evidence at trial concerning its practices, policies and/or procedures for the closing of commercial mortgage loans that is contrary to, or any way materially different from, the policies and procedures for the "closing stage" that were produced to Defendants in this litigation, as follows:

1. On February 1, 2006, Defendants served a Rule 30(b)(6) deposition notice on John Hancock, containing 15 topics. Included among these topics were:

> Topic 2: "The terms and conditions contained in the Loan Application, including but not limited to, any and all **conditions that Defendants were required to meet for disbursement of the Loan**, and the negotiation of these terms and conditions between Defendants and John Hancock." (Emphasis added.)

> Topic 6: "The **requirements and conditions** that, following John Hancock's acceptance of the Loan Application, would have to have been met by Defendants

        **in order for John Hancock to fund or disburse the Loan** applied for in the Loan Application." (Emphasis added.)

2.      Because John Hancock produced a series of unprepared witnesses to testify in response to this 30(b)(6) notice, on March 29, 2006, Defendants moved to either compel John Hancock to produce properly prepared and informed corporate designees, or to preclude John Hancock from introducing any additional evidence concerning the 30(b)(6) topics. On March 30, 2006, the Court granted Defendants' motion "to the Extent of Precluding John Hancock from Proffering Any New Evidence on the Designated 30 (b)(6) Topics Not Testified To In Those Depositions."

3.      In response to queries from John Hancock, on April 7, 2006, Defendants specifically informed John Hancock that they wished to depose a corporate designee on the subject of "closing" a loan, which is encompassed within Topics 2 and 6, above. (See Exhibit A, which is attached hereto.) It is at closing that John Hancock (as with any lender) finally confirms that the "requirements and conditions . . . have been met . . . in order for John Hancock to fund or disburse the Loan." (Topic 6.)

4.      During discovery, John Hancock produced a manual that contains certain policies and procedures for the "closing stage" of a loan. (Pertinent pages are attached as Exhibit B, which is attached hereto.) This Manual describes a process "to validate the underwriting of loans from the time they are Committed until they are Closed" -- i.e., funded. (JH 2445). The "review stage" is the time period from commitment until "five days before funding," at which point it becomes the "closing stage." *Id.* It is simply preposterous for John Hancock to assert that Topic 6, concerning the requirements that must be met for actual <u>funding</u> of the loan, does not include the "closing stage" which leads to such funding.

5.  Nonetheless, John Hancock refused to produce such a witness for deposition, maintaining that the subject of "closing" a loan was not included in the topics that specifically included requirements for funding or disbursing a loan.

6.  On April 7, John Hancock filed a motion seeking reconsideration of this Court's March 30 Order concerning its 30(b)(6) testimony.  Upon reconsideration, the Court issued the following Order on April 12:

> In Reconsideration, John Hancock May Be Relieved From the Preclusion Order to the Extent It Supplies, Within 10 Days of the Date of this Order, Affidavits to the Level of Exquisite Detail of a Patent Claim, as to Those Matters Sought in the 30(b)(6) Deposition from Knowledgeable Persons and Then Produces Such Persons for Deposition Forthwith.

7.  Even though trial had been set to being on May 1, John Hancock interpreted the "ten days" as giving it two weeks to comply with Order, and filed three affidavits on April 25 and one more on April 26.

8.  None of these affidavits addresses the practice, policies or procedures by which John Hancock makes the final determination during the closing stage as to whether the ""requirements and conditions . . . have been met  . . . in order for John Hancock to fund or disburse the Loan," even though Defendants had specifically pointed out to John Hancock that this was necessarily included in Topic 2 and Topic 6 of the 30(b)(6) notice.

9.  In fact, the affidavits of Patricia Coyne and Timothy J. Malik contain this identical language (at ¶ 30 and  ¶ 27, respectively):

> Because Montgomery Partners' "Notice of Rule 30(b)(6) Videotape Deposition of Plaintiff John Hancock Life Insurance Company" does not request information concerning John Hancock's policies, practices and procedures for closing approved commercial mortgage loans, those topics are not addressed in this affidavit .

10.  Thus, despite this Court's <u>two</u> Orders concerning John Hancock's 30(b)(6) testimony, and despite the fact that Defendants specifically pointed out to John Hancock that

3

information concerning the "closing" was necessarily included in Topics 2 and 6 of their 30(b)(6) notice, John Hancock has refused to provide <u>either</u> a corporate designee <u>or</u> an affidavit respecting the closing stage. Accordingly, Defendants respectfully request an Order barring John Hancock from introducing any testimony or other evidence at trial that contradicts, or that is any way materially different, from the policies and procedures produced to Defendants (contained in JH 2445 through 2448).

WHEREFORE, for the foregoing reasons, Vesterra respectfully requests that this Court preclude John Hancock from introducing any testimony or other evidence at trial that contradicts, or that is any way materially different, from the policies and procedures produced to Defendants at JH 2445 through JH 2448.

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1**

The undersigned conferred with counsel for all parties in a good faith effort to resolve or narrow the issues contained in this motion.

Respectfully submitted,

Dated: May 1, 2006      /s/ Robert D. Hillman
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

    /s/ Howard D. Scher
Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

## **CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing Motion *in Limine* has been filed electronically today, was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and is available for viewing and downloading from the ECF system.

Dated:  May 1, 2006

    /s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr. (admitted *pro hac vice*)

# EXHIBIT A

Case 1:05-cv-11614-WGY   Document 84-2   Filed 05/01/2006   Page 1 of 2

# Buchanan Ingersoll PC

ATTORNEYS

**Brian J. McCormick, Jr.**
215 665 3957
mccormickbj@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA  19103-2985

T  215 665 8700
F  215 665 8760

www.buchananingersoll.com

April 7, 2006

**Via Electronic Mail and Regular Mail**

Brian A. Davis, Esquire
Choate Hall & Stewart, LLP
Two International Place
Boston, MA 02110

      Re:    *John Hancock Life Ins. Co. v. Vestmont Limited Partnership, et al.*

Dear Brian:

      In response to our telephone conversations of yesterday and this morning, Vesterra is willing to depose a corporate designee regarding the closing of a loan application, which, as we discussed, is subsumed within Topics 2 and 6 of Defendants Rule 30(b)(6) Notice of Deposition. However, we will not agree that this is the only area where John Hancock's testimony was deficient. Nor can we agree to withdraw our Motion or stipulate to the withdrawal of the Court's March 30th Order.

      I am also disappointed that you are now refusing your earlier offer to designate certain portions of Messrs. Malik and Ferrie's depositions as responsive to the topics listed in Defendants Rule 30(b)(6) Notice of Deposition. You have our topics, and you know what your witnesses testified. You should be able to perform this task reasonably quickly.

      As always, I am free to discuss these issues at your convenience.

                                    Very truly yours,

                                    Brian J. McCormick, Jr.

BJM:vpl
cc:    Howard D. Scher, Esquire
        Robert D. Hillman (via electronic mail)

# EXHIBIT B



# REAL ESTATE FINANCE GROUP

**Lending Guidelines
January 25, 2005**

JH 02278

## ASSET SUMMARY – DATA QUALITY REVIEW

The objective of the Asset Summary – Data Quality Review is to validate the underwriting of loans from the time they are Committed until they are Closed. The attached material is an aid to help Underwriters understand this process and assist them in complying with it.

In general, there are three phases to this process:

### 1. Commitment Stage

This stage begins when a loan has been Approved. The original signed Approval Document will be delivered to Tracey Stolpner for scanning. The Underwriter will also save the electronic Approval Document ("AD") into the "Approval Documents" folder on the "S Drive". After that an eMD Systems Administrator will transfer the final Approval Document information into eMD.

### 2. Review Stage

The Review Stage covers the period from Commitment up until five days before funding. There are three key elements of the Review Stage:

- A) Gathering the pertinent due diligence information on a Loan,
- B) Comparing this information to the AD and
- C) Assessing the impact any discrepancies may have on a Loan.

During the Review Stage, there are many pieces of due diligence received that need to be reviewed and then compared to the AD. Our intention is to input the pertinent data in eMD and report any material discrepancies that may impact the rating of the deal. As you will see on the attached process flow, it is the responsibility of the Underwriter, as well as the Closing Analyst, to ensure that data is reviewed and entered in a timely manner. The final product created during this stage is an Asset Summary which will be initialed by both the Underwriter and the Closing Analyst assigned to that particular deal.

The review to be performed by the Closing Analyst is summarized on Attachment A. The last item is a reaffirmation of the deal's underwritten cash flow and Rating, or an update of the underwritten cash flow and Rating, to be prepared by the Underwriter.

Attachment B identifies the tolerance levels for variances in any of the factors that derive the Rating of a Loan.

### 3. Closing Stage

The culmination of this process is a complete and accurate Asset Summary for every deal originated and closed by REFG. The benefits derived by this approach will include:

- A consistent approach for closing all Loans regardless of lending program,

- A data quality standard that ties the Post Commitment due diligence phase of a Loan into an overall system of checks and balances and

- Enhanced liquidity of our portfolio through the collection of key and accurate data supported by an Asset Summary that reflects the actual deal parameters at funding.

JH 02445



JH 02446

ATTACHMENT A

**CLOSING GROUP ASSET SUMMARY CASH FLOW CHECKLIST**

1. From the Independent Property Appraisal, verify the submarket vacancy and compare to the underwritten vacancy in the cash flow section of the Asset Summary. The underwritten vacancy should be the higher of the actual property vacancy or the submarket vacancy. Be careful to use the submarket vacancy from the appraisal. They also list a regional area vacancy and the appraiser's estimate of the property vacancy.

2. From the Independent Property Appraisal, verify that the market rents match what is underwritten for vacant rents on the rent roll.

3. Obtain a copy of the real estate tax bill, and verify that real estate taxes are the greater of the actual bill; or in the case of CA (Proposition 13), verify that real estate taxes are at least the product of the tax rate (typically 1.05 – 1.10%) multiplied by the current loan balance.

4. Verify that the replacement reserve underwritten is at least equal to what is contained in the Property Condition Report.

5. Make a copy of the Appraiser's underwritten cash flow, and compare all the numbers against the underwritten cash flow. If there are any major discrepancies (i.e., rent is much higher or lower than what is underwritten), contact the Underwriter; and verify the numbers.

6. Verify the assumptions used for TI / LC, and compare them against the Appraisal.

7. Compare the Appraiser's Concluded Valuation to the AD.

8. Please note - There will be times when we have to go back to the Appraiser and have them change the report because of erroneous or missing information. If you feel this is the case, let the Underwriter and Credit Officer know as soon as possible.

---

**UNDERWRITER ASSET SUMMARY REVIEW**

1. Confirm Final underwritten cash flow numbers and Valuation. Assess any impact on the Rating of the deal & re-rate it if necessary.

JH 02447

ATTACHMENT B

REAL ESTATE FINANCE GROUP
ASSET SUMMARY - DATA QUALITY REVIEW
SIGNOFF THRESHOLDS

1. **Need** – Establish reporting criteria for any Rating degradation resulting from the completion of an Asset Summary.

2. **Potential Issues -**
   a.) Final Underwritten Cash Flow could be less than Approved UCF,
   b.) An Appraised Value may be lower than Approved Value and
   c.) Loans may be re-sized/re-structured as a result of implementing this process.

These potential issues all tie into the Rating of a deal. The Final Rating of a deal will be the basis of defining materiality.

3. Materiality - Any Final ASR which results: [need to align with Operating Guidelines]

   - In a Rating downgrade more than 2 grades below the Approved Rating, and/or
   - Reduces a Rating to Baa3 or lower; and/or,
   - Causes a previously Sanctified loan to become Un-Sanctified;

requires the *Re-Approval*, *before* funding the loan. In addition, Team Leaders in their sole discretion may bring any other deal back for Re-Approval.

(Please note - The "Security" section of the Rating Form should not change from the way it was Approved. The effect of any Rating change will result from the Underwriting Section which scores Loan to Value, Debt Service Coverage Ratio and the ability to Refinance.)

4. **Immaterial** – A Summary & Certificate process will be completed for: [need to align with Operating Guidelines]

   - Any 1 category downward revision to Rating, provided such Rating is not lower than Baa2;
   - Any loan amount that is reduced, provided that the re-sized loan meets the initial Approved Rating.

Please note that in the event that an Asset Summary has increased underwritten cash flow, Lowered LTV, etc., an Underwriter's initials merely acknowledges that there has been no material degradation from Approval.

JH 02448