UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

JOHN HANCOCK LIFE INSURANCE
COMPANY,

           Plaintiff,

           v.

VESTMONT LIMITED PARTNERSHIP,
et al.,

           Defendants.

Civil Action No. 05-11614 WGY

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT
ON DEFENDANTS' COUNTERCLAIM UNDER M.G.L. c. 93A**

Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III, and Vesterra Corporation ("Vesterra" or "Defendants"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to Plaintiff/Counterclaim Defendant's "Renewed" -- and untimely -- Motion for Summary Judgment on Defendants' Counterclaim under M.G.L. c. 93A.[1]

**INTRODUCTION**

Nothing has changed since Plaintiff's prior motion for summary judgment on this counterclaim was denied. The meaning and the impact of the 10% Constant or 10% Breakeven requirement continues to be one of the most hotly disputed factual issues in this lawsuit. Nonetheless, John Hancock now asserts that it is "undisputed" that it did not change or

---

[1] As a preliminary matter, John Hancock's motion should be denied because it was filed on the eve of trial without even requesting from the Court an expedited briefing schedule.

misrepresent the disbursement requirements for the Loan at issue. In making this argument, Plaintiff relies on (1) the self-serving affidavits of its own employees (who cannot even agree on the meaning of this "disbursement requirement"); (2) a mischaracterization of <u>one</u> of the loan approval documents; and (3) a selective citation to, and gross mischaracterization of, the deposition testimony of one of Defendants' expert witnesses, Linda Spevacek.

Plaintiff essentially now argues that that the 10% Constant requirement would have had no impact on the Loan. However, at the very first deposition of one of Plaintiff's employees in late January, before John Hancock had developed any of its several explanations of why the 10% Constant would not affect the disbursement of the Loan, Timothy Malik testified that before the Loan would be closed or funded, the closer would confirm that all of the listed "disbursement requirements" had been met -- <u>without</u> adding the refrain since adopted by John Hancock, that this requirement had already been met, or that the closer would never again look at Avenel's actual financial figures (i.e., operating statement, rent rolls) in assessing this whether this particular requirement had been met. *See* Malik Tr. 131-32, 219-20.

Furthermore, Plaintiff's own documents state that John Hancock was required to apply the actual financials at closing, and Ms. Spevacek specifically testified (in parts of her deposition carefully avoided by Plaintiff) that both industry practice and John Hancock's own policies and procedures require that disbursement requirements be measured against the borrower's actual financials at closing.[2] For example, even Ms. Spevacek's testimony attached by Plaintiff in support of its motion actually supports <u>Defendants'</u> position:

> As is typical of an industry closing and is called for within John Hancock's policies and procedures, at closing, prior to closing the borrower must submit **actual property operating figures** in order to prove up that the property is earning enough to -- to qualify for the loan

---

[2] Because John Hancock refused to provide either a 30(b)(6) witness or any affidavit testimony concerning its closing policies, Defendants have filed a motion *in limine* to preclude any testimony that contradicts the policies and procedures that it produced concerning the closing stage.

2

>funds or the various reserve amounts that are structured within the documents. And also within John Hancock's policies is a requirement that those cash flows provided by the borrower at closing **based on actual property figures** are to be evaluated against the approval documents within John Hancock.

*See* Exhibit A (L. Spevacek deposition transcript), at 200-01 (emphasis added).

In addition to the closing procedures referred to by Ms. Spevacek, several other documents produced by Plaintiff in this case demonstrate that there is a disputed issue of material fact concerning the nature and impact of this "disbursement requirement":

- An August 17, 2004 internal memorandum -- that was cc'd to "closing" to confirm approval of the Loan -- listed the 10% breakeven among the "disbursement requirements," but referenced the August 10 approval (which contained only the financial projections that could not meet these requirement), and does not contain the phrase "according to the underwriting herein." (Trial Ex. No. 52.)

- The August 10, 2004 approval document, which includes the handwritten, additional "10% breakeven" requirement, includes only the financial projections submitted by the borrower and included in the Loan Application. These figures would not have allowed for funding of the full amount of the loan under the 10% Constant requirement. (Trial Ex. No. 45.)

- The August 16, 2004 approval document, relied on by John Hancock, specifically lists the "10% breakeven" as a continuing "disbursement requirement," contains two different sets of projected expenses per unit (compare JH0412 and JH0419), and does not support the interpretation that John Hancock now attributes to it (see ¶ 4 below). (Trial Ex. No. 50.)

- The background to all of this is a long-standing requirement in Manulife's Credit Procedures, dated April 28, 2004, which state that "the minimum acceptable Breakeven Interest Rate is 10%." (Trial Ex. No. 5, at JH001981). Nowhere in any of the documents relating to this transaction is this condition exempted from the standard requirement that apply to a borrower's actual financial figures.

- On May 10, 2005, Plaintiff sent Defendants a "Business Items Checklist" that needed to be competed before closing and disbursement. (Trial Ex. No. 66). This "checklist" described the multitude of current and actual financial data which would be reviewed prior to the time that Plaintiff actually funded the loan. *Id.* ("Property Operating (Income and Expenses) Statements or Financial Statements . . . for Year to Date 2005").

- Moreover, there are no existing John Hancock documents either waiving the 10% Constant requirement or stating that the requirement was not to be applied to the borrower's actual financial figures at closing.

3

In the face of the above evidence, Plaintiff can only rely on the recently-made assertions of its own employees -- and even these do not agree as to whether the 10% Constant was never a "disbursement requirement," or was waived, or would have been measured only against original *pro forma* figures (in violation of John Hancock's policies for the closing stage). There simply is no basis here to grant summary judgment, on the eve of a trial at which the jury is entitled to weigh all this evidence and make its own determinations as to credibility.

## DEFENDANTS' RESPONSE TO JOHN HANCOCK'S STATEMENT OF UNDISPUTED MATERIAL FACTS[3]

1.  Vesterra disputes certain of the assertions contained in paragraph 1 of John Hancock's "Statement of Undisputed Material Facts." Vesterra agrees that, in the summer of 2004, it negotiated the terms of a document that, in its final form, is entitled "Application to John Hancock Life Insurance Company for a First Mortgage Loan" (the "Loan Application"). (Trial Exhibit 28.) But Vesterra disputes the assertion that John Hancock agreed to provide Vesterra with $32 million in permanent financing (the "Loan") "at any time over the ensuing twelve months" or that this permanent financing was subject only to "various standard and negotiated conditions." Rather, the Loan Application contained what Vesterra believed were the essential terms and conditions under which John Hancock would make a forward commitment for up to $32 million with a locked interest rate based on certain occupancy achievements. In fact, John Hancock admits in a writing sent on or about May 9, 2005, that the Loan remained subject to John Hancock's approval, which had not been finally granted. (Trial Exhibit V.) In addition, the size and disbursement of the Loan was conditioned on and subject to certain considerations, such as the rental and occupancy of at least 80% of the units in the Avenel Apartments, *see* Trial Exhibit 28, at Conditions 49(2) (at JH0989), and was subject to the unfettered discretion of John

---

[3] Defendants incorporate herein by reference their Statement of Disputed Facts in Opposition to the Motion for Summary Judgment of Plaintiff John Hancock Life Insurance Company, filed on March 1, 2006.

Hancock so that it cannot properly be called a "commitment." *See id.*, at Conditions 6, 7, 8(a), 11(b), 12-14, 16(b), 19, 20 and 23. In addition, disbursement of the Loan was made subject to another condition that had not been agreed to by Vesterra and was not disclosed to Vesterra prior to this litigation -- the "10% Constant" or "10% Breakeven" disbursement requirement.

   2. Vesterra disputes certain of the assertions contained in paragraph 2 of John Hancock's "Statement of Undisputed Material Facts." Vesterra specifically disputes the implication that the 10% Constant was <u>only</u> an internal guideline. Unlike the other guidelines that were for internal approval only, the 10% Constant or 10% Breakeven was specifically made a "disbursement requirement" by John Hancock.

   3. Vesterra disputes certain of the assertions contained in paragraph 3 of John Hancock's "Statement of Undisputed Material Facts." Vesterra agrees that John Hancock's manipulated *pro forma* financial projections met the 10% Constant requirement, but specifically disputes the assertion that this *pro forma* would determine the amount of the Loan at closing. In fact, if the only requirement had been to measure the Loan against the August 2004 *pro forma*, there would have been no reason to list the 10% Breakeven as a "disbursement requirement" that remained to be satisfied before the Loan was funded.

   4. Vesterra disputes certain of the assertions contained in paragraph 4 of John Hancock's "Statement of Undisputed Material Facts." The August 16, 2004 John Hancock approval does <u>not</u> state that the 10% Constant was to be considered satisfied according to the financial projections contained therein, nor does it distinguish the other disbursement requirements by stating that they were to be applied as described in the Loan Application. Rather, the approval states:

> **Disbursement Requirements:** Rents of at least $4,221,126 plus other income of $284,114 and a minimum NCF DSCR of 1.25:1 and 10% breakeven according to underwriting herein, with the possibility of a Rental Achievement Reserve subject to 75% LTV and 1.25:1 DSCR as

described in commitment. (Trial Ex. 50.)

First, because the 10% Breakeven is specifically listed as one of the requirements to be met for disbursement, the only rational understanding is that it had not already been satisfied by the attached *pro forma* figures. Second, "according to the underwriting herein" appears in this context to mean that the 10% Constant requirement was added in the underwriting, in contrast to the other requirements for disbursement which were included in the Loan Application. Third, the phrase "described in [the] commitment" refers only to the possibility of a rental achievement reserve -- i.e., the partial funding of the loan based on at least 80% occupancy. John Hancock's fanciful explanations, developed after the fact, of why "disbursement requirement" does not mean "disbursement requirement," contradict the plain language of its own approval documents and its own policies and procedures for closing. At the very least, the jury must be given the opportunity to assess the credibility of this *ex post facto* rationalization which is not documented in any of John Hancock's contemporary documents, and which contradicts the very listing of the 10% Constant as a requirement that still had to be satisfied for disbursement.

5.      Vesterra disputes certain of the assertions contained in paragraph 5 of John Hancock's "Statement of Undisputed Material Facts." It agrees that the 10% Constant was never incorporated into the Loan Application. However, for all the reasons stated above in paragraph 4, it is evident that John Hancock did impose it as an additional requirement for funding the Loan -- in short, that "disbursement requirement" means just that: "disbursement requirement." Moreover, John Hancock recognized that the 10% Constant should have been incorporated into the Loan Application, and prepared an amendment to this document -- but then did not follow through when it learned that this would be a "deal killer," and instead imposed the requirement as part of the underwriting process.

6.      Vesterra disputes certain of the assertions contained in paragraph 6 of John

6

Hancock's "Statement of Undisputed Material Facts." Vesterra agrees that Ms. Spevacek testified that there was nothing wrong with John Hancock's use of the 10% Constant, <u>so long as</u> this did not impact funding the full amount of the Loan. However, Ms. Spevacek did <u>not</u> testify (at pages 193-95) that the figures included in the approval document would not have impacted the Loan. She was being questioned there about Exhibit 9 to her deposition, which was <u>not</u> the figures included in John Hancock's August 16 approval. Moreover, as noted above, Ms. Spevacek testified on the next page after those cited by John Hancock and attached to its motion, that John Hancock's policies require that the "cash flows provided by the borrower at closing **based on actual property figures** are to be evaluated against the approval documents within John Hancock." Spevacek Tr. at 201 (emphasis added). In addition, Ms. Spevacek also testified as follows during her deposition:

> [T]hey did not change the commitment document, but in three different documents they did add a condition that did not -- that does not exist in the commitment. So they did in fact change the requirements for the commitment. . . .   When something is added as a condition, a requirement of disbursement, that means that's a requirement for disbursement and that's something that John Hancock's guidelines call for as a whole separate underwriting guideline. If they wanted to modify that they could have. But they didn't modify it in the approval, they put it in as a . . . disbursement requirement . . . . If they intended to not have it apply at the closing, not impact the borrower, they could easily have issued a waiver of it with the amendment and shown a new -- a new Exhibit 1 that would show or some other change to the supplement in the paragraph that would show how it would not impact the borrower.
>
> [A]t the closing the 10 percent constant is actually applied to the borrower's actual operating figures. And when a borrower . . . submits those numbers at closing as he anticipates will work and then the requirement is applied, he will be impacted. . . .
>
> That's what John Hancock's policies provide, that the actual operating statements be measured and against the requirements and the requirement is listed as a disbursement requirement in three separate approval documents.

*Id.* at 253-57. For John Hancock to carefully select and cite a portion of Ms. Spevacek's

7

testimony, and to represent to this Court that she agrees with its interpretation of the impact of the 10% Constant disbursement requirement, is disingenuous.  In fact, at the very conclusion of her deposition, Ms. Spevacek testified that "one might say that [John Hancock's action] was <u>deceptive</u>," that John Hancock's actions had the potential to be <u>unfair</u> at closing and could have been <u>deceptive</u>, and that "when applied to the borrower's actual property operating figures [the 10% Constant] would have had an impact" on the Loan.  *Id.* at 258, 263-64.

## ARGUMENT

I.    **The Standard for Summary Judgment**

The standard for summary judgment is well established:

> In adjudicating a motion for summary judgment, a district court construes the facts "in the light most amiable to the nonmovant[ ] and indulge[s] all reasonable inferences favorable to [him]."  The Civil Rules empower the court to render summary judgment only when this portrait of the case depicts "no genuine issue as to any material fact" and establishes "that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A factual issue is "genuine" if "it may reasonably be resolved in favor of either party" and, therefore, requires the finder of fact to make "a choice between the parties' differing versions of the truth at trial."

*DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).  Thus, Vesterra, as the non-movant, is entitled to all reasonable inferences in its favor.  *Paparo v. M/V Eternity*, 433 F.3d 169, 172 (1st Cir. 2006) (reversing grant of summary judgment where reasonable inferences were not drawn in favor of the non-moving party).

II.    **Because John Hancock Has Not Established That There Are No Disputed Issues of Material Fact Concerning Vesterra's Counterclaim for John Hancock's Violation of Chapter 93A, Its Motion Must Be Denied**

John Hancock argues that Vesterra's counterclaim for violation of Chapter 93A should be dismissed because John Hancock asserts that it did not engage in any "unfair or deceptive" conduct, because it did not change or misrepresent the requirements for disbursement of the

Loan. Because a jury could reasonably draw inferences and make findings adverse to John Hancock on both of these issues, John Hancock's motion for summary judgment on Vesterra's Chapter 93A claim should be denied.

First, the sweep of 93A is broad. *See, e.g., Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004) ("unfair" conduct covered by statute includes conduct "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people") (internal quotation omitted). Thus, for example, causes of action under Chapter 93A have fewer requirements than a common law action for fraud. *See, e.g., Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 800, 840 N.E.2d 526, 534 n.20 (2006) (Chapter 93A does not require proof of actual reliance by the plaintiff on a representation). *See also Ameripride Linen & Apparel Services, Inc. v. Eat Well, Inc.*, 65 Mass. App. Ct. 63, 68, 836 N.E.2d 1116, 1120 (2005) ("conduct may be 'deceptive' if it 'could reasonably be found to have caused a person to act differently from the way he otherwise would have acted'") (citation omitted).

As explained above, there is substantial evidence from which a jury could conclude that John Hancock added an undisclosed requirement for the disbursement of the Loan to Defendants, and that this would have impacted the size of the Loan, contrary to what the borrower had been led to expect. Both John Hancock's own documents, and the reasonable inferences from these documents, support this conclusion, as does the detailed testimony of Defendants' expert, Ms. Spevacek. Of course, once the jury finds that there was an undisclosed funding requirement that could reduce the Loan requested by Defendants, the jury could easily conclude that John Hancock misrepresented these funding requirements, and that this action was both unfair and deceptive -- which would support a verdict in favor of Defendants' on their counterclaim under

9

Chapter 93A. Accordingly, John Hancock's motion for summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, John Hancock's renewed motion for summary judgment should be denied.

Respectfully submitted,

/s/ Robert D. Hillman
Steven J. Brooks (BBO # 059140)
Robert D. Hillman (BBO # 552637)
DEUTSCH WILLIAMS BROOKS
DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213
Tele.: 617-951-2300

/s/ Howard D. Scher
Howard D. Scher (admitted *pro hac vice*)
C. Randolph Ross (admitted *pro hac vice*)
Brian J. McCormick, Jr.(admitted *pro hac vice*)
BUCHANAN INGERSOLL PC
1835 Market Street, Floor 14
Philadelphia, PA 19103
Tele.: 215-665-8700

Attorneys for Defendants/Counterclaim Plaintiffs Vestmont Limited Partnership, Vestmont Limited Partnership II, Vestmont Limited Partnership III and Vesterra Corporation

Dated: May 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed electronically today, was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and is available for viewing and downloading from the ECF system.

Dated: May 1, 2006

/s/ Brian J. McCormick, Jr.
Brian J. McCormick, Jr. (admitted *pro hac vice*)

Case 1:05-cv-11614-WGY     Document 86     Filed 05/01/2006     Page 11 of 11

# EXHIBIT A

Case 1:05-cv-11614-WGY    Document 86-2    Filed 05/01/2006    Page 1 of 7

```
 1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4   JOHN HANCOCK LIFE     :CIVIL ACTION
     INSURANCE COMPANY     :No. 05-11614-WGY
 5                         :
           v.              :
 6                         :
     VESTMONT LIMITED      :
 7   PARTNERSHIP, et al    :
 8                - - -
 9            April 21, 2006
10                - - -
11        Videotaped oral deposition of
12   LINDA SPEVACEK, taken pursuant to notice,
13   was held at the law offices of WHITE &
14   WILLIAMS, One Liberty, 18th Floor,
15   Philadelphia, Pennsylvania, beginning at
16   10:04 a.m., on the above date, before
17   Nancy D. Ronayne, a Professional Court
18   Reporter and Notary Public in the
19   Commonwealth of Pennsylvania.
20                - - -
21
22        ESQUIRE DEPOSITION SERVICES
                Four Penn Center
23   1600 John F. Kennedy Boulevard-12th Floor
           Philadelphia, Pennsylvania 19103
24               (215) 988-9191
```

LINDA SPEVACEK

198

1  A. Well, what's -- what's
2  unusual if not improper would be to
3  reduce -- would be -- to increase the
4  prospective net operating income in an
5  underwriting process is quite unusual but
6  not prohibited.
7  Q. Not improper? Doesn't hurt
8  the borrower to increase --
9  A. No.
10 Q. -- the net operating income,
11 does it?
12 A. No, but I'm thinking
13 somewhat internally because not
14 everything is documented well and so
15 there could be some improper -- let's say
16 improper documentation of the changes
17 that were made.
18 Q. You saying that that could
19 hypothetically happen or that did happen?
20 A. No, that did happen. That
21 did happen.
22 Q. You think that these changes
23 were improperly documented internally at
24 Hancock?

199

1  A. Yes.
2  Q. What leads you to believe
3  that?
4  A. Not all of the changes that
5  were made were noted as they should have
6  been in the guidelines and there's two
7  sets of numbers in this second approval
8  document, which is potentially a cause
9  for concern.
10 Q. Are you aware of anyone
11 within Hancock who believes that these
12 changes were not properly documented?
13 A. No, I'm not.
14 Q. And would it matter to these
15 borrowers if Hancock properly or
16 improperly internally documented changes
17 that it was making in favor of the
18 borrowers?
19 A. Changes to the numbers, it
20 would not matter; changes to the
21 requirements of the loan, yes, it would
22 matter.
23 Q. Changes to requirements of
24 the loan that it had the potential to

200

1  impact, financially impact the borrowers,
2  correct?
3  A. Yes, thank you.
4  Q. Looking on page 17 of your
5  report. The very last line on page 17
6  says, there is no doubt in my mind that
7  at closing the disbursement -- this
8  disbursement requirement would have been
9  evaluated against the applicants'
10 submitted and certified property
11 operating financials; do you see that?
12 A. I do.
13 Q. First when you say this
14 disbursement requirement, you're talking
15 about the 10 percent constant or
16 10 percent breakeven, correct?
17 A. Yes.
18 Q. What is the basis for your
19 belief that -- that that requirement
20 would have been evaluated against the
21 borrowers' submitted and certified
22 property operating financials?
23 A. As is typical of an industry
24 closing and is called for within John

201

1  Hancock's policies and procedures, at
2  closing, prior to closing the borrower
3  must submit actual property operating
4  figures in order to prove up that the
5  property is earning enough to -- to
6  qualify for the loan funds or the various
7  reserve amounts that are structured
8  within the documents. And also within
9  John Hancock's policies is a requirement
10 that those cash flows provided by the
11 borrower at closing based on actual
12 property figures are to be evaluated
13 against the approval documents within
14 John Hancock.
15 Q. Now, would you agree with me
16 that between you and the people who are
17 actually going to perform this closing
18 that the people who were actually going
19 to perform this closing for Hancock would
20 know better as to what the 10 percent
21 constant would be applied against if at
22 all for purposes of closing this loan?
23 A. Sorry. You're going to have
24 to break that one down.

51 (Pages 198 to 201)

LINDA SPEVACEK

250

1  paragraph two. Again, his last sentence
2  in paragraph two says in the case of
3  other lenders many times the agreed
4  application or commitment is not as
5  thorough and key details such as
6  representations and warranties,
7  covenants, et cetera have to be hammered
8  out later. That is not my experience
9  with the industry, but perhaps that's
10 his.
11         In paragraph three there's a
12 discussion of the nature and benefit of a
13 forward commitment and an assessment of
14 the risk taken by the lender, and all of
15 the benefits to a lender of a forward
16 commitment and I would just note that
17 there are a number of benefits -- excuse
18 me, he notes the benefits that are
19 available to the borrower from a forward
20 commitment and I would also note that the
21 lender, properly structured, can benefit
22 from making -- from being in the -- the
23 business of making forward commitments as
24 well, that it gives them an opportunity

251

1  to perhaps make a loan on a transaction
2  before somebody else might.
3         In number four, a discussion
4  of contingencies and loan commitments, he
5  notes in the first sentence that the vast
6  majority of loan commitments contain
7  future terms and conditions, the outcomes
8  of which are not yet known. And in
9  return for knowing they have a commitment
10 the borrower is aware that closing is
11 still subject to some terms and
12 conditions. At the time of commitment no
13 one can foresee the results of all final
14 underwriting events. Again, as a general
15 statement as far as the industry goes, I
16 don't dispute what he's saying. However,
17 I believe that he could have emphasized
18 the financial benchmarks that are in
19 applications that are really the
20 operative ones, that the borrower really
21 wants to know upfront how are they going
22 to impact my loan.
23         Number five, which is John
24 Hancock's underwriting criteria and use

252

1  of it, I do not disagree that Hancock's
2  underwriting criteria, their policies are
3  intended as guidelines and may be used
4  flexibly. Again, as we discussed in my
5  earlier testimony, provided that there's
6  no -- that they're not changing things
7  that could potentially impact the
8  borrower.
9         And six, Hancock's use of
10 its underwriting guidelines and
11 10 percent constant were normal in the
12 industry. He talks about -- just give me
13 a moment here -- he talks about
14 guidelines being guidelines only and I
15 would concur with that alone. In his
16 paragraph on page 4 the first indent
17 where it begins, internally, he's
18 discussing using a benchmark, a constant
19 as a benchmark and he says this is
20 commonplace and works well as lenders --
21 works well as long as lenders do not
22 change a commitment after its issuance.
23 And then he says, quote, I see no
24 evidence that Hancock changed its

253

1  commitment in this case. And I would
2  make two comments on that. No, they did
3  not issue a change to their commitment,
4  but I believe that they should have and
5  that in the industry when a provision is
6  changed during an approval process that
7  could potentially affect a borrower that
8  an amendment would normally be issued,
9  and in fact John Hancock's policies do
10 provide for -- that changes be made in
11 writing. And there is some evidence,
12 although it's privileged documents so we
13 don't know what's in there but there is
14 evidence that Hancock perhaps did prepare
15 a loan amendment document for sending to
16 the borrower and ultimately did not send
17 it to them.
18         So I think there's more that
19 he could have said about this, should
20 have said, and it's -- it's troubling
21 when he says, I see no evidence that they
22 changed a commitment when in fact -- well
23 they did not change the commitment
24 document, but in three different

LINDA SPEVACEK

**254**

1  documents they did add a condition that
2  did not -- that does not exist in the
3  commitment. So they did in fact change
4  the requirements for the commitment.
5     Q. You would agree however that
6  no amendment is required if Hancock is
7  not imposing a term that has the
8  potential to affect the borrower?
9     A. Well, any and all provisions
10 potentially affect the borrower in some
11 way I guess -- if there's anything of
12 substance, I can't think of something,
13 could you give me an example of something
14 you mean.
15    Q. For example applying a
16 10 percent constant based on numbers that
17 will not impact the -- the amount of the
18 loan funded to the borrower?
19    A. When something is added as a
20 condition, a requirement of disbursement,
21 that means that's a requirement for
22 disbursement and that's something that
23 John Hancock's guidelines call for as a
24 whole separate underwriting guideline.

**255**

1  If they wanted to modify that they could
2  have. But they didn't modify it in the
3  approval, they put it in as a
4  disbursement condition in three different
5  documents -- disbursement requirement,
6  excuse me. So as far as that example
7  goes I think that's one that should have
8  been sent as a amendment. If they
9  intended to not have it apply at the
10 closing, not impact the borrower, they
11 could easily have issued a waiver of it
12 with the amendment and shown a new -- a
13 new Exhibit 1 that would show or some
14 other change to the supplement in the
15 paragraph that would show how it would
16 not impact the borrower.
17    Q. That's one way they could
18 have done it, right?
19    A. That's -- in my experience,
20 that's the right way that they should
21 have done it.
22    Q. Right based on what?
23    A. Based on to not -- based on
24 wanting to avoid any potential conflicts

**256**

1  at closing. Based on full disclosure,
2  which I think is important. And just so
3  that you avoid any kind of -- any kind of
4  issues at the closing.
5     Q. But again, if the ten
6  percent constant was being applied
7  against numbers that assured that the 10
8  percent constant would not have any
9  financial impact on the loan, there was
10 no need to amend the loan commitment in
11 those circumstances, correct?
12    A. Except at the closing the 10
13 percent constant is actually applied to
14 the borrower's actual operating figures.
15 And when a borrower has his application
16 and he has Exhibit 1 and expects that
17 based on these numbers, this occupancy,
18 these expenses, I will still be able to
19 qualify for the loan, and if he submits
20 those numbers at closing as he
21 anticipates will work and then the
22 requirement is applied, he will be
23 impacted.
24    Q. That's the assumption --

**257**

1  we've gone over this before, that's the
2  assumption that you make for purposes of
3  your opinion, correct, that the 10
4  percent constant would be applied against
5  the financials submitted by the borrower
6  at closing, correct?
7     A. That's what John Hancock's
8  policies provide, that the actual
9  operating statements be measured and
10 against the requirements and the
11 requirement is listed as a disbursement
12 requirement in three separate approval
13 documents.
14    Q. It's listed as a
15 disbursement requirement according to the
16 underwriting contained in the loan
17 approval that's Exhibit 8, correct?
18    A. It's hard for me to tell
19 what underwriting herein, that could
20 apply to everything, anything, I'm not
21 sure and again there's a couple different
22 sets of numbers in that document.
23    Q. You're not modifying your
24 testimony from earlier today, are you?

65 (Pages 254 to 257)

LINDA SPEVACEK

Page 258

1   A.  Am I?
2   Q.  Yes.
3   A.  Oh, my apologies. How?
4   Q.  No, my question is, you're
5   not attempting to modify the testimony
6   that you gave today?
7   A.  No, I'm not attempting to
8   modify.
9   Q.  All right. Anything else?
10  A.  Okay. Let's see. And
11  number seven, Hancock's behavior was
12  reasonable, I'm not -- I'm not
13  particularly comfortable commenting on
14  whether it was reasonable. I think that
15  they could have and should have done
16  something that would have explained very
17  clearly to the borrower. Now was it
18  unreasonable that they didn't, I can't
19  say. Whether their actions were unfair
20  or deceptive, whether intentionally so or
21  by virtue of setting up a situation that
22  could potentially cause a problem, one
23  might say it was deceptive.
24  Q.  Well, you've just testified

Page 259

1   if I recall it correctly, that you don't
2   know whether what Hancock did was
3   unreasonable, is that right?
4   A.  I'm saying I can't say it
5   was -- well --
6       MR. ROSS: I'm going to
7   throw in an objection there. Go
8   ahead.
9       THE WITNESS: Could you read
10  back what I said, please.
11      MR. DAVIS: Actually let me
12  ask you the question again and you
13  can answer my question if
14  possible.
15  BY MR. DAVIS:
16  Q.  Is it fair to say that you
17  do not know as you sit here today, you
18  cannot opine on whether Hancock's conduct
19  was unreasonable?
20  A.  When you put it that way,
21  and I say they should have done something
22  else, then I guess I would have to say it
23  was not reasonable.
24  Q.  Based on what?

Page 260

1   A.  Based on the fact that they
2   should have issued an amendment.
3   Q.  Stating what?
4   A.  Stating that a 10 percent
5   constant disbursement requirement was
6   imposed during the approval process and
7   either that we're not going to apply it
8   at closing or we are going to and this is
9   how it will be applied, this is how the
10  new numbers will look. And showing them
11  that on their numbers that they think
12  they have -- that the applicant thinks
13  that they have to meet in the
14  application, showing them that they won't
15  be impacted. I think that's the right
16  way and the reasonable way to do it.
17  Q.  Have you seen Mr. Ivor
18  Thomas's testimony in this case, his
19  deposition testimony, that the 10 percent
20  constant was effectively waived for
21  purposes of this loan?
22  A.  I did see his testimony.
23  Q.  Is that untruthful
24  testimony?

Page 261

1   A.  I -- I don't know. I was
2   looking for documentation which John
3   Hancock's policies require that any
4   modifications or waivers be actually
5   documented and there is -- there's no
6   signatures on what looks to be a request
7   for waiving this requirement. And it
8   should be very, very clearly documented
9   that it was waived if it was waived and
10  there's no documentation that says that.
11  Q.  Well certainly you've seen
12  documentation that showing that Hancock
13  changed the numbers upon which the 10
14  percent constant or breakeven would be
15  applied, correct?
16  A.  That --
17      MR. ROSS: Objection. Go
18  ahead.
19      THE WITNESS: I see how they
20  changed the numbers to apply it to
21  their own figures. When time
22  comes for closing and the borrower
23  submits their financials and the
24  disbursement requirement is

LINDA SPEVACEK

262

1   applied which is -- definition of
2   the disbursement requirement that
3   something meet a test, that under
4   that scenario the borrower could
5   be potentially impacted.
6   BY MR. DAVIS:
7       Q.  If the people who would
8   close this loan on Hancock's behalf were
9   to testify in this case that they would
10  not apply the 10 percent constant
11  requirement against the borrower's own
12  financials, that they would apply it only
13  against the underwriting contained in the
14  approval document, you have no basis to
15  challenge that, correct?
16      MR. ROSS:  Objection.
17      THE WITNESS:  I would say
18      that still would not be in
19      accordance with their policies and
20      procedures.
21  BY MR. DAVIS:
22      Q.  But Hancock is entitled to
23  waive those if they wish to do so,
24  correct?

263

1       A.  Yes.
2       Q.  Anything else in Mr.
3   Mercer's report -- withdraw that
4   question.
5       Are you prepared, have you
6   formed the opinion that Hancock's conduct
7   in these circumstances was unfair?
8       A.  To the -- to the extent that
9   it could have become unfair at closing,
10  certainly.
11      Q.  Was it unfair prior to
12  closing?
13      A.  I think it had the potential
14  to be unfair and that's about all I can
15  say on it because we don't know whether
16  it's fair or not until you get to that
17  point.
18      Q.  Was it deceptive?
19      A.  It could -- it could have
20  been deceptive.
21      Q.  It had the potential to be
22  deceptive, is that what you're saying?
23      A.  It has the potential to be
24  deceptive and certainly if it was -- if

264

1   it was done knowingly that it could have
2   impacted the borrower which it looks like
3   it did, there were calculations made that
4   it could have impacted the borrower and
5   it's not documented that it would not be
6   applied, it's potentially deceptive.
7       Q.  In fact the calculations
8   you've seen here today including Exhibit
9   Number 9 indicate that Hancock calculated
10  that the application of the 10 percent
11  constant using the revised projections
12  would not impact the borrower, correct?
13      A.  Using the revised
14  projections, that's correct.  However,
15  when applied to the borrower's actual
16  property operating figures it would have
17  had an impact.
18      Q.  But if Hancock wasn't going
19  to do that, then it wouldn't impact the
20  borrower, correct?
21      A.  That's correct.
22      Q.  Anything else?
23      MR. ROSS:  Take your time.
24      THE WITNESS:  I think that's

265

1   it.
2   BY MR. DAVIS:
3       Q.  Do you have any additional
4   opinions or conclusions that you expect
5   to offer at trial in this matter beyond
6   what we have discussed today?
7       A.  Not that I'm aware of at
8   this particular point.
9       MR. DAVIS:  Let's take break
10      for a few minutes, let me see if I
11      have any additional questions.
12      THE VIDEOGRAPHER:  Off tape.
13      3:48.
14      (A discussion off the record
15      occurred.)
16      THE VIDEOGRAPHER:  Back on
17      the record.  3:54.
18  BY MR. DAVIS:
19      Q.  Ms. Spevacek, I'm looking at
20  getting very deliberate about that, just
21  going back and looking at your report
22  again for a moment.  Exhibit B contains
23  the list of documents reviewed.  I think
24  we've already established that you